# Exhibit "D"

```
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF INDIANA
 2                     INDIANAPOLIS DIVISION


 3


 4
     NEXTGEAR CAPITAL, INC.,         )
 5                                   )
                  Plaintiff,         )
 6                                   )
               -v-                   ) CAUSE NO.
 7                                   ) 1:20-cv-00354-TWP-DLP
     PREMIER GROUP AUTOS, LLC,       )
 8   JAMES M. BLACKBURN, AND         )
     EDWARD A. KESSLER,              )
 9                                   )
                  Defendants.        )
10

11

12         The deposition upon oral examination of

13   EDWARD A. KESSLER, a witness produced and sworn before

14   me, Elizabeth T. Lindner, RPR, Notary Public in and

15   for the County of Marion, State of Indiana, taken on

16   behalf of the Plaintiff at the offices of Bose

17   McKinney & Evans, 111 Monument Circle, Suite 2700,

18   Indianapolis, Indiana, on October 29, 2021, at

19   10:04 a.m., pursuant to all applicable rules.

20

21

22

23

24              STEWART RICHARDSON & ASSOCIATES
                Registered Professional Reporters
25                      (800)869-0873
```

```
 1                         APPEARANCES

 2   FOR THE PLAINTIFF:

 3           Brian S. Jones, Esq.
             David J. Jurkiewicz, Esq.
 4           BOSE MCKINNEY & EVANS, LLP
             111 Monument Circle
 5           Suite 2700
             Indianapolis, IN  46204
 6           b.jones@boselaw.com
             djurkiewicz@boselaw.com
 7

 8   FOR THE DEFENDANT:
     Edward A. Kessler
 9
             Jason Delk, Esq.
10           Austin Sparks, Esq.
             DELK MCNALLY, LLP
11           211 South Walnut Street
             Muncie, IN  47305
12           delk@delkmcnally.com
             sparks@delkmcnally.com
13

14   FOR THE DEFENDANTS:
     Premier Group Autos, LLC, and James M. Blackburn
15
             Richard A. Rocap, Esq.
16           ROCAP LAW FIRM, LLC
             10293 North Meridian Street
17           Suite 175
             Indianapolis, IN  46290
18           rar@rocap-law.com

19

20

21

22

23

24

25
```

1          THE REPORTER:  My name is Elizabeth Lindner,
2     an associate of Stewart Richardson Deposition
3     Services, located in Indianapolis, Indiana.
4     Today's date is October 29, 2021.  The time is
5     10:04 a.m.  This deposition is being held at the
6     offices of Bose McKinney & Evans, located in
7     Indianapolis, Indiana.  The deponent's name is
8     Edward A. Kessler.
9          Will counsel please identify yourselves and
10     any persons present with you for the record.
11          MR. JONES:  Brian Jones on behalf of NextGear,
12     and I've got David Jurkiewicz here as well.
13          MR. ROCAP:  Richard Rocap here for
14     Mr. Blackburn and Premier Auto.
15          MR. DELK:  Jason Delk on behalf of Edward
16     Kessler, along with my associate, Austin Sparks.
17                    EDWARD A. KESSLER,
18     having been first duly sworn or affirmed to tell the
19     truth, the whole truth, and nothing but the truth,
20     was examined and testified as follows:
21     DIRECT EXAMINATION
22     BY MR. JONES:
23     Q  Sir, state your full name for the record, please.
24     A  Edward Anthony Kessler.
25     Q  Thank you, Mr. Kessler.  My name is Brian Jones.  I

```
 1   A   We manage pension funds on my side of the business.
 2       We also have compensation consulting and health and
 3       benefits consulting.
 4   Q   I gotcha.
 5           And where is that located?
 6   A   Pittsburgh.
 7   Q   And where do you currently live?
 8   A   Bethel Park.
 9   Q   Say it again.
10   A   Bethel Park.
11   Q   Bethel Park, okay.  And how long have you lived in
12       Bethel Park?
13   A   30 years.
14   Q   I kind of want to walk through your educational
15       background a little bit.  First, let's start,
16       what's your birth date?
17   A   9-29-88.
18   Q   And where were you born?
19   A   Pittsburgh.
20   Q   And where did you graduate high school from?
21   A   Bethel Park.
22   Q   Bethel Park High School?
23   A   Yes.
24   Q   And that was when?
25   A   '07.
```

1  Q  And did you go to college or university after high
2     school?
3  A  Yes.
4  Q  Where did you go?
5  A  Penn State Behrend up in Erie.
6  Q  And did you get a degree from Penn State Behrend?
7  A  Yes.
8  Q  What degree is that?
9  A  Mathematics.
10 Q  And what year was that?
11 A  '11.  MBA in '12.
12 Q  MBA in '12 from the same school?
13 A  Yes.
14 Q  Mathematics, is that BA or BS?
15 A  BS.
16 Q  Was there any particular focus of the MBA program
17    that you were involved in?
18 A  Just business administration.
19 Q  So 2012 you graduate with your MBA.  Kind of walk
20    me through your, I guess, post high school
21    employment starting with the first?
22 A  I worked for a construction company in Bethel Park.
23 Q  And what's the name of that construction company?
24 A  Addvetco, A-D-D-V-E-T-C-O.
25 Q  Addvetco.

1  A  Yes.

2  Q  Got it.  How long were you employed with Addvetco?

3  A  Summer internship started in '08, and I liquidated

4     the company around 2019 or so.

5  Q  So when you say you liquidated it, I take it you

6     were in charge of the company at that point?

7  A  Yeah, I was a managing partner.

8  Q  So kind of walk me through kind of the evolution of

9     your employment with Addvetco.  You started and, I

10    guess, what was your job title when you started?

11 A  Mainly administrative assistant, accountant.  I did

12    a lot of the QuickBooks accounting.

13 Q  And then kind of when was your next promotion

14    there?

15 A  Four months, six months.

16 Q  Okay.  Oh, wow.  What were you doing there?

17 A  Project managing.

18 Q  What is involved in project managing?

19 A  Scope of work, contracts, financials, percentage of

20    completions, percentage of, like, variance reports,

21    QuickBooks reports, percentage of completion,

22    earned value management, CPM scheduling.

23 Q  What does CPM scheduling mean?

24 A  Critical path method.

25 Q  So what is critical path method?

1    A   There's a program called Primavera, and critical

2        path scheduling is a construction schedule.

