# Exhibit "E"

Page 1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF INDIANA
2      INDIANAPOLIS DIVISION
3    Case No. 1:20-cv-00354-TWP-DLP
4

NEXTGEAR CAPITAL, INC.,    )
5            )
    Plaintiff,    )
6            )
     -vs-     )
7            )
PREMIER GROUP AUTOS, LLC,   )
8 JAMES M. BLACKBURN, and   )
 EDWARD A. KESSLER,    )
9            )
    Defendants.   )
10
11
12
13  VIDEORECORDED DEPOSITION OF JAMES M. BLACKBURN
14    The videorecorded deposition upon oral
 examination of JAMES M. BLACKBURN, a witness
15 produced and sworn before me, Craig Williams, RPR,
 CMRS, a Notary Public in and for the County of
16 Marion, State of Indiana, taken on behalf of the
 Plaintiff, via remote Zoom videoconference, on the
17 26th day of October 2021, at 10:00 a.m., pursuant
 to the Federal Rules of Civil Procedure with
18 written notice as to time and place thereof.
19
20
21
22
23
24
25

```
                                                    Page 2

 1                    APPEARANCES
 2            (All Parties Appearing Remotely)
 3
    FOR THE PLAINTIFF:
 4
             Brian S. Jones
 5           David J. Jurkiewicz
             BOSE MCKINNEY & EVANS LLP
 6           111 Monument Circle, Suite 2700
             Indianapolis, IN  46204
 7           317.684.5000
             b.jones@boselaw.com
 8           djurkiewicz@boselaw.com
 9  FOR THE DEFENDANTS PREMIER GROUP AUTOS, LLC and
    JAMES M. BLACKBURN:
10
             Richard A. Rocap
11           ROCAP LAW FIRM
             10293 North Meridian Street, Suite 175
12           Carmel, IN  46290-1130
             317.846.0700
13           rar@rocap-law.com
14  FOR THE DEFENDANT EDWARD A. KESSLER:
15           Jason Delk
             DELK MCNALLY LLP
16           211 S. Walnut Street
             Muncie, IN  47305
17           765.896.9495
             delk@delkmcnally.com
18
    VIDEOGRAPHER:
19
             Rocco Mercadante
20
21
22
23
24
25
```

Page 4

1          THE VIDEOGRAPHER:  Good morning.  We are

2     going on the record at 10:06 a.m. on 10/26/2021.

3     This is the Media Unit No. 1 of the

4     videorecorded deposition of James M. Blackburn

5     in the matter of NextGear Capital, Inc. versus

6     Premier Group Autos, LLC, et al., filed in the

7     U.S. District Court, Southern District of

8     Indiana, Indianapolis Division, Case

9     No. 1:20-cv-000354-TWP-DLP.

10          This deposition is being held remotely.  My

11     name is Rocco Mercadante from Veritext.  Our

12     court reporter today is Craig Williams from

13     Veritext as well.

14          I am not authorized to administer an oath.

15     I am not related to any party in this action,

16     nor am I financially interested in the outcome.

17          Counsel and all present in the room and

18     everyone attending will now state their

19     appearances and affiliations for the record,

20     after which time we can swear in the witness and

21     proceed.

22          MR. JONES:  Good morning.  Brian Jones for

23     NextGear Capital.  In the room with me is also

24     David Jurkiewicz.

25          MR. DELK:  Jason Delk on behalf of the

Page 5

1       defendant, Edward Kessler.

2             MR. ROCAP:  Richard Rocap on behalf of

3       Premier Auto Group, LLC and James Blackburn.

4             THE WITNESS:  James Blackburn, defendant.

5       I'm also here on behalf of Premier Auto Group.

6                   JAMES M. BLACKBURN,

7  having been duly sworn to tell the truth, the whole

8  truth, and nothing but the truth relating to said

9  matter was examined and testified as follows:

10 DIRECT EXAMINATION,

11     QUESTIONS BY BRIAN S. JONES:

12 Q   Good morning, Mr. Blackburn.  My name is Brian

13     Jones and I represent the plaintiff NextGear

14     Capital, Incorporated in this case.  I

15     appreciate you joining us this morning remotely.

16     I understand you are actually in the United

17     Kingdom at this time; is that correct?

18 A   No, not at the moment.  No, I leave on Thursday.

19 Q   Okay.  Where are you right now?

20 A   Ft. Lauderdale.

21 Q   Oh, you're in Ft. Lauderdale, Florida, okay, got

22     you.

