IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| NEXTGEAR CAPITAL, INC. | |
| *Plaintiff*, | |
| v. | CASE NO. 1:20-cv-00354-TWP-DLP |
| PREMIER GROUP AUTOS, LLC, JAMES M. BLACKBURN, and EDWARD A. KESSLER, | |
| *Defendants.* | |

---

## NEXTGEAR CAPITAL, INC.'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

---

NextGear Capital, Inc. ("NextGear"), respectfully submits its Brief in Support of its Motion for Summary Judgment, and states:

### INTRODUCTION

This is a simple contract case. The undisputed facts show that NextGear lent money to Premier Group Autos, LLC ("Premier"), and Premier failed to pay it back. James Blackburn and Edward Kessler, Premier's members, personally guaranteed Premier's obligations to NextGear, and so NextGear has sued all three Defendants to recover the amounts it is owed. As shown below, there are no genuine issues of material fact that NextGear has not been paid and that the Defendants are liable to NextGear. Summary judgment is warranted.

The Defendants, however, have attempted to complicate this otherwise straightforward case by challenging the enforceability of the loan documents, complaining about certain actions by NextGear, and trying to place blame on everyone

1

but themselves. In other words, the Defendants want to turn a simple contract case into a convoluted tort case. As a lender, NextGear frequently sees such behavior from parties trying to get out of having to pay a debt, and the caselaw reflects that the Court does too. This is why the terms of NextGear's loan documents are thorough and extensive—and why those same terms bar all of the Defendants' claims and defenses as a matter of law.

As a result, with no genuine issues of material fact, this case is ripe for summary judgment, and the Court should grant summary judgment in favor of NextGear.

<strong>FACTUAL BACKGROUND</strong>

## I.    ABOUT NEXTGEAR

Founded in 2013, NextGear is one of the nation's leading providers of "floor plan" financing to auto dealers. *See* https://www.nextgearcapital.com/about-us/our-story/ (last visited Jan. 26, 2022). With its headquarters located in Carmel, Indiana, NextGear offers flexible lines of credit, a robust array of services, and best-in-class support to its more than 22,000 dealer clients worldwide. *Id.*

## II.   BLACKBURN AND KESSLER FORM PREMIER.

One of the dealers that eventually became a NextGear client was Premier. The story of how Premier came to be provides the context necessary to understand the Defendants' attempts to avoid liablity in this case. As will be shown, the formation of Premier left in its wake a series of unpaid debts and broken promises.

### a.    Kessler Meets Blackburn.

In 2017, Edward Kessler, a native of Pittsburgh, Pennsylvania, worked as a project manager for his father's construction business in Bethel Park, Pennsylvania. (*See* Kessler Depo. at 10:18-19; 11:19-12:4; 13:19-14:11; true and correct excerpts of which are

attached as Exhibit "D" to Plaintiff's Designation of Evidence.)[1] Kessler had also started companies managing rental properties. (*Id.* at 18:17-20:25.)

In late 2017 or early 2018, Kessler visited some friends in Florida, and he was introduced to James Blackburn. (*Id.* at 24:21-25:6.) A native of the United Kingdom, Blackburn had been a Florida resident since 2012 and was involved with a number of businesses in the Fort Lauderdale, Florida area. (*See* Blackburn Depo. at 17:3-21; true and correct excerpts from the Blackburn Depo. are attached as Exhibit "E" to Pl.'s Desig. of Evid.) These businesses included Premier Warranty Company, Nautic Crew Worldwide, Nautic Charters, Abode Real Estate, Spectrum Title, and Premier Aviation Holdings. (*Id.* at 22:20-32:5.) Kessler must have been impressed with Blackburn because shortly thereafter, in early 2018, Kessler invested $200,000 into First Sky Airlines, another one of Blackburn's companies. (Ex. D at 26:9-27:7.)

Later that year, in October 2018, Kessler met Blackburn in Florida and they attended the Fort Lauderdale Boat Show. (*Id.* at 34:2-35:11.) At that show, they met with representatives of a company called Overfinch, a U.K.-based company that sells luxury conversions for Land Rovers and Range Rovers. (*Id.*) The Overfinch Land Rovers and Range Rovers are often sold for $180,000 or more. (*Id.* at 45:1-4.) Overfinch was just starting to expand its business into the United States. (*Id.* at 42:21-43:1.)

That meeting led to an overnight trip to New Orleans on a private jet chartered by Blackburn, and the next day, Kessler and Blackburn agreed they would form a company to buy and sell Overfinch vehicles. (*Id.* at 34:19-40:18; 41:2-4.) While Blackburn had some experience selling cars through his parents' car dealership back in the U.K., (Ex. E

---

[1] NextGear incorporates by reference all of the exhibits attached to its Designation of Evidence.

at 21:6-19), Kessler had no experience in the auto industry. (Ex. D at 46:9-13.) Nonetheless, Kessler accepted Blackburn's invitation to go into business together. (*Id.* at 41:2-4.) At that point, neither Blackburn and Kessler nor Kessler had seen any financial projections or estimates from Overfinch; Kessler had not seen any documentation concerning the financial success (or lack thereof) of any of Blackburn's businesses; and Kessler had not received any information about the $200,000 investment he had made in First Sky Airlines earlier that year. (*Id.* at 41:23-42:2; 42:21-44:1.) The private jet to New Orleans, however, was apparently convincing.

Premier was officially formed a few weeks later.[2] On November 5, 2018, Blackburn and Kessler entered into a rudimentary, one-page letter agreement outlining their financial contributions to the newly-formed company. (*See* Nov. 5, 2018 Letter Agreement, a true and correct copy of which is attached as Exhibit "F" to Pl.'s Desig. of Evid.) Under that agreement, Kessler and Blackburn were each to invest $50,000 into the company for the purpose of purchasing vehicles. Despite the language in the Letter Agreement stating that a more detailed agreement would follow in December, Premier never established a formal operating agreement. (Ex. E at 155:11-17.) Thus, both Blackburn and Kessler both had authority to bind the company to contracts. (*Id.* at 156:7-10.)

Shortly thereafter, Premier entered into a written agreement with Overfinch that obligated Premier to sell $1.5 million of Overfinch products (either 36 fully converted vehicles or $1.5 million in conversion kits) on or before December 3, 2019. (*See* Overfinch Agreement, a true and correct copy of which is attached as Exhibit "G" to Pl.'s

---

[2] Premier also operated under the assumed name of "Overfinch Miami." (*See* Ex. O at p. 1.)

Desig. of Evid.) That meant that, on average, Premier would have to purchase from Overfinch three fully converted vehicles or $125,000 worth of conversion kits per month from December 2018 to December 2019.

That same day, on December 3, 2018, Kessler—still without having seen a single financial document from Blackburn's companies—agreed to personally loan Premier $160,000.00 for the purchase of vehicles. (*See* Dec. 3, 2018 Kessler Loan Agreement, a true and correct copy of which is attached as Exhibit "H" to Pl.'s Desig. of Evid.) Premier then ordered its first vehicle from Overfinch.

### b.    Premier Looks for Financing, and Kessler Convinces His Parents to Loan Premier More Money.

During this same period, Premier began looking for a lender to obtain floorplan financing. In simple terms, under a floorplan financing arrangement, an auto dealer like Premier would have a line of credit with a lender that it could draw upon when buying a car. The line of available credit would decrease by the floorplanned amount, and fees and interest on the floorplanned amount would start accruing the moment the car was purchased by the dealer. When the dealer sells the car, it is obligated to pay the lender back. When the payment is received by the lender, the available credit increases by the amount paid back. If, however, a dealer sells a car and does not pay the lender back, that car is considered to be sold "out of trust." Premier wanted the benefits of floorplan financing, and considered doing business with a number of companies offering such financing. (Ex. E at 73:23-74:4.) One of those companies was NextGear.

