**In the Matter Of:**

*NEXTGEAR CAPITAL, INC.*

*-v-*

*PREMIER GROUP AUTOS, LLC, ET AL.*

_____

**Edward A. Kessler**

*October 29, 2021*

_____



EXHIBIT
**Exhibit A**

```
 1              UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF INDIANA
 2               INDIANAPOLIS DIVISION
 3
 4
     NEXTGEAR CAPITAL, INC.,        )
 5                                  )
             Plaintiff,             )
 6                                  )
          -v-                       ) CAUSE NO.
 7                                  ) 1:20-cv-00354-TWP-DLP
     PREMIER GROUP AUTOS, LLC,      )
 8   JAMES M. BLACKBURN, AND        )
     EDWARD A. KESSLER,             )
 9                                  )
             Defendants.            )
10
11
12        The deposition upon oral examination of
13   EDWARD A. KESSLER, a witness produced and sworn before
14   me, Elizabeth T. Lindner, RPR, Notary Public in and
15   for the County of Marion, State of Indiana, taken on
16   behalf of the Plaintiff at the offices of Bose
17   McKinney & Evans, 111 Monument Circle, Suite 2700,
18   Indianapolis, Indiana, on October 29, 2021, at
19   10:04 a.m., pursuant to all applicable rules.
20
21
22
23
24           STEWART RICHARDSON & ASSOCIATES
              Registered Professional Reporters
25                  (800)869-0873
```

```
                                          Page 2
 1                  APPEARANCES
 2   FOR THE PLAINTIFF:
 3       Brian S. Jones, Esq.
         David J. Jurkiewicz, Esq.
 4       BOSE MCKINNEY & EVANS, LLP
         111 Monument Circle
 5       Suite 2700
         Indianapolis, IN  46204
 6       b.jones@boselaw.com
         djurkiewicz@boselaw.com
 7
 8   FOR THE DEFENDANT:
     Edward A. Kessler
 9
         Jason Delk, Esq.
10       Austin Sparks, Esq.
         DELK MCNALLY, LLP
11       211 South Walnut Street
         Muncie, IN  47305
12       delk@delkmcnally.com
         sparks@delkmcnally.com
13
14   FOR THE DEFENDANTS:
     Premier Group Autos, LLC, and James M. Blackburn
15
         Richard A. Rocap, Esq.
16       ROCAP LAW FIRM, LLC
         10293 North Meridian Street
17       Suite 175
         Indianapolis, IN  46290
18       rar@rocap-law.com
19
20
21
22
23
24
25
```

```
                                          Page 3
 1              INDEX OF EXAMINATION
 2                                      PAGE
 3   DIRECT EXAMINATION
        Questions By Mr. Jones:             5
 4
     CROSS-EXAMINATION
 5      Questions By Mr. Rocap:           210
 6   REDIRECT EXAMINATION
        Questions By Mr. Jones:           236
 7
 8        INDEX OF PREVIOUSLY MARKED EXHIBITS
 9   NUM.         DESCRIPTION             PAGE
10   Exhibit 4   Photograph of Kessler driver's    73
                 license
11
     Exhibit 8   4/18/19 Kessler Power of    181
12               Attorney
13   Exhibit 20  Complaint filed in the Broward    50
                 County Circuit Court
14
     Exhibit 21  Loan Agreement between Overfinch   123
15               Miami and Edward P. Kessler and
                 Kristine E. Kessler
16
     Exhibit 22  NextGear agreement with unsigned   148
17               POAs
18   Exhibit 24  9/11/19 email chain between    171
                 Kessler, DeGroff, and Blackburn
19
20            INDEX OF MARKED EXHIBITS
21   NUM.         DESCRIPTION             PAGE
22   Exhibit 31  Screenshot of text message of    74
                 driver's license and vehicle
                 interior
23
24   Exhibit 32  1/31/19 email chain between    98
25               Mayoral and Blackburn
                        (continued)
```

```
                                          Page 4
 1        INDEX OF MARKED EXHIBITS (CONT.)
 2   NUM.         DESCRIPTION             PAGE
 3
     Exhibit 33  3/26/19 Email sent by Attorney    140
 4               Adam Zhamukhanov to Edward
                 Kessler
 5
     Exhibit 34  11/8/19 Letter to Overfinch    192
 6               Miami from Overfinch North
                 America
 7
     Exhibit 35  Defendant Edward Kessler's    200
 8               Answers to NextGear Capital,
                 Inc.'s First Set of
 9               Interrogatories
10   Exhibit 36  12/11/19 Default and Termination   202
                 letter to Blackburn from
11               Overfinch North America
12   Exhibit 37  Independent Accountant, Barry    203
                 Mukamal's, report and court
13               filing
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 9

1  A  Related to this case, yes.
2  Q  So obviously there's this case, and I think there's
3     some down in Florida; is that right?
4  A  There's one in Florida, and there was one, American
5     Express, which I just got dismissed with prejudice
6     two weeks ago.
7  Q  And that's kind of related to Premier; right?
8  A  Yes.
9  Q  Are there any other, like, civil proceedings or
10    arbitrations that you've been a party to that
11    aren't related to NextGear or Premier?
12 A  No.
13 Q  Have you ever filed bankruptcy?
14 A  No.
15 Q  Have you ever testified as a witness before in a
16    trial?
17 A  No.
18 Q  Are you currently employed?
19 A  Yes.
20 Q  Who is your employer?
21 A  Cowden Associates.  C-O-W, D as in David, E-N.
22 Q  Cowden Associates.  And what is your job title at
23    Cowden Associates?
24 A  Actuarial analyst.
25 Q  And what is Cowden Associates' business?

Page 10

1  A  We manage pension funds on my side of the business.
2     We also have compensation consulting and health and
3     benefits consulting.
4  Q  I gotcha.
5        And where is that located?
6  A  Pittsburgh.
7  Q  And where do you currently live?
8  A  Bethel Park.
9  Q  Say it again.
10 A  Bethel Park.
11 Q  Bethel Park, okay.  And how long have you lived in
12    Bethel Park?
13 A  30 years.
14 Q  I kind of want to walk through your educational
15    background a little bit.  First, let's start,
16    what's your birth date?
17 A  9-29-88.
18 Q  And where were you born?
19 A  Pittsburgh.
20 Q  And where did you graduate high school from?
21 A  Bethel Park.
22 Q  Bethel Park High School?
23 A  Yes.
24 Q  And that was when?
25 A  '07.

Page 11

1  Q  And did you go to college or university after high
2     school?
3  A  Yes.
4  Q  Where did you go?
5  A  Penn State Behrend up in Erie.
6  Q  And did you get a degree from Penn State Behrend?
7  A  Yes.
8  Q  What degree is that?
9  A  Mathematics.
10 Q  And what year was that?
11 A  '11.  MBA in '12.
12 Q  MBA in '12 from the same school?
13 A  Yes.
14 Q  Mathematics, is that BA or BS?
15 A  BS.
16 Q  Was there any particular focus of the MBA program
17    that you were involved in?
18 A  Just business administration.
19 Q  So 2012 you graduate with your MBA.  Kind of walk
20    me through your, I guess, post high school
21    employment starting with the first?
22 A  I worked for a construction company in Bethel Park.
23 Q  And what's the name of that construction company?
24 A  Addvetco, A-D-D-V-E-T-C-O.
25 Q  Addvetco.

Page 12

1  A  Yes.
2  Q  Got it.  How long were you employed with Addvetco?
3  A  Summer internship started in '08, and I liquidated
4     the company around 2019 or so.
5  Q  So when you say you liquidated it, I take it you
6     were in charge of the company at that point?
7  A  Yeah, I was a managing partner.
8  Q  So kind of walk me through kind of the evolution of
9     your employment with Addvetco.  You started and, I
10    guess, what was your job title when you started?
11 A  Mainly administrative assistant, accountant.  I did
12    a lot of the QuickBooks accounting.
13 Q  And then kind of when was your next promotion
14    there?
15 A  Four months, six months.
16 Q  Okay.  Oh, wow.  What were you doing there?
17 A  Project managing.
18 Q  What is involved in project managing?
19 A  Scope of work, contracts, financials, percentage of
20    completions, percentage of, like, variance reports,
21    QuickBooks reports, percentage of completion,
22    earned value management, CPM scheduling.
23 Q  What does CPM scheduling mean?
24 A  Critical path method.
25 Q  So what is critical path method?

1  Q  What does it do now?

2  A  It's liquidated.

3  Q  When did that happen?

4  A  2020, mainly because I had an asset-backing loan

5     into that company, and I had to liquidate it to pay

6     for my lawyer fees through this.

7  Q  Were you and Travis each 50 percent partners?

8  A  Yes.

9  Q  Who is Mr. Yates?

10 A  Economics professor at Penn State Behrend.

11 Q  Was he one of your professors when you were at

12    Behrend?

13 A  No, I went to grad school with him.

14 Q  So he was in your grad school classes and now he's

15    a professor; is that right?

16 A  Yes.

17 Q  Set aside ET Management -- hold on, how many

18    properties did it end up owning?

19 A  Three.

20 Q  Three properties.

21 A  Mostly fully leveraged by my loan.

22 Q  Where were those properties located?

23 A  Erie.

24 Q  How far is Erie from Bethel Park?

25 A  Two and a half hours.

1  Q  So not too bad.

2        Set aside ET Management then.  Next, what kind

3     of company did you work for?

4  A  Those were all the ones up north, yeah.

5  Q  That's it.  And when did you start with Cowden?

6  A  July 1, 2019.

7  Q  And did you start there in the actuarial position

8     you're in now?

9  A  Yes.

10 Q  If I remember correctly, actuaries have to take a

11    series of exams; right?

12 A  Yes.

13 Q  I don't know what those are called.  What are those

14    called?

15 A  The actuarial exams?

16 Q  Yeah.

17 A  The Probability Exam is the first one; Financial

18    Mathematics is the second one -- they changed the

19    curriculum.  It was MFE.  Now it's IFM, Investment

20    Financials, maybe -- STAM; LTAM; they just added

21    the SRM exam, which I'm exempt from.

22 Q  Because you were grandfathered in?

23 A  In a way.  There were VEE credits you have to

24    accomplish, and prior to them redeveloping the

25    curriculum, I had those passed, so I get exempt

1     from the SRM.

2        They just added the PA exam, which is

3     Predictive Analytics; and there's a series of

4     modules after that; and then there's Enrolled

5     Actuary exams.

6  Q  I think that's the name I'm thinking of, Enrolled

7     Actuary.

8  A  EA.  And then there's FSA tracks after that.

9  Q  And I take it you have -- all the ones you're not

10    exempt from, you have taken and passed?

11 A  No, I'm not a credentialed actuary.  That's why I'm

12    an actuarial analyst.

13 Q  Gotcha.  I had a case before where I had to, like,

14    learn all the steps and stuff.  I remember there

15    was a whole lot involved in that.  Thank you for

16    helping me remember that.

17       And so in your role as an actuarial analyst,

18    what do you do on a day-to-day basis?

19 A  Data importing, VBA, asset reconciliation,

20    forecasting, financial modeling, scenario testing,

21    benefit calculations, stochastic simulations,

22    program from Monte Carlo simulations.

23 Q  Are these calculations done primarily for, like,

24    asset managers or are they for individuals?

25 A  We manage the liability side of pensions.

1  Q  Gotcha.

2  A  We just get information from the investment

3     managers on the assets.  We calculate the fund

4     ration, which is assets divided by liabilities.

5  Q  Now, what type of pensions are they, public entity

6     pensions?

7  A  Some are public, some are multi-employer, some are

8     single employer, municipalities.

9  Q  Do you know, like, off the top of your head what

10    the total size of those asset portfolios are?

11 A  I can't share that information.

12 Q  Like in gross, not for each individual one.  Like,

13    are we talking small municipal, you know,

14    $500 million or are we talking --

15 A  Some are.

16 Q  -- tens of billions?

17 A  Some are in the billions.

18 Q  Okay.  At some point in that 2008 to 2019 time

19    frame, I take it you met James Blackburn?

20 A  Unfortunately, yes.

21 Q  So tell me about kind of how you met James

22    Blackburn and how you kind of got into business

23    with him.  When did you first meet him?

24 A  I would say maybe late 2017, 2018 through mutual

25    friends who some invested into a so-called business

1  that Blackburn was starting.
2  Q  So those mutual friends you mentioned, where were
3     they located?
4  A  Florida.
5  Q  And is that where you met Mr. Blackburn?
6  A  Yes.
7  Q  And you said that these mutual friends had invested
8     in a business Mr. Blackburn had?
9  A  Correct.
10 Q  What was that business?
11 A  First Sky Airlines.
12 Q  Okay.  And what does First Sky Airlines do?
13 A  Nothing.
14 Q  But, I mean, at the time, what did you understand?
15    What was it's --
16 A  It was a luxury airline, commercial, that had
17    access to the private terminals.
18 Q  So he had set up some type of business that allowed
19    access to private terminals at airports; is that
20    right?
21 A  Correct.
22 Q  And was he, like, operating that or was he --
23 A  He was a managing partner.
24 Q  And so your mutual friends had, I guess, gone into
25    business with him or just invested?

1  A  They invested.
2  Q  And at the time you met Mr. Blackburn, were your
3     friends involved with him in any other way other
4     than First Sky Airlines?
5  A  Not to my knowledge.
6  Q  So you met Mr. Blackburn in Florida late 2017,
7     early 2018; is that right?
8  A  Correct.
9  Q  Kind of walk me through kind of the next
10    interactions you had with him that kind of led to
11    you guys deciding to go into business together.
12 A  Well, I first thought I invested into First Sky
13    Airlines.  To this day, I haven't received a K-1
14    distribution from Mr. Blackburn.
15 Q  Okay.  Let me follow up on that one right there.
16    So you say you thought you invested in First Sky.
17    Tell me how that happened.
18 A  That means I have agreements signed off still in my
19    possession of me purchasing shares of the company.
20 Q  How many shares did you purchase, if you remember?
21 A  I believe it's 6 percent.  I have an email from
22    Mr. Blackburn confirming that.
23 Q  Okay.
24 A  As well as a list of investors.
25 Q  And was this in that early -- sorry -- late 2017,

1  early 2018 time frame?
2  A  Correct.
3  Q  Do you remember how much, I guess, the financial
4     investment was?
5  A  Probably around 200,000.
6  Q  Did you write him a check?
7  A  Multiple checks and/or wires.
8  Q  And did you ever receive any kind of actual shares
9     in the company?
10 A  The agreements that I have in my possession.
11 Q  Okay.  And did you ever receive any, like, books or
12    reports from the company?
13 A  I have them in my possession too.
14 Q  But you say you've never received a K-1?
15 A  Not from Mr. Blackburn.
16 Q  Did you ever receive it from First Sky?
17 A  Nope.
18 Q  So you've not received anything showing the, I
19    guess, the tax impact of your investment?
20 A  I received a K-1 from another investor.  My name,
21    as well as at least one other person that I know,
22    is not listed on the draft K-1.
23 Q  So I take it that would have been either roughly
24    March, April of '18 or March, April of '19 you
25    would have expected to receive that first K-1;

1  right?
2  A  There's questions questioning Blackburn where it's
3     at.
4  Q  And that's something you remember asking him kind
5     of around the time you expected that K-1 to arrive;
6     is that right?
7  A  Yeah.
8  Q  Is First Sky still in business?
9  A  No.  If you look up executive airlines, it was
10    dissolved.
11 Q  Was that voluntarily dissolved or administratively
12    dissolved?
13 A  You would have to ask him.
14 Q  Do you know, did the secretary of Florida -- I
15    assume it was a Florida company; right?
16 A  I believe Delaware.
17 Q  Delaware, oh, okay.
18    I was just wondering if maybe the Secretary of
19    State, they can force a business out if they
20    haven't filed their taxes or paid their fees
21    or . . .
22 A  (Indicating.)
23 Q  Don't know?
24 A  I don't know.
25 Q  That's fair.

Page 29

1    So tell me, what type of information did you
2    receive from Mr. Blackburn or any other folks about
3    First Sky before you sent him a $200,000
4    investment?
5  A  There's financial forecasts, letters of intent, a
6    business plan, resumes, some other marketing
7    material.
8  Q  And he had all that ready to go?
9  A  Yes.
10  Q  And I take it you reviewed it and found them to be
11    satisfactory?
12  A  To my knowledge back then, yes.  My knowledge now,
13    no.
14  Q  So tell me what you know now that you wish you'd
15    known then?
16  A  The letters of intent.
17  Q  What about them?
18  A  One's with Boeing.  There's an electronic signature
19    by the name of Michelle Walker, and if you Google
20    her, she actually works for Boeing, but there's no
21    date associated with the electronic signature.
22  Q  Okay.
23  A  The other letter of intent was MGM Grand to
24    purchase seats on the aircraft, made out to a
25    gentleman by the name of, I believe it was, Doug

Page 30

1    Seidenberg.  If you Google him, he works for MGM.
2    The signature on the letter of intent, I believe,
3    belongs to someone by the name of Daniel Madero,
4    who is James Blackburn's business partner and/or
5    was in Premier Aviation.
6  Q  So did Mr. Madero sign as if he was Doug
7    Seidenberg; is that what you're saying?
8  A  I believe so.
9  Q  I gotcha, okay.
10    And the Michelle Walker one you mentioned had
11    no date with the signature; was that something that
12    was apparent on the document itself?
13  A  Yeah, it's electronically signed, and there's a
14    date line, and there's nothing on the date.
15  Q  Gotcha.  Like, was it -- you know, some will have a
16    name, signature, title, and whatever, and then it
17    will have a separate date.  Or was it one of
18    those -- you know, the DocuSign has a box and gives
19    a date?  Is that what you're talking about?
20  A  No, there was a separate line for a date, and there
21    was just an electronic signature.
22  Q  I gotcha, okay.
23    So I take it what you've learned at some point
24    subsequent to the investment is that these letters
25    of intent were not actual legitimate letters of

Page 31

1    intent?
2  A  In my opinion, yes.
3  Q  I take it Mr. Blackburn has a different view or has
4    he expressed a different view to you?
5  A  You can ask him.
6  Q  Yeah, I'll have to add that to the questions when I
7    talk to him again on Wednesday.
8    What was the time frame in which you found out
9    these letters of intent might not be legitimate?
10  A  Probably late 2019 into 2020.
11  Q  Would that be kind of after some of the issues with
12    Premier Group Autos started to percolate?
13  A  Correct.
14  Q  And so in what time period was First Sky dissolved,
15    if you know?
16  A  I don't know off the top of my head.
17  Q  To this day, do you know what happened to your
18    $200,000?
19  A  Nope.
20  Q  So in, I guess, the early 2018 time frame when you
21    had invested that $200,000 with First Sky, how
22    would you characterize your relationship with
23    Mr. Blackburn at that time?
24  A  I thought it was good.
25  Q  Okay.

Page 32

1  A  Friendly relationship.
2  Q  What did you know about his businesses other than
3    First Sky?
4  A  He mentioned he owned real estate; First Sky --
5    Abode Real Estate might have been the company's
6    name -- he was in the yacht industry.
7  Q  What was he doing in the yacht industry, if you
8    remember?
9  A  He would claim he sold yachts, and he was also an
10    airplane salesman.
11  Q  He had a business for airplanes?
12  A  Premier Aviation.
13  Q  Any other businesses that you were aware of?
14  A  I think Premier Warranty, Nautic Crew.
15  Q  N-A-U-T-I-C?
16  A  N-A-U-T-I-C, yes, correct.
17  Q  Thank you.
18    If memory serves, that was staffing for
19    yachts; right?
20  A  He said it was his registered agent company that
21    had no expenses.
22  Q  So he said Nautic Crew was a registered agent
23    company that had no expenses?
24  A  Correct.
25  Q  I take it as you would find out it certainly had

Page 33

1    income?

2  A  If you want to call it that.

3  Q  Because what I understood from Mr. Blackburn on

4     Monday was Nautic Crew was involved in finding crew

5     to help staff yachts.  Was that your understanding

6     at the time?

7  A  He said it was a registered agent company.

8  Q  And there was also -- was it Nautic Worldwide; is

9     that the other one?  I might be wrong on that.

10 A  Off the top of my head, I don't know.

11 Q  I thought there were two Nautic companies.

12 A  I would have to check the Florida lawsuit.

13 Q  It might be in some of our documents here today.

14        At the time, did it appear that Mr. Blackburn

15    was operating his businesses in a forthright

16    manner?

17        MR. DELK:  Just to clarify, what time?

18        MR. JONES:  I'm sorry.  Yeah.  Thank you.

19 Q  In that 2018 -- early 2018 time frame around the

20    time of the First Sky investment.

21 A  Operating in an honest manner, it appeared that

22    way, yes.

23 Q  Had you spoken with anyone who ever had anything --

24    at that time period, that 2018 time period -- that

25    had anything negative to say about him?

Page 34

1  A  Not too much, no.

2  Q  So from the time in that early 2018 investment in

3     First Sky, walk me through the, I guess, the

4     evolution of deciding to go into business with him

5     with Premier Group Autos.

6  A  I went down to Fort Lauderdale for the Fort

7     Lauderdale Boat Show around, I believe, this time

8     in 2018; I think they hold the boat show around the

9     same weekend every year.

10 Q  So Octoberish?

11 A  I think it's the end of October or first week in

12    November.

13 Q  Okay.

14 A  And we were walking around the boat show, and we

15    came across a car that looked like a Range Rover,

16    but it was a lot more classier, and it was

17    definitely a few steps above your standard Range

18    Rover.

19 Q  So you found a good looking Range Rover.  Tell me

20    what happened there.

21 A  The company is called Overfinch.  Later that same

22    day, Blackburn took me; Tim Elmes; Mark Bernard;

23    Kevin Sloane, who is the owner of Overfinch; Alex

24    Sloane, which is the son of Kevin; and a few other

25    of his, quote/unquote, clients on a private jet to

Page 35

1     New Orleans for dinner.

2  Q  So this was a private jet that Mr. Blackburn had;

3     is that right?

4  A  He mentioned his friend owned it.

5  Q  Was this something that had been previously planned

6     or it just kind of happened once you guys met?

7  A  He planned it that day.

8  Q  So I take it you weren't planning to fly to New

9     Orleans for dinner that day but it ended up

10    happening anyway?

11 A  Correct.

12 Q  Where did he take you out to eat in New Orleans?

13 A  I forget.

14 Q  Commanders Palace is a good place if you ever get

15    there.

16 A  It was on that main street, Bourbon Street maybe?

17 Q  Bourbon, yeah.  So you were in The Quarter then for

18    dinner.

19        So you mentioned Tim Elmes.  Who is Tim Elmes?

20 A  Real estate agent.

21 Q  And is he, like, a Fort Lauderdale real estate

22    agent?

23 A  Correct.  He was also listed in the email as an

24    investor in First Sky.

25 Q  So was this a First Sky flight you guys were on?

Page 36

1     Some of the investors plus the Overfinch owners.

2  Q  Right.  But I meant was this, like, a private jet

3     you were on?  Did it go into a private terminal in

4     the New Orleans airport?

5  A  We went through the private terminal, yes.

6  Q  Who is Mark Bernard?

7  A  He was actually a mutual friend that introduced me

8     to Blackburn.

9  Q  How had you known Mr. Bernard?

10 A  Through another friend of mine who I went to high

11    school with up in Bethel Park who moved to Florida

12    our junior year.

13 Q  And so you'd known Mr. Bernard for a number of

14    years at that point?

15 A  I'd say a few years.

16 Q  And the Sloanes were in ownership of Overfinch?

17 A  They own Overfinch.

18 Q  Tell me what happened at that dinner.

19 A  Just networking mainly.  Everyone was spread out,

20    maybe four or five tables.

21 Q  No agreements formed or anything during that

22    dinner?

23 A  No.

24 Q  Did you guys stay in New Orleans that night or fly

25    back?

Page 37

1  A  Flew back around 3:00 a.m.
2  Q  And then what happened?
3  A  Went to bed.
4  Q  Okay.  Fair enough.  I'm sorry.  I should have --
5         MR. DELK:  That was good.
6  Q  Although, you never know --
7  A  I was tired.
8  Q  -- maybe 3:00 a.m. is when things get started in
9     Fort Lauderdale.  You never know.
10 A  Not for me.
11 Q  So then, I guess, like, the next event that
12    happened in terms of the Premier Group?
13 A  There was a breakfast.  I don't recall the
14    restaurant.  Both Sloanes were there; Samuel
15    Blackburn; I believe Matthew Thompson; Daniel
16    Madero; James Blackburn; myself; there was one
17    other individual who was actually listed as the CEO
18    of First Sky, Andres Dorchinelli (phonetic).
19 Q  I'm going to need your help on that one.
20 A  I'm going to need my own help on that one.  I don't
21    know how -- I mean, I don't know how to spell it.
22 Q  We'll see if we can find it in one of the emails or
23    exhibits or something.
24 A  That's fine.
25 Q  Dorchinelli you remember the name being?

Page 38

1  A  Around that, yes.
2  Q  Fair enough.  Tell me about Samuel Blackburn; had
3     you met him before?
4  A  Just through James.
5  Q  What did you know about him?
6  A  Salesman, owned multiple companies and had
7     revenue -- the story I was being told was that he
8     had revenue on multiple companies.
9  Q  You say "story"; did you find out that wasn't the
10    case?
11 A  Yes.
12 Q  And was that something that Samuel had told you or
13    James had told you?
14 A  James.
15 Q  And Daniel Madero, what did he do?
16 A  He was business partners in Premier Aviation with
17    James Blackburn.
18 Q  I'm trying to understand the difference between
19    what Premier Aviation did and what First Sky did;
20    what was the difference there?
21 A  I believe Premier Aviation was more of a lease
22    agreement with airplanes, private jets.
23       First Sky, to my understanding, was a
24    commercial airline that everyone would board the
25    plane in the private terminals versus the public

Page 39

1     terminals.
2  Q  Gotcha, okay.
3        So First Sky, that wasn't, like, a Gulf Stream
4     or anything; that was regular commercial planes?
5  A  Yeah.  The marketing material was 737, but I have
6     the -- the marketing material says the jet.  It's
7     at my house.
8  Q  And so was it the very next day you went to
9     breakfast?
10 A  It might have been the next day, or it might have
11    been the day after.  It was around the same weekend
12    of the Fort Lauderdale Boat Show because the
13    Overfinch owners were still in town.
14 Q  What happened at that breakfast?
15 A  James was trying to get a contract with the
16    Overfinch owners to sell their car, exclusive
17    rights, in south Florida.
18 Q  Had James mentioned that idea to you at any point
19    prior to this breakfast?
20 A  Prior to that breakfast, I do not believe so, no.
21 Q  And so when you went into that breakfast, were you
22    expecting to be discussing potential business
23    models or anything?
24 A  No.
25 Q  And so tell me kind of what happened as James was

Page 40

1     asking, you know, to sell Overfinch cars
2     exclusively in south Florida.
3  A  He took minutes, handwritten minutes.  At the end
4     of the meeting, he tried to get the Overfinch
5     people to sign.  They backed off and said let them
6     talk with their lawyers to send an agreement over.
7  Q  At that point, whenever they said, hey, we'll have
8     our lawyers draft something up or whatever, had you
9     agreed to go into business with James at that
10    point?
11 A  I think that was the time where James asked me if I
12    wanted to be a part of it.
13 Q  And what did you say when he asked?
14 A  He was under the understanding that I was still
15    liquidating a company up north, and he was also
16    under the full understanding that I was
17    interviewing currently with multiple actuarial
18    consultant companies around the country.
19 Q  So, I guess, before going into that breakfast,
20    James knew that about you, that you were
21    liquidating another company and you were
22    interviewing for other actuarial positions?
23 A  That is correct.
24 Q  Did he have any expectation you would be abandoning
25    those efforts and focusing full time on Premier?

Page 41

1  A  He knew I was not going to be around.
2  Q  And so when he asked if you wanted to be a part,
3     what did you say?
4  A  I'd be an investor.
5  Q  At that point when you agreed to be an investor in
6     Premier Group Autos, is it okay if I call it
7     Premier going forward?  Will you understand?
8  A  Can you say PGA?
9  Q  PGA, sure.
10 A  The reason I say that, when you say Premier,
11    Blackburn has Premier Warranty, which is his
12    holding company, Premier Aviation, which is his jet
13    leasing company.  So PGA would specifically
14    describe Premier Group Autos.
15 Q  Since golf isn't an issue in this, we can use PGA
16    and be okay; right?
17 A  I stink at golf.
18 Q  Yeah.  I was on the team, but I never had any
19    aspirations --
20 A  I try but --
21 Q  -- of going any further.
22 A  -- it's fun.
23 Q  At that point when he asked you to be an investor
24    in PGA, had you received any profits or
25    distributions or reporting about your investment in

Page 42

1     First Sky?
2  A  At that point, no.  Still to this day, no.
3  Q  I take it though, at that time there was no
4     indication or nothing that would suggest to you
5     that maybe there was a problem with First Sky?
6  A  There was nothing that was given to me that
7     indicated there was a problem in First Sky.
8  Q  And so you said you would be an investor in PGA.
9     Was the name decided at that point in time or just
10    it will be a company?
11 A  It was a company.
12 Q  Had you ever -- I take it from your previous
13    testimony, you'd never seen an Overfinch vehicle
14    before?
15 A  I had never seen an Overfinch vehicle before.  I
16    actually didn't even know that company existed.
17 Q  Do you know whether either James Blackburn or
18    Samuel Blackburn had ever bought or sold Overfinch
19    vehicles prior to that?
20 A  To my knowledge, no.
21 Q  What did the Overfinch guys tell you about their
22    business model or their financial forecasting or
23    whatever in this breakfast?
24 A  They recently opened up their manufacturing plant
25    in around 2017 to 2018 in Danville, Virginia.  So

Page 43

1     they were just getting into the U.S. market.
2  Q  Did they tell you anything kind of in detail about,
3     well, here's how much each vehicle costs, here's
4     how much we invest in it, here's our profit margin?
5  A  Mainly what we would have to buy the car off of
6     them for, yes.
7  Q  Did they have any information about sales of those
8     types of vehicles in the south Florida area?
9  A  No.
10 Q  Did they have any information, like, in similar
11    demographic areas in other parts of the country,
12    here's our sales?
13 A  They were just getting into the U.S. market.
14 Q  Did they talk at all about any kind of sales in the
15    European market?
16 A  They didn't provide to me their financials for the
17    European market.  There's a website stating it's
18    the No. 1 luxury car over in the UK.
19 Q  But at that point you had not seen any financials
20    for either the U.S. market or the European market;
21    is that right?
22 A  Correct.
23 Q  Did you see any other information from the
24    Overfinch folks that led you to conclude this would
25    be a good investment?

Page 44

1  A  From the Overfinch folks, no.
2  Q  Did James or anyone else that was at that breakfast
3     that wasn't with Overfinch, did they have any other
4     information that would demonstrate the viability of
5     that business plan?
6  A  James sent me the link of the Overfinch being the
7     No. 1 luxury SUV in the UK.  So it was mainly an
8     established franchise that was venturing to the new
9     market of the United States.
10 Q  Gotcha.
11        At what point, if you recall, in this process
12    was the name Premier Group Autos selected?
13 A  Probably around November 2018.
14 Q  And how was that business to be structured?  Did
15    you guys talk about that?
16 A  It was 50/50.  Each one of us was supposed to put
17    initial capital into the company.  In addition to
18    that, each one of us was supposed to buy a car.
19    And every time that car was sold, that loan was
20    supposed to be reinvested into a new car as, like,
21    a revolving line of credit owned by the owners of
22    the company.
23 Q  What was your initial capital investment, if you
24    remember?
25 A  $112,500.

Page 45

1 Q  And what was each car going to cost?
2 A  180,000.
3 Q  Is that kind of on average?
4 A  Yeah.
5 Q  So you were looking at 225,000 initial capital
6    total from both partners?
7 A  That's what I thought, and that's what does reflect
8    on the tax return that Blackburn's accountant
9    provided.
10 Q  And so this was going to be when PGA was formed,
11    you would both put that initial capital in and buy
12    a car; is that right?
13 A  Correct.
14 Q  So that would mean each -- were you guys partners
15    or members in an LLC?
16 A  I think on the bank documents it says manager.
17 Q  So each manager would provide an initial
18    out-of-pocket expense of nearly $300,000; is that
19    right?
20 A  Correct.
21 Q  How were those amounts decided upon?
22 A  Conversations between myself and Blackburn.
23 Q  Did you run any numbers to say, here's what we're
24    going to need initially to kind of keep going?
25 A  In a way.  I came up with an earned value

Page 46

1    management forecast, and it was 36 cars, based off
2    of -- that was the quota that was within the
3    Overfinch contract.  So it was three cars a month
4    for a year was our quota in the Overfinch contract.
5 Q  And so the kind of initial investment for you and
6    Mr. Blackburn was based off what the Overfinch
7    quota was going to be; is that right?
8 A  In a way.
9 Q  Now, this was your, I guess, first foray into the
10    business of purchasing and selling automobiles; is
11    that right?
12 A  Yes.  My businesses up home are not in the auto
13    industry.
14 Q  Mr. Blackburn had some auto experience in his
15    personal background; right?
16 A  I do believe so.
17 Q  That would apply also for Samuel; is that right?
18 A  You'd have to ask Samuel.
19 Q  Who decided -- or, I guess, did you and Blackburn
20    decide equally this should be set up as an LLC?
21 A  Yes, initially.
22 Q  Initially.
23 A  It got changed.
24 Q  When did it get changed?
25 A  Around April of 2019.

Page 47

1 Q  And what did it become in April of 2019?
2 A  An S corp.
3 Q  So it converted from an LLC to an S corp; is that
4    right?
5 A  Correct.
6 Q  Was there any paperwork or anything you had to fill
7    out in order to do that?
8 A  Me, no.  It was changed to an S corp by Blackburn.
9    There is a document where it says that change
10    happened because the lawyer thought the accountant
11    was doing it and the accountant thought the lawyer
12    was doing it.  Got changed to an S corp.
13      Coincidentally, in an S corp, if your assets
14    are less than a quarter of a million dollars, you
15    do not have to file a Schedule L with the IRS.  A
16    Schedule L consists of a detailed balance sheet.
17 Q  So I take it, at that time, the Schedule L didn't
18    have to be filed because the assets were under that
19    quarter million; is that correct?
20 A  Correct.
21 Q  I thought an LLC could choose to be taxed as an
22    S corp without changing its business structure; am
23    I wrong about that?
24 A  You would have to talk to maybe yourself.
25    Trust me, that's not going to help.

Page 48

1 A  All right.  Jason.
2 Q  Okay.  Right.  I'll have to talk to Jason.
3      MR. DELK:  Still won't help.
4 Q  I'll have to go to another floor and talk to our
5    business folks --
6 A  Perfect.
7 Q  -- and that takes forever.
8      So that was my -- I may be completely under
9    misimpression of how that works.
10      So I take it that S corp was something you
11    weren't consulted about or approved?
12 A  That's correct.  I asked for the K-1s for the 2018
13    fiscal year, mainly because we, obviously, had an
14    upfront loss, which I'm legally allowed to claim.
15 Q  Correct.  Yeah.
16 A  And I wanted to offset some of the income I've made
17    legally, and that's where that conversation kind of
18    started, and that's how -- what triggered the
19    change in the S corp.  I do have a K-1 from
20    Blackburn's accountant stating that the initial
21    capital is 225,000.  Given the production in
22    discovery, I can't figure out how the accountant
23    came up with those numbers.
24 Q  Okay.  But what you remember today is that you and
25    Blackburn had agreed that each was going to put in

Page 49

1 that 112,500; right?
2 A Correct.
3 Q Did you ever -- in this early formation of PGA,
4 November 2018 time frame -- did you retain counsel
5 to do the business filings?
6 A No.
7 Q And who did those?
8 A Blackburn.
9 Q Blackburn. James Blackburn; right?
10 A Yes. That's my fault. Yeah, James Blackburn.
11 Q Totally fine.
12 And if I say Blackburn, I'm more likely than
13 not meaning James.
14 A I understand, but just like with PGA, we
15 should . . .
16 Q Sure.
17 Did you guys ever put together an operating
18 agreement for the company?
19 A There was a one-page agreement that he drafted. I
20 was fairly okay with the terms. There are
21 signatures on that one-page document.
22 Q And did that divide up any of the responsibilities
23 or authority each of you had for the business?
24 A No, I think it was just titles.
25 Q So each of you had the ability, I guess, to enter

Page 50

1 into a contract on behalf of the business?
2 A Yes.
3 Q And I guess each of you could make a purchase or
4 incur some other type of debt on behalf of the
5 business without the authority of the other?
6 A No, there's -- in there it says it would be
7 mutually agreed upon.
8 Q Gotcha, okay.
9 As I understand it, PGA also did business as
10 Overfinch Miami; is that right?
11 A It was a d/b/a.
12 MR. JONES: We've been going about a little
13 over an hour. Why don't we take our first break.
14 THE REPORTER: Off the record at 11:10.
15 (A brief recess was taken.)
16 THE REPORTER: It is 11:22.
17 BY MR. ROCAP:
18 Q Mr. Kessler, I'm going to hand you what I
19 previously marked as Exhibit 20. That was used on
20 Monday. This is the first time I've had a chance
21 to put an exhibit sticker on it. This is a
22 Complaint that you filed in Florida against
23 Mr. Blackburn and some others. And the reason I'm
24 using this is I want to direct your attention to
25 some of the documents that were attached as

Page 51

1 exhibits to this Complaint.
2 A Uh-huh.
3 Q And so the first one I want you to take a look at
4 is Exhibit No. 1, and it is on the page that has --
5 A Okay. Got it.
6 Q The little numbers that the lawyers add at the
7 bottom are Bates labels.
8 A These, PAG?
9 Q Yeah, PAG is a Bates label, so PAG 31 is what I'm
10 looking at.
11 A I understand.
12 Q You had mentioned in your previous testimony that
13 there was a one-page agreement between you and
14 Mr. Blackburn.
15 A Correct.
16 Q Is Exhibit No. 1 to Exhibit 20 here we're looking
17 at, is that that one-page agreement?
18 A Yes.
19 Q And do you recall who drafted this up?
20 A Blackburn.
21 Q Blackburn did, okay.
22 A James Blackburn.
23 Q Thank you.
24 So in the first line here, it says that "Ed
25 and James will own 50% each of The Premier Group

Page 52

1 and its subsidiary Overfinch Miami."
2 When he says The Premier Group, I take it PGA
3 hadn't been chosen at that point; is that right?
4 A I would believe so.
5 Q Probably had to do a name search at some point?
6 A He did. He created the name. It was just the same
7 of the company. We were doing a d/b/a Overfinch
8 Miami.
9 Q Here it says subsidiary Overfinch Miami, but it was
10 never --
11 A D/b/a, yeah.
12 Q The second line is, "Both parties agree to support
13 the company in their own relative capacity."
14 What did you understand your involvement with
15 the company to be?
16 A Passive investor.
17 Q So as a passive investor, were you planning on
18 being involved in the day-to-day operation of the
19 company?
20 A No.
21 Q Now, on Monday Mr. Blackburn testified it was his
22 expectation you would be moving to Florida to
23 dedicate your full-time work toward PGA; is that
24 consistent with your recollection?
25 A That is not consistent with my recollection. I had

Page 53

1   absolutely zero plans on moving to Florida.  This
2   was still a time I was interviewing with Marsh &
3   McLennan Companies; Mercer out in Phoenix; Milliman
4   down in Tampa; Perr & Knight in Boca; Aon Hewitt, I
5   flew to Philly; Aon Hewitt in Colorado; Highmark
6   Health in Pittsburgh; and a couple other
7   miscellaneous ones.  And then Cowden called me, and
8   that was the job I decided to take.
9 Q   Would it be fair to say you don't recall any
10   communication to James Blackburn saying, I'm going
11   to move to Florida, dedicate my full-time efforts
12   to PGA?
13 A   Blackburn is well aware I was not moving to Florida
14   involving this company.
15 Q   The next line there is, "More detailed agreement to
16   follow after training in London in December."
17       Tell me about the training in London that is
18   mentioned there.
19 A   James Blackburn, I believe Sam Blackburn, and maybe
20   Daniel Madero flew to London to do the sales
21   training with the Overfinch Company.
22 Q   You did not go?
23 A   I did not go.
24 Q   And was Overfinch paying for that training, or was
25   this something PGA had to pay for?

Page 54

1 A   These charges actually showed up on the American
2   Express card that Blackburn applied for only in my
3   name, which once -- again, I just recently got
4   dismissed with prejudice about two weeks ago.
5 Q   Okay.
6 A   I filed a dispute with TransUnion.  I have a
7   screenshot of the information for the AmEx case.
8   My cell phone number is one digit off, my home
9   phone number is one digit off, and the address is
10   down in Florida.
11 Q   So at what point -- are you saying Mr. Blackburn
12   applied as you for an AmEx card?
13 A   Yes.
14 Q   And did he -- I'm assuming you would have to
15   provide a signature or other -- like a Social
16   Security number or something?
17 A   You have to -- you have your Social Security
18   numbers of your partners when you create a
19   business.  In order to open a bank account, you
20   have to have a photocopy of the driver's license of
21   your partners.  He had my information.
22 Q   Okay.
23 A   There is a signature on a tax reform (sic) from
24   AmEx in late January.  My name is forged on that,
25   and the phone number to contact the, quote/unquote,

Page 55

1   taxpayer starts at a 954 area code, which is
2   obviously not my phone number.
3 Q   So you say late January.  You mean January 2019?
4 A   Correct.
5 Q   So late January 2019 is, what, three months roughly
6   from the date this agreement was formed?
7 A   He racked up $100,000 on an AmEx card by the end of
8   January, and I was apparently the sole guarantor of
9   that card.  I found out about the forgery maybe
10   around in October of 2020 -- or, no, 2019 -- Donna
11   DeGroff sent me an email with that document.
12 Q   DeGroff, could you spell that for me.
13 A   I believe it's D-E, capital G, R-O-F-F.
14 Q   Oh, all right.  Who is Donna?
15 A   She ended up being the controller of the company
16   and was hired by Blackburn maybe in May or June of
17   2019.
18 Q   So she was the controller of PGA?
19 A   The original person was supposed to be Elaina,
20   which is his secretary from his other companies.
21   There was no books created until Donna got down
22   there and I flew down around May or June.
23 Q   So if I'm understanding kind of the flow of this --
24   and I know we're kind of hopping around.
25 A   That's fine.

Page 56

1 Q   I apologize for it -- there's what you knew at the
2   time and what you know now.  So you've got to flip
3   back and forth.
4 A   Correct.  No, I understand.
5 Q   So as of this late January 2019, there's about
6   100,000 on that AmEx card that Mr. Blackburn has
7   already charged; is that right?
8 A   Correct.
9 Q   And so if I'm understanding, at least the way this
10   is supposed to work, there's roughly -- you know,
11   each partner is putting 300,000 into the company?
12 A   Supposedly, yes.
13 Q   Supposedly, yeah.  So there's another 100,000 put
14   on the AmEx card?
15 A   Correct.
16 Q   So there's 100,000 of that 600,000 investment,
17   again, roughly --
18 A   Roughly.
19 Q   -- that something else has been done with; is that
20   right?
21 A   The AmEx card 100,000 is on top of the 112,500 that
22   each of us were supposed to put in that correspond
23   with the tax returns.  And I put my $180,000 in, in
24   a two-part loan, directly from my personal account
25   to Overfinch Miami.  I did sign third-party

Page 57

1    affidavits.  I do have them.
2  Q  Okay.
3  A  Meaning that I was, like, financing that car on
4     behalf of PGA because the money went strictly from
5     my personal to Overfinch.  It didn't go from my
6     personal to the company bank account to Overfinch.
7     So that's why Overfinch needed that affidavit.
8  Q  I gotcha.
9        Back on Exhibit No. 1 here in the agreement,
10     it mentions here, it says, under Ed Kessler,
11     "50,000 in upfront capital provided."
12        Was that the total amount that you were
13     putting in?  Because you mentioned 112,500 earlier.
14  A  Yeah, 50,000 was the first deposit that went in.
15  Q  Gotcha.
16  A  This was in three installments.  It was a $50,000
17     installment, another $50,000 installment, and then
18     at some point, either late in 2018 or early 2019 --
19     it was prior to the PGA bank account, it went into
20     a company called Nautic Crew -- was the other
21     $112,500.
22  Q  The next line says, "Use of credit facilities for
23     purchase of floor plan financing and showroom build
24     out."
25        What credit facilities was being referenced in

Page 58

1     this agreement here?
2  A  There wasn't any specific ones referenced.  This
3     was just prior to everything.  So, like, an
4     American Express wasn't talked about at this point.
5     I didn't even know NextGear Capital existed, to be
6     honest with you.
7        So it was just, like, okay, we -- like, down
8     here, needed to be agreed upon by both parties and
9     should be provided equally.
10  Q  Okay.
11  A  So it was just that both partners would have had to
12     have agreed upon any debt that was taken into the
13     company.
14  Q  Gotcha.  Also in that sentence we just looked at,
15     there's a term used called floor plan financing.
16  A  Okay.
17  Q  Which is not a day-to-day term.  So what was your
18     understanding of what floor plan financing was?
19  A  Mainly just another form of leverage, debt.
20  Q  What was your understanding of how it worked?
21  A  How it worked?
22  Q  Yeah.
23  A  To my understanding, at that point, I didn't really
24     have an understanding of, like, exactly how floor
25     plan worked.  There's a good way to use debt and

Page 59

1     there's a bad way to use debt.  The numbers are the
2     numbers; debt is debt.
3  Q  And so did you have just, like, even kind of a
4     rudimentary concept of how floor plan financing
5     would operate?
6  A  No, not at that time.  Mainly I was looking at it
7     as credit facilities, like, taking out a credit
8     card and/or just issuing some leverage on the
9     company.
10  Q  And what was a showroom buildout; what was that
11     going to be?
12  A  I do believe in the Overfinch contract, it included
13     some clause along the lines of having some type of
14     a showroom of an Overfinch, so they could, like,
15     park their cars there, like a showroom.  Kind of
16     like what they did at the Fort Lauderdale Boat Show
17     but an internal showroom, like a building, per se.
18  Q  Where you could bring potential clients and say,
19     hey, here's --
20  A  In a way, yes.
21  Q  That's your signature at the bottom of the page?
22  A  This is a correct signature of mine.  I did sign
23     this.
24  Q  It says you're going to be the director of
25     operations for the company under your section.

Page 60

1  A  Uh-huh.
2  Q  And that Mr. Blackburn is going to be chief
3     executive officer.  Did you guys have any breakdown
4     of job duties?
5  A  No, that was just a title.
6  Q  And it says, "Purchase of first vehicle to be
7     financed."
8        What does that mean?
9  A  I am supposed to buy a first car.
10  Q  But it doesn't say you're buying one.  It says
11     you're going to finance it.  Does that mean they're
12     going to pay you back or how does that work?
13  A  My loan goes into the company.  The company has a
14     loan to me.  Blackburn was supposed to do the same
15     thing.
16  Q  And then "Any additional financing required via
17     loan or capital support."
18  A  Okay.
19  Q  What does that mean, capital support?
20  A  Could be capital from the partners.
21  Q  Okay.  So might be more money from you then?
22  A  Yeah, it was mainly supposed to be financed by the
23     owners.
24  Q  It occurs to me one thing I didn't follow up on in
25     our earlier discussion, because you mentioned with

Page 61

1   your role in, I believe it was, Addvetco that you
2   were project manager, so you were involved in
3   contracting and doing analysis, projections, those
4   kind of things; right?
5 A   Yeah.
6 Q   And so have you ever heard of the term due
7   diligence?
8 A   Yeah, I've heard of the term.
9 Q   Is that something that's done in the project
10   management area?
11 A   In a way, yeah, sometimes it's done concurrently
12   with the operations of the job.
13 Q   I guess what I'm wondering is, as part of that
14   aspect of that job, was it common for you to do due
15   diligence on a project to determine, well, here's
16   how the flow's going to go, here's the timing, you
17   know, those things you were talking about earlier?
18 A   Some with the other project managers and/or the
19   superintendents of the projects, yeah.
20 Q   And when you mentioned contracting, were you
21   involved in drafting or negotiating contracts?
22 A   No.  Contracts were pretty much a template from the
23   VA Hospital.
24 Q   So would you review those contracts to know, like,
25   what the terms meant?

Page 62

1 A   Sometimes, yes.  Most of the time it was the
2   higher-ups, like the CEO.
3 Q   Here on Exhibit No. 1 again to Exhibit 20, the
4   November 5, 2018, agreement between you and
5   Mr. Blackburn, you're agreeing to use your credit
6   facilities, whatever they were, for the purchase of
7   floor plan financing.  As I take it, you didn't
8   have an understanding of what floor plan financing,
9   how it operated; is that right?
10 A   In a way.  Like, floor plan financing, however you
11   look at it, debt, there's good ways to use debt;
12   there's bad way to use debt.
13 Q   Okay.
14   Which we're going to get into is the discussion
15   that we had prior to the electronic signature of
16   this thing.  But the floor plan financing was not
17   used the way it was supposed to be used.
18 Q   So tell me how it was supposed to be used.
19 A   So the way you use debt is, if you buy a car, let's
20   say, for $50,000, you're buying an asset, you
21   put $20,000 -- I think the agreement summed out 40
22   grand, so let's just say 60 -- we would put
23   20 grand down as down payment and floor plan the
24   other 40.  So we're using $20,000 of our own money,
25   40,000 of NextGear's money to buy an asset.

Page 63

1 Q   Okay.
2 A   Now, you use that time, you pay interest on your
3   loan of $40,000, but you buy the vehicle in a way
4   where you know you can sell it above that 60,000,
5   maybe it's $70,000.
6 Q   Okay.
7 A   So you pay back the floor plan of $40,000, and the
8   difference is your profit margin on the sale, and
9   the $20,000 gets reimbursed back into the company
10   after the sale.
11 Q   So when you sell that car, you've got a debt to
12   whoever your floor plan lender is, in this case
13   NextGear, that has to be paid off?
14 A   After the sale of the car, NextGear would get paid
15   40, or whatever they floored on that car, the
16   company would get their $20,000 back that we put
17   down on a down payment, and the difference between
18   the buying price and the selling price would be the
19   profit margin that would also come back into the
20   company.
21 Q   Gotcha.  And you would use that to invest into a
22   new car or make distributions?
23 A   Correct.  That is how this debt was supposed to be
24   used.  That was the conversation.
25 Q   Was that what you understood as of November 5 here

Page 64

1   when you were agreeing to do floor plan financing,
2   that concept that we were talking about, that's how
3   it was going to work?
4 A   No, because at that time, I didn't even know
5   NextGear existed.  And this conversation happened
6   probably around late February or early March of
7   2019.
8 Q   So in this November 5, 2018, time period, I'm just
9   trying to get an understanding of what you believed
10   you were agreeing to with the term floor plan
11   financing here.
12 A   That the company could just -- they could take on
13   debt in a way, but there's -- like, okay, general
14   terms, you can take on debt.  But depending on how
15   you take on that debt is a completely different
16   story.  So that's -- my understanding here is there
17   could be some leverage that could happen in the
18   near future.
19 Q   But what I'm taking from your testimony is, you
20   didn't have a separate understanding of what floor
21   plan financing was in particular other than debt?
22 A   In a way, yes.
23 Q   You wouldn't sign your name to an agreement and
24   agree to put in tens of thousands of dollars
25   without kind of understanding the terms of that

Page 65

1   agreement; right?
2 A   In a way, but, I mean, it still has to be discussed
3     and approved upon by both owners prior to doing
4     anything.
5 Q   And so this agreement is put in place November 5.
6     The next page in the exhibit is Exhibit No. 2,
7     which appears to be the Overfinch distribution
8     agreement; is that correct?
9 A   To my knowledge, yes.
10 Q   Do you recall receiving this agreement and
11     reviewing it prior to executing it?
12 A   I believe Blackburn did email me this.
13 Q   Okay.  So you recall seeing it?
14 A   Yeah.
15 Q   And did you review its terms?
16 A   Most of it, yeah.
17 Q   If you take a look at the very first page of
18     Exhibit No. 2, and it's paragraph 1.4 is what I'm
19     looking at.
20 A   Okay.
21 Q   And it talks about the initial term means 12 months
22     from the effective date.
23 A   Okay.
24 Q   And if you go up to the very top, the first
25     sentence has a handwritten date up there.  Do you

Page 66

1     see?  And it looks like it's Monday the 3rd of
2     December, 2018.
3 A   Okay.
4 Q   Did I read that correctly?  It doesn't look like
5     23rd.
6 A   I would say 3rd.  I don't know what that -- it
7     looks like a C before it.
8 Q   Right.  I'm not sure what that was.
9         And then it says effective date?
10 A   Yeah.
11 Q   So that initial term, 12 months from the effective
12     date, that's, you know, basically December 2018 to
13     2019; is that right?
14 A   Correct.
15 Q   That comes into play -- if you'll switch to -- it's
16     page 5 of that exhibit, Bates number 36 at the
17     bottom right, and I'm looking at paragraph 2.5.
18 A   Hold on.  I'm trying to find it.  Sorry.
19 Q   I had it double sided to save on paper.  Sorry
20     about that.
21 A   Here (indicating)?
22 Q   Yeah, paragraph 2.5.
23 A   Minimum annual order quantity?
24 Q   Correct.  It says, "The Distributor is required to
25     place orders for a minimum of 36 Overfinch

Page 67

1     Conversions or Overfinch products to the value of
2     $1.5 million during the initial term."
3 A   Okay.
4 Q   Is that where you were talking about the quota you
5     mentioned earlier?
6 A   Yes.
7 Q   So it's 36 vehicles from December to December in
8     that first --
9 A   Yes.
10 Q   -- term?
11         Or 1.5 million of products; is that right?
12 A   Yeah.
13 Q   And the way Mr. Blackburn explained it was that an
14     Overfinch conversion was, like, taking that Range
15     Rover and making it the souped-up Range Rover, you
16     could buy products, just wheels or something for a
17     vehicle; is that correct?
18 A   Correct, yeah.
19 Q   And so, like you said, that's three conversions per
20     month or, I think, $125,000 in products per month
21     that was going to have to be ordered from
22     Overfinch; is that right?
23 A   Yeah, like, I was looking at it as units, like
24     cars, three per month, and that's the forecast that
25     I made off of.

Page 68

1 Q   And so in the November 5 agreement, you each agreed
2     to purchase one vehicle; right?
3 A   Uh-huh.
4 Q   And so by the end of December then, you would still
5     have to purchase another vehicle or another
6     conversion; is that right?
7 A   Can you please repeat that.
8 Q   Yeah.  So you guys had agreed to each of you would
9     purchase one vehicle.
10 A   The first and second cars, I was supposed to buy,
11     Blackburn was supposed to buy.
12 Q   Right.
13 A   Yeah.
14 Q   That would be done once this agreement was entered
15     into in December; right?
16 A   Around, yes.
17 Q   So then by the end of December 2018, PGA would have
18     had to purchase either another vehicle or $125,000
19     worth of Overfinch products; is that right?
20 A   Not necessarily.
21 Q   It just had to average out?
22 A   It was an average, yeah.
23 Q   Looking at Exhibit No. 3 of Exhibit 20.
24 A   Yes.
25 Q   Sorry.  It gets confusing.

Page 73

1  Q  As of --
2  A  Operating agreements.  Yeah.
3  Q  So as of, I guess, November when PGA was set up,
4     did Mr. Blackburn have your Social Security number
5     and driver's license?
6  A  He had my -- I believe he had my social.  The
7     driver's license, yes.  Specifically, that picture
8     (indicating), I took on November 30 of 2018.  I
9     still have the metadata of that on my phone.  I
10    even still have the text message conversation where
11    I texted that exact same picture to Mr. Blackburn.
12    The background of that picture is my granite
13    countertop that's in my basement up in Pittsburgh.
14 Q  You know what?  This might be a good time to -- I
15    think I got that.  I can't remember.
16 A  It's right here (indicating).
17 Q  So this picture, this is -- hand you what's been
18    previously marked Deposition Exhibit 4.
19 A  Yes.
20 Q  There's actually two pages to it, but I take it the
21    first page is a picture you took of your own
22    driver's license on your own granite countertop and
23    sent to Mr. Blackburn through text message?
24 A  I texted it to him.  I still have the text message
25    on my phone.

Page 74

1  Q  I think I have that.
2  A  I can send you a screenshot of the text message.
3        THE WITNESS:  I thought you sent it to him.
4        MR. JONES:  I'm going to mark this as a new
5     one.
6        (Exhibit 31 marked.)
7  Q  All right.  Mr. Kessler, handing you what's been
8     marked Exhibit 31.  This is that text message you
9     were talking about?
10 A  Yes.
11 Q  And this was sent November 30, 2018, based upon the
12    metadata of the picture?
13 A  You would have -- in the text message chain, I do
14    believe I sent a continuous conversation.
15 Q  Yeah, there's a lot of it.
16 A  So this specific text message doesn't have the time
17    stamp.
18 Q  The date, yeah.
19 A  But preceding ones, they do.
20 Q  Okay.  Gotcha.
21        And it looks like the preceding one,
22    Mr. Blackburn had sent you a picture of a Land
23    Rover?
24 A  Yeah.
25 Q  So November 30, 2018, you are sending your driver's

Page 75

1     license to Mr. Blackburn.  What was the reason you
2     sent that to him at that time?
3  A  That was when he was talking about getting the bank
4     account set up.
5        MR. ROCAP:  What was the date on that?  I've
6     forgotten.
7        THE WITNESS:  I believe it's November 30,
8     2018.
9        MR. ROCAP:  Thank you.
10 BY MR. JONES:
11 Q  And so had you and Mr. Blackburn discussed, well,
12    like, what bank are we going to use, what type of
13    accounts?
14 A  No.
15 Q  It was something he was going to manage?
16 A  Yeah, he would pick a bank.  I mean, to my -- being
17    an honest businessman up home, I pick a bank; my
18    investors, they don't really dictate on what bank I
19    choose.  It's just a bank.
20 Q  A bank's a bank for the most part.
21 A  That is what I thought, yes.
22 Q  So when you say, that is what you thought, what --
23    obviously --
24 A  There was a reason why he picked HSBC.
25 Q  Why did he pick HSBC?

Page 76

1  A  There's no HSBC up in Pittsburgh, for one.
2     Secondly, HSBC for security reasons uses a dual
3     authentication system.  Nowadays we get text
4     messages to our phones.  HSBC issues bank fobs that
5     send security codes for you to log into the
6     account.
7  Q  So in order to access that account, you'd have to
8     have the fob, not just a phone with a text number?
9  A  Correct.
10 Q  I take it what you're saying is, that choice of
11    HSBC would mean there was no local branch you could
12    go into where you lived?
13 A  Correct.
14 Q  And that if you didn't have that fob, there was no
15    way you were getting in to look at the account?
16 A  I found out maybe in May or June that the bank fob
17    that Mr. Blackburn was using was registered in my
18    name.  I got another bank fob issued to my house
19    maybe in July of 2019.  The bank would not let me
20    register the bank fob because the bank was stating
21    that there was already one registered in my name.
22        There's multiple text messages to
23    Mr. Blackburn that the bank fob you have is
24    registered in my name, and the bank won't let me
25    register this one in my name.  You need to transfer

Page 77

1    the one you currently have in your name so I can
2    register this one into my name.
3  Q  **Gotcha.  Did that ever happen?**
4  A  Nope.
5  Q  **Set aside kind of the bank account for now.  Had**
6    **you guys talked in this November 2018 time frame**
7    **about how you were going to do accounting for the**
8    **business?  In other words, were you going to hire**
9    **an accountant or use QuickBooks or --**
10  A  There's text messages that his account for his
11    other businesses, Elaina was taking care of it.
12  Q  **So your understanding was that, I guess, kind of**
13    **consistent with your being a passive investor,**
14    **Mr. Blackburn and his accountant were going to take**
15    **care of the details getting the bank account set**
16    **up, and you provided him the information he needed**
17    **to do that?**
18  A  That is correct.
19  Q  **Were you expecting to have to sign a bank account**
20    **agreement?**
21  A  I signed bank signature cards in which I still do
22    have to this day in my possession.
23  Q  **And do you recall when you signed those signature**
24    **cards?**
25  A  Early months of 2019.  I don't know if it was

Page 78

1    January or February, but I'd just have to check the
2    dates on them.
3  Q  **So by December 3, 2018, when you entered into the**
4    **loan agreement that we just looked at a few minutes**
5    **ago, there were no PGA bank accounts; is that**
6    **correct?**
7  A  That's where the initial capital went into Nautic
8    Crew, which to my understanding was a registered
9    agent company that had no expense.  He was supposed
10    to wire his money into Nautic Crew.  Some of the
11    upfront expenses that were on behalf of the company
12    were supposed to get deducted off of that initial
13    capital.  And when I came down next time I was in
14    town to set up the bank account, the remaining
15    funds from that -- those initial purchases, the
16    remaining funds were supposed to get transferred
17    from Nautic Crew into the PGA bank account.
18  Q  **Did you have any concerns about having to wire your**
19    **loan into an account that wasn't controlled by the**
20    **company you were a member of?**
21  A  At that time, no.  I grew up around very honest
22    people that were men and women of their word.  I'm
23    a man of my word.  If I told you that, hey, wire
24    this money into this account, I'll transfer it
25    over, I would transfer it over.

Page 79

1    My investors up north, not a single one of
2    them, have looked at the bank account for a
3    multiple number of years.  The current investors in
4    one of the companies that's been operating for
5    about a year now, they actually forfeited their
6    managerial rights on the company.  I'm the only
7    manager.  My signature's the only one that matters.
8    They are just members of the company.  They have
9    not looked at the bank account.  They don't have
10    access to the bank account.
11  Q  **Which company is that you're talking about?**
12  A  It's called RF Capital.
13  Q  **RF Capital, okay.  Because you had mentioned**
14    **earlier, I believe, ET Management and Peak**
15    **Solutions.**
16  A  Right.
17  Q  **I take it there are other companies you're involved**
18    **with; is that right?**
19  A  So ET Management Group was a company that owned
20    three properties that was mainly leveraged by a
21    loan of myself.  And I mentioned in the beginning
22    that ET Management got liquidated.
23  Q  **Yeah.**
24  A  So I had to liquidate that company in order to get
25    my asset-backing loans back to pay for my lawyer

Page 80

1    fees, which are just shy of $400,000.  Every one of
2    my lawyers are paid 100 percent in full with my own
3    money as of this point.
4    Those properties in ET Management Group were
5    rolled over into a new LLC called RF Capital, in
6    which there were a few other investors that came
7    into that company.
8  Q  **Are there any other companies that we haven't**
9    **talked about yet that you're associated with?**
10  A  I just formed a company called Peak Consultants,
11    LLC, maybe a week ago or so.
12  Q  **Okay.  And what does Peak Consultants do?**
13  A  Financial consulting, controller company.  I do the
14    QuickBooks of some clients.  The main purpose of
15    that is I don't really want to partner with
16    someone, given this experience.
17  Q  **Sure.**
18  A  So if someone doesn't want to listen to my
19    financial consulting, I don't get dragged down with
20    the business.
21  Q  **Gotcha.  Okay.**
22    **Any other businesses that you're either a**
23    **member or manager of?**
24  A  No.
25  Q  **Okay.  Want to make sure we have a full list here.**

Page 81

1  A  I didn't want to, like, elude those businesses.
2     You were talking about in 2019.
3  Q  Totally understand.
4  A  The one was done in maybe December of 2020.
5  Q  Okay.
6  A  And Peak Consultants --
7  Q  Just last week.
8  A  -- just maybe a week ago or so.
9  Q  That's totally fine.
10 A  I'm not trying to hide anything.
11 Q  And upon behalf of all the members of the bar, we
12    appreciate you paying lawyers in full.
13 A  They are paid in full.  You can ask Jason.
14 Q  He's smiling, so I know it's in affirm of your
15    answer there.
16        And back in the early days of PGA here,
17    switching gears, by the end of December 2018, if I
18    understand correctly, you had sent $112,000 to
19    Nautic Crew; is that right?
20 A  Yes.
21 Q  And then also that loan, that $160,000 loan; right?
22 A  Yes.  And the $20,000 other portion of that loan to
23    buy the car, I'd have to look at the affidavit to
24    see the date of that.  I don't know if it was the
25    end of 2018 or early 2019.

Page 82

1  Q  Gotcha.
2  A  But, yes, and -- so, yeah, $300,000 into this, and
3     that was the upfront capital.
4  Q  Fair to say, by the end of December 2018, in total
5     you had known Mr. Blackburn for maybe a little over
6     a year at that point?
7  A  Yeah, a year, year and a half or so.
8  Q  So by the end of December 2018, you're roughly a
9     half million dollars invested in this guy's
10    businesses; right?
11 A  Yes.
12 Q  At that point, had you received any information
13    about your First Sky investment?
14 A  At that time, no.
15 Q  Had you received any information about where your
16    money into PGA was going other than to Nautic Crew?
17 A  No.  It was into Nautic Crew, and I was expecting
18    early months into 2019 that everything was going to
19    get rolled over.
20 Q  Okay.  So did it concern you by the end of
21    December 2018, PGA still didn't have a bank account
22    set up?
23 A  I mean, there's -- in a way, yes.  And in a way,
24    no.  I mean, I trusted my business partner.  That's
25    how I looked at -- I went into this as a cordial

Page 83

1     business investment that I thought was a very good
2     opportunity the way it was initially set up.  Now,
3     the way it was executed was completely different
4     from the way it was set up.
5         And as I said before, I grew up around trusted
6     people.  We made decisions that were in the best
7     interest of the company, like, the fiduciary
8     responsibility.  It wasn't so much decisions that
9     were in the best interests for ourselves, and that
10    business model was the only one I knew of for the
11    ten years that I worked prior to meeting Blackburn.
12 Q  Gotcha.
13 A  I was never exposed to the fraud that I was about
14    to experience when I started going through some of
15    the bank accounts when I went down in June or so of
16    2019.
17 Q  A few more questions and I think we can take a
18    lunch break.  I mean, setting up a bank account,
19    that's not a -- in your experience, is that
20    normally a multi-month process?
21 A  To gather some of the documentation.  I mean, I've
22    solely opened up the bank accounts for the
23    businesses up north.  None of my partners have been
24    there.  They have given me their information, and
25    I've taken their information, went to the bank.

Page 84

1     I've signed off on the business cards, and the bank
2     accounts are set up.  That's how I only know how to
3     do business.  And that's what I was assuming that
4     Blackburn was going to do with my information.  It
5     just turned out not to be that instance.
6  Q  And I take it one of the things that you were, I
7     guess, expecting when you entered into the
8     agreements with Mr. Blackburn to set up the
9     business was you would have access to information
10    about how the business was being run, where the
11    finances were going, that kind of thing?
12 A  Yeah.  It was supposed to be, like, a full
13    disclosure, transparent.  He would give me access
14    to Nautic Crew.  He would transfer everything over,
15    and I believed the story that I was being told.
16 Q  So you had texted your driver's license to
17    Mr. Blackburn the end of November.  Did you ever
18    follow up in that December 2018 time frame to say,
19    hey, have you set up the bank account yet?
20 A  I don't believe so.  I wasn't in town.  The next
21    time I went in town, we met with the two bank
22    representatives, Denisha Perez and I forget the
23    other lady's name.  I might have it in an email, or
24    it might come to me.
25 Q  You had mentioned a term a couple of minutes ago

Page 85

1    that I want to follow up on.  You used the word
2    fiduciary.  That obviously has some legal meaning.
3    I want to ask you what your understanding of being
4    a fiduciary means.
5 A  You have to look out for the best interest of the
6    company.
7 Q  When you entered into an agreement with
8    Mr. Blackburn, did you expect that you and he would
9    have a fiduciary relationship to each other?
10 A  To each other, yes.  I mean, I have a fiduciary
11    responsibility to my partners, and I thought that's
12    how people did business.
13 Q  And sitting here today, do you believe you
14    fulfilled your fiduciary obligation to
15    Mr. Blackburn and PGA?
16 A  I tried my best at every angle that I possibly
17    could to -- even to the point of trying to freeze
18    the bank account to try to stop the bleeding.  I
19    have months of emails to the bank that they ignored
20    prior to the bank getting robbed of $80,000 in
21    February or so of 2020.  That's when the bank
22    opened up to me and realized they were trusting the
23    wrong person.
24 Q  And that was HSBC; right?
25 A  That is correct.

Page 86

1 Q  Sitting here today, do you believe Mr. Blackburn
2    violated his fiduciary obligations to you and PGA?
3 A  Absolutely.
4       MR. JONES:  Why don't we take a lunch break.
5       THE REPORTER:  Off the record at 12:13.
6       (A brief recess was taken.)
7       THE REPORTER:  It's 12:33.
8       MR. JONES:  All right.  Mr. Kessler, we just
9    took a brief break, and Mr. Rocap and I are going
10    to have our food brought in.  I hope you don't mind
11    us chewing.
12       THE WITNESS:  That's okay.
13 BY MR. JONES:
14 Q  You mentioned prior to the break there was $80,000
15    from HSBC in February of 2020.  I want to follow up
16    on, what is that referencing there?
17 A  So the bank account was dwindling, and this is
18    after I'd tried to freeze it multiple times.  The
19    bank account was around $2,000, and Blackburn was
20    saying there was a commission check coming in.
21    $80,000 check got presented to the bank.  $80,000
22    was wired out within a week.  The bank account went
23    from $2,000 to $82,000 to zero to negative 80.
24 Q  Because the check bounced?
25 A  Yes.  And the signer of the check -- after trying

Page 87

1    to get an image of the check from the bank for a
2    while, I had to get a court order from my lawyers,
3    and I wouldn't have paid my lawyers in Florida to
4    get a court order to get the bank to send me the
5    bank statements and a copy of the check if I could
6    have logged onto the bank account for free.
7      So I got, through the court order, all the
8    bank statements and a copy of the check.  The check
9    was from a company called Metier Accumulators.
10 Q  Spell that for me.
11 A  I think it's, M-E-T-I-E-R, Accumulators.
12 Q  Okay.
13 A  When you look up the company, the manager of the
14    company is called Madero Holdings, which is owned
15    by Daniel Madero.
16      And after contacting some of the bank reps up
17    north, how banks work is, if bank A presents a
18    check to bank B, bank B technic- -- usually makes
19    partial of those funds available, and then within
20    three to five business days will go back to bank A
21    to collect the remaining of the funds.
22 Q  Okay.
23 A  All $80,000 got made available immediately.
24    $80,000 was wired out within those three to five
25    business days of the bank going back to the bank

Page 88

1    that issued the check.  Check bounced and the bank
2    account went to negative $80,000.
3      There is also an email, maybe in March or so,
4    from Blackburn, because we were trying to get some
5    of the financial data that made up the 2018 tax
6    returns that was never gotten over, Donna sent an
7    email.  And Blackburn responded to the email
8    stating, "Donna, stay out of it.  My affairs with
9    Ed are none of your concern.  If Ed has a problem,
10    tell him to file a lawsuit.  The company is now
11    bankrupt."
12 Q  Okay.  Do you know who the money was wired to?
13 A  I have -- I mean, Nautic Crew, I believe, had ten
14    grand.  I do have the screenshot of these
15    transactions, but Nautic Crew, Samuel Blackburn,
16    James Blackburn, and a guy that owned, I believe
17    owns, a villa in Barbados.  Anthony Trebane
18    (phonetic) is coming to my head.
19 Q  Trebane, you said?
20 A  Yeah.  I don't know how to spell it.  I have the
21    PDF of the bank transactions that will show this.
22 Q  And you mentioned this Anthony Trebane, or whoever
23    it was, had a villa in Barbados?
24 A  Yeah, I believe he had a villa in Barbados.
25 Q  I believe Mr. Blackburn also had a property in

Page 93

1    I'd probably say around the same height.
2  Q  Gotcha.  Because I haven't seen a picture of the
3     guy, but I found out he's been involved with the
4     company.  I was, like, who is this guy?
5  A  I don't know if I have a picture.  If I do, I'll
6     find it.
7  Q  So kind of let's go back in time a little bit.
8     Let's go -- we were talking about 2020 -- let's
9     talk about early 2019.  At some point, I guess, by
10    early 2019, there were two cars that had been
11    bought from Overfinch, right, or at least you
12    bought one for sure?
13 A  I definitely bought one, yes.
14 Q  And do you know if James Blackburn had bought one?
15 A  James Blackburn had not bought one, nor did he buy
16    one.
17 Q  And so were you keeping track kind of on a
18    day-to-day basis of how sales were going?
19 A  Not too much on a day-to-day basis.  They did send
20    me the sales, maybe some type in an email, in March
21    or so.  And that's when I compared the sales
22    numbers that they were giving me to the benchmark
23    of my forecast of 36 cars and the profit margins
24    that I contacted on those 36 cars.
25       So, like, the graph and the Excel spreadsheet

Page 94

1    I had did not only track quantity of per month and
2    accumulated per month so we could know it as soon
3    as we fell behind either quantity-wise or -- it
4    also calculated anticipated profit per month as
5    well as accumulated over time.  It was a combo
6    chart.
7       And when they gave me those numbers, the
8    quantity was in a good spot given, like, the
9    startup time because we didn't get the first car
10   until maybe January or February.  So I can't really
11   technically take the three cars that were supposed
12   to get sold in January if we don't have a car to --
13 Q  So tell --
14 A  That Overfinch had to turn the car around --
15 Q  Gotcha.
16 A  -- to get it in our possession as it is.
17 Q  Okay.
18 A  But the profit margin on the cars was lower than
19   the benchmark.
20      So around March, I do believe there's emails
21   and/or text messages stating, hey, the quantities
22   are pretty good on the number of sales coming in,
23   but the profit margin over time is below what the
24   benchmark is.
25      So in that case, you're kind of realizing that

Page 95

1    you're thinking you're going to make more money,
2    but now you're, in reality, you're kind of behind
3    the eight ball.
4  Q  And was it apparent, in your analysis there, what
5     was causing the profit margin to be lower than
6     expected?
7  A  I think the initial sales price, some -- I'd have
8     to look at the assumptions that I had in this
9     spreadsheet, but I do believe I stated, like,
10    every -- I think there was two wholesale cars per
11    every one retail.
12 Q  Okay.
13 A  So the wholesale were probably around 200,000 that
14    this they were buying them for, because they would
15    have to mark it up again to make profit from them,
16    which is just typical business.  The retail ones
17    were going straight to the client, and there were a
18    few people that were wiring 225 right into the
19    company and walking out the door with the car.
20       So those were the numbers that, I think -- to
21    get back to your question, so it might have been
22    the retail numbers were lower than expected, and it
23    wasn't one for every two wholesale.  It might have
24    been three wholesale for every one.  So, like, that
25    profit margin is lower on the wholesale side than

Page 96

1    it is on the retail side.
2  Q  Gotcha.
3  A  So that would affect the profitability margin, not
4     per car but over time on the accumulated line.
5  Q  So if I understand it, it was taking Overfinch six
6     or eight weeks to get a car to you; right?
7  A  Sometimes that's like -- yeah, that did take some
8     time.  It took probably a month, month and a half,
9     could be two.
10 Q  And so I guess based upon kind of that lag, from
11    the time the orders are placed and you received a
12    car you could actually sell, that meant the sales
13    were going to have to accelerate in the second half
14    of 2019 to meet --
15 A  To meet the target of 36.  I do believe if things
16    were operating like a real business, I think that
17    would be a good, valid argument to Overfinch:  We
18    didn't meet, maybe, the 36 quota, but you guys
19    definitely did make money off of this, but we can't
20    sell 36 cars if you can't --
21 Q  Give it to us?
22 A  -- turn it over in the amount of time.
23 Q  Gotcha.
24       And was there any kind of set time frame they
25    had in order to turn those over to you?

1  A  Set? I would say, no. I think it was they were --
2     I honestly think Overfinch was giving a forthright
3     effort to turn the cars over in the most efficient
4     way possible.
5  Q  Knowing that it takes some time to --
6  A  If we were buying it off of them, they could be
7     making 10 to 15 grand every car they gave us, and
8     they have no risk to it, which, I mean, there's
9     text messages about possibly selling the
10    distributorship to a company called Premier Imports
11    down in Miami. So they have probably a few hundred
12    mil in floor plan financing. They have
13    Lamborghini, LaFerraris. They bought six of these
14    cars off the top of my head.
15       We could have sold the distributorship to them
16    and acted in a similar manner to what Overfinch was
17    doing with us, and we could have got $5,000 per car
18    that they bought. So Blackburn and I have
19    either split it for 2,500, or if it was a higher
20    commission, just split it. And we'd have got an
21    annuity, pretty much, of 2,500, or whatever number
22    was, for our life. For every car that Prestige
23    sold or maybe some of these other high-end car
24    dealerships that -- maybe, like, Prestige was in
25    the south Florida region or if there was another

1     one over. So there were talks about selling the
2     distributorship and collecting an annuity and
3     obviously derisking the entire business plan.
4        (Exhibit 32 marked.)
5  Q  I'm handing you what I'm marking Exhibit 32. This
6     is probably not something you've seen before, maybe
7     you have. I just don't know. It's been produced
8     in this case in native form. That's why it doesn't
9     have a Bates number on it.
10 A  This is the first time I've seen this.
11 Q  Take a couple of minutes to read through it, and,
12    you know, with emails you've got to go all the way
13    back and all that stuff.
14 A  Am I allowed to mark this up just to check stuff?
15 Q  No -- you can as long as we say on the record --
16 A  That's fine.
17 Q  -- it's your annotations.
18 A  I'm trying -- I have to put all this together.
19    That's fine.
20    (Witness reviews document.)
21 A  Okay.
22 Q  Again, I know this is probably the first time
23    you're seeing Exhibit 32.
24 A  Yes, that is correct.
25 Q  As with all emails you have to go to the back page

1     first.
2  A  Yeah.
3  Q  So the series of emails starts at the end of
4     January 2019, and these are emails, some internal
5     NextGear emails, but also with Mr. Blackburn.
6  A  Okay.
7  Q  And tell me how you first became aware of NextGear,
8     in general?
9  A  When Blackburn -- you guys -- or your client sent
10    me the agreement for the $500,000 with the $100,000
11    retainer.
12 Q  So that was the first time you heard of NextGear in
13    general?
14 A  Yeah.
15 Q  I take it from your testimony earlier, which floor
16    plan lender to go with would have been something
17    you would have consulted Mr. Blackburn on?
18 A  Yeah. My understanding of a 50/50 partnership is
19    consulting each other, making an agreement both
20    people are aware of, and going forward with that
21    agreement, and that is not what happened in this
22    scenario.
23 Q  And if I remember correctly, when you did your
24    one-page agreement with Mr. Blackburn, "any
25    additional financing shall be agreed to by both

1     parties and shared equally," that's what you were
2     expecting?
3  A  That's what I was expecting.
4  Q  Did it come as a surprise to you that when you
5     received that NextGear contract, you know, did that
6     just come out of the blue?
7  A  Yeah, in a way.
8  Q  Okay.
9  A  And through discovery through NextGear, your client
10    actually has four forged signatures of mine. One
11    is on the million dollar application form.
12       You'll notice on the two tax returns that you
13    have, I still have that email I sent to
14    Blackburn. Now, it was being told to me that they
15    were being used for the American Express, which was
16    that tax form, that American Express sent around the
17    end of January, that my name ended up being forged
18    on, the telephone number was wrong, and I recently
19    got dismissed with prejudice from American Express
20    in the last two weeks.
21 Q  You've mentioned that a couple times, you got
22    dismissed with prejudice. Did you pay any money to
23    American Express?
24 A  No, I just paid money to my lawyer.
25 Q  When you say, dismissed with prejudice, was it a

Page 101

1    motion to dismiss?
2  A  Yeah.  I have a document that American Express
3     dropped the lawsuit with prejudice, cannot refile
4     against me.
5         MR. DELK:  Saw he was a victim of fraud and
6     felt sorry for him, was basically it.
7         MR. JONES:  Gotcha.
8  Q  You mentioned the signature on the $1 million
9     application --
10 A  Yes.
11 Q  -- that was forged.
12 A  And there are two phone numbers on there that are
13    incorrect as well.
14 Q  And that was part of that AmEx application but that
15    stuff also got sent to NextGear, if I'm
16    understanding?
17 A  So the NextGear application had my cell phone and
18    home phone number, but each one of them was one
19    digit off.  My cell phone number is 527-8695, which
20    is really the only line to contact me.  My home
21    phone number is (412) 854-2610.  In the screenshot
22    through the dispute with TransUnion, my cell phone
23    number is listed as 537-8695, and my home number is
24    listed as 845-2610.
25 Q  So each one digit off.

Page 102

1  A  Yeah.  So American Express had no way of contacting
2     me.
3  Q  I gotcha.
4  A  And your million dollar application, there's an
5     office number, which you wouldn't be able to
6     contact me there.  And then I saw -- I believe
7     there was a business phone number, and I've never
8     seen that phone number before in my life.
9         I'd have to relook at it, but I do believe the
10    cell phone on there of (412) 527-8659 is correct.
11    There is an email address of, I believe,
12    ek13@peaksolutions.com or .net, which is my Peak
13    Solutions email.
14 Q  Okay.
15 A  You guys might not be aware of this, but I did have
16    an Overfinch Miami email.  It was
17    ed@overfinchmiami.  I do believe it got deleted
18    from the domain name around July of 2019.
19        I still -- I exported all the emails in
20    digital form into another computer, because I had
21    it loaded on Outlook on my computer that I
22    currently have with me.  Every time I open up
23    Outlook, I'll get an error of the Overfinch email.
24        There's also a text message from Blackburn to
25    me stating he bought the domain name of Overfinch

Page 103

1     Miami.
2  Q  So the first time you hear about NextGear or see
3     anything from NextGear is an actual contract?
4  A  Pretty much, yeah.
5  Q  What was your reaction to that?
6  A  I disagreed to it.
7         I mean, if you guys think of it logically, if
8     it was my true signature on the million dollar
9     application when your client approved for half that
10    amount, why would it get denied?  I was the one
11    that denied it.  It made no sense for -- I didn't
12    think the company was financially ready to endeavor
13    in another half-a-million-dollar loan, and it
14    really didn't make sense to me to fork out $100,000
15    in a retainer.
16        So that agreement came to me around, maybe,
17    late February or so.  I still have the email that
18    it was voided.  That's when I went to my parents.
19        There was a $300,000 loan.  So in substitute
20    of the NextGear loan, that $300,000, those cars
21    that we know are about a buck-80, so you're looking
22    at 360,000.  Instead of giving NextGear the
23    $100,000 retainer, which doesn't make sense in my
24    opinion, I got a $300,000 loan from my parents.
25    And that $100,000 was supposed to be used, the

Page 104

1     other 60 of the $100,000, to purchase the two cars
2     that would have been used as a revolving line of
3     credit similar to the cars that I bought and the
4     one that Blackburn was supposed to buy.
5  Q  So you say you denied the contract.  You didn't
6     want to do the 1 million with NextGear.  Did you
7     call Blackburn or email him and say, hey, what is
8     this?
9  A  Most likely a conversation.  A few things, the half
10    a million dollar, the $100,000 line of credit, and,
11    specifically, the power of attorney needed to be
12    electronically signed in that agreement.
13 Q  Okay.
14 A  There is an email that I sent to my buddy down in
15    Florida who is a lawyer.  I still have the email.
16    It was sent to the ed@overfinchmiami, and I just
17    said, like, hey, can you review this?  I think it
18    was either the $150,000 one or the other.
19        He does mention in bold writing, you're giving
20    the power of attorney to NextGear, which mainly
21    means they can do whatever they want.
22        So Blackburn was well aware that if the power
23    of attorney needed to be executed, there would be
24    no NextGear agreement, at all.
25 Q  So had you discussed -- prior to getting that

Page 105

1   NextGear agreement with Blackburn, had you
2   discussed, hey, we need to get floor plan
3   financing?
4   A  No.
5   Q  Did it come to you as a complete surprise when he
6      was even seeking floor plan financing?
7   A  In a way.  When it hit my desk or the email, but at
8      the same time, I thought it was in good faith.  I
9      thought it was, like, an honest business move based
10     on that conversation that I talked about prior with
11     what his natural intentions were on how to use the
12     floor plan financing.  But as I said before, I grew
13     up around honest individuals that did business the
14     correct way, and that was the only thing that I was
15     accustomed to.
16  Q  Did you expect that if there was going to be a --
17     clearly, as of the November agreement, you had
18     mentioned in writing the floor plan financing.  So
19     at some point you knew there was going to be a
20     floor plan financing idea; right?
21  A  Possibly, but I mean . . .
22  Q  Did you expect that you would be involved in any
23     kind of evaluating who the potential floor plan
24     lenders were?
25  A  I would think -- as I said before, my idea of 50/50

Page 106

1   partnership is passing the ideas from one to the
2   other, making sure both are okay with it and then
3   proceeding with it.  That's my interpretation of a
4   business model; just me and Blackburn have
5   different interpretations of what that business
6   model means.
7   Q  Sure.  So taking a look at Exhibit 32 then, I take
8      it this is the email --
9   A  This is this one?
10  Q  Yeah.
11  A  Okay.
12  Q  The one you hadn't seen until today.
13     That very top email, January 31, 2019, this
14     predates you receiving a copy of a NextGear
15     contract; is that right?
16  A  That is correct.
17  Q  And in that top email there, Mr. Blackburn, from
18     his Premier Aviation holdings email, had -- by this
19     point in time, had Premier Group Autos not set up
20     an email domain?
21  A  I would have to double check the date of the text
22     message that Blackburn stated to me that he bought
23     the domain name.
24  Q  The Overfinch Miami domain name?
25  A  Yes.  Hold on for a second.  I do believe it was

Page 107

1   set up -- I do believe it was set up around
2   December or so of 2018.
3      Because on the American Express card, I made
4   one purchase in the delivery of the car from
5   Danville down to Fort Lauderdale in the amount of
6   $1,745, I believe.  That was the only single
7   purchase in a true business expense that I made.
8   And I had contacts with the company that was
9   transmitting the vehicle, and I got the certificate
10  of insurance of the company that was transmitting
11  the vehicle.  I think the company was -- it was
12  AmeriFreight.  The guy's name was Harry.
13  Q  And that was to your Overfinch Miami email?
14  A  I believe it was to my Overfinch Miami email, yes.
15  Q  And that was a charge that you had made on the AmEx
16     card?
17  A  Yes.
18  Q  At that time, did you understand that, like,
19     Premier had gotten the AmEx cards, like, you and
20     Mr. Blackburn?
21  A  Correct.  It was my understanding that it was a
22     corporate card.
23  Q  Gotcha.
24  A  And that was the story that I was being told.  As
25     stated before, I wasn't the one that applied for

Page 108

1   the card.  I was listening to the story that I was
2   being told by what I thought was my business
3   partner.
4      Yeah, and I found out some of the charges
5   later on the AmEx card, maybe in October of 2019,
6   September of 2019.  And there's a company on there
7   called Citylife Social.  If you look it up, it
8   belongs to James Blackburn.  It's a credit card
9   processing company on how he can take money off of
10  someone's credit card.  It was dissolved in, I
11  believe, 2017.  Those transactions came in 2018 and
12  2019.
13  Q  The one charge on the AmEx that you say you made
14     that was a legitimate business charge, that was in
15     December 2018 time frame; is that right?
16  A  Yes, I believe so.  December, January, yes.
17  Q  And as of that December 2018 time frame, so Premier
18     then had a credit card account; is that right?
19  A  Blackburn signed up for an American Express card.
20  Q  But didn't have a bank account yet?
21  A  I believe the bank account got set up in January,
22     February 2019.  So to answer your question, yes.
23  Q  Did that seem unusual to you for a company to have
24     a credit card but no bank account yet?
25  A  In a way, I was naive.  Like I said before, I'm

Page 109

1  used to people that were very honest people, men
2  and women of their word.  And I believed the story
3  that was being told to me, and it just took me some
4  time to filter through the smokescreen that was
5  being built in front of me.  And it was -- I
6  started to know a little bit in maybe May and June.
7  But I just couldn't understand the financials,
8  because once I got my hands on that bank statement
9  and I started reconciling and creating cost of
10 accounts through Excel and the code, it was -- I
11 couldn't understand why the financial picture of
12 the company was just kind of being intentionally
13 thrown downhill, if that makes sense.
14 Q  Yeah, I gotcha.
15     So kind of getting back to this January time
16 frame here, you guys took your first delivery of
17 the first car sometime in that January?
18 A  Around January/February, yes.
19 Q  And so then the sales and the proceeds from that
20 sale would be reinvested back into making
21 additional orders from Overfinch; correct?
22 A  That's correct.  I believe the first car was a
23 Carpathian Grey Overfinch.  That was the one that
24 was owned by my two-piece loan of 160,000 and the
25 20,000.

Page 110

1  Q  Right.
2  A  I do believe, off the top of my head, Prestige
3  Imports is the one that bought that car probably
4  around February, March.  But we used that car in, I
5  believe, the Miami Boat Show that happens around
6  February or March.
7  Q  Take a look at this Exhibit 32.  I swear I'll ask
8  you a question about it here at some point.  This
9  is, obviously, not your words.  This is
10 Mr. Blackburn using his Premier Aviation Holdings
11 email and signing as Premier Aviation Holdings.
12 Did that ever -- would it concern you to find out
13 your business partner was not using the emails set
14 up for the actual business itself?
15 A  I mean, knowing what I know now, yes.
16 Q  And what he says -- and this is to Arturo Mayoral
17 at NextGear, which is also Cox Auto, Inc.  That's
18 their parent company.
19 A  Understood.
20 Q  He says, "Ed currently resides in PA but is in the
21 process of looking for a place in Florida."
22     Was that true at the time in end of
23 January 2019?
24 A  That is false.  Part of it is false.  So I
25 currently did reside in PA, but I was never in the

Page 111

1  process of looking for a place in Florida.
2  Q  And he says, Mr. Blackburn says, "He," meaning you
3  Ed --
4  A  Okay.
5  Q  -- "is an owner in the business and is head of
6  operations.  He will be in control of logistics and
7  daily operational procedures."
8     Anything in those two sentences true?
9  A  I am an owner of the business.  The title --
10 whatever the title on this agreement is -- head of
11 operations, but Blackburn knew it was a passive
12 investment, that I was not going to be moving down
13 to Florida or residing in Florida.
14 Q  Weren't going to be in control of logistics or
15 daily operational procedures?
16 A  No.  I literally was taking interviews at his
17 office, phone call interviews.  I was talking to
18 Mercer; that interview was out in Phoenix.  But the
19 phone call interview, I was literally in
20 Blackburn's office.
21 Q  The next paragraph he says, "The $225,000 and
22 $250,000 in assets is the first vehicle we have
23 bought outright and own and the cash we have
24 invested in the dealership."
25     Help me understand these numbers here.  The

Page 112

1  225, I think I understand because that was the
2  112-five you put in and the 112-five he would put
3  in.
4  A  Yes.
5  Q  What's the other $250,000 in assets?
6  A  I have absolutely no idea.  Unless -- okay.  So
7  when is this?  Okay.  So at this point, I bought a
8  vehicle.  So that would be the 180,000.  So what
9  are we off, 70 --
10 Q  Yeah.
11 A  -- in assets.  Well, he didn't buy a car.  The
12 American Express charges were either London
13 training or went to the Citylife Social company or
14 was my expense to deliver the car, so those are
15 expenses.  None of those went to assets.
16 Q  I'm just -- I wasn't able to make sense of it.  I'm
17 wondering if you're able to make sense of it.
18     MR. DELK:  We're also assuming that's
19 accurate.
20     MR. JONES:  Oh, that's kind of my next
21 question, Jason, right.  We're dealing with a
22 fraudster here.
23 Q  Do you believe those two numbers represented there
24 are in any way accurate?
25 A  I do not believe they are accurate.  I still can't

Page 113

1  even justify the 225.  I can justify my 112-five.
2  I can't recreate how the CPA created the 2018 tax
3  return.
4  Q  So the next sentence there, he says, "Ed and myself
5     have injected 475,000 into the dealership of our
6     own cash and is not subject to any outstanding
7     debt."
8        Do you believe that was an accurate
9     representation by Mr. Blackburn?
10 A  This is an inaccurate representation by
11    Mr. Blackburn.  I still cannot find where his money
12    is.  And at this time, at the end of January, he
13    already racked up an American Express card of
14    $100,000, so that would be debt.
15       And, technically, my loan to the company, even
16    though it's a loan, that's also debt.  So you're
17    looking at $280,000 in debt; my 112-five which
18    is -- that truly went in there, but I can't figure
19    out his 112-five, and I know he didn't buy a car.
20    So I would disagree with that sentence there.
21 Q  And then the next sentence is, "The $95,000 in
22    liabilities are marketing campaigns and equipment
23    purchases that we have committed to."
24       Do you have any understanding of what the
25    95,000 that he's talking about there is?

Page 114

1  A  I mean, the only number that's close to that is the
2     $100,000 on the AmEx.  But in regards to other
3     liabilities at this time, no.
4  Q  And then he says in the final sentence of that
5     email is, "Ed's Social Security card will follow in
6     a separate email."
7        Do you recall Mr. Blackburn ever obtaining a
8     copy of your Social Security card?
9  A  Yes.
10 Q  When was that?
11 A  I believe I still do have the email, but I don't
12    know the date off the top of my head.
13 Q  Was that as part of the AmEx credit card
14    application?
15 A  I do believe so.  I mean, technically it would have
16    had to have been, in my mindset, because I didn't
17    even know about NextGear.  I mean, I wish I had
18    been copied on some of these emails.  Obviously he
19    wasn't copying me for a reason.
20       So he would have had my Social Security number
21    because he would have had to apply for an AmEx
22    card.  He also had my tax returns because AmEx sent
23    that tax return -- taxpayer -- I forget the form
24    number, but that's where I found out that my name
25    was forged on and the phone number was wrong, but

Page 115

1  my tax returns would also have my Social Security
2  number on it.
3  Q  Gotcha.
4  A  Those tax returns don't have a signature on the
5     front of them either, and I still have that email.
6  Q  And so where Mr. Blackburn is saying he's going to
7     send his Social Security card, that's probably
8     something he had in his possession and could
9     forward on?
10 A  I do believe so, yeah.
11 Q  I believe that's all I have on Exhibit 32 here.
12       So if I'm recalling kind of the flow here, in
13    February 2019 or so, there's a contract from
14    NextGear that shows up in your inbox for a million
15    dollars, and you say no way.
16 A  It was for -- the application was for a million
17    dollars.  The agreement that came in was for
18    $500,000 and $100,000 retainer.
19 Q  So did you actually see a copy of the $1 million
20    application?
21 A  No.  The first time I saw the million dollar
22    application was through discovery with NextGear.
23 Q  I gotcha.  So that would be this case; right?
24 A  Yeah, like, me versus you.
25 Q  Gotcha.

Page 116

1        I take it you weren't involved in an
2     application for the one million or the 500,000 or
3     even what ultimately ended up being the 150?
4  A  Ultimately, yeah.
5  Q  I take it, however, at one point you did sign
6     agreements with NextGear; right?
7  A  I did electronically sign the parts of the
8     agreement with the NextGear agreement for the
9     $150,000, mainly because of the $150,000, the
10    $40,000 increments, the power of attorney did not
11    need to be signed, as well as the conversation that
12    Blackburn and I had based on how he was going about
13    to use the loan.
14 Q  Tell me about that conversation.  First of all,
15    when was it?
16 A  Fairly -- right before the electronic signatures.
17 Q  So this is something, like, March maybe?
18 A  Yeah.  And I think those things are signed
19    March 26, I believe, electronically.
20 Q  What did you and Blackburn say in that conversation
21    to each other?
22 A  So this went back to the conversation I did
23    reference in this deposition probably a few hours
24    ago.  There's good ways to use debt, and there's
25    bad ways to use debt.

Page 117

1    The pitch that Blackburn gave me on this was
2  the good way to use debt.  This is where, if a car
3  was worth $60,000, you put your $20,000 down, you
4  floor the rest from NextGear for the $40,000, in
5  anticipation that you can sell that car for 65, 70,
6  $75,000.  You sell that car.  You pay back NextGear
7  their $40,000.
8    The company gets back their down payment of
9  $20,000, and the difference goes back into the
10 company as profit.  That's what that conversation
11 was.
12 Q  Did you guys talk about amounts of money that you
13    would be comfortable with from NextGear?  Like, did
14    you say, hey, I'm not going to do 500,000, but I
15    can do 200 or 150 or whatever.  Was that part of
16    that conversation?
17 A  I believe it was mainly just the 150 came in.  As I
18    said, like, the 150, I was okay with, but there was
19    other conditions that were based on that 150.  It
20    wasn't just, oh, I'm okay with borrowing $150,000.
21    It was 150, the $40,000 increments, the power of
22    attorney did not need to be signed, and the
23    conversation.  So it wasn't just, like, an
24    arbitrary amount.  There was other conditions that
25    Blackburn well, 100 percent, knew of going into

Page 118

1    that.
2  Q  And so the conversations you were having with
3     Blackburn, did you ever, yourself, have any direct
4     conversations with NextGear?
5  A  Direct conversation with NextGear is, no.  I went
6     to my business partner who I trusted that I thought
7     was the head of the business that was looking out
8     for the business.
9  Q  And so, I guess, by the time you got the $500,000
10    agreement in your inbox, you were aware that -- you
11    learned that James was involved in negotiating with
12    NextGear; is that right?
13 A  Yes.
14 Q  And I take it, then, that you were okay with him
15    continuing to do so on terms that you were talking
16    about; right?
17 A  The terms that I was talking about, yes.
18 Q  And one of those terms you mentioned was that there
19    didn't need to be a signed POA; is that right?
20 A  Yes.
21 Q  And did James ever tell you that, hey, we're okay
22    on that; you don't need a signed power of attorney?
23 A  Yes.
24 Q  So I take it you never spoke with Mr. Mayoral?
25 A  I've never spoken to Mr. Mayoral.

Page 119

1  Q  Nor on the phone or anything?
2  A  I've never talked to him.  I've never even met the
3     guy.  So correct.
4  Q  Okay.
5  A  Nor vice versa.  So, like, I know, like, okay me
6     talking to him, but I never got reached out to from
7     a NextGear rep either.
8  Q  Right.
9  A  In fact, if you go through your discovery on them,
10    you guys didn't even add me -- not you but your
11    client -- didn't add me as a point of contact until
12    October, November of 2019, after all $350,000 was
13    floored.  And I have one voice mail, and I still
14    have it on my phone, on November 13, 2019, and I
15    can -- I still have the voice mail.  And they were
16    saying, Ed, this is -- I forget the gentleman's
17    name -- but we're trying to settle with Blackburn
18    on this.  We're not getting any help.  We want to
19    talk to you.
20    And it's, like, okay, now you want to talk?
21    You didn't -- yes, I didn't talk to NextGear, but
22    nor did NextGear come and talk to me.
23 Q  I gotcha.
24    So you knew Blackburn was negotiating,
25    speaking with NextGear, and I guess you were okay

Page 120

1  with him continuing to do so on the terms you had
2  talked about; right?
3  A  On the terms we had talked about, yes.
4  Q  And so you had authorized him to communicate with
5     NextGear on your behalf; is that right?
6  A  Based off the terms that he was fully understanding
7     of the terms.
8  Q  And he had authority to do so because it was going
9     to be PGA that was entering into this; right?
10    MR. DELK:  Objection to form.
11 A  It's not so much PGA.  I mean, the agreements are
12    Edward A. Kessler and James Blackburn.
13 Q  Okay.
14 A  So, I mean, he doesn't have the full right -- like,
15    you saw the agreement.  He has to -- it's mutually
16    agreed upon.  So mutually agreed upon is making
17    sure we're both under the understanding and going
18    forward.  That is completely different between
19    doing something behind my back and me finding out
20    after the fact.
21 Q  One thing you mentioned on good ways to use debt
22    and bad ways to use debt, you were expecting, I
23    guess, if you were going to do a floor plan deal
24    with someone, NextGear or someone else, that the
25    business was going to be repaying back those loans

Page 121

1    as they're due to be paid back; is that right?
2  A  In the ways -- the good ways to use debt?
3  Q  Yeah.
4  A  That's how you use debt.
5  Q  Did you ever expect that any funds that were floor
6     planned with NextGear would be converted to
7     operational expenses instead of paying back that
8     debt?
9  A  Say that again.  I just want to relisten to that
10    question.
11 Q  Yeah.  Did you expect at the time that you entered
12    into the agreements with NextGear that the funds
13    that were being floor planned with NextGear would
14    be directed to operational expenses of PGA as
15    opposed to paying back the debt owed to NextGear?
16 A  I would not expect loans from NextGear to be used
17    as operational expenses, nor my loans to be used as
18    operational expenses, nor my parents' loans to be
19    used as operational expenses.  That is the bad way
20    to use debt, and that is what leads a company to
21    bankruptcy.
22 Q  You mentioned your parents, and I want to make
23    sure.
24       MR. JURKIEWICZ:  May I do a couple follow-ups
25    on this?

Page 122

1       MR. JONES:  Go right ahead.
2       MR. JURKIEWICZ:  You mentioned that you had no
3     communications with Art Mayoral; is that correct?
4       THE WITNESS:  I've had no communications with
5     Arturo Mayoral, nor have I ever seen the guy in my
6     life.
7       MR. JURKIEWICZ:  Have you ever logged into the
8     NextGear portal?
9       THE WITNESS:  Besides the electronic agreement
10    to sign the electronic documents, no.
11      There is an email in around September that --
12    after those two cars got floored, of Donna asking
13    James if he changed the password to the NextGear
14    because she couldn't log in anymore.
15      I also did have complications logging in
16    because apparently the last four PIN numbers to log
17    in were the last four numbers of your Social
18    Security card.  They were incorrect for whatever
19    reason.  My last digits are 3763.
20      MR. JURKIEWICZ:  When you said you had trouble
21    logging in, is that for the purpose of signing the
22    documents or to look at the financial information
23    on the NextGear portal?
24      THE WITNESS:  That was to originally sign in
25    for the electronic signatures.

Page 123

1       MR. JURKIEWICZ:  Did you ever attempt to log
2     into the NextGear portal to look at financial
3     information --
4       THE WITNESS:  No.
5       MR. JURKIEWICZ:  -- related to PGA?
6       THE WITNESS:  Huh-uh.
7       MR. JURKIEWICZ:  All right.  Thanks.
8       THE WITNESS:  Yep.
9       MR. ROCAP:  We had huh-uh instead of a no.
10      THE WITNESS:  Oh.  No.
11      MR. JONES:  Oh, yeah, okay.  Let's make sure
12    we don't do that again.
13 BY MR. JONES:
14 Q  I'm going to hand you something we used as an
15    exhibit previously, and I want to make sure we know
16    what number to use, so give me one second here.
17    This one was previously marked as Exhibit 21.
18       MR. Kessler, I'm going to hand you what's been
19    previously marked as Exhibit 21.  You had mentioned
20    your parents as a source of funding, and I believe
21    this is the loan agreement you were referencing; is
22    that right?
23 A  Yes.
24 Q  So Exhibit 21 is a loan with your parents and
25    Premier Group Autos; is that right?

Page 124

1  A  That is right.
2  Q  And this was executed prior to the NextGear
3     paperwork; is that right?
4  A  That is correct.  As mentioned before, this loan
5     made more financial sense to the company than
6     borrowing $500,000 from NextGear and giving
7     NextGear a $100,000 retainer.
8  Q  Gotcha.  And so after you received the $500,000
9     contract -- at some point in February, roughly?
10 A  February, March.
11 Q  -- at what point did you propose to Mr. Blackburn,
12    hey, why don't we just get money from my parents?
13 A  There's text messages that say, hey, we might be
14    able to go another route that might not be as
15    strict on the terms and conditions.
16 Q  And at the time of those text messages -- was it
17    probably late February 2019, maybe?
18 A  Right after the NextGear one got voided.  So
19    probably around that timeline, late February, early
20    March.
21 Q  Gotcha.
22 A  And this was executed the 11th day of March.
23 Q  When did you first approach your parents about
24    putting money into -- or this loan agreement?
25 A  After the voided NextGear agreement.

Page 133

1 distributions that wasn't associated with loans
2 into the business, like, the purportedly $225,000,
3 like, you're not supposed to take that back out
4 prior to contributing back to this loan.
5 Q And then on the final page there, is that your
6 signature there?
7 A This is my correct signature.
8 Q And Mr. Blackburn's as well?
9 A Yes, this is electronically signed. I do still
10 have the digital email of this, and I sent in the
11 email "old fashioned way" because I physically
12 scanned -- mine is already -- mine is physically
13 handwritten. So in the email I said "old fashioned
14 way," and he sent back with this signature and
15 this --
16 Q The initial?
17 A Initials, yeah.
18 Q And I'm assuming your parents at some point signed
19 this; right?
20 A I do believe so. But, regardless, the wire money
21 was wired into the account, into PGA's bank account
22 from, I believe it was, an LPL financial account.
23 Q Do you believe, did your mom or your dad ask, like,
24 any questions about the terms of this agreement?
25 A Yeah, I do believe I have an email from my dad, and

Page 134

1 he said it looks fine.
2 Q So you, Mr. Blackburn, and your dad, at least, read
3 this all the way through?
4 A In a way, yeah.
5 Q And nobody caught that the paragraph just cuts off
6 on H and goes nowhere?
7 A Yeah, it could have been just the -- I mean, the
8 intentions of what that paragraph meant was stated
9 there.
10 Q Okay. Because, I mean, you plainly come across as
11 someone who pays attention to detail and is
12 conscientious of those things. I'm just wondering
13 how it could happen that you get a $300,000 loan
14 from your parents and there's an incomplete
15 paragraph at the end of this.
16 A Okay.
17 Q I'm just wondering how four people or three people
18 read it and didn't catch it.
19 A It's just an unopened -- it's two missed words.
20 Could have put a period there. I mean, it still
21 states that no one was supposed to draw equity out
22 of the company or reimburse their loans prior to
23 this loan.
24 Q So with this $300,000 loan in hand, how soon after
25 this money came to the company did PGA purchase two

Page 135

1 new vehicles?
2 A Blackburn only purchased one vehicle, to my
3 knowledge. So as soon as he got the money, going
4 through the bank statements, he didn't abide by the
5 terms of the agreement right off the bat.
6 MR. JURKIEWICZ: You stated that Blackburn
7 only purchased one vehicle to your knowledge; is
8 that correct?
9 THE WITNESS: Blackburn didn't -- with his own
10 money, did not purchase a vehicle.
11 MR. JURKIEWICZ: Was your prior testimony that
12 Blackburn purchased one vehicle?
13 MR. DELK: Using those funds.
14 THE WITNESS: Using those funds.
15 MR. DELK: Operating on behalf of PGA using --
16 MR. JURKIEWICZ: That was going to be -- do
17 you mean PGA purchased one vehicle?
18 THE WITNESS: Yes. So I guess what I meant
19 is, this money went in, Blackburn had control of
20 the money and wired the money to Overfinch. So I
21 was saying he used this money to buy a car, not
22 necessarily Blackburn bought a car.
23 MR. JURKIEWICZ: Right.
24 MR. JONES: Gotcha.
25 MR. JURKIEWICZ: All right. Thanks.

Page 136

1 BY MR. JONES:
2 Q So would this $300,000, what was the discussion
3 between you and Blackburn then about still wanting
4 to get 150,000 in floor plan from NextGear?
5 MR. DELK: Objection to form.
6 A So there wasn't discussion. I wasn't even aware
7 that he went back to NextGear to try to get
8 $150,000.
9 Q Okay.
10 A So it was my understanding at this time that this
11 agreement was a substitute for the original
12 $500,000 and the $100,000 retainer. So at this
13 point in time, I'm under the impression where
14 Blackburn put his 112-five in, I put my 112-five
15 in, I put my 180 in, and my parents put 300 in, and
16 the $100,000 retainer that initially was supposed
17 to get wired to NextGear is supposed to be used to
18 obtain the other $60,000 to obtain the second
19 vehicle.
20 So in my interpretation, this company is
21 pretty much fully funded by the owners and/or
22 relatives of the owner in asset backing loans that
23 are all supposed to be intended to be used as a
24 revolving line of credit and would be getting paid
25 interest on their money.

Page 137

1        There was interest there.  There is an email
2  there with mine and supposedly Blackburn's loan to
3  defer interest payments to the end of the year.
4  Q  Okay.
5  A  Which is mainly -- which now I know why he did that
6  but -- what was I talking about?  Deferred interest
7  payment?
8  Q  Uh-huh.
9  A  So my loan wasn't supposed to get taken interest,
10  and it would have accrued the interest over the
11  number of days at, whatever the terms were,
12  6 percent, 6 1/2 percent, number of days divided by
13  365 is the exponent.
14  Q  Fair to say, then, once you got the money from your
15  folks, that you were thinking, well, we're not even
16  going to have an agreement with NextGear at all;
17  right?
18  A  That was my interpretation at this point, yes.
19  Q  How soon after your agreement with your parents did
20  you find out in fact Mr. Blackburn had been
21  communicating with NextGear about a $150,000 level?
22  A  When that agreement came to my email around
23  probably March 26 or so.
24  Q  And what was your reaction to finding out that, in
25  fact, Mr. Blackburn had been continuing to

Page 138

1  negotiate with NextGear?
2  A  I mean, in all honesty, I didn't think we needed it
3  at that point.
4  Q  Okay.
5  A  Now, what he spun was the narrative that I was
6  explaining before with the conversation that we had
7  that not so much about the Overfinch cars at
8  $180,000 but some lower quantity cars of 60,
9  $70,000 that we could put 20 or $30,000 down and
10  floor plan the other 40 or whatever and still use
11  the debt in the proper way that the debt is
12  supposed to be used.  It just created a versatility
13  of the business model.
14  Q  So this was money you could use for cars that
15  weren't Overfinch cars?
16  A  Correct.
17  Q  Gotcha, okay.  And those might be much less than
18  the 200,000 that the Overfinch cost?
19  A  Oh, yeah, correct.
20  Q  Gotcha.
21  A  You don't -- so when you use leverage or a floor
22  plan on an asset that is owned by a liability, so
23  now -- let's take my car for example.  So I have a
24  loan into the company for $180,000.  So I think it
25  would be agreed upon that if you sell that car for

Page 139

1  above $180,000, the company makes a profit.  So if
2  you floor a car that's owned by the liability and
3  adding $40,000 to your checking account, as well as
4  the liability on the balance sheet, now I have to
5  sell that car for $220,000 to make a profit.  So if
6  you're really trying to operate an honest,
7  profitable business, that's not what you do in
8  flooring a liability.
9        And I don't think I was aware of it until I
10  saw some of the bank statements in June.  And then
11  going through the numbers, I do believe there are
12  text messages like, why would you floor a
13  liability?  And it just didn't make sense to me.
14  Because I know the financial impact of the numbers
15  when you floor a liability.  So the loans weren't
16  being used in the way they were supposed to be
17  used.
18        And the next thing was probably, he texted me
19  and agreed for a buyout around June or July saying,
20  I'll buy you and your parents out at any time.
21        And then the buyout started escalating
22  probably in August, September, and his attorney,
23  Raul Gastes, was supposedly working on the buyout
24  agreement.
25      MR. JONES:  I'm going to hand you what I'm

Page 140

1  going to mark as -- I think we are up to --
2      THE REPORTER:  33.
3      MR. JONES:  -- 33.
4      Can we take a quick break?
5      THE REPORTER:  It is 1:51 p.m.
6      (Exhibit 33 marked.)
7      (A brief recess was taken.)
8      THE REPORTER:  It is 1:56 p.m.
9  BY MR. JONES:
10  Q  After a brief break, Mr. Kessler, I've handed you
11  what I've marked Exhibit 33, and ask you if you've
12  seen this email before.
13  A  Yes, this was the email that I was mentioning that
14  I emailed my lawyer friend down in Florida.
15  Q  Okay.  Was this something you did prior to
16  executing the NextGear agreement?
17  A  Yes.  March 26, yes.
18  Q  So I take it you forwarded it to him, and he wrote
19  this back to you; is that right?
20  A  Yeah.
21  Q  And the things he tells you about the agreement,
22  the first point says, "I didn't go over all the
23  documents, but here's a quick summary."  And point
24  1 is, and grants NextGear a security interest in
25  all of borrower's assets and properties, and it

Page 141

1  says that's as to Premier Group Autos, LLC; is that
2  right?
3  A  Yes.
4  Q  Point 2 is the personal guarantee.  You are
5  personally guaranteeing the loan if the company
6  can't pay and/or defaults.  Do you see that?
7  A  Yes.
8  Q  When you received this email, what did you
9  understand that to mean?
10     MR. DELK:  Other than what it says?
11 A  Other than -- yeah.
12 Q  Let me ask it this way.  Did you understand that to
13    mean anything other than what it says?
14 A  I understood what it states right there, yes.
15 Q  And then point 3 regarding the power of attorney,
16    you list three issues there, A, B, and C, and he
17    bolded, "Sell any of the collateral, e.g., all of
18    Borrower's assets and properties."
19        What concerns did you have in response to
20    seeing that from your lawyer?
21 A  I mean, the main thing was, like giving your client
22    the power of attorney, which will allow them to do
23    pretty much anything.  Like, that's mainly what I
24    was concerned with.
25 Q  Okay.

Page 142

1  A  And I -- Blackburn was 100 percent aware that this
2     NextGear agreement would not have gone through if
3     that power of attorney needed to be signed.
4  Q  And at this point, March 26, 2019, your lawyer is
5     telling you that what is seen the documents, he is
6     saying you are giving the power of attorney; right?
7         MR. DELK:  Objection, misstates the document.
8     The document speaks for itself.
9  A  Yeah, it says you are giving the power of attorney
10    to NextGear.
11 Q  And there's nothing in here about the power of
12    attorney being optional; right?
13        MR. DELK:  Objection to form.
14 A  The power of attorney was included in the
15    documents.  It just didn't need -- like, so the
16    agreement that was sent to them, he sees just PDFs.
17 Q  Right.
18 A  Not so much a DocuSign, per se.  So he sees a power
19    of attorney that's included in the documents, which
20    is part of the agreement.  So how I'm looking at it
21    is, if that power of attorney needed to be signed,
22    then the whole agreement is voided.  You can't pick
23    and choose and have agreements signed on my behalf
24    behind my back and then try to use it against me
25    and sue me for a million dollars.

Page 143

1  Q  So you had testified earlier that you had told
2     Mr. Blackburn you can continue to negotiate with
3     NextGear but it will not include a power of
4     attorney.  That's your testimony; right?
5         MR. DELK:  Let's clarify the timing of that.
6  A  Yes.  Say that again.
7  Q  You testified earlier today that in the February,
8     March, early March --
9         MR. DELK:  Misstates prior testimony.  Didn't
10    testify it was February or March.
11 A  No, I --
12 Q  Okay.
13 A  So I didn't say -- as I said before, that agreement
14    with my parents, in my mindset, was a substitute to
15    the NextGear agreement.
16 Q  Okay.
17 A  So as I stated before, at that time it was my
18    understanding that was a substitute of
19    NextGear.  And I didn't know that, like you said,
20    Blackburn was still contacting NextGear that I
21    wasn't aware of, nor was I copied on any of the
22    communications.
23 Q  So then when you found out that he was, was when
24    you forwarded that agreement on to your attorney to
25    review; correct?

Page 144

1         MR. DELK:  Let's clarify which agreement.
2  A  Yeah.
3  Q  So the agreement you emailed to your lawyer.
4  A  I would have to go back to the agreement.  I mean,
5     this is -- it could have been the $150,000, it
6     could have been the 500 depending on how quickly he
7     got back to the original email.  I would have to go
8     back to my records to accurately answer that
9     question.
10 Q  But suffice it to say, as of Tuesday, March 26,
11    2019, 7:20 p.m., you've got an email from your
12    lawyer having reviewed a NextGear agreement.
13 A  Reviewing a NextGear agreement, correct.
14 Q  Where it gave NextGear a security interest in all
15    of the borrower's assets and properties, point 1.
16 A  Yes.
17 Q  Point 2, it had a personal guarantee; right?
18 A  Yes.
19 Q  And point 3, it describes what happens in a power
20    of attorney that was just part of that agreement as
21    you just testified; right?
22 A  That was part of that agreement, yes.
23 Q  And after receiving this email, at some point you
24    went on to the electronic DocuSign that had been
25    sent to you by NextGear and signed electronically

Page 145

1   where you were supposed to sign; correct?
2        MR. DELK:  Objection to form.
3   A  I electronically signed that document.  The power
4      of attorney did not need to be signed.
5   Q  Now, when you say "the power of attorney did not
6      need to be signed," do you mean -- did someone ever
7      tell you, "Hey, don't worry about the power of
8      attorney.  It's not part of the deal"?
9   A  Then why did NextGear require the power of attorney
10     to be electronically signed in the other agreement,
11     the $500,000 with the $100,000 retainer?  That
12     needed to be required, electronically signed.  So
13     why didn't -- why didn't NextGear -- why did
14     NextGear then not require this power of attorney to
15     be signed?  Like, if that power of attorney needed
16     to be electronically signed, this whole entire
17     agreement would not have gone through, and I
18     wouldn't be talking to you today.
19  Q  So it's your testimony, then, that when you looked
20     at the DocuSign for the $500,000, there was a place
21     for you to sign the power of attorney
22     electronically?
23  A  Electronically for the power of attorney for the
24     $500,000 loan with the $100,000 retainer, yes.
25  Q  Okay.

Page 146

1   A  NextGear Capital required an electronic signature
2      for the power of attorney on that agreement.  On
3      the $150,000, it did not require an electronic
4      signature.
5   Q  Okay.
6   A  And when I was backing up all the documents, I have
7      an email from Donna around probably November, and
8      the NextGear agreement has both power of attorneys,
9      both mine and Blackburn's both are blank.
10     Everywhere blank.
11  Q  The reason for that is Indiana requires a wet
12     signature on notarized documents, doesn't it?
13  A  I don't believe that.
14       MR. DELK:  Object to form.  Indiana or
15     Florida?
16  Q  You don't believe what the law is?
17  A  Then why did -- then why did --
18  Q  Do you know if Florida requires a wet signature on
19     documents?
20  A  Why did NextGear require an electronic signature on
21     the other agreement?
22  Q  I'm taking your word that it did.  Could be an
23     error.  I honestly don't know.  But my
24     understanding is that there was no electronic
25     signature option on power of attorneys.  Maybe you

Page 147

1   saw something different.
2        MR. DELK:  Objection to form.
3   A  It's my testimony that I saw an electronic
4      signature required on that power of attorney.
5   Q  At any point between the time you executed the
6      documents with NextGear and -- sorry.  Let me
7      rephrase that.
8        At any point between the time you saw the
9      $500,000 agreement with NextGear that you didn't
10     end up signing and the agreement you did sign, did
11     anyone tell you that you would not have to sign a
12     power of attorney agreement?
13  A  Blackburn.
14  Q  Blackburn told you?
15  A  Yes.
16  Q  Okay.
17  A  He said the power of attorney was not needed for
18     the $150,000 loan, which NextGear didn't require
19     the electronic signature.  So it was my
20     interpretation that the power of attorney was not
21     needed.  When I found out the power of attorney got
22     signed was when I got served with papers in January
23     or so of 2020.
24  Q  Set aside the power of attorney issue here for now.
25     I'm going to hand you what was previously marked as

Page 148

1   Exhibit 22.  I want to ask you if you have seen
2   these documents before.
3   A  I do believe this is the NextGear agreement that
4      did not require the power of attorneys to be
5      signed.  Like, these are the ones that are both
6      blank.
7   Q  The first page of Exhibit 22 is obviously a cover
8      sheet with information about the folks involved,
9      stakeholder, guarantor information.  So flip that
10     page to the next one.  At the very top it says,
11     "Demand Promissory Note and Loan and Security
12     Agreement."
13       Do you see that?
14  A  Yeah.  I know, but I want to focus on this for a
15     second.
16  Q  Sure.
17  A  The last four digits of my Social Security number
18     on this one is 2763, which is incorrect.
19  Q  Okay.
20  A  Date of birth on this is 9-30-1988, which is also
21     incorrect.
22  Q  Okay.
23  A  My home phone number, 954, is incorrect.  My ZIP
24     code is incorrect.
25  Q  When you received the electronic document to

Page 169

1  Verified Complaint you filed in Florida, that
2  nowhere does it mention or allege that the NextGear
3  note is invalid?
4       MR. DELK:  Objection to the form.  The
5  Verified Complaint speaks for itself.
6 A  Yeah, I mean, this Complaint plus the counterclaim
7  that I have against NextGear, this is all
8  entangled.  AmEx is in this one.  I mean, this is a
9  whole packet.  The NextGear countersuit is a whole
10  packet.
11 Q  And portions of that Verified Complaint were
12  verified by you under the penalty of perjury,
13  correct?
14       MR. DELK:  Yes, we stipulate that document
15  speaks for itself, the verification.
16 A  I don't know how -- my answers are my answers.  I'm
17  telling the truth.  I don't know what to tell you.
18 Q  At some point you were aware that PGA started floor
19  planning with NextGear; correct?
20 A  After the fact, yes.
21 Q  After you had electronically signed the documents;
22  right?
23 A  After the documents were electronically signed.
24 Q  So PGA began to take funds from NextGear and use
25  them for its business; correct?

Page 170

1       MR. DELK:  Objection to form.
2 A  Around June, unbeknownst to me, there was a power
3  of attorney that was forged on April 18, which
4  those funds wouldn't have been let go by NextGear.
5 Q  When did you first find out that you believed the
6  power of attorney was forged?
7 A  When you guys served me on a lawsuit on January or
8  so of 2020.
9 Q  Okay.  Up until that point, between the time you
10  electronically signed the documents and you found
11  out, as you allege, a power of attorney was forged,
12  did you understand that PGA had an obligation to
13  pay back any funds that were lent to it by
14  NextGear?
15 A  Around September, that's when the agreement with
16  Blackburn was to buy me out and within also in
17  those text messages was to forfeit me from the
18  liabilities and in writing he agreed to that.
19 Q  September 2019?
20 A  September of 2019 I tried to freeze the bank
21  account probably around November -- October,
22  November.  I tried to save -- I tried to save
23  everyone's money, including my own.
24 Q  Okay.
25 A  Like the last 180, if the bank would have froze the

Page 171

1  bank account, some of the money still would have
2  been in there.
3 Q  You said 180; did you mean 80?
4 A  No.  There was 180 that got wired in once I went
5  through the bank statements probably around
6  November or so.
7 Q  This next one we marked previously.
8       Mr. Kessler, I've handed you what's been
9  marked Exhibit 24 and used in Monday's deposition.
10 A  Okay.
11 Q  I want to ask you if you recall this series of
12  emails.  Again, you've got to go to the back page
13  first; right?  Do you recall this series of emails?
14 A  Yes.
15 Q  Okay.  The very first email, again, the very bottom
16  one, it's an email from Donna at Overfinch.  That
17  was Donna DeGroff; is that right?
18 A  Yes.
19 Q  And it's an email -- from her to Mr. Blackburn, and
20  she says, "James -- just pulled up our NextGear
21  Account and see that we are flooring another
22  vehicle today?"
23       Did Donna have access to the NextGear portal?
24 A  You would have to ask her.  I know there's another
25  email maybe in October of her saying -- asking

Page 172

1  Blackburn if he changed the password to the
2  NextGear.
3 Q  And did you have access at this time to the
4  NextGear account or the portal?
5 A  I never logged into the portal.  I wasn't --
6 Q  But did you have access?
7 A  I don't know.  I mean, I got blocked with the wrong
8  Social Security number.  So I don't know if -- I
9  didn't log in, as I answered David's question
10  before.
11 Q  So I'm just wondering, if this is a September 11,
12  2019, email from Donna to James, she mentions she
13  can pull up the NextGear account.  Did you ever get
14  back with her and say, "Well, how come you can
15  access and I can't?"
16 A  I mean, she was the controller.  I just -- I didn't
17  log into the NextGear account.
18 Q  And what she says in the second paragraph, "The VIN
19  number they are showing is for [a] vehicle we
20  already sold to John Turner.  If we are purchasing
21  this back from him, we need to get paperwork to him
22  for signatures.  Are we purchasing this vehicle
23  back from Mr. Turner?  This will take Inventory
24  Line up to the $250,000 level."
25       In response you write, "We can't floor

Page 197

1   an email where you told Mr. Blackburn in September,
2   hey, we can't floor vehicles we don't own.
3 A  Yeah.
4 Q  And he wrote back and said, that's not what we're
5   doing.
6       And I asked you what your reaction was to
7   that.  You said, I trusted my business partner.
8 A  I was trying to figure out what was going on.
9   Like, I didn't believe -- he said he bought that,
10   but bought it with what?
11 Q  Okay.
12 A  And that's what Donna and I were trying to look
13   into.  And then the next thing we know, we're
14   blocked out of the NextGear.  So now we're getting
15   blocked out of there.  We still don't have access
16   to the bank electronically because of the bank fob.
17   So I still can't log into the bank.  So we had to
18   try to get PDFs from the bank of screenshots of
19   some transactions to try to piece something
20   together.
21 Q  This is in June 2019 or after?
22 A  I still don't have digital access to it.
23 Q  Okay.
24 A  I didn't have digital access for an entire year.
25   Because I can guarantee you, if I could have logged

Page 198

1   into the bank account for free to access these
2   documents, I would not have paid my lawyers
3   thousands of dollars to obtain the bank statements
4   through a court order.
5 Q  One of the things Mr. Blackburn testified to on
6   Monday was that there was some agreement with some
7   dealerships that PGA was selling Overfinch vehicles
8   that they would buy them back in 60 to 90 days.  Do
9   you recall that ever being the terms that PGA
10   entered into?
11 A  I have never seen one of those agreements nor have
12   I signed one of those agreements.
13 Q  Is that something you would expect PGA to have
14   agreed to do, to purchase vehicles back from a
15   dealer if they didn't sell?
16 A  I mean, I would say no.  I mean, they bought the
17   vehicle.  It's in -- it's on their floor plan, and
18   they would assume the risk on it.
19 Q  Okay.  As I understand it, you've subsequently
20   discovered that Mr. Blackburn had directed
21   substantial sums from PGA into other businesses or
22   accounts that he controlled; is that correct?
23 A  Yes.
24 Q  And if Premier sold a vehicle, who had authority to
25   decide what to do with the funds from the vehicle

Page 199

1   sale?
2 A  I mean, it would come into the bank account, which
3   he's an authorized signator and I'm an authorized
4   signator.
5 Q  So was it your expectation that Mr. Blackburn would
6   consult with you, like, hey, how are we going to
7   use this money that came from a vehicle sale?
8 A  That was my expectation.  I mean, just like I said
9   before, a lot of these vehicle sales were supposed
10   to just get -- the principal value of it -- I mean,
11   the profit can go back into the company it's
12   operating, but the principal of the purchase should
13   get reinvested into another vehicle.
14 Q  And so what to do with the proceeds from the sale
15   of any of Premier's inventory, that was decisions
16   that you and Mr. Blackburn needed to make together;
17   is that right?
18 A  My interpretation of a business partnership is both
19   partners make decisions that they both agree upon.
20   In the original agreement with Blackburn, that's
21   what it states, and it didn't happen that way.
22   Usually he would do stuff behind my back, and I
23   would find out after the fact.
24       MR. JONES:  Mark this as -- I think we're
25   Exhibit 35?

Page 200

1       THE REPORTER:  Yes.
2       (Exhibit 35 marked.)
3 Q  Mr. Kessler, I'm handing you what's been marked
4   Exhibit 35.  These are your answers to NextGear's
5   interrogatories in this case.
6       THE WITNESS:  Is there any way I can go to the
7   restroom real quick?
8       MR. JONES:  Let's take a break.
9       THE REPORTER:  Off the record at 3:57 p.m.
10       (A brief recess was taken.)
11       THE REPORTER:  4:03, we're on the record.
12 BY MR. JONES:
13 Q  All right.  Mr. Kessler, we're back on the record.
14   I've just handed you Exhibit 35, which are your
15   answers to NextGear's Interrogatories in this case.
16       Before we took the break, I was asking about,
17   you know, the role that you and Mr. Blackburn would
18   have in determining what to do with the proceeds of
19   the sales of the vehicles and their inventory that
20   Premier was selling.  Do you remember that?
21 A  Yes.
22 Q  And it was your expectation it was something you
23   would both decide together how to utilize those
24   funds; is that correct?
25 A  Yes.

1 Q There's a lot of exhibits on the -- in the report,
2 but what I want to direct your attention to is
3 Exhibit No. 2. It's at page Bates number PAG-B585.
4 Do you see that?
5 A Is it this?
6 Q Yes, sir. It's on the back.
7 A Okay.
8 Q And that is listing, it says, PGA liabilities.
9 That's Premier Group Autos' liabilities; is that
10 right?
11 A Yes.
12 Q And it lists here, for example, the first one is
13 Edward Kessler loan dated 12-3-2018. Do you see
14 that, $160,000?
15 A Yes.
16 Q And then your supplemental loan from January 3,
17 2019; correct?
18 A That was the 20,000 to finish off purchasing the
19 first car, yes.
20 Q And then it has the loan to your parents, the
21 300,000. Do you see that?
22 A Yes.
23 Q And then it has the NextGear loan $344,978. Do you
24 see that?
25 A Yes.

1 Q That's listed as a liability of Premier Group
2 Autos; is that correct?
3 A In this report, yes.
4 Q In Mr. Mukamal's report; right?
5 A Yes.
6 Q The independent accountant that you filed with the
7 Court?
8 A Correct.
9 Q Now, if you'll turn with me --
10 A American Express is on here as well.
11 Q And that's been dismissed, as you've said; right?
12 A That has been dismissed.
13 Q So Exhibit No. 4, it's on page PAG-B590 and
14 actually starts at 589, but that's because I
15 printed it double sided to save paper.
16 A No, that's fine.
17 Q This is a Detailed Listing of Payments Made to
18 Blackburn Entities & Insiders, and there's a lot of
19 them, with a summary provided under kind of each
20 category.
21 A Okay.
22 Q And the first one is the Nautic Crew Worldwide. Do
23 you see that?
24 A Yes.
25 Q And it says the net activity was $354,990. Do you

1 see that there?
2 A Yes.
3 Q And then to Mr. Blackburn himself, it's a net of
4 $150,560?
5 A Uh-huh.
6 Q And then --
7 A Yes.
8 Q -- to Samuel Blackburn, 172,475; correct?
9 A Yes.
10 Q Then to Nicholas Blackburn; who is Nicholas
11 Blackburn?
12 A I believe that is James' other brother who lives in
13 Liverpool.
14 Q And do you have any idea as to why --
15 A No.
16 Q And then there's this Citylife Social category that
17 you had mentioned. That's the AmEx one?
18 A That's his credit card processing company that he
19 can charge off of a credit card.
20 Q I gotcha. And so it has a grand total of payments
21 to Blackburn entities and insiders of $733,752. Do
22 you see that?
23 A Yes.
24 Q Is that -- let me back up. Did you ever expect at
25 any point in time that Mr. Blackburn had

1 transferred out of PGA anything to the tune of
2 $733,752?
3 A I would say, like, the first time I was aware of
4 some of it was when I reconciled the books in May
5 or June, and that's when I started to disagree
6 with -- like, everyone was just supposed to be
7 commission. I found out that people are getting
8 salaries. The company can't afford to pay
9 salaries.
10 I was questioning him on why is stuff going to
11 Nautic Crew. There was never any invoices. There
12 was never any receipts. He said he was giving them
13 to Elaina, but when I followed up with Elaina, she
14 gave everything to James and he said he was
15 reviewing it. There's text messages related to
16 this.
17 I tried to stop; saying, like, I'm in
18 disagreeance with everything going to Nautic Crew.
19 He would agree to it, and then he would just
20 continue doing it. And that's when I started -- I
21 tried to go the buyout route.
22 Q Okay. And was one of the liabilities that you
23 wanted to be bought out of the Premier liability to
24 NextGear?
25 A It was both liabilities; like, AmEx he was supposed

Page 209

1   to buy.  We had text messages agreeing that he was
2   to purchase me and my father out and release a
3   lien -- or release of the -- any other liabilities
4   on the table around probably August.
5 Q But the buyout never actually happened, did it?
6 A No.  I -- I believed him that he was going to buy
7   me out, and then as time went on and I realized
8   that the buyout was a delay tactic, I tried to
9   freeze the bank account.
10       And going through your discovery, it seemed
11   like he was doing the same type of psychological
12   delay tactic on -- he's getting you guys 100,000 or
13   he's setting up a different account.  That never
14   happened.
15       I was trying to work with him.  Going through
16   your discoveries, it seemed like you guys were
17   trying to work with him.  And both of us just
18   seemed like we had enough.  We both sued him, but
19   now we're suing each other, and here we are.
20 Q Was there ever a point in time that you felt like,
21   well, James, he's trying really hard, but he's
22   doing it in good faith and things aren't working
23   out?
24 A No, it was more along the lines of I couldn't
25   understand why someone was kind of intentionally

Page 210

1   bankrupting their own company.  Me trying to give
2   my financial advice of, the company can't afford
3   salaries.  These trips to Barbados for two weeks
4   for $36,000, expenses going to Nautic Crew.
5       The way it was designed, it was just a prebook
6   several shows that correspond with the text message
7   on the white board, show the car off on those
8   shows.  A lot of the company was supposed to be
9   owned and bought fully financed by the owners.
10   Everything was supposed to be a revolving line of
11   credit.  This company was set up so Blackburn could
12   really get three sources of income:  One being
13   retained earnings.  Two, sales proceeds.  And
14   three, he was supposed to get interest on his loan.
15       He never put his loan in.  I still can't find
16   his 112-five, and, I mean, it was just a
17   pump-and-dump scheme, and I couldn't realize it
18   until it was too late.
19       MR. JONES:  Give me one or two minutes, and I
20   think I'll be good.
21       (A discussion was held off the record.)
22       MR. JONES:  I pass the witness.
23 CROSS-EXAMINATION
24 BY MR. ROCAP:
25 Q Mr. Kessler, I just have a few questions for you.

Page 211

1   Not very long.
2       Early on you said that you met James through
3   some mutual friends in Florida.  Can you identify
4   who those people were?
5 A Mark Bernard.
6 Q Bernard?
7 A Yeah.
8 Q Anybody else?
9 A And then he was the main -- he was the person that
10   introduced me to James.  He's also the person that
11   signed as a witness of the first agreement for the
12   purchase of the first shares of the First Sky
13   investment.
14 Q Okay.  The company that you worked at before
15   Cowden, I kept hearing the name, but I couldn't
16   quite understand what it was.  What was it?
17 A It was Addvetco.
18 Q Addvetco?
19 A Yeah, A-D-D-V-E-T-C-O.
20 Q And that was owned by basically four guys at the
21   time, your father and three other fellows?
22 A My father and two other fellows, yeah.
23 Q Two other, okay.  And then how long did you work
24   for Addvetco?
25 A I had summer internships probably around 2008 until

Page 212

1   I graduated in '11.  I had probably another summer
2   internship from '11 to '12.  And then after I got
3   out of grad school, I started full-time there and
4   then studied the actuary exams on the backend.
5 Q And then at some point in time you were appointed
6   the managing partner of Addvetco?
7 A Yes.
8 Q And when was that?
9 A I'd have to double check the -- there was different
10   stages of buyouts and/or gift of shares.  So, like,
11   I would have to double check some of the records.
12   The company was liquidated in 2019, I believe.  All
13   payables were paid out to --
14 Q I heard all that part.
15 A -- lenders.
16 Q How long had you been the managing partner at
17   Addvetco prior to its liquidation?
18 A I think the 24 1/2 percent might have been around
19   2015, 2014.
20 Q And if I understand correctly, the business of
21   Addvetco was to install, I think you said,
22   elevators in Veteran Hospital facilities?
23 A Not just elevators.  A lot of renovations at the VA
24   Hospital, both in Oakland, PA, as well as Aspinwall
25   out on 28 -- you guys don't know the street.

Page 213

```
 1  Q  Did Addvetco do any business other than with VA?
 2  A  No.  The VA, we had a good relationship with them.
 3     We were actually one of four certified contractors
 4     in one of their programs for them to accept bids
 5     from.
 6  Q  And during your tenure as managing partner of
 7     Addvetco, I take it you had occasion to review and
 8     execute on behalf of Addvetco construction or other
 9     types of agreements with the VA?
10  A  Yeah.  I mean, we would consult with each other.
11     But usually -- I was never majority shareholder.
12  Q  I understand.  I'm just asking you from a physical
13     standpoint as the managing partner of Addvetco.
14  A  One of the managers, but the CEO pretty much
15     executed everything.  He was 51 percent.
16  Q  As the managing partner, would you have the
17     obligation to get the contract and kind of go
18     through it and make sure it was going to be fine,
19     make sure everything was the way it was supposed to
20     be before you presented it to the managing partner
21     or the other partners?
22  A  Yeah.  I mean, sometimes I'd go through it,
23     sometimes another, depending on who the project
24     manager was for a specific job.
25  Q  And it was important to go through and read those
```

Page 214

```
 1     things closely and make sure you understand them
 2     and make sure that the VA hadn't put something in
 3     there that you weren't expecting?
 4  A  I mean, we're talking about a government entity
 5     that's -- I mean, we just had a good business
 6     relationship with them.  We fulfill our contracts,
 7     they paid their bills, we paid our bills.  That's
 8     how we did business.
 9  Q  You've still got to read agreements; right?
10  A  Yeah, I would say so.
11  Q  In Addvetco's work for the VA, did you hire
12     subcontractors?
13  A  Yes.
14  Q  Would you have contracts with the subcontractors?
15  A  Yeah, there were some subcontracts.
16  Q  And how would those be prepared?  Did you have
17     lawyers prepare those?  Did you purchase them from
18     a service?
19  A  I think originally some of them were just in-house
20     drafted.  I think we may later on have had legal
21     counsel draft something that the CEO would present
22     to the subcontractors, but most of the
23     subcontractors we had relationships with for years
24     down the line prior to maybe getting a more
25     sophisticated agreement.
```

Page 215

```
 1  Q  But before somebody presented that contract to the
 2     subcontractor for signature, somebody at Addvetco
 3     would have to go through it and make sure the terms
 4     were correct and proper?
 5  A  Yeah, the CEO would do that.
 6  Q  Would you do that as the managing partner?
 7  A  Sometimes yeah, sometimes no.
 8  Q  You knew it was important to go through those
 9     contracts and make sure they were accurately
10     completed so that there was no misunderstanding
11     down the road as to what the relationship between
12     Addvetco and the subcontractor was to be?
13  A  I mean, the subcontractor executed their scope of
14     work, and we would work together as a team to try
15     to get the job done.
16  Q  Looking at Exhibit 20, which is the Florida
17     Complaint, and going back to Exhibit No. 1 to that
18     Complaint, which appears at PAG-B0031.
19  A  Hold on.  Sorry.
20  Q  That's all right.
21  A  I'm trying to sort through everything.
22  Q  It's maybe 10 pages back or so, PAG-B0031.
23  A  Okay.
24  Q  This is the agreement between you and
25     Mr. Blackburn; right?
```

Page 216

```
 1  A  Yeah.
 2  Q  Where were you physically located when you signed
 3     this?
 4  A  This was around the time of the Fort Lauderdale
 5     Boat Show.  I do believe I was in Fort Lauderdale
 6     at this time.
 7  Q  And had Premier Auto Groups been set up at this
 8     time, legally established?
 9  A  Legally, I do not believe so.  I would have to
10     check the filing date that James did for the
11     company.
12  Q  You had an opportunity to read this completely and
13     fully before you signed it?
14  A  Yeah, we read it.  There was also conversations.
15  Q  And when it says in here you're to be the director
16     of operations for the company, am I correct that it
17     was your understanding that that really wasn't
18     going to be a job; that was just a title?
19  A  It was mainly a title.  I mean, Blackburn and I had
20     multiple conversations that I was not going to be
21     around.  I was liquidating a company up north, and
22     I was interviewing for actuarial positions.  I did
23     some of the interviewing at his office.
24  Q  Eventually, you get to Exhibit No. 3 to that
25     Complaint, PAG-B0044.
```

Filing # 104416149 E-Filed 03/05/2020 03:13:06 PM

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT IN AND FOR BROWARD COUNTY, FLORIDA

EDWARD KESSLER, individually and on behalf of PREMIER GROUP AUTOS, LLC d/b/a Overfinch Miami,

CASE NO.: $2c$-4101

       Plaintiffs,

v.

JAMES BLACKBURN, individually;
KERRY KENWRIGHT, individually;
CITYLIFE SOCIAL, LLC; NAUTIC CREW
WORLDWIDE, LLC d/b/a Nautic Charters
d/b/a Nautic Charter Worldwide; AND
PREMIER WARRANTY CO. d/b/a CityLife
Social d/b/a CityLife Social App
Development d/b/a International Yacht
Company d/b/a Quiet Planes,

       Defendants.

_____/

## VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL

Now comes Edward Kessler, individually and on behalf of Premier Group Autos, LLC d/b/a Overfinch Miami, and sues James Blackburn, individually; Kerry Kenwright, individually; CityLife Social, LLC; Nautic Crew Worldwide, LLC d/b/a Nautic Charters d/b/a Nautic Charter Worldwide; and Premier Warranty Co. d/b/a CityLife Social d/b/a CityLife Social App Development d/b/a International Yacht Company dba Quiet Planes (collectively, "Defendants"), and states as follows:

### Preliminary Statement

1.    This is an action for damages brought by Plaintiff Edward Kessler ("Kessler"), both directly and derivatively on behalf of Premier Group Autos, LLC d/b/a Overfinch Miami ("PGA"), against Defendant James Blackburn ("Blackburn") and various companies controlled by

00585419.DOCX 16

Exhibit __20__

Witness _____

Date _____ ETL

**PAG-B0007**

Blackburn for judicial dissolution, judicial expulsion, fraud, fraud in the inducement, unjust enrichment, civil theft, and breach of fiduciary duties.

2.      PGA was formed for the purpose of distributing high-end aftermarket Land Rovers utilizing the Overfinch branding and trademark.  However, Blackburn caused irreparable damage to PGA and its operations by breaching his fiduciary duties to PGA, including funneling money from PGA to himself and his companies; and causing PGA to default on its loan agreements and its exclusive distribution agreement with Overfinch North America.

3.      Kessler also suffered damages, individually and apart from PGA, due to Blackburn's fraudulent acts, which included forging Kessler's name on loan agreements, and signature on a credit card application and using the credit card for Blackburn's personal use.

### Parties, Jurisdiction and Venue

4.      This is an action for damages in excess of $30,000, exclusive of attorney's fees and interest, stemming from actions that occurred in Broward County, Florida, and therefore jurisdiction is proper in this Court.

5.      PGA had its principal place of business in Broward County, Florida and is otherwise *sui juris*.

6.      Kessler, a resident of Pittsburgh, Pennsylvania, is the 50% interest holder of PGA, pursuant to an agreement between Kessler and Blackburn dated November 5, 2018 (the "Agreement"), and is otherwise *sui juris*.

7.      Blackburn is a 50% interest holder in PGA pursuant to the Agreement.  Further, Blackburn is a resident of Broward County and conducted substantial business within the state as the CEO of PGA from the date of inception through the filing of this Complaint, and is otherwise *sui juris*.

00583419.DOCX 16                                              2

8.      Kerry Kenwright, a/k/a Kerry Blackburn ("Kenwright"), is a resident of Broward County, Florida and the spouse of Blackburn, and is otherwise *sui juris*. Kenwright conducted substantial business within the state of Florida and is the registered agent and director of Premier Warranty (defined below).

9.      CityLife Social, LLC ("CityLife"), is a Florida limited liability company with its principal place of business in Broward County, Florida.

10.     Nautic Crew Worldwide, LLC d/b/a Nautic Charters d/b/a Nautic Charter Worldwide ("Nautic Crew"), is a Florida limited liability company with its principal place of business in Broward County, Florida.

11.     Premier Warranty Company d/b/a CityLife Social d/b/a CityLife Social App Development d/b/a International Yacht Company d/b/a Quiet Planes ("Premier Warranty," and together with CityLife and Nautic Crew, the "Blackburn Entities") is a Florida company with its principal place of business in Broward County, Florida.

12.     All Defendants are residents of and/or do business in Broward County, Florida, and the facts and circumstances giving rise to the claims asserted occurred in Broward County, Florida. Therefore, venue is proper in this Court.

## Facts Supporting Claims

13.     In 2018, Blackburn pitched Kessler on the idea of distributing high end, aftermarket Land Rovers utilizing the Overfinch brand. Ultimately, Blackburn and Kessler agreed to a 50/50 venture.

PAG-B0009

A. *The Inception of Premier Group Autos, LLC*

14.     To that end, on November 5, 2018, Kessler and Blackburn entered into the Agreement, wherein among other things, each party agreed to provide $50,000 of up front capital, additional financing or capital support, and use of credit facilities for the purchase of floorplan financing and a showroom buildout. Pursuant to the Agreement, Kessler was named Director of Operations of PGA. A copy of the Agreement is attached hereto at **Exhibit 1.**

15.     Kessler and Blackburn further agreed that each would fund the purchase of initial vehicles, with Kessler agreeing to fund the purchase of the first vehicle, and Blackburn agreeing to fund the purchase of the second vehicle.

16.     Subsequently, on December 3, 2018, PGA entered into a distribution agreement (the "Distribution Agreement") with Overfinch North America, Inc. ("Overfinch NA"), in which PGA became the exclusive Overfinch distributor in South Florida[1] for a period of one year. Included in the Distribution Agreement was a minimum requirement that PGA show at a minimum number of annual events, and certain financing and payment thresholds. A copy of the Distribution Agreement is attached hereto at **Exhibit 2.**

17.     In order to purchase its first vehicle, Kessler loaned PGA $180,536.40, which amount was specifically designated for the purchase of the first vehicle. The loan was memorialized by a note between Kessler and PGA dated December 3, 2018, for a term of 12 months with 5% interest (the "EAK Note"). At Kessler's discretion, the funds of the EAK Note could be re-invested into another vehicle upon the sale of the first vehicle. A copy of the EAK Note is attached hereto at **Exhibit 3.**

---

[1] Inclusive of "Miami-Dade, Broward, Palm Beach, Monroe, Collier, Lee, Henry, Florida Keys and the Glades".

00583419.DOCX 16                                            4

18.     Indeed, the funds from the EAK Note were used to purchase PGA's first vehicle in January 2019, which was later sold. The funds from the EAK Note were reinvested into another vehicle for PGA. And for a few months thereafter, the business looked like it was starting to pick up steam. Unbeknownst to Kessler, Blackburn had other plans.

### B. *The NextGear Loan*

19.     On or about March 26, 2019, PGA entered into a Promissory Note with NextGear Capital, for floorplan financing (the "NextGear Note"). The NextGear Note included a security interest in all assets of PGA. The NextGear Note was signed electronically by Blackburn and Plaintiff, as Managers of PGA, and included personal guarantees by both Blackburn and Plaintiff. A copy of the NextGear Note is included at **Exhibit 4**.

20.     Purportedly, on April 18, 2019, a Power of Attorney (the "POA") was executed in Kessler's name, granting NextGear certain rights, including authority to execute documents, settle claims, and contact third parties in PGA's name. According to the attestation of the Notary Public, Arturo Mayoral, Senior Client Solutions Executive with NextGear, Kessler signed the POA in front of Mr. Mayoral in Broward County, Florida. However, Kessler did not sign the POA, and was not in Broward County or even the state of Florida on or around the date he purportedly signed the POA.

21.     Blackburn executed a POA in favor of NextGear on April 18, 2019, which was also notarized by Mayoral. A copy of Blackburn's POA is attached hereto at **Exhibit 5**.

22.     Blackburn forged Kessler's signature on the POA, or caused Kessler's signature to be forged on the POA, or knew or had reason to know that Kessler did not actually sign the POA. A copy of the POA is attached hereto at **Exhibit 6**.

PAG-B0011

23.    The POA was required by NextGear to obtain advances over and above the $150,000 loaned to PGA under the NextGear Note. Kessler and Blackburn specifically discussed the possibility of additional financing through NextGear, but Kessler objected to the additional terms NextGear required, including a mandatory retainer of $100,000 cash and the execution of the POA.  Accordingly, Kessler refused to consent to additional financing over and above $150,000 from NextGear.

24.    In fact, to provide sufficient financing to purchase vehicles without the objectionable terms required by NextGear, Kessler's father, Edward Kessler Sr. ("Kessler Sr.") loaned PGA $300,000 for the purchase of vehicles.  A copy of the promissory note in favor of Kessler Sr. is attached hereto at **Exhibit 7**.

25.    Unknown to Kessler, and in violation of the terms of the NextGear Note, Blackburn began "flooring"[2] vehicles that had already been sold, as well as vehicles PGA did not own. Kessler first became alerted to the potential issue in or around September 2019 when NextGear charged back PGA's bank account.  Kessler questioned Blackburn regarding the chargeback and discrepancies, but Blackburn deflected and refused to provide an explanation or information relating thereto.

26.    Based upon these apparent breaches of the NextGear Note, NextGear terminated the line of credit and accelerated the note.

27.    NextGear recently filed litigation against Kessler and Blackburn, individually, under their guarantees, and against PGA under the NextGear Note in a case pending in U.S. District

---

[2]   As used in the industry, "flooring" is a form of financing using specific cars as collateral.

PAG-B0012

Court for the Southern District of Indiana.[3]  Among the allegations made by NextGear in the suit is an alleged continuing default by PGA to pay amounts due under the NextGear Note.  NextGear claims the amounts due and owing total $357,588.73 – far in excess of the limited funding Kessler agreed to.

28.     On December 11, 2019, Overfinch notified PGA that its Distribution Agreement was cancelled for failing to meet the minimum purchase requirements.  On the same date, Overfinch also sent PGA a cease and desist letter, advising PGA that it was infringing on Overfinch's intellectual property by using the Overfinch trademark without authorization, including PGA's registration of the domain www.overfinchmiami.com.

29.     Kessler discovered that Blackburn also violated the terms of the loan from Kessler Sr., by utilizing the funds for operating expenses or funneling proceeds of the loan to Blackburn and the Blackburn Entities rather than investing them into vehicles and vehicle kits.

C.  *Blackburn Forges American Express Documents*

30.     At Blackburn's request and recommendation, Kessler agreed to allow PGA to obtain corporate credit cards issued by American Express.  Blackburn advised that both owners' names and social security numbers needed to be provided in order to open the account.  With this representation, Kessler agreed to allow Blackburn to use his social security number along (along with Blackburn's) to open the account.  Shortly thereafter, in or around January 2019, Kessler received a credit card from American Express bearing his name and PGA's name (the "PGA Amex").

---

[3] That case is styled *NextGear Capital, Inc. v. Premier Group Autos, LLC*, et al., Case No. 1:20-CV-354, which was removed from the Superior Court of Hamilton County, Indiana, Case No., 29D03-1912-PL-011904.

00383419.DOCX 16                                      7

PAG-B0013

31.     Aside from authorizing the company to obtain the credit card Kessler had no involvement in applying for the PGA Amex, and did not complete or sign an application for such card.

32.     Apparently, Blackburn also had a PGA Amex.  Although unknown to Kessler, Blackburn did not provide his social security number or use his credit information to obtain one contrary to what he represented to Kessler.

33.     During the time the PGA Amex was active and in use, Kessler made only one purchase on the card, to transport a Land Rover (a wholly business related expense), in the amount of $1,745.

34.     Blackburn told Kessler that Blackburn had used the PGA Amex to pre-pay various shows and events for PGA.  However, Kessler began receiving billing statements for the PGA Amex for purchases made by Blackburn or at Blackburn's direction, which appeared to be largely or wholly personal in nature, and not, in fact, prepayments of PGA's shows and events.

35.     In or around October 2019, Kessler saw the application for the PGA Amex for the first time, which is when he learned that Blackburn did not supply his social security number to open the account, contrary to his representation to Kessler.  It is also the first time Kessler learned that Blackburn had forged Kessler's signature on the application.

36.     Blackburn made personal purchases and purchases unrelated to PGA's operations on the PGA Amex without Kessler's knowledge or authorization.

37.     Moreover, the statements from American Express indicate that thousands of dollars of purchases were made on the card issued in Kessler's name.  Despite this, Kessler only made a single purchase on the PGA Amex, and did not authorize anyone else to use the card issued in his

00583419.DOCX 16                                         8

name. Blackburn, or someone at Blackburn's direction, made charges to the PGA Amex card issued in Kessler's name.

38.     American Express brought suit against Kessler and PGA for the debt incurred on the PGA Amex (the "Amex Case"), in the amount of $109,497.52.[4]  Blackburn was not named in the Amex Case because apparently he did not provide his own credit information or social security number when he fraudulently applied for the PGA Amex by forging Kessler's signature.

39.     The Amex Case was apparently settled at Blackburn's direction.   Kessler is unaware whether any amounts due and owing to American Express have been paid or remain outstanding.

### D.  *Blackburn Uses PGA as a Cash Cow*

40.     Blackburn had access to and control of PGA's bank accounts.  He used this access and control to move PGA's money into and between his various companies and for his personal benefit, without Kessler's knowledge or consent.

41.     Between February 8, 2019, and December 9, 2019, Blackburn transferred funds from PGA to Nautic Crew through a variety of checks, wires, and online transfers totaling $344,740.  Once Kessler became aware of the transfers, he made requests to Blackburn for information evidencing the "operating expenses" claimed by Blackburn. Despite several requests, Plaintiff was not provided any detail or reason for these transfers into Nautic Crew – an entity owned and controlled by Blackburn and Kenwright.

42.     Further, between April 16, 2019, and December 9, 2019, Blackburn paid over $116,000 for personal items out of PGA's funds, including, without limitation, restaurants,

---

[4] The case was styled *American Express National Bank v. Edward Kessler and Premier Group Autos, LLC*, Case No. CACE-19-021456, pending in the Circuit Court in Broward County, Florida. The suit was voluntarily dismissed without prejudice on November 29, 2019.

PAG-B0015

jewelry, clothes, nanny services, life insurance, and personal vacation expenses.  Kessler did not authorize these personal expenses to be paid from PGA's funds.

### E. *Blackburn's Fraudulent Scheme*

43.     Blackburn built and orchestrated a fraudulent scheme to drain PGA of its assets, and in the process destroyed PGA's business opportunities; while defrauding Kessler by forging his name on documents obligating Kessler to debts he did not agree to incur, and PGA to debts beyond what Kessler consented.  Blackburn then took the majority of those ill-gotten funds for his own personal gain – to support the Blackburn Entities and lavish personal spending.

44.     Additionally, while Blackburn and Kessler agreed to put in initial capital of $50,000, and more as needed, Blackburn either failed to contribute his share of the capital, or pulled it back out.  Meanwhile, Kessler contributed the initial $50,000, plus additional capital contributions of $62,500, for a total of $112,500.  Kessler did not authorize a waiver of Blackburn's obligation to contribute capital to PGA, or authorize Blackburn to withdraw his capital if contributed.

45.     Additionally, Blackburn failed to fund the purchase of the second vehicle (or any vehicle) pursuant to the Agreement.  Kessler did not authorize a waiver of Blackburn's obligation to fund the purchase of a vehicle.

46.     In furtherance of this scheme, Blackburn utilized a web of companies in which he has an ownership interest, and/or over which he exercises control, including but not limited to the Blackburn Entities, to remove and hide money and assets from PGA, to the detriment of Kessler and PGA's legitimate creditors.[5]

---

[5] In addition to the Blackburn Entities, Blackburn is known to have an interest or involvement in the following: Exec Airline, Inc.; Grajay Enterprises, LLC; International Yacht Corp. dba International Yacht Collection; Latin American Wings, Corp.; Lawrence & Lilly Investments, LLC; Lauderdale Ahead, Inc.;

PAG-B0016

47.     Based upon the foregoing, Kessler individually and derivatively on behalf of PGA brings the following claims.

48.     All conditions precedent to bringing these claims have been met or waived.

### COUNT I
### Judicial Dissolution of Premier Group Autos, LLC
### *(Fla. Stat. 605.0702(1)(b)(2))*

49.     Plaintiff repeats and realleges the allegations set forth in Paragraphs 1-48 of this Complaint as if fully set forth herein.

50.     The Florida Statutes governing limited liability companies like PGA require a court to judicially dissolve the company upon the request of a member or manager in interest and upon the occurrence of a number of enumerated events including the impracticability of continuing business.

51.     Due to Blackburn's fraudulent conduct, breaches of contracts, including the Agreement, the Distribution Agreement, Next Gear Note, EAK Note, and promissory notes in favor of Kessler, Sr., and PGA's lack of operating capital or remaining assets, it is impractical for PGA to continue business operations.

52.     To allow PGA to continue business operations would cause PGA and Kessler irreparable injury.

WHEREFORE, Plaintiff Edward Kessler respectfully requests this Court (1) enter a judgment of dissolution dissolving Premier Group Autos, LLC; (2) appoint a receiver pursuant to Fla. Stat. § 607.1434; and (3) such other and further relief as the Court deems just and proper.

---

Luxury Yacht Life, LLC dba Diversified Funding; Mansory USA, LLC; Nautic Charters, LLC; Premier Aviation Holdings. LLC; Premier Holdings Group, LLC; Premier Jet Leasing, LLC; Richport Air Operation Account, LLC; Softe, Inc.; U.S. Aircraft Parts, LLC; and Yachte Training, LLC.

PAG-B0017

Further, the Plaintiff requests this Court take any other measures necessary to preserve any remaining corporate assets.

**COUNT II**
**Judicial Dissolution of Premier Group Autos, LLC**
***(Fla. Stat. 605.0702(1)(b)(3))***

53.     Plaintiff repeats and realleges the allegations set forth in Paragraphs 1-48 of this Complaint as if fully set forth herein.

54.     The Florida Statutes governing limited liability companies like PGA require a court to judicially dissolve the company upon the request of a member or manager in interest and upon the occurrence of a number of enumerated events including when a manager or member in control of the company have acted, are acting, or are reasonably expected to act in a manner that is illegal or fraudulent.

55.     Blackburn is the member in control of PGA's operations, as the company's CEO. In this role, Blackburn has exhibited numerous instances of fraudulent and potentially illegal behavior, including forging Kessler's name to documents related to the company, transferring assets and cash from PGA to the Blackburn Entities, knowingly and flagrantly violating the terms of the Distribution Agreement and the NextGear Note, and financing cars already sold or never owned by PGA.

56.     Moreover, were this Court to permit PGA to continue operations, it is reasonably expected that Blackburn would continue his pattern of fraudulent and/or illegal behavior in the name of the company and/or Kessler.

WHEREFORE, Plaintiff Edward Kessler respectfully requests this Court (1) enter a judgment of dissolution dissolving Premier Group Autos, LLC; (2) appoint a receiver pursuant to Fla. Stat. § 607.1434; and (3) such other and further relief as the Court deems just and proper.

PAG-B0018

Further, the Plaintiff requests this Court take any other measures necessary to preserve any remaining corporate assets.

## COUNT III
### Judicial Dissolution of Premier Group Autos, LLC
### (Fla. Stat. 605.0702(1)(b)(4))

57.     Plaintiff repeats and realleges the allegations set forth in Paragraphs 1-48 of this Complaint as if fully set forth herein.

58.     The Florida Statutes governing limited liability companies like PGA require a court to judicially dissolve the company upon the request of a member or manager in interest and upon the occurrence of a number of enumerated events including when the assets of the company are being misappropriated or wasted, causing injury to the company or one or more of its members.

59.     Under Blackburn's control, PGA has misappropriated or wasted substantially all of PGA's assets – the majority of which flowed to the Blackburn Entities (in the approximate amount of at least $344,740); or went directly to pay for Blackburn's personal expenses (in the approximate amount of at least $116,000) – all in the course of just a few months.

60.     These funds were largely comprised of Kessler's initial investment, Kessler's loan to PGA, Kessler Sr.'s loan to PGA, the funds from the NextGear Note, and the expenses fraudulently charged to the PGA Amex.

61.     Moreover, were this Court to permit PGA to continue operations, it is reasonably expected that Blackburn would continue his pattern of fraudulent and/or illegal behavior in the name of the company, which would cause irreparable injury to Kessler and PGA.

WHEREFORE, Plaintiff Edward Kessler respectfully requests this Court (1) enter a judgment of dissolution dissolving Premier Group Autos, LLC; (2) appoint a receiver pursuant to Fla. Stat. § 607.1434; and (3) such other and further relief as the Court deems just and proper.

PAG-B0019

Further, the Plaintiff requests this Court take any other measures necessary to preserve any remaining corporate assets.

**COUNT IV**
**Judicial Expulsion of Blackburn**
**from Premier Group Autos, LLC**
**as alternative to Counts I-III**
**(Fla. Stat. 605.0602)**

62.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1-48 of this Complaint as if fully set forth herein.

63.    The Florida Statutes governing limited liability companies like PGA allow a court to remove a member from management upon the request of a member or manager in interest and upon the occurrence of a number of enumerated events including: (a) wrongful conduct, (b) consistent or willful material breach of the operating agreement or a duty or obligation; or (c) a member engaging in activities or affairs that makes it not reasonably practicable to carry on the activities of the business with the person as a member.

64.    In the instant case, and as described above, Blackburn has demonstrated all three bases for expulsion as a member.

65.    Blackburn has engaged in wrongful conduct as a member in the management of PGA by forging Kessler's name, or having Kessler's name forged, or knowingly using and obtaining access to funds loaned and credit extended over the objection of Kessler or without his approval.

66.    Blackburn has consistently and willfully breached material terms of multiple agreements to the detriment of Kessler and/or PGA, including:

>    a.    the Agreement governing the formation and management of PGA, by failing to contribute the stated capital;

PAG-B0020

   b.   the Agreement between Kessler and Blackburn that each should fund the purchase of an initial vehicle;

   c.   the terms included in the promissory note from Kessler Sr., which required the funds to be reinvested in cars and inventory;

   d.   the Distribution Agreement, by consciously disregarding and breaching terms including those related to use of the name "Overfinch" and other IP held by Overfinch NA; and

   e.   the NextGear Note, by double-financing vehicles, and flooring vehicles already sold or never owned by PGA.

The breaches of these various agreements were material, and consistent or willful. Indeed, because of Blackburn's breaches, the Distribution Agreement was terminated, and the NextGear Note was called, leaving PGA with no viable business plan and no financing to continue.

67.   Finally, because of Blackburn's breaches, and his overall fraudulent behavior and reckless indifference to the damages caused to PGA and Kessler, it is impracticable for PGA to continue its operations with Blackburn as a member.

WHEREFORE, in the event Court does not dissolve PGA or appoint a receiver pursuant to Counts I-III, Plaintiff Edward Kessler respectfully requests this Court enter a judgment expelling James Blackburn as a member and manager of Premier Group Autos, LLC, and such other and further relief as the Court deems just and proper.

COUNT V
Fraud
(Kessler v. Blackburn)

68.   Plaintiff repeats and realleges the allegations set forth in Paragraphs 1-48 of this Complaint as if fully set forth herein.

PAG-B0021

69.    In the course of Kessler and Blackburn's business relationship related to PGA, Blackburn made several false and fraudulent misrepresentations to Kessler that Blackburn knew were false:

a.  Blackburn represented to Kessler that the NextGear Note would be limited to the original note value of $150,000, but unilaterally, without Kessler's knowledge or consent, and contemporaneously with the NextGear Note, executed the Addendum that provided for additional extensions of financing that Kessler didn't agree to and to which he had previously objected.

b.  Blackburn represented that he would personally fund the purchase of PGA's second vehicle, after Kessler personally funded the purchase of PGA's first vehicle, but unilaterally and without Kessler's knowledge or consent, did not personally fund the purchase of any vehicle and instead used PGA's credit or assets to fund the purchase of the second vehicle.

c.  Blackburn knowingly forged Kessler's signature on documents or knew Kessler's signature was forged.

d.  Blackburn siphoned at least $344,740 from PGA to Nautic Crew. Blackburn knew these transfers were improper and not in furtherance of PGA's operations, though he represented as much to Kessler.

e.  Blackburn knowingly charged personal expenses to the PGA Amex and paid for personal expenses out of PGA's bank account without Kessler's knowledge or consent. When asked about the expenses, Blackburn claimed they were expenses for PGA.

00583419.DOCX 16

16

PAG-B0022

      f.  Blackburn knowingly obtained improper financing for vehicles that were already financed, had already been sold, and/or were never owned by PGA.

70.    At the time of these actions and statements, Blackburn knew the representations were false, and made them with the intent to defraud and deceive PGA and Kessler and/or those providing goods and services to PGA.

71.    At the time the statements and actions were made, Kessler had no knowledge of the acts or of the falsity of the statements.

72.    Kessler believed Blackburn was operating in good faith and in the best interests of the business operations. In reliance upon this belief, Kessler continued to further the business's ventures by providing financing, assisting in obtaining other sources of funding, and continuing operations.

73.    Kessler's reliance upon Blackburn was justified because Blackburn concealed his various fraudulent acts and misrepresentations to prevent their discovery.

74.    As a proximate result of Blackburn's fraud and deceit and the facts alleged herein, Kessler was defrauded by Blackburn and may be personally liable to PGA's creditors for at least the following amounts:

      a.  $109,497.52 for the PGA Amex expenditures; and

      b.  $357,588.73 for the amounts allegedly due under the NextGear Loan.

WHEREFORE, Plaintiff Edward Kessler respectfully requests this Court enter a judgment (i) awarding Kessler damages totaling at least $467,086.25 plus interest, against James Blackburn; (ii) declaring the imposition of an equitable lien on the Blackburn Entities; (iii) appointing a receiver, custodian, or examiner to investigate and/or oversee the Blackburn Entities and preserve the assets therein; (iv) and such other and further relief as the Court deems just and proper.

00583419.DOCX 16                 17

## COUNT VI
### Fraud in the Inducement
### *(Kessler v. Blackburn)*

75.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1-48 of this Complaint as if fully set forth herein.

76.    In the formation of PGA, Blackburn represented to Kessler that he intended to form a legitimate enterprise to distribute Overfinch branded Land Rovers.

77.    However, from the inception of PGA, Blackburn knew that he would, in fact use PGA as a front and Kessler as pawn to bring money into the business, only to funnel it back out for his own purposes.

78.    Blackburn knew these representations were false but made them anyway to lure Kessler into the business, to give PGA the air of legitimacy, and to bring in funding.

79.    Kessler was justified in his reliance on his belief this was to be a legitimate business venture by virtue of the fact that Blackburn had connections with Overfinch NA to obtain, and did obtain, the Distribution Agreement.

80.    Because of Kessler's reliance upon Blackburn's fraudulent misrepresentations in the formation of PGA, Kessler incurred damages of at least the following amounts:

        a.   $112,500 Initial equity payment

        b.   $42,000 non-asset backed loans

        c.   $180,536.40 asset backed loans

81.    The money invested or loaned by Kessler to PGA was ultimately used by Blackburn for his own benefit and/or transferred to the Blackburn Entities for Blackburn's benefit.

WHEREFORE, Plaintiff Edward Kessler respectfully requests this Court enter a judgment (i) awarding Kessler damages of $335,036.40, plus interest, against James Blackburn; (ii)

PAG-B0024

declaring the imposition of an equitable lien on the Blackburn Entities; (iii) appointing a receiver, custodian, or examiner to investigate and/or oversee the Blackburn Entities and preserve the assets therein; (iv) and such other and further relief as the Court deems just and proper.

### COUNT VII
### Unjust Enrichment
### *(All Plaintiffs v. All Defendants)*

82.     Plaintiff repeats and realleges the allegations set forth in Paragraphs 1-48 of this Complaint as if fully set forth herein.

83.     Blackburn, Kenwright, and/or the Blackburn Entities have been unjustly enriched at the expense of Kessler and PGA as a result of the PGA Amex transactions, the PGA funds transferred directly to the Blackburn Entities, and the personal expenses Blackburn paid PGA.

84.     Kessler and PGA have conferred a benefit on Blackburn, Kenwright, and/or the Blackburn Entities by virtue of their liability for the PGA Amex purchases and the NextGear Note, as well the funds loaned by Kessler to PGA under the belief that they would be used for legitimate PGA business operations.

85.     Blackburn, Kenwright, and the Blackburn Entities had knowledge of the benefit conferred by Kessler and PGA.

86.     Blackburn, Kenwright, and the Blackburn Entities accepted or retained the benefit conferred.

87.     The circumstances would be inequitable for Blackburn, Kenwright, and/or the Blackburn Entities to retain the benefit without paying fair value for it.

WHEREFORE, Plaintiff Edward Kessler respectfully requests this Court enter a judgment (i) awarding Kessler damages of $584,283.64, plus interest, against James Blackburn, Kerry Kenwright, CityLife, Nautic Crew, and Premier Warranty; (ii) declaring the imposition of an

PAG-B0025

equitable lien on the Blackburn Entities; (iii) appointing a receiver, custodian, or examiner to investigate and/or oversee the Blackburn Entities and preserve the assets therein; (iv) and such other and further relief as the Court deems just and proper.

### COUNT VIII
### Breach of Fiduciary Duties
### (*PGA v. Blackburn*)

88.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1-48 of this Complaint as if fully set forth herein.

89.    As CEO of PGA, Blackburn owed PGA duties, including the duty of care and the duty of loyalty.

90.    Blackburn had an obligation to discharge his duties in good faith with the care an ordinarily prudent officer in a like position would exercise and in a manner reasonably believed to be in the best interests of PGA, to consider all material information reasonably available in making business decisions, and to seek out information reasonably necessary to fulfill his duty to manage the activities of the company.

91.    At all times material hereto, PGA was insolvent or in the zone of insolvency.

92.    Blackburn breached his fiduciary duties owed to PGA and its creditors by, among other acts and omissions, the following:

      a.   failing to adhere to the requirements of the NextGear Note, causing a default under the note and a loss of financing;

      b.   causing PGA to finance cars that had either already been financed or sold, or were not owned by PGA;

PAG-B0026

      c.   causing waste of PGA's assets by using PGA's access to credit and its cash assets for his own benefit or the benefit of the Blackburn Entities, to the detriment of PGA; and

      d.   committing fraudulent acts, including forgery, under the guise of furthering PGA's business operations.

93.    In committing these acts, Blackburn failed to fulfill his fiduciary duties owed to PGA and its creditors. The significant damages that directly resulted from these acts and omissions include, but are not necessarily limited to, the loss of PGA's business prospects and continued operations, diminution of PGA's enterprise value, and/or waste and dissipation of PGA's corporate assets.

94.    All of PGA's losses were the proximate result of Blackburn's acts while purported acting on behalf of PGA.

WHEREFORE, Plaintiff Edward Kessler demands judgment against James Blackburn for breaches of fiduciary duties, and an award of damages, pre-judgment interest, and costs incurred as a result of the same, and such other and further relief as the Court deems just and proper.

### COUNT IX
### Breach of Fiduciary Duties
### *(Kessler v. Blackburn)*

95.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1-48 of this Complaint as if fully set forth herein.

96.    As members of PGA, Blackburn owed Kessler fiduciary duties in the way he managed the business of PGA, including the duties of care and loyalty.

97.    Blackburn had an obligation to discharge his duties in good faith with the care an ordinarily prudent officer in a like position would exercise and in a manner reasonably believed to

PAG-B0027

be in the best interests of PGA, to consider all material information reasonably available in making business decisions, and to seek out information reasonably necessary to fulfill his duty to manage the activities of the company.

98.     Blackburn breached his fiduciary duties owed to Kessler by, among other acts and omissions, the following:

       a.  failing to adhere to the requirements of the NextGear Note, causing a default under the note and a loss of financing;

       b.  failing to adhere to the agreement between Kessler and Blackburn that Blackburn would fund the purchase of PGA's second vehicle after Kessler personally funded the purchase of PGA's first vehicle;

       c.  causing PGA to finance cars that had either already been financed or sold, or were not owned by PGA;

       d.  causing waste of PGA's assets by using PGA's access to credit and its cash assets for his own benefit or the benefit of the Blackburn Entities, to the detriment of PGA; and

       e.  committing fraudulent acts, including forgery, under the guise of furthering PGA's business operations.

99.     In committing these acts, Blackburn failed to fulfill his fiduciary duties owed to Kessler. The significant damages that directly resulted from these acts and omissions include, but are not necessarily limited to, the loss of PGA's business prospects and continued operations, diminution of PGA's enterprise value, and/or waste and dissipation of PGA's corporate assets.

100.    All of PGA's losses were the proximate result of Blackburn's acts while purported acting on behalf of PGA.

00383419.DOCX 16                                22

WHEREFORE, Plaintiff Edward Kessler demands judgment against James Blackburn for breaches of fiduciary duties, and an award of damages, pre-judgment interest, and costs incurred as a result of the same, and such other and further relief as the Court deems just and proper.

### JURY TRIAL DEMAND

Plaintiff demands a jury trial for all issues triable by a jury.

Respectfully Submitted,

BAST AMRON LLP
*Counsel for Plaintiff Edward Kessler*
SunTrust International Center
One Southeast Third Avenue, Suite 1400
Miami, FL 33131
Telephone: 305.379.7904
Facsimile: 305.379.7905
Email: bamron@bastamron.com
Email: dquick@bastamron.com

By:   */s/Brett M. Amron*
      Brett M. Amron, Esq. (FBN 0148342)
      Dana R. Quick, Esq. (FBN 0074402)

00383419.DOCX 16

23

PAG-B0029

## VERIFICATION

State of Pennsylvania          )
                               ) ss:
County of _Allegheny_          )

I, Edward A. Kessler, declare as follows:

I am the Plaintiff in the above-referenced lawsuit. I have read the foregoing Verified Complaint and declare under penalty of perjury that the foregoing factual allegations set forth in Paragraphs 14 through 43 are true and correct.

FURTHER AFFIANT SAYETH NAUGHT.

_____
Edward A. Kessler

THE FOREGOING INSTRUMENT was sworn to (or affirmed) and subscribed before me by means of ☑ physical presence or ☐ online notarization, this 5TH day of March, 2020, by Edward A. Kessler, who is personally known to me or has produced DRIVERS LICENSE as identification.

_____
Notary Public, State of PENNSYLVANIA

My Commission Expires: OCTOBER 17, 2021

Commonwealth of Pennsylvania
Notary Seal
NICHOLE L KOSTELNIK - Notary Public
CITY OF MCKEESPORT, ALLEGHENY COUNTY
My Commission Expires Oct 17, 2021

00584414000A16                              24

PAG-B0030

Agreement Between Ed Kessler and James Blackburn
5th November 2018

Agreed the following:

- Ed and James will own 50% each of The Premier Group and its subsidiary Overfinch Miami.
- Both parties agree to support the company in their own relative capacity.
- More detailed agreement to follow after training in London in December.
- Initial commitments below.

Ed Kessler
- $50,000 in upfront capital provided
- Use of credit facilities for purchase of floorplan financing and showroom build out.
- Director of operations for the company
- Purchase of first vehicle to be financed
- Any additional financing required via loan or capital support

James Blackburn
- $50,000 in upfront capital provided
- Use of credit facilities for purchase of floorplan financing and showroom build out.
- Chief Executive officer for the company
- Purchase of the first vehicle to be financed
- Any additional financing required via loan or capital support

Any additional financing needed shall be agreed to buy both parties and shall be provided equally.
Both parties capital input is capped at $100,000.
Any extra funds needed shall be sourced in a mutually agreed way.

Ed Kessler

James Blackburn

**EXHIBIT**
**1**

PAG-B0031

## DISTRIBUTION AGREEMENT

This International Distribution Agreement ("Agreement") is made effective as of .Monday..C3ʳᵈ..December.1ʒ. ("Effective Date") by and between Premier Group Autos LLC ("Distributor") with company registration number LI800263245 with its principal place of business at 1500 Cordova Road, 206 Fort Lauderdale, Florida, 33316 and Overfinch North America Inc. ("OVERFINCH") with its principal place of business at 500 Stinson Drive, Danville VA 24540 USA.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

I. **DEFINITIONS**

1.1 "Conversion" means exterior products including body styling package, badges, lettering, wheels and tires and the fitment thereof by OVERFINCH.

1.2 "Conversion Value" means the value of the Products and services supplied by OVERFINCH as set out in the relevant order acceptance and / or invoice. For the avoidance of doubt, the Conversion Value does not include taxes, duties, freight and transportation charges and similar costs, all of which are payable by the Distributor.

1.3 "Customers" means any current or potential purchasers or end-users of the Products.

1.4 "Initial Term" means twelve months from the Effective Date.

1.5 "Introducers Fee" means an amount in US dollars to be agreed on a deal by deal basis between the parties.

1.6 "Order Value" means the total value of the order including the Vehicle Value and Conversion Value as set-out in such order that is accepted by OVERFINCH.

**EXHIBIT 2**

i

PAG-B0032

1.7   "Products" means any Overfinch products sold by OVERFINCH to Distributor for resale to Customers pursuant to the terms of this Agreement, and any related services (including OVERFINCH training).

1.8   "Term" means twelve months commencing from the Effective date and thereafter each twelve-month period following the anniversary of the Initial Term.

1.9   "Territory" means the utility and industrial market segments in South Florida (Miami Dade, Broward, Palm Beach, Monroe, Collier, Lee, Henry, Florida Keys and the Glades) only.

1.10   "Vehicle" means a new vehicle that OVERFINCH has manufactured parts for and is capable of being modified by OVERFINCH.

1.11   "Vehicle Value" means the cost of the vehicle as Invoiced to Overfinch by the supplying automotive dealer. For the avoidance of doubt, the Vehicle Value does not include state or local taxes, freight and transportation charges and similar costs, all of which are payable by the Distributor.

II.   **RELATIONSHIP**

2.1   **Appointment.** OVERFINCH appoints the Distributor as an exclusive, independent distributor of Products to Customers in the Territory. Distributor accepts such appointment and agrees to devote sufficient time and resources to the performance of its duties hereunder. Distributor shall promptly notify OVERFINCH of all inquiries related to Products from persons or entities located outside the Territory. Distributor shall notify OVERFINCH of all changes in personnel assigned to its account.

OVERFINCH reserves the right to transact any business to retail Customers within the Territory that are as a result of online sales made via its website or other online platform and / or sales resulting from any local or national brand advertising events that it has organized and participated in.

OVERFINCH may terminate the exclusivity under this Agreement upon thirty (30) days notice at any time that the Distributor has placed no orders with OVERFINCH for any rolling two-month period, providing that the Distributor has not already ordered, prior to the commencement of that two-month

JB AS.

Final Version – 27/11/2018                                                                2

PAG-B0033

period, Products that would exceed the minimum amount required by the end of that two-month period.

2.2     **Independent Contractor**. Distributor is an independent contractor. Distributor is not an employee, representative, or agent of OVERFINCH. Distributor is not authorized to make any agreement, warranty or representation on behalf of OVERFINCH, or to create any liability or obligation, express or implied, on behalf of OVERFINCH. Distributor shall not appoint any third party to promote or sell Products or otherwise perform any of Distributor's obligations hereunder. Distributor shall conduct its business in its own name, maintain its own office and be responsible for its expenses, personnel and operations.

2.3     **Direct Sales**. OVERFINCH reserves the right to honor online store orders from Customers that are based within the Territory, with no compensation to the Distributor.

During the Initial Term and any renewal Term, in the event that the Distributor can demonstrate via an information registration service acceptable to OVERFINCH that is has recorded a Customer's details at an event it attended and / or hosted, whereby it introduced that Customer to the Overfinch brand and that Customer is within the Territory and would like to place an order to purchase Products from OVERFINCH directly within a six month period from that introduction, OVERFINCH shall refer that Customer to the Distributor. In the event such Customer is located outside of the Territory OVERFINCH shall pay the Distributor an Introducers Fee.

The Distributor is required to submit the information registration record to OVERFINCH on a monthly basis and within 5 working days following an event that the Distributor has hosted.

OVERFINCH shall maintain an information registration service whereby it records Customer's details at any brand advertising event that it attends and / or hosts.

2.4     **Sales Terms**. OVERFINCH may decline to quote any potential sale and may accept or reject any order, providing that such declination or rejection is based upon a reasonable commercial decision.

All sales of Products by OVERFINCH shall be subject to the OVERFINCH Sales Terms in effect at time of sale, as reflected on the OVERFINCH sales order acknowledgment, to the extent that they do not conflict with the provisions of this Agreement. By placing each order hereunder, Distributor confirms

*JB AS ·*

Final Version – 27/11/2018                                                    3

its agreement with and acceptance of the OVERFINCH Sales Terms. Distributor must extend, honor and perform the warranty services as set forth in the OVERFINCH Sales Terms to Customers. OVERFINCH shall be bound only by the warranty applicable to parts as set forth in the applicable OVERFINCH Sales Terms, and Distributor shall indemnify OVERFINCH against any additional warranty terms. Any warranty or other sales terms required by law in the Territory must be provided by Distributor, and Distributor shall indemnify OVERFINCH for any failure to comply with any such requirements. Distributor must also notify OVERFINCH if any of its standard warranty or other sales terms conflict with any law in the Territory.

During the Initial Term and any subsequent renewal Term thereafter the Distributor shall notify OVERFINCH promptly of any potential warranty claim relating to its Products. Any warranty claims are at the sole decision of OVERFINCH and any costs or expenses incurred by the Distributor shall only be reimbursed providing these have been pre-authorized in writing by OVERFINCH.

OVERFINCH Conversions/Products shall be ordered on a monthly basis. There is no guarantee in respect of the delivery date of any Vehicles. OVERFINCH has no control over the lead time of the Vehicle from the manufacturer. It is not guaranteed, and it is dependent upon the model year of the Vehicle being ordered, but it is envisaged that a Vehicle will be delivered with the Conversion within 16 weeks from OVERFINCH'S acceptance of a Vehicle order. OVERFINCH shall update the Distributor on lead times of Vehicles as and when it receives updates from the supplying automotive dealer.

Upon OVERFINCH's acceptance of an order submitted by the Distributor for a Vehicle and Conversion, the Distributor is required to comply with the following payment terms:

1.) 10% non-refundable deposit of the total Order Value upon OVERFINCH'S acceptance of the order;

2.) Remaining balance of the Vehicle Value to be paid on or before collection of the Vehicle by OVERFINCH from the Land Rover dealer;

3.) Remaining balance of the Conversion Value to be paid upon completion of the conversion by OVERFINCH and before delivery of it to the Distributor.

Upon OVERFINCH's acceptance of an order submitted by the Distributor for a Conversion, the Distributor is required to comply with the following payment terms:

1.) 10% non-refundable deposit of the total Order Value upon OVERFINCH'S acceptance of the order;

·JB

4

PAG-B0035

2.) Remaining balance of the Conversion Value to be paid upon completion of the conversion by OVERFINCH and before delivery of it to the Distributor.

Payment must be made in cleared funds via wire transfer or cheque only.

All orders are exclusive of state and local taxes, freight and transportation charges and similar costs, all of which should be paid by the Distributor.

Prices for Products shall be those provided in writing by OVERFINCH to Distributor and may be modified by OVERFINCH from time to time. Distributor shall pay all amounts in U.S. Dollars.

Distributor shall provide OVERFINCH with its standard end-user price list upon request.

Distributor acknowledges that OVERFINCH pricing fully compensates Distributor on an ongoing basis for customer and market development, for providing product support and services in the Territory.

Delivery of the Products shall take place at OVERFINCH'S place of business. Acceptance of any change to the delivery point requested by the Distributor shall be at OVERFINCH'S sole discretion and at the Distributors risk and expense.

2.5    Minimum Annual Order Quantity

The Distributor is required to place orders for a minimum of 36 OVERFINCH Conversions or Overfinch Products to the value of $1,500,000.00 during the Initial Term. One Conversion/Product order shall be placed upon the Effective Date of this agreement. Thereafter the remaining minimum order quantity shall be spread in equal instalments across each month of the Initial Term, with the Distributor ordering a minimum of 3 Conversions or the equivalent value in Products each month.

Unless notified by OVERFINCH in writing 30 days prior to the expiry of the Initial Term, the contract shall automatically renew for a further Term. The minimum annual order requirement for any such renewal Term shall be an increase of 10% of the minimum annual order value required in the previous Term.

The initial minimum annual order shall commence on the above Effective Date, with each subsequent minimum annual order commencing upon each renewal Term.

PAG-B0036

The Distributor has the intention to open an Overfinch showroom within the Territory within 8 to 12 months from the Effective Date of this agreement. Upon the Distributor confirming it has finalized its plans in respect of that showroom, both parties shall enter into further discussions regarding the terms of this agreement in view of the investment proposed by the Distributor and document any such variation to the terms hereof that are agreeable between both parties at that time. Further, subject to the Distributor's performance throughout the Initial Term, the parties may enter into discussions regarding distributorships in other potential territories in the United States of America.

### 2.6   Initial Order

Upon execution of this Agreement, the Distributor shall submit an initial order for an OVERFINCH Conversion.

### III.   RESPONSIBILITIES

3.1   **Promotion.** Distributor shall devote sufficient time and resources to successfully promote and sell Products to Customers. Distributor shall ensure that all sales personnel are properly trained and possess the appropriate technical competency to promote Products effectively. Distributor shall respond in a timely and professional manner to all inquiries from and referrals to Customers. Distributor shall furnish any market information requested by OVERFINCH, including without limitation annual sales plans, monthly sales reports, monthly forecasting reports, sales forecast updates and explanations of any discrepancies between forecasted and actual sales. Distributor shall attend any required OVERFINCH sales training.

3.2   **Marketing.** The Distributor is required to advertise and promote the Products on a regular basis on an appropriate marketing platform akin to the prestige of the brand. The Distributor should submit a proposed marketing plan to OVERFINCH for its review and written consent.

OVERFINCH may from time to time carry out local and / or national brand advertising and marketing activities, within or outside of the Territory and request the Distributor to make a reasonable contribution to such costs and expenses associated and incurred in respect of that brand advertising. OVERFINCH shall provide reasonable notice of anticipated costs and expenditure for such brand advertising.

JB AS.

PAG-B0037

3.3     Events.  The Distributor shall host 10 exclusive events during the course of the initial term in order to promote the OVERFINCH brand and Vehicles.  OVERFINCH will provide marketing material and product support for use at such events, upon reasonable notice and as required.   The Distributor shall cover the reasonable costs and expenses incurred by OVERFINCH in this regard.

3.4     Customer and Product Support.  Distributor shall follow up and maintain contact with Customers to ensure customer satisfaction.  Distributor shall ensure that Customers receive information about any recalls on Products provided to Distributor.  Distributor shall employ personnel who are educated in the field and sufficiently knowledgeable of Products to perform the technical support and services required hereunder.

3.5     Technical and Marketing Materials.  Distributor shall maintain an adequate inventory of current OVERFINCH technical and marketing materials to promote Products.  Distributor may not use any technical or marketing materials not provided by OVERFINCH.  Prior written approval for the use of any marketing material should be obtained from OVERFINCH.  Distributor shall provide any translations of OVERFINCH technical and marketing materials to OVERFINCH.

3.6     Compliance.  Distributor shall comply with all governmental laws, regulations and orders of all relevant jurisdictions that may be applicable to Distributor under this Agreement, including without limitation the U.S. Export Administration Act, the U.S. Foreign Corrupt Practices Act and all licensing and registration requirements in the Territory.  Distributor shall advise OVERFINCH with respect to any warranty requirements, noise ordinances, safety standards, specifications and other requirements applicable to Products imposed by law, regulation or order in the Territory.  Distributor shall notify OVERFINCH of the existence and content of any provision of law in the Territory or any other applicable law that conflicts with any provision of this Agreement or any other document, such as warranty or sales terms, at the time of execution or at any time thereafter.

3.7     Training.  OVERFINCH shall provide sales and technical training and support as appropriate. The Distributor shall cover the reasonable costs and expenses incurred by OVERFINCH in providing this.

JB AS.

Final Version – 27/11/2018                                                                                              7

PAG-B0038

IV      INTELLECTUAL PROPERTY AND CONFIDENTIALITY

4.1.     Intellectual Property.  Distributor acknowledges that trademarks, service marks, trade dress, patents, copyrights, trade secrets, licenses and any other intellectual property used by OVERFINCH are the sole property of OVERFINCH.  Distributor shall not use such OVERFINCH property except in the normal course of promoting Products, or promoting OVERFINCH in general, under the terms of this Agreement.  Distributor shall not remove or alter any trademarks, service marks or trade dress that identify OVERFINCH, nor use any trademarks, service marks, trade dress or any other intellectual property that, in the sole discretion of OVERFINCH, are confusingly similar to those of OVERFINCH. Distributor shall make every effort to safeguard the intellectual property of OVERFINCH, and shall immediately notify OVERFINCH in writing of any infringement or suspected infringement and cooperate with OVERFINCH, as OVERFINCH deems necessary, to protect such property against infringement (such cooperation to be at OVERFINCH expense unless the infringement arose from Distributor acts or omissions).  Distributor shall comply with the OVERFINCH INTELLECTUAL PROPERTY POLICY, as provided by OVERFINCH.  OVERFINCH my immediately terminate this Agreement for any violations of these intellectual property requirements.  Upon termination of this agreement the Distributor shall not use the intellectual property.

4.2     Confidentiality.  All confidential information provided, from time to time, by OVERFINCH to Distributor has been or is provided in strict confidentiality, and can neither be disclosed by Distributor to third parties during the term of this Agreement or after termination or expiration, nor used by Distributor for purposes other than those set forth in this Agreement.  Distributor shall maintain such information in strict confidence during the term of this Agreement and for five (5) years after termination or expiration, except when disclosure of such information is required by law.  Within thirty (30) days of any request by OVERFINCH or termination or expiration of this Agreement, Distributor shall return or destroy, according to OVERFINCH's instruction at such time, all confidential information and any demonstration products provided by OVERFINCH.  Distributor shall ensure compliance with these confidentiality obligations by its employees, representatives and agents, including without limitation by obtaining appropriate confidentiality agreements from such persons.

4.3     Other brands.  The Distributor shall not fit any other after-market tuning brands parts and / or accessories branded or unbranded to any Vehicle's supplied by OVERFINCH, so as to cause confusion in the market place that any other brands products are that of OVERFINCH or vice versa.

## V.   TERM AND TERMINATION

5.1   **Term.**  Subject to termination, this Agreement shall have an initial term of one (1) year, commencing on the Effective Date, and shall renew automatically for additional one (1) year periods, subject to the below.

5.2   **Termination.**  Either party may terminate this Agreement without cause upon thirty (30) days written notice to the other party to expire upon the end of the Initial Term or following that the anniversary of any renewal Term thereafter.  Either party may also choose to render the agreement non-exclusive upon thirty (30) days written notice to expire upon the end of the Initial Term or following that the anniversary of any renewal Term thereafter (in addition to the right of OVERFINCH elsewhere in this Agreement to render the Agreement non-exclusive for failure by Distributor to meet its minimum orders).

Either party may terminate this Agreement immediately upon the other party's insolvency, bankruptcy, suspension of business, assignment of assets for the benefit of creditors, voluntary or involuntary dissolution, appointment of a trustee for all or a substantial portion of the party's assets, or breach of this Agreement.  OVERFINCH reserves the right to immediately terminate this Agreement on written notice to Distributor if, in the sole discretion of OVERFINCH, the laws or economic circumstances in the Territory have changed in a material way so as to adversely impact OVERFINCH's relationship with Distributor or OVERFINCH's ability to conduct business in the Territory.  Upon termination or expiration of this Agreement, OVERFINCH has the right of first refusal in respect of any Products and / or Vehicles and may, at its sole discretion, repurchase from Distributor, at the lesser of either the net prices paid by Distributor or the open market value, any of the Vehicles purchased and remaining unsold by Distributor.  OVERFINCH's repurchase of Distributor's Vehicle inventory pursuant to the termination provisions hereof (or Distributor's right to sell such inventory if not so repurchased by OVERFINCH) shall constitute Distributor's sole remedy for termination or expiration of this Agreement.  All intellectual property, confidentiality, non-compete and non-hire rights and obligations set forth in this Agreement shall survive termination or expiration.

5.3   **Transition.**  During any notice period and after termination or expiration of this Agreement, Distributor shall cooperate with OVERFINCH to assure a smooth transition for Customers and OVERFINCH.  Distributor shall introduce OVERFINCH personnel (and the personnel of any distributor or sales representative specified by OVERFINCH) to Customers who have ordered or expressed

JB AS.

PAG-B0040

interest in Products and invite OVERFINCH (and any distributor or sales representative specified by OVERFINCH) to accompany Distributor's personnel on sales calls related to Products. Distributor shall take all necessary action to terminate any registration as an OVERFINCH distributor with any governmental authority. All indebtedness of Distributor to OVERFINCH shall become immediately due and payable without further notice or demand, which is hereby waived. Distributor shall also cooperate with OVERFINCH in identifying and producing copies of correspondence and business records related to all past, present and pending business activities conducted on behalf of Customers.

5.4    **Warranty.**   Distributor shall honor all warranties existing upon expiration or termination of this Agreement until any such warranties expire.

VI.    **GENERAL PROVISIONS**

6.1    **Indemnification and Limitation of Liability.**   The Distributor shall fully indemnify, defend and hold harmless OVERFINCH and all related parties, to the extent that it is not as a direct result of a defective Product supplied by OVERFINCH, from and against any claims or losses arising directly or indirectly from, as a result of or in connection with its performance or breach under this Agreement (including without limitation the above obligation to inform OVERFINCH of any compliance or other relevant legal issues in the Territory), or any other act or omission of Distributor. In no event, whether as a result of breach of contract, indemnity, warranty, tort (including negligence), strict liability or otherwise, shall OVERFINCH liability for any loss or damage exceed the price of the specific Product that gave rise to the claim, nor include any special, consequential, incidental or punitive damages.

6.2    **Insurance.**   Distributor agrees to obtain and maintain commercially reasonable insurance, including without limitation comprehensive general liability coverage with combined policy limits of at least $1,000,000 per occurrence and covering bodily injury, personal injury, and property damage, including blanket contractual liability and naming OVERFINCH and its directors, officers, employees, and authorized representatives as additional insureds with respect to operations under this Agreement. Distributor agrees to furnish OVERFINCH with certificates showing the amount and existence of the required coverages and specifying that the policies shall not be canceled or materially changed except after (30) thirty days written notice to OVERFINCH. Distributor acknowledges that compliance with the specific insurance requirement above does not relieve Distributor of its obligation to maintain commercially reasonable insurance (either in regard to higher comprehensive general liability coverage limits or other

PAG-B0041

types of coverage, including without limitation employer liability, automobile liability and worker compensation coverage.).

6.3     **Governing Law and Dispute Resolution.** The laws of the Commonwealth of Virginia excluding conflict of laws principles, shall govern this Agreement. The parties reject any applicability of the United Nations Convention on Contracts for the International Sale of Goods. Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by binding arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, and judgment on the arbitration award may be entered in any court of competent jurisdiction. Arbitration shall be held at a mutually acceptable location in Virginia, or another location agreed upon by the parties, and shall be conducted in English. Either party may seek injunctive relief in a court of competent jurisdiction or other interim measures in the event of breach or threatened breach of this Agreement. The prevailing party to any dispute shall be entitled to recover legal fees and other costs (including without limitation arbitration fees, disbursements, collection costs and the allocated cost of in-house counsel).

6.4     **Miscellaneous.** Any notice pursuant to this Agreement shall be deemed given when sent by registered or certified mail (return receipt requested) or overnight delivery to an authorized officer at the headquarters of the other party at the address set forth in this Agreement. Distributor may not assign or otherwise transfer this Agreement or any rights or obligations hereunder without the prior written consent of OVERFINCH. The sale of the majority of Distributor's stock shall constitute an assignment for the purposes of this Agreement. No failure or delay by either party in exercising any right or remedy, or insisting upon strict compliance by the other party with any obligation in this Agreement, shall constitute a waiver of any right thereafter to demand exact compliance with the terms of this Agreement. The invalidity, in whole or part, of any provision in this Agreement shall not affect the remainder of such provision or any other provision and, where possible, shall be replaced by a valid provision that effects as close as possible the intent of the invalid provision. Neither party shall be liable for failure to perform or delay in performance of any obligation under this Agreement (except payment of amounts already due and owing) where such failure or delay results from any event beyond its reasonable control. The English language version of this Agreement shall govern and control any translations of the Agreement into any other language. This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof, and any modification hereof must be in a writing signed by both parties.

*JB AS.*

Final Version – 27/11/2018

11

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed and each of the undersigned represents and warrants that he or she is duly authorized to execute this Agreement.

PREMIER GROUP AUTOS LLC
1500 Cordova Road, 206 Fort Lauderdale,
Florida, 33316

By: _____

Name: _James Blackburn_____

Title: _Owner_____

OVERFINCH NORTH AMERICA INC.
500 Stinson Drive
Danville VA 24540

By: _____

Name: _Alexander Sloane._____

Title: _VICE PRESIDENT._____

Final Version – 27/11/2018

12

PAG-B0043

Agreement between
Edward Anthony Kessler
&
Premier Group Autos LLC


12.03.2018


This agreement made today between the above parties is subject to the following terms:

1. Edward Kessler will provide a loan to Premier Group Autos LLC for the purchase of the first vehicle.
2. The loan amount will be $160,000 USD
3. The loan will bear interest at 5% per annum
4. The initial term of the loan will be 12 months
5. Upon sale of the vehicle the lessor has the ability to re – loan at his discretion.


Signed

Edward Kessler

James Blackburn

EXHIBIT
3

PAG-B0044

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

## NextGear Capital Contract Cover Sheet

| | |
|---|---|
| Exact Legal Name: Premier Group Autos LLC | |
| DBA Name: Overfinch Miami | |
| Requested Floorplan Amount: $1,000,000.00 | |
| Federal Tax ID: 83-2535106 | Dealer License #: VI/1127700/1 | Business Type: Limited Liability Corporation |
| State of Incorporation of Residence: FL | |
| Business Email: sales@overfinchmiami.com | State Organization ID: |

### Address Information

Address: 11 SW 12th Ave Ste 103 Bldg 59

| City: Dania Beach | State: FL | ZIP:33004 | County: Broward |
|---|---|---|---|
| Phone Number: 954-440-0717 | Fax Number: | | |
| Is Main Lot: Yes | Is Mailing Address: Yes | Has Physical Inventory: Yes | |

### Stakeholder/Guarantor Information

| Stakeholder/Guarantor Name: James Michael C Blackburn | Title: Manager | % of Ownership: 50% |
|---|---|---|
| Home Address: 4875 NE 4th Ave | | |
| City: Ft Lauderdale | State:FL | ZIP: 33334 | Own or Rent: Own |
| Home Phone: 754-200-8823 | Cell Phone: 954-232-7661 | SS#: xxx-xx-5859 | DOB: 5/22/1990 |
| Drivers License #: B421-453-90-182-0 | | | |

| Stakeholder/Guarantor Name: Edward Anthony Kessler | Title: Manager | % of Ownership: 50% |
|---|---|---|
| Home Address: 5909 Murray Ave | | |
| City: Bethel Park | State: PA | ZIP: 15101 | Own or Rent: Own |
| Home Phone:954-870-7174 | Cell Phone: 412-527-8695 | SS#: xxx-xx-2703 | DOB: 9/30/1988 |
| Drivers License #: 28 368 574 | | | |

INTERNAL USE ONLY:
Home Market: Ft. Lauderdale North

| Credit Limit Type: Retail | Credit Limit Amount: $150,000.00 |
|---|---|
| Terms: D60/30/30 -- F80/45/45 – R3.0 – C%10/5 | |

Account #125308



EXHIBIT
4

PAG-B0045

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

## DEMAND PROMISSORY NOTE
## AND LOAN AND SECURITY AGREEMENT

FOR VALUE RECEIVED, the undersigned borrower ("Borrower") promises to pay to the order of NextGear Capital, Inc. ("Lender"), with its principal office at 11799 North College Avenue, Carmel, Indiana 46032, or such other place as Lender may designate in writing or on the Discover Portal from time to time, in lawful money of the United States of America, the principal sum of One Hundred Fifty Thousand Dollars and Zero Cents ($150,000.00), or such greater or lesser sum which may be advanced to or on behalf of Borrower from time to time, together with all costs, interest, fees, and expenses as provided for under this Note and the other Loan Documents. Unless otherwise stated in an addendum to this Note, this Note shall become effective on the date of Borrower's execution hereof as set forth below Borrower's signature (such date, or the effective date otherwise stated in the applicable addendum, the "Effective Date").

NOW, THEREFORE, in consideration of the mutual covenants, agreements and conditions contained herein, Borrower and Lender (each, a "Party" and collectively, the "Parties") agree as follows:

1.  DEFINITIONS. Capitalized terms used in this Note or in the other Loan Documents without definition shall have the respective meanings as set forth in Appendix A attached hereto and incorporated herein by reference (such meanings to be equally applicable to both the singular and plural forms of the terms defined). Any capitalized terms used herein or in another Loan Document, but not otherwise defined herein or in such other Loan Document, as the case may be, shall have the meanings ascribed to them in the UCC.

2.  GRANT OF SECURITY INTEREST. In order to secure full and prompt payment of all Liabilities and performance of all obligations of Borrower to Lender, its Affiliates, and/or their respective successors or assigns:

    (a) Borrower grants to Lender a continuing security interest in all of Borrower's assets and properties, wherever located, including, without limitation, all equipment of any kind or nature; all vehicles and vehicle parts; all Inventory now owned or hereafter acquired, including, without limitation, all Lender Financed Inventory now owned or hereafter acquired; all amounts in Borrower's Reserve held by or on behalf of Lender, if any; all documents, documents of title, deposit accounts, accounts receivable, manufacturer rebates and incentive payments, chattel paper, including, without limitation, all Receivables and general intangibles now owned or hereafter acquired by Borrower; all cash reserves; all of Borrower's books and records (including any books and records contained on computer hardware or software or otherwise stored by or on behalf of Borrower in electronic or digital form); and all additions, accessions, accessories, replacements, substitutions, and proceeds of any of the foregoing (collectively, the "Collateral").

    (b) The security interest given to Lender in Section 2(a) is given to Lender to secure payment of all Liabilities and the performance of all obligations of Borrower to Lender, and its Affiliates, including all obligations of Borrower under this Note, under any other Loan Document, or otherwise, all without relief from valuation or appraisement Laws. Upon the request of Lender, Borrower shall promptly execute and deliver to Lender or its designee such further documents and instruments, and shall take such further actions, in each case as Lender may deem necessary or desirable to protect Lender's interest in the Collateral or otherwise effectuate the provisions of this Note and the other Loan Documents. Without limiting the generality of the foregoing, Borrower shall, upon the request of Lender, (i) use its best efforts to secure all consents and approvals that may be necessary or appropriate for the assignment to Lender of any Collateral (including any contract of Borrower that constitutes any portion of the Collateral), or that may be necessary in order for Lender to receive the full benefit of all Collateral and to enforce its security interest in the Collateral; (ii) provide Lender and its Representatives with full access to all Collateral, including any and all books and records relating thereto; and (iii) deliver to Lender all Collateral consisting of negotiable documents, chattel paper, and instruments not deposited for collection in the aggregate (in each case, accompanied by any related bills of sale or any other instruments of transfer executed for Borrower), in each case promptly after Borrower receives the same.

    (c) Borrower authorizes Lender to file any UCC financing statements and any amendments thereto and any continuation statements under the UCC, in each case to the extent necessary or desirable in Lender's sole discretion to effect or preserve the security interest granted by Borrower hereunder or under any other Loan Document. Further, Borrower hereby acknowledges, ratifies and approves any UCC financing statements or other filings under the UCC that may have been made by or on behalf of Lender and its Affiliates prior to the Effective Date. The security interest granted by Borrower in Section 2(a) shall be in addition to, and not a substitution for, any right of offset, netting, or reclamation that Lender or any of its Affiliates may have against Borrower, whether pursuant to this Note, any other Loan Document, any Law or otherwise.

3.  INTEREST RATE. Interest shall accrue on Borrower's Liabilities to Lender in accordance with the following schedule:

    (a) All outstanding Liabilities relating to a Floorplan Advance or a Receivable Advance shall accrue Interest on a per annum basis from the Floorplan Date or the Receivable Origination Date, as the case may be, based upon a 360-day year, and such Interest shall be compounded daily at the Base Rate, plus the Contract Rate, until such outstanding Liabilities are paid in full.

    (b) The Base Rate may be amended or modified by Lender from time to time in Lender's sole discretion by posting such amendment or modification on the Finance Program Rate, Fee and Term Schedule. However, Lender may increase the Base Rate by no more than fifty (50) basis points (i.e. one-half of one percent) in any thirty (30) day period.

4.  BORROWER'S REPRESENTATIONS, WARRANTIES, AND COVENANTS. At the time of Borrower's execution of this Note and continuing at all times thereafter until all Liabilities have been indefeasibly paid and satisfied in full and this Note and all other Loan Documents terminated in accordance with their respective terms, Borrower hereby represents, warrants, covenants, and agrees:

NextGear Demand Promissory Note and Loan and Security Agreement (v. 1.1)

PAG-B0046

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy by the designated custodian

(a)   To sell, lease, or rent Lender Financed Inventory only in the Ordinary Course of Business and in accordance with Law, and not to sell or otherwise dispose of any Lender Financed Inventory except as herein provided.

(b)   To keep Lender Financed Inventory only at Borrower's Place of Business and not to remove any Lender Financed Inventory from such place for a period exceeding twenty-four (24) hours, unless such item of Lender Financed Inventory is the subject of an active daily rental agreement (and floorplanned pursuant to a rental Advance Schedule executed by Borrower and Lender), or such removal has been previously authorized in writing by Lender. Notwithstanding the foregoing, Borrower may request Lender to authorize Borrower to consign certain Lender Financed Inventory to another licensed dealer at such consignee dealer's place of business. Borrower's request to consign Lender Financed Inventory as referenced above is subject to Borrower and the consignee dealer executing and delivering to Lender any documentation that Lender may require, including a UCC financing statement or other similar filing on consignee dealer, or an authorization for Lender to make any such filing. Lender may deny Borrower's request to consign Lender Financed Inventory in Lender's sole and absolute discretion.

(c)   To keep Inventory in good repair and insured against all physical risks in such amounts and under such policies issued by such insurance companies as are deemed necessary and satisfactory by Lender; provided, however, that any insurance company issuing required coverage to Borrower pursuant to the requirements of this Section 4(c) shall have been assigned to an A.M. Best Financial Size Category (FSC) of "X" or higher, and shall have a minimum A.M. Best Financial Strength (FSR) rating of "A–". Lender shall be named "loss payee" on such insurance policies. Borrower shall provide Lender with a certificate or certificates of insurance evidencing that the above-mandated insurance requirements have been satisfied and specifying that the applicable insurance carriers will mail direct written notice to Lender at least thirty (30) days prior to any cancellation or non-renewal of any of the above-mandated policies. Alternatively, and unless the Unit of Lender Financed Inventory has been branded as "salvage" or is otherwise ineligible for the Collateral Protection Program, Borrower may satisfy the insurance coverages required under this Section 4(c) by voluntarily enrolling in Lender's Collateral Protection Program and satisfying and adhering to all conditions and other terms thereof at all times during Borrower's enrollment in the Collateral Protection Program. In the event Borrower fails to procure, maintain or provide proof of the insurance coverages required under this Section 4(c), Lender may enroll Borrower in Lender's Collateral Protection Program, or, alternatively, Lender may secure on Borrower's behalf such policies of insurance as Lender, in its sole discretion, deems necessary, in each case from such insurers, in such amounts and with such coverages and deductibles as Lender, in its sole discretion, deems necessary. Charges incurred under the Collateral Protection Program are calculated as of the Floorplan Date from the amount of each original Floorplan Advance related to a Unit of Lender Financed Inventory, through the life of the Floorplan Advance. Upon Borrower's enrollment in the Collateral Protection Program (whether voluntary or otherwise), Borrower shall be subject to, and at all times comply with and adhere to, the terms and conditions applicable to the Collateral Protection Program and Borrower's enrollment and participation therein. Borrower understands and agrees that Lender has an insurable interest in the Collateral, including all Lender Financed Inventory, by virtue of Borrower's pledge of the Collateral as security to Lender for the repayment of all Liabilities by Borrower to Lender. Fees, charges and other terms and conditions for the Collateral Protection Program are published in the Finance Program Rate, Fee and Term Schedule or on the documents referenced therein.

(d)   To keep at all times complete and accurate records of Borrower's Business and provide to Lender promptly (but in any event within two (2) Business Days) copies of such records and any financial information regarding Borrower's Business or Borrower's financial condition generally, in each case as Lender may request. Borrower authorizes Lender to share such information and any and all other information that Lender may possess regarding Borrower's Credit Line or Borrower's relationship with Lender, including information regarding this Note and the other Loan Documents; Borrower's loan history; account history; payment history; audit history; account balance; loan application; credit worthiness; credit availability; and such other general business information regarding Borrower's Credit Line and Borrower's relationship with Lender, to any and all Persons that Lender, in its sole discretion, deems reasonable, including auctions. Without limiting the generality of the foregoing, Borrower shall maintain complete and accurate records and financial statements for all Advances requested or made hereunder, and all other transactions hereunder, including bank statements, cancelled checks, sales invoices, proofs of payment, and other sales files, in each case for at least a period of five (5) years after the date on which such Advance was made or such transaction occurred, as the case may be.

(e)   To allow Lender and its Representatives to inspect Lender Financed Inventory during normal business hours and at other reasonable times at Borrower's Place of Business and such other places as any Lender Financed Inventory may be located and to inspect and make copies of Borrower's books and records. Borrower shall pay Lender for the costs and expenses incurred by Lender or its Representatives to undertake such audits of any Lender Financed Inventory and such inspections and copying of Borrower's books and records, in each case on the applicable Maturity Date.

(f)   To hold all amounts received from the sale of any Unit of Lender Financed Inventory in the form as received in trust for the sole benefit of and for Lender, and to remit such funds satisfying all amounts due Lender and owing by Borrower for such Unit of Lender Financed Inventory, in each case within twenty-four (24) hours of Borrower's receipt of such funds (or receipt of such funds by any Affiliate of Borrower).

(g)   To hold all amounts received that relate to any Receivable that is subject to a Receivable Advance in the form as received in trust for the sole benefit of and for Lender, and to remit such funds satisfying all amounts due Lender and owing by Borrower for and in connection with such Receivable, in each case within twenty-four (24) hours of Borrower's receipt of such funds (or receipt of such funds by any Affiliate of Borrower).

(h)   That, for each Receivable which is the subject of a Receivable Advance, (i) Borrower is the sole and unconditional owner of such Receivable; (ii) such Receivable is not already encumbered by any voluntary or involuntary Liens which are senior to Lender's security interest in such Receivable; (iii) Borrower has a legal right to pledge such Receivable to Lender as security for all Liabilities of Borrower; (iv) such Receivable represents an original bona fide sale to the buyer(s) named therein; (v) such Receivable is now and will remain free from any claim, defense, setoff, or counterclaim of any nature and is enforceable against the buyer(s) named therein and third parties according to its terms; (vi) all statements, facts, numbers, and other information in such Receivable and all related documents are true and accurate to the best of Borrower's knowledge, are free from fraud, and have not been altered or modified subsequent to their execution, except for such alterations or

NextGear Demand Promissory Note and Loan and Security Agreement (v. 1.1)

PAG-B0047

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Cop
by the designated custodian

(r) That Borrower and all Guarantors are legally competent and have all necessary power and authority to enter into and perform their respective obligations under this Note and the other Loan Documents.

(s) That Borrower shall not disclose to any third party, without the written consent of Lender, any terms and conditions applicable to Borrower's Credit Line, whether such terms and conditions are set forth on the applicable Advance Schedule, this Note or any other Loan Document.

(t) That Borrower may have an account with Lender where information can be accessed and transmissions can be sent through the Discover Portal or by other electronic means, and Borrower shall have the means and the affirmative obligation to control access to the account information of Borrower by passwords and a Borrower account number. Borrower shall be solely responsible for any unauthorized access to Borrower's account. Access to Borrower's account may be revoked or otherwise restricted by Lender at any time, in Lender's sole discretion, without prior notice to Borrower.

(u) That Borrower shall use Advances solely for Business purposes and not for personal, family, or household purposes. This means, among other things, that Borrower may not use Advances to purchase a vehicle for Borrower's personal, family, or household use, and no Lender Financed Inventory may be used for Borrower's personal, family, or household use. This Note and all Advances requested or made hereunder shall be requested and made only for commercial purposes and Borrower hereby expressly and unconditionally waives, to the fullest extent permitted by Law, the protections of any Law intended to protect consumers or regulate consumer loans.

(v) That Borrower will provide Lender the name of each individual authorized to buy Inventory and make Advance requests hereunder on Borrower's behalf. Notwithstanding the foregoing or anything to the contrary in any Loan Document, Borrower shall be responsible and liable for all Advance requests and other Liabilities incurred by any such appointed individual or any other actual or apparent representative or agent of Borrower (regardless of whether such Person is specifically appointed by Borrower as contemplated above).

5.    CREDIT TERMS AND CONDITIONS.  Borrower understands and agrees to the following terms, conditions, covenants, and other agreements relating to its Credit Line and any Advances made under this Note and the other Loan Documents, and acknowledges that any failure by Borrower to adhere to any such terms, conditions, covenants, or other agreements shall result in Lender having the right (in addition to any other right that Lender may have), in its sole discretion and without notice to Borrower, to declare a Maturity Event with respect to all Advances:

(a) The decision to make an Advance to or on behalf of Borrower is the exclusive right of Lender, whether or not an Event of Default has occurred, and Borrower understands that Lender may refuse to make an Advance at any time, with or without cause and without prior notice to Borrower or any Guarantors of such decision. Borrower is not obligated to finance any Inventory or Receivable through Lender.

(b) Borrower's Credit Line may require a Reserve as a credit underwriting condition to the grant of credit and as additional security for the repayment of Liabilities by Borrower. In the event a Reserve is either requested by Borrower or required by Lender, Borrower will be required to execute a reserve agreement, and the applicable Required Reserve Amount and Reserve Charge will be indicated on the applicable Advance Schedule.

(c) Borrower must deliver or cause to be delivered to Lender the Title or MSO for any Unit of Inventory at the time of any related Floorplan Advance request, or, in the event of a Universal Source Purchase, within seven (7) days after Lender funds the related Floorplan Advance.

(d) Borrower must deliver or cause to be delivered to Lender the original Receivable which is the subject of a Receivable Advance request within seven (7) days after Lender funds such Receivable Advance. In the event that a Receivable Advance is made by Lender with respect to a Unit for which there is an unpaid Floorplan Advance, then any such Receivable Advance made to Borrower shall be net of such unpaid Floorplan Advance and all other unpaid Liabilities of Borrower with respect to such Unit.

(e) Borrower must be in complete compliance with this Note and the other Loan Documents before an Advance request may be approved by Lender. Additionally, Lender may require certain other information from Borrower to be submitted before Lender will consider an Advance request.

(f) Borrower shall pay all Liabilities, without notice, that concern or relate to a Floorplan Advance for any Unit of Lender Financed Inventory on or before the Maturity Date. Lender shall apply such payments to any and all Liabilities relating to such Floorplan Advance. Notwithstanding anything herein to the contrary, if a shortage exists between the payments received by Lender with respect to a Floorplan Advance, and the Liabilities relating to such Floorplan Advance, then such shortage shall be immediately due and payable and shall continue to be considered a Liability owed by Borrower to Lender, secured by the Collateral.

(g) Borrower shall pay all Liabilities, without notice, that concern or relate to a Receivable Advance for a subject Receivable on or before the Maturity Date. Lender shall apply such payments to any and all Liabilities relating to such Receivable Advance. Notwithstanding anything herein to the contrary, if a shortage exists between the payments received by Lender with respect to a Receivable Advance, and the Liabilities relating to such Receivable Advance, then such shortage shall be immediately due and payable and shall continue to be considered a Liability owed by Borrower to Lender, secured by the Collateral.

(h) Borrower shall pay all Liabilities, without notice, which do not concern or relate to a Floorplan Advance or a Receivable Advance, including Administrative Charges and other account level charges, in each case on their respective Maturity Dates.

(i) With respect to payments that relate to a Floorplan Advance or a Receivable Advance which exceed the outstanding Liabilities owed by Borrower in connection with such Floorplan Advance or Receivable Advance, as the case may be, and with respect to payments for all other Liabilities, the order and method of application of such payments shall be at the sole discretion of Lender. Notwithstanding anything herein

NextGear Demand Promissory Note and Loan and Security Agreement (v. 1.1)

PAG-B0048

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY

This is a copy view of the Authoritative Copy
by the designated custodian

to the contrary, in the event Lender declares an Event of Default, Lender may apply all subsequent payments, including payments directly related to a Floorplan Advance or a Receivable Advance, in any manner or order. Payments initiated or received by Lender after 5:00PM EST may be applied the next Business Day.

(j)   Unless either (i) the Maturity Date for a Floorplan Advance has been accelerated as the result of a Maturity Event or a declaration of an Event of Default; or (ii) such Floorplan Advance is in the final Period pursuant to the applicable Advance Schedule, a Curtailment of such Floorplan Advance will automatically be processed at the end of the current Period. Upon the processing of the Curtailment for a Floorplan Advance, Borrower shall pay the accrued Interest, accrued Floorplan Fee, any other accrued Floorplan Advance related fees, and a principal reduction of such Floorplan Advance, in each case pursuant to this Note, the applicable Advance Schedule, and any applicable event sale or promotional terms in effect for such Floorplan Advance. Additionally, unless (a) the Maturity Date for a Floorplan Advance has been accelerated as the result of a Maturity Event or a declaration of an Event of Default; or (b) Borrower has notified Lender that Borrower has disposed of the subject Unit of Lender Financed Inventory by sale or otherwise, Borrower shall be deemed to have requested, and Lender may, in its sole discretion, automatically approve and process, an Extension with respect to such Floorplan Advance. With respect to any Extension, the Period, rate of Interest, Floorplan Fee, any other fees, including Floorplan Advance related fees, and the principal reduction required to be paid by Borrower for such Extension shall, in each case, be equal in all respects to those of the last Period, and, upon the processing of such Extension, Borrower shall pay such accrued Interest, accrued Floorplan Fee, any other fees, including accrued Floorplan Advance related fees, and a principal reduction of such Floorplan Advance, in each case pursuant to this Note, the applicable Advance Schedule, and any applicable event sale or promotional terms in effect for such Floorplan Advance. Additionally, for each Extension, Borrower shall be charged any applicable Universal Program Fee (including any related Extension fee) set forth in the Finance Program Rate, Fee, and Term Schedule for the applicable Finance Program.

(k)   Unless either (i) the Maturity Date for a Receivable Advance has been accelerated as the result of a Maturity Event or a declaration of an Event of Default; or (ii) such Receivable Advance is in the final Period pursuant to the applicable Advance Schedule, a Curtailment of such Receivable Advance will automatically be processed at the end of the current Period. Upon the processing of the Curtailment for a Receivable Advance, Borrower shall pay the accrued Interest, accrued Receivable Fee, any other accrued Receivable Advance related fees, and a principal reduction of such Receivable Advance, in each case pursuant to this Note, the applicable Advance Schedule, and any applicable event sale or promotional terms in effect for such Receivable Advance.

(l)   Lender or its Affiliates may hold any property (and proceeds thereof) or funds belonging to or payable to Borrower or any of its Affiliates ("Setoff Funds") and apply such Setoff Funds to any outstanding Liabilities of Borrower or to any amounts owing by Borrower to any Affiliate of Lender, and Borrower hereby grants to Lender and its Affiliates, as the case may be, a lien on such Setoff Funds. Lender and its Affiliates may at any time apply any or all of the Setoff Funds to any outstanding Liabilities of Borrower or to any amounts owing by Borrower to any Affiliate of Lender. Borrower expressly waives any requirement of maturity or mutuality among Lender and its various Affiliates.

(m)   Any statement of Borrower's account furnished or made available to Borrower by Lender, to the extent no objection is made in writing by Borrower within thirty (30) days after Borrower's receipt of such statement, shall constitute a definitive statement of Borrower's Credit Line and Liabilities as of the date of such statement and shall be binding upon Borrower.

(n)   Borrower hereby expressly authorizes Lender and its Affiliates to communicate with Borrower via facsimile transmissions, email, telephonic transmissions, both to a residential telephone line and/or cell phone, including text messaging, using an automatic telephone dialing system or an artificial or prerecorded voice message, and/or any other forms of communication, for any purpose, including general business matters, account information, marketing materials, collection, and/or any other communication needs. Borrower agrees that such express permission shall extend to any and all of the contact information that Borrower has provided herein, including physical and email addresses, phone numbers, fax numbers, etc., and to such other addresses, phone numbers, email addresses, online chat, social media platforms, etc. that Borrower may provide to Lender or that Lender may obtain from any third party at a later date.

(o)   So long as Borrower is not in default of this Note or any other Loan Document, Borrower may sell Lender Financed Inventory to bona fide buyers in the Ordinary Course of Business, but nothing herein shall be deemed to waive or release any interest Lender may have hereunder or under any other agreement in any proceeds or replacements of such Lender Financed Inventory. Upon the sale of any Unit of Lender Financed Inventory, Borrower shall hold the proceeds from such sale in trust for the benefit of Lender, and Borrower shall pay to Lender, in accordance with this Note and the other Loan Documents, an amount equal to the unpaid balance of the Liabilities relating to such Unit of Lender Financed Inventory.

(p)   Borrower shall allow Lender and its Representatives to access Borrower's books and records at Borrower's Place of Business and such other places as any Lender Financed Inventory may be located, in order to conduct audits of Borrower's Lender Financed Inventory, in each case without prior notice to Borrower of such audits. Borrower shall be responsible for and agrees to pay all of Lender's expenses in conducting such audits.

(q)   Each Unit of Lender Financed Inventory must be physically verified at the time of any audit conducted by or on behalf of Lender to be at Borrower's Place of Business, or such other place as Lender may authorize. In the event that any Unit of Lender Financed Inventory is not so verified, Lender may, in its sole discretion, provide Borrower an opportunity to produce such Unit of Lender Financed Inventory at Borrower's Place of Business, or such other place as Lender may authorize.

(r)   Borrower may request from Lender, for a legitimate business purpose, the Title to a Unit of Lender Financed Inventory, but Lender reserves the right to grant or deny such request in its sole discretion. In the event Lender grants any such request, any Title provided to Borrower or to any other Person on Borrower's behalf, must be returned to Lender by the close of business on the seventh (7th) day after the date of Lender's release of such Title.

NextGear Demand Promissory Note and Loan and Security Agreement (v. 1.1)

PAG-B0049

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

This is a copy view of the Authoritative Copy h by the designated custodian

(s)     Borrower and each Guarantor authorize Lender to obtain and share credit information relating to Borrower and its Guarantors from and with credit bureaus, financial institutions, trade creditors, affiliates, and others and to conduct such other credit investigations that Lender in its sole discretion deems necessary. The individual signing below on behalf of Borrower expressly authorizes Lender to obtain his or her consumer credit report from time to time at Lender's discretion, and expressly ratifies any such consumer credit report that may have been obtained by or on behalf of Lender prior to the Effective Date. Borrower also authorizes Lender to contact any third parties to disclose information, including information contained in Lender application, for the purpose of, among other things, obtaining intercreditor agreements and perfecting Lender's security interest. Further, if a Credit Line is granted, Borrower and each Guarantor authorize Lender to review Borrower's account periodically, which may include obtaining additional credit information on Borrower and each Guarantor through any available medium.

(t)     Borrower's account is subject to "NSF" fees in the amount stated in the Finance Program Rate, Fee, and Term Schedule or the maximum amount permitted by Law for each check or ACH issued by Borrower and each ACH or other electronic payment debited or drawn from any of Borrower's designated accounts by Lender or its Representatives pursuant to an ACH authorization or other request for electronic payments provided by Borrower which is subsequently returned for insufficient funds, in addition to any charge or fee imposed by Borrower's and/or Lender's depository institution.

(u)     Lender may process checks electronically, at first presentment and any re-presentments, by transmitting the amount of the check, routing number, account number, and check serial number to Borrower's financial institution. By submitting a check for payment, Borrower authorizes Lender to initiate an electronic debit from Borrower's bank account. When Lender processes Borrower's check electronically, Borrower's payment may be debited from Borrower's bank account as soon as the same day Lender receives Borrower's check.

(v)     Borrower's account is subject to a late fee in the amount stated in the Finance Program Rate, Fee, and Term Schedule or the maximum amount permitted by Law for any Unit of Lender Financed Inventory for which Borrower fails to remit payment under this Note or any other Loan Document when due. Borrower acknowledges and agrees that the late fee charged by Lender is a reasonable estimate of Lender's additional administrative burden and costs incurred due to the delay and inconvenience to Lender associated with a late payment.

(w)     Borrower's account is subject to Administrative Charges. Borrower acknowledges and agrees that any such Administrative Charge charged by Lender is permitted under this Note and the other Loan Documents, and Borrower consents to the assessment of any such Administrative Charge to Borrower's account.

(x)     Borrower's account is subject to Universal Program Fees. Lender maintains and publishes the "Finance Program Rate, Fee, and Term Schedule" for each Finance Program applicable to Borrower's Credit Line via posting the same on the Discover Portal. Borrower may request a copy of the Finance Program Rate, Fee, and Term Schedule from Lender in writing at any time. All universal or generally applicable rates and fees and any amendments to the Terms and Conditions shall be published therein, incorporated herein by reference and made a part of this Note and any other applicable Loan Documents. The rates and fees applied to Borrower's Liabilities under this Note, any amended Terms and Conditions, or any applicable event sale or promotional terms in effect with respect to an eligible Floorplan Advance or Receivable Advance shall be (i) the applicable rates and fees set forth on the applicable Advance Schedule; (ii) the rates, fees, and amendments to the Terms and Conditions most recently published on the applicable Finance Program Rate, Fee, and Term Schedule; and (iii) the rates, fees, terms, and conditions as set forth in the applicable marketing materials outlining event sale and/or promotional terms. Lender may amend the rates, fees, terms and/or Terms and Conditions from time to time, at Lender's sole discretion, and without additional notice to Borrower other than the publication of such amendments on the Discover Portal.

(y)     Lender maintains and publishes the Lender Guide on the Discover Portal. Borrower acknowledges and agrees that the Lender Guide and the content found therein are not part of this Note or any other Loan Document, are for informational purposes only, and do not create any new or additional contract rights or obligations for Borrower or Lender. Borrower acknowledges and agrees that the Lender Guide and the content therein is subject to change by Lender at any time without notice. To the extent the Lender Guide and the content therein are determined to create or provide additional contractual rights for Borrower and a conflict exists between this Note or any other Loan Document, on the one hand, and the Lender Guide, on the other hand, the provision of this Note or the other Loan Document, as the case may be, shall prevail.

(z)     Borrower waives demand, presentment for payment, notice of dishonor, protest, and notice of protest, and expressly agrees that this Note and all payments coming due under it and any other Loan Documents may be extended or modified from time to time without in any way affecting Borrower's liability under this Note or any other Loan Document. Borrower and Guarantors understand that Lender may, at any time and without notice to Borrower, with or without cause, demand that this Note immediately be paid in full. The demand nature of this Note does not limit Lender's election of remedies upon an Event of Default by Borrower, and Borrower and Guarantors acknowledge that upon Lender's declaration of an occurrence of an Event of Default, all Liabilities of Borrower shall automatically accelerate and Lender may, at any time and without notice to Borrower, demand immediate payment of all Liabilities of Borrower and take such further action as may be contemplated under Section 7 or otherwise permitted by Law or in equity. Borrower shall have the right to pay all Liabilities in full at any time.

(aa)    Notwithstanding Section 4(f), upon any disposition of a Unit of Lender Financed Inventory, whether by sale or otherwise, or the receipt by Borrower (or any other Person on behalf of Borrower) of full or partial payment by or on behalf of the purchaser of such Unit of Lender Financed Inventory, Lender may, without notice to Borrower and in Lender's sole discretion, declare a Maturity Event with respect to the related Floorplan Advance.

(bb)    Notwithstanding Section 4(g), upon any receipt by Borrower of full payment under any Receivable that is subject to a Receivable Advance, or upon Borrower's declaration of a default under any such Receivable, Lender may, without notice to Borrower and in Lender's sole discretion, declare a Maturity Event with respect to the related Receivable Advance.

NextGear Demand Promissory Note and Loan and Security Agreement (v. 1.1)

PAG-B0050

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

(cc) The receipt, by Lender or Borrower, or any third party on Borrower's behalf, of proceeds or other consideration related to any Unit of Lender Financed Inventory shall constitute conclusive proof of the sale or other disposition of such Unit of Lender Financed Inventory for purposes of this Note and the other Loan Documents.

(dd) Borrower acknowledges that Cox Automotive, Inc. (formerly Manheim, Inc.) and Manheim Remarketing, Inc., together with each of their respective direct and indirect subsidiaries and affiliated U.S. auctions (collectively "Manheim"), are Affiliates of Lender. Borrower may from time to time purchase a Unit through a Manheim auction sale (including online purchases via OVE.com or through other Manheim-operated online sales channels). For any Unit purchased by Borrower through a Manheim auction sale (including online purchases via OVE.com or through other Manheim-operated online sales channels) that remains unsettled with Manheim (each, an "Unsettled Unit"), Borrower hereby requests, directs and authorizes Lender, as of the date Lender receives a request for payment from Manheim with respect to such Unsettled Unit, to process and approve, in Lender's sole discretion, a Floorplan Advance on Borrower's Credit Line, which Lender may pay and remit directly to Manheim on Borrower's behalf for such Unsettled Unit. Borrower acknowledges that if any such request is received by Lender from Manheim within seven (7) days of Borrower's purchase of such Unsettled Unit, the purchase will be processed as a Universal Source Purchase, and if any such request is received by Lender from Manheim outside of seven (7) days of Borrower's purchase of such Unsettled Unit, the purchase will be processed as a Specific Source Purchase.

6.   EVENTS OF DEFAULT.  The occurrence of any of the following events shall be considered an event of default under this Note and the other Loan Documents (each, an "Event of Default"):

(a)  Borrower or any Guarantor fails to perform any of its obligations, undertakings or covenants under this Note or under any other Loan Document, including any obligation to repay any Liability when due and Borrower's obligation to pay upon demand any outstanding Liabilities under this Note or any of the other Loan Documents.

(b)  Borrower or any Guarantor breaches or otherwise violates any provision of this Note or any other Loan Document.

(c)  Borrower makes any representation or warranty to Lender, or provides to Lender any schedule, certificate, financial statement, report, notice, or other writing, which is false or misleading in any material respect when made or delivered.

(d)  Any damage or destruction of any Inventory and appropriate insurance naming Lender as "Loss Payee" is not in effect as required under Section 4(c).

(e)  Borrower or any Guarantor, or any of their respective Parent Companies, has defaulted in the payment or performance of any debt or obligation under any other agreement, whether to Lender or to a third party.

(f)  Borrower or any Guarantor, or any of their respective Parent Companies, becomes insolvent or consents to the appointment of a trustee, receiver, or other custodian for such Borrower, Guarantor or Parent Company, as the case may be, or for any property belonging to any of the foregoing Persons; or such Borrower, Guarantor, or Parent Company, as the case may be, makes a general assignment for the benefit of its creditors; or any bankruptcy, reorganization, debt arrangement, or other case or proceeding under any bankruptcy or insolvency Law, or a dissolution or liquidation proceeding, is commenced by or against such Borrower, Guarantor, or Parent Company, as the case may be.

(g)  Any material change in the management, ownership, or control of Borrower or its Parent Company occurs (unless such material change has been consented to in writing by Lender).

(h)  The voluntary or administrative dissolution, death, or incompetence of Borrower or any Guarantor, or any of their respective Parent Companies.

(i)  Any change in the financial condition of Borrower or any Guarantor, or any of their respective Parent Companies, which Lender in good faith deems adverse.

(j)  Borrower or any Guarantor, or any of their respective Parent Companies, admits in writing that it is unable to pay its debts as they become due.

(k)  Borrower fails to deliver, revokes or amends (other than at the written request of Lender) any power of attorney or similar authorization that it has executed in favor of Lender.

(l)  Lender in good faith deems itself insecure for any reason.

7.   RIGHTS AND REMEDIES.  Upon any Event of Default, Lender may, at its option and without notice to Borrower, exercise any or all of the following rights in a separate, successive, or concurrent fashion, and Lender's exercise of any rights hereunder shall not preclude Lender from pursuing other rights and remedies in conjunction therewith or at a later time:

(a)  Demand immediate payment of all Liabilities and other indebtedness and amounts owed to Lender and its Affiliates by Borrower and its Affiliates. Lender shall have all rights and remedies available hereunder and under the other Loan Documents, and all rights and remedies available to Lender at law or in equity, including the rights and remedies of a secured party under the UCC. These rights and remedies include the right to cancel any unfunded Advances; to enter into Borrower's premises with or without legal process, but without force, and to take possession of and remove any Collateral; and to notify any account debtors or other Person obligated on Collateral to make payment or otherwise render performance to or for the benefit of Lender. Lender shall have the right to contact any third parties, including auctions,

PAG-B0051

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy held by the designated custodian

governmental agencies, Borrower's licensing authorities, consumer finance companies, floorplan companies, other finance companies, consumers, other borrowers, Auction Insurance Agency, and such other Persons as Lender may elect to contact in its sole discretion, and to share such information as is necessary, in Lender's sole discretion, for any reason, including for purposes of and related to collection of any Liabilities of Borrower. At Lender's request, and to the extent Borrower may lawfully do so, Borrower shall assemble, prepare for removal, and make available to Lender at a place designated by Lender which is reasonably convenient for Lender and Borrower such Collateral as Lender may request.

(b)  Initiate proceedings to appoint a receiver in any court of competent jurisdiction. To the extent permitted by Law, Borrower waives the right to notice and hearing of the appointment of a receiver and consents to such appointment without requiring Lender to post a bond.

(c)  To the extent permitted by Law, Borrower gives consent to Lender to proceed in any action to collect on or execute against any and all bonds that Borrower or its Affiliates may have posted with any governmental authorities or third parties.

(d)  Without limiting the foregoing, Lender may take control of any funds generated by any Collateral, and in Lender's name or Borrower's name, demand, collect, receipt for, settle, compromise, sue for, repossess, accept returns of, foreclose, or realize upon any Collateral. Borrower waives any and all rights it may have to notice prior to seizure by Lender of any Collateral. Borrower agrees that private sale of any Lender Financed Inventory at the amount then owed to Lender on such Lender Financed Inventory, less costs reasonably incurred by Lender in preparation of disposition of such Collateral, shall be a commercially reasonable method of disposition of such Collateral. Additionally, Borrower further agrees that any Inventory Collateral repossessed or otherwise obtained by Lender after an Event of Default may be disposed of by Lender, in Lender's sole discretion, at any regular or online sale of any wholesale auto auction that may be an Affiliate of Lender, or at any National Auto Auction Association member, and, in each case, any such a sale is and shall be deemed commercially reasonable for all purposes. Borrower shall be liable to Lender for any deficiency resulting from Lender's disposition of the Collateral. Borrower agrees that the Collateral is of the type customarily sold on a recognized market and that Lender therefore has no obligation to notify Borrower prior to a sale of any Collateral. Lender shall not be responsible for the accuracy or validity of any document or for the existence or value of any Collateral. Lender shall not be required to marshal any assets in favor of Borrower. Lender has no obligation to pursue any third party for any liability or obligation owed to Borrower. Borrower further agrees to pay all reasonable attorneys' fees and other collection costs incurred by Lender and its Affiliates in enforcing this Note and any other Loan Document after any Event of Default. To the extent not prohibited by Law, Borrower waives all appraisement, valuation, antideficiency, homestead, exemption, and usury Laws now or hereafter in effect, and releases all right to appeal after payment in full.

8.  LOAN DOCUMENTS. In addition to the execution and delivery of this Note, upon the request of Lender, Borrower shall execute (or cause the execution of) the following additional documents in connection with Borrower's Credit Line (together with all other documents and instruments executed by Borrower in connection with this Note or Borrower's Credit Line, and in each case as the same may be amended, restated, renewed, extended or otherwise modified from time to time, the "Loan Documents"), each of which shall be incorporated herein by reference and made a part of this Note: (a) a power of attorney in favor of Lender and its designated Representative; (b) prior to Lender making any Advances under this Note, an Advance Schedule for each unique set of terms for the Finance Program applicable to Borrower, which may be amended from time to time; (c) such guaranties of Borrower's Liabilities as Lender may request, including guaranties of all legal and beneficial owners of Borrower; (d) a reserve agreement in favor of Lender; (e) prior to Lender authorizing Borrower to place any Lender Financed Inventory on consignment with another licensed dealer, a consignment agreement acceptable to Lender; (f) such ACH authorization and requests for automated payments as Lender may request from time to time; and (g) such other documents or certifications as Lender may request or require from Borrower or any Guarantor from time to time.

9.  ASSIGNMENT. This Note and any other Loan Document may be assigned by Lender without notice to Borrower, but Borrower may not assign this Note or any other Loan Document without the prior written consent of Lender.

10.  THIRD PARTY BENEFICIARIES. Neither this Note nor any other Loan Document is intended to confer upon any Person other than the Parties any rights or remedies hereunder; provided, however, that the rights and remedies afforded to Lender under Sections 2, 5(l), 5(n), 5(s), 5(dd), 7, 11 and 14 shall also inure to the benefit of the Affiliates of Lender and such Affiliates shall be intended third party beneficiaries of the provisions thereof.

11.  INDEMNIFICATION. Borrower shall, at its expense, defend, indemnify and hold harmless Lender and its Affiliates, and each of their respective directors, officers, principals, partners, shareholders or holders of any ownership interest, as the case may be, employees, Representatives, attorneys, and agents (together with Lender, the "Lender Parties") from and against any and all claims, judgments, losses, damages, demands, payments, fines, costs, expenses (including reasonable attorneys' fees and court costs), and liabilities of any nature or description incurred by a Lender Party to the extent arising from or relating to any of the following: (a) any personal injury or property damage caused by Borrower or any of its Representatives; (b) any breach by Borrower of this Note or any other Loan Document, including the breach of any representation, warranty, or other agreement contained in this Note or in any other Loan Document; and (c) Borrnwer's operation of its Business or any of Borrower's operations or activities.

12.  NO JOINT VENTURE, PARTNERSHIP, OR AGENCY. Nothing contained in this Note or in any other Loan Document shall subject Lender or its Affiliates or any of its or their respective Representatives to any liability for, or in respect of, the business, assets, profits, losses, or liabilities of the Borrower. This Note does not constitute and shall not be characterized as a joint venture, partnership, or agency between Lender and Borrower. Nothing in this Section 12 shall limit any of the Liabilities of Borrower, or any of the other obligations of Borrower or any Guarantor under this Note or any of the other Loan Documents.

13.  AMENDMENT; MERGER. This Note and the other Loan Documents are intended by the Parties to be an amendment to and restatement of any prior Demand Promissory Note and Loan and Security Agreement or similar document or instrument (including any prior promissory note, loan and security agreement or similar contract) between Lender (or any predecessor of Lender, including Dealer Services Corporation and/or Manheim

PAG-B0052

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

Automotive Financial Services, Inc.) and Borrower. With the exception of the amendments and modifications that Lender is entitled to make without the prior written consent of Borrower pursuant to this Note or any other Loan Document, this Note may be modified or amended only upon the written consent of Lender and Borrower. In the case of the other Loan Documents, with the exception of the amendments and modifications that Lender is entitled to make without the prior written consent of Borrower pursuant to this Note or any other Loan Document, such other Loan Documents may be modified or amended only upon the written consent of Lender and the Person to whom such amendment relates. Additionally, the Finance Programs, Lender Guide, descriptions of specific Units of Lender Financed Inventory, amounts and terms of Advances, Maturity Dates, Extensions, Interest, Base Rates, Administrative Charges, Lender Universal Program Fees, late fees, NSF fees, and other charges allowed by this Note or any other Loan Document may be proven by the records kept by Lender. Notwithstanding the foregoing, any advance and/or loan originated pursuant to one or more agreements between Borrower and Dealer Services Corporation and/or Manheim Automotive Financial Services, Inc. prior to the Effective Date for which indebtedness from Borrower remains outstanding as of the Effective Date, shall remain subject to the terms and conditions of such prior agreement(s) for all intents and purposes until such indebtedness has been indefeasibly repaid and satisfied in full.

14. EXECUTION. The Parties understand and agree that Lender may execute this Note and any other Loan Documents by affixing the signature of an authorized representative of Lender via signature stamp. Additionally, Lender may execute this Note and any other Loan Documents by affixing to this Note or such other Loan Document, as the case may be, an electronic or digital signature, which electronic or digital signature shall for all purposes be deemed effective to constitute the valid signature of Lender. Any electronic or digital signature affixed to this Note or any other Loan Documents by Lender shall be deemed to satisfy all requirements imposed on electronic or digital signatures under the UCC, the Electronic Signatures in Global and National Commerce Act (the "E-Sign Act"), and any other similar Laws relating to the validity or enforceability of electronic or digital signatures, and such electronic or digital signature shall not be denied legal effect, validity, or enforceability solely because it is in electronic or digital form. Notwithstanding the foregoing, Borrower may execute this Note and any other Loan Documents only by original signature of an authorized representative of Borrower, unless otherwise authorized by Lender. Lender may, in its sole discretion, permit Borrower and/or any Guarantor to execute this Note and any other Loan Documents by affixing to this Note or such other Loan Document, as the case may be, an electronic or digital signature of an authorized representative of Borrower or of any Guarantor, as applicable. Borrower and each Guarantor acknowledges and agrees that any electronic or digital signature of Borrower or any such Guarantor shall for all purposes be deemed effective and constitute the valid signature of Borrower or any such Guarantor, as the case may be, and shall be deemed to satisfy all requirements imposed on electronic or digital signatures under the UCC, the E-Sign Act, and any other similar Laws relating to the validity or enforceability of electronic or digital signatures (including without limitation, any enactment of the Uniform Electronic Transactions Act (UETA)), and such electronic or digital signature shall not be denied legal effect, validity, or enforceability solely because it is in electronic or digital form. A facsimile or photocopied reproduction of signatures on this Note and any other Loan Documents shall be deemed original signatures for all intents and purposes. This Note and the other Loan Documents may be executed by the Parties in one or more counterparts which, collectively, shall constitute one and the same agreement.

15. NOTICES. All notices, demands and requests required or permitted to be given under this Note and any other Loan Document shall be (a) in writing, (b) delivered by personal delivery or sent by commercial delivery service or certified mail, return receipt requested, (c) deemed to have been given on the date of personal delivery or the date set forth in the records of the delivery service or on the return receipt, and (d) addressed as follows (or, in the case of Lender, to any other subsequent address that Lender may provide to Borrower (through written notice, via the Discover Portal, or otherwise) for purposes of directing future notices, demands or requests):

If to Lender:

NextGear Capital, Inc., 11799 North College Avenue, Carmel, IN 46032
Telephone: (317) 571-3721

with a copy to:

NextGear Capital, Inc., 11799 North College Avenue, Carmel, IN 46032
Telephone: (317) 571-3721
Attention: Legal Department

If to Borrower:

Premier Group Autos LLC DBA Overfinch Miami, 11 SW 12th Ave Ste 103 Bldg 59,
Dania Beach, FL 33004-3527
Telephone: 954-440-0717

16. NO WAIVER. No failure or delay by Lender in exercising any right, power, or privilege or the granting of an exception by Lender with respect to any of the Terms or Conditions will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege, or the exercise of any other right, power, or privilege by Lender.

17. TERMINATION. No termination of this Note shall alter Borrower's Liabilities or any outstanding obligations of Borrower or any Guarantor under this Note or any of the other Loan Documents, including any outstanding obligations relating to Advances and amounts funded or committed prior to the effective date of such termination, and all rights and remedies, including the security interest granted herein and the rights of Lender as a secured party hereunder, shall extend until all Liabilities of Borrower have been indefeasibly paid and satisfied in full.

18. LEGAL FEES AND COLLECTION COSTS. Borrower shall pay to Lender all reasonable legal fees, expenses, and collection costs incurred by any Lender Parties, including Lender as a result of any Event of Default, or any failure by Borrower or any Guarantor to perform any obligation or satisfy any Liability of Borrower, including any prosecution by Borrower or any Guarantor or any of their respective Representatives of affirmative claims or counterclaims against Lender Parties.

NextGear Demand Promissory Note and Loan and Security Agreement (v. 1.1)

PAG-B0053

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

19. SEVERABILITY. Any provision of this Note or any other Loan Document that is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability, without rendering invalid or unenforceable the remaining provisions of this Note and the other Loan Documents or affecting the validity or enforceability of any provision of this Note or any other Loan Document in any other jurisdiction.

20. GOVERNING LAW. Except with respect to the interpretation or enforcement of the arbitration and other provisions set forth in Section 22 (which shall be governed by the Federal Arbitration Act), the validity, enforceability, and interpretation of this Note and the other Loan Documents shall be governed by the internal Laws of the State of Indiana, without regard to conflicts of Laws provisions thereof.

21. JURISDICTION AND VENUE. As evidenced by Borrower's signature below, subject to the provisions noted in Section 22, Borrower submits to the personal jurisdiction and venue of the state and federal courts of Marion County and Hamilton County, Indiana, and agrees that any and all claims or disputes pertaining to this Note or any other Loan Document, or to any matter arising out of or related to this Note or any other Loan Document, which are initiated by Borrower against Lender, to the extent, if any, that such claims or disputes are not subject to the provisions noted in Section 22 below, shall be brought in the state or federal courts of Marion County or Hamilton County, Indiana. Further, Borrower expressly consents to the jurisdiction and venue of the state and federal courts of Marion County and Hamilton County, Indiana, as to any legal or equitable action that may be brought in such court by Lender, and waives any objection based upon lack of personal jurisdiction, improper venue, or forum non conveniens with respect to any such action. Borrower acknowledges and agrees that Lender reserves the right to initiate and prosecute any action against Borrower in any court of competent jurisdiction, and Borrower consents to such forum as Lender may elect.

22. MANDATORY BINDING ARBITRATION; WAIVER OF CLASS ACTION RIGHTS.

(a)   In most cases, any disputes or claims that Borrower may have can be resolved quickly and to Borrower's satisfaction by contacting Lender regarding such dispute or claims. In the unlikely event that Lender is unable to resolve a dispute or claim that Borrower may have, Borrower agrees to arbitrate any such dispute or claim in accordance with this Section 22.  This agreement to arbitrate is intended to be broadly interpreted, and includes (i) all disputes, claims and counterclaims arising out of or relating to this Note or any other Loan Document or any aspect of Borrower's past, present or future relationship with Lender, whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory; (ii) all disputes, claims and counterclaims that may have arisen prior to the Effective Date or from any prior dealings, contract or agreement between Borrower and Lender (including all disputes, claims and counterclaims relating to any marketing or advertising by Lender); and (iii) any disputes, claims and counterclaims that may arise after the termination of this Note and any other Loan Document. Additionally, Borrower acknowledges that Lender may (BUT SHALL IN NO EVENT BE REQUIRED TO) arbitrate any dispute or claim that it may have against Borrower, with any such arbitration being governed by the provisions of this Section 22.  BY AGREEING TO ARBITRATION, BORROWER UNDERSTANDS AND AGREES THAT IT IS WAIVING ITS RIGHTS TO MAINTAIN OTHER AVAILABLE RESOLUTION PROCESSES, SUCH AS COURT ACTION (INCLUDING A JURY TRIAL) OR ADMINISTRATIVE PROCEEDING, IN ORDER TO SETTLE OR RESOLVE DISPUTES OR ANY CLAIMS AGAINST LENDER. ARBITRATION IS DIFFERENT THAN A COURT ACTION, AND THE RULES IN ARBITRATION ARE DIFFERENT THAN THE RULES THAT APPLY IN COURT. THERE IS NO JUDGE OR JURY IN ARBITRATION, AND REVIEW IS LIMITED, BUT AN ARBITRATOR CAN AWARD THE SAME DAMAGES AND RELIEF AS A COURT, SUBJECT TO THE AGREED TERMS AND LIMITATIONS IN THIS NOTE. Borrower, at its election, may opt-out of the arbitration provisions set forth in Sections 22(a), 22(c) and 22(d) by providing written notice of its election to opt-out no later than thirty (30) days after the Effective Date, which notice shall be provided to Lender pursuant to Section 15 ("Opt-Out Notice"); provided that such Opt-Out Notice shall become effective only upon Borrower's receipt of written confirmation from Lender that such Opt-Out Notice has been received by Lender within the required time period.  Borrower acknowledges and agrees that, irrespective of any Opt-Out Notice or any written confirmation thereof, Borrower shall in all events be subject to the provisions of Section 22(b).

(b)   ANY ARBITRATION OR OTHER LEGAL PROCEEDING OF ANY TYPE OR NATURE ARISING UNDER OR RELATING TO THIS NOTE OR ANY OF THE OTHER LOAN DOCUMENTS, OR TO ANY ASPECT OF BORROWER'S PAST, PRESENT OR FUTURE RELATIONSHIP OR ACTIVITIES WITH OR INVOLVING LENDER (INCLUDING ANY MARKETING ACTIVITIES OR SOLICITATIONS BY OR ON BEHALF OF LENDER), WILL TAKE PLACE ON AN INDIVIDUAL BASIS.  CLASS ARBITRATIONS AND CLASS ACTIONS OF ANY KIND (WHETHER PURSUED THROUGH ARBITRATION OR THROUGH THE COURTS) ARE NOT PERMITTED.  BORROWER AGREES THAT IT MAY BRING CLAIMS AGAINST LENDER ONLY IN ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING.  BORROWER AGREES THAT, BY ENTERING INTO THIS NOTE, BORROWER IS WAIVING ITS RIGHT TO PARTICIPATE IN ANY CLASS ACTION OR OTHER SIMILAR REPRESENTATIVE PROCEEDING. UNLESS CONSENTED TO IN WRITING BY LENDER, THE ARBITRATOR MAY NOT CONSOLIDATE MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING. BORROWER ACKNOWLEDGES AND AGREES THAT THE SIZE OF BORROWER'S CREDIT LINE, THE INTEREST RATE TO WHICH ADVANCES ARE SUBJECT AND CERTAIN FEES CHARGED TO BORROWER, AS WELL AS THE SIZE AND DATES OF SPECIFIC ADVANCES, ARE UNIQUE TO AND NEGOTIATED BY BORROWER, AND THAT SUCH FACTORS WILL AND DO VARY AMONG BORROWERS.

(c)   Any dispute or claim subject to arbitration pursuant to this Section 22 shall be submitted to binding arbitration administered by the Judicial Arbitration and Mediation Service ("JAMS") pursuant to its Comprehensive Arbitration Rules and Procedures as then in effect (the "JAMS Comprehensive Rules"); provided, however, that any dispute or claim that is subject to arbitration pursuant to this Section 22 and that involves disputes or claims where the aggregate amount reasonably in dispute or controversy is less than $100,000, shall be submitted to binding arbitration administered by JAMS pursuant to its Streamlined Arbitration Rules and Procedures as in effect on the Effective Date (the "JAMS Streamlined Rules"). The disputes and claims subject to arbitration pursuant to this Section 22 will be resolved by a single arbitrator selected pursuant to the JAMS Comprehensive Rules or the JAMS Streamlined Rules, as the case may be. The arbitrator shall be bound by and shall strictly enforce the terms of this Note and the other Loan Documents and may not limit, expand, or otherwise modify any term or provision of this Note or any other Loan Document or any other contract or document between Borrower and Lender. The arbitrator shall not have the

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

power to award to Borrower any damages that are excluded or that have been waived by Borrower under this Note or any other Loan Document, and Borrower irrevocably waives any claim that it may have thereto. The arbitrator shall not have the power to order pre-hearing discovery of documents or the taking of depositions. The arbitrator shall render a written decision within six (6) months after being selected. Any arbitration will be held in Indianapolis, Indiana (or its greater metro area). Each Party will bear its own expenses in the arbitration and will share equally the costs of arbitration: provided, however, that the arbitrator may, in his or her discretion, award costs and fees to the prevailing Party. The result of any arbitration shall be final and binding upon the Parties. Judgment upon any arbitration award may be entered in any court having jurisdiction over the award or over the applicable party or its assets.

(d) This Note and the other Loan Documents evidence transactions in interstate commerce, and thus the Federal Arbitration Act governs the interpretation and enforcement of this Section 22, notwithstanding the provisions of Section 20.

23. WAIVER OF JURY TRIAL. AFTER CONSULTING OR HAVING HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL, LENDER AND BORROWER KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVE ANY RIGHT EITHER PARTY MAY HAVE TO A TRIAL BY JURY IN ANY LITIGATION BASED UPON OR ARISING OUT OF THIS NOTE OR ANY OTHER LOAN DOCUMENT, OR ANY OF THE TRANSACTIONS CONTEMPLATED BY THIS NOTE OR ANY OF THE OTHER LOAN DOCUMENTS, OR ANY COURSE OF CONDUCT, STATEMENT, WHETHER ORAL OR WRITTEN, OR ACTIONS OF LENDER OR BORROWER. NEITHER LENDER NOR BORROWER SHALL SEEK TO CONSOLIDATE, BY COUNTERCLAIM OR OTHERWISE, ANY ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED. THESE PROVISIONS SHALL NOT HAVE BEEN DEEMED TO HAVE BEEN MODIFIED IN ANY RESPECT OR RELINQUISHED BY LENDER OR BORROWER EXCEPT BY WRITTEN INSTRUMENT EXECUTED BY BOTH LENDER AND BORROWER.

24. LIMITATION OF LIABILITY. IN NO EVENT SHALL ANY LENDER PARTY BE LIABLE FOR ANY SPECIAL, INDIRECT, EXEMPLARY, PUNITIVE, INCIDENTAL, MULTIPLE OR CONSEQUENTIAL DAMAGES (INCLUDING ANY DAMAGES RESULTING FROM LOSS OF USE, LOSS OF PROFITS, LOSS OF BUSINESS OR OTHER ECONOMIC LOSS) ARISING OUT OF OR IN CONNECTION WITH THIS NOTE OR ANY OTHER LOAN DOCUMENT (OR ANY ADVANCES MADE BY LENDER HEREUNDER OR THEREUNDER), EVEN IF SUCH LENDER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. FURTHER, IN NO EVENT SHALL THE LENDER PARTIES, COLLECTIVELY, BE LIABLE FOR ANY DAMAGES UNDER THIS NOTE OR ANY OTHER LOAN DOCUMENT (OR IN CONNECTION WITH ANY ADVANCE BY LENDER HEREUNDER OR THEREUNDER) THAT EXCEED, IN THE AGGREGATE, AN AMOUNT EQUAL TO THE SUM OF THE INTEREST AND FLOORPLAN FEES ACTUALLY PAID TO LENDER BY BORROWER UNDER THIS NOTE DURING THE TWELVE (12) MONTH PERIOD IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO THE CLAIM AT ISSUE (OR, IN THE CASE OF MULTIPLE EVENTS, THE FIRST SUCH EVENT GIVING RISE TO THE CLAIM AT ISSUE).

25. WAIVER OF BOND. BORROWER WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY BOND OR SURETY OR SECURITY ON SUCH BOND WHICH MIGHT, BUT FOR THIS WAIVER, BE REQUIRED OF LENDER DURING ATTEMPTS TO RECOVER COLLATERAL OR OTHERWISE.

26. CALIFORNIA BORROWERS. In the event Borrower's Place of Business is in the State of California, Borrower acknowledges and agrees that any initial Advance made under this Note must be in the amount of at least Five Thousand Dollars and Zero Cents ($5,000), and Borrower shall neither request nor accept any initial Advance under this Note in an amount less than Five Thousand Dollars and Zero Cents ($5,000).

27. DISCLAIMER. THE DISCOVER PORTAL LICENSED OR PROVIDED HEREUNDER IS PROVIDED AS A CONVENIENCE TO BORROWER AND ON AN "AS-IS" BASIS. LENDER MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, ORAL OR WRITTEN, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTIES OF NON-INFRINGEMENT, TITLE, ACCURACY, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, LENDER MAKES NO REPRESENTATIONS OR WARRANTIES THAT THE DISCOVER PORTAL WILL OPERATE ERROR-FREE OR ON AN UNINTERRUPTED BASIS, AND LENDER SHALL IN NO EVENT BE LIABLE OR RESPONSIBLE FOR ANY OUTAGE OR OTHER LOSS OF FUNCTIONALITY OR CONNECTIVITY WITH RESPECT TO THE DISCOVER PORTAL, AND NO SUCH OUTAGE OR OTHER LOSS OF FUNCTIONALITY OR CONNECTIVITY SHALL EXCUSE ANY FAILURE BY BORROWER TO TIMELY PERFORM ALL OF ITS OBLIGATIONS TO LENDER UNDER THIS NOTE AND THE OTHER LOAN DOCUMENTS.

28. DESCRIPTIVE HEADINGS; INTERPRETATION. The descriptive headings herein are for convenience of reference only and shall not control or affect the meaning or construction of any provision of this Note. As used in this Note and the other Loan Documents, the terms "include," "includes," and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of like import. Words (including the defined terms set forth in Appendix A) of one gender shall be held to include the other gender as the context requires. Any references in this Note or in the other Loan Documents to a particular statute or regulation shall be deemed to include all amendments thereto, rules and regulations thereunder and any successor statute, rule, or regulation, or published clarifications or interpretations with respect thereto, in each case as in effect from time to time.

29. EFFECTIVE DATE OF OTHER LOAN DOCUMENTS. Unless otherwise stated in the applicable Loan Document, the effective date of any Loan Document executed by a party shall be the later of (a) the Effective Date of this Note, or (b) the date of Borrower's execution thereof as set forth below Borrower's signature thereon (or, in the case of any guaranty, the date of Guarantor's execution thereof as set forth below Guarantor's signature thereon). In the event that the date of Borrower's or Guarantor's execution of any Loan Document is not set forth below Borrower's or Guarantor's signature thereon, then the effective date of such Loan Document shall be deemed to be the Effective Date of this Note.

WHEREFORE, the Parties, by their respective duly authorized representatives, have executed this Demand Promissory Note and Loan and Security Agreement on the dates set forth below.

PAG-B0055

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

**LENDER:**

NEXTGEAR CAPITAL, INC.

Shane O'Dell

By: 32464EC045174EF

Name:   Shane O'Dell
Title:   President
Date:   3/27/2019  |  10:47:56 AM EDT

**BORROWER:**

Premier Group Autos LLC DBA Overfinch Miami

James Michael C Blackburn

By: C465919C8BD84D1

Name:   James Michael C Blackburn
Title:   Manager
Date:   3/26/2019  |  4:42:48 PM EDT

Edward Anthony Kessler

By: 8426728A15AC406

Name:   Edward Anthony Kessler
Title:   Manager
Date:   /27/2019  |  10:46:09 AM EDT

NextGear Demand Promissory Note and Loan and Security Agreement (v. 1.1)

PAG-B0056

DocuSign Envelope ID: FAE10158-F48A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

GUARANTORS ACKNOWLEDGE AND CONSENT TO THE FOREGOING:



Guarantor (Sign)    James Michael C Blackburn
                    C48591BCBBDB4D1

Name:    James Michael C Blackburn

Guarantor (Sign)    Edward Anthony Kessler
                    R420320A15AC496

Name:    Edward Anthony Kessler

NextGear Demand Promissory Note and Loan and Security Agreement (v. 1.1)

PAG-B0057

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

## APPENDIX A

(1)  "Administrative Charge" shall mean any expense charged by Lender to Borrower that is reasonable or necessary, in Lender's sole discretion, to administer or monitor Borrower's account, to preserve any Collateral, or to collect any Liabilities owed by Borrower.

(2)  "Advance" shall mean any discretionary loan or payment in any amount, for any purpose, made pursuant to this Note by Lender to Borrower or on Borrower's behalf to any third party.

(3)  "Advance Schedule" shall mean any addendum or other document executed pursuant to this Note, in each case as modified from time to time, which indicates the applicable specific terms regarding Borrower's Floorplan Fees, Receivable Fees, Contract Rate of Interest, Period(s), Required Reserve Amount, Reserve Charge, required principal reduction to obtain a Curtailment of the Maturity Date, and number of available Curtailments.

(4)  "ACH" shall mean any payment by or on behalf of Borrower to Lender made via a nationwide electronic funds transfer network processing electronic debit and credit entries to or from Borrower's bank accounts.

(5)  "Affiliate" shall mean, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such first-named Person (which shall, for purposes of clarity, include any parent company and any direct or indirect subsidiary of such first-named Person) and, if such first-named Person is a natural person, also includes any member of such first-named Person's immediate family.  For purposes of this definition, the term "control" means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

(6)  "Base Rate" shall mean the greater of that variable rate of interest or that fixed rate of interest as stated in the Finance Program Rate, Fee, and Term Schedule.

(7)  "Borrower" shall have the meaning set forth in the Preamble.

(8)  "Borrower's Place of Business" shall mean the primary place where the Collateral and Borrower's books and records are kept, and where Borrower's operations are conducted.

(9)  "Business" shall mean Borrower's business, as it relates to the purchase and sale, lease, or rent of Inventory and/or the origination of any Receivables.

(10)  "Business Day" shall mean any day other than a Saturday, Sunday, federal holiday or day on which banking institutions in Carmel, Indiana are authorized or obligated by Law or executive order to be closed.

(11)  "Check" shall mean any payment by or on behalf of Borrower to Lender not made in cash, via certified funds, wire transfer, or ACH.

(12)  "Collateral" shall have the meaning set forth in Section 2(a).

(13)  "Collateral Protection Program" shall mean that certain program in which Borrower may participate in lieu of providing third party insurance as required under this Note.

(14)  "Contract Rate" shall mean that rate of interest as stated on the applicable Advance Schedule.

(15)  "Credit Line" shall mean Borrower's floorplan line of credit with Lender pursuant to and under this Note.

(16)  "Curtailment" shall mean that grant by Lender, in its sole discretion, to Borrower of additional time extending the Maturity Date with respect to a Floorplan Advance or a Receivable Advance for an additional Period.  The number of allowable Curtailments for a Floorplan Advance or a Receivable Advance shall be as stated on the applicable Advance Schedule.

(17)  "Discover Portal" shall mean that certain web-based portal located at http://www.nextgearcapital.com (or any similar successor or related portal, interface or website including any mobile or tablet application or website) owned, operated or maintained by Lender and, subject to the Terms and Conditions, to which Borrower shall have access to from time to time as determined by Lender.

(18)  "Effective Date" shall have the meaning set forth in the Preamble.

(19)  "E-Sign Act" shall have the meaning set forth in Section 14.

(20)  "Event of Default" shall have the meaning set forth in Section 6.

(21)  "Extension" shall mean that grant by Lender, in its sole discretion, to Borrower of additional time extending the Maturity Date with respect to a Floorplan Advance beyond the last Period as stated on the applicable Advance Schedule.

NextGear Demand Promissory Note and Loan and Security Agreement (v. 1.1)

PAG-B0058

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy by the designated custodian

(22)   "Finance Program" shall mean any finance program offered by Lender and available to Borrower for the financing of Inventory or Receivables pursuant to an Advance under this Note.

(23)   "Finance Program Rate, Fee, and Term Schedule" shall mean that current schedule of applicable universal interest rates, fees and term and condition amendments for each Finance Program, including Universal Program Fees; late fees; fees relating to returned checks or ACH payments due to insufficient funds; the Base Rate; Collateral Protection Program fees; and notice of amendments to the Terms and Conditions, published by Lender via posting such schedule of such universal rates and fees and notice of amendments to the Terms and Conditions on the Discover Portal.

(24)   "Floorplan Advance" shall mean an Advance made pursuant to this Note relating to a Unit of Inventory to be offered for sale, lease or rent, or leased or rented by Borrower in the Ordinary Course of Business.

(25)   "Floorplan Date" shall mean (a) for a Universal Source Purchase, the sale date, regardless of the date the Floorplan Advance is actually requested or funded; and (b) for a Specific Source Purchase, the date the request for the Floorplan Advance is received by Lender, regardless of the date such Floorplan Advance is actually funded.

(26)   "Floorplan Fee" shall mean the fee charged by Lender to Borrower, as set forth on the applicable Advance Schedule, for each Unit of Lender Financed Inventory for each Period, including any Extensions thereof.

(27)   "Guarantor" shall mean any Person executing this Note as a Guarantor or any Person executing any guaranty pursuant to this Note.

(28)   "Interest" shall mean the aggregate rate of interest which accrues on all outstanding Liabilities of Borrower under or arising under this Note or any of the other Loan Documents.

(29)   "Inventory" shall mean all Units held by Borrower for wholesale or retail sale, lease, or rent, or leased or rented by Borrower. "Inventory" includes Lender Financed Inventory.

(30)   "JAMS" shall have the meaning set forth in Section 22(c).

(31)   "JAMS Comprehensive Rules" shall have the meaning set forth in Section 22(c).

(32)   "JAMS Streamlined Rules" shall have the meaning set forth in Section 22(c).

(33)   "Law" or "Laws" shall mean applicable common law and any applicable statute, permit, ordinance, code or other law, rule, regulation or order enacted, adopted, promulgated or applied by any governmental authority, all as in effect from time to time.

(34)   "Lender" shall have the meaning set forth in the Preamble.

(35)   "Lender Financed Inventory" shall mean all Units for which an Advance has been made under this Note.

(36)   "Lender Guide" shall mean those procedures and instructions for the use of Lender's system and the Discover Portal, in each case as modified by Lender from time to time in Lender's sole discretion, which are available in hard copy upon Borrower's written request to Lender or by Borrower logging onto the Discover Portal.

(37)   "Lender Parties" shall have the meaning set forth in Section 11.

(38)   "Liabilities" shall mean any and all Advances, debts, financial obligations, Administrative Charges, Lender Universal Program Fees, Interest, Floorplan Fees, NSF fees, late fees, charges, expenses, attorneys' fees, costs of collection, covenants, and duties owing, arising, due, or payable from Borrower to Lender of any kind or nature, present, or future, under any instrument, guaranty, or other document, whether arising under this Note, any other Loan Document, or otherwise, whether directly or indirectly (including those acquired by assignment), absolute or contingent, primary or secondary, due or to become due, now existing, or hereafter arising, and however required.

(39)   "Liens" shall mean any claims, liabilities, security interests, liens, mortgages, deeds of trust, pledges, conditions, charges, claims, options, rights of first refusal, easements, proxies, voting trusts or agreements, transfer restrictions under any contract or agreement or encumbrances of any kind or nature whatsoever.

(40)   "Loan Documents" shall have the meaning set forth in Section 8.

(41)   "Maturity Date" shall mean (a) for all Liabilities concerning or relating to a Floorplan Advance or a Receivable Advance, the earlier of the last day of the current Period or the day on which Lender declares a Maturity Event; (b) for all Liabilities not directly related to a Floorplan Advance or a Receivable Advance, ten (10) days after the date such Liability is posted to Borrower's account; and (c) for One Day Loans, the date such One Day Loan is posted to Borrower's account. Notwithstanding the foregoing, upon the declaration of an Event of Default by Lender, the Maturity Date for all Liabilities shall be the earlier of (i) the date on which such Event of Default is declared by Lender, or (ii) the date on which such Event of Default first occurred. In the event the Maturity Date is not a Business Day, the Maturity Date shall be deemed to be the next Business Day.

PAG-B0059

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

(42)   "Maturity Event" shall mean any event, act or circumstance arising under this Note or any other Loan Document (including any failure by Borrower to adhere to any term or provision of this Note or any other Loan Document), which causes Lender to declare the event, act or circumstance a "Maturity Event" with respect to any Floorplan Advance or Receivable Advance.

(43)   "MSO" shall mean the manufacturer's statement of origin or other document evidencing ownership of a Unit issued by the manufacturer of the Unit.

(44)   "Note" shall mean this Demand Promissory Note and Loan and Security Agreement and all present and future amendments, modifications, and addendums related thereto.

(45)   "One Day Loan" shall mean the amount of any Advance that is in excess of the market value of a Unit, as determined by Lender in its sole discretion. The determination of whether to approve an Advance which would result in the posting of a One Day Loan to Borrower's account shall be in Lender's sole discretion. One Day Loans mature on the date on which they post to Borrower's account.

(46)   "Opt-Out Notice" shall have the meaning set forth in Section 22(a).

(47)   "Ordinary Course of Business" shall mean the ordinary course of the Business of Borrower, consistent with past practices (but only to the extent such past practices were in compliance with Law and in accordance with best industry practices).

(48)   "Parent Company" shall mean, with respect to Borrower or any Guarantor, the Person(s) that, directly or indirectly, have the power to direct or cause the direction of the management and policies of Borrower or Guarantor, as the case may be, whether through the ownership of voting securities, by contract or otherwise.

(49)   "Party" or "Parties" shall have the meaning set forth in the Preamble.

(50)   "Period" shall mean the number of days set forth on the applicable Advance Schedule, which (a) in the case of a Floorplan Advance, shall be calculated beginning on the Floorplan Date; and (b) in the case of a Receivable Advance, shall be calculated beginning on the Receivable Origination Date.

(51)   "Person" shall mean any individual, corporation, joint stock company, association, partnership, joint ventures, trust, estate, limited liability company, limited liability partnership, governmental authority or other entity or organization.

(52)   "Receivable" shall mean chattel paper, including a retail installment contract or buy here pay here contract, evidencing a monetary obligation of a buyer for the purchase of a motor vehicle from Borrower and the granting of a security interest in the vehicle to Borrower as security for the repayment of the monetary obligation.

(53)   "Receivable Advance" shall mean an Advance made pursuant to this Note to provide Borrower with working capital secured by a specific Receivable owned and originated by Borrower in the Ordinary Course of Business.

(54)   "Receivable Fee" shall mean the fee charged by Lender to Borrower, set forth on the applicable Advance Schedule, for each individual Receivable Advance for each Period.

(55)   "Receivable Origination Date" shall mean, with respect to any Receivable for which a Receivable Advance is made pursuant to this Note, the date on which such Receivable was originated by Borrower.

(56)   "Representative" shall mean, with respect to Borrower or Lender, as the case may be, the directors, officers, stockholders, employees, trustees, agents, and representatives, including any investment banker, consultant, attorney, or accountant, of Borrower or Lender, as the case may be.

(57)   "Required Reserve Amount" shall mean the aggregate total amount of funds required to be remitted by Borrower to Lender, as set forth in the applicable Advance Schedule, and held in the Reserve as a condition to the grant of credit to Borrower under this Note and the other Loan Documents.

(58)   "Reserve" shall mean the cash deposited with Lender by Borrower on a voluntary basis or as required as an underwriting condition and held by Lender as additional security for Borrower's Liabilities, and other Obligations (as defined in the applicable reserve agreement) to the Lender Parties.

(59)   "Reserve Charge" shall mean that charge by Lender to Borrower, as set forth on the applicable Advance Schedule, assessed for the purpose of funding any Reserve.

(60)   "Setoff Funds" shall have the meaning set forth in Section 5(l).

(61)   "Specific Source Purchase" shall mean all purchases or other requests for an Advance, made by or on behalf of Borrower that do not constitute a Universal Source Purchase.

(62)   "Terms and Conditions" shall mean all provisions of this Note and the other Loan Documents, with the exception of terms specifically referenced on the applicable Advance Schedule.

PAG-B0060

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

(63)    "Title" shall mean the certificate of title or other document evidencing ownership of a Unit issued by a duly authorized state, commonwealth, province, or government agency.

(64)    "UCC" shall mean the Uniform Commercial Code as enacted in the State where the Collateral at issue is located.

(65)    "Unit" shall mean any manufactured item, including motor vehicles, for which there exists a Title, MSO, or other similar evidence of ownership acceptable to Lender.

(66)    "Universal Program Fee" shall mean any published fee, as stated in the Finance Program Rate, Fee, and Term Schedule, charged by Lender to Borrower pursuant to a Finance Program.

(67)    "Universal Source Purchase" shall mean any purchase made by or on behalf of Borrower for which (a) a request for an Advance is made by or on behalf of Borrower; (b) from an auction or third party business that has entered into a universal funding agreement with Lender; and (c) such request for an Advance is received by Lender within seven (7) days of Borrower's purchase of the vehicle that is the subject of such request.



DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

## ADDENDUM TO DEMAND PROMISSORY NOTE
## AND LOAN AND SECURITY AGREEMENT – READY LOGISTICS

THIS ADDENDUM TO DEMAND PROMISSORY NOTE AND LOAN AND SECURITY AGREEMENT (this "Addendum") is being entered into by the undersigned borrower ("Borrower") and NextGear Capital, Inc. ("Lender"), pursuant to that certain Demand Promissory Note and Loan and Security Agreement by and between Borrower and Lender (the "Note").

WHEREAS, Borrower has requested of Lender that Lender make one or more Advances on behalf of Borrower, directly to Ready Logistics LLC ("Ready Logistics") in order to cover transportation and other related acquisition charges (collectively "Charges") incurred by Borrower related to one or more Units of Lender Financed Inventory; and

WHEREAS, subject to the terms and conditions set forth in the Note and the other Loan Documents, all as the same now exist or are hereafter amended, supplemented or added to, Lender is willing to make such Advance(s);

NOW, THEREFORE, in consideration of the premises and the mutual agreements and covenants set forth herein, and other good and valuable consideration, the undersigned hereby agree as follows:



1.  Notwithstanding anything to the contrary in the Note or the other Loan Documents, the decision to make an Advance related to Charges on behalf of Borrower is the exclusive right of Lender, whether or not an Event of Default has occurred.

2.  Borrower acknowledges and agrees that Lender may make such Advance(s) at any time on or after receipt of an invoice from Ready Logistics for such Charges.

3.  Borrower acknowledges and agrees that each Advance made by Lender on behalf of Borrower, directly to Ready Logistics, to cover Charges, shall be added to the outstanding balance for the related Unit of Lender Financed Inventory for which such Charge applies, as of the date Lender receives notice from Ready Logistics of such Charge. Such Advance, shall accrue Interest and other related charges as of such date, regardless of the date the related Charge is actually paid. Borrower acknowledges and agrees that if an Advance related to a Charge is added to Borrower's account on a date other than the Floorplan Date for such Unit of Lender Financed Inventory, that the number of days remaining in the applicable Period, for an Advance related to a Charge will be reduced to the number of days remaining in the applicable Period for the related Unit of Lender Financed Inventory.

4.  Borrower acknowledges and agrees that such Advance(s) is a Liability under the Note and, except as provided for herein, is subject to all terms and conditions noted therein. Borrower acknowledges and agrees that Borrower is and shall remain obligated to repay such Liability, including accrued Interest, to Lender no later than the Maturity Date for such Advance, excepting that Lender may, in its sole discretion and without notice, defer payment of the Advance or any portion thereof (excluding Interest) until final payoff.

5.  Borrower acknowledges and agrees that Borrower is and shall remain obligated to repay such Liability to Lender for such Advance(s) no later than the Maturity Date for such Advance(s), regardless of whether the sale of the related Unit of Lender Financed Inventory, for which an Advance was made to Ready Logistics on Borrower's behalf, is subsequently arbitrated, voided, or the vehicle is otherwise returned for any reason.

Capitalized terms used herein but not defined herein shall have the respective meanings as set forth in the Note (such meanings to be equally applicable to both the singular and plural forms of the terms defined).

The undersigned Borrower hereby expressly acknowledges that this Addendum shall be binding on Borrower whether executed in original, "wet ink" form; submitted by facsimile; or submitted by electronically transmitted signature ("e-signature"). The undersigned Borrower further acknowledges that the acceptance of the terms of this Addendum, if by e-signature, shall be deemed to satisfy all requirements imposed on electronic or digital

PAG-B0062

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy held by the designated custodian

signatures under the Electronic Signatures in Global and National Commerce Act (the "E-Sign Act"), 15 U.S.C. §7001(a) et seq., and any other similar laws relating to the validity or enforceability of electronic or digital signatures. Each of the parties acknowledges and agrees that this Addendum may be executed by affixing to this Addendum an electronic or digital signature, which shall for all purposes be deemed effective to constitute the valid signature of the party affixing such electronic or digital signature.

☒  Borrower, by its duly authorized representative, AGREES to be bound by the terms of this Addendum as of the date set forth below.

☐  Borrower, by its duly authorized representative, DECLINES the terms of this Addendum.  Borrower will not request any Advances to be made to Ready Logistics on Borrower's behalf for Charges, and Lender will not approve any such requests.

**BORROWER:**

PREMIER GROUP AUTOS LLC DBA OVERFINCH MIAMI

By: _James Michael C Blackburn_

Name: James Michael C Blackburn

Title: Manager

Date: 3/26/2019 | 4:42:48 PM EDT

**LENDER:**

NEXTGEAR CAPITAL, INC.

By: _Shane O'Dell_

Name: Shane O'Dell

Title: President

Date: 3/27/2019 | 10:47:56 AM EDT

Dealer # 125308

Addendum to Demand Promissory Note and Loan and Security Agreement (v. 3.2)

PAG-B0063

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy
by the designated custodian

## ADVANCE SCHEDULE
(Retail)

| Borrower: | Premier Group Autos LLC DBA Overfinch Miami | Market: | Ft. Lauderdale North |
| Account Number: 125308 | | Finance Program: | Core |

This Advance Schedule is being entered into by the undersigned borrower ("Borrower") and NextGear Capital, Inc. ("Lender") pursuant to that certain Demand Promissory Note and Loan and Security Agreement by and between Borrower and Lender (the "Note"). Capitalized terms used herein but not defined herein shall have the respective meanings as set forth in the Note (such meanings to be equally applicable to both the singular and plural forms of the terms defined).

The following terms shall apply to Advances made under the Note and this Advance Schedule:

The Floorplan Fee, the Period(s), and the required principal reduction for Curtailment for each Advance made pursuant to the Note and this Advance Schedule shall be as follows:

| Period | Number of Days in Period | Required Principal Reduction for Curtailment of Maturity Date | Floorplan Fee |
| --- | --- | --- | --- |
| 1 | 60 | 10% | $80.00 |
| 2 | 30 | 5% | $45.00 |
| 3 | 30 | N/A – No Further Curtailments Available | $45.00 |

Contract Rate: 3.0%

Additional fees, charges, and other terms applicable to Advances made pursuant to the Note and this Advance Schedule are set forth on the Finance Program Rate, Fee, and Term Schedule, which can be found on the Discover Portal.

The undersigned Borrower hereby expressly acknowledges that this Advance Schedule shall be binding on Borrower whether executed in original, "wet ink" form; submitted by facsimile; or submitted by electronically transmitted signature ("e-signature"). The undersigned Borrower further acknowledges that the acceptance of the terms of this Advance Schedule, if by e-signature, shall be deemed to satisfy all requirements imposed on electronic or digital signatures under the Electronic Signatures in Global and National Commerce Act (the "E-Sign Act"), 15 U.S.C. §7001(a) et seq., and any other similar laws relating to the validity or enforceability of electronic or digital signatures. Each of the parties acknowledges and agrees that this Advance Schedule may be executed by affixing to this Advance Schedule an electronic or digital signature, which shall for all purposes be deemed effective to constitute the valid signature of the party affixing such electronic or digital signature.

WHEREFORE, the Parties, by their respective duly authorized representatives, have executed this Advance Schedule on the dates set forth below.

LENDER:

NEXTGEAR CAPITAL, INC.

DocuSigned by:

*Shane O'Dell*

By: 32464EC045174EF...
Name: Shane O'Dell
Title: President

Date: 3/27/2019 | 10:47:56 AM EDT

Advance Schedule (Retail) (v. 1.1)

PAG-B0064

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-F8526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy
by the designated custodian

**BORROWER**:

Premier Group Autos LLC DBA Overfinch Miami

DocuSigned by:

*James Michael C Blackburn*

By: ⎿C465819C99D04D1...

Name:   James Michael C Blackburn
Title:    Manager

Date:    3/26/2019 | 4:42:48 PM EDT

DocuSigned by:

*Edward Anthony Kessler*

By: ⎿8420328A15AC496...

Name:   Edward Anthony Kessler
Title:    Manager

Date:    3/27/2019 | 10:46:09 AM EDT

Advance Schedule (Retail) (v. 1.1)

PAG-B0065

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

## INDIVIDUAL GUARANTY

THIS INDIVIDUAL GUARANTY (this "Guaranty") is made and entered into by the undersigned guarantor ("Guarantor") in favor of NextGear Capital, Inc. ("Lender") and it Affiliates, pursuant to that certain Demand Promissory Note and Loan and Security Agreement by and between Borrower (as defined below) and Lender (the "Note").

NOW, THEREFORE, in consideration of any loan or other financial accommodation heretofore or hereafter at any time made or granted to Borrower by Lender, and the mutual covenants, agreements, and conditions contained herein, Guarantor agrees as follows:

1.  DEFINITIONS. Capitalized terms used herein and not defined in this Section 1 or elsewhere in this Guaranty shall have the respective meanings as set forth in the Note (such meanings to be equally applicable to both the singular and plural forms of the terms defined). Any capitalized terms used herein, but not otherwise defined herein or in the Note, as the case may be, shall have the meanings ascribed to them in the UCC.

    (a)  "Borrower" shall mean the Person listed below, including any Affiliates of such Person, whether now in existence or hereinafter established or acquired:

         Premier Group Autos LLC DBA Overfinch Miami, 11 SW 12th Ave Ste 103 Bldg 59, Dania Beach, FL 33004-3527
         Telephone: (954) 440-0717

    (b)  "Liabilities" shall mean any and all Advances, debts, financial obligations, fees, charges, expenses, attorneys' fees and costs of collection owing, arising, due, or payable from Borrower to Lender or any of its Affiliates, of any kind or nature, present or future, under any instrument, guaranty, or other document, whether arising under the Note or any other Loan Document, whether directly or indirectly, absolute or contingent, primary or secondary, due or to become due, now existing or hereafter arising, and however acquired.

2.  GUARANTY AND OTHER AGREEMENTS.

    (a)  Guaranty Obligations. Guarantor hereby voluntarily, unconditionally, and absolutely guarantees (i) the full and prompt payment when due, whether by acceleration or otherwise, and at all times hereafter, of all Liabilities; and (ii) the full and prompt performance of all the terms, covenants, conditions, and agreements related to the Liabilities. Guarantor further agrees to pay all expenses, including attorneys' fees and court costs (including, in each case, those relating to bankruptcy and appeals), paid or incurred by Lender or its Affiliates in endeavoring to collect on any Liabilities, and in enforcing this Guaranty or in defending any claims by Borrower or any Guarantor related to any of the Liabilities, plus interest on such amounts at the lesser of (A) thirteen percent (13%) per annum, compounded daily, or (B) the maximum rate permitted by Law. Interest on such amounts paid or incurred by Lender shall be computed from the date of payment made by Lender and shall be payable on demand.

    (b)  General Nature of Guaranty. Guarantor acknowledges that this Guaranty is a guaranty of payment and not of collection, and that his or her obligations hereunder shall be absolute, unconditional, and unaffected by: (i) the waiver of the performance or observance by Borrower or any Guarantor of any agreement, covenant, term, or condition to be performed or observed by Borrower or any such Guarantor, as the case may be; (ii) the extension of time for the payment of any sums owing or payable with respect to any of the Liabilities or the time for performance of any other obligation arising out of or relating to any of the Liabilities; (iii) the modification, alteration, or amendment of any obligation arising out of or relating to any of the Liabilities; (iv) any failure, delay, or omission by Lender to enforce, assert, or exercise any right, power, or remedy in connection with any of the Liabilities; (v) the genuineness, validity, or enforceability of any of the Liabilities or any document related thereto; (vi) the existence, value, or condition of, or failure of Lender or any of its Affiliates to perfect its lien against, any security pledged in connection with the Liabilities; (vii) the release of any security pledged in connection with the Liabilities, or the release, modification, waiver, or failure to enforce any other guaranty, pledge, or security agreement; (viii) the voluntary or involuntary liquidation, dissolution, sale of all or substantially all of the property, marshalling of assets and liabilities, receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization, arrangement, composition, or readjustment or other similar application or proceeding affecting Borrower or any assets of Borrower; (ix) the release or discharge of Borrower or any other Guarantor from the performance or observance of any agreements, covenants, terms, or conditions in connection with any of the Liabilities, by operation of Law or otherwise; (x) the default of Borrower in any obligations to Guarantor or any torts committed by Borrower against Guarantor, even if Lender is alleged to be complicit or to have committed a direct tort against Guarantor; or (xi) any change in Borrower's ownership, entity type, legal structure, or state of organization or formation, or in Guarantor's relationship to Borrower or any other Guarantor.

    (c)  Continuing and Unlimited Nature of Guaranty. The obligations of Guarantor under this Guaranty shall be continuing and shall cover any and all Liabilities existing as of the effective date of this Guaranty and any and all Liabilities thereafter incurred by Borrower, including any and all Liabilities existing at the time of any termination of this Guaranty. This Guaranty shall be unlimited in amount and shall continue in effect until this Guaranty is terminated pursuant to Section 3.

    (d)  Waivers by Guarantor. Guarantor hereby expressly waives: (i) notice of the acceptance by Lender of this Guaranty; (ii) notice of the existence, creation, or non-payment of all or any of the Liabilities; (iii) presentment, demand, notice of dishonor, protest, and all other notices whatsoever; (iv) any diligence in collection or protection of or realization upon any of the Liabilities, any obligation under this Guaranty, or any security for or guaranty of any of the foregoing; (v) impairment of any collateral securing the Liabilities; (vi) notice of any change in Borrower's credit terms or limits with Lender, including any temporary or permanent increases in Borrower's Credit Line (and Guarantor prospectively consents to any such change); (vii) any non-contractual duties of Lender to Borrower or any Guarantor; and (viii) the protections of any Laws intended to protect consumers or regulate consumer loans, as the Liabilities are commercial in nature.

    (e)  Authorization. Guarantor authorizes Lender to obtain and share credit information relating to Guarantor from and with credit bureaus, financial institutions, trade creditors, affiliates, and others and to conduct such other credit investigations that Lender in its sole discretion deems necessary.

PAG-B0066

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy
by the designated custodian

Guarantor expressly authorizes Lender to obtain his or her consumer credit report from time to time at Lender's discretion, and expressly ratifies any such consumer credit report that may have been obtained by or on behalf of Lender prior to the effective date of this Guaranty. Guarantor also authorizes Lender to contact any third parties to disclose information for the purpose of, among other things, obtaining intercreditor agreements and perfecting Lender's security interest. Further, Guarantor authorizes Lender to periodically obtain additional credit information on Guarantor through any available medium.

(f) <u>Communication</u>. Guarantor hereby expressly authorizes Lender and its Affiliates to communicate with Guarantor via facsimile transmissions, email messages, telephonic transmissions, both to a residential telephone line and/or cell phone, including text messaging, using an automatic telephone dialing system or an artificial or prerecorded voice message, and/or any other forms of communication, for any purpose, including general business matters, account information, marketing materials, collection, and/or any other communication needs. Guarantor acknowledges and agrees that such express permission shall extend to any and all of the contact information that Guarantor has provided herein, including any physical and email addresses, phone numbers, fax numbers, etc., and to such other addresses, phone numbers, email addresses, online chat, social media platforms, etc. that Guarantor may provide to Lender or any of its Affiliates or that Lender or any of its Affiliates may obtain from any third party at a later date.

(g) <u>Enforcement</u>. In no event shall Lender have any obligation to proceed against Borrower, any other Guarantor or any other Person, or any security pledged in connection with the Liabilities, before seeking satisfaction from Guarantor. Lender may, at its option, proceed, prior or subsequent to, or simultaneously with, the enforcement of its rights hereunder, to exercise any right or remedy it may have against Borrower, any other Guarantor or other Person, or any security pledged in connection with the Liabilities. This Guaranty is in addition to, and not in substitution for, any other guaranty or other securites which Lender may now or hereafter hold.

(h) <u>Reinstatement</u>. Guarantor agrees that, if, at any time, all or any part of any payment theretofore applied by Lender to any of the Liabilities is or must be rescinded or returned by Lender for any reason whatsoever (including as a result of any insolvency, bankruptcy, or reorganization of Borrower or any of his or her Affiliates), such Liabilities shall, for purposes of this Guaranty, to the extent that such payment is or must be rescinded or returned, be deemed to have continued in existence, notwithstanding such application by Lender, and this Guaranty shall continue to be effective or reinstated, as applicable, as to all such Liabilities, all as though such application by Lender had not been made.

(i) <u>Financial Statements</u>. Upon Lender's request, Guarantor will provide Lender with Guarantor's audited financial statements, as certified by Guarantor's independent certified public accountant, and such other financial statement information, and other materials as Lender may request from time to time.

(j) <u>Application of Payments; Subrogation</u>. Any amounts received by Lender from any source on account of the Liabilities may be applied by it toward the payment of such of the Liabilities, and in such order of application as Lender may from time to time elect. Notwithstanding any payments made by or for the account of Guarantor, Guarantor shall not be subrogated to any rights of Lender.

3.   TERMINATION.

(a) <u>Payment of Liabilities and Termination of Credit Line</u>. This Guaranty shall be terminated upon the occurrence of all of the following: (i) the payment by Borrower or any Guarantor, either jointly or severally, of all Liabilities outstanding; (ii) the payment of all obligations by Guarantor which may be due to Lender under this Guaranty; and (iii) the filing of a UCC termination statement as to Borrower by or on behalf of Lender, or other written verification from Lender that Borrower's Credit Line is terminated.

(b) <u>Revocation of Guaranty</u>. This Guaranty may be revoked by Guarantor upon written notice to Lender by certified mail, return receipt requested, to the address provided in Section 5(d). This Guaranty shall be deemed terminated upon the occurrence of a revocation in the manner provided in this Section 3(b). However, such revocation and termination shall in no way terminate or otherwise affect: (i) any obligations of Guarantor existing on or prior to the effective date of such revocation or termination; or (ii) any obligations of Guarantor arising after the effective date of such revocation or termination with respect to any Liabilities incurred by Borrower on or before the effective date of such revocation or termination.

4.   EVENTS OF DEFAULT. The occurrence of any of the following events shall be considered an event of default under this Guaranty (each, an "<u>Event of Default</u>"):

(a) Guarantor fails to make full payment of any amount owed hereunder after notice from Lender;

(b) Guarantor fails to perform or observe any agreement, covenant, term, or condition contained in this Guaranty (other than any monetary obligation described in clause (a) above), and such failure continues for ten (10) days after notice from Lender;

(c) Guarantor makes an assignment for the benefit of creditors or fails to pay his or her debts as the same become due and payable;

(d) Guarantor petitions or applies to any tribunal for the appointment of a trustee or receiver of the business, estate, or assets of any substantial portion of his or her business, estate, or assets, or commences any proceedings relating to Guarantor under any bankruptcy, reorganization, insolvency, readjustment of debt, dissolution, or liquidation Law of any jurisdiction, whether now or hereafter in effect (each, a "<u>Bankruptcy Filing</u>");

(e) any Bankruptcy Filing is filed or any related proceedings commenced against Guarantor, and Guarantor by any act indicates his or her approval thereof, consent thereto, or acquiescence therein, or any order is entered appointing any trustee or receiver, declaring Guarantor bankrupt or insolvent, or approving or accepting the Bankruptcy Filing in any such proceedings;

NextGear Individual Guaranty (v. 1.1)

PAG-B0067

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy held by the designated custodian

(f) any suit or proceeding is filed or any related proceedings commenced against Guarantor or any of his or her Affiliates, which, if adversely determined, could substantially impair the ability of Guarantor or Borrower to perform any of their respective obligations with respect to this Guaranty or any of the Liabilities, in each case as determined by Lender in its sole and absolute discretion; or

(g) there is any Event of Default by Guarantor under the Note.

If an Event of Default under this Guaranty shall have occurred, in addition to pursuing any remedies which may be available to Lender with respect to the Liabilities, Lender, at its option, may take whatever action at law or in equity Lender may deem necessary, regardless of whether Lender shall have exercised any of its rights or remedies with respect to any of the Liabilities, and Lender may demand, at its option, that Guarantor pay forthwith the full amount which would be due and payable hereunder as if all Liabilities were then due and payable.

5.   GENERAL.

(a)   Assignment: Successors and Assigns.  This Guaranty may be assigned by Lender without notice to Guarantor, but Guarantor may not assign this Guaranty without the prior written consent of Lender.  The guaranty and the other agreements contained herein shall bind the legal representatives, heirs, successors, and assigns of Guarantor, and shall inure to the benefit of Lender and its successors and assigns.  Each reference to Guarantor herein shall be deemed to include the legal representatives, heirs, and agents of Guarantor, and their respective successors and assigns.

(b)   Amendment: Merger.  This Guaranty is intended by the Parties to be an amendment to and restatement of any prior Individual Guaranty or other similar document or instrument between Lender (or any predecessor of Lender, including Dealer Services Corporation and/or Manheim Automotive Financial Services, Inc.) and Guarantor, or otherwise executed by Guarantor for the benefit Lender (or any predecessor of Lender, including Dealer Services Corporation and/or Manheim Automotive Financial Services, Inc.).  This Guaranty may be modified or amended only upon the written consent of Lender and Guarantor.  The Parties acknowledge that Guarantor may have also acknowledged and consented to the terms and conditions set forth in the Note, and, in such event, this Guaranty shall be deemed supplemental and in addition to the terms and conditions of the Note to which Guarantor has acknowledged and consented.  In the event of any conflict between a term or provision set forth in this Guaranty, and a term or provision set forth in the Note, the term or provision set forth in this Guaranty shall, as between Lender and Guarantor, be deemed controlling.

(c)   Execution.  Guarantor may execute this Guaranty only by original signature of Guarantor, unless otherwise authorized by Lender.  Lender may, in its sole discretion, permit Guarantor to execute this Guaranty by affixing to this Guaranty an electronic or digital signature.  Guarantor acknowledges and agrees that any electronic or digital signature of Guarantor shall for all purposes be deemed effective and constitute the valid signature of Guarantor, and shall be deemed to satisfy all requirements imposed on electronic or digital signatures under the UCC, the Electronic Signatures in Global and National Commerce Act (the "E-Sign Act"), and any other similar Laws relating to the validity or enforceability of electronic or digital signatures (including, without limitation, any enactment of the Uniform Electronic Transactions Act (UETA)), and such electronic or digital signature shall not be denied legal effect, validity, or enforceability solely because it is in electronic or digital form.  A facsimile or photocopied reproduction of the signatures on this Guaranty shall be deemed original signatures for all intents and purposes.

(d)   Notices.  All notices, demands and requests required or permitted to be given under this Guaranty shall be (i) in writing, (ii) delivered by personal delivery or sent by commercial delivery service or certified mail, return receipt requested (except with respect to notices pursuant to Section 3(b), which notices may only be given by certified mail, return receipt requested), (iii) deemed to have been given on the date of personal delivery or the date set forth in the records of the delivery service or on the return receipt, and (iv) addressed as follows (or, in the case of Lender, to any other subsequent address that Lender may provide to Guarantor (through written notice or otherwise)) for purposes of directing future notices, demands or requests):

|   |   |
|---|---|
| If to Lender: | NextGear Capital, Inc., 11799 North College Avenue, Carmel, IN 46032<br>Telephone: (317) 571-3721 |
|   | with a copy to: |
|   | NextGear Capital, Inc., 11799 North College Avenue, Carmel, IN 46032<br>Telephone: (317) 571-3721<br>Attention: Legal Department |
| If to Guarantor: | James Michael C Blackburn, 1500 Cordova Rd #206, Fort Lauderdale, FL 33316<br>Telephone: 954-232-7661 |

(e)   No Waiver.  No failure or delay by Lender in exercising any right, power, or privilege or the granting of an exception by Lender with respect to any term or condition of this Guaranty will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege, or the exercise of any other right, power, or privilege by Lender.

(f)   Severability.  Any provision of this Guaranty that is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability, without rendering invalid or unenforceable the remaining provisions of this Guaranty or affecting the validity or enforceability of any provision of this Guaranty in any other jurisdiction.

(g)   Governing Law.  Except with respect to the interpretation or enforcement of the arbitration and other provisions set forth in Section 5(i) (which shall be governed by the Federal Arbitration Act), the validity, enforceability, and interpretation of this Guaranty shall be governed by the internal Laws of the State of Indiana, without regard to conflicts of Laws provisions thereof.

NextGear Individual Guaranty (v. 1.1)

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy
by the designated custodian

(h) <u>Jurisdiction and Venue</u>. As evidenced by Guarantor's signature below, subject to the provisions in Section 5(i), Guarantor submits to the personal jurisdiction and venue of the state and federal courts of Marion County and Hamilton County, Indiana, and agrees that any and all claims or disputes pertaining to this Guaranty, or to any matter arising out of or related to this Guaranty, which are initiated by Guarantor against Lender, to the extent, if any, that such claims or disputes are not subject to the provisions noted in Section 5(i), shall be brought in the state or federal courts of Marion County or Hamilton County, Indiana. Further, Guarantor expressly consents to the jurisdiction and venue of the state and federal courts of Marion County and Hamilton County, Indiana, as to any legal or equitable action that may be brought in such court by Lender, and waives any objection based upon lack of personal jurisdiction, improper venue or forum non conveniens with respect to any such action. Guarantor acknowledges and agrees that Lender reserves the right to initiate and prosecute any action against Guarantor in any court of competent jurisdiction, and Guarantor consents to such forum as Lender may elect.

(i) <u>Mandatory Binding Arbitration; Waiver of Class Action Rights</u>.

(i) In the unlikely event that Lender is unable to resolve a dispute or claim that Guarantor may have, Guarantor agrees to arbitrate any such dispute or claim in accordance with this Section 5(i). This agreement to arbitrate is intended to be broadly interpreted, and includes (i) all disputes, claims and counterclaims arising out of or relating to this Guaranty or any aspect of Guarantor's past, present or future relationship with Lender, whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory; (ii) all disputes, claims and counterclaims that may have arisen before this Guaranty or any prior contract or agreement between Guarantor and Lender; and (iii) any disputes, claims and counterclaims that may arise after the termination of this Guaranty. Additionally, Guarantor acknowledges that Lender may (BUT SHALL IN NO EVENT BE REQUIRED TO) arbitrate any dispute or claim that it may have against Guarantor, with any such arbitration being governed by the provisions of this Section 5(i). BY AGREEING TO ARBITRATION, GUARANTOR UNDERSTANDS AND AGREES THAT IT IS WAIVING ITS RIGHTS TO MAINTAIN OTHER AVAILABLE RESOLUTION PROCESSES, SUCH AS COURT ACTION (INCLUDING A JURY TRIAL) OR ADMINISTRATIVE PROCEEDING, IN ORDER TO SETTLE OR RESOLVE DISPUTES OR ANY CLAIMS AGAINST LENDER. ARBITRATION IS DIFFERENT THAN A COURT ACTION, AND THE RULES IN ARBITRATION ARE DIFFERENT THAN THE RULES THAT APPLY IN COURT. THERE IS NO JUDGE OR JURY IN ARBITRATION, AND REVIEW IS LIMITED, BUT AN ARBITRATOR CAN AWARD THE SAME DAMAGES AND RELIEF AS A COURT, SUBJECT TO THE AGREED TERMS AND LIMITATIONS IN THIS NOTE. Guarantor, at his or her election, may opt-out of the arbitration provisions set forth in Sections 5(i)(i), 5(i)(iii) and 5(i)(iv) by providing written notice of his or her election to opt-out no later than thirty (30) days after Guarantor's execution of this Guaranty, which notice shall be provided to Lender pursuant to Section 5(d) ("Opt-Out Notice"), provided that such Opt-Out Notice shall become effective only upon Guarantor's receipt of written confirmation from Lender that such Opt-Out Notice has been received by Lender within the required time period. Guarantor acknowledges and agrees that, irrespective of any Opt-Out Notice or any written confirmation thereof, Guarantor shall in all events be subject to the provisions of Section 5(i)(ii).

(ii) ANY ARBITRATION OR OTHER LEGAL PROCEEDING OF ANY TYPE OR NATURE UNDER OR RELATING TO THIS GUARANTY OR TO ANY ASPECT OF GUARANTOR'S PAST, PRESENT OR FUTURE RELATIONSHIP OR ACTIVITIES WITH OR INVOLVING LENDER (INCLUDING ANY MARKETING ACTIVITIES OR SOLICITATIONS BY OR ON BEHALF OF LENDER), WILL TAKE PLACE ON AN INDIVIDUAL BASIS. CLASS ARBITRATIONS AND CLASS ACTIONS OF ANY KIND (WHETHER PURSUED THROUGH ARBITRATION OR THROUGH THE COURTS) ARE NOT PERMITTED. GUARANTOR AGREES THAT IT MAY BRING CLAIMS AGAINST LENDER ONLY IN HIS OR HER INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. GUARANTOR AGREES THAT, BY ENTERING INTO THIS GUARANTY, GUARANTOR IS WAIVING HIS OR HER RIGHT TO PARTICIPATE IN ANY CLASS ACTION OR OTHER SIMILAR REPRESENTATIVE PROCEEDING. UNLESS CONSENTED TO IN WRITING BY LENDER, THE ARBITRATOR MAY NOT CONSOLIDATE MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING. GUARANTOR ACKNOWLEDGES AND AGREES THAT THE SIZE OF BORROWER'S CREDIT LINE, THE INTEREST RATE TO WHICH ADVANCES ARE SUBJECT AND CERTAIN FEES CHARGED TO BORROWER, AS WELL AS THE SIZE AND DATES OF SPECIFIC ADVANCES AND WHAT (IF ANY) GUARANTIES ARE REQUIRED, ARE UNIQUE TO AND NEGOTIATED BY BORROWER (AND, IF APPLICABLE, GUARANTOR), AND THAT SUCH FACTORS WILL AND DO VARY AMONG BORROWERS AND OTHER GUARANTORS.

(iii) Any dispute or claim subject to arbitration pursuant to this Section 5(i) shall be submitted to binding arbitration administered by the Judicial Arbitration and Mediation Service ("JAMS") pursuant to its Comprehensive Arbitration Rules and Procedures as then in effect (the "JAMS Comprehensive Rules"); provided, however, that any dispute or claim that is subject to arbitration pursuant to this Section 5(i) and that involves disputes or claims where the aggregate amount reasonably in dispute or controversy is less than $100,000, shall be submitted to binding arbitration administered by JAMS pursuant to its Streamlined Arbitration Rules and Procedures as in effect as of the effective date of this Guaranty (the "JAMS Streamlined Rules"). The disputes and claims subject to arbitration pursuant to this Section 5(i) will be resolved by a single arbitrator selected pursuant to the JAMS Comprehensive Rules or the JAMS Streamlined Rules, as the case may be. The arbitrator shall be bound by and shall strictly enforce the terms of this Guaranty and may not limit, expand or otherwise modify any term or provision of this Guaranty or any other contract or document between Guarantor and Lender. The arbitrator shall not have the power to award to Guarantor any damages that are excluded or that have been waived by Guarantor under this Guaranty, and Guarantor irrevocably waives any claim that it may have thereto. The arbitrator shall not have the power to order pre-hearing discovery of documents or the taking of depositions. The arbitrator shall render a written decision within six (6) months after being selected. Any arbitration will be held in Indianapolis, Indiana (or its greater metro area). Each Party will bear its own expenses in the arbitration and will share equally the costs of the arbitration; provided, however, that the arbitrator may, in his or her discretion, award costs and fees to the prevailing Party. The result of any arbitration shall be final and binding upon the Parties. Judgment upon any arbitration award may be entered in any court having jurisdiction over the award or over the applicable party or its assets.

NextGear Individual Guaranty (v. 1.1)

PAG-B0069

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

(iv) This Guaranty evidences transactions in interstate commerce, and thus the Federal Arbitration Act governs the interpretation and enforcement of this Section 5(i), notwithstanding the provisions of Section 5(g).

(j) WAIVER OF JURY TRIAL. AFTER CONSULTING OR HAVING HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL, LENDER AND GUARANTOR KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVE ANY RIGHT EITHER PARTY MAY HAVE TO A TRIAL BY JURY IN ANY LITIGATION BASED UPON OR ARISING OUT OF THIS GUARANTY, OR ANY OF THE TRANSACTIONS CONTEMPLATED BY THIS GUARANTY, OR ANY COURSE OF CONDUCT, STATEMENT, WHETHER ORAL OR WRITTEN, OR ACTIONS OF LENDER OR GUARANTOR. NEITHER LENDER NOR GUARANTOR SHALL SEEK TO CONSOLIDATE, BY COUNTERCLAIM OR OTHERWISE, ANY ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED. THESE PROVISIONS SHALL NOT HAVE BEEN DEEMED TO HAVE BEEN MODIFIED IN ANY RESPECT OR RELINQUISHED BY LENDER OR GUARANTOR EXCEPT BY WRITTEN INSTRUMENT EXECUTED BY BOTH LENDER AND GUARANTOR.

(k) LIMITATION OF LIABILITY. IN NO EVENT SHALL ANY LENDER PARTY BE LIABLE FOR ANY SPECIAL, INDIRECT, EXEMPLARY, PUNITIVE, INCIDENTAL, MULTIPLE OR CONSEQUENTIAL DAMAGES (INCLUDING ANY DAMAGES RESULTING FROM LOSS OF USE, LOSS OF PROFITS, LOSS OF BUSINESS OR OTHER ECONOMIC LOSS) ARISING OUT OF OR IN CONNECTION WITH THIS GUARANTY, EVEN IF SUCH LENDER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. FURTHER, IN NO EVENT SHALL THE LENDER PARTIES, COLLECTIVELY, BE LIABLE FOR ANY DAMAGES UNDER THIS GUARANTY OR ANY OTHER LOAN DOCUMENT THAT EXCEED, IN THE AGGREGATE, AN AMOUNT EQUAL TO THE SUM OF THE INTEREST AND FLOORPLAN FEES ACTUALLY PAID TO LENDER BY BORROWER UNDER THE NOTE DURING THE TWELVE (12) MONTH PERIOD IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO THE CLAIM AT ISSUE (OR, IN THE CASE OF MULTIPLE EVENTS, THE FIRST SUCH EVENT GIVING RISE TO THE CLAIM AT ISSUE).

(l) Descriptive Headings; Interpretation. The descriptive headings herein are for convenience of reference only and shall not control or affect the meaning or construction of any provision of this Guaranty. As used in this Guaranty, the terms "include," "includes," and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of like import.

WHEREFORE, Guarantor has executed this Guaranty on the date set forth below.



GUARANTOR:

By:

Name: James Michael C Blackburn
3/26/2019 | 4:42:48 PM EDT

Date:

NextGear Individual Guaranty (v. 1.1)

PAG-B0070

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy
by the designated custodian

## INDIVIDUAL GUARANTY

THIS INDIVIDUAL GUARANTY (this "Guaranty") is made and entered into by the undersigned guarantor ("Guarantor") in favor of NextGear Capital, Inc. ("Lender") and it Affiliates, pursuant to that certain Demand Promissory Note and Loan and Security Agreement by and between Borrower (as defined below) and Lender (the "Note").

NOW, THEREFORE, in consideration of any loan or other financial accommodation heretofore or hereafter at any time made or granted to Borrower by Lender, and the mutual covenants, agreements, and conditions contained herein, Guarantor agrees as follows:

1.  DEFINITIONS. Capitalized terms used herein and not defined in this Section 1 or elsewhere in this Guaranty shall have the respective meanings as set forth in the Note (such meanings to be equally applicable to both the singular and plural forms of the terms defined). Any capitalized terms used herein, but not otherwise defined herein or in the Note, as the case may be, shall have the meanings ascribed to them in  he UCC.

    (a)  "Borrower" shall mean the Person listed below, including any Affiliates of such Person, whether now in existence or hereinafter established or acquired:

        Premier Group Autos LLC DBA Overfinch Miami, 11 SW 12th Ave Ste 103 Bldg 59, Dania Beach, FL 33004-3527
        Telephone: (954) 440-0717

    (b)  "Liabilities" shall mean any and all Advances, debts, financial obligations, fees, charges, expenses, attorneys' fees, and costs of collection owing, arising, due, or payable from Borrower to Lender or any of its Affiliates, of any kind or nature, present or future, under any instrument, guaranty, or other document, whether arising under the Note or any other Loan Document, whether directly or indirectly, absolute or contingent, primary or secondary, due or to become due, now existing or hereafter arising, and however acquired.

2.  GUARANTY AND OTHER AGREEMENTS.

    (a)  Guaranty Obligations. Guarantor hereby voluntarily, unconditionally, and absolutely guarantees (i) the full and prompt payment when due, whether by acceleration or otherwise, and at all times hereafter, of all Liabilities; and (ii) the full and prompt performance of all the terms, covenants, conditions, and agreements related to the Liabilities. Guarantor further agrees to pay all expenses, including attorneys' fees and court costs (including, in each case, those relating to bankruptcy and appeals), paid or incurred by Lender or its Affiliates in endeavoring to collect on any Liabilities, or in enforcing this Guaranty or in defending any claims by Borrower or any Guarantor related to any of the Liabilities, plus interest on such amounts at the lesser of (A) thirteen percent (13%) per annum, compounded daily, or (B) the maximum rate permitted by Law. Interest on such amounts paid or incurred by Lender shall be computed from the date of payment made by Lender and shall be payable on demand.

    (b)  General Nature of Guaranty. Guarantor acknowledges that this Guaranty is a guaranty of payment and not of collection, and that his or her obligations hereunder shall be absolute, unconditional, and unaffected by: (i) the waiver of the performance or observance by Borrower or any Guarantor of any agreement, covenant, term, or condition to be performed or observed by Borrower or any such Guarantor, as the case may be; (ii) the extension of time for the payment of any sums owing or payable with respect to any of the Liabilities or the time for performance of any other obligation arising out of or relating to any of the Liabilities; (iii) the modification, alteration, or amendment of any obligation arising out of or relating to any of the Liabilities; (iv) any failure, delay, or omission by Lender to enforce, assert, or exercise any right, power, or remedy in connection with any of the Liabilities; (v) the genuineness, validity, or enforceability of any of the Liabilities or any document related thereto; (vi) the existence, value, or condition of, or failure of Lender or any of its Affiliates to perfect its lien against, any security pledged in connection with the Liabilities; (vii) the release of any security pledged in connection with the Liabilities, or the release, modification, waiver, or failure to enforce any other guaranty, pledge, or security agreement; (viii) the voluntary or involuntary liquidation, dissolution, sale of all or substantially all of the property, marshalling of assets and liabilities, receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization, arrangement, composition, or readjustment or other similar application or proceeding affecting Borrower or any assets of Borrower; (ix) the release or discharge of Borrower or any other Guarantor from the performance or observance of any agreements, covenants, terms, or conditions in connection with any of the Liabilities, by operation of Law or otherwise; (x) the default of Borrower in any obligations to Guarantor or any torts committed by Borrower against Guarantor, even if Lender is alleged to be complicit or to have committed a direct tort against Guarantor; or (xi) any change in Borrower's ownership, entity type, legal structure, or state of organization or formation, or in Guarantor's relationship to Borrower or any other Guarantor.

    (c)  Continuing and Unlimited Nature of Guaranty. The obligations of Guarantor under this Guaranty shall be continuing and shall cover any and all Liabilities existing as of the effective date of this Guaranty and any and all Liabilities thereafter incurred by Borrower, including any and all Liabilities existing at the time of any termination of this Guaranty. This Guaranty shall be unlimited in amount and shall continue in effect until this Guaranty is terminated pursuant to Section 3.

    (d)  Waivers by Guarantor. Guarantor hereby expressly waives: (i) notice of the acceptance by Lender of this Guaranty; (ii) notice of the existence, creation, or non-payment of all or any of the Liabilities; (iii) presentment, demand, notice of dishonor, protest, and all other notices whatsoever; (iv) diligence in collection or protection of, or realization upon any of the Liabilities, any obligation under this Guaranty, or any security for or guaranty of any of the foregoing; (v) impairment of any collateral securing the Liabilities; (vi) notice of any change in Borrower's credit terms or limits with Lender, including any temporary or permanent increases in Borrower's Credit Line (and Guarantor prospectively consents to any such change); (vii) any non-contractual duties of Lender to Borrower or any Guarantor; and (viii) the protections of any Laws intended to protect consumers or regulate consumer loans, as the Liabilities are commercial in nature.

    (e)  Authorization. Guarantor authorizes Lender to obtain and share credit information relating to Guarantor from and with credit bureaus, financial institutions, trade creditors, affiliates, and others and to conduct such other credit investigations that Lender in its sole discretion deems necessary.

PAG-B0071

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

Guarantor expressly authorizes Lender to obtain his or her consumer credit report from time to time at Lender's discretion, and expressly ratifies any such consumer credit report that may have been obtained by or on behalf of Lender prior to the effective date of this Guaranty. Guarantor also authorizes Lender to contact any third parties to disclose information for the purpose of, among other things, obtaining intercreditor agreements and perfecting Lender's security interest. Further, Guarantor authorizes Lender to periodically obtain additional credit information on Guarantor through any available medium.

(f) Communication. Guarantor hereby expressly authorizes Lender and its Affiliates to communicate with Guarantor via facsimile transmissions, email messages, telephonic transmissions, both to a residential telephone line and/or cell phone, including text messaging, using an automatic telephone dialing system or an artificial or prerecorded voice message, and/or any other forms of communication, for any purpose, including general business matters, account information, marketing materials, collection, and/or any other communication needs. Guarantor acknowledges and agrees that such express permission shall extend to any and all of the contact information that Guarantor has provided herein, including any physical and email addresses, phone numbers, fax numbers, etc., and to such other addresses, phone numbers, email addresses, online chat, social media platforms, etc. that Guarantor may provide to Lender or any of its Affiliates or that Lender or any of its Affiliates may obtain from any third party at a later date.

(g) Enforcement. In no event shall Lender have any obligation to proceed against Borrower, any other Guarantor or any other Person, or any security pledged in connection with the Liabilities, before seeking satisfaction from Guarantor. Lender may, at its option, proceed, prior or subsequent to, or simultaneously with, the enforcement of its rights hereunder, to exercise any right or remedy it may have against Borrower, any other Guarantor or other Person, or any security pledged in connection with the Liabilities. This Guaranty is in addition to, and not in substitution for, any other guaranty or other securites which Lender may now or hereafter hold.

(h) Reinstatement. Guarantor agrees that, if, at any time, all or any part of any payment theretofore applied by Lender to any of the Liabilities is or must be rescinded or returned by Lender for any reason whatsoever (including as a result of any insolvency, bankruptcy, or reorganization of Borrower or any of his or her Affiliates), such Liabilities shall, for purposes of this Guaranty, to the extent that such payment is or must be rescinded or returned, be deemed to have continued in existence, notwithstanding such application by Lender, and this Guaranty shall continue to be effective or reinstated, as applicable, as to all such Liabilities, all as though such application by Lender had not been made.

(i) Financial Statements. Upon Lender's request, Guarantor will provide Lender with Guarantor's audited financial statements, as certified by Guarantor's independent certified public accountant, and such other financial statements, information, and other materials as Lender may request from time to time.

(j) Application of Payments; Subrogation. Any amounts received by Lender from any source on account of the Liabilities may be applied by it toward the payment of such of the Liabilities, and in such order of application, as Lender may from time to time elect. Notwithstanding any payments made by or for the account of Guarantor, Guarantor shall not be subrogated to any rights of Lender.

3. TERMINATION.

(a) Payment of Liabilities and Termination of Credit Line. This Guaranty shall be terminated upon the occurrence of all of the following: (i) the payment by Borrower or any Guarantor, either jointly or severally, of all Liabilities outstanding; (ii) the payment of all obligations by Guarantor which may be due to Lender under this Guaranty; and (iii) the filing of a UCC termination statement as to Borrower by or on behalf of Lender, or other written verification from Lender that Borrower's Credit Line is terminated.

(b) Revocation of Guaranty. This Guaranty may be revoked by Guarantor upon written notice to Lender by certified mail, return receipt requested, to the address provided in Section 5(d). This Guaranty shall be deemed terminated upon the occurrence of a revocation in the manner provided in this Section 3(b). However, such revocation and termination shall in no way terminate or otherwise affect: (i) any obligations of Guarantor existing on or prior to the effective date of such revocation or termination; or (ii) any obligations of Guarantor arising after the effective date of such revocation or termination with respect to any Liabilities incurred by Borrower on or before the effective date of such revocation or termination.

4. EVENTS OF DEFAULT. The occurrence of any of the following events shall be considered an event of default under this Guaranty (each, an "Event of Default"):

(a) Guarantor fails to make full payment of any amount owed hereunder after notice from Lender;

(b) Guarantor fails to perform or observe any agreement, covenant, term, or condition contained in this Guaranty (other than any monetary obligation described in clause (a) above), and such failure continues for ten (10) days after notice from Lender;

(c) Guarantor makes an assignment for the benefit of creditors or fails to pay his or her debts as the same become due and payable;

(d) Guarantor petitions or applies to any tribunal for the appointment of a trustee or receiver of the business, estate, or assets or of any substantial portion of his or her business, estate, or assets, or commences any proceedings relating to Guarantor under any bankruptcy, reorganization, insolvency, readjustment of debt, dissolution, or liquidation Law of any jurisdiction, whether now or hereafter in effect (each, a "Bankruptcy Filing");

(e) any Bankruptcy Filing is filed or any related proceedings commenced against Guarantor, and Guarantor by any act indicates his or her approval thereof, consent thereto, or acquiescence therein, or any order is entered appointing any trustee or receiver, declaring Guarantor bankrupt or insolvent, or approving or accepting the Bankruptcy Filing in any such proceedings;

NextGear Individual Guaranty (v. 1.1)

PAG-B0072

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

(f) any suit or proceeding is filed or any related proceedings commenced against Guarantor or any of his or her Affiliates, which, if adversely determined, could substantially impair the ability of Guarantor or Borrower to perform any of their respective obligations with respect to this Guaranty or any of the Liabilities, in each case as determined by Lender in its sole and absolute discretion; or

(g) there is any Event of Default by Guarantor under the Note.

If an Event of Default under this Guaranty shall have occurred, in addition to pursuing any remedies which may be available to Lender with respect to the Liabilities, Lender, at its option, may take whatever action at law or in equity Lender may deem necessary, regardless of whether Lender shall have exercised any of its rights or remedies with respect to any of the Liabilities, and Lender may demand, at its option, that Guarantor pay forthwith the full amount which would be due and payable hereunder as if all Liabilities were then due and payable.

5. GENERAL.

(a) Assignment; Successors and Assigns. This Guaranty may be assigned by Lender without notice to Guarantor, but Guarantor may not assign this Guaranty without the prior written consent of Lender. The guaranty and the other agreements contained herein shall bind the legal representatives, heirs, successors, and assigns of Guarantor, and shall inure to the benefit of Lender and its successors and assigns. Each reference to Guarantor herein shall be deemed to include the legal representatives, heirs, and agents of Guarantor, and their respective successors and assigns.

(b) Amendment; Merger. This Guaranty is intended by the Parties to be an amendment to and restatement of any prior Individual Guaranty or other similar document or instrument between Lender (or any predecessor of Lender, including Dealer Services Corporation and/or Manheim Automotive Financial Services, Inc.) and Guarantor, or otherwise executed by Guarantor for the benefit Lender (or any predecessor of Lender, including Dealer Services Corporation and/or Manheim Automotive Financial Services, Inc.). This Guaranty may be modified or amended only upon the written consent of Lender and Guarantor. The Parties acknowledge that Guarantor may have also acknowledged and consented to the terms and conditions set forth in the Note, and, in such event, this Guaranty shall be deemed supplemental and in addition to the terms and conditions of the Note to which Guarantor has acknowledged and consented. In the event of any conflict between a term or provision set forth in this Guaranty, and a term or provision set forth in the Note, the term or provision set forth in this Guaranty shall, as between Lender and Guarantor, be deemed controlling.

(c) Execution. Guarantor may execute this Guaranty only by original signature of Guarantor, unless otherwise authorized by Lender. Lender may, in its sole discretion, permit Guarantor to execute this Guaranty by affixing to this Guaranty an electronic or digital signature. Guarantor acknowledges and agrees that any electronic or digital signature of Guarantor shall for all purposes be deemed effective and constitute the valid signature of Guarantor, and shall be deemed to satisfy all requirements imposed on electronic or digital signatures under the UCC, the Electronic Signatures in Global and National Commerce Act (the "E-Sign Act"), and any other similar Laws relating to the validity or enforceability of electronic or digital signatures (including, without limitation, any enactment of the Uniform Electronic Transactions Act (UETA)), and such electronic or digital signature shall not be denied legal effect, validity, or enforceability solely because it is in electronic or digital form. A facsimile or photocopied reproduction of the signatures on this Guaranty shall be deemed original signatures for all intents and purposes.

(d) Notices. All notices, demands and requests required or permitted to be given under this Guaranty shall be (i) in writing, (ii) delivered by personal delivery or sent by commercial delivery service or certified mail, return receipt requested (except with respect to notices pursuant to Section 3(b), which notices may only be given by certified mail, return receipt requested), (iii) deemed to have been given on the date of personal delivery or the date set forth in the records of the delivery service or on the return receipt, and (iv) addressed as follows (or, in the case of Lender, to any other subsequent address that Lender may provide to Guarantor (through written notice or otherwise) for purposes of directing future notices, demands or requests):

If to Lender:        NextGear Capital, Inc., 11799 North College Avenue, Carmel, IN 46032
                     Telephone: (317) 571-3721

                     with a copy to:

                     NextGear Capital, Inc., 11799 North College Avenue, Carmel, IN 46032
                     Telephone: (317) 571-3721
                     Attention: Legal Department

If to Guarantor:     Edward Anthony Kessler, 1500 Cordova Rd #206, Fort Lauderdale, FL 33316
                     Telephone: 412-527-8695

(e) No Waiver. No failure or delay by Lender in exercising any right, power, or privilege or the granting of an exception by Lender with respect to any term or condition of this Guaranty will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege, or the exercise of any other right, power, or privilege by Lender.

(f) Severability. Any provision of this Guaranty that is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability, without rendering invalid or unenforceable the remaining provisions of this Guaranty or affecting the validity or enforceability of any provision of this Guaranty in any other jurisdiction.

(g) Governing Law. Except with respect to the interpretation or enforcement of the arbitration and other provisions set forth in Section 5(i) (which shall be governed by the Federal Arbitration Act), the validity, enforceability, and interpretation of this Guaranty shall be governed by the internal Laws of the State of Indiana, without regard to conflicts of Laws provisions thereof.

NextGear Individual Guaranty (v. 1.1)

PAG-B0073

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

(h)   Jurisdiction and Venue.  As evidenced by Guarantor's signature below, subject to the provisions in Section 5(i), Guarantor submits to the personal jurisdiction and venue of the state and federal courts of Marion County and Hamilton County, Indiana, and agrees that any and all claims or disputes pertaining to this Guaranty, or to any matter arising out of or related to this Guaranty, which are initiated by Guarantor against Lender, to the extent, if any, that such claims or disputes are not subject to the provisions noted in Section 5(i), shall be brought in the state or federal courts of Marion County or Hamilton County, Indiana.  Further, Guarantor expressly consents to the jurisdiction and venue of the state and federal courts of Marion County and Hamilton County, Indiana, as to any legal or equitable action that may be brought in such court by Lender, and waives any objection based upon lack of personal jurisdiction, improper venue or forum non conveniens with respect to any such action.  Guarantor acknowledges and agrees that Lender reserves the right to initiate and prosecute any action against Guarantor in any court of competent jurisdiction, and Guarantor consents to such forum as Lender may elect.

(i)   Mandatory Binding Arbitration; Waiver of Class Action Rights.

   (i)   In the unlikely event that Lender is unable to resolve a dispute or claim that Guarantor may have, Guarantor agrees to arbitrate any such dispute or claim in accordance with this Section 5(i).  This agreement to arbitrate is intended to be broadly interpreted, and includes (i) all disputes, claims and counterclaims arising out of or relating to this Guaranty or any aspect of Guarantor's past, present or future relationship with Lender, whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory; (ii) all disputes, claims and counterclaims that may have arisen before this Guaranty or any prior contract or agreement between Guarantor and Lender; and (iii) any disputes, claims and counterclaims that may arise after the termination of this Guaranty.  Additionally, Guarantor acknowledges that Lender may (BUT SHALL IN NO EVENT BE REQUIRED TO) arbitrate any dispute or claim that it may have against Guarantor, with any such arbitration being governed by the provisions of this Section 5(i).  BY AGREEING TO ARBITRATION, GUARANTOR UNDERSTANDS AND AGREES THAT IT IS WAIVING ITS RIGHTS TO MAINTAIN OTHER AVAILABLE RESOLUTION PROCESSES, SUCH AS COURT ACTION (INCLUDING A JURY TRIAL) OR ADMINISTRATIVE PROCEEDING, IN ORDER TO SETTLE OR RESOLVE DISPUTES OR ANY CLAIMS AGAINST LENDER. ARBITRATION IS DIFFERENT THAN A COURT ACTION. AND THE RULES IN ARBITRATION ARE DIFFERENT THAN THE RULES THAT APPLY IN COURT. THERE IS NO JUDGE OR JURY IN ARBITRATION, AND REVIEW IS LIMITED, BUT AN ARBITRATOR CAN AWARD THE SAME DAMAGES AND RELIEF AS A COURT, SUBJECT TO THE AGREED TERMS AND LIMITATIONS IN THIS NOTE. Guarantor, at his or her election, may opt-out of the arbitration provisions set forth in Sections 5(i)(i), 5(i)(iii) and 5(i)(iv) by providing written notice of his or her election to opt-out no later than thirty (30) days after Guarantor's execution of this Guaranty, which notice shall be provided to Lender pursuant to Section 5(g) ("Opt-Out Notice"), provided that such Opt-Out Notice shall become effective only upon Guarantor's receipt of written confirmation from Lender that such Opt-Out Notice has been received by Lender within the required time period.  Guarantor acknowledges and agrees that, irrespective of any Opt-Out Notice or any written confirmation thereof, Guarantor shall in all events be subject to the provisions of Section 5(i)(ii).

   (ii)   ANY ARBITRATION OR OTHER LEGAL PROCEEDING OF ANY TYPE OR NATURE UNDER OR RELATING TO THIS GUARANTY OR TO ANY ASPECT OF GUARANTOR'S PAST, PRESENT OR FUTURE RELATIONSHIP OR ACTIVITIES WITH OR INVOLVING LENDER (INCLUDING ANY MARKETING ACTIVITIES OR SOLICITATIONS BY OR ON BEHALF OF LENDER), WILL TAKE PLACE ON AN INDIVIDUAL BASIS.  CLASS ARBITRATIONS AND CLASS ACTIONS OF ANY KIND (WHETHER PURSUED THROUGH ARBITRATION OR THROUGH THE COURTS) ARE NOT PERMITTED.  GUARANTOR AGREES THAT IT MAY BRING CLAIMS AGAINST LENDER ONLY IN HIS OR HER INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING.  GUARANTOR AGREES THAT, BY ENTERING INTO THIS GUARANTY, GUARANTOR IS WAIVING HIS OR HER RIGHT TO PARTICIPATE IN ANY CLASS ACTION OR OTHER SIMILAR REPRESENTATIVE PROCEEDING.  UNLESS CONSENTED TO IN WRITING BY LENDER, THE ARBITRATOR MAY NOT CONSOLIDATE MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING.  GUARANTOR ACKNOWLEDGES AND AGREES THAT THE SIZE OF BORROWER'S CREDIT LINE, THE INTEREST RATE TO WHICH ADVANCES ARE SUBJECT AND CERTAIN FEES CHARGED TO BORROWER, AS WELL AS THE SIZE AND DATES OF SPECIFIC ADVANCES AND WHAT (IF ANY) GUARANTIES ARE REQUIRED, ARE UNIQUE TO AND NEGOTIATED BY BORROWER (AND, IF APPLICABLE, GUARANTOR), AND THAT SUCH FACTORS WILL AND DO VARY AMONG BORROWERS AND OTHER GUARANTORS.

   (iii)   Any dispute or claim subject to arbitration pursuant to this Section 5(i) shall be submitted to binding arbitration administered by the Judicial Arbitration and Mediation Service ("JAMS") pursuant to its Comprehensive Arbitration Rules and Procedures as then in effect (the "JAMS Comprehensive Rules"); provided, however, that any dispute or claim that is subject to arbitration pursuant to this Section 5(i) and that involves disputes or claims where the aggregate amount reasonably in dispute or controversy is less than $100,000, shall be submitted to binding arbitration administered by JAMS pursuant to its Streamlined Arbitration Rules and Procedures as in effect as of the effective date of this Guaranty (the "JAMS Streamlined Rules").  The disputes and claims subject to arbitration pursuant to this Section 5(i) will be resolved by a single arbitrator selected pursuant to the JAMS Comprehensive Rules or the JAMS Streamlined Rules, as the case may be.  The arbitrator shall be bound by and shall strictly enforce the terms of this Guaranty and may not limit, expand or otherwise modify any term or provision of this Guaranty or any other contract or document between Guarantor and Lender.  The arbitrator shall not have the power to award to Guarantor any damages that are excluded or that have been waived by Guarantor under this Guaranty, and Guarantor irrevocably waives any claim that it may have thereto.  The arbitrator shall not have the power to order pre-hearing discovery of documents or the taking of depositions.  The arbitrator shall render a written decision within six (6) months after being selected.  Any arbitration will be held in Indianapolis, Indiana (or its greater metro area).  Each Party will bear its own expenses in the arbitration and will share equally the costs of the arbitration; provided, however, that the arbitrator may, in his or her discretion, award costs and fees to the prevailing Party.  The result of any arbitration shall be final and binding upon the Parties.  Judgment upon any arbitration award may be entered in any court having jurisdiction over the award or over the applicable party or its assets.

NextGear Individual Guaranty (v. 1.1)

PAG-B0074

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF876

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

(iv) This Guaranty evidences transactions in interstate commerce, and thus the Federal Arbitration Act governs the interpretation and enforcement of this Section 5(i), notwithstanding the provisions of Section 5(g).

(j) WAIVER OF JURY TRIAL. AFTER CONSULTING OR HAVING HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL, LENDER AND GUARANTOR KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVE ANY RIGHT EITHER PARTY MAY HAVE TO A TRIAL BY JURY IN ANY LITIGATION BASED UPON OR ARISING OUT OF THIS GUARANTY, OR ANY OF THE TRANSACTIONS CONTEMPLATED BY THIS GUARANTY, OR ANY COURSE OF CONDUCT, STATEMENT, WHETHER ORAL OR WRITTEN, OR ACTIONS OF LENDER OR GUARANTOR.   NEITHER LENDER NOR GUARANTOR SHALL SEEK TO CONSOLIDATE, BY COUNTERCLAIM OR OTHERWISE, ANY ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED.   THESE PROVISIONS SHALL NOT HAVE BEEN DEEMED TO HAVE BEEN MODIFIED IN ANY RESPECT OR RELINQUISHED BY LENDER OR GUARANTOR EXCEPT BY WRITTEN INSTRUMENT EXECUTED BY BOTH LENDER AND GUARANTOR.

(k) LIMITATION OF LIABILITY.   IN NO EVENT SHALL ANY LENDER PARTY BE LIABLE FOR ANY SPECIAL, INDIRECT, EXEMPLARY, PUNITIVE, INCIDENTAL, MULTIPLE OR CONSEQUENTIAL DAMAGES (INCLUDING ANY DAMAGES RESULTING FROM LOSS OF USE, LOSS OF PROFITS, LOSS OF BUSINESS OR OTHER ECONOMIC LOSS) ARISING OUT OF OR IN CONNECTION WITH THIS GUARANTY, EVEN IF SUCH LENDER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. FURTHER, IN NO EVENT SHALL THE LENDER PARTIES, COLLECTIVELY, BE LIABLE FOR ANY DAMAGES UNDER THIS GUARANTY OR ANY OTHER LOAN DOCUMENT THAT EXCEED, IN THE AGGREGATE, AN AMOUNT EQUAL TO THE SUM OF THE INTEREST AND FLOORPLAN FEES ACTUALLY PAID TO LENDER BY BORROWER UNDER THE NOTE DURING THE TWELVE (12) MONTH PERIOD IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO THE CLAIM AT ISSUE (OR, IN THE CASE OF MULTIPLE EVENTS, THE FIRST SUCH EVENT GIVING RISE TO THE CLAIM AT ISSUE).

(l) Descriptive Headings; Interpretation.   The descriptive headings herein are for convenience of reference only and shall not control or affect the meaning or construction of any provision of this Guaranty.   As used in this Guaranty, the terms "include," "includes," and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of like import.

WHEREFORE, Guarantor has executed this Guaranty on the date set forth below.

GUARANTOR:

By:

Name:   Edward Anthony Kessler

Date:   3/27/2019 | 10:46:09 AM EDT

NextGear Individual Guaranty (v. 1.1)

PAG-B0075

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

## ACH AUTHORIZATION AND REQUEST
(Debit or Credit)

The undersigned borrower ("Borrower") has incurred, or may in the future incur, certain Liabilities to NextGear Capital, Inc. ("Lender") under that certain Demand Promissory Note and Loan and Security Agreement by and between Borrower and Lender (the "Note"). Capitalized terms used herein but not defined herein shall have the respective meanings as set forth in the Note (such meanings to be equally applicable to both the singular and plural forms of the terms defined).

Borrower hereby authorizes and requests Lender, as Lender under the Note, to initiate electronic debit entries (each, an "Authorized Debit") to the bank account specified below (the "Designated Account") in payment of amounts and other Liabilities owed by Borrower under the Note and the other Loan Documents. Lender may initiate an Authorized Debit, (i) in the amount requested by Borrower in a written or oral communication with Lender (an "Elective Payment"); or (ii) in the amount due and owing by Borrower under the Note and the other Loan Documents, including all interest, fees, and other Liabilities with respect thereto (a "Required Payment"). Additionally, Borrower authorizes and requests Lender, as Lender under the Note, to initiate electronic credit entries (each, an "Authorized Credit") to the Designated Account. Borrower further acknowledges and agrees that:

- Lender may initiate an Elective Payment from the Designated Account at any time on or after the date such request is made by Borrower.

- Lender may initiate a Required Payment from the Designated Account on or after the first Business Day following a Maturity Date for any Liability, in each case in such amount as is due and owing with respect to such Liability on the date that such Required Payment is initiated by Lender (including any applicable fees and other amounts incurred by Borrower or accrued on such Liability after the Maturity Date).

- Borrower must maintain sufficient funds in the Designated Account to satisfy its payment obligations to Lender under this ACH Authorization and Request. If the Designated Account holds insufficient funds to cover an Authorized Debit, Borrower may be assessed fees or other charges by both the financial institution at which the Designated Account is held (the "Depository Bank") and by Lender, just as if Borrower had written a check to Lender that was returned for insufficient funds.

- Borrower is solely responsible for any overdraft charges or other fees that the Depository Bank may assess in connection with any transfers, whether debit or credit, initiated pursuant to this ACH Authorization and Request (including any Authorized Debit or Authorized Credit).

- This ACH Authorization and Request shall be deemed a "Loan Document" for all intents and purposes under the Note, and Lender shall be entitled to avail itself of any limitations of liability and other similar protection or relief afforded Lender under the Note, and these provisions and protections shall apply to any Authorized Debit, Authorized Credit, or other transaction initiated by Lender hereunder. Additionally, Lender shall have no liability and shall not be responsible for any damages arising from or relating to any checks or other payments dishonored after the available balance in the Designated Account is reduced by any Authorized Debit or other transaction initiated by Lender hereunder.

- Borrower will remain liable and responsible for all amounts owed under the Note and the other Loan Documents which remain unpaid as a result of an unsuccessful attempt to debit funds from the Designated Account pursuant to this ACH Authorization and Request.

- This ACH Authorization and Request does not create a fiduciary relationship between Lender and Borrower.

- Borrower is bound by the Operating Rules of the National Automated Clearing House Association (NACHA), as in effect from time to time with regard to each Authorized Debit, Authorized Credit, and other transaction initiated by Lender hereunder.

- Lender may provide via email to the email account designated below ("Designated Email") confirmation of each Authorized Debit, Authorized Credit, and other transaction processed hereunder (each a "Confirmation Email").

- Lender's business records reflecting the following shall be deemed conclusive proof of Borrower's authorization and request for an Authorized Debit: (1) a Confirmation Email of an Authorized Debit having been sent by Lender to the Designated Email or otherwise communicated to Borrower; and (2) no written objection having been confirmed received by Lender from Borrower within five (5) Business Days from the date the Confirmation Email or other communication was sent to Borrower.

- Borrower shall maintain the active status of the Designated Email (or provide immediate written notification to Lender of any change in the Designated Email) at all times.

- Borrower is the owner (or joint-owner) of the Designated Account, or, if the Designated Account is a corporate or other company account, the undersigned representative of Borrower is a duly authorized corporate or company representative of Borrower with permission to make and authorize the Authorized Debits, Authorized Credits and other transactions authorized by Borrower hereunder, in each case in the manner described herein. In the event that any of Borrower's Designated Account information changes, or in the event that Borrower closes the Designated Account, Borrower will promptly notify Lender at least ten (10) Business Days prior to such change or closure so that Lender can process Borrower's updated Designated Account information.

Lender may, if necessary, initiate adjustments at any time and without advance notice to Borrower for any debit or credit entry made in error to the Designated Account pursuant to this ACH Authorization and Request. This ACH Authorization and Request will remain in effect until Lender

PAG-B0076

DocuSign Envelope ID: FAE10158-F46A-48C8-BEB2-FB526DFFF676

THIS IS A COPY.
This is a copy view of the Authoritative Copy.
by the designated custodian

has received, and has had sufficient time (but not less than ten (10) Business Days) to process, a written notice of termination delivered by Borrower to Lender in accordance with the provisions of Section 15 of the Note. Lender may terminate this ACH Authorization and Request at any time by providing written notice to Borrower. A facsimile or photocopied reproduction of any signature on this ACH Authorization and Request shall be deemed an original signature for all intents and purposes.

The undersigned Borrower hereby expressly acknowledges that this ACH Authorization and Request shall be binding on Borrower whether executed in original, "wet ink" form; submitted by facsimile; or submitted by electronically transmitted signature ("e-signature"). The undersigned Borrower further acknowledges that the acceptance of the terms of this ACH Authorization and Request, if by e-signature, shall be deemed to satisfy all requirements imposed on electronic or digital signatures under the Electronic Signatures in Global and National Commerce Act (the "E-Sign Act"), 15 U.S.C. §7001(a) et seq., and any other similar laws relating to the validity or enforceability of electronic or digital signatures. Each of the parties acknowledges and agrees that this ACH Authorization and Request may be executed by affixing to this ACH Authorization and Request an electronic or digital signature, which shall for all purposes be deemed effective to constitute the valid signature of the party affixing such electronic or digital signature.

| Designated Bank Account and Designated Email |
|---|
| Bank Name: HSBC   Account Number: ▓▓716 Routing Number: ▓▓088 |
| Signor 1 on Account: James Michael C Blackburn   Signor 2 on Account: Edward Anthony Kessler |
| Designated Email (for payment confirmation): sales@overfinchmiami.com |

WHEREFORE, Borrower, by its duly authorized representative, has executed this ACH Authorization and Request on the date set forth below.

BORROWER:

Premier Group Autos LLC DBA Overfinch Miami

DocuSigned by:
*James Michael C Blackburn*

By: ───────C465619C8BD8401...
Name:   James Michael C Blackburn
Title:   Manager

Date:   3/26/2019 | 4:42:48 PM EDT

DocuSigned by:
*Edward Anthony Kessler*

By: ───────8425328A15AC490...
Name:   Edward Anthony Kessler
Title:   Manager

Date:   3/27/2019 | 10:46:09 AM EDT

NextGear ACH Authorization and Request (Debit or Credit) (v 1.1)

PAG-B0077

## POWER OF ATTORNEY
(Entity/Partnership)

This Power of Attorney is executed by the undersigned borrower ("Borrower") and delivered to NextGear Capital, Inc. ("Lender") pursuant to that certain Demand Promissory Note and Loan and Security Agreement by and between Borrower and Lender (the "Note"). Capitalized terms used herein but not defined herein shall have the respective meanings as set forth in the Note (such meanings to be equally applicable to both the singular and plural forms of the terms defined). Any capitalized terms used herein, but not otherwise defined herein or in the Note, as the case may be, shall have the meanings ascribed to them in the UCC.

1. No Person to whom this Power of Attorney is presented, as authority for Lender to take any action described below, shall be required to inquire into or seek confirmation from Borrower as to the authority of Lender to take any action described below, or as to the existence of or fulfillment of any condition to this Power of Attorney, which is intended to grant to Lender unconditionally the authority to take and perform the actions described below. Borrower irrevocably waives any right that it may have, now or at any time in the future, to commence any claim, litigation, suit, petition, writ, or proceeding in any court of competent jurisdiction or before any arbitrator or neutral, against any Person acting in reliance upon or otherwise acknowledging any power or authority granted by Borrower under this Power of Attorney. The Power of Attorney granted hereby is coupled with an interest and may not be revoked or canceled by Borrower without Lender's written consent or as otherwise allowed by Law. This Power of Attorney shall be deemed a "Loan Document" for all intents and purposes as referenced in the Note.

2. With or without the occurrence of an Event of Default under the Note, Borrower irrevocably appoints Lender (and all Representatives designated by Lender), with full power of substitution, as Borrower's true and lawful attorney-in-fact with full power and authority in the place and stead of Borrower and in the name of Borrower or in its own name, from time to time in Lender's discretion, to take any and all appropriate actions and to execute and deliver any and all documents and instruments which may be necessary or desirable to accomplish the purposes of the Note and each of the other Loan Documents. Without limiting the generality of the foregoing, Borrower hereby grants to Lender the power and right, on behalf of Borrower, without further notice to or assent by Borrower, at any time, to do the following:

   (a) execute such security agreements, invoices, notes, and related documentation as may be necessary for Borrower to acquire, refinance, or sell any Collateral (including any Units secured or to be secured by Advances made thereon);

   (b) execute all documents necessary for Lender to perfect or secure its interest in the Collateral;

   (c) make, settle, and adjust claims under policies of insurance, and endorse any check, draft, instrument, or other item of payment for the proceeds of such policies of insurance, and make all determinations and decisions with respect to such policies of insurance;

   (d) endorse the name of Borrower upon any document, instrument, certificate, evidence of title, state registration documents, trust receipt, checks or other items of payment, or any related or similar documents, in each case as necessary to pay for or protect the Collateral, including, without limitation, any agreements between Borrower and any global positioning satellite company;

   (e) endorse the name of Borrower upon any items of payment or proceeds of any Collateral (including any Units constituting Collateral), and to deposit the same to the account of Lender on account of Borrower's Liabilities under the Note and the other Loan Documents;

   (f) endorse the name of Borrower upon any chattel paper, document, instrument, invoice, freight bill, bill of lading, or similar document or agreement relating to any Collateral;

   (g) use the information recorded on or contained in any data processing equipment, computer hardware, or software relating to any Collateral to which Borrower has access;

   (h) pay or discharge any taxes, liens, security interests, or other encumbrances levied or placed on or threatened against Borrower or any of the Collateral;

   (i) communicate with any party to any contract with regard to the assignment of the right, title, and interest of Borrower in and under such contract and/or the Collateral, and other matters relating thereto;

   (j) contact any third parties and disclose and/or receive any Borrower information, including, without limitation, information or data in Borrower's application for credit with Lender, the Note, or Borrower's Credit Line, in each case for the purpose of, among other things, preserving Lender's security interest in the Collateral and ensuring the satisfaction of Borrower's Liabilities under the Note and the other Loan Documents; and

   (k) do all other things reasonably necessary to satisfy Borrower's Liabilities under the Note and the other Loan Documents.

3. Upon the occurrence of an Event of Default under the Note, Borrower irrevocably appoints Lender (and all Representatives designated by Lender), with full power of substitution, as Borrower's true and lawful attorney-in-fact with full power and authority in the place and stead of Borrower and in the name of Borrower or in its own name, from time to time in Lender's discretion, to do the following:

   (a) demand, collect, accept receipt for, settle, compromise, adjust, foreclose, or realize upon any of the Collateral, in each case in such manner as Lender may determine;

   (b) file or prosecute any claim, litigation, suit, petition, writ, or proceeding in any court of competent jurisdiction or before any arbitrator or other neutral, or take any other action otherwise deemed appropriate by Lender for the purpose of collecting any and all such moneys due to



EXHIBIT
5

PAG-B0078

Borrower, whenever payable, and to enforce any other right in respect of the Collateral, including, without limitation, confessing to or consenting to judgments, writs of replevin or possession, and/or any equitable relief in favor of Lender or its Affiliates;

(c) file or prosecute all proofs of claim against any account debtor on behalf of Borrower; and

(d) notify the United States Postal Service of a change in address for the delivery of Borrower's mail to an address designated by Lender, and to receive Borrower's mail on behalf of Borrower.

4. Any provision of this Power of Attorney that is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability, without rendering invalid or unenforceable the remaining provisions of this Power of Attorney or affecting the validity or enforceability of any provision of this Power of Attorney in any other jurisdiction. Borrower hereby ratifies, to the extent permitted by Law, all that Lender or its designated Representatives shall lawfully do or cause to be done by virtue hereof, whether such actions were done before or after the actual execution date of this Power of Attorney. The rights and privileges set forth herein shall be deemed supplemental and in addition to any rights and privileges to which Lender or any other Person may be entitled under the Note or any other Loan Document. A facsimile or photocopied reproduction of any signature on this Power of Attorney shall be deemed an original signature for all intents and purposes.

WHEREFORE, Borrower, by its duly authorized representative, has executed this Power of Attorney on the date set forth below.

BORROWER:

Premier Group Autos LLC DBA Overfinch Miami

By: _____

Name: James Michael C Blackburn

Title: Manager

Date: 4.18.19

STATE OF __FLORIDA__ )
                                          ) SS:
COUNTY OF __BROWARD__ )

Before me, a Notary Public in and for said County and State, personally appeared   James Michael C Blackburn known to me to be the Manager of   Premier Group Autos LLC DBA Overfinch Miami who acknowledged the execution of the foregoing Power of Attorney, and who, having been duly sworn, states that any representations contained therein are true.

Witness my hand and Notarial Seal this _18_ day of _April_, 20_19_.

Notary Signature _____

Notary Name (Printed) __ARTURO MAYORAL__

My Commission Expires: _10/11/2021_         County of Residence: __BROWARD__



Notary Public State of Florida
Arturo Mayoral
My Commission GG 150838
Expires 10/11/2021

PAG-B0079

### POWER OF ATTORNEY
(Entity/Partnership)

This Power of Attorney is executed by the undersigned borrower ("Borrower") and delivered to NextGear Capital, Inc. ("Lender") pursuant to that certain Demand Promissory Note and Loan and Security Agreement by and between Borrower and Lender (the "Note"). Capitalized terms used herein but not defined herein shall have the respective meanings as set forth in the Note (such meanings to be equally applicable to both the singular and plural forms of the terms defined). Any capitalized terms used herein, but not otherwise defined herein or in the Note, as the case may be, shall have the meanings ascribed to them in the UCC.

1. No Person to whom this Power of Attorney is presented, as authority for Lender to take any action described below, shall be required to inquire into or seek confirmation from Borrower as to the authority of Lender to take any action described below, or as to the existence of or fulfillment of any condition to this Power of Attorney, which is intended to grant to Lender unconditionally the authority to take and perform the actions described below. Borrower irrevocably waives any right that it may have, now or at any time in the future, to commence any claim, litigation, suit, petition, writ, or proceeding in any court of competent jurisdiction or before any arbitrator or other neutral, against any Person acting in reliance upon or otherwise acknowledging any power or authority granted by Borrower under this Power of Attorney. The Power of Attorney granted hereby is coupled with an interest and may not be revoked or canceled by Borrower without Lender's written consent or as otherwise allowed by Law. This Power of Attorney shall be deemed a "Loan Document" for all intents and purposes as referenced in the Note.

2. With or without the occurrence of an Event of Default under the Note, Borrower irrevocably appoints Lender (and all Representatives designated by Lender), with full power of substitution, as Borrower's true and lawful attorney-in-fact with full power and authority in the place and stead of Borrower and in the name of Borrower or in its own name, from time to time in Lender's discretion, to take any and all appropriate actions and to execute and deliver any and all documents and instruments which may be necessary or desirable to accomplish the purposes of the Note and each of the other Loan Documents. Without limiting the generality of the foregoing, Borrower hereby grants to Lender the power and right, on behalf of Borrower, without further notice to or assent by Borrower, at any time, to do the following:

   (a) execute such security agreements, invoices, notes, and related documentation as may be necessary for Borrower to acquire, refinance, or sell any Collateral (including any Units secured or to be secured by Advances made thereon);

   (b) execute all documents necessary for Lender to perfect or secure its interest in the Collateral;

   (c) make, settle, and adjust claims under policies of insurance, and endorse any check, draft, instrument, or other item of payment for the proceeds of such policies of insurance, and make all determinations and decisions with respect to such policies of insurance;

   (d) endorse the name of Borrower upon any document, instrument, certificate, evidence of title, state registration documents, trust receipt, checks or other items of payment, or any related or similar documents, in each case as necessary to pay for or protect the Collateral, including, without limitation, any agreements between Borrower and any global positioning satellite company;

   (e) endorse the name of Borrower upon any items of payment or proceeds of any Collateral (including any Units constituting Collateral), and to deposit the same to the account of Lender on account of Borrower's Liabilities under the Note and the other Loan Documents;

   (f) endorse the name of Borrower upon any chattel paper, document, instrument, invoice, freight bill, bill of lading, or similar document or agreement relating to any Collateral;

   (g) use the information recorded on or contained in any data processing equipment, computer hardware, or software relating to any Collateral to which Borrower has access;

   (h) pay or discharge any taxes, liens, security interests, or other encumbrances levied or placed on or threatened against Borrower or any of the Collateral;

   (i) communicate with any party to any contract with regard to the assignment of the right, title, and interest of Borrower in and under such contract and/or the Collateral, and other matters relating thereto;

   (j) contact any third parties and disclose and/or receive any Borrower information, including, without limitation, information or data in Borrower's application for credit with Lender, the Note, or Borrower's Credit Line, in each case for the purpose of, among other things, preserving Lender's security interest in the Collateral and ensuring the satisfaction of Borrower's Liabilities under the Note and the other Loan Documents; and

   (k) do all other things reasonably necessary to satisfy Borrower's Liabilities under the Note and the other Loan Documents.

3. Upon the occurrence of an Event of Default under the Note, Borrower irrevocably appoints Lender (and all Representatives designated by Lender), with full power of substitution, as Borrower's true and lawful attorney-in-fact with full power and authority in the place and stead of Borrower and in the name of Borrower or in its own name, from time to time in Lender's discretion, to do the following:

   (a) demand, collect, accept receipt for, settle, compromise, adjust, foreclose, or realize upon any of the Collateral, in each case in such manner as Lender may determine;

   (b) file or prosecute any claim, litigation, suit, petition, writ, or proceeding in any court of competent jurisdiction or before any arbitrator or other neutral, or take any other action otherwise deemed appropriate by Lender for the purpose of collecting any and all such moneys due to



**EXHIBIT**

**6**

Borrower, whenever payable, and to enforce any other right in respect of the Collateral, including, without limitation, confessing to or consenting to judgments, writs of replevin or possession, and/or any equitable relief in favor of Lender or its Affiliates;

(c) file or prosecute all proofs of claim against any account debtor on behalf of Borrower; and

(d) notify the United States Postal Service of a change in address for the delivery of Borrower's mail to an address designated by Lender, and to receive Borrower's mail on behalf of Borrower.

4. Any provision of this Power of Attorney that is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability, without rendering invalid or unenforceable the remaining provisions of this Power of Attorney or affecting the validity or enforceability of any provision of this Power of Attorney in any other jurisdiction. Borrower hereby ratifies, to the extent permitted by Law, all that Lender or its designated Representatives shall lawfully do or cause to be done by virtue hereof, whether such actions were done before or after the actual execution date of this Power of Attorney. The rights and privileges set forth herein shall be deemed supplemental and in addition to any rights and privileges to which Lender or any other Person may be entitled under the Note or any other Loan Document. A facsimile or photocopied reproduction of any signature on this Power of Attorney shall be deemed an original signature for all intents and purposes.

WHEREFORE, Borrower, by its duly authorized representative, has executed this Power of Attorney on the date set forth below.

**BORROWER:**

Premier Group Autos LLC DBA Overfinch Miami

By:
Name:   Edward Anthony Kessler
Title:   Manager
Date:   4.18.19

STATE OF  _Florida_         )
                           )  SS:
COUNTY OF  _Broward_        )

Before me, a Notary Public in and for said County and State, personally appeared   Edward Anthony Kessler known to me to be the Manager of  Premier Group Autos LLC DBA Overfinch Miami who acknowledged the execution of the foregoing Power of Attorney, and who, having been duly sworn, states that any representations contained therein are true.

Witness my hand and Notarial Seal this _18_ day of _April_, 20_19_

Notary Signature

Notary Name (Printed)   ARTURO MAYORAL

My Commission Expires: _10/11/2021_         County of Residence: _BROWARD_

Notary Public State of Florida
Arturo Mayoral
My Commission GG 150838
Expires 10/11/2021

BUSINESS LOAN AGREEMENT

MADE: the 11th Day of March 2019

BETWEEN

PREMIER GROUP AUTOS, LLC, a Florida Limited Liability Corporation

DBA – "OVERFINCH MIAMI"

(hereinafter called "BORROWER")

AND

EDWARD P. KESSLER & KRISTINE E. KESSLER (hereinafter called "LENDER")

WHEREAS, the LENDER promises to loan the BORROWER and the BORROWER promises to repay this principal amount to the LENDER.  The LOAN amount will be:

*THREE HUNDRED THOUSAND DOLLARS AND ZERO CENTS*

*$300,000.00*

*@ $i^{(12)}$ = 8.00% annual which is equivalent to $i^{(12)}/12$ = 0.666% per month*

Lawful money of the United States of America, together with interest thereon at the rate provided in the LOAN until the indebtedness is paid in full and in the manner and at the times therein set forth.

A.   TRANSER OF FUNDS
     a.   The funds will be wired per the wiring instructions presented in various emails.

B.   PAYMENTS
     a.   The BORROWER will pay the LENDER interest payments on the 1st of every month starting on May 1st, 2019
     b.   Per the agreement, the interest on the principal is due on the 1st of every month.
     c.   The BORROWER has the right to either write a check or wire the interest payments to the LENDER.
     d.   The LENDER will, if not already, have a wiring agreement set up with a bank in order to receive the wire transfers.

BORROWER Initials E.K /_____      LENDER Initials _____ /_____      Page 1 of 4

**EXHIBIT**

**7**

PAG-B0082

C.  PURPOSE OF LOAN
   a.  The LOAN was lent to the BORROWER in order to purchase two (2) new Overfinch Range Rovers in order to increase the inventory of the fleet owned by the BORROWER.  BORROWER will use this loan strictly for business transactions in "revolving" its inventory for the betterment of the business.
   b.  The BORROWER is to use this money for only purchasing vehicles in which will be reinvested into a new vehicle once a current vehicle has been sold.

D.  DEFAULT
   a.  Notwithstanding anything to the contrary in this Agreement, if the BORROWER defaults in the performance of any obligation under this Agreement, then the LENDER may declare the principal amount owing and interest due under this Agreement at the time to be immediately due and payable.
   b.  If the BORROWER defaults and does not meet the financial statues or number of car sales expected to repay the LENDER the principal amount, but has inventory (Overfinch Range Rover) available, the title of the vehicle/s will be transferred from the BORROWER to the LENDER in order for the LENDER to acquire an "asset" as a substitute for repayments.  This will give LENDER opportunity to sell vehicle on its own to receive the principal in a different route.

E.  BINDING EFFECT
   a.  This Agreement will pass to the benefit of an be binding upon the respective heirs, executors, administrators, successors and permitted assigns of the Borrower and Lender.  The BORROWER waives presentment for payment, notice of non-payment, protest, and notice of protest.

F.  LOAN TERMS REVISIT
   a.  This LOAN agreement will be revisited by all parties in OCTOBER of the 2019 fiscal year.
   b.  Terms will depend on the performance of the BORROWER throughout the year.
   c.  Terms will be negotiated by all parties on whether all or some of the principal will be repaid by the end of the 2019 fiscal year.  The option of keeping the money in the company will be on the table as well.
   d.  Whatever decision is made, all parties will have to agree on the terms, but seniority will go to the LENDER.

G.  EVENT OF ADDITIONAL FUNDING REQUESTS FROM DIFFERENT LENDERS
   a.  In the event the BORROWER askes for more loans from different parties, the LENDER of this loan shall be made aware of any requests.  The LENDER of this

BORROWER Initials F.A.K /_____          LENDER Initials _____/_____          Page 2 of 4

loan will distinguish what path it would like to take as an effect to a choice made by the BORROWER.

H.   SENIORITY

    a.   This loan will have seniority over other loans already put in the business by the current owners of the business.

    b.   The owners will have to repay this principal prior to repaying the principal of their own loans, unless the LENDER of this agreement agrees with any of those requests/transactions in writing.

    c.   This loan will also have seniority over any stock holder's contributions (equity) in the company as it stands before the processing of this loan.  The owners of the BORROWER will know draw contribution money out of the company, and not

BORROWER Initials _E A K_ /_____          LENDER initials _____/_____          Page 3 of 4

WITNESS and due execution hereof the day and year first above written.

BORROWER

WITNESS:                                          PREMIER GROUP AUTOS, LLC
                                                  DBA: OVERFINCH MIAMI

_____                   By : _____
                                                  Edward A. Kessler – Member/Manager

_____                   By : _____
                                                  James Blackburn – Member/Manager

LENDER:

WITNESS:

_____                   By: _____
                                                  Edward P. Kessler

_____                   By: _____
                                                  Kristine E. Kessler

BORROWER Initials E A K / ⟋          LENDER Initials _____ / _____          Page 4 of 4

PAG-B0085

PAG-B0086

BUSINESS LOAN AGREEMENT



Exhibit _21_
Witness_____
Date_____ ETL

MADE: the 11th Day of March 2019

BETWEEN

PREMIER GROUP AUTOS, LLC, a Florida Limited Liability Corporation

DBA – "OVERFINCH MIAMI"

(hereinafter called "BORROWER")

AND

EDWARD P. KESSLER & KRISTINE E. KESSLER (hereinafter called "LENDER")

WHEREAS, the LENDER promises to loan the BORROWER and the BORROWER promises to repay this principal amount to the LENDER. The LOAN amount will be:

*THREE HUNDRED THOUSAND DOLLARS AND ZERO CENTS*

*$300,000.00*

*@ $i^{(12)} = 8.00\%$ annual which is equivalent to $i^{(12)}/12 = 0.666\%$ per month*

Lawful money of the United States of America, together with interest thereon at the rate provided in the LOAN until the indebtedness is paid in full and in the manner and at the times therein set forth.

A.  TRANSER OF FUNDS
    a.  The funds will be wired per the wiring instructions presented in various emails.

B.  PAYMENTS
    a.  The BORROWER will pay the LENDER interest payments on the 1st of every month starting on May 1st, 2019
    b.  Per the agreement, the interest on the principal is due on the 1st of every month.
    c.  The BORROWER has the right to either write a check or wire the interest payments to the LENDER.
    d.  The LENDER will, if not already, have a wiring agreement set up with a bank in order to receive the wire transfers.

BORROWER Initials _EAK_ /_____          LENDER Initials _____/_____          Page 1 of 4

C.    PURPOSE OF LOAN

    a.   The LOAN was lent to the BORROWER in order to purchase two (2) new Overfinch Range Rovers in order to increase the inventory of the fleet owned by the BORROWER.  BORROWER will use this loan strictly for business transactions in "revolving" its inventory for the betterment of the business.

    b.   The BORROWER is to use this money for only purchasing vehicles in which will be reinvested into a new vehicle once a current vehicle has been sold.

D.    DEFAULT

    a.   Notwithstanding anything to the contrary in this Agreement, if the BORROWER defaults in the performance of any obligation under this Agreement, then the LENDER may declare the principal amount owing and interest due under this Agreement at the time to be immediately due and payable.

    b.   If the BORROWER defaults and does not meet the financial statues or number of car sales expected to repay the LENDER the principal amount, but has inventory (Overfinch Range Rover) available, the title of the vehicle/s will be transferred from the BORROWER to the LENDER in order for the LENDER to acquire an "asset" as a substitute for repayments.  This will give LENDER opportunity to sell vehicle on its own to receive the principal in a different route.

E.    BINDING EFFECT

    a.   This Agreement will pass to the benefit of an be binding upon the respective heirs, executors, administrators, successors and permitted assigns of the Borrower and Lender.  The BORROWER waives presentment for payment, notice of non-payment, protest, and notice of protest.

F.    LOAN TERMS REVISIT

    a.   This LOAN agreement will be revisited by all parties in OCTOBER of the 2019 fiscal year.

    b.   Terms will depend on the performance of the BORROWER throughout the year.

    c.   Terms will be negotiated by all parties on whether all or some of the principal will be repaid by the end of the 2019 fiscal year.  The option of keeping the money in the company will be on the table as well.

    d.   Whatever decision is made, all parties will have to agree on the terms, but seniority will go to the LENDER.

G.    EVENT OF ADDITIONAL FUNDING REQUESTS FROM DIFFERENT LENDERS

    a.   In the event the BORROWER asks for more loans from different parties, the LENDER of this loan shall be made aware of any requests.  The LENDER of this

loan will distinguish what path it would like to take as an effect to a choice made by the BORROWER.

H.   SENIORITY

   a.   This loan will have seniority over other loans already put in the business by the current owners of the business.
   b.   The owners will have to repay this principal prior to repaying the principal of their own loans, unless the LENDER of this agreement agrees with any of those requests/transactions in writing.
   c.   This loan will also have seniority over any stock holder's contributions (equity) in the company as it stands before the processing of this loan.  The owners of the BORROWER will know draw contribution money out of the company, and not

WITNESS and due execution hereof the day and year first above written.

BORROWER

WITNESS:

PREMIER GROUP AUTOS, LLC
DBA: OVERFINCH MIAMI

By : _____
Edward A. Kessler – Member/Manager

By : _____
James Blackburn – Member/Manager

LENDER:

WITNESS:

By: _____
Edward P. Kessler

By: _____
Kristine E. Kessler

BORROWER Initials E.A.K / _____    LENDER Initials _____ / _____    Page 4 of 4

**New iMessage**          Cancel

To: James Blackburn







   iMessage  

      

**From:** James Blackburn <james@premieraviationholdings.com>
**To:** "Mayoral, Arturo (CAI - Carmel)" <Arturo.Mayoral@coxautoinc.com>
**Subject:** Re: New Application Premier Group Autos LLC (New App Pending)
**Date:** Thu, 31 Jan 2019 19:18:35 +0000
**Importance:** Normal
**Inline-Images:** image001.png

---

Hi Arturo,

Ed currently resides in PA but is in the process of looking for a place in Florida. He is an owner in the business and is head of operations. He will be in control of logistics and daily operational procedures.

The $225,000 & $250,000 in assets is the first vehicle we have bought outright and own and the cash we have invested in the dealership. Ed and myself have injected $475,000 into the dealership of our own cash and is not subject to any outstanding debt. The $95,000 in liabilities are marketing campaigns and equipment purchases that we have committed to.

Ed's social security card will follow in a separate email.

Very best regards,

James Blackburn
President and Chief Executive


Premier Aviation Holdings LLC
1500 Cordova Road, Suite 206,
Fort Lauderdale, Florida, 33316

Cell: 954 232 7661
Office: 954 440 0717
Email: info@premieraviationholdings.com
Web: www.premieraviationholdings.com

Confidentiality Notice: This e-mail, and any attachment to it, contains privileged and confidential information intended only for the use of the individual(s) or entity named on the e-mail. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that reading this e-mail is strictly prohibited. If you have received this e-mail in error, please immediately return it to the sender and delete it from your system.

On Jan 31, 2019, at 13:38, Mayoral, Arturo (CAI - Carmel) <Arturo.Mayoral@coxautoinc.com> wrote:

James, please see below.
Regards,



Exhibit 32
Witness Kessler
Date 10/29/21 FTL

Arturo F. Mayoral
Sales Executive.
Arturo.mayoral@coxautoinc.com
m: 954.607.7222 | f: 855.619.0747

---

**From:** Barnes, Michael (CAI - Carmel) <michael.barnes@coxautoinc.com> on behalf of MDLending <ngc.mdlending@coxautoinc.com>
**Sent:** Thursday, January 31, 2019 1:36 PM
**To:** Mayoral, Arturo (CAI - Carmel)
**Subject:** New Application Premier Group Autos LLC (New App Pending)

Hello Arturo,

Lending is needing the following prior to a credit decision being made:

FOR THE FEIDL TO ADDRESS:

1. SSN Card-The SSN for Edward Kessler is reporting back as incorrect. Please provide a copy of his SSN Card for verification purposes.

2. INFORMATION-Edward Kessler driver's license and home address on the application both list Pennsylvania while the dealership is located in the state of Florida. Please help me understand what will Edward's day to day functions be at the dealership?

FOR THE CLIENT TO ADDRESS:

1. The client provided a balance sheet that listed $225,000 in current assets and $250,000 in other assets. Please help me understand what these assets are?

2. The client provided a balance sheet that lists $475,000 in assets supported by $95,000 in liabilities indicating that $380,000 will be put into the dealership? Please help me understand where specifically this money is coming from, is it subordinated by any debt, what assets will this money be supporting?

Thank You,

**Michael S. Barnes**
Sr. Commercial Lending Underwriter – Major Dealer
Financial Solutions

11799 North College Ave
Carmel, IN 46032
P: 317.975.2607
<image001.png>
Cox Automotive



**Edward Kessler**

| | |
|---|---|
| **From:** | Adam Zhamukhanov <adam@adamzlegal.com> |
| **Sent:** | Tuesday, March 26, 2019 7:20 PM |
| **To:** | Edward Kessler |
| **Subject:** | RE: Agreement |

Ed,

I didn't go over all of the documents, but here is a quick summary of the points you were asking about:

1. Granting NextGear Capital, Inc. a security interest in "all of Borrower's assets and properties, wherever located…including all equipment…all vehicles…all vehicle parts…all inventory, [etc] now owned or hereafter acquired. – **Premier Group Autos LLC.**

2. **Personal Guarantee:** You are personally guaranteeing the loan and are liable if the company cannot repay/defaults.

3. **You are giving the power of attorney to NextGear Capital, Inc., which will allow them to do pretty much anything, including:**

   a. to take any and all actions necessary to execute and deliver any and all loan documents and instruments;

   b. **sell any of the collateral, e.g., all of Borrower's assets and properties;**

   c. do anything and everything necessary to satisfy the borrower's liabilities under the note and other loan documents.

**An advancement of money is being made directly to Ready Logistics, for which Premier Group Autos LLC will be liable and will have to repay.**

Call me if you have any questions.

**Adam Zhamukhanov, Esq.**
Adam Legal, LLC
2326 S. Congress Ave. Suite 2D,
Palm Springs, FL 33406
**Tel:** (386) 627-0746 | **Email:** Adam@adamzlegal.com

*Confidentiality Statement: This e-mail and any attachments are for the exclusive and confidential use of the intended recipient. If you received this in error, please do not read, distribute, or take action in reliance upon this message. Instead, please notify us immediately by return e-mail and promptly delete this message and its attachments from your computer system. We do not waive attorney-client or work product privilege by the transmission of this message*

*Legal advice: Clients often have informal discussions with lawyers re the lawyer's sense of whether and how laws may apply. Those informal discussions do not constitute legal advice and should not be relied upon as such. The only way for someone to be assured by a lawyer in this firm regarding the foregoing is to (1) formally retain the firm, and (2) obtain a written research memo or legal opinion. Any purely verbal discussion on such matters is simply the lawyer's best (and unconfirmed) understanding and may not be relied upon.*

**From:** Edward Kessler <ek13@peaksolutionsllc.net>
**Sent:** Tuesday, March 26, 2019 6:57 PM



Exhibit 33
Witness Kessler
Date 10/29/21   ETL

**To:** Adam Zhamukhanov <adam@adamzlegal.com>
**Subject:** Agreement


Ed Kessler, MBA, PMP, PMI-SP
Peak Solutions III, LLC
C: (412) 527-8695



**OVERFINCH**
— NORTH AMERICA —

**Premier Group Autos LLC**
1500 Cordova Road
Suite 206
Fort Lauderdale, Florida 33316

**Post and email (james@premieraviationholdings.com)**

Our ref: Premier Auto
Your ref: Overfinch

08 November 2019

Dear sirs

**Overfinch Miami**

As per the discussions and terms of the distribution agreement, the minimum Overfinch product spend for the initial term of the agreement is $1.5 million. This was to be spread across 12 months in equal amounts. We are now in month 11 of the agreement and your Overfinch product spend thus far equates to approximately $557,326.74. In view of this and the fact that there aren't regular monthly orders being placed we write to provide you with 30 days' notice to terminate the distribution agreement. It shall therefore terminate on 8th December 2019.

Due to the recent transactions that we have become aware of relating to the financing of vehicles, we shall suspend all existing business / transactions with you and you should not trade under or using the Overfinch brand with immediate effect, pending the outcome of the investigations.

In respect of your use of the trading name 'Overfinch Miami' and any stationary and / marketing material bearing the use of the trading name and your contact details you should discontinue any use immediately, pending the outcome of the investigations, but in any event this should be returned to us or before midnight on 8th December 2019. Further, we are aware that you registered the domain name www.overfinchmiami.com. We kindly request that you arrange for the transfer of this domain to Overfinch North America Inc. As you are aware the Overfinch trademark is registered in United States of America in a number of classes and you are not licenced or authorised to use the Overfinch mark, without our consent.

Should you wish to discuss the content of this notice further, please respond in writing to leah.shah@overfinch.com and alex.sloane@overfinch.com .

Yours faithfully

**Overfinch North America Inc.**

Exhibit 34
Witness Kesslee
Date 10/29/21 ETL

Overfinch Product Development and Engineering Facility, 500 Stinson Drive, Danville, Virginia, 24540
Mailing/Billing address: Overfinch, PO Box 3355, Danville, VA 24543

T 1-866-5050-411  E inquiries@overfinch.com  W overfinch.com

PAG-B0565

Filing # 110321507 E-Filed 07/16/2020 09:44:11 AM

IN THE CIRCUIT COURT OF THE
SEVENTEENTH JUDICIAL CIRCUIT IN
AND FOR BROWARD COUNTY, FLORIDA

EDWARD KESSLER, individually and on
behalf of PREMIER GROUP AUTOS, LLC
d/b/a Overfinch Miami,

       Plaintiffs,

v.

JAMES BLACKBURN, individually;
KERRY KENWRIGHT, individually;
CITYLIFE SOCIAL, LLC; NAUTIC CREW
WORLDWIDE, LLC d/b/a Nautic Charters
d/b/a Nautic Charter Worldwide; AND
PREMIER WARRANTY CO. d/b/a CityLife
Social d/b/a CityLife Social App
Development d/b/a International Yacht
Company d/b/a Quiet Planes,

       Defendants.

_____/

CASE NO.: CACE 20-004101
DIVISION: 07
JUDGE: Jack Tuter

### PLAINTIFFS' NOTICE OF FILING REPORT OF INDEPENDENT ACCOUNTANT

    Plaintiffs, EDWARD KESSLER ("Kessler") and PREMIER GROUP AUTOS, LLC

("PGA"), by and through their undersigned counsel, hereby give notice of filing of the Report of

Independent Accountant, attached hereto at **Exhibit A.**



Exhibit 37
Witness Kessler
Date 10/29/21 ETL

**PAG-B0566**
KM000001

Case No. CACE 20-004101

Dated: July 16, 2020

BAST AMRON LLP
*Counsel for Plaintiffs*
SunTrust International Center
One Southeast Third Avenue, Suite 1400
Miami, FL 33131
Telephone: 305.379.7904
Facsimile: 305.379.7905
Email: bamron@bastamron.com
Email: jhart@bastamron.com
Email: dquick@bastamron.com

By: __/s/ Dana R. Quick_____
     Brett M. Amron, Esq. (FBN 148342)
     Jeremy J. Hart, Esq. (FBN 510645)
     Dana R. Quick, Esq. (FBN 0074402)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed with the

Florida Courts E-Filing Portal, which served a copy via automated e-service upon the all parties,

this 16th day of July, 2020.

By: __/s/ Dana R. Quick_____
     Dana R. Quick, Esq.

PAG-B0567
KM000002

IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

Case No. CACE 20004101

EDWARD KESSLER, et al,

    Plaintiff(s) / Petitioner(s)

v.

JAMES BLACKBURN, et al

    Defendant(s) / Respondent(s)

_____ /

REPORT OF INDEPENDENT ACCOUNTANT

BARRY MUKAMAL, CPA/PFS/ABV/CFE/CFF/CIRA

July 13, 2020



PAG-B0568
KM000003

## TABLE OF CONTENTS

|  | Page No. |
|---|---|
| **Introduction and Scope of Engagement** | 3 |
| **Professional Qualifications of Barry Mukamal** | 3 |
| **Background and Overview** | 4 |
| **Summary of Findings** | 7 |
| Discussion | 10 |
| Conclusion | 13 |

## EXHIBITS

| Exhibit 1 | Documents Considered |
|---|---|
| Exhibit 2 | PGA Liabilities |
| Exhibit 3 | Sources and Uses of Cash |
| Exhibit 4 | Detail of Payments Made to Blackburn Entities and Insiders |
| Exhibit 5 | Summary of American Express Card Charges |
| Exhibit 6 | Detail of Personal Expenses |

## ATTACHMENTS

| Attachment 1 | Curriculum Vitae |
|---|---|
| Attachment 2 | Testimony Record |
| Attachment 3 | Court's Order Appointing Accountant dated April 30, 2020 |
| Attachment 4 | Kessler – Blackburn Agreement dated November 5, 2018 |
| Attachment 5 | Overfinch America Distribution Agreement dated December 3, 2018 |
| Attachment 6 | Agreement between Edward Anthony Kessler and Premier Group Autos, LLC dated December 3, 2018 |
| Attachment 7 | Business Loan Agreement Edward P. Kessler and Kristine E. Kessler dated March 11, 2019 |
| Attachment 8 | NextGear Capital Agreement dated April 18, 2019 |



Kapila/Mukamal
CPAs Forensic and Insolvency Advisors

PAG-B0569

KM000004

## INTRODUCTION AND SCOPE OF ENGAGEMENT

1. Barry E. Mukamal, CPA of KapilaMukamal, LLP (hereinafter referred to as "KM") was appointed by this Court to "prepare the Reports as that term is defined in the Status Conference Order, and any schedules, spreadsheets or supplemental reports as needed to do so" ("Report") to include: a) an accounting of all assets, whether liquid or not, and liabilities of PGA[1]; and b) a schedule of all of PGA's expenditures of $2,500 or more, from PGA's inception through the present, along with an explanation for each expenditure.[2]

2. This Report sets forth KM's opinions based on the information available and the analyses KM has performed through the date of this Report. KM reserves the right to supplement this Report as necessary, and to respond to any other relevant information that becomes available between the date of this Report and, in the event required by the Court, the date that I may testify in this matter.

## PROFESSIONAL QUALIFICATIONS OF BARRY E. MUKAMAL

3. I, Barry E. Mukamal, am Co-Managing Partner at Kapila Mukamal, LLP. I am a Certified Public Accountant ("CPA") licensed in Florida. My Curriculum Vitae is attached hereto as Attachment 1 and includes additional details of my professional qualifications and experience.

4. I possess over 40 years of experience in the public accounting profession and financial services industry. I am accredited in business valuation ("ABV") and hold accreditation as

---

[1] Premier Group Autos, LLC

[2] See Attachment 3.

Page 3 of 13

*Kapila*/Mukamal

CPAs, Forensic and Insolvency Advisors

PAG-B0570

KM000005

a personal financial specialist ("PFS"), certified fraud examiner ("CFE"), and certified in financial forensics ("CFF") and am a Certified Insolvency and Restructuring Advisor ("CIRA"). Areas of expertise include financial accounting, business valuation, forensic (investigative) accounting in litigation proceedings, economic damages, bankruptcy and insolvency matters. I have been appointed and currently serve as a Bankruptcy Panel Trustee in the Southern District of Florida. My prior experience includes consulting and expert testimony in numerous arbitration and litigation matters. A list of cases in which I have previously provided expert testimony is also included in Attachment 2. I expend approximately 50% of my billable hours for expert testimony work, of which approximately 60% pertains to plaintiff representation, and approximately 40% pertains to defense representation.

5. Other professionals at KapilaMukamal, LLP have worked on this engagement under my supervision and direction. I have reviewed and am familiar with all such procedures performed and work inventory prepared. Fees for professional services provided are based on hours actually expended by each assigned staff member extended by the standard hourly billing rate for that individual. Hourly billing rates for professional staff working on this matter range from $190 to $550. Fees are not contingent on the outcome of this matter.

## BACKGROUND AND OVERVIEW

6. PGA was formed by and between Edward A. Kessler ("Kessler" or "Plaintiff") and James Blackburn ("Blackburn" or "Defendant") pursuant to an agreement dated November 5, 2018 (the "Agreement") see Attachment 4. Material contracts entered into by PGA to carry

Page 4 of 13



out its business plan to sell aftermarket Overfinch-branded Land Rover and Range Rover vehicles included:

    a. Distribution agreement with Overfinch America dated December 3, 2018 (Attachment 5);

    b. Loan Agreement for $160,000 between Kessler and PGA dated December 3, 2018 (the "EAK Loan") (Attachment 6);

    c. Business Loan Agreement for $300,000 between PGA and Edward P. Kessler and Kristine Kessler dated March 11, 2019 ("Kessler Sr. Loan") (Attachment 7);

    d. Demand Promissory Note and Loan and Security Agreement between PGA and NextGear Capital, Inc. dated April 18, 2019 (the "NextGear Loan")[3] to finance vehicle purchases (Attachment 8).

7. The EAK Loan, and an additional $20,356 funded by Kessler in January 2019, provided the funds to purchase the first Overfinch vehicle thereby commencing PGA's business operations. Proceeds from the sale of the first vehicle financed by the EAK Loan were deposited into the PGA bank account..

8. Funds provided to PGA via the Kessler Sr. Loan were used to purchase two additional vehicles. PGA paid interest of $2,000 monthly[4] from May to December 2019 to Edward P. Kessler on the $300,000 Kessler Senior Loan. No interest was paid on the Kessler Sr. Loan balance in 2020.

---

[3] Plaintiff has alleged that his signature was forged on the NextGear Loan documents.

[4] Equal to 8% interest on the $300,000 loan, consistent with the Kessler Sr. Loan Agreement.



Kapila/Mukamal

CPAs, Forensic and Insolvency Advisors

PAG-B0572

KM000007

9.  The NextGear loan funds were also used to purchase vehicles.  PGA repaid partial funds to NextGear between April 2019 and September 2019.  The information provided to KM indicates that PGA did not make any further repayments to NextGear after September 19, 2019.[5]

10. Kessler funded another $25,000 into PGA on May 31, 2019.  This funding does not appear to have been evidenced by a note as with the EAK Loan.[6]

11. There was transactional activity in the PGA bank accounts maintained at HSBC from February 7, 2019 to April 20, 2020.[7]

12. There was transactional activity on the PGA American Express credit card account[8] from December 20, 2018 to May 27, 2019.[9]

13. The records provided indicate that PGA made its final vehicle sale in October 2019.

14. By the end of its first thirteen months of operations, PGA had been named as a defendant in three separate lawsuits brought by third parties seeking repayment of over $492,000.[10]

---

[5] NextGear filed a lawsuit against PGA seeking the return of over $357,000 in unpaid funds. This is addressed further below.

[6] Kessler also funded an additional $7,000 into PGA in September 2019 which was reflected on the PGA general ledger as being returned to Kessler approximately two weeks later.

[7] HSBC checking account ending in 3716 and HSBC savings account ending in 3724. KM was advised by Mr. Blackburn that there were no PGA bank accounts other than the aforementioned HSBC accounts.

[8] Blackburn and Kessler each had an American Express card for the American Express account ending in 1005.

[9] American Express did not allow any further charges after this date due to non-payment of over $100,000 in prior American Express charges.

[10] American Express National Bank v. Edward Kessler and Premier Group Autos, LLC [Case No. CACE-19-021456, Broward County Circuit Court] filed October 16, 2019 for $109,497.52.
Naples Motorsports, Inc. v. Premier Group Autos, LLC [Case No. CACE-19-022213] filed October 27, 2019 for $25,000.00.
NextGear Capital, Inc. v. Premier Group Autos, LLC [Case No. 1:20-CV-354, US District Court for the Southern District of Indiana] filed December 18, 2019 for $357,588.73.

Page 6 of 13



## SUMMARY OF FINDINGS

15. Based on the information analyzed by KM, the company does not appear to have any remaining identifiable assets.[11]

16. PGA's liabilities amount to $1,009,499. PGA also may be obligated for up to an additional $230,000 in potential liabilities. *See* **Exhibit 2 – PGA Liabilities** for detail.

17. KM, in accordance with the court's instruction, identified those expenditures greater than $2,500. A list of those expenditures in their summary categories identified by KM are attached as **Exhibit 3 – Sources and Uses of Cash**.

18. Excluding cash outflows from the company which could not be identified as having a business purpose[12], PGA posted a modest profit. In the short time of its existence, PGA realized $2.6 million in sales revenue reduced by almost $2.2 million in vehicle purchases and another $340,000 in expenses assumed or identified by KM to be related to PGA's business operations resulting in estimated net income related to identified business operations of $65,610 as reflected in Table #1 below.

---

The aggregate $492,068.25 sought by the Plaintiffs in the lawsuits does not include pre-judgment interest, post-judgment interest or treble damages (sought by Naples Motorsports, Inc.).

[11] Amounts that might otherwise be classified as receivables for an ongoing business operation (such as disbursements to Blackburn entities) are considered, for purposes of this report, to be uncollectible by PGA. Those amounts are detailed further below.

[12] KM's inability to identify the business purpose of the cash outflows referenced is a result of KM not being provided with supporting documentation evidencing the business purpose for those expenditures.

Page 7 of 13



**Kapila/Mukamal**

CPAs Forensic and Insolvency Advisors

**PAG-B0574**
KM000009

*Table #1 – Premier Group Autos Estimated Net Income*

*for December 1, 2018 to April 20, 2020* [13] [14] [15]

| Revenue | | |
|---|---|---|
| Vehicle Sales Revenues [2] | | 2,605,007 |
| | | |
| Expenses | | |
| HSBC Account | | |
| Vehicle Purchases | (2,198,927) | |
| Events, Shows & Marketing | (120,342) | |
| Miscellaneous Business Expense | (50,920) | |
| Vehicle Transport, Towing, & Delivery | (41,540) | |
| Professional Fees | (40,966) | |
| Interest Expense (Kessler Sr. Loan) | (16,000) | |
| Wages/ Commissions | (15,492) | |
| Vehicle Detailing, Repair & Maintenance | (13,811) | |
| Garage Insurance | (11,745) | |
| Other Vehicle Expenses (Tags, Gas, Parking & Tolls) | (9,440) | |
| Business Expenses - Edward A. Kessler | (7,094) | |
| Subtotal: Expenses *(HSBC Account)* | (2,526,278) | |
| Expenses *(Amercian Express Account)* | (13,119) | |
| Total Expenses | | (2,539,397) |
| Net Income | | 65,610 |
| | | |
| Notes: | | |
| 1) Source | Exhibit 3 - Sources and Uses of Cash | | |
| 2) Excludes $255,000 customer deposits for which there was no evidence of vehicle purchase or sales. | | |

---

[13] April 20, 2020 was the last day of banking activity as reflected on the HSBC bank statements.

[14] KM was advised by PGA bookkeeper, Donna DeGroff, that PGA's 2018 activity was recorded under Blackburn entities Nautic Crew or Premier Warranty. To the extent that any PGA-related transactions were recorded under those or any other entities, such amounts would modify KM's findings.

[15] Excludes any cash outflows (i.e. – Expenses) for which a business purpose was not identified. See Exhibit 3 – Sources and Uses of Cash.

Page 8 of 13



Kapila/Mukamal

CPAs  Forensic and Insolvency Advisors

PAG-B0575

KM000010

19. PGA disbursed in excess of $1.17 million, and also incurred in excess of $96,000 in unpaid American Express card charges, for which no support as to business purpose has been provided. [16]

20. Included in the $1.17 million noted above, were over $930,000 in funds paid to Blackburn controlled entities or for Blackburn-related expenditures as summarized in Table #2 below. In comparison, PGA paid just under $7,100 to Kessler – an amount which *was* supported by expense reports submitted to PGA by Kessler.

---

[16] *See* Table 2, Footnote 2.

Page 9 of 13

*Kapila/Mukamal*

CPAs, Forensic and Insolvency Advisors

PAG-B0576

KM000011

*Table #2 – PGA Payments to or for the benefit of PGA Owners*

| | | Blackburn [5] | Kessler [6] | Total |
|---|---|---|---|---|
| Nautic Crew Worldwide, LLC | [1] | $  354,990 | $        - | $  354,990 |
| James M Blackburn | | 150,560 | - | 150,560 |
| Samuel Blackburn | | 172,475 | - | 172,475 |
| Nicholas R Blackburn | | 7,037 | - | 7,037 |
| Blackburn Entities & Insiders - HSBC Acct | [2] | 685,062 | - | 685,062 |
| City Life Social, LLC - Amex Acct | [3] | 48,690 | - | 48,690 |
| Blackburn Entities & Insiders -Total | | 733,752 | - | 733,752 |
| | | | | |
| Personal Expenses - HSBC | [2] | 135,969 | - | 135,969 |
| Rent to Southern Center Associates | [4] | 33,611 | - | 33,611 |
| Travel - Barbados | | 16,432 | - | 16,432 |
| Personal Expenses - American Express | [3] | 12,060 | - | 12,060 |
| Kessler Business Expense Reimbursments | | - | 7,094 | 7,094 |
| Grand Total | | $  931,824 | $  7,094 | $  938,918 |

Notes:

1) Net of $11,405 NSF checks.
2) Per HSBC bank records for accounts ending #3716 & #3724 for the period from January 3, 2019 through May 4, 2020. Excludes cash outflows categorized on Exhibit 3 - Sources and Uses of Cash as Pending Classification totaling $306,120. Documentation to identify unclassified cash outflows has not been provided and it is unknown whether these disbursements inured to the benefit of Blackburn or PGA.
3) Per American Express #1005 credit card statements for the period from December 20, 2018 through May 27, 2019. *See* **Exhibit 5.**
4) The office premises is leased by Nautic Crew Worldwide, LLC.
5) Support for amounts in the Blackburn column was not provided.
6) Supported by Kessler Expense reports.

## DISCUSSION

21. KM reviewed the complaint and pleadings, including the Order Appointing Accountant, in the matter as well as the material contracts referenced above to obtain an understanding of the case.

Page 10 of 13



Kapila/Mukamal

CPAs Forensic and Insolvency Advisors

22. Documentation was requested from both parties including: all bank statements; balance sheets, income statements, and general ledger for 2019 and year-to-date 2020 (the "Accounting Reports"); documents supporting expenditures made by PGA whether direct or indirect (i.e. – via credit cards); and documentation relating to the NextGear Loan. KM reviewed and relied on the information provided by Plaintiff to perform its assigned scope of work.[17]

23. KM interviewed bookkeeper Donna DeGroff. Ms. DeGroff advised that she maintained hard copy files for PGA transactions on premises at the Blackburn office located at 1500 Cordova Road. Ms. DeGroff further advised that any documents supporting transactions, to the extent that such supporting documents were provided to DeGroff by Blackburn, were available in hard copy format at the time she ceased providing bookkeeping services for PGA.[18]

---

[17] The Plaintiff provided the requested information ranging from January 2019 to January 2020 for the Accounting Reports prepared by PGA bookkeeper Donna DeGroff as well as the HSBC bank account statements for January 2019 to May 2020. The Accounting Reports generally provide an accurate reflection of PGA's transactional activity. Ms. DeGroff advised KM that in many instances Mr. Blackburn did not provide her with any documents supporting various PGA cash outflows. As result, she created a series of accounts in the PGA income statement to categorize such unsupported cash outflows by payee and/or their purported purpose (i.e. – "Nautic Crew", "Travel - Barbados", etc…). KM used the Accounting Reports, specifically the general ledger, and the HSBC bank account statements as the basis for its analysis.

[18] Documents were not provided by the Defendants. A laptop utilized by PGA was provided to KM for imaging. KM obtained a forensic image of the laptop. The laptop image contained files which related to PGA including: vehicle sales; vehicle purchase orders; interim income statements and general ledgers; various interim schedules in Microsoft Excel (e.g. –NextGear funding activity); and, other PGA related information. With the exception of vehicle purchases, KM did not identify any support for the various expenditures incurred by PGA on the laptop forensic image. KM observed, but did not analyze, many emails on the laptop image.

Page 11 of 13



Kapila/Mukamal

CPAs  Forensic and Insolvency Advisors

PAG-B0578

KM000013

24. KM conducted calls with the Plaintiff and, separately, the Defendant with each of their respective counsel on those calls. KM also had other calls with counsel for each party to follow-up on document requests and related reporting issues.

25. The general ledgers provided by the Plaintiff were validated by KM referencing the HSBC banking records which were separately provided by the Plaintiff. [19] PGA's general ledger only reflects activity through January 24, 2020. KM therefore reconstructed the activity reflected on the HSBC bank account statements for January 25, 2020 to April 20, 2020. [20]

26. In accordance with the Court's Order, KM invited counsel for both parties to participate in a Meet and Confer on June 22, 2020 at 4:00 pm. [21] The Meet and Confer took place as scheduled. Plaintiff's Counsel participated. Defense Counsel did not participate. [22]

---

[19] In order to complete this analysis, the bank statements were converted into Microsoft Excel database format. The data validation was a time-consuming endeavor due to the fact that each transaction description from the Frazer general ledger includes all data relevant to the transaction aggregated into a single data field rather than separate data fields (e.g. payee, purpose, time period, invoice number, etc…). As a result, the matching of the transactions as recorded on the PGA general ledger to their corresponding activity and payee on the bank statements required much more effort than would have been anticipated had PGA general ledger transaction information been reflected in separate data fields. Furthermore, identification of the account where the reciprocal entry was recorded for a cash transaction had to be determined manually by date and amount.

[20] Identification of the account where the reciprocal entry was recorded for cash transaction activity had to be determined manually by date and amount.

[21] The Meet and Confer call was scheduled after Defense Counsel's assistant confirmed that he was available at that date and time. KM did not receive an acceptance of the electronic calendar invite from Defense Counsel. However, after the invite was sent to counsel, the Defendant provided a tentative acceptance response to the calendar invite. As the electronic calendar invitations were only provided to the parties' attorneys, we assume that Defense Counsel forwarded (or caused to have forwarded) the invitation to his client. The Defendant did not participate in the Meet and Confer call.

[22] Defense Counsel conferred with the accountants on June 23rd. At that time, KM reiterated KM's prior requests of May 4th, May 13th and May 19th for documents supporting the various cash outflows from PGA as business expenditures. KM also requested documents memorializing the agreement asserted by Blackburn providing for Blackburn's expenses to be reimbursed by PGA in lieu of him taking a salary from PGA. To date, such information has not been provided by the Defendant.

Page 12 of 13



CPAs Forensic and Insolvency Advisors

PAG-B0579

KM000014

## CONCLUSION

27. KM provides this Report for the Court's consideration and is available to advise the Court further as to any questions or follow-up inquiries the Court may deem appropriate. KM reserves the right to revise this Report for relevant documentation provided to KM subsequent to the date of this Report.

Respectfully submitted,

Barry Mukamal, CPA/PFS/ABV/CFE/CFF/CIRA



CPAs Forensic and Insolvency Advisors

PAG-B0580

KM000015

# Exhibit 1

PAG-B0581

KM000016

Kessler et al v. Blackburn et al | Case No. CACE-20-004101

## Exhibit 1 - Documents Considered

| Description | Date Produced |
|---|---|
| Documents produced by Plaintiff | |
| Bought Car with EAK Loan Affidavit.pdf | 2020 05 02 |
| Missing Wire - 1s (4).msg | 2020 05 02 |
| Missing Wire - 1s.msg | 2020 05 02 |
| RE deposit list.msg | 2020 05 02 |
| RE Missing Wire - 1s (5).msg | 2020 05 02 |
| RE Missing Wire - 1s.msg | 2020 05 02 |
| RE Overfinch Miami 1st Vehicle (1).msg | 2020 05 02 |
| RE Overfinch Miami 1st Vehicle (2).msg | 2020 05 02 |
| RE Overfinch Miami 1st Vehicle (3).msg | 2020 05 02 |
| RE Overfinch Miami 1st Vehicle .msg | 2020 05 02 |
| Amex Charges.pdf | 2020 05 11 |
| Balance Sheet & Income Stmt.zip | 2020 05 11 |
| Checks (00600452xC20C6).PDF | 2020 05 11 |
| General Ledger 01.01.19 - .12.31.19 (00587246xC20C6).PDF | 2020 05 11 |
| General Ledger.zip | 2020 05 11 |
| Kessler expense reports 3.pdf | 2020 05 11 |
| Kessler expense reports.4.pdf | 2020 05 11 |
| Kessler expense reports.5.pdf | 2020 05 11 |
| Kessler Expense Reports.zip | 2020 05 11 |
| Kessler.expense reports 1.pdf | 2020 05 11 |
| Kessler.expense reports.2.pdf | 2020 05 11 |
| R-4-1 (Balance Sheet) 2020-01-24 1704.pdf | 2020 05 11 |
| R-4-1 (Income Statement) 2020-01-20 1144.pdf | 2020 05 11 |
| R-4-1 (Income Statement) 2020-01-24 1705.pdf | 2020 05 11 |
| R-4-2-D (General Ledger Listing) 2020-01-20 1143.pdf | 2020 05 11 |
| Statements and Checks.zip | 2020 05 11 |
| Statements_3110 (00600451xC20C6).PDF | 2020 05 11 |
| Statements_3716 (00600450xC20C6).PDF | 2020 05 11 |
| Wire Records (00601383xC20C6).xlsx | 2020 05 12 |
| Blackburn TLO Report (00583793xC20C6).pdf | 2020 05 26 |
| FRZDATA1_2020.csv | 2020 05 26 |
| Kenwright TLO Report (00584268xC20C6).pdf | 2020 05 26 |

| Pleadings | |
|---|---|
| 2020 03 05 Complaint | |
| 2020 03 02 Affidavit of Donna DeGroff | |
| 2020 04 20 Motion to Dismiss | |
| 2020 04 30 Order Appointing Accountant | |
| 2020 06 09 Hearing Transcript | |

| Agreements | |
|---|---|
| 2018 11 05 Kessler Blackburn Agreement.pdf | |

Kessler et al v. Blackburn et al | Case No. CACE-20-004101

## Exhibit 1 - Documents Considered

| Description | Date Produced |
| --- | --- |
| 2018 12 03 Edward A Kessler $160K Loan to PGA.pdf | |
| 2018 12 03 Overfinch Distribution Agreement.pdf | |
| 2019 03 11 Edward Kessler Sr $300K Loan to PGA.pdf | |
| 2019 04 18 NextGear Financing Agreement.pdf | |

| Other | |
| --- | --- |
| 2019 10 27 Naples Motorsports, Inc v Premier Group Autos Complaint | |

PAG-B0583

KM000018

Exhibit 2

PAG-B0584

KM000019

Kessler et al v. Blackburn et al | Case No. CACE-20-004101

## Exhibit 2  - PGA Liabilities

| | | Principal | Interest | Total |
|---|---|---|---|---|
| Edward A. Kessler Loan dated 12/3/2018 ("EAK Loan") | [1] | 160,000 | 12,667 | 172,667 |
| Edward A. Kessler supplement to EAK Loan 1/3/2019 | [2] | 20,356 | | 20,356 |
| Ewdard P. Kessler & Kristine Kessler Loan dated 3/11/2019 ("Kessler Sr. Loan") | [3] | 300,000 | 12,000 | 312,000 |
| NextGear Loan dated 4/28/2019 | [4] | 344,978 | | 344,978 |
| Kessler Subsequent Loan 5/31/2019 | [5] | 25,000 | | 25,000 |
| American Express | [6] | 109,498 | | 109,498 |
| Naples Motorsports, Inc. | [7] | 25,000 | | 25,000 |
| Total Known Outstanding Liabilities | | 984,832 | 24,667 | 1,009,499 |
| | | | | |
| Potential Liabilities - PGA Customer Deposits | [8] | 230,000 | | 230,000 |
| Total Liabilties | | 1,214,832 | 24,667 | 1,239,499 |

Notes:

1) Kessler loaned $160,000 to PGA to purchase the first Overfinch vehicle by paying Overfinch directly for the vehicle in December 2018. See Attachment 4. No interest or principal was paid on this loan.  Interest as calcuated above is reflected through June 30, 2020.

2) Represents additional payment to Overfinch made by Kessler in January 2019 to complete the first Overfinch vehicle purchase.  A loan agreement between PGA and Kessler for this second payment was not provided.  Interest, if applicable, has not been calculated.

3) PGA paid $2,000 monthly interest on this loan from May to December 2019.  No principal payments were made.  Interest as calculated above is reflected through June 30, 2020. *See* Attachment 6.

4) NextGear alleged a balance due of $357,589 in their December 18, 2019 complaint.  Interest charges likely are continuing to accrue but have not been included in this analysis.

5) Reflects undocumented loan funded by Kessler to PGA in May 2019.  Interest, if appliable, has not been calculated.

6) Unpaid balance due from PGA as alleged in the American Express complaint against PGA.  This amount agrees with the Amercian Express statements received by PGA.  American Express voluntarily dismissed its complaint against PGA in November 2019, however, KM has not been provided evidence that this balance has been satisfied.  The amount reflected excludes accrued interest, if any.

7) Naples Motorsports, Inc. ("NMS") complaint against PGA in Broward County [Case #CACE 19-022213] alleged that PGA did not deliver an Overfinch vehicle to NMS for which this $25,000 was advanced. NMS claimed the vehicle PGA provided to NMS was not what had been ordered; NMS returned the unwanted vehicle but PGA did not refund the $25,000 deposit. NMS is seeking treble damages, which are not included above.

8) The PGA January 24, 2020 internal balance sheet reflects $255,000 Customer Deposits, including the amount reflected in Footnote 7 above.  There was no evidence in any of the records reviewed by KM, including the bank statments, that any of the Customer Deposits were satisfied either by product delivery (i.e. - sale) or refund.

PAG-B0585

KM000020

Exhibit 3

PAG-B0586

KM000021

Kessler et al v. Blackburn et al | Case No. CACE-20-004101

Exhibit 3 | Summary of Sources and Uses of Cash for Premier Group Autos LLC [1]

| | | Activity | Evidence of, or Assumed, Business Connection | No Evidence of PGA Expense | Pending Classification |
|---|---|---|---|---|---|
| **Sources of Cash** | | | | | |
| Vehicle Sales Revenues | [2] | 2,605,007 | 2,605,007 | - | - |
| Customer Deposits | [3] | 255,000 | 255,000 | | |
| Loan - Edward A. Kessler ("EAK Loan") | [4] | 180,536 | 180,536 | - | - |
| Loan - Edward P. Kessler & Kristine Kessler | [5] | 300,000 | 300,000 | - | - |
| Floorplan Loan - NextGear Funding | [6] | 285,972 | 285,972 | - | - |
| Loan - Edward A. Kessler | [7] | 25,000 | 25,000 | - | - |
| Line of Credit | | 1,213 | 1,213 | - | - |
| Unidentified Deposits | [8] | 50,742 | - | - | 50,742 |
| **Total Sources** | | 3,703,472 | 3,652,729 | - | 50,742 |
| | | | | | |
| **Uses of Cash** | | | | | |
| Vehicle Purchases | [9] | (2,198,927) | (2,198,927) | - | - |
| Blackburn Entities & Insiders | [10] | (685,062) | - | (685,062) | - |
| Travel | | (142,065) | - | - | (142,065) |
| Personal Expenses | | (135,969) | - | (135,969) | - |
| Events, Shows & Marketing | | (120,342) | (120,342) | - | - |
| Meals | | (79,265) | - | - | (79,265) |
| Credit Card Payments | | (55,441) | - | - | (55,441) |
| Miscellaneous Business Expense | | (50,920) | (50,920) | - | - |
| Vehicle Transport, Towing, & Delivery | | (41,540) | (41,540) | - | - |
| Professional Fees | | (40,966) | (40,966) | - | - |
| Rent | [11] | (33,611) | - | (33,611) | - |
| Cash | | (17,962) | - | - | (17,962) |
| Travel - Barbados | | (16,432) | - | (16,432) | - |
| Interest Expense (Kessler Sr. Loan) | | (16,000) | (16,000) | - | - |
| Wages/ Commissions | | (15,492) | (15,492) | - | - |
| Vehicle Detailing, Repair & Maintenance | | (13,811) | (13,811) | - | - |
| Garage Insurance | | (11,745) | (11,745) | - | - |
| Entertainment | | (11,387) | - | - | (11,387) |
| Other Vehicle Expenses (Tags, Gas, Parking & Tolls) | | (9,440) | (9,440) | - | - |
| Business Expenses - Edward A. Kessler | | (7,094) | (7,094) | - | - |
| **Total Uses of Cash** | [12] | (3,703,471) | (2,526,278) | (871,074) | (306,120) |
| | | | | | |
| American Express | [13] | (109,498) | (13,119) | (60,750) | (35,629) |
| **Total Incurred by PGA** | | (3,812,969) | (2,539,397) | (931,824) | (341,748) |
| Less: Customer Deposits & Loans (Kessler, NextGear, Line of Credit) | | (1,047,722) | | | |
| **Net Profit** | | 65,610 | | | |

Notes:

1) Source | PGA accounting records validated by HSBC bank statements

2) Excludes $255,000 customer deposits for which there was no evidence of vehicle purchase or sales, which are reflected as liabilities for purposes of this report. See Exhibit 2, Footnotes 7 and 8. To the extent that any of these Customer Deposits is determined to represent a PGA sale, such amount would increase PGA's estimated sales revenue accordingly.

3) Source | Exhibit 2.

4) Amounts loaned to PGA by Kessler to purchase the first Overfinch vehicle. See Exhibit 2, Footnotes 1 and 2.

5) Kessler Sr. Loan dated March 11, 2019. See Exhibit 2, Footnote 3.

6) The PGA Balance Sheet dated January 24, 2020 reflects a $344,978 outstanding liability to NextGear for floorplan financing. Neither the general ledger nor the bank statements reflect payments to NextGear subsequent to September 20, 2019. Note there is a discrepancy between the amount of receipts reflected on the bank statements ($285,972 above) and the PGA internal balance sheet ($344,978) which KM is unable to reconcile pending receipt of source documentation. NextGear alleges an outstanding balance of $357,589 in its complaint against PGA (see Complaint at ¶13).

7) Funded by Kessler in May 2019. Note that Kessler also funded another $7,000 into PGA in September 2019 which was reflected on the PGA general ledgers as being returned to Kessler approximately two weeks later which is not reflected above.

PAG-B0587

KM000022

Kessler et al v. Blackburn et al | Case No. CACE-20-004101

**Exhibit 3 | Summary of Sources and Uses of Cash for Premier Group Autos LLC** [1]

8) Deposits with no descriptive source in the books or the bank statements.

9) Includes initial vehicle purchase funded by EAK Loan which did not flow through PGA's bank account but was instead paid directly by Kessler.

10) Includes Nautic Crew, James Blackburn, Samuel Blackburn, Nicholas Blackburn and City Life Social.  *See*  Exhibit 4.

11) The office premises is leased by Nautic Crew Worldwide, LLC.

12) Excludes $592,012 of inter-account transfers between the two PGA bank accounts at HSBC.

13) American Express credit card activity, both payments and charges, was not recorded on the PGA general ledger.  *See*  Exhibit 5.

14) Assumed Business Connection expenditures include: Events, Shows and Marketing; Miscellaneous Business Expense; and Professional Fees.  Upon receipt of supporting documentation, such amounts may be reclassified into one of the other two categories.

15) Documentation supporting classification of these expenditures as related to PGA's business operations has not been provided. Upon receipt of supporting documentation, such amounts may be reclassified into one of the other two categories.

16) Documentation supporting classification of these expenditures has not been provided.   Upon receipt of supporting documentation, such amounts may be reclassified into one of the other two categories.

PAG-B0588

KM000023

# Exhibit 4

PAG-B0589

KM000024

Kessler et al v. Blackburn et al | Case No. CACE-20-004101

## Exhibit 4 - Detail of Payments Made to Blackburn Entities & Insiders

Source | Bank Records for HSBC (#3716 & #3724) and American Express #1005 account statements

| Bank ID # | Statement Clearing Date | Check # / Dep Ref # | Payee/ Received From | Deposits / Credits | Checks / Debits | Net Activity |
|---|---|---|---|---|---|---|
| HSBC-3716 | 02/13/2019 | 1455 | Nautic Crew Worldwide, LLC | - | 1,500 | (1,500) |
| HSBC-3716 | 02/13/2019 | 1454 | Nautic Crew Worldwide, LLC | - | 12,500 | (12,500) |
| HSBC-3716 | 02/20/2019 | 1456 | Nautic Crew Worldwide, LLC | - | 10,000 | (10,000) |
| HSBC-3716 | 03/15/2019 | 3 | Nautic Crew Worldwide, LLC | - | 7,600 | (7,600) |
| HSBC-3716 | 03/18/2019 | 5 | Nautic Crew Worldwide, LLC | - | 4,500 | (4,500) |
| HSBC-3716 | 03/25/2019 | 8 | Nautic Crew Worldwide, LLC | - | 7,000 | (7,000) |
| HSBC-3716 | 04/01/2019 | 16 | Nautic Crew Worldwide, LLC | - | 7,500 | (7,500) |
| HSBC-3716 | 04/02/2019 | | Nautic Crew Worldwide, LLC | - | 6,500 | (6,500) |
| HSBC-3716 | 04/02/2019 | 22 | Nautic Crew Worldwide, LLC | - | 5,900 | (5,900) |
| HSBC-3716 | 04/04/2019 | 26 | Nautic Crew Worldwide, LLC | - | 5,000 | (5,000) |
| HSBC-3716 | 04/09/2019 | 34 | Nautic Crew Worldwide, LLC | - | 5,500 | (5,500) |
| HSBC-3716 | 04/16/2019 | 39 | Nautic Crew Worldwide, LLC | - | 7,500 | (7,500) |
| HSBC-3716 | 04/22/2019 | | Nautic Crew Worldwide, LLC | - | 6,500 | (6,500) |
| HSBC-3716 | 04/30/2019 | 47 | Nautic Crew Worldwide, LLC | - | 12,000 | (12,000) |
| HSBC-3716 | 05/01/2019 | 58 | Nautic Crew Worldwide, LLC | - | 4,000 | (4,000) |
| HSBC-3716 | 05/02/2019 | 62 | Nautic Crew Worldwide, LLC | - | 5,000 | (5,000) |
| HSBC-3716 | 05/06/2019 | | Nautic Crew Worldwide, LLC | - | 5,000 | (5,000) |
| HSBC-3716 | 05/13/2019 | | Nautic Crew Worldwide, LLC | - | 5,800 | (5,800) |
| HSBC-3716 | 05/14/2019 | | Nautic Crew Worldwide, LLC | - | 2,500 | (2,500) |
| HSBC-3716 | 05/20/2019 | | Nautic Crew Worldwide, LLC | - | 3,500 | (3,500) |
| HSBC-3716 | 05/28/2019 | | Nautic Crew Worldwide, LLC | - | 4,000 | (4,000) |
| HSBC-3716 | 05/30/2019 | 85 | Nautic Crew Worldwide, LLC | - | 11,000 | (11,000) |
| HSBC-3716 | 06/03/2019 | | Nautic Crew Worldwide, LLC | - | 4,000 | (4,000) |
| HSBC-3716 | 06/04/2019 | | Nautic Crew Worldwide, LLC | - | 1,750 | (1,750) |
| HSBC-3716 | 06/05/2019 | | Nautic Crew Worldwide, LLC | - | 2,000 | (2,000) |
| HSBC-3716 | 06/07/2019 | | Nautic Crew Worldwide, LLC | - | 1,300 | (1,300) |
| HSBC-3716 | 06/11/2019 | | Nautic Crew Worldwide, LLC | - | 4,000 | (4,000) |
| HSBC-3716 | 06/13/2019 | | Nautic Crew Worldwide, LLC | - | 1,750 | (1,750) |
| HSBC-3716 | 06/17/2019 | | Nautic Crew Worldwide, LLC | - | 1,500 | (1,500) |
| HSBC-3716 | 06/20/2019 | | Nautic Crew Worldwide, LLC | - | 2,800 | (2,800) |
| HSBC-3716 | 06/24/2019 | | Nautic Crew Worldwide, LLC | - | 3,000 | (3,000) |
| HSBC-3716 | 06/25/2019 | 106 | Nautic Crew Worldwide, LLC | - | 4,000 | (4,000) |
| HSBC-3716 | 06/28/2019 | 108 | Nautic Crew Worldwide, LLC | - | 940 | (940) |
| HSBC-3716 | 07/02/2019 | | Nautic Crew Worldwide, LLC | - | 650 | (650) |
| HSBC-3716 | 07/02/2019 | | Nautic Crew Worldwide, LLC | - | 950 | (950) |
| HSBC-3716 | 07/05/2019 | | Nautic Crew Worldwide, LLC | - | 4,500 | (4,500) |
| HSBC-3716 | 07/08/2019 | | Nautic Crew Worldwide, LLC | - | 3,800 | (3,800) |
| HSBC-3716 | 07/09/2019 | | Nautic Crew Worldwide, LLC | - | 6,000 | (6,000) |
| HSBC-3716 | 07/11/2019 | | Nautic Crew Worldwide, LLC | - | 3,500 | (3,500) |
| HSBC-3716 | 07/16/2019 | 120 | Nautic Crew Worldwide, LLC | - | 4,700 | (4,700) |
| HSBC-3716 | 07/22/2019 | 127 | Nautic Crew Worldwide, LLC | - | 4,500 | (4,500) |
| HSBC-3716 | 07/23/2019 | 128 | Nautic Crew Worldwide, LLC | - | 1,250 | (1,250) |
| HSBC-3716 | 07/25/2019 | | Nautic Crew Worldwide, LLC | - | 2,500 | (2,500) |
| HSBC-3716 | 07/30/2019 | | Nautic Crew Worldwide, LLC | - | 4,500 | (4,500) |
| HSBC-3716 | 08/01/2019 | 143 | Nautic Crew Worldwide, LLC | - | 2,000 | (2,000) |
| HSBC-3716 | 08/06/2019 | 148 | Nautic Crew Worldwide, LLC | - | 8,750 | (8,750) |
| HSBC-3716 | 08/06/2019 | 149 | Nautic Crew Worldwide, LLC | - | 5,000 | (5,000) |
| HSBC-3716 | 08/08/2019 | 152 | Nautic Crew Worldwide, LLC | - | 6,700 | (6,700) |
| HSBC-3716 | 08/14/2019 | 160 | Nautic Crew Worldwide, LLC | - | 1,290 | (1,290) |
| HSBC-3716 | 08/20/2019 | 166 | Nautic Crew Worldwide, LLC | - | 5,900 | (5,900) |
| HSBC-3716 | 08/27/2019 | 176 | Nautic Crew Worldwide, LLC | - | 5,800 | (5,800) |
| HSBC-3716 | 09/04/2019 | 183 | Nautic Crew Worldwide, LLC | - | 6,210 | (6,210) |
| HSBC-3716 | 09/09/2019 | 187 | Nautic Crew Worldwide, LLC | - | 2,500 | (2,500) |
| HSBC-3716 | 09/10/2019 | 196 | Nautic Crew Worldwide, LLC | - | 5,100 | (5,100) |

PAG-B0590

KM000025

Kessler et al v. Blackburn et al | Case No. CACE-20-004101

**Exhibit 4 - Detail of Payments Made to Blackburn Entities & Insiders**

Source | Bank Records for HSBC (#3716 & #3724) and American Express #1005 account statements

| Bank ID # | Statement Clear Date | Check # / Dep Ref # | Payee/ Received From | Deposits / Credits | Checks / Debits | Net Activity |
|---|---|---|---|---|---|---|
| HSBC-3716 | 09/12/2019 | 201 | Nautic Crew Worldwide, LLC | - | 7,250 | (7,250) |
| HSBC-3716 | 09/17/2019 | 203 | Nautic Crew Worldwide, LLC | - | 3,405 | (3,405) |
| HSBC-3716 | 09/18/2019 | | Nautic Crew Worldwide, LLC | 3,405 | - | 3,405 |
| HSBC-3716 | 09/20/2019 | | Nautic Crew Worldwide, LLC | - | 5,000 | (5,000) |
| HSBC-3724 | 09/20/2019 | | Nautic Crew Worldwide, LLC | - | 10,000 | (10,000) |
| HSBC-3716 | 09/26/2019 | 206 | Nautic Crew Worldwide, LLC | - | 4,150 | (4,150) |
| HSBC-3716 | 10/02/2019 | 219 | Nautic Crew Worldwide, LLC | - | 2,250 | (2,250) |
| HSBC-3716 | 10/04/2019 | 227 | Nautic Crew Worldwide, LLC | - | 6,650 | (6,650) |
| HSBC-3716 | 10/08/2019 | 229 | Nautic Crew Worldwide, LLC | - | 5,600 | (5,600) |
| HSBC-3716 | 10/16/2019 | 235 | Nautic Crew Worldwide, LLC | - | 4,500 | (4,500) |
| HSBC-3716 | 10/21/2019 | 240 | Nautic Crew Worldwide, LLC | - | 3,000 | (3,000) |
| HSBC-3716 | 10/23/2019 | 241 | Nautic Crew Worldwide, LLC | - | 2,500 | (2,500) |
| HSBC-3716 | 10/28/2019 | 253 | Nautic Crew Worldwide, LLC | - | 2,800 | (2,800) |
| HSBC-3716 | 11/04/2019 | 251 | Nautic Crew Worldwide, LLC | - | 4,100 | (4,100) |
| HSBC-3716 | 11/05/2019 | 274 | Nautic Crew Worldwide, LLC | - | 5,500 | (5,500) |
| HSBC-3716 | 11/06/2019 | 277 | Nautic Crew Worldwide, LLC | - | 4,800 | (4,800) |
| HSBC-3716 | 11/14/2019 | 285 | Nautic Crew Worldwide, LLC | - | 4,250 | (4,250) |
| HSBC-3716 | 11/18/2019 | 290 | Nautic Crew Worldwide, LLC | - | 1,800 | (1,800) |
| HSBC-3716 | 11/21/2019 | 295 | Nautic Crew Worldwide, LLC | - | 2,800 | (2,800) |
| HSBC-3716 | 11/22/2019 | 264 | Nautic Crew Worldwide, LLC | - | 2,650 | (2,650) |
| HSBC-3716 | 11/26/2019 | 300 | Nautic Crew Worldwide, LLC | - | 900 | (900) |
| HSBC-3716 | 11/26/2019 | 303 | Nautic Crew Worldwide, LLC | - | 750 | (750) |
| HSBC-3716 | 12/03/2019 | 313 | Nautic Crew Worldwide, LLC | - | 1,750 | (1,750) |
| HSBC-3716 | 12/04/2019 | 314 | Nautic Crew Worldwide, LLC | - | 1,750 | (1,750) |
| HSBC-3716 | 12/05/2019 | 315 | Nautic Crew Worldwide, LLC | - | 4,500 | (4,500) |
| HSBC-3716 | 12/09/2019 | 311 | Nautic Crew Worldwide, LLC | - | 2,300 | (2,300) |
| HSBC-3716 | 01/07/2020 | 312 | Nautic Crew Worldwide, LLC | - | 4,000 | (4,000) |
| HSBC-3716 | 01/08/2020 | | Nautic Crew Worldwide, LLC | 4,000 | - | 4,000 |
| HSBC-3716 | 02/10/2020 | 312 | Nautic Crew Worldwide, LLC | - | 4,000 | (4,000) |
| HSBC-3716 | 02/11/2020 | | Nautic Crew Worldwide, LLC | 4,000 | - | 4,000 |
| HSBC-3716 | 02/21/2020 | | Nautic Crew Worldwide, LLC | - | 10,000 | (10,000) |
| | | | **Nautic Crew Worldwide, LLC Total** | **11,405** | **366,395** | **(354,990)** |
| | | | | | | |
| HSBC-3716 | 05/06/2019 | | James M Blackburn | - | 10,250 | (10,250) |
| HSBC-3716 | 05/16/2019 | | James M Blackburn | - | 3,000 | (3,000) |
| HSBC-3716 | 07/23/2019 | | James M Blackburn | - | 100 | (100) |
| HSBC-3716 | 09/05/2019 | | James M Blackburn | - | 150 | (150) |
| HSBC-3716 | 09/20/2019 | | James M Blackburn | - | 3,000 | (3,000) |
| HSBC-3716 | 10/28/2019 | | James M Blackburn | - | 40,000 | (40,000) |
| HSBC-3716 | 11/22/2019 | | James M Blackburn | - | 10,000 | (10,000) |
| HSBC-3716 | 02/10/2020 | | James M Blackburn | - | 32,060 | (32,060) |
| HSBC-3716 | 02/21/2020 | | James M Blackburn | - | 25,000 | (25,000) |
| HSBC-3716 | 02/21/2020 | | James M Blackburn | - | 25,000 | (25,000) |
| HSBC-3716 | 02/21/2020 | | James M Blackburn | - | 2,000 | (2,000) |
| | | | **James M Blackburn Total** | **-** | **150,560** | **(150,560)** |
| | | | | | | |
| HSBC-3716 | 02/20/2019 | 1 | Samuel Blackburn | - | 5,625 | (5,625) |
| HSBC-3716 | 03/01/2019 | | Samuel Blackburn | - | 9,500 | (9,500) |
| HSBC-3716 | 03/20/2019 | | Samuel Blackburn | - | 10,000 | (10,000) |
| HSBC-3716 | 03/26/2019 | 15 | Samuel Blackburn | - | 615 | (615) |
| HSBC-3716 | 03/26/2019 | 14 | Samuel Blackburn | - | 3,962 | (3,962) |
| HSBC-3716 | 04/02/2019 | | Samuel Blackburn | - | 7,500 | (7,500) |
| HSBC-3716 | 04/09/2019 | 38 | Samuel Blackburn | - | 2,500 | (2,500) |
| HSBC-3716 | 04/09/2019 | 37 | Samuel Blackburn | - | 340 | (340) |

PAG-B0591

KM000026

Kessler et al v. Blackburn et al | Case No. CACE-20-004101

## Exhibit 4 - Detail of Payments Made to Blackburn Entities & Insiders

Source | Bank Records for HSBC (#3716 & #3724) and American Express #1005 account Statements

| Bank ID # | Statement Clearing Date | Check # / Dep Ref # | Payee/ Received From | Deposits / Credits | Checks / Debits | Net Activity |
|---|---|---|---|---|---|---|
| HSBC-3716 | 04/15/2019 | 41 | Samuel Blackburn | - | 739 | (739) |
| HSBC-3716 | 04/15/2019 | 42 | Samuel Blackburn | - | 220 | (220) |
| HSBC-3716 | 04/26/2019 | 45 | Samuel Blackburn | - | 2,500 | (2,500) |
| HSBC-3716 | 05/07/2019 | 63 | Samuel Blackburn | - | 3,797 | (3,797) |
| HSBC-3716 | 05/14/2019 | 73 | Samuel Blackburn | - | 6,500 | (6,500) |
| HSBC-3716 | 06/03/2019 | 84 | Samuel Blackburn | - | 3,500 | (3,500) |
| HSBC-3716 | 06/05/2019 | 87 | Samuel Blackburn | - | 2,500 | (2,500) |
| HSBC-3716 | 06/12/2019 | 92 | Samuel Blackburn | - | 920 | (920) |
| HSBC-3716 | 06/21/2019 | 103 | Samuel Blackburn | - | 6,300 | (6,300) |
| HSBC-3716 | 07/02/2019 | 112 | Samuel Blackburn | - | 10,485 | (10,485) |
| HSBC-3716 | 07/08/2019 | 114 | Samuel Blackburn | - | 3,000 | (3,000) |
| HSBC-3716 | 07/08/2019 | 116 | Samuel Blackburn | - | 2,500 | (2,500) |
| HSBC-3716 | 07/23/2019 | | Samuel Blackburn | - | 7,500 | (7,500) |
| HSBC-3716 | 07/25/2019 | 129 | Samuel Blackburn | - | 2,630 | (2,630) |
| HSBC-3716 | 07/26/2019 | 131 | Samuel Blackburn | - | 1,990 | (1,990) |
| HSBC-3716 | 08/07/2019 | 150 | Samuel Blackburn | - | 2,500 | (2,500) |
| HSBC-3716 | 08/21/2019 | | Samuel Blackburn | - | 7,500 | (7,500) |
| HSBC-3716 | 08/27/2019 | 177 | Samuel Blackburn | - | 6,490 | (6,490) |
| HSBC-3716 | 09/10/2019 | 199 | Samuel Blackburn | - | 2,500 | (2,500) |
| HSBC-3716 | 09/20/2019 | 211 | Samuel Blackburn | - | 6,285 | (6,285) |
| HSBC-3724 | 09/20/2019 | | Samuel Blackburn | - | 5,400 | (5,400) |
| HSBC-3716 | 09/26/2019 | 207 | Samuel Blackburn | - | 1,216 | (1,216) |
| HSBC-3716 | 09/30/2019 | 218 | Samuel Blackburn | - | 1,060 | (1,060) |
| HSBC-3716 | 10/08/2019 | 228 | Samuel Blackburn | - | 12,741 | (12,741) |
| HSBC-3716 | 10/16/2019 | 233 | Samuel Blackburn | - | 500 | (500) |
| HSBC-3716 | 10/17/2019 | 237 | Samuel Blackburn | - | 750 | (750) |
| HSBC-3716 | 10/25/2019 | 250 | Samuel Blackburn | - | 2,500 | (2,500) |
| HSBC-3716 | 10/25/2019 | 243 | Samuel Blackburn | - | 1,000 | (1,000) |
| HSBC-3716 | 11/05/2019 | 276 | Samuel Blackburn | - | 2,500 | (2,500) |
| HSBC-3716 | 11/07/2019 | 280 | Samuel Blackburn | - | 8,750 | (8,750) |
| HSBC-3716 | 11/15/2019 | 292 | Samuel Blackburn | - | 750 | (750) |
| HSBC-3716 | 11/22/2019 | 298 | Samuel Blackburn | - | 9,160 | (9,160) |
| HSBC-3716 | 12/05/2019 | 310 | Samuel Blackburn | - | 2,500 | (2,500) |
| HSBC-3716 | 02/21/2020 | | Samuel Blackburn | - | 2,500 | (2,500) |
| HSBC-3716 | 02/21/2020 | | Samuel Blackburn | - | 750 | (750) |
| | | | **Samuel Blackburn Total** | - | **172,475** | **(172,475)** |
| | | | | | | |
| HSBC-3716 | 03/05/2019 | | Nicholas R Blackburn | - | 7,037 | (7,037) |
| | | | **Nicholas R Blackburn Total** | - | **7,037** | **(7,037)** |
| | | | | | | |
| | | | **Blackburn Entities and Insiders** | **11,405** | **696,467** | **(685,062)** |
| | | | | | | |
| Amex-1005 | | | CityLife Social, LLC | | 7,500 | (7,500) |
| Amex-1005 | | | CityLife Social, LLC | - | 3,500 | (3,500) |
| Amex-1005 | | | CityLife Social, LLC | - | 450 | (450) |
| Amex-1005 | | | CityLife Social, LLC | - | 500 | (500) |
| Amex-1005 | | | CityLife Social, LLC | - | 1,000 | (1,000) |
| Amex-1005 | | | CityLife Social, LLC | - | 500 | (500) |
| Amex-1005 | | | CityLife Social, LLC | - | 2,500 | (2,500) |
| Amex-1005 | | | CityLife Social, LLC | - | 1,100 | (1,100) |
| Amex-1005 | | | CityLife Social, LLC | - | 2,400 | (2,400) |
| Amex-1005 | | | CityLife Social, LLC | - | 1,000 | (1,000) |
| Amex-1005 | | | CityLife Social, LLC | - | 500 | (500) |
| Amex-1005 | | | CityLife Social, LLC | - | 1,000 | (1,000) |

PAG-B0592

KM000027

Kessler et al v. Blackburn et al | Case No. CACF-20-004101

## Exhibit 4 - Detail of Payments Made to Blackburn Entities & Insiders

Source | Bank Records for HSBC (#3716 & #3724) and American Express #1005 account statements

| Bank ID # | Statement Clearing Date | Check # / Dep Ref # | Payee/ Received From | Deposits / Credits | Checks / Debits | Net Activity |
|---|---|---|---|---|---|---|
| Amex-1005 | | | CityLife Social, LLC | - | 500 | (500) |
| Amex-1005 | | | CityLife Social, LLC | - | 1,000 | (1,000) |
| Amex-1005 | | | CityLife Social, LLC | - | 1,500 | (1,500) |
| Amex-1005 | | | CityLife Social, LLC | - | 500 | (500) |
| Amex-1005 | | | CityLife Social, LLC | - | 500 | (500) |
| Amex-1005 | | | CityLife Social, LLC | - | 7,500 | (7,500) |
| Amex-1005 | | | CityLife Social, LLC | - | 1,250 | (1,250) |
| Amex-1005 | | | CityLife Social, LLC | - | 1,000 | (1,000) |
| Amex-1005 | | | CityLife Social, LLC | - | 1,250 | (1,250) |
| Amex-1005 | | | CityLife Social, LLC | - | 1,275 | (1,275) |
| Amex-1005 | | | CityLife Social, LLC | - | 3,465 | (3,465) |
| Amex-1005 | | | CityLife Social, LLC | - | 500 | (500) |
| Amex-1005 | | | CityLife Social, LLC | - | 2,000 | (2,000) |
| Amex-1005 | | | CityLife Social, LLC | - | 2,000 | (2,000) |
| Amex-1005 | | | CityLife Social, LLC | - | 2,500 | (2,500) |
| | | | **CityLife Social, LLC Total** | - | 48,690 | (48,690) |
| | | | **Grand Total** | 11,405 | 745,157 | (733,752) |

PAG-B0593

KM000028

# Exhibit 5

PAG-B0594

KM000029

Kessler et al v. Blackburn et al | Case No. CACE-20-004101

**Exhibit 5 - Summary of American Express Card Charges | December 20, 2018 to May 27, 2019**

Source: American Express #2-71005 credit card statements for the periods indicated.

| Charges [1] | Net Activity | Assumed Business Connection | No Evidence of PGA Expense | Pending Classification |
|---|---|---|---|---|
| City Life Social (Blackburn entity) | (48,690) | - | (48,690) | - |
| Misc. Business Expense | (16,779) | (16,779) | - | - |
| Travel | (13,008) | - | - | (13,008) |
| Personal Expenses | (12,060) | - | (12,060) | - |
| Further Investigation Required | (10,525) | - | - | (10,525) |
| Cash | (6,127) | - | - | (6,127) |
| Meals | (3,755) | - | - | (3,755) |
| Vehicle Detailing, Repair & Maintenance | (2,754) | (2,754) | - | - |
| Entertainment | (2,213) | - | - | (2,213) |
| Events, Shows & Marketing | (1,923) | (1,923) | - | - |
| Vehicle Transport, Towing, & Delivery | (1,745) | (1,745) | - | - |
| Other Vehicle Expenses (Tags, Gas, Parking & Tolls) | (341) | (341) | - | - |
| Total Charges | (119,921) | (23,543) | (60,750) | (35,629) |
| Payments [2] | 10,424 | | | |
| Net Due to American Express [1] | (109,498) | | | |

Notes:

1) Uses categorized by KM based on identification of payees.

2) Payments were not made via the PGA accounts at HSBC. KM was unable to identify the source of the payments.

3) Excludes accrued interest, if any.

4) Assumed Business Connection expenditures include: Events, Shows and Marketing; and, Miscellaneous Business Expense. Upon receipt of supporting documentation, such amounts may be reclassified into one of the other two categories.

5) Documentation supporting classification of these expenditures as related to PGA's business operations has not been provided. Upon receipt of supporting documentation, such amounts may be reclassified into one of the other two categories.

6) Documentation supporting classification of these expenditures has not been provided. Upon receipt of supporting documentation, such amounts may be reclassified into one of the other two categories.

KM000030

# Exhibit 6

PAG-B0596

KM000031

Kessler et al v. Blackburn et al | Case No. CACE-20-004101

## Exhibit 6 - Detail of Personal Expenses

Source: Bank Records for HSBC (#3716 & #3724).

| Bank ID # | Statement Clearing Date | Check # / Dep Ref # | Payee / Received From | Net Activity |
|---|---|---|---|---|
| HSBC-3716 | 02/22/2019 | | Rani Arabella Inc | (435.00) |
| HSBC-3716 | 02/25/2019 | | Rani Arabella Inc | 60.00 |
| HSBC-3716 | 02/26/2019 | | Neiman Marcus | (1,725.60) |
| HSBC-3716 | 02/26/2019 | | Neiman Marcus | (267.50) |
| HSBC-3716 | 03/01/2019 | | Anthony Troulan/ FirstCaribbean International Bank | (13,000.00) |
| HSBC-3716 | 03/01/2019 | | Ditech Flower Shop | (548.95) |
| HSBC-3716 | 03/04/2019 | | Teco Stores | (508.44) |
| HSBC-3716 | 03/04/2019 | | Ditech Flower Shop | (82.10) |
| HSBC-3716 | 03/06/2019 | | TJ Baldwyn Son Stratfo | (427.65) |
| HSBC-3716 | 03/13/2019 | | Turmeaus Sampling Lounge | (40.93) |
| HSBC-3716 | 03/13/2019 | | Turmeaus Sampling Lounge | (35.47) |
| HSBC-3716 | 03/20/2019 | | Itunes.Com | (9.99) |
| HSBC-3716 | 03/25/2019 | | Neiman Marcus | (1,000.00) |
| HSBC-3716 | 03/25/2019 | | Neiman Marcus | (834.60) |
| HSBC-3716 | 03/25/2019 | | Neiman Marcus | (743.65) |
| HSBC-3716 | 03/25/2019 | | Itunes.Com | (9.99) |
| HSBC-3716 | 03/25/2019 | | Itunes.Com | (0.99) |
| HSBC-3716 | 03/25/2019 | | Itunes.Com | (5.99) |
| HSBC-3716 | 04/01/2019 | | Meat Market | (116.84) |
| HSBC-3716 | 04/01/2019 | | Meat Market | (230.46) |
| HSBC-3716 | 04/01/2019 | | Meat Market | (230.46) |
| HSBC 3716 | 04/01/2019 | | Itunes.Com | (2.83) |
| HSBC-3716 | 04/02/2019 | 21 Bob Willie | | (500.00) |
| HSBC 3716 | 04/02/2019 | | Meat Market | (1,048.10) |
| HSBC-3716 | 04/03/2019 | | Neiman Marcus | (556.40) |
| HSBC-3716 | 04/04/2019 | | Bergdorf Goodman | (865.56) |
| HSBC-3716 | 04/05/2019 | | Francis L Dean & Associates | (84.00) |
| HSBC-3716 | 04/09/2019 | | HCMG Cardiology Associates | (65.00) |
| HSBC 3716 | 04/10/2019 | | Lowes | (414.42) |
| HSBC-3716 | 04/11/2019 | | Lowes | (11.40) |
| HSBC-3716 | 04/12/2019 | | Anthony Troulan/ FirstCaribbean International Bank | (10,750.00) |
| HSBC-3716 | 04/12/2019 | | Massaging Inso | (48.00) |
| HSBC-3716 | 04/12/2019 | | Itunes.Com | (9.99) |
| HSBC-3716 | 04/15/2019 | | Southport Hardware | (19.84) |
| HSBC-3716 | 04/15/2019 | | Millionaire Ga | (4,805.00) |
| HSBC-3716 | 04/16/2019 | | Rock Lives On | (4,500.00) |
| HSBC-3716 | 04/17/2019 | | Millionaire Ga | (500.00) |
| HSBC-3716 | 04/18/2019 | | Lucky Farmers Market C | (60.12) |
| HSBC-3716 | 04/18/2019 | | Itunes.Com | (69.98) |
| HSBC-3716 | 04/19/2019 | | Flora Ottimer | (10.69) |
| HSBC-3716 | 04/22/2019 | | Pompano Discount Liquo | (467.92) |
| HSBC-3716 | 04/22/2019 | | Publix | (67.39) |
| HSBC-3716 | 04/22/2019 | | Publix | (12.67) |
| HSBC-3716 | 04/23/2019 | | Neiman Marcus | (126.26) |
| HSBC-3716 | 04/24/2019 | | Lucky Farmers Market C | (46.16) |

PAG-B0597

KM000032

Kessler et al v. Blackburn et al | Case No. CACE-20-004101

## Exhibit 6 – Detail of Personal Expenses

Source: Bank Records for HSBC (#3716 & #3724).

| Bank ID # | Statement Clearing Date | Check # / Dep Ref # | Payee / Received From | Net Activity |
|---|---|---|---|---|
| HSBC-3716 | 04/24/2019 | | Florida Foot & Ankle | (220.00) |
| HSBC-3716 | 04/25/2019 | | Lucky's Meat Market | (497.77) |
| HSBC-3716 | 04/26/2019 | | Meat Market | (1,043.49) |
| HSBC-3716 | 04/26/2019 | | Meat Market | (301.12) |
| HSBC-3716 | 04/29/2019 | | Publix | (199.64) |
| HSBC-3716 | 04/29/2019 | | Walgreens | (24.87) |
| HSBC-3716 | 04/29/2019 | | Walgreens | (2.79) |
| HSBC-3716 | 04/29/2019 | | Lucky Farmers Market C | (93.62) |
| HSBC-3716 | 05/01/2019 | | Publix | (45.35) |
| HSBC-3716 | 05/01/2019 | | Itunes.Com | (5.99) |
| HSBC-3716 | 05/02/2019 | | Anthony Troulan/ FirstCaribbean International Bank | (2,500.00) |
| HSBC-3716 | 05/02/2019 | | Itunes.Com | (2.99) |
| HSBC-3716 | 05/02/2019 | | Retro Red's Beauty Shop | (36.00) |
| HSBC-3716 | 05/06/2019 | | Lowes | (31.85) |
| HSBC-3716 | 05/09/2019 | 64 | Tim Elms | (2,000.00) |
| HSBC-3716 | 05/13/2019 | | Itunes.Com | (9.99) |
| HSBC-3716 | 05/13/2019 | | Samsonite Brands | (321.64) |
| HSBC-3716 | 05/13/2019 | | Winn-Dixie | (3.79) |
| HSBC-3716 | 05/13/2019 | | Smittys Old Fashion Butcher | (267.88) |
| HSBC-3716 | 05/14/2019 | | Neiman Marcus | (731.88) |
| HSBC-3716 | 05/15/2019 | | Neiman Marcus | (583.15) |
| HSBC-3716 | 05/17/2019 | | Itunes.Com | (69.98) |
| HSBC-3716 | 05/28/2019 | | Anthony Troulan/ FirstCaribbean International Bank | (1,616.00) |
| HSBC-3716 | 05/28/2019 | | Anthony Troulan/ FirstCaribbean International Bank | (2,728.00) |
| HSBC-3716 | 05/28/2019 | | Itunes.Com | (5.99) |
| HSBC-3716 | 05/30/2019 | 65 | Tim Elms | (2,000.00) |
| HSBC-3716 | 06/03/2019 | | Itunes.Com | (2.99) |
| HSBC-3716 | 06/05/2019 | | Embroidme | (84.80) |
| HSBC-3716 | 06/06/2019 | | Paypal Ebay Inc | (4.00) |
| HSBC-3716 | 06/07/2019 | | Duane Reade Pharmacy | (29.40) |
| HSBC-3716 | 06/10/2019 | | See Eyewear | (107.79) |
| HSBC-3716 | 06/10/2019 | | Duane Reade Pharmacy | (54.99) |
| HSBC-3716 | 06/10/2019 | | Bergdorf Goodman | (1,001.65) |
| HSBC-3716 | 06/11/2019 | | Itunes.Com | (9.99) |
| HSBC-3716 | 06/17/2019 | | Samsonite Brands | 23.16 |
| HSBC-3716 | 06/18/2019 | | Itunes.Com | (9.99) |
| HSBC-3716 | 06/18/2019 | | Itunes.Com | (59.99) |
| HSBC-3716 | 06/18/2019 | | Francis L Dean & Associates | (84.00) |
| HSBC-3716 | 06/24/2019 | | GFS Store | (77.02) |
| HSBC-3716 | 06/24/2019 | | Havana Republic Cigar | (71.69) |
| HSBC-3716 | 06/25/2019 | | Adams Hometown Market | (1,018.23) |
| HSBC-3716 | 06/25/2019 | | Shore Discount | (712.70) |
| HSBC-3716 | 06/28/2019 | | The Art of Shaving | (42.50) |
| HSBC-3716 | 06/28/2019 | | Instacart | (50.98) |
| HSBC-3716 | 07/01/2019 | | Itunes.Com | (5.99) |

PAG-B0598

KM000033

Kessler et al v. Blackburn et al | Case No. CACE-20-004101

## Exhibit 6 - Detail of Personal Expenses

Source: Bank Records for HSBC (#3716 & #3724).

| Bank ID # | Statement Clearing Date | Check # / Dep Ref # | Payee / Received From | Net Activity |
|---|---|---|---|---|
| HSBC-3716 | 07/02/2019 | | Itunes.Com | (2.99) |
| HSBC-3716 | 07/02/2019 | | Itunes.Com | (2.99) |
| HSBC-3716 | 07/02/2019 | | Paypal Ebay Inc | (154.00) |
| HSBC-3716 | 07/05/2019 | | Winn-Dixie | (66.20) |
| HSBC-3716 | 07/05/2019 | | Instacart | (115.03) |
| HSBC-3716 | 07/05/2019 | | Instacart | (78.65) |
| HSBC-3716 | 07/05/2019 | | Instacart | (52.49) |
| HSBC-3716 | 07/08/2019 | | Pompano Discount Liquo | (490.78) |
| HSBC-3716 | 07/08/2019 | | Instacart | (57.08) |
| HSBC-3716 | 07/08/2019 | | Instacart | (51.64) |
| HSBC-3716 | 07/09/2019 | | Instacart | (45.24) |
| HSBC-3716 | 07/10/2019 | | Homeology Propery Ins | (590.00) |
| HSBC-3716 | 07/11/2019 | | Louis Vuitton | (309.45) |
| HSBC-3716 | 07/11/2019 | | Reiss | (48.35) |
| HSBC-3716 | 07/12/2019 | | Itunes.Com | (9.99) |
| HSBC-3716 | 07/15/2019 | | Turmeaus Sampling Lounge | (190.85) |
| HSBC-3716 | 07/16/2019 | | Instacart | (42.64) |
| HSBC-3716 | 07/18/2019 | | Itunes.Com | (69.98) |
| HSBC-3716 | 07/18/2019 | | Instacart | (101.99) |
| HSBC-3716 | 07/22/2019 | | Neiman Marcus | (458.82) |
| HSBC-3716 | 07/22/2019 | | Harrods Ltd | (1,425.61) |
| HSBC-3716 | 07/22/2019 | | Harrods Ltd | (937.48) |
| HSBC-3716 | 07/22/2019 | | Boots | (7.16) |
| HSBC-3716 | 07/24/2019 | | Instacart | (66.40) |
| HSBC-3716 | 07/26/2019 | | Instacart | (46.66) |
| HSBC-3716 | 07/26/2019 | | In Elite Luxury | (3,165.00) |
| HSBC-3716 | 07/29/2019 | | Gucci | (4,000.00) |
| HSBC-3716 | 07/29/2019 | | Sherry-Lehmann Inc | (326.41) |
| HSBC-3716 | 07/29/2019 | | CVS Pharmacy | (16.31) |
| HSBC-3716 | 07/29/2019 | | itunes.Com | (5.99) |
| HSBC-3716 | 08/01/2019 | | Itunes.Com | (2.99) |
| HSBC-3716 | 08/01/2019 | | Instacart | (43.21) |
| HSBC-3716 | 08/01/2019 | | Instacart | (115.00) |
| HSBC-3716 | 08/01/2019 | | Instacart | (2.24) |
| HSBC-3716 | 08/06/2019 | | Instacart | (90.00) |
| HSBC-3716 | 08/06/2019 | | Instacart | (70.64) |
| HSBC-3716 | 08/06/2019 | | Couture Kids | (253.63) |
| HSBC-3716 | 08/06/2019 | | Sitters Studio | (472.50) |
| HSBC-3716 | 08/09/2019 | | Golden Gate Meat Co | (447.67) |
| HSBC-3716 | 08/09/2019 | | Winco Foods | (114.83) |
| HSBC-3716 | 08/09/2019 | | Francis L Dean & Associates | (335.78) |
| HSBC-3716 | 08/12/2019 | | Whole Foods | (63.20) |
| HSBC-3716 | 08/12/2019 | | Fry's Electronics | (283.17) |
| HSBC-3716 | 08/12/2019 | | Itunes.Com | (9.99) |
| HSBC-3716 | 08/13/2019 | | Whole Foods | (397.12) |

PAG-B0599

KM000034

Kessler et al v. Blackburn et al | Case No. CACE-20-004101

## Exhibit 6  - Detail of Personal Expenses

Source: Bank Records for HSBC (#3716 & #3724).

| Bank ID # | Statement Clearing Date | Check # / Dep Ref # | Payee / Received From | Net Activity |
|---|---|---|---|---|
| HSBC-3716 | 08/14/2019 | | Swenson & Silacci Flowers | (87.25) |
| HSBC-3716 | 08/15/2019 | | Extra Space | (131.57) |
| HSBC-3716 | 08/15/2019 | | Itunes.Com | (9.99) |
| HSBC-3716 | 08/19/2019 | | Itunes.Com | (59.99) |
| HSBC-3716 | 08/19/2019 | | The Meatery | (36.18) |
| HSBC-3716 | 08/22/2019 | | Instacart | (48.00) |
| HSBC-3716 | 08/22/2019 | | Instacart | (128.98) |
| HSBC-3716 | 08/23/2019 | | Instacart | (38.34) |
| HSBC-3716 | 08/26/2019 | | Broward Medical and Urgent Care | (100.00) |
| HSBC-3716 | 08/26/2019 | | Publix | (66.03) |
| HSBC-3716 | 08/27/2019 | | CVS Pharmacy | (21.39) |
| HSBC-3716 | 08/27/2019 | | Instacart | (54.83) |
| HSBC-3716 | 08/28/2019 | | Brothers Marketp | (649.21) |
| HSBC-3716 | 08/28/2019 | | CVS Pharmacy | (7.22) |
| HSBC-3716 | 08/29/2019 | | Gulf Verc Ent | (60.00) |
| HSBC-3716 | 08/29/2019 | | Brothers Marketp | (138.78) |
| HSBC-3716 | 08/29/2019 | | Itunes.Com | (5.99) |
| HSBC-3716 | 08/30/2019 | | In Pond Hoppers | (149.75) |
| HSBC-3716 | 09/03/2019 | | Itunes.Com | (2.99) |
| HSBC-3716 | 09/06/2019 | | Instacart | (185.08) |
| HSBC-3716 | 09/10/2019 | | Unique | (291.43) |
| HSBC-3716 | 09/10/2019 | | Instacart | (89.49) |
| HSBC-3716 | 09/12/2019 | | Itunes.Com | (9.99) |
| HSBC-3716 | 09/12/2019 | | Alex and Annin | (160.50) |
| HSBC-3716 | 09/13/2019 | | Royal Warrant | (125.00) |
| HSBC-3716 | 09/13/2019 | | Royal Warrant | (448.83) |
| HSBC-3716 | 09/16/2019 | | Uber Eats | (24.00) |
| HSBC-3716 | 09/16/2019 | | Instacart | (52.72) |
| HSBC-3716 | 09/16/2019 | | Instacart | (51.04) |
| HSBC-3716 | 09/16/2019 | 197 | Lincoln Life Insurance Co. | (1,240.50) |
| HSBC-3716 | 09/17/2019 | | Uber Eats | (36.58) |
| HSBC-3716 | 09/18/2019 | | Itunes.Com | (69.98) |
| HSBC-3716 | 09/18/2019 | | Retro Red's Beauty Shop | (37.50) |
| HSBC-3716 | 09/26/2019 | | Francis L Dean & Associates | (171.55) |
| HSBC-3716 | 09/26/2019 | | Turmeaus Sampling Lounge | (113.94) |
| HSBC-3716 | 09/26/2019 | | Turmeaus Sampling Lounge | (18.03) |
| HSBC-3716 | 09/30/2019 | | Instacart | (43.49) |
| HSBC-3716 | 09/30/2019 | | Itunes.Com | (5.99) |
| HSBC-3716 | 10/02/2019 | | Brooks Brothers | (380.00) |
| HSBC-3716 | 10/02/2019 | | Itunes.Com | (2.99) |
| HSBC-3716 | 10/02/2019 | | The Arts Club | (1,299.76) |
| HSBC-3716 | 10/02/2019 | | The Arts Club | (88.77) |
| HSBC-3716 | 10/07/2019 | | The Loop T1 Co | (443.84) |
| HSBC-3716 | 10/08/2019 | | Instacart | (57.80) |
| HSBC-3716 | 10/08/2019 | 222 | Lincoln Life Insurance Co. | (2,536.50) |

PAG-B0600

KM000035

Kessler et al v. Blackburn et al | Case No. CACE-20-004101

## Exhibit 6  - Detail of Personal Expenses

Source: Bank Records for HSBC (#3716 & #3724).

| Bank ID # | Statement Clearing Date | Check # / Dep Ref # | Payee / Received From | Net Activity |
|---|---|---|---|---|
| HSBC-3716 | 10/09/2019 | | F Mcintyre Sons Ltd | (113.49) |
| HSBC-3716 | 10/11/2019 | | Boots | (18.49) |
| HSBC-3716 | 10/15/2019 | | Lowes | (238.47) |
| HSBC-3716 | 10/15/2019 | | Itunes.Com | (9.99) |
| HSBC-3716 | 10/15/2019 | | Smittys Old Fashion Butcher | (131.63) |
| HSBC-3716 | 10/15/2019 | | Instacart | (171.42) |
| HSBC-3716 | 10/15/2019 | | The Fish Peddler | (223.75) |
| HSBC-3716 | 10/15/2019 | | TM Zac Brown Band | (852.50) |
| HSBC-3716 | 10/15/2019 | | Publix | (63.64) |
| HSBC-3716 | 10/15/2019 | | Itunes.Com | (9.99) |
| HSBC-3716 | 10/15/2019 | | Publix | (25.30) |
| HSBC-3716 | 10/16/2019 | | The Arts Club | (8.68) |
| HSBC-3716 | 10/16/2019 | | The Fish Peddler | (749.47) |
| HSBC-3716 | 10/18/2019 | | Grifs Western Main Store | (1,225.73) |
| HSBC-3716 | 10/18/2019 | | Instacart | (75.00) |
| HSBC-3716 | 10/18/2019 | | Instacart | (20.44) |
| HSBC-3716 | 10/21/2019 | | Itunes.Com | (65.98) |
| HSBC-3716 | 10/21/2019 | | TM Live Nation VIP Cl | (594.00) |
| HSBC-3716 | 10/21/2019 | | Smittys Old Fashion Butcher | (443.28) |
| HSBC-3716 | 10/21/2019 | | Instacart | (57.44) |
| HSBC-3716 | 10/23/2019 | | Instacart | (59.08) |
| HSBC-3716 | 10/23/2019 | | Instacart | (63.37) |
| HSBC-3716 | 10/25/2019 | | Francis L Dean & Associates | (150.00) |
| HSBC-3716 | 10/25/2019 | 249 | Tim Elms | (1,500.00) |
| HSBC-3716 | 10/28/2019 | | Neiman Marcus | (722.25) |
| HSBC-3716 | 10/28/2019 | | Flora Ottimer | (175.48) |
| HSBC-3716 | 10/28/2019 | | Neiman Marcus | (1,487.30) |
| HSBC-3716 | 10/28/2019 | | Vudu.com | (2.99) |
| HSBC-3716 | 10/29/2019 | | Smittys Old Fashion Butcher | (577.23) |
| HSBC-3716 | 10/29/2019 | | Instacart | (88.78) |
| HSBC-3716 | 10/29/2019 | | Neiman Marcus | (72.99) |
| HSBC-3716 | 10/29/2019 | | Francis L Dean & Associates | (102.50) |
| HSBC-3716 | 11/01/2019 | | Apple | (2.99) |
| HSBC-3716 | 11/01/2019 | | Smittys Old Fashion Butcher | (663.66) |
| HSBC-3716 | 11/04/2019 | | Uber Eats | (63.02) |
| HSBC-3716 | 11/04/2019 | | Instacart | (196.12) |
| HSBC-3716 | 11/04/2019 | | Anthony Troulan/ FirstCaribbean International Bank | (2,500.00) |
| HSBC-3716 | 11/04/2019 | | Instacart | (44.45) |
| HSBC-3716 | 11/04/2019 | 286 | Tim Elms | (1,500.00) |
| HSBC-3716 | 11/06/2019 | | Anthony Troulan/ FirstCaribbean International Bank | (3,500.00) |
| HSBC-3716 | 11/08/2019 | | Lone Star Mgmt Ltd | (341.66) |
| HSBC-3716 | 11/08/2019 | | Sand Bank Investment | (321.94) |
| HSBC-3716 | 11/08/2019 | | Diamonds Internatlonals | (3,906.00) |
| HSBC-3716 | 11/08/2019 | | One Eleven East Inc | (82.81) |
| HSBC-3716 | 11/12/2019 | | Apple | (11.07) |

PAG-B0601

KM000036

Kessler et al v. Blackburn et al | Case No. CACE-20-004101

## Exhibit 6 - Detail of Personal Expenses

Source: Bank Records for HSBC (#3716 & #3724).

| Bank ID # | Statement Clearing Date | Check # / Dep Ref # | Payee / Received From | Net Activity |
|---|---|---|---|---|
| HSBC-3716 | 11/12/2019 | | Lone Star Mgmt Ltd | (55.90) |
| HSBC-3716 | 11/14/2019 | | Instacart | (121.87) |
| HSBC-3716 | 11/15/2019 | 291 | Tim Elms | (1,500.00) |
| HSBC-3716 | 11/18/2019 | | Apple | (9.99) |
| HSBC-3716 | 11/18/2019 | | Smittys Old Fashion Butcher | (284.30) |
| HSBC-3716 | 11/18/2019 | | Smittys Old Fashion Butcher | (38.65) |
| HSBC-3716 | 11/18/2019 | | Publix | (108.50) |
| HSBC-3716 | 11/18/2019 | | Instacart | (57.30) |
| HSBC-3716 | 11/18/2019 | | Apple | (59.99) |
| HSBC-3716 | 11/19/2019 | | Apple | (5.99) |
| HSBC-3716 | 11/20/2019 | | Instacart | (43.40) |
| HSBC-3716 | 11/22/2019 | | Elite Imaging | (122.16) |
| HSBC-3716 | 11/22/2019 | | Apple | (49.99) |
| HSBC-3716 | 11/22/2019 | | Instacart | (42.90) |
| HSBC-3716 | 11/25/2019 | | Tim Elms | 1,000.00 |
| HSBC-3716 | 11/25/2019 | | Smittys Old Fashion Butcher | (1,213.00) |
| HSBC-3716 | 11/25/2019 | | Instacart | (59.03) |
| HSBC-3716 | 11/25/2019 | | Instacart | (42.59) |
| HSBC-3716 | 11/25/2019 | 299 | Tim Elms | (1,500.00) |
| HSBC-3716 | 11/26/2019 | | Neiman Marcus | (156.22) |
| HSBC-3716 | 11/26/2019 | | Vudu.com | (5.99) |
| HSBC-3716 | 11/27/2019 | | The Golf Warehouse | (39.99) |
| HSBC-3716 | 11/27/2019 | | Instacart | (95.44) |
| HSBC-3716 | 11/29/2019 | | Smittys Old Fashion Butcher | (426.88) |
| HSBC-3716 | 12/03/2019 | | Instacart | (40.48) |
| HSBC-3716 | 12/03/2019 | | Instacart | (94.29) |
| HSBC-3716 | 12/03/2019 | | Apple | (2.99) |
| HSBC-3716 | 12/03/2019 | | Vudu.com | (3.99) |
| HSBC-3716 | 12/03/2019 | 305 | Tim Elms | (1,500.00) |
| HSBC-3716 | 12/04/2019 | | Neiman Marcus | (457.96) |
| HSBC-3716 | 12/04/2019 | | Neiman Marcus | (646.36) |
| HSBC-3716 | 12/04/2019 | | Neiman Marcus | (147.24) |
| HSBC-3716 | 12/04/2019 | | Vudu.com | (3.99) |
| HSBC-3716 | 12/04/2019 | | Instacart | (66.56) |
| HSBC-3716 | 12/05/2019 | | Talbots | (95.52) |
| HSBC-3716 | 12/05/2019 | | Retro Red's Beauty Shop | (60.00) |
| HSBC-3716 | 12/06/2019 | | Sherry-Lehmann Inc | (362.06) |
| HSBC-3716 | 12/09/2019 | | The Golf Warehouse | (119.99) |
| HSBC-3716 | 12/09/2019 | | Vudu.com | (3.99) |
| HSBC-3716 | 12/09/2019 | | Vudu.com | (3.99) |
| HSBC-3716 | 12/10/2019 | | Prime Video | (4.52) |
| HSBC-3716 | 12/12/2019 | | Apple | (1.99) |
| HSBC-3716 | 12/12/2019 | | Apple | (11.07) |
| HSBC-3716 | 12/13/2019 | | Instacart | (56.48) |
| HSBC-3716 | 12/19/2019 | | Apple | (14.98) |

PAG-B0602

KM000037

Kessler et al v. Blackburn et al | Case No. CACE 20 004101

## Exhibit 6 - Detail of Personal Expenses

Source: Bank Records for HSBC (#3716 & #3724).

| Bank ID # | Statement Clearing Date | Check # / Dep Ref # | Payee / Received From | Net Activity |
|-----------|------------------------|---------------------|-----------------------|--------------|
| HSBC-3716 | 12/19/2019 | | Apple | (5.99) |
| HSBC-3716 | 12/23/2019 | | Apple | (59.99) |
| HSBC-3716 | 12/26/2019 | | Vudu.com | (7.99) |
| HSBC-3716 | 12/27/2019 | | Vudu.com | (6.99) |
| HSBC-3716 | 12/30/2019 | | Vudu.com | (2.99) |
| HSBC-3716 | 12/30/2019 | | Vudu.com | (3.99) |
| HSBC-3716 | 01/02/2020 | | Apple | (2.99) |
| HSBC-3716 | 02/21/2020 | | Anthony Troulan/ FirstCaribbean International Bank | (5,500.00) |
| HSBC-3716 | 02/21/2020 | | Anthony Troulan/ FirstCaribbean International Bank | (9,000.00) |
| | | | | (135,969.44) |

PAG-B0603
KM000038

Attachment 1

PAG-B0604

KM000039

# PROFILE | PROFESSIONAL SERVICES

**PARTNER**

## BARRY E. MUKAMAL CPA*/PFS, ABV, CFE, CFF, CIRA

Barry Mukamal brings more than 30 years of multidisciplinary experience to the Advisory Services Division. He successfully addresses complex issues in bankruptcy and insolvency, capital recovery, fraud, business valuation, and economic damages.

A Chapter 7 Panel Trustee in the Southern District of Florida, Mr. Mukamal has extensive experience operating and/or terminating businesses, operational shutdowns, and liquidating their assets in the U.S. Bankruptcy Court system as well as in state court proceedings. He has been appointed as liquidating trustee and/or plan administrator in numerous complex cases requiring administration and resolution of multiple Ponzi schemes including fraud investigations, quantification of economic damages, and resolution of claims. As plan administrator or trustee on several failed commercial real estate projects, Mr. Mukamal has managed and marketed the completion of construction projects including resolving related creditor claims and construction contractor claims.

Mr. Mukamal has represented debtors, creditors, and creditors' committees in matters of insolvency fraud and abuse, and has assisted trustees in their asset recovery efforts. He has served as a court appointed receiver and mediator, and has testified as an expert witness at the local, state and federal level.

Mr. Mukamal's litigation support experience includes lost profits litigation, fraud investigations, accounting malpractice, and business valuation. He has been retained in investigations and embezzlement issues associated with financial fraud schemes, and occupational fraud.

### AREAS OF EXPERTISE
Bankruptcy and Insolvency
Solvency Opinions
Business Valuations
Commercial Damage Calculations
Contract Disputes
Investigation of Commercial Fraud
Marital Dissolution and Forensic Analysis
Succession Planning
Audit and Review

### KEY CLIENTS
Law Firms
Bankruptcy Trustees, Receivers
 and Assignees
Real Estate Companies
Construction Companies
Insurance Providers
Domestic and International Companies
Distributors
Aviation Companies
Agricultural Companies

### EDUCATION
Master of Accounting,
University of Buffalo
Bachelor of Business Administration,
University of Buffalo

### ACCREDITATIONS & DESIGNATIONS
Chapter 7 Panel Trustee
Certified Fraud Examiner
Certified Insolvency & Restructuring Advisor
 (CIRA)
Business Valuations (AICPA)
Personal Financial Specialist (AICPA)
Certified in Financial Forensics (AICPA)

*Licensed by the State of Florida

### PROFESSIONAL & CIVIC AFFILIATIONS
American Institute of Certified Public Accountants (AICPA)
Florida Institute of Certified Public Accountants (FICPA)
Association of Certified Fraud Examiners
Chapter 7 Panel Trustee, Southern District of Florida

### ARTICLES, SEMINARS & PRESENTATIONS
"Fiduciary Responsibilities of Professionals in Bankruptcy", presented at
 the 2011 Central Florida Bankruptcy Law Association Annual Seminar
"Taxation Issues Facing the Domestic Relations Practitioner",
 presented at Palm Beach County Bar Association's Family Law
 CLE Committee Seminar
"Privacy and Security Issues in a Trustee's Office and ECF Environment",
 presented at the National Association of Bankruptcy Trustees
"Bankruptcy and Marital Debts: Is It Enforceable or Dischargeable?",
 presented at ABA/CLE Webinar
American Academy of Matrimonial Lawyers - "Keep Your Client From
 Drowning: How To Deal With Bankruptcies And Foreclosures"
The Institute 33rd Annual - Florida Chapter - "The Financial Distressed Client:
 Positioning the Client for Modification, Bankruptcy and/or Foreclosure"
Florida Fiduciary Forum - Ethics Presentation, 2011

### AWARDS
2009 Top CPA's in Litigation Support, *South Florida Legal Guide*
2006 Litigation Key Partner Award Winner, *South Florida Business Journal*



**Kapila/Mukamal**

CPAs, Forensic and Insolvency Advisors

The Kapila Building / 1000 S. Federal Highway / Suite 200 / Miami, FL 33131
T. 786.517.5771 / F. 954.761.1033 / bmukamal@kapilamukamal.com
www.kapilamukamal.com   **PAG-B0605**

KM000040

## BARRY E. MUKAMAL CPA*/PFS, ABV, CFE, CFF, CIRA   CURRICULUM VITAE

### EDUCATION & DESIGNATIONS

**CPA** - Certified Public Accountant (1978), *regulated by the State of Florida

**PFS** - Personal Financial Specialist (1999), conferred by the American Institute of Certified Public Accountants

**ABV** - Accredited in Business Valuation (2000), conferred by the American Institute of Certified Pub ic Accountants

**CFE** - Certified Fraud Examiner (1994), conferred by the Association of Certified Fraud Examiner

**CFF** - Certified in Financial Forensics (2009), conferred by the American Institute of Certified Public Accountants

**CIRA** - Certified Insolvency & Restructuring Advisor

**M.B.A.**, Accounting and Business Administration, University of Buffalo,

**B. S.**, Accounting, University of Buffalo

Extensive continued education in the areas of business valuation, forensic accounting, accounting and auditing, as well as meeting bi-annual requirements for all designations of AICPA and ACFE for continued professional education.

### PROFESSIONAL HISTORY

**Kapila Mukamal** - 2014-present

**Marcum LLP** - January 1997-2014

**Mukamal, Appel, Fromberg & Margolies, P. A.** - 1982-1997

**Laventhal and Horwath** - 1981

**American Assurance Group, Treasurer, Insurance Conglomerate** - 1980

**Peat, Marwick, Mitchell & Company** - 1977-1980

### PRESENTATIONS/SEMINARS

- Top Ten DSO Issues in Bankruptcy", Continuing Legal Education (CLE) Fall Conference, 2009.
- Privacy and Security Issues", 2009 National Association of Bankruptcy Trustees (NABT) Spring Seminar.
- Taxation Issues Facing The Domestic Relations Practitioner", Palm Beach County Bar Assoc ation, Family LawCLE Committee presentation.
- Privacy and Security Issues in a Trustee's Office and ECF Environment", National Association of Bankruptcy Trustees.
- Understanding Financial Discovery", Florida Board, Family Law Financial Accounting and Cross Examination Seminar.
- Federal Tax Filing Requirements", Regional 21 Bankruptcy Trustee Association.
- Topics involving financial controls and risk management presented to financial institutions and organizations involved with distressed properties.

*Licensed by the State of Florida

## BARRY E. MUKAMAL CPA*/PFS, ABV, CFE, CFF, CIRA    CURRICULUM VITAE

### RANGE OF EXPERIENCE

A partner at KapilaMukamal, Barry Mukamal brings more than 30 years of multidisciplinary experience to the firm's Advisory Services division. Experienced in some 30 industries, he successfully addresses complex issues in bankruptcy and insolvency, capital recovery, fraud, business valuation and economic damages.

Mr. Mukamal is a Chapter 7 Panel Trustee in the Southern District of Florida. He has extensive experience operating businesses and liquidating their assets in the U.S. Bankruptcy Court system as well as in state court proceedings. He has been appointed as liquidating trustee and/or plan administrator in numerous complex cases requiring administration and resolution of litigation, quantification of economic damages and resolution of claims. As plan administrator or trustee on several failed commercial real estate projects, Mr. Mukamal has managed and marketed the completion of construction projects including resolving related creditor claims and construction contractor claims.

Mr. Mukamal has represented debtors, creditors and creditors' committees in matters of insolvency fraud and abuse, and has assisted trustees in their asset recovery efforts. He has served as a court appointed receiver and mediator, and has testified as an expert witness at the local, state and federal level. He has extensive experience in litigation involving preference transfers and fraudulent conveyances in the context of bankrupt entities.

Mr. Mukamal's extensive litigation support experience includes matrimonial dissolution, lost profits litigation, fraud investigations and business valuations. He has been involved in numerous high profile, high-net-worth divorces involving assets in the U.S. and abroad. In addition, he has been retained in investigations and embezzlement issues associated with financial fraud schemes such as Ponzi schemes and occupational fraud. His experience also extends to lost profits litigation, damages in relation to breach of contract, and personal injury and wrongful death actions. Mr. Mukamal's testimony for the plaintiff in a patent damage action facilitated a multi million dollar award for the client.

Mr. Mukamal's involvement with audit and review engagements make him particularly qualified to address issues of accounting malpractice and to testify in such areas. He has been involved in audit, review, accounting and tax engagements ranging from small, closely-held entities to SEC clients in various industries, including insurance, manufacturing, distribution, real estate, health care, publishing, agriculture, seafood and aviation.

### PROFESSIONAL & CIVIC AFFILIATIONS
- American Institute of Certified Public Accountants (AICPA)
- Florida Institute of Certified Public Accountants (FICPA)
- Association of Certified Fraud Examiners
- Institute of Business Appraisers
- Greater Miami Chamber of Commerce, Trustee Member
- Chapter 7 Panel Trustee, Southern District of Florida
- Association of Insolvency & Restructuring Advisors
- Peninsula Bank, Board of Directors

### AWARDS & RECOGNITIONS
- 2006 Litigation Key Partner Award Winner, South Florida Business Journal
- 2009 Top CPAs in Litigation Support in South Florida - South Florida Legal Guide

*Licensed by the State of Florida

**BARRY E. MUKAMAL CPA\*/PFS, ABV, CFE, CFF, CIRA** | CURRICULUM VITAE

## RECEIVERSHIP EXPERIENCE

Barry Mukamal's experience runs the full gamut of receivership, insolvency and litigation support work on behalf of creditors. He is a member of the panel of Bankruptcy Trustees for the Southern District of Florida. Mr. Mukamal has served as trustee in thousands of bankruptcy cases and most recently, as plan administrator in two cases involving troubled real estate projects on complex high rise condominium projects. His technical skills, abilities and experience are applied on a "hands on basis" in each assignment, which allows him to:

- Quickly assess and analyze the current environment of the estate and formulate an asset management plan to optimize the estate's value
- Termination of Operations
- Communicate and manage the expectations of creditors and equity holders during the execution of the asset management plan
- Effectively manage the financial resources of an estate to optimize the estate's value
- Efficiently manage third party service providers who are needed to maintain or enhance the Estate's value for creditors and equity stakeholders
- Manage the marketing and sale of estate assets of any type
- Identify potentially fraudulent transactions and perform detailed investigations of the debtors' financial affairs
- Manage litigation to optimize the estate's recovery value.

He is well skilled in negotiation and positioning. He has participated in both in-court and out-of-court workouts in a variety of industries including commercial and residential real estate, agriculture, aerospace, manufacturing and distribution. His seasoned skills and experience that are exemplified in the areas of bankruptcy/insolvency and litigation are equally available to assist creditors and debtors in other contexts, including where creditors enter into an assignment for the benefit of creditors with troubled private and public company debtors.

In such challenging situations, he employs the same high standards of conduct and accountability, financial reporting, and asset management and disposition strategies that are routinely used in his Trustee engagements. He is fully cognizant that an assignee acts as a fiduciary for the benefit of all parties with correlative duties tantamount to that of a bankruptcy trustee or court appointed receiver. In addition to the general duties of any fiduciary, such duties may include the following:

- Inventory, secure and protect the property
- Convert the estate to cash in the most expedite and efficient manner that maximizes the net recovery value.
- Take legal action to recover on causes of action that are part of the estate, including receivables, fraudulent transfers and preferential transfers
- Determine which creditors have valid and enforceable claims
- Consider and deal with any tax issues incident to the administration of the estate
- Account for and distribute cash to creditors in accordance with their priority under common or statutory law.

\*Licensed by the State of Florida

PAG-B0608

KM000043

Attachment 2

PAG-B0609

KM000044

## BARRY E. MUKAMAL - RECENT TESTIMONY HISTORY

| ID | Case Name | Court | Case Number | Judge | Type of Testimony | Year |
|----|-----------|-------|-------------|-------|-------------------|------|
| 1 | DAVID C ARNOLD v ASSOCIATION LAW GROUP, ET AL | MIAMI-DADE | 12-13962 ca 40 | | DEPOSITION / TESTIMONY | 2014 |
| 2 | TODD LARY/STARBRIGHT v BOSTON SCIENTIFIC CORPORATION | SOUTHERN DISTRICT OF FLORIDA | 1:11 CV 23820 | | TRIAL TESTIMONY | 2014 |
| 3 | AMERICAN EDUCATIONAL ENTERPRISES, LLC v THE BOARD OF TRUSTEES OF THE INTERNAL IMPROVEMENT TRUST FUND | MIAMI-DADE COUNTY | CASE #02-23922 CA 09 | | DEPOSITION | 2014 |
| 4 | P & S ASSOCIATES GENERAL PARTNERSHIP & S & P ASSOCIATES GENERAL PARTNERSHIP v ROBERTA P. ALVES, Et AL | BROWARD COUNTY | CASE #12-028324(07) | | TRIAL TESTIMONY | 2014 |
| 5 | IRONSHORE INDEMNITY INC. et al v BANYON 1030-32 LLC ET AL, ROBERT FURR TRUSTEE | BANKRUPTCY COURT SOUTHERN DISTRICT OF FLORIDA | 12-CV-61678-MGL 12-CV-61753-WJZ 12-CV-61813-KMW | | DEPOSITION | 2014 |
| 6 | PATRICIA MONTES DE OCA v JOSE JUAN REN'ERIA | CIRCUIT COURT - MIAMI-DADE COUNTY, FLORIDA | 2012-021622-FC-04 | | Testimony | 2014 |
| 7 | BANNING LARY, MD, ET AL. v BOSTON SCIENTIFIC CORPORATION | US DISTRICT COURT SOUTHERN DISTRICT OF FLORIDA | 1:11-cv-23820-O'SULLIVAN | O'SULLIVAN | Deposition & Trial | 2014 |
| 8 | TELTRONICS, INC. | BANKRUPTCY COURT MIDDLE DISTRICT OF FLORIDA | 8:11-BK-12150-KRM | KRM | Deposition & Trial | 2015 |
| 9 | ARAZOZA BROTHERS CORP | CIRCUIT COURT MIAMI-DADE COUNTY, FLORIDA | 13-1908 CA 25 | | Deposition | 2015 |
| 10 | DYADIC INTERNATIONAL, INC. v ERNST & YOUNG, LP, et al. | CIRCUIT COURT PALM BEACH COUNTY, FLORIDA | 50 2009 CA010680 XXXX MB AA | | Deposition | 2015 |
| 11 | TELTRONICS, INC. | BANKRUPTCY COURT MIDDLE DISTRICT OF FLORIDA | 8:11-BK-12150-KRM | KRM | Deposition & Trial | 2015 |
| 12 | RONALD DEMASI | BANKRUPTCY COURT MIDDLE DISTRICT OF FLORIDA | 8:13-BK-08406-MGW | MGW | Deposition & Trial | 2015 |
| 13 | XTEC, INC. | CIRCUIT COURT MIAMI-DADE COUNTY, FLORIDA | 13-38362 CA 09 | | Deposition & Trial | 2015 |

KM000045

PAG-B0610

## BAREY E. MUKAMAL - RECENT TESTIMONY HISTORY

| | Case Name | Court | Case Number | Judge | Type of Testimony | Year |
|---|---|---|---|---|---|---|
| 14 | LINDA S. ORTIZ V. HECTOR P. ORTIZ | CIRCUIT COURT 11TH JUDICIAL CIRCUIT MIAMI-DADE COUNTY, FL | 2014-8076-FC04 (3S) 2014-022865-FC04 (39) | | Trial | 2015 |
| 15 | FUTURESELECT PORTFOLIO MANAGEMENT, INC. V. TREMONT GROUP HOLDINGS, INC. | SUPERIOR COURT OF THE STATE OF WASHINGTON | 10-2-30732-0-SEA | | Deposition & Trial | 2015/2016 |
| 16 | TAYLOR, BEAN & WHITAKER PLAN TRUST V. PRICEWATERHOUSECOOPERS, LLP | 11TH JUDICIAL CIRCUIT MIAMI-DADE COUNTY | 13-33964 (40) | | Deposition | 2015/2016 |
| 17 | AGRO SUPPLY, S.A. V. AGRITRADE, LP | 11TH JUDICIAL CIRCUIT MIAMI-DADE COUNTY | 13-15713 CA 01 | | Deposition & Trial | 2015/2016 |
| 18 | DISABILITY LAW CLAIMS, PA, ET AL. V. IW SOLUTIONS, LLC | DISTRICT COURT SOUTHERN DISTRICT OF FLORIDA | 14-6177-CIV-DIMITROULEAS /SNOW | | Deposition | 2015/2016 |
| 19 | MAJORCA ISLES MASTER ASSOCIATION | BANKRUPTCY COURT SOUTHERN DISTRICT OF FLORIDA | 12-19056 BYC AJC | AJC | Trial | 2015/2016 |
| 20 | CITY NATIONAL BANK OF FLORIDA V. MAC-ACCESS, CORP | CIRCUIT COURT 11TH JUDICIAL CIRCUIT MIAMI-DADE COUNTY, FL | 2015-029121-CA-01(22) | HANZMAN | Forensic Examination | 2016 |
| 21 | LAPOUC V. LAPOUC | CIRCUIT COURT 11TH JUDICIAL CIRCUIT MIAMI-DADE COUNTY, FL | | | Trial | 2016/2017 |
| 22 | LAMINGTON RESOURCES, INC V. BURGER KING CORPORATION, V. BK CENTROAMERICA CAYMAN LTD. ET AL. | INTERNATIONAL CHAMBER OF COMMERCE INTERNATIONAL COURT OF ARBITRATION | CASE NO. 20786/RC | | Deposition | 2016/2017 |
| 23 | PEDRO A. TORRES V. ASTOR PROPERTY HOLDINGS, LLC, ET AL. | CIRCUIT COURT 11TH JUDICIAL CIRCUIT MIAMI-DADE COUNTY, FL | 2015-014693-CA(20) | | Deposition/Trial | 2016/2017 |
| 24 | S.R. KALB AND ASSOCIATES, INC. V. 2250 & 2233 NW 77 TER, LLC AND MICHAEL I. ROSE | CIRCUIT COURT 11TH JUDICIAL CIRCUIT MIAMI-DADE COUNTY, FL | 2016-001586-CA-01 | | Receiver | 2016/2017 |
| 25 | REMOS BUILDING & DEVELOPMENT CORPORATION V. CHAPEL TRAIL ASSOCIATES, LTD | CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT, IN AND FOR BROWARD COUNTY, FL | 05-05212 (02) | | Deposition | 2017 |

PAG-B0611

KM000046

## BARRY E. MUKAMAL - RECENT TESTIMONY HISTORY

| ID | Case Name | Court | Case Number | Judge | Type of Testimony | Year |
|---|---|---|---|---|---|---|
| 26 | LARRY V. GORDON V. ROBERT FISHMAN | IN THE CIRCUIT COURT OF THE 15TH JUDICIAL CIRCUIT IN AND FOR PALM BEACH COUNTY, FLORIDA | 2014-CA-008927 (AD) | BARKDULL | Deposition | 2017 |
| 27 | GARY DEAR, as Class Representative V. Q-CLUB HOTEL, LLC | UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF FLORIDA | 15-60472-CIV-COHN/SELTZER | COHN | Trial | 2017 |
| 28 | BAHAMAN VILLAGE, LLC V. FPL | CIRCUIT COURT 11TH JUDICIAL CIRCUIT MIAMI-DADE COUNTY, FL | 13-34551-CA-09 | | Deposition | 2017 |
| 29 | DAVID L. CLARKE, ET AL V. IWU INLANDS DEVELOPMENT CORP. AND PRIVE DEVELOPERS LLC AND TRUST 75 LT21 | CIRCUIT COURT 11TH JUDICIAL CIRCUIT MIAMI-DADE COUNTY, FL | 14-21513-CA-00 | BAGLEY | Deposition | 2018 |
| 30 | PHILIP VON KAHLE, CURATOR V. FIDELITY AND DEPOSIT COMPANY OF MARYLAND | CIRCUIT COURT 11TH JUDICIAL CIRCUIT MIAMI-DADE COUNTY, FL | 16-021099-CA-01 | THORNTON | Deposition | 2018 |
| 31 | HAROLT SAMRA V. VICKEN BEDOYAN, WPM MIAMI, INC, et al. | CIRCUIT COURT 11TH JUDICIAL CIRCUIT MIAMI-DADE COUNTY, FL | 14-22854-CA-40 | THOMAS | Trial | 2018 |
| 32 | JOEL BETH NAVRATIK, et al. V. JON J. RAPPAPORT AND PET MEDICAL CENTERS, LLC | CIRCUIT COURT 11TH JUDICIAL CIRCUIT MIAMI-DADE COUNTY, FL | 17-019695-CA-01(44) | Thomas | Deposition & Trial | 2018 |
| 33 | STORATI V. TOTAL GSM, LLC | CIRCUIT COURT 11TH JUDICIAL CIRCUIT MIAMI-DADE COUNTY, FL | 11-2/9U/ | Butchko | Deposition | 2018 |
| 34 | CONTRAZZA INTERNATIONAL CONSTRUCTION, INC. V. UNIVERSAL TOWERS CONSTRUCTION, INC. | CIRCUIT COURT 9TH JUDICIAL CIRCUIT FOR ORANGE COUNTY, FLORIDA | 2015-CA-008342 | | Deposition/Trial | 2018 |
| 35 | SHOW ME HOSPITALITY, LLC V. TIM HORTONS USA INC. | UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF FLORIDA | 17-22679-CIV | Martinez-Onan-Reyes | Deposition | 2019 |
| 36 | WAVE LENGTHS HAIR SALON OF FLORIDA, INC V. CBL & ASSOCIATES PROPERTIES, INC | UNITED STATES DISTRICT COURT MIDDLE DISTRICT OF FLORIDA | 2:16-cv-00206-SPC-MRM | | Deposition | 2019 |
| 37 | BOUDKO, POLINA V. BUYANOV, DMITRIY | CIRCUIT COURT 11TH JUDICIAL CIRCUIT MIAMI-DADE COUNTY, FL | 17-04537-H-U4 | Young | Deposition | 2019 |
| 38 | STEVEN R. SCHAFER, ET AL V. ROBERT A. DICRISCI, ET AL. | CIRCUIT COURT 11TH JUDICIAL CIRCUIT MIAMI-DADE COUNTY, FL | 17-021621-CA-43 | Butchco | Deposition | 2019 |

KM000047

PAG-B0612

## BARRY E. MUKAMAL - RECENT TESTIMONY HISTORY

| ID | Case Name | Court | Case Number | Judge | Type of Testimony | Year |
|----|-----------|-------|-------------|-------|-------------------|------|
| 39 | SCHECHTER OPERATING CAPITAL LLP V. BAINBRIDGE INVESTOR, LLC | CIRCUIT COURT 15TH JUDICIAL CIRCUIT PALM BEACH COUNTY, FL | 50-2016-CA-8692 | | Deposition | 2019 |
| 40 | IRONSHORE INDEMNITY INC. et al V. BANYON 1030-32 LLC ET AL, ROBERT FURR TRUSTEE | BANKRUPTCY COURT SOUTHERN DISTRICT OF FLORIDA | 12-CV-61678-MGC 12-CV-61753-WJZ 12-CV-61813-KMW | Ray | Trial | 2019 |
| 41 | BOYWIC FARMS, LTD V. BRITT L. WEAVER | AMERICAN ARBITRATION ASSOCIATION | 01-18-0001-9008 | | Deposition | 2019 |
| 42 | MANDARIN LAKES NEIGHBORHOOD HOMEOWNERS ASSOCIATION, INC V. | CIRCUIT COURT 11TH JUDICIAL CIRCUIT MIAMI-DADE COUNTY, FL | 18-03995O-CA-01 | | Deposition | 2019 |
| 43 | HADAD CONSULTING, LLC V. URBAN FARMERS, INC | CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT, IN AND FOR BROWARD COUNTY, FL | 17-019215 | | Trial | 2021 |

PAG-B0613

KM000048

# Attachment 3

PAG-B0614

KM000049

Filing # 106896478 E-Filed 04/30/2020 12:21:16 PM

## IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
## IN AND FOR BROWARD COUNTY, FLORIDA

CASE NO.   CACE20004101   DIVISION   07   JUDGE   Jack Tuter

**Edward Kessler, et al**

Plaintiff(s) / Petitioner(s)

v.

**James Blackburn, et al**

Defendant(s) / Respondent(s)

_____ /

## ORDER APPOINTING ACCOUNTANT

THIS CAUSE having come before the Court on Plaintiff's Notice of Filing Proposed Accountants (the "Notice") and the Motion to Amend and/or Strike Plaintiff's Notice of Filing Proposed Accountants (the "Motion to Strike"), and in furtherance of the Order on Status Conference entered April 20, 2020 (the "Status Conference Order"), it is hereby ORDERED:

1. The Court appoints Barry Mukamal, CPA, PFS, ABV, CFE, CFF, CIRA of Kapila Mukamal located at The Kapila Building, 1000 South Federal Highway, Suite 200, Fort Lauderdale, FL 33316 ("Mukamal") to act as an independent accountant in this matter.

2. Mukamal shall prepare the Reports as that term is defined in the Status Conference Order, and any schedules, spreadsheets, or supplemental reports as needed to do so. For the avoidance of doubt, the Reports shall include:

   a. an accounting of the assets, whether liquid or not, and liabilities of PGA; and

   b. a schedule of all of PGA's expenditures of $2,500 or more, from PGA's inception through the present, along with an explanation for each expenditure.

3. Premier Group Autos, LLC ("PGA") members Edward Kessler and James Blackburn (the "Members"), PGA's employees, and anyone acting on behalf of PGA shall provide

PAG-B0615

KM000050

CaseNo: CACE20004101
Page 2 of 2

Mukamal with all information and documents in their possession, custody, or control reasonably necessary to prepare the Reports, and shall obtain any available additional information and documents from third parties reasonably necessary to complete the Reports. The Members and their agents shall comply with all information and documents requests from Mukamal.

4. Mukamal shall cap his firm's rates at a $425 per hour blended rate.

5. The Members shall each be responsible for 50% of the fees and costs associated with the Reports, including any fee retainer required by Mukamal.

6. The Court reserves jurisdiction to modify the scope of the accounting and other powers conferred upon Mukamal herein.

**DONE** and **ORDERED** in Chambers, at Broward County, Florida on 04-30-2020.

CACE20004101 04-30-2020 10:09 AM

CACE20004101 04-30-2020 10:09 AM
Hon. Jack Tuter
**CIRCUIT JUDGE**
Electronically Signed by Jack Tuter

**Copies Furnished To:**
Brett M Amron , E-mail : bamron@bastamron.com
Brett M Amron , E-mail : mdesverqunat@bastamron.com
Brett M Amron , E-mail : kjones@bastamron.com
Dana Quick , E-mail : dquick@bastamron.com
Dana Quick , E-mail : mdesverqunat@bastamron.com
Dana Quick , E-mail : jmiranda@bastamron.com
Raul Gastesi Jr , E-mail : Efiling@glmlegal.com
Raul Gastesi Jr , E-mail : acevedo@glmlegal.com
Raul Gastesi Jr , E-mail : gastesi@glmlegal.com

# Attachment 4

PAG-B0617

KM000052

Agreement Between Ed Kessler and James Blackburn
5th November 2018

Agreed the following:

- Ed and James will own 50% each of The Premier Group and its subsidiary Overfinch Miami.
- Both parties agree to support the company in their own relative capacity.
- More detailed agreement to follow after training in London in December.
- Initial commitments below.

Ed Kessler
- $50,000 in upfront capital provided
- Use of credit facilities for purchase of floorplan financing and showroom build out.
- Director of operations for the company
- Purchase of first vehicle to be financed
- Any additional financing required via loan or capital support

James Blackburn
- $50,000 in upfront capital provided
- Use of credit facilities for purchase of floorplan financing and showroom build out.
- Chief Executive officer for the company
- Purchase of the first vehicle to be financed
- Any additional financing required via loan or capital support

Any additional financing needed shall be agreed to buy both parties and shall be provided equally.
Both parties capital input is capped at $100,000.
Any extra funds needed shall be sourced in a mutually agreed way.

Ed Kessler

James Blackburn

**EXHIBIT**

**1**

PAG-B0618

KM000053

# Attachment 5

PAG-B0619

KM000054

## DISTRIBUTION AGREEMENT

This International Distribution Agreement ("Agreement") is made effective as of ,Monday..03ᵗʰ..December..18. ("Effective Date") by and between Premier Group Autos LLC ("Distributor") with company registration number LI800263245 with its principal place of business at 1500 Cordova Road, 206 Fort Lauderdale, Florida, 33316 and Overfinch North America Inc. ("OVERFINCH") with its principal place of business at 500 Stinson Drive, Danville VA  24540 USA.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

I.   **DEFINITIONS**

1.1   "Conversion" means exterior products including body styling package, badges, lettering, wheels and tires and the fitment thereof by OVERFINCH.

1.2   "Conversion Value" means the value of the Products and services supplied by OVERFINCH as set out in the relevant order acceptance and / or invoice.   For the avoidance of doubt, the Conversion Value does not include taxes, duties, freight and transportation charges and similar costs, all of which are payable by the Distributor.

1.3   "Customers" means any current or potential purchasers or end-users of the Products.

1.4   "Initial Term" means twelve months from the Effective Date.

1.5   "Introducers Fee" means an amount in US dollars to be agreed on a deal by deal basis between the parties.

1.6   "Order Value" means the total value of the order including the Vehicle Value and Conversion Value as set-out in such order that is accepted by OVERFINCH.

**EXHIBIT**
**2**

1.7 "Products" means any Overfinch products sold by OVERFINCH to Distributor for resale to Customers pursuant to the terms of this Agreement, and any related services (including OVERFINCH training).

1.8 "Term" means twelve months commencing from the Effective date and thereafter each twelve-month period following the anniversary of the Initial Term.

1.9 "Territory" means the utility and industrial market segments in South Florida (Miami Dade, Broward, Palm Beach, Monroe, Collier, Lee, Henry, Florida Keys and the Glades) only.

1.10 "Vehicle" means a new vehicle that OVERFINCH has manufactured parts for and is capable of being modified by OVERFINCH.

1.11 "Vehicle Value" means the cost of the vehicle as invoiced to Overfinch by the supplying automotive dealer. For the avoidance of doubt, the Vehicle Value does not include state or local taxes, freight and transportation charges and similar costs, all of which are payable by the Distributor.

II.   **RELATIONSHIP**

2.1   **Appointment.** OVERFINCH appoints the Distributor as an exclusive, independent distributor of Products to Customers in the Territory. Distributor accepts such appointment and agrees to devote sufficient time and resources to the performance of its duties hereunder. Distributor shall promptly notify OVERFINCH of all inquires related to Products from persons or entities located outside the Territory. Distributor shall notify OVERFINCH of all changes in personnel assigned to its account.

OVERFINCH reserves the right to transact any business to retail Customers within the Territory that are as a result of online sales made via its website or other online platform and / or sales resulting from any local or national brand advertising events that it has organized and participated in.

OVERFINCH may terminate the exclusivity under this Agreement upon thirty (30) days notice at any time that the Distributor has placed no orders with OVERFINCH for any rolling two-month period, providing that the Distributor has not already ordered, prior to the commencement of that two-month

JB AS.

PAG-B0621
KM000056

period. Products that would exceed the minimum amount required by the end of that two-month period.

2.2     **Independent Contractor.** Distributor is an independent contractor. Distributor is not an employee, representative, or agent of OVERFINCH. Distributor is not authorized to make any agreement, warranty or representation on behalf of OVERFINCH, or to create any liability or obligation, express or implied, on behalf of OVERFINCH. Distributor shall not appoint any third party to promote or sell Products or otherwise perform any of Distributor's obligations hereunder. Distributor shall conduct its business in its own name, maintain its own office and be responsible for its expenses, personnel and operations.

2.3     **Direct Sales.** OVERFINCH reserves the right to honor online store orders from Customers that are based within the Territory, with no compensation to the Distributor.

During the Initial Term and any renewal Term, in the event that the Distributor can demonstrate via an information registration service acceptable to OVERFINCH that is has recorded a Customer's details at an event it attended and / or hosted, whereby it introduced that Customer to the Overfinch brand and that Customer is within the Territory and would like to place an order to purchase Products from OVERFINCH directly within a six month period from that introduction, OVERFINCH shall refer that Customer to the Distributor. In the event such Customer is located outside of the Territory OVERFINCH shall pay the Distributor an Introducers Fee.

The Distributor is required to submit the information registration record to OVERFINCH on a monthly basis and within 5 working days following an event that the Distributor has hosted.

OVERFINCH shall maintain an information registration service whereby it records Customer's details at any brand advertising event that it attends and / or hosts.

2.4     **Sales Terms.** OVERFINCH may decline to quote any potential sale and may accept or reject any order, providing that such declination or rejection is based upon a reasonable commercial decision.

All sales of Products by OVERFINCH shall be subject to the OVERFINCH Sales Terms in effect at time of sale, as reflected on the OVERFINCH sales order acknowledgment, to the extent that they do not conflict with the provisions of this Agreement. By placing each order hereunder, Distributor confirms

JB AS .

PAG-B0622
KM000057

its agreement with and acceptance of the OVERFINCH Sales Terms. Distributor must extend, honor and perform the warranty services as set forth in the OVERFINCH Sales Terms to Customers. OVERFINCH shall be bound only by the warranty applicable to parts as set forth in the applicable OVERFINCH Sales Terms, and Distributor shall indemnify OVERFINCH against any additional warranty terms. Any warranty or other sales terms required by law in the Territory must be provided by Distributor, and Distributor shall indemnify OVERFINCH for any failure to comply with any such requirements. Distributor must also notify OVERFINCH if any of its standard warranty or other sales terms conflict with any law in the Territory.

During the Initial Term and any subsequent renewal Term thereafter the Distributor shall notify OVERFINCH promptly of any potential warranty claim relating to its Products. Any warranty claims are at the sole decision of OVERFINCH and any costs or expenses incurred by the Distributor shall only be reimbursed providing these have been pre-authorized in writing by OVERFINCH.

OVERFINCH Conversions/Products shall be ordered on a monthly basis. There is no guarantee in respect of the delivery date of any Vehicles. OVERFINCH has no control over the lead time of the Vehicle from the manufacturer. It is not guaranteed, and it is dependent upon the model year of the Vehicle being ordered, but it is envisaged that a Vehicle will be delivered with the Conversion within 16 weeks from OVERFINCH'S acceptance of a Vehicle order. OVERFINCH shall update the Distributor on lead times of Vehicles as and when it receives updates from the supplying automotive dealer.

Upon OVERFINCH's acceptance of an order submitted by the Distributor for a Vehicle and Conversion, the Distributor is required to comply with the following payment terms:
1.) 10% non-refundable deposit of the total Order Value upon OVERFINCH'S acceptance of the order;
2.) Remaining balance of the Vehicle Value to be paid on or before collection of the Vehicle by OVERFINCH from the Land Rover dealer;
3.) Remaining balance of the Conversion Value to be paid upon completion of the conversion by OVERFINCH and before delivery of it to the Distributor.

Upon OVERFINCH's acceptance of an order submitted by the Distributor for a Conversion, the Distributor is required to comply with the following payment terms:
1.) 10% non-refundable deposit of the total Order Value upon OVERFINCH'S acceptance of the order;

*JB*

PAG-B0623

KM000058

2.)  Remaining balance of the Conversion Value to be paid upon completion of the conversion by OVERFINCH and before delivery of it to the Distributor.

Payment must be made in cleared funds via wire transfer or cheque only.

All orders are exclusive of state and local taxes, freight and transportation charges and similar costs, all of which should be paid by the Distributor.

Prices for Products shall be those provided in writing by OVERFINCH to Distributor and may be modified by OVERFINCH from time to time.  Distributor shall pay all amounts in U.S. Dollars.

Distributor shall provide OVERFINCH with its standard end-user price list upon request.

Distributor acknowledges that OVERFINCH pricing fully compensates Distributor on an ongoing basis for customer and market development, for providing product support and services in the Territory.

Delivery of the Products shall take place at OVERFINCH'S place of business. Acceptance of any change to the delivery point requested by the Distributor shall be at OVERFINCH'S sole discretion and at the Distributors risk and expense.

## 2.5   Minimum Annual Order Quantity

The Distributor is required to place orders for a minimum of 36 OVERFINCH Conversions or Overfinch Products to the value of $1,500,000.00 during the Initial Term.  One Conversion/Product order shall be placed upon the Effective Date of this agreement.  Thereafter the remaining minimum order quantity shall be spread in equal instalments across each month of the Initial Term, with the Distributor ordering a minimum of 3 Conversions or the equivalent value in Products each month.

Unless notified by OVERFINCH in writing 30 days prior to the expiry of the Initial Term, the contract shall automatically renew for a further Term.  The minimum annual order requirement for any such renewal Term shall be an increase of 10% of the minimum annual order value required in the previous Term.

The initial minimum annual order shall commence on the above Effective Date, with each subsequent minimum annual order commencing upon each renewal Term.

JB AS.

PAG-B0624
KM000059

The Distributor has the intention to open an Overfinch showroom within the Territory within 8 to 12 months from the Effective Date of this agreement. Upon the Distributor confirming it has finalized its plans in respect of that showroom, both parties shall enter into further discussions regarding the terms of this agreement in view of the investment proposed by the Distributor and document any such variation to the terms hereof that are agreeable between both parties at that time. Further, subject to the Distributor's performance throughout the Initial Term, the parties may enter into discussions regarding distributorships in other potential territories in the United States of America.

### 2.6   Initial Order

Upon execution of this Agreement, the Distributor shall submit an initial order for an OVERFINCH Conversion.

### III.   RESPONSIBILITIES

**3.1   Promotion.** Distributor shall devote sufficient time and resources to successfully promote and sell Products to Customers. Distributor shall ensure that all sales personnel are properly trained and possess the appropriate technical competency to promote Products effectively. Distributor shall respond in a timely and professional manner to all inquiries from and referrals to Customers. Distributor shall furnish any market information requested by OVERFINCH, including without limitation annual sales plans, monthly sales reports, monthly forecasting reports, sales forecast updates and explanations of any discrepancies between forecasted and actual sales. Distributor shall attend any required OVERFINCH sales training.

**3.2   Marketing.** The Distributor is required to advertise and promote the Products on a regular basis on an appropriate marketing platform akin to the prestige of the brand. The Distributor should submit a proposed marketing plan to OVERFINCH for its review and written consent.

OVERFINCH may from time to time carry out local and / or national brand advertising and marketing activities, within or outside of the Territory and request the Distributor to make a reasonable contribution to such costs and expenses associated and incurred in respect of that brand advertising. OVERFINCH shall provide reasonable notice of anticipated costs and expenditure for such brand advertising.

*JB AS.*

PAG-B0625

KM000060

3.3     Events.  The Distributor shall host 10 exclusive events during the course of the initial term in order to promote the OVERFINCH brand and Vehicles.  OVERFINCH will provide marketing material and product support for use at such events, upon reasonable notice and as required.   The Distributor shall cover the reasonable costs and expenses incurred by OVERFINCH in this regard.

3.4     **Customer and Product Support**.  Distributor shall follow up and maintain contact with Customers to ensure customer satisfaction.  Distributor shall ensure that Customers receive information about any recalls on Products provided to Distributor.   Distributor shall employ personnel who are educated in the field and sufficiently knowledgeable of Products to perform the technical support and services required hereunder.

3.5     **Technical and Marketing Materials**.  Distributor shall maintain an adequate inventory of current OVERFINCH technical and marketing materials to promote Products.  Distributor may not use any technical or marketing materials not provided by OVERFINCH.  Prior written approval for the use of any marketing material should be obtained from OVERFINCH.   Distributor shall provide any translations of OVERFINCH technical and marketing materials to OVERFINCH.

3.6     **Compliance**.  Distributor shall comply with all governmental laws, regulations and orders of all relevant jurisdictions that may be applicable to Distributor under this Agreement, including without limitation the U.S. Export Administration Act, the U.S. Foreign Corrupt Practices Act and all licensing and registration requirements in the Territory.  Distributor shall advise OVERFINCH with respect to any warranty requirements, noise ordinances, safety standards, specifications and other requirements applicable to Products imposed by law, regulation or order in the Territory.  Distributor shall notify OVERFINCH of the existence and content of any provision of law in the Territory or any other applicable law that conflicts with any provision of this Agreement or any other document, such as warranty or sales terms, at the time of execution or at any time thereafter.

3.7     **Training.**  OVERFINCH shall provide sales and technical training and support as appropriate.  The Distributor shall cover the reasonable costs and expenses incurred by OVERFINCH in providing this.

*JB AS.*

PAG-B0626

KM000061

IV.   INTELLECTUAL PROPERTY AND CONFIDENTIALITY

4.1.   **Intellectual Property.** Distributor acknowledges that trademarks, service marks, trade dress, patents, copyrights, trade secrets, licenses and any other intellectual property used by OVERFINCH are the sole property of OVERFINCH. Distributor shall not use such OVERFINCH property except in the normal course of promoting Products, or promoting OVERFINCH in general, under the terms of this Agreement. Distributor shall not remove or alter any trademarks, service marks or trade dress that identify OVERFINCH, nor use any trademarks, service marks, trade dress or any other intellectual property that, in the sole discretion of OVERFINCH, are confusingly similar to those of OVERFINCH. Distributor shall make every effort to safeguard the intellectual property of OVERFINCH, and shall immediately notify OVERFINCH in writing of any infringement or suspected infringement and cooperate with OVERFINCH, as OVERFINCH deems necessary, to protect such property against infringement (such cooperation to be at OVERFINCH expense unless the infringement arose from Distributor acts or omissions). Distributor shall comply with the OVERFINCH INTELLECTUAL PROPERTY POLICY, as provided by OVERFINCH. OVERFINCH my immediately terminate this Agreement for any violations of these intellectual property requirements. Upon termination of this agreement the Distributor shall not use the intellectual property.

4.2   **Confidentiality.** All confidential information provided, from time to time, by OVERFINCH to Distributor has been or is provided in strict confidentiality, and can neither be disclosed by Distributor to third parties during the term of this Agreement or after termination or expiration, nor used by Distributor for purposes other than those set forth in this Agreement. Distributor shall maintain such information in strict confidence during the term of this Agreement and for five (5) years after termination or expiration, except when disclosure of such information is required by law. Within thirty (30) days of any request by OVERFINCH or termination or expiration of this Agreement, Distributor shall return or destroy, according to OVERFINCH's instruction at such time, all confidential information and any demonstration products provided by OVERFINCH. Distributor shall ensure compliance with these confidentiality obligations by its employees, representatives and agents, including without limitation by obtaining appropriate confidentiality agreements from such persons.

4.3   **Other brands.** The Distributor shall not fit any other after-market tuning brands parts and / or accessories branded or unbranded to any Vehicle's supplied by OVERFINCH, so as to cause confusion in the market place that any other brands products are that of OVERFINCH or vice versa

*JB  AS.*

PAG-B0627
KM000062

## V.    TERM AND TERMINATION

5.1    Term.   Subject to termination, this Agreement shall have an initial term of one (1) year, commencing on the Effective Date, and shall renew automatically for additional one (1) year periods, subject to the below.

5.2    Termination.  Either party may terminate this Agreement without cause upon thirty (30) days written notice to the other party to expire upon the end of the Initial Term or following that the anniversary of any renewal Term thereafter.  Either party may also choose to render the agreement non-exclusive upon thirty (30) days written notice to expire upon the end of the Initial Term or following that the anniversary of any renewal Term thereafter (in addition to the right of OVERFINCH elsewhere in this Agreement to render the Agreement non-exclusive for failure by Distributor to meet its minimum orders).

Either party may terminate this Agreement immediately upon the other party's insolvency, bankruptcy, suspension of business, assignment of assets for the benefit of creditors, voluntary or involuntary dissolution, appointment of a trustee for all or a substantial portion of the party's assets, or breach of this Agreement.  OVERFINCH reserves the right to immediately terminate this Agreement on written notice to Distributor if, in the sole discretion of OVERFINCH, the laws or economic circumstances in the Territory have changed in a material way so as to adversely impact OVERFINCH's relationship with Distributor or OVERFINCH's ability to conduct business in the Territory.  Upon termination or expiration of this Agreement, OVERFINCH has the right of first refusal in respect of any Products and / or Vehicles and may, at its sole discretion, repurchase from Distributor, at the lesser of either the net prices paid by Distributor or the open market value, any of the Vehicles purchased and remaining unsold by Distributor.  OVERFINCH's repurchase of Distributor's Vehicle inventory pursuant to the termination provisions hereof (or Distributor's right to sell such inventory if not so repurchased by OVERFINCH) shall constitute Distributor's sole remedy for termination or expiration of this Agreement.   All intellectual property, confidentiality, non-compete and non-hire rights and obligations set forth in this Agreement shall survive termination or expiration.

5.3    Transition.  During any notice period and after termination or expiration of this Agreement, Distributor shall cooperate with OVERFINCH to assure a smooth transition for Customers and OVERFINCH.  Distributor shall introduce OVERFINCH personnel (and the personnel of any distributor or sales representative specified by OVERFINCH) to Customers who have ordered or expressed

PAG-B0628

KM000063

interest in Products and invite OVERFINCH (and any distributor or sales representative specified by OVERFINCH) to accompany Distributor's personnel on sales calls related to Products. Distributor shall take all necessary action to terminate any registration as an OVERFINCH distributor with any governmental authority. All indebtedness of Distributor to OVERFINCH shall become immediately due and payable without further notice or demand, which is hereby waived. Distributor shall also cooperate with OVERFINCH in identifying and producing copies of correspondence and business records related to all past, present and pending business activities conducted on behalf of Customers.

5.4   **Warranty.**   Distributor shall honor all warranties existing upon expiration or termination of this Agreement until any such warranties expire.

VI.   **GENERAL PROVISIONS**

6.1   **Indemnification and Limitation of Liability.**   The Distributor shall fully indemnify, defend and hold harmless OVERFINCH and all related parties, to the extent that it is not as a direct result of a defective Product supplied by OVERFINCH, from and against any claims or losses arising directly or indirectly from, as a result of or in connection with its performance or breach under this Agreement (including without limitation the above obligation to inform OVERFINCH of any compliance or other relevant legal issues in the Territory), or any other act or omission of Distributor. In no event, whether as a result of breach of contract, indemnity, warranty, tort (including negligence), strict liability or otherwise, shall OVERFINCH liability for any loss or damage exceed the price of the specific Product that gave rise to the claim, nor include any special, consequential, incidental or punitive damages.

6.2   **Insurance.**   Distributor agrees to obtain and maintain commercially reasonable insurance, including without limitation comprehensive general liability coverage with combined policy limits of at least $1,000,000 per occurrence and covering bodily injury, personal injury, and property damage, including blanket contractual liability and naming OVERFINCH and its directors, officers, employees, and authorized representatives as additional insureds with respect to operations under this Agreement. Distributor agrees to furnish OVERFINCH with certificates showing the amount and existence of the required coverages and specifying that the policies shall not be canceled or materially changed except after (30) thirty days written notice to OVERFINCH. Distributor acknowledges that compliance with the specific insurance requirement above does not relieve Distributor of its obligation to maintain commercially reasonable insurance (either in regard to higher comprehensive general liability coverage limits or other

10

PAG-B0629

KM000064

types of coverage, including without limitation employer liability, automobile liability and worker compensation coverage.).

6.3     **Governing Law and Dispute Resolution.**   The laws of the Commonwealth of Virginia excluding conflict of laws principles, shall govern this Agreement.  The parties reject any applicability of the United Nations Convention on Contracts for the International Sale of Goods.  Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by binding arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, and judgment on the arbitration award may be entered in any court of competent jurisdiction.  Arbitration shall be held at a mutually acceptable location in Virginia, or another location agreed upon by the parties, and shall be conducted in English.  Either party may seek injunctive relief in a court of competent jurisdiction or other interim measures in the event of breach or threatened breach of this Agreement   The prevailing party to any dispute shall be entitled to recover legal fees and other costs (including without limitation arbitration fees, disbursements, collection costs and the allocated cost of in-house counsel).

6.4     **Miscellaneous.**  Any notice pursuant to this Agreement shall be deemed given when sent by registered or certified mail (return receipt requested) or overnight delivery to an authorized officer at the headquarters of the other party at the address set forth in this Agreement.  Distributor may not assign or otherwise transfer this Agreement or any rights or obligations hereunder without the prior written consent of OVERFINCH.  The sale of the majority of Distributor's stock shall constitute an assignment for the purposes of this Agreement.  No failure or delay by either party in exercising any right or remedy, or insisting upon strict compliance by the other party with any obligation in this Agreement, shall constitute a waiver of any right thereafter to demand exact compliance with the terms of this Agreement.  The invalidity, in whole or part, of any provision in this Agreement shall not affect the remainder of such provision or any other provision and, where possible. shall be replaced by a valid provision that effects as close as possible the intent of the invalid provision.  Neither party shall be liable for failure to perform or delay in performance of any obligation under this Agreement (except payment of amounts already due and owing) where such failure or delay results from any event beyond its reasonable control.  The English language version of this Agreement shall govern and control any translations of the Agreement into any other language.  This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof, and any modification hereof must be in a writing signed by both parties.

JB AS.

11

PAG-B0630
KM000065

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed and each of the undersigned represents and warrants that he or she is duly authorized to execute this Agreement.

PREMIER GROUP AUTOS LLC

1500 Cordova Road, 206 Fort Lauderdale,

Florida, 33316

By: _____

Name: _James  Blackburn_____

Title: _Owner_____

OVERFINCH NORTH AMERICA INC.

500 Stinson Drive

Danville VA  24540

By: _____

Name: _Alexander  Doane._____

Title: _vice  president._____

# Attachment 6

PAG-B0632

KM000067

Agreement between
Edward Anthony Kessler
&
Premier Group Autos LLC

12.03.2018

This agreement made today between the above parties is subject to the following terms:

1. Edward Kessler will provide a loan to Premier Group Autos LLC for the purchase of the first vehicle.
2. The loan amount will be $160,000 USD
3. The loan will bear interest at 5% per annum
4. The initial term of the loan will be 12 months
5. Upon sale of the vehicle the lessor has the ability to re – loan at his discretion.

Signed

Edward Kessler

James Blackburn

**EXHIBIT**

**3**

PAG-B0633

KM000068

# Attachment 7

PAG-B0634

KM000069

## BUSINESS LOAN AGREEMENT

MADE: the 11th Day of March 2019

BETWEEN

### PREMIER GROUP AUTOS, LLC, a Florida Limited Liability Corporation

### DBA – "OVERFINCH MIAMI"

(hereinafter called "BORROWER")

AND

EDWARD P. KESSLER & KRISTINE E. KESSLER (hereinafter called "LENDER")

WHEREAS, the LENDER promises to loan the BORROWER and the BORROWER promises to repay this principal amount to the LENDER.  The LOAN amount will be:

*THREE HUNDRED THOUSAND DOLLARS AND ZERO CENTS*

*$300,000.00*

*@ $i^{(12)}$ = 8.00% annual which is equivalent to $i^{(12)}/12$ = 0.666% per month*

Lawful money of the United States of America, together with interest thereon at the rate provided in the LOAN until the indebtedness is paid in full and in the manner and at the times therein set forth.

A.  TRANSER OF FUNDS
   a.  The funds will be wired per the wiring instructions presented in various emails.

B.  PAYMENTS
   a.  The BORROWER will pay the LENDER interest payments on the 1st of every month starting on May 1st, 2019
   b.  Per the agreement, the interest on the principal is due on the 1st of every month.
   c.  The BORROWER has the right to either write a check or wire the interest payments to the LENDER.
   d.  The LENDER will, if not already, have a wiring agreement set up with a bank in order to receive the wire transfers.

BORROWER Initials  EJK /_____          LENDER Initials _____/_____          Page 1 of 4

**EXHIBIT**

**7**

PAG-B0635

KM000070

C.   PURPOSE OF LOAN

  a. The LOAN was lent to the BORROWER in order to purchase two (2) new Overfinch Range Rovers in order to increase the inventory of the fleet owned by the BORROWER.  BORROWER will use this loan strictly for business transactions in "revolving" its inventory for the betterment of the business.

  b. The BORROWER is to use this money for only purchasing vehicles in which will be reinvested into a new vehicle once a current vehicle has been sold.

D.   DEFAULT

  a. Notwithstanding anything to the contrary in this Agreement, if the BORROWER defaults in the performance of any obligation under this Agreement, then the LENDER may declare the principal amount owing and interest due under this Agreement at the time to be immediately due and payable.

  b. If the BORROWER defaults and does not meet the financial statues or number of car sales expected to repay the LENDER the principal amount, but has inventory (Overfinch Range Rover) available, the title of the vehicle/s will be transferred from the BORROWER to the LENDER in order for the LENDER to acquire an "asset" as a substitute for repayments.  This will give LENDER opportunity to sell vehicle on its own to receive the principal in a different route.

E.   BINDING EFFECT

  a. This Agreement will pass to the benefit of an be binding upon the respective heirs, executors, administrators, successors and permitted assigns of the Borrower and Lender.  The BORROWER waives presentment for payment, notice of non-payment, protest, and notice of protest.

F.   LOAN TERMS REVISIT

  a. This LOAN agreement will be revisited by all parties in OCTOBER of the 2019 fiscal year.

  b. Terms will depend on the performance of the BORROWER throughout the year.

  c. Terms will be negotiated by all parties on whether all or some of the principal will be repaid by the end of the 2019 fiscal year.  The option of keeping the money in the company will be on the table as well.

  d. Whatever decision is made, all parties will have to agree on the terms, but seniority will go to the LENDER.

G.   EVENT OF ADDITIONAL FUNDING REQUESTS FROM DIFFERENT LENDERS

  a. In the event the BORROWER askes for more loans from different parties, the LENDER of this loan shall be made aware of any requests.  The LENDER of this

BORROWER Initials _F A K_ / _____          LENDER Initials _____ / _____          Page 2 of 4

PAG-B0636

KM000071

loan will distinguish what path it would like to take as an effect to a choice made by the BORROWER.

H.   SENIORITY

    a.  This loan will have seniority over other loans already put in the business by the current owners of the business.

    b.  The owners will have to repay this principal prior to repaying the principal of their own loans, unless the LENDER of this agreement agrees with any of those requests/transactions in writing.

    c.  This loan will also have seniority over any stock holder's contributions (equity) in the company as it stands before the processing of this loan.  The owners of the BORROWER will know draw contribution money out of the company, and not

BORROWER Initials F4 K /_____        LENDER Initials _____/_____        Page 3 of 4

WITNESS and due execution hereof the day and year first above written.

BORROWER

WITNESS:

PREMIER GROUP AUTOS, LLC
DBA: OVERFINCH MIAMI

By : _____
Edward A. Kessler – Member/Manager

By : _____
James Blackburn – Member/Manager

LENDER:

WITNESS:

By: _____
Edward P. Kessler

By: _____
Kristine E. Kessler

BORROWER Initials _E A K_ / _____        LENDER Initials _____ / _____        Page 4 of 4

PAG-B0638

KM000073

Attachment 8

PAG-B0639

KM000074

DocuSign Envelope ID: FAE10158-F46A-48C6-BE92-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

## NextGear Capital Contract Cover Sheet

| | | |
|---|---|---|
| Exact Legal Name: Premier Group Autos LLC | | |
| DBA Name: Overfinch Miami | | |
| Requested Floorplan Amount: $1,000,000.00 | | Business Type: Limited Liability Corporation |
| Federal Tax ID: ▇▇▇▇ | Dealer License #: ▇▇▇▇ | |
| State of Incorporation of Residence: FL | | State Organization ID: |
| Business Email: sales@overfinchmiami.com | | |

### Address Information

| | | | |
|---|---|---|---|
| Address: 11 SW 12th Ave Ste 103 Bldg 59 | | | |
| City: Dania Beach | State: FL | ZIP:33004 | County: Broward |
| Phone: 954-440-0717 | Fax Number: | | |
| Is Main Lot: Yes | Is Mailing Address: Yes | Has Physical Inventory: Yes | |

### Stakeholder/Guarantor Information

| | | | |
|---|---|---|---|
| Stakeholder/Guarantor Name: James Michael C Blackburn | Title: Manager | % of Ownership: 50% | |
| Home Address: ▇▇▇▇ | | | |
| City: Ft Lauderdale | State:FL | ZIP: 33334 | Own or Rent: Own |
| Home Phone: ▇▇▇▇ | Cell Phone: ▇▇▇▇ | SS#: xxx-xx-5859 | DOB: ▇▇▇▇ |
| Drivers License #: ▇▇▇▇ | | | |

| | | | |
|---|---|---|---|
| Stakeholder/Guarantor Name: Edward Anthony Kessler | Title: Manager | % of Ownership: 50% | |
| Home Address ▇▇▇▇ | | | |
| City: Bethel Park | State: PA | ZIP: 15101 | Own or Rent: Own |
| Home Phone ▇▇▇▇ | Cell Phone: ▇▇▇▇ | SS#: xxx-xx-27▇▇ | DOB: ▇▇▇▇ |
| Drivers License # ▇▇▇▇ | | | |

**INTERNAL USE ONLY:**

Home Market: Ft. Lauderdale North

| | |
|---|---|
| Credit Limit Type: Retail | Credit Limit Amount: $150,000.00 |
| Terms: D60/30/30 -- F80/45 ▇▇ -- R0.0 -- C% ▇▇ | |

Account #125308



**EXHIBIT**
**4**

PAG-B0640

KM000075

DocuSign Envelope ID: FAE10158-F4bA-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

## DEMAND PROMISSORY NOTE
## AND LOAN AND SECURITY AGREEMENT

FOR VALUE RECEIVED, the undersigned borrower ("Borrower") promises to pay to the order of NextGear Capital, Inc. ("Lender"), with its principal office at 11799 North College Avenue, Carmel, Indiana 46032, or such other place as Lender may designate in writing or on the Discover Portal from time to time, in lawful money of the United States of America, the principal sum of One Hundred Fifty Thousand Dollars and Zero Cents ($150,000.00), or such greater or lesser sum which may be advanced to or on behalf of Borrower from time to time, together with all costs, interest, fees, and expenses as provided for under this Note and the other Loan Documents. Unless otherwise stated in an addendum to this Note, this Note shall become effective on the date of Borrower's execution hereof as set forth below Borrower's signature (such date, or the effective date otherwise stated in the applicable addendum, the "Effective Date").

NOW, THEREFORE, in consideration of the mutual covenants, agreements and conditions contained herein, Borrower and Lender (each, a "Party" and collectively, the "Parties") agree as follows:

1. DEFINITIONS. Capitalized terms used in this Note or in the other Loan Documents without definition shall have the respective meanings as set forth in Appendix A attached hereto and incorporated herein by reference (such meanings to be equally applicable to both the singular and plural forms of the terms defined). Any capitalized terms used herein or in another Loan Document, but not otherwise defined herein or in such other Loan Document, as the case may be, shall have the meanings ascribed to them in the UCC.

2. GRANT OF SECURITY INTEREST. In order to secure full and prompt payment of all Liabilities and performance of all obligations of Borrower to Lender, its Affiliates, and/or their respective successors or assigns:

    (a) Borrower grants to Lender a continuing security interest in all of Borrower's assets and properties, wherever located, including, without limitation, all equipment of any kind or nature; all vehicles and vehicle parts; all Inventory now owned or hereafter acquired, including, without limitation, all Lender Financed Inventory now owned or hereafter acquired; all amounts in Borrower's Reserve held by or on behalf of Lender, if any; all documents, documents of title, deposit accounts, accounts receivable, manufacturer rebates and incentive payments, chattel paper, including, without limitation, all Receivables and general intangibles now owned or hereafter acquired by Borrower; all cash reserves; all of Borrower's books and records (including any books and records contained on computer hardware or software or otherwise stored by or on behalf of Borrower in electronic or digital form); and all additions, accessions, accessories, replacements, substitutions, and proceeds of any of the foregoing (collectively, the "Collateral").

    (b) The security interest given to Lender in Section 2(a) is given to Lender to secure payment of all Liabilities and the performance of all obligations of Borrower to Lender, and its Affiliates, including all obligations of Borrower under this Note, under any other Loan Document, or otherwise, all without relief from valuation or appraisement Laws. Upon the request of Lender, Borrower shall promptly execute and deliver to Lender or its designee such further documents and instruments, and shall take such further actions, in each case as Lender may deem necessary or desirable to protect Lender's interest in the Collateral or otherwise effectuate the provisions of this Note and the other Loan Documents. Without limiting the generality of the foregoing, Borrower shall, upon the request of Lender, (i) use its best efforts to secure all consents and approvals that may be necessary or appropriate for the assignment to Lender of any Collateral (including any contract of Borrower that constitutes any portion of the Collateral), or that may be necessary in order for Lender to receive the full benefit of all Collateral and to enforce its security interest in the Collateral; (ii) provide Lender and its Representatives with full access to all Collateral, including any and all books and records relating thereto; and (iii) deliver to Lender all Collateral consisting of negotiable documents, chattel paper, and instruments not deposited for collection in the aggregate (in each case, accompanied by any related bills of sale or any other instruments of transfer executed for Borrower), in each case promptly after Borrower receives the same.

    (c) Borrower authorizes Lender to file any UCC financing statements and any amendments thereto and any continuation statements under the UCC, in each case to the extent necessary or desirable in Lender's sole discretion to effect or preserve the security interest granted by Borrower hereunder or under any other Loan Document. Further, Borrower hereby acknowledges, ratifies and approves any UCC financing statements or other filings under the UCC that may have been made by or on behalf of Lender and its Affiliates prior to the Effective Date. The security interest granted by Borrower in Section 2(a) shall be in addition to, and not a substitution for, any right of offset, netting, or reclamation that Lender or any of its Affiliates may have against Borrower, whether pursuant to this Note, any other Loan Document, any Law or otherwise.

3. INTEREST RATE. Interest shall accrue on Borrower's Liabilities to Lender in accordance with the following schedule:

    (a) All outstanding Liabilities relating to a Floorplan Advance or a Receivable Advance shall accrue Interest on a per annum basis from the Floorplan Date or the Receivable Origination Date, as the case may be, based upon a 360-day year, and such Interest shall be compounded daily at the Base Rate, plus the Contract Rate, until such outstanding Liabilities are paid in full.

    (b) The Base Rate may be amended or modified by Lender from time to time in Lender's sole discretion by posting such amendment or modification on the Finance Program Rate, Fee and Term Schedule. However, Lender may increase the Base Rate by no more than fifty (50) basis points (i.e. one-half of one percent) in any thirty (30) day period.

4. BORROWER'S REPRESENTATIONS, WARRANTIES, AND COVENANTS. At the time of Borrower's execution of this Note and continuing at all times thereafter until all Liabilities have been indefeasibly paid and satisfied in full and this Note and all other Loan Documents terminated in accordance with their respective terms, Borrower hereby represents, warrants, covenants, and agrees.

NextGear Demand Promissory Note and Loan and Security Agreement (v 1.1)

PAGE-30641
KM000076

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy
by the designated custodian

(a)  To sell, lease, or rent Lender Financed Inventory only in the Ordinary Course of Business and in accordance with Law, and not to sell or otherwise dispose of any Lender Financed Inventory except as herein provided.

(b)  To keep Lender Financed Inventory only at Borrower's Place of Business and not to remove any Lender Financed Inventory from such place for a period exceeding twenty-four (24) hours, unless such item of Lender Financed Inventory is the subject of an active daily rental agreement (and floorplan) pursuant to a rental Advance Schedule executed by Borrower and Lender), or such removal has been previously authorized in writing by Lender.  Notwithstanding the foregoing, Borrower may request Lender to authorize Borrower to consign certain Lender Financed Inventory to another licensed dealer at such consignee dealer's place of business.  Borrower's request to consign Lender Financed Inventory as referenced above is subject to Borrower and the consignee dealer executing and delivering to Lender any documentation that Lender may require, including a UCC financing statement or other similar filing on consignee dealer, or an authorization for Lender to make any such filing.  Lender may deny Borrower's request to consign Lender Financed Inventory in Lender's sole and absolute discretion.

(c)  To keep Inventory in good repair and insured against all physical risks in such amounts and under such policies issued by such insurance companies as are deemed necessary and satisfactory by Lender; provided, however, that any insurance company issuing required coverage to Borrower pursuant to the requirements of this Section 4(c) shall have been assigned to an A.M. Best Financial Size Category (FSC) of "X" or higher, and shall have a minimum A.M. Best Financial Strength (FSR) rating of "A-".  Lender shall be named "loss payee" on such insurance policies.  Borrower shall provide Lender with a certificate or certificates of insurance evidencing that the above-mandated insurance requirements have been satisfied and specifying that the applicable insurance carriers will mail direct written notice to Lender at least thirty (30) days prior to any cancellation or non-renewal of any of the above-mandated policies.  Alternatively, and unless the Unit of Lender Financed Inventory has been branded as "salvage" or is otherwise ineligible for the Collateral Protection Program, Borrower may satisfy the insurance coverages required under this Section 4(c) by voluntarily enrolling in Lender's Collateral Protection Program and satisfying and adhering to all conditions and other terms thereof at all times during Borrower's enrollment in the Collateral Protection Program.  In the event Borrower fails to procure, maintain or provide proof of the insurance coverages required under this Section 4(c), Lender may enroll Borrower in Lender's Collateral Protection Program, or, alternatively, Lender may secure on Borrower's behalf such policies of insurance as Lender, in its sole discretion, deems necessary, in each case from such insurers, in such amounts and with such coverages and deductibles as Lender, in its sole discretion, deems necessary.  Charges incurred under the Collateral Protection Program are calculated as of the Floorplan Date from the amount of each original Floorplan Advance related to a Unit of Lender Financed Inventory, through the life of the Floorplan Advance.  Upon Borrower's enrollment in the Collateral Protection Program (whether voluntary or otherwise), Borrower shall be subject to, and at all times comply with and adhere to, the terms and conditions applicable to the Collateral Protection Program and Borrower's enrollment and participation therein.  Borrower understands and agrees that Lender has an interest in the Collateral, including all Lender Financed Inventory, by virtue of Borrower's pledge of the Collateral as security to Lender for the repayment of all Liabilities by Borrower to Lender.  Fees, charges and other terms and conditions for the Collateral Protection Program are published in the Finance Program Rate, Fee and Term Schedule or on the documents referenced therein.

(d)  To keep at all times complete and accurate records of Borrower's Business and provide to Lender promptly (but in any event within two (2) Business Days) copies of such records and any financial information regarding Borrower's Business or Borrower's financial condition generally, in each case as Lender may request.  Borrower authorizes Lender to share such information and any and all other information that Lender may possess regarding Borrower's Credit Line or Borrower's relationship with Lender, including information regarding this Note and the other Loan Documents, Borrower's loan history; payment history; audit history; account balance; loan application; credit worthiness; credit availability; and such other general business information regarding Borrower's Credit Line and Borrower's relationship with Lender, to any and all Persons that Lender, in its sole discretion, deems reasonable, including auctions.  Without limiting the generality of the foregoing, Borrower shall maintain complete and accurate records and financial statements for all Advances requested or made hereunder, and all other transactions hereunder, including bank statements, cancelled checks, sales invoices, proofs of payment, and other sales files, in each case for at least a period of five (5) years after the date on which such Advance was made or such transaction occurred, as the case may be.

(e)  To allow Lender and its Representatives to inspect Lender Financed Inventory during normal business hours and at other reasonable times at Borrower's Place of Business and such other places as any Lender Financed Inventory may be located and to inspect and make copies of Borrower's books and records.  Borrower shall pay Lender for the costs and expenses incurred by Lender or its Representatives to undertake such audits of any Lender Financed Inventory and such inspections and copying of Borrower's books and records, in each case on the applicable Maturity Date.

(f)  To hold all amounts received from the sale of any Unit of Lender Financed Inventory in the form as received in trust for the sole benefit of and for Lender, and to remit such funds satisfying all amounts due Lender and owing by Borrower for such Unit of Lender Financed Inventory, in each case within twenty-four (24) hours of Borrower's receipt of such funds (or receipt of such funds by any Affiliate of Borrower).

(g)  To hold all amounts received that relate to any Receivable that is subject to a Receivable Advance in the form as received in trust for the sole benefit of and for Lender, and to remit such funds satisfying all amounts due Lender and owing by Borrower for and in connection with such Receivable, in each case within twenty-four (24) hours of Borrower's receipt of such funds (or receipt of such funds by any Affiliate of Borrower).

(h)  That, for each Receivable which is the subject of a Receivable Advance, (i) Borrower is the sole and unconditional owner of such Receivable; (ii) such Receivable is not already encumbered by any voluntary or involuntary Liens which are senior to Lender's security interest in such Receivable; (iii) Borrower has a legal right to pledge such Receivable to Lender as security for all Liabilities of Borrower; (iv) such Receivable represents an original bona fide sale to the buyer(s) named therein; (v) such Receivable is now and will remain free from any claim, defense, setoff, or counterclaim of any nature and is enforceable against the buyer(s) named therein and third parties according to its terms; (vi) all statements, facts, numbers, and other information in such Receivable and all related documents are true and accurate to the best of Borrower's knowledge, are free from fraud, and have not been altered or modified subsequent to their execution, except for such alterations or

PAG-B0642
KM000077

DocuSign Envelope ID: FAE10158-F48A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy by the designated custodian

(r)   That Borrower and all Guarantors are legally competent and have all necessary power and authority to enter into and perform their respective obligations under this Note and the other Loan Documents.

(s)   That Borrower shall not disclose to any third party, without the written consent of Lender, any terms and conditions applicable to Borrower's Credit Line, whether such terms and conditions are set forth on the applicable Advance Schedule, this Note or any other Loan Document.

(t)   That Borrower may have an account with Lender where information can be accessed and transmissions can be sent through the Discover Portal or by other electronic means, and Borrower shall have the means and the affirmative obligation to control access to the account information of Borrower by passwords and a Borrower account number. Borrower shall be solely responsible for any unauthorized access to Borrower's account. Access to Borrower's account may be revoked or otherwise restricted by Lender at any time, in Lender's sole discretion, without prior notice to Borrower.

(u)   That Borrower shall use Advances solely for Business purposes and not for personal, family, or household purposes. This means, among other things, that Borrower may not use Advances to purchase a vehicle for Borrower's personal, family, or household use, and no Lender Financed Inventory may be used for Borrower's personal, family, or household use. This Note and all Advances requested or made hereunder shall be requested and made only for commercial purposes and Borrower hereby expressly and unconditionally waives, to the fullest extent permitted by Law, the protections of any Law intended to protect consumers or regulate consumer loans.

(v)   That Borrower will provide Lender the name of each individual authorized to buy Inventory and make Advance requests hereunder on Borrower's behalf. Notwithstanding the foregoing or anything to the contrary in any Loan Document, Borrower shall be responsible and liable for all Advance requests and other Liabilities incurred by any such appointed individual or any other actual or apparent representative or agent of Borrower (regardless of whether such Person is specifically appointed by Borrower as contemplated above).

5.   CREDIT TERMS AND CONDITIONS. Borrower understands and agrees to the following terms, conditions, covenants, and other agreements relating to its Credit Line and any Advances made under this Note and the other Loan Documents, and acknowledges that any failure by Borrower to adhere to any such terms, conditions, covenants, or other agreements shall result in Lender having the right (in addition to any other right that Lender may have), in its sole discretion and without notice to Borrower, to declare a Maturity Event with respect to all Advances:

(a)   The decision to make an Advance to or on behalf of Borrower is the exclusive right of Lender, whether or not an Event of Default has occurred, and Borrower understands that Lender may refuse to make an Advance at any time, with or without cause and without prior notice to Borrower or any Guarantors of such decision. Borrower is not obligated to finance any Inventory or Receivable through Lender.

(b)   Borrower's Credit Line may require a Reserve as a credit underwriting condition to the grant of credit and as additional security for the repayment of Liabilities by Borrower. In the event a Reserve is either requested by Borrower or required by Lender, Borrower will be required to execute a reserve agreement, and the applicable Required Reserve Amount and Reserve Charge will be indicated on the applicable Advance Schedule.

(c)   Borrower must deliver or cause to be delivered to Lender the Title or MSO for any Unit of Inventory at the time of any related Floorplan Advance request, or, in the event of a Universal Source Purchase, within seven (7) days after Lender funds the related Floorplan Advance.

(d)   Borrower must deliver or cause to be delivered to Lender the original Receivable which is the subject of a Receivable Advance request within seven (7) days after Lender funds such Receivable Advance. In the event that a Receivable Advance is made by Lender with respect to a Unit for which there is an unpaid Floorplan Advance, then any such Receivable Advance made to Borrower shall be net of such unpaid Floorplan Advance and all other unpaid Liabilities of Borrower with respect to such Unit.

(e)   Borrower must be in complete compliance with this Note and the other Loan Documents before an Advance request may be approved by Lender. Additionally, Lender may require certain other information from Borrower to be submitted before Lender will consider an Advance request.

(f)   Borrower shall pay all Liabilities, without notice, that concern or relate to a Floorplan Advance for any Unit of Lender Financed Inventory on or before the Maturity Date. Lender shall apply such payments to any and all Liabilities relating to such Floorplan Advance. Notwithstanding anything herein to the contrary, if a shortage exists between the payments received by Lender with respect to a Floorplan Advance, and the Liabilities relating to such Floorplan Advance, then such shortage shall be immediately due and payable and shall continue to be considered a Liability owed by Borrower to Lender, secured by the Collateral.

(g)   Borrower shall pay all Liabilities, without notice, that concern or relate to a Receivable Advance for a subject Receivable on or before the Maturity Date. Lender shall apply such payments to any and all Liabilities relating to such Receivable Advance. Notwithstanding anything herein to the contrary, if a shortage exists between the payments received by Lender with respect to a Receivable Advance, and the Liabilities relating to such Receivable Advance, then such shortage shall be immediately due and payable and shall continue to be considered a Liability owed by Borrower to Lender, secured by the Collateral.

(h)   Borrower shall pay all Liabilities, without notice, which do not concern or relate to a Floorplan Advance or a Receivable Advance, including Administrative Charges and other account level charges, in each case on their respective Maturity Dates.

(i)   With respect to payments that relate to a Floorplan Advance or a Receivable Advance which exceed the outstanding Liabilities owed by Borrower in connection with such Floorplan Advance or Receivable Advance, as the case may be, and with respect to payments for all other Liabilities, the order and method of application of such payments shall be at the sole discretion of Lender. Notwithstanding anything herein

PAG-B0643
KM000078

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy
by the designated custodian

to the contrary, in the event Lender declares an Event of Default, Lender may apply all subsequent payments, including payments directly related to a Floorplan Advance or a Receivable Advance, in any manner or order. Payments initiated or received by Lender after 5:00PM EST may be applied the next Business Day.

(j) Unless either (i) the Maturity Date for a Floorplan Advance has been accelerated as the result of a Maturity Event or a declaration of an Event of Default; or (ii) such Floorplan Advance is in the final Period pursuant to the applicable Advance Schedule, a Curtailment of such Floorplan Advance will automatically be processed at the end of the current Period. Upon the processing of the Curtailment for a Floorplan Advance, Borrower shall pay the accrued Interest, accrued Floorplan Fee, any other accrued Floorplan Advance related fees, and a principal reduction of such Floorplan Advance, in each case pursuant to this Note, the applicable Advance Schedule, and any applicable event sale or promotional terms in effect for such Floorplan Advance. Additionally, unless (a) the Maturity Date for a Floorplan Advance has been accelerated as the result of a Maturity Event or a declaration of an Event of Default; or (b) Borrower has notified Lender that Borrower has disposed of the subject Unit of Lender Financed Inventory by sale or otherwise, Borrower shall be deemed to have requested, and Lender may, in its sole discretion, automatically approve and process, an Extension with respect to such Floorplan Advance. With respect to any Extension, the Period, rate of Interest, Floorplan Fee, any other fees, including Floorplan Advance related fees, and the principal reduction required to be paid by Borrower for such Extension shall, in each case, be equal in all respects to those of the last Period and, upon the processing of such Extension, Borrower shall pay such accrued Interest, accrued Floorplan Fee, any other fees, including accrued Floorplan Advance related fees, and a principal reduction of such Floorplan Advance, in each case pursuant to this Note, the applicable Advance Schedule, and any applicable event sale or promotional terms in effect for such Floorplan Advance. Additionally, for each Extension, Borrower shall be charged any applicable Universal Program Fee (including any related Extension fee) set forth in the Finance Program Rate, Fee, and Term Schedule for the applicable Finance Program.

(k) Unless either (i) the Maturity Date for a Receivable Advance has been accelerated as the result of a Maturity Event or a declaration of an Event of Default; or (ii) such Receivable Advance is in the final Period pursuant to the applicable Advance Schedule, a Curtailment of such Receivable Advance will automatically be processed at the end of the current Period. Upon the processing of the Curtailment for a Receivable Advance, Borrower shall pay the accrued Interest, accrued Receivable Fee, any other accrued Receivable Advance related fees, and a principal reduction of such Receivable Advance, in each case pursuant to this Note, the applicable Advance Schedule, and any applicable event sale or promotional terms in effect for such Receivable Advance.

(l) Lender or its Affiliates may hold any property (and proceeds thereof) or funds belonging to or payable to Borrower or any of its Affiliates ("Setoff Funds") and apply such Setoff Funds to any outstanding Liabilities of Borrower or to any amounts owing by Borrower to any Affiliate of Lender, and Borrower hereby grants to Lender and its Affiliates, as the case may be, a lien on such Setoff Funds. Lender and its Affiliates may at any time apply any or all of the Setoff Funds to any outstanding Liabilities of Borrower or to any amounts owing by Borrower to any Affiliate of Lender. Borrower expressly waives any requirement of maturity or mutuality among Lender and its various Affiliates.

(m) Any statement of Borrower's account furnished or made available to Borrower by Lender, to the extent no objection is made in writing by Borrower within thirty (30) days after Borrower's receipt of such statement, shall constitute a definitive statement of Borrower's Credit Line and Liabilities as of the date of such statement and shall be binding upon Borrower.

(n) Borrower hereby expressly authorizes Lender and its Affiliates to communicate with Borrower via facsimile transmissions, email, telephonic transmissions, both to a residential telephone line and/or cell phone, including text messaging, using an automatic telephone dialing system or an artificial or prerecorded voice message, and/or any other forms of communication, for any purpose, including general business matters, account information, marketing materials, collection, and/or any other communication needs. Borrower agrees that such express permission shall extend to any and all of the contact information that Borrower has provided herein, including physical and email addresses, phone numbers, fax numbers, etc., and to such other addresses, phone numbers, email addresses, online chat, social media platforms, etc. that Borrower may provide to Lender or that Lender may obtain from any third party at a later date.

(o) So long as Borrower is not in default of this Note or any other Loan Document, Borrower may sell Lender Financed Inventory to bona fide buyers in the Ordinary Course of Business, but nothing herein shall be deemed to waive or release any interest Lender may have hereunder or under any other agreement in any proceeds or replacements of such Lender Financed Inventory. Upon the sale of any Unit of Lender Financed Inventory, Borrower shall hold the proceeds from such sale in trust for the benefit of Lender, and Borrower shall pay to Lender, in accordance with this Note and the other Loan Documents, an amount equal to the unpaid balance of the Liabilities relating to such Unit of Lender Financed Inventory.

(p) Borrower shall allow Lender and its Representatives to access Borrower's books and records at Borrower's Place of Business and such other places as any Lender Financed Inventory may be located, in order to conduct audits of Borrower's Lender Financed Inventory, in each case without prior notice to Borrower of such audits. Borrower shall be responsible for and agrees to pay all of Lender's expenses in conducting such audits.

(q) Each Unit of Lender Financed Inventory must be physically verified at the time of any audit conducted by or on behalf of Lender to be at Borrower's Place of Business, or such other place as Lender may authorize. In the event that any Unit of Lender Financed Inventory is not so verified, Lender may, in its sole discretion, provide Borrower an opportunity to produce such Unit of Lender Financed Inventory at Borrower's Place of Business, or such other place as Lender may authorize.

(r) Borrower may request from Lender, for a legitimate business purpose, the Title to a Unit of Lender Financed Inventory, but Lender reserves the right to grant or deny such request in its sole discretion. In the event Lender grants any such request, any Title provided to Borrower or to any other Person on Borrower's behalf, must be returned to Lender by the close of business on the seventh (7th) day after the date of Lender's release of such Title.

DocuSign Envelope ID: FAE10158-F4GA-49CG-DEB2-FB528DFFF876

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

(s)   Borrower and each Guarantor authorize Lender to obtain and share credit information relating to Borrower and its Guarantors from and with credit bureaus, financial institutions, trade creditors, affiliates, and others and to conduct such other credit investigations that Lender in its sole discretion deems necessary. The individual signing below on behalf of Borrower expressly authorizes Lender to obtain his or her consumer credit report from time to time at Lender's discretion, and expressly ratifies any such consumer credit report that may have been obtained by or on behalf of Lender prior to the Effective Date. Borrower also authorizes Lender to contact any third parties to disclose information, including information contained in Lender application, for the purpose of, among other things, obtaining intercreditor agreements and perfecting Lender's security interest. Further, if a Credit Line is granted, Borrower and each Guarantor authorize Lender to review Borrower's account periodically, which may include obtaining additional credit information on Borrower and each Guarantor through any available medium.

(t)   Borrower's account is subject to "NSF" fees in the amount stated in the Finance Program Rate, Fee, and Term Schedule or the maximum amount permitted by Law for each check or ACH issued by Borrower and each ACH or other electronic payment debited or drawn from any of Borrower's designated accounts by Lender or its Representatives pursuant to an ACH authorization or other request for electronic payments provided by Borrower which is subsequently returned for insufficient funds, in addition to any charge or fee imposed by Borrower's and/or Lender's depository institution.

(u)   Lender may process checks electronically, at first presentment and any re-presentments, by transmitting the amount of the check, routing number, account number, and check serial number to Borrower's financial institution. By submitting a check for payment, Borrower authorizes Lender to initiate an electronic debit from Borrower's bank account. When Lender processes Borrower's check electronically, Borrower's payment may be debited from Borrower's bank account as soon as the same day Lender receives Borrower's check.

(v)   Borrower's account is subject to a late fee in the amount stated in the Finance Program Rate, Fee, and Term Schedule or the maximum amount permitted by Law for any Unit of Lender Financed Inventory for which Borrower fails to remit payment under this Note or any other Loan Document when due. Borrower acknowledges and agrees that the late fee charged by Lender is a reasonable estimate of Lender's additional administrative burden and costs incurred due to the delay and inconvenience to Lender associated with a late payment.

(w)   Borrower's account is subject to Administrative Charges. Borrower acknowledges and agrees that any such Administrative Charge charged by Lender is permitted under this Note and the other Loan Documents, and Borrower consents to the assessment of any such Administrative Charge to Borrower's account.

(x)   Borrower's account is subject to Universal Program Fees. Lender maintains and publishes the "Finance Program Rate, Fee, and Term Schedule" for each Finance Program applicable to Borrower's Credit Line via posting the same on the Discover Portal. Borrower may request a copy of the Finance Program Rate, Fee, and Term Schedule from Lender in writing at any time. All universal or generally applicable rates and fees and any amendments to the Terms and Conditions shall be published herein, incorporated herein by reference and made a part of this Note and any other applicable Loan Documents. The rates and fees applied to Borrower's Liabilities under this Note, any amended Terms and Conditions, or any applicable event sale or promotional terms in effect with respect to an eligible Floorplan Advance or Receivable Advance shall be (i) the applicable rates and fees set forth on the applicable Advance Schedule; (ii) the rates, fees, and amendments to the Terms and Conditions most recently published on the applicable Finance Program Rate, Fee, and Term Schedule; and (iii) the rates, fees, terms, and conditions as set forth in the applicable marketing materials outlining event sale and/or promotional terms. Lender may amend the rates, fees, terms and/or Terms and Conditions from time to time, at Lender's sole discretion, and without additional notice to Borrower other than the publication of such amendments on the Discover Portal.

(y)   Lender maintains and publishes the Lender Guide on the Discover Portal. Borrower acknowledges and agrees that the Lender Guide and the content found therein are not part of this Note or any other Loan Document, are for informational purposes only, and do not create any new or additional contract rights or obligations for Borrower or Lender. Borrower acknowledges and agrees that the Lender Guide and the content therein is subject to change by Lender at any time without notice. To the extent the Lender Guide and the content therein are determined to create or provide additional contractual rights for Borrower and a conflict exists between this Note or any other Loan Document, on the one hand, and the Lender Guide, on the other hand, the provision of this Note or the other Loan Document, as the case may be, shall prevail.

(z)   Borrower waives demand, presentment for payment, notice of dishonor, protest, and notice of protest, and expressly agrees that this Note and all payments coming due under it and any other Loan Documents may be extended or modified from time to time without in any way affecting Borrower's liability under this Note or any other Loan Document. Borrower and Guarantors understand that Lender may, at any time and without notice to Borrower, with or without cause, demand that this Note immediately be paid in full. The demand nature of this Note does not limit Lender's election of remedies upon an Event of Default by Borrower, and Borrower and Guarantors acknowledge that upon Lender's declaration of an occurrence of an Event of Default, all Liabilities of Borrower shall automatically accelerate and Lender may, at any time and without notice to Borrower, demand immediate payment of all Liabilities of Borrower and take such further action as may be contemplated under Section 7 or otherwise permitted by Law or in equity. Borrower shall have the right to pay all Liabilities in full at any time.

(aa)   Notwithstanding Section 4(f), upon any disposition of a Unit of Lender Financed Inventory, whether by sale or otherwise, or the receipt by Borrower (or any other Person on behalf of Borrower) of full or partial payment by or on behalf of the purchaser of such Unit of Lender Financed Inventory, Lender may, without notice to Borrower and in Lender's sole discretion, declare a Maturity Event with respect to the related Floorplan Advance.

(bb)   Notwithstanding Section 4(g), upon any receipt by Borrower of full payment under any Receivable that is subject to a Receivable Advance, or upon Borrower's declaration of a default under any such Receivable, Lender may, without notice to Borrower and in Lender's sole discretion, declare a Maturity Event with respect to the related Receivable Advance.

PAGE B0645
KM000080

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

(cc)  The receipt, by Lender or Borrower, or any third party on Borrower's behalf, of proceeds or other consideration related to any Unit of Lender Financed Inventory shall constitute conclusive proof of the sale or other disposition of such Unit of Lender Financed Inventory for purposes of this Note and the other Loan Documents.

(dd)  Borrower acknowledges that Cox Automotive, Inc. (formerly Manheim, Inc.) and Manheim Remarketing, Inc., together with each of their respective direct and indirect subsidiaries and affiliated U.S. auctions (collectively "Manheim"), are Affiliates of Lender. Borrower may from time to time purchase a Unit through a Manheim auction sale (including online purchases via OVE.com or through other Manheim-operated online sales channels). For any Unit purchased by Borrower through a Manheim auction sale (including online purchases via OVE.com or through other Manheim-operated online sales channels) that remains unsettled with Manheim (each, an "Unsettled Unit"), Borrower hereby requests, directs and authorizes Lender, as of the date Lender receives a request for payment from Manheim with respect to such Unsettled Unit, to process and approve, in Lender's sole discretion, a Floorplan Advance on Borrower's Credit Line, which Lender may pay and remit directly to Manheim on Borrower's behalf for such Unsettled Unit. Borrower acknowledges that if any such request is received by Lender from Manheim within seven (7) days of Borrower's purchase of such Unsettled Unit, the purchase will be processed as a Universal Source Purchase, and if any such request is received by Lender from Manheim outside of seven (7) days of Borrower's purchase of such Unsettled Unit, the purchase will be processed as a Specific Source Purchase.

6.  EVENTS OF DEFAULT.  The occurrence of any of the following events shall be considered an event of default under this Note and the other Loan Documents (each, an "Event of Default"):

(a)  Borrower or any Guarantor fails to perform any of its obligations, undertakings or covenants under this Note or under any other Loan Document, including any obligation to repay any Liability when due and Borrower's obligation to pay upon demand any outstanding Liabilities under this Note or any of the other Loan Documents.

(b)  Borrower or any Guarantor breaches or otherwise violates any provision of this Note or any other Loan Document.

(c)  Borrower makes any representation or warranty to Lender, or provides to Lender any schedule, certificate, financial statement, report, notice, or other writing, which is false or misleading in any material respect when made or delivered.

(d)  Any damage or destruction of any Inventory and appropriate insurance naming Lender as "Loss Payee" is not in effect as required under Section 4(c).

(e)  Borrower or any Guarantor, or any of their respective Parent Companies, has defaulted in the payment or performance of any debt or obligation under any other agreement, whether to Lender or to a third party.

(f)  Borrower or any Guarantor, or any of their respective Parent Companies, becomes insolvent or consents to the appointment of a trustee, receiver, or other custodian for such Borrower, Guarantor, or Parent Company, as the case may be, or for any property belonging to any of the foregoing Persons; or such Borrower, Guarantor, or Parent Company, as the case may be, makes a general assignment for the benefit of its creditors; or any bankruptcy, reorganization, debt arrangement, or other case or proceeding under any bankruptcy or insolvency Law, or a dissolution or liquidation proceeding, is commenced by or against such Borrower, Guarantor, or Parent Company, as the case may be.

(g)  Any material change in the management, ownership, or control of Borrower or its Parent Company occurs (unless such material change has been consented to in writing by Lender).

(h)  The voluntary or administrative dissolution, death, or incompetence of Borrower or any Guarantor, or any of their respective Parent Companies.

(i)  Any change in the financial condition of Borrower or any Guarantor, or any of their respective Parent Companies, which Lender in good faith deems adverse.

(j)  Borrower or any Guarantor, or any of their respective Parent Companies, admits in writing that it is unable to pay its debts as they become due.

(k)  Borrower fails to deliver, revokes or amends (other than at the written request of Lender) any power of attorney or similar authorization that it has executed in favor of Lender.

(l)  Lender in good faith deems itself insecure for any reason.

7.  RIGHTS AND REMEDIES.  Upon any Event of Default, Lender may, at its option and without notice to Borrower, exercise any or all of the following rights in a separate, successive, or concurrent fashion, and Lender's exercise of any rights hereunder shall not preclude Lender from pursuing other rights and remedies in conjunction therewith or at a later time:

(a)  Demand immediate payment of all Liabilities and other indebtedness and amounts owed to Lender and its Affiliates by Borrower and its Affiliates.  Lender shall have all rights and remedies available hereunder and under the other Loan Documents, and all rights and remedies available to Lender at law or in equity, including the rights and remedies of a secured party under the UCC. These rights and remedies include the right to cancel any unfunded Advances; to enter into Borrower's premises with or without legal process, but without force, and to take possession of and remove any Collateral; and to notify any account debtors or other Person obligated on Collateral to make payment or otherwise render performance to or for the benefit of Lender. Lender shall have the right to contact any third parties, including auctions,

NextGear Demand Promissory Note and Loan and Security Agreement (v. 1.1)

PAG B0646
KM000081

DocuSign Envelope ID: FAE10158-F46A-48C6-8EB2-FB528DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

governmental agencies, Borrower's licensing authorities, consumer finance companies, floorplan companies, other finance companies, consumers, other borrowers, Auction Insurance Agency, and such other Persons as Lender may elect to contact in its sole discretion, and to share such information as is necessary, in Lender's sole discretion, for any reason, including for purposes of and related to collection of any Liabilities of Borrower. At Lender's request, and to the extent Borrower may lawfully do so, Borrower shall assemble, prepare for removal, and make available to Lender at a place designated by Lender which is reasonably convenient for Lender and Borrower such Collateral as Lender may request.

(b) Initiate proceedings to appoint a receiver in any court of competent jurisdiction. To the extent permitted by Law, Borrower waives the right to notice and hearing of the appointment of a receiver and consents to such appointment without requiring Lender to post a bond.

(c) To the extent permitted by Law, Borrower gives consent to Lender to proceed in any action to collect on or execute against any and all bonds that Borrower or its Affiliates may have posted with any governmental authorities or third parties.

(d) Without limiting the foregoing, Lender may take control of any funds generated by any Collateral, and in Lender's name or Borrower's name, demand, collect, receipt for, settle, compromise, sue for, repossess, accept returns of, foreclose, or realize upon any Collateral. Borrower waives any and all rights it may have to notice prior to seizure by Lender of any Collateral. Borrower agrees that private sale of any Lender Financed Inventory at the amount then owed to Lender on such Lender Financed Inventory, less costs reasonably incurred by Lender in preparation of disposition of such Lender Financed Inventory, shall be a commercially reasonable method of disposition of such Collateral. Additionally, Borrower further agrees that any Inventory Collateral repossessed or otherwise obtained by Lender after an Event of Default may be disposed of by Lender, in Lender's sole discretion, at any regular or online sale of any wholesale auto auction that may be an Affiliate of Lender, or at any National Auto Auction Association member, and, in each case, any such a sale is and shall be deemed commercially reasonable for all purposes. Borrower shall be liable to Lender for any deficiency resulting from Lender's disposition of the Collateral. Borrower agrees that the Collateral is of the type customarily sold on a recognized market and that Lender therefore has no obligation to notify Borrower prior to a sale of any Collateral. Lender shall not be responsible for the accuracy or validity of any document or for the existence or value of any Collateral. Lender shall not be required to marshal any assets in favor of Borrower. Lender has no obligation to pursue any third party for any liability or obligation owed to Borrower. Borrower further agrees to pay all reasonable attorneys' fees and other collection costs incurred by Lender and its Affiliates in enforcing this Note and any other Loan Document after any Event of Default. To the extent not prohibited by Law, Borrower waives all appraisement, valuation, anti-deficiency, homestead, exemption, and usury Laws now or hereafter in effect, and releases all right to appeal after payment in full.

8. LOAN DOCUMENTS. In addition to the execution and delivery of this Note, upon the request of Lender, Borrower shall execute (or cause the execution of) the following additional documents in connection with Borrower's Credit Line (together with all other documents and instruments executed by Borrower in connection with this Note or Borrower's Credit Line, and in each case the same may be amended, restated, renewed, extended or otherwise modified from time to time, the "**Loan Documents**"), each of which shall be incorporated herein by reference and made a part of this Note: (a) a power of attorney in favor of Lender and its designated Representative; (b) prior to Lender making any Advances under this Note, an Advance Schedule for each unique set of terms for the Finance Program applicable to Borrower, which may be amended from time to time; (c) such guaranties of Borrower's Liabilities as Lender may request, including guaranties of all legal and beneficial owners of Borrower; (d) a reserve agreement in favor of Lender; (e) prior to Lender authorizing Borrower to place any Lender Financed Inventory on consignment with another licensed dealer, a consignment agreement acceptable to Lender; (f) such ACH authorization and requests for automated payments as Lender may request from time to time; and (g) such other documents or certifications as Lender may request or require from Borrower or any Guarantor from time to time.

9. ASSIGNMENT. This Note and any other Loan Document may be assigned by Lender without notice to Borrower, but Borrower may not assign this Note or any other Loan Document without the prior written consent of Lender.

10. THIRD PARTY BENEFICIARIES. Neither this Note nor any other Loan Document is intended to confer upon any Person other than the Parties any rights or remedies hereunder; _provided_, **however**, that the rights and remedies afforded to Lender under Sections 2, 5(l), 5(n), 5(s), 5(dd), 7, 11 and 14 shall also inure to the benefit of the Affiliates of Lender and such Affiliates shall be intended third party beneficiaries of the provisions thereof.

11. INDEMNIFICATION. Borrower shall, at its expense, defend, indemnify and hold harmless Lender and its Affiliates, and each of their respective directors, officers, principals, partners, shareholders or holders of any ownership interest, as the case may be, employees, Representatives, attorneys, and agents (together with Lender, the "**Lender Parties**") from and against any and all claims, judgments, losses, damages, demands, payments, fines, costs, expenses (including reasonable attorneys' fees and court costs), and liabilities of any nature or description incurred by a Lender Party to the extent arising from or relating to any of the following: (a) any personal injury or property damage caused by Borrower or any of its Representatives; (b) any breach by Borrower of this Note or any other Loan Document, including the breach of any representation, warranty, or other agreement contained in this Note or in any other Loan Document; and (c) Borrower's operation of its Business or any of Borrower's operations or activities.

12. NO JOINT VENTURE, PARTNERSHIP, OR AGENCY. Nothing contained in this Note or in any other Loan Document shall subject Lender or its Affiliates or any of its or their respective Representatives to any liability for, or in respect of, the business, assets, profits, losses, or liabilities of the Borrower. This Note does not constitute and shall not be characterized as a joint venture, partnership, or agency between Lender and Borrower. Nothing in this Section 12 shall limit any of the Liabilities of Borrower, or any of the other obligations of Borrower or any Guarantor under this Note or any of the other Loan Documents.

13. AMENDMENT; MERGER. This Note and the other Loan Documents are intended by the Parties to be an amendment to and restatement of any prior Demand Promissory Note and Loan and Security Agreement or similar document or instrument (including any prior promissory note, loan and security agreement or similar contract) between Lender (or any predecessor of Lender, including Dealer Services Corporation and/or Manheim

PAG-B0647
KM000082

DocuSign Envelope ID: FAE10158-F48A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

Automotive Financial Services, Inc.) and Borrower.  With the exception of the amendments and modifications that Lender is entitled to make without the prior written consent of Borrower pursuant to this Note or any other Loan Document, this Note may be modified or amended only upon the written consent of Lender and Borrower.  In the case of the other Loan Documents, with the exception of the amendments and modifications that Lender is entitled to make without the prior written consent of Borrower pursuant to this Note or any other Loan Document, such other Loan Documents may be modified or amended only upon the written consent of Lender and the Person to whom such amendment relates.  Additionally, the Finance Programs, Lender Guide, descriptions of specific Units of Lender Financed Inventory, amounts and terms of Advances, Maturity Dates, Extensions, Interest, Base Rates, Administrative Charges, Lender Universal Program Fees, late fees, NSF fees, and other charges allowed by this Note or any other Loan Document may be proven by the records kept by Lender.  Notwithstanding the foregoing, any advance and/or loan originated pursuant to one or more agreements between Borrower and Dealer Services Corporation and/or Manheim Automotive Financial Services, Inc. prior to the Effective Date for which indebtedness from Borrower remains outstanding as of the Effective Date, shall remain subject to the terms and conditions of such prior agreement(s) for all intents and purposes until such indebtedness has been indefeasibly repaid and satisfied in full.

14.  EXECUTION.  The Parties understand and agree that Lender may execute this Note and any other Loan Documents by affixing the signature of an authorized representative of Lender via signature stamp.  Additionally, Lender may execute this Note and any other Loan Documents by affixing to this Note or such other Loan Document, as the case may be, an electronic or digital signature, which electronic or digital signature shall for all purposes be deemed effective to constitute the valid signature of Lender.  Any electronic or digital signature affixed to this Note or any other Loan Documents by Lender shall be deemed to satisfy all requirements imposed on electronic or digital signatures under the UCC, the Electronic Signatures in Global and National Commerce Act (the "E-Sign Act"), and any other similar Laws relating to the validity or enforceability of electronic or digital signatures, and such electronic or digital signature shall not be denied legal effect, validity, or enforceability solely because it is in electronic or digital form.  Notwithstanding the foregoing, Borrower may execute this Note and any other Loan Documents only by original signature of an authorized representative of Borrower, unless otherwise authorized by Lender.  Lender may, in its sole discretion, permit Borrower and/or any Guarantor to execute this Note and any other Loan Documents by affixing to this Note or such other Loan Document, as the case may be, an electronic or digital signature of an authorized representative of Borrower or of any Guarantor, as applicable.  Borrower and each Guarantor acknowledges and agrees that any electronic or digital signature of Borrower or any such Guarantor shall for all purposes be deemed effective and constitute the valid signature of Borrower or any such Guarantor, as the case may be, and shall be deemed to satisfy all requirements imposed on electronic or digital signatures under the UCC, the E-Sign Act, and any other similar Laws relating to the validity or enforceability of electronic or digital signatures (including without limitation, any enactment of the Uniform Electronic Transactions Act (UETA)), and such electronic or digital signature shall not be denied legal effect, validity, or enforceability solely because it is in electronic or digital form.  A facsimile or photocopied reproduction of signatures on this Note and any other Loan Documents shall be deemed original signatures for all intents and purposes.  This Note and the other Loan Documents may be executed by the Parties in one or more counterparts which, collectively, shall constitute one and the same agreement.

15.  NOTICES.  All notices, demands and requests required or permitted to be given under this Note and any other Loan Document shall be (a) in writing, (b) delivered by personal delivery or sent by commercial delivery service or certified mail, return receipt requested, (c) deemed to have been given on the date of personal delivery or the date set forth in the records of the delivery service or on the return receipt, and (d) addressed as follows (or, in the case of Lender, to any other subsequent address that Lender may provide to Borrower (through written notice, via the Discover Portal, or otherwise) for purposes of directing future notices, demands or requests):

If to Lender:

NextGear Capital, Inc., 11799 North College Avenue, Carmel, IN  46032
Telephone: (317) 571-3721

with a copy to:

NextGear Capital, Inc., 11799 North College Avenue, Carmel, IN  46032
Telephone: (317) 571-3721
Attention: Legal Department

If to Borrower:

Premier Group Autos LLC DBA Overfinch Miami, 11 SW 12th Ave Ste 103 Bldg 59,
Dania Beach, FL 33004-3527
Telephone: 954-440-0717

16.  NO WAIVER.  No failure or delay by Lender in exercising any right, power, or privilege or the granting of an exception by Lender with respect to any of the Terms or Conditions will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege, or the exercise of any other right, power, or privilege by Lender.

17.  TERMINATION.  No termination of this Note shall alter Borrower's Liabilities or any outstanding obligations of Borrower or any Guarantor under this Note or any of the other Loan Documents, including any outstanding obligations relating to Advances and amounts funded or committed prior to the effective date of such termination, and all rights and remedies, including the security interest granted herein and the rights of Lender as a secured party hereunder, shall extend until all Liabilities of Borrower have been indefeasibly paid and satisfied in full.

18.  LEGAL FEES AND COLLECTION COSTS.  Borrower shall pay to Lender all reasonable legal fees, expenses, and collection costs incurred by any Lender Parties, including Lender as a result of any Event of Default, or any failure by Borrower or any Guarantor to perform any obligation or satisfy any Liability of Borrower, including any prosecution by Borrower or any Guarantor or any of their respective Representatives of affirmative claims or counterclaims against Lender Parties.

PAG-B0648
KM000083

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

19. **SEVERABILITY.** Any provision of this Note or any other Loan Document that is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability, without rendering invalid or unenforceable the remaining provisions of this Note and the other Loan Documents or affecting the validity or enforceability of any provision of this Note or any other Loan Document in any other jurisdiction.

20. **GOVERNING LAW.** Except with respect to the interpretation or enforcement of the arbitration and other provisions set forth in Section 22 (which shall be governed by the Federal Arbitration Act), the validity, enforceability, and interpretation of this Note and the other Loan Documents shall be governed by the internal Laws of the State of Indiana, without regard to conflicts of Laws provisions thereof.

21. **JURISDICTION AND VENUE.** As evidenced by Borrower's signature below, subject to the provisions noted in Section 22, Borrower submits to the personal jurisdiction and venue of the state and federal courts of Marion County and Hamilton County, Indiana, and agrees that any and all claims or disputes pertaining to this Note or any other Loan Document, or to any matter arising out of or related to this Note or any other Loan Document, which are initiated by Borrower against Lender, to the extent, if any, that such claims or disputes are not subject to the provisions noted in Section 22 below, shall be brought in the state or federal courts of Marion County or Hamilton County, Indiana. Further, Borrower expressly consents to the jurisdiction and venue of the state and federal courts of Marion County or Hamilton County, Indiana, as to any legal or equitable action that may be brought in such court by Lender, and waives any objection based upon lack of personal jurisdiction, improper venue, or forum non conveniens with respect to any such action. Borrower acknowledges and agrees that Lender reserves the right to initiate and prosecute any action against Borrower in any court of competent jurisdiction, and Borrower consents to such forum as Lender may elect.

22. **MANDATORY BINDING ARBITRATION; WAIVER OF CLASS ACTION RIGHTS.**

    (a) In most cases, any disputes or claims that Borrower may have can be resolved quickly and to Borrower's satisfaction by contacting Lender regarding such dispute or claims. In the unlikely event that Lender is unable to resolve a dispute or claim that Borrower may have, Borrower agrees to arbitrate any such dispute or claim in accordance with this Section 22. This agreement to arbitrate is intended to be broadly interpreted, and includes (i) all disputes, claims and counterclaims arising out of or relating to this Note or any other Loan Document or any aspect of Borrower's past, present or future relationship with Lender, whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory; (ii) all disputes, claims and counterclaims that may have arisen prior to the Effective Date or from any prior dealings, contract or agreement between Borrower and Lender (including all disputes, claims and counterclaims relating to any marketing or advertising by Lender); and (iii) any disputes, claims and counterclaims that may arise after the termination of this Note and any other Loan Document. Additionally, Borrower acknowledges that Lender may (BUT SHALL IN NO EVENT BE REQUIRED TO) arbitrate any dispute or claim that it may have against Borrower, with any such arbitration being governed by the provisions of this Section 22. BY AGREEING TO ARBITRATION, BORROWER UNDERSTANDS AND AGREES THAT IT IS WAIVING ITS RIGHTS TO MAINTAIN OTHER AVAILABLE RESOLUTION PROCESSES, SUCH AS COURT ACTION (INCLUDING A JURY TRIAL) OR ADMINISTRATIVE PROCEEDING, IN ORDER TO SETTLE OR RESOLVE DISPUTES OR ANY CLAIMS AGAINST LENDER. ARBITRATION IS DIFFERENT THAN A COURT ACTION, AND THE RULES IN ARBITRATION ARE DIFFERENT THAN THE RULES THAT APPLY IN COURT. THERE IS NO JUDGE OR JURY IN ARBITRATION, AND REVIEW IS LIMITED, BUT AN ARBITRATOR CAN AWARD THE SAME DAMAGES AND RELIEF AS A COURT, SUBJECT TO THE AGREED TERMS AND LIMITATIONS IN THIS NOTE Borrower, at its election, may opt-out of the arbitration provisions set forth in Sections 22(a), 22(c) and 22(d) by providing written notice of its election to opt-out no later than thirty (30) days after the Effective Date, which notice shall be provided to Lender pursuant to Section 15 ("Opt-Out Notice"), provided that such Opt-Out Notice shall become effective only upon Borrower's receipt of written confirmation from Lender that such Opt-Out Notice has been received by Lender within the required time period. Borrower acknowledges and agrees that, irrespective of any Opt-Out Notice or any written confirmation thereof, Borrower shall in all events be subject to the provisions of Section 22(b).

    (b) ANY ARBITRATION OR OTHER LEGAL PROCEEDING OF ANY TYPE OR NATURE ARISING UNDER OR RELATING TO THIS NOTE OR ANY OF THE OTHER LOAN DOCUMENTS, OR TO ANY ASPECT OF BORROWER'S PAST, PRESENT OR FUTURE RELATIONSHIP OR ACTIVITIES WITH OR INVOLVING LENDER (INCLUDING ANY MARKETING ACTIVITIES OR SOLICITATIONS BY OR ON BEHALF OF LENDER), WILL TAKE PLACE ON AN INDIVIDUAL BASIS. CLASS ARBITRATIONS AND CLASS ACTIONS OF ANY KIND (WHETHER PURSUED THROUGH ARBITRATION OR THROUGH THE COURTS) ARE NOT PERMITTED. BORROWER AGREES THAT IT MAY BRING CLAIMS AGAINST LENDER ONLY IN ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. BORROWER AGREES THAT, BY ENTERING INTO THIS NOTE, BORROWER IS WAIVING ITS RIGHT TO PARTICIPATE IN ANY CLASS ACTION OR OTHER SIMILAR REPRESENTATIVE PROCEEDING. UNLESS CONSENTED TO IN WRITING BY LENDER, THE ARBITRATOR MAY NOT CONSOLIDATE MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING. BORROWER ACKNOWLEDGES AND AGREES THAT THE SIZE OF BORROWER'S CREDIT LINE, THE INTEREST RATE TO WHICH ADVANCES ARE SUBJECT AND CERTAIN FEES CHARGED TO BORROWER, AS WELL AS THE SIZE AND DATES OF SPECIFIC ADVANCES, ARE UNIQUE TO AND NEGOTIATED BY BORROWER, AND THAT SUCH FACTORS WILL AND DO VARY AMONG BORROWERS.

    (c) Any dispute or claim subject to arbitration pursuant to this Section 22 shall be submitted to binding arbitration administered by the Judicial Arbitration and Mediation Service ("JAMS") pursuant to its Comprehensive Arbitration Rules and Procedures in then effect (the "JAMS Comprehensive Rules"); provided, however, that any dispute or claim that is subject to arbitration pursuant to this Section 22 and that involves disputes or claims where the aggregate amount reasonably in dispute or controversy is less than $100,000, shall be submitted to binding arbitration administered by JAMS pursuant to its Streamlined Arbitration Rules and Procedures as in effect on the Effective Date (the "JAMS Streamlined Rules"). The disputes and claims subject to arbitration pursuant to this Section 22 will be resolved by a single arbitrator selected pursuant to the JAMS Comprehensive Rules or the JAMS Streamlined Rules, as the case may be. The arbitrator shall be bound by and shall strictly enforce the terms of this Note and the other Loan Documents and may not limit, expand, or otherwise modify any term or provision of this Note or any other Loan Document or any other contract or document between Borrower and Lender. The arbitrator shall not have the

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

power to award to Borrower any damages that are excluded or that have been waived by Borrower under this Note or any other Loan Document, and Borrower irrevocably waives any claim that it may have thereto. The arbitrator shall not have the power to order pre-hearing discovery of documents or the taking of depositions. The arbitrator shall render a written decision within six (6) months after being selected. Any arbitration will be held in Indianapolis, Indiana (or its greater metro area). Each Party will bear its own expenses in the arbitration and will share equally the costs of the arbitration; provided, however, that the arbitrator may, in his or her discretion, award costs and fees to the prevailing Party. The result of any arbitration shall be final and binding upon the Parties. Judgment upon any arbitration award may be entered in any court having jurisdiction over the award or over the applicable party or its assets.

(d)  This Note and the other Loan Documents evidence transactions in interstate commerce, and thus the Federal Arbitration Act governs the interpretation and enforcement of this Section 22, notwithstanding the provisions of Section 20.

23.  WAIVER OF JURY TRIAL.  AFTER CONSULTING OR HAVING HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL, LENDER AND BORROWER KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVE ANY RIGHT EITHER PARTY MAY HAVE TO A TRIAL BY JURY IN ANY LITIGATION BASED UPON OR ARISING OUT OF THIS NOTE OR ANY OTHER LOAN DOCUMENT, OR ANY OF THE TRANSACTIONS CONTEMPLATED BY THIS NOTE OR ANY OF THE OTHER LOAN DOCUMENTS, OR ANY COURSE OF CONDUCT, STATEMENT, WHETHER ORAL OR WRITTEN, OR ACTIONS OF LENDER OR BORROWER.  NEITHER LENDER NOR BORROWER SHALL SEEK TO CONSOLIDATE, BY COUNTERCLAIM OR OTHERWISE, ANY ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED. THESE PROVISIONS SHALL NOT HAVE BEEN DEEMED TO HAVE BEEN MODIFIED IN ANY RESPECT OR RELINQUISHED BY LENDER OR BORROWER EXCEPT BY WRITTEN INSTRUMENT EXECUTED BY BOTH LENDER AND BORROWER.

24.  LIMITATION OF LIABILITY.  IN NO EVENT SHALL ANY LENDER PARTY BE LIABLE FOR ANY SPECIAL, INDIRECT, EXEMPLARY, PUNITIVE, INCIDENTAL, MULTIPLE OR CONSEQUENTIAL DAMAGES (INCLUDING ANY DAMAGES RESULTING FROM LOSS OF USE, LOSS OF PROFITS, LOSS OF BUSINESS OR OTHER ECONOMIC LOSS) ARISING OUT OF OR IN CONNECTION WITH THIS NOTE OR ANY OTHER LOAN DOCUMENT (OR ANY ADVANCES MADE BY LENDER HEREUNDER OR THEREUNDER), EVEN IF SUCH LENDER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. FURTHER, IN NO EVENT SHALL THE LENDER PARTIES, COLLECTIVELY, BE LIABLE FOR ANY DAMAGES UNDER THIS NOTE OR ANY OTHER LOAN DOCUMENT (OR IN CONNECTION WITH ANY ADVANCE BY LENDER HEREUNDER OR THEREUNDER) THAT EXCEED, IN THE AGGREGATE, AN AMOUNT EQUAL TO THE SUM OF THE INTEREST AND FLOORPLAN FEES ACTUALLY PAID TO LENDER BY BORROWER UNDER THIS NOTE DURING THE TWELVE (12) MONTH PERIOD IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO THE CLAIM AT ISSUE (OR, IN THE CASE OF MULTIPLE EVENTS, THE FIRST SUCH EVENT GIVING RISE TO THE CLAIM AT ISSUE).

25.  WAIVER OF BOND.  BORROWER WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY BOND OR SURETY OR SECURITY ON SUCH BOND WHICH MIGHT, BUT FOR THIS WAIVER, BE REQUIRED OF LENDER DURING ATTEMPTS TO RECOVER COLLATERAL OR OTHERWISE.

26.  CALIFORNIA BORROWERS.  In the event Borrower's Place of Business is in the State of California, Borrower acknowledges and agrees that any initial Advance made under this Note must be in the amount of at least Five Thousand Dollars and Zero Cents ($5,000), and Borrower shall neither request nor accept any initial Advance under this Note in an amount less than Five Thousand Dollars and Zero Cents ($5,000).

27.  DISCLAIMER.  THE DISCOVER PORTAL LICENSED OR PROVIDED HEREUNDER IS PROVIDED AS A CONVENIENCE TO BORROWER AND ON AN "AS-IS" BASIS.  LENDER MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, ORAL OR WRITTEN, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTIES OF NON-INFRINGEMENT, TITLE, ACCURACY, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE.  WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, LENDER MAKES NO REPRESENTATIONS OR WARRANTIES THAT THE DISCOVER PORTAL WILL OPERATE ERROR-FREE OR ON AN UNINTERRUPTED BASIS, AND LENDER SHALL IN NO EVENT BE LIABLE OR RESPONSIBLE FOR ANY OUTAGE OR OTHER LOSS OF FUNCTIONALITY OR CONNECTIVITY WITH RESPECT TO THE DISCOVER PORTAL, AND NO SUCH OUTAGE OR OTHER LOSS OF FUNCTIONALITY OR CONNECTIVITY SHALL EXCUSE ANY FAILURE BY BORROWER TO TIMELY PERFORM ALL OF ITS OBLIGATIONS TO LENDER UNDER THIS NOTE AND THE OTHER LOAN DOCUMENTS.

28.  DESCRIPTIVE HEADINGS; INTERPRETATION.  The descriptive headings herein are for convenience of reference only and shall not control or affect the meaning or construction of any provision of this Note.  As used in this Note and the other Loan Documents, the terms "include," "includes," and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of like import. Words (including the defined terms set forth in Appendix A) of one gender shall be held to include the other gender as the context requires. Any references in this Note or in the other Loan Documents to a particular statute or regulation shall be deemed to include all amendments thereto, rules and regulations thereunder and any successor statute, rule, or regulation, or published clarifications or interpretations with respect thereto, in each case as in effect from time to time.

29.  EFFECTIVE DATE OF OTHER LOAN DOCUMENTS.  Unless otherwise stated in the applicable Loan Document, the effective date of any Loan Document executed by a party shall be the later of (a) the Effective Date of this Note, or (b) the date of Borrower's execution thereof as set forth below Borrower's signature thereon (or, in the case of any guaranty, the date of Guarantor's execution thereof as set forth below Guarantor's signature thereon). In the event that the date of Borrower's or Guarantor's execution of any Loan Document is not set forth below Borrower's or Guarantor's signature thereon, then the effective date of such Loan Document shall be deemed to be the Effective Date of this Note.

WHEREFORE, the Parties, by their respective duly authorized representatives, have executed this Demand Promissory Note and Loan and Security Agreement on the dates set forth below.

NextGear Demand Promissory Note and Loan and Security Agreement (v. 1.1)

PAG-B0650
KM000085

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

**LENDER**:

NEXTGEAR CAPITAL, INC.

DocuSigned by:

*Shane O'Dell*

By: ──32464EC045174EF...

Name:   Shane O'Dell
Title:   President
          3/27/2019 | 10:47:56 AM EDT
Date:


**BORROWER**:

Premier Group Autos LLC DBA Overfinch Miami

DocuSigned by:

*James Michael C Blackburn*

By: ──C485919C88D84D1...

Name:   James Michael C Blackburn
Title:   Manager
          3/26/2019 | 4:42:48 PM EDT
Date:

DocuSigned by:

*Edward Anthony Kessler*

By: ──8420326A154C49E...

Name:   Edward Anthony Kessler
Title:   Manager
3/27/2019 | 10:46:09 AM EDT
Date:

NextGear Demand Promissory Note and Loan and Security Agreement (v. 1 1)

PAGE0651
KM000086

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

GUARANTORS ACKNOWLEDGE AND CONSENT TO THE FOREGOING:



Guarantor (Sign)     *James Michael C Blackburn*
                     C485919CBBD84D1

Name:    James Michael C Blackburn

Guarantor (Sign)     DocuSigned by:
                     *Edward Anthony Kessler*
                     8420328A15AC498

Name:    Edward Anthony Kessler

NextGear Demand Promissory Note and Loan and Security Agreement (v. 1.1)

PAG-B0652
KM000087

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

## APPENDIX A

(1)  "Administrative Charge" shall mean any expense charged by Lender to Borrower that is reasonable or necessary, in Lender's sole discretion, to administer or monitor Borrower's account, to preserve any Collateral, or to collect any Liabilities owed by Borrower.

(2)  "Advance" shall mean any discretionary loan or payment in any amount, for any purpose, made pursuant to this Note by Lender to Borrower or on Borrower's behalf to any third party.

(3)  "Advance Schedule" shall mean any addendum or other document executed pursuant to this Note, in each case as modified from time to time, which indicates the applicable specific terms regarding Borrower's Floorplan Fees, Receivable Fees, Contract Rate of Interest, Period(s), Required Reserve Amount, Reserve Charge, required principal reduction to obtain a Curtailment of the Maturity Date, and number of available Curtailments.

(4)  "ACH" shall mean any payment by or on behalf of Borrower to Lender made via a nationwide electronic funds transfer network processing electronic debit and credit entries to or from Borrower's bank accounts.

(5)  "Affiliate" shall mean, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such first-named Person (which shall, for purposes of clarity, include any parent company and any direct or indirect subsidiary of such first-named Person) and, if such first-named Person is a natural person, also includes any member of such first-named Person's immediate family.  For purposes of this definition, the term "control" means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

(6)  "Base Rate" shall mean the greater of that variable rate of interest or that fixed rate of interest as stated in the Finance Program Rate, Fee, and Term Schedule.

(7)  "Borrower" shall have the meaning set forth in the Preamble.

(8)  "Borrower's Place of Business" shall mean the primary place where the Collateral and Borrower's books and records are kept, and where Borrower's operations are conducted.

(9)  "Business" shall mean Borrower's business, as it relates to the purchase and sale, lease, or rent of Inventory and/or the origination of any Receivables.

(10)  "Business Day" shall mean any day other than a Saturday, Sunday, federal holiday or day on which banking institutions in Carmel, Indiana are authorized or obligated by Law or executive order to be closed.

(11)  "Check" shall mean any payment by or on behalf of Borrower to Lender not made in cash, via certified funds, wire transfer, or ACH.

(12)  "Collateral" shall have the meaning set forth in Section 2(a).

(13)  "Collateral Protection Program" shall mean that certain program in which Borrower may participate in lieu of providing third party insurance as required under this Note.

(14)  "Contract Rate" shall mean that rate of interest as stated on the applicable Advance Schedule.

(15)  "Credit Line" shall mean Borrower's floorplan line of credit with Lender pursuant to and under this Note.

(16)  "Curtailment" shall mean that grant by Lender, in its sole discretion, to Borrower of additional time extending the Maturity Date with respect to a Floorplan Advance or a Receivable Advance for an additional Period.  The number of allowable Curtailments for a Floorplan Advance or a Receivable Advance shall be as stated on the applicable Advance Schedule.

(17)  "Discover Portal" shall mean that certain web-based portal located at http://www.nextgearcapital.com (or any similar successor or related portal, interface or website including any mobile or tablet application or website) owned, operated or maintained by Lender and, subject to the Terms and Conditions, to which Borrower shall have access to from time to time as determined by Lender.

(18)  "Effective Date" shall have the meaning set forth in the Preamble.

(19)  "E-Sign Act" shall have the meaning set forth in Section 14.

(20)  "Event of Default" shall have the meaning set forth in Section 6.

(21)  "Extension" shall mean that grant by Lender, in its sole discretion, to Borrower of additional time extending the Maturity Date with respect to a Floorplan Advance beyond the last Period as stated on the applicable Advance Schedule.

PAGAB0653
KM000088

DocuSign Envelope ID: FAE10158-F46A-48C8-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy
by the designated custodian

(22)   "Finance Program" shall mean any finance program offered by Lender and available to Borrower for the financing of Inventory or Receivables pursuant to an Advance under this Note.

(23)   "Finance Program Rate, Fees, and Term Schedule" shall mean that current schedule of applicable universal interest rates, fees and term and condition amendments for each Finance Program, including Universal Program Fees; late fees; fees relating to returned checks or ACH payments due to insufficient funds; the Base Rate; Collateral Protection Program fees; and notice of amendments to the Terms and Conditions, published by Lender via posting such schedule of such universal rates and fees and notice of amendments to the Terms and Conditions on the Discover Portal.

(24)   "Floorplan Advance" shall mean an Advance made pursuant to this Note relating to a Unit of Inventory to be offered for sale, lease or rent, or leased or rented by Borrower in the Ordinary Course of Business.

(25)   "Floorplan Date" shall mean (a) for a Universal Source Purchase, the sale date, regardless of the date the Floorplan Advance is actually requested or funded; and (b) for a Specific Source Purchase, the date the request for the Floorplan Advance is received by Lender, regardless of the date such Floorplan Advance is actually funded.

(26)   "Floorplan Fee" shall mean the fee charged by Lender to Borrower, as set forth on the applicable Advance Schedule, for each Unit of Lender Financed Inventory for each Period, including any Extensions thereof.

(27)   "Guarantor" shall mean any Person executing this Note as a Guarantor or any Person executing any guaranty pursuant to this Note.

(28)   "Interest" shall mean the aggregate rate of interest which accrues on all outstanding Liabilities of Borrower under or arising under this Note or any of the other Loan Documents.

(29)   "Inventory" shall mean all Units held by Borrower for wholesale or retail sale, lease, or rent, or leased or rented by Borrower. "Inventory" includes Lender Financed Inventory.

(30)   "JAMS" shall have the meaning set forth in Section 22(c).

(31)   "JAMS Comprehensive Rules" shall have the meaning set forth in Section 22(c).

(32)   "JAMS Streamlined Rules" shall have the meaning set forth in Section 22(c).

(33)   "Law" or "Laws" shall mean applicable common law and any applicable statute, permit, ordinance, code or other law, rule, regulation or order enacted, adopted, promulgated or applied by any governmental authority, all as in effect from time to time.

(34)   "Lender" shall have the meaning set forth in the Preamble.

(35)   "Lender Financed Inventory" shall mean all Units for which an Advance has been made under this Note.

(36)   "Lender Guide" shall mean those procedures and instructions for the use of Lender's system and the Discover Portal, in each case as modified by Lender from time to time in Lender's sole discretion, which are available in hard copy upon Borrower's written request to Lender or by Borrower logging onto the Discover Portal.

(37)   "Lender Parties" shall have the meaning set forth in Section 11.

(38)   "Liabilities" shall mean any and all Advances, debts, financial obligations, Administrative Charges, Lender Universal Program Fees, Interest, Floorplan Fees, NSF fees, late fees, charges, expenses, attorneys' fees, costs of collection, covenants, and duties owing, arising, due, or payable from Borrower to Lender of any kind or nature, present, or future, under any instrument, guaranty, or other document, whether arising under this Note, any other Loan Document, or otherwise, whether directly or indirectly (including those acquired by assignment), absolute or contingent, primary or secondary, due or to become due, now existing, or hereafter arising, and however acquired.

(39)   "Liens" shall mean any claims, liabilities, security interests, liens, mortgages, deeds of trust, pledges, conditions, charges, claims, options, rights of first refusal, easements, proxies, voting trusts or agreements, transfer restrictions under any contract or agreement or encumbrances of any kind or nature whatsoever.

(40)   "Loan Documents" shall have the meaning set forth in Section 8.

(41)   "Maturity Date" shall mean (a) for all Liabilities concerning or relating to a Floorplan Advance or a Receivable Advance, the earlier of the last day of the current Period or the day on which Lender declares a Maturity Event; (b) for all Liabilities not directly related to a Floorplan Advance or a Receivable Advance, ten (10) days after the date such Liability is posted to Borrower's account; and (c) for One Day Loans, the date such One Day Loan is posted to Borrower's account. Notwithstanding the foregoing, upon the declaration of an Event of Default by Lender, the Maturity Date for all Liabilities shall be the earlier of (i) the date on which such Event of Default is declared by Lender, or (ii) the date on which such Event of Default first occurred. In the event the Maturity Date is not a Business Day, the Maturity Date shall be deemed to be the next Business Day.

PAG-R0654
KM000089

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

(42)   "Maturity Event" shall mean any event, act or circumstance arising under this Note or any other Loan Document (including any failure by Borrower to adhere to any term or provision of this Note or any other Loan Document), which causes Lender to declare the event, act or circumstance a "Maturity Event" with respect to any Floorplan Advance or Receivable Advance.

(43)   "MSO" shall mean the manufacturer's statement of origin or other document evidencing ownership of a Unit issued by the manufacturer of the Unit.

(44)   "Note" shall mean this Demand Promissory Note and Loan and Security Agreement and all present and future amendments, modifications, and addendums related thereto.

(45)   "One Day Loan" shall mean the amount of any Advance that is in excess of the market value of a Unit, as determined by Lender in its sole discretion. The determination of whether to approve an Advance which would result in the posting of a One Day Loan to Borrower's account shall be in Lender's sole discretion. One Day Loans mature on the date on which they post to Borrower's account.

(46)   "Opt-Out Notice" shall have the meaning set forth in Section 22(a).

(47)   "Ordinary Course of Business" shall mean the ordinary course of the Business of Borrower, consistent with past practices (but only to the extent such past practices were in compliance with Law and in accordance with best industry practices).

(48)   "Parent Company" shall mean, with respect to Borrower or any Guarantor, the Person(s) that, directly or indirectly, have the power to direct or cause the direction of the management and policies of Borrower or Guarantor, as the case may be, whether through the ownership of voting securities, by contract or otherwise.

(49)   "Party" or "Parties" shall have the meaning set forth in the Preamble.

(50)   "Period" shall mean the number of days set forth on the applicable Advance Schedule, which (a) in the case of a Floorplan Advance, shall be calculated beginning on the Floorplan Date; and (b) in the case of a Receivable Advance, shall be calculated beginning on the Receivable Origination Date.

(51)   "Person" shall mean any individual, corporation, joint stock company, association, partnership, joint ventures, trust, estate, limited liability company, limited liability partnership, governmental authority or other entity or organization.

(52)   "Receivable" shall mean chattel paper, including a retail installment contract or buy here pay here contract, evidencing a monetary obligation of a buyer for the purchase of a motor vehicle from Borrower and the granting of a security interest in the vehicle to Borrower as security for the repayment of the monetary obligation.

(53)   "Receivable Advance" shall mean an Advance made pursuant to this Note to provide Borrower with working capital secured by a specific Receivable owned and originated by Borrower in the Ordinary Course of Business.

(54)   "Receivable Fee" shall mean the fee charged by Lender to Borrower, set forth on the applicable Advance Schedule, for each individual Receivable Advance for each Period.

(55)   "Receivable Origination Date" shall mean, with respect to any Receivable for which a Receivable Advance is made pursuant to this Note, the date on which such Receivable was originated by Borrower.

(56)   "Representative" shall mean, with respect to Borrower or Lender, as the case may be, the directors, officers, stockholders, employees, trustees, agents, and representatives, including any investment banker, consultant, attorney, or accountant, of Borrower or Lender, as the case may be.

(57)   "Required Reserve Amount" shall mean the aggregate total amount of funds required to be remitted by Borrower to Lender, as set forth in the applicable Advance Schedule, and held in the Reserve as a condition to the grant of credit to Borrower under this Note and the other Loan Documents.

(58)   "Reserve" shall mean the cash deposited with Lender by Borrower on a voluntary basis or as required as an underwriting condition and held by Lender as additional security for Borrower's Liabilities, and other Obligations (as defined in the applicable reserve agreement) to the Lender Parties.

(59)   "Reserve Charge" shall mean that charge by Lender to Borrower, as set forth on the applicable Advance Schedule, assessed for the purpose of funding any Reserve.

(60)   "Setoff Funds" shall have the meaning set forth in Section 5(l).

(61)   "Specific Source Purchase" shall mean all purchases or other requests for an Advance, made by or on behalf of Borrower that do not constitute a Universal Source Purchase.

(62)   "Terms and Conditions" shall mean all provisions of this Note and the other Loan Documents, with the exception of terms specifically referenced on the applicable Advance Schedule.

DocuSign Envelope ID: FAE10158-F46A-48C8-BEB2-FB526DFFF676

This is a copy view of the Authoritative Copy h
by the designated custodian

(63)  "Title" shall mean the certificate of title or other document evidencing ownership of a Unit issued by a duly authorized state, commonwealth, province, or government agency.

(64)  "UCC" shall mean the Uniform Commercial Code as enacted in the State where the Collateral at issue is located.

(65)  "Unit" shall mean any manufactured item, including motor vehicles, for which there exists a Title, MSO, or other similar evidence of ownership acceptable to Lender.

(66)  "Universal Program Fee" shall mean any published fee, as stated in the Finance Program Rate, Fee, and Term Schedule, charged by Lender to Borrower pursuant to a Finance Program.

(67)  "Universal Source Purchase" shall mean any purchase made by or on behalf of Borrower for which (a) a request for an Advance is made by or on behalf of Borrower; (b) from an auction or third party business that has entered into a universal funding agreement with Lender; and (c) such request for an Advance is received by Lender within seven (7) days of Borrower's purchase of the vehicle that is the subject of such request.



NextGear Demand Promissory Note and Loan and Security Agreement (v. 1.1)

KM000091

DocuSign Envelope ID: FAE10158-F46A-48C8-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy held by the designated custodian

## ADDENDUM TO DEMAND PROMISSORY NOTE
## AND LOAN AND SECURITY AGREEMENT – READY LOGISTICS

THIS ADDENDUM TO DEMAND PROMISSORY NOTE AND LOAN AND SECURITY AGREEMENT (this "Addendum") is being entered into by the undersigned borrower ("Borrower") and NextGear Capital, Inc. ("Lender"), pursuant to that certain Demand Promissory Note and Loan and Security Agreement by and between Borrower and Lender (the "Note").

WHEREAS, Borrower has requested of Lender that Lender make one or more Advances on behalf of Borrower, directly to Ready Logistics LLC ("Ready Logistics") in order to cover transportation and other related acquisition charges (collectively "Charges") incurred by Borrower related to one or more Units of Lender Financed Inventory; and

WHEREAS, subject to the terms and conditions set forth in the Note and the other Loan Documents, all as the same now exist or are hereafter amended, supplemented or added to, Lender is willing to make such Advance(s);

NOW, THEREFORE, in consideration of the premises and the mutual agreements and covenants set forth herein, and other good and valuable consideration, the undersigned hereby agree as follows:

1.  Notwithstanding anything to the contrary in the Note or the other Loan Documents, the decision to make an Advance related to Charges on behalf of Borrower is the exclusive right of Lender, whether or not an Event of Default has occurred.

2.  Borrower acknowledges and agrees that Lender may make such Advance(s) at any time on or after receipt of an invoice from Ready Logistics for such Charges.

3.  Borrower acknowledges and agrees that each Advance made by Lender on behalf of Borrower, directly to Ready Logistics, to cover Charges, shall be added to the outstanding balance for the related Unit of Lender Financed Inventory for which such Charge applies, as of the date Lender receives notice from Ready Logistics of such Charge. Such Advance, shall accrue Interest and other related charges as if such date, regardless of the date the related Charge is actually paid. Borrower acknowledges and agrees that if an Advance related to a Charge is added to Borrower's account on a date other than the Floorplan Date for such Unit of Lender Financed Inventory, that the number of days remaining in the applicable Period, for an Advance related to a Charge, will be reduced to the number of days remaining in the applicable Period for the related Unit of Lender Financed Inventory.

    Borrower acknowledges and agrees that such Advance(s) is a Liability under the Note and, except as provided for herein, is subject to all terms and conditions noted therein. Borrower acknowledges and agrees that Borrower is and shall remain obligated to repay such Liability, including accrued Interest, to Lender no later than the Maturity Date for such Advance, excepting that Lender may, in its sole discretion and without notice, defer payment of the Advance or any portion thereof (excluding Interest) until final payoff.

5.  Borrower acknowledges and agrees that Borrower is and shall remain obligated to repay such Liability to Lender for such Advance(s) no later than the Maturity Date for such Advance(s), regardless of whether the sale of the related Unit of Lender Financed Inventory, for which an Advance was made to Ready Logistics on Borrower's behalf, is subsequently arbitrated, voided, or the vehicle is otherwise returned for any reason.

Capitalized terms used herein but not defined herein shall have the respective meanings as set forth in the Note (such meanings to be equally applicable to both the singular and plural forms of the terms defined).

The undersigned Borrower hereby expressly acknowledges that this Addendum shall be binding on Borrower whether executed in original, "wet ink" form; submitted by facsimile; or submitted by electronically transmitted signature ("e-signature"). The undersigned Borrower further acknowledge(s) that the acceptance of the terms of this Addendum, if by e-signature, shall be deemed to satisfy all requirements imposed on electronic or digital

Addendum to Demand Promissory Note and Loan and Security Agreement (v. 3.2)

PAG-B0657

KM000092

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy held by the designated custodian

signatures under the Electronic Signatures in Global and National Commerce Act (the "E-Sign Act"), 15 U.S.C. §7001(a) et seq., and any other similar laws relating to the validity or enforceability of electronic or digital signatures. Each of the parties acknowledges and agrees that this Addendum may be executed by affixing to this Addendum an electronic or digital signature, which shall for all purposes be deemed effective to constitute the valid signature of the party affixing such electronic or digital signature.

☒ Borrower, by its duly authorized representative, AGREES to be bound by the terms of this Addendum as of the date set forth below.

☐ Borrower, by its duly authorized representative, DECLINES the terms of this Addendum. Borrower will not request any Advances to be made to Ready Logistics on Borrower's behalf for Charges, and Lender will not approve any such requests.

**BORROWER:**

PREMIER GROUP AUTOS LLC DBA OVERFINCH MIAMI

By: _James Michael C Blackburn_

Name: James Michael C Blackburn

Title: Manager

Date: 3/26/2019 | 4:42:48 PM EDT

**LENDER:**

NEXTGEAR CAPITAL, INC.

By: _Shane O'Dell_

Name: Shane O'Dell

Title: President

Date: 3/27/2019 | 10:47:56 AM EDT

Dealer # 125308

Addendum to Demand Promissory Note and Loan and Security Agreement (v. 3.2)
PAG-B0658

KM000093

DocuSign Envelope ID: FAE10158 F46A 48C6-BCD2-FD520DFFF076

THIS IS A COPY
This is a copy view of the Authoritative Copy
by the designated custodian

## ADVANCE SCHEDULE
(Retail)

Borrower:   Premier Group Autos LLC DBA Overfinch Miami          Market:   Ft. Lauderdale North

Account Number:   125308          Finance Program:   Core

This Advance Schedule is being entered into by the undersigned borrower ("Borrower") and NextGear Capital, Inc. ("Lender") pursuant to that certain Demand Promissory Note and Loan and Security Agreement by and between Borrower and Lender (the "Note"). Capitalized terms used herein but not defined herein shall have the respective meanings as set forth in the Note (such meanings to be equally applicable to both the singular and plural forms of the terms defined).

The following terms shall apply to Advances made under the Note and this Advance Schedule:

The Floorplan Fee, the Period(s), and the required principal reduction for Curtailment for each Advance made pursuant to the Note and this Advance Schedule shall be as follows:

| Period | Number of Days in Period | Required Principal Reduction for Curtailment of Maturity Date | Floorplan Fee |
|--------|--------------------------|--------------------------------------------------------------|---------------|
| 1 | 60 | 10% | $80.00 |
| 2 | 30 | 5% | $45.00 |
| 3 | 30 | N/A -- No Further Curtailments Available | $45.00 |

Contract Rate: 3.0%

Additional fees, charges, and other terms applicable to Advances made pursuant to the Note and this Advance Schedule are set forth on the Finance Program Rate, Fee, and Term Schedule, which can be found on the Discover Portal.

The undersigned Borrower hereby expressly acknowledges that this Advance Schedule shall be binding on Borrower whether executed in original, "wet ink" form; submitted by facsimile; or submitted by electronically transmitted signature ("e-signature"). The undersigned Borrower further acknowledges that the acceptance of the terms of this Advance Schedule, if by e-signature, shall be deemed to satisfy all requirements imposed on electronic or digital signatures under the Electronic Signatures in Global and National Commerce Act (the "E-Sign Act"), 15 U.S.C. §7001(a) et seq., and any other similar laws relating to the validity or enforceability of electronic or digital signatures. Each of the parties acknowledges and agrees that this Advance Schedule may be executed by affixing to this Advance Schedule an electronic or digital signature, which shall for all purposes be deemed effective to constitute the valid signature of the party affixing such electronic or digital signature.

WHEREFORE, the Parties, by their respective duly authorized representatives, have executed this Advance Schedule on the dates set forth below.

LENDER:

NEXTGEAR CAPITAL, INC.

DocuSigned by:

*Shane O'Dell*

32484ECD45174EF

By:

Name:   Shane O'Dell

Title:   President

Date:   3/27/2019 | 10:47:56 AM EDT

PAG-B0659
KM000094

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy
by the designated custodian

**BORROWER:**

Premier Group Autos LLC DBA Overfinch Miami

DocuSigned by:

*James Michael C Blackburn*

C46591 8CB8064D1...

By:

Name:   James Michael C Blackburn

Title:   Manager

3/26/2019 | 4:42:48 PM EDT

Date:

DocuSigned by:

*Edward Anthony Kessler*

8420328A15AC498...

By:

Name:   Edward Anthony Kessler

Title:   Manager

Date:                     3/27/2019 | 10:46:09 AM EDT

Advance Schedule (Retail) (v. 1 1)
PAG-B0660
KM000095

DocuSign Envelope ID: FAE10158-F48A-48C8-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

## INDIVIDUAL GUARANTY

THIS INDIVIDUAL GUARANTY (this "Guaranty") is made and entered into by the undersigned guarantor ("Guarantor") in favor of NextGear Capital, Inc. ("Lender") and it Affiliates, pursuant to that certain Demand Promissory Note and Loan and Security Agreement by and between Borrower (as defined below) and Lender (the "Note").

NOW, THEREFORE, in consideration of any loan or other financial accommodation heretofore or hereafter at any time made or granted to Borrower by Lender, and the mutual covenants, agreements, and conditions contained herein, Guarantor agrees as follows:

1.  DEFINITIONS. Capitalized terms used herein and not defined in this Section 1 or elsewhere in this Guaranty shall have the respective meanings as set forth in the Note (such meanings to be equally applicable to both the singular and plural forms of the terms defined). Any capitalized terms used herein, but not otherwise defined herein or in the Note, as the case may be, shall have the meanings ascribed to them in the UCC.

    (a) "Borrower" shall mean the Person listed below, including any Affiliates of such Person, whether now in existence or hereinafter established or acquired:

        Premier Group Autos LLC DBA Overfinch Miami, 11 SW 12th Ave Ste 103 Bldg 59, Dania Beach, FL 33004-3527
        Telephone: (954) 440-0717

    (b) "Liabilities" shall mean any and all Advances, debts, financial obligations, fees, charges, expenses, attorneys' fees and costs of collection owing, arising, due, or payable from Borrower to Lender or any of its Affiliates, of any kind or nature, present or future, under any instrument, guaranty, or other document, whether arising under the Note or any other Loan Document, whether directly or indirectly, absolute or contingent, primary or secondary, due or to become due, now existing or hereafter arising, and however acquired.

2.  GUARANTY AND OTHER AGREEMENTS.

    (a) Guaranty Obligations. Guarantor hereby voluntarily, unconditionally, and absolutely guarantees (i) the full and prompt payment when due, whether by acceleration or otherwise, and at all times hereafter, of all Liabilities; and (ii) the full and prompt performance of all the terms, covenants, conditions, and agreements related to the Liabilities. Guarantor further agrees to pay all expenses, including attorneys' fees and court costs (including, in each case, those relating to bankruptcy and appeals), paid or incurred by Lender or its Affiliates in endeavoring to collect on any Liabilities, and in enforcing this Guaranty or in defending any claims by Borrower or any Guarantor related to any of the Liabilities, plus interest on such amounts at the lesser of (A) thirteen percent (13%) per annum, compounded daily, or (B) the maximum rate permitted by Law. Interest on such amounts paid or incurred by Lender shall be computed from the date of payment made by Lender and shall be payable on demand.

    (b) General Nature of Guaranty. Guarantor acknowledges that this Guaranty is a guaranty of payment and not of collection, and that his or her obligations hereunder shall be absolute, unconditional, and unaffected by: (i) the waiver of the performance or observance by Borrower or any Guarantor of any agreement, covenant, term, or condition to be performed or observed by Borrower or any such Guarantor, as the case may be; (ii) the extension of time for the payment of any sums owing or payable with respect to any of the Liabilities or the time for performance of any other obligation arising out of or relating to any of the Liabilities; (iii) the modification, alteration, or amendment of any obligation arising out of or relating to any of the Liabilities; (iv) any failure, delay, or omission by Lender to enforce, assert, or exercise any right, power, or remedy in connection with any of the Liabilities; (v) the genuineness, validity, or enforceability of any of the Liabilities or any document related thereto; (vi) the existence, value, or condition of, or failure of Lender or any of its Affiliates to perfect its lien against, any security pledged in connection with the Liabilities; (vii) the release of any security pledged in connection with the Liabilities, or the release, modification, waiver, or failure to enforce any other guaranty, pledge, or security agreement; (viii) the voluntary or involuntary liquidation, dissolution, sale of all or substantially all of the property, marshalling of assets and liabilities, receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization, arrangement, composition, or readjustment or other similar application or proceeding affecting Borrower or any assets of Borrower; (ix) the release or discharge of Borrower or any other Guarantor from the performance or observance of any agreements, covenants, terms, or conditions in connection with any of the Liabilities, by operation of Law or otherwise; (x) the default of Borrower in any obligations to Guarantor or any torts committed by Borrower against Guarantor, even if Lender is alleged to be complicit or to have committed a direct tort against Guarantor; or (xi) any change in Borrower's ownership, entity type, legal structure, or state of organization or formation, or in Guarantor's relationship to Borrower or any other Guarantor.

    (c) Continuing and Unlimited Nature of Guaranty. The obligations of Guarantor under this Guaranty shall be continuing and shall cover any and all Liabilities existing as of the effective date of this Guaranty and any and all Liabilities thereafter incurred by Borrower, including any and all Liabilities existing at the time of any termination of this Guaranty. This Guaranty shall be unlimited in amount and shall continue in effect until this Guaranty is terminated pursuant to Section 3.

    (d) Waivers by Guarantor. Guarantor hereby expressly waives: (i) notice of the acceptance by Lender of this Guaranty; (ii) notice of the existence, creation, or non-payment of all or any of the Liabilities; (iii) presentment, demand, notice of dishonor, protest, and all other notices whatsoever; (iv) diligence in collection or protection of, or realization upon any one of the Liabilities, any obligation under this Guaranty, or any security for or guaranty of any of the foregoing; (v) impairment of any collateral securing the Liabilities; (vi) notice of any change in Borrower's credit terms or limits with Lender, including any temporary or permnant increases in Borrower's Credit Line (and Guarantor prospectively consents to any such change); (vii) any non-contractual duties of Lender to Borrower or any Guarantor; and (viii) the protections of any Laws intended to protect consumers or regulate consumer loans, as the Liabilities are commercial in nature.

    (e) Authorization. Guarantor authorizes Lender to obtain and share credit information relating to Guarantor from and with credit bureaus, financial institutions, trade creditors, affiliates, and others and to conduct such other credit investigations that Lender in its sole discretion deems necessary

Page 1 of 5

KM000096

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy
by the designated custodian

Guarantor expressly authorizes Lender to obtain his or her consumer credit report from time to time at Lender's discretion, and expressly ratifies any such consumer credit report that may have been obtained by or on behalf of Lender prior to the effective date of this Guaranty. Guarantor also authorizes Lender to contact any third parties to disclose information for the purpose of, among other things, obtaining intercreditor agreements and perfecting Lender's security interest. Further, Guarantor authorizes Lender to periodically obtain additional credit information on Guarantor through any available medium.

(f) **Communication.** Guarantor hereby expressly authorizes Lender and its Affiliates to communicate with Guarantor via facsimile transmissions, email messages, telephonic transmissions, both to a residential telephone line and/or cell phone, including text messaging, using an automatic telephone dialing system or an artificial or prerecorded voice message, and/or any other forms of communication, for any purpose, including general business matters, account information, marketing materials, collection, and/or any other communication needs. Guarantor acknowledges and agrees that such express permission shall extend to any and all of the contact information that Guarantor has provided herein, including any physical and email addresses, phone numbers, fax numbers, etc., and to such other addresses, phone numbers, email addresses, online chat, social media platforms, etc. that Guarantor may provide to Lender or any of its Affiliates or that Lender or any of its Affiliates may obtain from any third party at a later date.

(g) **Enforcement.** In no event shall Lender have any obligation to proceed against Borrower, any other Guarantor or any other Person, or any security pledged in connection with the Liabilities, before seeking satisfaction from Guarantor. Lender may, at its option, proceed, prior or subsequent to, or simultaneously with, the enforcement of its rights hereunder, to exercise any right or remedy it may have against Borrower, any other Guarantor or other Person, or any security pledged in connection with the Liabilities. This Guaranty is in addition to, and not in substitution for, any other guaranty or other securites which Lender may now or hereafter hold.

(h) **Reinstatement.** Guarantor agrees that, if, at any time, all or any part of any payment theretofore applied by Lender to any of the Liabilities is or must be rescinded or returned by Lender for any reason whatsoever (including as a result of any insolvency, bankruptcy, or reorganization of Borrower or any of his or her Affiliates), such Liabilities shall, for purposes of this Guaranty, to the extent that such payment is or must be rescinded or returned, be deemed to have continued in existence, notwithstanding such application by Lender, and this Guaranty shall continue to be effective or reinstated, as applicable, as to all such Liabilities, all as though such application by Lender had not been made.

(i) **Financial Statements.** Upon Lender's request, Guarantor will provide Lender with Guarantor's audited financial statements, as certified by Guarantor's independent certified public accountant, and such other financial statements, information, and other materials as Lender may request from time to time.

(j) **Application of Payments; Subrogation.** Any amounts received by Lender from any source on account of the Liabilities may be applied by it toward the payment of such of the Liabilities, and in such order of application, as Lender may from time to time elect. Notwithstanding any payments made by or for the account of Guarantor, Guarantor shall not be subrogated to any rights of Lender.

3. **TERMINATION.**

(a) **Payment of Liabilities and Termination of Credit Line.** This Guaranty shall be terminated upon the occurrence of all of the following: (i) the payment by Borrower or any Guarantor, either jointly or severally, of all Liabilities outstanding; (ii) the payment of all obligations by Guarantor which may be due to Lender under this Guaranty; and (iii) the filing of a UCC termination statement as to Borrower by or on behalf of Lender, or other written verification from Lender that Borrower's Credit Line is terminated.

(b) **Revocation of Guaranty.** This Guaranty may be revoked by Guarantor upon written notice to Lender by certified mail, return receipt requested, to the address provided in Section 5(d). This Guaranty shall be deemed terminated upon the occurrence of a revocation in the manner provided in this Section 3(b). However, such revocation and termination shall in no way terminate or otherwise affect: (i) any obligations of Guarantor existing on or prior to the effective date of such revocation or termination; or (ii) any obligations of Guarantor arising after the effective date of such revocation or termination with respect to any Liabilities incurred by Borrower on or before the effective date of such revocation or termination.

4. **EVENTS OF DEFAULT.** The occurrence of any of the following events shall be considered an event of default under this Guaranty (each, an "Event of Default"):

(a) Guarantor fails to make full payment of any amount owed hereunder after notice from Lender;

(b) Guarantor fails to perform or observe any agreement, covenant, term, or condition contained in this Guaranty (other than any monetary obligation described in clause (a) above), and such failure continues for ten (10) days after notice from Lender;

(c) Guarantor makes an assignment for the benefit of creditors or fails to pay his or her debts as the same become due and payable;

(d) Guarantor petitions or applies to any tribunal for the appointment of a trustee or receiver of the business, estate, or assets or of any substantial portion of his or her business, estate, or assets, or commences any proceedings relating to Guarantor under any bankruptcy, reorganization, insolvency, readjustment of debt, dissolution, or liquidation Law of any jurisdiction, whether now or hereafter in effect (each, a "Bankruptcy Filing");

(e) any Bankruptcy Filing is filed or any related proceedings commenced against Guarantor, and Guarantor by any act indicates his or her approval thereof, consent thereto, or acquiescence therein, or any order is entered appointing any trustee or receiver, declaring Guarantor bankrupt or insolvent, or approving or accepting the Bankruptcy Filing in any such proceedings;

NextGear Individual Guaranty (v. 1.1)
PAG-B0662
KM000097

DocuSign Envelope ID: FAE10158-F40A-48C0-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

(f)   any suit or proceeding is filed or any related proceedings commenced against Guarantor or any of his or her Affiliates, which, if adversely determined, could substantially impair the ability of Guarantor or Borrower to perform any of their respective obligations with respect to this Guaranty or any of the Liabilities, in each case as determined by Lender in its sole and absolute discretion; or

(g)   there is any Event of Default by Guarantor under the Note.

If an Event of Default under this Guaranty shall have occurred, in addition to pursuing any remedies which may be available to Lender with respect to the Liabilities, Lender, at its option, may take whatever action at law or in equity Lender may deem necessary, regardless of whether Lender shall have exercised any of its rights or remedies with respect to any of the Liabilities, and Lender may demand, at its option, that Guarantor pay forthwith the full amount which would be due and payable hereunder as if all Liabilities were then due and payable.

5.   GENERAL.

(a)   Assignment; Successors and Assigns.  This Guaranty may be assigned by Lender without notice to Guarantor, but Guarantor may not assign this Guaranty without the prior written consent of Lender.  The guaranty and the other agreements contained herein shall bind the legal representatives, heirs, successors, and assigns of Guarantor, and shall inure to the benefit of Lender and its successors and assigns.  Each reference to Guarantor herein shall be deemed to include the legal representatives, heirs, and agents of Guarantor, and their respective successors and assigns.

(b)   Amendment; Merger.  This Guaranty is intended by the Parties to be an amendment to and restatement of any prior Individual Guaranty or other similar document or instrument between Lender (or any predecessor of Lender, including Dealer Services Corporation and/or Manheim Automotive Financial Services, Inc.) and Guarantor, or otherwise executed by Guarantor for the benefit Lender (or any predecessor of Lender, including Dealer Services Corporation and/or Manheim Automotive Financial Services, Inc.).  This Guaranty may be modified or amended only upon the written consent of Lender and Guarantor.  The Parties acknowledge that Guarantor may have also acknowledged and consented to the terms and conditions set forth in the Note, and, in such event, this Guaranty shall be deemed supplemental and in addition to the terms and conditions of the Note to which Guarantor has acknowledged and consented.  In the event of any conflict between a term or provision set forth in this Guaranty, and a term or provision set forth in the Note, the term or provision set forth in this Guaranty shall, as between Lender and Guarantor, be deemed controlling.

(c)   Execution.  Guarantor may execute this Guaranty only by original signature of Guarantor, unless otherwise authorized by Lender.  Lender may, in its sole discretion, permit Guarantor to execute this Guaranty by affixing to this Guaranty an electronic or digital signature.  Guarantor acknowledges and agrees that any electronic or digital signature of Guarantor shall for all purposes be deemed effective and constitute the valid signature of Guarantor, and shall be deemed to satisfy all requirements imposed on electronic or digital signatures under the UCC, the Electronic Signatures in Global and National Commerce Act (the "E-Sign Act"), and any other similar Laws relating to the validity or enforceability of electronic or digital signatures (including, without limitation, any enactment of the Uniform Electronic Transactions Act (UETA)), and such electronic or digital signature shall not be denied legal effect, validity, or enforceability solely because it is in electronic or digital form.  A facsimile or photocopied reproduction of the signatures on this Guaranty shall be deemed original signatures for all intents and purposes.

(d)   Notices.  All notices, demands and requests required or permitted to be given under this Guaranty shall be (i) in writing, (ii) delivered by personal delivery or sent by commercial delivery service or certified mail, return receipt requested (except with respect to notices pursuant to Section 3(b), which notices may only be given by certified mail, return receipt requested), (iii) deemed to have been given on the date of personal delivery or the date set forth in the records of the delivery service or on the return receipt, and (iv) addressed as follows (or, in the case of Lender, to any other subsequent address that Lender may provide to Guarantor (through written notice or otherwise) for purposes of directing future notices, demands or requests):

If to Lender:        NextGear Capital, Inc., 11799 North College Avenue, Carmel, IN  46032
                     Telephone: (317) 571-3721

                     with a copy to:

                     NextGear Capital, Inc., 11799 North College Avenue, Carmel, IN  46032
                     Telephone: (317) 571-3721
                     Attention: Legal Department

If to Guarantor:     James Michael C Blackburn, 1500 Cordova Rd #206, Fort Lauderdale, FL 33316
                     Telephone: 954-232-7661

(e)   No Waiver.  No failure or delay by Lender in exercising any right, power, or privilege or the granting of an exception by Lender with respect to any term or condition of this Guaranty will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege, or the exercise of any other right, power, or privilege by Lender.

(f)   Severability.  Any provision of this Guaranty that is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability, without rendering invalid or unenforceable the remaining provisions of this Guaranty or affecting the validity or enforceability of any provision of this Guaranty in any other jurisdiction.

(g)   Governing Law.  Except with respect to the interpretation or enforcement of the arbitration and other provisions set forth in Section 5(i) (which shall be governed by the Federal Arbitration Act), the validity, enforceability, and interpretation of this Guaranty shall be governed by the internal Laws of the State of Indiana, without regard to conflicts of Laws provisions thereof

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy
by the designated custodian

(h)  Jurisdiction and Venue. As evidenced by Guarantor's signature below, subject to the provisions in Section 5(i), Guarantor submits to the personal jurisdiction and venue of the state and federal courts of Marion County and Hamilton County, Indiana, and agrees that any and all claims or disputes pertaining to this Guaranty, or to any matter arising out of or related to this Guaranty, which are initiated by Guarantor against Lender, to the extent, if any, that such claims or disputes are not subject to the provisions noted in Section 5(i), shall be brought in the state or federal courts of Marion County or Hamilton County, Indiana. Further, Guarantor expressly consents to the jurisdiction and venue of the state and federal courts of Marion County and Hamilton County, Indiana, as to any legal or equitable action that may be brought in such court by Lender, and waives any objection based upon lack of personal jurisdiction, improper venue or forum non conveniens with respect to any such action. Guarantor acknowledges and agrees that Lender reserves the right to initiate and prosecute any action against Guarantor in any court of competent jurisdiction, and Guarantor consents to such forum as Lender may elect.

(i)  Mandatory Binding Arbitration; Waiver of Class Action Rights.

(i)  In the unlikely event that Lender is unable to resolve a dispute or claim that Guarantor may have, Guarantor agrees to arbitrate any such dispute or claim in accordance with this Section 5(i). This agreement to arbitrate is intended to be broadly interpreted, and includes (i) all disputes, claims and counterclaims arising out of or relating to this Guaranty or any aspect of Guarantor's past, present or future relationship with Lender, whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory; (ii) all disputes, claims and counterclaims that may have arisen before this Guaranty or any prior contract or agreement between Guarantor and Lender; and (iii) any disputes, claims and counterclaims that may arise after the termination of this Guaranty. Additionally, Guarantor acknowledges that Lender may (BUT SHALL IN NO EVENT BE REQUIRED TO) arbitrate any dispute or claim that it may have against Guarantor, with any such arbitration being governed by the provisions of this Section 5(i). BY AGREEING TO ARBITRATION, GUARANTOR UNDERSTANDS AND AGREES THAT IT IS WAIVING ITS RIGHTS TO MAINTAIN OTHER AVAILABLE RESOLUTION PROCESSES, SUCH AS COURT ACTION (INCLUDING A JURY TRIAL) OR ADMINISTRATIVE PROCEEDING, IN ORDER TO SETTLE OR RESOLVE DISPUTES OR ANY CLAIMS AGAINST LENDER. ARBITRATION IS DIFFERENT THAN A COURT ACTION, AND THE RULES IN ARBITRATION ARE DIFFERENT THAN THE RULES THAT APPLY IN COURT. THERE IS NO JUDGE OR JURY IN ARBITRATION, AND REVIEW IS LIMITED, BUT AN ARBITRATOR CAN AWARD THE SAME DAMAGES AND RELIEF AS A COURT, SUBJECT TO THE AGREED TERMS AND LIMITATIONS IN THIS NOTE. Guarantor, at his or her election, may opt-out of the arbitration provisions set forth in Sections 5(i)(i), 5(i)(iii) and 5(i)(iv) by providing written notice of his or her election to opt-out no later than thirty (30) days after Guarantor's execution of this Guaranty, which notice shall be provided to Lender pursuant to Section 5(d) ("Opt-Out Notice"), provided that such Opt-Out Notice shall become effective only upon Guarantor's receipt of written confirmation from Lender that such Opt-Out Notice has been received by Lender within the required time period. Guarantor acknowledges and agrees that, irrespective of any Opt-Out Notice or any written confirmation thereof, Guarantor shall in all events be subject to the provisions of Section 5(i)(ii).

(ii)  ANY ARBITRATION OR OTHER LEGAL PROCEEDING OF ANY TYPE OR NATURE UNDER OR RELATING TO THIS GUARANTY OR TO ANY ASPECT OF GUARANTOR'S PAST, PRESENT OR FUTURE RELATIONSHIP OR ACTIVITIES WITH OR INVOLVING LENDER (INCLUDING ANY MARKETING ACTIVITIES OR SOLICITATIONS BY OR ON BEHALF OF LENDER), WILL TAKE PLACE ON AN INDIVIDUAL BASIS. CLASS ARBITRATIONS AND CLASS ACTIONS OF ANY KIND (WHETHER PURSUED THROUGH ARBITRATION OR THROUGH THE COURTS) ARE NOT PERMITTED. GUARANTOR AGREES THAT IT MAY BRING CLAIMS AGAINST LENDER ONLY IN HIS OR HER INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. GUARANTOR AGREES THAT, BY ENTERING INTO THIS GUARANTY, GUARANTOR IS WAIVING HIS OR HER RIGHT TO PARTICIPATE IN ANY CLASS ACTION OR OTHER SIMILAR REPRESENTATIVE PROCEEDING. UNLESS CONSENTED TO IN WRITING BY LENDER, THE ARBITRATOR MAY NOT CONSOLIDATE MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING. GUARANTOR ACKNOWLEDGES AND AGREES THAT THE SIZE OF BORROWER'S CREDIT LINE, THE INTEREST RATE TO WHICH ADVANCES ARE SUBJECT AND CERTAIN FEES CHARGED TO BORROWER, AS WELL AS THE SIZE AND DATES OF SPECIFIC ADVANCES AND WHAT (IF ANY) GUARANTIES ARE REQUIRED, ARE UNIQUE TO AND NEGOTIATED BY BORROWER (AND, IF APPLICABLE, GUARANTOR), AND THAT SUCH FACTORS WILL AND DO VARY AMONG BORROWERS AND OTHER GUARANTORS.

(iii)  Any dispute or claim subject to arbitration pursuant to this Section 5(i) shall be submitted to binding arbitration administered by the Judicial Arbitration and Mediation Service ("JAMS") pursuant to its Comprehensive Arbitration Rules and Procedures as then in effect (the "JAMS Comprehensive Rules"); provided, however, that any dispute or claim that is subject to arbitration pursuant to this Section 5(i) and that involves disputes or claims where the aggregate amount reasonably in dispute or controversy is less than $100,000, shall be submitted to binding arbitration administered by JAMS pursuant to its Streamlined Arbitration Rules and Procedures as in effect as of the effective date of this Guaranty (the "JAMS Streamlined Rules"). The disputes and claims subject to arbitration pursuant to this Section 5(i) will be resolved by a single arbitrator selected pursuant to the JAMS Comprehensive Rules or the JAMS Streamlined Rules, as the case may be. The arbitrator shall be bound by and shall strictly enforce the terms of this Guaranty and may not limit, expand or otherwise modify any term or provision of this Guaranty or any other contract or document between Guarantor and Lender. The arbitrator shall not have the power to award to Guarantor any damages that are excluded or that have been waived by Guarantor under this Guaranty, and Guarantor irrevocably waives any claim that it may have thereto. The arbitrator shall not have the power to order pre-hearing discovery of documents or the taking of depositions. The arbitrator shall render a written decision within six (6) months after being selected. Any arbitration will be held in Indianapolis, Indiana (or its greater metro area). Each Party will bear its own expenses in the arbitration and will share equally the costs of the arbitration; provided, however, that the arbitrator may, in his or her discretion, award costs and fees to the prevailing Party. The result of any arbitration shall be final and binding upon the Parties. Judgment upon any arbitration award may be entered in any court having jurisdiction over the award or over the applicable party or its assets.

NextGear Individual Guaranty (v. 1.1)

PAG-B0664
KM000099

DocuSign Envelope ID: FAE10158 F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

(iv) This Guaranty evidences transactions in interstate commerce, and thus the Federal Arbitration Act governs the interpretation and enforcement of this Section 5(i), notwithstanding the provisions of Section 5(g).

(j) WAIVER OF JURY TRIAL. AFTER CONSULTING OR HAVING HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL, LENDER AND GUARANTOR KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVE ANY RIGHT EITHER PARTY MAY HAVE TO A TRIAL BY JURY IN ANY LITIGATION BASED UPON OR ARISING OUT OF THIS GUARANTY, OR ANY OF THE TRANSACTIONS CONTEMPLATED BY THIS GUARANTY, OR ANY COURSE OF CONDUCT, STATEMENT, WHETHER ORAL OR WRITTEN, OR ACTIONS OF LENDER OR GUARANTOR.  NEITHER LENDER NOR GUARANTOR SHALL SEEK TO CONSOLIDATE, BY COUNTERCLAIM OR OTHERWISE, ANY ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED. THESE PROVISIONS SHALL NOT HAVE BEEN DEEMED TO HAVE BEEN MODIFIED IN ANY RESPECT OR RELINQUISHED BY LENDER OR GUARANTOR EXCEPT BY WRITTEN INSTRUMENT EXECUTED BY BOTH LENDER AND GUARANTOR.

(k) LIMITATION OF LIABILITY.  IN NO EVENT SHALL ANY LENDER PARTY BE LIABLE FOR ANY SPECIAL, INDIRECT, EXEMPLARY, PUNITIVE, INCIDENTAL, MULTIPLE OR CONSEQUENTIAL DAMAGES (INCLUDING ANY DAMAGES RESULTING FROM LOSS OF USE, LOSS OF PROFITS, LOSS OF BUSINESS OR OTHER ECONOMIC LOSS) ARISING OUT OF OR IN CONNECTION WITH THIS GUARANTY, EVEN IF SUCH LENDER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. FURTHER, IN NO EVENT SHALL THE LENDER PARTIES, COLLECTIVELY, BE LIABLE FOR ANY DAMAGES UNDER THIS GUARANTY OR ANY OTHER LOAN DOCUMENT THAT EXCEED, IN THE AGGREGATE, AN AMOUNT EQUAL TO THE SUM OF THE INTEREST AND FLOORPLAN FEES ACTUALLY PAID TO LENDER BY BORROWER UNDER THE NOTE DURING THE TWELVE (12) MONTH PERIOD IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO THE CLAIM AT ISSUE (OR, IN THE CASE OF MULTIPLE EVENTS, THE FIRST SUCH EVENT GIVING RISE TO THE CLAIM AT ISSUE).

(l) Descriptive Headings; Interpretation.  The descriptive headings herein are for convenience of reference only and shall not control or affect the meaning or construction of any provision of this Guaranty. As used in this Guaranty, the terms "include," "includes," and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of like import.

WHEREFORE, Guarantor has executed this Guaranty on the date set forth below.

GUARANTOR

By:

Name:  James Michael C Blackburn

Date:

*James Michael C Blackburn*
3/26/2019 | 4:42:48 PM EDT

COPY VIEW

NextGear Ind. Guaranty (v. 1.1)

PAGE0066
KM000100

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy
by the designated custodian

## INDIVIDUAL GUARANTY

THIS INDIVIDUAL GUARANTY (this "Guaranty") is made and entered into by the undersigned guarantor ("Guarantor") in favor of NextGear Capital, Inc. ("Lender") and it Affiliates, pursuant to that certain Demand Promissory Note and Loan and Security Agreement by and between Borrower (as defined below) and Lender (the "Note").

NOW, THEREFORE, in consideration of any loan or other financial accommodation heretofore or hereafter at any time made or granted to Borrower by Lender, and the mutual covenants, agreements, and conditions contained herein, Guarantor agrees as follows:

1.   DEFINITIONS.  Capitalized terms used herein and not defined in this Section 1 or elsewhere in this Guaranty shall have the respective meanings as set forth in the Note (such meanings to be equally applicable to both the singular and plural forms of the terms defined). Any capitalized terms used herein, but not otherwise defined herein or in the Note, as the case may be, shall have the meanings ascribed to them in the UCC.

   (a)   "Borrower" shall mean the Person listed below, including any Affiliates of such Person, whether now in existence or hereinafter established or acquired:

Premier Group Autos LLC DBA Overfinch Miami, 11 SW 12th Ave Ste 103 Bldg 59, Dania Beach, FL 33004-3527
Telephone: (954) 440-0717

   (b)   "Liabilities" shall mean any and all Advances, debts, financial obligations, fees, charges, expenses, attorneys' fees and costs of collection owing, arising, due, or payable from Borrower to Lender or any of its Affiliates, of any kind or nature, present or future, under any instrument, guaranty, or other document, whether arising under the Note or any other Loan Document, whether directly or indirectly, absolute or contingent, primary or secondary, due or to become due, now existing or hereafter arising, and however acquired.

2.   GUARANTY AND OTHER AGREEMENTS.

   (a)   Guaranty Obligations.  Guarantor hereby voluntarily, unconditionally, and absolutely guarantees (i) the full and prompt payment when due, whether by acceleration or otherwise, and at all times hereafter, of all Liabilities; and (ii) the full and prompt performance of all the terms, covenants, conditions, and agreements related to the Liabilities. Guarantor further agrees to pay all expenses, including attorneys' fees and court costs (including, in each case, those relating to bankruptcy and appeals), paid or incurred by Lender or its Affiliates in endeavoring to collect on any Liabilities, and in enforcing this Guaranty or in defending any claims by Borrower or any Guarantor related to any of the Liabilities, plus interest on such amounts at the lesser of (A) thirteen percent (13%) per annum, compounded daily, or (B) the maximum rate permitted by Law. Interest on such amounts paid or incurred by Lender shall be computed from the date of payment made by Lender and shall be payable on demand.

   (b)   General Nature of Guaranty.  Guarantor acknowledges that this Guaranty is a guaranty of payment and not of collection, and that his or her obligations hereunder shall be absolute, unconditional, and unaffected by: (i) the waiver of the performance or observance by Borrower or any Guarantor of any agreement, covenant, term, or condition to be performed or observed by Borrower or any such Guarantor, as the case may be; (ii) the extension of time for the payment of any sums owing or payable with respect to any of the Liabilities or the time for performance of any other obligation arising out of or relating to any of the Liabilities; (iii) the modification, alteration, or amendment of any obligation arising out of or relating to any of the Liabilities; (iv) any failure, delay, or omission by Lender to enforce, assert, or exercise any right, power, or remedy in connection with any of the Liabilities; (v) the genuineness, validity, or enforceability of any of the Liabilities or any document related thereto; (vi) the existence, value, or condition of, or failure of Lender or any of its Affiliates to perfect its lien against, any security pledged in connection with the Liabilities; (vii) the release of any security pledged in connection with the Liabilities, or the release, modification, waiver, or failure to enforce any other guaranty, pledge, or security agreement; (viii) the voluntary or involuntary liquidation, dissolution, sale of all or substantially all of the property, marshalling of assets and liabilities, receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization, arrangement, composition, or readjustment or other similar application or proceeding affecting Borrower or any assets of Borrower; (ix) the release or discharge of Borrower or any other Guarantor from the performance or observance of any agreements, covenants, terms, or conditions in connection with any of the Liabilities, by operation of Law or otherwise; (x) the default of Borrower in any obligations to Guarantor or any torts committed by Borrower against Guarantor, even if Lender is alleged to be complicit or to have committed a direct tort against Guarantor; or (xi) any change in Borrower's ownership, entity type, legal structure, or state of organization or formation, or in Guarantor's relationship to Borrower or any other Guarantor.

   (c)   Continuing and Unlimited Nature of Guaranty.  The obligations of Guarantor under this Guaranty shall be continuing and shall cover any and all Liabilities existing as of the effective date of this Guaranty and any and all Liabilities thereafter incurred by Borrwer, including any and all Liabilities existing at the time of any termination of this Guaranty. This Guaranty shall be unlimited in amount and shall continue in effect until this Guaranty is terminated pursuant to Section 3.

   (d)   Waivers by Guarantor.  Guarantor hereby expressly waives: (i) notice of the acceptance by Lender of this Guaranty; (ii) notice of the existence, creation, or non-payment of all or any of the Liabilities; (iii) presentment, demand, notice of dishonor, protest, and all other notices whatsoever; (iv) diligence in collection or protection of, or realization upon any of the Liabilities, any obligation under this Guaranty, or any security for or guaranty of any of the foregoing; (v) impairment of any collateral securing the Liabilities; (vi) notice of any change in Borrower's credit terms or limits with Lender, including any temporary or permnant increases in Borrower's Credit Line (and Guarantor prospectively consents to any such change); (vii) any non-contractual duties of Lender to Borrower or any Guarantor; and (viii) the protections of any Laws intended to protect consumers or regulate consumer loans, as the Liabilities are commercial in nature.

   (e)   Authorization.  Guarantor authorizes Lender to obtain and share credit information relating to Guarantor from and with credit bureaus, financial institutions, trade creditors, affiliates, and others and to conduct such other credit investigations that Lender in its sole discretion deems necessary.

DocuSign Envelope ID: FAE10158 F46A 48C6 BEB2 FB528DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

Guarantor expressly authorizes Lender to obtain his or her consumer credit report from time to time at Lender's discretion, and expressly ratifies any such consumer credit report that may have been obtained by or on behalf of Lender prior to the effective date of this Guaranty. Guarantor also authorizes Lender to contact any third parties to disclose information for the purpose of, among other things, obtaining intercreditor agreements and perfecting Lender's security interest. Further, Guarantor authorizes Lender to periodically obtain additional credit information on Guarantor through any available medium.

(f) Communication. Guarantor hereby expressly authorizes Lender and its Affiliates to communicate with Guarantor via facsimile transmissions, email messages, telephonic transmissions, both to a residential telephone line and/or cell phone, including text messaging, using an automatic telephone dialing system or an artificial or prerecorded voice message, and/or any other forms of communication, for any purpose, including general business matters, account information, marketing materials, collection, and/or any other communication needs. Guarantor acknowledges and agrees that such express permission shall extend to any and all of the contact information that Guarantor has provided herein, including any physical and email addresses, phone numbers, fax numbers, etc., and to such other addresses, phone numbers, email addresses, online chat, social media platforms, etc. that Guarantor may provide to Lender or any of its Affiliates or that Lender or any of its Affiliates may obtain from any third party at a later date.

(g) Enforcement. In no event shall Lender have any obligation to proceed against Borrower, any other Guarantor or any other Person, or any security pledged in connection with the Liabilities, before seeking satisfaction from Guarantor. Lender may, at its option, proceed, prior or subsequent to, or simultaneously with, the enforcement of its rights hereunder, to exercise any right or remedy it may have against Borrower, any other Guarantor or other Person, or any security pledged in connection with the Liabilities. This Guaranty is in addition to, and not in substitution for, any other guaranty or other securities which Lender may now or hereafter hold.

(h) Reinstatement. Guarantor agrees that, if, at any time, all or any part of any payment theretofore applied by Lender to any of the Liabilities is or must be rescinded or returned by Lender for any reason whatsoever (including as a result of any insolvency, bankruptcy, or reorganization of Borrower or any of his or her Affiliates), such Liabilities shall, for purposes of this Guaranty, to the extent that such payment is or must be rescinded or returned, be deemed to have continued in existence, notwithstanding such application by Lender, and this Guaranty shall continue to be effective or reinstated, as applicable, as to all such Liabilities, all as though such application by Lender had not been made.

(i) Financial Statements. Upon Lender's request, Guarantor will provide Lender with Guarantor's audited financial statements, as certified by Guarantor's independent certified public accountant, and such other financial statements, information, and other materials as Lender may request from time to time.

(j) Application of Payments; Subrogation. Any amounts received by Lender from any source on account of the Liabilities may be applied by it toward the payment of such of the Liabilities, and in such order of application, as Lender may from time to time elect. Notwithstanding any payments made by or for the account of Guarantor, Guarantor shall not be subrogated to any rights of Lender.

3. TERMINATION.

(a) Payment of Liabilities and Termination of Credit Line. This Guaranty shall be terminated upon the occurrence of all of the following: (i) the payment by Borrower or any Guarantor, either jointly or severally, of all Liabilities outstanding; (ii) the payment of all obligations by Guarantor which may be due to Lender under this Guaranty; and (iii) the filing of a UCC termination statement as to Borrower by or on behalf of Lender, or other written verification from Lender that Borrower's Credit Line is terminated.

(b) Revocation of Guaranty. This Guaranty may be revoked by Guarantor upon written notice to Lender by certified mail, return receipt requested, to the address provided in Section 5(d). This Guaranty shall be deemed terminated upon the occurrence of a revocation in the manner provided in this Section 3(b). However, such revocation and termination shall in no way terminate or otherwise affect: (i) any obligations of Guarantor existing on or prior to the effective date of such revocation or termination; or (ii) any obligations of Guarantor arising after the effective date of such revocation or termination with respect to any Liabilities incurred by Borrower on or before the effective date of such revocation or termination.

4. EVENTS OF DEFAULT. The occurrence of any of the following events shall be considered an event of default under this Guaranty (each, an "Event of Default"):

(a) Guarantor fails to make full payment of any amount owed hereunder after notice from Lender;

(b) Guarantor fails to perform or observe any agreement, covenant, term, or condition contained in this Guaranty (other than any monetary obligation described in clause (a) above), and such failure continues for ten (10) days after notice from Lender;

(c) Guarantor makes an assignment for the benefit of creditors or fails to pay his or her debts as the same become due and payable;

(d) Guarantor petitions or applies to any tribunal for the appointment of a trustee or receiver of the business, estate, or assets or of any substantial portion of his or her business, estate, or assets, or commences any proceedings relating to Guarantor under any bankruptcy, reorganization, insolvency, readjustment of debt, dissolution, or liquidation Law of any jurisdiction, whether now or hereafter in effect (each, a "Bankruptcy Filing");

(e) any Bankruptcy Filing is filed or any related proceedings commenced against Guarantor, and Guarantor by any act indicates his or her approval thereof, consent thereto, or acquiescence therein, or any order is entered appointing any trustee or receiver, declaring Guarantor bankrupt or insolvent, or approving or accepting the Bankruptcy Filing in any such proceedings;

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

(f) any suit or proceeding is filed or any related proceedings commenced against Guarantor or any of his or her Affiliates, which, if adversely determined, could substantially impair the ability of Guarantor or Borrower to perform any of their respective obligations with respect to this Guaranty or any of the Liabilities, in each case as determined by Lender in its sole and absolute discretion; or

(g) there is any Event of Default by Guarantor under the Note

If an Event of Default under this Guaranty shall have occurred, in addition to pursuing any remedies which may be available to Lender with respect to the Liabilities, Lender, at its option, may take whatever action at law or in equity Lender may deem necessary, regardless of whether Lender shall have exercised any of its rights or remedies with respect to any of the Liabilities, and Lender may demand, at its option, that Guarantor pay forthwith the full amount which would be due and payable hereunder as if all Liabilities were then due and payable.

5.   GENERAL.

(a) Assignment; Successors and Assigns. This Guaranty may be assigned by Lender without notice to Guarantor, but Guarantor may not assign this Guaranty without the prior written consent of Lender. The guaranty and the other agreements contained herein shall bind the legal representatives, heirs, successors, and assigns of Guarantor, and shall inure to the benefit of Lender and its successors and assigns. Each reference to Guarantor herein shall be deemed to include the legal representatives, heirs, and agents of Guarantor, and their respective successors and assigns.

(b) Amendment; Merger. This Guaranty is intended by the Parties to be an amendment to and restatement of any prior Individual Guaranty or other similar document or instrument between Lender (or any predecessor of Lender, including Dealer Services Corporation and/or Manheim Automotive Financial Services, Inc.) and Guarantor, or otherwise executed by Guarantor for the benefit Lender (or any predecessor of Lender, including Dealer Services Corporation and/or Manheim Automotive Financial Services, Inc.). This Guaranty may be modified or amended only upon the written consent of Lender and Guarantor. The Parties acknowledge that Guarantor may have also acknowledged and consented to the terms and conditions set forth in the Note, and, in such event, this Guaranty shall be deemed supplemental and in addition to the terms and conditions of the Note to which Guarantor has acknowledged and consented. In the event of any conflict between a term or provision set forth in this Guaranty, and a term or provision set forth in the Note, the term or provision set forth in this Guaranty shall, as between Lender and Guarantor, be deemed controlling.

(c) Execution. Guarantor may execute this Guaranty only by original signature of Guarantor, unless otherwise authorized by Lender. Lender may, in its sole discretion, permit Guarantor to execute this Guaranty by affixing to this Guaranty an electronic or digital signature. Guarantor acknowledges and agrees that any electronic or digital signature of Guarantor shall for all purposes be deemed effective and constitute the valid signature of Guarantor, and shall be deemed to satisfy all requirements imposed on electronic or digital signatures under the UCC, the Electronic Signatures in Global and National Commerce Act (the "E-Sign Act"), and any other similar Laws relating to the validity or enforceability of electronic or digital signatures (including, without limitation, any enactment of the Uniform Electronic Transactions Act (UETA)), and such electronic or digital signature shall not be denied legal effect, validity, or enforceability solely because it is in electronic or digital form. A facsimile or photocopied reproduction of the signatures on this Guaranty shall be deemed original signatures for all intents and purposes.

(d) Notices. All notices, demands and requests required or permitted to be given under this Guaranty shall be (i) in writing, (ii) delivered by personal delivery or sent by commercial delivery service or certified mail, return receipt requested (except with respect to notices pursuant to Section 3(b), which notices may only be given by certified mail, return receipt requested), (iii) deemed to have been given on the date of personal delivery or the date set forth in the records of the delivery service or on the return receipt, and (iv) addressed as follows (or, in the case of Lender, to any other subsequent address that Lender may provide to Guarantor (through written notice or otherwise) for purposes of directing future notices, demands or requests):

If to Lender:          NextGear Capital, Inc., 11799 North College Avenue, Carmel, IN  46032
                       Telephone: (317) 571-3721

                       with a copy to:

                       NextGear Capital, Inc., 11799 North College Avenue, Carmel, IN  46032
                       Telephone: (317) 571-3721
                       Attention: Legal Department

If to Guarantor:       Edward Anthony Kessler, 1500 Cordova Rd #206, Fort Lauderdale, FL 33316
                       Telephone: 412-527-8695

(e) No Waiver. No failure or delay by Lender in exercising any right, power, or privilege or the granting of an exception by Lender with respect to any term or condition of this Guaranty will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege, or the exercise of any other right, power, or privilege by Lender.

(f) Severability. Any provision of this Guaranty that is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability. without rendering invalid or unenforceable the remaining provisions of this Guaranty or affecting the validity or enforceability of any provision of this Guaranty in any other jurisdiction.

(g) Governing Law. Except with respect to the interpretation or enforcement of the arbitration and other provisions set forth in Section 5(i) (which shall be governed by the Federal Arbitration Act), the validity, enforceability, and interpretation of this Guaranty shall be governed by the internal Laws of the State of Indiana. without regard to conflicts of Laws provisions thereof.

DocuSign Envelope ID: FAE10158 F46A 48C6 BEB2 FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

(h) <u>Jurisdiction and Venue</u>. As evidenced by Guarantor's signature below, subject to the provisions in Section 5(i), Guarantor submits to the personal jurisdiction and venue of the state and federal courts of Marion County and Hamilton County, Indiana, and agrees that any and all claims or disputes pertaining to this Guaranty, or to any matter arising out of or related to this Guaranty, which are initiated by Guarantor against Lender, to the extent, if any, that such claims or disputes are not subject to the provisions noted in Section 5(i), shall be brought in the state or federal courts of Marion County or Hamilton County, Indiana. Further, Guarantor expressly consents to the jurisdiction and venue of the state and federal courts of Marion County and Hamilton County, Indiana, as to any legal or equitable action that may be brought in such court by Lender, and waives any objection based upon lack of personal jurisdiction, improper venue or forum non conveniens with respect to any such action. Guarantor acknowledges and agrees that Lender reserves the right to initiate and prosecute any action against Guarantor in any court of competent jurisdiction, and Guarantor consents to such forum as Lender may elect.

(i) <u>Mandatory Binding Arbitration; Waiver of Class Action Rights</u>.

   (i) In the unlikely event that Lender is unable to resolve a dispute or claim that Guarantor may have, Guarantor agrees to arbitrate any such dispute or claim in accordance with this Section 5(i). This agreement to arbitrate is intended to be broadly interpreted, and includes (i) all disputes, claims and counterclaims arising out of or relating to this Guaranty or any aspect of Guarantor's past, present or future relationship with Lender, whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory; (ii) all disputes, claims and counterclaims that may have arisen before this Guaranty or any prior contract or agreement between Guarantor and Lender; and (iii) any disputes, claims and counterclaims that may arise after the termination of this Guaranty. Additionally, Guarantor acknowledges that Lender may (BUT SHALL IN NO EVENT BE REQUIRED TO) arbitrate any dispute or claim that it may have against Guarantor, with any such arbitration being governed by the provisions of this Section 5(i). BY AGREEING TO ARBITRATION, GUARANTOR UNDERSTANDS AND AGREES THAT IT IS WAIVING ITS RIGHTS TO MAINTAIN OTHER AVAILABLE RESOLUTION PROCESSES, SUCH AS COURT ACTION (INCLUDING A JURY TRIAL) OR ADMINISTRATIVE PROCEEDING, IN ORDER TO SETTLE OR RESOLVE DISPUTES OR ANY CLAIMS AGAINST LENDER. ARBITRATION IS DIFFERENT THAN A COURT ACTION, AND THE RULES IN ARBITRATION ARE DIFFERENT THAN THE RULES THAT APPLY IN COURT. THERE IS NO JUDGE OR JURY IN ARBITRATION, AND REVIEW IS LIMITED, BUT AN ARBITRATOR CAN AWARD THE SAME DAMAGES AND RELIEF AS A COURT, SUBJECT TO THE AGREED TERMS AND LIMITATIONS IN THIS NOTE. Guarantor, at his or her election, may opt-out of the arbitration provisions set forth in Sections 5(i)(i), 5(i)(iii) and 5(i)(iv) by providing written notice of his or her election to opt-out no later than thirty (30) days after Guarantor's execution of this Guaranty, which notice shall be provided to Lender pursuant to Section 5(l) ("Opt-Out Notice"), provided that such Opt-Out Notice shall become effective only upon Guarantor's receipt of written confirmation from Lender that such Opt-Out Notice has been received by Lender within the required time period. Guarantor acknowledges and agrees that, irrespective of any Opt-Out Notice or any written confirmation thereof, Guarantor shall in all events be subject to the provisions of Section 5(i)(ii).

   (ii) ANY ARBITRATION OR OTHER LEGAL PROCEEDING OF ANY TYPE OR NATURE UNDER OR RELATING TO THIS GUARANTY OR TO ANY ASPECT OF GUARANTOR'S PAST, PRESENT OR FUTURE RELATIONSHIP OR ACTIVITIES WITH OR INVOLVING LENDER (INCLUDING ANY MARKETING ACTIVITIES OR SOLICITATIONS BY OR ON BEHALF OF LENDER), WILL TAKE PLACE ON AN INDIVIDUAL BASIS. CLASS ARBITRATIONS AND CLASS ACTIONS OF ANY KIND (WHETHER PURSUED THROUGH ARBITRATION OR THROUGH THE COURTS) ARE NOT PERMITTED. GUARANTOR AGREES THAT IT MAY BRING CLAIMS AGAINST LENDER ONLY IN HIS OR HER INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. GUARANTOR AGREES THAT, BY ENTERING INTO THIS GUARANTY, GUARANTOR IS WAIVING HIS OR HER RIGHT TO PARTICIPATE IN ANY CLASS ACTION OR OTHER SIMILAR REPRESENTATIVE PROCEEDING. UNLESS CONSENTED TO IN WRITING BY LENDER, THE ARBITRATOR MAY NOT CONSOLIDATE MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING. GUARANTOR ACKNOWLEDGES AND AGREES THAT THE SIZE OF BORROWER'S CREDIT LINE, THE INTEREST RATE TO WHICH ADVANCES ARE SUBJECT AND CERTAIN FEES CHARGED TO BORROWER, AS WELL AS THE SIZE AND DATES OF SPECIFIC ADVANCES AND WHAT (IF ANY) GUARANTIES ARE REQUIRED, ARE UNIQUE TO AND NEGOTIATED BY BORROWER (AND, IF APPLICABLE, GUARANTOR), AND THAT SUCH FACTORS WILL AND DO VARY AMONG BORROWERS AND OTHER GUARANTORS.

   (iii) Any dispute or claim subject to arbitration pursuant to this Section 5(i) shall be submitted to binding arbitration administered by the Judicial Arbitration and Mediation Service ("JAMS") pursuant to its Comprehensive Arbitration Rules and Procedures as then in effect (the "JAMS Comprehensive Rules"); provided, however, that any dispute or claim that is subject to arbitration pursuant to this Section 5(i) and that involves disputes or claims where the aggregate amount reasonably in dispute or controversy is less than $100,000, shall be submitted to binding arbitration administered by JAMS pursuant to its Streamlined Arbitration Rules and Procedures as in effect as of the effective date of this Guaranty (the "JAMS Streamlined Rules"). The disputes and claims subject to arbitration pursuant to this Section 5(i) will be resolved by a single arbitrator selected pursuant to the JAMS Comprehensive Rules or the JAMS Streamlined Rules, as the case may be. The arbitrator shall be bound by and shall strictly enforce the terms of this Guaranty and may not limit, expand or otherwise modify any term or provision of this Guaranty or any other contract or document between Guarantor and Lender. The arbitrator shall not have the power to award to Guarantor any damages that are excluded or that have been waived by Guarantor under this Guaranty, and Guarantor irrevocably waives any claim that it may have thereto. The arbitrator shall not have the power to order pre-hearing discovery of documents or the taking of depositions. The arbitrator shall render a written decision within six (6) months after being selected. Any arbitration will be held in Indianapolis, Indiana (or its greater metro area). Each Party will bear its own expenses in the arbitration and will share equally the costs of the arbitration; provided, however, that the arbitrator may, in his or her discretion, award costs and fees to the prevailing Party. The result of any arbitration shall be final and binding upon the Parties. Judgment upon any arbitration award may be entered in any court having jurisdiction over the award or over the applicable party or its assets.

KM000104

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

(iv) This Guaranty evidences transactions in interstate commerce, and thus the Federal Arbitration Act governs the interpretation and enforcement of this Section 5(i), notwithstanding the provisions of Section 5(g).

(j) WAIVER OF JURY TRIAL. AFTER CONSULTING OR HAVING HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL, LENDER AND GUARANTOR KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVE ANY RIGHT EITHER PARTY MAY HAVE TO A TRIAL BY JURY IN ANY LITIGATION BASED UPON OR ARISING OUT OF THIS GUARANTY, OR ANY OF THE TRANSACTIONS CONTEMPLATED BY THIS GUARANTY, OR ANY COURSE OF CONDUCT, STATEMENT, WHETHER ORAL OR WRITTEN, OR ACTIONS OF LENDER OR GUARANTOR. NEITHER LENDER NOR GUARANTOR SHALL SEEK TO CONSOLIDATE, BY COUNTERCLAIM OR OTHERWISE, ANY ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED. THESE PROVISIONS SHALL NOT HAVE BEEN DEEMED TO HAVE BEEN MODIFIED IN ANY RESPECT OR RELINQUISHED BY LENDER OR GUARANTOR EXCEPT BY WRITTEN INSTRUMENT EXECUTED BY BOTH LENDER AND GUARANTOR.

(k) LIMITATION OF LIABILITY. IN NO EVENT SHALL ANY LENDER PARTY BE LIABLE FOR ANY SPECIAL, INDIRECT, EXEMPLARY, PUNITIVE, INCIDENTAL, MULTIPLE OR CONSEQUENTIAL DAMAGES (INCLUDING ANY DAMAGES RESULTING FROM LOSS OF USE, LOSS OF PROFITS, LOSS OF BUSINESS OR OTHER ECONOMIC LOSS) ARISING OUT OF OR IN CONNECTION WITH THIS GUARANTY, EVEN IF SUCH LENDER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. FURTHER, IN NO EVENT SHALL THE LENDER PARTIES, COLLECTIVELY, BE LIABLE FOR ANY DAMAGES UNDER THIS GUARANTY OR ANY OTHER LOAN DOCUMENT THAT EXCEED, IN THE AGGREGATE, AN AMOUNT EQUAL TO THE SUM OF THE INTEREST AND FLOORPLAN FEES ACTUALLY PAID TO LENDER BY BORROWER UNDER THE NOTE DURING THE TWELVE (12) MONTH PERIOD IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO THE CLAIM AT ISSUE (OR, IN THE CASE OF MULTIPLE EVENTS, THE FIRST SUCH EVENT GIVING RISE TO THE CLAIM AT ISSUE).

(l) Descriptive Headings; Interpretation. The descriptive headings herein are for convenience of reference only and shall not control or affect the meaning or construction of any provision of this Guaranty. As used in this Guaranty, the terms "include," "includes," and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of like import.

WHEREFORE, Guarantor has executed this Guaranty on the date set forth below.

GUARANTOR

By: _____

Name: Edward Anthony Kessler

Date: 3/27/2019 | 10:46:09 AM EDT

DocuSign Envelope ID: FAF1015R F46A-48C6-DED2-FB526DFFF876

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

## ACH AUTHORIZATION AND REQUEST
(Debit or Credit)

The undersigned borrower ("Borrower") has incurred, or may in the future incur, certain Liabilities to NextGear Capital, Inc. ("Lender") under that certain Demand Promissory Note and Loan and Security Agreement by and between Borrower and Lender (the "Note"). Capitalized terms used herein but not defined herein shall have the respective meanings as set forth in the Note (such meanings to be equally applicable to both the singular and plural forms of the terms defined).

Borrower hereby authorizes and requests Lender, as Lender under the Note, to initiate electronic debit entries (each, an "Authorized Debit") to the bank account specified below (the "Designated Account") in payment of amounts and other Liabilities owed by Borrower under the Note and the other Loan Documents. Lender may initiate an Authorized Debit, (i) in the amount requested by Borrower in a written or oral communication with Lender (an "Elective Payment"); or (ii) in the amount due and owing by Borrower under the Note and the other Loan Documents, including all interest, fees, and other Liabilities with respect thereto (a "Required Payment"). Additionally, Borrower authorizes and requests Lender, as Lender under the Note, to initiate electronic credit entries (each, an "Authorized Credit") to the Designated Account. Borrower further acknowledges and agrees that:

* Lender may initiate an Elective Payment from the Designated Account at any time on or after the date such request is made by Borrower.

* Lender may initiate a Required Payment from the Designated Account on or after the first Business Day following a Maturity Date for any Liability, in each case in such amount as is due and owing with respect to such Liability on the date that such Required Payment is initiated by Lender (including any applicable fees and other amounts incurred by Borrower or accrued on such Liability after the Maturity Date).

* Borrower must maintain sufficient funds in the Designated Account to satisfy its payment obligations to Lender under this ACH Authorization and Request. If the Designated Account holds insufficient funds to cover an Authorized Debit, Borrower may be assessed fees or other charges by both the financial institution at which the Designated Account is held (the "Depository Bank") and by Lender, just as if Borrower had written a check to Lender that was returned for insufficient funds.

* Borrower is solely responsible for any overdraft charges or other fees that the Depository Bank may assess in connection with any transfers, whether debit or credit, initiated pursuant to this ACH Authorization and Request (including any Authorized Debit or Authorized Credit).

* This ACH Authorization and Request shall be deemed a "Loan Document" for all intents and purposes under the Note, and Lender shall be entitled to avail itself of any limitations of liability and other similar protections or relief afforded Lender under the Note, and these provisions and protections shall apply to any Authorized Debit, Authorized Credit, or other transaction initiated by Lender hereunder. Additionally, Lender shall have no liability and shall not be responsible for any damages arising from or relating to any checks or other payments dishonored after the available balance in the Designated Account is reduced by any Authorized Debit or other transaction initiated by Lender hereunder.

* Borrower will remain liable and responsible for all amounts owed under the Note and the other Loan Documents which remain unpaid as a result of an unsuccessful attempt to debit funds from the Designated Account pursuant to this ACH Authorization and Request.

* This ACH Authorization and Request does not create a fiduciary relationship between Lender and Borrower.

* Borrower is bound by the Operating Rules of the National Automated Clearing House Association (NACHA), as in effect from time to time with regard to each Authorized Debit, Authorized Credit, and other transaction initiated by Lender hereunder.

* Lender may provide via email to the email account designated below ("Designated Email") confirmation of each Authorized Debit, Authorized Credit, and other transaction processed hereunder (each a "Confirmation Email").

* Lender's business records reflecting the following shall be deemed conclusive proof of Borrower's authorization and request for an Authorized Debit: (1) a Confirmation Email of an Authorized Debit having been sent by Lender to the Designated Email or otherwise communicated to Borrower; and (2) no written objection having been confirmed received by Lender from Borrower within five (5) Business Days from the date the Confirmation Email or other communication was sent to Borrower.

* Borrower shall maintain the active status of the Designated Email (or provide immediate written notification to Lender of any change in the Designated Email) at all times.

* Borrower is the owner (or joint-owner) of the Designated Account, or, if the Designated Account is a corporate or other company account, the undersigned representative of Borrower is a duly authorized corporate or company representative of Borrower with permission to make and authorize the Authorized Debits, Authorized Credits and other transactions authorized by Borrower hereunder, in each case in the manner described herein. In the event that any of Borrower's Designated Account information changes, or in the event that Borrower closes the Designated Account, Borrower will promptly notify Lender at least ten (10) Business Days prior to such change or closure so that Lender can process Borrower's updated Designated Account information

Lender may, if necessary, initiate adjustments at any time and without advance notice to Borrower for any debit or credit entry made in error to the Designated Account pursuant to this ACH Authorization and Request. This ACH Authorization and Request will remain in effect until Lender

Page 1                                      NextGear ACH Authorization and Request (ACH-Default) (v 1.1)

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY

This is a copy view of the Authoritative Copy by the designated custodian

has received, and has had sufficient time (but not less than ten (10) Business Days) to process, a written notice of termination delivered by Borrower to Lender in accordance with the provisions of Section 15 of the Note. Lender may terminate this ACH Authorization and Request at any time by providing written notice to Borrower. A facsimile or photocopied reproduction of any signature on this ACH Authorization and Request shall be deemed an original signature for all intents and purposes.

The undersigned Borrower hereby expressly acknowledges that this ACH Authorization and Request shall be binding on Borrower whether executed in original, "wet ink" form; submitted by facsimile; or submitted by electronically transmitted signature ("e-signature") The undersigned Borrower further acknowledges that the acceptance of the terms of this ACH Authorization and Request, if by e-signature, shall be deemed to satisfy all requirements imposed on electronic or digital signatures under the Electronic Signatures in Global and National Commerce Act (the "E-Sign Act"), 15 U.S.C. §7001(a) et seq., and any other similar laws relating to the validity or enforceability of electronic or digital signatures. Each of the parties acknowledges and agrees that this ACH Authorization and Request may be executed by affixing to this ACH Authorization and Request an electronic or digital signature, which shall for all purposes be deemed effective to constitute the valid signature of the party affixing such electronic or digital signature.

| Designated Bank Account and Designated Email |
| --- |
| Bank Name: HSBC   Account Number: ▉▉▉3716 Routing Number: ▉▉▉088 |
| Signor 1 on Account: James Michael C Blackburn   Signor 2 on Account: Edward Anthony Kessler |
| Designated Email (for payment confirmation): sales@overfinchmiami.com |

WHEREFORE, Borrower, by its duly authorized representative, has executed this ACH Authorization and Request on the date set forth below.

BORROWER:

Premier Group Autos LLC DBA Overfinch Miami

*James Michael C Blackburn*
— C485819CB8D84D1...

By:

Name:    James Michael C Blackburn
Title:    Manager

Date:    3/26/2019 | 4:42:48 PM EDT

*Edward Anthony Kessler*
— 842032BA15AC496...

By:

Name:    Edward Anthony Kessler
Title:    Manager

Date:    3/27/2019 | 10:46:09 AM EDT

COPY VIEW

## POWER OF ATTORNEY
(Entity/Partnership)

This Power of Attorney is executed by the undersigned borrower ("Borrower") and delivered to NextGear Capital, Inc. ("Lender") pursuant to that certain Demand Promissory Note and Loan and Security Agreement by and between Borrower and Lender (the "Note"). Capitalized terms used herein but not defined herein shall have the respective meanings as set forth in the Note (such meanings to be equally applicable to both the singular and plural forms of the terms defined). Any capitalized terms used herein, but not otherwise defined herein or in the Note, as the case may be, shall have the meanings ascribed to them in the UCC.

1. No Person to whom this Power of Attorney is presented, as authority for Lender to take any action described below, shall be required to inquire into or seek confirmation from Borrower as to the authority of Lender to take any action described below, or as to the existence of or fulfillment of any condition to this Power of Attorney, which is intended to grant to Lender unconditionally the authority to take and perform the actions described below. Borrower irrevocably waives any right that it may have, now or at any time in the future, to commence any claim, litigation, suit, petition, writ, or proceeding in any court of competent jurisdiction or before any arbitrator or other neutral, against any Person acting in reliance upon or otherwise acknowledging any power or authority granted by Borrower under this Power of Attorney. The Power of Attorney granted hereby is coupled with an interest and may not be revoked or canceled by Borrower without Lender's written consent or as otherwise allowed by Law. This Power of Attorney shall be deemed a "Loan Document" for all intents and purposes as referenced in the Note.

2. With or without the occurrence of an Event of Default under the Note, Borrower irrevocably appoints Lender (and all Representatives designated by Lender), with full power of substitution, as Borrower's true and lawful attorney-in-fact with full power and authority in the place and stead of Borrower and in the name of Borrower or in its own name, from time to time in Lender's discretion, to take any and all appropriate actions and to execute and deliver any and all documents and instruments which may be necessary or desirable to accomplish the purposes of the Note and each of the other Loan Documents. Without limiting the generality of the foregoing, Borrower hereby grants to Lender the power and right, on behalf of Borrower, without further notice to or assent by Borrower, at any time, to do the following:

   (a) execute such security agreements, invoices, notes, and related documentation as may be necessary for Borrower to acquire, refinance, or sell any Collateral (including any Units secured or to be secured by Advances made thereon);

   (b) execute all documents necessary for Lender to perfect or secure its interest in the Collateral;

   (c) make, settle, and adjust claims under policies of insurance, and endorse any check, draft, instrument, or other item of payment for the proceeds of such policies of insurance, and make all determinations and decisions with respect to such policies of insurance;

   (d) endorse the name of Borrower upon any document, instrument, certificate, evidence of title, state registration documents, trust receipt, checks or other items of payment, or any related or similar documents, in each case as necessary to pay for or protect the Collateral, including, without limitation, any agreements between Borrower and any global positioning satellite company;

   (e) endorse the name of Borrower upon any items of payment or proceeds of any Collateral (including any Units constituting Collateral), and to deposit the same to the account of Lender on account of Borrower's Liabilities under the Note and the other Loan Documents;

   (f) endorse the name of Borrower upon any chattel paper, document, instrument, invoice, freight bill, bill of lading, or similar document or agreement relating to any Collateral;

   (g) use the information recorded on or contained in any data processing equipment, computer hardware, or software relating to any Collateral to which Borrower has access;

   (h) pay or discharge any taxes, liens, security interests, or other encumbrances levied or placed on or threatened against Borrower or any of the Collateral;

   (i) communicate with any party to any contract with regard to the assignment of the right, title, and interest of Borrower in and under such contract and/or the Collateral, and other matters relating thereto;

   (j) contact any third parties and disclose and/or receive any Borrower information, including, without limitation, information or data in Borrower's application for credit with Lender, the Note, or Borrower's Credit Line, in each case for the purpose of, among other things, preserving Lender's security interest in the Collateral and ensuring the satisfaction of Borrower's Liabilities under the Note and the other Loan Documents; and

   (k) do all other things reasonably necessary to satisfy Borrower's Liabilities under the Note and the other Loan Documents.

3. Upon the occurrence of an Event of Default under the Note, Borrower irrevocably appoints Lender (and all Representatives designated by Lender), with full power of substitution, as Borrower's true and lawful attorney-in-fact with full power and authority in the place and stead of Borrower and in the name of Borrower or in its own name, from time to time in Lender's discretion, to do the following:

   (a) demand, collect, accept receipt for, settle, compromise, adjust, foreclose, or realize upon any of the Collateral, in each case in such manner as Lender may determine;

   (b) file or prosecute any claim, litigation, suit, petition, writ, or proceeding in any court of competent jurisdiction or before any arbitrator or other neutral, or take any other action otherwise deemed appropriate by Lender for the purpose of collecting any and all such moneys due to

**EXHIBIT**

**5**

Borrower, whenever payable, and to enforce any other right in respect of the Collateral, including, without limitation, confessing to or consenting to judgments, writs of replevin or possession, and/or any equitable relief in favor of Lender or its Affiliates;

(c)   file or prosecute all proofs of claim against any account debtor on behalf of Borrower; and

(d)   notify the United States Postal Service of a change in address for the delivery of Borrower's mail to an address designated by Lender, and to receive Borrower's mail on behalf of Borrower.

4.   Any provision of this Power of Attorney that is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability, without rendering invalid or unenforceable the remaining provisions of this Power of Attorney or affecting the validity or enforceability of any provision of this Power of Attorney in any other jurisdiction. Borrower hereby ratifies, to the extent permitted by Law, all that Lender or its designated Representatives shall lawfully do or cause to be done by virtue hereof, whether such actions were done before or after the actual execution date of this Power of Attorney. The rights and privileges set forth herein shall be deemed supplemental and in addition to any rights and privileges to which Lender or any other Person may be entitled under the Note or any other Loan Document. A facsimile or photocopied reproduction of any signature on this Power of Attorney shall be deemed an original signature for all intents and purposes.

WHEREFORE, Borrower, by its duly authorized representative, has executed this Power of Attorney on the date set forth below.

BORROWER:

Premier Group Autos LLC DBA Overfinch Miami

By: 
Name:   James Michael C Blackburn
Title:   Manager
Date:   4·18·19

STATE OF  FLORIDA          )
                           )   SS:
COUNTY OF  BROWARD         )

Before me, a Notary Public in and for said County and State, personally appeared   James Michael C Blackburn known to me to be the Manager of   Premier Group Autos LLC DBA Overfinch Miami who acknowledged the execution of the foregoing Power of Attorney, and who, having been duly sworn, states that any representations contained therein are true.

Witness my hand and Notarial Seal this  18  day of  APRIL , 20 19 .

Notary Signature

Notary Name (Printed)   ARTURO MAYORA,

My Commission Expires:  10/11/2021         County of Residence:  BROWARD

Notary Public State of Florida
Arturo Mayoral
My Commission GG 150838
Expires 10/11/2021

PAG-B0674

KM000109

## POWER OF ATTORNEY
(Entity/Partnership)

This Power of Attorney is executed by the undersigned borrower ("Borrower") and delivered to NextGear Capital, Inc. ("Lender") pursuant to that certain Demand Promissory Note and Loan and Security Agreement by and between Borrower and Lender (the "Note"). Capitalized terms used herein but not defined herein shall have the respective meanings as set forth in the Note (such meanings to be equally applicable to both the singular and plural forms of the terms defined). Any capitalized terms used herein, but not otherwise defined herein or in the Note, as the case may be, shall have the meanings ascribed to them in the UCC.

1.   No Person to whom this Power of Attorney is presented, as authority for Lender to take any action described below, shall be required to inquire into or seek confirmation from Borrower as to the authority of Lender to take any action described below, or as to the existence of or fulfillment of any condition to this Power of Attorney, which is intended to grant to Lender unconditionally the authority to take and perform the singular described below. Borrower irrevocably waives any right that it may have, now or at any time in the future, to commence any claim, litigation, suit, petition, writ, or proceeding in any court of competent jurisdiction or before any arbitrator or other neutral, against any Person acting in reliance upon or otherwise acknowledging any power or authority granted by Borrower under this Power of Attorney. The Power of Attorney granted hereby is coupled with an interest and may not be revoked or canceled by Borrower without Lender's written consent or as otherwise allowed by Law. This Power of Attorney shall be deemed a "Loan Document" for all intents and purposes as referenced in the Note.

2.   With or without the occurrence of an Event of Default under the Note, Borrower irrevocably appoints Lender (and all Representatives designated by Lender), with full power of substitution, as Borrower's true and lawful attorney-in-fact with full power and authority in the place and stead of Borrower and in the name of Borrower or in its own name, from time to time in Lender's discretion, to take any and all appropriate actions and to execute and deliver any and all documents and instruments which may be necessary or desirable to accomplish the purposes of the Note and each of the other Loan Documents. Without limiting the generality of the foregoing, Borrower hereby grants to Lender the power and right, on behalf of Borrower, without further notice to or assent by Borrower, at any time, to do the following:

   (a)   execute such security agreements, invoices, notes, and related documentation as may be necessary for Borrower to acquire, refinance, or sell any Collateral (including any Units secured or to be secured by Advances made thereon);

   (b)   execute all documents necessary for Lender to perfect or secure its interest in the Collateral;

   (c)   make, settle, and adjust claims under policies of insurance, and endorse any check, draft, instrument, or other item of payment for the proceeds of such policies of insurance, and make all determinations and decisions with respect to such policies of insurance;

   (d)   endorse the name of Borrower upon any document, instrument, certificate, evidence of title, state registration documents, trust receipt, checks or other items of payment, or any related or similar documents, in each case as necessary to pay for or protect the Collateral, including, without limitation, any agreements between Borrower and any global positioning satellite company;

   (e)   endorse the name of Borrower upon any items of payment or proceeds of any Collateral (including any Units constituting Collateral), and to deposit the same to the account of Lender on account of Borrower's Liabilities under the Note and the other Loan Documents;

   (f)   endorse the name of Borrower upon any chattel paper, document, instrument, invoice, freight bill, bill of lading, or similar document or agreement relating to any Collateral;

   (g)   use the information recorded on or contained in any data processing equipment, computer hardware, or software relating to any Collateral to which Borrower has access;

   (h)   pay or discharge any taxes, liens, security interests, or other encumbrances levied or placed on or threatened against Borrower or any of the Collateral;

   (i)   communicate with any party to any contract with regard to the assignment of the right, title, and interest of Borrower in and under such contract and/or the Collateral, and other matters relating thereto;

   (j)   contact any third parties and disclose and/or receive any Borrower information, including, without limitation, information or data in Borrower's application for credit with Lender, the Note, or Borrower's Credit Line, in each case for the purpose of, among other things, preserving Lender's security interest in the Collateral and ensuring the satisfaction of Borrower's Liabilities under the Note and the other Loan Documents; and

   (k)   do all other things reasonably necessary to satisfy Borrower's Liabilities under the Note and the other Loan Documents.

3.   Upon the occurrence of an Event of Default under the Note, Borrower irrevocably appoints Lender (and all Representatives designated by Lender), with full power of substitution, as Borrower's true and lawful attorney-in-fact with full power and authority in the place and stead of Borrower and in the name of Borrower or in its own name, from time to time in Lender's discretion, to do the following:

   (a)   demand, collect, accept receipt for, settle, compromise, adjust, foreclose, or realize upon any of the Collateral, in each case in such manner as Lender may determine;

   (b)   file or prosecute any claim, litigation, suit, petition, writ, or proceeding in any court of competent jurisdiction or before any arbitrator or other neutral, or take any other action otherwise deemed appropriate by Lender for the purpose of collecting any and all such moneys due to



**EXHIBIT**

**6**

PAG-B0675

KM000110

Borrower, whenever payable, and to enforce any other right in respect of the Collateral, including, without limitation, confessing to or consenting to judgments, writs of replevin or possession, and/or any equitable relief in favor of Lender or its Affiliates;

(c) file or prosecute all proofs of claim against any account debtor on behalf of Borrower; and

(d) notify the United States Postal Service of a change in address for the delivery of Borrower's mail to an address designated by Lender, and to receive Borrower's mail on behalf of Borrower.

4. Any provision of this Power of Attorney that is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability, without rendering invalid or unenforceable the remaining provisions of this Power of Attorney or affecting the validity or enforceability of any provision of this Power of Attorney in any other jurisdiction. Borrower hereby ratifies, to the extent permitted by Law, all that Lender or its designated Representatives shall lawfully do or cause to be done by virtue hereof, whether such actions were done before or after the actual execution date of this Power of Attorney. The rights and privileges set forth herein shall be deemed supplemental and in addition to any rights and privileges to which Lender or any other Person may be entitled under the Note or any other Loan Document. A facsimile or photocopied reproduction of any signature on this Power of Attorney shall be deemed an original signature for all intents and purposes.

WHEREFORE, Borrower, by its duly authorized representative, has executed this Power of Attorney on the date set forth below.

BORROWER:

Premier Group Autos LLC DBA Overfinch Miami

By: 
Name:    Edward Anthony Kessler
Title:    Manager
Date:    4.18.19

STATE OF FLORIDA    )
                    )  SS:
COUNTY OF BROWARD   )

Before me, a Notary Public in and for said County and State, personally appeared    Edward Anthony Kessler known to me to be the Manager of   Premier Group Autos LLC DBA Overfinch Miami who acknowledged the execution of the foregoing Power of Attorney, and who, having been duly sworn, states that any representations contained therein are true.

Witness my hand and Notarial Seal this 18 day of April, 20 19

Notary Signature 

Notary Name (Printed)    ARTURO MAYORAL

My Commission Expires: 10/11/2021    County of Residence: BROWARD



Notary Public State of Florida
Arturo Mayoral
My Commission GG 150638
Expires 10/11/2021

## SECURED NOTE

**$225,000.00**

**Virginia Beach, VA**
**October 3, 2019**

FOR VALUE RECEIVED, the undersigned promises to pay to JAMES C. ARCHBELL III, or ORDER, the principal sum of TWO HUNDRED TWENTY-FIVE THOUSAND AND NO/100 (**$225,000.00**) Dollars, with interest from the above date at the rate of twelve (**12%**) per centum per annum, the said sum being due and payable via interest only payments of **$1,050.00** beginning on the 17th day of October, 2019, and every 14th day thereafter, with a BALLOON PAYMENT of the entire balance of the debt, including interest, cost and fees, if applicable, being due and payable no later than **January 3, 2020**. The said principal and interest shall be payable at 530 Woodlake Circle, Suite 200, Chesapeake, Virginia 23320, or at such other place as the holder may otherwise specify in writing.

NOTICE: THE NOTE IS SUBJECT TO CALL IN FULL OR THE TERMS THEREOF BEING MODIFIED IN THE EVENT OF SALE OR CONVEYANCE OF THE VEHICLE SECURING THIS NOTE. **Collateral: 2020 Land Rover, VIN#SALGS5SE6LA572387**

The Maker(s) shall be deemed in default in the event any installment payment is not received by the Noteholder within 5 days of its due date.

It is agreed that in the event of default under this note that the Maker(s) and endorser(s) hereof shall pay all costs and expenses of collection, and that if after default this note be placed in the hands of an attorney for collection, a fee of twenty-five percent of the amount due hereon, both before and after judgment shall, if and to the extent permitted by law, be collectible herewith.

It is further agreed that this note, or any part of the principal or interest due thereon, may be renewed from time to time by the holder hereof or payment extended, at the request of the then owners of the property securing this indebtedness, or at the request of any parties bound hereon, or who has assumed or may hereafter assume payment hereof, without the consent of or notice to other parties bound hereon and without releasing them from liability in connection therewith.

The maker(s) and endorser(s) waive demand, presentment, protest and notice of dishonor; and the benefit of their homestead exemptions as to this obligation.

The maker(s) hereby authorizes and appoints Brett B. Thompson or any other attorneys from Thompson Law Group, PLLC, of Virginia Beach, Virginia as his or her attorney in fact to appear in any court in the State of Virginia after any of the above terms or provisions of this note have been breached by the maker(s), and waive the issuing and service of process and confess judgment, jointly and severally, in favor of the Noteholder for the amount of all principal, late charges, interest and additional charges that are due and payable, which charges arise out of the performance of this note, with interest from the date of the breach, together with the costs of the suit, which costs shall include reasonable attorney's fees and expenses incurred in the suit, and

1

PAG-B0677

thereupon release all errors and waive all rights to appeal. The foregoing is in addition to any other legal or equitable rights or remedies which the Note Holder may have.

## IMPORTANT NOTICE

**THIS AGREEMENT CONTAINS A CONFESSION OF JUDGMENT PROVISION WHICH CONSTITUTES A WAIVER OF IMPORTANT RIGHTS YOU MAY HAVE AS A DEBTOR AND ALLOWS THE CREDITOR TO OBTAIN A JUDGMENT AGAINST YOU WITHOUT ANY FURTHER NOTICE.**

PREMIER GROUP AUTOS, LLC
DBA Overfinch Miami

BY:_____

Print name:_____

Title:_____

_____
James Blackburn

2

PAG-B0678

## DISTRIBUTION AGREEMENT

This International Distribution Agreement ("Agreement") is made effective as of
.Monday...03rd...December.18.. ("Effective Date") by and between Premier Group
Autos LLC ("Distributor") with company registration number LI800263245 with its principal place of
business at 1500 Cordova Road, 206 Fort Lauderdale, Florida, 33316 and Overfinch North America Inc.
("OVERFINCH") with its principal place of business at 500 Stinson Drive, Danville VA 24540 USA.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby
acknowledged, the parties agree as follows:

I.      **DEFINITIONS**

1.1     "Conversion" means exterior products including body styling package, badges, lettering, wheels
        and tires and the fitment thereof by OVERFINCH.

1.2     "Conversion Value" means the value of the Products and services supplied by OVERFINCH as
        set out in the relevant order acceptance and / or invoice.  For the avoidance of doubt, the
        Conversion Value does not include taxes, duties, freight and transportation charges and similar
        costs, all of which are payable by the Distributor.

1.3     "Customers" means any current or potential purchasers or end-users of the Products.

1.4     "Initial Term" means twelve months from the Effective Date.

1.5     "Introducers Fee" means an amount in US dollars to be agreed on a deal by deal basis between
        the parties.

1.6     "Order Value" means the total value of the order including the Vehicle Value and Conversion
        Value as set-out in such order that is accepted by OVERFINCH.

1.7     "Products" means any Overfinch products sold by OVERFINCH to Distributor for resale to Customers pursuant to the terms of this Agreement, and any related services (including OVERFINCH training).

1.8     "Term" means twelve months commencing from the Effective date and thereafter each twelve-month period following the anniversary of the Initial Term.

1.9     "Territory" means the utility and industrial market segments in South Florida (Miami Dade, Broward, Palm Beach, Monroe, Collier, Lee, Henry, Florida Keys and the Glades) only.

1.10    "Vehicle" means a new vehicle that OVERFINCH has manufactured parts for and is capable of being modified by OVERFINCH.

1.11    "Vehicle Value" means the cost of the vehicle as invoiced to Overfinch by the supplying automotive dealer.  For the avoidance of doubt, the Vehicle Value does not include state or local taxes, freight and transportation charges and similar costs, all of which are payable by the Distributor.

## II.     RELATIONSHIP

2.1     Appointment.  OVERFINCH appoints the Distributor as an exclusive, independent distributor of Products to Customers in the Territory.  Distributor accepts such appointment and agrees to devote sufficient time and resources to the performance of its duties hereunder.  Distributor shall promptly notify OVERFINCH of all inquiries related to Products from persons or entities located outside the Territory.  Distributor shall notify OVERFINCH of all changes in personnel assigned to its account.

OVERFINCH reserves the right to transact any business to retail Customers within the Territory that are as a result of online sales made via its website or other online platform and / or sales resulting from any local or national brand advertising events that it has organized and participated in.

OVERFINCH may terminate the exclusivity under this Agreement upon thirty (30) days notice at any time that the Distributor has placed no orders with OVERFINCH for any rolling two-month period, providing that the Distributor has not already ordered, prior to the commencement of that two-month

JB AS.

PAG-B0680

period, Products that would exceed the minimum amount required by the end of that two-month period.

2.2    **Independent Contractor.**  Distributor is an independent contractor.  Distributor is not an employee, representative, or agent of OVERFINCH.  Distributor is not authorized to make any agreement, warranty or representation on behalf of OVERFINCH, or to create any liability or obligation, express or implied, on behalf of OVERFINCH.  Distributor shall not appoint any third party to promote or sell Products or otherwise perform any of Distributor's obligations hereunder.  Distributor shall conduct its business in its own name, maintain its own office and be responsible for its expenses, personnel and operations.

2.3    **Direct Sales.**  OVERFINCH reserves the right to honor online store orders from Customers that are based within the Territory, with no compensation to the Distributor.

During the Initial Term and any renewal Term, in the event that the Distributor can demonstrate via an information registration service acceptable to OVERFINCH that is has recorded a Customer's details at an event it attended and / or hosted, whereby it introduced that Customer to the Overfinch brand and that Customer is within the Territory and would like to place an order to purchase Products from OVERFINCH directly within a six month period from that introduction, OVERFINCH shall refer that Customer to the Distributor.   In the event such Customer is located outside of the Territory OVERFINCH shall pay the Distributor an Introducers Fee.

The Distributor is required to submit the information registration record to OVERFINCH on a monthly basis and within 5 working days following an event that the Distributor has hosted.

OVERFINCH shall maintain an information registration service whereby it records Customer's details at any brand advertising event that it attends and / or hosts.

2.4    **Sales Terms.**  OVERFINCH may decline to quote any potential sale and may accept or reject any order, providing that such declination or rejection is based upon a reasonable commercial decision.

All sales of Products by OVERFINCH shall be subject to the OVERFINCH Sales Terms in effect at time of sale, as reflected on the OVERFINCH sales order acknowledgment, to the extent that they do not conflict with the provisions of this Agreement.  By placing each order hereunder, Distributor confirms

JB  AS .

PAG-B0681

its agreement with and acceptance of the OVERFINCH Sales Terms. Distributor must extend, honor and perform the warranty services as set forth in the OVERFINCH Sales Terms to Customers. OVERFINCH shall be bound only by the warranty applicable to parts as set forth in the applicable OVERFINCH Sales Terms, and Distributor shall indemnify OVERFINCH against any additional warranty terms. Any warranty or other sales terms required by law in the Territory must be provided by Distributor, and Distributor shall indemnify OVERFINCH for any failure to comply with any such requirements. Distributor must also notify OVERFINCH if any of its standard warranty or other sales terms conflict with any law in the Territory.

During the Initial Term and any subsequent renewal Term thereafter the Distributor shall notify OVERFINCH promptly of any potential warranty claim relating to its Products. Any warranty claims are at the sole decision of OVERFINCH and any costs or expenses incurred by the Distributor shall only be reimbursed providing these have been pre-authorized in writing by OVERFINCH.

OVERFINCH Conversions/Products shall be ordered on a monthly basis. There is no guarantee in respect of the delivery date of any Vehicles. OVERFINCH has no control over the lead time of the Vehicle from the manufacturer. It is not guaranteed, and it is dependent upon the model year of the Vehicle being ordered, but it is envisaged that a Vehicle will be delivered with the Conversion within 16 weeks from OVERFINCH'S acceptance of a Vehicle order. OVERFINCH shall update the Distributor on lead times of Vehicles as and when it receives updates from the supplying automotive dealer.

Upon OVERFINCH's acceptance of an order submitted by the Distributor for a Vehicle and Conversion, the Distributor is required to comply with the following payment terms:

1.) 10% non-refundable deposit of the total Order Value upon OVERFINCH'S acceptance of the order;

2.) Remaining balance of the Vehicle Value to be paid on or before collection of the Vehicle by OVERFINCH from the Land Rover dealer;

3.) Remaining balance of the Conversion Value to be paid upon completion of the conversion by OVERFINCH and before delivery of it to the Distributor.

Upon OVERFINCH's acceptance of an order submitted by the Distributor for a Conversion, the Distributor is required to comply with the following payment terms:

1.) 10% non-refundable deposit of the total Order Value upon OVERFINCH'S acceptance of the order;

JB

PAG-B0682

2.) Remaining balance of the Conversion Value to be paid upon completion of the conversion by OVERFINCH and before delivery of it to the Distributor.

Payment must be made in cleared funds via wire transfer or cheque only.

All orders are exclusive of state and local taxes, freight and transportation charges and similar costs, all of which should be paid by the Distributor.

Prices for Products shall be those provided in writing by OVERFINCH to Distributor and may be modified by OVERFINCH from time to time. Distributor shall pay all amounts in U.S. Dollars.

Distributor shall provide OVERFINCH with its standard end-user price list upon request.

Distributor acknowledges that OVERFINCH pricing fully compensates Distributor on an ongoing basis for customer and market development, for providing product support and services in the Territory.

Delivery of the Products shall take place at OVERFINCH'S place of business. Acceptance of any change to the delivery point requested by the Distributor shall be at OVERFINCH'S sole discretion and at the Distributors risk and expense.

### 2.5    Minimum Annual Order Quantity

The Distributor is required to place orders for a minimum of 36 OVERFINCH Conversions or Overfinch Products to the value of $1,500,000.00 during the Initial Term. One Conversion/Product order shall be placed upon the Effective Date of this agreement. Thereafter the remaining minimum order quantity shall be spread in equal instalments across each month of the Initial Term, with the Distributor ordering a minimum of 3 Conversions or the equivalent value in Products each month.

Unless notified by OVERFINCH in writing 30 days prior to the expiry of the Initial Term, the contract shall automatically renew for a further Term. The minimum annual order requirement for any such renewal Term shall be an increase of 10% of the minimum annual order value required in the previous Term.

The initial minimum annual order shall commence on the above Effective Date, with each subsequent minimum annual order commencing upon each renewal Term.

JB AS.

PAG-B0683

The Distributor has the intention to open an Overfinch showroom within the Territory within 8 to 12 months from the Effective Date of this agreement. Upon the Distributor confirming it has finalized its plans in respect of that showroom, both parties shall enter into further discussions regarding the terms of this agreement in view of the investment proposed by the Distributor and document any such variation to the terms hereof that are agreeable between both parties at that time. Further, subject to the Distributor's performance throughout the Initial Term, the parties may enter into discussions regarding distributorships in other potential territories in the United States of America.

**2.6     Initial Order**

Upon execution of this Agreement, the Distributor shall submit an initial order for an OVERFINCH Conversion.

## III.    RESPONSIBILITIES

3.1     **Promotion**. Distributor shall devote sufficient time and resources to successfully promote and sell Products to Customers. Distributor shall ensure that all sales personnel are properly trained and possess the appropriate technical competency to promote Products effectively. Distributor shall respond in a timely and professional manner to all inquiries from and referrals to Customers. Distributor shall furnish any market information requested by OVERFINCH, including without limitation annual sales plans, monthly sales reports, monthly forecasting reports, sales forecast updates and explanations of any discrepancies between forecasted and actual sales. Distributor shall attend any required OVERFINCH sales training.

3.2     **Marketing**. The Distributor is required to advertise and promote the Products on a regular basis on an appropriate marketing platform akin to the prestige of the brand. The Distributor should submit a proposed marketing plan to OVERFINCH for its review and written consent.

OVERFINCH may from time to time carry out local and / or national brand advertising and marketing activities, within or outside of the Territory and request the Distributor to make a reasonable contribution to such costs and expenses associated and incurred in respect of that brand advertising. OVERFINCH shall provide reasonable notice of anticipated costs and expenditure for such brand advertising.

_JB AS._

3.3    Events.  The Distributor shall host 10 exclusive events during the course of the initial term in order to promote the OVERFINCH brand and Vehicles.  OVERFINCH will provide marketing material and product support for use at such events, upon reasonable notice and as required.   The Distributor shall cover the reasonable costs and expenses incurred by OVERFINCH in this regard.

3.4    Customer and Product Support.  Distributor shall follow up and maintain contact with Customers to ensure customer satisfaction.  Distributor shall ensure that Customers receive information about any recalls on Products provided to Distributor.  Distributor shall employ personnel who are educated in the field and sufficiently knowledgeable of Products to perform the technical support and services required hereunder.

3.5    Technical and Marketing Materials.  Distributor shall maintain an adequate inventory of current OVERFINCH technical and marketing materials to promote Products.  Distributor may not use any technical or marketing materials not provided by OVERFINCH.  Prior written approval for the use of any marketing material should be obtained from OVERFINCH.  Distributor shall provide any translations of OVERFINCH technical and marketing materials to OVERFINCH.

3.6    Compliance.  Distributor shall comply with all governmental laws, regulations and orders of all relevant jurisdictions that may be applicable to Distributor under this Agreement, including without limitation the U.S. Export Administration Act, the U.S. Foreign Corrupt Practices Act and all licensing and registration requirements in the Territory.  Distributor shall advise OVERFINCH with respect to any warranty requirements, noise ordinances, safety standards, specifications and other requirements applicable to Products imposed by law, regulation or order in the Territory.  Distributor shall notify OVERFINCH of the existence and content of any provision of law in the Territory or any other applicable law that conflicts with any provision of this Agreement or any other document, such as warranty or sales terms, at the time of execution or at any time thereafter.

3.7    Training.  OVERFINCH shall provide sales and technical training and support as appropriate. The Distributor shall cover the reasonable costs and expenses incurred by OVERFINCH in providing this.

JB AS.

IV.    INTELLECTUAL PROPERTY AND CONFIDENTIALITY

4.1.    Intellectual Property. Distributor acknowledges that trademarks, service marks, trade dress, patents, copyrights, trade secrets, licenses and any other intellectual property used by OVERFINCH are the sole property of OVERFINCH. Distributor shall not use such OVERFINCH property except in the normal course of promoting Products, or promoting OVERFINCH in general, under the terms of this Agreement. Distributor shall not remove or alter any trademarks, service marks or trade dress that identify OVERFINCH, nor use any trademarks, service marks, trade dress or any other intellectual property that, in the sole discretion of OVERFINCH, are confusingly similar to those of OVERFINCH. Distributor shall make every effort to safeguard the intellectual property of OVERFINCH, and shall immediately notify OVERFINCH in writing of any infringement or suspected infringement and cooperate with OVERFINCH, as OVERFINCH deems necessary, to protect such property against infringement (such cooperation to be at OVERFINCH expense unless the infringement arose from Distributor acts or omissions). Distributor shall comply with the OVERFINCH INTELLECTUAL PROPERTY POLICY, as provided by OVERFINCH. OVERFINCH my immediately terminate this Agreement for any violations of these intellectual property requirements. Upon termination of this agreement the Distributor shall not use the intellectual property.

4.2    Confidentiality. All confidential information provided, from time to time, by OVERFINCH to Distributor has been or is provided in strict confidentiality, and can neither be disclosed by Distributor to third parties during the term of this Agreement or after termination or expiration, nor used by Distributor for purposes other than those set forth in this Agreement. Distributor shall maintain such information in strict confidence during the term of this Agreement and for five (5) years after termination or expiration, except when disclosure of such information is required by law. Within thirty (30) days of any request by OVERFINCH or termination or expiration of this Agreement, Distributor shall return or destroy, according to OVERFINCH's instruction at such time, all confidential information and any demonstration products provided by OVERFINCH. Distributor shall ensure compliance with these confidentiality obligations by its employees, representatives and agents, including without limitation by obtaining appropriate confidentiality agreements from such persons.

4.3    Other brands. The Distributor shall not fit any other after-market tuning brands parts and / or accessories branded or unbranded to any Vehicle's supplied by OVERFINCH, so as to cause confusion in the market place that any other brands products are that of OVERFINCH or vice versa.

JB AS-

8

Final Version – 27/11/2018

V.    TERM AND TERMINATION

5.1    **Term.**  Subject to termination, this Agreement shall have an initial term of one (1) year, commencing on the Effective Date, and shall renew automatically for additional one (1) year periods, subject to the below.

5.2    **Termination.**  Either party may terminate this Agreement without cause upon thirty (30) days written notice to the other party to expire upon the end of the Initial Term or following that the anniversary of any renewal Term thereafter.  Either party may also choose to render the agreement non-exclusive upon thirty (30) days written notice to expire upon the end of the Initial Term or following that the anniversary of any renewal Term thereafter (in addition to the right of OVERFINCH elsewhere in this Agreement to render the Agreement non-exclusive for failure by Distributor to meet its minimum orders).

Either party may terminate this Agreement immediately upon the other party's insolvency, bankruptcy, suspension of business, assignment of assets for the benefit of creditors, voluntary or involuntary dissolution, appointment of a trustee for all or a substantial portion of the party's assets, or breach of this Agreement.  OVERFINCH reserves the right to immediately terminate this Agreement on written notice to Distributor if, in the sole discretion of OVERFINCH, the laws or economic circumstances in the Territory have changed in a material way so as to adversely impact OVERFINCH's relationship with Distributor or OVERFINCH's ability to conduct business in the Territory.  Upon termination or expiration of this Agreement, OVERFINCH has the right of first refusal in respect of any Products and / or Vehicles and may, at its sole discretion, repurchase from Distributor, at the lesser of either the net prices paid by Distributor or the open market value, any of the Vehicles purchased and remaining unsold by Distributor.  OVERFINCH's repurchase of Distributor's Vehicle inventory pursuant to the termination provisions hereof (or Distributor's right to sell such inventory if not so repurchased by OVERFINCH) shall constitute Distributor's sole remedy for termination or expiration of this Agreement.  All intellectual property, confidentiality, non-compete and non-hire rights and obligations set forth in this Agreement shall survive termination or expiration.

5.3    **Transition.**  During any notice period and after termination or expiration of this Agreement, Distributor shall cooperate with OVERFINCH to assure a smooth transition for Customers and OVERFINCH.  Distributor shall introduce OVERFINCH personnel (and the personnel of any distributor or sales representative specified by OVERFINCH) to Customers who have ordered or expressed

*JB AS.*

interest in Products and invite OVERFINCH (and any distributor or sales representative specified by OVERFINCH) to accompany Distributor's personnel on sales calls related to Products. Distributor shall take all necessary action to terminate any registration as an OVERFINCH distributor with any governmental authority. All indebtedness of Distributor to OVERFINCH shall become immediately due and payable without further notice or demand, which is hereby waived. Distributor shall also cooperate with OVERFINCH in identifying and producing copies of correspondence and business records related to all past, present and pending business activities conducted on behalf of Customers.

5.4    **Warranty.**  Distributor shall honor all warranties existing upon expiration or termination of this Agreement until any such warranties expire.

VI.    **GENERAL PROVISIONS**

6.1    **Indemnification and Limitation of Liability.**  The Distributor shall fully indemnify, defend and hold harmless OVERFINCH and all related parties, to the extent that it is not as a direct result of a defective Product supplied by OVERFINCH, from and against any claims or losses arising directly or indirectly from, as a result of or in connection with its performance or breach under this Agreement (including without limitation the above obligation to inform OVERFINCH of any compliance or other relevant legal issues in the Territory), or any other act or omission of Distributor. In no event, whether as a result of breach of contract, indemnity, warranty, tort (including negligence), strict liability or otherwise, shall OVERFINCH liability for any loss or damage exceed the price of the specific Product that gave rise to the claim, nor include any special, consequential, incidental or punitive damages.

6.2    **Insurance.**  Distributor agrees to obtain and maintain commercially reasonable insurance, including without limitation comprehensive general liability coverage with combined policy limits of at least $1,000,000 per occurrence and covering bodily injury, personal injury, and property damage, including blanket contractual liability and naming OVERFINCH and its directors, officers, employees, and authorized representatives as additional insureds with respect to operations under this Agreement. Distributor agrees to furnish OVERFINCH with certificates showing the amount and existence of the required coverages and specifying that the policies shall not be canceled or materially changed except after (30) thirty days written notice to OVERFINCH. Distributor acknowledges that compliance with the specific insurance requirement above does not relieve Distributor of its obligation to maintain commercially reasonable insurance (either in regard to higher comprehensive general liability coverage limits or other

*JB ʌˢ*

types of coverage, including without limitation employer liability, automobile liability and worker compensation coverage.).

6.3     **Governing Law and Dispute Resolution.**  The laws of the Commonwealth of Virginia excluding conflict of laws principles, shall govern this Agreement.  The parties reject any applicability of the United Nations Convention on Contracts for the International Sale of Goods.  Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by binding arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, and judgment on the arbitration award may be entered in any court of competent jurisdiction.  Arbitration shall be held at a mutually acceptable location in Virginia, or another location agreed upon by the parties, and shall be conducted in English.  Either party may seek injunctive relief in a court of competent jurisdiction or other interim measures in the event of breach or threatened breach of this Agreement.  The prevailing party to any dispute shall be entitled to recover legal fees and other costs (including without limitation arbitration fees, disbursements, collection costs and the allocated cost of in-house counsel).

6.4     **Miscellaneous.**  Any notice pursuant to this Agreement shall be deemed given when sent by registered or certified mail (return receipt requested) or overnight delivery to an authorized officer at the headquarters of the other party at the address set forth in this Agreement.  Distributor may not assign or otherwise transfer this Agreement or any rights or obligations hereunder without the prior written consent of OVERFINCH.  The sale of the majority of Distributor's stock shall constitute an assignment for the purposes of this Agreement.  No failure or delay by either party in exercising any right or remedy, or insisting upon strict compliance by the other party with any obligation in this Agreement, shall constitute a waiver of any right thereafter to demand exact compliance with the terms of this Agreement.  The invalidity, in whole or part, of any provision in this Agreement shall not affect the remainder of such provision or any other provision and, where possible, shall be replaced by a valid provision that effects as close as possible the intent of the invalid provision.  Neither party shall be liable for failure to perform or delay in performance of any obligation under this Agreement (except payment of amounts already due and owing) where such failure or delay results from any event beyond its reasonable control.  The English language version of this Agreement shall govern and control any translations of the Agreement into any other language.  This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof, and any modification hereof must be in a writing signed by both parties.

*JB AS.*

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed and each of the undersigned represents and warrants that he or she is duly authorized to execute this Agreement.

PREMIER GROUP AUTOS LLC

1500 Cordova Road, 206 Fort Lauderdale,

Florida, 33316

By: _____

Name: _James  Blackburn_____

Title: _Owner_____

OVERFINCH NORTH AMERICA INC.

500 Stinson Drive

Danville VA  24540

By: _____

Name: _Alexander  Sloane._____

Title: _Vice  President._____

12

PAG-B0690



December 11, 2019

**By Overnight Delivery and Electronic Mail (james@premieraviationholdings.com)**
James Blackburn
Premier Group Autos LLC
1500 Cordova Road, Suite 206
Fort Lauderdale, Florida 33316

Re:    Further Notice of Default and Termination

Dear Mr. Blackburn:

This letter constitutes further notice of default and termination under the terms of the parties' distribution agreement (the "Distribution Agreement") dated 3rd December 2018.

Section 2.5 of the Distribution Agreement required that Premier Group Autos purchase a minimum of 36 Overfinch Conversions or Overfinch Products with a value of $1,500,000.00 during the Initial Term. Premier Group Autos failed to purchase either 36 Overfinch Conversions or Overfinch Products with a value of $1,500,000.00 during the Initial Term, which failure constitutes a breach of the Distribution Agreement. Accordingly, Overfinch is once again providing notice of termination of the Distribution Agreement pursuant to Section 5.2 of that agreement.

Overfinch reserves all rights and remedies available to it for Premier Group Auto's breach of the Distribution Agreement under the Distribution Agreement's terms, as well as state and federal law.

Regards,

Overfinch North America Inc.

Overfinch Product Development and Engineering Co. Inc. 500 Sunset Drive, Danville, Virginia 24540
Mailing/Billing address: Overfinch, PO Box 5555, Danville, VA 24543

T 1 866 5050 111  E enquiries@overfinch.com  W overfinch.com                    PAG-B0691

| | |
|---|---|
| **From:** | James Blackburn |
| **To:** | Dick Rocap |
| **Subject:** | Premier Group Autos 12.11.19.pdf |
| **Date:** | Friday, February 28, 2020 3:56:12 AM |
| **Attachments:** | Premier Group Autos 12.11.19.pdf |
| | ATT00001.htm |

Overfinch North America then reissued this letter omitting the part about " due to the financing of vehicles" part I believe on next gears request.

## BARRY E. MUKAMAL - RECENT TESTIMONY HISTORY

| ID | Case Name | Court | Case Number | Judge | Type of Testimony | Year |
|---|---|---|---|---|---|---|
| 1 | DAVID C ARNOLD v ASSOCIATION LAW GROUP, ET AL | MIAMI-DADE | 12-13962 ca 40 | | DEPOSITION / TESTIMONY | 2014 |
| 2 | TODD LARY/STARBRIGHT | SOUTHERN DISTRICT OF FLORIDA | 1:11 CV 23820 | | TRIAL TESTIMONY | 2014 |
| 3 | AMERICAN EDUCATIONAL ENTERPRISES, LLC v THE BOARD OF TRUSTEES OF THE INTERNAL IMPROVEMENT TRUST FUND | MIAMI-DADE COUNTY | CASE #02-23922 CA 05 | | DEPOSITION | 2014 |
| 4 | P & S ASSOCIATES GENERAL PARTNERSHIP & S & P ASSOCIATES GENERAL PARTNERSHIP v ROBERTA P ALVES, ET AL | BROWARD COUNTY | CASE #12-028324(07) | | TRIAL TESTIMONY | 2014 |
| 5 | IRONSHORE INDEMNITY INC. et al v BANYON 1030-32 LLC ET AL, ROBERT FURR TRUSTEE | BANKRUPTCY COURT SOUTHERN DISTRICT OF FLORIDA | 12-CV-61678-MGC 12-CV-61753-WJZ 12-CV-61813-KMW | | DEPOSITION | 2014 |
| 6 | PATRICIA MONTES DE OCA v JOSE JUAN RENTERIA | CIRCUIT COURT - MIAMI DADE COUNTY, FLORIDA | 2012-021622-FC-04 | | Testimony | 2014 |
| 7 | BANNING LARY, M.D. ET AL v BOSTON SCIENTIFIC CORPORATION | US DISTRICT COURT SOUTHERN DISTRICT OF FLORIDA | 1:11-cv-23820-O'SULL VAN | O'SULLIVAN | Deposition & Trial | 2014 |
| 8 | TELTRONICS, INC. | BANKRUPTCY COURT MIDDLE DISTRICT OF FLORIDA | 8:11-BK-12150-KRM | KRM | Deposition & Trial | 2015 |
| 9 | ARAOZA BROTHERS CORP. | CIRCUIT COURT MIAMI-DADE COUNTY, FLORIDA | 13-1908 CA 25 | | Deposition | 2015 |
| 10 | DYADIC INTERNATIONAL, INC. v. ERNST & YOUNG, LP, et al. | CIRCUIT COURT PALM BEACH COUNTY, FLORIDA | 50 2009 CA010680 XXXX MB AA | | Deposition | 2015 |
| 11 | TELTRONICS, INC. | BANKRUPTCY COURT MIDDLE DISTRICT OF FLORIDA | 8:11-BK-12150-KRM | KRM | Deposition & Trial | 2015 |
| 12 | RONALD DI MASI | BANKRUPTCY COURT MIDDLE DISTRICT OF FLORIDA | 8:13-BK-08406-MGW | MGW | Deposition & Trial | 2015 |
| 13 | XTEC, INC. | CIRCUIT COURT MIAMI-DADE COUNTY, FLORIDA | 13-38362 CA 09 | | Deposition & Trial | 2015 |

KM000901

## BARRY E. MUKAMAL - RECENT TESTIMONY HISTORY

| ID | Case Name | Court | Case Number | Judge | Type of Testimony | Year |
|---|---|---|---|---|---|---|
| 14 | LINDA S. ORTIZ V. HECTOR P. ORTIZ | CIRCUIT COURT 11TH JUDICIAL CIRCUIT MIAMI-DADE COUNTY, FL | 2014-8076-FC04 (39) 2014-022865-FC04 (39) | | Trial | 2015 |
| 15 | FUTURESELECT PORTFOLIO MANAGEMENT, INC V. TREMONT GROUP HOLDINGS, INC. | SUPERIOR COURT OF THE STATE OF WASHINGTON | 10-2-00732-0 SEA | | Deposition & Trial | 2015/2016 |
| 16 | TAYLOR, BEAN & WHITAKER PLAN TRUST V. PRICEWATERHOUSECOOPERS, LLP | 11TH JUDICIAL CIRCUIT MIAMI-DADE COUNTY | 13-33964 (40) | | Deposition | 2015/2016 |
| 17 | AGRO SUPPLY, S.A. V. AGRITRADE, LP | 11TH JUDICIAL CIRCUIT MIAMI-DADE COUNTY | 13-15713 CA 01 | | Deposition & Trial | 2015/2016 |
| 18 | DISABILITY LAW CLAIMS, PA, ET AL V. IM SOLUTIONS, LLC | DISTRICT COURT SOUTHERN DISTRICT OF FLORIDA | 14-6177-CIV-DIMITROULEAS /SNOW | | Deposition | 2015/2016 |
| 19 | MAJORCA ISLES MASTER ASSOCIATION | BANKRUPTCY COURT SOUTHERN DISTRICT OF FLORIDA | 12-19056 BKC AJC | AJC | Trial | 2015/2016 |
| 20 | CITY NATIONAL BANK OF FLORIDA V. MAC-ACCESS, CORP | CIRCUIT COURT 11TH JUDICIAL CIRCUIT MIAMI-DADE COUNTY, FL | 2015-029121-CA-01(22) | HANZMAN | Forensic Examination | 2016 |
| 21 | LAPCIUC V. LAPCIUC | CIRCUIT COURT 11TH JUDICIAL CIRCUIT MIAMI-DADE COUNTY, FL | | | Trial | 2016/2017 |
| 22 | LAMINGTON RESOURCES, INC. V. BURGER KING CORPORATION, V. BK CENTROAMERICA CAYMAN LTD, ET AL. | INTERNATIONAL CHAMBER OF COMMERCE INTERNATIONAL COURT OF ARBITRATION | CASE NO. 20786/RD | | Deposition | 2016/2017 |
| 23 | PEDRO A. TORRES V. ASTOR PROPERTY HOLDINGS, LLC, ET AL | CIRCUIT COURT 11TH JUDICIAL CIRCUIT MIAMI-DADE COUNTY, FL | 2015-014693-CA(20) | | Deposition/Trial | 2016/2017 |
| 24 | S.R. KALB AND ASSOCIATES, INC. V. 2250 & 2233 NW 77 TER, LLC AND MICHAEL I. ROSE | CIRCUIT COURT 11TH JUDICIAL CIRCUIT MIAMI-DADE COUNTY, FL | 2016-001586-CA-01 | | Receiver | 2016/2017 |
| 25 | REMOS BUILDING & DEVELOPMENT CORPORATION V. CHAPEL TRAIL ASSOCIATES, LTD | CIRCUIT COURT OF THE 17TH JUDICAL CIRCUIT, IN AND FOR BROWARD COUNTY, FL | 07-02212 (02) | | Deposition | 2017 |

PAG-B0694
KM00008092

## BARRY E. MUKAMAL - RECENT TESTIMONY HISTORY

| ID | Case Name | Court | Case Number | Judge | Type of Testimony | Year |
|---|---|---|---|---|---|---|
| 26 | LARRY V. GORDON V. ROBERT FISHMAN | IN THE CIRCUIT COURT OF THE 15TH JUDICIAL CIRCUIT IN AND FOR PALM BEACH COUNTY, FLORIDA | 2014-CA-008927 (AD) | BARKDULL | Deposition | 2017 |
| 27 | GARY UKAR, as class representative V. Q-CLUB HOTEL, LLC | UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF FLORIDA | 16-60474 CIV COHN/SELTZER | COHN | Trial | 2017 |
| 28 | BAHAMIAN VILLAGE, LLC V. FPL | CIRCUIT COURT 11TH JUDICIAL CIRCUIT MIAMI-DADE COUNTY, FL | 13-34551-CA-09 | | Deposition | 2017 |
| 29 | DAVID L. CLARKE, ET AL. V. TWO ISLANDS DVELOPMENT CORP. AND PRIVE DEVELOPERS LLC AND TRUST 75 LT21 | CIRCUIT COURT 11TH JUDICIAL CIRCUIT MIAMI-DADE COUNTY, FL | 14-21519-CA-09 | BAGLEY | Deposition | 2018 |
| 30 | PHILIP VON KAHLE, CURATOR. V. FIDELITY AND DEPOSIT COMPANY OF MARYLAND | CIRCUIT COURT 11TH JUDICIAL CIRCUIT MIAMI-DADE COUNTY, FL | 16-021099-CA-01 | THORNTON | Deposition | 2018 |
| 31 | HAROUT SAMRA V. VICKEN BEDOYAN, WPM MIAMI, INC, et al. | CIRCUIT COURT 11TH JUDICIAL CIRCUIT MIAMI-DADE COUNTY, FL | 14-22854-CA-40 | THOMAS | Trial | 2018 |
| 32 | JOEL BETH NAVRATIK, et al. V. JON J. RAPPAPORT AND PET MEDICAL CENTERS, LLC | CIRCUIT COURT 11TH JUDICIAL CIRCUIT MIAMI-DADE COUNTY, FL | 17-019695-CA-01(44) | Thomas | Deposition & Trial | 2018 |
| 33 | STONA11 V. TOTAL GSM, LLC | CIRCUIT COURT 11TH JUDICIAL CIRCUIT MIAMI-DADE COUNTY, FL | 14-27587 | Butchko | Deposition | 2018 |
| 34 | CONTRAZZA INTERNATIONAL CONSTRUCTION, INC. V. UNIVERSAL TOWERS CONSTRUCTION, INC. | CIRCUIT COURT 9TH JUDICIAL CIRCUIT FOR ORANGE COUNTY, FLORIDA | 2015-CA-008342 | | Deposition/Trial | 2018 |
| 35 | SHOW ME HOSPITALITY, LLL V. TIM HORTONS USA INC. | UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF FLORIDA | 17-22679-CIV | Martinez/Otazo-Reyes | Deposition | 2019 |
| 36 | WAVE LENGTHS HAIR SALON OF FLORIDA, INC V. CBL & ASSOCIATES PROPERTIES, INC. | UNITED STATES DISTRICT COURT MIDDLE DISTRICT OF FLORIDA | 2:16-cv-00206-SPC-MRM | | Deposition | 2019 |
| 37 | BOUDKO, POLINA V. BUYANOV, DMITRIY | CIRCUIT COURT 11TH JUDICIAL CIRCUIT MIAMI-DADE COUNTY, FL | 17-04537-FC-04 | Young | Deposition | 2019 |
| 38 | STEVEN R. SCHAFER, ET AL. V. ROBERT A. DICRISCI, ET AL. | CIRCUIT COURT 11TH JUDICIAL CIRCUIT MIAMI-DADE COUNTY, FL | 17-021621-CA-43 | Butchco | Deposition | 2019 |

PAG-B0695

KM000903

## BARRY E. MUKAMAL - RECENT TESTIMONY HISTORY

| ID | Case Name | Court | Case Number | Judge | Type of Testimony | Year |
|---|---|---|---|---|---|---|
| 39 | SCHECHTER OPERATING CAPITAL LLP v BAINBRIDGE INVESTOR, LLC | CIRCUIT COURT 15TH JUDICIAL CIRCUIT PALM BEACH COUNTY, FL | 50-2016-CA-8692 | | Deposition | 2019 |
| 40 | IRONSHORE INDEMNITY INC. et al v BANYON 1030-32 LLC ET AL, ROBERT FURR TRUSTEE | BANKRUPTCY COURT SOUTHERN DISTRICT OF FLORIDA | 12-CV-61678-MGC 12-CV-61753-WJZ 12-CV-61813-KMW | Ray | Trial | 2019 |
| 41 | BOYWIC FARMS, LTD v BRITT L. WEAVER | AMERICAN ARBITRATION ASSOCIATION | 01-18-0001-9008 | | Deposition | 2019 |
| 42 | MANDARIN LAKES NEIGHBORHOOD HOMEOWNERS' ASSOCIATION, INC v RAFAEL ROCA, AMALIA PAPADIMITRIOU, ROBERT BENWARE, RAUL SANCHEZ AND D.R. HORTON, INC | CIRCUIT COURT 11TH JUDICIAL CIRCUIT MIAMI-DADE COUNTY, FL | 18-039950-CA-01 | | Deposition | 2019 |
| 43 | HADAD CONSULTING, LLC v URBAN FARMERS, INC | CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT IN AND FOR BROWARD COUNTY, FL | 17-019215 | | Trial | 2020 |
| 44 | IMC GROUP, LLC, ET AL v COMVEST IMC HOLDINGS, LLC ET AL | CIRCUIT COURT 11TH JUDICIAL CIRCUIT MIAMI-DADE COUNTY, FL | 18-3297 CA 01 (43) | | Deposition | 2020 |

PAG-B0696  KM000904



## Barry E. Mukamal, CPA, CIRA, PFS, ABV, CFE, CFF

**bmukamal@kapilamukamal.com**

Mr. Mukamal's career spans more than forty years. He has developed a national bankruptcy, insolvency and advisory practice of highly trained professionals specializing in a complex array of services in the accounting and advisory industry. These services include: (i) forensic and investigative accounting of sophisticated white collar crime, occupational fraud and abuse; (ii) expert witness reporting and testimony involving complex business litigation and the quantification of economic damages; and (iii) matrimonial services to high net worth individuals with significant domestic and international assets and business interests.

In addition to spearheading a practice combining the three disciplines described above, Mr. Mukamal has grown to be one of the most reliable and recognizable fiduciaries serving both Federal and State Courts located in the Southeastern United States. In his capacity as a Chapter 7 Panel Trustee, Mr. Mukamal has overseen and continues to oversee hundreds of cases annually with a significant number of those cases involving a multitude of asset types and business concerns across nearly every industry. He has been appointed Liquidating Trustee and/or Plan Administrator in numerous complex cases requiring administration and resolution of multiple Ponzi schemes including fraud investigations, quantification of economic damages and resolution of claims. Mr. Mukamal has managed and marketed the completion of construction projects including resolving related creditor claims and construction contractor claims. He has been involved in Accountant and Auditor Standard of Care and compliance with Professional Standards, accounting and tax engagements and commercial and contract damage analysis ranging from small closely-held entities to SEC clients in various industries including insurance, manufacturing, distribution, real estate, health care, publishing, agriculture, timeshare developers, seafood and aviation.

Mr. Mukamal's fiduciary assignments include those as operating Chapter 11/Liquidating Trustee, State Court Receiverships, Court Examiner and Financial Advisor to various creditor committees. While performing his duties in each of these capacities, Mr. Mukamal has been successful in marshaling distressed assets, securing both operating and non-operating businesses, preserving their value and realizing recoveries consistently exceeding expectations. While advising the Court as an Examiner or as Financial Advisor, Mr. Mukamal has been instrumental in providing even-handed, clear and concise consultation resulting in the ability of the Court and creditor committees to exercise business judgment and decisions affecting significant interests and hundreds of millions of dollars of monetary recoveries and asset preservation.

Mr. Mukamal's extensive litigation support experience includes matrimonial dissolution, fraud investigations, accounting malpractice and business valuations. He has been involved in numerous high profile, high-net-worth divorces involving assets in the U.S. and abroad, equitable distribution, opinions on income and lifestyle and asset and business valuations. In addition, he has been retained in investigations and embezzlement issues associated with financial fraud schemes such as Ponzi schemes and occupational fraud. His experience also extends to lost profits litigation, damages in relation to breach of contract, personal injury and wrongful death actions. Mr. Mukamal's testimony for the plaintiff in a patent damage action facilitated a multi-million dollar award for the client.

Mr. Mukamal has represented debtors, creditors and creditors' committees in matters of insolvency fraud and abuse and assisted trustees in their asset recovery efforts. He has served as Court appointed Receiver and Mediator and has testified as an expert witness at the state, local and federal levels.

As a Receiver, Mr. Mukamal has utilized his technical skills, abilities and experience on a "hands-on" basis which allows him to quickly assess and analyze the current environment of the business. He is well skilled in negotiating and positioning. He has participated in both in-court and out-of-court workouts in a variety of industries. He has performed forensic investigations to trace flows of funds, investigated fraudulent transfers to insiders and related parties and filed lawsuits to recover preferential payments for the estate.





## Barry E. Mukamal, CPA, CIRA, PFS, ABV, CFE, CFF

bmukamal@kapilamukamal.com

### AREAS OF EXPERTISE

Bankruptcy and Insolvency
Solvency Opinions
Business Valuations
Commercial and Contract Damage Analysis
Contract Disputes
Investigation of Commercial Fraud
Marital Dissolution and Forensic Analysis
Succession Planning
Accountant and Auditor Standard of Care and
   Compliance with Professional Standards

### ACCOMPLISHMENTS

- *South Florida Legal Guide—*
    *Top CPA in Litigation Support – multiple years*
- *South Florida Business Journal—*
    *Litigation Key Partner Award Winner*

### EDUCATION / QUALIFICATIONS / ACCREDITATIONS

CPA  - Certified Public Accountant
CIRA - Certified Insolvency and Restructuring
         Advisor
CFE  - Certified Fraud Examiner
ABV  - Accredited in Business Valuation
PFS  - Personal Financial Specialist
CFF  - Certified in Financial Forensics

Chapter 7 Panel Trustee

University of Buffalo, New York —
M.B.A., Accounting and Business Administration,
B.S., Accounting—Magna Cum Laude

### PROFESSIONAL AND CIVIC ASSOCIATIONS

American Institute of Certified Public Accountants
(AICPA)
Florida Institute of Certified Public Accountants
(FICPA)
Association of Insolvency and Restructuring Advisors
(AIRA)
Association of Certified Fraud Examiners (ACFE)
American Bankruptcy Institute (ABI)
National Association of Bankruptcy Trustees (NABT)

### Industries Served as Trustee and Professional

Real Estate and Construction Companies
Insurance Providers
Distributors
Aviation Companies
Agricultural Companies
Homeowner Associations
Condo Hotels and Hotels
Franchise Operations and Franchisors
Auditor Standard of Care
Probate Estates and Trusts
Hospitals and Health Care Providers
Timeshare Developers

### ARTICLES, SEMINARS AND PRESENTATIONS

"Fiduciary Responsibilities of Professionals in
Bankruptcy" - 2011 Central Florida Bankruptcy Law Association
Annual Seminar

"Taxation Issues Facing the Domestic Relations Practitioner" - Palm
Beach County Bar Association Family Law CLE Committee Seminar

"Privacy and Security Issues in a Trustee's Office and ECF Environ-
ment" - National Association of Bankruptcy Trustees

"Keep Your Client From Drowning: How to Deal With Bankruptcies
and Foreclosures—American Academy of Matrimonial Lawyers

"The Financial Distressed Client: Positioning the   Client for Modi-
fication, Bankruptcy and/or Foreclosure—FICPA Ethics Presenta-
tion, Florida Fiduciary   Forum, 2011

"Recovering Value: Effective Strategies to Recover Assets (Once
Found)" - The Offshore Alert Conference, April, 2018

"Bankruptcy Estate Taxation under the Tax Cuts and Jobs Act" -
National Association of Bankruptcy Trustees (NABT) Annual Confer-
ence, August 2018

"Commercial Fraud Issues: Don't Confuse a Financial Audit with a
Fraud Audit" - American Bankruptcy Institute Newsletter, 2019

"Strategies in Bankruptcy Court" - Dade Legal Aid Seminar—
Moderator—January 2020

"Valuation Testimony" - American Bankruptcy Institute - 2020
Spring Southeast Virtual Bankruptcy Workshop.

"Identification of Assets and Impact of Divorce and Separation on
Recoverable Assets" - CV Region 21 U.S. Trustee Training—
November 2020

KapilaMukamal, LLP
The Kapila Building
1000 S. Federal Highway, Suite 200
Fort Lauderdale, Florida 33316
Main   786-517-5771
Direct  786-517-5730
www.kapilamukamal.com



CPAs, Forensic and Insolvency Advisors

PAG-B0698

KM000900