**Andrew Gregory Ramey - - December 10, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION


NEXTGEAR CAPITAL, INC.,        )
                              )
        Plaintiff,            )
                              )   CASE NO.
vs.                           )   1:20-cv-00354-TWP-DLP
                              )
                              )
PREMIER GROUP AUTOS, LLC,     )
JAMES M. BLACKBURN, AND       )
EDWARD A. KESSLER,            )
                              )
        Defendants.           )




    THE DEPOSITION UPON ORAL EXAMINATION OF

    A N D R E W   G R E G O R Y   R A M E Y,

    a witness produced and sworn before me, Donna
T. Feider, a Notary Public at large in and for the
State of Indiana, taken on behalf of the
Defendant, at the offices of Bose McKinney &
Evans, 111 Monument Circle, Suite 2700,
Indianapolis, Marion County, Indiana, on Friday,
the 10th day of December, 2021, commencing at
approximately 10:04 a.m., pursuant to the Indiana
Rules of Trial Procedure, pursuant to Notice.

EXHIBIT
**Exhibit B**

**Andrew Gregory Ramey -  - December 10, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

---

2

```
          A P P E A R A N C E S
FOR THE PLAINTIFF NEXTGEAR CAPITAL, INC.:
        Brian S. Jones, Esq.
        BOSE MCKINNEY & EVANS
        111 Monument Circle
        Suite 2700
        Indianapolis, IN  46204
        bjones@boselaw.com
FOR THE DEFENDANT EDWARD KESSLER:
        Jason R. Delk, Esq.
        Austin Sparks, Esq.
        DELK MCNALLY
        211 South Walnut Street
        Muncie, IN  47305
        delk@delkmcnally.com
FOR THE DEFENDANTS PREMIER GROUP AUTOS, LLC
AND JAMES M. BLACKBURN:
        Richard A. Rocap, Esq.
        ROCAP LAW FIRM
        10293 North Meridian Street
        Suite 175
        Carmel, IN  46290
        rar@rocaplaw.com
ALSO PRESENT:
        Gary Hoke
*
```

---

3

```
    I N D E X   O F   E X A M I N A T I O N
                                      PAGE
DIRECT EXAMINATION.....................04
    Questions By: Mr. Delk
CROSS-EXAMINATION.....................104
    Questions By: Mr. Rocap
CROSS-EXAMINATION.....................104
    Questions By: Mr. Jones
REDIRECT EXAMINATION..................108
    Questions By: Mr. Delk
    I N D E X   O F   E X H I B I T S
Defendant's Deposition Exhibits      PAGE
Ex. 3 - Confidential Dealer Application....54
Ex. 4 - Photocopy of driver's license......97
Ex. 8 - Kessler Power of Attorney..........98
Ex. 10 - Pre-Activation Quality Control
         Form..............................41
Ex. 17 - NextGear Capital, Inc.s' Objections
         and Responses to Edward A. Kessler's
         First Interrogatories.............65
Ex. 18 - 3/25/2019 e-mail string, Bates
         NXTGR 2028........................45
Ex. 40 - 1/25/2019 to 1/28/2019 e-mail
         string, Bates NXTGR 2004 - 2006....46
Ex. 41 - SOT Vehicle Report................84
Ex. 42 - NextGear Capital, Inc.'s Amended
         Objections and Responses to Edward
         A. Kessler's First Interrogatories..99
Ex. 43 - Balance Calculation for Written Off
         Account Report....................101
*
```

---

4

```
 1          (The witness is sworn by the court
 2     reporter at 10:04 a.m., at which time the
 3     following proceedings are had:)
 4
 5          ANDREW GREGORY RAMEY,
 6          having been duly sworn to tell the
 7          truth, the whole truth and nothing but
 8          the truth relating to said matter, is
 9          examined and testifies as follows:
10  DIRECT EXAMINATION,
11       QUESTIONS BY MR. DELK:
12  Q.   Could you state your full name for the record,
13       please.
14  A.   Andrew Gregory Ramey.
15  Q.   Mr. Ramey, how old are you?
16  A.   I am 37 years old.
17  Q.   What's your date of birth?
18  A.   November 26, 1984.
19  Q.   Where were you born?
20  A.   Muncie, Indiana.
21  Q.   No kidding?
22  A.   Yeah.
23  Q.   Got something in common.
24  A.   Really?
25  Q.   Yeah.  Where'd you go to high school?
```

---

5

```
 1  A.   Blackford High School.
 2  Q.   Are you married?
 3  A.   I am not.
 4  Q.   Have you ever been married?
 5  A.   No.
 6  Q.   Where do you live today?
 7  A.   I live in Westfield, Indiana.
 8  Q.   What's your address?
 9  A.   286 East Quail Wood Lane.  That's two words.
10  Q.   Okay.
11  A.   And then it's Westfield, 46074.
12  Q.   And are you currently employed?
13  A.   I am.
14  Q.   And by whom?
15  A.   Cox Automotive, NextGear Capital.
16  Q.   And so dual employment?
17  A.   Singular.  NextGear's owned by Cox Automotive.
18  Q.   So who do you actually provide services for?
19       Is it Cox Automotive or NextGear Capital?
20  A.   NextGear Capital.
21  Q.   Is that where your paycheck comes from is
22       NextGear Capital?
23  A.   The paycheck actually, I believe it says, "Cox
24       Automotive."
25  Q.   How long did you work for NextGear Capital?
```

---

**Andrew Gregory Ramey -  - December 10, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

---

Page 2

```
        A P P E A R A N C E S
FOR THE PLAINTIFF NEXTGEAR CAPITAL, INC.:
        Brian S. Jones, Esq.
        BOSE MCKINNEY & EVANS
        111 Monument Circle
        Suite 2700
        Indianapolis, IN  46204
        bjones@boselaw.com
FOR THE DEFENDANT EDWARD KESSLER:
        Jason R. Delk, Esq.
        Austin Sparks, Esq.
        DELK MCNALLY
        211 South Walnut Street
        Muncie, IN  47305
        delk@delkmcnally.com
FOR THE DEFENDANTS PREMIER GROUP AUTOS, LLC
AND JAMES M. BLACKBURN:
        Richard A. Rocap, Esq.
        ROCAP LAW FIRM
        10293 North Meridian Street
        Suite 175
        Carmel, IN  46290
        rar@rocaplaw.com
ALSO PRESENT:
        Gary Hoke
*
```

---

Page 3

```
    I N D E X   O F   E X A M I N A T I O N
                                        PAGE
DIRECT EXAMINATION.........................04
  Questions By: Mr. Delk
CROSS-EXAMINATION.........................104
  Questions By: Mr. Rocap
CROSS-EXAMINATION.........................104
  Questions By: Mr. Jones
REDIRECT EXAMINATION......................108
  Questions By: Mr. Delk
    I N D E X   O F   E X H I B I T S
Defendant's Deposition Exhibits         PAGE
Ex. 3 - Confidential Dealer Application......54
Ex. 4 - Photocopy of driver's license.......97
Ex. 8 - Kessler Power of Attorney...........98
Ex. 10 - Pre-Activation Quality Control
         Form..............................41
Ex. 17 - NextGear Capital, Inc.s' Objections
         and Responses to Edward A. Kessler's
         First Interrogatories.............65
Ex. 18 - 3/25/2019 e-mail string, Bates
         NXTGR 2028........................45
Ex. 40 - 1/25/2019 to 1/28/2019 e-mail
         string, Bates NXTGR 2004 - 2006....46
Ex. 41 - SOT Vehicle Report................84
Ex. 42 - NextGear Capital, Inc.'s Amended
         Objections and Responses to Edward
         A. Kessler's First Interrogatories..99
Ex. 43 - Balance Calculation for Written Off
         Account Report...................101
*
```

---

Page 4

```
 1          (The witness is sworn by the court
 2     reporter at 10:04 a.m., at which time the
 3     following proceedings are had:)
 4
 5          ANDREW GREOGRY RAMEY,
 6          having been duly sworn to tell the
 7          truth, the whole truth and nothing but
 8          the truth relating to said matter, is
 9          examined and testifies as follows:
10  DIRECT EXAMINATION,
11     QUESTIONS BY MR. DELK:
12  Q.  Could you state your full name for the record,
13      please.
14  A.  Andrew Gregory Ramey.
15  Q.  Mr. Ramey, how old are you?
16  A.  I am 37 years old.
17  Q.  What's your date of birth?
18  A.  November 26, 1984.
19  Q.  Where were you born?
20  A.  Muncie, Indiana.
21  Q.  No kidding?
22  A.  Yeah.
23  Q.  Got something in common.
24  A.  Really?
25  Q.  Yeah.  Where'd you go to high school?
```

---

Page 5

```
 1  A.  Blackford High School.
 2  Q.  Are you married?
 3  A.  I am not.
 4  Q.  Have you ever been married?
 5  A.  No.
 6  Q.  Where do you live today?
 7  A.  I live in Westfield, Indiana.
 8  Q.  What's your address?
 9  A.  286 East Quail Wood Lane.  That's two words.
10  Q.  Okay.
11  A.  And then it's Westfield, 46074.
12  Q.  And are you currently employed?
13  A.  I am.
14  Q.  And by whom?
15  A.  Cox Automotive, NextGear Capital.
16  Q.  And so dual employment?
17  A.  Singular.  NextGear's owned by Cox Automotive.
18  Q.  So who do you actually provide services for?
19      Is it Cox Automotive or NextGear Capital?
20  A.  NextGear Capital.
21  Q.  Is that where your paycheck comes from is
22      NextGear Capital?
23  A.  The paycheck actually, I believe it says, "Cox
24      Automotive."
25  Q.  How long did you work for NextGear Capital?
```

---

**Andrew Gregory Ramey -  - December 10, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

6

1  A.   Eight and a half years.
2  Q.   So you are, let's see, 37.  So that puts you
3       right around 29 or so when you started with
4       NextGear?
5  A.   Yes.  That's correct.
6  Q.   All right.  Prior to NextGear, what did you
7       do?
8  A.   I worked for Farmers Insurance.
9  Q.   What did you do for Farmers?
10 A.   I worked for a sales rep just basically
11      assisting with sales, generating sales, things
12      like that.
13 Q.   Commercial lines or personal lines?
14 A.   Personal.
15 Q.   And where was that out of?
16 A.   It was Whitestown, Indiana.
17 Q.   What agency did you work for?
18 A.   His name was Tony Miller.
19 Q.   And so how long were you with Tony Miller or
20      Farmers Insurance?
21 A.   About a year.
22 Q.   So that brings you roughly to around 28 years
23      old or so?
24 A.   Uh-huh.
25 Q.   You did that for a year.  What did you do

7

1       prior to Farmers?
2  A.   I worked for a restaurant.
3  Q.   What restaurant?
4  A.   MacKenzie River.
5  Q.   Where's that?
6  A.   It's located in Indianapolis.
7  Q.   Whereabouts?
8  A.   Castleton area.
9  Q.   Is it still in business?
10 A.   Yes.
11 Q.   Where in Castleton?
12 A.   86th and Allisonville area.  It's over --
13      shoot.  I'm trying to think.  It's on the
14      south side of 86th.
15 Q.   Okay.
16 A.   Do you know where Lakeshore Apartments are, by
17      chance?
18 Q.   No, but it's okay.
19 A.   Yeah.
20 Q.   All right.  And what'd you do for MacKenzie
21      River restaurant?
22 A.   Just a server.
23 Q.   Server?
24 A.   Yeah.
25 Q.   And how long were you there?

8

1  A.   About a year as well.
2  Q.   All right.  What did you do?  We're working
3       backwards.  What did you do before that?
4  A.   It would have been college at that point.
5  Q.   Where did you go to college?
6  A.   Indiana University and then IUPUI.
7  Q.   So you started at IU there in Bloomington?
8  A.   Yes.
9  Q.   And then how many years did you do at
10      Bloomington?
11 A.   Four.
12 Q.   Four years at Bloomington?
13 A.   Yes.
14 Q.   Did you obtain your undergrad degree?
15 A.   I did not.
16 Q.   Okay.  So then you transferred to IUPUI?
17 A.   That is correct.
18 Q.   All right.  And how long were you at IUPUI?
19 A.   Two years.
20 Q.   And did you obtain a degree from IUPUI?
21 A.   I did not.
22 Q.   Okay.  So you do not have that a college
23      degree?
24 A.   That is correct.
25 Q.   What were you majoring in or studying at the

9

1       time?
2  A.   Marketing.
3  Q.   All right.  So have we gone through your
4       professional history up to this point?
5  A.   Yes.
6  Q.   All right.  Have you ever been deposed before?
7  A.   I have not.
8  Q.   First time?
9  A.   That is correct.
10 Q.   All right.  So let's go over just a little bit
11      of the ground rules.  I'm sure your lawyer
12      already talked to you about those.  And are
13      you being represented here today by Mr. Jones?
14 A.   I am.
15 Q.   Okay.  All right.  So this is not a sprint.
16      This is a marathon.  So, you know, we want to
17      make sure that we take sufficient breaks.  If
18      you need to take a break, just let me know, if
19      you need to go to the bathroom --
20 A.   Sure.
21 Q.   -- anything like that.  But if a question is
22      pending, I ask that you just answer it before
23      taking a break.  Do you understand?
24 A.   I do.
25 Q.   All right.  You need to try to give audible

**Andrew Gregory Ramey -  - December 10, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

10

```
1    answers the best you can.  Obviously we have a
2    court reporter here taking everything down.
3    This will become rather conversational, and a
4    lot of times you're going to anticipate my
5    question, and you're ready to answer before I
6    finish.  So if you could just let me finish,
7    then give your answer, it would be
8    appreciated.  Understand?
9  A.  Yes.
10 Q.  That was needing for an audible response.
11   And, again, when I do that, I'm not trying to
12   be a smart alec with you.  I'm just trying to
13   get a clear record.  Okay?
14 A.  I understand.
15 Q.  Now, I can't promise you that I won't be a
16   smart alec with you today, but nonetheless,
17   just try to give audible answers.
18 A.  Absolutely.
19 Q.  All right.  So if I ask a question and you
20   give me an answer, I'm going to make two
21   assumptions, one, you understood my question,
22   and two, you gave me a truthful and accurate
23   answer.  Are those fair assumptions to make?
24 A.  Yes.
25 Q.  What did you do to prepare for your deposition
```

11

```
1    today?
2  A.  I met with Brian and Gary earlier this morning
3    for about an hour.
4  Q.  Okay.  Anything else?
5  A.  Other than reviewing briefly the documents
6    that I signed, no.
7  Q.  The interrogatory answers?
8  A.  Correct.
9  Q.  What other documents did you review in
10   anticipation of your deposition today?
11 A.  None.
12 Q.  So your interrogatory answers only?
13 A.  That is correct.
14 Q.  All right.  When you were -- you've testified
15   three different times now through the
16   interrogatory answers that you assisted with
17   providing answers to the interrogatories.
18   What documents did you review in providing
19   answers to the interrogatories?
20 A.  None.
21 Q.  All right.  Let's talk about your time with
22   NextGear Capital.  Okay?  When were you first
23   hired by NextGear?  I think you said when you
24   were around 29 or so; is that right?
25 A.  That's correct.  Yeah.
```

12

```
1  Q.  Do you know approximate month and year?
2  A.  Oh, that would have been -- so I was hired as
3    a temporary employee in April of 2013, and
4    then I was brought on as a permanent employee
5    in July of that same year.
6  Q.  When you were hired in as a temp employee,
7    what did you do for NextGear?
8  A.  It was mostly data entry.  I worked in the
9    Funding Services department.  I would receive
10   requests to floor plan vehicles on a dealer's
11   line, and I would enter that information and
12   then approve, deny, or pend the units based on
13   the information given.
14 Q.  Okay.  And that's what you did when you were
15   hired as a temp?
16 A.  Correct.
17 Q.  All right.  Did you have, like, a set -- let
18   me back up.  As a temp employee, did you have
19   some sort of document or manual or something
20   you would review when you would get a request
21   to floor plan a document to either say yes,
22   approved, denied, or pending, or how did you
23   know what to do?
24 A.  Sure.  There was training when I first started
25   to walk through the process.  There were
```

