UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA

NEXTGEAR CAPITAL, INC.,      )
                             )
        Plaintiff,           )
                             )   CASE NO.
vs.                          )   1:20-cv-00354-TWP-DLP
                             )
                             )
PREMIER GROUP AUTOS, LLC,    )
JAMES M. BLACKBURN, and      )
EDWARD A. KESSLER,           )
                             )
        Defendants.          )


THE DEPOSITION UPON ORAL EXAMINATION OF

A R T U R O     M A Y O R A L,

    a witness produced and sworn before me, Donna
T. Feider, a Notary Public at large in and for the
State of Indiana, taken on behalf of the Defendant,
at the offices of Bose McKinney & Evans, LLP, 111
Monument Circle, Suite 2700, Indianapolis, Marion
County, Indiana, on Thursday, the 22nd day of July,
2021, commencing at approximately 10:05 a.m.,
pursuant to the Federal Rules of Trial Procedure,
pursuant to Notice.

EXHIBIT
**Exhibit C**

**Arturo Mayoral - CONFIDENTIAL - July 22, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

---

2

A P P E A R A N C E S

FOR THE PLAINTIFF NEXTGEAR CAPITAL, INC.:

    Brian Jones, Esq.

    BOSE MCKINNEY & EVANS, LLP

    111 Monument Circle

    Suite 2700

    Indianapolis, IN  46204

    b.jones@boselaw.com

FOR THE DEFENDANT EDWARD A. KESSLER:

    Jason R. Delk, Esq.

    DELK MCNALLY

    211 South Walnut Street

    Muncie, IN  47305

    delk@delkmcnally.com

FOR THE DEFENDANTS PREMIER GROUP AUTOS, LLC
AND JAMES M. BLACKBURN:

    Richard A. Rocap, Esq.

    ROCAP LAW FIRM

    10293 North Meridian Street

    Suite 175

    Carmel, IN  46290

    rar@rocap-law.com

ALSO PRESENT:

    Gary Hoke

    Edward A. Kessler (telephonically)

*

---

4

I N D E X   O F   E X H I B I T S

C O N T I N U E D

Plaintiff's Deposition Exhibits        PAGE

Ex. 10 - Pre-Activation Quality Control Form..144

Ex. 11 - 2019 Incentive Compensation Plan:

    Sr. Client Solutions Executive......145

Ex. 12 - NextGear policies, NG002203 through

    NG002208...........................152

Ex. 13 - NextGear Internal Credit Guidelines,

    Effective June 1, 2021.............156

Ex. 14 - 6/6/2019 to 6/13/2019 e-mail exchange

    between Arturo Mayoral and Jason

    Kubicki, Subject:  Premier Group

    Autos LLC - 125308.................159

Ex. 15 - 9/6/2019 e-mail to Claudia Coello

    from Lending@nextgearcapital.com......163

Ex. 16 - 3/11/19 Performance Improvement Plan..165

Ex. 17 - NextGear Capital, Inc.'s Objections

    and Responses to Edward A. Kessler's

    First Interrogatories................174

*

---

3

I N D E X   O F   E X A M I N A T I O N

                   PAGE

DIRECT EXAMINATION........................05

  Questions By:  Mr. Delk

CROSS-EXAMINATION.........................186

  Questions By:  Mr. Rocap

REDIRECT EXAMINATION......................192

  Questions By:  Mr. Delk

CROSS-EXAMINATION.........................194

  Questions By:  Mr. Jones

FURTHER REDIRECT EXAMINATION.................195

  Questions By:  Mr. Delk

I N D E X   O F   E X H I B I T S

Plaintiff's Deposition Exhibits    PAGE

Ex. 1 - Photocopy of Pennsylvania driver's

    license...............................54

Ex. 2 - 6/11/2021 letter to Richard Rocap

    from Jason Delk; Subpoena to Testify

    at Deposition to Arturo Mayoral.......59

Ex. 3 - Confidential Dealer Application........84

Ex. 4 - Photocopy of Pennsylvania driver's

    license..............................103

Ex. 5 - 3/3/2021 e-mail exchange between

    Arturo Mayoral and Jordan Cox.........105

Ex. 6 - Discover transcript...................115

Ex. 7 - Salesforce transcript.................118

Ex. 8 - Edward Kessler Power of Attorney......141

Ex. 9 - James Blackburn Power of Attorney.....141

*

---

5

1       (The witness is sworn by the court

2    reporter at 10:05 a.m., at which time the

3    following proceedings are had:)

4

5       A R T U R O   M A Y O R A L,

6    having been duly sworn to tell the

7    truth, the whole truth and nothing but

8    the truth relating to said matter, is

9    examined and testifies as follows:

10  DIRECT EXAMINATION,

11    QUESTIONS BY MR. DELK:

12  Q.  Good morning.  If you could state and spell

13    your name for the record, please.

14  A.  **Yes.  My name is Arturo Mayoral, A-R-T-U-R-O,**

15    **last name M-A-Y-O-R-A-L.**

16  Q.  And, Mr. Mayoral, how old are you?

17  A.  **Fifty-five.**

18  Q.  And your date of birth?

19  A.  **February 22, 1966.**

20  Q.  Have you ever had your deposition taken

21    before?

22  A.  **First time.**

23  Q.  All right.  So I'm going to try to lay some

24    ground rules for us to make sure we have a

25    good, clean record today because obviously

---

**Arturo Mayoral - CONFIDENTIAL - July 22, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

6

1   you can see the court reporter sitting next
2   to what would be your left, my right, and
3   trying to take down everything we say today.
4   So one of the most important things is to try
5   to not talk over one another.  At times
6   you'll notice this is a very conversational
7   type of proceeding where you're already going
8   to anticipate what the answer to my question
9   is or what my question's going to be, and
10  you're going to start to talk, and that's
11  talking over one another.  That's common,
12  natural, human interaction, but it makes for
13  a difficult record.  So if you could try to
14  wait until I complete my question before
15  giving an answer, that will be helpful.
16  Okay?
17  A.   Absolutely.
18  Q.   All right.  Now, one of the other things,
19  which is normal, you and I are sitting here
20  looking at each other, talking, we will use a
21  lot of times head nods or head shakes to say
22  "yeah" or "no" or "uh-uh" or "uh-huh."
23  Again, it makes it difficult for the court
24  reporter.
25  A.   Of course.

7

1   Q.   So if you could try to give, you know, verbal
2   responses and avoid the uh-huhs or uh-uhs,
3   that would likewise help to get a good record
4   today.
5   A.   Yes.
6   Q.   Okay.  A couple other things.  When I ask a
7   question and you give me an answer, I'm going
8   to make an assumption that, A, you understood
9   my question, and, B, you gave me a truthful
10  and accurate response.  Are those fair
11  assumptions to make?
12  A.   Correct.
13  Q.   Okay.  This is not a, you know, a contest of
14  a sprint.  This is more of a marathon.  So if
15  at any time you need to take a break, go to
16  the restroom, get coffee, stretch your legs,
17  whatever it may be, just let me know, and
18  we'll try to accommodate that request.  Okay?
19  A.   I appreciate that.
20  Q.   And the only request I have of you is that if
21  there is a question pending, I would ask that
22  you go ahead and give me an answer to that
23  question before taking the break.
24  A.   Correct.
25  Q.   Okay.  Is there anything that you have had,

8

1   whether it be medicine or something similar
2   to that, that would affect your memory or
3   anything like that in the last 24 hours?
4   A.   Absolutely not.
5   Q.   Okay.  You feel like you have a rather good
6   memory?
7   A.   For the last 24 hours, absolutely.
8   Q.   Okay.  All right.  So --
9   A.   Pre pandemic, another issue.
10  Q.   Understood.  Understood.  All right.  Well,
11  let's just start with a little bit of
12  background.  I'm sure your lawyer helped get
13  you ready for today --
14  A.   He did.
15  Q.   -- and explained to you kind of maybe even
16  the types of question I was going to ask, but
17  let's just go through your background just so
18  we can get an understanding of who you are,
19  where you're from, that type of thing.  So
20  you've already given me your age.  I know
21  you've come from Florida for today's
22  deposition, which we appreciate.  Thank you.
23  A.   That is correct.
24  Q.   And you hail from Fort Lauderdale; is that
25  right?

9

1   A.   Fort Lauderdale area, actually the town of
2   Southwest Ranches.
3   Q.   Southwest?
4   A.   Ranches.
5   Q.   Ranches?
6   A.   Yes.
7   Q.   And would that be north, south, east, or
8   west?
9   A.   That's west Broward County.
10  Q.   Okay.  It wouldn't be east of Fort Lauderdale
11  because you'd be in the ocean?
12  A.   In the ocean, correct.  No.  It's borderline
13  with the Everglades in Broward County.
14  Q.   Oh, great.  You know, you heard us talking
15  about COVID before we went on the record.  My
16  wife and I stayed down in southwest Florida
17  for the months of January and February to
18  beat the winter, and I did it about 15 years
19  too soon because I'm not ready to retire yet,
20  but now this coming winter, I'm going to be
21  terribly jealous of your location, so I was
22  in that area quite a bit.  Really enjoyed it.
23  A.   Great time of year to go.
24  Q.   And can you give me your home address,
25  please.

**Arturo Mayoral - CONFIDENTIAL - July 22, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

10

1   A.    Sure.  It's 16620 Southwest 52nd Place,
2         Southwest Ranches, Florida 33331.
3   Q.    And are you currently married?
4   A.    Correct.
5   Q.    And who is your spouse?
6   A.    My spouse is Vivian, V-I-V-I-A-N, last name
7         A-F-O-N-S-O, Afonso.
8   Q.    And do you have any children?
9   A.    I have a daughter named Vivian Mayoral, age
10        16.
11  Q.    How long have you been married to Vivian?
12  A.    Seventeen years.
13  Q.    I won't ask you for the actual anniversary
14        date.
15  A.    May 1.
16  Q.    Okay, May 1.  You knew it.
17  A.    They'll never forgive me if I don't.
18        MR. JONES:  I instruct you not to answer
19        unless you know it.  Right?  I don't want to
20        get you in trouble.
21  FURTHER QUESTIONS BY MR. DELK:
22  Q.    Sounds good.  Okay.  How long have you lived
23        there at 16620 Southwest 52nd Place?
24  A.    As of July 13, four years.
25  Q.    Four or 40?

11

1   A.    Four.
2   Q.    Okay.  Four.
3   A.    I'm not that old.
4   Q.    I didn't think.  Now, you are currently
5         employed by NextGear Capital; is that right?
6   A.    That is correct.
7   Q.    I see you even have the NextGear Capital
8         shirt on today.
9   A.    Wear it proudly.
10  Q.    Yes indeed.  And how long have you been
11        employed with NextGear Capital?
12  A.    Come September 3, it will be eight years, so
13        seven and three quarters.
14  Q.    And let's talk about your work history prior
15        to NextGear Capital.  Where were you employed
16        prior to working for NextGear?
17  A.    Prior to NextGear, I was at Credit Acceptance
18        Corporation.
19  Q.    Okay.  And tell me where Credit Acceptance
20        Corporation is based out of.
21  A.    Michigan, Detroit.
22  Q.    And did you work for them in Detroit or in
23        Florida?
24  A.    In Florida.
25  Q.    Okay.  And what did you do for Credit

12

1         Acceptance Corporation?
2   A.    I was a market area manager.
3   Q.    Tell me what that is or means.
4   A.    Basically I was the manager for south Florida
5         for all the customers of Credit Acceptance
6         Corporation.
7   Q.    And what did Credit Acceptance Corporation
8         do?
9   A.    It's a subprime finance company.
10  Q.    And how long were you with Credit Acceptance
11        Corporation?
12  A.    Two years.
13  Q.    What prompted you to leave Credit Acceptance?
14  A.    NextGear called me.  David was the recruiter.
15  Q.    Okay.  So somebody from NextGear recruited
16        you --
17  A.    Correct.
18  Q.    -- to come work for NextGear?  Okay.  Prior
19        to Credit Acceptance, where did you work?
20  A.    Gunther Volkswagen.
21  Q.    Gunther Volkswagen?
22  A.    Correct.
23  Q.    A car dealership?
24  A.    Correct.
25  Q.    And what did you do for Gunther Volkswagen?

13

1   A.    Internet sales manager.
2   Q.    How long did you do that?
3   A.    Two years.
4   Q.    And why did you leave Gunther?
5   A.    Retail hours were horrendous in the car
6         business.  My daughter at the time was about
7         two years old.  I looked for a change,
8         started applying for jobs, and Credit
9         Acceptance brought me on board.
10  Q.    Okay.
11  A.    And I got my weekends back.
12  Q.    Yeah.  And let's just do one more.  Prior to
13        Gunther, where were you?
14  A.    Ed Morris.
15  Q.    Ed Morris?
16  A.    Yes, Ed Morris Automotive.
17  Q.    And is that a --
18  A.    Another dealership, General Motors.
19  Q.    Okay.  And what did you do for them?
20  A.    Same thing, internet sales manager.
21  Q.    And you made the change from Ed Morris to
22        Gunther why?
23  A.    Closer to my house, and a friend of mine
24        called me and said, "We have an opening.  Are
25        you interested?"  And I'm more inclined to

**Arturo Mayoral - CONFIDENTIAL - July 22, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

14

1      European brands than the American brands.
2      I'm a Volkswagen fan, BMW fan.
3  Q.  Me too.  Tell me your highest level of
4      education, please.
5  A.  I have an MBA.
6  Q.  And where did you obtain your MBA from?
7  A.  At Hult International Business School.
8  Q.  Could you spell that for me.
9  A.  H-U-L-T, International Business School in
10     Cambridge, Massachusetts.
11 Q.  Now, did you attend onsite or online?
12 A.  Onsite, graduated 1993.
13 Q.  That would have been before online courses, I
14     believe.
15 A.  Yeah.
16 Q.  Tell me, where did you go to get your
17     undergrad, then?
18 A.  My undergrad is from Hofstra University.
19 Q.  Hofstra?
20 A.  Yes, in Hempstead.
21 Q.  Are you from the New York area originally?
22 A.  No.  I lived there many years.  I'm
23     originally from Venezuela.
24 Q.  Okay.  When did you come to the United
25     States?

15

1  A.  Permanently in 1999.  Before that, I did
2      boarding school, college, my MBA, went back,
3      worked for the family business, came back in
4      '99.
5  Q.  Great.  Just out of curiosity, what is the
6      family business?  That's always interesting.
7  A.  Would you care to guess?
8  Q.  I have no idea.
9  A.  The car business.
10 Q.  The car business.  You came by it naturally?
11 A.  Yes.
12 Q.  Got it.
13 A.  Born into it.
14 Q.  All right.  So let's now focus our attention
15     back to NextGear Capital, your current
16     employment.
17 A.  Yes.
18 Q.  You've been there close to eight years, seven
19     and three quarter years.  When you were first
20     hired in at NextGear, tell me your position.
21 A.  I was hired as sales executive.
22 Q.  Now, I've seen obviously some documents in
23     this case.  Is that your position currently
24     today?
25 A.  That is my current position, yes.  I have had

16

1      other positions in the company as well.
2  Q.  Great.  See, you already anticipated where I
3      was going.  That's normal.  So let's focus
4      with when you were first hired in as a sales
5      executive, what did you do, what are your job
6      duties, you know, that type of thing.
7  A.  My job duties are to prospect for new
8      customers and basically show them the product
9      that we have, sell them on it.  I gather all
10     required documentation.
11 Q.  Okay.
12 A.  I then write down a summary of my initial
13     findings with that prospect.
14 Q.  Okay.
15 A.  And I submit that to the Lending department
16     at NextGear Capital.
17 Q.  Let's -- I kind of got ahead of myself, and
18     your answer reminded me.  You say, you know,
19     "Show the product we have."  What does
20     NextGear do?
21 A.  NextGear offers financing for car
22     dealerships' inventory, independent car
23     dealers.
24 Q.  Independent car dealers.  So I've litigated a
25     case or two regarding -- what is it called?

17

1      Floor financing; is that right?
2  A.  Yeah, floor plan.
3  Q.  Floor planning.  Thank you.  And so
4      NextGear -- tell me when I'm speaking out of
5      school here.  NextGear floor plans for
6      independent dealers who don't have the
7      traditional GM or Ford behind their name?
8  A.  Correct.  Those are called captive dealers.
9  Q.  Okay.  All right.  Very good.
10 A.  Captive lenders.  Sorry.
11 Q.  Captive lenders.  All right.  So basically
12     you go out, you find independent dealers and
13     show them what you can do for them in the
14     sense of financing the vehicles to be able to
15     get them on their lot to be able to sell
16     them?  Is that kind of a layman's way of
17     describing it?
18 A.  That's a perfect way.
19 Q.  All right.  Now, the duties you just
20     described to me as a sales executive.  And my
21     question -- I just want to make sure we're
22     clear for the record.  My question was what
23     your duties were when you first hired in as a
24     sales executive.  Are those the same duties
25     you have today as a sales executive?

**Arturo Mayoral - CONFIDENTIAL - July 22, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

18

1  A.  Yes.  Correct.

2  Q.  And would they have been the same duties in

3      April of 2019?

4  A.  Correct.

5  Q.  Okay.  And we'll come back to it.  I'm going

6      to drill down a little bit into some of the

7      areas you talked about.  But let's go to the

8      other positions that you've had within the

9      company.  So you had a sales executive

10     position when you were first hired.  So tell

11     me the year you were hired at NextGear and

12     then when it changed to a different position.

13 A.  September 2013 was my hire.

14 Q.  Okay.

15 A.  Give me one second.  I'm trying to recall

16     dates.

17 Q.  That's fine.  Do the best you can.

18 A.  I believe it was early 2016, I got an offer

19     to become an account executive in the

20     Caribbean market, which is Puerto Rico.  And

21     I accepted a position, which I fulfilled for

22     eight months.  Due to operating concerns in

23     the territory of Puerto Rico, hurricanes,

24     we -- the company decided to pull out of

25     Puerto Rico, and I came back and was the

19

1      account executive in Miami South for another

2      two years.

3  Q.  Okay.

4  A.  And then the sales position in Fort

5      Lauderdale opened up, and I switched back to

6      sales, as I am more inclined towards the

7      sales side rather than the operations side.

8  Q.  Understood.  I'm not necessarily in the car

9      financing business, but I've had lots of

10     friends, for example, in medical sales,

11     medical device sales.  They get promoted up

12     into operations.  They say, "Ah, not as good.

13     I don't enjoy it, and, frankly, I made more

14     money as a salesperson," so that's when they

15     made the change.

16 A.  Correct.

17 Q.  Is that kind of what your thought?

18 A.  Yeah, pretty much.

19 Q.  Okay.  So tell me what an account executive

20     does or what were your duties as an account

21     executive.

22 A.  The account executive manages the portfolio

23     of dealers in the given territory.  Basically

24     we make sure that all the audits are cleared,

25     that the payments are being done on time.  If

20

1      they're not, we have to do a little

2      collection, not too much, but, you know, try

3      to control the dealer into paying us the

4      money that they owe us.  In extreme scenarios

5      where an account was defaulted, we were

6      tasked with repo'ing the inventory and making

7      sure that we got it to auction and try to

8      recuperate as much as possible from that

9      loss.

10 Q.  Okay.  Any other aspect of your job duties or

11     requirements while you served as an account

12     executive?

13 A.  Basically represent NextGear as well and make

14     sure that the customers are happy and that

15     everything's moving along perfectly.

16 Q.  Okay.  So basically, if my rough math is

17     correct, you served in the account executive

18     role for about two years and eight months or

19     so?

20 A.  Correct.

21 Q.  Okay.  And then, so for the remaining really

22     five years, you've been a sales executive?

23 A.  Correct.

24 Q.  Okay.  And your current territory is the Fort

25     Lauderdale area?

21

1  A.  Correct.  It's the -- the technical name is

2      Miami North, but, yes.

3  Q.  Okay.

4  A.  It's the Broward County area.

5  Q.  All right.  If you know, how many sales

6      executives are within the State of Florida

7      for NextGear?  Is it county by county or is

8      it just because there's so much population

9      down southeast that you're one county?

10 A.  That's an interesting question.  We changed

11     our operating system because of the pandemic.

12     We used to have, I believe it was, eight or

13     nine salespeople in the State of Florida,

14     different territories.  We had Miami South,

15     Miami North, West Palm Beach, Orlando, Tampa,

16     Sarasota, Jacksonville, and Tallahassee.

17 Q.  Okay.

18 A.  We now switched to a hybrid model where we

19     have inside salespeople working the less

20     populated areas, and we have sales

21     executives, field sales executives in the

22     field in the more metro areas.

23 Q.  Okay.

24 A.  So right now we only have Miami South, Miami

25     North, Orlando, Tampa.

**Arturo Mayoral - CONFIDENTIAL - July 22, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

22

1  Q.  All right.  As a sales executive, when you
2      first hired in, did NextGear provide you any
3      type of training or procedures to follow or
4      anything like that?
5  A.  Yes.
6  Q.  All right.  Tell me about that.
7  A.  Basically it's, you know, training to teach
8      you how to use the product, how to present
9      the product.  There's some sales training as
10     well, Challenger training, but, I mean, it's
11     pretty straightforward.  It's called
12     onboarding.  All the employees go through it.
13     I was actually paired up with one of my
14     peers, who also showed me the ropes.  But
15     it's pretty standard.
16 Q.  Okay.  Basically just teaching you the nature
17     of the business, how to go out and sell the
18     products, maybe some preferential sales
19     techniques perhaps?
20 A.  Correct.  And I also did -- the National
21     Independent Association of Dealers had a
22     course at NextGear, and we all took the
23     course.  And basically it's all the financing
24     part of the dealership, the operating part of
25     the dealership, which I went through at

23

1      General Motors University when I was working
2      with my family.
3  Q.  Got it.  Okay.
4  A.  So it's basically all the accounting and
5      operational part of the dealerships.
6  Q.  All right.  So when I was asking you about
7      your duties as a sales executive, you
8      identified five different areas.
9  A.  But I didn't finish.
10 Q.  Oh, go ahead.  Anything else?
11 A.  Yeah.  I'm also tasked with contract
12     execution.
13 Q.  Okay.
14 A.  Back then.  And then up to that point, I
15     would pretty much separate myself from the
16     dealer and turn it over to the account
17     executive, which they're now called
18     performance managers.
19 Q.  Okay.  And then you're then going out and
20     prospecting new customers?
21 A.  Correct.
22 Q.  Just continually selling the product?
23 A.  Correct.
24 Q.  Okay.  All right.  So let's talk about the
25     first duty you identified.  And, again, I

24

1      understand you're giving me, you know, kind
2      of general categories.
3  A.  10,000-foot view.
4  Q.  Exactly, and that's fine.  And we can drill
5      down more if need be, or if you need to give
6      me more detail, feel free to do, so.  But in
7      terms of prospecting new customers, what do
8      you mean by that precisely?
9  A.  Basically it's seeking out customers, you
10     know, that -- I would be driving through
11     dealerships, you know, and, "Oh, these guys
12     aren't with us."  I'd go in there, show them
13     the product, see if they were interested, and
14     then just basically follow the procedures as
15     the script.
16 Q.  So, in essence cold calling but cold calling
17     in person?
18 A.  Yeah, in person, also on the phone.  It could
19     be through e-mail.  We also have -- at that
20     time we had the inside sales team, which
21     provided leads to the sales executives as
22     well.  I believe that we have 24 hours to
23     respond to a certain customer after we get a
24     lead from the Business Development Center,
25     otherwise known as BDC.

25

1  Q.  BDC.  All right.  Anything else you can think
2      of as relates to prospecting new customers in
3      terms of your job duty or function?
4  A.  No.
5  Q.  Okay.
6  A.  Not that I can think of.
7  Q.  "Show the product we have" is the next thing
8      you said.  Obviously you then, you found the
9      prospect or potential customer.  You come in,
10     have a sit down or a meeting with the owner
11     or manager, and tell me about --
12 A.  More with the owner.
13 Q.  Okay.  Tell me about that.  What happens?
14 A.  I usually do discovery, ask them their
15     business model, what they're trying to
16     achieve, how they're going to achieve that
17     goal and get a basic sense of if the customer
18     is worthy of a line of credit for NextGear or
19     not.
20 Q.  Okay.  Meaning you think it's going to be a
21     good fit or they have the creditability, or
22     what do you mean by that?
23 A.  Yes, if it would be a good fit, if they have
24     the creditability, if they're honest.
25 Q.  Or have a need or what have you?

**Arturo Mayoral - CONFIDENTIAL - July 22, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

26

1  A.   Or have a need.  They'll tell you if they
2       don't have a need.
3  Q.   Yeah.  Right.  All right.  Gather all the
4       required documents is the next duty you
5       identified.  Tell me everything about that.
6  A.   Basically this would be a credit application
7       signed in wet ink.
8  Q.   Okay.
9  A.   Dealer license.
10 Q.   Dealer license?
11 A.   Correct.  That's the State of Florida.  I'm
12      sure in Indiana as well.  But DMV issues a
13      license for the dealer.
14 Q.   Got it.  Okay.  What else?  What other
15      documents?
16 A.   Articles of incorporation.
17 Q.   Okay.
18 A.   Driver's license for the owners.
19 Q.   Okay.
20 A.   Certificate of insurance.
21 Q.   Okay.
22 A.   Bond.
23 Q.   What do you mean by bond?
24 A.   Dealers have to be bonded.
25 Q.   Okay.

27

1  A.   So I have to collect that bond information.
2  Q.   Got it.  All right.  What else?
3  A.   If it's over -- at that time, if it was over
4       a million dollars, then we have to provide
5       financials, audited financials.
6  Q.   All right.
7  A.   I would have to provide two years taxes,
8       corporate and personal.
9  Q.   All right.
10 A.   A resumé for the owners.
11 Q.   Okay.
12 A.   And, again, a description of their business
13      model and my initial discovery process.
14 Q.   You said, "initial discovery process"?
15 A.   Correct, the initial interview, what's the
16      business model.
17 Q.   Okay.  So you kind of write up, I think you
18      said that, write a summary of the prospect?
19 A.   Correct.
20 Q.   So basically, after your initial meeting,
21      gathering of certain materials that you just
22      identified, you write up a summary that
23      basically says, "Yes, this is a good fit.  We
24      think we should pursue them"?  Is that in
25      essence what the summary is?

28

1  A.   Well, yes, and but it's a little more
2       detailed.
3  Q.   All right.  How?
4  A.   The business model is that they're going to
5       be buying cars between 20,000 and $30,000.
6       They expect to fix those cars and get them
7       ready for sale within 30 days, their average
8       cost per time, what it is they're looking for
9       to do with the additional working capital
10      that we're going to be providing, and
11      basically it's paint the picture where, you
12      know, the numbers are black and white.
13 Q.   Got it.  Okay.  So we just talked about the
14      summary of the prospect.  Then submit to the
15      Lending department is what you said.  So what
16      does that entail?
17 A.   Basically it's getting all the documents
18      scanned in, put in an e-mail and sent up to
19      the Lending department.
20 Q.   Underwriting?
21 A.   Underwriting, correct.
22 Q.   And then they gather all those materials that
23      you have done or you gathered, they evaluate,
24      decide yes, no, we can lend, and then they
25      proceed from there?

