Page 143

```
 1           UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF INDIANA
 2               INDIANAPOLIS DIVISION
 3
            Case Number 1:20-cv-CV-00354-TWP-DLP
 4
 5
    NEXTGEAR CAPITAL, INC.,           )
 6                                    )
                        Plaintiff,    )
 7                                    )
           -vs-                       )
 8                                    )
    PREMIER GROUP AUTOS, LLC;         )
 9  JAMES M. BLACKBURN; and           )
    EDWARD A. KESSLER,                )
10                                    )
                        Defendants.   )
11
12            30(b)(6) REMOTE DEPOSITION
13                        OF
14              JAMES M. BLACKBURN
15          Individually and on behalf of
16               PREMIER GROUP AUTOS
17                    Volume II
18
         The continued 30(b)(6) remote video-recorded
19  deposition upon oral examination of JAMES M.
    BLACKBURN, individually and on behalf of Premier
20  Group Autos, a witness remotely sworn by me, Tara
    Gandel Hudson, RPR, CRR, a Notary Public in and for
21  the County of Hancock, State of Indiana, taken on
    behalf of the Plaintiff, with the witness located
22  in Fort Lauderdale, Broward County, Florida, on the
    14th day of January, 2022, scheduled to commence at
23  9:00 a.m., pursuant to the Federal Rules of Civil
    Procedure with written notice as to the time and
24  place thereof.
25
```

Veritext Legal Solutions
www.veritext.com                                   888-391-3376

**EXHIBIT** Exhibit E

## Page 144

```
 1        APPEARANCES
          (All appearing remotely.)
 2
   FOR THE PLAINTIFF:
 3 NextGear Capital, Inc.
 4     Brian S. Jones
       David J. Jurkiewicz
 5     BOSE McKINNEY & EVANS LLP
       111 Monument Circle
 6     Suite 2700
       Indianapolis, IN  46204
 7     317.684.5000
       b.jones@boselaw.com
 8     djurkiewica@boselaw.com
 9
   FOR THE DEFENDANTS:
10 Premier Group Autos and James M. Blackburn
11     Richard A. Rocap
       ATTORNEY AT LAW
12     10293 North Meridian Street
       Suite 175
13     Carmel, IN  46290
       317.846.0700
14     rar@rocap-law.com
15
   FOR THE DEFENDANT:
16 Edward A. Kessler
17     Jason Delk
       DELK McNALLY LLP
18     211 South Walnut Street
       Muncie, IN  47305
19     765.896.9495
       delk@delkmcnally.com
20
21 THE VIDEOGRAPHER:
22     Peter Hudson, CLVS
23
24
25
```

## Page 145

```
 1
            INDEX OF EXAMINATION
 2                               PAGE
 3 DIRECT EXAMINATION (continued) ................147
       Questions by Brian S. Jones
 4 CROSS-EXAMINATION .............................178
       Questions by Jason Delk
 5 REDIRECT EXAMINATION ..........................217
       Questions by Brian S. Jones
 6
 7
 8        INDEX OF EXHIBITS
 9 Deposition Exhibit:
10 Exhibit 3  - Confidential Dealer Application ..187
11 Exhibit 7  - NG002267-69 ......................161
12 Exhibit 8  - Power of Attorney; NG000273-74 ...192
13 Exhibit 9  - Power of Attorney; NG000244-45 ...183
14 Exhibit 20 - Verified Complaint and Demand ....201
             for Jury Trial; PAG-B0007-86
15
   Exhibit 26 - 9-24-19 email chain; Blackburn ...218
16        to Donna
17 Exhibit 30 - 10-24-19 email; Kessler to .......148
             Blackburn; PAG-B0155-56
18
   Exhibit 44 - Vehicle History Detail Report; ...159
19        NG000218-NG000233
20 Exhibit 45 - Response to NextGear Capital, ....170
             Inc.'s First Interrogatories to
21           premier Group Autos, LLC
22 Exhibit 46 - NG002267-2269 ....................174
23 Exhibit 47 - Notice of Service of Answer to ...198
             Interrogatories
24
25
```

## Page 146

 1  (9:00 a.m.)
 2      THE VIDEOGRAPHER:  We are on the record at
 3  9:05 a.m. Eastern Standard Time on January 14,
 4  2022, beginning the continued remote
 5  video-recorded deposition of James M. Blackburn
 6  and Premier Group Autos, LLC, taken in the
 7  matter of NextGear Capital, Inc., v. Premier
 8  Group Autos, LLC; James M. Blackburn; and
 9  Edward A. Kessler, in the United States District
10  Court for the Southern District of Indiana,
11  Indianapolis Division.
12      Case Number 1:20-cv-00354.
13      My name is Peter Hudson, the videographer,
14  and the court reporter is Tara Hudson, both
15  representing Veritext Midwest.
16      Counsel, please state your appearances.
17      MR. JONES:  Good morning.  Brian Jones for
18  NextGear Capital.
19      MR. ROCAP:  Richard Rocap for Premier Auto
20  and James Blackburn.
21      MR. DELK:  Jason Delk on behalf of Edward
22  Kessler.
23      MR. JURKIEWICZ:  And David Jurkiewicz for
24  NextGear Capital.
25      THE VIDEOGRAPHER:  Thank you.  The court

## Page 147

 1  reporter will swear the witness, and you may
 2  then proceed.
 3      JAMES M. BLACKBURN,
 4  having been remotely duly sworn to tell the truth,
 5  the whole truth and nothing but the truth relating
 6  to said matter, was examined and testified as
 7  follows:
 8  DIRECT EXAMINATION (continued),
 9  QUESTIONS BY BRIAN S. JONES:
10  Q  Good morning, Mr. Blackburn.  Again, my name is
11     Brian Jones.  I represent NextGear Capital in
12     this case.  I appreciate your time this morning.
13        I'm going to try to move as quickly as
14     possible since we're continuing on where we left
15     off last time.
16        Same rules as before will apply in terms of
17     trying to make sure I finish my question and you
18     finish your answer before we start talking,
19     especially since we're on a Zoom.
20        Is that okay?
21  A  Yeah.
22  Q  When we left off last time, we were talking
23     about Exhibit Number 30.  There is a --
24        Have you been able to receive the Dropbox
25     link that I sent of the exhibits?