3        Meaning, you derive the shortest chain of events in

4        order to complete the project, which means there is

5        no float on those activities, and if you do not get

6        those activities done on the dates that they're

7        required to get done, the end game project will get

8        extended and obviously lead to more costs.

9    Q   Gotcha.  So I guess that's a method of trying to

10       streamline that and get it done in as short as

11       possible time?

12   A   Correct.

13   Q   When you became project manager, did you have any

14       kind of formal training in how those -- all the

15       various tasks that you described, how you're

16       supposed to do that?

17   A   No, I taught myself.

18   Q   Taught yourself, okay.

19            I guess, who ran this company before you came

20       in?

21   A   Arthur Dupont, CEO.

22   Q   Dupont?

23   A   Yeah.  Other partners were Ed Digorio and my

24       father.

25   Q   And your father, okay.  Ed Digorio, you said?

```
 1  A  Yeah.
 2  Q  Can you spell that?
 3  A  D-I-G-O-R-I-O.
 4  Q  And what's your father's name?
 5  A  Edward P. Kessler.
 6  Q  And so are you a junior?
 7  A  Technically, I think I'm a third.  My dad's dad is
 8     also Ed Kessler.
 9  Q  Gotcha.  And so there were three partners in that
10     firm when you came in; is that right?
11  A  Correct.
12  Q  So you mentioned the kind of the job duties in that
13     project managing role being finding the scope of
14     work, looking at contracts, financials, earned
15     value management, and the CPM scheduling you just
16     mentioned.
17         Did the skills kind of you learned, your
18     mathematics and MBA background, help with dealing
19     with those job tasks?
20  A  Yeah, for the most part.  Microsoft Excel was
21     utilized quite frequently.  VBA code, which is
22     automating some of the financial updates, being
23     more efficient, executing the code rather than
24     doing it manually over and over again to cut costs.
25  Q  Okay.
```

```
 1   A   The son.
 2   Q   Son.  Was he also a partner at that point?
 3   A   Yes.
 4   Q   And why was the decision made to liquidate?
 5   A   Artie retired.
 6   Q   Who retired?
 7   A   Artie, the CEO.
 8   Q   And did you share in the proceeds of that company
 9       sale?
10   A   Yeah, owners took distributions.  They were the
11       last ones to take their money out.  All payables
12       were paid in full.  All subcontractors were paid in
13       full.  We owed no one money.
14   Q   So it was a clean liquidation, not, like, a forced
15       liquidation?
16   A   Correct.
17   Q   At the same time, I mean, you're at Addvetco from
18       2008 to 2019, did you have any other companies or
19       jobs you worked for in that eleven-year period?
20   A   Yes.
21   Q   Start with the earliest one of those.  What was
22       that?
23   A   Peak Solutions.
24   Q   Peak?
25   A   P-E-A-K, Solutions III, the Roman numeral 3, LLC.
```

```
 1  Q  Gotcha.
 2  A  We just get information from the investment
 3     managers on the assets.  We calculate the fund
 4     ration, which is assets divided by liabilities.
 5  Q  Now, what type of pensions are they, public entity
 6     pensions?
 7  A  Some are public, some are multi-employer, some are
 8     single employer, municipalities.
 9  Q  Do you know, like, off the top of your head what
10     the total size of those asset portfolios are?
11  A  I can't share that information.
12  Q  Like in gross, not for each individual one.  Like,
13     are we talking small municipal, you know,
14     $500 million or are we talking --
15  A  Some are.
16  Q  -- tens of billions?
17  A  Some are in the billions.
18  Q  Okay.  At some point in that 2008 to 2019 time
19     frame, I take it you met James Blackburn?
20  A  Unfortunately, yes.
21  Q  So tell me about kind of how you met James
22     Blackburn and how you kind of got into business
23     with him.  When did you first meet him?
24  A  I would say maybe late 2017, 2018 through mutual
25     friends who some invested into a so-called business
```

1      that Blackburn was starting.

2  Q  So those mutual friends you mentioned, where were

3      they located?

4  A  Florida.

5  Q  And is that where you met Mr. Blackburn?

6  A  Yes.

7  Q  And you said that these mutual friends had invested

8      in a business Mr. Blackburn had?

9  A  Correct.

10  Q  What was that business?

11  A  First Sky Airlines.

12  Q  Okay.  And what does First Sky Airlines do?

13  A  Nothing.

14  Q  But, I mean, at the time, what did you understand?

15      What was it's --

16  A  It was a luxury airline, commercial, that had

17      access to the private terminals.

18  Q  So he had set up some type of business that allowed

19      access to private terminals at airports; is that

20      right?

21  A  Correct.

22  Q  And was he, like, operating that or was he --

23  A  He was a managing partner.

24  Q  And so your mutual friends had, I guess, gone into

25      business with him or just invested?