23           So you're heading back to the United

24     Kingdom on Thursday; is that right?

25 A   Yeah, I return to Ft. Lauderdale today and then

```
                                          Page 17

 1      deposition?

 2  A   No.

 3  Q   All right.  So let's start with kind of walking

 4      through kind of your personal background.  Where

 5      were you born, sir?

 6  A   England.

 7  Q   What part of England?

 8  A   Liverpool.

 9  Q   In Liverpool?  Okay.

10          And what was your birth date?

11  A   May 22nd, 1990.

12  Q   1990, okay, got you.

13          And I take it you're still a citizen of the

14      UK; is that right?

15  A   Yes.

16  Q   Okay.  So walk me through -- as I understand, at

17      some point you moved to the United States; is

18      that right?

19  A   Yes.

20  Q   And when did that occur?

21  A   2012.

22  Q   2012, okay.

23          And what brought you to move to the United

24      States?

25  A   My ex-wife.
```

```
 1       that correct?
 2    A  I think this was a résumé that was specifically
 3       put together for NextGear.
 4    Q  For NextGear?
 5    A  I believe so.
 6    Q  Okay.  So after your graduation in 2006, kind of
 7       walk me through your employment history,
 8       starting with the earliest you had.
 9    A  I went to work for the family business.
10    Q  And what is the family business?
11    A  The business is car sales.
12    Q  And that was in the UK; right?
13    A  Correct.
14    Q  What part of the UK was that?
15    A  Northwest.
16    Q  Okay.
17            And was it a particular brand of cars you
18       were selling, like a dealership?
19    A  Used.
20    Q  Used cars?  Okay.
21            Do your parents own that business?
22    A  They used to.
23    Q  They used to?  Okay.
24            When did they sell that business?
25    A  I don't recall exact dates.
```

Page 22

1  Q   Okay.  Within the last five years, ten years?

2  A   No, it was just after I left.

3  Q   Okay.  So right after 2012.

4      At the very bottom of the résumé there,

5      Exhibit 19, it mentions Premier Motors Limited.

6      Was that the family business you were talking

7      about?

8  A   Yes.

9  Q   And you worked in sales, it says there, from

10     2006 to roughly 2012; is that right?

11 A   Yes, roughly.

12 Q   Okay.  And it says your father's business

13     focused on selling new and used automobiles in

14     the northwest of the UK and that you became the

15     top producing sales agent.  Had you taken any

16     classes or training on how to do sales?

17 A   No.

18 Q   No?  Just kind of learned from your father?

19 A   Yeah.

20 Q   Okay.  The next one up is starting in 2012 to

21     the present, and it's the Premier Warranty

22     Company.  Do you see that?

23 A   Yep.

24 Q   Tell me, what is the Premier Warranty Company?

25 A   That is a company that I founded when I first

Page 23

```
 1        moved to America to act as a holding company for
 2        different things I was getting involved in.
 3   Q    Okay.  That Premier Warranty Company, is it like
 4        a, is it a corporation or an LLC or what is it?
 5   A    Yeah, it's a company.
 6   Q    Do you know if it's incorporated or is it formed
 7        as an --
 8   A    It's a company, it's incorporated.  It's a
 9        company, yeah.  It's not an LLC.  It's actually
10        Premier Warranty Company.
11   Q    Got you.
12             And you set that up as a holding company.
13        So it mentions that it had four subsidiary
14        companies there.  Did those companies preexist
15        the formation of Premier Warranty Company?
16   A    Under different ownership, two of them did.
17   Q    Okay.  Which ones were those?
18   A    Nautic Crew Worldwide and Nautic Charters.
19   Q    Okay.  And so those had been formed and owned by
20        someone prior to your involvement; is that
21        right?
22   A    Correct.
23   Q    Tell me, what is Nautic Charters?
24   A    It was a charter division of Nautic Crew.
25   Q    Okay.  And what does Nautic Crew do?
```

```
                                                  Page 24

 1    A    It was a yacht crew placement agency.

 2    Q    Okay.  So by yacht crew placement agency, is

 3         that, you would find people who would work on

 4         yachts as crew members?

 5    A    Correct.

 6    Q    Okay.  And so the Nautic Charters, what work did

 7         it provide?

 8    A    It was a charter brokerage for yacht charters.

 9    Q    Got you.  So if someone wanted to charter a

10         yacht, they would contact Nautic Charters and

11         say, Hey, I need to charter a yacht?

12    A    Correct.

13    Q    Got you.  And you would find them the yachts to

14         charter; is that right?

15    A    Correct.

16    Q    Or Nautic would?

17    A    Correct.

18    Q    How did you become involved in those two

19         businesses?

20    A    I shared office space with them when they were

21         still good.  And when the owner was finally

22         ready to go bust, I did a deal with him to take

23         the two companies over.

24    Q    So did you buy him out?

25    A    Yeah.
```

Page 25

1   Q   Okay.  And so you moved into the United States

2       in 2012.  How soon after you moved into the

3       United States in 2012 did you set up Premier

4       Warranty Company and then purchase the interest

5       in the Nautic companies?