In February 2019, Premier applied for a $1 million line of credit from NextGear, but was not approved. (*Id.* at 80:2-17.) NextGear offered Premier a $500,000 line of credit, but with the requirement that Premier post $100,000 as a deposit or "reserve account."

(*Id.*) Kessler did not want those terms, and instead convinced his parents to loan Premier $300,000 to purchase new vehicles. (Ex. D at 123:18-124:7; *see also* Kessler Parents Loan Agreement, a true and correct copy of which is attached as Exhibit "I" to Pl.'s Desig. of Evid.)

At that point, Premier had ordered only three vehicles from Overfinch and was therefore already 6 vehicles shy of the pace required to fulfill the purchase requirements of the Overfinch contract. (*Id*. at 125:12-126:10.) Thus, before Premier ever elected to do business with NextGear, Kessler and his family members had already put roughly $500,000 of their own money into Premier. (*Id*. at 126:17-127:7.) In fact, if you add in his $200,000 investment in First Sky Airlines, Kessler and his family had invested roughly $800,000 in Blackburn's businesses just a little over a year after Kessler was first introduced to Blackburn. (*Id*.)

### III.    PREMIER AND NEXTGEAR ENTER INTO A FLOORPLAN AGREEMENT.

After rejecting NextGear's terms for a $500,000 line of credit, Premier ultimately agreed to a $150,000 line of credit that did not require a reserve account. On or about March 26, 2019, NextGear sent electronic versions of a Demand Promissory Note and Loan and Security Agreement (the "Note") in the principal sum of $150,000.00 to Blackburn and Kessler to execute on behalf of Premier. (A true and correct copy of the Note is attached as Exhibit "A" to Pl.'s Desig. of Evid.; the Note is also attached as Exhibit "A" to NextGear's Am. Compl.) NextGear sent the electronic versions to Blackburn's and Kessler's email addresses through the DocuSign service. (Ex. E. at 83:18-20.) Blackburn and Kessler both had opportunities to review the documents before signing, and Kessler even had his lawyer review the terms of the Note and Individual Guaranties and provide an analysis of their terms. (A true and correct copy of

the Analysis Email from Kessler's Lawyer is attached as Exhibit "J" to Pl.'s Desig. of Evid.) Blackburn signed the Note through DocuSign on March 26, 2019. (*See* Ex. A at p. 12.) After receiving his lawyer's analysis, Kessler signed the Note through DocuSign the next day. (Ex. D at 116:5-13; 144:10-145:4.) At the same time they signed the Note, Blackburn and Kessler also each signed Individual Personal Guaranties.[3] (True and correct copies of the Blackburn and Kessler Guaranties are attached as Exhibits "B" and "C," respectively, to Pl.'s Desig. of Evid.; the Guaranties were also attached to NextGear's Am. Compl. as Exhibits "B" and "C," respectively.)

## IV.   THE TERMS OF THE NOTE AND GUARANTIES.

The terms of NextGear's Note and Guaranties are thorough, comprehensive, and ultimately preclude all of the Defendants' arguments against liability. As such, NextGear sets forth the relevant terms below.

### a.   The Terms of the Note.

Under the Note, Premier is the "Borrower" and NextGear is the "Lender." First, the Note sets the principal amount of the Note as $150,000 or "such greater or lesser sum which may be advanced to or on behalf of Borrower from time to time...."

> FOR VALUE RECEIVED, the undersigned borrower ("Borrower") promises to pay to the order of NextGear Capital, Inc. ("Lender"), with its principal office at 11799 North College Avenue, Carmel, Indiana 46032, or such other place as Lender may designate in writing or on the Discover Portal from time to time, in lawful money of the United States of America, the principal sum of One Hundred Fifty Thousand Dollars and Zero Cents ($150,000.00), or such greater or lesser sum which may be advanced to or on behalf of Borrower from time to time, together with all costs, interest, fees, and expenses as provided for under this Note and the other Loan Documents. Unless otherwise stated in an addendum to this Note, this Note shall become effective on the date of Borrower's execution hereof as set forth below Borrower's signature (such date, or the effective date otherwise stated in the applicable addendum, the "Effective Date").

(Ex. A at p. 1.)[4] The Note then grants NextGear a security interest as follows:

---

[3] The Note package emailed to Blackburn and Kessler also contained Power of Attorney ("POA") documents, but due to Indiana's "wet" signature requirement for POAs, those could not be signed through DocuSign.

[4] NextGear includes images of the terms of the Note and Guaranties for brevity and the Court's convenience. The "Copy View" watermark is embedded in the document file.

> 2.   GRANT OF SECURITY INTEREST.  In order to secure full and prompt payment of all Liabilities and performance of all obligations of Borrower
> to Lender, its Affiliates, and/or their respective successors or assigns:
>
> (a)   Borrower grants to Lender a continuing security interest in all of Borrower's assets and properties, wherever located, including, without
> limitation, all equipment of any kind or nature, all vehicles and vehicle parts; all Inventory now owned or hereafter acquired, including,
> without limitation, all Lender Financed Inventory now owned or hereafter acquired; all amounts in Borrower's Reserve held by or on behalf
> of Lender, if any; all documents, documents of title, deposit accounts, accounts receivable, manufacturer rebates and incentive payments,
> chattel paper, including, without limitation, all Receivables and general intangibles now owned or hereafter acquired by Borrower; all cash
> reserves; all of Borrower's books and records (including any books and records contained on computer hardware or software or otherwise
> stored by or on behalf of Borrower in electronic or digital form); and all additions, accessions, accessories, replacements, substitutions, and
> proceeds of any of the foregoing (collectively, the "Collateral").

(Ex. A at ¶ 2(a)). The Note also obligates Premier to pay back amounts advanced for

floorplanned inventory:

> (f)   Borrower shall pay all Liabilities, without notice, that concern or relate to a Floorplan Advance for any Unit of Lender Financed Inventory
> on or before the Maturity Date.  Lender shall apply such payments to any and all Liabilities relating to such Floorplan Advance.
> Notwithstanding anything herein to the contrary, if a shortage exists between the payments received by Lender with respect to a Floorplan
> Advance, and the Liabilities relating to such Floorplan Advance, then such shortage shall be immediately due and payable and shall continue
> to be considered a Liability owed by Borrower to Lender, secured by the Collateral.

(*Id.* at ¶ 5(f).) The failure to do so constitutes an event of default:

> 6.   EVENTS OF DEFAULT.  The occurrence of any of the following events shall be considered an event of default under this Note and the other
> Loan Documents (each, an "Event of Default"):
>
> (a)   Borrower or any Guarantor fails to perform any of its obligations, undertakings or covenants under this Note or under any other Loan
> Document, including any obligation to repay any Liability when due and Borrower's obligation to pay upon demand any outstanding
> Liabilities under this Note or any of the other Loan Documents.

(*Id.* at ¶ 6(a).) A Guarantor's failure to make a required payment also constitutes an

event of default:

> (e)   Borrower or any Guarantor, or any of their respective Parent Companies, has defaulted in the payment or performance of any debt or
> obligation under any other agreement, whether to Lender or to a third party.