13

```
1    training documents that I could refer to.
2    Essentially it was the same process every
3    time, so once you get the hang of it, you
4    don't really have to refer to anything other
5    than your own knowledge.
6  Q.  What would be a qualification to approve a
7    request to floor plan a vehicle?
8  A.  Sure.  We required a copy of the bill of sale
9    and then also a copy of the title and any
10   corresponding reassignments or documentation
11   that would go with that title.
12 Q.  Okay.  What about denying one?  What would be
13   triggered if you denied a request?
14 A.  Sure.  If it fell outside of the policy.
15 Q.  And what policy?
16 A.  That would be the floor plan policy.
17 Q.  For that specific customer or --
18 A.  No.  It was a broad policy for floor planning.
19   It wasn't really customer specific.
20 Q.  Okay.  If it didn't meet certain criteria,
21   then you would deny the request?
22 A.  That's correct.
23 Q.  Okay.  And how long did you hold this
24   position?  I know you said you were a temp in
25   April of 2013, became permanent July 2013.
```

**Andrew Gregory Ramey -  - December 10, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

14

1    And at that point in time in July 2013, were
2    you still on data entry?
3  A.  Yes.
4  Q.  Did you have a specific title or was it just
5    data entry?
6  A.  I believe it was Funding Services
7    representative.
8  Q.  Sounds more official, doesn't it?  All right.
9    How long did you hold that position once you
10   became a permanent employee as a Funding
11   Services rep?
12 A.  I don't know the exact amount of time.
13 Q.  All right.  Give me your best estimate.
14 A.  Probably about a year.
15 Q.  Okay.  So roughly one year, you're in that
16   position.  What's your next position at
17   NextGear?
18 A.  It was a -- it was an escalated position.  I
19   don't remember the title exactly.
20 Q.  When you say escalated -- sorry to cut you
21   off.
22 A.  Sure.  It was -- I would handle escalated
23   requests.  It wasn't the entry-level position,
24   but it was someone with a little bit more
25   tenure, a little bit more experience that

15

1    could handle more complicated issues and
2    questions and things like that.
3  Q.  Okay.
4  A.  I also helped with training of new team
5    members.
6  Q.  Within the Funding Services department?
7  A.  That is correct.
8  Q.  Okay.  And then did you have a specific title
9    once you were in the escalation of Funding
10   Services?
11 A.  I did.  I just can't remember what it is off
12   the top of my head.
13 Q.  How long were you in that position?
14 A.  Again, it was about a year.  I don't know the
15   exact amount of time, but it was roughly that.
16 Q.  Okay.  So about this takes us to summer months
17   of 2015 or so is where we are now.  What was
18   your next role or next title?
19 A.  I was a supervisor in the Funding Services
20   department.
21 Q.  Okay.  Let's talk about what your job duties
22   were as a supervisor of Funding Services.
23 A.  So I essentially had a team of roughly eight
24   to ten people that did the same tasks that I
25   had previously done as a Funding Services

16

1    representative.
2  Q.  So you oversaw their work?
3  A.  That's correct.
4  Q.  You were in charge of them basically?
5  A.  Yeah.
6  Q.  And how long did you hold the supervisor
7    position of Funding Services?
8  A.  Roughly two years.
9  Q.  All right.  So summer of 2017 is where we are
10   now.  And what -- was it a promotion you
11   received?
12 A.  Yes.  I had moved into my current role.  At
13   the time, it was manager of Lending Services.
14   Since then I've been promoted to senior
15   manager of Lending Services but essentially
16   for the most part the same role.
17 Q.  All right.  So what's a manager of Lending
18   Services do?
19 A.  Sure.  In charge of the administrative
20   functions of Lending.  So if it's not
21   Underwriting, it typically falls under me, so
22   application entry, some account maintenance,
23   contracting, activation of new accounts,
24   things like that, administrative functions.
25 Q.  Okay.  Let's try to break that down.  So you

17

1    said if it doesn't fall within Underwriting,
2    it would be fall within your department or
3    your function?
4  A.  Correct.
5  Q.  All right.  So you said application entry,
6    account management, I believe --
7  A.  Maintenance.
8  Q.  Oh, maintenance.  Thank you.  Contracting?
9  A.  (Nodding head affirmatively.)
10 Q.  What else?
11 A.  Activations of accounts and then also line
12   modifications, so existing accounts that had
13   changes made to them.
14 Q.  Line modifications.  Anything else?
15 A.  I'm sure there is.  Responsible for e-mail
16   in-box sorting, those types of things.
17 Q.  What do you mean by that?
18 A.  Routing.  So we have a general in-box that
19   requests and just e-mails come to, and
20   depending on the nature of the request,
21   someone would route that to a sub-folder so
22   that someone on the team could work it, more
23   specialized.
24 Q.  All right.  So you would kind of oversee
25   communications coming into, like, a general

**Andrew Gregory Ramey -  - December 10, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

18

```
1        e-mail distribution list, and you would make
2        sure it got farmed out to whomever needed to
3        deal with it?
4     A. My team would.
5     Q. Your team would?
6     A. Yes.
7     Q. Okay.  Anything else you can think of?
8     A. Not at this time.
9     Q. All right.  So let's talk about Underwriting.
10       Have you ever worked in the Underwriting
11       department or had your hands on it in any way
12       in your tenure with NextGear?
13    A. No.
14    Q. All right.  Can you describe for me what
15       Underwriting is generally?
16    A. Yeah.  The underwriters take information and
17       documentation from a particular dealer that's
18       applying for a line of credit, and they take
19       that information, and to the best of your
20       ability, they make a decision on whether or
21       not the dealer is approved for what they're
22       requesting, whether they're declined for what
23       they're requesting, or if there's somewhere in
24       the middle that they can approve, maybe not
25       quite what the dealer's requesting but
```

19

```
1        something that the dealer would agree to, a
2        lower amount or more expensive terms, things
3        like that.
4     Q. Okay.  So they're the ones that analyze a
5        person's credit worthiness or a dealer's
6        credit worthiness?
7     A. That is correct.
8     Q. And then determine, okay, NextGear is willing
9        to enter into a lending relationship with this
10       dealer at this level, whatever the credit
11       limit may be, based upon their analysis of the
12       overall dealer?  Is that a fair summation of
13       Underwriting as a whole?
14    A. Yeah.  That would be fair.
15    Q. Okay.  And you have not worked in Underwriting
16       before?
17    A. I have not.
18    Q. And then so if it's not part of Underwriting,
19       once the decision has been made, okay, we're
20       going to give Dealer X a line of credit, then
21       basically the entire process thereafter is
22       within your department?
23    A. That is correct.
24    Q. All right.  And that would be not only as it
25       relates to activation but then also just,
```

20

```
1        what, dealer management?  I think you said
2        account maintenance?
3     A. There are a few pieces, bank account changes,
4        address changes, e-mail changes, phone number
5        changes.  That's kind of what falls under that
6        account maintenance umbrella.
7     Q. All right.  So we're going to talk about kind
8        of these umbrellas here in a minute.  One
9        thing I forgot to ask you is, beyond the two
10       gentlemen sitting here next to you, did you
11       talk to anybody else about your deposition
12       today?
13    A. No.
14    Q. Have you talked to Arturo Mayoral?
15    A. I've spoken to him, yes.
16    Q. About this case?
17    A. No.
18    Q. When's the last time you talked to
19       Mr. Mayoral?
20    A. Within the last month through e-mail.
21    Q. All right.  And was it related to this dispute
22       in any way?
23    A. No.
24    Q. Was it related to other business?
25    A. That is correct.
```

21

```
1     Q. Have you ever talked to Mr. Mayoral at all
2        about this case at any time?
3     A. No, I have not.
4     Q. Never asked him any information related to
5        interrogatory answers?
6     A. No, I have not.
7           MR. JONES:  Jason, do you mean verbally
8        when you say, "talk"?
9           MR. DELK:  I don't know any way else.
10          MR. JONES:  Okay.
11    FURTHER QUESTIONS BY MR. DELK:
12    Q. Did you use sign language?
13    A. No.
14    Q. Okay.  Have you communicated in any way with
15       Mr. Mayoral about interrogatory answers?
16    A. No.
17    Q. Written communications?
18    A. No.
19    Q. E-mails?
20    A. No.
21    Q. Oral communications?
22    A. No.
23    Q. Sign language?
24    A. No.
25    Q. Okay.  All right.  So you spent basically an
```

**Andrew Gregory Ramey - - December 10, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

22

1    hour or so this morning talking about your
2    deposition today with your attorneys, and
3    that's all you did to prepare?
4 A. That is correct.
5 Q. And you looked at the documents you signed
6    under oath, the interrogatories?
7 A. That is correct.
8 Q. The interrogatory answers?
9 A. Yes.
10 Q. How many interrogatory answers have you
11    reviewed and signed under oath? Let me get a
12    sense.
13 A. Three.
14 Q. All right. Let's talk about going back to
15    your position as manager of Lending Services,
16    and now you're a senior manager of Lending
17    Services. Can you describe for me any
18    difference between a manager of Lending
19    Services versus senior manager of Lending
20    Services?
21 A. I have different folks that report to me. In
22    the past when I was a manager of Lending
23    Services, there were supervisors that reported
24    to me. Now I have managers and supervisors
25    that report to me, and really it's more of a

23

1    structural thing where the title was changed
2    so that I could have a manager report directly
3    to me.
4 Q. Okay. So one of the umbrellas you talked
5    about was application entry. What does that
6    mean? What does that entail?
7 A. Absolutely. A dealer who applies for a line
8    of credit submits documentation to NextGear,
9    to Lending, and I have a group of folks that
10    will take that information and either verify
11    it as it's already in the system or enter that
12    into our system, unload documents and
13    essentially get it ready for Underwriting.
14 Q. Okay. So the application entry aspect of the
15    process is really kind of first?
16 A. Correct.
17 Q. Then it goes to Underwriting, then it goes to
18    either approval, denial, and then thereafter,
19    right?
20 A. That is correct.
21 Q. All right. So if someone within your
22    department of Lending Services notes that
23    there's a problem or an irregularity with an
24    application, what's done with that?
25 A. It would be pended out. If there was an

24

1    irregularity or a problem, missing document,
2    it would be pended out for that either
3    clarification or missing piece before it was
4    moved forward.
5 Q. All right. Account maintenance, what do you
6    mean by that? What does that mean?
7 A. Sure. It would be already existing accounts,
8    approved and activated accounts that need some
9    kind of maintenance, whether that be, like I
10    said, a bank change, a bank account change, an
11    address change, an additional address for an
12    additional location, communication change,
13    e-mail, phone number, pretty much limited to
14    those things.
15 Q. All right. Contracting?
16 A. Once the underwriter has approved a request,
17    my team would review that approval, make sure
18    that what is approved is what is listed on the
19    contract as far as approval amount, terms of
20    the contract, pricing, things like that. They
21    would send the contract out via DocuSign.
22 Q. Is your team in Lending responsible for making
23    sure all the required documents are executed
24    as part of the contracting process?
25 A. Yes.

25

1 Q. What documents are required to be executed as
2    part of the contracting process?
3 A. It's our contract package, so the note, any
4    corresponding guaranties, an advanced
5    schedule. And let's see. An addendum for
6    Ready Auto, which is an additional product
7    that we offer. They can opt in or out. Our
8    collateral protection page, which, again, the
9    dealer can opt in or out of.
10 Q. Okay.
11 A. Those are the parts of the contract that are
12    required for activation.
13 Q. What about a Power of Attorney?
14 A. The Power of Attorney is not required to be
15    fully executed before account activation.
16 Q. Is it required, though, to be part of the
17    contract process as a whole?
18 A. It is sent once the contract is activated,
19    sent to the business, the signers on the
20    account.
21 Q. Yes or no, is a Power of Attorney required to
22    be executed by a dealer to have a contract in
23    place?
24 A. No.
25 Q. It's not? What happens if no Power of

**Andrew Gregory Ramey -  - December 10, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

26

```
1        Attorney is ever executed?
2   A.   What do you mean by ever?
3   Q.   I sign a contract with you.  I sign a personal
4        guaranty with you.  I never sign a Power of
5        Attorney.  What happens?
6   A.   At 30 days post activation, the account would
7        be locked.
8   Q.   And what does that mean?
9   A.   The dealer would not have any access to be
10       able to floor units.  Really that's it.
11  Q.   In your experience with NextGear, have you
12       ever seen any line of credit or loan where
13       you've allowed a dealer to sign a contract but
14       never sign a Power of Attorney and still get
15       money?
16  A.   No.
17  Q.   All right.  Activation is another role.  What
18       does that mean?
19  A.   So the contract comes back through DocuSign
20       once all the parties have signed.  My team
21       reviews those signatures, makes sure that
22       everything is signed where it should be
23       signed, then applies our president Scott
24       Maybee's signature to the contract, then
25       activates the account in our system.  So the
```

27

```
1        documents are automatically uploaded, but they
2        will go through a few steps where they
3        essentially turn on the account and activate
4        it so that the dealer can utilize their line
5        of credit.
6   Q.   You said, "review signatures."  Describe that.
7   A.   They're digital signatures, so they're not
8        reviewing for accuracy or anything like that.
9        They're just reviewing to make sure that
10       they're in the places that they should be in.
11  Q.   Does NextGear have any procedures, protocols,
12       whatever you want to call them, to try to look
13       for any fraud as relates to the application
14       process?
15  A.   We do.  We require that our -- when the
16       contract goes out, the contract is sent to
17       separate e-mails for each signer to ensure
18       that they each have an individual e-mail
19       account, that someone's not receiving all of
20       the contracts to one e-mail address.
21  Q.   The word stipulations, what does that mean to
22       you in the context of the contracting process?
23  A.   Requirements that are needed to be met before
24       the contract can be fully executed.
25  Q.   Whose requirements?
```

28

```
1   A.   NextGear, Lending.
2   Q.   Okay.  So when we're talking stipulations,
3        it's various requirements that NextGear
4        requires before a contract can be executed,
5        correct?
6   A.   Correct.
7   Q.   As part of your department of Lending
8        Services, does NextGear do anything as relates
9        to verifying the accuracy of signatures on any
10       of the documents?
11  A.   No.
12  Q.   What happens if someone within Lending
13       Services raises a question about, "Hey, this
14       signature doesn't match a signature on a
15       license," for example?  What happens?
16  A.   During the application process, if it's a --
17       not a digital application, if it's a paper
18       application, they will match the signature to
19       the driver's license, and if there's a big
20       discrepancy, they will push back.
21  Q.   Who's they?
22  A.   LSR, Lending Services representative.
23  Q.   Yeah.
24  A.   Someone on the team.
25  Q.   Nobody will know what that means when reading
```

29

```
1        the transcript.
2   A.   Sure.  Yeah.
3   Q.   We can probably figure it out.  But Lending
4        Services rep would -- someone would reach out
5        to who?
6   A.   It would be the sales executive that was
7        responsible for assisting the dealer and
8        submitting the application pack.
9   Q.   And then what would happen from there?
10  A.   We would require -- if it were a paper
11       application, we would require another paper
12       application be filled out and signed.
13  Q.   Okay.  Do you know if that happened in this
14       case?
15  A.   I do not.
16  Q.   Okay.  Do you know whether or not someone
17       within your department raised a question or
18       suspicion about the accuracy of Mr. Edward
19       Kessler's signature on an application?
20  A.   I do not.
21  Q.   You have no knowledge of that?
22  A.   None.
23  Q.   What should have happened if that happened,
24       meaning what's the protocol if somebody in the
25       department says, "We have a written
```

**SMITH REPORTING**
**www.smithreporting.net**

**Andrew Gregory Ramey -  - December 10, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

26

1    Attorney is ever executed?
2 A.  What do you mean by ever?
3 Q.  I sign a contract with you.  I sign a personal
4    guaranty with you.  I never sign a Power of
5    Attorney.  What happens?
6 A.  At 30 days post activation, the account would
7    be locked.
8 Q.  And what does that mean?
9 A.  The dealer would not have any access to be
10    able to floor units.  Really that's it.
11 Q.  In your experience with NextGear, have you
12    ever seen any line of credit or loan where
13    you've allowed a dealer to sign a contract but
14    never sign a Power of Attorney and still get
15    money?
16 A.  No.
17 Q.  All right.  Activation is another role.  What
18    does that mean?
19 A.  So the contract comes back through DocuSign
20    once all the parties have signed.  My team
21    reviews those signatures, makes sure that
22    everything is signed where it should be
23    signed, then applies our president Scott
24    Maybee's signature to the contract, then
25    activates the account in our system.  So the

27

1    documents are automatically uploaded, but they
2    will go through a few steps where they
3    essentially turn on the account and activate
4    it so that the dealer can utilize their line
5    of credit.
6 Q.  You said, "review signatures."  Describe that.
7 A.  They're digital signatures, so they're not
8    reviewing for accuracy or anything like that.
9    They're just reviewing to make sure that
10    they're in the places that they should be in.
11 Q.  Does NextGear have any procedures, protocols,
12    whatever you want to call them, to try to look
13    for any fraud as relates to the application
14    process?
15 A.  We do.  We require that our -- when the
16    contract goes out, the contract is sent to
17    separate e-mails for each signer to ensure
18    that they each have an individual e-mail
19    account, that someone's not receiving all of
20    the contracts to one e-mail address.
21 Q.  The word stipulations, what does that mean to
22    you in the context of the contracting process?
23 A.  Requirements that are needed to be met before
24    the contract can be fully executed.
25 Q.  Whose requirements?