29

1  A.   Correct.
2  Q.   Okay.  And then after you get the approval,
3       let's say, from the underwriters or the
4       Lending department, then that's when you're
5       tasked with going out and getting contract
6       execution?
7  A.   That is correct, but it actually is a
8       DocuSign.  So what I usually do is I call the
9       customer, tell them, "Hey, there's a DocuSign
10      in your e-mail."  I inform them of what the
11      access code is.  I'll stay with them on the
12      line if I don't do it personally, see if they
13      have any questions on the contract, and from
14      there, they just close the contract, and
15      that's it.  They're contract activated.
16 Q.   So do you in your role as the sales
17      executive, do you actually have to go gather
18      the documentation or the contracts required
19      to be signed or is that something that --
20 A.   It gets sent out from corporate.
21 Q.   Corporate sends it out?
22 A.   Correct.
23 Q.   And you're kind of the intermediary face of
24      the company, so to speak?
25 A.   Correct.

**Arturo Mayoral - CONFIDENTIAL - July 22, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

30

1  Q.  Helping facilitate the signatures?
2  A.  Correct.
3  Q.  Okay.  Do you know what documents are
4      required to be signed as part of, you said,
5      the contract execution?
6  A.  Correct.  We require the DocuSign to be
7      signed obviously, and then there is a Power
8      of Attorney that has to be signed within 30
9      days of the account activating or the account
10     will be locked.
11 Q.  Okay.  Any other -- so you identified a Power
12     of Attorney, and we'll go to that in a little
13     while.
14 A.  Yes.
15 Q.  Any other documents that you are aware of
16     that have to be signed as part of the
17     contract process?
18 A.  Not that I'm aware.
19 Q.  Okay.  And the contract documents, we've
20     obviously seen them in this case.  Those are
21     the ones that you had Mr. Kessler and
22     Mr. Blackburn sign via DocuSign; is that
23     right?
24 A.  That is correct.
25 Q.  Okay.  Now, you listed off several, like,

31

1      10 different documents that you're
2      responsible for gathering as part of the
3      document-gathering process --
4  A.  Correct.
5  Q.  -- to submit to Underwriting.  You listed
6      them very quickly.  Is there some sort of
7      document or manual or procedures that you
8      have that NextGear has given you to
9      demonstrate, like, what documents you need to
10     gather or is it you've done it for so long,
11     you just know?
12 A.  Yeah.  I've done it for so long that it's
13     natural for me.  I'm sure I was trained.  I
14     don't know if there is a document per se,
15     but, I mean, it's what I do every day.
16 Q.  Sure.  Okay.  All right.  During the, I
17     guess, time in which you've prospected the
18     new customer to the point in time of contract
19     execution, is there a steadfast, general
20     period of time that passes in order to get
21     from Point A to the very end step of contract
22     execution?
23 A.  There's no set time.
24 Q.  It's kind of just a process?
25 A.  It is.  I mean, Underwriting could find that

32

1      there's an error on the Social Security
2      number, and they may request a Social
3      Security card, so I'm in charge of collecting
4      those documents and making sure they get to
5      Underwriting.
6  Q.  All right.
7  A.  So that could put the deal back three, four
8      days.
9  Q.  Okay.
10 A.  So there's no specific given time.  It kind
11     of ebbs and flows.
12 Q.  Now, when you're gathering the documents you
13     identified as part of the document-gathering
14     process you mentioned before, are you
15     specifically doing anything to verify the
16     information in any way?
17 A.  No.  That's done by Underwriting.
18 Q.  All right.  And when Underwriting, if they
19     have a question about the veracity or
20     correctness or authenticity of a document, do
21     they come back to you and ask you to go
22     investigate?
23 A.  Correct.
24 Q.  All right.  Now, in this specific case
25     dealing with Premier Group Autos,

33

1      Mr. Blackburn, and Mr. Kessler, did the
2      Underwriting or Lending folks ever come to
3      you and ask you to go gather more information
4      because they had a request about the
5      authenticity of any documents?
6  A.  Yes.
7  Q.  All right.  Tell me about that.
8  A.  They requested a Social Security card.  I
9      believe it was for Mr. Kessler.  I'm not
10     completely sure of that, but I know there was
11     some missing Social Security card.  And they
12     had some questions on the corporate
13     financials that I submitted to Mr. Kessler, I
14     believe.  And then that's it.
15 Q.  Okay.  So those are the only two questions --
16 A.  That I can remember.
17 Q.  All right.  Now, do you know who a person --
18     and I don't want to guess as to gender, but
19     I'm guessing it's a female, but I've been
20     wrong before -- Tuesdae Artman?
21 A.  Tuesdae Artman is a female.  She works in the
22     Lending department, I believe, doing clerical
23     work.
24 Q.  Okay.  Is she a Lending Services
25     representative?

**Arturo Mayoral - CONFIDENTIAL - July 22, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

34

1  A.    Yeah.
2  Q.    And what is that?  Just clerical work?
3  A.    Yeah.
4  A.    My assistants always get mad at me for
5        calling my assistants secretaries.  They want
6        to be called executive assistants.
7  A.    Yeah.  There you go.
8  Q.    Same concept here?
9  A.    Yeah.
10 Q.    Now, some of the materials I've seen, for
11       example, you know, when you use Outlook or
12       some other e-mail platform -- it looks like
13       maybe NextGear uses Outlook for their
14       e-mail -- you can have a general catchall
15       e-mail where it goes to several different
16       people, one of which is called MDAccounts.
17 A.    That's major dealer accounts.
18 Q.    Okay.  And would you receive that e-mail
19       as --
20 A.    I would not.
21 Q.    Okay.  What is MDAccounts?  Who does that
22       e-mail go to?
23 A.    Major dealer accounts is accounts that are
24       over $1 million dollars, a million and above.
25 Q.    Okay.

35

1  A.    It's handled by a higher group of
2        underwriters.
3  Q.    All right.
4  A.    It's a more intricate process, as I explained
5        before.  There's financials to be gathered,
6        resumés, more information than normally we
7        would gather, and that would go to the
8        Underwriting team.
9  Q.    Okay.
10 A.    Actually, personally, I don't know where it
11       goes.  I know it goes to a catchall.  After
12       that, I don't have that information.
13 Q.    Back in the early part of 2019, do you have
14       any knowledge as to who would have been on
15       the MDAccounts team, who would have received
16       an e-mail to MDAccounts?
17 A.    No.
18 Q.    Okay.  Do you know of anyone within NextGear
19       who would know this information?
20 A.    No.  Well, I'm sure there are but not that I
21       know.
22 Q.    Right.  And that's fine.  That's all I'm
23       asking today is your knowledge.
24 A.    Correct.
25 Q.    I don't want you to guess.

36

1  A.    Correct.
2  Q.    And just to kind of finish up the duties that
3        we were talking about, after you get the
4        documents signed, the contract execution,
5        you're basically done with the account?
6  A.    Yes.  I also sometimes as a courtesy to the
7        customers may have done delivery for them for
8        the Power of Attorney.
9  Q.    Okay.  That was going right into -- I don't
10       know if you read my outline before I got
11       started this morning.
12 A.    No.
13 Q.    I'm teasing.
14 A.    I'm just going through the facts.
15 Q.    No, I get it.  I appreciate that.  That's
16       literally where I was going next.  It's
17       pretty obvious where we're going today.
18       You've already done a good job of
19       anticipating my questions.  So you are a
20       notary public, correct?
21 A.    Yes.  Eight years.  Well, seven and three
22       quarters, since I started working for
23       NextGear.
24 Q.    All right.  And becoming a notary public, was
25       that a requirement of employment with

37

1        NextGear?
2  A.    No.
3  Q.    All right.  Why did you decide to become a
4        notary public?
5  A.    To assist the dealers and make sure that
6        everything flows and keep the customers
7        happy.
8  Q.    What do you mean by that?  How does being a
9        notary public assist the dealers in making
10       sure --
11 A.    Well, normally they would have to go to a
12       bank, which would take time.  If I'm in the
13       area and they ask me, I'll gladly do the
14       notary for them.  I mean, it's no problem for
15       me.
16 Q.    Do you hold yourself out, outside of your
17       employment with NextGear, independently as a
18       notary public?  In other words --
19 A.    No.
20 Q.    Okay.  You don't do any other services for --
21 A.    Absolutely not.  I haven't married anyone.
22       THE COURT REPORTER:  Sir, please let him
23       get his question out.
24       THE WITNESS:  Sorry.  Sorry.
25 FURTHER QUESTIONS BY MR. DELK:

**Arturo Mayoral - CONFIDENTIAL - July 22, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

38

1  Q.   That's all right.  Yeah.  So it's not like
2       you're hanging up a shingle saying, you know,
3       "Come to my house, and I'll, you know,
4       notarize documents for you"?
5  A.   No.
6  Q.   It's purely in furtherance of the NextGear
7       business, true?
8  A.   Correct.
9  Q.   In your position as sales executive, are you
10      aware of other NextGear sales executives who
11      are also notary publics?
12 A.   I believe I am, yes.  I'm sure there is a
13      couple.
14 Q.   Okay.  Tell me who they are.
15 A.   I can't off the top of my head, but it's
16      knowledge that there are several notaries in
17      the company.
18 Q.   Okay.  Is that something that is in any way
19      encouraged by NextGear?
20 A.   I would say no.
21 Q.   All right.  So this was something that you
22      thought to do just to be a better sales
23      executive and further NextGear's business to
24      help maybe close a deal and just make it easy
25      for the dealer to sign up and do things?

39

1  A.   Yes.  I believe it was a peer that told me
2       that this would a good thing to do for the
3       dealers.
4  Q.   Okay.  And a peer at NextGear, meaning --
5  A.   Yeah.
6  Q.   -- an employee?
7  A.   Uh-huh.
8  Q.   And do you know who that employee was?
9  A.   I don't recall.  It was a long time ago.
10 Q.   Was it a supervisor or superior of yours?
11 A.   No.  It was -- it's a close peer, same level.
12 Q.   Sales executive?
13 A.   Yeah.
14 Q.   All right.  So you've been a notary public
15      ever since you started with NextGear, I think
16      you said, right?
17 A.   Yeah, close.
18 Q.   Yeah.  Give or take a few month?
19 A.   Couple of months, correct.
20 Q.   Sure.  Now, tell me the process that you had
21      to undergo to become a notary public.  And
22      it's the State of Florida, right?
23 A.   Of course.  The State of Florida requires an
24      eight-hours course, which I took online.
25      Requires a background check.

40

1  Q.   Okay.
2  A.   And requires that we be bonded and insured.
3  Q.   Do you understand why or have any
4       understanding or knowledge as to why the
5       requirement of being bonded and insured is
6       there?
7  A.   Yes.  For errors and omissions.
8  Q.   And do you pay that bonding and insurance
9       personally?
10 A.   I believe I did pay it, but I was reimbursed
11      by the company.
12 Q.   Okay.  So you pay for it; then you submit a
13      reimbursement request?
14 A.   Yes.
15 Q.   Is that the way it's been the last seven and
16      a half or so years?
17 A.   Correct.
18 Q.   All right.  When you first submitted your
19      reimbursement request for the costs
20      associated with being bonded and insured, did
21      NextGear ever balk at that request or say,
22      "That's not something that we're going to pay
23      for"?
24 A.   No.
25 Q.   All right.  So they gladly paid for it?

41

1  A.   Yeah.
2  Q.   And pay for it every year?
3  A.   Every two years.
4  Q.   Every two years.  So you pay for it or renew
5       it every two years?
6  A.   Yeah.
7  Q.   Have you turned or made a claim to your
8       bonding company, insurance company, as a
9       result of this lawsuit?
10 A.   Never.
11 Q.   Why not?
12 A.   Never had to.
13 Q.   Okay.  The insurance or the bond, who is the
14      named insured?
15 A.   It would be me.
16 Q.   All right.  Is NextGear listed as an
17      additional insured?
18 A.   No.
19 Q.   What is the, I guess you said it's every two
20      years.  What is the cost associated with
21      getting bonded and insured?
22 A.   I believe it's about 125, 145 dollars.  I'm
23      not entirely sure of the amount.
24 Q.   Okay.  And that's every two years?
25 A.   Yeah.

**Arturo Mayoral - CONFIDENTIAL - July 22, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

42

1  Q.   And do you know the limit of liability that
2       you're insured for?
3  A.   I do not know.
4  Q.   Okay.  Basically that's just a -- in order to
5       be bonded and insured, it's a box you have to
6       check in order to maintain --
7  A.   I believe it's $25,000.
8  Q.   Okay.  But it's a box you have to check to
9       maintain your notary public license?
10 A.   Correct.
11 Q.   All right.  Now, this eight-hour course that
12      you took online, did you ever receive any
13      sort of printouts or manuals or anything you
14      can download as part of the educational
15      process?
16 A.   Yes.
17 Q.   All right.  Do you still have those with you?
18 A.   I would be surprised if I don't, but they're
19      probably in a box somewhere in my garage.
20 Q.   Okay.  Did you look for those manuals or
21      training policies or anything you received as
22      part of the process to become a notary public
23      in anticipation of this deposition today?
24 A.   No.
25 Q.   All right.  Why not?

43

1  A.   Didn't know I had to.
2  Q.   Okay.  All right.  So let's talk about what
3       you learned in order to become a notary
4       public.  And I assume it was you take this
5       eight-hour online course, you figure it out,
6       learn the information, and then do you take
7       an online course to become a notary public?
8  A.   Correct.
9  Q.   Okay.  It's, like, the test afterwards?
10 A.   Yes.  It's tested obviously.
11 Q.   Okay.  So tell me what you learned and what
12      you're trained on to be a notary public in
13      the State of Florida.
14 A.   Basically what you're allowed and not allowed
15      to do.  I can notarize documents, testify to
16      certain facts.  I cannot notarize documents
17      for myself or my family.
18 Q.   Okay.
19 A.   I can marry people.  I can notarize vehicle
20      titles as well.
21 Q.   Okay.
22 A.   And that's pretty much all I can remember.
23 Q.   All right.  Now, in terms of the actual
24      process, you know, I'm sure they taught you,
25      you know, Step A to Step Z of actually how

44

1       you notarize a document, true?
2  A.   Yeah.
3  Q.   Okay.  Walk me through that process of what
4       you were trained step by step.
5  A.   Basically it's just to give the document to
6       the person, make sure that they understand
7       what they are signing, that they're signing
8       of free will.  I observe them signing, make
9       sure that the dates are correct.  I then look
10      at the person's driver's license, verify
11      signature, I then fill out my notary section
12      with the correct dates.  I apply my
13      signature, and then I apply my notary seal.
14 Q.   Okay.  So when you say "give the document to
15      the person," I guess, help me understand
16      that.  Are you possessing the documents that
17      he notarized or is it more of the person
18      comes to you and says, "Here, I need this
19      notarized.  Can you notarize it for me?"
20 A.   We normally send the Power of Attorney
21      through the DocuSign as well, so they'll
22      receive that.  Most of the time, they'll have
23      it printed out when I'm there.
24 Q.   Okay.
25 A.   Sometimes they don't, and I'll have my own

45

1       copy just in case.  I'm sure you do the same
2       thing.  And I provide them the document if
3       they don't have it.
4  Q.   In furtherance of NextGear's business, are
5       there any other documents that you notarize
6       on behalf of NextGear besides the Power of
7       Attorney?
8  A.   None.
9  Q.   Okay.  That's the only document during the
10      contract process that requires a notary?
11 A.   Correct.
12 Q.   Now, you mentioned the application early in
13      your testimony that had to be wet ink?
14 A.   Correct.
15 Q.   And wet signatures, I think?
16 A.   Correct.
17 Q.   Do you fill the application out on behalf of
18      the dealer or are they filling it out on
19      their own?
20 A.   It depends on the situation.  Most of the
21      time, the dealer will fill it out themselves.
22 Q.   Okay.
23 A.   There are people that really don't understand
24      how to fill an application, so I'll help them
25      out.

**Arturo Mayoral - CONFIDENTIAL - July 22, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

46

```
1  Q.   Okay.  And when the application's getting
2       filled out, are you present during that time,
3       meaning face to face filling it out with
4       them?
5  A.   If I'm on location, yes.  I could receive it
6       by e-mail.
7  Q.   Okay.  With respect to this situation with
8       Mr. Kessler and Mr. Blackburn and Premier
9       Group Autos, were you in person during the
10      time the application was being --
11 A.   I was not.
12 Q.   You were not.  Okay.  Tell me how that works.
13 A.   I sent them the application.
14 Q.   Via e-mail?
15 A.   Via e-mail, correct.
16 Q.   Okay.
17 A.   And then I received it, I believe, the same
18      day.
19 Q.   Via e-mail?
20 A.   Via e-mail, correct.
21 Q.   Okay.
22 A.   So it was sent to Mr. Blackburn, and it got
23      filled out, came back to me pretty much the
24      same day with all the documents that I
25      requested.
```

47

```
1  Q.   Got it.  All right.  And we'll come back to
2       that in a little while.  Thank you.  All
3       right.  So going back to the process for
4       getting a document notarized.  You really
5       identified one, two, three, four, five
6       different steps during the notary process.
7       Is there any leeway in any of those five
8       steps that you identified?
9  A.   No.  Absolutely not.
10 Q.   All right.  No leeway whatsoever?
11 A.   (Shaking head negatively.)
12 Q.   You shook your head.
13 A.   I'm sorry.  No.  It wouldn't be valid.
14 Q.   It would not be valid?
15 A.   No.
16 Q.   Okay.  All right.  So the next step, you say,
17      you observe them sign the document?
18 A.   Correct.
19 Q.   All right.  And that literally is probably
20      just what it means, you sit there and you
21      watch the person sign the document, correct?
22 A.   Correct.
23 Q.   All right.  Then the next step, you said, is
24      you verify the signature, right?
25 A.   Correct.
```

48

```
1  Q.   And the way in which you verify the signature
2       is you look at their driver's license?
3  A.   Yes, or the documents that I have.  You know,
4       they have to submit the driver's license
5       beforehand, so usually I'll have that
6       beforehand.
7  Q.   Okay.  So they have to submit the driver's
8       license beforehand?
9  A.   Correct, with the application.
10 Q.   All right.  Now -- oh, okay.  So as part of
11      the application process, they've already
12      submitted to you the driver's license?
13 A.   Correct.  That's how we verify the wet-ink
14      signature as well.
15 Q.   All right.  Now, when you are getting a
16      document notarized and the person is there
17      signing, do you ask to see their actual
18      driver's license?
19 A.   It depends on the situation.
20 Q.   Okay.
21 A.   I believe in this situation, I did not ask
22      for it since I had the copy.
23 Q.   Okay.  Did you ask for the actual driver's
24      license of Mr. Blackburn when he was signing
25      the Power of Attorney document?
```

49

```
1  A.   I don't recall.
2  Q.   Did you ask for the actual physical driver's
3       license of Mr. Kessler at the time this --
4  A.   No.  I don't -- no.  I had the copy.
5  Q.   Okay.  So you don't remember if you asked for
6       the license of Mr. Blackburn, but yet you're
7       certain that you did not ask for the copy of
8       the driver's license of Mr. Kessler?
9  A.   Well, I wouldn't have had to ask for
10      Mr. Blackburn's driver's license because he
11      was already known to me.  We had had four
12      meetings prior.  And he regularly attended
13      the auction at Manheim Fort Lauderdale.
14 Q.   What is that?
15 A.   Where they buy the vehicles.
16 Q.   Okay.  And you're there during the auctions?
17 A.   Sometimes I go as a courtesy and social
18      relations.
19 Q.   Okay.
20 A.   Help out some dealers if they have any
21      problems.
22 Q.   So prior to the day in which the Power of
23      Attorney document was signed by Mr. Blackburn
24      in April of 2019, how many times have you met
25      Mr. Blackburn in person?
```

**Arturo Mayoral - CONFIDENTIAL - July 22, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

50

1  A.  At least five times.
2  Q.  Prior to April, I think it's -- prior to
3      April 18, 2019, have you ever met Mr. Kessler
4      in person?
5  A.  No.
6  Q.  Have you ever met Mr. Kessler in person?
7  A.  I was introduced to a person that introduced
8      themself as Mr. Kessler.
9  Q.  Okay.  What do you mean by that?
10 A.  We walked into a conference room.
11     Mr. Blackburn said, "This is Ed Kessler."
12     "Pleasure meeting you, Ed Kessler."  And
13     that was it.  That's the only time I've seen
14     him.
15 Q.  What did you do to verify Mr. Kessler's
16     identity at the time you walked into that
17     conference room?
18 A.  I looked at the driver's license picture, had
19     a semblance.  The signature looked very
20     similar.  I have no doubt, no reason to doubt
21     that it wasn't Mr. Kessler.
22 Q.  Okay.  So you looked at his license or a
23     picture of his license?
24 A.  A picture of his license.
25 Q.  So you looked at -- and was it in color or

51

1      black and white?
2  A.  Black and white.
3  Q.  So you looked at a black-and-white picture of
4      Mr. Kessler's license, and then you looked at
5      the person sitting in that conference room,
6      and you believe it was the same person?
7  A.  Correct.
8  Q.  Let me ask it a different way.  Was it the
9      same person?
10 A.  I don't know.
11 Q.  All right.  So help me understand that.  You
12     believe it was the same person, but when I
13     asked if it was the same person, you say, "I
14     don't know."  Help me understand that.
15 A.  I have no way of knowing if it was the same
16     person or not.  I mean, they represented to
17     me that person.  I had no reason to believe
18     otherwise.
19 Q.  Well, you looked at the picture of the
20     license, right?  Yes?
21 A.  Yes.
22 Q.  And did you look at his face?
23 A.  Yes.
24 Q.  Was it the same person in the photo, yes or
25     no?

52

1  A.  Yes.  It looked the same.
2  Q.  Okay.  All right.  So then -- let me ask you
3      this, though.  During the notary process, you
4      said you need a driver's license.  In your
5      training, did your training ever teach you it
6      was acceptable to use a copy or a picture of
7      a driver's license in lieu of the actual
8      driver's license?
9  A.  Always.
10 Q.  Always what?
11 A.  We always take copies of licenses.  Because
12     how are you going to get the real license to
13     corporate when the person's in Florida?  So
14     we get scanned licenses, and we send them to
15     corporate.
16 Q.  Okay.
17 A.  They determine if it's a real license or not.
18 Q.  I understand.  But, so I'm talking about when
19     you're there, in general -- we're not talking
20     about this specific day in question, but in
21     general -- when you're getting a Power of
22     Attorney document notarized by these
23     individuals, do you ask for their actual
24     license to see it in person?
25 A.  It depends if I'm carrying the documents with

53

1      me that were submitted prior.
2  Q.  Okay.
3  A.  It depends if the person is known to me.
4  Q.  Okay.
5  A.  Or if the person volunteers the license.
6  Q.  All right.  And in this specific case with
7      Mr. Kessler and Mr. Blackburn, you can't
8      recall whether or not you asked for an actual
9      copy of their license?
10 A.  I know I didn't with Mr. Blackburn because he
11     was known to me.
12 Q.  Right.  You said that.  Thank you.  And then
13     Mr. Kessler?
14 A.  I believe I used the photocopy that I had.
15 Q.  And it was, again, to be clear, a
16     black-and-white photocopy?
17 A.  Correct.
18 Q.  And how did you get the black-and-white
19     photocopy of Mr. Kessler's license?
20 A.  It was submitted to me with the application
21     documents.
22 Q.  And who submitted that to you?
23 A.  I believe it came from Mr. Blackburn.  I
24     would have to check my records.
25         (Whereupon Exhibit No. 1 is marked for

**Arturo Mayoral - CONFIDENTIAL - July 22, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

54

```
1          identification.)
2    FURTHER QUESTIONS BY MR. DELK:
3    Q.   Mr. Mayoral, I'm handing you what's been
4         identified as Exhibit 1.
5              MR. DELK:  I forgot you were coming.
6         I'll send it to you.  Sorry about that.
7         Sorry, Dick.  I was trying to be
8         conscientious of my copies today.
9              MR. ROCAP:  It's all right.  Is that
10        Mr. Kessler's license?
11             MR. DELK:  It is.
12   FURTHER QUESTIONS BY MR. DELK:
13   Q.   All right.  Exhibit 1 in front of you is what
14        I received through discovery requests from
15        your counsel.  Is this a true and accurate
16        copy of the driver's license of Mr. Kessler
17        that you used to verify his identity?
18   A.   It's -- it's the picture, but it's a little
19        faded.  The one that I had, you could see the
20        signature clearer.
21   Q.   Okay.  The one you had, was it that -- was it
22        the size that's set forth in Exhibit 1?
23   A.   No.  It's the same size.  It's just the
24        copy's faded.  That's all.  But it's the same
25        license.
```

55

```
1              MR. JONES:  Jason, we've got other larger
2         versions that are clearer if you want me to
3         let you know what Bates number that is.  Look
4         at 257.
5         THE WITNESS:  Yeah.  That's a lot
6         clearer.
7              MR. DELK:  So 257?
8              MR. JONES:  Uh-huh.  And we can get
9         printouts if you need.
10   FURTHER QUESTIONS BY MR. DELK:
11   Q.   So the document identified as NG000257, it
12        looks to be an actual blow-up of the
13        photograph, taking up an entire page, true?
14   A.   Yes.
15   Q.   And is that what you had?
16   A.   Correct.
17   Q.   That is the exact photograph and copy that
18        you had when you were notarizing the
19        documents in April of 2019?
20   A.   Yes, sir.
21   Q.   Okay.  And that's referenced or set forth in
22        000257, correct?
23   A.   Correct.
24   Q.   Okay.
25   A.   Yes, that is the one.
```

56

```
1    Q.   Okay.  And because -- is it your testimony,
2         because you had this black-and-white picture
3         of the license, you did not need to ask for
4         Mr. Kessler's license?
5    A.   Correct.
6    Q.   And is there ever a time -- and I think you
7         said it just depends on if you have the
8         copies of licenses with you or not.  Is there
9         ever a time in your seven and three quarter
10        years experience with NextGear where you had
11        doubts as to the identity of the person?
12   A.   No, never.
13   Q.   All right.  So then it's fair to say, then,
14        you never had a doubt about the identity of
15        Mr. Kessler when you were sitting in this
16        conference room; is that true?
17   A.   True.
18   Q.   Describe the individual who claimed to be
19        Mr. Kessler on April 18, 2019.  What did he
20        look like?
21   A.   Kind of about a little taller than me, thin.
22        So it would sound disrespectful, but
23        elongated face like a mango.
24   Q.   Okay.
25   A.   A little darker skin than me, but -- and
```

57

```
1         brownish black hair.
2    Q.   Okay.
3    A.   That's about all I recall.
4    Q.   All right.  Did you speak with Mr. Kessler?
5    A.   I did.  We exchanged pleasantries.  I asked
6         him how long he was going to be in town.  He
7         said, "For a couple of days."  I asked him if
8         he had any questions on the Power of Attorney
9         or if he understood everything that was in
10        it.  He said that it was fine, that he had no
11        issues, and went ahead and signed.
12   Q.   Okay.  And, to be clear, the person who
13        claimed to be Mr. Kessler is my question.
14   A.   That person that was introduced to me as
15        Mr. Kessler, yes.
16   Q.   Right.  But after he was introduced to you,
17        tell me what you did to verify his identity.
18   A.   Looked at the picture, looked at the
19        signature, compared both.  I was satisfied.
20   Q.   Okay.
21   A.   Moved on.
22   Q.   All right.
23   A.   Followed procedures.
24   Q.   What procedures?  What procedures?
25   A.   Verified the signature on the picture.
```

**Arturo Mayoral - CONFIDENTIAL - July 22, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

58

1  Q.  The procedures you already --
2  A.  **Correct, the ones that I already gave you.**
3  Q.  I just want to make sure there were no other
4      procedures you're referencing.
5  A.  **No.**
6  Q.  All right.  I think I asked this before.  I
7      can't remember the answer, so I apologize.
8      As part of your training of being a notary
9      public, do you -- I guess, was it trained or
10     taught to you that it is acceptable when
11     notarizing a document to use a copy of the
12     license instead of actually having the
13     license there?
14 A.  **I'm not aware of that.**
15 Q.  Okay.
16 A.  **I do believe that you can use a copy of the**
17     **driver's license.**
18 Q.  Okay.  And where does that belief come from?
19 A.  **My understanding.**
20 Q.  From where?
21 A.  **I guess the training that I did.**
22 Q.  All right.  So somewhere within these manuals
23     that you think you still have, it was taught
24     to you that it is okay to use a photograph or
25     a copy of the license when notarizing a

59

1      document?
2  A.  **Yes.**
3  Q.  Instead of the person sitting right in front
4      of you, asking, "Let me see your driver's
5      license"?
6  A.  **Yes.**
7  Q.  And you believe that you have that manual
8      still?
9  A.  **I'm not sure.  It could be.**
10 Q.  All right.
11 A.  **My wife does like to throw out things.**
12 Q.  But to the best of your memory, you still
13     have it in a box somewhere, you think?  I
14     think you said you're pretty confident about
15     it?
16 A.  **I would hope so.**
17 Q.  All right.
18         (Whereupon Exhibit No. 2 is marked for
19     identification.)
20 FURTHER QUESTIONS BY MR. DELK:
21 Q.  I'm handing you what's been marked as Exhibit
22     2.  Flip through the pages of Exhibit 2, and
23     tell me if you recognize this document.
24         MR. ROCAP:  Jason, could you just
25     identify the page numbers?