Page 172

1  the proceeds from the sales of the SOT vehicles
2  were used to pay Ed Kessler's father?
3  A  I don't recall.
4  Q  Okay.
5  A  And then the proceeds of the sale of the SOT
6  vehicles went back into the bank account and
7  were used to pay different obligations.  So it's
8  a possibility, but I don't recall.
9  Q  Okay.
10     Let's see.  I need to supplement Exhibit 7,
11  which was 2267.
12     So I'm going to drop into the Dropbox
13  folder -- hopefully it will update for you in
14  relatively real time -- that clear version of
15  that exhibit we were looking at earlier because
16  it's not fair to not have a clear version.
17     Let me find it on my computer here first.
18     MR. DELK:  Brian, would you email it to us
19  as well?  Because I downloaded everything, and I
20  don't know how to get back into Dropbox quickly
21  or easily.
22     MR. JONES:  Yeah.  Tell you what, I wonder
23  if you can drop it in the chat.
24     MR. DELK:  The chat.  Now you're --
25     MR. JONES:  Now I'm getting -- I'm

Page 173

1  getting --
2     MR. ROCAP:  The chat button at the bottom
3  of your Zoom screen, Jason, if you click on
4  that, then the link to the Dropbox that Brian
5  put in there will open up, or it will be there,
6  and then you can click on it and open it.
7     MR. JONES:  Yeah.  So let me just -- I'll
8  drop it in the Dropbox here, and then I will
9  email the exact same thing to everyone here.
10     MR. DELK:  Dick, my comment or question
11  about technology should be coming from somebody
12  more your age.  No offense.
13     THE WITNESS:  Where's the dog today, Jason?
14     MR. DELK:  Down on the floor underneath my
15  desk.  I'm at my actual office today.  She's
16  asleep.
17  BY MR. JONES:
18  Q  Okay.  So hopefully this will help.  In the
19  Dropbox -- and I just emailed to all counsel as
20  well.
21     Mr. Blackburn, I put a document in that's
22  got -- its file name is NG002267.
23     Do you see that in there?
24  A  Yeah.
25     MR. JONES:  This will be -- let's mark this

Page 174

1  Exhibit 46.
2     (Deposition Exhibit 46 was presented for
3  identification.)
4  BY MR. JONES:
5  Q  And this is a cleaner version of a document we
6  were looking at earlier.  It hasn't been
7  scanned, and so you can actually zoom in on it.
8  So that's what -- what I want --
9     MR. DELK:  Could you give me the --
10  I don't have it in email yet, nor is it in
11  the little chat thing.
12     MR. JONES:  Yeah.  The chat wasn't letting
13  me send it.  I just sent the email.  The email
14  is on its way to you guys.
15     MR. DELK:  There it is.
16  BY MR. JONES:
17  Q  So, Mr. Blackburn, the second page of that pdf,
18  and there is an entry there, it's kind of like
19  the -- like the sixth column.  It's got 4-16-19.
20     It says:
21     "Arturo F. Mayoral.  Comments:  Spoke with
22  James, and he was at the auction.  Hopefully, he
23  will buy."
24     And my only question on that was whether
25  you recall --

Page 175

1  I'm sorry?  Go ahead.
2  A  Oh, yeah, further down here, spoke with James.
3  Q  Yeah.  It's on the second page, and it says
4  Comments.  It's right beside where it says
5  Arturo F. Mayoral the first time in that column
6  there.
7  A  Yeah.  Which is on April 4th.
8  Q  So the one just underneath that, it says,
9  "4-16-19."
10 A  I can see where it says -- there we go.  I've
11  got it.
12     "Spoke with James.  He was at the auction.
13  Hopefully, he'll buy."
14     Okay.  I'm there.
15 Q  So any reason to dispute the note here that
16  Mr. Mayoral saw you at the auction on April 16,
17  2019?
18 A  It doesn't say he saw me.  He said he spoke to
19  me.
20 Q  Oh, yeah.  Okay.
21 A  It says:
22     "Spoke with James.  He was at the auction."
23     Doesn't say Arturo was there.
24 Q  Okay.  Okay.  I can see how you see that.
25     Do you recall yourself being at the auction

9 (Pages 172 - 175)

Page 180

1  Q  Okay. And then when the idea --
2  A  Account manager or whatever.
3  Q  Okay.
4      And then when the idea of getting the
5  NextGear loan came about, was it something that
6  you were working on on behalf of PGA or Premier,
7  and you brought the idea to Mr. Kessler?
8  A  I don't recall.
9  Q  Okay.
10     Tell me about the levels of financing PGA
11 was attempting to obtain from NextGear. How did
12 that come about?
13     I know there was originally a request for a
14 million dollars, I believe, and then tell me how
15 that came to be where we only settled upon
16 150,000.
17 A  Seem to remember that we asked for a million.
18 They said no. They offered us -- I think they
19 offered us 500,000, providing we put a hundred
20 thousand in trust, and we didn't want to do
21 that.
22     So they said, "Or we can give you 150 grand
23 to start your account, and you can grow from
24 there."
25     So I think that's what we took.

Page 181

1  Q  What discussions were had with you and
2  Mr. Kessler about the $500,000 loan opportunity
3  that was there?
4      Were there any discussions at all about the
5  execution of a power of attorney associated with
6  the $500,000 loan?
7  A  Not that I recall.
8  Q  Did Mr. Kessler --
9      When presented the documents from NextGear,
10 did Mr. Kessler and you have any discussions
11 about Mr. Kessler's objection to signing a power
12 of attorney document?
13 A  I don't recall. I don't think so, but I can't
14 recall.
15 Q  Mr. Kessler says that, in fact, he objected to
16 signing the power of attorney document.
17     I take it in light of your testimony just
18 now, you would have no reason to dispute
19 Mr. Kessler's testimony.
20     True?
21 A  I don't recall. I don't remember.
22 Q  Now, tell me how you received the documents for
23 execution related to the current NextGear note
24 for $150,000. Tell me how the actual note,
25 personal guaranty, et cetera, was sent to you

Page 182

1  for execution.
2  A  I believe it was over email.
3  Q  Okay.
4      Was it actual -- like a pdf sent to you?
5  Was it a DocuSign? Was it --
6  A  I think it was -- I think it was a DocuSign.
7  Q  All right.
8      Now, tell me what documents you had to sign
9  over DocuSign or via email.
10 A  I don't recall. As far as I know, it was
11 everything.
12 Q  Do you remember any discussions you had with
13 Arturo Mayoral about the need to sign a power of
14 attorney document in any way?
15 A  I don't recall any communication with -- I know
16 that we spoke to Arturo a lot. I don't recall
17 any specific conversations about some power of
18 attorney documents.
19 Q  Now, when you say "we," who is "we"?
20 A  Me and Arturo.
21 Q  Okay.
22     So you and Arturo spoke a lot; correct?
23 A  No. Only in the beginning when he was
24 introducing us to -- was it Claudia?
25 Q  Okay.