1    A   They invested.
2    Q   And at the time you met Mr. Blackburn, were your
3        friends involved with him in any other way other
4        than First Sky Airlines?
5    A   Not to my knowledge.
6    Q   So you met Mr. Blackburn in Florida late 2017,
7        early 2018; is that right?
8    A   Correct.
9    Q   Kind of walk me through kind of the next
10       interactions you had with him that kind of led to
11       you guys deciding to go into business together.
12   A   Well, I first thought I invested into First Sky
13       Airlines.  To this day, I haven't received a K-1
14       distribution from Mr. Blackburn.
15   Q   Okay.  Let me follow up on that one right there.
16       So you say you thought you invested in First Sky.
17       Tell me how that happened.
18   A   That means I have agreements signed off still in my
19       possession of me purchasing shares of the company.
20   Q   How many shares did you purchase, if you remember?
21   A   I believe it's 6 percent.  I have an email from
22       Mr. Blackburn confirming that.
23   Q   Okay.
24   A   As well as a list of investors.
25   Q   And was this in that early -- sorry -- late 2017,

```
 1      early 2018 time frame?
 2  A   Correct.
 3  Q   Do you remember how much, I guess, the financial
 4      investment was?
 5  A   Probably around 200,000.
 6  Q   Did you write him a check?
 7  A   Multiple checks and/or wires.
 8  Q   And did you ever receive any kind of actual shares
 9      in the company?
10  A   The agreements that I have in my possession.
11  Q   Okay.  And did you ever receive any, like, books or
12      reports from the company?
13  A   I have them in my possession too.
14  Q   But you say you've never received a K-1?
15  A   Not from Mr. Blackburn.
16  Q   Did you ever receive it from First Sky?
17  A   Nope.
18  Q   So you've not received anything showing the, I
19      guess, the tax impact of your investment?
20  A   I received a K-1 from another investor.  My name,
21      as well as at least one other person that I know,
22      is not listed on the draft K-1.
23  Q   So I take it that would have been either roughly
24      March, April of '18 or March, April of '19 you
25      would have expected to receive that first K-1;
```

```
 1   A   Not too much, no.
 2   Q   So from the time in that early 2018 investment in
 3       First Sky, walk me through the, I guess, the
 4       evolution of deciding to go into business with him
 5       with Premier Group Autos.
 6   A   I went down to Fort Lauderdale for the Fort
 7       Lauderdale Boat Show around, I believe, this time
 8       in 2018; I think they hold the boat show around the
 9       same weekend every year.
10   Q   So Octoberish?
11   A   I think it's the end of October or first week in
12       November.
13   Q   Okay.
14   A   And we were walking around the boat show, and we
15       came across a car that looked like a Range Rover,
16       but it was a lot more classier, and it was
17       definitely a few steps above your standard Range
18       Rover.
19   Q   So you found a good looking Range Rover.  Tell me
20       what happened there.
21   A   The company is called Overfinch.  Later that same
22       day, Blackburn took me; Tim Elmes; Mark Bernard;
23       Kevin Sloane, who is the owner of Overfinch; Alex
24       Sloane, which is the son of Kevin; and a few other
25       of his, quote/unquote, clients on a private jet to
```

```
 1      New Orleans for dinner.
 2   Q  So this was a private jet that Mr. Blackburn had;
 3      is that right?
 4   A  He mentioned his friend owned it.
 5   Q  Was this something that had been previously planned
 6      or it just kind of happened once you guys met?
 7   A  He planned it that day.
 8   Q  So I take it you weren't planning to fly to New
 9      Orleans for dinner that day but it ended up
10      happening anyway?
11   A  Correct.
12   Q  Where did he take you out to eat in New Orleans?
13   A  I forget.
14   Q  Commanders Palace is a good place if you ever get
15      there.
16   A  It was on that main street, Bourbon Street maybe?
17   Q  Bourbon, yeah.  So you were in The Quarter then for
18      dinner.
19          So you mentioned Tim Elmes.  Who is Tim Elmes?
20   A  Real estate agent.
21   Q  And is he, like, a Fort Lauderdale real estate
22      agent?
23   A  Correct.  He was also listed in the email as an
24      investor in First Sky.
25   Q  So was this a First Sky flight you guys were on?
```

```
 1   A   Some of the investors plus the Overfinch owners.
 2   Q   Right.  But I meant was this, like, a private jet
 3       you were on?  Did it go into a private terminal in
 4       the New Orleans airport?
 5   A   We went through the private terminal, yes.
 6   Q   Who is Mark Bernard?
 7   A   He was actually a mutual friend that introduced me
 8       to Blackburn.
 9   Q   How had you known Mr. Bernard?
10   A   Through another friend of mine who I went to high
11       school with up in Bethel Park who moved to Florida
12       our junior year.
13   Q   And so you'd known Mr. Bernard for a number of
14       years at that point?
15   A   I'd say a few years.
16   Q   And the Sloanes were in ownership of Overfinch?
17   A   They own Overfinch.
18   Q   Tell me what happened at that dinner.
19   A   Just networking mainly.  Everyone was spread out,
20       maybe four or five tables.
21   Q   No agreements formed or anything during that
22       dinner?
23   A   No.
24   Q   Did you guys stay in New Orleans that night or fly
25       back?
```

1    A   Flew back around 3:00 a.m.

2    Q   And then what happened?

3    A   Went to bed.

4    Q   Okay.  Fair enough.  I'm sorry.  I should have --

5            MR. DELK:  That was good.

6    Q   Although, you never know --

7    A   I was tired.

8    Q   -- maybe 3:00 a.m. is when things get started in

9        Fort Lauderdale.  You never know.

10   A   Not for me.

11   Q   So then, I guess, like, the next event that

12       happened in terms of the Premier Group?

13   A   There was a breakfast.  I don't recall the

14       restaurant.  Both Sloanes were there; Samuel

15       Blackburn; I believe Matthew Thompson; Daniel

16       Madero; James Blackburn; myself; there was one

17       other individual who was actually listed as the CEO

18       of First Sky, Andres Dorchinelli (phonetic).

19   Q   I'm going to need your help on that one.

20   A   I'm going to need my own help on that one.  I don't

21       know how -- I mean, I don't know how to spell it.

22   Q   We'll see if we can find it in one of the emails or

23       exhibits or something.