6   A   I'd have to go back and check exact dates.  I

7       know I formed Premier Warranty Company in 2012,

8       not long after I arrived.  And I believe I took

9       over Nautic in 2014.

10  Q   2014, okay, got you.

11          The other two companies that are listed

12      here under Premier Warranty Company are Abode

13      Real Estate and Spectrum Title.  What do those

14      companies do?

15  A   Abode Real Estate is a real estate company, and

16      Spectrum Title is a title company.

17  Q   What type of real estate does Abode work with,

18      commercial or residential?

19  A   Residential.

20  Q   And in what areas?

21  A   Fort Lauderdale.

22  Q   In the Fort Lauderdale area?

23          And does Spectrum Title do the title work

24      for those residential properties?

25  A   Yes.

Page 26

```
 1   Q   When did you create Abode and Spectrum?

 2   A   I didn't create Spectrum.

 3   Q   Okay.

 4   A   I created Abode in 2017, I think.

 5   Q   And how did you come to acquire Spectrum?

 6   A   The broker we had for Abode had an attorney

 7       friend who wanted some backing starts in a title

 8       company.

 9   Q   And approximately when did you acquire Spectrum?

10   A   I never acquired Spectrum.  I was a small owner

11       in Spectrum, and I acquired that stake, again,

12       I'd have to check, but it was around the same

13       time as Abode.

14   Q   Okay.  In that 2017 or so time frame?

15   A   I believe so, yeah.

16   Q   Okay.  So it says in the résumé, "Premier

17       Warranty Company is compromised of and currently

18       manages the operations of four subsidiaries."

19           You mentioned Nautic Charters and Nautic

20       Crew, that you owned those outright; is that

21       right?

22   A   We did.

23   Q   You did.

24           Are they still in business or are they

25       gone?
```

```
                                            Page 27

 1   A   Not really, no.  Nautic Charters we closed.

 2       Nautic Crew Worldwide we still have as a shell

 3       company, but it doesn't do any transactions.

 4   Q   Got you.  When did Nautic Charter close?

 5   A   2019 -- 2020.

 6   Q   2020?

 7           Was that related to the pandemic?

 8   A   We just didn't see much point in keeping it

 9       alive with the travel market closing down, so

10       yeah.

11   Q   Sure, got you.

12           And Abode and Spectrum, are they still

13       going?

14   A   They are, although without any involvement from

15       me.

16   Q   Okay.  So is Abode still something that you own?

17   A   No.  We sold Abode to Compass in 2020.

18   Q   Okay, got you.

19           Then Spectrum, do you still have a minority

20       ownership in that?

21   A   No.

22   Q   When did you sell that ownership?

23   A   Just before we sold Abode.  So end of 2019,

24       early 2020.

25   Q   Where it says here, "Premier Warranty Company
```

Page 28

```
 1      manages the operations of four subsidiary
 2      companies," it sounds like Spectrum wasn't a
 3      subsidiary of Premier Warranty Company; is that
 4      correct?
 5   A  No.  My stake in Spectrum was owned and managed
 6      by Premier.
 7   Q  Okay, I got you.
 8          But it says here on the résumé -- I take it
 9      you prepared this résumé; is that correct?
10   A  No.
11   Q  Okay.  Do you know who prepared this résumé?
12   A  Someone in our office prepared it for me.  I'm
13      pretty sure I verbalized it, because it's all
14      correct, but someone else put it together.
15   Q  Someone else put it together for you, okay, I
16      got you.
17   A  Yeah.  I've never written a résumé, believe it
18      or not.
19   Q  Okay.  Underneath the part, it says, "President
20      and CEO."  And it says, "In addition to the
21      day-to-day management of each subsidiary, key
22      roles included the development of a unique brand
23      to the South Florida real estate and yachting
24      industry."
25          I take it that's referring to Abode and
```