(*Id.* at ¶ 6(e).) And where, as here, NextGear has to sue to enforce its rights under the

Note, Premier must pay NextGear's attorney's fees and costs:

> 18.   LEGAL FEES AND COLLECTION COSTS.  Borrower shall pay to Lender all reasonable legal fees, expenses, and collection costs incurred by
> any Lender Parties, including Lender as a result of any Event of Default, or any failure by Borrower or any Guarantor to perform any obligation
> or satisfy any Liability of Borrower, including any prosecution by Borrower or any Guarantor or any of their respective Representatives of
> affirmative claims or counterclaims against Lender Parties.

(*Id.* at ¶ 18.)

Finally, the Note makes clear that it is governed solely by Indiana law; that the unenforceability of any parts of the Note in one jurisdiction applies only within that jurisdiction; and that the only appropriate jurisdiction and venue for any court proceedings are the state and federal courts covering Marion and Hamilton Counties in Indiana:

> 19. SEVERABILITY. Any provision of this Note or any other Loan Document that is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability, without rendering invalid or unenforceable the remaining provisions of this Note and the other Loan Documents or affecting the validity or enforceability of any provision of this Note or any other Loan Document in any other jurisdiction.
>
> 20. GOVERNING LAW. Except with respect to the interpretation or enforcement of the arbitration and other provisions set forth in Section 22 (which shall be governed by the Federal Arbitration Act), the validity, enforceability, and interpretation of this Note and the other Loan Documents shall be governed by the internal Laws of the State of Indiana, without regard to conflicts of Laws provisions thereof.
>
> 21. JURISDICTION AND VENUE. As evidenced by Borrower's signature below, subject to the provisions noted in Section 22, Borrower submits to the personal jurisdiction and venue of the state and federal courts of Marion County and Hamilton County, Indiana, and agrees that any and all claims or disputes pertaining to this Note or any other Loan Document, or to any matter arising out of or related to this Note or any other Loan Document, which are initiated by Borrower against Lender, to the extent, if any, that such claims or disputes are not subject to the provisions noted in Section 22 below, shall be brought in the state or federal courts of Marion County or Hamilton County, Indiana. Further, Borrower expressly consents to the jurisdiction and venue of the state and federal courts of Marion County and Hamilton County, Indiana, as to any legal or equitable action that may be brought in such court by Lender, and waives any objection based upon lack of personal jurisdiction, improper venue, or forum non conveniens with respect to any such action. Borrower acknowledges and agrees that Lender reserves the right to initiate and prosecute any action against Borrower in any court of competent jurisdiction, and Borrower consents to such forum as Lender may elect.

(*Id.* at ¶¶ 19-20.) And in such proceedings, NextGear cannot be held liable for any of the following types of damages:

> 24. LIMITATION OF LIABILITY. IN NO EVENT SHALL ANY LENDER PARTY BE LIABLE FOR ANY SPECIAL, INDIRECT, EXEMPLARY, PUNITIVE, INCIDENTAL, MULTIPLE OR CONSEQUENTIAL DAMAGES (INCLUDING ANY DAMAGES RESULTING FROM LOSS OF USE, LOSS OF PROFITS, LOSS OF BUSINESS OR OTHER ECONOMIC LOSS) ARISING OUT OF OR IN CONNECTION WITH THIS NOTE OR ANY OTHER LOAN DOCUMENT (OR ANY ADVANCES MADE BY LENDER HEREUNDER OR THEREUNDER), EVEN IF SUCH LENDER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. FURTHER, IN NO EVENT SHALL THE LENDER PARTIES, COLLECTIVELY, BE LIABLE FOR ANY DAMAGES UNDER THIS NOTE OR ANY OTHER LOAN DOCUMENT (OR IN CONNECTION WITH ANY ADVANCE BY LENDER HEREUNDER OR THEREUNDER) THAT EXCEED, IN THE AGGREGATE, AN AMOUNT EQUAL TO THE SUM OF THE INTEREST AND FLOORPLAN FEES ACTUALLY PAID TO LENDER BY BORROWER UNDER THIS NOTE DURING THE TWELVE (12) MONTH PERIOD IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO THE CLAIM AT ISSUE (OR, IN THE CASE OF MULTIPLE EVENTS, THE FIRST SUCH EVENT GIVING RISE TO THE CLAIM AT ISSUE).

(*Id.* at ¶ 24.)

### b.   The Terms of the Guaranties

Both the Blackburn and Kessler Guaranties broadly obligate each of them to personally satisfy all of Premier's obligations under the Note:

> 2.  GUARANTY AND OTHER AGREEMENTS.
>
> (a)  _Guaranty Obligations._  Guarantor hereby voluntarily, unconditionally, and absolutely guarantees (i) the full and prompt payment when due, whether by acceleration or otherwise, and at all times hereafter, of all Liabilities, and (ii) the full and prompt performance of all the terms, covenants, conditions, and agreements related to the Liabilities.  Guarantor further agrees to pay all expenses, including attorneys' fees and court costs (including, in each case, those relating to bankruptcy and appeals), paid or incurred by Lender or its Affiliates in endeavoring to collect on any Liabilities, and in enforcing this Guaranty or in defending any claims by Borrower or any Guarantor related to any of the Liabilities, plus interest on such amounts at the lesser of (A) thirteen percent (13%) per annum, compounded daily, or (B) the maximum rate permitted by Law.  Interest on such amounts paid or incurred by Lender shall be computed from the date of payment made by Lender and shall be payable on demand.

(Exs. B and C at ¶ 2(a).) Additionally, Blackburn and Kessler each agreed to give up a number of grounds to challenge their personal liability, including, as relevant here, any alleged tort committed by NextGear against Premier, Blackburn, or Kessler:

> (b)  _General Nature of Guaranty._  Guarantor acknowledges that this Guaranty is a guaranty of payment and not of collection, and that his or her obligations hereunder shall be absolute, unconditional, and unaffected by: (i) the waiver of the performance or observance by Borrower or any Guarantor of any agreement, covenant, term, or condition to be performed or observed by Borrower or any such Guarantor, as the case may be; (ii) the extension of time for the payment of any sums owing or payable with respect to any of the Liabilities or the time for performance of any other obligation arising out of or relating to any of the Liabilities, (iii) the modification, alteration, or amendment of any obligation arising out of or relating to any of the Liabilities, (iv) any failure, delay, or omission by Lender to enforce, assert, or exercise any right, power, or remedy in connection with any of the Liabilities, (v) the genuineness, validity, or enforceability of any of the Liabilities or any document related thereto; (vi) the existence, value, or condition of, or failure of Lender or any of its Affiliates to perfect its lien against, any security pledged in connection with the Liabilities, (vii) the release of any security pledged in connection with the Liabilities, or the release, modification, waiver, or failure to enforce any other guaranty, pledge, or security agreement; (viii) the voluntary or involuntary liquidation, dissolution, sale of all or substantially all of the property, marshalling of assets and liabilities, receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization, arrangement, composition, or readjustment or other similar application or proceeding affecting Borrower or any assets of Borrower; (ix) the release or discharge of Borrower or any other Guarantor from the performance or observance of any agreements, covenants, terms, or conditions in connection with any of the Liabilities, by operation of Law or otherwise; (x) the default of Borrower in any obligations to Guarantor or any torts committed by Borrower against Guarantor, even if Lender is alleged to be complicit or to have committed a direct tort against Guarantor; or (xi) any change in Borrower's ownership, entity type, legal structure, or state of organization or formation, or in Guarantor's relationship to Borrower or any other Guarantor.