28

1 A.  NextGear, Lending.
2 Q.  Okay.  So when we're talking stipulations,
3    it's various requirements that NextGear
4    requires before a contract can be executed,
5    correct?
6 A.  Correct.
7 Q.  As part of your department of Lending
8    Services, does NextGear do anything as relates
9    to verifying the accuracy of signatures on any
10    of the documents?
11 A.  No.
12 Q.  What happens if someone within Lending
13    Services raises a question about, "Hey, this
14    signature doesn't match a signature on a
15    license," for example?  What happens?
16 A.  During the application process, if it's a --
17    not a digital application, if it's a paper
18    application, they will match the signature to
19    the driver's license, and if there's a big
20    discrepancy, they will push back.
21 Q.  Who's they?
22 A.  LSR, Lending Services representative.
23 Q.  Yeah.
24 A.  Someone on the team.
25 Q.  Nobody will know what that means when reading

29

1    the transcript.
2 A.  Sure.  Yeah.
3 Q.  We can probably figure it out.  But Lending
4    Services rep would -- someone would reach out
5    to who?
6 A.  It would be the sales executive that was
7    responsible for assisting the dealer and
8    submitting the application pack.
9 Q.  And then what would happen from there?
10 A.  We would require -- if it were a paper
11    application, we would require another paper
12    application be filled out and signed.
13 Q.  Okay.  Do you know if that happened in this
14    case?
15 A.  I do not.
16 Q.  Okay.  Do you know whether or not someone
17    within your department raised a question or
18    suspicion about the accuracy of Mr. Edward
19    Kessler's signature on an application?
20 A.  I do not.
21 Q.  You have no knowledge of that?
22 A.  None.
23 Q.  What should have happened if that happened,
24    meaning what's the protocol if somebody in the
25    department says, "We have a written

Andrew Gregory Ramey -  - December 10, 2021
Nextgear Capital v. Premier Group Autos, et al.

30

1     application.  It doesn't match the license
2     signature of Mr. Kessler"?  What's required to
3     be done within your department?
4  A. **They would reach out to the sales executive,**
5     **let them know of the discrepancy, and ask for**
6     **a second application.**
7  Q. Okay.  And so that's the procedure to be
8     followed?
9  A. **Correct.**
10 Q. All right.  Is that a written procedure some
11    place, or how do you know that?
12 A. **It's not written.  It's something that, again,**
13    **in training through bringing on new employees,**
14    **it's something we train them and make sure**
15    **that they are knowledgeable of before they're**
16    **on their own and they're reviewing those**
17    **applications.**
18 Q. Why have that procedure in place?  What's the
19    importance of that?
20 A. **Well, we want to make sure that, to the best**
21    **of our ability, that the person signing the**
22    **application is the person that they're**
23    **claiming to be.**
24 Q. Makes sense, right?
25 A. **Yeah.**

31

1  Q. And the ultimate goal is to, what, prevent
2     fraud?  I mean, what's the policy behind that
3     procedure?
4  A. **The idea is to, to the best of our ability,**
5     **prevent someone from claiming to be someone**
6     **else and apply for credit on their behalf.**
7  Q. And taking it one step further, if the second
8     application isn't obtained, what happens next?
9  A. **The application would remain in a pending**
10    **status for 60 days.  If we don't receive**
11    **anything within -- by that day 60, we would**
12    **expire the application, so basically close it**
13    **out.**
14 Q. All right.  So when an irregularity is found
15    in the signatures on the application, it goes
16    to the sales executive.  The sales executive's
17    supposed to get another application, correct?
18 A. **Yes.**
19 Q. And then that second application the
20    executive's supposed to get is then provided
21    to Lending, correct?
22 A. **Correct.**
23 Q. And then Lending looks at the second
24    application and verifies do we have legit
25    signatures or do we not, right?

32

1  A. **That is correct.**
2  Q. All right.  And if in fact a second
3     application is never obtained, it goes into a
4     pending status, correct?
5  A. **That is correct.**
6  Q. And then after 60 days, if a second
7     application is never obtained, you close the
8     account out?
9  A. **Right.  Yeah.  The request is closed.**
10 Q. And you don't know whether or not that request
11    for a second application ever happened in this
12    case with Mr. Kessler, Mr. Blackburn, and
13    Premier Group Autos, correct?
14 A. **I do not know.**
15 Q. Do you know of anybody who would know if that
16    happened?
17 A. **Without reviewing it, no.  I don't know that**
18    **anyone would remember that off the top of**
19    **their head.**
20 Q. Would that be contained within a document some
21    place?  I mean, presumably it should be,
22    right, if a second application was obtained?
23 A. **Yes, it would be.**
24 Q. Did you assist at all in providing documents
25    responsive to our Request for Production of

33

1     Documents?
2  A. **I did not.**
3  Q. Do you know who did from the company?
4  A. **Not specifically, no.**
5  Q. Do you know generally?
6  A. **I could guess, but I don't want to do that.**
7  Q. But you have no idea as to who actually went
8     and gathered documents when we sent that
9     request for materials?
10 A. **That is correct.**
11 Q. Okay.  I'm trying to think where I was in the
12    list here.  So line modification is another
13    duty or responsibility you discussed.  Tell me
14    about that.  What does that mean?
15 A. **Those are existing accounts already activated**
16    **where a dealer makes a request for a change to**
17    **their account, again, whether that be raising**
18    **or lowering of their line, changing of**
19    **pricing, changing of any terms on the account.**
20    **They submit a request to Lending, and my team**
21    **will, again, get that request ready.  It's**
22    **essentially the same process as a new**
23    **application.  An underwriter will review it,**
24    **approve or decline or approve something in the**
25    **middle and then move to Contracting.**

**Andrew Gregory Ramey -  - December 10, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

38

1    the application entry process it was
2    discovered that there was a document missing
3    or anything like that, if the underwriter had
4    additional questions, they would push out for
5    those, the answers to those questions or
6    missing documentation before moving forward
7    with their decision.  So the dealer could
8    potentially have to provide additional
9    information.
10 Q.  Okay.  Is there certain thresholds in terms
11     of -- again, line of credit that's been issued
12     is $150,000.  Are there certain thresholds
13     where NextGear would look and say, "Okay,
14     that's what you were approved for originally.
15     Now you're asking for another hundred."  I
16     mean, is there -- I guess, how is that
17     analyzed or determined as to whether or not
18     that would be approved, right?
19 A.  Honestly, that would be more of a question for
20     an underwriter.
21 Q.  Okay.
22 A.  I don't -- that's not my cup of tea, so it's
23     not -- it's not something that I make a
24     decision on ever really.
25 Q.  Okay.  Do you find it peculiar in your

39

1    experience at all to have somebody approved
2    for $150,000 underlying line of credit, but
3    then they're able to get an increase of
4    $100,000 and then a couple months later or a
5    week later get another $100,000?  Do you find
6    that odd at all in your experience?
7 A.  No.
8 Q.  No?  That's normal course?
9 A.  I wouldn't say it's normal course, but it's
10     not an odd request.
11 Q.  Not an odd request.  Do you find it to be an
12     odd situation where NextGear has approved, in
13     essence, two increases that are more than the
14     underlying 150,000?
15 A.  No.
16 Q.  Not at all?
17 A.  No, not at all.
18 Q.  Okay.  How often have you seen that where
19     somebody has asked for increases that are --
20     that exceed the approved amount that they're
21     originally provided?
22 A.  Quite often.
23 Q.  Okay.
24 A.  Not immediately typically, but, yeah.  Over
25     the course of their history with NextGear,

40

1    yeah, if they have a need for a larger line,
2    they will ask for that.
3 Q.  How well do you know Arturo Mayoral?
4 A.  Not very well at all outside of
5    professionally.
6 Q.  All right.  You understand he is a notary
7    public?
8 A.  Yes.
9 Q.  How many notary publics are employed by
10     NextGear?
11 A.  I have no clue.
12 Q.  Do you know if that is a requirement of
13     NextGear to have sales executives be notary
14     publics?
15 A.  I don't believe that's a requirement, no.
16 Q.  All right.  Is it commonplace for sales
17     executives responsible for getting the
18     contract signed to actually be a notary
19     public?
20 A.  I've seen it.  I don't know how common it is.
21 Q.  How many sales executives are employed by
22     NextGear, if you know?
23 A.  I don't.
24 Q.  As part of the contracting process, you know,
25     you identified several documents that need to

41

1    be obtained, right?  How does NextGear keep
2    track of how those documents are getting
3    signed and executed and handled basically?
4 A.  We utilize DocuSign.  Once the contract goes
5    out, DocuSign essentially manages the
6    signatures, and it doesn't return to us
7    until -- when I say, "return to us," it
8    doesn't -- it doesn't alert us until all of
9    the signers have signed.
10 Q.  What is a Pre-Activation Quality Control Form?
11 A.  That, I am not aware of.
12     (Whereupon Exhibit No. 10 is marked for
13     identification.)
14 FURTHER QUESTIONS BY MR. DELK:
15 Q.  I'm handing you what's been marked previously
16     as Exhibit 10 from Arturo Mayoral's
17     deposition.  Have you seen Exhibit 10 before,
18     maybe not this specific one related to this
19     case but the general form?
20 A.  I have, yes.
21 Q.  Okay.  And describe what the Pre-Activation
22     Quality Control Form is and what purpose it
23     serves.  Walk me through it.
24 A.  Typically it's used more in the
25     million-dollar-line-of-credit-and-up space.

**Andrew Gregory Ramey - - December 10, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

42

1  Q.   Okay.
2  A.   There's a team that handles contracting for
3       that, again, reports up to me. Because
4       obviously with the higher amount of line of
5       credit, there's more risk. There's more due
6       diligence that's taken to make sure that the
7       contract that goes out is correct, and that's
8       what this form is for. It's to assist that
9       team into making sure that they checked all
10      the boxes and make sure that everything's
11      accurate.
12 Q.   And everything is obtained that's required to
13      be obtained, right?
14 A.   That is correct.
15 Q.   All right. So let's look at Exhibit 10. Look
16      to the far right. In Section II, the far
17      right, you see scoring. What is that? What
18      does that mean?
19 A.   I believe it's a scoring metric used by the
20      Quality Assurance team making sure that what
21      is on the form is correct.
22 Q.   Is this Pre-Activation Quality Control Form,
23      is this completed or handled by someone within
24      your department?
25 A.   Yes.

43

1  Q.   Okay. And who is the person that would be
2       doing this? I mean, obviously it looks like
3       "Prepared by Caitlin Arnold" and "Reviewed by
4       Jason Kubicki"?
5  A.   Yeah.
6  Q.   Do you know those individuals?
7  A.   I do.
8  Q.   All right. Who is Caitlin Arnold?
9  A.   She is -- she reports to me. She is on my
10      Quality Assurance team.
11 Q.   Okay. And then Jason Kubicki, who's that?
12 A.   He reports indirectly to me through another
13      manager, but he is a Lending analyst.
14      MR. DELK: And Kubicki, for the record, is
15      K-U-B-I-C-K-I.
16 FURTHER QUESTIONS BY MR. DELK:
17 Q.   And so this is part of what is used to make
18      sure documents are being handled correctly and
19      signed and obtained, et cetera, correct?
20 A.   Correct.
21 Q.   All right. And the scoring, you don't
22      understand what the scoring is, but you
23      believe it to be some sort of metric that is
24      used to make sure all the boxes are checked,
25      so to speak?

44

1  A.   That is correct.
2  Q.   And there, if you'll look at Section II, line
3       9, it says, "Power of Attorney, quantity 2,"
4       correct?
5  A.   Correct.
6  Q.   And then, "Documents correct? Yes," what does
7       that mean?
8  A.   That would mean that there were two Powers of
9       Attorney prepared and that they were prepared
10      correctly.
11 Q.   The actual document was prepared correctly?
12 A.   Yes.
13 Q.   All right. Isn't the Power of Attorney
14      documents that were used in 2018, 2019, and
15      even to this day, aren't they form documents?
16 A.   They are, but based on the name of the entity
17      and the name of the person signing, those
18      pieces have to be changed.
19 Q.   Those pieces?
20 A.   Yes.
21 Q.   Specific to the borrower the actual member of
22      the borrower signing the Power of Attorney or
23      whatever document it may be?
24 A.   That's correct.
25 Q.   All right. You can put that to the side.