60

1         MR. DELK:  It's my subpoena.
2         MR. ROCAP:  Oh, okay.
3  A.  **Yes.  This is the subpoena that was served to**
4      **me a couple of months back.**
5  Q.  Okay.  And you've seen the subpoena in
6      Exhibit 2?
7  A.  **Yes.**
8  Q.  And your counsel sent it to you?
9  A.  **Yes.  My counsel has it.**
10 Q.  Okay.
11 A.  **And I was notified.**
12 Q.  All right.
13 A.  **And that's why I'm here today.**
14 Q.  Yes indeed.  Now, if you look at the sixth
15     page of Exhibit 2, you can see that's an
16     Exhibit A, right?
17 A.  **Yeah.  Got it.**
18 Q.  All right.  And Exhibit A is basically the
19     documents that you were commanded to bring
20     with you today to your deposition.  Have you
21     ever seen this Exhibit A before?
22 A.  **I have, and all documents have been given to**
23     **my legal counsel.**
24 Q.  All right.  Well, let's just walk through
25     them.  No. 1, all e-mails, communications,

61

1      text messages, et cetera, by and between you
2      and James Blackburn, right?
3  A.  **Correct.**
4  Q.  And you've already given all those documents
5      to your counsel?
6  A.  **Yes, sir.**
7  Q.  It's the same request as it relates to Edward
8      Kessler?
9  A.  **Yes, sir.**
10 Q.  No. 3, basically all documents that relate to
11     Edward Kessler.  Anything you have you've
12     already given to your counsel?
13 A.  **Correct.**
14 Q.  All right.  No. 4, all documents, e-mails, et
15     cetera, that relate to Edward Kessler and/or
16     the Power of Attorney document purportedly
17     executed by Edward Kessler.  Same answer, I
18     assume?
19 A.  **Yes, sir.**
20 Q.  All right.  Five, all documents, receipts,
21     logs and the like that relates to or
22     evidences your location or general
23     whereabouts on April 18, 2019.
24 A.  **Yes, sir.**
25 Q.  You've given those to your counsel,

**Arturo Mayoral - CONFIDENTIAL - July 22, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

62

1      everything you have?
2  A.  Yes, sir.
3  Q.  All right.  What did you do on April 18,
4      2019?  Do you remember your day at all?
5  A.  To my recollection, I left my home office
6      around 10 a.m.  I was scheduled to meet with
7      Mr. Blackburn and Mr. Kessler.  I believe it
8      was at 11:30 a.m. on that day.  I drove from
9      my home down to downtown Fort Lauderdale
10     where their offices were located, and I went
11     up to the office, went into the conference
12     room.
13          Mr. Blackburn was there waiting.  I
14     believe Mr. Kessler or purportedly
15     Mr. Kessler was there as well.  After that,
16     we did -- we parted ways.  I had lunch at a
17     restaurant right next to the building where
18     their offices are, which is one of my
19     favorite restaurants.
20  Q.  What's the name of that?
21  A.  Southport Raw Bar.
22  Q.  All right.
23  A.  And then I headed back to the home office,
24     stopping first by FedEx to drop off the Power
25     of Attorneys.  After that, I don't know if I

63

1      went on prospecting or not, but I do recall
2      the lunch because I love that place, and I
3      don't usually get out to that part of town.
4  Q.  All right.  Now, you said in your explanation
5      of your day "purportedly Mr. Kessler."  Why
6      did you say "purportedly"?
7  A.  Because that's the wording that you are using
8      here.
9  Q.  Well, you don't believe it to be purportedly
10     Mr. Kessler?
11  A.  No, but I'm assuming now that I'm here and
12     you used those words.
13  Q.  All right.  Well, I need to know, is there
14     any doubt in your mind --
15  A.  At the moment, no.
16  Q.  All right.  Let me finish my question.  Is
17     there any doubt in your mind that Mr. Kessler
18     signed that document, the Power of Attorney
19     document, in front of you?
20  A.  There is no doubt.
21          MR. JONES:  Hold on.  There's no Power of
22     Attorney document in front of him.
23          MR. DELK:  I understand, but you're
24     talking about the Power of Attorney document.
25          MR. JONES:  You said "in front of" him.

64

1      I just want to make sure he's not pointing to
2      any document in front of you.
3  FURTHER QUESTIONS BY MR. DELK:
4  Q.  On the day, April 18, 2019, is there any
5      doubt in your mind whatsoever that
6      Mr. Kessler was not there signing that Power
7      of Attorney document?
8  A.  No.
9  Q.  No doubt?
10  A.  No doubt.
11  Q.  Is there any doubt in your mind as you sit
12     here today?
13  A.  I don't know.
14  Q.  Okay.  Why?  You were very confident when he
15     was there purportedly in April 18 of 2019,
16     but now you're sitting here in your
17     deposition, you're not so sure?
18  A.  Why would be -- why would we be here
19     otherwise?  Because that's what you guys are
20     contesting.
21  Q.  So the fact that we're contesting that makes
22     you less sure of your knowledge --
23  A.  No.  No.  At the moment, I was very sure that
24     it was him.
25  Q.  Okay.  So just because I'm making a certain

65

1      allegation, that changes your testimony or
2      changes your confidence?
3  A.  No, not at all.
4          MR. JONES:  Objection.  That's not -- go
5      ahead.
6  FURTHER QUESTIONS BY MR. DELK:
7  Q.  So, as you sit here today in your deposition,
8      are you still confident that Edward Kessler
9      was sitting in front of you signing the Power
10     of Attorney document on April 18, 2019?
11  A.  Yes, sir.
12  Q.  And you're confident why?
13  A.  He was introduced to me by a known person.
14  Q.  Okay.
15  A.  Whom I had trust, and that trust was
16     violated.
17  Q.  All right.  But you know from your training
18     as a notary public, using somebody's word
19     about somebody being a person they represent
20     to be isn't good enough, right?  You know
21     that?
22  A.  Correct.
23  Q.  All right.  So then how are you so confident?
24  A.  Driver's license.
25  Q.  And you just held up and showed me --

**Arturo Mayoral - CONFIDENTIAL - July 22, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

66

1  A.   Exhibit 1.
2  Q.   Exhibit 1.  All right.
3       THE WITNESS:  Would it be all right,
4  would anybody care for a break at this point
5  since we have --
6       MR. JONES:  That's fine.
7       MR. DELK:  If you need a break, we can
8  take a break.  Five minutes or so?
9       THE WITNESS:  Yeah.  Give me ten minutes.
10 I'll go downstairs, have a cigarette, and
11 come back.
12      MR. DELK:  Understood.
13          (BRIEF RECESS TAKEN.)
14 FURTHER QUESTIONS BY MR. DELK:
15 Q.   Mr. Mayoral, we're back on the record after a
16      brief smoke break.
17 A.   Thank you, sir.
18 Q.   You're welcome.  We were working through
19      Exhibit 2, which is the subpoena that I sent
20      to your counsel for you, working through
21      Exhibit A of that subpoena, and we were on
22      request No. 6.  And, again, these are
23      documents or items I asked or commanded you
24      to bring to your deposition today.  No. 6 is
25      all training manuals, policies, procedures,

67

1       and other documents that refer to, relate to,
2       and/or evidence the training received to
3       be a notary public in the State of Florida.
4       You did not bring the manual that you
5       referenced before earlier in your testimony,
6       correct?
7  A.   I did not.
8  Q.   All right.  As a matter of fact, you didn't
9       even bother to look for it; isn't that
10      correct?
11 A.   Correct.
12 Q.   Is there any reason why you didn't bother to
13      look for it?
14 A.   I must have missed No. 6.
15 Q.   Okay.  And you'll, when you return, you'll go
16      look for that manual, right?
17 A.   Yes, sir.  Yes, sir.
18 Q.   And you'll produce it to your counsel, who'll
19      produce it to me?
20 A.   I have no problem with that.  Yes.
21 Q.   And if I have further questions of you,
22      you'll come back for your deposition and
23      answer questions related to that manual?
24      MR. JONES:  Objection.
25      MR. DELK:  You won't?

68

1       MR. JONES:  You don't get to depose
2  witnesses multiple times.
3       MR. DELK:  Oh, I do if you don't bring
4  documents you're commanded to bring and you
5  have them in your possession, you didn't
6  bother to look for them.
7       MR. JONES:  You haven't established that
8  he actually has it, so.
9       MR. DELK:  Well, I think I did already.
10 FURTHER QUESTIONS BY MR. DELK:
11 Q.   But nonetheless, you're going to get it for
12      me, you're going to get it to your counsel
13      and give it to me, right?
14 A.   If available, yes.
15 Q.   If available.  But I think you testified
16      before already that you believe it's in a box
17      somewhere in your house unless your wife
18      tossed it?
19 A.   Correct.
20 Q.   All right.  Request No. 7, basically the same
21      question but related to any policies or
22      procedures or manuals you received from
23      NextGear relating to your service as a notary
24      public.  Do you have any of those documents?
25 A.   To my knowledge, there are no such documents.

69

1  Q.   All right.  No. 8, I asked for the electronic
2       version, including all metadata, of the
3       photograph you took of the license of Edward
4       Kessler on April 18, 2019.  And I think the
5       answer would be the same; you've given
6       everything you have related to Mr. Kessler to
7       your counsel?
8  A.   Correct.
9  Q.   And No. 9 is the camera, phone, and/or other
10      device that you used to take that photograph
11      of Edward Kessler's license on April 18,
12      2019.
13 A.   I did not take a picture of Edward Kessler's
14      license.  I had a photocopy.
15 Q.   Okay.  So, therefore, No. 9, you have nothing
16      to give me, right?
17 A.   Correct.
18 Q.   Okay.  All right.  And, to be clear, that
19      manual or policy or procedure, whatever it is
20      you learned or received from the State of
21      Florida about the process to follow to be a
22      notary public, you believe that that training
23      you received tells you you can use a
24      photocopy of a license to verify somebody's
25      identity?

**Arturo Mayoral - CONFIDENTIAL - July 22, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

74

1  A.   Correct.
2  Q.   And do you know why that is?
3  A.   I do not.
4  Q.   Have you ever been told why?
5  A.   I assume it's a legal issue, but I have no
6       knowledge of why.  I have no legal education.
7  Q.   In your seven-and-three-quarter-year time
8       frame or so, give or take a few months, of
9       being a notary public, have you ever looked
10      up the Florida statutory law relating to
11      certain requirements you have to do to become
12      a notary public and the process of when
13      you're actually notarizing the document?
14          MR. JONES: Object to the form.  It's
15      kind of compound there.
16 FURTHER QUESTIONS BY MR. DELK:
17 Q.   Have you ever looked at the Florida law
18      related to notary public requirements?
19 A.   Hmm.  To my recollection, I believe that I
20      saw those when I was taking the course, but I
21      have no other recollection of that.
22 Q.   Okay.  I'm talking about your general
23      practice and your role as a sales executive
24      and then when you do the notary for the Power
25      of Attorney.  Is your general practice to use

75

1       a copy of the driver's license or to actually
2       ask the person for the driver's license when
3       you're there?
4  A.   Both.
5  Q.   What do you do more often?
6  A.   More often I would use a copy of the license
7       because it's already been checked by
8       Underwriting as a real signature, so.
9  Q.   So does Underwriting send you some sort of
10      okay or verification that we validated?
11 A.   I only get a notice when it's not validated.
12      They will send me an e-mail that the
13      signature does not match the driver's
14      license.  It happens quite often.
15 Q.   It does?
16 A.   It does.  I actually have the same problem
17      with my driver's license and my real
18      signature.
19 Q.   Okay.  Do you, in your opinion, do you
20      believe Exhibit 1 or the signature of
21      Mr. Edward Kessler on his identification is
22      the same as the Power of Attorney document
23      that NextGear claims Mr. Kessler signed?
24          MR. JONES: Object to form.  You asked
25      for opinion testimony.  He's not an expert.

76

1  FURTHER QUESTIONS BY MR. DELK:
2  Q.   Go ahead and answer.
3  A.   Could you repeat the question, please?
4  Q.   In your experience -- and I'm not asking for
5       an expert opinion.  I'm asking for your
6       observation as a notary public, which your
7       duty or job is to verify signatures.
8  A.   Correct.
9       I'm asking you, do you believe the signature
10      that's set forth on Mr. Kessler's
11      identification is the same signature that's
12      set forth on the Power of Attorney document?
13 A.   Yes.
14 Q.   Let me ask you this.  When Mr. Kessler was
15      allegedly sitting in front of you in the
16      conference room on April 18, 2019, did you
17      actually pull out the picture and verify his
18      signature?
19          MR. JONES: Objection.  Asked and
20      answered.
21 A.   Yes.  It has been answered, and I did answer
22      yes, correct.
23 Q.   Talk to me about your compensation and
24      specifically the year 2019.  Are you a
25      salaried employee?

77

1  A.   Yes, sir.
2  Q.   What's your annual salary?
3  A.   Annual salary at that time, I believe, was
4       $71,000 a year.
5  Q.   And being in sales, like in any other sales
6       position, I assume there is some sort of
7       commission-based --
8  A.   Correct, incentive.
9  Q.   All right.  Tell me about that.
10 A.   The incentive was based on the amount of
11      activations received in a certain month, and
12      there's also a component on the number of
13      loans achieved in a certain month.
14 Q.   Okay.  And so you make -- again, just in
15      general terms, in the year 2019, you get paid
16      more money if you sign and sell a new loan to
17      a customer?
18 A.   Correct.
19 Q.   In a given year, and I'm speaking in general
20      terms here, your best estimate, how many
21      times are you actually notarizing a Power of
22      Attorney document for a customer?
23 A.   Somewhere between 60 and 75.
24 Q.   Sixty to 75 different Power of Attorney
25      documents you've notarized for customers on

**Arturo Mayoral - CONFIDENTIAL - July 22, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

78

1    average during your tenure with NextGear?
2 A.  **Oh, 10 years?**
3 Q.  Tenure.
4 A.  **Oh, my tenure?  I would say that number was**
5    **per year, so do the math.**
6 Q.  Yeah.  So 60 to 75 per year?
7 A.  **Correct.**
8 Q.  Okay.  In 2019, do you recall how many Power
9    of Attorney documents you notarized on behalf
10   of NextGear?
11 A.  **I couldn't give you an accurate number.**
12 Q.  But your best estimate would be in that 60
13   to 75 range?
14 A.  **In that ballpark area, yes.**
15 Q.  Focusing your attention to the year 2019, as
16   a sales executive, do you have quotas?
17 A.  **Yes, we have quotas.  They're called key**
18   **performance indicators.**
19 Q.  Key performance indicators.  Is that
20   corporate speak for quota?
21 A.  **Correct.**
22 Q.  All right.
23 A.  **You know acronyms.  Everybody loves an**
24   **acronym.**
25 Q.  Sure.  And do you know what your quota was --

79

1    let me back up.  Was it a quota on an annual
2    basis, monthly basis, or how is it?
3 A.  **It's monthly.**
4 Q.  Okay.  And do you know what your quota was on
5    a monthly basis for the year 2019?
6 A.  **I believe it was 10 activations a month, 15**
7    **applications.**
8 Q.  Fifteen applications?
9 A.  **Correct.**
10 Q.  Per month?
11 A.  **Correct.**
12 Q.  So let me just make sure I understand that.
13   In essence, NextGear is saying to you, "We
14   want to have at least 15 applications come to
15   us per month"?
16 A.  **Correct.**
17 Q.  "And I want you to close 10 of those deals"?
18 A.  **Yes.  Out of the 15, five maybe declined or**
19   **may lose interest along the way.**
20 Q.  Yeah.
21 A.  **So, on average, that would be an accurate**
22   **number.**
23 Q.  But they're saying minimums?
24 A.  **Yeah.**
25 Q.  Your quota, you better be doing at least 15

80

1    applications coming in to us per month, and
2    you better be closing at least 10?
3 A.  **Correct.**
4 Q.  All right.  What happens if you don't?
5 A.  **After, I believe, 90 -- no, 60 days of not**
6    **meeting quota, you get put on a Performance**
7    **Improvement Plan, which is basically working**
8    **one on one with your manager, getting you**
9    **back up to pace.**
10 Q.  And have you ever been put on a Performance
11   Improvement?
12 A.  **I have.**
13 Q.  Are you on one as you sit here today?
14 A.  **No.**
15 Q.  How many times have you been put on a
16   Performance Improvement Plan?
17 A.  **Once.**
18 Q.  And I believe I have a copy of that document,
19   right?
20 A.  **Yes.**
21 Q.  And is that a document you looked at today in
22   preparation of your deposition?
23 A.  **No.**
24 Q.  Okay.  All right.  So we've kind of danced
25   around the April 18, 2019, day.  I asked you

81

1    what you did that day.  I don't intend to go
2    back and ask all those exact same questions,
3    but I do want to really focus in now on the
4    actual Premier Group Autos and how just kind
5    of the genesis of this relationship started,
6    and I'll work my way through.  So tell me how
7    Premier Group Autos was introduced to
8    NextGear.
9 A.  **To my recollection, I received a lead from**
10   **the Business Development Center.  Usually**
11   **those come about when a prospect calls the**
12   **company directly, and they inquire about**
13   **information.  I get the referral.  I**
14   **immediately reach out to the customer and**
15   **commence negotiations.**
16 Q.  Okay.  And that's what you believe happened
17   here?
18 A.  **Yes.**
19 Q.  All right.  And when you reached out to the
20   customer, who did you reach out to?
21 A.  **Mr. Blackburn, as he was the only locally**
22   **accessible partner.**
23 Q.  Okay.  And how did you reach out to him?  By
24   phone, in person?
25 A.  **We made an appointment, and we subsequently**

**SMITH REPORTING**
**www.smithreporting.net**

**Arturo Mayoral - CONFIDENTIAL - July 22, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

82

1    met.
2  Q.   Okay.  And where did you meet?
3  A.   In their offices.
4  Q.   Who's "they"?
5  A.   Premier Group Autos.
6  Q.   Okay.  Tell me about that meeting.
7  A.   I explained to Mr. Blackburn, and I believe
8       either his nephew or brother, an individual
9       called Samuel Blackburn, was there as well.
10 Q.   Okay.
11 A.   I explained how the floor plan works, our
12      expectations of our customers, and the
13      procedure on how to apply for the line of
14      credit.
15 Q.   Okay.  How long did that meeting last?
16 A.   I would say about 45 minutes.
17 Q.   During the meeting, did Mr. Blackburn ever
18      get Mr. Kessler on the phone?
19 A.   I believe he informed me that he was out of
20      town and that they were both in agreement
21      about this and that he would inform
22      everything about our meeting to him, and
23      that's where we left it at.
24 Q.   But you never spoke to Mr. Blackburn during
25      this initial meeting?

83

1         MR. JONES:  Object to form.  You meant
2    Kessler, didn't you?
3         MR. DELK:  Thank you.
4  FURTHER QUESTIONS BY MR. DELK:
5  Q.   Mr. Kessler.
6  A.   No, on the initial meeting, no.
7  Q.   And I think you said this, but to be clear,
8       the only time you claim to have ever talked
9       to Mr. Kessler is on April 18, 2019, right?
10        MR. JONES:  Objection.  Asked and
11   answered, I think.
12 FURTHER QUESTIONS BY MR. DELK:
13 Q.   Go ahead.
14 A.   To my recollection, that's the only time,
15      correct.  I may have spoken to him on the
16      phone.  I'm not completely sure of that.
17 Q.   After this first meeting that you arranged at
18      their office to kind of prospect, if you
19      will, and to show them the products, right,
20      did you leave an application with them,
21      Mr. Blackburn that is?
22 A.   I believe I did.
23 Q.   And I think you testified previously the
24      application was left, but yet Mr. Blackburn
25      filled it out and then sent it to you via

84

1    e-mail?
2  A.   Correct.
3         MR. DELK:  I'm going to put the exhibit
4    sticker on the back of the document.
5         (Whereupon Exhibit No. 3 is marked for
6    identification.)
7  FURTHER QUESTIONS BY MR. DELK:
8  Q.   Mr. Mayoral, I'm handing you what's been
9       marked as Exhibit 3, and it is Bates
10      No. NG000393.  This is the dealer application
11      that we've been talking about, right?
12 A.   Correct.
13 Q.   Now, the actual information that's contained
14      on the application, whose handwriting is
15      that, if you know?
16 A.   I believe it states that the application was
17      completed by James Blackburn, owner/partner.
18 Q.   All right.  Now, when you got the
19      application, and I think you said, again, via
20      e-mail, what did you do with it?
21 A.   I looked over the application to make sure
22      that all the required fields were correctly
23      filled out.  Other than that, I verified the
24      address, the amount, if he correctly stated
25      the number of sales this third time and does

85

1    it match what we discussed on the original
2    discovery.  All of those boxes checked out.
3  Q.   Okay.
4  A.   I put all the documents together.  I did the
5       summary and submitted to Lending.
6  Q.   Now, this summary, is it, like, a Word
7       document?  Where do you fill this summary
8       out?
9  A.   At the time, I believe it was an online form.
10      Nowadays we do it on Salesforce.
11 Q.   All right.  At the time, you believe it was
12      an online form, so --
13 A.   I believe so.  It's transitional time.
14 Q.   The first meeting you had with Mr. Blackburn,
15      was it in fact January 17, 2019?
16 A.   Yes.
17 Q.   All right.  Now, so on my computer screen,
18      I'm putting back up in front of you the copy
19      or the photograph of Edward Kessler's
20      license, Bates labeled NG000257.  And you can
21      see, and this is what I think you said you
22      used to verify the signature.  Now, I want
23      you to tell me, do you believe the signature
24      on the ID of Ed Kessler is the same as the
25      second signature on Exhibit 3?

**SMITH REPORTING**
**www.smithreporting.net**

**Arturo Mayoral - CONFIDENTIAL - July 22, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

---

86

1       MR. JONES: Object to form. Calls for an
2   expert opinion.
3   A.   I'm sorry. I'm not an expert. They seem
4        similar.
5   Q.   Your job as a notary public is to verify
6        signatures, right?
7   A.   But you're asking me about the application,
8        not about the Power of Attorney.
9   Q.   I understand. Your job as a notary public is
10       to verify signatures?
11  A.   Correct.
12  Q.   Okay. So I'm asking you right now to put
13       your notary public hat on and verify
14       signatures.
15  A.   Okay.
16  Q.   Now, I want you to tell me. Could you verify
17       that the signature at the bottom of Exhibit 3
18       is the same as the signature on the ID of
19       Mr. Kessler?
20       MR. JONES: Object to form. You said
21   "verify." You mean you want him to tell you
22   if they look similar or if he's --
23       MR. DELK: I want him to verify.
24  FURTHER QUESTIONS BY MR. DELK:
25  Q.   Would you notarize? Would you notarize this

---

87

1        application?
2        MR. JONES: Object to form. Calls --
3   A.   I wouldn't because --
4        MR. JONES: Stop. When I say,
5   "Objection," you stop.
6        THE WITNESS: Sorry.
7        MR. JONES: Object to form. Calls for
8   speculation.
9   FURTHER QUESTIONS BY MR. DELK:
10  Q.   Go ahead and answer my question.
11  A.   Could you repeat your question, please?
12  Q.   All right. If you were asked to notarize
13       Exhibit 3 and verify Edward Kessler's
14       signature, would you state that the signature
15       at the bottom of Exhibit 3 is the same as the
16       signature on the identification of
17       Mr. Kessler?
18  A.   I could not do that because I did not
19       presence the signature.
20  Q.   You didn't what?
21  A.   I wasn't present at the signature. I wasn't
22       present at the moment they signed the
23       application, so as a notary, I could not give
24       you my opinion. I would not notarize it
25       because the person was not present in front

---

88

1   of me.
2   Q.   Okay. Now I'm going to give you a
3        hypothetical. You're present, and somebody
4        claims to be Edward Kessler, and you have the
5        copy of the ID sitting there. Would you
6        verify and say that these are the same
7        signatures on the application and the ID?
8   A.   I would believe I would, yes.
9   Q.   So, in your opinion as a notary public, you
10       believe those signatures to be the same?
11  A.   If the person was in front of me, yes, and I
12       saw the license, it seemed similar. Why not?
13  Q.   So what do you mean, why not?
14  A.   I mean it's what you have to do.
15  Q.   What do you mean, you have to do? What do
16       you mean?
17  A.   If the signatures match --
18  Q.   Well, do you think that those signatures
19       match, the ID and the application?
20  A.   They seem very similar.
21  Q.   How so? Tell me how you think they seem
22       similar.
23       MR. JONES: And, again, objection to
24   form. It calls for opinion testimony. He's
25   not a handwriting expert.