Page 183

1      Now, you have, I believe, what Mr. Jones
2  provided to you in his Dropbox which would be
3  identified as Exhibit 9.
4  A  What's the name of the actual document?
5      MR. ROCAP: It's James M. Blackburn 9.
6      MR. DELK: Yep. James M. Blackburn 9;
7  correct.
8      Thank you, Dick.
9  A  Okay. Got it.
10     (Deposition Exhibit 9 was presented for
11 identification.)
12 BY MR. DELK:
13 Q  That is a power of attorney document. If you
14 look to the second page, is that your signature
15 signing the power of attorney document?
16 A  It looks like it, yeah.
17 Q  And is that your -- also your handwriting for
18 the date, 4-18-19?
19 A  Yeah.
20 Q  Okay.
21     Now, you can see there also, on the sending
22 page, that there's a notary there, and it looks
23 like Arturo Mayoral. And he attests that you
24 personally appeared before him and signed the
25 power of attorney document; correct?

Page 188

1  identified as Exhibit -- previously marked as
2  Exhibit 3, if I can figure this out here.
3       MR. DELK:  I'll forward it to you.  Yep.
4  BY MR. DELK:
5  Q  All right.  Mr. Blackburn, can you see Exhibit 3
6     on my screen that I'm sharing with you?
7  A  I can.
8  Q  Now, it's the second page of Exhibit 3.
9       Does this document look familiar to you?
10 A  I mean, it's all of our information.  It looks
11    like a -- yeah, it's an application form for
12    NextGear.
13 Q  All right.  And this is your handwriting on
14    Exhibit 3; correct?
15      MR. ROCAP:  Could you be more specific,
16    please, Jason.
17      MR. DELK:  Sure.
18 BY MR. DELK:
19 Q  Under "Business Credit Information" -- or
20    "Business Credit Applicant Information" on the
21    left-hand side, that's your handwriting;
22    correct?
23 A  It looks like -- it looks like it, yeah.
24 Q  Same question as relates to under "Business
25    Banking Information."

Page 189

1       That's your handwriting; correct?
2  A  Yeah, it looks like it.
3  Q  Same question related to guarantor information.
4       That is your handwriting; correct?
5  A  Yes.
6  Q  Same question as relates to the second guarantor
7     information, James Blackburn.
8       That's your handwriting; correct?
9  A  Looks like it, yeah.
10 Q  All right.  Now, the signature -- the signatures
11    there, you signed Mr. Kessler's name?  "Yes" or
12    "No"?
13 A  Doesn't look like my handwriting.
14 Q  So my question to you was did you sign
15    Mr. Kessler's name to this application set forth
16    in Exhibit 3?
17 A  I don't believe so.
18 Q  So which one is your signature?
19 A  The bottom one --
20 Q  All right.
21 A  -- looks like a lopsided version of mine.
22 Q  So the second signature set forth on Exhibit 3
23    is your signature?
24 A  Yeah.
25 Q  And did you sign that?  That's your signature

Page 190

1     there?
2  A  I mean, I don't recall signing it.  It doesn't
3     look like my signature, but I wouldn't have been
4     averse to signing it.
5  Q  Okay.  And so do you recognize the first
6     signature on Exhibit 3 as Edward Kessler's
7     signature or someone else's signature?  Or tell
8     me about that.
9  A  I don't really recall what Ed Kessler's
10    signature looks like, but it doesn't look like
11    my handwriting.
12 Q  What about the 17th Jan '19 on Exhibit 3 for
13    both signatures?  Is that your handwriting?
14 A  The second one looks like my handwriting.
15 Q  The second one does, next to your signature?
16 A  Yeah.  I K all my Js.
17 Q  Okay.  And then the --
18      So the 17th Jan '19, you're saying that is
19    not -- that is not your handwriting?
20 A  I don't --
21      MR. ROCAP:  Which -- which one
22    specifically --
23 A  I don't --
24      MR. ROCAP:  -- are you talking about?
25

Page 191

1  BY MR. DELK:
2  Q  The first one.
3  A  Okay.
4       MR. ROCAP:  Okay.  Thank you.
5  BY MR. DELK:
6  Q  The first 17th Jan '19, is that your
7     handwriting?
8  A  To me, Jason, it looks like the first one was
9     signed and dated by Ed and the second one was
10    signed and dated by me.  That's how it looks to
11    me, but I don't recall executing this specific
12    document.  I'm trying to check in here.
13 Q  What are you checking, Mr. Blackburn?
14 A  I'm checking to see the day calendar to see if
15    me and Ed were in the same city on the 17th of
16    January, '19.
17 Q  Okay.
18 A  Taking a while.
19 Q  That's all right.
20 A  I've only got copies of Ed's tax returns from
21    that day.  Let's see.
22      It doesn't say.  I've just got copies of
23    tax returns and a couple of meetings I was in.
24 Q  Okay.
25      Going back to the power of attorney

Page 192

1  document, Exhibit 9.  Were you, Mr. Kessler, and
2  Mr. Mayoral in your office on April 18, 2019, to
3  sign the power of attorney documents?
4  A  Repeat the question, please, Jason.
5  Q  On April 18, 2019, were you, Mr. Mayoral, and
6  Mr. Kessler in the same room signing the power
7  of attorney documents set forth in Exhibits 8
8  and 9?
9      (Deposition Exhibit 8 was presented for
10  identification.)
11 A  I don't recall.
12 BY MR. DELK:
13 Q  Mr. Mayoral says that he was in your office --
14  he testified to this, and I'm paraphrasing --
15  but he was in your office, and you signed the
16  power of attorney document, and that someone who
17  appeared to be Mr. Kessler likewise signed a
18  power of attorney document.
19     Do you recall that testimony to be
20  accurate?
21 A  I don't recall.  Did the person who appeared to
22  be Mr. Kessler provide identification that was
23  verified by Mr. Mayoral?
24 Q  Mr. Mayoral said no license was provided to him.
25  He had a picture of a license.