24   A   That's fine.

25   Q   Dorchinelli you remember the name being?

```
 1   A   Around that, yes.
 2   Q   Fair enough.  Tell me about Samuel Blackburn; had
 3       you met him before?
 4   A   Just through James.
 5   Q   What did you know about him?
 6   A   Salesman, owned multiple companies and had
 7       revenue -- the story I was being told was that he
 8       had revenue on multiple companies.
 9   Q   You say "story"; did you find out that wasn't the
10       case?
11   A   Yes.
12   Q   And was that something that Samuel had told you or
13       James had told you?
14   A   James.
15   Q   And Daniel Madero, what did he do?
16   A   He was business partners in Premier Aviation with
17       James Blackburn.
18   Q   I'm trying to understand the difference between
19       what Premier Aviation did and what First Sky did;
20       what was the difference there?
21   A   I believe Premier Aviation was more of a lease
22       agreement with airplanes, private jets.
23           First Sky, to my understanding, was a
24       commercial airline that everyone would board the
25       plane in the private terminals versus the public
```

```
 1      terminals.
 2   Q  Gotcha, okay.
 3          So First Sky, that wasn't, like, a Gulf Stream
 4      or anything; that was regular commercial planes?
 5   A  Yeah.  The marketing material was 737, but I have
 6      the -- the marketing material says the jet.  It's
 7      at my house.
 8   Q  And so was it the very next day you went to
 9      breakfast?
10   A  It might have been the next day, or it might have
11      been the day after.  It was around the same weekend
12      of the Fort Lauderdale Boat Show because the
13      Overfinch owners were still in town.
14   Q  What happened at that breakfast?
15   A  James was trying to get a contract with the
16      Overfinch owners to sell their car, exclusive
17      rights, in south Florida.
18   Q  Had James mentioned that idea to you at any point
19      prior to this breakfast?
20   A  Prior to that breakfast, I do not believe so, no.
21   Q  And so when you went into that breakfast, were you
22      expecting to be discussing potential business
23      models or anything?
24   A  No.
25   Q  And so tell me kind of what happened as James was
```

```
 1        asking, you know, to sell Overfinch cars
 2        exclusively in south Florida.
 3   A    He took minutes, handwritten minutes.  At the end
 4        of the meeting, he tried to get the Overfinch
 5        people to sign.  They backed off and said let them
 6        talk with their lawyers to send an agreement over.
 7   Q    At that point, whenever they said, hey, we'll have
 8        our lawyers draft something up or whatever, had you
 9        agreed to go into business with James at that
10        point?
11   A    I think that was the time where James asked me if I
12        wanted to be a part of it.
13   Q    And what did you say when he asked?
14   A    He was under the understanding that I was still
15        liquidating a company up north, and he was also
16        under the full understanding that I was
17        interviewing currently with multiple actuarial
18        consultant companies around the country.
19   Q    So, I guess, before going into that breakfast,
20        James knew that about you, that you were
21        liquidating another company and you were
22        interviewing for other actuarial positions?
23   A    That is correct.
24   Q    Did he have any expectation you would be abandoning
25        those efforts and focusing full time on Premier?
```

```
 1   A   He knew I was not going to be around.
 2   Q   And so when he asked if you wanted to be a part,
 3       what did you say?
 4   A   I'd be an investor.
 5   Q   At that point when you agreed to be an investor in
 6       Premier Group Autos, is it okay if I call it
 7       Premier going forward?  Will you understand?
 8   A   Can you say PGA?
 9   Q   PGA, sure.
10   A   The reason I say that, when you say Premier,
11       Blackburn has Premier Warranty, which is his
12       holding company, Premier Aviation, which is his jet
13       leasing company.  So PGA would specifically
14       describe Premier Group Autos.
15   Q   Since golf isn't an issue in this, we can use PGA
16       and be okay; right?
17   A   I stink at golf.
18   Q   Yeah.  I was on the team, but I never had any
19       aspirations --
20   A   I try but --
21   Q   -- of going any further.
22   A   -- it's fun.
23   Q   At that point when he asked you to be an investor
24       in PGA, had you received any profits or
25       distributions or reporting about your investment in
```

```
 1      First Sky?
 2  A  At that point, no.  Still to this day, no.
 3  Q  I take it though, at that time there was no
 4      indication or nothing that would suggest to you
 5      that maybe there was a problem with First Sky?
 6  A  There was nothing that was given to me that
 7      indicated there was a problem in First Sky.
 8  Q  And so you said you would be an investor in PGA.
 9      Was the name decided at that point in time or just
10      it will be a company?
11  A  It was a company.
12  Q  Had you ever -- I take it from your previous
13      testimony, you'd never seen an Overfinch vehicle
14      before?
15  A  I had never seen an Overfinch vehicle before.  I
16      actually didn't even know that company existed.
17  Q  Do you know whether either James Blackburn or
18      Samuel Blackburn had ever bought or sold Overfinch
19      vehicles prior to that?
20  A  To my knowledge, no.
21  Q  What did the Overfinch guys tell you about their
22      business model or their financial forecasting or
23      whatever in this breakfast?
24  A  They recently opened up their manufacturing plant
25      in around 2017 to 2018 in Danville, Virginia.  So
```

```
 1      they were just getting into the U.S. market.
 2   Q  Did they tell you anything kind of in detail about,
 3      well, here's how much each vehicle costs, here's
 4      how much we invest in it, here's our profit margin?
 5   A  Mainly what we would have to buy the car off of
 6      them for, yes.
 7   Q  Did they have any information about sales of those
 8      types of vehicles in the south Florida area?
 9   A  No.
10   Q  Did they have any information, like, in similar
11      demographic areas in other parts of the country,
12      here's our sales?
13   A  They were just getting into the U.S. market.
14   Q  Did they talk at all about any kind of sales in the
15      European market?
16   A  They didn't provide to me their financials for the
17      European market.  There's a website stating it's
18      the No. 1 luxury car over in the UK.
19   Q  But at that point you had not seen any financials
20      for either the U.S. market or the European market;
21      is that right?
22   A  Correct.
23   Q  Did you see any other information from the
24      Overfinch folks that led you to conclude this would
25      be a good investment?
```

```
 1   A   From the Overfinch folks, no.
 2   Q   Did James or anyone else that was at that breakfast
 3       that wasn't with Overfinch, did they have any other
 4       information that would demonstrate the viability of
 5       that business plan?
 6   A   James sent me the link of the Overfinch being the
 7       No. 1 luxury SUV in the UK.  So it was mainly an
 8       established franchise that was venturing to the new
 9       market of the United States.
10   Q   Gotcha.
11           At what point, if you recall, in this process
12       was the name Premier Group Autos selected?
13   A   Probably around November 2018.
14   Q   And how was that business to be structured?  Did
15       you guys talk about that?
16   A   It was 50/50.  Each one of us was supposed to put
17       initial capital into the company.  In addition to
18       that, each one of us was supposed to buy a car.
19       And every time that car was sold, that loan was
20       supposed to be reinvested into a new car as, like,
21       a revolving line of credit owned by the owners of
22       the company.
23   Q   What was your initial capital investment, if you
24       remember?
25   A   $112,500.
```

1    Q   And what was each car going to cost?

2    A   180,000.

3    Q   Is that kind of on average?

4    A   Yeah.

5    Q   So you were looking at 225,000 initial capital

6        total from both partners?

7    A   That's what I thought, and that's what does reflect

8        on the tax return that Blackburn's accountant

9        provided.

10   Q   And so this was going to be when PGA was formed,

11       you would both put that initial capital in and buy

12       a car; is that right?

13   A   Correct.

14   Q   So that would mean each -- were you guys partners

15       or members in an LLC?

16   A   I think on the bank documents it says manager.

17   Q   So each manager would provide an initial

18       out-of-pocket expense of nearly $300,000; is that

19       right?

20   A   Correct.

21   Q   How were those amounts decided upon?

22   A   Conversations between myself and Blackburn.

23   Q   Did you run any numbers to say, here's what we're

24       going to need initially to kind of keep going?