Page 29

```
 1       then Nautic; is that right?
 2   A   I believe so, yeah.
 3   Q   Okay.  And then it says, "Exclusive software to
 4       meet the objectives of each subsidiary."
 5           Did you develop software?
 6   A   We did for Nautic Crew, yeah.
 7   Q   Okay.  So do you have like any background in --
 8   A   We did for Nautic Crew and we did for Abode as
 9       well.
10   Q   So do you have a background in software
11       development?
12   A   Not really, no.  No, I employ people who can
13       build software and tell them what I wanted to
14       do.
15   Q   I got you.  So you hired folks to work for you
16       with these companies and they ended up
17       developing that software; is that right?
18   A   Correct.
19   Q   Got you.
20           If you go to the next one up in the chain,
21       Premier Aviation Holdings, do you see that?
22   A   Yeah.
23   Q   That's listed as 2015 to present.  What does
24       Premier Aviation Holdings do?
25   A   It's an aircraft brokerage.
```

Page 30

```
 1   Q   Okay.  So do you buy and sell like private
 2       aircraft?
 3   A   No, we just -- we have done that in the past,
 4       but we primarily broker aircrafts.
 5   Q   Okay.  So you broker it for third parties in
 6       those deals; is that right?
 7   A   Correct.
 8   Q   And is Premier Aviation Holdings still in
 9       business?
10   A   Yes.
11   Q   Okay.  And where is that based?
12   A   Fort Lauderdale.
13   Q   Fort Lauderdale, okay.
14           When you came to the U.S. with your
15       soon-to-be ex-wife, how did you obtain the
16       financing to set up Premier Warranty Company and
17       the subsidiaries that ultimately you bought
18       into?
19   A   You are talking about two totally different time
20       frames.  If you are asking me where I got the
21       $150 to form the company, probably by own
22       pocket.
23   Q   Okay.
24   A   Abode and Spectrum didn't come until three or
25       four, five years later.
```

Page 31

```
 1   Q   Right.  So it sounds like the first thing that
 2       you were involved with in 2014 was the Nautic
 3       Crew; is that right?
 4   A   Nautic Crew, yeah, about 2014, so it was two
 5       years after.
 6   Q   So from 2012 to 2014, what was Premier Warranty
 7       Company doing?
 8   A   We were doing software sales.
 9   Q   Software sales, okay.
10           And what kind of software were you selling?
11   A   Mobile applications.
12   Q   Okay.  So for like mobile phones?
13   A   Yeah, we'd build mobile applications for
14       businesses.
15   Q   Got you.  Okay.
16           And that was done under the Premier
17       Warranty Company name or was there a different
18       company?
19   A   It was done under Premier Warranty Company.
20   Q   Okay.  And then I take it from the profits you
21       generated in the sale of mobile applications,
22       you were then able to invest into Nautic and
23       Abode and Spectrum; is that right?
24   A   I mean, yeah, profit made from anything was how
25       I was able to invest in other companies, yeah.
```

```
                                               Page 32

 1    Q    Got you.  Okay.

 2              I take it those companies did fairly well

 3         during at least the 2014 to 2018 or so time

 4         frame?

 5    A    Not particularly, no.

 6    Q    No?

 7    A    I mean, they'd still be here today if they were

 8         doing really well.

 9    Q    Okay, fair enough.

10    A    Not really.

11    Q    I got you.

12              Oh, one of the things it lists kind of

13         towards the very top part of Exhibit 19, it

14         talks about these core competencies.  And I'm

15         wondering, you said you didn't write these --

16         this résumé; is that right?

17    A    I didn't write it, no.

18    Q    Look at kind of the core competencies that have

19         the little asterisk beside them, and it says

20         things like "visionary leadership, budget sales

21         forecasting, risk management, vendor sourcing

22         and negotiation."

23              Did you review and approve this résumé

24         before it was sent to NextGear?

25    A    Yeah.
```

```
                                              Page 73
 1       invest this $300,000 into Premier Group Autos?
 2    A  I believe it was Ed asking them.
 3    Q  Okay.  And they had the money to invest into the
 4       company; is that right?
 5    A  Yeah, I believe so.  Evidently they did.
 6    Q  Yeah, okay.
 7            And it looks like under that agreement, at
 8       least, that it says -- it's on the first page,
 9       paragraph B, subsection A, "The Borrower will
10       pay the Lender interest payments on the first of
11       every month starting on May 1st, 2019."
12            So this was going to give Premier a couple
13       of months to get those things purchased, those
14       conversions purchased, and start generating some
15       income; is that right?
16    A  Yes.
17    Q  Now, at some point in March of 2019, do you
18       recall entering into a floor plan financing
19       agreement with NextGear?
20    A  With Premier.
21    Q  So you guys remember when you did that?
22    A  Yeah.
23    Q  Tell me, what was the first time you had heard
24       or came to learn about what NextGear is and
25       does?
```

```
 1   A   When we completed some research as to what floor
 2       plans were available, there were a couple of
 3       people who popped up, and obviously NextGear
 4       won.
 5   Q   If I remember correctly, you had testified
 6       earlier that that was in that November, December
 7       2018 time frame, you guys had done that
 8       research; is that right?
 9   A   I can't remember when the research was done.
10   Q   Did you speak with -- because you said you
11       identified like three companies that could
12       provide floor plan financing.  Did you speak
13       with all of them?
14   A   I can't remember.
15   Q   Okay.  Do you remember speaking with NextGear?
16   A   Yeah, vaguely.
17   Q   Do you remember who you kind of first talked to
18       at NextGear?
19   A   It was Arturo.
20   Q   Arturo?  Okay.
21           And he was down in Florida; is that right?
22   A   Yeah.
23   Q   And what do you remember kind of those first
24       discussions with Arturo being about?
25   A   I don't really.  I seem to recall we met him at
```