(_Id._ at ¶ 2(b).) Moreover, both Blackburn and Kessler each waived all forms of notice pertaining to their guaranties, any non-contractual duties from NextGear to Premier and its Guarantors, and they both consented in advance to any change in Premier's credit line (whether a temporary or permanent increase):

> (d)  _Waivers by Guarantor._  Guarantor hereby expressly waives: (i) notice of the acceptance by Lender of this Guaranty; (ii) notice of the existence, creation, or non-payment of all or any of the Liabilities; (iii) presentment, demand, notice of dishonor, protest, and all other notices whatsoever; (iv) diligence in collection or protection of, or realization upon any of the Liabilities, any obligation under this Guaranty, or any security for or guaranty of any of the foregoing; (v) impairment of any collateral securing the Liabilities; (vi) notice of any change in Borrower's credit terms or limits with Lender, including any temporary or permanent increases in Borrower's Credit Line (and Guarantor prospectively consents to any such change); (vii) any non-contractual duties of Lender to Borrower or any Guarantor; and (viii) the protections of any Laws intended to protect consumers or regulate consumer loans, as the Liabilities are commercial in nature.

(_Id._ at ¶ 2(d).)

Similar to the terms of the Note, the guaranties define a failure to make required

payments an event of default:

> 4.   EVENTS OF DEFAULT.  The occurrence of any of the following events shall be considered an event of default under this Guaranty (each, an "Event of Default"):
>
>    (a)   Guarantor fails to make full payment of any amount owed hereunder after notice from Lender,

(*Id.* at ¶ 4(a).) The guaranties also contain similar choice of law, jurisdiction, and venue

provisions, as well as similar limitation-of-liability provisions:

> (g)   Governing Law.  Except with respect to the interpretation or enforcement of the arbitration and other provisions set forth in Section 5(i) (which shall be governed by the Federal Arbitration Act), the validity, enforceability, and interpretation of this Guaranty shall be governed by the internal Laws of the State of Indiana, without regard to conflicts of Laws provisions thereof.

> (h)   Jurisdiction and Venue.  As evidenced by Guarantor's signature below, subject to the provisions in Section 5(i), Guarantor submits to the personal jurisdiction and venue of the state and federal courts of Marion County and Hamilton County, Indiana, and agrees that any and all claims or disputes pertaining to this Guaranty, or to any matter arising out of or related to this Guaranty, which are initiated by Guarantor against Lender, to the extent, if any, that such claims or disputes are not subject to the provisions noted in Section 5(i), shall be brought in the state or federal courts of Marion County or Hamilton County, Indiana.  Further, Guarantor expressly consents to the jurisdiction and venue of the state and federal courts of Marion County and Hamilton County, Indiana, as to any legal or equitable action that may be brought in such court by Lender, and waives any objection based upon lack of personal jurisdiction, improper venue or forum non conveniens with respect to any such action.  Guarantor acknowledges and agrees that Lender reserves the right to initiate and prosecute any action against Guarantor in any court of competent jurisdiction, and Guarantor consents to such forum as Lender may elect.

> (k)   LIMITATION OF LIABILITY.   IN NO EVENT SHALL ANY LENDER PARTY BE LIABLE FOR ANY SPECIAL, INDIRECT, EXEMPLARY, PUNITIVE, INCIDENTAL, MULTIPLE OR CONSEQUENTIAL DAMAGES (INCLUDING ANY DAMAGES RESULTING FROM LOSS OF USE, LOSS OF PROFITS, LOSS OF BUSINESS OR OTHER ECONOMIC LOSS) ARISING OUT OF OR IN CONNECTION WITH THIS GUARANTY, EVEN IF SUCH LENDER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. FURTHER, IN NO EVENT SHALL THE LENDER PARTIES, COLLECTIVELY, BE LIABLE FOR ANY DAMAGES UNDER THIS GUARANTY OR ANY OTHER LOAN DOCUMENT THAT EXCEED, IN THE AGGREGATE, AN AMOUNT EQUAL TO THE SUM OF THE INTEREST AND FLOORPLAN FEES ACTUALLY PAID TO LENDER BY BORROWER UNDER THE NOTE DURING THE TWELVE (12) MONTH PERIOD IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO THE CLAIM AT ISSUE (OR, IN THE CASE OF MULTIPLE EVENTS, THE FIRST SUCH EVENT GIVING RISE TO THE CLAIM AT ISSUE).

(*Id.* at ¶ 5(g), (h), and (k).) As discussed below, the cumulative effect of all of these terms

is to bar, completely, all of the Defendants' defenses and counterclaims.

**V.   PREMIER BEGINS FLOORING VEHICLES WITH NEXTGEAR, BUT EVENTUALLY FAILS TO PAY BACK NEXTGEAR FOR SIX VEHICLES SOLD "OUT OF TRUST."**

Premier floored its first vehicle with NextGear—a Mercedes bought at the Manheim

auto auction in Fort Lauderdale—on April 16, 2019. (*See* Vehicle History Report (Stock

Number 2), a true and correct copy of which is attached as Exhibit "K" to Pl.'s Desig. of

Evid.; *see also* Declaration of Stephen Smith at ¶ 8, a true and correct copy of which is

attached as Exhibit "M" to Pl.'s Desig. of Evid.; *see also* Manheim Bill of Sale, a true and correct copy of which is attached as Exhibit "S" to Pl.'s Desig. of Evid.) Over the next five months, Premier floored another ten vehicles with NextGear.

Things quickly began to change for the worse in the late summer of 2019. Around that time, Premier sought and obtained a $100,000 temporary increase in its line of credit. (Ex. E at 154:19-21.) Premier then sent in a payment to NextGear of approximately $150,000, which, because the payments are immediately credited to the account before they post, meant that nearly $250,000 in credit was available to Premier. (*See* Collection Management Notes at pp. 1-2, a true and correct copy of which is attached as Exhibit "L" to Pl.'s Desig. of Evid.) Premier then immediately floored approximately $100,000 more in vehicles. (*Id.*) Days later, however, Premier's $150,000 payment was rejected by its bank as "NSF," or "Non-sufficient funds." (*Id.*) Due to Premier's bounced payment, its original $150,000 line of credit resulted in nearly $350,000 of liabilities.

Instead of paying NextGear back in full on the six remaining vehicles for which it owed payments, Premier used NextGear's money to pay its own operational expenses, as Blackburn admitted. (Ex. E at 131:7-14.) Premier proceeded to sell six vehicles "out of trust." The following table provides the details for the six "out of trust" vehicles:

| Stock Number | Date Floored | Vehicle Description | VIN | Original Amount Advanced | Principal Balance Remaining |
|---|---|---|---|---|---|
| 7 | 5/9/2019 | 2019 Land Rover Range Rover | SALGS5RE4KA551428 | $39,999.00 | $32,489.19 |
| 8 | 6/5/2019 | 2018 Land Rover Range Rover Evoque | SALVP2RX6JH295033 | $33,100.00 | $29,790.00 |
| 10 | 8/6/2019 | 2002 Hummer H1 TDSL | 137FA84352E197749 | $42,700.00 | $42,700.00 |
| 11 | 9/10/2019 | 2019 Land Rover Range Rover V8 | SALGS5RE6KA530077 | $45,000.00 | $45,000.00 |
| 12 | 9/11/2019 | 2019 Land Rover Range Rover V8 | SALGS5RE5KA548540 | $99,999.00 | $99,999.00 |
| 14 | 9/19/2019 | 2019 Land Rover Range Rover | SALGS2RE6KA546018 | $95,000.00 | $95,000.00 |
| | | | | **TOTAL** | **$344,978.19** |

(Ex. M at ¶ 10.)