45

1       Thank you.
2       (Whereupon Exhibit No. 18 is marked for
3       identification.)
4  FURTHER QUESTIONS BY MR. DELK:
5  Q.   I'm handing you what's been marked as
6       Exhibit 18. Exhibit 18, do you see that kind
7       of looks like a cutout of an Excel spreadsheet
8       or some sort of table there in the document?
9  A.   Yes.
10 Q.   Describe for me what that is.
11 A.   It's essentially a summary of what the
12      underwriter approved, some dealer information
13      as well, but it gives information about the
14      dealer and then also what the underwriter
15      approved and then any outstanding
16      stipulations.
17 Q.   And those stipulations are the requirements
18      for the contracting process, correct?
19 A.   Yes.
20 Q.   Yes?
21 A.   Yes.
22 Q.   And there on Exhibit 18, it lists two
23      different Powers of Attorney, correct?
24 A.   Yes.
25 Q.   And a Power of Attorney for Edward Kessler and

**Andrew Gregory Ramey -  - December 10, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

46

```
1        a Power of Attorney for James Blackburn,
2        correct?
3   A.   Yes.
4           (Whereupon Exhibit No. 19 is marked for
5        identification.  Note:  This exhibit was later
6        reidentified as Exhibit No. 40.)
7   FURTHER QUESTIONS BY MR. DELK:
8   Q.   I'm handing you what's been premarked as
9        Exhibit 19.  Take a look at Exhibit 19 for me.
10          MR. DELK:  For some reason, I'm missing a
11       copy.
12          MR. JONES:  I can pull it up here.
13          MR. DELK:  NG2004.
14  FURTHER QUESTIONS BY MR. DELK:
15  Q.   All right.  So Exhibit 19 consists of three
16       pages, NG002004 through 2006.  And it's an
17       e-mail chain, correct?
18  A.   Yes.
19  Q.   Okay.  Now, let's work on the last page, page
20       2006 or the third page of Exhibit 9 -- 19,
21       excuse me.  Kind of walk me through what's
22       happening here, if you know.  I understand
23       your actual e-mail is not on here, but I'm
24       guessing that you may have received this
25       through some of the general e-mails or no?
```

47

```
1   A.   I have not seen this, no.
2   Q.   You've never seen this document before?
3   A.   Correct.
4   Q.   Okay.  From your general knowledge and
5        understanding of the process, can you try to
6        describe or explain to me kind of the process
7        of what's happening here?
8   A.   Yeah.  Sure.
9   Q.   All right.  So the first e-mail on the third
10       page of Exhibit 19 looks like a FastTrack
11       Submission.  What is that?
12  A.   Yeah.  It looks to be a confirmation of a
13       submission by our -- FastTrack is the customer
14       summary, so details about the request, the
15       application that the SE typically gathers
16       based off of things like sales volume and
17       stuff like that.
18  Q.   So the sales executive, information he gathers
19       about the potential customer of NextGear?
20  A.   Correct.
21  Q.   Okay.  Now, look up at the next e-mail,
22       Friday, January 25, from Arturo Mayoral to
23       Sales.  "Please see attached documents for the
24       above application."  Do you have any
25       understanding of what's going on there?
```

48

```
1   A.   Yes.  It appears Art has submitted the
2        application and supporting documents to the
3        Sales team for review.
4   Q.   Okay.  And then the next e-mail up, again,
5        from NG Sales to Lending.  Now, the Lending
6        e-mail, ngc.Lending@coxautoinc.com, is that
7        that general e-mail you discussed before where
8        you would see it come in?
9   A.   Yes.
10  Q.   Okay.  So --
11  A.   Personally would not see it come in.  My team
12       would see it come in.
13  Q.   Your team would?
14  A.   Yes.
15  Q.   But you have access to this?
16  A.   I do.
17  Q.   Okay.  But this is probably one of many
18       applications you receive throughout the
19       company, and you're not analyzing each one,
20       you personally?
21  A.   That is correct.
22  Q.   Okay.  All right.  So tell me what's going on
23       here in this e-mail from NG Sales to Lending
24       on January 25, 2019, at 2:02 p.m.
25  A.   Sure.  This is an older process, but Sales
```

49

```
1        would submit the application once they would
2        review the application and supporting
3        documentation, send it over to Lending and
4        then let -- with this grid down here,
5        basically letting Lending know who to contact
6        in the event that questions are needed.
7   Q.   Okay.  All right.  And so why is it going to
8        Lending and not Underwriting?
9   A.   Sure.  Again, my team is responsible for
10       entering that information that's on the
11       application and then uploading the documents
12       and then making sure that the requirements to
13       go to Underwriting are fulfilled, and at that
14       point it would be sent to Underwriting.
15  Q.   Okay.  Got it.  All right.  The next e-mail,
16       it's on the first page of the Exhibit 19.  So
17       this is from the general Lending e-mail to MD
18       Accounts.  Who's that or what is that?
19  A.   That is the team that handles our
20       million-dollar-and-up requests.
21  Q.   Okay.  And so who's Tuesdae Artman?  Do you
22       know who that is?
23  A.   Yes.  She works for me.
24  Q.   Do you know her well?
25  A.   Not terribly, no.  I mean, she's worked for me
```

**Andrew Gregory Ramey -  - December 10, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

50

1      for two or three years, so, I mean, we have a
2      working relationship.
3  Q.  Do you find her to be trustworthy?
4  A.  Yeah, I do.
5  Q.  Do you trust her judgment?
6  A.  I do.
7  Q.  Have you ever had a situation where she has
8      been untrustworthy?
9  A.  No.
10 Q.  Have you ever had a situation where she was
11     wrong with respect to her review or analysis
12     of an application or a loan request?
13 A.  Yes.
14 Q.  You have?
15 A.  Yes.
16 Q.  Describe it for me.
17 A.  Specifically I can't speak to that because
18     it's a manual process.  Everybody makes
19     mistakes.
20 Q.  Describe Tuesdae Artman's responsibilities or
21     her job functions.
22 A.  Can I ask at this time or currently?
23 Q.  Great question.  How about now?  And then
24     we'll go backwards.
25 A.  Now she is responsible for contract -- sending

51

1      contracts and then activating new contracts as
2      well.
3  Q.  Okay.  And then how about in January of 2019?
4  A.  At that time, she was responsible for
5      application entry.
6  Q.  And that is doing what?
7  A.  The front end, so when the request comes to
8      Lending, entering the information into our
9      system, uploading the documents, and then
10     preparing it for Underwriting.
11 Q.  Kind of like the initial gatekeeper?
12 A.  Correct.
13 Q.  And verifying the accuracy of the information?
14 A.  No, not really.  That's more the underwriter's
15     responsibility.
16 Q.  All right.  So let's just look at this e-mail
17     from Ms. Artman.  And, by the way, you've
18     never seen Exhibit 19 before today right now
19     in this deposition?
20 A.  No.
21 Q.  Is that correct, you've never seen it?
22 A.  That is correct.
23 Q.  All right.  So it says, "Hello team.  This app
24     is ready for review.  Only the customer
25     summary, source e-mail, and app have been

52

1      uploaded.  Nothing has been dummied."  What
2      does that mean?
3  A.  Our system requires fields to be filled out
4      even to save an application.  So at times if
5      there's missing information, they'll enter
6      something as a placeholder until we receive
7      that information.
8  Q.  Okay.  "I would recommend taking a closer look
9      at the lot's address listed on the app.  He
10     might have it switched for his mailing
11     address."  Do you have any understanding what
12     that means or what she's saying to look at
13     closer?
14 A.  I think so.  Sometimes on the application, the
15     applicant will get an address switched,
16     whether it's a main address or an additional
17     address or a mailing address.  I think that's
18     what she's speaking to, but without talking to
19     her, I wouldn't know for sure.
20 Q.  So I'm sorry.  Say that again.  What is it?
21 A.  If a dealer has a -- for instance, if a dealer
22     has a mailing address that's different from
23     this primary address --
24 Q.  Got it.
25 A.  -- sometimes those can be switched.

53

1  Q.  Okay.  Then she continues, "As of now, I only
2      entered in the main lot address from the
3      dealer license and selected all three options
4      for it."  What are all three options for it?
5  A.  That would be a physical lot, a mailing
6      address, and a title release address.
7  Q.  And when we're talking about the physical lot,
8      where the actual cars will be that are
9      presumably being floored?
10 A.  That is correct.
11 Q.  Eventually being floored?
12 A.  That is correct.
13 Q.  And then she says, "Another thing to check
14     into is the signature for Edward.  Looks much
15     different than his ID."  Any understanding or
16     idea what's going on there?
17 A.  I don't want to assume for her, but I would
18     imagine she saw a discrepancy.
19 Q.  In Edward's signature?
20 A.  Correct.
21 Q.  When she analyzed the application versus
22     Edward's ID, she saw a discrepancy in the
23     signature, correct?
24 A.  Correct.
25 Q.  And when that happened, protocol or procedure

**Andrew Gregory Ramey -  - December 10, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

---

54

1  is they need to go get another application,
2  right?
3  A.  Correct.
4  Q.  And you don't know whether or not that
5  happened in this case?
6  A.  I don't know.
7  Q.  I'm handing you what's been previously
8  identified as Exhibit 19. I'll put the sticker
9  on the back of the document.
10  (Whereupon Exhibit No. 3 is marked for
11  identification.)
12  MR. JONES: Hey, Jason, before you do
13  that, it looks like we have a different
14  Exhibit 19 that was actually used with
15  Blackburn and then what was marked here as 19.
16  MR. DELK: I was just going off from
17  Mayoral. I didn't realize you used sequential
18  ones.
19  MR. JONES: Yeah, I know. We did
20  sequential ones, yeah.
21  MR. DELK: Okay.
22  MR. JONES: So we may want to renumber
23  that. Let me tell you what the last number I
24  have for --
25  MR. DELK: Why the hell didn't you use

---

55

1  letters?
2  MR. JONES: What's that?
3  MR. DELK: Why didn't you use letters?
4  You're the opposite side.
5  MR. JONES: I don't want AA, BB. It's a
6  mess.
7  MR. HOKE: You can go to Greek letters.
8  MR. JONES: Exactly. Oh, it's such a
9  to-do. So we ended Kessler with 37. Maybe we
10  just want to call it 40 just to be sure there
11  wasn't any astray. So if we want to just
12  enter a stipulation on the record that Exhibit
13  19, we can remark that as Exhibit 40?
14  MR. DELK: That's fine.
15  MR. JONES: Would that be -- that way
16  we'll have a clear record.
17  MR. DELK: That's fine. No worries.
18  Thank you for saying that.
19  FURTHER QUESTIONS BY MR. DELK:
20  Q.  All right. So I'm handing you what's been
21  previously identified or marked as Exhibit 3.
22  It's the specific application in this case.
23  Have you ever seen Exhibit 3 before today?
24  A.  No.
25  Q.  You can put it down. I don't need to ask you

---

56

1  about it if you haven't seen it.
2  As it relates to getting the Power of
3  Attorney executed, and I'm talking generally,
4  are there any sort of procedures or
5  requirements relating to the actual execution
6  of the Power of Attorney?
7  A.  It's required that it's signed in front of a
8  notary and signed wet ink.
9  Q.  Okay. Anything else?
10  A.  No, not that I'm aware of.
11  Q.  And are there any requirements as it relates
12  to who the notary is?
13  A.  No.
14  Q.  Meaning it doesn't need to be a NextGear
15  employee? It can be a notary public that
16  hangs a shingle out off Washington Street?
17  A.  That's correct.
18  Q.  Other than signing the interrogatories on
19  behalf of NextGear in this case, what other
20  involvement have you had as relates to Premier
21  Group Autos, this loan, Mr. Kessler, and
22  Mr. Blackburn? Anything?
23  A.  Nothing.
24  Q.  You weren't involved in the underlying
25  application process personally?

---

57

1  A.  No, not directly.
2  Q.  Other than the fact of being the manager, and
3  your people were working and doing what
4  they're supposed to be doing presumably?
5  A.  That is correct.
6  Q.  Do you know why you were selected? Well, let
7  me back up. Who contacted you about signing
8  the interrogatory answers?
9  A.  Gary Hoke.
10  Q.  Do you know why you were selected?
11  A.  I do not.
12  Q.  How often do you sign interrogatory answers on
13  behalf of NextGear Capital?
14  A.  If not that's the only time, it's been less
15  than five.
16  Q.  Other than this case, when's the last time you
17  signed interrogatory answers on behalf of
18  NextGear Capital?
19  A.  I don't remember.
20  Q.  More than a year ago?
21  A.  I don't remember.
22  Q.  More than two years ago?
23  A.  I don't remember.
24  Q.  What's your best estimate?
25  A.  Between a year and two years ago.

---

**Andrew Gregory Ramey - - December 10, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

---

66

1     whether it had to be wet-ink signed or
2     electronically signed, but I verified that
3     what was in it was accurate.
4  Q.  Do you know what 28 U.S. Code §1746 is?
5  A.  I do not.
6  Q.  Did you bother to look and see what that
7     means?
8  A.  I did not.
9  Q.  Look at page 11 of Exhibit 17.  That is your
10    electronic signature, correct?
11 A.  Yes.
12 Q.  And go ahead and read into the record what you
13    were verifying.
14 A.  "Pursuant to 28 U.S.C. §1746, I declare under
15    the penalties of perjury that the foregoing
16    statements are true and accurate to the best
17    of my knowledge, information, and belief."
18 Q.  And we already clarified that your knowledge,
19    information, and belief is based upon your
20    review of correspondence between Mr. Hoke and
21    Mr. Mayoral and your other memories and/or
22    experiences?
23 A.  Correct.
24 Q.  Take a look at page 5.  It said to describe in
25    detail -- this interrogatory, I'm sorry,

---

67

1     interrogatory No. 4 on page 5.  "Describe in
2     detail the circumstances surrounding the
3     signing of the Power of Attorney documents
4     which were signed by Blackburn and purportedly
5     by Kessler.  As part of your answer, state in
6     detail the reason why the Power of Attorney
7     documents were required to be signed, identify
8     who was present at the signing of the Power of
9     Attorney documents, the location of the
10    signing and all discussions had between
11    Blackburn and Arturo Mayoral before, during,
12    and after the signing of the Power of Attorney
13    documents."
14    All right.  Now, after various objections,
15    here is your answer on page 6.  It's actually
16    NextGear Capital's answer that you verified
17    was correct under oath.  "Subject to and
18    without waiver of the foregoing objections,
19    NextGear states that on April 18, 2019,
20    Blackburn and Kessler each signed a separate
21    Power of Attorney on behalf of borrower."
22    Where did you get that information from?
23 A.  I got it from the e-mail where Art verified
24    that that was true.
25 Q.  Okay.  "Kessler and Blackburn were each within

---

68

1     the presence of Arturo Mayoral at 1500 Cordova
2     Road, Suite 206, Fort Lauderdale, Florida
3     33316 at the time they signed the Power of
4     Attorney documents."  Same question.  Where
5     did you get that information from?
6  A.  From the e-mail.
7  Q.  Okay.  "Kessler provided his Pennsylvania
8     driver's license as identification, a picture
9     of which was taken contemporaneously with
10    Kessler's signing of the Power of Attorney
11    that he executed."  Where did you get that
12    from?
13 A.  The e-mail.
14 Q.  So there is an e-mail that states, from
15    Mr. Mayoral to Mr. Hoke, that he took a
16    picture of the Pennsylvania driver's license
17    at the signing of the Power of Attorney?
18 A.  Yes.
19    MR. JONES:  Objection.  That assumes
20    facts not in evidence.  He said that he got
21    an e-mail where Mr. Mayoral verified the
22    information.
23    MR. DELK:  He didn't say that.  Quit
24    testifying for the witness.
25 FURTHER QUESTIONS BY MR. DELK:

---

69

1  Q.  Yes or no?
2     MR. JONES:  Hold on.  I'm making an
3     objection.
4     MR. DELK:  Hold on.  Then make it.  What
5     is it?  Asked and answered?
6     MR. JONES:  Asked and answered.
7     MR. DELK:  Thank you.  That's it.
8  FURTHER QUESTIONS BY MR. DELK:
9  Q.  Yes or no?  Yes or no?  Did you review an
10    e-mail from Mr. Mayoral to Mr. Hoke that says,
11    "Kessler provided his Pennsylvania driver's
12    license as identification, a picture of which
13    was taken contemporaneously with Kessler's
14    signing of the Power of Attorney that he
15    executed"?
16 A.  I don't recall that specifically.
17 Q.  Then why did you put it in the answer?
18    MR. JONES:  Objection.  He's already
19    testified he didn't put it in the answer.
20 FURTHER QUESTIONS BY MR. DELK:
21 Q.  I'm sorry.  Mr. Hoke put it in the answer for
22    you; is that right?
23    MR. JONES:  Objection.  Asked and
24    answered.  He's already testified he doesn't
25    know who wrote the answer.

---

**Andrew Gregory Ramey -  - December 10, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

---

70

1  FURTHER QUESTIONS BY MR. DELK:
2  Q.  What did you do to verify the accuracy of that
3      statement?
4  A.  I trusted that Art's e-mail was correct.
5  Q.  So there is an e-mail that says that?
6  A.  I believe so, yes.
7      MR. JONES:  Objection.  Vague.  Says what?
8  FURTHER QUESTIONS BY MR. DELK:
9  Q.  Answer my question.  Yes or no?  Have you seen
10     an e-mail from Mr. Mayoral to anybody stating
11     that he took a picture of Mr. Kessler's
12     Pennsylvania driver's license
13     contemporaneously with Mr. Kessler's signing
14     of the Power of Attorney?
15 A.  I don't recall.
16 Q.  Okay.  If you can't recall that the e-mail
17     exists, then why did you verify that that was
18     accurate?
19 A.  Because this was six months ago.
20 Q.  I'm asking when you sat down -- you understand
21     what it is to be under penalty of perjury,
22     right?
23 A.  Yes.
24 Q.  You understand the importance of that?
25 A.  Yes.