---

89

1        MR. DELK: Great. Objection noted.
2   FURTHER QUESTIONS BY MR. DELK:
3   Q.   Tell me how you think they look similar.
4   A.   The loop at the beginning and then this part
5        over here seems very similar to that.
6   Q.   You said the "part at the very end"?
7   A.   Yeah.
8   Q.   Okay. Now, we were talking just a minute
9        ago, just a few seconds ago, actually, about
10       why the person needs to be there. What's
11       more important to you as a notary public, the
12       person being there in person or verifying a
13       signature based upon an identification?
14  A.   Both.
15  Q.   Neither one's more important than the other?
16  A.   No.
17  Q.   Okay. And why do you use the actual
18       identification? Is it to verify the person's
19       identity and the signature or is it something
20       different?
21  A.   Correct, both.
22  Q.   Okay. Both. All right. Now, looking at the
23       application on Exhibit 3 and verifying
24       signatures as a notary public does, you agree
25       that the date, 17 January, '19, is in fact

---

90

1     the same handwriting, right?
2  A.  Yes.  I would believe so.
3  Q.  You would -- I mean, that's obvious, right?
4     Yes?
5  A.  Identical, yes.
6  Q.  All right.  Does that put up a red flag or a
7     worry for you at all about somebody having
8     the exact same handwriting filling out the
9     date?
10 A.  Not on an application because the dealer
11    could have filled out the dates and then
12    passed it to his partner to sign.
13 Q.  Okay.  But you didn't fill out this
14    application, right?
15 A.  No.  It says it was filled out by James
16    Blackburn in the bottom left, last line,
17    "Application Completed By."
18 Q.  No, I see that.  Thank you.  In terms of the
19    application and the guarantor information
20    that's set forth in Exhibit 3, do you do
21    anything to verify the contact information or
22    the telephone number or anything of that
23    nature?
24 A.  No.
25 Q.  Does anybody from NextGear do anything to

91

1     verify the accuracy of the information set
2     forth on the guarantor information?
3  A.  I would believe the Underwriting department
4     does that.
5  Q.  You believe so or you know so?
6  A.  I know so.
7  Q.  Okay.  So you know that the Underwriting
8     department verifies that information?
9  A.  Correct.
10 Q.  All right.  Now, I want to focus your
11    attention, and we've touched a little bit
12    already on the day that we're really here to
13    talk about, April 18, 2019.  Remind me of
14    when you arrived at the Premier Group Autos
15    office.
16 A.  I believe it was April 18 close or around
17    11:30 a.m.
18 Q.  Who arranged the meeting for you to come and
19    sign or get the Power of Attorney signed?
20 A.  I believe that was Mr. Blackburn.
21 Q.  And how was the meeting arranged?
22 A.  His partner was supposed to be coming into
23    town, and he'll be there shortly for a few
24    days, and I believe we made the appointment
25    to meet.

92

1  Q.  Now, when you said that Mr. Kessler was
2     purportedly going to be in town for a few
3     days, who told you that information?
4  A.  Mr. Blackburn.
5  Q.  Okay.  And the setting up of this April 18,
6     2019, meeting, was it done over the phone,
7     over e-mail, text message?
8  A.  Telephone.
9  Q.  Telephone.  Who called who?
10 A.  Most likely I called Mr. Blackburn.
11 Q.  And what's your cellular phone number?
12 A.  I'm sorry?
13 Q.  Cell phone number.
14 A.  His or mine?
15 Q.  Yours.
16 A.  Mine was at the time (954) 607-7222.
17 Q.  And who's your wireless carrier?
18 A.  At the time, I believe it was Verizon.  It
19    still is.
20 Q.  And the cell phone you used, what kind of
21    phone was it?
22 A.  An iPhone.
23 Q.  Is that a company-provided iPhone or a
24    personal phone?
25 A.  Personal.

93

1  Q.  And then the company reimburses you for your
2     plan?
3  A.  No.  We have -- we had an office allowance.
4     We discontinued that practice, and now we
5     have corporate phones.
6  Q.  Okay.  And the name of the customer from
7     Verizon for this cell phone number you gave
8     me, is it in your name, your wife's name?
9  A.  My name.
10 Q.  Okay.  All right.  So do you know when you
11    called Mr. Blackburn prior to April 18, 2019?
12 A.  No recollection.
13 Q.  Was it a day before, two days before?
14 A.  It could have been two or three days before.
15    I have no recollection.
16 Q.  All right.  So you call him up.  And what do
17    you say to him?
18 A.  "Can you please inform me when your partner's
19    going to be in town?  We have to get the
20    notary done."  And that was it.
21    He said -- I'm sure he said, "He's coming
22    in next week" or tomorrow, day after.  I
23    don't have any recollection, but I'm sure we
24    made the appointment, and that's how it came
25    about.

**Arturo Mayoral - CONFIDENTIAL - July 22, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

94

1  Q.  Okay.  How long was the phone call?  Was it
2      just kind of that short and quick?
3  A.  Short.
4  Q.  Okay.  And then Mr. Blackburn presumably
5      tells you where to meet or what?
6  A.  Yes.  We had previously met at their offices,
7      and that's where we always met.
8  Q.  Okay.  All right.  So you arrive at the
9      Premier Group Autos office on April 18, 2019,
10     I think you said around 11:30 in the morning?
11 A.  Correct.
12 Q.  Do you know if that was the scheduled time
13     for the meeting or it was just a, "Hey, swing
14     by"?
15 A.  No.  That was the scheduled time.
16 Q.  Okay.  So would that be, that scheduled time,
17     reflected on your Outlook calendar?
18 A.  Possibly, although I don't normally do that.
19 Q.  How do you keep track of your appointments?
20 A.  Mentally.
21 Q.  Okay.  All right.  So you show up.  And is
22     there a reception area?  Or tell me.
23 A.  I went up to the second floor of the
24     building.  The door was locked.  I rang on
25     the bell.  Mr. Blackburn showed up at the

95

1      door and opened the door for me.
2  Q.  Okay.  And then he opens the door.  And then
3      what happens next?
4  A.  We proceed to the conference room.
5  Q.  All right.
6  A.  Where I'm introduced to Mr. Kessler.
7  Q.  So is the person who you believe to be
8      Mr. Kessler, is he seated at the table?
9  A.  At the table, correct.
10 Q.  All right.  We already talked about the best
11     memory of his appearance.  And so tell me
12     what happens next.
13 A.  As I mentioned earlier, introduced to the
14     person.  We had chitchat, small talk.  I
15     proceeded to sit down, show him the document
16     again.
17 Q.  The Power of Attorney document?
18 A.  Correct, the Power of Attorney document.
19     Asked him if he had any concerns or questions
20     on the document.  He stated, "No," and he
21     willingly signed.
22 Q.  All right.  Now, who signed -- who did you
23     present the Power of Attorney document to
24     first?
25 A.  Mr. Kessler.

96

1  Q.  All right.  So is Mr. Kessler and Mr.
2      Blackburn in the same conference room?
3  A.  Yes.
4  Q.  Okay.  And so you present the Power of
5      Attorney document to Mr. Kessler?
6  A.  Correct.
7  Q.  And Mr. Blackburn is sitting to Mr. Kessler's
8      right or left?
9  A.  As I recall, he was at the head of the table,
10     pretty much like we are right now, at the
11     head of the table and either side.
12 Q.  Okay.  So Mr. Blackburn's at the head of the
13     table, and you are sitting across from the
14     man you claim to be Mr. Kessler?
15 A.  Mr. -- yes.  Correct.
16 Q.  Okay.  And you present the Power of Attorney
17     document to Mr. Kessler, and tell me what
18     happens next in terms of discussion.  You
19     asked if he has any questions, and then what?
20 A.  He replies, "No."
21 Q.  Okay.
22 A.  And he willingly signs the contract.
23 Q.  Okay.  Now, when you present the Power of
24     Attorney document to Mr. Kessler, is any
25     aspect or portion of the Power of Attorney

97

1      document pre-signed or pre-filled out in any
2      way?
3  A.  Could you be more clear?
4  Q.  Well, do you present him a completely blank
5      Power of Attorney?
6  A.  No.  No.  It's already filled in.
7  Q.  Okay.  What's filled in?
8  A.  All the terms and conditions of the Power of
9      Attorney.
10 Q.  The typewritten?
11 A.  Correct.
12 Q.  Yeah.  Sure.  But I'm talking about
13     handwriting.
14 A.  Oh, the handwriting part, I get you.  Yes.
15     After the signature, after the customer
16     completes the signature, I fill out the State
17     of Florida section.
18 Q.  No, I understand that.  Let me just make sure
19     we're on the same page.  When you first
20     present the Power of Attorney document to the
21     person you claim to be Mr. Kessler, is there
22     any handwriting on the document at all before
23     giving it to Mr. Kessler?
24 A.  No.
25 Q.  Okay.  So you give it to him, ask him if he

**Arturo Mayoral - CONFIDENTIAL - July 22, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

98

```
1     has any questions.  He says, "No."  And then
2     you say Mr. Kessler willingly signed,
3     correct?
4  A.  Correct.
5  Q.  All right.  Now, does Mr. Kessler fill out
6     the entirety of the portion where he's
7     required to sign?
8  A.  He does.
9  Q.  Does he give the Power of Attorney document
10    to any other person for any other sort of
11    filling out of the Power of Attorney?
12 A.  He gave it to me.
13 Q.  Okay.  So, to be clear, Mr. Kessler signs and
14    dates the Power of Attorney and gives it to
15    you?
16 A.  Correct.
17 Q.  All right.  And then when he does that, what
18    happens next after he signs and dates it?  So
19    you see him sign his name and date it,
20    correct?
21 A.  Uh-huh.
22 Q.  Is that a yes?
23 A.  Correct.
24 Q.  And then he gives you the Power of Attorney
25    document?
```

99

```
1  A.  Yes.
2  Q.  And then what do you do?
3  A.  I look at the Power of Attorney.  I look at
4     the driver's license copy that I have.
5     Signatures appear similar.  The person
6     appears similar.  I go ahead and fill out the
7     State of Florida section, date it, sign it,
8     and stamp it.
9  Q.  Okay.  And then with that original document,
10    what do you do with it?
11 A.  That original document is put into a
12    FedEx --
13 Q.  That was a bad question.  You jumped ahead of
14    me --
15 A.  Sorry.
16 Q.  -- because that's logical what you do.  But
17    when you actually received it back after you
18    signed, dated it, stamped it, notarized it,
19    what do you do with it after that?  Do you
20    just place it off to the side?
21 A.  I immediately put it in a FedEx envelope that
22    already has the label, I seal the envelope,
23    and I send it to corporate.
24 Q.  Okay.  Now, after you obtain the Kessler
25    signature, what happens next, still focusing
```

100

```
1     on the meeting?
2  A.  Yes.  Mr. Blackburn signed his Power of
3     Attorney as well.  I verified as well, and no
4     need for the license because he was known to
5     me.  I also filled out the State of Florida
6     section with my information, my signature,
7     and my stamp, proceeded to place that in the
8     FedEx envelope with Mr. Kessler's Power of
9     Attorney.
10 Q.  Okay.  So you did not verify Mr. Blackburn's
11    identity or his signature, correct?
12 A.  He was known to me previously.
13 Q.  Because he was known to you?
14 A.  Correct.
15 Q.  And is that a kind of either/or in terms of
16    serving as a notary public?  If the person is
17    known to you, you don't necessarily have to
18    ask for the identification?
19 A.  That is correct.
20 Q.  All right.  But here, with Mr. Kessler, you
21    had to ask for identification or at least you
22    had it?
23 A.  I had it, correct.
24 Q.  And therefore --
25 A.  Correct.
```

101

```
1  Q.  Okay.  In terms of getting Blackburn's
2     signature, tell me about that.  So you gave
3     him the Power of Attorney document.  And at
4     the time you gave him the Power of Attorney
5     document, was anything filled out or
6     handwritten on the Power of Attorney
7     document?
8  A.  No, sir.
9  Q.  Okay.  So you then observe Mr. Blackburn sign
10    and date the Power of Attorney document?
11 A.  Yes, sir.
12 Q.  And then he gives you the Power of Attorney
13    document?
14 A.  Yes, sir.
15 Q.  All right.  Did Mr. Blackburn have anybody
16    else fill out anything in the handwriting at
17    all on the Power of Attorney document?
18 A.  No, sir.
19 Q.  Okay.  So it was Mr. Blackburn's handwriting
20    on his Power of Attorney document and
21    Mr. Kessler's handwriting on his Power of
22    Attorney document?
23 A.  Correct.
24 Q.  Okay.  All right.  And then he -- then
25    Mr. Blackburn gives you the Power of
```

**Arturo Mayoral - CONFIDENTIAL - July 22, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

102

1    Attorney; you put it into the FedEx envelope,
2    correct?
3  A.  Yes, sir.
4  Q.  And is that the end of the meeting?
5  A.  Yes, that's the end of the meeting.  We shake
6    hands, part ways.
7  Q.  So, I mean, we're talking, it sounds like --
8  A.  Fifteen minutes.
9  Q.  I was going to say maybe five.  But 15?
10  A.  Yeah, pleasantries.
11  Q.  Fifteen's because of the pleasantries?
12  A.  Correct.
13  Q.  I mean, the actual business is less than two,
14    three minutes?
15  A.  Correct.
16  Q.  Okay.  All right.  And so tell me, after you
17    get the Power of Attorney documents, you put
18    them into the FedEx envelope, tell me about
19    the pleasantries that are discussed.  I think
20    you mentioned before Mr. Kessler apparently
21    said he's going to be in town for a few days?
22  A.  Correct.  We mostly spoke about their
23    business, their Range Rovers.  We talked
24    about obtaining inventory at the auctions and
25    how they go about that, the weather, how long

103

1    he's going to be in town, for a couple of
2    days, and that's about it.
3  Q.  Okay.  Was there anybody else present in the
4    meeting?
5  A.  No.
6  Q.  So just the three of you?
7  A.  Correct.
8  Q.  Blackburn, you, and Kessler?  Yes?
9  A.  Correct.  Yes.
10  Q.  Did you see anybody else going up into the
11    meeting and/or after the meeting?
12  A.  I did not see anyone else in the office.
13  Q.  Okay.  So no bookkeepers or secretaries or
14    anything like that?
15  A.  No, not at that meeting.
16    MR. JONES:  Hey, Jason, I had copies
17    printed if you want to use that.
18    MR. DELK:  Thank you.  I'm going to go
19    ahead and just mark them.
20    THE WITNESS:  Exhibit 1?  Yeah.
21    MR. JONES:  He'll just put it in there.
22    Because we were talking about it, so I wanted
23    to make sure we have it in the record.
24    (Whereupon Exhibit No. 4 is marked for
25    identification.)

104

1  FURTHER QUESTIONS BY MR. DELK:
2  Q.  To be clear, Mr. Mayoral, I'm handing you
3    what's been marked as Exhibit 4.  In Exhibit
4    4, the first page is identified as NG000257.
5    And is the first page of Exhibit 4 a true and
6    accurate copy of the photograph ID of
7    Mr. Edward Kessler that you used to verify
8    Mr. Kessler's signature and identity on April
9    18, 2019?
10  A.  Yes, sir, it is.
11  Q.  And so you had -- it was this size?
12  A.  Yes, sir.
13  Q.  It's identical basically?
14  A.  Identical.
15  Q.  And it was in black and white?
16  A.  Yes, sir.
17  Q.  Not color?
18  A.  Yes, sir.
19  Q.  And then the same with the second page of
20    Exhibit 4, identified as NG000258, that is
21    the identification of Mr. James Blackburn,
22    correct?
23  A.  Yes, sir.  Correct.
24  Q.  And you didn't use that during the Power of
25    Attorney?

105

1  A.  I had no need to use it as he was known to
2    me.
3  Q.  Perfect.  Mr. Mayoral, who is Jordan Cox?
4  A.  Jordan Cox is my regional director, my
5    supervisor.
6  Q.  Okay.  And is he still your regional director
7    or supervisor?
8  A.  Yes, sir.
9  Q.  Okay.
10    (Whereupon Exhibit No. 5 is marked for
11    identification.)
12  FURTHER QUESTIONS BY MR. DELK:
13  Q.  I'm handing you what's been identified as
14    Exhibit 5.  It is Bates labeled NG000259, for
15    Mr. Rocap's benefit.
16    MR. DELK:  I'm sorry, Dick.  I don't have
17    copies for you.
18    MR. JONES:  Here you go.
19    MR. DELK:  That's my error.
20  FURTHER QUESTIONS BY MR. DELK:
21  Q.  Exhibit 5 consists of, looks like, e-mail
22    correspondence, two different e-mails between
23    you and Jordan Cox, true?
24  A.  Correct.
25  Q.  All right.  Looking at the bottom e-mail

**Arturo Mayoral - CONFIDENTIAL - July 22, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

---

106

1    dated March 23, 2021, at 4:42 p.m., it looks
2    like the subject line is "Premier Group
3    Autos - POA Issue"?
4  A.    Uh-huh.
5  Q.    All right.  Why did you send this e-mail to
6        Mr. Cox?
7  A.    Mr. Cox had requested, "Please see attached
8        and let me see what you know and recollect,
9        and send me whatever information you have."
10       So Mr. Cox was my supervisor, was requesting
11       that I send all documentation and anything
12       that I could recall on this specific account.
13  Q.   What was attached?  What did Mr. Cox attach
14       asking you to look at?
15  A.   I believe it was the subpoena.
16  Q.   What subpoena?
17  A.   The one that you sent me, that you sent to my
18       lawyers.
19  Q.   The subpoena's dated June 11, 2021.
20  A.   Okay.  So --
21            (CELL PHONE RINGING.)
22  A.   Sorry.  Let me recollect my thoughts.
23  Q.   That's okay.  You thought it was the
24       subpoena?
25  A.   Yes.  It was probably some notice that there

---

107

1        was a problem with this account, that there
2        was an issue, and to provide any
3        documentation that I could provide or
4        anything that I could recall from this deal.
5  Q.    Okay.  And so you then respond, and, again,
6        that's at the bottom half of the first page
7        of Exhibit 5.  You say, "Jordan, On March 27,
8        2019, I received a Docustamp check image for
9        the above account from James Blackburn."
10       What is that?
11  A.   A Docstamp check, State of Florida has a tax
12       on lines of credit.  When you submit a line
13       of credit to the State of Florida and get
14       what's called a UCC, there's a tax to be
15       paid.  That's called a Docstamp, documentary
16       stamps.
17  Q.   Okay.
18  A.   I believe it comes from when they used to use
19       tax stamps on the documents.  Now obviously
20       it's electronic.  Every line of credit has to
21       have a Docstamp check paid before we can
22       activate the account.
23  Q.   Okay.  I forgot to ask you this.  On April
24       18, 2019, at the actual Premier Group Autos
25       office, you were in a conference room.

---

108

1        Describe the conference room for me.
2  A.    There is a hallway entrance, a glass-door
3        hallway entrance.  You take a right-hand
4        side.  There's a glass wall with a conference
5        room pretty much like this one and a glass
6        door.
7  Q.    Okay.  And do you remember any specific,
8        like, artwork or colors on the walls or
9        anything like that?
10  A.   They did have a lot of posters for yachts and
11       jet planes.  They claimed to have a brokerage
12       and an airplane charter business as well.
13  Q.   When you say "they," you mean --
14  A.   Mr. Blackburn.
15  Q.   All right.
16  A.   I do recall that the office had a beautiful
17       waterfront view in front of the marina.
18  Q.   Okay.  All right.  So, going back to Exhibit
19       5, the second sentence says, "Ed Kessler was
20       out of town and would not return for a couple
21       of weeks."  What are you basing that
22       statement off of?
23  A.   From Mr. Blackburn's information.
24  Q.   Okay.  "Two weeks later" -- I'm still reading
25       from the e-mail.  "Two weeks later, I was

---

109

1        contacted to meet both partners at their
2        corporate office located at 1500 Cordova
3        Road, Suite 206, Fort Lauderdale, Florida
4        33316," correct?
5  A.    So I believe Mr. Blackburn did contact me
6        letting me know instead of me contacting him
7        like I told you previously.
8  Q.    Okay.
9  A.    I mean, it's in my notes, so I'm pretty sure
10       that this is accurate.
11  Q.   So you believe that your notes closer in time
12       to the date in question are more accurate
13       than --
14  A.   Correct, than my recollection.
15  Q.   Okay.  And it's still possible, though, that
16       you may have reached out to Mr. Blackburn,
17       Mr. Blackburn returned your call and said --
18  A.   Precisely, yeah.
19  Q.   Right.  Okay.  You said, "Where they also
20       have a jet charter business and a yacht
21       brokerage.  On April 18, 2019, I met with
22       Mr. Blackburn and Mr. Kessler.  I verified
23       the IDs and followed Procedure notarizing
24       their respective documents."  All right.  I
25       want to focus on this sentence, "I verified

---

**Arturo Mayoral - CONFIDENTIAL - July 22, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

110

1         the IDs."
2  A.    Correct.  I verified Mr. Kessler's ID.  I did
3         not have to verify Mr. Blackburn's ID as he
4         was known to me.
5  Q.    Okay.  So let's just be clear what we're
6         talking about that we're verifying IDs.  You
7         didn't verify the actual identification of
8         Mr. Kessler?
9  A.    No.  I identified a copy of the
10        identification.
11 Q.    You identified a copy of an identification or
12        a photograph of an identification given to
13        you by Mr. Blackburn?
14 A.    Correct.
15 Q.    You never once actually received
16        Mr. Kessler's identification card or ID from
17        Mr. Kessler, correct?
18 A.    I believe so.  Correct.
19 Q.    Okay.  So you didn't verify the actual
20        identification?  You identified the picture
21        of the identification card?
22 A.    Correct.
23 Q.    And tell me how you identify a picture of an
24        identification card.  What did you do to
25        verify it?

111

1  A.    You basically look at it, look at the picture
2         and look at the signature.
3  Q.    Okay.  So your verification is by looking at
4         the photograph of Mr. Kessler and then
5         looking at purportedly Mr. Kessler and
6         saying, "Yes, it's the same person"?
7  A.    Correct.
8  Q.    Okay.  Then it says, "I verified the IDs."
9         And let me ask another question.  By the way,
10        why didn't you say to your boss, Mr. Cox, "I
11        verified a photograph of the identification
12        card of Mr. Kessler"?
13 A.    I don't know, honestly.
14 Q.    Because that's more accurate, right?
15 A.    Yeah.  I didn't go into such detail.
16 Q.    "I verified the IDs and followed Procedure."
17        That's with a capital P.  Lawyers, we see a
18        capitalized term, and it gets me all excited
19        thinking it's, like, a defined term
20        somewhere.  Any reason why you used capital
21        P?
22 A.    Probably a typo.
23 Q.    Okay.  And when you say, "followed
24        Procedure," what procedure are you
25        referencing?

112

1  A.    The notary procedure.
2  Q.    The one we've already identified?
3  A.    Correct, sir.
4  Q.    All right.  "...and followed Procedure
5         notarizing the respective documents.  I
6         collected the Docstamp check and POAs and
7         placed them in a FedEx envelope."  True?
8  A.    True.
9  Q.    "They were immediately sent to corporate by
10        me."  So after the meeting, do you take it
11        to, like, a FedEx dropbox?
12 A.    Yes, sir.
13 Q.    All right.  "I then proceeded to Onboard the
14        dealer and set up their preferences in the
15        portal."  Now, that's what I want to talk
16        about.  What does it mean to onboard the
17        dealer?  What does that mean?
18 A.    Onboarding the dealer is educating the dealer
19        on how to use the floor plan.
20 Q.    Okay.
21 A.    Setting the correct expectations of their
22        performance, teaching them how to use the
23        portal, which is the internet access to their
24        account, how to request titles if they need
25        so, basically how the whole system works and

113

1         how to get the most advantage of it.  So it's
2         basically educating the dealer on how to use
3         the system.
4  Q.    Okay.  So did that happen at the April 18,
5         2019, meeting?
6  A.    I have no recollection.  It could have
7         happened at that meeting.  It could have
8         happened before.  It must have happened
9         before probably.  I have no recollection,
10        again, but usually I do the onboarding right
11        after the contract's closed.  The Power of
12        Attorney has no influence whatsoever on the
13        activation of the account.
14 Q.    Well -- okay.  I mean, can a customer draw on
15        funds or request funds without being
16        onboarded or knowing how to --
17 A.    Yes, they can.
18 Q.    -- or even knowing how to use the portal or
19        anything?
20 A.    Yes, they can.
21 Q.    Did that happen here?
22 A.    It did not.
23 Q.    Okay.
24 A.    I don't believe it did.  I believe that their
25        first vehicle was a vehicle that was owned by

**Arturo Mayoral - CONFIDENTIAL - July 22, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

114

1  Mr. Blackburn.  He had the bill of sale, and
2  we proceeded to upload that information into
3  the portal, and I believe he got paid for
4  that vehicle.
5  Q.  Okay.  But you're using the term there, "I
6  then proceeded to Onboard the dealer."  I
7  mean, that suggests, doesn't it, that you're
8  onboarding and setting up of the portal --
9  A.  Yeah.  See, and here it says, "We also
10  Specific Sourced the Range Rover."  So I did
11  do the onboarding that day, and we did put
12  that vehicle on the floor plan.
13  Q.  All right.  So then when is the first time,
14  then, funds or a loan of funds were issued
15  from NextGear to Premier Group Autos?
16  A.  I don't have access to that information.  It
17  could have been at that moment.  I do believe
18  it was before that.  I believe they had an
19  auction purchase, but, again, I don't
20  recollect.  I mean, so many customers and so
21  many years ago, but I do believe that they
22  bought right after they signed the contract,
23  so, again, I would have to go back and look
24  into the records.
25  Q.  Okay.  Then it goes on, "All my activities

115

1  are logged in Salesforce"?
2  A.  That is correct.
3  Q.  All right.  What do you mean by all
4  activities?  Like, give me an idea of what
5  you mean by that.
6  A.  Any time I had a contact with a customer, be
7  it a phone call, e-mail, that all gets logged
8  into Salesforce.  Visits get logged into
9  Salesforce.
10  Q.  Okay.  I've asked for Salesforce information,
11  and I don't see anything relating to your
12  activities.  I have a printout, I think, and
13  maybe the best way to get me the information
14  perhaps.
15  (Whereupon Exhibit No. 6 is marked for
16  identification.)
17  FURTHER QUESTIONS BY MR. DELK:
18  Q.  I'm handing you what's been marked as Exhibit
19  6.  I don't want to put words in your mouth,
20  but I'm going to represent to you that I
21  believe this to be the Salesforce printout of
22  activity for the Premier Group Autos account.
23  Does this look to be that Salesforce
24  information?
25  MR. JONES:  What are those Bates numbers

116

1  on there?
2  MR. DELK:  It is NG000014 through 33.
3  MR. JONES:  Thanks.
4  A.  It appears to be a transcript of Salesforce.
5  Q.  Okay.  So for some reason, the first date I
6  have is September 20, 2019, and I don't see
7  you anywhere.
8  A.  September 20, 2019, was when the account was
9  discovered to be in default, so that would be
10  the end.  So, like the e-mails, it would
11  start at the very back.  And, again, this is
12  April 2020.
13  Q.  Yeah.  I mean, there's no activity by you
14  logged into this Salesforce printouts, and
15  the first date where it starts is when the
16  account becomes in default.
17  A.  This I don't believe is Salesforce.  This I
18  believe comes from our other system,
19  Discover.
20  Q.  Okay.
21  MR. DELK:  Brian, do you know?
22  MR. JONES:  I'm looking now to see if
23  we've got it.
24  MR. HOKE:  It's from Discover, not
25  Salesforce.

117

1  MR. DELK:  All right.  Do you have the
2  Salesforce stuff?
3  MR. JONES:  I don't have it here in this
4  computer.
5  THE WITNESS:  It's required that we log
6  all our activities.
7  MR. JONES:  Hold on.  Let me see.
8  MR. DELK:  Because I knew you were going
9  to get me that.  I assumed that's what this
10  was.
11  MR. JONES:  Let me see.  It may not be on
12  this computer.  You want to e-mail that to
13  me?
14  MR. HOKE:  Yeah.
15  THE WITNESS:  Yeah.  There's financial
16  information here that wouldn't be in
17  Salesforce.
18  MR. JONES:  Do you want to get a lunch
19  break, and we can get that printed out?
20  MR. DELK:  That's fine.  I was planning
21  on plowing through subject to your approval,
22  but we can take a quick one.  That's fine.
23  MR. JONES:  That might help us resolve
24  it.  That way we can get you a bunch of
25  e-mails.