Page 193

1  A  Was it the same guy?
2  Q  He says he thinks so, but I'm asking your
3  memory.  Do you have memory --
4  A  I don't recall.  I don't recall, Jason.
5     (A discussion was held off the record.)
6  BY MR. DELK:
7  Q  Mr. Blackburn, if you could look at, in the
8  Dropbox folder, James Blackburn Exhibit 8 -- or
9  -8?
10 A  James Blackburn-8, yeah.
11 Q  This is Exhibit 8.
12     This is the power of attorney document that
13  was purportedly signed by Mr. Kessler.  Look at
14  the second page of Exhibit 8, please.
15 A  Yeah, I've got it.
16 Q  All right.
17     Now, that is your handwriting there on the
18  date of 4-18-19; correct?
19 A  I don't recall.  I don't think I signed this on
20  behalf of Ed.  I've already been asked this
21  question.
22 Q  What's that?
23 A  I don't believe I signed this document on behalf
24  of Ed.
25 Q  Right.  But I'm talking about the date, the

Page 194

1  4.18.19.
2     That is your handwriting though; correct?
3  A  I don't know.  It could be.
4  Q  Well, "Yes" or "No," do you --
5     MR. ROCAP:  He said, "It could be."
6  A  I don't know.
7  BY MR. DELK:
8  Q  You don't know?  Or you don't know?  It could
9  be?  What was the answer exactly?
10 A  I don't know if that is my handwriting or not.
11 Q  Let's look at --
12     I'm going to share my screen again just to
13  be able to switch back and forth between them.
14     So here, this is Exhibit 8 that we're
15  looking at.  The date right here where my cursor
16  is, 4-18-19.
17     And then if you look at your power of
18  attorney document that you signed, 4-18-19
19  there, and you said that was your handwriting.
20     You agree those are both --
21 A  What exhibit?
22     What exhibit are you saying?
23     MR. ROCAP:  You're not sharing anything,
24  Jason.
25     MR. DELK:  I'm sorry.  Damn it.

Page 195

1  BY MR. DELK:
2  Q  So Exhibit 9, this is -- this is your
3  handwriting, you already testified.  4-18-19,
4  that's your date; correct?
5  A  Yeah.
6  Q  Then if you look at Exhibit 8, the Kessler POA,
7  the 4-18-19 --
8  A  Yeah.
9  Q  -- that's your handwriting; correct?
10 A  That doesn't mean it's the same.  I don't recall
11  signing it.  It does look like it, but I don't
12  recall dating that document.  I certainly didn't
13  sign it.  I don't know whether I dated it or
14  not.  I can't remember the meeting.
15     (Reporter request for clarification.)
16 A  I said that it does look like my handwriting on
17  the date, although I don't recall the document.
18 BY MR. DELK:
19 Q  The signature there on Exhibit 8 for Edward
20  Kessler, did you sign that document?
21 A  Not that I recall, no.
22 Q  Does that look like your signature when you
23  attempt to sign Edward Kessler's name?
24 A  Well, I don't recall.  I usually just write "Ed
25  Kessler."

Page 208

1  minute we used it, he'd text me and says, "What
2  was that for?" And I would tell him.
3  Q  So your testimony, "Yes" or "No," did you
4     communicate to Mr. Kessler the two different
5     temporary increases of a hundred thousand
6     dollars apiece? "Yes" or "No"?
7  A  I -- I don't recall specifically communicating
8     with him. So I'm not going to say yes, but I
9     know that he was kept informed of everything
10    that was going on.
11 Q  And that's because of Donna; is that right?
12 A  He was in daily contact with both Donna and me.
13    And that's not to mention he also had
14    access to both. He had access to the bank, and
15    he had access to NextGear. So he -- I don't
16    know whether he logged on and had a look or
17    whatever, but he had access. He had user names
18    and passwords for both sites.
19 Q  Now, Mr. Kessler has testified that he had no
20    access to the bank fob or the ability to access
21    the HSBC account.
22    Are you calling that into question,
23    Mr. Kessler's testimony about it?
24 A  Oh, with -- without doubts. Anyone -- anyone in
25    this country can walk into a HSBC branch if

Page 209

1     their name's on an account and ask for any
2     document they want. Anybody.
3     So Ed's claim of "I have no access" is
4     complete and utter convenience and rubbish. He
5     could have gone into any branch in the country
6     and asked for documentation, as he could have
7     with NextGear.
8     He could have rang NextGear up and said,
9     "I'd like this documentation" or "I'd like this."
10    I mean, he got it. He was on every account.
11 Q  So NextGear has provided to PGA approximately --
12    what? -- $350,000 or so, rough numbers?
13    Is that about right?
14 A  Off the top, vaguely, yeah.
15 Q  Where did the money go?
16 A  Into the business account.
17 Q  To the PGA business account?
18 A  Yeah.
19 Q  And then where did it go from there?
20 A  I don't recall exactly. I don't know. It was
21    used for -- oh, I can't remember. That's three
22    years ago.
23    So it was used for business expenses. It
24    was used for, you know, staff wages. It was
25    used for rent. It was used for expenses. It

Page 210

1     was used -- it was swallowed up by other
2     expenses when it should have gone back to
3     NextGear.
4  Q  Was it used for any personal expenses for you?
5  A  I don't recall.
6  Q  So it's possible it could have happened that you
7     used the NextGear money to pay some of your
8     personal expenses?
9  A  I don't recall. I don't recall.
10 Q  Was it possible --
11 A  It could have.
12    It could have paid some of my expenses. It
13    could have paid some of Ed's. It could have
14    paid Donna's. It could have paid anything. I
15    don't recall exactly what it was used for.
16    I do know that a large chunk of it went to
17    Overfinch for check deposits, I believe.
18 Q  Were you ever present at any time where Ed
19    Kessler and Mr. Mayoral were in the same room,
20    same meeting, some auction?
21    Do you have any memory at all of
22    Mr. Kessler and Mr. Mayoral being together?
23 A  I don't recall. I believe they met, but I don't
24    recall any specific occasions.
25 Q  Why do you say you believe they met?

Page 211

1  A  Because I believe they have met before.
2  Q  Right.
3     But I'm asking what is that belief based
4     upon? Is it a memory, knowledge, or what? We
5     don't want you guessing, Mr. Blackburn.
6  A  I think Ed -- I seem to recall vaguely that Ed
7     met Arturo in the very beginning when we first
8     started using NextGear. I could be wrong, but I
9     believe that's the case. According to
10    Mr. Mayoral, he met him in my office.
11 Q  Yeah. But you don't have any memory of that
12    because Mr. Mayoral said you were in the office?
13 A  As I said, I don't recall, no.
14 Q  Have you had any conversations at all, either
15    you or your lawyer, with lawyers for NextGear?
16    MR. ROCAP: Objection. Invades
17    attorney-client privilege. You can't ask him
18    about things that he and I have talked about.
19    MR. DELK: I'm not.
20 BY MR. DELK:
21 Q  Have you or your lawyers had any conversations
22    with any of the lawyers from NextGear?
23    MR. DELK: It's not privileged.
24    MR. ROCAP: Then it's vague and ambiguous.
25