25   A   In a way.  I came up with an earned value

1    management forecast, and it was 36 cars, based off

2    of -- that was the quota that was within the

3    Overfinch contract.  So it was three cars a month

4    for a year was our quota in the Overfinch contract.

5  Q  And so the kind of initial investment for you and

6    Mr. Blackburn was based off what the Overfinch

7    quota was going to be; is that right?

8  A  In a way.

9  Q  Now, this was your, I guess, first foray into the

10    business of purchasing and selling automobiles; is

11    that right?

12  A  Yes.  My businesses up home are not in the auto

13    industry.

14  Q  Mr. Blackburn had some auto experience in his

15    personal background; right?

16  A  I do believe so.

17  Q  That would apply also for Samuel; is that right?

18  A  You'd have to ask Samuel.

19  Q  Who decided -- or, I guess, did you and Blackburn

20    decide equally this should be set up as an LLC?

21  A  Yes, initially.

22  Q  Initially.

23  A  It got changed.

24  Q  When did it get changed?

25  A  Around April of 2019.

```
 1            I take it you weren't involved in an
 2       application for the one million or the 500,000 or
 3       even what ultimately ended up being the 150?
 4    A  Ultimately, yeah.
 5    Q  I take it, however, at one point you did sign
 6       agreements with NextGear; right?
 7    A  I did electronically sign the parts of the
 8       agreement with the NextGear agreement for the
 9       $150,000, mainly because of the $150,000, the
10       $40,000 increments, the power of attorney did not
11       need to be signed, as well as the conversation that
12       Blackburn and I had based on how he was going about
13       to use the loan.
14    Q  Tell me about that conversation.  First of all,
15       when was it?
16    A  Fairly -- right before the electronic signatures.
17    Q  So this is something, like, March maybe?
18    A  Yeah.  And I think those things are signed
19       March 26, I believe, electronically.
20    Q  What did you and Blackburn say in that conversation
21       to each other?
22    A  So this went back to the conversation I did
23       reference in this deposition probably a few hours
24       ago.  There's good ways to use debt, and there's
25       bad ways to use debt.
```

```
 1              MR. JURKIEWICZ:  Did you ever attempt to log

 2       into the NextGear portal to look at financial

 3       information --

 4              THE WITNESS:  No.

 5              MR. JURKIEWICZ:  -- related to PGA?

 6              THE WITNESS:  Huh-uh.

 7              MR. JURKIEWICZ:  All right.  Thanks.

 8              THE WITNESS:  Yep.

 9              MR. ROCAP:  We had huh-uh instead of a no.

10              THE WITNESS:  Oh.  No.

11              MR. JONES:  Oh, yeah, okay.  Let's make sure

12       we don't do that again.

13   BY MR. JONES:

14   Q   I'm going to hand you something we used as an

15       exhibit previously, and I want to make sure we know

16       what number to use, so give me one second here.

17       This one was previously marked as Exhibit 21.

18              Mr. Kessler, I'm going to hand you what's been

19       previously marked as Exhibit 21.  You had mentioned

20       your parents as a source of funding, and I believe

21       this is the loan agreement you were referencing; is

22       that right?

23   A   Yes.

24   Q   So Exhibit 21 is a loan with your parents and

25       Premier Group Autos; is that right?
```

1   A   That is right.

2   Q   And this was executed prior to the NextGear

3       paperwork; is that right?

4   A   That is correct.  As mentioned before, this loan

5       made more financial sense to the company than

6       borrowing $500,000 from NextGear and giving

7       NextGear a $100,000 retainer.

8   Q   Gotcha.  And so after you received the $500,000

9       contract -- at some point in February, roughly?

10  A   February, March.

11  Q   -- at what point did you propose to Mr. Blackburn,

12      hey, why don't we just get money from my parents?

13  A   There's text messages that say, hey, we might be

14      able to go another route that might not be as

15      strict on the terms and conditions.

16  Q   And at the time of those text messages -- was it

17      probably late February 2019, maybe?

18  A   Right after the NextGear one got voided.  So

19      probably around that timeline, late February, early

20      March.

21  Q   Gotcha.

22  A   And this was executed the 11th day of March.

23  Q   When did you first approach your parents about

24      putting money into -- or this loan agreement?