Page 80

1    Q    That was it?  Okay.

2              You had mentioned you had spoken with

3         Samuel and Ed about some of the terms that

4         NextGear was proposing, and it sounds like you

5         guys had applied for a one-million-dollar floor

6         plan but that wasn't approved; is that right?

7    A    That's what I seem to recall.

8    Q    Okay.  And then you mentioned the $500,000 -- I

9         guess the $500,000 option would include a

10        $100,000, like you said, earnest money; is that

11        right?

12   A    Again, that's what I recall.

13   Q    Okay.  And so that earnest money would be

14        something you would have to provide to NextGear

15        in order to secure that $500,000 line of credit;

16        is that right?

17   A    That's what I recall.

18   Q    And then the $150,000, if I wrote this down

19        correctly, did not require any kind of earnest

20        money from Premier; is that right?

21   A    I don't recall it did, no.

22   Q    Okay.  And in discussions with Samuel and Ed, I

23        guess Premier decided to go with the $150,000

24        option; is that right?

25   A    Yeah.

Page 83

1        these documents with NextGear?

2   A    Vaguely, yeah.

3   Q    Okay.  The second page of the exhibit is

4        entitled, "Demand Promissory Note and Loan and

5        Security Agreement."

6             I'm not going to ask you a bunch of

7        questions about the terms, because they're

8        self-explanatory.  But I do want to direct your

9        attention to the -- it says page 12 of 13 at the

10       bottom left, Bates-labeled NG83.

11  A    Page 12, NG83.

12  Q    Do you see that?

13  A    Yeah.

14  Q    I want to ask you, is that your electronic

15       signature affixed to the document there on that

16       page?

17  A    I believe so.

18  Q    Okay.  And this is one that was done through

19       DocuSign.  Do you recall that?

20  A    Yeah, I remember, it was electronically signed.

21  Q    Okay.  And it has the time of your signature as

22       March 26, 2019, at 4:42 p.m. Eastern Time.  Do

23       you see that?

24  A    Yeah.

25  Q    Okay.  Does that -- I'm sorry, does that refresh

Page 111

```
 1        temporary increase in our loan increase.  So it
 2        was 350 grand in the end, of which $200,000 was
 3        a temporary increase.  That you can only have --
 4        I can't remember the time period, 30 days maybe,
 5        maybe less, I don't recall.  But that was the
 6        issue.  It was a loan increase temporarily.
 7             So when that temporary period passed,
 8        NextGear wanted the money, and it had been
 9        swallowed up operationally or whatever and we
10        couldn't afford to immediately cut them a check.
11        Things became very hostile, which we understand.
12   Q    I got you.  So was there anything that -- again,
13        I'm trying to understand this -- was there
14        anything that these people from NextGear said to
15        Overfinch or to Mr. Archbell that wasn't true?
16   A    Well, I don't know the extent of the
17        conversation.  I wasn't in the room.  All I know
18        is that a gentleman who worked for NextGear took
19        it upon himself -- you know, it wasn't a
20        high-level member of staff, it was a field rep
21        for that area -- took it upon himself to tell
22        Overfinch what was going on.  And then also
23        obtained contact details for Mr. Archbell and
24        let Mr. Archbell know what was going on.
25             So whatever was said, whether it was true
```