As a result of its failure to make payments, NextGear declared Premier in default on October 7, 2019, and demanded immediate payment. (Ex. L at p. 6.) Despite numerous assurances from Premier that it would repay NextGear, Premier never made another payment. (*Id.* at pp. 2-6.)

## VI.   PREMIER COLLAPSES, AND KESSLER SUES BLACKBURN IN FLORIDA.

By November 2019, just a year after it was formed, Premier was nowhere close to meeting the sales volume required under its contract with Overfinch. On November 8, 2019, Overfinch informed Premier that it would not renew its contract with Premier due to its failure to meet its requirements. (*See* Nov. 2019 Overfinch Letter, a true and correct copy of which is attached as Exhibit "N" to Pl.'s Desig. of Evid.)

A few months later, Premier was finished. In early March 2020, Kessler, on behalf of himself and Premier, filed suit against Blackburn, Blackburn's wife, and several of Blackburn's companies in Florida state court. (*See* Florida Complaint, a true and correct copy of which is attached as Exhibit "O" to Pl.'s Desig. of Evid.) The suit alleges, among other things, that Blackburn committed fraud and breached his fiduciary duties. (*Id.*) That suit remains pending, and while the majority of its allegations have no bearing on

13

the Defendants' liability to NextGear, it is worth noting that in his own complaint against Blackburn, Kessler admitted under the penalty of perjury that he signed the NextGear Note and his personal guaranty. (*Id.* at ¶ 19.) Kessler even attached a copy of the Note and his guaranty as exhibits to the Florida case. (*Id.* at Ex. 4.)

## STATEMENT OF UNDISPUTED MATERIAL FACTS

In light of the foregoing factual background, the story of how Blackburn and Kessler formed and managed Premier and why Premier ultimately failed is interesting, but those facts are not material to the legal issue before the Court—namely, the Defendants' liablity to NextGear. Relevant here are the following facts:

- NextGear advanced funds to Premier and to one or more third parties on Premier's behalf in order to finance Premier's inventory. (Ex. M at ¶ 8.)

- The advances were made by NextGear in conformity with the terms of the Note, but have not been fully repaid as agreed by Premier and Blackburn and Kessler. (*Id.* at ¶¶ 9-10.)

- As such, Premier defaulted pursuant to Paragraph 6 of the Note, which NextGear owns and holds. (*Id.* at ¶ 11.)

- As a result of the occurrence and continuance of an event of default, NextGear declared the entire debt to be due and owing. (*Id.* at ¶ 12.)

- As a result of Premier's default, NextGear has incurred and continues to incur expenses under the Note, including, without limitation, attorneys' fees and costs, all of which NextGear is entitled to recover under the Note. (*Id.* at ¶ 13.)

- Despite NextGear's demand for payment, Premier has failed to make payments for the amounts due and owing under the Note. (*Id.* at ¶ 14.)

- Interest continues to accrue on the debt owed by Premier to NextGear. (*Id.* at ¶ 15.)

- Pursuant to their respective Individual Guaranties, Blackburn and Kessler are each liable to NextGear for payment of the remaining debt. (*Id.* at ¶ 16.)

- All conditions precedent to the right of NextGear to recover under the Note and the Guaranties have occurred or have been waived. (*Id.* at ¶ 17.)

- The Guaranties also provide for the recovery by NextGear of all costs of collection, including reasonable attorneys' fees. (*Id.* at ¶ 19.)

As of January 26, 2022, the remaining debt totals $429,070.39, including principal, interest, and fees. (*Id.* at ¶ 20.) The following table sets forth NextGear's damages:

| CATEGORY | AMOUNT |
|---|---|
| Principal Balance | $344,978.19 |
| Floor Plan Fees | $2,118.50 |
| Pre-Write Off Interest (through 3/30/2020) | $20,222.59 |
| Post-Write Off Interest (3/31/2020 to 1/26/2022) | $52,314.00 |
| Other Vehicle-Specific Fees, Including Collateral Protection and Late Fees | $8,607.21 |
| Collateral Audit Fees | $190.00 |
| Filing Fees and Service of Complaints | $564.90 |
| NSF Fees | $75.00 |
| TOTAL: | $429,070.39 |

(*Id.*) Premier, Blackburn, and Kessler are liable for all of those damages, plus NextGear's attorney's fees and costs.

## ARGUMENT & AUTHORITIES

This case is ripe for summary judgment.[5] NextGear's claims involve interpretation of the law and construction of the clear and unambiguous terms of the Note and the Guaranties. Summary judgment is warranted here because the Defendants unquestionably have breached their contracts with NextGear. Based upon the foregoing undisputed facts, and as discussed below, Nextgear is entitled to summary judgment in its favor on all counts of its Complaint and the Kessler Counterclaim.

---

[5] The standard of review for summary judgments is well-established. Summary judgment is appropriate if "there are no genuine issues of material fact and judgment as a matter of law is warranted for the moving party." *Hoppe v. Lewis University*, 692 F.3d 833, 838 (7th Cir. 2012). In determining whether a genuine issue of material fact exists, the Court must review the record in the light most favorable to the nonmoving party and make all reasonable inferences in the nonmoving party's favor. *Bekker v. Humana Health Plan, Inc.*, 229 F.3d 662, 669 (7th Cir. 2000). However, "[o]nce a party has made a properly-supported motion for summary judgment, the nonmoving party may not simply rest upon the pleadings but must instead submit evidentiary materials that 'set forth specific facts showing that there is a genuine issue for trial.'" *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (quoting FED. R. CIV. P. 56(e)). If the nonmoving party fails to proffer such evidence, summary judgment must be granted. *See id.* at 937-38. "[C]ontract interpretation is often a question of law well suited for disposition on summary judgment." *Zemco Mfg., Inc. v. Navistar Int'l Transp. Corp.*, 270 F.3d 1117, 1127 (7th Cir. 2001).

## I.   THE COURT SHOULD GRANT SUMMARY JUDGMENT BECAUSE THE DEFENDANTS BREACHED THEIR CONTRACTS WITH NEXTGEAR.

The law governing breach-of-contract claims is well settled. Questions of contract interpretation are pure questions of law. *Lawson v. Sun Microsystems, Inc.*, 791 F.3d 754, 761 (7th Cir. 2015). Under Indiana law, which unquestionably applies here, the essential elements of an action for breach of contract are: (1) the existence of a contract, (2) the defendant's breach of the contract, and (3) damages.[6]  *See Am. Family Mut. Ins. Co. v. Matusiak*, 878 N.E.2d 529, 533 (Ind. Ct. App. 2007); *Roger v. Am. Testing and Eng'g Corp.*, 734 N.E.2d 606, 614 (Ind. Ct. App. 2000). Construction of written contracts, such as the Note and Guaranties, is a pure question of law for which summary judgment is particularly appropriate. *Peoples Bank & Trust Co. v. Price*, 714 N.E.2d 712, 716 (Ind. Ct. App. 1999); *Kordick v. Merchants Nat'l Bank & Trust Co.*, 496 N.E.2d 119, 124 (Ind. Ct. App. 1986); *Lawson*, 791 F.3d at 761. Absent ambiguity, courts will not look outside the instrument to arrive at the parties' intent.  *First Savings & Loan Ass'n of Central Indiana v. Treaster*, 490 N.E.2d 1149, 1152 (Ind. Ct.App. 1986) (under Indiana's "four corner doctrine," if a contract is unambiguous, the court will determine the intent of the parties such that parol or extrinsic evidence is inadmissible). Unambiguous language of a contract is conclusive upon the parties to a contract and upon the court.  *Price*, 714 N.E.2d at 716 (*citing Turnpaugh v. Wolf*, 482 N.E.2d 506, 508 (Ind. Ct. App. 1985)); *Scott v. Anderson Newspapers, Inc.*, 477 N.E.2d 553, 559 (Ind. Ct. App. 1985).