---

71

1  Q.  You understand you're signing a document under
2      oath on behalf of your employer, NextGear
3      Capital?
4  A.  Yes.
5  Q.  You understand it's an important task?
6  A.  Yes.
7  Q.  All right.  So when you're saying that that's
8      true under penalty of perjury, what did you do
9      to verify it was accurate?
10 A.  I trusted that the information given to me was
11     accurate and that Art was being honest and
12     truthful.
13 Q.  All right.  So I haven't seen this e-mail that
14     says that he took a picture of the license,
15     and in fact, Mr. Mayoral said in his depo --
16     have you read his deposition?
17 A.  I have not.
18 Q.  Mr. Mayoral testified under oath that he never
19     took a picture of Mr. Kessler's license.
20 A.  Okay.
21 Q.  So you're telling me there's an e-mail that
22     Mr. Mayoral says he did?
23 A.  I don't know if it specifically says that.  I
24     would have to go back and look.
25 Q.  Do you have access to that e-mail?

---

72

1  A.  Not currently, no.
2  Q.  You have your e-mail on your phone, right?
3  A.  I don't have my phone with me.
4  Q.  You don't have a computer or any way to look
5      it up?
6  A.  Not on me, no.
7      MR. DELK:  We haven't seen that e-mail.
8      It hasn't been produced to us.
9      MR. JONES:  I don't -- I think it's
10     privileged.
11     MR. DELK:  How so?  We just talked about
12     it ad nauseam of what it says, and it goes
13     right to the heart of a misstatement under
14     oath.  We're entitled to see it.  Where is it?
15     MR. JONES:  It hasn't been produced, and
16     we're not going to produce it.  It was an
17     internal attorney-client privileged document
18     preparing responses to interrogatories in this
19     case.
20     MR. DELK:  Did you provide a privilege
21     log?
22     MR. JONES:  Do you want a privilege log?
23     You're supposed to request one.
24     MR. DELK:  No, you're not.  It's required
25     to be done at the time you make any claim of

---

73

1      privilege.
2      MR. JONES:  I didn't give you a privilege
3      log.  We still have time in the discovery
4      period, so if you want a privilege log, you
5      can get it.
6  FURTHER QUESTIONS BY MR. DELK:
7  Q.  So you believe there's an e-mail, though?
8  A.  I don't know.
9  Q.  You don't know.  Okay.
10     MR. JONES:  If you want to have your
11     associate provide the specific Request for
12     Production where you actually asked for that
13     document, I'll be happy to take it and look at
14     it to see if we even had to respond to it in
15     the first place.
16 FURTHER QUESTIONS BY MR. DELK:
17 Q.  All right.  So you think an e-mail that you
18     may or may not know exists is what you
19     reviewed to say that that was accurate?
20     You're relying on what Mr. Mayoral said in an
21     e-mail; is that what you're saying?
22 A.  I'm -- I'm relying that this would not have
23     been sent to me had it not been accurate.
24 Q.  Okay.  You've changed your answers again on
25     behalf of the company, right?

---

**SMITH REPORTING**
**www.smithreporting.net**

**Andrew Gregory Ramey -  - December 10, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

74

1          MR. JONES:  Objection.  Vague.  When?
2    FURTHER QUESTIONS BY MR. DELK:
3    Q.   Have you ever changed your answers?  Have you
4         ever changed your answer from interrogatory 4?
5    A.   **I believe there were other drafts that came,**
6         **yes.**
7    Q.   Okay.  And so your statement there that you
8         originally said in May of 2021 was accurate
9         under penalties of perjury is now no longer
10        accurate; isn't that right?
11   A.   **That is correct.**
12   Q.   All right.  How did you learn of that
13        information?
14   A.   **The -- the following interrogatory corrected**
15        **that information.**
16   Q.   In your amended answer?
17   A.   **Yes.**
18   Q.   But what did you learn, Andrew Ramey, a
19        representative of NextGear, what did you learn
20        that prompted you to change your interrogatory
21        answer?
22        MR. JONES:  Objection.  He's not
23        testifying as a representative of NextGear
24        here.  You said, "representative."  He was
25        verifying information on behalf of the company

75

1         in the interrogatories.
2    FURTHER QUESTIONS BY MR. DELK:
3    Q.   Did you sign interrogatory answers on behalf
4         of the company?  Yes or no?
5    A.   **Yes.**
6    Q.   Okay.  You didn't sign them on behalf of
7         Andrew Ramey, did you?
8    A.   **No.**
9    Q.   Okay.  Thank you.  So what did you learn to
10        change your interrogatory answer to say that
11        Mr. Kessler did not provide a copy of his
12        driver's license, a picture of which was taken
13        contemporaneously with the execution of a POA?
14   A.   **I learned that the picture was taken prior to**
15        **the signing of the Power of Attorney.**
16   Q.   And when did you learn that?
17   A.   **This morning.**
18   Q.   This morning?
19   A.   **Yeah.  I was reminded this morning.**
20   Q.   What is it?  Don't --
21   A.   **This was a --**
22   Q.   You have a chance to be truthful.
23   A.   **I am being truthful.**
24        MR. JONES:  Don't badger my witness,
25        please.

76

1          MR. DELK:  I'm not badgering the witness.
2          MR. JONES:  Yeah, you are.  I don't
3     appreciate the tone either.
4          MR. DELK:  I don't appreciate being lied
5     to in a federal case.
6    FURTHER QUESTIONS BY MR. DELK:
7    Q.   So here's what I want to know.  Did you just
8         learn of that this morning for the first time?
9    A.   **No.**
10   Q.   Oh, okay.  So when was it, then?
11   A.   **There was an e-mail.**
12   Q.   Another e-mail?
13   A.   **I don't recall when.  I can verify it.  I can**
14        **go back and check, but, again, this was six**
15        **months ago, and I don't recall when it was.**
16   Q.   I'm asking you when you learned that your
17        answer to interrogatory No. 4 was inaccurate,
18        and you said, "this morning."  Now you're
19        saying it was some other time.  When was it,
20        then?  When did you learn it, and what did you
21        learn?
22   A.   **Again, I learned that the picture was taken**
23        **before the Power of Attorney was signed.**
24   Q.   And you learned of that this morning, didn't
25        you?

77

1          MR. JONES:  Objection.  He's already
2     testified he doesn't know when it was taken.
3          MR. DELK:  He testified it was this
4     morning.  I'm just trying to now figure out
5     which is the true answer.
6          MR. JONES:  Look, if you've got a document
7     you want to talk to him about, you've got the
8     amended interrogatory.
9          MR. DELK:  Quit testifying for the
10    witness.
11         MR. JONES:  I'm not testifying.
12         MR. DELK:  Yes, you are.
13         MR. JONES:  I'm asking --
14         MR. DELK:  What's your objection?
15         MR. JONES:  -- if there's -- objection.
16    Asked and answered.
17         MR. DELK:  Thank you.  Now --
18         MR. JONES:  If there's a document you want
19    to refer him to, please refer him to this
20    document.  He's already made it clear he
21    doesn't recall.
22   FURTHER QUESTIONS BY MR. DELK:
23   Q.   You just testified that you learned of it this
24        morning, and then you tried to say, "Well, I
25        was reminded of it this morning."  I want to

**Andrew Gregory Ramey -  - December 10, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

78

```
1       know what really happened.  When did you learn
2       that your answer to interrogatory 4, you
3       personally, when did you learn it was
4       inaccurate?
5    A. This morning.
6    Q. Thank you.  Now --
7           MR. JONES:  We've been going an hour and
8       20 minutes.
9           MR. DELK:  No, we're not taking a break
10      right now.
11          MR. JONES:  Oh, no.  We are.
12          MR. DELK:  You want to talk to your
13      witness about what's happening right now.
14      We're not taking a break.
15          MR. JONES:  He agreed that we could take a
16      break.  You do not have a question pending.
17      We're going off the record.
18   FURTHER QUESTIONS BY MR. DELK:
19   Q.  You understand --
20          MR. DELK:  We're not going off the record
21      yet.
22   FURTHER QUESTIONS BY MR. DELK:
23   Q.  You understand you can't talk to your lawyers
24      about a pending question or your testimony
25      today?  You understand that?
```

79

```
1    A. Yes.
2    Q. You can't talk about your answers.  You
3       understand that?
4    A. Yes.
5           MR. JONES:  Yeah.  It's been an hour and
6       20 minutes.  We need to take a bathroom break.
7       Let's take a break.
8           MR. DELK:  I get why you want a break.
9           We can take a break, and you can go to the
10      bathroom.  Do you need to go to the bathroom?
11          THE WITNESS:  Yeah.
12          MR. JONES:  I do, too.
13          (BRIEF RECESS TAKEN.)
14   FURTHER QUESTIONS BY MR. DELK:
15   Q.  Mr. Ramey, during the break, did you happen to
16      talk about your testimony at all?
17   A. No.
18   Q. All right.  So it's true, isn't it, that you
19      have never read the amended interrogatory
20      answers and second amended interrogatory
21      answers, true?
22   A. That is not true.
23   Q. Or you read them this morning, right?
24   A. No.
25   Q. Oh.
```

80

```
1    A. I read them before I signed them.
2    Q. You did?
3    A. I did.
4    Q. Okay.  Did you pay attention to what was in
5       the documents?
6    A. I did.
7    Q. When did you sign or get the amended
8       interrogatory answers, the first amended?
9    A. I don't recall.
10   Q. How long ago?  Any idea?
11   A. A few months.
12   Q. And how did you come about doing amended
13      interrogatory answers?
14   A. They were provided to me by Gary Hoke.
15   Q. All right.  Pre filled out already?
16   A. Yes.
17   Q. Did you add any additional information?
18   A. I did not.
19   Q. Did you review any documents?
20   A. I did not.
21   Q. Did you verify the accuracy?
22   A. I did not.
23   Q. So you were just relying upon what Mr. Hoke
24      told you?
25   A. Yes.
```

81

```
1    Q. Did Mr. Hoke tell you they were accurate?
2    A. No.
3    Q. Did you have any questions for Mr. Hoke?
4    A. I did not.  I read them, and they were pretty
5       straightforward.
6    Q. Okay.  So help me, then, understand.  Let me
7       back up here.  Let's go back, actually, to the
8       interrogatories, the first ones, Exhibit 17.
9       You have them in front of you there?
10   A. Yes.
11   Q. Look at interrogatory 6.  It starts on page 7,
12      and your answer is in the top of page 8.  I'm
13      not going to read the entire interrogatory 6
14      into the record, but basically it's asking for
15      information as to why the Power of Attorney
16      was signed.  It said, "State with
17      particularity when you required the POA
18      documents to be signed; identify and describe
19      in detail all communications had with
20      Blackburn regarding the signing; state whether
21      you required the POA documents to be signed
22      prior to you lending money; and, identify all
23      documents that relate to the execution of the
24      POA."  Do you see that?
25   A. Yeah.
```

**Andrew Gregory Ramey -  - December 10, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

86

```
1        looked at, then, what financial document or
2        what within the system did you look at to
3        verify that NextGear began lending money to
4        borrower on April 16, 2019.
5    A.  I would have looked at our loan management
6        system, Discover, to see when that first floor
7        plan was entered.
8    Q.  Okay.  And would that correlate to actual
9        money going out the door into Premier Group
10       Autos's bank account?  Or describe that.
11   A.  Depending on a lot of different factors, yes,
12       it would have.
13   Q.  Okay.
14   A.  The system, depending on whether -- there's a
15       lot of different variables there, but, yes, it
16       would correlate.
17   Q.  So it's possible, isn't it, for example, if
18       you say it began lending money on April 16,
19       that it may have been processed by NextGear,
20       but actual money didn't hit the door or
21       actually go into the other account of Premier
22       Group Autos for a couple of days; is that
23       right?
24   A.  That's possible, yes.
25   Q.  Okay.  Do you know if that happened in this
```

87

```
1        case?
2    A.  I don't.
3    Q.  Okay.  But just because you, say, began
4        lending money on April 16, 2019, that doesn't
5        mean that money actually hit Premier Group
6        Autos's bank account, does it?
7    A.  Not necessarily.
8    Q.  Okay.  And then that's ultimately the critical
9        aspect, right, is when does the money hit the
10       borrower's bank account, right?
11   A.  Yes.
12   Q.  All right.  Take a look at page 9 of the
13       interrogatory answers, still on Exhibit 17.
14       There it's asking you to explain why you
15       denied certain Request for Admissions.  Do you
16       see that?
17   A.  I do.
18   Q.  Have you ever seen the Request for Admissions
19       in this case?
20   A.  No.
21   Q.  So look at the answer on page 10.  The answer
22       states, "NextGear states that it denied
23       Request for Admissions 1, 2, and 5 on the
24       grounds that Kessler did, in fact, sign the
25       Power of Attorney in front of Arturo Mayoral."
```

88

```
1        Do you see that?
2    A.  I do.
3    Q.  All right.  So tell me how you're able to
4        verify that that's an accurate statement if
5        you've never even seen the Request for
6        Admissions?
7    A.  Because when this was sent to me, I trusted
8        that Art did his job and made sure that the
9        Power of Attorney was signed.
10   Q.  How do you know what Request for Admissions 1,
11       2, or 5 even relates to?  How do you know it
12       relates to Art Mayoral or anything else?
13   A.  Based on the second half of that sentence.
14   Q.  Okay.  So you're assuming, right?
15   A.  Yes.
16   Q.  But you had no idea what Request for
17       Admissions 1, 2, or 5 were asking, right?
18   A.  No.
19   Q.  Is that right?
20   A.  Correct.
21   Q.  Is that still an accurate statement today?
22   A.  What statement is that?  This?
23   A.  The first sentence.
24   A.  I don't know.
25           MR. JONES:  Are you asking him whether
```

89

```
1        that's what NextGear's current answers are or
2        are you asking him whether that -- I'm sorry.
3        I'm lost.  Sorry.
4    A.  Can you ask me the question again, please?
5    Q.  You weren't confused until Mr. Jones said
6        something, were you?
7    A.  Well, I feel like you're trying to confuse me.
8    Q.  Yes or no?  Is it an accurate statement as you
9        sit here today, this first sentence, is it
10       accurate, "NextGear states that it denied
11       Request for Admissions 1, 2, and 5 on the
12       grounds that Kessler did in fact sign the
13       power of attorney in front of Arturo Mayoral"?
14       Is that accurate as you sit here today?  Yes
15       or no?
16   A.  At the time I signed it, I believed it to be
17       accurate.
18   Q.  Based upon what?
19   A.  Trusting that Art did his job and that the
20       folks that provided this to me did their job
21       as well.
22   Q.  Art did his job how?  What do you mean?
23   A.  Verifying that the Power of Attorney was
24       signed by the appropriate parties, and as a
25       notary, he notarized it.
```

**Andrew Gregory Ramey -  - December 10, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

90

1  Q.   And you agree with me that Art didn't do his
2       job, did he?
3  A.   **I don't know.  It certainly doesn't sound that**
4       **way.**
5  Q.   What do you mean?
6  A.   **I'm assuming -- I don't want to assume whether**
7       **or not Art did or didn't do his job, but the**
8       **fact that these were amended, something**
9       **changed.**
10 Q.   What changed?
11 A.   **Without reviewing both, again, because it's**
12      **been so long, I wouldn't be able to answer**
13      **that question.**
14 Q.   Reviewing both of what?
15 A.   **The interrogatories.**
16 Q.   I know, but I'm asking you what changed.  In
17      your knowledge, what changed to make you
18      change the answer or to amend them?
19 A.   **I don't recall.**
20 Q.   That's what you learned this morning, right?
21 A.   **No.**
22 Q.   Okay.  Then what is it that changed?
23 A.   **I don't recall.**
24 Q.   Okay.  How many times did you sign amended
25      interrogatory answers?