118

1        MR. DELK:  That's fine.  Thank you.
2        MR. JONES:  If there was something where
3    it didn't get produced by me, that's on me,
4    and we can fix that, make it all right.
5        MR. DELK:  Let me just make sure.  This
6    is another document I had, but this was
7    originally produced, and I don't believe it
8    to be -- is this Salesforce?
9        MR. HOKE:  That's Discover.
10       MR. DELK:  We can go off the record, take
11   a break.  Thank you.
12       (BRIEF RECESS TAKEN.)
13       (Whereupon Exhibit No. 7 is marked for
14   identification.)
15   FURTHER QUESTIONS BY MR. DELK:
16   Q.   We are back on the record after a brief lunch
17        break and getting a few documents
18        straightened out.  Mr. Mayoral, I was in the
19        process of talking to you about the e-mail
20        set forth at the bottom of Exhibit 5 where it
21        says, "All my activities are logged in
22        Salesforce."
23   A.   Correct.
24   Q.   And that's when we broke into the Salesforce
25        discussion.  Now I want to talk to you a

119

1        little bit about Salesforce in general.  Tell
2        me what you are required to do or supposed to
3        do with Salesforce as a sales executive.
4    A.   Log our visits.  We have to log our phone
5         calls.  Any interactions that we've had with
6         a customer must be documented.
7    Q.   Okay.  Tell me about that.  What do you mean?
8    A.   If I did a visit with a customer, I'll just
9         log the visit and say, "Hey, I was here with
10        a customer.  We did this," and next, and move
11        on.
12   Q.   Okay.  So you summarize or give information
13        about what you did at that visit or the
14        nature of the phone call or something like
15        that?
16   A.   Correct.
17   Q.   Okay.  Is there some sort of written policy
18        or procedure from corporate or NextGear to
19        sales executives explaining what they need to
20        put into Salesforce?
21   A.   Not that I'm aware of.
22   Q.   Okay.  How did you learn of what you were
23        required to put into Salesforce?
24   A.   Most likely it was in a corporate training.
25   Q.   Okay.

120

1    A.   I don't recall it because it was so long ago.
2    Q.   Okay.
3    A.   But most likely every time you roll out a new
4         product, we do get training on it.
5    Q.   Okay.  And so you are -- any time you have an
6         interaction with a customer, you log it, and
7         then you give information as to what was
8         discussed and what you did, correct?
9    A.   Yeah, or a summary thereof.
10   Q.   A summary thereof.  Not a blow-by-blow but
11        certainly a summary, correct?
12   A.   Yeah, thousand-foot overview.
13   Q.   And you highlight important things that you
14        did at that meeting or discussed, correct?
15   A.   To the best of my abilities, yes.
16   Q.   Okay.  Have you ever been criticized from any
17        of your superiors at all about not logging
18        information accurately or correctly into
19        Salesforce?
20   A.   I have not.
21   Q.   All right.  So let's just look at the
22        Salesforce printout.  I'm handing you what's
23        been marked as Exhibit 7.  The type is a bit
24        small, but I think we can work with it.
25       MR. DELK:  Everybody has copies already?

121

1        MR. HOKE:  Yeah.
2    FURTHER QUESTIONS BY MR. DELK:
3    Q.   All right.  So Exhibit 7 was produced to me
4         during the break from your counsel, and this
5         is the Salesforce printout.  And so let's
6         look at kind of like the -- underneath the
7         column identified as Activity Date on Exhibit
8         7.  Do you see that at the very top?
9    A.   Yes, sir.
10   Q.   All right.  So I want to go down to the --
11        really your first entry.  It looks like maybe
12        that would be January 15, 2019, correct?
13       MR. JONES:  There's actually one earlier.
14       MR. DELK:  Oh, is it?
15       MR. JONES:  Yeah.
16       MR. DELK:  Oh, thank you.
17   FURTHER QUESTIONS BY MR. DELK:
18   Q.   December 13, 2018.  Do you see that there,
19        first page of Exhibit 7?
20   A.   Okay.  Yes.  Correct.
21   Q.   So then you come over.  It says, "Name,
22        Arturo F. Mayoral, comments."  Are these your
23        comments?  It says, "Office for jet sales?
24        Dealer not in, left card"?
25   A.   Correct.

126

1    he requested that we lower the line to
2    150,000 with no collateral.  So we went from
3    a million to 300 to 150.
4  Q.  And, to be clear, when you're saying "he,"
5    this is James Blackburn?
6  A.  Yes, sir.
7  Q.  It's not Ed Kessler?
8  A.  Yes, sir.
9  Q.  Correct, it's not --
10 A.  Correct, it's not Ed Kessler.
11 Q.  All right.  So then March 19, 2019, you have
12    another activity, "Spoke with James, who
13    requested we void contract and relook for
14    150,000.  No ADCO."  That's --
15 A.  Yeah, additional collateral.
16 Q.  Okay.  That's what you just mentioned?
17 A.  Correct.
18 Q.  And is that the actual nature of the
19    transaction that took place is it ended up
20    being for $150,000?
21 A.  Correct, sir.
22 Q.  March 22, 2019, "James was at auction.  No
23    answer yet from Lending."  What is that?
24 A.  That means that I ran into Mr. Blackburn at
25    the auction, and we still had not received an

127

1    approval from Lending, so he probably
2    approached me, asked me, "Hey, you know,
3    where's my contract?"
4        I'm like, "It's not approved yet."
5  Q.  Okay.  March 25, 2019, another log-in by you.
6    "Comments, Closing DocuSign."  What's that?
7  A.  That means that the DocuSign was sent to the
8    dealer.  I informed them of the access code
9    and the procedure, and they proceeded to do
10    the DocuSign.
11 Q.  Again, and you were memorializing in
12    Salesforce what you were doing in making sure
13    you secured contract documents?
14 A.  Correct.
15 Q.  The fact that you sent the e-mail, you logged
16    it in?
17 A.  Correct.
18 Q.  All right.  Let's look for your next entry.
19    Looks like March 29, 2019, "James is trying
20    to buy a vehicle today"?
21 A.  Correct.  That would probably be at the
22    auction as well.  He attended regularly, and
23    I was there every Friday, so we ran into each
24    other every Friday.  He was trying to
25    purchase a vehicle.  Obviously high-end Range

128

1    Rovers aren't easy to come by, so, you know,
2    it's a hit-or-miss proposition.
3  Q.  Okay.  And so what did that have to do with
4    you and logging something into Salesforce?
5    Just the fact that you had an interaction
6    with a customer?
7  A.  Correct.
8  Q.  Okay.  So the fact -- I mean, he wasn't
9    asking for money or anything?  He was just
10    saying, "Hey, I'm trying to buy a vehicle
11    today"?
12 A.  Correct.
13 Q.  And the fact that you even ran into a
14    customer, had a discussion with a customer
15    about him wanting to buy a vehicle, you
16    thought enough to log that into Salesforce?
17 A.  Yes, sir.
18 Q.  Being thorough?
19 A.  Yes, sir.
20 Q.  Documenting everything that you did with a
21    customer, correct?
22 A.  As best as I can, yes.
23 Q.  Okay.  Makes sense.  All right.  4/16/19,
24    page 2 of Exhibit 7, that looks like your
25    next entry.  4/16/19, "Comments, Spoke with

129

1    James, and he was at the auction.  Hopefully
2    he will buy."  Again, same thing, right?
3  A.  Correct.
4  Q.  Ran into him; he's hoping to buy some sort of
5    vehicle, right?
6  A.  Correct.
7  Q.  And, again, you being thorough, logging your
8    interactions with a customer, you put that
9    into Salesforce?
10 A.  Yes, sir.
11 Q.  All right.  4/18/19 looks like your next
12    interaction.  "Onboarded dealers at office.
13    Rapid pay Range Rover," correct?
14 A.  Correct.
15 Q.  All right.  Now, what is that?
16 A.  Basically the onboarding, as I explained
17    before, is training the dealer on the portal.
18    Rapid pay on the Range Rover would be that he
19    is in possession of a title of the Range
20    Rover, and he wants to put it on the floor
21    plan with us.
22 Q.  Okay.  And so he -- let me just make sure.
23    So the onboarding process you already talked
24    about, that's what you did, and because you
25    did that, you logged it into Salesforce,

**Arturo Mayoral - CONFIDENTIAL - July 22, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

---

130

1    correct?
2 A.  Correct.
3 Q.  Now, what did -- rapid pay Range Rover,
4    explain that to me.
5 A.  Yeah.  Again, rapid pay is the process of
6    putting a car on the floor plan that was not
7    bought at the auction, that the dealer has in
8    his inventory.
9 Q.  Okay.
10 A.  So the dealer basically owns that vehicle.
11    He's sending us the title.  We reimburse the
12    dealer.
13 Q.  Okay.  So he must have put it on the floor
14    plan.  So whatever the value of that vehicle
15    is, you then give the money?
16 A.  Correct.
17 Q.  Okay.  And so was that transaction done that
18    day on April 18, 2019?
19 A.  Yes.
20 Q.  Okay.  So, I mean, was it instantaneous,
21    title is given, money goes?
22 A.  The way it works, it's done through the
23    portal.  You upload the image of the title
24    front and back and the bill of sale.
25 Q.  All right.

---

131

1 A.  You do the process, which is a five-step
2    process, the valuation.  If you agree with
3    the valuation, then it gets sent to NextGear.
4    The dealer puts the title and the bill of
5    sale in the FedEx envelope, and we pay the
6    dealer even before we receive that title, so
7    that's why it's called rapid pay.
8 Q.  And so because you were doing the onboarding
9    process that day, getting the portal set up,
10    you then were able to do the rapid pay for
11    the Range Rover on that same day?
12 A.  Correct.  It was just a coincidence that it
13    happened that way.
14 Q.  Okay.  Do you know how much money was then
15    floored or given from NextGear in exchange
16    for that Range Rover?
17 A.  I do not recall.
18 Q.  All right.  And so those were obviously two
19    significant activities you did, so you logged
20    them in Salesforce, correct?
21 A.  Correct.
22 Q.  Now, you didn't log in on 4/18/19 the fact
23    you got the POA signed?
24 A.  Correct.  I must have omitted that.  Again,
25    as much as I can, time permitting.  I may

---

132

1    have skipped that, may have forgotten it in a
2    rush to get to the next appointment.  I
3    failed to disclose that.
4 Q.  Okay.  So you mentioned when you run into him
5    at an auction and he says he's going to buy a
6    vehicle, has nothing to do with NextGear, but
7    yet getting the POA signed, having the POA
8    signed on April 18, 2019, you failed to log
9    that into Salesforce?
10 A.  Yes.
11 Q.  All right.  Go the same page, going down to
12    August 23, 2019.  Do you see that entry?
13 A.  Yes.
14 Q.  All right.  It says -- this is, again, your
15    log-in or your entry -- "Met with James'
16    partner at the auction.  All is well"?
17 A.  Correct.
18 Q.  Who are you referencing there?
19 A.  Mr. Kessler.
20 Q.  Okay.  So it's your testimony that the
21    individual you met on August 23, 2019, at the
22    auction, is it the exact same person that you
23    observed sign the Power of Attorney?
24 A.  Correct.
25 Q.  Okay.  What did you discuss with him?

---

133

1 A.  I don't recall.  It must have been
2    pleasantries, "What are you doing here?"
3    But, honestly, I don't recall what was
4    discussed.
5 Q.  Okay.  Was Mr. Blackburn at the auction on
6    that day, too?
7 A.  He was not.
8 Q.  He was not?  So it was only this individual
9    you believed to be Mr. Kessler?
10 A.  Correct, or Mr. Blackburn's partner.
11 Q.  Do you understand that to be one and the same
12    person?
13 A.  Yes, sir.  Yes, sir.
14 Q.  Okay.  All right.  Now, you mentioned before
15    that you trusted Mr. Blackburn, right?
16 A.  Yes, sir.
17 Q.  And you developed a relationship with him a
18    period over a few months or so leading into
19    the execution of the contract documents,
20    right?
21 A.  I would say so, yes.
22 Q.  Now, you understand what it means to be under
23    oath, correct?
24 A.  Correct.
25 Q.  Tell the truth?

---

**Arturo Mayoral - CONFIDENTIAL - July 22, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

134

1  A.   Yes, sir.
2  Q.   If you don't, you get in trouble, right?
3  A.   Of course.
4  Q.   Now, knowing you're under oath, is it
5       possible that Mr. Blackburn gave you the two
6       Power of Attorney documents, said they were
7       signed by him and Mr. Kessler, gave them to
8       you and said, "It's all good," and then you
9       just notarized it outside the presence?
10 A.   No.  That's not possible, under oath.
11 Q.   Because you don't mention having --
12 A.   Correct.
13 Q.   -- the POA signed.
14 A.   But yet you have my signature and my stamp
15      and the date on the POAs.
16 Q.   I get that.  I mean, it's possible you swung
17      by, picked them up and signed it after the
18      fact and then sent them in?
19 A.   No, that's not possible.
20 Q.   Okay.  But you failed to log in to Salesforce
21      the very first time you meet Mr. Kessler's
22      partner -- I'm sorry, Mr. Blackburn's
23      partner, correct?
24 A.   Uh-huh.
25 Q.   Is that true?  You failed to log in into

135

1       Salesforce?
2  A.   What do you mean?
3  Q.   Okay.  Salesforce is there to memorialize and
4       document all your entries, correct?
5  A.   Correct.
6  Q.   You failed to log in to Salesforce and state
7       in Salesforce that you met Mr. Blackburn's
8       partner?
9  A.   Correct.  Correct.  I omitted that.  I just
10      mentioned the onboarding and the rapid pay of
11      the vehicle.
12 Q.   Now, getting the Power of Attorney documents
13      signed is a very important part of your job,
14      isn't it?
15 A.   It isn't.
16 Q.   It isn't?
17 A.   It is not.
18 Q.   Help me understand that.
19 A.   It is not part of my duties.  We just do it
20      as a courtesy for the customer.  As a matter
21      of fact, the customer is responsible to
22      obtain that Power of Attorney.  Most of the
23      times, they get busy, they forget, they don't
24      do it.
25 Q.   Okay.

136

1  A.   So, as a courtesy, in order to get their
2       account not locked so they can keep
3       performing and they can keep doing business,
4       I do it as a courtesy.
5  Q.   Okay.  Well, I mean, isn't that something you
6       want your boss to know, you are going above
7       and beyond what your duties are to give a
8       courtesy to the customer?
9  A.   My numbers speak for themselves.
10 Q.   Okay.  But wouldn't you want your boss to
11      know that?
12 A.   They're not into the day-to-day details.
13 Q.   So I think you testified somewhere between 60
14      to 75 times per year you notarize Power of
15      Attorney documents for customers?
16 A.   Correct.  That would be about 50 percent of
17      my customers.
18 Q.   Okay.  And you're saying -- do you log that
19      into Salesforce when you do that?
20 A.   I would have to check.  Most likely, most of
21      the time, again, time permitting and to the
22      best of my ability, yes.
23 Q.   Okay.  Were you in a rush on April 18, 2019?
24 A.   I'm always in a rush.
25 Q.   But from your -- from what you told me you

137

1       did on that day, it sounds like you had a
2       nice lunch at your favorite restaurant?
3  A.   Half an hour.
4  Q.   Okay.  And then you went home and went back
5       to your business office?  You didn't go
6       anywhere else?
7  A.   I said I don't recall going anywhere else
8       after going to the home office.
9  Q.   Okay.
10 A.   But, again, you can see Salesforce for that.
11 Q.   In looking at Exhibit 5, there again you say,
12      "All" -- you understand what the word all
13      means, right?
14 A.   Uh-huh.
15 Q.   "All my activities are logged in Salesforce"?
16 A.   Wrong choice of word.  Most of my activities
17      or the majority of my activities are logged.
18 Q.   Are what?
19 A.   Are logged.
20 Q.   But you didn't say that to your boss, did
21      you?  You said, "all."  All means all, right?
22 A.   Well, it's a matter of speak.
23 Q.   Okay.  So are you inaccurate in your e-mail
24      in Exhibit 5 to your boss explaining what
25      happened?

**Arturo Mayoral - CONFIDENTIAL - July 22, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

138

1  A.   No, because I did log the visit.
2  Q.   But you failed to mention --
3  A.   The specifics, yes.
4  Q.   Now, going back to the time that you served
5       as Power of Attorney seven and some three
6       quarters years ago, give or take a few
7       months, you've done it 60 to 75 times on
8       average per year on behalf of NextGear.  Tell
9       me what the best practice in your opinion is
10      as a notary public when you don't know
11      someone, you've never met them for the first
12      time, to actually ask for their actual
13      identification or do you use a
14      black-and-white photograph copy of the ID?
15 A.   As I mentioned before, if I have the
16      photocopy of the driver's license, I do not
17      request because I already have it.
18 Q.   Okay.  So that you believe to be the best
19      practice as a notary public in fulfilling
20      your notary public duties?
21 A.   I do.
22 Q.   Okay.  How often in those 60 to 75 times per
23      year you do notary public services do you
24      actually ask for, "Let me see your
25      identification, please"?

139

1  A.   I couldn't tell.  I wouldn't know.  I mean,
2       it's so many customers, but I would say about
3       50 percent of the time.
4  Q.   Okay.  And when that happens, when you ask
5       for -- let me back up.  Fifty percent of the
6       time.  And during that 50 percent of the
7       time, have you met that person previously?
8  A.   No.
9  Q.   Okay.  And so you're asking for the ID
10      because you've never met the person, right?
11 A.   Yeah.  Or I didn't have the copy of the
12      license.
13 Q.   All right.  Now, when you actually ask for
14      the ID, do you take a photograph of it?
15 A.   I do not.
16 Q.   Okay.
17 A.   Because it's already in the system.
18 Q.   Well, I thought it was a situation where you
19      don't already have a copy of --
20 A.   Yeah.  I forgot to bring the copy.
21 Q.   Okay.
22 A.   So sometimes I, you know, I'll leave a paper
23      behind or whatever on the desk, and then I'll
24      request it if I don't have it with me
25 Q.   Okay.  So you know for a fact in those

140

1       situations, corporate already has copies of
2       the licenses or IDs?
3  A.   Yes, sir.
4  Q.   Okay.  And then you -- it's a situation where
5       you forget to bring the photocopy with you?
6  A.   Yes.
7  Q.   Then you say, "Oh, I forgot.  Can I see your
8       actual ID"?
9  A.   That is correct.
10 Q.   And then you do not take a photograph of it?
11 A.   I do not.
12 Q.   Okay.  Have you ever taken a photograph of an
13      ID during the notary process while working
14      for NextGear?
15 A.   I have not.
16 Q.   You have not, never?
17 A.   Never.
18      Never of all the, what is that, 60 to 75
19      times time seven, you've never done it once;
20      is that correct?
21 A.   Correct.
22 Q.   Okay.  Now, still looking at Exhibit 5, it
23      says in your e-mail report to your boss,
24      there at the second sentence -- or the third
25      sentence, excuse me, the second line, "Two

141

1       weeks later I was contacted to meet both
2       partners at their corporate office located at
3       1500 Cordova Road, Suite 206."  Now, you were
4       clear in your testimony that you met with
5       Mr. Blackburn and a person that you believed
6       to be Mr. Kessler, correct?
7  A.   Yes.
8  Q.   Now, are you aware that Mr. Blackburn has
9       testified under oath as it relates to the
10      execution of the Power of Attorney document
11      that that was done solely between you and
12      Mr. Kessler?
13 A.   That's not accurate.
14 Q.   Okay.  But I'm asking, are you aware of that
15      fact that Mr. Blackburn has testified?
16 A.   I am not aware of that.
17 Q.   Okay.  So if Mr. Blackburn were to testify
18      that the signing of the Power of Attorney
19      document was done solely between you and
20      Mr. Kessler, he would be lying?
21 A.   Yes.
22         (Whereupon Exhibit No. 8 and Exhibit No.
23      9 are marked for identification.)
24 FURTHER QUESTIONS BY MR. DELK:
25 Q.   All right.  Mr. Mayoral, I am handing you

**Arturo Mayoral - CONFIDENTIAL - July 22, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

142

1    what's been marked for identification as
2    Exhibits 8 and 9.  Exhibits 8 and 9 are the
3    Power of Attorney documents we've been
4    talking about ad nauseam today, correct?
5 A.    Correct.
6 Q.    All right.  And Exhibits 8 and 9 are the true
7    and accurate copy of those Power of Attorney
8    documents?
9        MR. JONES:  Why don't you have him do it
10   one at a time?  Because I'm still trying to
11   figure out what -- what's the Bates number on
12   8?
13 FURTHER QUESTIONS BY MR. DELK:
14 Q.    Exhibit 8, NG000273, is that a true and
15   accurate copy of the Power of Attorney
16   documents that you previously testified about
17   where you witnessed Edward Kessler sign the
18   Power of Attorney?
19 A.    Yes, sir.
20 Q.    Okay.  Same question as relates to Exhibit 9,
21   Power of Attorney document for Mr. Blackburn,
22   is it a true and accurate copy of the Power
23   of Attorney document you witnessed
24   Mr. Blackburn sign?
25 A.    Yes, sir.

143

1 Q.    All right.  Now, looking at Exhibit 8, that
2    is the Kessler Power of Attorney, correct?
3 A.    Yes.
4 Q.    All right.  Now, looking at page 2 of Exhibit
5    8, there's the signature.  You verified
6    Mr. Kessler's signature; is that your
7    testimony?
8 A.    Yes.
9 Q.    And how did you verify his signature?
10 A.    As stated before, I verified the signature
11   through a copy of the driver's license.
12 Q.    And that is a prior exhibit we've looked at,
13   Exhibit 4, correct?
14 A.    Correct.
15 Q.    All right.  Now, down at the bottom there,
16   this is your notary certificate, correct?
17 A.    Correct.
18 Q.    All right.  So let me ask you this.  How --
19   or, I guess, who provided you with the notary
20   representation?  Is that your own verbiage or
21   is it verbiage that NextGear puts on the
22   Power of Attorney document?
23 A.    That's from NextGear.
24 Q.    Okay.  Do you ever have any hand at all in
25   writing the attestation clause?

144

1 A.    I do not.
2 Q.    Okay.  So that's all NextGear?
3 A.    Correct.
4 Q.    All right.  So there you say, "State of
5    Florida.  County of Broward.  Before me, a
6    Notary Public in and for said County and
7    State, personally appeared Edward Anthony
8    Kessler, known to me to be the Manager of
9    Premier Group Autos, LLC, doing business as
10   Overfinch Miami, who acknowledged the
11   execution of the foregoing Power of Attorney,
12   and who, having been duly sworn, states that
13   any representations contained therein are
14   true."  You see that?
15 A.    Yes.
16 Q.    And then you witness it, sign off and put
17   your seal and notarize it, correct?
18 A.    That is correct.
19 Q.    All right.  And then the same question as
20   relates to Exhibit 9 for Blackburn.  You make
21   the same attestation notarizing the signature
22   of Mr. Blackburn, correct?
23 A.    Correct.
24       (Whereupon Exhibit No. 10 is marked for
25   identification.)

145

1 FURTHER QUESTIONS BY MR. DELK:
2 Q.    I'm handing you what's been marked as Exhibit
3    10.  It's Bates No. NG000844.  What is
4    Exhibit 10?
5 A.    I wouldn't know.  I've never seen this
6    document before.
7 Q.    Never seen it?  Okay.  Fair enough.  Makes it
8    easy.
9 A.    That's interesting.
10       (Whereupon Exhibit No. 11 is marked for
11   identification.)
12 FURTHER QUESTIONS BY MR. DELK:
13 Q.    I'm handing you what's been identified or
14   marked as Exhibit 11.  Can you tell me what
15   Exhibit 11 is, please.
16 A.    Yes, sir.  This is the Incentive Compensation
17   Plan for seniors and executives for the year
18   of 2019.
19 Q.    And this is your compensation plan that was
20   in effect during the month of April 2019,
21   correct?
22 A.    That is correct.
23 Q.    All right.  And, in fact, it looks like maybe
24   your DocuSign signature is on the last page
25   of Exhibit 11, correct?

**Arturo Mayoral - CONFIDENTIAL - July 22, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

150

1  Q.  I'm slow with math.  That's why I'm a lawyer.
2      Thank you for helping me out with that.
3          MR. JONES:  So now my figures have a
4      bunch of zeroes at the end of it.
5          MR. DELK:  The ridiculous stupid joke is
6      plaintiff's lawyers can only divide by three,
7      right?
8          MR. JONES:  Right.
9  FURTHER QUESTIONS BY MR. DELK:
10  Q.  All right.  Do you have any knowledge in your
11      position as a sales account executive in
12      terms of the dates when Premier Group Autos
13      was drawing down on the line of credit or
14      receiving funds?
15  A.  **No.  I don't have access to that information.**
16  Q.  Okay.  Because I think, if your testimony is
17      correct, you said once the account's signed
18      up, you get all the documents done, you're
19      kind of --
20  A.  **Correct.  It gets passed to the performance**
21      **manager.  The performance manager would have**
22      **more details on that.**
23  Q.  And the performance manager for Premier Group
24      Autos was who?
25  A.  **Claudia Coello, now Claudia Figueroa.  She**

151

1      got married.
2  Q.  Okay.
3  A.  **And you can see her notes in Salesforce as**
4      **well.**
5  Q.  I was going to say, I would assume her
6      note -- yeah, there she is.  Okay.  So if I
7      were to show you various documents relating
8      to, looks like, financial information
9      regarding transactions, have you ever seen a
10      document that looks like this before?
11  A.  **I've seen it as a performance manager or**
12      **account executive but not that particular**
13      **one.**
14  Q.  Well, maybe we'll go to that, and maybe you
15      can help me understand some of it perhaps.
16  A.  **As far as I can take it, I'll help you.**
17  Q.  Okay.  Now, we've mentioned before an account
18      being locked if a Power of Attorney is not
19      obtained within 30 days after what?
20  A.  **Contract closing.**
21  Q.  Contract closing.  And the contract closing
22      is DocuSign --
23  A.  **Correct.**
24  Q.  -- of the loan documents?
25  A.  **Correct.**

152

1          (Whereupon Exhibit No. 12 is marked for
2      identification.)
3  FURTHER QUESTIONS BY MR. DELK:
4  Q.  Okay.  So I'm handing you what's been marked
5      as Exhibit 12, and it's Bates No. NG002203.
6      First of all, there's an incredible amount of
7      black redactions all over this document.  Do
8      you recognize this document in any way save
9      for all the black marks all over it?
10  A.  **Absolutely not.  Never seen it.**
11  Q.  Okay.  Look at page 3 of 6.  There underneath
12      all the black redactions, it says, "Lending
13      processes activation after thorough vetting
14      and upon receipt of an executed contract.
15      NextGear Capital requires original Power of
16      Attorney no later than 30 days from account
17      activation."  What I just read you, is that
18      your understanding of the policy of NextGear
19      relating to a Power of Attorney document?
20  A.  **Yes, sir.**
21  Q.  Okay.  And there, then it goes on to say,
22      "Accounts not meeting this requirement are
23      locked"?
24  A.  **Correct.**
25  Q.  And is that your understanding of the

153

1      NextGear policy?
2  A.  **Yes, sir.**
3  Q.  So have you been, in your seven and three
4      quarter years or so with NextGear, have you
5      had or been involved with customers that have
6      not gotten their Power of Attorney document
7      in within 30 days?
8  A.  **Yes, sir.**
9  Q.  And then the account was locked?
10  A.  **Yes, sir.**
11  Q.  And then what happens in those situations?
12  A.  **Normally we would be receiving a call from**
13      **the dealer stating that they don't understand**
14      **why their account is locked, that they can't**
15      **buy vehicles.  Usually it's when they're at**
16      **the auction trying to make payment.  I will**
17      **then research the account and see that the**
18      **Power of Attorney is not in, and I'll inform**
19      **the customer that they failed to return the**
20      **Power of Attorney within 30 days as**
21      **instructed.  They are provided a FedEx label**
22      **and the Power of Attorney.**
23          **And then what happens is that they -- I**
24      **have to re-send the Power of Attorney to**
25      **them.  They sign it, and they send it to**

**Arturo Mayoral - CONFIDENTIAL - July 22, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

154

1    corporate.  Once it's received at corporate,
2    the account gets unlocked.  Usually it
3    happens five days after the lock.
4  Q.  And when you say "lock," what do you mean?
5    What does that mean?
6  A.  They can't purchase vehicles.
7  Q.  Meaning they can't get funds?
8  A.  They can't get funds, correct.
9  Q.  Okay.  Have you been involved in a situation
10   where the dealer refuses to return a Power of
11   Attorney?
12 A.  Never.
13 Q.  So meaning when it has happened, they, oh,
14   realize, they sign it and send it back,
15   right?
16 A.  Correct.
17 Q.  So how many times has that happened, meaning
18   how many times that you've been a part of a
19   customer relationship or experience where the
20   account's been locked for a failure to return
21   the Power of Attorney within 30 days of
22   contract signing?
23 A.  I would say it happens, out of ten, two
24   times.
25 Q.  Okay.