Page 216

1  meeting Arturo on a couple of occasions, and
2  then we were passed over to Claudia.
3  Q  Do you recall meeting Mr. Mayoral at your office
4  or just --
5  A  No.
6  Q  Okay.
7  A  I don't recall the specifics of a meeting with
8  Mr. Mayoral.
9      MR. DELK:  Give me just one second here.
10  I'm going to go through my notes and make sure I
11  have nothing else for you.
12      THE WITNESS:  You guys aren't leaving me
13  already, are you?
14      MR. ROCAP:  Don't encourage them, James.
15  BY MR. DELK:
16  Q  Mr. Blackburn, did you have any conversations
17  with Mr. Mayoral or anybody from NextGear
18  regarding the need for the signing of power of
19  attorney documents?
20      MR. ROCAP:  Objection.  Asked and answered.
21  But you can answer if you can.
22  A  I don't recall, Jason.
23      THE WITNESS:  Am I allowed to ask a
24  question?
25      MR. ROCAP:  No.

Page 217

1      MR. DELK:  No.
2      MR. JONES:  Only if you go to law school.
3      THE WITNESS:  Yeah.
4      MR. DELK:  But if you asked it, I thought I
5  could answer it.
6      That's all the questions I have for you.
7  Thank you.
8      MR. ROCAP:  Brian, any follow-up?
9      MR. JONES:  Just, I think, a couple ones.
10  REDIRECT EXAMINATION,
11      QUESTIONS BY BRIAN S. JONES:
12  Q  Mr. Blackburn, Mr. Delk had mentioned in his
13  questions to you two temporary increases in the
14  line of credit.  I want to make sure I clear up
15  some confusion on that.
16      As I recall, there was a $100,000 temporary
17  increase to the NextGear line of credit.
18      Do you remember that?
19  A  I don't really -- I don't really, Brian, no.
20  What I remember is that there was a value put on
21  it.  So there was you have a hundred grand
22  available and then another hundred dollar grand
23  available, and we used it in the way that I
24  showed you --
25      (Reporter request for clarification.)

Page 218

1  A  The vehicles in the table in Exhibit 45, is it?
2      MR. ROCAP:  Correct.
3  BY MR. JONES:
4  Q  Yeah.
5  A  -- was portrayed.
6  Q  I'm wondering if you recall sending in a payment
7  to NextGear that was returned as nonsufficient
8  funds?
9  A  I don't.
10  Q  Okay.
11      Take a look at Exhibit Number 26 in the
12  Dropbox folder.  James M. Blackburn 26.
13  A  Yeah.
14      (Deposition Exhibit 26 was presented for
15  identification.)
16  BY MR. JONES:
17  Q  At the bottom of that first page, Donna says, in
18  that second paragraph:
19      "Also included is two notices we received
20  for --
21      I'm sorry.
22      -- "two units, Vero and Turner, that
23  NextGear is demanding payments on.  They were
24  returned by the bank as NSF."
25      Do you recall that?

Page 219

1  A  I mean, I don't recall specifically, but I can
2  read.  So I know what's going on.
3  Q  Okay.
4      So if a payment goes back to NextGear, then
5  that increases your line of credit by that
6  amount of the payment made; right?
7      MR. ROCAP:  Objection.  Object as a
8  mischaracterization by the use of the term
9  "increase."
10      MR. JONES:  Yeah.  Thank you, Dick.  I
11  think you're right.
12  BY MR. JONES:
13  Q  So, Mr. Blackburn, what I'm asking is let's say
14  you've got, you know, 250,000 on your line of
15  credit with NextGear, and you floor plan a
16  hundred thousand vehicles with NextGear, and
17  then you send a payment of a hundred thousand to
18  NextGear.
19      Then your line of credit would be the
20  $250,000; right?
21  A  Yes.
22  Q  So any payment kind of goes back onto -- or it
23  increases the amount of available credit under
24  the line of credit; right?
25  A  Well, I don't really -- it depends.  It could

20 (Pages 216 - 219)



**EXHIBIT**

3

# NEXTGEAR CAPITAL
## CONFIDENTIAL DEALER APPLICATION

### BUSINESS CREDIT APPLICANT INFORMATION

- Legal Name: Premier Group Autos LLC
- DBA Name (if applicable): Overfinch Miami
- Requested Credit Limit Amount $: 4,000,000
- Requested Product Type:
  - ☐ Retail
  - ☐ Wholesale
  - ☐ R.V.
  - ☐ Powersports
  - ☐ Salvage
  - ☐ Marine
  - ☐ Heavy Truck
  - ☐ Other

- Auction Access #: S44 8050
- Dealer License #: VF11127700/1  Exp Date: 04/30/2019
- Date of Formation/Organization: Florida
- Federal Tax ID: ___ State Tax ID: 16-8017647H
- Date Business Started: Dec 10th 2018     86-0

- Business Profile:
  - ☑ Retail
  - ☐ Wholesale
  - ☐ Rental
  - ☐ Powersports
  - ☐ Salvage
  - ☐ Marine
  - ☐ RV
  - ☐ Other

- Business Structure:
  - ☑ Corporation
  - ☐ Partnership
  - ☐ Sole-Proprietor

- Business Email: Sales@Overfinchmiami.com
- Business Website: www.overfinch.com
- Physical Address: 1500 Cordola Rd. #206  State: FL Zip: 33316 County: Broward
- ☐ Own ☑ Rent  Business #: 954-440-0719  Business Fax #: ___
- Mail Address: ___

- Avg Monthly Sales: 10  Avg Unit Turn Days: 5
- Avg Wholesale Unit Price $: 130,000  Avg # Units on Lot: 5

- Services you offer:
  - ☐ Warranties - List Name(s) of Warranty Co: ___
  - ☐ BHPH - List Name(s) of Finance Co: ___
  - ☐ Mechanical
  - ☐ Insurance
  - ☐ Consignment
  - ☐ Body Shop

- Where are the majority of your units obtained:
  - ☐ Auction
  - ☐ Wholesalers
  - ☐ Retailers
  - ☐ Trade-Ins
  - ☐ Internet
  - ☐ Other

- Second Location: ☑ Yes ☐ No  Has Physical Inventory: ☐ Yes ☑ No
- Physical Address: 11 SW 12th Ave, Unit 103
- Data Bch  State: FL  Zip: 33004  County: USA

- Own ☑ Rent  Business #: 954-440  Business Fax #: ___
- 8717 James Blackburn
- Application Completed By: James Blackburn
- Owner/Partner