25  A   After the voided NextGear agreement.

```
 1   Q   What was the discussion with your folks?  Hey,
 2       guys, I have got an investment opportunity.  What
 3       was that conversation like?
 4   A   Mainly along those lines.  I thought it was a good
 5       investment opportunity, saying, like, this
 6       agreement was similar to the revolving line of
 7       credit that my loan was supposed to do, as well as
 8       Blackburn's was supposed to do, which is the good
 9       way to use debt.  I just used the people following
10       agreements and using the debt the way it's supposed
11       to be used.
12   Q   How many, as of the date of the business loan
13       agreement, how many cars had PGA actually sold?
14   A   I would have to go back through the bank records.
15   Q   Is it ten, less than ten?
16   A   I'd say less than ten.  But to give you a firm
17       number, I would have to reference the bank accounts
18       and re-reconcile.
19   Q   And had you at that point -- because you mentioned
20       earlier, you set up an Excel chart to kind of help
21       you track everything, had you set it up at this
22       point?
23   A   I would have to check the emails, but I believe the
24       forecast of 36 cars, three cars a month showing
25       profit and counts, both per month and accumulated
```

```
 1      over time, was set up.
 2   Q  And were you on pace as of this point to hit that
 3      target?
 4   A  Taking into account that January was kind of, like,
 5      a voided month and not taking into so much account
 6      the three cars were going to be sold in January
 7      since Overfinch still has to deliver the car, I do
 8      believe there is a text message of me saying the
 9      quantity is on track, but the per profit per car is
10      not on track.
11   Q  And so when you went to your parents, did your
12      parents ask for any kind of information about, hey,
13      how are your sales doing?  What are the profits?
14      Who were the investors?  Anything?
15   A  It was mainly they trusted their son, and I trusted
16      my business partner.
17   Q  And so as of this date of Exhibit 21 here,
18      March 11, 2019, your business dealings, either your
19      personal ones or your family's dealings with
20      Mr. Blackburn were your $200,000 investment in
21      First Sky, the almost $300,000 you put into your
22      loan to the company and your capital investment --
23   A  Uh-huh.
24   Q  -- and then you got your mom and your dad to loan
25      $300,000.
```

```
 1   A   Uh-huh.

 2   Q   So --

 3   A   Yes.

 4   Q   -- as of March 11, 2019, or so, you and your family

 5       are roughly $800,000 in terms of investment to

 6       Mr. Blackburn; is that right?

 7   A   In or around, yeah.

 8   Q   As of March 11, 2019, other than the analysis

 9       you've done on the profit margin, had you received

10       any paperwork or any numbers from Mr. Blackburn

11       explaining where any of that half a million dollars

12       was used for the businesses or how it was

13       performing?

14   A   I received those tax -- or -- as of March, no.

15       April is when I finally got the K-1 for the 2018

16       tax returns and mainly was because I pushed for it

17       because I wanted to recognize the upfront loss.

18           I mean, I produce my K-1s to my investors

19       without them really asking for it.  It's kind of

20       like that's what my interpretation of what a true

21       businessman does.  So I was waiting for it, and I

22       asked for it, and he would say, they went on

23       extension.  And I think extension now goes to

24       October, November.

25   Q   And I'm just wondering, you said your parents
```

```
 1         MR. DELK:  Let's clarify which agreement.
 2   A   Yeah.
 3   Q   So the agreement you emailed to your lawyer.
 4   A   I would have to go back to the agreement.  I mean,
 5       this is -- it could have been the $150,000, it
 6       could have been the 500 depending on how quickly he
 7       got back to the original email.  I would have to go
 8       back to my records to accurately answer that
 9       question.
10   Q   But suffice it to say, as of Tuesday, March 26,
11       2019, 7:20 p.m., you've got an email from your
12       lawyer having reviewed a NextGear agreement.
13   A   Reviewing a NextGear agreement, correct.
14   Q   Where it gave NextGear a security interest in all
15       of the borrower's assets and properties, point 1.
16   A   Yes.
17   Q   Point 2, it had a personal guarantee; right?
18   A   Yes.
19   Q   And point 3, it describes what happens in a power
20       of attorney that was just part of that agreement as
21       you just testified; right?
22   A   That was part of that agreement, yes.
23   Q   And after receiving this email, at some point you
24       went on to the electronic DocuSign that had been
25       sent to you by NextGear and signed electronically
```

1    where you were supposed to sign; correct?

2         MR. DELK:  Objection to form.

3    A  I electronically signed that document.  The power

4       of attorney did not need to be signed.

5    Q  Now, when you say "the power of attorney did not

6       need to be signed," do you mean -- did someone ever

7       tell you, "Hey, don't worry about the power of

8       attorney.  It's not part of the deal"?

9    A  Then why did NextGear require the power of attorney

10      to be electronically signed in the other agreement,

11      the $500,000 with the $100,000 retainer?  That

12      needed to be required, electronically signed.  So

13      why didn't -- why didn't NextGear -- why did

14      NextGear then not require this power of attorney to

15      be signed?  Like, if that power of attorney needed

16      to be electronically signed, this whole entire

17      agreement would not have gone through, and I

18      wouldn't be talking to you today.

19   Q  So it's your testimony, then, that when you looked

20      at the DocuSign for the $500,000, there was a place

21      for you to sign the power of attorney

22      electronically?

23   A  Electronically for the power of attorney for the

24      $500,000 loan with the $100,000 retainer, yes.

25   Q  Okay.

1    an email from Blackburn to NextGear for a temp
2    increase.
3  Q  And do you know whether Mr. Blackburn -- scratch
4    that.  Do you know whether Premier Group Autos had
5    authority under the NextGear note to request a
6    temporary increase?
7  A  Premier Group Autos and/or its representatives?
8  Q  No, just Premier Group Autos?
9  A  Well, the representatives are part of that
10   agreement as well, not just PGA.  I mean,
11   Blackburn, if he -- like, PGA can't -- like,
12   Blackburn can request it, like he did request it
13   behind my back.  As I sit here today, I know it,
14   but you guys also agreed to it without consulting
15   me, and that's, in my opinion, a part of a
16   violation of a POA.
17 Q  But not a violation of the note?
18      MR. DELK:  Calls for a legal conclusion.
19 A  Isn't the power of attorney part of the note, the
20   whole NextGear document?
21 Q  The whole loan package; is that what you're talking
22   about?
23 A  I'm taking that as the whole note agreement.  That
24   obviously included a power of attorney.
25 Q  I'm going to hand you what's been previously marked

```
 1     as Exhibit 8, and I believe you're going to say
 2     this is a forged document, but the terms in here,
 3     the printed terms, the typewritten ones, which one
 4     of those provisions has NextGear used?
 5          MR. DELK:  Objection to form.
 6  A  Well, I mean, this was part of your entire
 7     agreement.  So in my opinion, your whole agreement
 8     is fraudulent.
 9          THE WITNESS:  Do you have this as well?
10     Because I'm going -- this is going to take some
11     time to reread this.  Sorry.
12          MR. JONES:  Jason, here's a copy of what he's
13     reading.  I knew I had them.  I just couldn't find
14     them.
15          (Witness reviews document.)
16  A  Okay.  Brian, I tried to read it.
17  Q  Thank you for that.  I know that's a lot.  I
18     apologize for that.
19  A  No, I understand.
20          All right.  So I guess my answer to this is,
21     some of the key terms that reference some of the
22     definitions within your other agreement.  Note, it
23     also says "This Power of Attorney shall be deemed a
24     'Loan Document' for all intents and purposes as
25     referenced in the Note."
```

1       Note, in your definition, shall mean this

2   Demand Promissory Note and Loan and Security

3   Agreement and for all present and future

4   amendments, modifications, and addendums related

5   thereto.