Page 114

```
 1        almost too coincidental to me that he didn't
 2        have something negative or derogatory to say
 3        about me and Mr. Kessler which made him pull out
 4        of the deal.
 5   Q    But sitting here today, you don't know what he
 6        said to Mr. Archbell or to Overfinch; right?
 7   A    I have no idea what his words were.
 8   Q    Have you spoken to Mr. Archbell since that time?
 9   A    Yes.
10   Q    Have you?
11   A    Yeah.
12   Q    And have you asked him, Well, what did NextGear
13        tell you?
14   A    Well, I did inquire.  The issue with
15        Mr. Archbell is, he has a relationship with
16        NextGear.  He owns a dealership in -- off the
17        top of my head, I think it's in Virginia --
18   Q    Okay.
19   A    -- where he spends a lot of his time.
20             He's a very friendly, amicable guy, and he
21        just said, Look, I no longer want to get
22        involved.  He acknowledged that he was aware of
23        problems we were having with NextGear and just
24        said, You know, I've got a relationship with
25        them as well and, therefore, this relationship
```

```
 1        asked me how would that look, so I told you how
 2        it would look.  I don't recall any specific -- I
 3        can't tell you this came in for this car and was
 4        used for that purpose instead of NextGear.  You
 5        asked me how operation -- how it could be used
 6        operationally, and I gave you an example.
 7    Q   And that was something you remember actually
 8        happening, using NextGear funds for operational
 9        purposes?
10    A   Overall, the reason we couldn't pay NextGear
11        back was because when we received money, it was
12        used for things like rent and wages and whatever
13        else.  Before we had the chance to pay NextGear
14        back, there wasn't enough money there to do it.
15    Q   So it wasn't that you didn't have enough money
16        to pay NextGear back, you got the money from the
17        car, you just chose to pay someone else; right?
18    A   I don't recall.
19    Q   Tell me about the Nautic Crew on bank statements
20        issue.  What is that all about?
21    A   So Nautic Crew is one of my companies.
22    Q   Right.
23    A   So when I started -- when I got involved in the
24        company with Ed, Ed wanted the company to be one
25        of my, if not my only sole focus.  So we agreed
```

Page 137

1   STATE OF INDIANA              )
                                 )  SS:
2   COUNTY OF MARION             )

3

4        I, Craig Williams, RPR, CMRS, a Notary Public

5   in and for the County of Marion, State of Indiana,

6   at large, do hereby certify that JAMES M.

7   BLACKBURN, the deponent herein, was by me first

8   duly sworn to tell the truth, the whole truth, and

9   nothing but the truth in the aforementioned matter;

10       That the foregoing viderecorded deposition was

11  taken on behalf of the Plaintiff, via remote Zoom

12  videoconference, on the 26th day of October 2021,

13  at 10:00 a.m., pursuant to the Federal Rules of

14  Civil Procedure;

15       That said deposition was taken down in

16  stenograph notes and translated into an English

17  transcript under my direction, and that said

18  transcript is a true record of the testimony given

19  by the said deponent; and that signature was

20  requested by the deponent and all parties present,

21  the deposition to be read with the same force and

22  effect as if signed by the deponent;

23       That the parties were represented by their

24  counsel as aforementioned.

25       I do further certify that I am a disinterested

Page 138

1    person in this cause of action, that I am not a

2    relative or attorney of either party or otherwise

3    interested in the event of this action, and that I

4    am not in the employ of the attorneys for any

5    party.

6         IN WITNESS WHEREOF, I have hereunto set my

7    hand and affixed my notarial seal on this 1st day

8    of November, 2021.

9

10

11              N O T A R Y   P U B L I C

12

13   My Commission Expires:

14   January 14, 2024

15   County of Residence:

16   Marion County

17

18

19

20

21

22

23

24

25

Page 143

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

Case Number 1:20-cv-00354-TWP-DLP

NEXTGEAR CAPITAL, INC.,            )
                                  )
                    Plaintiff,    )
                                  )
        -vs-                      )
                                  )
PREMIER GROUP AUTOS, LLC;         )
JAMES M. BLACKBURN; and           )
EDWARD A. KESSLER,                )
                                  )
                    Defendants.   )

30(b)(6) REMOTE DEPOSITION
OF
JAMES M. BLACKBURN
Individually and on behalf of
PREMIER GROUP AUTOS
Volume II