---

[6] Indiana law applies here because, as stated above, Premier, Blackburn, and Kessler agreed that Indiana law applies without regard to any conflicts of law analysis. Moreover, "Indiana 'favors contractual stipulations as to governing law[,]'" and courts apply the governing law stipulated to in an agreement. *St. Paul Travelers Companies, Inc. v. Corn Island Shipyard, Inc.*, 495 F.3d 376, 383 (7th Cir. 2007) (quoting *Allen v. Great Am. Reserve Ins. Co.,* 766 N.E.2d 1157, 1162 (Ind. 2002) (citations omitted)).

Here, there is no allegation that either the Note or a Guaranty contains any ambiguities. As such, the only question for the Court is whether all three elements of a breach-of-contract action are met. The answer to that question is a clear "yes."

First, as stated above, valid contracts exist. Premier unquestionably executed the Note, and Blackburn and Kessler unquestionably executed their Guaranties. Second, the Defendants breached those contracts. Premier and Blackburn and Kessler unquestionably failed to make all required payments under the terms of the Note and Guaranties. Despite NextGear's demand, none of the Defendants have fulfilled their contractual obligations. Finally, NextGear has unquestionably suffered damages as a result of the Defendants' breaches of their contracts.

As such, the Court should grant summary judgment in favor of NextGear and against the Defendants in the amount of $429,070.39, as well as post-judgment interest and NextGear's attorney's fees.

## II. THE DEFENDANTS HAVE NO COMPETENT SUMMARY JUDGMENT EVIDENCE SUPPORTING THEIR AFFIRMATIVE DEFENSES.

Premier and Blackburn assert three affirmative defenses that pertain to the active complaint in this case: waiver, prior breach, and interference. (*See* ECF No. 113 at p. 5.) Premier and Blackburn, however, have no evidence supporting any waiver or breach by NextGear, nor any evidence that NextGear interfered in any way with any business relationship of Premier.[7] In fact, when asked at his deposition exactly what NextGear said to anyone that caused Premier to lose any business opportunities, Blackburn,

---

[7] Blackburn and Premier previously filed a counterclaim alleging that NextGear tortiously interfered with a financing contract. The Court dismissed that counterclaim on April 30, 2021. (*See* ECF No. 63.)

Premier's corporate representative, admitted he did not know. (Ex. E at 111:12-17; 114:5-7.)

Similarly, Kessler also asserts estoppel, fraud, and illegality; failure of conditions precedent; prior breach; and lack of privity, mutuality, and assent as affirmative defenses. (*See* ECF No. 114 at pp. 11-12.) Kessler, however, has no competent summary judgment evidence supporting any such defenses. Indeed, Kessler has affirmed that he voluntarily signed the NextGear Note and Guaranty after having his personal lawyer review the documents. (Ex. D at 116:5-13; 144:10-145:4.) And to date, Kessler has identified no illegality pertaining to the Note or Guaranty, nor how NextGear purportedly breached the Note and Guaranty.

As such, the Defendants have no competent summary judgment evidence supporting any of their defenses, and based on the unambiguous terms of the Note and Guaranties, the Court should grant summary judgment against Premier, Blackburn, and Kessler.

III.   **THE COURT SHOULD GRANT SUMMARY JUDGMENT AGAINST KESSLER'S COUNTERCLAIMS BECAUSE THE POWER OF ATTORNEY IS IRRELEVANT TO THIS CASE AND BECAUSE THEY ARE BARRED BY THE UNAMBIGUOUS TERMS OF THE NOTE AND KESSLER GUARANTY.**

Kessler's Counterclaim concerns a power of attorney ("POA") that Kessler claims he never signed—a fact NextGear does not dispute. On April 18, 2019, someone purporting to be Mr. Kessler signed the POA in the presence of a NextGear employee, Arturo Mayoral, but it was not Kessler and it was not Blackburn. (*See* NextGear's Second Am. Responses to Kessler's Interrogatories at p. 6, a true and correct copy of which is attached as Exhibit "P" to Pl.'s Desig. of Evid.) To date, the identity of the person who actually signed the POA remains a mystery.

18

Ultimately, however, the POA itself is irrelevant to this case. NextGear is not seeking any relief based on the terms of any POA. Indeed, NextGear's active complaint does not even mention a POA. (*See*, e.g., ECF. No. 109.) Mr. Kessler is not liable here because of the terms of a POA he did not sign, but instead due to the unambiguous terms of the Note and Guaranty he unquestionably did sign.

### a.   Kessler's Counterclaims Have No Basis in Fact.

But rather than acknowledging his indisputable liability, Kessler's Counterclaim spins a tale of fraud and deceit, and in doing so, advances factual claims that are easily disproven. For example, Kessler asserts that, "before NextGear would lend money under the NextGear Note and the $150,000.00 line of credit, NextGear still required Kessler and Blackburn to execute the Power of Attorney documents." (Kessler Counterclaim, ECF No. 114 at ¶ 16.) Kessler further claims that "[a]fter NextGear obtained the forged and fraudulently obtained POA, unbeknownst to Kessler, Blackburn began flooring vehicles and drawing on the line of credit. Also, because NextGear now had the fraudulently obtained POA, NextGear and Blackburn increased the originally authorized line of credit from $150,000.00 to over $350,00.00, which, again, was done without Kessler's knowledge and/or consent." (*Id*. at ¶ 22.)

No competent summary judgment evidence supports any of these allegations. First, NextGear lent money to Premier before any POA was signed. Premier first floored a vehicle with NextGear on April 16, 2019, ***two days before*** Mr. Blackburn signed a POA on behalf of Premier. (*See* Premier POA, a true and correct copy of which is attached as Exhibit "Q" to Pl.'s Desig. of Evid.; *see also* Ex. K; Ex. M at ¶ 8; Ex. S.) Second, it is the first sentence of the Note itself, rather than the express terms of the

Premier POA, that gave NextGear the power to unilaterally increase Premier's line of credit:

> FOR VALUE RECEIVED, the undersigned borrower ("Borrower") promises to pay to the order of NextGear Capital, Inc. ("Lender"), with its principal office at 11799 North College Avenue, Carmel, Indiana 46032, or such other place as Lender may designate in writing or on the Discover Portal from time to time, in lawful money of the United States of America, the principal sum of One Hundred Fifty Thousand Dollars and Zero Cents ($150,000.00), *or such greater or lesser sum which may be advanced to or on behalf of Borrower from time to time*, together with all costs, interest, fees, and expenses as provided for under this Note and the other Loan Documents.

(Ex. A at p. 1) (emphasis added.) In fact, the terms of NextGear's POAs generally give NextGear the right to process titles for its dealers and to protect its collateral; changing the limits of lines of credit is not even mentioned in the document. (Ex. Q.) Moreover, when asked exactly which powers stated in the POA that NextGear used in this case, Kessler could not legitimately identify to a single power NextGear actually used. (Ex. D at 181:25-192:8.)