91

1  A.   **Three of them.**
2  Q.   Three total?
3  A.   **Yes.**
4  Q.   But you amended them twice?
5  A.   **Yes.**
6  Q.   And each time you received a request to sign
7       an amended interrogatory answer, was it from
8       Mr. Hoke to you via e-mail?
9  A.   **That is correct.**
10 Q.   Was there any further communication about why
11      an amendment needed to be made?
12 A.   **I don't recall.**
13 Q.   When you were asked to sign an amended
14      interrogatory answer the first time, did you
15      do any investigation?
16 A.   **I reviewed the document before I signed it.**
17 Q.   All right.  But you did nothing else beyond
18      that, right?
19 A.   **Right.**
20 Q.   Okay.  The second time you were requested to
21      sign a second amended interrogatory answer,
22      what happened?  Describe the process.
23 A.   **Gary e-mailed it to me, asked me to sign, and**
24      **I reviewed it, and I signed it and returned**
25      **it.**

92

1  Q.   You didn't sign it, though, did you?
2  A.   **I believe one of them I actually did sign.**
3  Q.   Really?
4  A.   **Yeah.  I -- wet ink, yes.**
5  Q.   And how did you send it back?
6  A.   **I scanned it and uploaded it and e-mailed it**
7       **back.**
8  Q.   Do you know if that was the first amended or
9       the second amended interrogatories?
10 A.   **I don't -- I mean, I could look at them and**
11      **tell you, but I don't recall off the top of my**
12      **head.**
13 Q.   Okay.  So the second amended interrogatories,
14      you received an e-mail from Mr. Hoke, correct?
15 A.   **Yes.**
16 Q.   And was there anything else contained within
17      that e-mail?
18 A.   **I don't recall.**
19 Q.   Okay.  And he requested you to sign the second
20      amended interrogatories, correct?
21 A.   **Yes.**
22 Q.   And what did you do?
23 A.   **I reviewed them and signed them.**
24 Q.   Okay.  Did you, after reviewing them or during
25      your review, did you do anything to verify

93

1       their accuracy?
2  A.   **Again, read them, and from my recollection,**
3       **nothing stood out to indicate to me that they**
4       **were incorrect, so, no, I didn't do any kind**
5       **of additional research or anything.**
6  Q.   You just blindly trusted what Mr. Hoke --
7  A.   **No, not blindly.**
8  Q.   Well, then tell me how you verified it.
9  A.   **Again, because the pieces that really applied**
10      **to me in my role are more based off of**
11      **experience and trusting that my team did their**
12      **job, I trusted.  Again, nothing stood out**
13      **to me as inaccurate, so I signed it and**
14      **returned it.**
15 Q.   You understand that originally you swore under
16      oath that a photo of Mr. Kessler's license was
17      taken contemporaneously with him signing an
18      alleged POA, right?
19 A.   **I do.**
20 Q.   Okay.  And then now, later, that's completely
21      different, and in fact they're saying
22      Mr. Kessler probably wasn't even there, and a
23      photo of his license wasn't taken
24      contemporaneously, right?
25 A.   **Yes.**

**Andrew Gregory Ramey -  - December 10, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

94

1  Q.  You understand that?
2  **A.  Yes.**
3  Q.  All right.  That didn't jump out to you as odd
4      or peculiar in any way?
5  **A.  No.  I believe that that would have been the**
6      **reason for the amended interrogatories.**
7  Q.  Did you ask any questions of why that's now
8      changing?
9  **A.  I did not.**
10     MR. JONES:  Again, if you had the
11     discussions with counsel, don't tell him what
12     those discussions with counsel were.  Okay?
13     THE WITNESS:  Okay.
14 FURTHER QUESTIONS BY MR. DELK:
15 Q.  But you didn't ask any questions about why
16     that change was being made?
17 **A.  I don't recall.**
18 Q.  Okay.  But you didn't do anything when the
19     first amended and the second amended
20     interrogatory answers were given to you other
21     than read them, sign them, and return them,
22     right?
23 **A.  Correct.**
24 Q.  So how do you know what's accurate between the
25     original, the amended, and the second amended?

95

1      How do you know what's what?  How do you know
2      what's right?  How do you know what's
3      truthful?
4  **A.  Yeah.  I'm trusting that the -- that Gary, who**
5      **sent it to me, was putting what was truthful**
6      **on there.**
7  Q.  But originally you thought it was truthful
8      because you apparently saw this e-mail where
9      Mr. Mayoral said, "I took a photos of his
10     license," right?
11 **A.  Yes.**
12 Q.  And you trusted that the first time?
13 **A.  Yes.**
14 Q.  And then later, they're saying, "Whoa, whoa.
15     Wait a minute.  I need you to sign something
16     else under oath that says that didn't happen."
17     That didn't cause you to ask any questions at
18     all?
19 **A.  No.  Again, without going back and looking at**
20     **all the e-mails, I don't recall if I asked**
21     **something, if I did, what it was.  It's just,**
22     **I mean, it's been a few months, and there's**
23     **been a lot of -- I get a lot of e-mails.**
24 Q.  Okay.  It's not every day you're being asked
25     to change your story under penalty of perjury

96

1      in a federal case, is it?
2  **A.  No.  I trusted that what was provided as far**
3      **as on Art's side and Gary's side was correct.**
4  Q.  You trusted what the in-house counsel of
5      NextGear Capital was telling you was correct,
6      right?
7  **A.  Yes.**
8  Q.  I asked you about whether or not Mr. Mayoral
9      had done his job, and you said, "Apparently
10     no," or, "It sounds that way," right?  Explain
11     that for me.  How do you believe Mr. Mayoral
12     failed to do his job correctly?
13 **A.  Based on the changes in the response, it seems**
14     **that the first response where he said he had**
15     **taken a picture wasn't accurate.**
16 Q.  Now, Mr. Mayoral testified he had never done
17     that.  So is Mr. Mayoral lying or are you?
18 **A.  I'm not lying.**
19     MR. JONES:  Objection.  Form.
20 FURTHER QUESTIONS BY MR. DELK:
21 Q.  Okay.  Well, Mr. Mayoral testified under oath
22     under penalty of perjury, just like you are
23     today and just like you were three times prior
24     in your interrogatory answers, that he never
25     took a picture of the license.  You understand

97

1      that?
2  **A.  I do.**
3  Q.  Okay.  So that didn't prompt you to ask
4      questions directly of Art Mayoral?
5  **A.  No, because, again, what I was signing at the**
6      **time I believed to be truthful and accurate.**
7  Q.  Okay.  But then the fact that the
8      interrogatory answers were changing two
9      different times, that's what leads you to
10     believe that in fact Mr. Mayoral didn't do his
11     job?
12 **A.  That's correct.**
13 Q.  Anything else other than the fact the
14     interrogatory answers changed?
15 **A.  No.**
16 Q.  Have you ever seen Mr. Kessler's license?
17 **A.  No.**
18 Q.  I'm showing you what's been marked as Exhibit
19     4.  Have you ever seen Mr. Kessler before?
20 **A.  No.**
21 Q.  Exhibit 4 is a copy or a picture -- it's a
22     photocopy of a picture of Mr. Kessler's
23     license.  You can see Mr. Kessler's signature
24     there, correct?
25 **A.  Yes.**

Andrew Gregory Ramey - - December 10, 2021
Nextgear Capital v. Premier Group Autos, et al.

98

1  Q.   All right.  I'm going to hand you Exhibit 3.
2       Do you see Mr. Kessler's signature on Exhibit
3       3 anywhere?
4  A.   It doesn't appear to be a good match, no.
5  Q.   I'm going to hand you what's been marked
6       previously as Exhibit 8.  It's the Power of
7       Attorney of Mr. Kessler.  Does that look like
8       Mr. Kessler's signature compared to his
9       license?
10 A.   Not exactly, no.
11 Q.   Would that cause you to raise some questions
12      in your role as senior managing or the senior
13      manager of Lending Services?
14 A.   No, because I wouldn't -- I don't see all of
15      the POAs that come through.  My team processes
16      them.
17 Q.   No.  I'm asking you in your experience in your
18      role, and you're sitting here right now today,
19      would that cause you to ask some questions?
20 A.   Yeah, it would.
21 Q.   Why?
22 A.   Because there's a bit of a discrepancy.
23 Q.   More than a bit, isn't there?
24 A.   Well, I mean, I'm not a handwriting expert.
25 Q.   I'm not asking for your handwriting-expert

99

1       opinion.  I'm just asking for common sense.
2  A.   Yeah.  No, they look different.
3  Q.   Thank you.  So when you did your -- or signed
4       off on the first amended interrogatory
5       answers, you did not speak with Mr. Mayoral,
6       correct?
7  A.   Not directly, no.
8  Q.   And, well, you didn't have any communication
9       with him?  I think you've already testified to
10      that?
11 A.   That is correct.  I didn't reach out to him.
12      He didn't reach out to me.
13 Q.   All right.  So then let me hand you what's
14      been marked as -- well, let's mark it as
15      Exhibit 42.
16           (Whereupon Exhibit No. 42 is marked for
17      identification.)
18 FURTHER QUESTIONS BY MR. DELK:
19 Q.   It is the amended -- the first amended
20      interrogatory answers.  Go to interrogatory 4,
21      which is the same interrogatory, but you amend
22      the answer.  The answer's there on page 6,
23      subject to and without waiving objections, but
24      I want you to go down to the fifth line of the
25      answer that starts with, "Blackburn had

100

1       previously..."  Do you see that?
2  A.   Yes.
3  Q.   So there it is.  "Blackburn had previously
4       provided Mayoral with a copy of Kessler's
5       Pennsylvania driver's license by e-mail."  Do
6       you see that sentence?
7  A.   Yes.
8  Q.   All right.  What did you do to verify that
9       that was accurate?
10 A.   I trusted that Art and what Gary had provided
11      me was accurate, yes.  I didn't do anything.
12 Q.   You did nothing?
13 A.   No.
14 Q.   You did nothing, correct?
15 A.   Correct.
16           MR. DELK:  You may have gotten a free
17      lunch, but I'm getting close to being finished
18      I think maybe.  I did that for your benefit.
19           THE WITNESS:  I appreciate that.
20           MR. JONES:  Never trust a lawyer when he
21      says he's almost done, by the way.
22           MR. JONES:  Yeah.  Only a couple thousand.
23           MR. JONES:  A couple thousand or two.
24      Overpromised, underdeveloped, right?
25           MR. DELK:  We can go off the record.

101

1           (BRIEF RECESS TAKEN.)
2           (Whereupon Exhibit No. 43 is marked for
3       identification.)
4  FURTHER QUESTIONS BY MR. DELK:
5  Q.   Mr. Ramey, I'm handing you what's marked as
6       Exhibit 43.  Can you tell me what Exhibit 43
7       is?  And for the record, it's NG0 -- basically
8       NG4.
9  A.   Balance Calculation for Written Off Account
10      Report.
11 Q.   Have you seen documents like this before in
12      your --
13 A.   No.
14 Q.   Okay.  Can you describe for me what this is
15      other than just reading me the title?  Do you
16      have an understanding?
17 A.   Based off my own knowledge, yeah, I really
18      don't.
19 Q.   Okay.
20 A.   Sorry.
21 Q.   No worries.  Have you ever seen a document
22      like this before?
23 A.   If I have, I don't recall.  It's not something
24      I come -- if I've come across it, very, very
25      rare.  It doesn't look familiar to me.

| Date of Review: | 3/25/2019 | |
|---|---|---|
| Reviewed by: | Kubicki, Jason | |
| Prepared by: | Arnold, Caitlin | |
| Other Reviewer or Preparer: | | |
| Legal Name: | Premier Group Autos LLC | |
| Account #: | 125308 | |
| Contract Type: | Full Contract | |

# Pre-Activation Quality Control Form

| SECTION I – Perfection Verification | | Documents Correct? | If any line items answered "NO", then COMMENTS ARE REQUIRED |
|---|---|---|---|
| 1 | UCC Filing | N/A | To be filed in FL |
| 2 | PMSI | N/A | |
| 3 | Non-Purchase Money Funding | N/A | |
| 4 | Other Document (If applicable) | N/A | |

| SECTION II – Contract Documents | | Quantity | Documents Correct? | If any line items answered "NO", then COMMENTS ARE REQUIRED | Scoring | | |
|---|---|---|---|---|---|---|---|
| | | | | | Value | Earned | Maximum |
| 5 | Cover Page | 1 | YES | | 1 | 1 | 1 |
| 6 | Promissory Note | 1 | YES | | 5 | 5 | 5 |
| 7 | Limit Amendment | 0 | N/A | | N/A | 0 | N/A |
| 8 | Advance Schedule | 1 | YES | | 5 | 5 | 5 |
| 9 | Power of Attorney (POA) | 2 | YES | | 5 | 10 | 10 |
| 10 | Individual Guaranty (IPG) | 2 | YES | | 4 | 8 | 8 |
| 11 | ACH Authorization | 1 | YES | Routing # needs updated in Discover | 4 | 4 | 4 |
| 12 | Collateral Protection (Insurance) | 1 | YES | | 1 | 1 | 1 |
| 13 | Ready Logistics Addendum | 1 | YES | | 1 | 1 | 1 |
| 14 | Reserve Agreement | 0 | N/A | | N/A | 0 | N/A |
| 15 | Monthly Billing Addendum (Rental ACH) | 0 | N/A | | N/A | 0 | N/A |
| 16 | Negative Pledge Addendum (wo/exceptions) | 0 | N/A | | N/A | 0 | N/A |
| 17 | Negative Pledge Addendum (w/exceptions) | 0 | N/A | | N/A | 0 | N/A |
| 18 | ACH SS | 0 | N/A | | N/A | 0 | N/A |
| 19 | Utilization Addendum | 0 | N/A | | N/A | 0 | N/A |
| 20 | Debt to Equity/Financial Covenants | 0 | N/A | | N/A | 0 | N/A |
| 21 | GPS Tracker | 0 | N/A | | N/A | 0 | N/A |
| 22 | Trust Guaranty | 0 | N/A | | N/A | 0 | N/A |
| 23 | Corporate Guaranty | 0 | N/A | | N/A | 0 | N/A |
| 25 | Title Holding | 0 | N/A | | N/A | 0 | N/A |
| | | | | SCORING TOTAL | | 35 | 35 |
| | | | | | | Earned | Maximum |

Additional Comments



EXHIBIT
10
Ramey
12-10-21

NGo00844
V7 bradc 08/16/18
NXTGR–000000844

PENGAD 800-631-6989

## IN THE UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

NEXTGEAR CAPITAL, INC.

    *Plaintiff,*

v.

PREMIER GROUP AUTOS, LLC,
JAMES M. BLACKBURN, and
EDWARD A. KESSLER,

    *Defendants.*

CASE NO. 1:20-cv-00354-TWP-DLP

---

### NEXTGEAR CAPTIAL, INC.'S OBJECTIONS AND RESPONSES TO EDWARD A. KESSLER'S FIRST INTERROGATORIES

---

NextGear Capital, Inc. ("NextGear"), respectfully submits its Objections and Responses to Edward A. Kessler's ("Kessler") First Interrogatories, and states:

### GENERAL OBJECTIONS

NextGear generally objects to Kessler's Interrogatories and their accompanying instructions and definitions on the following grounds, each of which are expressly incorporated by reference into each of the answers below:

**A. Obligations Beyond the Rules.** NextGear objects to the Interrogatories and their accompanying instructions and definitions to the extent they purport to impose requirements in addition to or beyond those contained in the Rules. NextGear will respond to Kessler's discovery requests in accordance with the Rules, and NextGear rejects anything to the contrary contained in Kessler's discovery requests.



EXHIBIT

17

Ramey
12-10-21

**B. Discovery Is Incomplete and Ongoing**. Discovery is incomplete and ongoing in this litigation, and NextGear reserves the right to modify or amend its responses based on subsequent discovery or investigation in this litigation.