155

1  A.  Twenty percent of the time.
2  Q.  All right.
3  A.  This is why we now have a formal onboarding
4    process that includes the Power of Attorney,
5    includes, you know, the portal, having the
6    titles, everything else.
7  Q.  Okay.
8  A.  So we now almost make sure that they have to
9    send it in.  Again, we don't force them.
10   It's not a requirement, from our side
11   anyways, the sales side, but that's it.
12 Q.  Okay.  But you being a good steward of
13   customer relationships, you facilitate and
14   help the process and get it done, right,
15   meaning the Power of Attorney?
16 A.  Obviously, anything to help the dealer.
17 Q.  Yeah.  Now, do you know from your experience
18   and knowledge of NextGear and how it
19   operates, what is your understanding of what
20   would take place if in fact the dealer
21   refuses to return the Power of Attorney
22   document?
23 A.  I have not seen that happen yet.  My
24   understanding is that the account would
25   remain locked.  The performance manager would

156

1    reach out to that dealer, and my guess would
2    be that that dealer would be terminated
3    within a certain period of time and they
4    would have to pay off their loan.
5  Q.  And they wouldn't be able to, certainly
6    during the period it's locked, would not be
7    able to draw down on any funds?
8  A.  Absolutely not.
9      (Whereupon Exhibit No. 13 is marked for
10   identification.)
11 FURTHER QUESTIONS BY MR. DELK:
12 Q.  I'm handing you what's been identified as
13   Exhibit 13.  It is Bates label NG002209.
14   There we at least have the benefit of a
15   title.  It says, "Internal Credit Guidelines,
16   Effective June 1, 2021."  Have you seen this
17   document before?
18 A.  I believe I've seen this document before,
19   yes.
20 Q.  Okay.  And if you look at page 4, Power of
21   Attorney, you see that part?
22 A.  Yes, sir.
23 Q.  It says, "Set at 30 days, NO EXCEPTIONS," in
24   all caps, right?
25 A.  Correct.

157

1  Q.  Now, as part of your receipt of this document
2    in Exhibit 13, is this part of, like, a
3    training or phone call you have with maybe
4    account executives or team leaders?
5  A.  No.  These are just guidelines.  I'm sure
6    they're posted in SharePoint.
7  Q.  What's SharePoint?
8  A.  Internal documents.
9  Q.  What types of documents would be within
10   SharePoint?  Policies?
11 A.  Policies.
12 Q.  Procedures?
13 A.  Yeah.  Human resources.
14 Q.  Okay.  All right.  So there -- do you know, I
15   guess, the Internal Credit Guidelines, do you
16   know who this is applicable to?  I mean, is
17   it applicable to you as a sales account
18   executive?
19 A.  It is not.
20 Q.  Do you know who this document is geared
21   towards?  Because it's hard to see what's
22   here because of all the redactions.
23 A.  This would probably be geared towards the
24   underwriters and the performance managers.
25 Q.  Okay.  Still looking at page 4.  "Ensure that

**Arturo Mayoral - CONFIDENTIAL - July 22, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

158

1    the signed and notarized POA is sent in ASAP
2    after activation," right?
3 A. Correct.
4 Q. Now, I guess, who is -- who was involved with
5    the customer immediately after contract
6    execution or activation?  It's still you,
7    though, right?
8 A. At the time that we're speaking about, that
9    would be the performance manager.
10 Q. Okay.  After contract execution, that would
11    be performance manager?
12 A. Correct, at that time.
13 Q. Now, do you ever assist the performance
14    manager in getting the POAs signed?
15 A. Certainly.
16 Q. And why do you do that?
17 A. Teamwork.
18 Q. Is it done just because you help do the
19    transaction or the sale or are you
20    specifically requested or it just varies?
21 A. Fairness, I'm in the area.  The performance
22    manager can't make it, and since we're a
23    team, I'll take one for the team.
24 Q. And there, the second bullet point there,
25    still looking at page 4 of Exhibit 13, there

159

1    it says, "If the original, signed, and
2    notarized POA is not received by Lending
3    within 30 days after activation, the
4    Dealer/Client's Line of Credit will be LOCKED
5    until the original POA is received"?
6 A. That is correct.
7 Q. And that is your understanding as well is the
8    way the process works?
9 A. Yes.  That's a fact.
10 Q. I mean, what do you mean by that?  Like --
11 A. Come day 30, if we don't have the POA, that
12    account is automatically locked.
13 Q. And no access to funds in any way?
14 A. (Shaking head negatively.)
15 Q. Correct?
16 A. Correct.
17    (Whereupon Exhibit No. 14 is marked for
18    identification.)
19 FURTHER QUESTIONS BY MR. DELK:
20 Q. I'm handing you what's been marked as Exhibit
21    14.  This is Bates label NG002024, and really
22    I want to focus your attention to the first
23    page of Exhibit 14, and it's the e-mail right
24    in the center of the page.  It looks like it
25    has, like, a copy of, looks like, maybe an

160

1    Excel spreadsheet or something.  You see
2    that?
3 A. Yes.
4 Q. All right.  And you mentioned the word
5    stipulations before, and that is -- well,
6    explain to me what stipulations are.
7 A. Documents or items that are required in order
8    to secure the line of credit.
9 Q. Okay.  All right.  And so here the
10    stipulations mentioned are promissory note,
11    correct?
12 A. Where are you looking at that?
13 Q. Right there under Stipulations, first page of
14    Exhibit 14.
15 A. Okay.  Yes.  Yes.  I see it.
16 Q. So these stipulations are a promissory note,
17    correct?
18 A. Correct.
19 Q. Advance schedule core?
20 A. Correct.
21 Q. Per-car reserve, up front required?
22 A. Yes.
23 Q. Yes?
24 A. Per-car reserve, yes, correct.
25 Q. Per-car reserve, reserve agreement, correct?

161

1 A. Yeah.
2 Q. There it says, "Power of Attorney," and then
3    under Stipulation Comments, it says, "Edward
4    Kessler," correct?
5 A. Yes.
6 Q. Then another Power of Attorney, and then
7    under the Comments, "James Blackburn,"
8    correct?
9 A. Correct.
10 Q. Okay.  I think you mentioned that Lending or
11    Underwriting needed the Social Security card
12    of Mr. Kessler; is that right?
13 A. Yes.
14 Q. How did you go about seeking to obtain the
15    Social Security card of Mr. Kessler?
16 A. The normal procedure would be to contact the
17    prospect and request the missing item.
18 Q. Well, I understand normal procedure.  But in
19    this case, how did it happen?
20 A. To the best of my recollection, I requested
21    it from Mr. Blackburn, and he readily
22    submitted it.
23 Q. I think we've heard about obviously the
24    Salesforce program and then also the Discover
25    program, correct?

**Arturo Mayoral - CONFIDENTIAL - July 22, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

162

1  A.   Yes.
2  Q.   Tell me from your understanding the
3       difference between the two.  We already know
4       what the point of Salesforce is.  What's the
5       point of Discover?  What do you do with
6       Discover?
7  A.   **To my understanding, Discover is our own**
8       **proprietary system where we track our**
9       **applications and all customer data basically**
10      **on the operations side.  It's more towards**
11      **the operations side than the sales side, so**
12      **it would involve more Underwriting, the**
13      **performance managers, the regional directors.**
14      **Sales hardly goes into Discover since we have**
15      **all the same information in Salesforce.**
16 Q.   Got it.  That's why I have a printout of
17      Discover, and I don't see your name anywhere,
18      but that would explain why.
19 A.   **That is why, correct.  It's not used by sales**
20      **at all.**
21 Q.   Now, your two-year-and-eight-month period of
22      time serving as an account executive, I guess
23      that was more of a customer hand-holding,
24      making sure -- I think you described your
25      duties a little bit, but is that --

163

1  A.   **Yeah.  Sure.  I mean, it's more on the**
2       **operational side, making sure that the**
3       **dealers comply by our guidelines, that**
4       **payments are made on time.**
5  Q.   Yeah.
6  A.   **That the audits are correct and that no**
7       **vehicles have been sold out of trust.**
8            (Whereupon Exhibit No. 15 is marked for
9       identification.)
10 FURTHER QUESTIONS BY MR. DELK:
11 Q.   Now, I know you're not copied on Exhibit 15.
12      It's an e-mail identified as NG000043, and
13      it's marked as Exhibit 15.
14 A.   **Yes.**
15 Q.   Can you tell me -- just take your time.  Take
16      a moment.  Help me understand what's going on
17      here from your knowledge of the way NextGear
18      works.
19 A.   **From what I can see here, this is a request**
20      **for an increase of a line of credit.**
21 Q.   Okay.
22 A.   **It's a temporary increase request.**
23 Q.   Okay.
24 A.   **If I remember correctly, a temporary increase**
25      **just for 60 days or 30.  I can't really**

164

1       recall.  It's been a while.  And that's it.
2  Q.   Okay.  So here, it looks like in the middle
3       or towards the end of the bottom of Exhibit
4       15 on page 1, it says, "Current Contracted
5       Credit Limit Per Type, Retail:  $150,000"?
6  A.   Correct.
7  Q.   And that's what you recall or remember to be
8       the original loan amount?
9  A.   Correct.
10 Q.   All right.  Or the available line of credit
11      that can be drawn down on?
12 A.   Correct.
13 Q.   And then it's a requested temp increase
14      amount of $100,000, correct?
15 A.   Yes.
16 Q.   And that's set forth obviously in the e-mail.
17      And it looks like it's from Lending to
18      Claudia Coello?
19 A.   Correct.
20 Q.   Who's Claudia Coello?
21 A.   **She is the performance manager on this**
22      **account or was.**
23 Q.   Or was.  Do you know if she's still employed
24      by NextGear?
25 A.   **She is.**

165

1  Q.   So from your knowledge, though, if in fact an
2       account is locked because a Power of Attorney
3       has not been signed, NextGear obviously isn't
4       going to give more money, right?
5  A.   Correct.
6  Q.   And do you know in this situation if the
7       additional hundred thousand dollars was in
8       fact provided to Premier Group Autos as a
9       result of this request?
10 A.   **I do not know.  I do not have that**
11      **information.**
12           (Whereupon Exhibit No. 16 is marked for
13      identification.)
14 FURTHER QUESTIONS BY MR. DELK:
15 Q.   Mr. Mayoral, I'm handing you what's been
16      marked as Exhibit 16.  It is Bates labeled
17      NG002241.  Now, this is the Performance
18      Improvement Plan we discussed, correct?
19 A.   Correct.
20 Q.   Now, it's dated March 11, 2019, yes?
21 A.   **Yes.**
22 Q.   And it's not in fact in the summer months?  I
23      think you thought it may have been?
24 A.   **Correct.  This is a while back.**
25 Q.   I understand.  I just want to clarify that

**Arturo Mayoral - CONFIDENTIAL - July 22, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

166

```
 1      you weren't thinking of some other
 2      Performance Improvement Plan but rather it's
 3      this one.
 4   A. Yeah, it's this one.  It's the only one.
 5   Q. Which is Exhibit 16.  And it looks like you
 6      had prior discussions with your manager,
 7      Stacy Fields, on January 23 and February 14
 8      of 2019, correct?
 9   A. Correct.
10   Q. And it looks like it was a mere discussion
11      and was done presumably one on one?
12   A. Correct.
13   Q. All right.  So tell me about the first
14      discussion in January, on January 23.
15   A. I'm sorry.  I'm not seeing that.
16   Q. Well, I don't think anything in the document
17      references or memorializes what was discussed
18      on January 23, but it certainly shows that a
19      discussion was had.
20   A. Oh, I see it.  I see it, yeah, date of
21      previous discussions and warnings.
22   Q. Yeah.
23   A. Probably the warning was on 1/23, and then
24      the discussion came on 2/14, which is a
25      one-on-one discussion.
```

167

```
 1   Q. Okay.  And what was the nature of the warning
 2      or the discussion?
 3   A. The nature of the warning is that my
 4      performance was suffering and that I needed
 5      to do something about it.
 6   Q. And they put you on a Performance Improvement
 7      Plan because your performance was suffering?
 8   A. Correct.
 9   Q. And the performance was suffering how?
10   A. I went through a dry spell.  I believe it was
11      in January starting that year when we came
12      back from our annual meeting.  And it was two
13      months in a row, so that put me a little
14      back.  But apparently, according to this
15      document, I did good, and I'm still in good
16      standing.
17   Q. You're obviously still employed?  Yes?
18      Mr. Mayoral?
19   A. Yes, sir.  Yes, sir.  I'm sorry.
20   Q. That's kind of like a --
21   A. Yeah, I thought it was a comment, not a
22      question.
23   Q. It sounds like your lawyer making an
24      objection.
25   A. After dealing with you guys...
```

168

```
 1        MR. JONES:  Jason, what I heard you say
 2      was he was prepared well, so thank you for
 3      that.  I'm kidding.
 4        MR. DELK:  Your client is sitting right
 5      here.
 6        MR. JONES:  I just wanted it on the
 7      record.
 8        MR. DELK:  Helping you scratch your back.
 9   FURTHER QUESTIONS BY MR. DELK:
10   Q. All right.  Looking there at the bottom of
11      Exhibit 16, April 15, 2019.
12   A. Yes, sir.
13   Q. Looking at the comments here, "As discussed
14      last month..."  So maybe there was another
15      discussion had in March presumably.  "...the
16      expectations were for you to end the month of
17      March with a positive trend in both
18      Applications and Activations percentage to
19      goal for the three-month rolling average and
20      end March with 80 percent to goal or better
21      in both Applications and Activations."  Now,
22      I believe you told me your quotas were, what,
23      10 new activations?
24   A. Correct.
25   Q. And 15 new --
```

169

```
 1   A. Applications.
 2   Q. -- applications?  Okay.  So apparently for a
 3      few-month period, it looks like, you weren't
 4      hitting that, right?
 5   A. Yes.  Actually, I want to correct something.
 6      It was 14 applications, not 15.
 7   Q. Fourteen applications, 10 activations?
 8   A. Correct.
 9   Q. Okay.  "You have brought your three-month
10      rolling application percentage to goal from
11      59.52 to 64.29 and activation percentage to
12      goal from 50 percent to 56.67 percent, still
13      far below the minimum expectation of 80
14      percent but an improvement."  You see that?
15   A. Correct.
16   Q. All right.  Then looking at the last
17      sentence, "The expectation for April is to
18      meet your application goal of 15 and your
19      activation goal of 10.  A strong focus on
20      these expectations is imperative."  Now, you
21      received this follow-up review on April 15,
22      2019, right?
23   A. Yes.
24   Q. Was this follow-up review submitted to you
25      via e-mail or was it read to you or was it
```

**Arturo Mayoral - CONFIDENTIAL - July 22, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

170

1 discussion and Ms. Fields is going in and
2 memorializing it onto your PIP plan, do you
3 know?
4 A.  Yes.  It's normally a one-on-one meeting, and
5 then it gets documented.
6 Q.  All right.  So you had this meeting with
7 Stacy Fields three days before you assist
8 getting the Power of Attorney document
9 signed, right?
10 A.  Correct.
11 Q.  Now, on April 15, do you know how many
12 applications you have submitted for the month
13 of April?
14 A.  I have no recollection.  I'm sure it's
15 documented.  I have no recollection of it.
16 Q.  Do you recall when you had the follow-up on
17 April 15, 2019, do you feel like you were
18 doing what you needed to be doing in terms of
19 hitting your quotas or whether you were
20 behind, you were ahead?  Any idea?
21 A.  I'm sorry.  Could you repeat that?
22 Q.  So when you received this follow-up meeting
23 with Ms. Fields on April 15, 2019, on April 1
24 to April 10, you feel like you were meeting
25 your quota, were on pace to meet it, were you

171

1 behind, ahead?
2 A.  I believe I was on track to meet the quota.
3 Q.  Okay.  So, in other words, though, you felt
4 under the gun or felt some pressure to meet
5 the quota because you were on a Performance
6 Improvement plan?
7     MR. JONES:  Objection to form.
8 FURTHER QUESTIONS BY MR. DELK:
9 Q.  Did you feel pressured?
10 A.  No.
11 Q.  So this Performance Improvement Plan didn't
12 make you swallow hard or make you nervous at
13 all?
14 A.  Yes, it did, but, again, knowing my abilities
15 and my track record, I knew I would be able
16 to overcome anything thrown at me.
17 Q.  Because of -- and that's fair, right?  I
18 mean, you've never had a Performance
19 Improvement Plan in your career --
20 A.  In my career, correct.
21 Q.  -- at NextGear save for this one time?
22 A.  Correct.
23 Q.  And so, I mean, it's fair?  We're all humans.
24 It's fair that you in fact would feel under
25 the gun or nervous to make sure you busted

172

1 your butt --
2 A.  Sure.
3 Q.  -- and complied with the PIP plan, right?
4 A.  Sure.
5 Q.  And this happens to be three days before you
6 got the POA signed, right?
7 A.  Yes.  But, again, the contract was activated
8 before the POA, so it wouldn't fall into my
9 April goals.  It would fall into my March
10 goals.
11 Q.  Okay.  Sure.  But if the POA doesn't get
12 signed and the account's locked --
13 A.  It wouldn't have made a difference to me.
14 Q.  It doesn't make a difference to you?
15 A.  No.
16 Q.  And it's terminated?
17 A.  Yeah.
18 Q.  So you still get paid for activations even
19 though an account was later terminated?
20 A.  Correct, even the following day.
21 Q.  All right.  The following day get paid?
22 A.  No.  If the account gets terminated the
23 following day of activation, I still get
24 paid.
25 Q.  You still get paid, but yet you were still

173

1 under this Performance Improvement Plan,
2 right?
3 A.  Yeah.
4 Q.  All right.
5     THE WITNESS:  I'm sorry.  Could we have a
6 five-minute bathroom break?
7     MR. DELK:  Sure.
8     (BRIEF RECESS TAKEN.)
9 FURTHER QUESTIONS BY MR. DELK:
10 Q.  We're back on the record here.  All right.
11 Mr. Mayoral, I want to go through some
12 Answers to Interrogatories.  And, first of
13 all, I know you're not a lawyer.  You've made
14 that clear to me today.  At least you've said
15 that to me today, and I understand that.  But
16 do you know what the NextGear Answers to
17 Interrogatories are or have you participated
18 in any way in providing answers?
19 A.  Not that I'm aware of.
20 Q.  Okay.  Who is Andrew Ramey or -- yeah, Ramey?
21 A.  Andrew Ramey is one of the Lending
22 supervisors.
23 Q.  Is he your Lending supervisor?
24 A.  No.  I mean, I do work with him sometimes,
25 but there's several supervisors.

**Arturo Mayoral - CONFIDENTIAL - July 22, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

174

1  Q.   Do you know where Mr. Ramey is located, his
2       actual physical presence?
3  A.   **I know he's at corporate headquarters.**
4  Q.   Which is Carmel?
5  A.   **Correct.**
6  Q.   And if you know, NextGear Capital, is that
7       owned by Cox Automotive Group?
8  A.   **Yes, it is.**
9  Q.   Okay.  And do you know what Cox Automotive
10      Group is?
11 A.   **They're based out of Atlanta, Georgia.**
12 Q.   All right.
13          (Whereupon Exhibit No. 17 is marked for
14      identification.)
15 FURTHER QUESTIONS BY MR. DELK:
16 Q.   I'll hand you what's marked as Exhibit 17.
17      And you can see from the title of Exhibit 17
18      this document is NextGear Capital,
19      Incorporated's Objections and Responses to
20      Edward A. Kessler's First Interrogatories.
21      Do you see that?
22 A.   **Yes, sir.**
23 Q.   Now, have you ever seen this document in any
24      fashion or some version of it at all?
25 A.   **No, sir.**

175

1  Q.   Meaning the interrogatories.  Did anybody
2       call you up in or around, I don't know,
3       perhaps April, March, February, asking for
4       information from you at all?
5           MR. JONES:  Objection.  Calls for
6       information protected by attorney-client
7       privilege.  I instruct the witness not to
8       answer to the extent it involves any
9       communications with lawyers.
10 FURTHER QUESTIONS BY MR. DELK:
11 Q.   Yeah, I didn't ask what you discussed.  I'm
12      asking if it happened.  That's not
13      privileged.
14 A.   **I believe that I was notified by Jordan Cox,**
15      **my supervisor, that they needed records, but**
16      **I've never seen this document before.**
17 Q.   Okay.  So you may have never seen this
18      document before.  So Jordan Cox, your
19      supervisor, contacted you and said they need
20      records from you, right?
21 A.   **Correct.**
22 Q.   And frankly, Exhibit 5, we've looked at
23      Exhibit 5 quite a bit today, if I can find
24      it.  Exhibit 5 is the e-mail chain between
25      you and Jordan Cox, your supervisor, in

176

1       March, on March 23, 2021, and that's where
2       you gave the explanation of the day in
3       question, about the execution of the POA,
4       correct?
5  A.   **Correct.**
6  Q.   Now, do you know if in fact Mr. Cox when he
7       sent you the e-mail -- we don't have the
8       benefit of what was attached.  We'd like to
9       have that.  But on March 23, 2021, at 3:26
10      p.m. from Jordan Cox to you, "Please see
11      attached."  Do you believe the attached could
12      have been these interrogatories?
13 A.   **It could have been.  I don't believe I ever**
14      **opened the attachment.**
15 Q.   Okay.  Besides your counsel, Mr. Jones or
16      Mr. Jurkiewicz, did you have any oral
17      discussions at all about what happened on
18      February 18, 2019?
19 A.   **No.  It was all written down.**
20          MR. JONES:  Objection.  You said
21      "February 18."
22          MR. DELK:  April 18.  Thank you.
23          MR. JONES:  And I would also object and
24      instruct the witness that any discussion
25      including Gary Hoke, that would also be

177

1       attorney-client privilege, just so you're
2       clear on that.
3  FURTHER QUESTIONS BY MR. DELK:
4  Q.   Okay.  Anybody besides Mr. Hoke, Mr. Jones,
5       or Mr. Jurkiewicz where you're providing
6       information related to what took place on
7       April 18, 2019?
8  A.   **No one else.**
9  Q.   But you did in fact discuss it with these
10      individuals in, what, the early part of 2019?
11 A.   **I believe it was first with Mr. Cox, and I**
12      **believe --**
13          MR. JONES:  Hold on.  Hold on.  You said
14      "2019," Jason.
15          MR. DELK:  Yeah.
16          MR. JONES:  So you were pointing to these
17      individuals.  Like, the lawyers, you mean?
18          MR. DELK:  Sorry.  2021.  Thank you.
19 A.   **Yes.  I believe Mr. Hoke contacted me**
20      **sometime after I submitted all the**
21      **documentation informing me that I had to come**
22      **up for the subpoena and to start making**
23      **travel arrangements.**
24 Q.   Okay.  Well, let's look at Exhibit 17.  And
25      looking at page 11 of Exhibit 17, you can see

**Arturo Mayoral - CONFIDENTIAL - July 22, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

178

1    there at the very top of page 11, it says,
2    "Verification.  Pursuant to 28 U.S.C. §1746,
3    I declare under penalties of perjury that the
4    foregoing statements are true and accurate to
5    the best of my knowledge, information, and
6    belief."  Do you see that?
7  A.    Yes, sir.
8  Q.    Then it's signed by NextGear Capital by
9    Andrew Ramey, correct?
10 A.    Correct.
11 Q.    And you understand that the oath to tell the
12   truth is the same you took today, right?
13 A.    Yes.
14 Q.    Okay.  Now, take a look at page 4 of Exhibit
15   17, and it's interrogatory No. 1.  I asked to
16   identify -- I asked NextGear to "Identify all
17   individuals who have assisted in answering
18   these Interrogatories, the Requests for
19   Admission, and the Request for Production
20   served on Defendant in this case."
21       And there it states, "Andrew Ramey,
22   Manager of Lending Services for NextGear
23   Capital, Arturo Mayoral, Sr., Client
24   Solutions Executive for NextGear Capital."
25   Do you see that?

179

1  A.    Yes.
2  Q.    So is this answer in your opinion accurate or
3    inaccurate in the sense of answering the
4    interrogatories?  Did you provide information
5    in assisting answering these questions?
6  A.    Yes, I did.
7  Q.    Okay.  Do you know which ones?
8  A.    No.  I just provided the information that was
9    available to me on my records.
10 Q.    All right.  Well, let's look at interrogatory
11   No. 4 on page 5.  There the question was,
12   "Describe in detail the circumstances
13   surrounding the signing of the Power of
14   Attorney documents which were signed by
15   Blackburn and purportedly by Kessler.  As
16   part of your answer, state in detail the
17   reason why the Power of Attorney documents
18   were required to be signed, identify who was
19   present at the signing of the Power of
20   Attorney documents, the location of the
21   signing and all discussions had between
22   Blackburn and Arturo Mayoral before, during,
23   and after the signing of the Power of
24   Attorney documents."  Do you see that
25   interrogatory?

180

1  A.    Yes, sir.
2  Q.    All right.  Did you provide information to
3    either your counsel or to your supervisor to
4    allow NextGear to answer interrogatory 4?
5  A.    Can you say your question another way,
6    please?
7  Q.    Did you talk to somebody and provide
8    information to NextGear to allow NextGear to
9    answer interrogatory No. 4?
10 A.    Again, the only information I provided was
11   the information that was recorded on my
12   records and my memory to the best of my
13   ability.
14 Q.    So you talked to somebody to allow them to
15   answer interrogatory 4, correct?
16 A.    Yes.
17 Q.    Okay.  All right.  So then look at page 6.
18   After various objections from NextGear, there
19   the first full paragraph at the top of page
20   6, it says, "Subject to and without waiver of
21   the foregoing objections, NextGear states
22   that on the April 18, 2019, Blackburn and
23   Kessler each signed a separate Power of
24   Attorney on behalf of Borrower."  Is that
25   true or false?