### BUSINESS BANKING INFORMATION

- Bank Name: HSBC
- City: Fort Lauderdale  State: FL
- Contact Name: Keisha Buchanan
- Checking Acct #: [redacted] 3766
- Bank Routing #: 061004340  Bank Phone #: 786-435-8236

### GUARANTOR INFORMATION

- Name: Edward Kessler  Title: Owner
- Home Address: 5809 Murray Ave
- Ownership: 50%  ☐ Rent ☑ Own
- City: Bethel Pk  State: PA  Zip: ___
- Mail Address: 1500 Cordola Rd, #206
- City: Fort Lauderdale  State: FL  Zip: 33316  County: USA
- DOB: 29 Sept 85
- Driver's License #: [redacted]  State of Issue: PA  Exp Date: 09/30/2020
- Home Ph: [redacted]  Cell Ph #: [redacted]
- Personal Email: ek13@RealSolutionsllc.net
- Individual Auction Access #: None yet

### GUARANTOR INFORMATION

- Name: James Blackburn  Title: Owner
- Home Address: 4875 NE 14th Avenue
- Ownership: 50%  ☐ Rent ☑ Own
- City: Fort Lauderdale  State: FL  Zip: 33316  County: USA
- Mail Address: 1500 Cordola Rd #206
- City: Fort Lauderdale  State: FL  Zip: 33316  County: Broward
- DOB: 05-22-90
- Driver's License #: B421-453-90-182-0
- State of Issue: Florida  Exp Date: 05-22-2026
- Home Ph: [redacted]  Cell Ph #: 786-823-7661
- Personal Email: James@Overfinchmiami.com

### CURRENT/FORMER FLOOR PLAN FINANCING

- Individual Auction Access: ___
- Finance Company: ___
- Year Obtained: ___  Credit Limit $: ___
- Finance Company: ___
- Year Obtained: ___  Credit Limit $: ___  Credit Balance $: ___

### AGREEMENT

Each of the undersigned, in his or her individual capacity, and in any representative capacity (individually and together, "You" and "Your"), hereby certifies that the information contained within this application and any financial statements and other materials provided in connection herewith (together with all contents thereof), are true, complete, and accurate in all respects. You hereby authorize NextGear Capital, Inc., together with its subsidiaries, affiliates, and parent companies (collectively, "NextGear Capital") to (1) obtain and share credit and other information relating to You from and with credit bureaus, financial institutions, trade creditors, affiliates, and others, and to conduct such credit investigations as NextGear Capital, in its sole discretion, deems necessary; (2) obtain Your consumer credit report, and You expressly ratify any consumer credit report or other materials that may have been obtained by or on behalf of NextGear Capital prior to the date hereof; and (3) contact any third parties to disclose any information in the now or hereafter be in NextGear Capital's possession, including information contained in its application and in any financial statements or other materials provided or obtained in connection herewith, for purposes of, among other things, assessing Your creditworthiness, collecting any outstanding debt owed by You or obtaining intercepted, subordination, or similar agreements, that NextGear Capital may obtain credit reports about You in the future to review, update, collect, and service such line of credit, and for any other purposes permitted by law. You hereby expressly authorize NextGear Capital to communicate with You via facsimile transmissions, email, telephone transmissions, both to a residential telephone line and/or cell phone, including text messaging, using an automatic telephone dialing system or an artificial or pre-recorded voice message and/or any other forms of communication, for any purpose, including general business matters, account information, marketing materials, collection, and/or any other communication needs. You agree that such express permission shall extend to any and all of the contact information that You have provided herein, including physical and email addresses, phone numbers, fax numbers, etc., and to such other addresses, phone numbers, email addresses, online chat, social media platforms, etc. that You may provide to NextGear Capital, or that NextGear Capital may obtain from any third party at a later date. You have authority to provide this consent because You are the subscriber of the telephone number or You are a customary user who has authority to consent to these communications. If You change your telephone number(s), You agree to contact NextGear Capital immediately to advise of any such change. You understand and agree the line of credit requested, if approved, may be used solely for Your business or commercial purposes and not for any personal, family, or household purposes. Neither this application nor any other loan request by You shall constitute a commitment by NextGear Capital to lend funds to You or to take any other action. NextGear Capital may approve or reject this application in its sole discretion with or without notice to You. You acknowledge and agree that this application is being executed in both Your individual capacity and in Your representative capacity, if any.

California Residents: An applicant, if married, may apply for a separate account.

Ohio Residents: The Ohio laws against discrimination require that all creditors make credit equally available to all creditworthy customers, and that credit reporting agencies maintain separate credit histories on each individual upon request. The Ohio Civil Rights Commission administers compliance with this law.

NOTICE: If this application is denied, You have the right to a written statement of the specific reasons for the denial. To obtain the statement, contact NextGear Capital, Attn: Lending, 1320 City Center Dr. Suite 100, Carmel, IN 46032, tel: (888) 693-6206, within 60 days from the date You are notified of our decision. We will send You a written statement of reasons for the denial within 30 days after receiving Your request for the statement. The federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status; age (provided the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The federal agency that administers compliance with this law concerning the creditor is: Federal Trade Commission, Equal Credit Opportunity, Washington DC 20580.

Signature: [signed]  Date: 1/10/19
Signature: [signed]  Date: 1/10/19

All advances made in California by NextGear Capital are made pursuant to NextGear Capital's California Finance Lender License #6036505.

NG000393

NXTGR-00000393

## POWER OF ATTORNEY
(Entity/Partnership)



EXHIBIT
8
Mayoral
7-22-21

      This Power of Attorney is executed by the undersigned borrower ("Borrower") and delivered to NextGear Capital, Inc. ("Lender") pursuant to that certain Demand Promissory Note and Loan and Security Agreement by and between Borrower and Lender (the "Note"). Capitalized terms used herein but not defined herein shall have the respective meanings as set forth in the Note (such meanings to be equally applicable to both the singular and plural forms of the terms defined). Any capitalized terms used herein, but not otherwise defined herein or in the Note, as the case may be, shall have the meanings ascribed to them in the UCC.

1. No Person to whom this Power of Attorney is presented, as authority for Lender to take any action described below, shall be required to inquire into or seek confirmation from Borrower as to the authority of Lender to take any action described below, or as to the existence of or fulfillment of any condition to this Power of Attorney, which is intended to grant to Lender unconditionally the authority to take and perform the actions described below. Borrower irrevocably waives any right that it may have, now or at any time in the future, to commence any claim, litigation, suit, petition, writ, or proceeding in any court of competent jurisdiction or before any arbitrator or other neutral, against any Person acting in reliance upon or otherwise acknowledging any power or authority granted by Borrower under this Power of Attorney. The Power of Attorney granted hereby is coupled with an interest and may not be revoked or canceled by Borrower without Lender's written consent or as otherwise allowed by Law. This Power of Attorney shall be deemed a "Loan Document" for all intents and purposes as referenced in the Note.