6       In addition, this power of attorney shall be

7   deemed a loan document.  The definition of loan

8   document shall have the meaning set forth in

9   Section 8.

10      Section 8, "In addition to the execution and

11  delivery of this Note, upon the request of the

12  Lender, Borrower shall execute (or cause execution

13  of) the following additional documents in

14  connection with the Borrower's Credit Line

15  (together with all other documents and instruments

16  executed by Borrower in connection with this Note

17  or Borrower's Credit Line, and in each case as the

18  same may be amended, restated, renewed, extended or

19  otherwise modified from time to time, the 'Loan

20  Documents'), each of which shall be incorporated

21  within the reference and made a part of this Note:

22  A power of attorney in favor of the Lender and its

23  designated Representative; prior to Lender making

24  any Advances under the Note, an Advanced Schedule

25  for each unique set of terms for the Finance

```
 1       Program applicable to Borrower, which may be
 2       amended from time to time; such guarantees of
 3       Borrower's Liabilities as Lender may request,
 4       including guarantees of all legal and beneficial
 5       owners of Borrower; a reserve agreement in the
 6       favor of the Lender; prior to Lender authorizing
 7       Borrower to place any Lender Financed Inventory on
 8       consignment with another licensed dealer, a
 9       consignment agreement acceptable to the Lender."
10            So I do believe, in my opinion, that this
11       power of attorney does tie into multiple
12       definitions of and -- not only definitions but
13       documents as well -- and this agreement, Demand
14       Promissory Note and Loan Security Agreement, so
15       that's, in my opinion, voided.
16            I mean, in here you're referencing your
17       definitions and agreement here (indicating).  So in
18       my opinion, this entire thing is voided.
19    Q  What law school did you graduate from?
20    A  I didn't go to law school.
21    Q  What powers listed in Exhibit 8 has NextGear
22       exercised with regard to this case?
23            MR. DELK:  This case or the --
24            MR. JONES:  Yeah, I shouldn't say this case.
25       I apologize.  Let me scratch that.
```

 1  Q  With regard to Exhibit 8, what powers granted to it
 2     under the terms of a power of attorney has NextGear
 3     executed or utilized with regard to Premier Group
 4     Autos?
 5         MR. DELK:  Objection to form.
 6  A  Because this entire loan agreement is fraudulent.
 7     I mean, you're referencing loan documents.  You're
 8     referencing specific agreements within this.  The
 9     loan wouldn't have even went through, and none of
10     us would be here today.
11  Q  I appreciate your response, but I'm going to have
12     to respond as nonresponsive.
13         Let's take a look at paragraph 2 which lists
14     the powers granted to the lender under the power of
15     attorney, which of those powers in paragraph 2 --
16  A  Paragraph 1 is also a part of this entire document
17     as well.  I mean, this whole document, you can't --
18     of this paragraph or that paragraph.  This is an
19     entire document.
20         So all of this has to be taken into
21     consideration, not just a portion of it or what
22     your view is a portion of it that may or may not be
23     in the best interest of your case in this.
24         But this (indicating) references to be a loan
25     document to, in your definitions of loan documents

1    within your own contract, reference Demand
2    Promissory Note and Loan and Security Agreement.
3    So this (indicating) is part of this (indicating),
4    in my opinion.
5  Q  Okay.
6  A  So tell me -- or executing -- or having a -- yes, I
7    know you would say this is forged, which it is,
8    this (indicating) ties into this (indicating), your
9    entire agreement.
10 Q  Is it your testimony that in order for the NextGear
11   loan documents to be valid, they had to have signed
12   signatures on powers of attorney from both you and
13   Mr. Blackburn?
14 A  Say that again.
15 Q  Yeah.  Is it your testimony -- or, rather, I should
16   say, is it your belief that in order for any part
17   of the NextGear loan documents to be valid, they
18   had to have signatures from both you and
19   Mr. Blackburn on powers of attorney documents?
20     MR. DELK:  Calls for a legal conclusion.
21   Document speaks for itself.
22 Q  You can answer.
23 A  It is my belief that NextGear needed signatures
24   from me and Blackburn for any -- on a power of
25   attorney -- for any of this to be valid, as I am

```
 1      sitting here today.
 2   Q  So taking a look at paragraph 2 of Exhibit 8, which
 3      lists the powers granted in the power of attorney,
 4      which of those powers has NextGear utilized or
 5      exercised with regard to Premier Group Autos?
 6           MR. DELK:  Asked and answered.
 7   A  Brian, I don't know how many times I have to answer
 8      this question.  I've answered it the same way
 9      multiple times.  I'm going to continue to answer it
10      the same way because it's the truth.
11   Q  Okay.  Let me ask you this then.  Has NextGear
12      exercised power 2A on Exhibit 8 with regard to
13      Premier Group Autos?
14           MR. DELK:  Objection to form.
15   A  Would execute notes be part of it since this whole
16      thing is a note?  I mean, this is an entire
17      document that is forged that you needed to get this
18      loan to go through.
19   Q  So --
20   A  So --
21   Q  -- is that a yes or a no?
22   A  That's my answer.
23   Q  That NextGear exercised power 2A?
24   A  You're picking parts of it.  This is an entire --
25      this (indicating) is part of this (indicating).
```

```
 1      Paragraph 1 is part of this document, and it's not
 2      just paragraph 2 applies or paragraph -- like, this
 3      is an entire document, and you're referencing parts
 4      of this document (indicating) within here
 5      (indicating).  So this (indicating) wouldn't have
 6      even gone through without this (indicating),
 7      without the power of attorney.
 8           So in my opinion, this entire obtaining of the
 9      funds or getting this document to go through in the
10      first place, it was obtained fraudulently.
11   Q  Did NextGear exercise power 2B?
12   A  Well, you notarized forged, executed documents, so
13      in my opinion, you violated that one.
14           MR. DELK:  Unless I missed it, I don't think
15      there's a question pending.
16           MR. JONES:  I asked him if NextGear exercised
17      2B.
18           MR. DELK:  And you answered it.
19   A  I answered it.
20   Q  Were you looking for other ways?  I thought you
21      were still answering.  I apologize if you weren't.
22   A  In my opinion, I believe, yeah, execute all
23      documents necessary for the lender to perfect and
24      secure its interest in the collateral.
25           So, yeah, you didn't -- they notarized a
```

```
 1      forged signature, so I say you violated that one.
 2      And I was looking into something else.  Sorry.
 3   Q  Did NextGear exercise power 2(c)?
 4   A  So are you saying, in my opinion, if you violated
 5      one of these and maybe not another one, this
 6      applies to the loan?
 7   Q  I'm asking if you believe that NextGear exercised
 8      the power under 2(c).
 9   A  I'm saying maybe not (c), policies of insurance.
10   Q  Okay.  How about 2(d)?
11   A  Endorse the name of a borrower on any document,
12      yeah, you violated that one.
13   Q  I thought you told me earlier we need to read this
14      thing in its entirety.  So why don't you go ahead
15      and read the rest of the sentence and see what
16      those terms listed there actually apply to?
17   A  It's a loan document for all intents and references
18      in the note, which is this (indicating) entire
19      thing.
20   Q  So 2(d) is a power that says the lender may
21      "endorse the name of Borrower upon any document,
22      instrument, certificate, evidence of title, state
23      registration documents, trust receipts, checks, or
24      other items of payment or any related or similar
25      documents, in each case as necessary to pay for or
```