        The continued 30(b)(6) remote video-recorded
deposition upon oral examination of JAMES M.
BLACKBURN, individually and on behalf of Premier
Group Autos, a witness remotely sworn by me, Tara
Gandel Hudson, RPR, CRR, a Notary Public in and for
the County of Hancock, State of Indiana, taken on
behalf of the Plaintiff, with the witness located
in Fort Lauderdale, Broward County, Florida, on the
14th day of January, 2022, scheduled to commence at
9:00 a.m., pursuant to the Federal Rules of Civil
Procedure with written notice as to the time and
place thereof.

```
                                              Page 144

 1                    APPEARANCES
                 (All appearing remotely.)
 2
    FOR THE PLAINTIFF:
 3  NextGear Capital, Inc.
 4            Brian S. Jones
              David J. Jurkiewicz
 5            BOSE McKINNEY & EVANS LLP
              111 Monument Circle
 6            Suite 2700
              Indianapolis, IN  46204
 7            317.684.5000
              b.jones@boselaw.com
 8            djurkiewica@boselaw.com
 9
    FOR THE DEFENDANTS:
10  Premier Group Autos and James M. Blackburn
11            Richard A. Rocap
              ATTORNEY AT LAW
12            10293 North Meridian Street
              Suite 175
13            Carmel, IN  46290
              317.846.0700
14            rar@rocap-law.com
15
    FOR THE DEFENDANT:
16  Edward A. Kessler
17            Jason Delk
              DELK McNALLY LLP
18            211 South Walnut Street
              Muncie, IN  47305
19            765.896.9495
              delk@delkmcnally.com
20
21  THE VIDEOGRAPHER:
22            Peter Hudson, CLVS
23
24
25
```

Page 146

1    (9:00 a.m.)

2          THE VIDEOGRAPHER:   We are on the record at

3    9:05 a.m. Eastern Standard Time on January 14,

4    2022, beginning the continued remote

5    video-recorded deposition of James M. Blackburn

6    and Premier Group Autos, LLC, taken in the

7    matter of NextGear Capital, Inc., v. Premier

8    Group Autos, LLC; James M. Blackburn; and

9    Edward A. Kessler, in the United States District

10   Court for the Southern District of Indiana,

11   Indianapolis Division.

12         Case Number 1:20-cv-00354.

13         My name is Peter Hudson, the videographer,

14   and the court reporter is Tara Hudson, both

15   representing Veritext Midwest.

16         Counsel, please state your appearances.

17         MR. JONES:   Good morning.   Brian Jones for

18   NextGear Capital.

19         MR. ROCAP:   Richard Rocap for Premier Auto

20   and James Blackburn.

21         MR. DELK:   Jason Delk on behalf of Edward

22   Kessler.

23         MR. JURKIEWICZ:   And David Jurkiewicz for

24   NextGear Capital.

25         THE VIDEOGRAPHER:   Thank you.   The court

Page 147

1       reporter will swear the witness, and you may

2       then proceed.

3                       JAMES M. BLACKBURN,

4    having been remotely duly sworn to tell the truth,

5    the whole truth and nothing but the truth relating

6    to said matter, was examined and testified as

7    follows:

8    DIRECT EXAMINATION (continued),

9       QUESTIONS BY BRIAN S. JONES:

10   Q   Good morning, Mr. Blackburn.  Again, my name is

11      Brian Jones.  I represent NextGear Capital in

12      this case.  I appreciate your time this morning.

13          I'm going to try to move as quickly as

14      possible since we're continuing on where we left

15      off last time.

16          Same rules as before will apply in terms of

17      trying to make sure I finish my question and you

18      finish your answer before we start talking,

19      especially since we're on a Zoom.

20          Is that okay?

21   A   Yeah.

22   Q   When we left off last time, we were talking

23      about Exhibit Number 30.  There is a --

24          Have you been able to receive the Dropbox

25      link that I sent of the exhibits?

Page 154

```
 1        he was offered his so-called "dream job" with --
 2        the name of the company escapes me -- but as an
 3        actuary.
 4             So working, you know, really long hours,
 5        which I know he was, and then trying to keep
 6        abreast of all of this was a bit too
 7        overwhelming for him.
 8   Q    Were there any other factors that you thought
 9        was kind of motivating him to want to be bought
10        out?
11             MR. DELK:  Objection to form.
12   A    I mean, only what he says in the email there,
13        that he was a little bit concerned about the
14        increased credit line on the floor plan and
15        seeming not to be clear on the bank statements.
16   BY MR. JONES:
17   Q    Okay.
18   A    Outside of that, I don't recall any.
19   Q    That increased credit line, if I recall, was a
20        temporary increase; is that right?
21   A    I believe so, yes.
22   Q    So it wasn't like Premier had committed itself
23        to a higher credit limit all the time going
24        forward; right?
25   A    Well, I mean, we did -- didn't we? -- because
```

Page 155

1      it's not temporary anymore.