Third, as stated, on April 18, 2019, NextGear obtained a POA from Premier, the borrower under the Note. (Ex. Q.) No party in this case credibly questions the validity of the Premier POA, which fully binds Premier, nor Blackburn's authority to sign the POA and bind Premier. Thus, NextGear did not need any POA from Kessler because it already had a binding POA from Premier.

Finally, Kessler's allegation that any credit limit increase was done without his consent is belied by the express terms of the Guaranty he admits he signed. Kessler's Guaranty states that he expressly waived "notice of any change in Borrower's credit terms or limits with Lender, including any temporary or permnant increases in Borrower's Credit Line (and *Guarantor prospectively consents* to any such

change)." (Ex. C at ¶ 2(d)(vi)) (emphasis added.) Thus, NextGear did not need any POA from Kessler in order to increase Premier's line of credit; Kessler had already consented to such a change. Moreover, Kessler was aware that the initial Credit Line of $150,000 was not an immutable ceiling, as the very first sentence of the Note states otherwise, and Kessler has admitted to executing the Note, both in his capacity as a Manager of Premier and as a Guarantor thereunder. (Ex. A at p. 1.)

Aside from being based on easily disproven facts, Kessler's Counterclaims fail as a matter of law. Kessler asserts claims for forgery, deception, and violation of a Florida statute related to notaries, and he seeks a declaratory judgment and indemnification. All of these claims fail as a matter of law, and summary judgment is appropriate.

**b.     The Express Terms of the Kessler Guaranty Bar All of His Counterclaims.**

As a threshold matter, all of the claims Kessler asserts in his Counterclaim are barred by the unambiguous and express terms of the Kessler Guaranty. First, as stated above, the Kessler Guaranty states that Kessler's obligations "shall be absolute, unconditional, and unaffected" by, among other things, "(v) the genuineness, validity, or enforceability of any of the Liabilities or any document related thereto; ...[or] (x) the default of Borrower in any obligations to Guarantor or any torts committed by Borrower against Guarantor, even if Lender is alleged to be complicit or to have committed a direct tort against Guarantor[....]" (Ex. C at ¶ 2(b).) Thus, neither the lack of enforceability of any document related to Kessler's liablties under the Guaranty, nor even a direct tort (such as forgery or deception) by NextGear against Kessler can relieve Kessler of any of his obligations under the Guaranty. That is the bargain Kessler agreed to, and that bargain bars his tort claims here.

21

The Guaranty further bars the application of any law other than Indiana law. It provides that, except for claims submitted to arbitration, all questions pertaining to "the validity, enforceability, and interpretation of this Guaranty shall be governed by the internal Laws of the State of Indiana, without regard to conflicts of Laws provisions thereof." Thus, Kessler's claim for violations of Florida law are barred by the agreement Kessler signed.

Finally, the Guaranty makes clear that NextGear cannot be held liable for "any special, indirect, exemplary, punitive, incidental, multiple or consequential damages (including any damages resulting from loss of use, loss of profits, loss of business or other economic loss) arising out of or in connection with this Guaranty." (*Id*. at ¶ 5(k).) As such, Kessler's claims for these types of damages are barred as a matter of law.

### c. Kessler's Counterclaims Fail as a Matter of Law.

Even if Kessler's claims survived the terms of the Kessler Guaranty—and as stated above, they do not—each of his counterclaims fails as a matter of law.

### 1. Kessler's Forgery Claim Fails Because He Cannot Show Criminal Intent.

In Indiana, forgery is committed when "a person who, with intent to defraud, makes utters, or possesses a written instrument in such a manner that it purports to have been made: (1) by another person; (2) at another time; (3) with different provisions; or (4) by authority of one who did not give authority; commits forgery, a Class C felony." IND. CODE § 35–43–5–2(a). Since Kessler seeks relief under Indiana's Crime Victims Act, however, criminal intent is also an essential element that must be proven. *See, e.g., Manzon v. Stant Corp.*, 138 F. Supp. 2d 1110, 1116 (S.D. Ind. 2001) (noting that the burden to prove the *mens rea* element is high because "as a punitive statute, the victim's

relief statute, Indiana Code § 34–24–3–1, should be strictly construed.") (citing *NationsCredit Comm'l Corp. v. Grauel Enterprises, Inc.*, 703 N.E.2d 1072, 1078 (Ind. Ct. App. 1998)). Thus, Kessler must prove that NextGear had an intent to defraud Kessler through a purportedly forged POA.

Kessler cannot make the required showing, however, because he has no competent summary judgment evidence showing criminal intent on NextGear's part. In fact, Kessler cannot even show that the POA was used or relied upon by NextGear or any other person or entity. Without the POA being used to perpetuate a fraud, his forgery claim fails. Moreover, the competent summary judgment evidence shows that someone purporting to be Mr. Kessler signed the POA, which means that NextGear itself was misled. That, too, defeats the intent element. Further, NextGear had no need to obtain a POA from Kessler because, as stated, it already had a valid and enforceable POA signed by Premier. In short, the competent summary judgment evidence shows none of the elements required for a forgery claim, and summary judgment should be granted.

### 2.    *Kessler's Deception Claim Fails Because the Statute Has Been Repealed, and He Cannot Show Criminal Intent.*

Kessler's claim for deception under I.C. § 35-43-5-3 fails because that statute has been repealed. *See* IND. P.L. 174-2021, Sec. 45. As such, that claim is no longer actionable. But even if it were, it fails for the same reasons as his forgery claim—namely, that a claim for deception under the Crime Victims Act requires proof of criminal intent. *Conner v. Howe*, 344 F. Supp.2d 1164, 1174-75 (S.D. Ind. 2004). As stated, Kessler has no competent summary judgment evidence showing that NextGear possessed the requisite *mens rea*. Thus, Kessler's claim for deception also fails.

### 3. *Kessler's Claim Under Florida's Notarial Law Fails Because Such Claims Are Not Proper Here, Kessler Cannot Show a Statutory Violation, and Has No Damages Flowing from the POA.*

As stated, both the Note and Guaranty expressly state that they are interpreted solely under Indiana law. That, alone, disposes of Kessler's claim under Florida Statute § 117.05 because no law outside of Indiana law can determine the enforceability of the Note or Guaranty pursuant to their express terms. (*See* Ex. A at ¶ 20; Ex. C at ¶ 5(g).) Summary judgment should be granted on that basis alone.

But even if the Note and Guaranty did not bar such a claim, and assuming the POA was material to Kessler's liability under his Guaranty, reviewing alleged notarial misconduct is not properly within the jurisdiction of a court. Rather, as the Southern District of Florida has held, "[i]t falls within the jurisdiction of the Florida Governor's office to review alleged misconduct of a notary public and discipline, if necessary." *Filippova v. Mogilvesky*, No. 18-80044-CIV, 2018 WL 7825449, at *4 (S.D. Fla. Aug. 29, 2018). Thus, this Court is not the proper place to raise any violation of Florida's notary statutes.