**C. Privilege**. NextGear objects to the Interrogatories and their accompanying instructions and definitions to the extent they purport to seek information that is protected by the attorney-client privilege, or any other legally recognized privilege, including information, materials, or documents that contain or reflect confidential communications between or among NextGear and its attorneys or that are otherwise privileged. Accordingly, unless otherwise indicated, NextGear's answers exclude from their scope all privileged information. Inadvertent disclosure of privileged information by NextGear is not a waiver of any applicable privilege. NextGear further objects to the extent any part of any Request seeks sensitive or confidential corporate information not related to the subject matter of this lawsuit.

**D. Work Product**. NextGear objects to each Interrogatory and the accompanying instructions and definitions to the extent they seek information, materials, or documents protected by the work-product doctrine, including such information, materials, or documents that were prepared in anticipation of litigation by or for NextGear or its representatives, or that contain or reflect the work product, mental impressions, conclusions, opinions, or legal theories of an attorney or representative of NextGear concerning this litigation.

**E. Trial Preparation Materials**. NextGear objects to each Interrogatory and the accompanying instructions and definitions to the extent that it seeks to discover information that was acquired or developed in anticipation of litigation.

**F.  Unduly Burdensome or Facts Known By Others**. NextGear objects to each Interrogatory and the accompanying instructions and definitions to the extent it is intended to impose upon NextGear an obligation to provide or describe facts and events beyond the personal knowledge of NextGear and within the knowledge of other parties. NextGear should not bear the unnecessary and duplicative burden of investigating such matters when Kessler has received or may receive discovery on such matters from the party or parties directly involved.

**G.  Unduly Burdensome and Immaterial or Lack of Time References**. NextGear objects to each Interrogatory and the accompanying instructions and definitions to the extent it includes no time references and purports to require NextGear to provide information concerning an unlimited period of time.

**H. Other Objections**. In answering any Interrogatory, NextGear does not waive or intend to waive:

(1)  objections as to competency, relevancy, materiality, or admissibility;

(2)  rights to object on any grounds to the use of any responses herein in any subsequent proceedings, including the trial of this or any other actions;

(3)  objections as to vagueness or ambiguity; and

(4)  rights to object further to this or any other requests in this proceeding.

In providing answers to Kessler's Interrogatories, NextGear does not stipulate, concede, or otherwise admit that the subject matter of the Interrogatory or of the Answers is relevant, material, or admissible. All objections to the introduction of Kessler's Interrogatories and/or NextGear's Answers are expressly preserved and may be interposed at any time at or before trial.

Subject to the foregoing general objections, and without waiving them, NextGear's specific objections and Answers are set forth below.

## ANSWERS TO INTERROGATORIES

1.  Identify all individuals who have assisted in answering these Interrogatories, the Requests for Admission and the Requests for Production served on Defendant in this case.

**ANSWER:** Andrew Ramey, Manager of Lending Services for NextGear Capital, Inc. Arturo Mayoral, Sr. Client Solutions Executive for NextGear Capital, Inc.

2.  Identify all persons/individuals who have knowledge with respect to any of the allegations in Plaintiff's Complaint and/or the defenses/denials asserted in Plaintiff's Answer to the Counterclaim; and state what knowledge each person/individual has and/or claims to have.

**ANSWER:** NextGear objects to this Interrogatory as overly broad and unduly burdensome because it seeks identification of "all persons/individuals" with knowledge concerning "any" of the allegations in NextGear's Complaint without limitation as to time, location, subject, or information within NextGear's care, custody, or control. NextGear further objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege.

Subject to and without waiver of the foregoing objections, NextGear states that the witnesses identified in its Disclosures and Witness and Exhibit Lists (and any supplements thereto) represent NextGear's best knowledge regarding persons that may have knowledge pertaining to the allegations in NextGear's Complaint.

4

3.   Identify all individuals you plan to call as a witness in the trial of this matter and describe in detail the nature of the testimony of each such person/individual You plan to call as a witness.

**ANSWER:** NextGear objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege and work-product doctrine.

Subject to and without waiver of the foregoing objections, while NextGear has not yet finalized any decisions about which witnesses it will call for trial, NextGear states that the witnesses identified in its Disclosures and Witness and Exhibit Lists (and any supplements thereto) are those that NextGear may call as a witness for trial, whether in person or through a deposition.

4.   Describe in detail the circumstances surrounding the signing of the Power of Attorney documents which were signed by Blackburn and purportedly by Kessler. As part of your answer, state in detail the reason why the Power of Attorney documents were required to be signed, identify who was present at the signing of the Power of Attorney documents, the location of the signing and all discussions had between Blackburn and Arturo Mayoral before, during and after the signing of the Power of Attorney documents.

**ANSWER:** NextGear objects to this interrogatory as overly broad, unduly burdensome, vague, and ambiguous. The interrogatory is overly broad and unduly burdensome because it seeks description of "the circumstances surrounding the signing of the Power of Attorney documents" without limitation as to time, location, subject, or information within NextGear's care, custody, or control. The interrogatory is vague and ambiguous because the term "circumstances surrounding the signing of the Power of

5

Attorney documents" is undefined and provides no basis for NextGear to determine what information constitutes a "circumstance" or not.

Subject to and without waiver of the foregoing objections, NextGear states that on April 18, 2019, Blackburn and Kessler each signed a separate Power of Attorney on behalf of Borrower. Kessler and Blackburn were each within the presence of Arturo Mayoral at 1500 Cordova Rd Suite 206, Fort Lauderdale, Florida 33316 at the time they signed the Power of Attorney documents. Kessler provided his Pennsylvania driver's license as identification, a picture of which was taken contemporaneously with Kessler's signing of the Power of Attorney that he executed. Kessler signed the Power of Attorney without reservation and of his own free will.


5. Identify all lending transactions for the past five (5) years in which You did not require a power of attorney document to be signed by the Borrower as part of the lending process and/or overall lending transaction and identify all documents that relate to and/or refer to each such lending transaction identified.

**ANSWER:** NextGear objects to this Interrogatory as overly broad, unduly burdensome, vague and ambiguous, not relevant to any party's claim or defense, and not proportional to the needs of the case. Specifically, the interrogatory would require NextGear to engage in a manual search of hundreds of transactions on an issue that is not relevant to any dispute between the parties, and the burden and expense of such a search grossly outweighs any benefit for this case. NextGear further objects to the interrogatory as overly broad, unduly burdensome, and calling for the protected and confidential financial information of third persons not involved in this case because it seeks "all documents" that relate to any lending transactions responsive to the

6

interrogatory—information that is wholly unrelated to any issue between Kessler and NextGear.

6. With respect to the subject Demand Promissory Note and Loan and Security Agreement with PGA, describe in detail why You required the subject Power of Attorney documents to be signed by Kessler and Blackburn. As part of your answer, also provide the following information: (a) state with particularity when You required the Power of Attorney documents to be signed by Kessler and/or Blackburn; (b) identify and describe in detail all communications had with Blackburn regarding the signing of the subject Power of Attorney documents; (c) state whether You required the Power of Attorney documents to be signed prior to You lending any money to PGA; and (d) identify all documents that relate to and/or refer to the execution of the Power of Attorney documents and/or communications had surrounding the execution of the Power of Attorney documents.

**ANSWER:** NextGear objects to this interrogatory as overly broad, unduly burdensome, and vague and ambiguous in that it seeks information about "all communications had with Blackburn" and identification of "all documents that related to and/or refer to the execution of the Power of Attorney documents and/or communications had surrounding the execution of the Power of Attorney documents" without limitation as to time, scope, and whether the information sought is within NextGear's care, custody, or control. NextGear further objects to the interrogatory as requesting information protected by the attorney-client privilege and work-product doctrine.

7

Subject to and without waiver of the foregoing objections, NextGear states that it required the execution of a Power of Attorney on behalf of Borrower as part of its ordinary, customary, and regular business practices, primarily in order to allow NextGear to process titles on Borrower's behalf as needed, in order to prevent unnecessary delays in Borrower's business flow. NextGear informed Blackburn and Kessler that a Power of Attorney needed to be executed on Borrower's behalf as part of NextGear's ordinary, customary, and regular business practices. NextGear did not require the execution of either Power of Attorney prior to lending money to Premier Group Autos, LLC, and in fact began lending money to Borrower on April 16, 2019, two days before any Power of Attorney was executed on Borrower's behalf. Documents pertaining to the two Power of Attorney forms executed on Borrower's behalf will be produced as part of NextGear's responses to Kessler's Requests for Production, subject to NextGear's objections therein.

7. Identify and describe in detail the compensation structure and/or compensation package for Arturo Mayoral for the years 2018, 2019 and 2020 and state whether the signing of new loans and/or new loan agreements for customers in any way impacts Mayoral's compensation, and if so, to what extent. As part of your answer also identify any and all documents that relate to and/or refer to Arturo Mayoral's compensation for the years 2018, 2019 and 2020.

**ANSWER:** NextGear objects to this Interrogatory as calling for the personal and confidential financial information of a third party. NextGear further objects to this request as overly broad, unduly burdensome, calling for information not relevant to any party's claim or defense, and not proportional to the needs of the case.

8. Describe in detail why You did not require the Power of Attorney documents to be electronically signed by Kessler when you originally sent the Loan Documents (as that term is defined in the Note) to Kessler via DocuSign for Kessler's electronic signature.

**ANSWER:** NextGear states that Indiana law, which governs the terms of the Note, required, at the time the two Power of Attorney documents were executed, that all Powers of Attorney must be notarized in order to be effective.  Therefore,  physical signatures were required.

9. For each of the accompanying Requests for Admission (served simultaneously with these Interrogatories) which you do not admit without qualification, please state with specificity and in detail how the fact or facts which you are requested to admit are not true and state what you contend the true facts are. Please identify by name, address, employer, telephone number, and relationship to you, if any, each and every witness that you contend can or will so testify, and describe each and every document which you believe refutes the fact or facts which you have been requested to admit.

If you give lack of information or knowledge as a reason for failing to admit or deny a Request, please describe all efforts made by you or your attorney or insurance company to obtain the necessary information to permit you to admit or deny the Request, and which you contend constitutes "reasonable inquiry" within the meaning of Rule 36 of the Indiana Rules of Trial Procedure. Also, with respect to each of the above Requests for Admission that you contend you can neither admit nor deny, please state separately whether you presently know of any facts or any person who knows of any facts that tend

9

to prove that the matters set forth in such Request for Admission are not true. For each Request for Admission with respect to which you claim to have such facts or know of any such person, please do the following:

(a) State in detail all facts which you contend tend to disprove the truth of the Request for Admission;

(b) Identify by name, address and telephone number, and relationship to you, if any, each and every person who you contend can or will testify that the Request for Admission is not true; and

(c) Identify and describe each and every document or item of tangible evidence that you contend will prove that the Request for Admission is not true and identify the present custodian of each and every document by name, address and telephone number and relationship to you, if any.

**ANSWER:** NextGear states that it denied Requests for Admissions 1, 2, and 5 on the grounds that Kessler did, in fact, sign the Power of Attorney in front of Arturo Mayoral. Request for Admission 3 was denied because NextGear was willing to lend money, and did in fact lend money, to Premier Group Autos, LLC beginning on **April 16, 2019**—two days prior to the execution of any Power of Attorney for Borrower. Request for Admission 4 was denied for the reasons stated therein.

10

**VERIFICATION**

Pursuant to 28 U.S.C. §1746, I declare under the penalties of perjury that the foregoing statements are true and accurate to the best of my knowledge, information, and belief.

NEXTGEAR CAPITAL, INC.

BY: /s/ Andrew Ramey
PRINTED:  Andrew Ramey
TITLE: Manager of Lending Services

AS TO OBJECTIONS:

Dated: May 21, 2021                          Respectfully submitted,

/s/ Brian S. Jones
DAVID J. JURKIEWICZ
Attorney No. 18018-53
BRIAN S. JONES
Attorney No. 29578-49
**BOSE MCKINNEY & EVANS LLP**
111 Monument Circle, Suite 2700
Indianapolis, IN 46204
Telephone: (317) 684-5000
Facsimile: (317) 684-5173
djurkiewicz@boselaw.com
b.jones@boselaw.com

**ATTORNEYS FOR NEXTGEAR CAPITAL, INC.**

11

## CERTIFICATE OF SERVICE

I certify that on May 21, 2021, a true and correct copy of the above and foregoing was served via email on all counsel of record.

/s/ Brian S. Jones
BRIAN S. JONES

4096483

12

**From:** MD Accounts
**To:** Chandler, Will (CAI - Carmel); Mayoral, Arturo (CAI - Carmel)
**Cc:** Hollowell, Faith (CAI - Carmel); MD Accounts
**Subject:** RE: New_Financial Summary_Premier Group Autos LLC.xlsm 175328
**Date:** Monday, March 25, 2019 1:47:37 PM
**Attachments:** image001.png
image002.png

Arturo, please see updated approval below:

Approved to increase to $150k retail
Retail TP D60/30/30 – F80/45/45 –R3 0 – C%10
Finance Type: Core
James Blackburn 50% Member
Edward Kessler 50% Member

| Dealer Name | | | | |
|---|---|---|---|---|
| **NPMS:** | NextGear Int'l/C.Blvd | **Approved Amount** | | |
| **Dealer Type:** | Core | **Approved Amount** | | |
| **Dealer Phone #:** | (954) 440-0717 | **Approved Terms** | | |
| **Dealer Address:** | 11 SW 12th Ave Ste 103 Bldg 59 | **Approved Amount** | | |
| **PM:** | William Chandler | **Approved Terms** | | |
| **RD:** | Arturo Mayoral | **STIPULATION COMMENTS** | | |
| **Underwriter** | F Hollowell | | | |
| **STIPULATIONS** | | | | |
| Promissory Note | | $150,000 | | |
| Advance Schedule: Core | | D60/30/30 – F80/45/45 –R3 0 – C%10 x | | |
| Power Of Attorney | | Edward Kessler | | |
| Power Of Attorney | | James Blackburn | | |
| Guarantor - Personal | | Edward Kessler | | |
| Guarantor - Personal | | James Blackburn | | |
| ACH Authorization & Request | | | | |
| Insurance Certificate | | | | |
| IRS form 8821- Information Release Document - completed by Client | | | | |
| UCC Filing | | UCC filed for Premier Group Autos LLC in the State of FL | | |
| Ready Logistics Addendum | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | **Operational Stipulations** | |
| Other | | Dealer going to floor only x portion of the value on the vehicle $80k with NGC and remaining value on x a dealer in round note every. NGC will require MSO's dc | | |

Thank you,
Caitlin Arnold



---

**From:** Hollowell, Faith (CAI - Carmel)
**Sent:** Monday, March 25, 2019 10:32 AM
**To:** MD Accounts <ngc MDLending@coxautoinc.com>
**Cc:** Pederson, Brittany (CAI - Carmel) <Brittany.Pederson@coxautoinc.com>
**Subject:** RE: New_Financial Summary_Premier Group Autos LLC.xlsm
Stips have been updated and uploaded to discover; Ready for contracts

**From:** Redini, Luke (CAI - Carmel)
**Sent:** Monday, March 25, 2019 8:15 AM
**To:** Hollowell, Faith (CAI - Carmel) <Faith.Hollowell@coxautoinc.com>
**Subject:** New_Financial Summary_Premier Group Autos LLC.xlsm

Faith,

Please update the stipulations based on the relook decision, upload Financial Summary and send to MDLending

Thanks,

Luke Redini
Vice President, Sales – and Lending
14700 Finch's-Ct Ste
Carmel IN 46032
A: xx/ xx4



# SOT Vehicle Report

**Business:** Overfinch Miami (125308)

**Buyer Business Status:** Terminated

**LOC Type:** All

**Run Date:** 5/21/2021 3:34 PM

**Flooring Status:** Both (Approved & Written Off)

**Unit Status:** CUV, SAU, SOT

**Requested By:** Gary Hoke

| Stock # | Date Floored | Vehicle Description | VIN | Original Amount | Principal Balance | Written Off Principal | Vehicle Status |
|---|---|---|---|---|---|---|---|
| 7 | 5/9/2019 | 2019 Land Rover Range Rover | SALGS5RE4KA551428 | $ 39,999.00 | $ 32,489.19 | $ 32,489.19 | SOT |
| 8 | 6/5/2019 | 2018 Land Rover Range Rover Evoque | SALVP2RX6JH295033 | $ 33,100.00 | $ 29,790.00 | $ 29,790.00 | SAU |
| 10 | 8/6/2019 | 2002 HUMMER H1 TDSL | 137FA84352E197749 | $ 42,700.00 | $ 42,700.00 | $ 42,700.00 | SAU |
| 11 | 9/10/2019 | 2019 LAND ROVER RANGE ROVER V8 | SALGS5RE6KA530077 | $ 45,000.00 | $ 45,000.00 | $ 45,000.00 | SAU |
| 12 | 9/11/2019 | 2019 LAND ROVER RANGE ROVER V8 | SALGS5RE5KA548540 | $ 99,999.00 | $ 99,999.00 | $ 99,999.00 | SAU |
| 14 | 9/19/2019 | 2019 Land Rover Range Rover | SALGS2RE6KA546018 | $ 95,000.00 | $ 95,000.00 | $ 95,000.00 | SOT |
| **Total: 6 Records** | | | | **$ 355,798.00** | **$ 344,978.19** | **$ 344,978.19** | |



EXHIBIT
41
Ramer
12-10-21
PENGAD 800-631-6989

NXFGR-000000118

NG000118

# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

NEXTGEAR CAPITAL, INC.