181

1  A.    True.
2  Q.    "Kessler and Blackburn were each within the
3    presence of Arturo Mayoral at 1500 Cordova
4    Road, Suite 206, Fort Lauderdale, Florida at
5    the time they signed the Power of Attorney
6    documents."  True or false?
7  A.    True.
8  Q.    "Kessler provided his Pennsylvania driver's
9    license as identification, a picture of which
10   was taken contemporaneously with Kessler's
11   signing of the Power of Attorney that he
12   executed."  True or false?
13 A.    False.
14 Q.    Did you ever state that to anybody to allow
15   them to put this into the interrogatory
16   answer?
17 A.    No.  I said that I had a copy of the license,
18   provided that copy of the license, but that's
19   it.  I had no mention of a picture
20   whatsoever.
21 Q.    So you never told anybody that you took a
22   photograph of Kessler's ID contemporaneously
23   with the signing of the Power of Attorney,
24   correct?
25 A.    Correct.

**Arturo Mayoral - CONFIDENTIAL - July 22, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

182

1  Q.  Do you have any understanding as to why
2      NextGear would state under oath under penalty
3      of perjury that you did that?
4  A.  I do not.
5  Q.  In fact, you testified before you've never
6      even taken a photo of an ID, right?
7  A.  Correct.
8  Q.  So you have no idea where this is even coming
9      from?
10 A.  I would not know.
11 Q.  Did anybody from NextGear ask you to verify
12     that what they were putting in their
13     interrogatory answers were truthful or
14     accurate?
15 A.  No.  Well, I mean, again, I haven't seen this
16     document before, so I wouldn't know.
17 Q.  Mr. Mayoral, what did you do to prepare for
18     your deposition today?
19 A.  Flew from Fort Lauderdale to Indiana.
20 Q.  When did you come in?  Yesterday?
21 A.  Tuesday evening.
22 Q.  Okay.
23 A.  Met with the corporate lawyers yesterday.
24 Q.  Would that be Mr. Jones sitting next to you?
25 A.  Correct, Mr. Jones and Mr. Hoke.  And we

183

1      prepared yesterday a good two hours.
2  Q.  About two hours?
3  A.  Yeah.
4  Q.  Was there anybody else present during your
5      meeting with Mr. Jones and Mr. Hoke?
6  A.  No.
7  Q.  The three of you?
8  A.  Yes.
9  Q.  Here in the Bose McKinney office?
10 A.  Yes, sir.
11 Q.  Did you at least get a good steak dinner that
12     night?
13 A.  I did not.  I had a nice burger at the hotel.
14 Q.  I'll blame it on COVID or something.  Right?
15 A.  Yeah.  Their services are limited.
16 Q.  Did you review any documents as part of your
17     preparation?
18 A.  Yes, I did.
19 Q.  Tell me which documents.
20 A.  Several e-mails of -- several of the
21     documents you showed me today.
22 Q.  Okay.
23 A.  That's about it.
24 Q.  So e-mails?
25 A.  Correct.

184

1  Q.  Any other documents that we did not talk
2      about today or I show you today that you
3      recall reviewing?
4  A.  I don't recall reviewing anything else.
5  Q.  Okay.  Did you review the interrogatory
6      answers?
7  A.  I had not seen that before.
8          MR. DELK:  Give me about five minutes.
9          MR. JONES:  Sure.
10         MR. DELK:  And I'll be ready to wrap up
11     possibly.  I don't want to promise you
12     anything.
13         (BRIEF RECESS TAKEN.)
14 FURTHER QUESTIONS BY MR. DELK:
15 Q.  Mr. Mayoral, a couple of questions for you,
16     and we'll be wrapped up here.  Now, you
17     understand Mr. Kessler contends he wasn't in
18     Florida and didn't sign the Power of
19     Attorney?  You understand that, right?
20 A.  Yes.
21 Q.  And, in fact, he will testify under oath and
22     be able to demonstrate he was not in Florida
23     and didn't sign the Power of Attorney?
24         MR. JONES:  Object to form.  Assumes
25     facts not in evidence.

185

1  FURTHER QUESTIONS BY MR. DELK:
2  Q.  Now, if Mr. Kessler testifies that in fact he
3      never signed the Power of Attorney and was
4      not in Florida and you didn't see him sign
5      the Power of Attorney, who's lying, you or
6      him?
7  A.  It would be him.
8  Q.  Okay.
9  A.  I was presented the person claiming to be
10     Edward Kessler.
11 Q.  Well, what is your explanation for the fact
12     that Mr. Kessler wasn't in Florida and signed
13     the Power of Attorney on April 18, 2019?
14         MR. JONES:  Again, object to form.  Calls
15     for facts not in evidence.
16 FURTHER QUESTIONS BY MR. DELK:
17 Q.  Go ahead.
18 A.  I wouldn't know.
19 Q.  You don't have an explanation?
20 A.  I don't.  He was presented to me as
21     Mr. Kessler.
22 Q.  Well, that's what Mr. Blackburn presented him
23     to you, this individual?
24 A.  Uh-huh.
25 Q.  Right?



NG000849





WRITER'S DIRECT NUMBER: (765) 896-9495
MUNCIE OFFICE
DELK@DELKMCNALLY.COM

June 11, 2021

*Via Certified Mail*

David J. Jurkiewicz
BOSE McKINNEY & EVANS LLP
111 Monument Circle, Suite 2700
Indianapolis, IN 46204

>      **Re:**    *Nextgear Capital, Inc. v. Premier Group Autos, LLC, et. al.*

Counsel:

Enclosed please find a Subpoena to Testify at a Deposition in the above referenced case, directed to Arturo Mayoral. In addition, the subpoena seeks document production, with an attached Exhibit A listing those requests.

>      Very truly yours,
>
>      DELK McNALLY LLP

Jason R. Delk

JRD/ser

Enclosures

Pcc:    Richard A. Rocap
ROCAP LAW FIRM LLC
10293 N. Meridian St., Ste. 175
Indianapolis, IN 46290



3815 River Crossing Parkway, Suite 181
Indianapolis, IN 46240
(317) 442-4444

211 South Walnut Street
Muncie, IN 47305
(765) 896-9495
www.delkmcnally.com

610 N. Rangeline Road
Carmel, IN 46033
(317) 442-4444



WRITER'S DIRECT NUMBER: (765) 896-9495
MUNCIE OFFICE
DELK@DELKMCNALLY.COM

June 11, 2021

Richard A. Rocap
ROCAP LAW FIRM LLC
10293 N. Meridian St., Ste. 175
Indianapolis, IN 46290

   **Re:**  ***Nextgear Capital, Inc. v. Premier Group Autos, LLC, et. al.***

Counsel:

   Enclosed please find a copy of a Subpoena to Testify at a Deposition in the above referenced case. It was sent today to David J. Jurkiewicz and directed to Aruturo Mayoral.

      Very truly yours,

      DELK McNALLY LLP

      Jason R. Delk

JRD/scg

Enclosures

3815 River Crossing Parkway, Suite 181
Indianapolis, IN 46240
(317) 442-4444

211 South Walnut Street
Muncie, IN 47305
(765) 896-9495
www.delkmcnally.com

610 N. Rangeline Road
Carmel, IN 46033
(317) 442-4444

AO 88A (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of Indiana

| | |
|---|---|
| NEXTGEAR CAPITAL, INC. | ) |
| *Plaintiff* | ) |
| v. | )   Civil Action No.   1:20-cv-00354-TWP-DLP |
| PREMIER GROUP AUTOS, LLC, JAMES M. | ) |
| BLACKBURN, and EDWARD A. KESSLER | ) |
| *Defendant* | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:        Arturo Mayoral, c/o Brian Jones, Bose, McKinney & Evans LLP

*(Name of person to whom this subpoena is directed)*

☑ **Testimony:** YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters:

| Place: Bose McKinney & Evans LLP<br>111 Monument Circle, Suite 2700<br>Indianapolis, IN 46204 | Date and Time:<br>07/22/2021 10:00 am |
|---|---|

The deposition will be recorded by this method:   In person Court Reporter

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material: See Exhibit A.

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date 6/11/21

| CLERK OF COURT | |
|---|---|
| | OR |
| _____ | _____ |
| *Signature of Clerk or Deputy Clerk* | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Edward A. Kessler
_____ , who issues or requests this subpoena, are:

Jason R. Delk, Delk McNally LLP, 211 S. Walnut St., Muncie, IN 47304, delk@delkmcnally.com, 765/896-9495

**Notice to the person who issues or requests this subpoena**
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.  1:20-cv-00354-TWP-DLP

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

    ☐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____

_____ on *(date)* _____ ; or

    ☐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
(i) is a party or a party's officer; or
(ii) is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
(A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
(B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

(A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;
(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information; or
(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## EXHIBIT A

1. All emails, communications, text messages, notes, instant messages, electronic communications, letters, correspondence, facsimiles, and the like, by and between Arturo Mayoral and James Blackburn.

2. All emails, communications, text messages, notes, instant messages, electronic communications, letters, correspondence, facsimiles, and the like, by and between Arturo Mayoral and Edward Kessler.

3. All documents (electronic or hard copy), emails, communications, text messages, notes, instant messages, electronic communications, letters, correspondence, facsimiles, memoranda and/or reports that in any way relate to and/or refer to Edward Kessler.

4. All documents (electronic or hard copy), emails, communications, text messages, notes, instant messages, electronic communications, letters, correspondence, facsimiles, memoranda and/or reports that in any way relate to and/or refer to Edward Kessler and/or the Power of Attorney document purportedly executed by Edward Kessler.

5. All documents, receipts, logs, reports, emails, communications, text messages, and the like, that in any way relates to, refers to, references and/or evidences your location(s) and/or general whereabouts on April 18, 2019.

6. All training manuals, policies, procedures and other documents that refer to, relate to and/or evidence the training You received to be a notary public in the state of Florida.

7. All training manuals, polices, procedures and/or other documents that in any way refer to and/or relate to Your training, duties, procedures and/or obligations while serving as a notary public, whether received from the state of Florida and/or Your employer, NextGear Capital, Inc.

8. The electronic version (including all metadata) of the photograph you took of the license of Edward Kessler on April 18, 2019.

9. The camera, phone and/or other device (for copying and/or inspection) that You used to take the photograph of Edward Kessler's license on April 18, 2019.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon all counsel of record via USPS Certified/Return Receipt and email this 11th day of June, 2021.

/s/ Jason R. Delk
Jason R. Delk

DELK McNALLY, LLP
211 S. Walnut Street
Muncie, IN 47305
Telephone: 765/896-9495
Facsimile: 888/453-0545





CERTIFIED MAIL

9414 8116 9900 0233 3394 74

David J. Jurkiewicz
BOSE McKINNEY & EVANS LLP
111 Monument Circle, Suite 2700
Indianapolis IN 46204-5120



DELK McNALLY LLP
ATTORNEYS AT LAW

211 South Walnut Street
Muncie, Indiana 47305





Richard A. Rocap
ROCAP LAW FIRM LLC
10293 N. Meridian St., Ste. 175
Carmel IN 46290-1130



DELK McNALLY LLP
ATTORNEYS AT LAW

211 South Walnut Street
Muncie, Indiana 47305



# CONFIDENTIAL CREDIT DEALER APPLICATION

## BUSINESS CREDIT APPLICANT INFORMATION

Name: PREMIER GROUP AUTOS LLC
DBA / Trade Name: ONEFINANCE MIAMI

Business Auction Access #: S44 80 50
Agent License #: M/M27100/1   Est. Date: 04/30/2019
State of License or Organization: Florida
Legal Tax ID: 16-8011647474   State Tax ID: 16-8011647474

In Business Since: Dec 10th 2018

Business Structure:
☐ Retail
☐ Corporation
☐ Partnership
☐ Sole Proprietor
☐ Other

Sells:
☐ New
☐ Used
☐ 2-7
☐ Other

☐ Salvage
☐ Powersports
☐ Marine

Address: Sales @ Onefinancemiami.com
Email Address: www.Onefinance.com
Street Address: 1500 Concord Rd, #206
Fort Lauderdale, FL 33316   County: Broward
City: Fort Lauderdale   State: FL   Zip: 33316

## GUARANTOR INFORMATION

Name: Edward Kessler   Title: Owner
Ownership: 50
Home Address: 5909 Murray Ave
City: Pittsburgh   State: PA   County: U.SA
Co Fort Lauderdale, FL 33316   County: Broward
Drivers License #: 28 369 548
State of Issue: PA   Exp Date: 09/30/2020
Home Phone #: 414-741-3163
Personal Email: eck13@RocsSolutionsllc.net
Individual Auction Access #: None yet

## BUSINESS BANKING INFORMATION

Bank Name: HSBC   Title: Owner
Lender Name: Fort Lauderdale   State: FL
Contact Name: Kevine Brennan
Checking Account: 06 1005 13 76
Bank Phone #: 786 435 8585

## GUARANTOR INFORMATION

Name: James Blackburn   Title: Owner
Ownership: 50
Home Address: 4875 N6 4th Avenue
City: Fort Lauderdale   State: FL   County: U.SA
Drivers License #: B421-453-60-182-0
State of Issue: Florida   Exp Date: 05-22-2020
Home Ph #: 883
Personal Email: James@onefinancemiami.com
Individual Auction Access #: 1,385

## CURRENT/FORMER FLOOR PLAN FINANCING

## AGREEMENT

NC-000393





NG000258

**From:** Cox, Jordan (CAI - Kentucky) <Jordan.Cox@coxautoinc.com>
**Sent:** Tuesday, March 23, 2021 3:26 PM
**To:** Mayoral, Art (CAI - Florida) <Arturo.Mayoral@coxautoinc.com>
**Subject:** POA ISSUE

Please see attached and let me know what you can recollect here and send me whatever info you have. Thanks!


 Thank You,

**Jordan Cox**
Regional Sales Director - Southeast


11799 N College Avenue
Carmel, IN 46032
m: 812.249.8125 | f: 877.454.8136

---

**From:** "Mayoral, Art (CAI - Florida)" <Arturo.Mayoral@coxautoinc.com>
**Date:** March 23, 2021 at 4:42:12 PM EDT
**To:** "Cox, Jordan (CAI - Kentucky)" <Jordan.Cox@coxautoinc.com>
**Subject:** 125308 Premier Group Autos - POA ISSUE

Jordan,

On March 27th 2019 I received the Docstamp check image for the above account from James Blackburn.  Ed Kessler was out of town and would not return for a couple of weeks. Two weeks later I was contacted to meet both partners at their corporate office located at 1500 Cordova Rd Suite 206, Fort Lauderdale Fl. 33316.  Where they also have a jet charter business and a Yacht Brokerage.
On April 18th 2019 I met with Mr. Blackburn and Mr. Kessler. I verified the ID's and followed Procedure notarizing their respective documents.  I collected the Docstamp check and POA's and placed them in a Fedex Envelope. They were immediately sent to corporate by me. I then proceeded to Onboard the dealer and set up their preferences in the portal.  We also Specific Sourced a Range rover. All my activities are logged in Salesforce.  I also found these in my records.

Regards,

**Arturo F. Mayoral**
Sales Executive



NG000259

NXTGR-000000259

NextGear Capital, Inc.
11799 North College Avenue
Carmel, IN 46032
Arturo.mayoral@coxautoinc.com
C : 954.383.8503 | f: 855.619.0747

COX AUTOMOTIVE'    NEXTGEAR
CAPITAL

NG000260

NXTGR-000000260



EXHIBIT
8
Mayoral
7-22-21

## POWER OF ATTORNEY
### (Entity/Partnership)

This Power of Attorney is executed by the undersigned borrower ("Borrower") and delivered to NextGear Capital, Inc. ("Lender") pursuant to that certain Demand Promissory Note and Loan and Security Agreement by and between Borrower and Lender (the "Note"). Capitalized terms used herein but not defined herein shall have the respective meanings as set forth in the Note (such meanings to be equally applicable to both the singular and plural forms of the terms defined). Any capitalized terms used herein, but not otherwise defined herein or in the Note, as the case may be, shall have the meanings ascribed to them in the UCC.

1.  No Person to whom this Power of Attorney is presented, as authority for Lender to take any action described below, shall be required to inquire into or seek confirmation from Borrower as to the authority of Lender to take any action described below, or as to the existence of or fulfillment of any condition to this Power of Attorney, which is intended to grant to Lender unconditionally the authority to take and perform the actions described below. Borrower irrevocably waives any right that it may have, now or at any time in the future, to commence any claim, litigation, suit, petition, writ, or proceeding in any court of competent jurisdiction or before any arbitrator or other neutral, against any Person acting in reliance upon or otherwise acknowledging any power or authority granted by Borrower under this Power of Attorney. The Power of Attorney granted hereby is coupled with an interest and may not be revoked or canceled by Borrower without Lender's written consent or as otherwise allowed by Law. This Power of Attorney shall be deemed a "Loan Document" for all intents and purposes as referenced in the Note.

2.  With or without the occurrence of an Event of Default under the Note, Borrower irrevocably appoints Lender (and all Representatives designated by Lender), with full power of substitution, as Borrower's true and lawful attorney-in-fact with full power and authority in the place and stead of Borrower and in the name of Borrower or in its own name, from time to time in Lender's discretion, to take any and all appropriate actions and to execute and deliver any and all documents and instruments which may be necessary or desirable to accomplish the purposes of the Note and each of the other Loan Documents. Without limiting the generality of the foregoing, Borrower hereby grants to Lender the power and right, on behalf of Borrower, without further notice to or assent by Borrower, at any time, to do the following:

    (a)  execute such security agreements, invoices, notes, and related documentation as may be necessary for Borrower to acquire, refinance, or sell any Collateral (including any Units secured or to be secured by Advances made thereon);

    (b)  execute all documents necessary for Lender to perfect or secure its interest in the Collateral;

    (c)  make, settle, and adjust claims under policies of insurance, and endorse any check, draft, instrument, or other item of payment for the proceeds of such policies of insurance, and make all determinations and decisions with respect to such policies of insurance;

    (d)  endorse the name of Borrower upon any document, instrument, certificate, evidence of title, state registration documents, trust receipt, checks or other items of payment, or any related or similar documents, in each case as necessary to pay for or protect the Collateral, including, without limitation, any agreements between Borrower and any global positioning satellite company;

    (e)  endorse the name of Borrower upon any items of payment or proceeds of any Collateral (including any Units constituting Collateral), and to deposit the same to the account of Lender on account of Borrower's Liabilities under the Note and the other Loan Documents;

    (f)  endorse the name of Borrower upon any chattel paper, document, instrument, invoice, freight bill, bill of lading, or similar document or agreement relating to any Collateral;

    (g)  use the information recorded on or contained in any data processing equipment, computer hardware, or software relating to any Collateral to which Borrower has access;

    (h)  pay or discharge any taxes, liens, security interests, or other encumbrances levied or placed on or threatened against Borrower or any of the Collateral;

    (i)  communicate with any party to any contract with regard to the assignment of the right, title, and interest of Borrower in and under such contract and/or the Collateral, and other matters relating thereto;

    (j)  contact any third parties and disclose and/or receive any Borrower information, including, without limitation, information or data in Borrower's application for credit with Lender, the Note, or Borrower's Credit Line, in each case for the purpose of, among other things, preserving Lender's security interest in the Collateral and ensuring the satisfaction of Borrower's Liabilities under the Note and the other Loan Documents; and

    (k)  do all other things reasonably necessary to satisfy Borrower's Liabilities under the Note and the other Loan Documents.

3.  Upon the occurrence of an Event of Default under the Note, Borrower irrevocably appoints Lender (and all Representatives designated by Lender), with full power of substitution, as Borrower's true and lawful attorney-in-fact with full power and authority in the place and stead of Borrower and in the name of Borrower or in its own name, from time to time in Lender's discretion, to do the following:

    (a)  demand, collect, accept receipt for, settle, compromise, adjust, foreclose, or realize upon any of the Collateral, in each case in such manner as Lender may determine;

    (b)  file or prosecute any claim, litigation, suit, petition, writ, or proceeding in any court of competent jurisdiction or before any arbitrator or other neutral, or take any other action otherwise deemed appropriate by Lender for the purpose of collecting any and all such moneys due to

NXTGR-000000273

Borrower, whenever payable, and to enforce any other right in respect of the Collateral, including, without limitation, confessing to or consenting to judgments, writs of replevin or possession, and/or any equitable relief in favor of Lender or its Affiliates;

(c) file or prosecute all proofs of claim against any account debtor on behalf of Borrower; and

(d) notify the United States Postal Service of a change in address for the delivery of Borrower's mail to an address designated by Lender, and to receive Borrower's mail on behalf of Borrower.

4. Any provision of this Power of Attorney that is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability, without rendering invalid or unenforceable the remaining provisions of this Power of Attorney or affecting the validity or enforceability of any provision of this Power of Attorney in any other jurisdiction. Borrower hereby ratifies, to the extent permitted by Law, all that Lender or its designated Representatives shall lawfully do or cause to be done by virtue hereof, whether such actions were done before or after the actual execution date of this Power of Attorney. The rights and privileges set forth herein shall be deemed supplemental and in addition to any rights and privileges to which Lender or any other Person may be entitled under the Note or any other Loan Document. A facsimile or photocopied reproduction of any signature on this Power of Attorney shall be deemed an original signature for all intents and purposes.

WHEREFORE, Borrower, by its duly authorized representative, has executed this Power of Attorney on the date set forth below.

**BORROWER:**

Premier Group Autos LLC DBA Overfinch Miami

By: _____

Name:  Edward Anthony Kessler

Title:  Manager

Date:  4. 18. 19

STATE OF _Florida_                )
                                  )  SS:
COUNTY OF _Broward_               )

Before me, a Notary Public in and for said County and State, personally appeared   Edward Anthony Kessler known to me to be the Manager of   Premier Group Autos LLC DBA Overfinch Miami who acknowledged the execution of the foregoing Power of Attorney, and who, having been duly sworn, states that any representations contained therein are true.

Witness my hand and Notarial Seal this _18_ day of _April_, 20_19_

Notary Signature _____

Notary Name (Printed)  ARTURO MAYORAL

My Commission Expires: _10/11/2021_          County of Residence: _BROWARD_

Notary Public State of Florida
Arturo Mayoral
My Commission GG 150838
Expires 10/11/2021

NG000274

NXTGR-000000274



## POWER OF ATTORNEY
(Entity/Partnership)

This Power of Attorney is executed by the undersigned borrower ("Borrower") and delivered to NextGear Capital, Inc. ("Lender") pursuant to that certain Demand Promissory Note and Loan and Security Agreement by and between Borrower and Lender (the "Note"). Capitalized terms used herein but not defined herein shall have the respective meanings as set forth in the Note (such meanings to be equally applicable to both the singular and plural forms of the terms defined). Any capitalized terms used herein, but not otherwise defined herein or in the Note, as the case may be, shall have the meanings ascribed to them in the UCC.

1.  No Person to whom this Power of Attorney is presented, as authority for Lender to take any action described below, shall be required to inquire into or seek confirmation from Borrower as to the authority of Lender to take any action described below, or as to the existence of or fulfillment of any condition to this Power of Attorney, which is intended to grant to Lender unconditionally the authority to take and perform the actions described below. Borrower irrevocably waives any right that it may have, now or at any time in the future, to commence any claim, litigation, suit, petition, writ, or proceeding in any court of competent jurisdiction or before any arbitrator or other neutral, against any Person acting in reliance upon or otherwise acknowledging any power or authority granted by Borrower under this Power of Attorney. The Power of Attorney granted hereby is coupled with an interest and may not be revoked or canceled by Borrower without Lender's written consent or as otherwise allowed by Law. This Power of Attorney shall be deemed a "Loan Document" for all intents and purposes as referenced in the Note.

2.  With or without the occurrence of an Event of Default under the Note, Borrower irrevocably appoints Lender (and all Representatives designated by Lender), with full power of substitution, as Borrower's true and lawful attorney-in-fact with full power and authority in the place and stead of Borrower and in the name of Borrower or in its own name, from time to time in Lender's discretion, to take any and all appropriate actions and to execute and deliver any and all documents and instruments which may be necessary or desirable to accomplish the purposes of the Note and each of the other Loan Documents. Without limiting the generality of the foregoing, Borrower hereby grants to Lender the power and right, on behalf of Borrower, without further notice to or assent by Borrower, at any time, to do the following:

    (a)  execute such security agreements, invoices, notes, and related documentation as may be necessary for Borrower to acquire, refinance, or sell any Collateral (including any Units secured or to be secured by Advances made thereon);

    (b)  execute all documents necessary for Lender to perfect or secure its interest in the Collateral;

    (c)  make, settle, and adjust claims under policies of insurance, and endorse any check, draft, instrument, or other item of payment for the proceeds of such policies of insurance, and make all determinations and decisions with respect to such policies of insurance;

    (d)  endorse the name of Borrower upon any document, instrument, certificate, evidence of title, state registration documents, trust receipt, checks or other items of payment, or any related or similar documents, in each case as necessary to pay for or protect the Collateral, including, without limitation, any agreements between Borrower and any global positioning satellite company;

    (e)  endorse the name of Borrower upon any items of payment or proceeds of any Collateral (including any Units constituting Collateral), and to deposit the same to the account of Lender on account of Borrower's Liabilities under the Note and the other Loan Documents;

    (f)  endorse the name of Borrower upon any chattel paper, document, instrument, invoice, freight bill, bill of lading, or similar document or agreement relating to any Collateral;

    (g)  use the information recorded on or contained in any data processing equipment, computer hardware, or software relating to any Collateral to which Borrower has access;

    (h)  pay or discharge any taxes, liens, security interests, or other encumbrances levied or placed on or threatened against Borrower or any of the Collateral;

    (i)  communicate with any party to any contract with regard to the assignment of the right, title, and interest of Borrower in and under such contract and/or the Collateral, and other matters relating thereto;

    (j)  contact any third parties and disclose and/or receive any Borrower information, including, without limitation, information or data in Borrower's application for credit with Lender, the Note, or Borrower's Credit Line, in each case for the purpose of, among other things, preserving Lender's security interest in the Collateral and ensuring the satisfaction of Borrower's Liabilities under the Note and the other Loan Documents; and

    (k)  do all other things reasonably necessary to satisfy Borrower's Liabilities under the Note and the other Loan Documents.

3.  Upon the occurrence of an Event of Default under the Note, Borrower irrevocably appoints Lender (and all Representatives designated by Lender), with full power of substitution, as Borrower's true and lawful attorney-in-fact with full power and authority in the place and stead of Borrower and in the name of Borrower or in its own name, from time to time in Lender's discretion, to do the following:

    (a)  demand, collect, accept receipt for, settle, compromise, adjust, foreclose, or realize upon any of the Collateral, in each case in such manner as Lender may determine;

    (b)  file or prosecute any claim, litigation, suit, petition, writ, or proceeding in any court of competent jurisdiction or before any arbitrator or other neutral, or take any other action otherwise deemed appropriate by Lender for the purpose of collecting any and all such moneys due to

NG000244

NXTGR-000000244

Borrower, whenever payable, and to enforce any other right in respect of the Collateral, including, without limitation, confessing to or consenting to judgments, writs of replevin or possession, and/or any equitable relief in favor of Lender or its Affiliates;

(c) file or prosecute all proofs of claim against any account debtor on behalf of Borrower; and

(d) notify the United States Postal Service of a change in address for the delivery of Borrower's mail to an address designated by Lender, and to receive Borrower's mail on behalf of Borrower.