2. With or without the occurrence of an Event of Default under the Note, Borrower irrevocably appoints Lender (and all Representatives designated by Lender), with full power of substitution, as Borrower's true and lawful attorney-in-fact with full power and authority in the place and stead of Borrower and in the name of Borrower or in its own name, from time to time in Lender's discretion, to take any and all appropriate actions and to execute and deliver any and all documents and instruments which may be necessary or desirable to accomplish the purposes of the Note and each of the other Loan Documents. Without limiting the generality of the foregoing, Borrower hereby grants to Lender the power and right, on behalf of Borrower, without further notice to or assent by Borrower, at any time, to do the following:

    (a) execute such security agreements, invoices, notes, and related documentation as may be necessary for Borrower to acquire, refinance, or sell any Collateral (including any Units secured or to be secured by Advances made thereon);

    (b) execute all documents necessary for Lender to perfect or secure its interest in the Collateral;

    (c) make, settle, and adjust claims under policies of insurance, and endorse any check, draft, instrument, or other item of payment for the proceeds of such policies of insurance, and make all determinations and decisions with respect to such policies of insurance;

    (d) endorse the name of Borrower upon any document, instrument, certificate, evidence of title, state registration documents, trust receipt, checks or other items of payment, or any related or similar documents, in each case as necessary to pay for or protect the Collateral, including, without limitation, any agreements between Borrower and any global positioning satellite company;

    (e) endorse the name of Borrower upon any items of payment or proceeds of any Collateral (including any Units constituting Collateral), and to deposit the same to the account of Lender on account of Borrower's Liabilities under the Note and the other Loan Documents;

    (f) endorse the name of Borrower upon any chattel paper, document, instrument, invoice, freight bill, bill of lading, or similar document or agreement relating to any Collateral;

    (g) use the information recorded on or contained in any data processing equipment, computer hardware, or software relating to any Collateral to which Borrower has access;

    (h) pay or discharge any taxes, liens, security interests, or other encumbrances levied or placed on or threatened against Borrower or any of the Collateral;

    (i) communicate with any party to any contract with regard to the assignment of the right, title, and interest of Borrower in and under such contract and/or the Collateral, and other matters relating thereto;

    (j) contact any third parties and disclose and/or receive any Borrower information, including, without limitation, information or data in Borrower's application for credit with Lender, the Note, or Borrower's Credit Line, in each case for the purpose of, among other things, preserving Lender's security interest in the Collateral and ensuring the satisfaction of Borrower's Liabilities under the Note and the other Loan Documents; and

    (k) do all other things reasonably necessary to satisfy Borrower's Liabilities under the Note and the other Loan Documents.

3. Upon the occurrence of an Event of Default under the Note, Borrower irrevocably appoints Lender (and all Representatives designated by Lender), with full power of substitution, as Borrower's true and lawful attorney-in-fact with full power and authority in the place and stead of Borrower and in the name of Borrower or in its own name, from time to time in Lender's discretion, to do the following:

    (a) demand, collect, accept receipt for, settle, compromise, adjust, foreclose, or realize upon any of the Collateral, in each case in such manner as Lender may determine;

    (b) file or prosecute any claim, litigation, suit, petition, writ, or proceeding in any court of competent jurisdiction or before any arbitrator or other neutral, or take any other action otherwise deemed appropriate by Lender for the purpose of collecting any and all such moneys due to

Borrower, whenever payable, and to enforce any other right in respect of the Collateral, including, without limitation, confessing to or consenting to judgments, writs of replevin or possession, and/or any equitable relief in favor of Lender or its Affiliates;

(c) file or prosecute all proofs of claim against any account debtor on behalf of Borrower; and

(d) notify the United States Postal Service of a change in address for the delivery of Borrower's mail to an address designated by Lender, and to receive Borrower's mail on behalf of Borrower.

4. Any provision of this Power of Attorney that is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability, without rendering invalid or unenforceable the remaining provisions of this Power of Attorney or affecting the validity or enforceability of any provision of this Power of Attorney in any other jurisdiction. Borrower hereby ratifies, to the extent permitted by Law, all that Lender or its designated Representatives shall lawfully do or cause to be done by virtue hereof, whether such actions were done before or after the actual execution date of this Power of Attorney. The rights and privileges set forth herein shall be deemed supplemental and in addition to any rights and privileges to which Lender or any other Person may be entitled under the Note or any other Loan Document. A facsimile or photocopied reproduction of any signature on this Power of Attorney shall be deemed an original signature for all intents and purposes.

WHEREFORE, Borrower, by its duly authorized representative, has executed this Power of Attorney on the date set forth below.

**BORROWER:**

Premier Group Autos LLC DBA Overfinch Miami

By: _____
Name: Edward Anthony Kessler
Title: Manager
Date: 4·18·19

STATE OF __Florida__    )
                        ) SS:
COUNTY OF __Broward__   )

Before me, a Notary Public in and for said County and State, personally appeared Edward Anthony Kessler known to me to be the Manager of Premier Group Autos LLC DBA Overfinch Miami who acknowledged the execution of the foregoing Power of Attorney, and who, having been duly sworn, states that any representations contained therein are true.

Witness my hand and Notarial Seal this __18__ day of __April__, 20__19__.

Notary Signature _____

Notary Name (Printed) __Arturo Mayoral__

My Commission Expires: __10/11/2021__     County of Residence: __Broward__



Notary Public State of Florida
Arturo Mayoral
My Commission GG 150838
Expires 10/11/2021

NG000274

NXTGR-000000274

## POWER OF ATTORNEY
(Entity/Partnership)



EXHIBIT 9
Mayoral
7-22-21

This Power of Attorney is executed by the undersigned borrower ("**Borrower**") and delivered to NextGear Capital, Inc. ("**Lender**") pursuant to that certain Demand Promissory Note and Loan and Security Agreement by and between Borrower and Lender (the "**Note**"). Capitalized terms used herein but not defined herein shall have the respective meanings as set forth in the Note (such meanings to be equally applicable to both the singular and plural forms of the terms defined). Any capitalized terms used herein, but not otherwise defined herein or in the Note, as the case may be, shall have the meanings ascribed to them in the UCC.