1    protect the Collateral, including, without
2    limitation, any agreements between Borrower and any
3    global positioning satellite company."
4         Do you know whether NextGear utilized any of
5    those powers listed in paragraph 2(d) there to pay
6    for or protect the collateral?
7  A  NextGear wouldn't have any collateral.
8  Q  So my question was, do you know whether they did?
9  A  In my opinion, yeah, you violated that one.
10 Q  How did NextGear violate power 2(d)?
11 A  I mean, in my opinion, you're executing documents
12   in order to get the collateral.  Like, there
13   wouldn't be any collateral that NextGear would be
14   out of if it wasn't for this document being signed.
15   I mean, I can't control someone forging my name
16   behind my back.
17 Q  Do you know whether the note that you do agree you
18   signed creates collateral?
19        MR. DELK:  Objection to form.
20 A  The collateral of the cars that got floored, in my
21   opinion, would be the collateral, but those cars
22   wouldn't have been able to be floored without this
23   document being signed.
24 Q  Okay.  Who is the borrower under the power of
25   attorney?

```
 1        MR. DELK:  Objection to form.
 2  Q  You just have to look at the second page of the
 3     power of attorney.  You don't have to look at other
 4     documents.
 5  A  It says, the borrower is Premier Group Autos, LLC,
 6     and I apparently had to sign off on it, and that's
 7     not my signature signing off on it.
 8  Q  Okay.
 9  A  And it would be also the representatives of the
10     company, which would be a shareholder, which would
11     be myself.  I mean, that's my opinion of the
12     borrower of the contract.
13  Q  So the borrower under the power of attorney was
14     Premier Group Autos, LLC, doing business as
15     Overfinch Miami; is that correct?
16  A  Also me and the representatives because in my
17     opinion, this document, even though it just says
18     borrower there (indicating), you have paragraph 1
19     here (indicating) that references the note and loan
20     documents and which talk about the representatives.
21     So it's tying everything together.  So . . .
22  Q  And it's your understanding that the
23     representatives under the note are also equally
24     bound to the terms of the note as is the borrower?
25        MR. DELK:  Objection to form.  Misstates
```

```
 1      testimony.
 2   A  I'm saying the representatives, you needed
 3      signatures from the representatives, which this is
 4      not my signature.
 5   Q  Do you know whether Mr. Blackburn executed a power
 6      of attorney on behalf of Premier Group Autos, LLC?
 7           MR. DELK:  Asked and answered.
 8   A  You would have to ask him.
 9   Q  Let's set that aside for now.
10           (Exhibit 34 marked.)
11           I'm going to hand you what I've marked as
12      Exhibit 34.  Mr. Kessler, have you seen Exhibit 34
13      before?
14   A  I do believe, off the top of my head, Donna may
15      have forwarded me this letter.
16   Q  Okay.
17   A  I would have to check the date of the email in
18      which she sent it to me.
19   Q  So this is dated November 8, 2019.  And it's
20      informing Overfinch Miami that under the terms of
21      the distribution agreement, Overfinch Miami was not
22      meeting the minimum product spend.  Do you see
23      that?
24   A  Yeah, I think this is alerting -- like, this was
25      just sent to James, which is probably why I didn't
```

```
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF INDIANA
 2                     INDIANAPOLIS DIVISION


 3


 4  NEXTGEAR CAPITAL, INC.,        )
                                   )
 5              Plaintiff,         )
                                   )
 6         -v-                     ) CAUSE NO.
                                   ) 1:20-cv-00354-TWP-DLP
 7  PREMIER GROUP AUTOS, LLC,      )
    JAMES M. BLACKBURN, AND        )
 8  EDWARD A. KESSLER,             )
                                   )
 9              Defendants.        )


10


11                    Job No. 166492


12


13         I, EDWARD A. KESSLER, state that I have read
    the foregoing transcript of the testimony given by me
    at my deposition on October 29, 2021, and that said
14  transcript constitutes a true and correct record of
    the testimony given by me at said deposition except as
15  I have so indicated on the errata sheets provided
    herein.

16


17


18


19                            _____
                              EDWARD A. KESSLER
20


21


22


23        STEWART RICHARDSON DEPOSITION SERVICES
              Registered Professional Reporters
24            One Indiana Square, Suite 2425
                 Indianapolis, IN  46204
25                    (800)869-0873
```

```
 1   STATE OF INDIANA

 2   COUNTY OF MARION

 3

 4        I, Elizabeth T. Lindner, a Notary Public in

 5   and for said county and state, do hereby certify that

 6   the deponent herein was by me first duly sworn to tell

 7   the truth, the whole truth, and nothing but the truth

 8   in the aforementioned matter;

 9        That the foregoing deposition was taken on

10   behalf of the Plaintiff; that said deposition was

11   taken at the time and place heretofore mentioned

12   between 10:04 a.m. and 5:02 p.m.;

13        That said deposition was taken down in

14   stenograph notes and afterwards reduced to typewriting

15   under my direction; and that the typewritten

16   transcript is a true record of the testimony given by

17   said deponent;

18        And thereafter presented to said witness for

19   signature; that this certificate does not purport to

20   acknowledge or verify the signature hereto of the

21   deponent.

22        I do further certify that I am a disinterested

23   person in this cause of action; that I am not a

24   relative of the attorneys for any of the parties.

25
```

```
 1              IN WITNESS WHEREOF, I have hereunto set my

 2   hand and affixed my notarial seal this 8th day of

 3   November, 2021.

 4

 5

 6

 7                        Elizabeth T. Lindner

 8                        ┌─────────────────────────────────┐
                          │      Elizabeth T. Lindner       │
 9                        │      NOTARY PUBLIC SEAL         │
                          │      STATE OF INDIANA           │
10                        │    Commission No. NP0673781     │
                          │ My Commission Expires Nov. 11, 2023 │
11                        └─────────────────────────────────┘

12

13   My commission expires:
     November 11, 2023
14
     Job No. 166492
15

16

17

18

19

20

21

22

23

24

25
```