2   Q   Okay.  So at the time -- yeah.  Let me thank you

3       for helping me with that.

4           So at the time back in October of 2019 when

5       this discussion was taking place, your

6       understanding was that increase in the floor

7       plan line of credit was a temporary one; is that

8       right?

9   A   It was 30 days, if my memory serves me

10      correctly.

11  Q   Okay.  One of the things I wanted to try to

12      clarify from our earlier discussion and as well

13      as the deposition I took of Mr. Kessler was this

14      issue of who had authority to act for Premier.

15      And so I want to ask you did Premier have an

16      official operating agreement?

17  A   No.  We both had equal.  You know, Ed can play

18      on I didn't have authority because of his lack

19      of judgments and the fact he didn't get off his

20      backside and go and sought something out.

21          He didn't rest back on, "I didn't have

22      access," but the proof's in the pudding.  He was

23      on every loan.  He was on the NextGear accounts.

24      He was on the bank accounts.  He had just as

25      much access to everything as I did.

Page 156

```
 1   Q   So did you ever sign a document that said that
 2       you would have to get Mr. Kessler's permission
 3       to take action on behalf of Premier?
 4   A   No --
 5   Q   Okay.
 6   A   -- not that I recall.
 7   Q   And did you believe you had authority to bind
 8       Premier to a contract?
 9           MR. DELK:  Objection to form.
10   A   Yeah.  We both did.
11   BY MR. JONES:
12   Q   Did you ever sign any documents stating that
13       both you and Ed Kessler had to agree before any
14       of Premier contracts -- Premier's contracts
15       would be binding?
16           MR. DELK:  Objection to form.
17   A   Not that I recall.
18   BY MR. JONES:
19   Q   Okay.  So did --
20           If Premier wanted to move money from
21       Premier to another company, is that something
22       that you would have to seek Ed Kessler's
23       permission for?
24   A   It's something that I would discuss with Ed.  I
25       wouldn't just unilaterally go and move hundreds
```

Page 221

1          THE VIDEOGRAPHER:  Is there any further

2     questions --

3          MR. ROCAP:  We will take signature.

4          THE VIDEOGRAPHER:  This then concludes the

5     deposition of James M. Blackburn on January 14,

6     2022.  The time is 10:37 a.m. Eastern Standard

7     Time, and we are off the record.

8          (Time noted:  10:37 a.m.)

9          AND FURTHER THE DEPONENT SAITH NOT.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 222

1    STATE OF INDIANA              )
                                   )   SS:
2    COUNTY OF HANCOCK             )

3         I, Tara Gandel Hudson, RPR, CRR, a Notary

4    Public in and for the County of Hancock, State of

5    Indiana at large, do hereby certify that the

6    deponent, JAMES M. BLACKBURN, was by me remotely

7    sworn to tell the truth, the whole truth, and

8    nothing but the truth in the aforementioned matter;

9         That the foregoing deposition was taken on

10   behalf of the Plaintiff, with the witness located

11   in Fort Lauderdale, Broward County, Florida, on the

12   14th day of January, 2022, scheduled to commence at

13   9:00 a.m., pursuant to the Federal Rules of Civil

14   Procedure;

15        That said deposition was reported

16   stenographically and transcribed to English under

17   my direction, and that the transcript is a true

18   record of the testimony received remotely of said

19   deponent; and that the signature of said deponent

20   to his deposition was requested;

21        That the parties were represented by their

22   counsel as aforementioned.

23        I do further certify that I am a disinterested

24   person in this cause of action; that I am not a

25   relative or attorney of either party, or otherwise

Page 223

1    interested in the event of this action, and am not
2    in the employ of the attorneys for either party.
3         IN WITNESS WHEREOF, I have hereunto set my
4    hand and affixed my notarial seal this 26th day of
5    January, 2022.
6
                    *Tara Gandel Hudson*
7                  Tara Gandel Hudson

                 _____
8

                         Seal
9         Notary Public, State of Indiana
               Commission No. 682534
10       My Commission Expires March 27, 2024
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25