But even if Kessler could have his claim for violation of Florida law heard here, Kessler still has no evidence that NextGear or its employee committed any violation of Florida law. Specifically, Florida Statute § 117.05 states that "[a] notary public may not notarize a signature on a document unless he or she personally knows, or has satisfactory evidence, that the person whose signature is to be notarized is the individual who is described in and who is executing the instrument." FLA. STAT. § 117.05(5). The competent summary judgment evidence in this case establishes that someone resembling and purporting to be Kessler appeared before Mayoral. Reviewing the

24

legitimate copy of Kessler's driver's license that was provided to him, Mayoral believed that the person across from him was, in fact, Kessler. (*See* Mayoral Depo. at 50:2-53:21, true and correct excerpts of which are attached as Exhibit "R" to Pl.'s Desig. of Evid.) That document is, by definition, "satisfactory evidence" under Florida law. *Id.* at § 117.05(5)(b)(2)(d). Thus, Kessler cannot show a violation of the Florida statute.

In any event, to the extent that Kessler is attempting to hold NextGear liable for any alleged misconduct by its employee, Arturo Mayoral, Kessler would have to show that he was somehow damaged by the purportedly improper notarial practices. Fla. Stat. § 117.05(6). Kessler cannot show any harm resulting from the Kessler POA because that document is not the basis of any of his liablities under the Note and Kessler Guaranty, nor did the POA contribute, in any way, to any of Premier's liablities here. Simply put, as stated previously, the Kessler POA is entirely irrelevant to this case. Summary judgment is warranted.

### 4.   *Kessler's Declaratory Judgment Is Meritless and Duplicative.*

The Court should grant summary judgment against Kessler's declaratory judgment claim because it merely restates his purported defenses to the Note and Guaranty— which have already been shown to be meritless—and because it is duplicative of his other claims. Kessler seeks a declaration that "he is not responsible and/or liable for the alleged breach of the NextGear Note as NextGear and/or Blackburn forged Kessler's name and/or signature to the subject POA, which document was required by NextGear to lend any money under the NextGear Note and to increase the amount of the line of credit under the NextGear Note." (Kessler Counterclaim, ECF No. 114, at ¶ 61.) As already shown above, these allegations are flat-out wrong because the Kessler POA was

not, in fact, required by NextGear to lend money. Instead, NextGear had already lent money to Premier two days before Blackburn executed a POA for Premier. Moreover, no POA was necessary for the line of credit to be increased under the Note because Blackburn had clear authority to obtain a temporary increase for Premier and because both Blackburn and Kessler had prospectively consented to any such increases under the express terms of their respective Guaranties. Thus, there is no genuine issue of material fact that Kessler's declaratory judgment fails.

As this Court has stated, "Courts commonly exercise their discretion and dismiss declaratory judgment claims where they are duplicative of breach of contract claims." *Couch v. Wilco Life Ins. Co.*, 363 F. Supp. 3d 886, 902 (S.D. Ind. 2019) (citing *Cliffs Mining Co. v. Wisconsin Electric Power Co.*, 2018 WL 6181470, \*7 (E.D. Wis. 2018) (dismissing declaratory judgment claim and finding that because that claim duplicated breach of contract claim, it "serves no useful purpose"); *Hess v. Biomet, Inc.*, 2017 WL 661511, \*12 (N.D. Ind. 2017) ("Because [the declaratory judgment claim] does not state a viable claim for relief not already raised in [the breach of contract claim], the Court in an exercise of its discretion dismisses [the declaratory judgment claim]"). Kessler's declaratory judgment claim should be dismissed because it is duplicative of Kessler's other claims and serves no useful purpose in this case. Summary judgment is warranted.

### 5. *Kessler's Claim for Indemnification Fails Because He Has No Indemnification Rights Against NextGear.*

Kessler's final counterclaim is for indemnification. He does not say whether that indemnification is based on contract, statute, or common-law indemnification, but the outcome is the same: Kessler has no claim for indemnification against NextGear.

"Generally, the right of indemnification arises only by contract, express or implied, or by statutory obligation." *Underwood v. Fulford*, 128 N.E.3d 519, 524–25 (Ind. Ct. App. 2019) (quoting *Rotec, Div. of Orbitron, Inc. v. Murray Equip., Inc.*, 626 N.E.2d 533, 535 (Ind. Ct. App. 1993), *reh'g denied*). In Indiana, however, a "right to indemnity may be implied at common law." *Rotec*, 626 N.E.2 at 535  (citing *Indianapolis Power & Light Co. v. Snodgrass*, 578 N.E.2d 669, 670-71 (Ind. 1991)). "In the absence of any express contractual or statutory obligation to indemnify, such action will lie only where a party seeking indemnity is without actual fault but has been compelled to pay damages due to the wrongful conduct of another ***for which he is constructively liable***." *Id.* (emphasis added).

Here, Kessler makes no claim that he has a contractual or statutory right of indemnification against NextGear. As such, Kessler must prove he is entitled to assert common-law indemnification, which means that he must show that he is without fault and that he has been compelled to pay damages due to the wrongful conduct of a party for which he is constructively liable. Here, Kessler is directly liable for his own breach of the Kessler Guaranty. Constructive liability is simply not in issue. Thus, any common-law indemnification claim fails on its face.

Beyond that, even if he had a viable common-law indemnification claim, Kessler's claim is premature at best. "The obligation to indemnify does not arise until the party seeking indemnity suffers loss or damages[.]" *Indianapolis–Marion Cnty. Pub. Library v. Charlier Clark & Linard*, PC, 929 N.E.2d 838, 848 (Ind. Ct. App. 2010), *trans. denied*. "In contribution or indemnification cases, the damage that occurs is the incurrence of a monetary obligation that is attributable to the actions of another party." *Pflanz v. Foster*, 888 N.E.2d 756, 759 (Ind. 2008). *See also Coca-Cola Bottling Co.*-

*Goshen, Ind. v. Vendo Co.*, 455 N.E.2d 370, 373 (Ind. Ct. App. 1983) (explaining that one of the elements of a claim for indemnity is that a claimant "has paid or been compelled to pay a judgment recovered by the injured person"); *cf. TLB Plastics Corp. v. Procter & Gamble Paper Prods. Co.*, 542 N.E.2d 1373, 1376 (Ind. Ct. App. 1989) (stating that a party seeking indemnity suffers loss "at the time of payment of the underlying claim, payment of a judgment on the underlying claim, or payment in settlement of the underlying claim"), *reh'g denied, trans. dismissed.* Since Kessler has yet to be ordered to pay anything to NextGear—although he certainly should be—any theoretical common-law indemnification claim is not yet ripe. Summary judgment is warranted.

## CONCLUSION

Accordingly, for the foregoing reasons, NextGear respectfully requests that the Court grant summary judgment in favor of NextGear and against all of the Defendants in the presently-due amount of $429,070.39 (or as may be adjusted over time), plus attorney's fees, costs, and post-judgment interest.

Dated: January 31, 2022              Respectfully submitted,


                                     /s/ Brian S. Jones
                                     DAVID J. JURKIEWICZ
                                     Attorney No. 18018-53
                                     BRIAN S. JONES
                                     Attorney No. 29578-49
                                     **BOSE MCKINNEY & EVANS LLP**
                                     111 Monument Circle, Suite 2700
                                     Indianapolis, IN 46204
                                     Telephone: (317) 684-5000
                                     Facsimile: (317) 684-5173
                                     djurkiewicz@boselaw.com
                                     b.jones@boselaw.com

                                     **ATTORNEYS FOR NEXTGEAR CAPITAL, INC.**

**CERTIFICATE OF SERVICE**

I certify that on January 31, 2022, a true and correct copy of the above and foregoing was served on all counsel of record through CM/ECF.

/s/ Brian S. Jones
BRIAN S. JONES

4295994