    *Plaintiff,*

v.

PREMIER GROUP AUTOS, LLC,
JAMES M. BLACKBURN, and
EDWARD A. KESSLER,

    *Defendants.*

CASE NO. 1:20-cv-00354-TWP-DLP

---

## NEXTGEAR CAPITAL, INC.'S AMENDED OBJECTIONS AND RESPONSES TO EDWARD A. KESSLER'S FIRST INTERROGATORIES

---

NextGear Capital, Inc. ("NextGear"), respectfully submits its Amended Objections and Responses to Edward A. Kessler's ("Kessler") First Interrogatories, and states:

### GENERAL OBJECTIONS

NextGear generally objects to Kessler's Interrogatories and their accompanying instructions and definitions on the following grounds, each of which are expressly incorporated by reference into each of the answers below:

**A. Obligations Beyond the Rules.** NextGear objects to the Interrogatories and their accompanying instructions and definitions to the extent they purport to impose requirements in addition to or beyond those contained in the Rules. NextGear will respond to Kessler's discovery requests in accordance with the Rules, and NextGear rejects anything to the contrary contained in Kessler's discovery requests.



EXHIBIT

42

Ramey
12-10-21

**B. Discovery Is Incomplete and Ongoing.** Discovery is incomplete and ongoing in this litigation, and NextGear reserves the right to modify or amend its responses based on subsequent discovery or investigation in this litigation.

**C. Privilege.** NextGear objects to the Interrogatories and their accompanying instructions and definitions to the extent they purport to seek information that is protected by the attorney-client privilege, or any other legally recognized privilege, including information, materials, or documents that contain or reflect confidential communications between or among NextGear and its attorneys or that are otherwise privileged. Accordingly, unless otherwise indicated, NextGear's answers exclude from their scope all privileged information. Inadvertent disclosure of privileged information by NextGear is not a waiver of any applicable privilege. NextGear further objects to the extent any part of any Request seeks sensitive or confidential corporate information not related to the subject matter of this lawsuit.

**D. Work Product.** NextGear objects to each Interrogatory and the accompanying instructions and definitions to the extent they seek information, materials, or documents protected by the work-product doctrine, including such information, materials, or documents that were prepared in anticipation of litigation by or for NextGear or its representatives, or that contain or reflect the work product, mental impressions, conclusions, opinions, or legal theories of an attorney or representative of NextGear concerning this litigation.

**E. Trial Preparation Materials.** NextGear objects to each Interrogatory and the accompanying instructions and definitions to the extent that it seeks to discover information that was acquired or developed in anticipation of litigation.

**F.  Unduly Burdensome or Facts Known By Others**. NextGear objects to each Interrogatory and the accompanying instructions and definitions to the extent it is intended to impose upon NextGear an obligation to provide or describe facts and events beyond the personal knowledge of NextGear and within the knowledge of other parties. NextGear should not bear the unnecessary and duplicative burden of investigating such matters when Kessler has received or may receive discovery on such matters from the party or parties directly involved.

**G.  Unduly Burdensome and Immaterial or Lack of Time References**. NextGear objects to each Interrogatory and the accompanying instructions and definitions to the extent it includes no time references and purports to require NextGear to provide information concerning an unlimited period of time.

**H. Other Objections**. In answering any Interrogatory, NextGear does not waive or intend to waive:

(1) objections as to competency, relevancy, materiality, or admissibility;

(2) rights to object on any grounds to the use of any responses herein in any subsequent proceedings, including the trial of this or any other actions;

(3) objections as to vagueness or ambiguity; and

(4) rights to object further to this or any other requests in this proceeding.

In providing answers to Kessler's Interrogatories, NextGear does not stipulate, concede, or otherwise admit that the subject matter of the Interrogatory or of the Answers is relevant, material, or admissible. All objections to the introduction of Kessler's Interrogatories and/or NextGear's Answers are expressly preserved and may be interposed at any time at or before trial.

3

Subject to the foregoing general objections, and without waiving them, NextGear's specific objections and Answers are set forth below.

## ANSWERS TO INTERROGATORIES

1.  Identify all individuals who have assisted in answering these Interrogatories, the Requests for Admission and the Requests for Production served on Defendant in this case.

**ANSWER:** Andrew Ramey, Manager of Lending Services for NextGear Capital, Inc. Arturo Mayoral, Sr. Client Solutions Executive for NextGear Capital, Inc.

2.  Identify all persons/individuals who have knowledge with respect to any of the allegations in Plaintiff's Complaint and/or the defenses/denials asserted in Plaintiff's Answer to the Counterclaim; and state what knowledge each person/individual has and/or claims to have.

**ANSWER:** NextGear objects to this Interrogatory as overly broad and unduly burdensome because it seeks identification of "all persons/individuals" with knowledge concerning "any" of the allegations in NextGear's Complaint without limitation as to time, location, subject, or information within NextGear's care, custody, or control. NextGear further objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege.

Subject to and without waiver of the foregoing objections, NextGear states that the witnesses identified in its Disclosures and Witness and Exhibit Lists (and any supplements thereto) represent NextGear's best knowledge regarding persons that may have knowledge pertaining to the allegations in NextGear's Complaint.

4

3. Identify all individuals you plan to call as a witness in the trial of this matter and describe in detail the nature of the testimony of each such person/individual You plan to call as a witness.

**ANSWER:** NextGear objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege and work-product doctrine.

Subject to and without waiver of the foregoing objections, while NextGear has not yet finalized any decisions about which witnesses it will call for trial, NextGear states that the witnesses identified in its Disclosures and Witness and Exhibit Lists (and any supplements thereto) are those that NextGear may call as a witness for trial, whether in person or through a deposition.

4. Describe in detail the circumstances surrounding the signing of the Power of Attorney documents which were signed by Blackburn and purportedly by Kessler. As part of your answer, state in detail the reason why the Power of Attorney documents were required to be signed, identify who was present at the signing of the Power of Attorney documents, the location of the signing and all discussions had between Blackburn and Arturo Mayoral before, during and after the signing of the Power of Attorney documents.

**ANSWER:** NextGear objects to this interrogatory as overly broad, unduly burdensome, vague, and ambiguous. The interrogatory is overly broad and unduly burdensome because it seeks description of "the circumstances surrounding the signing of the Power of Attorney documents" without limitation as to time, location, subject, or information within NextGear's care, custody, or control. The interrogatory is vague and ambiguous because the term "circumstances surrounding the signing of the Power of

5

Attorney documents" is undefined and provides no basis for NextGear to determine what information constitutes a "circumstance" or not.

Subject to and without waiver of the foregoing objections, NextGear states that on April 18, 2019, Blackburn and Kessler each signed a separate Power of Attorney on behalf of Borrower. Kessler and Blackburn were each within the presence of Arturo Mayoral ("Mayoral") at 1500 Cordova Rd Suite 206, Fort Lauderdale, Florida 33316 at the time they signed the Power of Attorney documents. Blackburn had previously provided Mayoral with a copy of Kessler's Pennsylvania driver's license by e-mail. Mayoral reviewed the copy of Kessler's driver's license and confirmed that Kessler appeared to be the same person identified in the photograph on the copy of Kessler's driver's license, and that Kessler's signature on the Power of Attorney appeared to match the signature shown on the copy of Kessler's driver's license. Kessler signed the Power of Attorney without reservation and of his own free will.

5.   Identify all lending transactions for the past five (5) years in which You did not require a power of attorney document to be signed by the Borrower as part of the lending process and/or overall lending transaction and identify all documents that relate to and/or refer to each such lending transaction identified.

**ANSWER:** NextGear objects to this Interrogatory as overly broad, unduly burdensome, vague and ambiguous, not relevant to any party's claim or defense, and not proportional to the needs of the case. Specifically, the interrogatory would require NextGear to engage in a manual search of hundreds of transactions on an issue that is not relevant to any dispute between the parties, and the burden and expense of such a search grossly outweighs any benefit for this case. NextGear further objects to the

6

interrogatory as overly broad, unduly burdensome, and calling for the protected and confidential financial information of third persons not involved in this case because it seeks "all documents" that relate to any lending transactions responsive to the interrogatory—information that is wholly unrelated to any issue between Kessler and NextGear.

6. With respect to the subject Demand Promissory Note and Loan and Security Agreement with PGA, describe in detail why You required the subject Power of Attorney documents to be signed by Kessler and Blackburn. As part of your answer, also provide the following information: (a) state with particularity when You required the Power of Attorney documents to be signed by Kessler and/or Blackburn; (b) identify and describe in detail all communications had with Blackburn regarding the signing of the subject Power of Attorney documents; (c) state whether You required the Power of Attorney documents to be signed prior to You lending any money to PGA; and (d) identify all documents that relate to and/or refer to the execution of the Power of Attorney documents and/or communications had surrounding the execution of the Power of Attorney documents.

**ANSWER:** NextGear objects to this interrogatory as overly broad, unduly burdensome, and vague and ambiguous in that it seeks information about "all communications had with Blackburn" and identification of "all documents that related to and/or refer to the execution of the Power of Attorney documents and/or communications had surrounding the execution of the Power of Attorney documents" without limitation as to time, scope, and whether the information sought is within NextGear's care, custody, or control. NextGear further objects to the interrogatory as

7

requesting information protected by the attorney-client privilege and work-product doctrine.

Subject to and without waiver of the foregoing objections, NextGear states that it required the execution of a Power of Attorney on behalf of Borrower as part of its ordinary, customary, and regular business practices, primarily in order to allow NextGear to process titles on Borrower's behalf as needed, in order to prevent unnecessary delays in Borrower's business flow. NextGear informed Blackburn and Kessler that a Power of Attorney needed to be executed on Borrower's behalf as part of NextGear's ordinary, customary, and regular business practices. NextGear did not require the execution of either Power of Attorney prior to lending money to Premier Group Autos, LLC, and in fact began lending money to Borrower on April 16, 2019, two days before any Power of Attorney was executed on Borrower's behalf. Documents pertaining to the two Power of Attorney forms executed on Borrower's behalf will be produced as part of NextGear's responses to Kessler's Requests for Production, subject to NextGear's objections therein.

7.  Identify and describe in detail the compensation structure and/or compensation package for Arturo Mayoral for the years 2018, 2019 and 2020 and state whether the signing of new loans and/or new loan agreements for customers in any way impacts Mayoral's compensation, and if so, to what extent. As part of your answer also identify any and all documents that relate to and/or refer to Arturo Mayoral's compensation for the years 2018, 2019 and 2020.

**ANSWER:** NextGear objects to this Interrogatory as calling for the personal and confidential financial information of a third party. NextGear further objects to this

8

request as overly broad, unduly burdensome, calling for information not relevant to any party's claim or defense, and not proportional to the needs of the case.

Subject to and without waiver of these objections, and pursuant to the Court's July 13, 2021 order, NextGear directs Defendant to documents produced by NextGear contemporaneously with these responses.

8. Describe in detail why You did not require the Power of Attorney documents to be electronically signed by Kessler when you originally sent the Loan Documents (as that term is defined in the Note) to Kessler via DocuSign for Kessler's electronic signature.

**ANSWER:** NextGear states that Indiana law, which governs the terms of the Note, required, at the time the two Power of Attorney documents were executed, that all Powers of Attorney must be notarized in order to be effective. Therefore, physical signatures were required.

9. For each of the accompanying Requests for Admission (served simultaneously with these Interrogatories) which you do not admit without qualification, please state with specificity and in detail how the fact or facts which you are requested to admit are not true and state what you contend the true facts are. Please identify by name, address, employer, telephone number, and relationship to you, if any, each and every witness that you contend can or will so testify, and describe each and every document which you believe refutes the fact or facts which you have been requested to admit.

If you give lack of information or knowledge as a reason for failing to admit or deny a Request, please describe all efforts made by you or your attorney or insurance company

to obtain the necessary information to permit you to admit or deny the Request, and which you contend constitutes "reasonable inquiry" within the meaning of Rule 36 of the Indiana Rules of Trial Procedure. Also, with respect to each of the above Requests for Admission that you contend you can neither admit nor deny, please state separately whether you presently know of any facts or any person who knows of any facts that tend to prove that the matters set forth in such Request for Admission are not true. For each Request for Admission with respect to which you claim to have such facts or know of any such person, please do the following:

(a) State in detail all facts which you contend tend to disprove the truth of the Request for Admission;

(b) Identify by name, address and telephone number, and relationship to you, if any, each and every person who you contend can or will testify that the Request for Admission is not true; and

(c) Identify and describe each and every document or item of tangible evidence that you contend will prove that the Request for Admission is not true and identify the present custodian of each and every document by name, address and telephone number and relationship to you, if any.

**ANSWER:** NextGear states that it denied Requests for Admissions 1, 2, and 5 on the grounds that Kessler did, in fact, sign the Power of Attorney in front of Arturo Mayoral. Request for Admission 3 was denied because NextGear was willing to lend money, and did in fact lend money, to Premier Group Autos, LLC beginning on **April 16, 2019**—two days prior to the execution of any Power of Attorney for Borrower. Request for Admission 4 was denied for the reasons stated therein.

10

## VERIFICATION

Pursuant to 28 U.S.C. §1746, I declare under the penalties of perjury that the foregoing statements are true and accurate to the best of my knowledge, information, and belief.

NEXTGEAR CAPITAL, INC.

BY: _____

PRINTED:  Andrew Ramey

TITLE: Senior Manager of Lending Services


AS TO OBJECTIONS:

Dated: July 21, 2021

Respectfully submitted,

/s/ Brian S. Jones
DAVID J. JURKIEWICZ
Attorney No. 18018-53
BRIAN S. JONES
Attorney No. 29578-49
**BOSE MCKINNEY & EVANS LLP**
111 Monument Circle, Suite 2700
Indianapolis, IN 46204
Telephone: (317) 684-5000
Facsimile: (317) 684-5173
djurkiewicz@boselaw.com
b.jones@boselaw.com

**ATTORNEYS FOR NEXTGEAR CAPITAL, INC.**

12

## CERTIFICATE OF SERVICE

I certify that on July 21, 2021, a true and correct copy of the above and foregoing was served via email on all counsel of record.

/s/ Brian S. Jones
BRIAN S. JONES

4163079

13