4. Any provision of this Power of Attorney that is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability, without rendering invalid or unenforceable the remaining provisions of this Power of Attorney or affecting the validity or enforceability of any provision of this Power of Attorney in any other jurisdiction. Borrower hereby ratifies, to the extent permitted by Law, all that Lender or its designated Representatives shall lawfully do or cause to be done by virtue hereof, whether such actions were done before or after the actual execution date of this Power of Attorney. The rights and privileges set forth herein shall be deemed supplemental and in addition to any rights and privileges to which Lender or any other Person may be entitled under the Note or any other Loan Document. A facsimile or photocopied reproduction of any signature on this Power of Attorney shall be deemed an original signature for all intents and purposes.

WHEREFORE, Borrower, by its duly authorized representative, has executed this Power of Attorney on the date set forth below.

**BORROWER:**

Premier Group Autos LLC DBA Overfinch Miami

By:
Name:   James Michael C Blackburn
Title:   Manager
Date:   4.18.19

STATE OF _FLORIDA_        )
                          ) SS:
COUNTY OF _BROWARD_       )

Before me, a Notary Public in and for said County and State, personally appeared   James Michael C Blackburn known to me to be the Manager of   Premier Group Autos LLC DBA Overfinch Miami who acknowledged the execution of the foregoing Power of Attorney, and who, having been duly sworn, states that any representations contained therein are true.

Witness my hand and Notarial Seal this _18_ day of _April_, 20_19_.

Notary Signature

Notary Name (Printed)   _Arturo Mayoral_

My Commission Expires: _10/11/2021_        County of Residence: _Broward_



Notary Public State of Florida
Arturo Mayoral
My Commission GG 150638
Expires 10/11/2021

NXTGR–000000245



**1. PURPOSE**

**2. SCOPE**

**3. POLICY**

*3.2 Underwriting and Credit Approval*

EXHIBIT

12

Mayoral
7-22-21

PENGAD 800-631-6989



### 3.3 Borrower Reserves

### 3.3.1 Reserve Charges

### 3.3.2 Reserve Release

### 3.4 Application, Activation, and Contracting



Lending processes activation after thorough vetting and upon receipt of an executed contract. NextGear Capital requires original Power of Attorney no later than 30 days from account activation. Accounts not meeting this requirement are locked.

Contracts must be fully executed, kept on file in the manner in which they were received, and include executed advance schedule(s) and Power of Attorney. Lending initiates contracting and re-contracting efforts, in conjunction with Legal, who produces contract versions. Any required addendums will be provided and executed by the dealer as part of the contract. All non-standard contracts require Legal oversight.



### 3.4.1 Non-Purchase Money Funding (NPMF)



### 3.5.3 Seasonal Temporary Increase Eligibility & Approval



### 3.5.4 Line Modifications





### 3.5.6 Line of Credit Adjustments



### 3.5.7 Account Reviews










# INTERNAL CREDIT GUIDELINES*

### Effective June 1, 2021

EXHIBIT

13

Mayoral
7-22-21

PENGAD 800-631-6989

## PROPRIETARY AND CONFIDENTIAL – NOT TO BE SHARED OUTSIDE NEXTGEAR CAPITAL

CONFIDENTIAL

NextGear Capital, Inc. -Internal Communication Only – Proprietary and Confidential –
NOT TO BE SHARED OUTSIDE OF COMPANY

NG002209





CONFIDENTIAL

NextGear Capital, Inc. – Internal Communication Only – Proprietary and Confidential – NOT TO BE SHARED OUTSIDE OF COMPANY



CONFIDENTIAL

NextGear Capital, Inc. - Internal Communication Only – Proprietary and Confidential – NOT TO BE SHARED OUTSIDE OF COMPANY

NG002211

3

## Power of Attorney (POA) -- Set at 30 days, NO EXCEPTIONS

- Ensure that the signed, and notarized POA is sent in ASAP after activation.
- If the original, signed, and notarized POA is not received by Lending within 30 days after activation, the Dealer/Client's Line of Credit will be LOCKED until the original POA is received.





CONFIDENTIAL

NextGear Capital, Inc. - Internal Communication Only – Proprietary and Confidential –
NOT TO BE SHARED OUTSIDE OF COMPANY

NG002213

5





CONFIDENTIAL

NextGear Capital, Inc. –Internal Communication Only – Proprietary and Confidential – NOT TO BE SHARED OUTSIDE OF COMPANY

NG002214





CONFIDENTIAL

NextGear Capital, Inc. -Internal Communication Only – Proprietary and Confidential –
NOT TO BE SHARED OUTSIDE OF COMPANY

NG002215





CONFIDENTIAL

NextGear Capital, Inc. – Internal Communication Only – Proprietary and Confidential – NOT TO BE SHARED OUTSIDE OF COMPANY

NG002216





CONFIDENTIAL

NextGear Capital, Inc. -Internal Communication Only – Proprietary and Confidential – NOT TO BE SHARED OUTSIDE OF COMPANY

NG002217



CONFIDENTIAL

NG002218





CONFIDENTIAL

NextGear Capital, Inc. –Internal Communication Only – Proprietary and Confidential –
NOT TO BE SHARED OUTSIDE OF COMPANY

NG002219

11

**From:** Mayoral, Arturo (CAI - Carmel)
**To:** MDLending; Coello, Claudia (CAI - Carmel)
**Subject:** RE: Premier Group Autos LLC - 125308
**Date:** Wednesday, March 13, 2019 11:12:43 AM
**Attachments:** image001.png
image002.png
image003.png

Yes, The dealer has signed DocuSign. Dealer is out of the country and return later this week  He will wire $100K ADCO to activate account.

Best 🙂

**Arturo F. Mayoral**

Arturo.Mayoral@coxautoinc.com



Know someone who could benefit from a relationship with NextGear?  Refer a dealer using the link below, and you'll get a $150 reward when they open an account and floor their first unit!

https://www.nextgearcapital.com/dealer-resources/dealer-referral/





**From:** Kubicki, Jason (CAI - Carmel) **On Behalf Of** MDLending
**Sent:** Wednesday, March 13, 2019 11:12 AM
**To:** Coello, Claudia (CAI - Carmel) <Claudia.Coello@coxautoinc.com>; Mayoral, Arturo (CAI - Carmel) <Arturo.Mayoral@coxautoinc.com>
**Cc:** MDLending <ngc MDLending@coxautoinc.com>
**Subject:** RE: Premier Group Autos LLC - 125308

**\*\*$100k upfront reserve required prior to activation\*\***

Approved to increase to $500k retail
Retail TP 77273-060/30/30 -- F75/40/40 -- R30 -- C%10/5
$100k upfront reserve
James Blackburn 50% Member
Edward Kessler 50% Member
UCC to be filed In FL

| Premier Group Autos LLC | | | | | |
|---|---|---|---|---|---|
| **NPMG:** | NextGear 1st UCC filed | | Approved Amount | Float Subject 1 $500,000.00 | |
| **Dealer Type:** | Core | | Approved Terms | | |
| **Dealer Phone #:** | (954) 440-0717 | | **Approved Amount** | | |
| **Dealer Address:** | 11 SW 12th Ave Ste 103 Bldg 59 | | **Approved Terms** | | |
| **PM:** | Arturo Mayoral | | **Approved Amount** | | |
| **RD:** | William Chandler | | **Approved Terms** | | |
| **Underwriter:** | Al Barnes | | | | |
| **STIPULATIONS** | | | **STIPULATION COMMENTS** | | |
| Promissory Note | | | $500k | | |
| Advance Schedule: Core | | | F7.5 Disb 30/30 -- F%/40/40 -- R30 -- C%10/5, $500K Upfront Reserve | | |
| Per Car Reserve - Upfront required | | | $100,000 Upfront required on PGR | | |
| Per Car Reserve - Reserve Agreement | | | | | |
| Power Of Attorney | | | Edward Kessler | | |
| Power Of Attorney | | | James Blackburn | | |
| Guarantee - Personal | | | Edward Kessler | | |
| Guarantee - Personal | | | James Blackburn | | |
| ACH Authorization & Request | | | | | |
| Insurance Certificate | | | | | |
| IRS form 4506 Information Release Document - completed w/Close | | | | | |
| UCC Filing | | | UCC filed for Premier Group Autos LLC in the State of FL | | |
| Resale Exemption Addendum | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| Other | | | **Operational Stipulations** | | |
| | | | None | | |

Thank you,

**Jason Kubicki**

Jason.Kubicki@coxautoinc.com





**From:** Kubicki, Jason (CAI - Carmel) [mailto:Jason.Kubicki@coxautoinc.com] **On Behalf Of** MDLending
**Sent:** Wednesday, March 6, 2019 3:48 PM
**To:** Lara, Kathy (CAI - Carmel) <Kathy.Lara@coxautoinc.com>

EXHIBIT

Mayoral
7-22-21

PENGAD 800-631-6989

NG002024

NXTGR-000002024

**Cc:** MD Accounts <mds.MRcompany@companies.com>
**Subject:** Premier Group Autos LLC - 125309

Hello,

I know this dealer was recently switched to your market. We sent a contract out a 2/17. Do you know if the dealer is going to sign?

Thank you,

**Jason Rubloff**
Rep, Inside Sales, F&I, R&L
Jason.Rubloff@company.com

NG002025

NXTGR-000002025

# Performance Improvement Plan



**Team Member Name:** Arturo Mayoral    **Job Title:** Sales Executive    **Date:** 3/11/19

**Department:** Sales    **Manager Name:** Stacy Fields

**Dates of Previous Discussions/Warnings:** 1/23 and 2/14 1:1 Discussion

## Summary of Current Performance Issues:

| | Visits | General | Revenue | EP Walks | LOC | Commission/Walk Loans | App LOC | App Total | Activations | ActionOn Goal | Application % of Goal | Activation % of Goal |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| February | 52 | 9 | $50,898.76 | 17.50% | $200,000.00 | 150 | 8 | 14 | 3 | 10 | 57.14% | 30.00% |

Your 3 month rolling average is now as follows:

| Sales Executive | LOC | Commission/Walk Loans | App Total | App Goal | Activations CM | Actions Goal | Application % of Goal | Activation % of Goal |
|---|---|---|---|---|---|---|---|---|
| Arturo F. Mayoral | $4,200,000.00 | 526 | 25 | 42 | 15 | 30 | 59.52% | 50.00% |

Additionally, your YTD performance is as follows:

| Sales Executive | | LOC | Commission/Walk Loans | App Total | App Goal | Activations | Actions Goal | Application % of Goal | Activation % of Goal |
|---|---|---|---|---|---|---|---|---|---|
| Arturo F. Mayoral | January | $2,000,000.00 | 183 | 7 | 14 | 5 | 10 | 50.00% | 50.00% |
| | February | $200,000.00 | 150 | 8 | 14 | 3 | 10 | 57.14% | 30.00% |

| Sales Executive | LOC | Commission/Walk Loans | App Total | App Goal | Activations | Action Goal | Application % of Goal | Activation % of Goal |
|---|---|---|---|---|---|---|---|---|
| Arturo F. Mayoral | $1,200,000.00 | 333 | 15 | 28 | 9 | 20 | 53.57% | 45.00% |

## Performance Expected:

- Consistent and sustained performance to goal in both activations and applications. Minimum expectation is 80% to goal on a 3 month rolling average. Arturo's goal is 14 applications and 10 Activations each month.
- 80+ new prospect, in-person visits each month to maintain a full pipeline

## Action Plan for Improvement

| | Action Item | Target Date | Date Completed |
|---|---|---|---|
| 1. | Build the Pipeline by Increasing Prospect Visits (min 20 per week) | Ongoing - weekly | |
| 2. | Build the Pipeline by Increasing Application Volume (min 4 per week) | Ongoing - weekly | |
| 3. | Your Outlook calendar is to be shared with RSD Stacy Fields. Pre-plan the week's visits by area of visit planned, cold call dealer names listed, auctions, and appointments using Outlook Calendar beginning 3/18. Coming week should be scheduled by prior Sunday and an email sent to RSD notifying that the calendar has been updated. | 3/18, continuing each Monday | |
| 4. | Engage with auctions and BDRs to increase lead opportunity | Ongoing – daily, weekly, monthly | |
| 5. | Meet with each PM to discuss new business strategy in their respective Markets and develop a top 5 target list to share with the PM and RSD weekly | 3/18, report weekly each Monday | |

## Follow Up (review progress against plan)

| | Date | Comments |
|---|---|---|
| 1. | 4/15/19 | As discussed last month, the expectations were for you to end the month of March with a positive trend in both applications and activations % to goal for the three month rolling average and end March with 80% to goal or better in both Applications and Activations. You have brought your three month rolling application % to goal from 59.52% to 64.29% and activation % to goal from 50.00% to 56.67%, still far below the minimum expectation of 80% but an improvement. You ended March at 85.71% to goal in applications and 80.00% to goal in activations. The expectation for April is to meet your Application goal of 15 and your activation goal of 10. A strong focus on these expectations is imperative. |

CONFIDENTIAL

EXHIBIT
16
Mayoral
7-22-21
PENGAD 800-631-6989

NG002241

## Performance Improvement Plan



| 2. | 5/8/19 | As discussed last month, the expectations for April were for you to meet your application goal of 15 and activation goal of 10. While you fell short of your application goal achieving only 9 applications, you exceeded your activation goal achieving 13. As both your application and activation % to goal have trended positive since the initial Performance Improvement Plan was put in place on 3/11, we will continue our performance improvement discussions. The expectation for May is to meet both your application goal of 15 and your activation goal of 10. Failure to meet either of these expectations will result in final written warning. |

You must demonstrate significant, consistent, and sustained improvement in your performance, with emphasis on the areas outlined above. Failure to demonstrate significant, consistent, and sustained improvement in these areas will lead to further action, up to and including separation of employment. This plan will be in place for the next 60 days, during which time we will review your progress and overall performance on a regular basis. We reserve the right to take corrective action at any time if the problems continue or if your performance declines.

**Team Member Comments**

I acknowledge that the contents of this Performance Improvement Plan were discussed with me and that any further performance issues may result in further action, up to and including separation of employment.

Team Member Signature: _____   Date: 5/8/19

Manager Signature: _____   Date: _____

HR Representative Signature: _____   Date: 5/8/19

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

**NEXTGEAR CAPITAL, INC.**

    *Plaintiff,*

v.

    **CASE NO. 1:20-cv-00354-TWP-DLP**

**PREMIER GROUP AUTOS, LLC,**
**JAMES M. BLACKBURN, and**
**EDWARD A. KESSLER,**

    *Defendants.*

---

### NEXTGEAR CAPTIAL, INC.'S OBJECTIONS AND RESPONSES TO EDWARD A. KESSLER'S FIRST INTERROGATORIES

---

NextGear Capital, Inc. ("NextGear"), respectfully submits its Objections and Responses to Edward A. Kessler's ("Kessler") First Interrogatories, and states:

### GENERAL OBJECTIONS

NextGear generally objects to Kessler's Interrogatories and their accompanying instructions and definitions on the following grounds, each of which are expressly incorporated by reference into each of the answers below:

**A. Obligations Beyond the Rules.** NextGear objects to the Interrogatories and their accompanying instructions and definitions to the extent they purport to impose requirements in addition to or beyond those contained in the Rules. NextGear will respond to Kessler's discovery requests in accordance with the Rules, and NextGear rejects anything to the contrary contained in Kessler's discovery requests.



**B. Discovery Is Incomplete and Ongoing**. Discovery is incomplete and ongoing in this litigation, and NextGear reserves the right to modify or amend its responses based on subsequent discovery or investigation in this litigation.

**C. Privilege**. NextGear objects to the Interrogatories and their accompanying instructions and definitions to the extent they purport to seek information that is protected by the attorney-client privilege, or any other legally recognized privilege, including information, materials, or documents that contain or reflect confidential communications between or among NextGear and its attorneys or that are otherwise privileged. Accordingly, unless otherwise indicated, NextGear's answers exclude from their scope all privileged information. Inadvertent disclosure of privileged information by NextGear is not a waiver of any applicable privilege. NextGear further objects to the extent any part of any Request seeks sensitive or confidential corporate information not related to the subject matter of this lawsuit.

**D. Work Product**. NextGear objects to each Interrogatory and the accompanying instructions and definitions to the extent they seek information, materials, or documents protected by the work-product doctrine, including such information, materials, or documents that were prepared in anticipation of litigation by or for NextGear or its representatives, or that contain or reflect the work product, mental impressions, conclusions, opinions, or legal theories of an attorney or representative of NextGear concerning this litigation.

**E. Trial Preparation Materials**. NextGear objects to each Interrogatory and the accompanying instructions and definitions to the extent that it seeks to discover information that was acquired or developed in anticipation of litigation.

2

**F.  Unduly Burdensome or Facts Known By Others**. NextGear objects to each Interrogatory and the accompanying instructions and definitions to the extent it is intended to impose upon NextGear an obligation to provide or describe facts and events beyond the personal knowledge of NextGear and within the knowledge of other parties. NextGear should not bear the unnecessary and duplicative burden of investigating such matters when Kessler has received or may receive discovery on such matters from the party or parties directly involved.

**G.  Unduly Burdensome and Immaterial or Lack of Time References**. NextGear objects to each Interrogatory and the accompanying instructions and definitions to the extent it includes no time references and purports to require NextGear to provide information concerning an unlimited period of time.

**H. Other Objections**. In answering any Interrogatory, NextGear does not waive or intend to waive:

(1)  objections as to competency, relevancy, materiality, or admissibility;

(2)  rights to object on any grounds to the use of any responses herein in any subsequent proceedings, including the trial of this or any other actions;

(3)  objections as to vagueness or ambiguity; and

(4)  rights to object further to this or any other requests in this proceeding.

In providing answers to Kessler's Interrogatories, NextGear does not stipulate, concede, or otherwise admit that the subject matter of the Interrogatory or of the Answers is relevant, material, or admissible. All objections to the introduction of Kessler's Interrogatories and/or NextGear's Answers are expressly preserved and may be interposed at any time at or before trial.

3

Subject to the foregoing general objections, and without waiving them, NextGear's specific objections and Answers are set forth below.

## ANSWERS TO INTERROGATORIES

1.   Identify all individuals who have assisted in answering these Interrogatories, the Requests for Admission and the Requests for Production served on Defendant in this case.

**ANSWER:** Andrew Ramey, Manager of Lending Services for NextGear Capital, Inc. Arturo Mayoral, Sr. Client Solutions Executive for NextGear Capital, Inc.


2.   Identify all persons/individuals who have knowledge with respect to any of the allegations in Plaintiff's Complaint and/or the defenses/denials asserted in Plaintiff's Answer to the Counterclaim; and state what knowledge each person/individual has and/or claims to have.

**ANSWER:** NextGear objects to this Interrogatory as overly broad and unduly burdensome because it seeks identification of "all persons/individuals" with knowledge concerning "any" of the allegations in NextGear's Complaint without limitation as to time, location, subject, or information within NextGear's care, custody, or control. NextGear further objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege.

Subject to and without waiver of the foregoing objections, NextGear states that the witnesses identified in its Disclosures and Witness and Exhibit Lists (and any supplements thereto) represent NextGear's best knowledge regarding persons that may have knowledge pertaining to the allegations in NextGear's Complaint.

4

3.   Identify all individuals you plan to call as a witness in the trial of this matter and describe in detail the nature of the testimony of each such person/individual You plan to call as a witness.

**ANSWER:** NextGear objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege and work-product doctrine.

Subject to and without waiver of the foregoing objections, while NextGear has not yet finalized any decisions about which witnesses it will call for trial, NextGear states that the witnesses identified in its Disclosures and Witness and Exhibit Lists (and any supplements thereto) are those that NextGear may call as a witness for trial, whether in person or through a deposition.

4.   Describe in detail the circumstances surrounding the signing of the Power of Attorney documents which were signed by Blackburn and purportedly by Kessler. As part of your answer, state in detail the reason why the Power of Attorney documents were required to be signed, identify who was present at the signing of the Power of Attorney documents, the location of the signing and all discussions had between Blackburn and Arturo Mayoral before, during and after the signing of the Power of Attorney documents.

**ANSWER:** NextGear objects to this interrogatory as overly broad, unduly burdensome, vague, and ambiguous. The interrogatory is overly broad and unduly burdensome because it seeks description of "the circumstances surrounding the signing of the Power of Attorney documents" without limitation as to time, location, subject, or information within NextGear's care, custody, or control. The interrogatory is vague and ambiguous because the term "circumstances surrounding the signing of the Power of

5

Attorney documents" is undefined and provides no basis for NextGear to determine what information constitutes a "circumstance" or not.

Subject to and without waiver of the foregoing objections, NextGear states that on April 18, 2019, Blackburn and Kessler each signed a separate Power of Attorney on behalf of Borrower.  Kessler and Blackburn were each within the presence of Arturo Mayoral at 1500 Cordova Rd Suite 206, Fort Lauderdale, Florida 33316 at the time they signed the Power of Attorney documents. Kessler provided his Pennsylvania driver's license as identification, a picture of which was taken contemporaneously with Kessler's signing of the Power of Attorney that he executed. Kessler signed the Power of Attorney without reservation and of his own free will.

5.  Identify all lending transactions for the past five (5) years in which You did not require a power of attorney document to be signed by the Borrower as part of the lending process and/or overall lending transaction and identify all documents that relate to and/or refer to each such lending transaction identified.

**ANSWER:** NextGear objects to this Interrogatory as overly broad, unduly burdensome, vague and ambiguous, not relevant to any party's claim or defense, and not proportional to the needs of the case. Specifically, the interrogatory would require NextGear to engage in a manual search of hundreds of transactions on an issue that is not relevant to any dispute between the parties, and the burden and expense of such a search grossly outweighs any benefit for this case. NextGear further objects to the interrogatory as overly broad, unduly burdensome, and calling for the protected and confidential financial information of third persons not involved in this case because it seeks "all documents" that relate to any lending transactions responsive to the

6

interrogatory—information that is wholly unrelated to any issue between Kessler and NextGear.

6. With respect to the subject Demand Promissory Note and Loan and Security Agreement with PGA, describe in detail why You required the subject Power of Attorney documents to be signed by Kessler and Blackburn. As part of your answer, also provide the following information: (a) state with particularity when You required the Power of Attorney documents to be signed by Kessler and/or Blackburn; (b) identify and describe in detail all communications had with Blackburn regarding the signing of the subject Power of Attorney documents; (c) state whether You required the Power of Attorney documents to be signed prior to You lending any money to PGA; and (d) identify all documents that relate to and/or refer to the execution of the Power of Attorney documents and/or communications had surrounding the execution of the Power of Attorney documents.

**ANSWER:** NextGear objects to this interrogatory as overly broad, unduly burdensome, and vague and ambiguous in that it seeks information about "all communications had with Blackburn" and identification of "all documents that related to and/or refer to the execution of the Power of Attorney documents and/or communications had surrounding the execution of the Power of Attorney documents" without limitation as to time, scope, and whether the information sought is within NextGear's care, custody, or control. NextGear further objects to the interrogatory as requesting information protected by the attorney-client privilege and work-product doctrine.

7

Subject to and without waiver of the foregoing objections, NextGear states that it required the execution of a Power of Attorney on behalf of Borrower as part of its ordinary, customary, and regular business practices, primarily in order to allow NextGear to process titles on Borrower's behalf as needed, in order to prevent unnecessary delays in Borrower's business flow. NextGear informed Blackburn and Kessler that a Power of Attorney needed to be executed on Borrower's behalf as part of NextGear's ordinary, customary, and regular business practices. NextGear did not require the execution of either Power of Attorney prior to lending money to Premier Group Autos, LLC, and in fact began lending money to Borrower on April 16, 2019, two days before any Power of Attorney was executed on Borrower's behalf. Documents pertaining to the two Power of Attorney forms executed on Borrower's behalf will be produced as part of NextGear's responses to Kessler's Requests for Production, subject to NextGear's objections therein.

7.   Identify and describe in detail the compensation structure and/or compensation package for Arturo Mayoral for the years 2018, 2019 and 2020 and state whether the signing of new loans and/or new loan agreements for customers in any way impacts Mayoral's compensation, and if so, to what extent. As part of your answer also identify any and all documents that relate to and/or refer to Arturo Mayoral's compensation for the years 2018, 2019 and 2020.

**ANSWER:** NextGear objects to this Interrogatory as calling for the personal and confidential financial information of a third party. NextGear further objects to this request as overly broad, unduly burdensome, calling for information not relevant to any party's claim or defense, and not proportional to the needs of the case.

8

8.  Describe in detail why You did not require the Power of Attorney documents to be electronically signed by Kessler when you originally sent the Loan Documents (as that term is defined in the Note) to Kessler via DocuSign for Kessler's electronic signature.

**ANSWER:** NextGear states that Indiana law, which governs the terms of the Note, required, at the time the two Power of Attorney documents were executed, that all Powers of Attorney must be notarized in order to be effective.  Therefore,  physical signatures were required.

9.  For each of the accompanying Requests for Admission (served simultaneously with these Interrogatories) which you do not admit without qualification, please state with specificity and in detail how the fact or facts which you are requested to admit are not true and state what you contend the true facts are. Please identify by name, address, employer, telephone number, and relationship to you, if any, each and every witness that you contend can or will so testify, and describe each and every document which you believe refutes the fact or facts which you have been requested to admit.

If you give lack of information or knowledge as a reason for failing to admit or deny a Request, please describe all efforts made by you or your attorney or insurance company to obtain the necessary information to permit you to admit or deny the Request, and which you contend constitutes "reasonable inquiry" within the meaning of Rule 36 of the Indiana Rules of Trial Procedure. Also, with respect to each of the above Requests for Admission that you contend you can neither admit nor deny, please state separately whether you presently know of any facts or any person who knows of any facts that tend

9

to prove that the matters set forth in such Request for Admission are not true. For each Request for Admission with respect to which you claim to have such facts or know of any such person, please do the following:

(a) State in detail all facts which you contend tend to disprove the truth of the Request for Admission;

(b) Identify by name, address and telephone number, and relationship to you, if any, each and every person who you contend can or will testify that the Request for Admission is not true; and

(c) Identify and describe each and every document or item of tangible evidence that you contend will prove that the Request for Admission is not true and identify the present custodian of each and every document by name, address and telephone number and relationship to you, if any.

**ANSWER:** NextGear states that it denied Requests for Admissions 1, 2, and 5 on the grounds that Kessler did, in fact, sign the Power of Attorney in front of Arturo Mayoral. Request for Admission 3 was denied because NextGear was willing to lend money, and did in fact lend money, to Premier Group Autos, LLC beginning on **April 16, 2019**—two days prior to the execution of any Power of Attorney for Borrower. Request for Admission 4 was denied for the reasons stated therein.

# VERIFICATION

Pursuant to 28 U.S.C. §1746, I declare under the penalties of perjury that the foregoing statements are true and accurate to the best of my knowledge, information, and belief.

NEXTGEAR CAPITAL, INC.

BY:/s/ Andrew Ramey
PRINTED:  Andrew Ramey
TITLE: Manager of Lending Services

AS TO OBJECTIONS:

Dated: May 21, 2021                          Respectfully submitted,

/s/ Brian S. Jones
DAVID J. JURKIEWICZ
Attorney No. 18018-53
BRIAN S. JONES
Attorney No. 29578-49
**BOSE MCKINNEY & EVANS LLP**
111 Monument Circle, Suite 2700
Indianapolis, IN 46204
Telephone: (317) 684-5000
Facsimile: (317) 684-5173
djurkiewicz@boselaw.com
b.jones@boselaw.com

**ATTORNEYS FOR NEXTGEAR CAPITAL, INC.**

11

## CERTIFICATE OF SERVICE

I certify that on May 21, 2021, a true and correct copy of the above and foregoing was served via email on all counsel of record.

/s/ Brian S. Jones
BRIAN S. JONES

4096423