1. No Person to whom this Power of Attorney is presented, as authority for Lender to take any action described below, shall be required to inquire into or seek confirmation from Borrower as to the authority of Lender to take any action described below, or as to the existence of or fulfillment of any condition to this Power of Attorney, which is intended to grant to Lender unconditionally the authority to take and perform the actions described below. Borrower irrevocably waives any right that it may have, now or at any time in the future, to commence any claim, litigation, suit, petition, writ, or proceeding in any court of competent jurisdiction or before any arbitrator or other neutral, against any Person acting in reliance upon or otherwise acknowledging any power or authority granted by Borrower under this Power of Attorney. The Power of Attorney granted hereby is coupled with an interest and may not be revoked or canceled by Borrower without Lender's written consent or as otherwise allowed by Law. This Power of Attorney shall be deemed a "Loan Document" for all intents and purposes as referenced in the Note.

2. With or without the occurrence of an Event of Default under the Note, Borrower irrevocably appoints Lender (and all Representatives designated by Lender), with full power of substitution, as Borrower's true and lawful attorney-in-fact with full power and authority in the place and stead of Borrower and in the name of Borrower or in its own name, from time to time in Lender's discretion, to take any and all appropriate actions and to execute and deliver any and all documents and instruments which may be necessary or desirable to accomplish the purposes of the Note and each of the other Loan Documents. Without limiting the generality of the foregoing, Borrower hereby grants to Lender the power and right, on behalf of Borrower, without further notice to or assent by Borrower, at any time, to do the following:

    (a) execute such security agreements, invoices, notes, and related documentation as may be necessary for Borrower to acquire, refinance, or sell any Collateral (including any Units secured or to be secured by Advances made thereon);

    (b) execute all documents necessary for Lender to perfect or secure its interest in the Collateral;

    (c) make, settle, and adjust claims under policies of insurance, and endorse any check, draft, instrument, or other item of payment for the proceeds of such policies of insurance, and make all determinations and decisions with respect to such policies of insurance;

    (d) endorse the name of Borrower upon any document, instrument, certificate, evidence of title, state registration documents, trust receipt, checks or other items of payment, or any related or similar documents, in each case as necessary to pay for or protect the Collateral, including, without limitation, any agreements between Borrower and any global positioning satellite company;

    (e) endorse the name of Borrower upon any items of payment or proceeds of any Collateral (including any Units constituting Collateral), and to deposit the same to the account of Lender on account of Borrower's Liabilities under the Note and the other Loan Documents;

    (f) endorse the name of Borrower upon any chattel paper, document, instrument, invoice, freight bill, bill of lading, or similar document or agreement relating to any Collateral;

    (g) use the information recorded on or contained in any data processing equipment, computer hardware, or software relating to any Collateral to which Borrower has access;

    (h) pay or discharge any taxes, liens, security interests, or other encumbrances levied or placed on or threatened against Borrower or any of the Collateral;

    (i) communicate with any party to any contract with regard to the assignment of the right, title, and interest of Borrower in and under such contract and/or the Collateral, and other matters relating thereto;

    (j) contact any third parties and disclose and/or receive any Borrower information, including, without limitation, information or data in Borrower's application for credit with Lender, the Note, or Borrower's Credit Line, in each case for the purpose of, among other things, preserving Lender's security interest in the Collateral and ensuring the satisfaction of Borrower's Liabilities under the Note and the other Loan Documents; and

    (k) do all other things reasonably necessary to satisfy Borrower's Liabilities under the Note and the other Loan Documents.

3. Upon the occurrence of an Event of Default under the Note, Borrower irrevocably appoints Lender (and all Representatives designated by Lender), with full power of substitution, as Borrower's true and lawful attorney-in-fact with full power and authority in the place and stead of Borrower and in the name of Borrower or in its own name, from time to time in Lender's discretion, to do the following:

    (a) demand, collect, accept receipt for, settle, compromise, adjust, foreclose, or realize upon any of the Collateral, in each case in such manner as Lender may determine;

    (b) file or prosecute any claim, litigation, suit, petition, writ, or proceeding in any court of competent jurisdiction or before any arbitrator or other neutral, or take any other action otherwise deemed appropriate by Lender for the purpose of collecting any and all such moneys due to

NG000244

NXTGR-000000244

**EXHIBIT 9**

Borrower, whenever payable, and to enforce any other right in respect of the Collateral, including, without limitation, confessing to or consenting to judgments, writs of replevin or possession, and/or any equitable relief in favor of Lender or its Affiliates;

(c) file or prosecute all proofs of claim against any account debtor on behalf of Borrower; and

(d) notify the United States Postal Service of a change in address for the delivery of Borrower's mail to an address designated by Lender, and to receive Borrower's mail on behalf of Borrower.

4. Any provision of this Power of Attorney that is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability, without rendering invalid or unenforceable the remaining provisions of this Power of Attorney or affecting the validity or enforceability of any provision of this Power of Attorney in any other jurisdiction. Borrower hereby ratifies, to the extent permitted by Law, all that Lender or its designated Representatives shall lawfully do or cause to be done by virtue hereof, whether such actions were done before or after the actual execution date of this Power of Attorney. The rights and privileges set forth herein shall be deemed supplemental and in addition to any rights and privileges to which Lender or any other Person may be entitled under the Note or any other Loan Document. A facsimile or photocopied reproduction of any signature on this Power of Attorney shall be deemed an original signature for all intents and purposes.

WHEREFORE, Borrower, by its duly authorized representative, has executed this Power of Attorney on the date set forth below.

**BORROWER**:

Premier Group Autos LLC DBA Overfinch Miami

By: _____
Name: James Michael C Blackburn
Title: Manager
Date: 4.18.19

STATE OF Florida        )
                        ) SS:
COUNTY OF Broward       )

Before me, a Notary Public in and for said County and State, personally appeared James Michael C Blackburn known to me to be the Manager of Premier Group Autos LLC DBA Overfinch Miami who acknowledged the execution of the foregoing Power of Attorney, and who, having been duly sworn, states that any representations contained therein are true.

Witness my hand and Notarial Seal this 18 day of April, 2019.

Notary Signature _____

Notary Name (Printed) Arturo Mayoral

My Commission Expires: 10/11/2021        County of Residence: Broward



Notary Public State of Florida
Arturo Mayoral
My Commission GG 150838
Expires 10/11/2021

NG000245

NXTGR-000000245

CONFIDENTIAL

NG002267


EXHIBIT 46



CONFIDENTIAL

NG002268



CONFIDENTIAL

NG002269