**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| **NEXTGEAR CAPITAL, INC.,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | **CASE NO. 1:20-cv-00354-TWP-DLP** |
| **v.** | ) | |
| | ) | |
| **PREMIER GROUP AUTOS, LLC,** | ) | |
| **JAMES M. BLACKBURN, and** | ) | |
| **EDWARD A. KESSLER,** | ) | |
| **Defendants** | ) | |

**AFFIDAVIT OF EDWARD A. KESSLER**

Defendant, Edward A. Kessler (hereinafter "Kessler"), after first being duly sworn upon his oath, deposes and states as follows:

1. I am an adult, over 18 years of age, am competent to testify and have personal knowledge of the facts set forth herein.

2. I currently reside in Bethel Park, Pennsylvania and have resided in Pennsylvania all of my life.

3. I am currently employed as an actuarial analyst for a company located in Pennsylvania.

4. In late 2017 to early 2018, I was introduced to James Blackburn through mutual friends in Florida.

5. In the latter part of 2018, I attended the Fort Lauderdale boat show and met with James Blackburn. During the time I was in Fort Lauderdale, Florida for the boat show, James Blackburn brought a business concept to me about investing in a potential dealership that would sell high-end Range Rover vehicles through the brand name called: "Overfinch".

EXHIBIT
Exhibit J

6.     In furtherance of the dealership business, James Blackburn formed a Florida limited liability company by the name of Premier Group Autos, LLC ("PGA").

7.     PGA was formed for the purpose of distributing high-end aftermarket Range Rovers utilizing the Overfinch branding and trademark.

8.      James Blackburn was a 50% owner in PGA and I, Edward Kessler ("Kessler"), was also a 50% owner of PGA.

9.     Blackburn and Kessler agreed to a 50/50 venture and entered into an agreement regarding the operations of PGA, a true and accurate copy is attached as Exhibit A.

10.     Pursuant to Blackburn and Kessler's agreement, Kessler and Blackburn agreed that each would make capital contributions to the company, and further agreed that each person would fund the purchase of at least one Range Rover from the Overfinch distribution.

11.     Kessler, as a 50% owner of PGA, was given the title of "Director of Operations." Kessler, however, despite the given title was a passive investor in PGA and never intended to have any day-to-day control or management of PGA.

12.     At the time PGA was formed, Kessler was in the process of actively interviewing for jobs as an actuarial analyst and had no intentions of working the PGA business.  Kessler informed Blackburn that Blackburn would be responsible for the operations and that Kessler would provide an investment in what Kessler believed to be a potentially profitable business through the sale of the Overfinch/Range Rover product.

13.     Kessler made an initial capital investment of $112,500.00 into PGA and also directly purchased an Overfinch/Range Rover for PGA's use in the amount of $180,536.40.

14.     Despite Blackburn's promise and obligation to make the same capital contribution and purchase an Overfinch/Range Rover, Blackburn never made his required capital contribution and never purchased an Overfinch/Range Rover.

15.     In or around late February 2019, I received an email from NextGear Capital and/or Docusign asking for me to review a purported note and loan agreement for PGA's apparent acquisition of a $500,000.00 line of credit from NextGear.  During this time (late February 2019), I was unaware that Blackburn, purportedly acting on behalf of PGA, was seeking to obtain any type of financing from NextGear or any other lender.

16.     I informed Blackburn that PGA did not need, nor was PGA ready for, any financing at this level and that terms of the $500,000.00 NextGear financing plan did not make smart financial sense for PGA.  For example, I told Blackburn that I would not agree to the $500,000.00 line of credit from NextGear because: (a) PGA could not afford such a large amount of financing; (b) the terms of the $500,000.00 financing arrangement required PGA to submit a $100,000.00 retainer; and (c) I would not agree to sign a Power of Attorney document that apparently was required to be signed as part of the $500,000.00 NextGear financing package.    In addition, I informed Blackburn that I would not sign a power of attorney document as part of any financing with NextGear as I had the power of attorney document from NextGear reviewed by an attorney and was counseled not to sign such a document as part of any financing transaction.

17.     I did believe, however, that PGA did need additional access to capital to help fund the purchase of Overfinch/Range Rover vehicles.  Thus, I approached my parents and requested that they provide a $300,000.00 asset backing loan so that PGA could have access to additional funds to purchase the Overfinch/Range Rover vehicles.

18.     My parents, Edward P. Kessler and Kristine E. Kessler, in or around March 11, 2019, agreed to provide PGA with a $300,000.00 loan, which was memorialized by a "Business Loan Agreement".

19.     Thus, after receipt of the $300,000.00 loan from my parents, I believed that PGA was properly capitalized and ready to engage in business through the purchase and sale of the Overfinch/Range Rover through an Overfinch distribution agreement.

20.     Blackburn, however, without my knowledge, still continued to discuss loan opportunities with NextGear.

21.     Ultimately, in the latter part of March 2019, Blackburn approached me and said that NextGear agreed to do a floor plan financing transaction that would not exceed $150,000.00 in a total line of credit and the line of credit was to be used in $40,000.00 increments to finance less expensive vehicles.  As part of this $150,000.00 Loan, Blackburn also told me that NextGear agreed that it would not require the execution of a Power of Attorney document as part of the transaction, which I previously objected to signing or providing as any part of a loan agreement. Blackburn further agreed that the $150,000.00 line of credit from NextGear would only be used by PGA in $40,000.00 increments, and when a non-Overfinch car was sold using the financing, the full $40,000.00 loan would be immediately repaid.

22.     With this understanding and agreement in place, I agreed that PGA could enter into a floor plan financing agreement for the $150,000.00 line of credit with NextGear.

23.     Thus, on or about March 26, 2019, I received from NextGear/Docusign the contract documents that required execution.  As part of the contract documents that I received from NextGear/Docusign, all of the documents required an electronic signature, but there was no place for me to electronically sign the Power of Attorney documents.  Because there was no place for

me to "click and sign" the power of attorney documents from NextGear/Docusign, I believed and confirmed what Blackburn previously told me about that the power of attorney documents were not required to be signed as part of the overall loan/contract process.

Discovery of Blackburn's Fraud and Misuse of PGA Funds

24.    In the early summer of 2019, I went to Florida to review the financial records of PGA, as I had not been able to access the bank records of PGA.  During this time (June 2019), I reviewed some of the PGA financial records and attempted to reconcile various expenditures made from the PGA account.  During this first review of the PGA financial records is when I first noticed that Blackburn was sending PGA funds to other companies that Blackburn owned or controlled.  I questioned Blackburn about these expenditures, but he never really provided a response that made sense and simply stated that he would reconcile the books and demonstrate that the expenditures to the other companies were justifiable and in furtherance of actual PGA business.

25.    To date, I have not received any accurate or justifiable explanation from Blackburn about the misuse of PGA's funds and Blackburn's use of PGA funds for his own benefit.

26.    In addition, during the summer of 2019, PGA's bookkeeper, Donna Degroff, asked Blackburn about a certain transaction using the NextGear line of credit.  Ms. Degroff also stated that this transaction would increase the NextGear line of credit to more than $250,000.00.  This is the first time that I learned that Blackburn was potentially misusing the NextGear line of credit.

27.    Later, on September 27, 2019, I received my first communication/notice from NextGear that PGA was delinquent and that the line of credit was in default.  Prior to September 27, 2019, I have never received any communication or notice from NextGear that the line of credit was in default or that Blackburn had misused the line of credit.  Prior to this time, I also had no

knowledge that Blackburn had increased the line of credit by more than $200,000.00, which was done without my knowledge and/or consent.

28.     As a result of Blackburn's misappropriation of PGA's funds, I have filed a lawsuit against Blackburn in the State of Florida.   A true and accurate copy of my lawsuit against Mr. Blackburn is attached as Exhibit B.

29.     As a result of a forensic investigation completed by a court ordered independent accountant, it was determined that Blackburn paid himself ( or entities he owns/controls or insiders of Blackburn) in excess of $900,000.00 of PGA's funds.   These payments from PGA funds included payments to Blackburn for trips to Barbados, jewelry and other personal expenditures for the personal benefit of Blackburn or Blackburn's family.   A true and accurate copy of the accounting report that was prepared as part of the Florida litigation by the court ordered accountant is attached as Exhibit C.

30.     It was also discovered that Blackburn had forged my name to an American Express credit card and Blackburn spent over $90,000.00 on the American Express credit card without my knowledge and/or consent.   American Express brought suit against me for collection of the credit card, but, ultimately, American Express realized that I was the victim of fraud and forgery and ultimately American Express dismissed the lawsuit and did not seek reimbursement for the funds that Blackburn inappropriately and unlawfully charged for his own benefit.

Discovery of the Forged Power of Attorney Document

31.     After I was served with the lawsuit in the above-referenced action from NextGear's counsel, I learned for the first time that my name was forged on the Power of Attorney document. To be clear, I never signed the subject Power of Attorney (a copy of which is attached to the

deposition transcript of Arturo Mayoral as Exhibit 8), nor did I authorize Blackburn or anyone else to sign my name.

32.     As stated in my Interrogatory Answers, I was not in Fort Lauderdale, Florida on April 18, 2019. But rather, I was in Pennsylvania. Specifically, after being in Erie, Pennsylvania on April 17, 2019 and driving back to Pittsburgh, I was still in Pittsburgh on the morning of April 18, 2019. On the morning of April 18, 2019, at 7:45 a.m., I took a picture of a hockey roster for a pickup game of hockey that I played in later that night in Pennsylvania. Also, on the same evening, I also checked in to LA Fitness in Bethel Park, Pennsylvania and worked out prior to the hockey game.

33.     As stated above, I did not agree to sign the subject Power of Attorney document as part of the NextGear loan/financing and would not have agreed to allow PGA to enter into the loan/financing agreement if NextGear required the execution of the Power of Attorney document, nor would I have signed any of the Loan documents, including the personal guaranty.

34.     However, since the instant litigation has taken place, I have now learned that NextGear required both Blackburn and myself to execute the Power of Attorney document as part of the overall lending process with NextGear.

35.     But, because NextGear assisted in the procurement of a forged Power of Attorney document, Blackburn was able to access the line of credit and incur more than $350,000.00 in debt without my knowledge and/or consent.

36.     Nearly one day after the forged Power of Attorney document was provided to NextGear, the PGA bank records demonstrate that the first $40,000.00 draw on the line of credit was made and deposited into the PGA bank account. A true and accurate copy of the relevant

portion of the PGA bank records demonstrating the deposit was made is attached hereto and made a part hereof as D.

37.    In addition, during this lawsuit, I have also discovered that my name was forged to a NextGear credit application wherein Blackburn was apparently looking to obtain a $1,000,000.00 line of credit.  A true and accurate copy of the forgery of the credit application is attached to Arturo Mayoral's deposition transcript as Exhibit 3).  I did not sign the NextGear credit application, nor did I permit Blackburn or anyone else to sign my name.

38.    Attached as Exhibit E hereto is a comparison of my actual real signatures, as compared to the forged signatures wherein my signature is forged.  In addition, my true and lawful signature is also set forth below on the affirmation page to this Affidavit.

39.    As a result of the forgery and fraud associated with the execution of the Power of Attorney document, I have been damaged by virtue of NextGear seeking to recover more than $420,000.00 from me for the default of the PGA line of credit.   In addition, I have incurred attorney's fees in excess of $60,000.00 through the defense of this action simply because of the forged Power of Attorney document that NextGear (and its representatives) assisted in procuring and which was required to obtain funding under the NextGear Loan Documents.

I AFFIRM UNDER THE PENALTIES FOR PERJURY THAT THE FOREGOING REPRESENTATIONS ARE TRUE AND CORRECT.

Date: January 31, 2022

Edward A. Kessler

Agreement Between Ed Kessler and James Blackburn
5th November 2018

Agreed the following:

- Ed and James will own 50% each of The Premier Group and its subsidiary Overfinch Miami.
- Both parties agree to support the company in their own relative capacity.
- More detailed agreement to follow after training in London in December.
- Initial commitments below.

Ed Kessler
- $50,000 in upfront capital provided
- Use of credit facilities for purchase of floorplan financing and showroom build out.
- Director of operations for the company
- Purchase of first vehicle to be financed
- Any additional financing required via loan or capital support

James Blackburn
- $50,000 in upfront capital provided
- Use of credit facilities for purchase of floorplan financing and showroom build out.
- Chief Executive officer for the company
- Purchase of the first vehicle to be financed
- Any additional financing required via loan or capital support

Any additional financing needed shall be agreed to buy both parties and shall be provided equally.
Both parties capital input is capped at $100,000.
Any extra funds needed shall be sourced in a mutually agreed way.

Ed Kessler

James Blackburn

EXHIBIT
**Exhibit A**

Filing # 104416149 E-Filed 03/05/2020 03:13:06 PM

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT IN AND FOR BROWARD COUNTY, FLORIDA

EDWARD KESSLER, individually and on behalf of PREMIER GROUP AUTOS, LLC d/b/a Overfinch Miami,

Plaintiffs,

v.

JAMES BLACKBURN, individually; KERRY KENWRIGHT, individually; CITYLIFE SOCIAL, LLC; NAUTIC CREW WORLDWIDE, LLC d/b/a Nautic Charters d/b/a Nautic Charter Worldwide; AND PREMIER WARRANTY CO. d/b/a CityLife Social d/b/a CityLife Social App Development d/b/a International Yacht Company d/b/a Quiet Planes,

Defendants.

_______________________________________/

CASE NO.: 20-4101

**VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL**

Now comes Edward Kessler, individually and on behalf of Premier Group Autos, LLC d/b/a Overfinch Miami, and sues James Blackburn, individually; Kerry Kenwright, individually; CityLife Social, LLC; Nautic Crew Worldwide, LLC d/b/a Nautic Charters d/b/a Nautic Charter Worldwide; and Premier Warranty Co. d/b/a CityLife Social d/b/a CityLife Social App Development d/b/a International Yacht Company dba Quiet Planes (collectively, "Defendants"), and states as follows:

**Preliminary Statement**

1. This is an action for damages brought by Plaintiff Edward Kessler ("Kessler"), both directly and derivatively on behalf of Premier Group Autos, LLC d/b/a Overfinch Miami ("PGA"), against Defendant James Blackburn ("Blackburn") and various companies controlled by

Blackburn for judicial dissolution, judicial expulsion, fraud, fraud in the inducement, unjust enrichment, civil theft, and breach of fiduciary duties.

2. PGA was formed for the purpose of distributing high-end aftermarket Land Rovers utilizing the Overfinch branding and trademark. However, Blackburn caused irreparable damage to PGA and its operations by breaching his fiduciary duties to PGA, including funneling money from PGA to himself and his companies; and causing PGA to default on its loan agreements and its exclusive distribution agreement with Overfinch North America.

3. Kessler also suffered damages, individually and apart from PGA, due to Blackburn's fraudulent acts, which included forging Kessler's name on loan agreements, and signature on a credit card application and using the credit card for Blackburn's personal use.

**Parties, Jurisdiction and Venue**

4. This is an action for damages in excess of $30,000, exclusive of attorney's fees and interest, stemming from actions that occurred in Broward County, Florida, and therefore jurisdiction is proper in this Court.

5. PGA had its principal place of business in Broward County, Florida and is otherwise *sui juris*.

6. Kessler, a resident of Pittsburgh, Pennsylvania, is the 50% interest holder of PGA, pursuant to an agreement between Kessler and Blackburn dated November 5, 2018 (the "Agreement"), and is otherwise *sui juris*.

7. Blackburn is a 50% interest holder in PGA pursuant to the Agreement. Further, Blackburn is a resident of Broward County and conducted substantial business within the state as the CEO of PGA from the date of inception through the filing of this Complaint, and is otherwise *sui juris*.

8. Kerry Kenwright, a/k/a Kerry Blackburn ("Kenwright"), is a resident of Broward County, Florida and the spouse of Blackburn, and is otherwise *sui juris*. Kenwright conducted substantial business within the state of Florida and is the registered agent and director of Premier Warranty (defined below).

9. CityLife Social, LLC ("CityLife"), is a Florida limited liability company with its principal place of business in Broward County, Florida.

10. Nautic Crew Worldwide, LLC d/b/a Nautic Charters d/b/a Nautic Charter Worldwide ("Nautic Crew"), is a Florida limited liability company with its principal place of business in Broward County, Florida.

11. Premier Warranty Company d/b/a CityLife Social d/b/a CityLife Social App Development d/b/a International Yacht Company d/b/a Quiet Planes ("Premier Warranty," and together with CityLife and Nautic Crew, the "Blackburn Entities") is a Florida company with its principal place of business in Broward County, Florida.

12. All Defendants are residents of and/or do business in Broward County, Florida, and the facts and circumstances giving rise to the claims asserted occurred in Broward County, Florida. Therefore, venue is proper in this Court.

**Facts Supporting Claims**

13. In 2018, Blackburn pitched Kessler on the idea of distributing high end, aftermarket Land Rovers utilizing the Overfinch brand. Ultimately, Blackburn and Kessler agreed to a 50/50 venture.

*A. The Inception of Premier Group Autos, LLC*

14. To that end, on November 5, 2018, Kessler and Blackburn entered into the Agreement, wherein among other things, each party agreed to provide $50,000 of up front capital, additional financing or capital support, and use of credit facilities for the purchase of floorplan financing and a showroom buildout. Pursuant to the Agreement, Kessler was named Director of Operations of PGA. A copy of the Agreement is attached hereto at **Exhibit 1**.

15. Kessler and Blackburn further agreed that each would fund the purchase of initial vehicles, with Kessler agreeing to fund the purchase of the first vehicle, and Blackburn agreeing to fund the purchase of the second vehicle.

16. Subsequently, on December 3, 2018, PGA entered into a distribution agreement (the "Distribution Agreement") with Overfinch North America, Inc. ("Overfinch NA"), in which PGA became the exclusive Overfinch distributor in South Florida[1] for a period of one year. Included in the Distribution Agreement was a minimum requirement that PGA show at a minimum number of annual events, and certain financing and payment thresholds. A copy of the Distribution Agreement is attached hereto at **Exhibit 2**.

17. In order to purchase its first vehicle, Kessler loaned PGA $180,536.40, which amount was specifically designated for the purchase of the first vehicle. The loan was memorialized by a note between Kessler and PGA dated December 3, 2018, for a term of 12 months with 5% interest (the "EAK Note"). At Kessler's discretion, the funds of the EAK Note could be re-invested into another vehicle upon the sale of the first vehicle. A copy of the EAK Note is attached hereto at **Exhibit 3**.

---

[1] Inclusive of "Miami-Dade, Broward, Palm Beach, Monroe, Collier, Lee, Henry, Florida Keys and the Glades".

18. Indeed, the funds from the EAK Note were used to purchase PGA's first vehicle in January 2019, which was later sold. The funds from the EAK Note were reinvested into another vehicle for PGA. And for a few months thereafter, the business looked like it was starting to pick up steam. Unbeknownst to Kessler, Blackburn had other plans.

*B. __The NextGear Loan__*

19. On or about March 26, 2019, PGA entered into a Promissory Note with NextGear Capital, for floorplan financing (the "NextGear Note"). The NextGear Note included a security interest in all assets of PGA. The NextGear Note was signed electronically by Blackburn and Plaintiff, as Managers of PGA, and included personal guarantees by both Blackburn and Plaintiff. A copy of the NextGear Note is included at **Exhibit 4**.

20. Purportedly, on April 18, 2019, a Power of Attorney (the "POA") was executed in Kessler's name, granting NextGear certain rights, including authority to execute documents, settle claims, and contact third parties in PGA's name. According to the attestation of the Notary Public, Arturo Mayoral, Senior Client Solutions Executive with NextGear, Kessler signed the POA in front of Mr. Mayoral in Broward County, Florida. However, Kessler did not sign the POA, and was not in Broward County or even the state of Florida on or around the date he purportedly signed the POA.

21. Blackburn executed a POA in favor of NextGear on April 18, 2019, which was also notarized by Mayoral. A copy of Blackburn's POA is attached hereto at **Exhibit 5**.

22. Blackburn forged Kessler's signature on the POA, or caused Kessler's signature to be forged on the POA, or knew or had reason to know that Kessler did not actually sign the POA. A copy of the POA is attached hereto at **Exhibit 6**.

23. The POA was required by NextGear to obtain advances over and above the $150,000 loaned to PGA under the NextGear Note. Kessler and Blackburn specifically discussed the possibility of additional financing through NextGear, but Kessler objected to the additional terms NextGear required, including a mandatory retainer of $100,000 cash and the execution of the POA. Accordingly, Kessler refused to consent to additional financing over and above $150,000 from NextGear.

24. In fact, to provide sufficient financing to purchase vehicles without the objectionable terms required by NextGear, Kessler's father, Edward Kessler Sr. ("Kessler Sr.") loaned PGA $300,000 for the purchase of vehicles. A copy of the promissory note in favor of Kessler Sr. is attached hereto at **Exhibit 7**.

25. Unknown to Kessler, and in violation of the terms of the NextGear Note, Blackburn began "flooring"[2] vehicles that had already been sold, as well as vehicles PGA did not own. Kessler first became alerted to the potential issue in or around September 2019 when NextGear charged back PGA's bank account. Kessler questioned Blackburn regarding the chargeback and discrepancies, but Blackburn deflected and refused to provide an explanation or information relating thereto.

26. Based upon these apparent breaches of the NextGear Note, NextGear terminated the line of credit and accelerated the note.

27. NextGear recently filed litigation against Kessler and Blackburn, individually, under their guarantees, and against PGA under the NextGear Note in a case pending in U.S. District

[2] As used in the industry, "flooring" is a form of financing using specific cars as collateral.

Court for the Southern District of Indiana.[3] Among the allegations made by NextGear in the suit is an alleged continuing default by PGA to pay amounts due under the NextGear Note. NextGear claims the amounts due and owing total $357,588.73 – far in excess of the limited funding Kessler agreed to.

28. On December 11, 2019, Overfinch notified PGA that its Distribution Agreement was cancelled for failing to meet the minimum purchase requirements. On the same date, Overfinch also sent PGA a cease and desist letter, advising PGA that it was infringing on Overfinch's intellectual property by using the Overfinch trademark without authorization, including PGA's registration of the domain www.overfinchmiami.com.

29. Kessler discovered that Blackburn also violated the terms of the loan from Kessler Sr., by utilizing the funds for operating expenses or funneling proceeds of the loan to Blackburn and the Blackburn Entities rather than investing them into vehicles and vehicle kits.

C. ***Blackburn Forges American Express Documents***

30. At Blackburn's request and recommendation, Kessler agreed to allow PGA to obtain corporate credit cards issued by American Express. Blackburn advised that both owners' names and social security numbers needed to be provided in order to open the account. With this representation, Kessler agreed to allow Blackburn to use his social security number along (along with Blackburn's) to open the account. Shortly thereafter, in or around January 2019, Kessler received a credit card from American Express bearing his name and PGA's name (the "PGA Amex").

[3] That case is styled *NextGear Capital, Inc. v. Premier Group Autos, LLC*, et al., Case No. 1:20-CV-354, which was removed from the Superior Court of Hamilton County, Indiana, Case No., 29D03-1912-PL-011904.

31. Aside from authorizing the company to obtain the credit card Kessler had no involvement in applying for the PGA Amex, and did not complete or sign an application for such card.

32. Apparently, Blackburn also had a PGA Amex. Although unknown to Kessler, Blackburn did not provide his social security number or use his credit information to obtain one contrary to what he represented to Kessler.

33. During the time the PGA Amex was active and in use, Kessler made only one purchase on the card, to transport a Land Rover (a wholly business related expense), in the amount of $1,745.

34. Blackburn told Kessler that Blackburn had used the PGA Amex to pre-pay various shows and events for PGA. However, Kessler began receiving billing statements for the PGA Amex for purchases made by Blackburn or at Blackburn's direction, which appeared to be largely or wholly personal in nature, and not, in fact, prepayments of PGA's shows and events.

35. In or around October 2019, Kessler saw the application for the PGA Amex for the first time, which is when he learned that Blackburn did not supply his social security number to open the account, contrary to his representation to Kessler. It is also the first time Kessler learned that Blackburn had forged Kessler's signature on the application.

36. Blackburn made personal purchases and purchases unrelated to PGA's operations on the PGA Amex without Kessler's knowledge or authorization.

37. Moreover, the statements from American Express indicate that thousands of dollars of purchases were made on the card issued in Kessler's name. Despite this, Kessler only made a single purchase on the PGA Amex, and did not authorize anyone else to use the card issued in his

name. Blackburn, or someone at Blackburn's direction, made charges to the PGA Amex card issued in Kessler's name.

38. American Express brought suit against Kessler and PGA for the debt incurred on the PGA Amex (the "Amex Case"), in the amount of $109,497.52.[4] Blackburn was not named in the Amex Case because apparently he did not provide his own credit information or social security number when he fraudulently applied for the PGA Amex by forging Kessler's signature.

39. The Amex Case was apparently settled at Blackburn's direction. Kessler is unaware whether any amounts due and owing to American Express have been paid or remain outstanding.

*D. __Blackburn Uses PGA as a Cash Cow__*

40. Blackburn had access to and control of PGA's bank accounts. He used this access and control to move PGA's money into and between his various companies and for his personal benefit, without Kessler's knowledge or consent.

41. Between February 8, 2019, and December 9, 2019, Blackburn transferred funds from PGA to Nautic Crew through a variety of checks, wires, and online transfers totaling $344,740. Once Kessler became aware of the transfers, he made requests to Blackburn for information evidencing the "operating expenses" claimed by Blackburn. Despite several requests, Plaintiff was not provided any detail or reason for these transfers into Nautic Crew – an entity owned and controlled by Blackburn and Kenwright.

42. Further, between April 16, 2019, and December 9, 2019, Blackburn paid over $116,000 for personal items out of PGA's funds, including, without limitation, restaurants,

[4] The case was styled *American Express National Bank v. Edward Kessler and Premier Group Autos, LLC*, Case No. CACE-19-021456, pending in the Circuit Court in Broward County, Florida. The suit was voluntarily dismissed without prejudice on November 29, 2019.

jewelry, clothes, nanny services, life insurance, and personal vacation expenses. Kessler did not authorize these personal expenses to be paid from PGA's funds.

*E. Blackburn's Fraudulent Scheme*

43. Blackburn built and orchestrated a fraudulent scheme to drain PGA of its assets, and in the process destroyed PGA's business opportunities; while defrauding Kessler by forging his name on documents obligating Kessler to debts he did not agree to incur, and PGA to debts beyond what Kessler consented. Blackburn then took the majority of those ill-gotten funds for his own personal gain – to support the Blackburn Entities and lavish personal spending.

44. Additionally, while Blackburn and Kessler agreed to put in initial capital of $50,000, and more as needed, Blackburn either failed to contribute his share of the capital, or pulled it back out. Meanwhile, Kessler contributed the initial $50,000, plus additional capital contributions of $62,500, for a total of $112,500. Kessler did not authorize a waiver of Blackburn's obligation to contribute capital to PGA, or authorize Blackburn to withdraw his capital if contributed.

45. Additionally, Blackburn failed to fund the purchase of the second vehicle (or any vehicle) pursuant to the Agreement. Kessler did not authorize a waiver of Blackburn's obligation to fund the purchase of a vehicle.

46. In furtherance of this scheme, Blackburn utilized a web of companies in which he has an ownership interest, and/or over which he exercises control, including but not limited to the Blackburn Entities, to remove and hide money and assets from PGA, to the detriment of Kessler and PGA's legitimate creditors.[5]

[5] In addition to the Blackburn Entities, Blackburn is known to have an interest or involvement in the following: Exec Airline, Inc.; Grajay Enterprises, LLC; International Yacht Corp. dba International Yacht Collection; Latin American Wings, Corp.; Lawrence & Lilly Investments, LLC; Lauderdale Ahead, Inc.;

47. Based upon the foregoing, Kessler individually and derivatively on behalf of PGA brings the following claims.

48. All conditions precedent to bringing these claims have been met or waived.

**COUNT I**
**Judicial Dissolution of Premier Group Autos, LLC**
***(Fla. Stat. 605.0702(1)(b)(2))***

49. Plaintiff repeats and realleges the allegations set forth in Paragraphs 1-48 of this Complaint as if fully set forth herein.

50. The Florida Statutes governing limited liability companies like PGA require a court to judicially dissolve the company upon the request of a member or manager in interest and upon the occurrence of a number of enumerated events including the impracticability of continuing business.

51. Due to Blackburn's fraudulent conduct, breaches of contracts, including the Agreement, the Distribution Agreement, Next Gear Note, EAK Note, and promissory notes in favor of Kessler, Sr., and PGA's lack of operating capital or remaining assets, it is impractical for PGA to continue business operations.

52. To allow PGA to continue business operations would cause PGA and Kessler irreparable injury.

WHEREFORE, Plaintiff Edward Kessler respectfully requests this Court (1) enter a judgment of dissolution dissolving Premier Group Autos, LLC; (2) appoint a receiver pursuant to Fla. Stat. § 607.1434; and (3) such other and further relief as the Court deems just and proper.

---

Luxury Yacht Life, LLC dba Diversified Funding; Mansory USA, LLC: Nautic Charters, LLC; Premier Aviation Holdings, LLC; Premier Holdings Group, LLC; Premier Jet Leasing, LLC; Richport Air Operation Account, LLC: Softe, Inc.; U.S. Aircraft Parts, LLC; and Yachte Training, LLC.

Further, the Plaintiff requests this Court take any other measures necessary to preserve any remaining corporate assets.

**COUNT II**
**Judicial Dissolution of Premier Group Autos, LLC**
***(Fla. Stat. 605.0702(1)(b)(3))***

53. Plaintiff repeats and realleges the allegations set forth in Paragraphs 1-48 of this Complaint as if fully set forth herein.

54. The Florida Statutes governing limited liability companies like PGA require a court to judicially dissolve the company upon the request of a member or manager in interest and upon the occurrence of a number of enumerated events including when a manager or member in control of the company have acted, are acting, or are reasonably expected to act in a manner that is illegal or fraudulent.

55. Blackburn is the member in control of PGA's operations, as the company's CEO. In this role, Blackburn has exhibited numerous instances of fraudulent and potentially illegal behavior, including forging Kessler's name to documents related to the company, transferring assets and cash from PGA to the Blackburn Entities, knowingly and flagrantly violating the terms of the Distribution Agreement and the NextGear Note, and financing cars already sold or never owned by PGA.

56. Moreover, were this Court to permit PGA to continue operations, it is reasonably expected that Blackburn would continue his pattern of fraudulent and/or illegal behavior in the name of the company and/or Kessler.

WHEREFORE, Plaintiff Edward Kessler respectfully requests this Court (1) enter a judgment of dissolution dissolving Premier Group Autos, LLC; (2) appoint a receiver pursuant to Fla. Stat. § 607.1434; and (3) such other and further relief as the Court deems just and proper.

Further, the Plaintiff requests this Court take any other measures necessary to preserve any remaining corporate assets.

**COUNT III**
**Judicial Dissolution of Premier Group Autos, LLC**
***(Fla. Stat. 605.0702(1)(b)(4))***

57. Plaintiff repeats and realleges the allegations set forth in Paragraphs 1-48 of this Complaint as if fully set forth herein.

58. The Florida Statutes governing limited liability companies like PGA require a court to judicially dissolve the company upon the request of a member or manager in interest and upon the occurrence of a number of enumerated events including when the assets of the company are being misappropriated or wasted, causing injury to the company or one or more of its members.

59. Under Blackburn's control, PGA has misappropriated or wasted substantially all of PGA's assets – the majority of which flowed to the Blackburn Entities (in the approximate amount of at least $344,740); or went directly to pay for Blackburn's personal expenses (in the approximate amount of at least $116,000) – all in the course of just a few months.

60. These funds were largely comprised of Kessler's initial investment, Kessler's loan to PGA, Kessler Sr.'s loan to PGA, the funds from the NextGear Note, and the expenses fraudulently charged to the PGA Amex.

61. Moreover, were this Court to permit PGA to continue operations, it is reasonably expected that Blackburn would continue his pattern of fraudulent and/or illegal behavior in the name of the company, which would cause irreparable injury to Kessler and PGA.

WHEREFORE, Plaintiff Edward Kessler respectfully requests this Court (1) enter a judgment of dissolution dissolving Premier Group Autos, LLC; (2) appoint a receiver pursuant to Fla. Stat. § 607.1434; and (3) such other and further relief as the Court deems just and proper.

Further, the Plaintiff requests this Court take any other measures necessary to preserve any remaining corporate assets.

**COUNT IV**
**Judicial Expulsion of Blackburn**
**from Premier Group Autos, LLC**
**as alternative to Counts I-III**
***(Fla. Stat. 605.0602)***

62. Plaintiff repeats and realleges the allegations set forth in Paragraphs 1-48 of this Complaint as if fully set forth herein.

63. The Florida Statutes governing limited liability companies like PGA allow a court to remove a member from management upon the request of a member or manager in interest and upon the occurrence of a number of enumerated events including: (a) wrongful conduct, (b) consistent or willful material breach of the operating agreement or a duty or obligation; or (c) a member engaging in activities or affairs that makes it not reasonably practicable to carry on the activities of the business with the person as a member.

64. In the instant case, and as described above, Blackburn has demonstrated all three bases for expulsion as a member.

65. Blackburn has engaged in wrongful conduct as a member in the management of PGA by forging Kessler's name, or having Kessler's name forged, or knowingly using and obtaining access to funds loaned and credit extended over the objection of Kessler or without his approval.

66. Blackburn has consistently and willfully breached material terms of multiple agreements to the detriment of Kessler and/or PGA, including:

a. the Agreement governing the formation and management of PGA, by failing to contribute the stated capital;

b. the Agreement between Kessler and Blackburn that each should fund the purchase of an initial vehicle;

c. the terms included in the promissory note from Kessler Sr., which required the funds to be reinvested in cars and inventory;

d. the Distribution Agreement, by consciously disregarding and breaching terms including those related to use of the name "Overfinch" and other IP held by Overfinch NA; and

e. the NextGear Note, by double-financing vehicles, and flooring vehicles already sold or never owned by PGA.

The breaches of these various agreements were material, and consistent or willful. Indeed, because of Blackburn's breaches, the Distribution Agreement was terminated, and the NextGear Note was called, leaving PGA with no viable business plan and no financing to continue.

67. Finally, because of Blackburn's breaches, and his overall fraudulent behavior and reckless indifference to the damages caused to PGA and Kessler, it is impracticable for PGA to continue its operations with Blackburn as a member.

WHEREFORE, in the event Court does not dissolve PGA or appoint a receiver pursuant to Counts I-III, Plaintiff Edward Kessler respectfully requests this Court enter a judgment expelling James Blackburn as a member and manager of Premier Group Autos, LLC, and such other and further relief as the Court deems just and proper.

**COUNT V**
**Fraud**
***(Kessler v. Blackburn)***

68. Plaintiff repeats and realleges the allegations set forth in Paragraphs 1-48 of this Complaint as if fully set forth herein.

69.     In the course of Kessler and Blackburn's business relationship related to PGA, Blackburn made several false and fraudulent misrepresentations to Kessler that Blackburn knew were false:

    a.  Blackburn represented to Kessler that the NextGear Note would be limited to the original note value of $150,000, but unilaterally, without Kessler's knowledge or consent, and contemporaneously with the NextGear Note, executed the Addendum that provided for additional extensions of financing that Kessler didn't agree to and to which he had previously objected.

    b.  Blackburn represented that he would personally fund the purchase of PGA's second vehicle, after Kessler personally funded the purchase of PGA's first vehicle, but unilaterally and without Kessler's knowledge or consent, did not personally fund the purchase of any vehicle and instead used PGA's credit or assets to fund the purchase of the second vehicle.

    c.  Blackburn knowingly forged Kessler's signature on documents or knew Kessler's signature was forged.

    d.  Blackburn siphoned at least $344,740 from PGA to Nautic Crew.  Blackburn knew these transfers were improper and not in furtherance of PGA's operations, though he represented as much to Kessler.

    e.  Blackburn knowingly charged personal expenses to the PGA Amex and paid for personal expenses out of PGA's bank account without Kessler's knowledge or consent.  When asked about the expenses, Blackburn claimed they were expenses for PGA.

f. Blackburn knowingly obtained improper financing for vehicles that were already financed, had already been sold, and/or were never owned by PGA.

70. At the time of these actions and statements, Blackburn knew the representations were false, and made them with the intent to defraud and deceive PGA and Kessler and/or those providing goods and services to PGA.

71. At the time the statements and actions were made, Kessler had no knowledge of the acts or of the falsity of the statements.

72. Kessler believed Blackburn was operating in good faith and in the best interests of the business operations. In reliance upon this belief, Kessler continued to further the business's ventures by providing financing, assisting in obtaining other sources of funding, and continuing operations.

73. Kessler's reliance upon Blackburn was justified because Blackburn concealed his various fraudulent acts and misrepresentations to prevent their discovery.

74. As a proximate result of Blackburn's fraud and deceit and the facts alleged herein, Kessler was defrauded by Blackburn and may be personally liable to PGA's creditors for at least the following amounts:

a. $109,497.52 for the PGA Amex expenditures; and

b. $357,588.73 for the amounts allegedly due under the NextGear Loan.

WHEREFORE, Plaintiff Edward Kessler respectfully requests this Court enter a judgment (i) awarding Kessler damages totaling at least $467,086.25 plus interest, against James Blackburn; (ii) declaring the imposition of an equitable lien on the Blackburn Entities; (iii) appointing a receiver, custodian, or examiner to investigate and/or oversee the Blackburn Entities and preserve the assets therein; (iv) and such other and further relief as the Court deems just and proper.

**COUNT VI**
**Fraud in the Inducement**
***(Kessler v. Blackburn)***

75. Plaintiff repeats and realleges the allegations set forth in Paragraphs 1-48 of this Complaint as if fully set forth herein.

76. In the formation of PGA, Blackburn represented to Kessler that he intended to form a legitimate enterprise to distribute Overfinch branded Land Rovers.

77. However, from the inception of PGA, Blackburn knew that he would, in fact use PGA as a front and Kessler as pawn to bring money into the business, only to funnel it back out for his own purposes.

78. Blackburn knew these representations were false but made them anyway to lure Kessler into the business, to give PGA the air of legitimacy, and to bring in funding.

79. Kessler was justified in his reliance on his belief this was to be a legitimate business venture by virtue of the fact that Blackburn had connections with Overfinch NA to obtain, and did obtain, the Distribution Agreement.

80. Because of Kessler's reliance upon Blackburn's fraudulent misrepresentations in the formation of PGA, Kessler incurred damages of at least the following amounts:

a. $112,500 Initial equity payment

b. $42,000 non-asset backed loans

c. $180,536.40 asset backed loans

81. The money invested or loaned by Kessler to PGA was ultimately used by Blackburn for his own benefit and/or transferred to the Blackburn Entities for Blackburn's benefit.

WHEREFORE, Plaintiff Edward Kessler respectfully requests this Court enter a judgment (i) awarding Kessler damages of $335,036.40, plus interest, against James Blackburn; (ii)

declaring the imposition of an equitable lien on the Blackburn Entities; (iii) appointing a receiver, custodian, or examiner to investigate and/or oversee the Blackburn Entities and preserve the assets therein; (iv) and such other and further relief as the Court deems just and proper.

**COUNT VII**
**Unjust Enrichment**
***(All Plaintiffs v. All Defendants)***

82. Plaintiff repeats and realleges the allegations set forth in Paragraphs 1-48 of this Complaint as if fully set forth herein.

83. Blackburn, Kenwright, and/or the Blackburn Entities have been unjustly enriched at the expense of Kessler and PGA as a result of the PGA Amex transactions, the PGA funds transferred directly to the Blackburn Entities, and the personal expenses Blackburn paid PGA.

84. Kessler and PGA have conferred a benefit on Blackburn, Kenwright, and/or the Blackburn Entities by virtue of their liability for the PGA Amex purchases and the NextGear Note, as well the funds loaned by Kessler to PGA under the belief that they would be used for legitimate PGA business operations.

85. Blackburn, Kenwright, and the Blackburn Entities had knowledge of the benefit conferred by Kessler and PGA.

86. Blackburn, Kenwright, and the Blackburn Entities accepted or retained the benefit conferred.

87. The circumstances would be inequitable for Blackburn, Kenwright, and/or the Blackburn Entities to retain the benefit without paying fair value for it.

WHEREFORE, Plaintiff Edward Kessler respectfully requests this Court enter a judgment (i) awarding Kessler damages of $584,283.64, plus interest, against James Blackburn, Kerry Kenwright, CityLife, Nautic Crew, and Premier Warranty; (ii) declaring the imposition of an

equitable lien on the Blackburn Entities; (iii) appointing a receiver, custodian, or examiner to investigate and/or oversee the Blackburn Entities and preserve the assets therein; (iv) and such other and further relief as the Court deems just and proper.

**COUNT VIII**
**Breach of Fiduciary Duties**
***(PGA v. Blackburn)***

88. Plaintiff repeats and realleges the allegations set forth in Paragraphs 1-48 of this Complaint as if fully set forth herein.

89. As CEO of PGA, Blackburn owed PGA duties, including the duty of care and the duty of loyalty.

90. Blackburn had an obligation to discharge his duties in good faith with the care an ordinarily prudent officer in a like position would exercise and in a manner reasonably believed to be in the best interests of PGA, to consider all material information reasonably available in making business decisions, and to seek out information reasonably necessary to fulfill his duty to manage the activities of the company.

91. At all times material hereto, PGA was insolvent or in the zone of insolvency.

92. Blackburn breached his fiduciary duties owed to PGA and its creditors by, among other acts and omissions, the following:

a. failing to adhere to the requirements of the NextGear Note, causing a default under the note and a loss of financing;

b. causing PGA to finance cars that had either already been financed or sold, or were not owned by PGA;

      c. causing waste of PGA's assets by using PGA's access to credit and its cash assets for his own benefit or the benefit of the Blackburn Entities, to the detriment of PGA; and

d. committing fraudulent acts, including forgery, under the guise of furthering PGA's business operations.

93. In committing these acts, Blackburn failed to fulfill his fiduciary duties owed to PGA and its creditors. The significant damages that directly resulted from these acts and omissions include, but are not necessarily limited to, the loss of PGA's business prospects and continued operations, diminution of PGA's enterprise value, and/or waste and dissipation of PGA's corporate assets.

94. All of PGA's losses were the proximate result of Blackburn's acts while purported acting on behalf of PGA.

WHEREFORE, Plaintiff Edward Kessler demands judgment against James Blackburn for breaches of fiduciary duties, and an award of damages, pre-judgment interest, and costs incurred as a result of the same, and such other and further relief as the Court deems just and proper.

**COUNT IX**
**Breach of Fiduciary Duties**
**(*Kessler v. Blackburn*)**

95. Plaintiff repeats and realleges the allegations set forth in Paragraphs 1-48 of this Complaint as if fully set forth herein.

96. As members of PGA, Blackburn owed Kessler fiduciary duties in the way he managed the business of PGA, including the duties of care and loyalty.

97. Blackburn had an obligation to discharge his duties in good faith with the care an ordinarily prudent officer in a like position would exercise and in a manner reasonably believed to

be in the best interests of PGA, to consider all material information reasonably available in making business decisions, and to seek out information reasonably necessary to fulfill his duty to manage the activities of the company.

98. Blackburn breached his fiduciary duties owed to Kessler by, among other acts and omissions, the following:

a. failing to adhere to the requirements of the NextGear Note, causing a default under the note and a loss of financing;

b. failing to adhere to the agreement between Kessler and Blackburn that Blackburn would fund the purchase of PGA's second vehicle after Kessler personally funded the purchase of PGA's first vehicle;

c. causing PGA to finance cars that had either already been financed or sold, or were not owned by PGA;

d. causing waste of PGA's assets by using PGA's access to credit and its cash assets for his own benefit or the benefit of the Blackburn Entities, to the detriment of PGA; and

e. committing fraudulent acts, including forgery, under the guise of furthering PGA's business operations.

99. In committing these acts, Blackburn failed to fulfill his fiduciary duties owed to Kessler. The significant damages that directly resulted from these acts and omissions include, but are not necessarily limited to, the loss of PGA's business prospects and continued operations, diminution of PGA's enterprise value, and/or waste and dissipation of PGA's corporate assets.

100. All of PGA's losses were the proximate result of Blackburn's acts while purported acting on behalf of PGA.

WHEREFORE, Plaintiff Edward Kessler demands judgment against James Blackburn for breaches of fiduciary duties, and an award of damages, pre-judgment interest, and costs incurred as a result of the same, and such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMAND**

Plaintiff demands a jury trial for all issues triable by a jury.

Respectfully Submitted,

BAST AMRON LLP
*Counsel for Plaintiff Edward Kessler*
SunTrust International Center
One Southeast Third Avenue, Suite 1400
Miami, FL 33131
Telephone: 305.379.7904
Facsimile: 305.379.7905
Email: bamron@bastmaron.com
Email: dquick@bastamron.com

By: */s/Brett M. Amron*
Brett M. Amron, Esq. (FBN 0148342)
Dana R. Quick, Esq. (FBN 0074402)

## VERIFICATION

State of Pennsylvania )
) ss:
County of Allegheny )

I, **Edward A. Kessler**, declare as follows:

I am the Plaintiff in the above-referenced lawsuit. I have read the foregoing Verified Complaint and declare under penalty of perjury that the foregoing factual allegations set forth in Paragraphs 14 through 43 are true and correct.

FURTHER AFFIANT SAYETH NAUGHT.

Edward A. Kessler

THE FOREGOING INSTRUMENT was sworn to (or affirmed) and subscribed before me by means of ☑ physical presence or ☐ online notarization, this 5TH day of MARCH, 2020, by Edward A. Kessler, who is ~~personally~~ known to me or has produced DRIVERS LICENSE as identification.

Notary Public, State of PENNSYLVANIA

My Commission Expires: OCTOBER 17, 2021

Commonwealth of Pennsylvania
Notarial Seal
NICHOLE L KOSTELNIK - Notary Public
CITY OF MCKEESPORT ALLEGHENY COUNTY
My Commission Expires Oct 17, 2021

Agreement Between Ed Kessler and James Blackburn
5th November 2018

Agreed the following:

- Ed and James will own 50% each of The Premier Group and its subsidiary Overfinch Miami.
- Both parties agree to support the company in their own relative capacity.
- More detailed agreement to follow after training in London in December.
- Initial commitments below.

Ed Kessler

- $50,000 in upfront capital provided
- Use of credit facilities for purchase of floorplan financing and showroom build out.
- Director of operations for the company
- Purchase of first vehicle to be financed
- Any additional financing required via loan or capital support

James Blackburn

- $50,000 in upfront capital provided
- Use of credit facilities for purchase of floorplan financing and showroom build out.
- Chief Executive officer for the company
- Purchase of the first vehicle to be financed
- Any additional financing required via loan or capital support

Any additional financing needed shall be agreed to buy both parties and shall be provided equally.
Both parties capital input is capped at $100,000.
Any extra funds needed shall be sourced in a mutually agreed way.

Ed Kessler

James Blackburn

EXHIBIT 1

PAG-B0031

## DISTRIBUTION AGREEMENT

This International Distribution Agreement ("Agreement") is made effective as of Monday 3rd December 18 ("Effective Date") by and between Premier Group Autos LLC ("Distributor") with company registration number L18000263245 with its principal place of business at 1500 Cordova Road, 206 Fort Lauderdale, Florida, 33316 and Overfinch North America Inc. ("OVERFINCH") with its principal place of business at 500 Stinson Drive, Danville VA 24540 USA.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

### 1. DEFINITIONS

1.1 "Conversion" means exterior products including body styling package, badges, lettering, wheels and tires and the fitment thereof by OVERFINCH.

1.2 "Conversion Value" means the value of the Products and services supplied by OVERFINCH as set out in the relevant order acceptance and / or invoice. For the avoidance of doubt, the Conversion Value does not include taxes, duties, freight and transportation charges and similar costs, all of which are payable by the Distributor.

1.3 "Customers" means any current or potential purchasers or end-users of the Products.

1.4 "Initial Term" means twelve months from the Effective Date.

1.5 "Introducers Fee" means an amount in US dollars to be agreed on a deal by deal basis between the parties.

1.6 "Order Value" means the total value of the order including the Vehicle Value and Conversion Value as set-out in such order that is accepted by OVERFINCH.

EXHIBIT
2

1.7 "Products" means any Overfinch products sold by OVERFINCH to Distributor for resale to Customers pursuant to the terms of this Agreement, and any related services (including OVERFINCH training).

1.8 "Term" means twelve months commencing from the Effective date and thereafter each twelve-month period following the anniversary of the Initial Term.

1.9 "Territory" means the utility and industrial market segments in South Florida (Miami Dade, Broward, Palm Beach, Monroe, Collier, Lee, Henry, Florida Keys and the Glades) only.

1.10 "Vehicle" means a new vehicle that OVERFINCH has manufactured parts for and is capable of being modified by OVERFINCH.

1.11 "Vehicle Value" means the cost of the vehicle as Invoiced to Overfinch by the supplying automotive dealer. For the avoidance of doubt, the Vehicle Value does not include state or local taxes, freight and transportation charges and similar costs, all of which are payable by the Distributor.

## II. RELATIONSHIP

2.1 **Appointment.** OVERFINCH appoints the Distributor as an exclusive, independent distributor of Products to Customers in the Territory. Distributor accepts such appointment and agrees to devote sufficient time and resources to the performance of its duties hereunder. Distributor shall promptly notify OVERFINCH of all inquiries related to Products from persons or entities located outside the Territory. Distributor shall notify OVERFINCH of all changes in personnel assigned to its account.

OVERFINCH reserves the right to transact any business to retail Customers within the Territory that are as a result of online sales made via its website or other online platform and / or sales resulting from any local or national brand advertising events that it has organized and participated in.

OVERFINCH may terminate the exclusivity under this Agreement upon thirty (30) days notice at any time that the Distributor has placed no orders with OVERFINCH for any rolling two-month period, providing that the Distributor has not already ordered, prior to the commencement of that two-month

JB AS.

period. Products that would exceed the minimum amount required by the end of that two-month period.

2.2 **Independent Contractor.** Distributor Is an independent contractor. Distributor is not an employee, representative, or agent of OVERFINCH. Distributor is not authorized to make any agreement, warranty or representation on behalf of OVERFINCH, or to create any liability or obligation, express or implied, on behalf of OVERFINCH. Distributor shall not appoint any third party to promote or sell Products or otherwise perform any of Distributor's obligations hereunder. Distributor shall conduct its business in its own name, maintain its own office and be responsible for its expenses, personnel and operations.

2.3 **Direct Sales.** OVERFINCH reserves the right to honor online store orders from Customers that are based within the Territory, with no compensation to the Distributor.

During the Initial Term and any renewal Term, in the event that the Distributor can demonstrate via an information registration service acceptable to OVERFINCH that is has recorded a Customer's details at an event it attended and / or hosted, whereby it introduced that Customer to the Overfinch brand and that Customer is within the Territory and would like to place an order to purchase Products from OVERFINCH directly within a six month period from that introduction, OVERFINCH shall refer that Customer to the Distributor. In the event such Customer is located outside of the Territory OVERFINCH shall pay the Distributor an Introducers Fee.

The Distributor is required to submit the information registration record to OVERFINCH on a monthly basis and within 5 working days following an event that the Distributor has hosted.

OVERFINCH shall maintain an information registration service whereby it records Customer's details at any brand advertising event that it attends and / or hosts.

2.4 **Sales Terms.** OVERFINCH may decline to quote any potential sale and may accept or reject any order, providing that such declination or rejection is based upon a reasonable commercial decision.

All sales of Products by OVERFINCH shall be subject to the OVERFINCH Sales Terms in effect at time of sale, as reflected on the OVERFINCH sales order acknowledgment, to the extent that they do not conflict with the provisions of this Agreement. By placing each order hereunder, Distributor confirms

JB AS.

its agreement with and acceptance of the OVERFINCH Sales Terms. Distributor must extend, honor and perform the warranty services as set forth in the OVERFINCH Sales Terms to Customers. OVERFINCH shall be bound only by the warranty applicable to parts as set forth in the applicable OVERFINCH Sales Terms, and Distributor shall indemnify OVERFINCH against any additional warranty terms. Any warranty or other sales terms required by law in the Territory must be provided by Distributor, and Distributor shall indemnify OVERFINCH for any failure to comply with any such requirements. Distributor must also notify OVERFINCH if any of its standard warranty or other sales terms conflict with any law in the Territory.

During the Initial Term and any subsequent renewal Term thereafter the Distributor shall notify OVERFINCH promptly of any potential warranty claim relating to its Products. Any warranty claims are at the sole decision of OVERFINCH and any costs or expenses incurred by the Distributor shall only be reimbursed providing these have been pre-authorized in writing by OVERFINCH.

OVERFINCH Conversions/Products shall be ordered on a monthly basis. There is no guarantee in respect of the delivery date of any Vehicles. OVERFINCH has no control over the lead time of the Vehicle from the manufacturer. It is not guaranteed, and it is dependent upon the model year of the Vehicle being ordered, but it is envisaged that a Vehicle will be delivered with the Conversion within 16 weeks from OVERFINCH'S acceptance of a Vehicle order. OVERFINCH shall update the Distributor on lead times of Vehicles as and when it receives updates from the supplying automotive dealer.

Upon OVERFINCH's acceptance of an order submitted by the Distributor for a Vehicle and Conversion, the Distributor is required to comply with the following payment terms:

1.) 10% non-refundable deposit of the total Order Value upon OVERFINCH'S acceptance of the order;
2.) Remaining balance of the Vehicle Value to be paid on or before collection of the Vehicle by OVERFINCH from the Land Rover dealer;
3.) Remaining balance of the Conversion Value to be paid upon completion of the conversion by OVERFINCH and before delivery of it to the Distributor.

Upon OVERFINCH's acceptance of an order submitted by the Distributor for a Conversion, the Distributor is required to comply with the following payment terms:

1.) 10% non-refundable deposit of the total Order Value upon OVERFINCH'S acceptance of the order;

JB

2.) Remaining balance of the Conversion Value to be paid upon completion of the conversion by OVERFINCH and before delivery of it to the Distributor.

Payment must be made in cleared funds via wire transfer or cheque only.

All orders are exclusive of state and local taxes, freight and transportation charges and similar costs, all of which should be paid by the Distributor.

Prices for Products shall be those provided in writing by OVERFINCH to Distributor and may be modified by OVERFINCH from time to time. Distributor shall pay all amounts in U.S. Dollars.

Distributor shall provide OVERFINCH with its standard end-user price list upon request.

Distributor acknowledges that OVERFINCH pricing fully compensates Distributor on an ongoing basis for customer and market development, for providing product support and services in the Territory.

Delivery of the Products shall take place at OVERFINCH'S place of business. Acceptance of any change to the delivery point requested by the Distributor shall be at OVERFINCH'S sole discretion and at the Distributors risk and expense.

**2.5 Minimum Annual Order Quantity**

The Distributor is required to place orders for a minimum of 36 OVERFINCH Conversions or Overfinch Products to the value of $1,500,000.00 during the Initial Term. One Conversion/Product order shall be placed upon the Effective Date of this agreement. Thereafter the remaining minimum order quantity shall be spread in equal instalments across each month of the Initial Term, with the Distributor ordering a minimum of 3 Conversions or the equivalent value in Products each month.

Unless notified by OVERFINCH in writing 30 days prior to the expiry of the Initial Term, the contract shall automatically renew for a further Term. The minimum annual order requirement for any such renewal Term shall be an increase of 10% of the minimum annual order value required in the previous Term.

The initial minimum annual order shall commence on the above Effective Date, with each subsequent minimum annual order commencing upon each renewal Term.

JB AS.

The Distributor has the intention to open an Overfinch showroom within the Territory within 8 to 12 months from the Effective Date of this agreement. Upon the Distributor confirming it has finalized its plans in respect of that showroom, both parties shall enter into further discussions regarding the terms of this agreement in view of the investment proposed by the Distributor and document any such variation to the terms hereof that are agreeable between both parties at that time. Further, subject to the Distributor's performance throughout the Initial Term, the parties may enter into discussions regarding distributorships in other potential territories in the United States of America.

**2.6 Initial Order**

Upon execution of this Agreement, the Distributor shall submit an initial order for an OVERFINCH Conversion.

## III. RESPONSIBILITIES

3.1 **Promotion.** Distributor shall devote sufficient time and resources to successfully promote and sell Products to Customers. Distributor shall ensure that all sales personnel are properly trained and possess the appropriate technical competency to promote Products effectively. Distributor shall respond in a timely and professional manner to all inquiries from and referrals to Customers. Distributor shall furnish any market information requested by OVERFINCH, including without limitation annual sales plans, monthly sales reports, monthly forecasting reports, sales forecast updates and explanations of any discrepancies between forecasted and actual sales. Distributor shall attend any required OVERFINCH sales training.

3.2 **Marketing.** The Distributor is required to advertise and promote the Products on a regular basis on an appropriate marketing platform akin to the prestige of the brand. The Distributor should submit a proposed marketing plan to OVERFINCH for its review and written consent.

OVERFINCH may from time to time carry out local and / or national brand advertising and marketing activities, within or outside of the Territory and request the Distributor to make a reasonable contribution to such costs and expenses associated and incurred in respect of that brand advertising. OVERFINCH shall provide reasonable notice of anticipated costs and expenditure for such brand advertising.

JB AS.

3.3 **Events.** The Distributor shall host 10 exclusive events during the course of the initial term in order to promote the OVERFINCH brand and Vehicles. OVERFINCH will provide marketing material and product support for use at such events, upon reasonable notice and as required. The Distributor shall cover the reasonable costs and expenses incurred by OVERFINCH in this regard.

3.4 **Customer and Product Support.** Distributor shall follow up and maintain contact with Customers to ensure customer satisfaction. Distributor shall ensure that Customers receive information about any recalls on Products provided to Distributor. Distributor shall employ personnel who are educated in the field and sufficiently knowledgeable of Products to perform the technical support and services required hereunder.

3.5 **Technical and Marketing Materials.** Distributor shall maintain an adequate inventory of current OVERFINCH technical and marketing materials to promote Products. Distributor may not use any technical or marketing materials not provided by OVERFINCH. Prior written approval for the use of any marketing material should be obtained from OVERFINCH. Distributor shall provide any translations of OVERFINCH technical and marketing materials to OVERFINCH.

3.6 **Compliance.** Distributor shall comply with all governmental laws, regulations and orders of all relevant jurisdictions that may be applicable to Distributor under this Agreement, including without limitation the U.S. Export Administration Act, the U.S. Foreign Corrupt Practices Act and all licensing and registration requirements in the Territory. Distributor shall advise OVERFINCH with respect to any warranty requirements, noise ordinances, safety standards, specifications and other requirements applicable to Products imposed by law, regulation or order in the Territory. Distributor shall notify OVERFINCH of the existence and content of any provision of law in the Territory or any other applicable law that conflicts with any provision of this Agreement or any other document, such as warranty or sales terms, at the time of execution or at any time thereafter.

3.7 **Training.** OVERFINCH shall provide sales and technical training and support as appropriate. The Distributor shall cover the reasonable costs and expenses incurred by OVERFINCH in providing this.

JB AS.

## IV INTELLECTUAL PROPERTY AND CONFIDENTIALITY

4.1. **Intellectual Property.** Distributor acknowledges that trademarks, service marks, trade dress, patents, copyrights, trade secrets, licenses and any other intellectual property used by OVERFINCH are the sole property of OVERFINCH. Distributor shall not use such OVERFINCH property except in the normal course of promoting Products, or promoting OVERFINCH in general, under the terms of this Agreement. Distributor shall not remove or alter any trademarks, service marks or trade dress that identify OVERFINCH, nor use any trademarks, service marks, trade dress or any other intellectual property that, in the sole discretion of OVERFINCH, are confusingly similar to those of OVERFINCH. Distributor shall make every effort to safeguard the intellectual property of OVERFINCH, and shall immediately notify OVERFINCH in writing of any infringement or suspected infringement and cooperate with OVERFINCH, as OVERFINCH deems necessary, to protect such property against infringement (such cooperation to be at OVERFINCH expense unless the infringement arose from Distributor acts or omissions). Distributor shall comply with the OVERFINCH INTELLECTUAL PROPERTY POLICY, as provided by OVERFINCH. OVERFINCH my immediately terminate this Agreement for any violations of these intellectual property requirements. Upon termination of this agreement the Distributor shall not use the intellectual property.

4.2 **Confidentiality.** All confidential information provided, from time to time, by OVERFINCH to Distributor has been or is provided in strict confidentiality, and can neither be disclosed by Distributor to third parties during the term of this Agreement or after termination or expiration, nor used by Distributor for purposes other than those set forth in this Agreement. Distributor shall maintain such information in strict confidence during the term of this Agreement and for five (5) years after termination or expiration, except when disclosure of such information is required by law. Within thirty (30) days of any request by OVERFINCH or termination or expiration of this Agreement, Distributor shall return or destroy, according to OVERFINCH's instruction at such time, all confidential information and any demonstration products provided by OVERFINCH. Distributor shall ensure compliance with these confidentiality obligations by its employees, representatives and agents, including without limitation by obtaining appropriate confidentiality agreements from such persons.

4.3 **Other brands.** The Distributor shall not fit any other after-market tuning brands parts and / or accessories branded or unbranded to any Vehicle's supplied by OVERFINCH, so as to cause confusion in the market place that any other brands products are that of OVERFINCH or vice versa.

JB AS.

## V. TERM AND TERMINATION

5.1 **Term.** Subject to termination, this Agreement shall have an initial term of one (1) year, commencing on the Effective Date, and shall renew automatically for additional one (1) year periods, subject to the below.

5.2 **Termination.** Either party may terminate this Agreement without cause upon thirty (30) days written notice to the other party to expire upon the end of the Initial Term or following that the anniversary of any renewal Term thereafter. Either party may also choose to render the agreement non-exclusive upon thirty (30) days written notice to expire upon the end of the Initial Term or following that the anniversary of any renewal Term thereafter (in addition to the right of OVERFINCH elsewhere in this Agreement to render the Agreement non-exclusive for failure by Distributor to meet its minimum orders).

Either party may terminate this Agreement immediately upon the other party's insolvency, bankruptcy, suspension of business, assignment of assets for the benefit of creditors, voluntary or involuntary dissolution, appointment of a trustee for all or a substantial portion of the party's assets, or breach of this Agreement. OVERFINCH reserves the right to immediately terminate this Agreement on written notice to Distributor if, in the sole discretion of OVERFINCH, the laws or economic circumstances in the Territory have changed in a material way so as to adversely impact OVERFINCH's relationship with Distributor or OVERFINCH's ability to conduct business in the Territory. Upon termination or expiration of this Agreement, OVERFINCH has the right of first refusal in respect of any Products and / or Vehicles and may, at its sole discretion, repurchase from Distributor, at the lesser of either the net prices paid by Distributor or the open market value, any of the Vehicles purchased and remaining unsold by Distributor. OVERFINCH's repurchase of Distributor's Vehicle inventory pursuant to the termination provisions hereof (or Distributor's right to sell such inventory if not so repurchased by OVERFINCH) shall constitute Distributor's sole remedy for termination or expiration of this Agreement. All intellectual property, confidentiality, non-compete and non-hire rights and obligations set forth in this Agreement shall survive termination or expiration.

5.3 **Transition.** During any notice period and after termination or expiration of this Agreement, Distributor shall cooperate with OVERFINCH to assure a smooth transition for Customers and OVERFINCH. Distributor shall introduce OVERFINCH personnel (and the personnel of any distributor or sales representative specified by OVERFINCH) to Customers who have ordered or expressed

JB AS.

interest in Products and invite OVERFINCH (and any distributor or sales representative specified by OVERFINCH) to accompany Distributor's personnel on sales calls related to Products. Distributor shall take all necessary action to terminate any registration as an OVERFINCH distributor with any governmental authority. All indebtedness of Distributor to OVERFINCH shall become immediately due and payable without further notice or demand, which is hereby waived. Distributor shall also cooperate with OVERFINCH in identifying and producing copies of correspondence and business records related to all past, present and pending business activities conducted on behalf of Customers.

5.4 **Warranty.** Distributor shall honor all warranties existing upon expiration or termination of this Agreement until any such warranties expire.

## VI. GENERAL PROVISIONS

6.1 **Indemnification and Limitation of Liability.** The Distributor shall fully indemnify, defend and hold harmless OVERFINCH and all related parties, to the extent that it is not as a direct result of a defective Product supplied by OVERFINCH, from and against any claims or losses arising directly or indirectly from, as a result of or in connection with its performance or breach under this Agreement (including without limitation the above obligation to inform OVERFINCH of any compliance or other relevant legal issues in the Territory), or any other act or omission of Distributor. In no event, whether as a result of breach of contract, indemnity, warranty, tort (including negligence), strict liability or otherwise, shall OVERFINCH liability for any loss or damage exceed the price of the specific Product that gave rise to the claim, nor include any special, consequential, incidental or punitive damages.

6.2 **Insurance.** Distributor agrees to obtain and maintain commercially reasonable insurance, including without limitation comprehensive general liability coverage with combined policy limits of at least $1,000,000 per occurrence and covering bodily injury, personal injury, and property damage, including blanket contractual liability and naming OVERFINCH and its directors, officers, employees, and authorized representatives as additional insureds with respect to operations under this Agreement. Distributor agrees to furnish OVERFINCH with certificates showing the amount and existence of the required coverages and specifying that the policies shall not be canceled or materially changed except after (30) thirty days written notice to OVERFINCH. Distributor acknowledges that compliance with the specific insurance requirement above does not relieve Distributor of its obligation to maintain commercially reasonable insurance (either in regard to higher comprehensive general liability coverage limits or other

JB AS

types of coverage, including without limitation employer liability, automobile liability and worker compensation coverage.).

6.3 **Governing Law and Dispute Resolution.** The laws of the Commonwealth of Virginia excluding conflict of laws principles, shall govern this Agreement. The parties reject any applicability of the United Nations Convention on Contracts for the International Sale of Goods. Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by binding arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, and judgment on the arbitration award may be entered in any court of competent jurisdiction. Arbitration shall be held at a mutually acceptable location in Virginia, or another location agreed upon by the parties, and shall be conducted in English. Either party may seek injunctive relief in a court of competent jurisdiction or other interim measures in the event of breach or threatened breach of this Agreement. The prevailing party to any dispute shall be entitled to recover legal fees and other costs (including without limitation arbitration fees, disbursements, collection costs and the allocated cost of in-house counsel).

6.4 **Miscellaneous.** Any notice pursuant to this Agreement shall be deemed given when sent by registered or certified mail (return receipt requested) or overnight delivery to an authorized officer at the headquarters of the other party at the address set forth in this Agreement. Distributor may not assign or otherwise transfer this Agreement or any rights or obligations hereunder without the prior written consent of OVERFINCH. The sale of the majority of Distributor's stock shall constitute an assignment for the purposes of this Agreement. No failure or delay by either party in exercising any right or remedy, or insisting upon strict compliance by the other party with any obligation in this Agreement, shall constitute a waiver of any right thereafter to demand exact compliance with the terms of this Agreement. The invalidity, in whole or part, of any provision in this Agreement shall not affect the remainder of such provision or any other provision and, where possible, shall be replaced by a valid provision that effects as close as possible the intent of the invalid provision. Neither party shall be liable for failure to perform or delay in performance of any obligation under this Agreement (except payment of amounts already due and owing) where such failure or delay results from any event beyond its reasonable control. The English language version of this Agreement shall govern and control any translations of the Agreement into any other language. This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof, and any modification hereof must be in a writing signed by both parties.

JB AS.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed and each of the undersigned represents and warrants that he or she is duly authorized to execute this Agreement.

| PREMIER GROUP AUTOS LLC | OVERFINCH NORTH AMERICA INC. |
|---|---|
| 1500 Cordova Road, 206 Fort Lauderdale, Florida, 33316 | 500 Stinson Drive<br>Danville VA 24540 |
| By: [signature] | By: [signature] |
| Name: James Blackburn | Name: Alexander Sloane. |
| Title: Owner | Title: Vice President. |

Agreement between
Edward Anthony Kessler
&
Premier Group Autos LLC

12.03.2018

This agreement made today between the above parties is subject to the following terms:

1. Edward Kessler will provide a loan to Premier Group Autos LLC for the purchase of the first vehicle.
2. The loan amount will be $160,000 USD
3. The loan will bear interest at 5% per annum
4. The initial term of the loan will be 12 months
5. Upon sale of the vehicle the lessor has the ability to re – loan at his discretion.

Signed

Edward Kessler

James Blackburn

EXHIBIT
3

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

## NextGear Capital Contract Cover Sheet

Exact Legal Name: Premier Group Autos LLC

DBA Name: Overfinch Miami

Requested Floorplan Amount: $1,000,000.00

Federal Tax ID: 83-2535106 | Dealer License #: VVI127700/1 | Business Type: Limited Liability Corporation

State of Incorporation of Residence: FL

Business Email: sales@overfinchmiami.com | State Organization ID:

### Address Information

Address: 11 SW 12th Ave Ste 103 Bldg 59

City: Dania Beach | State: FL | ZIP:33004 | County: Broward

Phone Number: 954-440-0717 | Fax Number:

Is Main Lot: Yes | Is Mailing Address: Yes | Has Physical Inventory: Yes

### Stakeholder/Guarantor Information

Stakeholder/Guarantor Name: James Michael C Blackburn | Title: Manager | % of Ownership: 50%

Home Address: 4875 NE 4th Ave

City: Ft Lauderdale | State:FL | ZIP: 33334 | Own or Rent: Own

Home Phone: 754-200-8823 | Cell Phone: 954-232-7661 | SS#: xxx-xx-5859 | DOB: 5/22/1900

Drivers License #: B421-453-90-182-0

Stakeholder/Guarantor Name: Edward Anthony Kessler | Title: Manager | % of Ownership: 50%

Home Address: 5909 Murray Ave

City: Bethel Park | State: PA | ZIP: 15101 | Own or Rent: Own

Home Phone:954-870-7174 | Cell Phone: 412-527-8695 | SS#: xxx-xx-2703 | DOB: 9/30/1988

Drivers License #: 28 368 574

INTERNAL USE ONLY:

Home Market: Ft. Lauderdale North

Credit Limit Type: Retail | Credit Limit Amount: $150,000.00

Terms: D60/30/30 -- F80/45/45 -- R3.0 -- C%10/5

Account #125308



EXHIBIT
4

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

# DEMAND PROMISSORY NOTE
# AND LOAN AND SECURITY AGREEMENT

FOR VALUE RECEIVED, the undersigned borrower ("Borrower") promises to pay to the order of NextGear Capital, Inc. ("Lender"), with its principal office at 11799 North College Avenue, Carmel, Indiana 46032, or such other place as Lender may designate in writing or on the Discover Portal from time to time, in lawful money of the United States of America, the principal sum of One Hundred Fifty Thousand Dollars and Zero Cents ($150,000.00), or such greater or lesser sum which may be advanced to or on behalf of Borrower from time to time, together with all costs, interest, fees, and expenses as provided for under this Note and the other Loan Documents. Unless otherwise stated in an addendum to this Note, this Note shall become effective on the date of Borrower's execution hereof as set forth below Borrower's signature (such date, or the effective date otherwise stated in the applicable addendum, the "Effective Date").

NOW, THEREFORE, in consideration of the mutual covenants, agreements and conditions contained herein, Borrower and Lender (each, a "Party" and collectively, the "Parties") agree as follows:

1. DEFINITIONS. Capitalized terms used in this Note or in the other Loan Documents without definition shall have the respective meanings as set forth in Appendix A attached hereto and incorporated herein by reference (such meanings to be equally applicable to both the singular and plural forms of the terms defined). Any capitalized terms used herein or in another Loan Document, but not otherwise defined herein or in such other Loan Document, as the case may be, shall have the meanings ascribed to them in the UCC.

2. GRANT OF SECURITY INTEREST. In order to secure full and prompt payment of all Liabilities and performance of all obligations of Borrower to Lender, its Affiliates, and/or their respective successors or assigns:

(a) Borrower grants to Lender a continuing security interest in all of Borrower's assets and properties, wherever located, including, without limitation, all equipment of any kind or nature; all vehicles and vehicle parts; all Inventory now owned or hereafter acquired, including, without limitation, all Lender Financed Inventory now owned or hereafter acquired; all amounts in Borrower's Reserve held by or on behalf of Lender, if any; all documents, documents of title, deposit accounts, accounts receivable, manufacturer rebates and incentive payments, chattel paper, including, without limitation, all Receivables and general intangibles now owned or hereafter acquired by Borrower; all cash reserves; all of Borrower's books and records (including any books and records contained on computer hardware or software or otherwise stored by or on behalf of Borrower in electronic or digital form); and all additions, accessions, accessories, replacements, substitutions, and proceeds of any of the foregoing (collectively, the "Collateral").

(b) The security interest given to Lender in Section 2(a) is given to Lender to secure payment of all Liabilities and the performance of all obligations of Borrower to Lender, and its Affiliates, including all obligations of Borrower under this Note, under any other Loan Document, or otherwise, all without relief from valuation or appraisement Laws. Upon the request of Lender, Borrower shall promptly execute and deliver to Lender or its designee such further documents and instruments, and shall take such further actions, in each case as Lender may deem necessary or desirable to protect Lender's interest in the Collateral or otherwise effectuate the provisions of this Note and the other Loan Documents. Without limiting the generality of the foregoing, Borrower shall, upon the request of Lender, (i) use its best efforts to secure all consents and approvals that may be necessary or appropriate for the assignment to Lender of any Collateral (including any contract of Borrower that constitutes any portion of the Collateral), or that may be necessary in order for Lender to receive the full benefit of all Collateral and to enforce its security interest in the Collateral; (ii) provide Lender and its Representatives with full access to all Collateral, including any and all books and records relating thereto; and (iii) deliver to Lender all Collateral consisting of negotiable documents, chattel paper, and instruments not deposited for collection in the aggregate (in each case, accompanied by any related bills of sale or any other instruments of transfer executed for Borrower), in each case promptly after Borrower receives the same.

(c) Borrower authorizes Lender to file any UCC financing statements and any amendments thereto and any continuation statements under the UCC, in each case to the extent necessary or desirable in Lender's sole discretion to effect or preserve the security interest granted by Borrower hereunder or under any other Loan Document. Further, Borrower hereby acknowledges, ratifies and approves any UCC financing statements or other filings under the UCC that may have been made by or on behalf of Lender and its Affiliates prior to the Effective Date. The security interest granted by Borrower in Section 2(a) shall be in addition to, and not a substitution for, any right of offset, netting, or reclamation that Lender or any of its Affiliates may have against Borrower, whether pursuant to this Note, any other Loan Document, any Law or otherwise.

3. INTEREST RATE. Interest shall accrue on Borrower's Liabilities to Lender in accordance with the following schedule:

(a) All outstanding Liabilities relating to a Floorplan Advance or a Receivable Advance shall accrue Interest on a per annum basis from the Floorplan Date or the Receivable Origination Date, as the case may be, based upon a 360-day year, and such Interest shall be compounded daily at the Base Rate, plus the Contract Rate, until such outstanding Liabilities are paid in full.

(b) The Base Rate may be amended or modified by Lender from time to time in Lender's sole discretion by posting such amendment or modification on the Finance Program Rate, Fee and Term Schedule. However, Lender may increase the Base Rate by no more than fifty (50) basis points (i.e. one-half of one percent) in any thirty (30) day period.

4. BORROWER'S REPRESENTATIONS, WARRANTIES, AND COVENANTS. At the time of Borrower's execution of this Note and continuing at all times thereafter until all Liabilities have been indefeasibly paid and satisfied in full and this Note and all other Loan Documents terminated in accordance with their respective terms, Borrower hereby represents, warrants, covenants, and agrees:

COPY VIEW

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy by the designated custodian

(a) To sell, lease, or rent Lender Financed Inventory only in the Ordinary Course of Business and in accordance with Law, and not to sell or otherwise dispose of any Lender Financed Inventory except as herein provided.

(b) To keep Lender Financed Inventory only at Borrower's Place of Business and not to remove any Lender Financed Inventory from such place for a period exceeding twenty-four (24) hours, unless such item of Lender Financed Inventory is the subject of an active daily rental agreement (and floorplanned pursuant to a rental Advance Schedule executed by Borrower and Lender), or such removal has been previously authorized in writing by Lender. Notwithstanding the foregoing, Borrower may request Lender to authorize Borrower to consign certain Lender Financed Inventory to another licensed dealer at such consignee dealer's place of business. Borrower's request to consign Lender Financed Inventory as referenced above is subject to Borrower and the consignee dealer executing and delivering to Lender any documentation that Lender may require, including a UCC financing statement or other similar filing on consignee dealer, or an authorization for Lender to make any such filing. Lender may deny Borrower's request to consign Lender Financed Inventory in Lender's sole and absolute discretion.

(c) To keep Inventory in good repair and insured against all physical risks in such amounts and under such policies issued by such insurance companies as are deemed necessary and satisfactory by Lender; provided, however, that any insurance company issuing required coverage to Borrower pursuant to the requirements of this Section 4(c) shall have been assigned to an A.M. Best Financial Size Category (FSC) of "X" or higher, and shall have a minimum A.M. Best Financial Strength (FSR) rating of "A-". Lender shall be named "loss payee" on such insurance policies. Borrower shall provide Lender with a certificate or certificates of insurance evidencing that the above-mandated insurance requirements have been satisfied and specifying that the applicable insurance carriers will mail direct written notice to Lender at least thirty (30) days prior to any cancellation or non-renewal of any of the above-mandated policies. Alternatively, and unless the Unit of Lender Financed Inventory has been branded as "salvage" or is otherwise ineligible for the Collateral Protection Program, Borrower may satisfy the insurance coverages required under this Section 4(c) by voluntarily enrolling in Lender's Collateral Protection Program and satisfying and adhering to all conditions and other terms thereof at all times during Borrower's enrollment in the Collateral Protection Program. In the event Borrower fails to procure, maintain or provide proof of the insurance coverages required under this Section 4(c), Lender may enroll Borrower in Lender's Collateral Protection Program, or, alternatively, Lender may secure on Borrower's behalf such policies of insurance as Lender, in its sole discretion, deems necessary, in each case from such insurers, in such amounts and with such coverages and deductibles as Lender, in its sole discretion, deems necessary. Charges incurred under the Collateral Protection Program are calculated as of the Floorplan Date from the amount of each original Floorplan Advance related to a Unit of Lender Financed Inventory, through the life of the Floorplan Advance. Upon Borrower's enrollment in the Collateral Protection Program (whether voluntary or otherwise), Borrower shall be subject to, and at all times comply with and adhere to, the terms and conditions applicable to the Collateral Protection Program and Borrower's enrollment and participation therein. Borrower understands and agrees that Lender has an insurable interest in the Collateral, including all Lender Financed Inventory, by virtue of Borrower's pledge of the Collateral as security to Lender for the repayment of all Liabilities by Borrower to Lender. Fees, charges and other terms and conditions for the Collateral Protection Program are published in the Finance Program Rate, Fee and Term Schedule or on the documents referenced therein.

(d) To keep at all times complete and accurate records of Borrower's Business and provide to Lender promptly (but in any event within two (2) Business Days) copies of such records and any financial information regarding Borrower's Business or Borrower's financial condition generally, in each case as Lender may request. Borrower authorizes Lender to share such information and any and all other information that Lender may possess regarding Borrower's Credit Line or Borrower's relationship with Lender, including information regarding this Note and the other Loan Documents; Borrower's loan history; account history; payment history; audit history; account balance; loan application; credit worthiness; credit availability; and such other general business information regarding Borrower's Credit Line and Borrower's relationship with Lender, to any and all Persons that Lender, in its sole discretion, deems reasonable, including auctions. Without limiting the generality of the foregoing, Borrower shall maintain complete and accurate records and financial statements for all Advances requested or made hereunder, and all other transactions hereunder, including bank statements, cancelled checks, sales invoices, proofs of payment, and other sales files, in each case for at least a period of five (5) years after the date on which such Advance was made or such transaction occurred, as the case may be.

(e) To allow Lender and its Representatives to inspect Lender Financed Inventory during normal business hours and at other reasonable times at Borrower's Place of Business and such other places as any Lender Financed Inventory may be located and to inspect and make copies of Borrower's books and records. Borrower shall pay Lender for the costs and expenses incurred by Lender or its Representatives to undertake such audits of any Lender Financed Inventory and such inspections and copying of Borrower's books and records, in each case on the applicable Maturity Date.

(f) To hold all amounts received from the sale of any Unit of Lender Financed Inventory in the form as received in trust for the sole benefit of and for Lender, and to remit such funds satisfying all amounts due Lender and owing by Borrower for such Unit of Lender Financed Inventory, in each case within twenty-four (24) hours of Borrower's receipt of such funds (or receipt of such funds by any Affiliate of Borrower).

(g) To hold all amounts received that relate to any Receivable that is subject to a Receivable Advance in the form as received in trust for the sole benefit of and for Lender, and to remit such funds satisfying all amounts due Lender and owing by Borrower for and in connection with such Receivable, in each case within twenty-four (24) hours of Borrower's receipt of such funds (or receipt of such funds by any Affiliate of Borrower).

(h) That, for each Receivable which is the subject of a Receivable Advance, (i) Borrower is the sole and unconditional owner of such Receivable; (ii) such Receivable is not already encumbered by any voluntary or involuntary Liens which are senior to Lender's security interest in such Receivable; (iii) Borrower has a legal right to pledge such Receivable to Lender as security for all Liabilities of Borrower; (iv) such Receivable represents an original bona fide sale to the buyer(s) named therein; (v) such Receivable is now and will remain free from any claim, defense, setoff, or counterclaim of any nature and is enforceable against the buyer(s) named therein and third parties according to its terms; (vi) all statements, facts, numbers, and other information in such Receivable and all related documents are true and accurate to the best of Borrower's knowledge, are free from fraud, and have not been altered or modified subsequent to their execution, except for such alterations or

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy by the designated custodian

(r) That Borrower and all Guarantors are legally competent and have all necessary power and authority to enter into and perform their respective obligations under this Note and the other Loan Documents.

(s) That Borrower shall not disclose to any third party, without the written consent of Lender, any terms and conditions applicable to Borrower's Credit Line, whether such terms and conditions are set forth on the applicable Advance Schedule, this Note or any other Loan Document.

(t) That Borrower may have an account with Lender where information can be accessed and transmissions can be sent through the Discover Portal or by other electronic means, and Borrower shall have the means and the affirmative obligation to control access to the account information of Borrower by passwords and a Borrower account number. Borrower shall be solely responsible for any unauthorized access to Borrower's account. Access to Borrower's account may be revoked or otherwise restricted by Lender at any time, in Lender's sole discretion, without prior notice to Borrower.

(u) That Borrower shall use Advances solely for Business purposes and not for personal, family, or household purposes. This means, among other things, that Borrower may not use Advances to purchase a vehicle for Borrower's personal, family, or household use, and no Lender Financed Inventory may be used for Borrower's personal, family, or household use. This Note and all Advances requested or made hereunder shall be requested and made only for commercial purposes and Borrower hereby expressly and unconditionally waives, to the fullest extent permitted by Law, the protections of any Law intended to protect consumers or regulate consumer loans.

(v) That Borrower will provide Lender the name of each individual authorized to buy Inventory and make Advance requests hereunder on Borrower's behalf. Notwithstanding the foregoing or anything to the contrary in any Loan Document, Borrower shall be responsible and liable for all Advance requests and other Liabilities incurred by any such appointed individual or any other actual or apparent representative or agent of Borrower (regardless of whether such Person is specifically appointed by Borrower as contemplated above).

5. CREDIT TERMS AND CONDITIONS. Borrower understands and agrees to the following terms, conditions, covenants, and other agreements relating to its Credit Line and any Advances made under this Note and the other Loan Documents, and acknowledges that any failure by Borrower to adhere to any such terms, conditions, covenants, or other agreements shall result in Lender having the right (in addition to any other right that Lender may have), in its sole discretion and without notice to Borrower, to declare a Maturity Event with respect to all Advances:

(a) The decision to make an Advance to or on behalf of Borrower is the exclusive right of Lender, whether or not an Event of Default has occurred, and Borrower understands that Lender may refuse to make an Advance at any time, with or without cause and without prior notice to Borrower or any Guarantors of such decision. Borrower is not obligated to finance any Inventory or Receivable through Lender.

(b) Borrower's Credit Line may require a Reserve as a credit underwriting condition to the grant of credit and as additional security for the repayment of Liabilities by Borrower. In the event a Reserve is either requested by Borrower or required by Lender, Borrower will be required to execute a reserve agreement, and the applicable Required Reserve Amount and Reserve Charge will be indicated on the applicable Advance Schedule.

(c) Borrower must deliver or cause to be delivered to Lender the Title or MSO for any Unit of Inventory at the time of any related Floorplan Advance request, or, in the event of a Universal Source Purchase, within seven (7) days after Lender funds the related Floorplan Advance.

(d) Borrower must deliver or cause to be delivered to Lender the original Receivable which is the subject of a Receivable Advance request within seven (7) days after Lender funds such Receivable Advance. In the event that a Receivable Advance is made by Lender with respect to a Unit for which there is an unpaid Floorplan Advance, then any such Receivable Advance made to Borrower shall be net of such unpaid Floorplan Advance and all other unpaid Liabilities of Borrower with respect to such Unit.

(e) Borrower must be in complete compliance with this Note and the other Loan Documents before an Advance request may be approved by Lender. Additionally, Lender may require certain other information from Borrower to be submitted before Lender will consider an Advance request.

(f) Borrower shall pay all Liabilities, without notice, that concern or relate to a Floorplan Advance for any Unit of Lender Financed Inventory on or before the Maturity Date. Lender shall apply such payments to any and all Liabilities relating to such Floorplan Advance. Notwithstanding anything herein to the contrary, if a shortage exists between the payments received by Lender with respect to a Floorplan Advance, and the Liabilities relating to such Floorplan Advance, then such shortage shall be immediately due and payable and shall continue to be considered a Liability owed by Borrower to Lender, secured by the Collateral.

(g) Borrower shall pay all Liabilities, without notice, that concern or relate to a Receivable Advance for a subject Receivable on or before the Maturity Date. Lender shall apply such payments to any and all Liabilities relating to such Receivable Advance. Notwithstanding anything herein to the contrary, if a shortage exists between the payments received by Lender with respect to a Receivable Advance, and the Liabilities relating to such Receivable Advance, then such shortage shall be immediately due and payable and shall continue to be considered a Liability owed by Borrower to Lender, secured by the Collateral.

(h) Borrower shall pay all Liabilities, without notice, which do not concern or relate to a Floorplan Advance or a Receivable Advance, including Administrative Charges and other account level charges, in each case on their respective Maturity Dates.

(i) With respect to payments that relate to a Floorplan Advance or a Receivable Advance which exceed the outstanding Liabilities owed by Borrower in connection with such Floorplan Advance or Receivable Advance, as the case may be, and with respect to payments for all other Liabilities, the order and method of application of such payments shall be at the sole discretion of Lender. Notwithstanding anything herein

THIS IS A COPY
This is a copy view of the Authoritative Copy by the designated custodian

to the contrary, in the event Lender declares an Event of Default, Lender may apply all subsequent payments, including payments directly related to a Floorplan Advance or a Receivable Advance, in any manner or order. Payments initiated or received by Lender after 5:00PM EST may be applied the next Business Day.

(j) Unless either (i) the Maturity Date for a Floorplan Advance has been accelerated as the result of a Maturity Event or a declaration of an Event of Default; or (ii) such Floorplan Advance is in the final Period pursuant to the applicable Advance Schedule, a Curtailment of such Floorplan Advance will automatically be processed at the end of the current Period. Upon the processing of the Curtailment for a Floorplan Advance, Borrower shall pay the accrued Interest, accrued Floorplan Fee, any other accrued Floorplan Advance related fees, and a principal reduction of such Floorplan Advance, in each case pursuant to this Note, the applicable Advance Schedule, and any applicable event sale or promotional terms in effect for such Floorplan Advance. Additionally, unless (a) the Maturity Date for a Floorplan Advance has been accelerated as the result of a Maturity Event or a declaration of an Event of Default; or (b) Borrower has notified Lender that Borrower has disposed of the subject Unit of Lender Financed Inventory by sale or otherwise, Borrower shall be deemed to have requested, and Lender may, in its sole discretion, automatically approve and process, an Extension with respect to such Floorplan Advance. With respect to any Extension, the Period, rate of Interest, Floorplan Fee, any other fees, including Floorplan Advance related fees, and the principal reduction required to be paid by Borrower for such Extension shall, in each case, be equal in all respects to those of the last Period, and, upon the processing of such Extension, Borrower shall pay such accrued Interest, accrued Floorplan Fee, any other fees, including accrued Floorplan Advance related fees, and a principal reduction of such Floorplan Advance, in each case pursuant to this Note, the applicable Advance Schedule, and any applicable event sale or promotional terms in effect for such Floorplan Advance. Additionally, for each Extension, Borrower shall be charged any applicable Universal Program Fee (including any related Extension fee) set forth in the Finance Program Rate, Fee, and Term Schedule for the applicable Finance Program.

(k) Unless either (i) the Maturity Date for a Receivable Advance has been accelerated as the result of a Maturity Event or a declaration of an Event of Default; or (ii) such Receivable Advance is in the final Period pursuant to the applicable Advance Schedule, a Curtailment of such Receivable Advance will automatically be processed at the end of the current Period. Upon the processing of the Curtailment for a Receivable Advance, Borrower shall pay the accrued Interest, accrued Receivable Fee, any other accrued Receivable Advance related fees, and a principal reduction of such Receivable Advance, in each case pursuant to this Note, the applicable Advance Schedule, and any applicable event sale or promotional terms in effect for such Receivable Advance.

(l) Lender or its Affiliates may hold any property (and proceeds thereof) or funds belonging to or payable to Borrower or any of its Affiliates ("Setoff Funds") and apply such Setoff Funds to any outstanding Liabilities of Borrower or to any amounts owing by Borrower to any Affiliate of Lender, and Borrower hereby grants to Lender and its Affiliates, as the case may be, a lien on such Setoff Funds. Lender and its Affiliates may at any time apply any or all of the Setoff Funds to any outstanding Liabilities of Borrower or to any amounts owing by Borrower to any Affiliate of Lender. Borrower expressly waives any requirement of maturity or mutuality among Lender and its various Affiliates.

(m) Any statement of Borrower's account furnished or made available to Borrower by Lender, to the extent no objection is made in writing by Borrower within thirty (30) days after Borrower's receipt of such statement, shall constitute a definitive statement of Borrower's Credit Line and Liabilities as of the date of such statement and shall be binding upon Borrower.

(n) Borrower hereby expressly authorizes Lender and its Affiliates to communicate with Borrower via facsimile transmissions, email, telephonic transmissions, both to a residential telephone line and/or cell phone, including text messaging, using an automatic telephone dialing system or an artificial or prerecorded voice message, and/or any other forms of communication, for any purpose, including general business matters, account information, marketing materials, collection, and/or any other communication needs. Borrower agrees that such express permission shall extend to any and all of the contact information that Borrower has provided herein, including physical and email addresses, phone numbers, fax numbers, etc., and to such other addresses, phone numbers, email addresses, online chat, social media platforms, etc. that Borrower may provide to Lender or that Lender may obtain from any third party at a later date.

(o) So long as Borrower is not in default of this Note or any other Loan Document, Borrower may sell Lender Financed Inventory to bona fide buyers in the Ordinary Course of Business, but nothing herein shall be deemed to waive or release any interest Lender may have hereunder or under any other agreement in any proceeds or replacements of such Lender Financed Inventory. Upon the sale of any Unit of Lender Financed Inventory, Borrower shall hold the proceeds from such sale in trust for the benefit of Lender, and Borrower shall pay to Lender, in accordance with this Note and the other Loan Documents, an amount equal to the unpaid balance of the Liabilities relating to such Unit of Lender Financed Inventory.

(p) Borrower shall allow Lender and its Representatives to access Borrower's books and records at Borrower's Place of Business and such other places as any Lender Financed Inventory may be located, in order to conduct audits of Borrower's Lender Financed Inventory, in each case without prior notice to Borrower of such audits. Borrower shall be responsible for and agrees to pay all of Lender's expenses in conducting such audits.

(q) Each Unit of Lender Financed Inventory must be physically verified at the time of any audit conducted by or on behalf of Lender to be at Borrower's Place of Business, or such other place as Lender may authorize. In the event that any Unit of Lender Financed Inventory is not so verified, Lender may, in its sole discretion, provide Borrower an opportunity to produce such Unit of Lender Financed Inventory at Borrower's Place of Business, or such other place as Lender may authorize.

(r) Borrower may request from Lender, for a legitimate business purpose, the Title to a Unit of Lender Financed Inventory, but Lender reserves the right to grant or deny such request in its sole discretion. In the event Lender grants any such request, any Title provided to Borrower or to any other Person on Borrower's behalf, must be returned to Lender by the close of business on the seventh (7th) day after the date of Lender's release of such Title.

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

(s) Borrower and each Guarantor authorize Lender to obtain and share credit information relating to Borrower and its Guarantors from and with credit bureaus, financial institutions, trade creditors, affiliates, and others and to conduct such other credit investigations that Lender in its sole discretion deems necessary. The individual signing below on behalf of Borrower expressly authorizes Lender to obtain his or her consumer credit report from time to time at Lender's discretion, and expressly ratifies any such consumer credit report that may have been obtained by or on behalf of Lender prior to the Effective Date. Borrower also authorizes Lender to contact any third parties to disclose information, including information contained in Lender application, for the purpose of, among other things, obtaining intercreditor agreements and perfecting Lender's security interest. Further, if a Credit Line is granted, Borrower and each Guarantor authorize Lender to review Borrower's account periodically, which may include obtaining additional credit information on Borrower and each Guarantor through any available medium.

(t) Borrower's account is subject to "NSF" fees in the amount stated in the Finance Program Rate, Fee, and Term Schedule or the maximum amount permitted by Law for each check or ACH issued by Borrower and each ACH or other electronic payment debited or drawn from any of Borrower's designated accounts by Lender or its Representatives pursuant to an ACH authorization or other request for electronic payments provided by Borrower which is subsequently returned for insufficient funds, in addition to any charge or fee imposed by Borrower's and/or Lender's depository institution.

(u) Lender may process checks electronically, at first presentment and any re-presentments, by transmitting the amount of the check, routing number, account number, and check serial number to Borrower's financial institution. By submitting a check for payment, Borrower authorizes Lender to initiate an electronic debit from Borrower's bank account. When Lender processes Borrower's check electronically, Borrower's payment may be debited from Borrower's bank account as soon as the same day Lender receives Borrower's check.

(v) Borrower's account is subject to a late fee in the amount stated in the Finance Program Rate, Fee, and Term Schedule or the maximum amount permitted by Law for any Unit of Lender Financed Inventory for which Borrower fails to remit payment under this Note or any other Loan Document when due. Borrower acknowledges and agrees that the late fee charged by Lender is a reasonable estimate of Lender's additional administrative burden and costs incurred due to the delay and inconvenience to Lender associated with a late payment.

(w) Borrower's account is subject to Administrative Charges. Borrower acknowledges and agrees that any such Administrative Charge charged by Lender is permitted under this Note and the other Loan Documents, and Borrower consents to the assessment of any such Administrative Charge to Borrower's account.

(x) Borrower's account is subject to Universal Program Fees. Lender maintains and publishes the "Finance Program Rate, Fee, and Term Schedule" for each Finance Program applicable to Borrower's Credit Line via posting the same on the Discover Portal. Borrower may request a copy of the Finance Program Rate, Fee, and Term Schedule from Lender in writing at any time. All universal or generally applicable rates and fees and any amendments to the Terms and Conditions shall be published therein, incorporated herein by reference and made a part of this Note and any other applicable Loan Documents. The rates and fees applied to Borrower's Liabilities under this Note, any amended Terms and Conditions, or any applicable event sale or promotional terms in effect with respect to an eligible Floorplan Advance or Receivable Advance shall be (i) the applicable rates and fees set forth on the applicable Advance Schedule; (ii) the rates, fees, and amendments to the Terms and Conditions most recently published on the applicable Finance Program Rate, Fee, and Term Schedule; and (iii) the rates, fees, terms, and conditions as set forth in the applicable marketing materials outlining event sale and/or promotional terms. Lender may amend the rates, fees, terms and/or Terms and Conditions from time to time, at Lender's sole discretion, and without additional notice to Borrower other than the publication of such amendments on the Discover Portal.

(y) Lender maintains and publishes the Lender Guide on the Discover Portal. Borrower acknowledges and agrees that the Lender Guide and the content found therein are not part of this Note or any other Loan Document, are for informational purposes only, and do not create any new or additional contract rights or obligations for Borrower or Lender. Borrower acknowledges and agrees that the Lender Guide and the content therein is subject to change by Lender at any time without notice. To the extent the Lender Guide and the content therein are determined to create or provide additional contractual rights for Borrower and a conflict exists between this Note or any other Loan Document, on the one hand, and the Lender Guide, on the other hand, the provision of this Note or the other Loan Document, as the case may be, shall prevail.

(z) Borrower waives demand, presentment for payment, notice of dishonor, protest, and notice of protest, and expressly agrees that this Note and all payments coming due under it and any other Loan Documents may be extended or modified from time to time without in any way affecting Borrower's liability under this Note or any other Loan Document. Borrower and Guarantors understand that Lender may, at any time and without notice to Borrower, with or without cause, demand that this Note immediately be paid in full. The demand nature of this Note does not limit Lender's election of remedies upon an Event of Default by Borrower, and Borrower and Guarantors acknowledge that upon Lender's declaration of an occurrence of an Event of Default, all Liabilities of Borrower shall automatically accelerate and Lender may, at any time and without notice to Borrower, demand immediate payment of all Liabilities of Borrower and take such further action as may be contemplated under Section 7 or otherwise permitted by Law or in equity. Borrower shall have the right to pay all Liabilities in full at any time.

(aa) Notwithstanding Section 4(f), upon any disposition of a Unit of Lender Financed Inventory, whether by sale or otherwise, or the receipt by Borrower (or any other Person on behalf of Borrower) of full or partial payment by or on behalf of the purchaser of such Unit of Lender Financed Inventory, Lender may, without notice to Borrower and in Lender's sole discretion, declare a Maturity Event with respect to the related Floorplan Advance.

(bb) Notwithstanding Section 4(g), upon any receipt by Borrower of full payment under any Receivable that is subject to a Receivable Advance, or upon Borrower's declaration of a default under any such Receivable, Lender may, without notice to Borrower and in Lender's sole discretion, declare a Maturity Event with respect to the related Receivable Advance.

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h by the designated custodian

(cc) The receipt, by Lender or Borrower, or any third party on Borrower's behalf, of proceeds or other consideration related to any Unit of Lender Financed Inventory shall constitute conclusive proof of the sale or other disposition of such Unit of Lender Financed Inventory for purposes of this Note and the other Loan Documents.

(dd) Borrower acknowledges that Cox Automotive, Inc. (formerly Manheim, Inc.) and Manheim Remarketing, Inc., together with each of their respective direct and indirect subsidiaries and affiliated U.S. auctions (collectively "Manheim"), are Affiliates of Lender. Borrower may from time to time purchase a Unit through a Manheim auction sale (including online purchases via OVE.com or through other Manheim-operated online sales channels). For any Unit purchased by Borrower through a Manheim auction sale (including online purchases via OVE.com or through other Manheim-operated online sales channels) that remains unsettled with Manheim (each, an "Unsettled Unit"), Borrower hereby requests, directs and authorizes Lender, as of the date Lender receives a request for payment from Manheim with respect to such Unsettled Unit, to process and approve, in Lender's sole discretion, a Floorplan Advance on Borrower's Credit Line, which Lender may pay and remit directly to Manheim on Borrower's behalf for such Unsettled Unit. Borrower acknowledges that if any such request is received by Lender from Manheim within seven (7) days of Borrower's purchase of such Unsettled Unit, the purchase will be processed as a Universal Source Purchase, and if any such request is received by Lender from Manheim outside of seven (7) days of Borrower's purchase of such Unsettled Unit, the purchase will be processed as a Specific Source Purchase.

6. EVENTS OF DEFAULT. The occurrence of any of the following events shall be considered an event of default under this Note and the other Loan Documents (each, an "Event of Default"):

(a) Borrower or any Guarantor fails to perform any of its obligations, undertakings or covenants under this Note or under any other Loan Document, including any obligation to repay any Liability when due and Borrower's obligation to pay upon demand any outstanding Liabilities under this Note or any of the other Loan Documents.

(b) Borrower or any Guarantor breaches or otherwise violates any provision of this Note or any other Loan Document.

(c) Borrower makes any representation or warranty to Lender, or provides to Lender any schedule, certificate, financial statement, report, notice, or other writing, which is false or misleading in any material respect when made or delivered.

(d) Any damage or destruction of any Inventory and appropriate insurance naming Lender as "Loss Payee" is not in effect as required under Section 4(c).

(e) Borrower or any Guarantor, or any of their respective Parent Companies, has defaulted in the payment or performance of any debt or obligation under any other agreement, whether to Lender or to a third party.

(f) Borrower or any Guarantor, or any of their respective Parent Companies, becomes insolvent or consents to the appointment of a trustee, receiver, or other custodian for such Borrower, Guarantor, or Parent Company, as the case may be, or for any property belonging to any of the foregoing Persons; or such Borrower, Guarantor, or Parent Company, as the case may be, makes a general assignment for the benefit of its creditors; or any bankruptcy, reorganization, debt arrangement, or other case or proceeding under any bankruptcy or insolvency Law, or a dissolution or liquidation proceeding, is commenced by or against such Borrower, Guarantor, or Parent Company, as the case may be.

(g) Any material change in the management, ownership, or control of Borrower or its Parent Company occurs (unless such material change has been consented to in writing by Lender).

(h) The voluntary or administrative dissolution, death, or incompetence of Borrower or any Guarantor, or any of their respective Parent Companies.

(i) Any change in the financial condition of Borrower or any Guarantor, or any of their respective Parent Companies, which Lender in good faith deems adverse.

(j) Borrower or any Guarantor, or any of their respective Parent Companies, admits in writing that it is unable to pay its debts as they become due.

(k) Borrower fails to deliver, revokes or amends (other than at the written request of Lender) any power of attorney or similar authorization that it has executed in favor of Lender.

(l) Lender in good faith deems itself insecure for any reason.

7. RIGHTS AND REMEDIES. Upon any Event of Default, Lender may, at its option and without notice to Borrower, exercise any or all of the following rights in a separate, successive, or concurrent fashion, and Lender's exercise of any rights hereunder shall not preclude Lender from pursuing other rights and remedies in conjunction therewith or at a later time:

(a) Demand immediate payment of all Liabilities and other indebtedness and amounts owed to Lender and its Affiliates by Borrower and its Affiliates. Lender shall have all rights and remedies available hereunder and under the other Loan Documents, and all rights and remedies available to Lender at law or in equity, including the rights and remedies of a secured party under the UCC. These rights and remedies include the right to cancel any unfunded Advances; to enter into Borrower's premises with or without legal process, but without force, and to take possession of and remove any Collateral; and to notify any account debtors or other Person obligated on Collateral to make payment or otherwise render performance to or for the benefit of Lender. Lender shall have the right to contact any third parties, including auctions,

COPY VIEW

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

governmental agencies, Borrower's licensing authorities, consumer finance companies, floorplan companies, other finance companies, consumers, other borrowers, Auction Insurance Agency, and such other Persons as Lender may elect to contact in its sole discretion, and to share such information as is necessary, in Lender's sole discretion, for any reason, including for purposes of and related to collection of any Liabilities of Borrower. At Lender's request, and to the extent Borrower may lawfully do so, Borrower shall assemble, prepare for removal, and make available to Lender at a place designated by Lender which is reasonably convenient for Lender and Borrower such Collateral as Lender may request.

(b) Initiate proceedings to appoint a receiver in any court of competent jurisdiction. To the extent permitted by Law, Borrower waives the right to notice and hearing of the appointment of a receiver and consents to such appointment without requiring Lender to post a bond.

(c) To the extent permitted by Law, Borrower gives consent to Lender to proceed in any action to collect on or execute against any and all bonds that Borrower or its Affiliates may have posted with any governmental authorities or third parties.

(d) Without limiting the foregoing, Lender may take control of any funds generated by any Collateral, and in Lender's name or Borrower's name, demand, collect, receipt for, settle, compromise, sue for, repossess, accept returns of, foreclose, or realize upon any Collateral. Borrower waives any and all rights it may have to notice prior to seizure by Lender of any Collateral. Borrower agrees that private sale of any Lender Financed Inventory at the amount then owed to Lender on such Lender Financed Inventory, less costs reasonably incurred by Lender in preparation of disposition of such Lender Financed Inventory, shall be a commercially reasonable method of disposition of such Collateral. Additionally, Borrower further agrees that any Inventory Collateral repossessed or otherwise obtained by Lender after an Event of Default may be disposed of by Lender, in Lender's sole discretion, at any regular or online sale of any wholesale auto auction that may be an Affiliate of Lender, or at any National Auto Auction Association member, and, in each case, any such a sale is and shall be deemed commercially reasonable for all purposes. Borrower shall be liable to Lender for any deficiency resulting from Lender's disposition of the Collateral. Borrower agrees that the Collateral is of the type customarily sold on a recognized market and that Lender therefore has no obligation to notify Borrower prior to a sale of any Collateral. Lender shall not be responsible for the accuracy or validity of any document or for the existence or value of any Collateral. Lender shall not be required to marshal any assets in favor of Borrower. Lender has no obligation to pursue any third party for any liability or obligation owed to Borrower. Borrower further agrees to pay all reasonable attorneys' fees and other collection costs incurred by Lender and its Affiliates in enforcing this Note and any other Loan Document after any Event of Default. To the extent not prohibited by Law, Borrower waives all appraisement, valuation, anti-deficiency, homestead, exemption, and usury Laws now or hereafter in effect, and releases all right to appeal after payment in full.

8. LOAN DOCUMENTS. In addition to the execution and delivery of this Note, upon the request of Lender, Borrower shall execute (or cause the execution of) the following additional documents in connection with Borrower's Credit Line (together with all other documents and instruments executed by Borrower in connection with this Note or Borrower's Credit Line, and in each case as the same may be amended, restated, renewed, extended or otherwise modified from time to time, the "Loan Documents"), each of which shall be incorporated herein by reference and made a part of this Note: (a) a power of attorney in favor of Lender and its designated Representative; (b) prior to Lender making any Advances under this Note, an Advance Schedule for each unique set of terms for the Finance Program applicable to Borrower, which may be amended from time to time; (c) such guaranties of Borrower's Liabilities as Lender may request, including guaranties of all legal and beneficial owners of Borrower; (d) a reserve agreement in favor of Lender; (e) prior to Lender authorizing Borrower to place any Lender Financed Inventory on consignment with another licensed dealer, a consignment agreement acceptable to Lender; (f) such ACH authorization and requests for automated payments as Lender may request from time to time; and (g) such other documents or certifications as Lender may request or require from Borrower or any Guarantor from time to time.

9. ASSIGNMENT. This Note and any other Loan Document may be assigned by Lender without notice to Borrower, but Borrower may not assign this Note or any other Loan Document without the prior written consent of Lender.

10. THIRD PARTY BENEFICIARIES. Neither this Note nor any other Loan Document is intended to confer upon any Person other than the Parties any rights or remedies hereunder; provided, however, that the rights and remedies afforded to Lender under Sections 2, 5(l), 5(n), 5(s), 5(dd), 7, 11 and 14 shall also inure to the benefit of the Affiliates of Lender and such Affiliates shall be intended third party beneficiaries of the provisions thereof.

11. INDEMNIFICATION. Borrower shall, at its expense, defend, indemnify and hold harmless Lender and its Affiliates, and each of their respective directors, officers, principals, partners, shareholders or holders of any ownership interest, as the case may be, employees, Representatives, attorneys, and agents (together with Lender, the "Lender Parties") from and against any and all claims, judgments, losses, damages, demands, payments, fines, costs, expenses (including reasonable attorneys' fees and court courts), and liabilities of any nature or description incurred by a Lender Party to the extent arising from or relating to any of the following: (a) any personal injury or property damage caused by Borrower or any of its Representatives; (b) any breach by Borrower of this Note or any other Loan Document, including the breach of any representation, warranty, or other agreement contained in this Note or in any other Loan Document; and (c) Borrower's operation of its Business or any of Borrower's operations or activities.

12. NO JOINT VENTURE, PARTNERSHIP, OR AGENCY. Nothing contained in this Note or in any other Loan Document shall subject Lender or its Affiliates or any of its or their respective Representatives to any liability for, or in respect of, the business, assets, profits, losses, or liabilities of the Borrower. This Note does not constitute and shall not be characterized as a joint venture, partnership, or agency between Lender and Borrower. Nothing in this Section 12 shall limit any of the Liabilities of Borrower, or any of the other obligations of Borrower or any Guarantor under this Note or any of the other Loan Documents.

13. AMENDMENT; MERGER. This Note and the other Loan Documents are intended by the Parties to be an amendment to and restatement of any prior Demand Promissory Note and Loan and Security Agreement or similar document or instrument (including any prior promissory note, loan and security agreement or similar contract) between Lender (or any predecessor of Lender, including Dealer Services Corporation and/or Manheim

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy held by the designated custodian

Automotive Financial Services, Inc.) and Borrower. With the exception of the amendments and modifications that Lender is entitled to make without the prior written consent of Borrower pursuant to this Note or any other Loan Document, this Note may be modified or amended only upon the written consent of Lender and Borrower. In the case of the other Loan Documents, with the exception of the amendments and modifications that Lender is entitled to make without the prior written consent of Borrower pursuant to this Note or any other Loan Document, such other Loan Documents may be modified or amended only upon the written consent of Lender and the Person to whom such amendment relates. Additionally, the Finance Programs, Lender Guide, descriptions of specific Units of Lender Financed Inventory, amounts and terms of Advances, Maturity Dates, Extensions, Interest, Base Rates, Administrative Charges, Lender Universal Program Fees, late fees, NSF fees, and other charges allowed by this Note or any other Loan Document may be proven by the records kept by Lender. Notwithstanding the foregoing, any advance and/or loan originated pursuant to one or more agreements between Borrower and Dealer Services Corporation and/or Manheim Automotive Financial Services, Inc. prior to the Effective Date for which indebtedness from Borrower remains outstanding as of the Effective Date, shall remain subject to the terms and conditions of such prior agreement(s) for all intents and purposes until such indebtedness has been indefeasibly repaid and satisfied in full.

14. EXECUTION. The Parties understand and agree that Lender may execute this Note and any other Loan Documents by affixing the signature of an authorized representative of Lender via signature stamp. Additionally, Lender may execute this Note and any other Loan Documents by affixing to this Note or such other Loan Document, as the case may be, an electronic or digital signature, which electronic or digital signature shall for all purposes be deemed effective to constitute the valid signature of Lender. Any electronic or digital signature affixed to this Note or any other Loan Documents by Lender shall be deemed to satisfy all requirements imposed on electronic or digital signatures under the UCC, the Electronic Signatures in Global and National Commerce Act (the "E-Sign Act"), and any other similar Laws relating to the validity or enforceability of electronic or digital signatures, and such electronic or digital signature shall not be denied legal effect, validity, or enforceability solely because it is in electronic or digital form. Notwithstanding the foregoing, Borrower may execute this Note and any other Loan Documents only by original signature of an authorized representative of Borrower, unless otherwise authorized by Lender. Lender may, in its sole discretion, permit Borrower and/or any Guarantor to execute this Note and any other Loan Documents by affixing to this Note or such other Loan Document, as the case may be, an electronic or digital signature of an authorized representative of Borrower or of any Guarantor, as applicable. Borrower and each Guarantor acknowledges and agrees that any electronic or digital signature of Borrower or any such Guarantor shall for all purposes be deemed effective and constitute the valid signature of Borrower or any such Guarantor, as the case may be, and shall be deemed to satisfy all requirements imposed on electronic or digital signatures under the UCC, the E-Sign Act, and any other similar Laws relating to the validity or enforceability of electronic or digital signatures (including without limitation, any enactment of the Uniform Electronic Transactions Act (UETA)), and such electronic or digital signature shall not be denied legal effect, validity, or enforceability solely because it is in electronic or digital form. A facsimile or photocopied reproduction of signatures on this Note and any other Loan Documents shall be deemed original signatures for all intents and purposes. This Note and the other Loan Documents may be executed by the Parties in one or more counterparts which, collectively, shall constitute one and the same agreement.

15. NOTICES. All notices, demands and requests required or permitted to be given under this Note and any other Loan Document shall be (a) in writing, (b) delivered by personal delivery or sent by commercial delivery service or certified mail, return receipt requested, (c) deemed to have been given on the date of personal delivery or the date set forth in the records of the delivery service or on the return receipt, and (d) addressed as follows (or, in the case of Lender, to any other subsequent address that Lender may provide to Borrower (through written notice, via the Discover Portal, or otherwise) for purposes of directing future notices, demands or requests):

If to Lender: NextGear Capital, Inc., 11799 North College Avenue, Carmel, IN 46032
Telephone: (317) 571-3721

with a copy to:

NextGear Capital, Inc., 11799 North College Avenue, Carmel, IN 46032
Telephone: (317) 571-3721
Attention: Legal Department

If to Borrower: Premier Group Autos LLC DBA Overfinch Miami, 11 SW 12th Ave Ste 103 Bldg 59, Dania Beach, FL 33004-3527
Telephone: 954-440-0717

16. NO WAIVER. No failure or delay by Lender in exercising any right, power, or privilege or the granting of an exception by Lender with respect to any of the Terms or Conditions will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege, or the exercise of any other right, power, or privilege by Lender.

17. TERMINATION. No termination of this Note shall alter Borrower's Liabilities or any outstanding obligations of Borrower or any Guarantor under this Note or any of the other Loan Documents, including any outstanding obligations relating to Advances and amounts funded or committed prior to the effective date of such termination, and all rights and remedies, including the security interest granted herein and the rights of Lender as a secured party hereunder, shall extend until all Liabilities of Borrower have been indefeasibly paid and satisfied in full.

18. LEGAL FEES AND COLLECTION COSTS. Borrower shall pay to Lender all reasonable legal fees, expenses, and collection costs incurred by any Lender Parties, including Lender as a result of any Event of Default, or any failure by Borrower or any Guarantor to perform any obligation or satisfy any Liability of Borrower, including any prosecution by Borrower or any Guarantor or any of their respective Representatives of affirmative claims or counterclaims against Lender Parties.

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF876

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

19. SEVERABILITY. Any provision of this Note or any other Loan Document that is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability, without rendering invalid or unenforceable the remaining provisions of this Note and the other Loan Documents or affecting the validity or enforceability of any provision of this Note or any other Loan Document in any other jurisdiction.

20. GOVERNING LAW. Except with respect to the interpretation or enforcement of the arbitration and other provisions set forth in Section 22 (which shall be governed by the Federal Arbitration Act), the validity, enforceability, and interpretation of this Note and the other Loan Documents shall be governed by the internal Laws of the State of Indiana, without regard to conflicts of Laws provisions thereof.

21. JURISDICTION AND VENUE. As evidenced by Borrower's signature below, subject to the provisions noted in Section 22, Borrower submits to the personal jurisdiction and venue of the state and federal courts of Marion County and Hamilton County, Indiana, and agrees that any and all claims or disputes pertaining to this Note or any other Loan Document, or to any matter arising out of or related to this Note or any other Loan Document, which are initiated by Borrower against Lender, to the extent, if any, that such claims or disputes are not subject to the provisions noted in Section 22 below, shall be brought in the state or federal courts of Marion County or Hamilton County, Indiana. Further, Borrower expressly consents to the jurisdiction and venue of the state and federal courts of Marion County and Hamilton County, Indiana, as to any legal or equitable action that may be brought in such court by Lender, and waives any objection based upon lack of personal jurisdiction, improper venue, or forum non conveniens with respect to any such action. Borrower acknowledges and agrees that Lender reserves the right to initiate and prosecute any action against Borrower in any court of competent jurisdiction, and Borrower consents to such forum as Lender may elect.

22. MANDATORY BINDING ARBITRATION; WAIVER OF CLASS ACTION RIGHTS.

(a) In most cases, any disputes or claims that Borrower may have can be resolved quickly and to Borrower's satisfaction by contacting Lender regarding such dispute or claims. In the unlikely event that Lender is unable to resolve a dispute or claim that Borrower may have, Borrower agrees to arbitrate any such dispute or claim in accordance with this Section 22. This agreement to arbitrate is intended to be broadly interpreted, and includes (i) all disputes, claims and counterclaims arising out of or relating to this Note or any other Loan Document or any aspect of Borrower's past, present or future relationship with Lender, whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory; (ii) all disputes, claims and counterclaims that may have arisen prior to the Effective Date or from any prior dealings, contract or agreement between Borrower and Lender (including all disputes, claims and counterclaims relating to any marketing or advertising by Lender); and (iii) any disputes, claims and counterclaims that may arise after the termination of this Note and any other Loan Document. Additionally, Borrower acknowledges that Lender may (BUT SHALL IN NO EVENT BE REQUIRED TO) arbitrate any dispute or claim that it may have against Borrower, with any such arbitration being governed by the provisions of this Section 22. BY AGREEING TO ARBITRATION, BORROWER UNDERSTANDS AND AGREES THAT IT IS WAIVING ITS RIGHTS TO MAINTAIN OTHER AVAILABLE RESOLUTION PROCESSES, SUCH AS COURT ACTION (INCLUDING A JURY TRIAL) OR ADMINISTRATIVE PROCEEDING, IN ORDER TO SETTLE OR RESOLVE DISPUTES OR ANY CLAIMS AGAINST LENDER. ARBITRATION IS DIFFERENT THAN A COURT ACTION, AND THE RULES IN ARBITRATION ARE DIFFERENT THAN THE RULES THAT APPLY IN COURT. THERE IS NO JUDGE OR JURY IN ARBITRATION, AND REVIEW IS LIMITED, BUT AN ARBITRATOR CAN AWARD THE SAME DAMAGES AND RELIEF AS A COURT, SUBJECT TO THE AGREED TERMS AND LIMITATIONS IN THIS NOTE. Borrower, at its election, may opt-out of the arbitration provisions set forth in Sections 22(a), 22(c) and 22(d) by providing written notice of its election to opt-out no later than thirty (30) days after the Effective Date, which notice shall be provided to Lender pursuant to Section 15 ("Opt-Out Notice"), provided that such Opt-Out Notice shall become effective only upon Borrower's receipt of written confirmation from Lender that such Opt-Out Notice has been received by Lender within the required time period. Borrower acknowledges and agrees that, irrespective of any Opt-Out Notice or any written confirmation thereof, Borrower shall in all events be subject to the provisions of Section 22(b).

(b) ANY ARBITRATION OR OTHER LEGAL PROCEEDING OF ANY TYPE OR NATURE ARISING UNDER OR RELATING TO THIS NOTE OR ANY OF THE OTHER LOAN DOCUMENTS, OR TO ANY ASPECT OF BORROWER'S PAST, PRESENT OR FUTURE RELATIONSHIP OR ACTIVITIES WITH OR INVOLVING LENDER (INCLUDING ANY MARKETING ACTIVITIES OR SOLICITATIONS BY OR ON BEHALF OF LENDER), WILL TAKE PLACE ON AN INDIVIDUAL BASIS. CLASS ARBITRATIONS AND CLASS ACTIONS OF ANY KIND (WHETHER PURSUED THROUGH ARBITRATION OR THROUGH THE COURTS) ARE NOT PERMITTED. BORROWER AGREES THAT IT MAY BRING CLAIMS AGAINST LENDER ONLY IN ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. BORROWER AGREES THAT, BY ENTERING INTO THIS NOTE, BORROWER IS WAIVING ITS RIGHT TO PARTICIPATE IN ANY CLASS ACTION OR OTHER SIMILAR REPRESENTATIVE PROCEEDING. UNLESS CONSENTED TO IN WRITING BY LENDER, THE ARBITRATOR MAY NOT CONSOLIDATE MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING. BORROWER ACKNOWLEDGES AND AGREES THAT THE SIZE OF BORROWER'S CREDIT LINE, THE INTEREST RATE TO WHICH ADVANCES ARE SUBJECT AND CERTAIN FEES CHARGED TO BORROWER, AS WELL AS THE SIZE AND DATES OF SPECIFIC ADVANCES, ARE UNIQUE TO AND NEGOTIATED BY BORROWER, AND THAT SUCH FACTORS WILL AND DO VARY AMONG BORROWERS.

(c) Any dispute or claim subject to arbitration pursuant to this Section 22 shall be submitted to binding arbitration administered by the Judicial Arbitration and Mediation Service ("JAMS") pursuant to its Comprehensive Arbitration Rules and Procedures as then in effect (the "JAMS Comprehensive Rules"); provided, however, that any dispute or claim that is subject to arbitration pursuant to this Section 22 and that involves disputes or claims where the aggregate amount reasonably in dispute or controversy is less than $100,000, shall be submitted to binding arbitration administered by JAMS pursuant to its Streamlined Arbitration Rules and Procedures as in effect on the Effective Date (the "JAMS Streamlined Rules"). The disputes and claims subject to arbitration pursuant to this Section 22 will be resolved by a single arbitrator selected pursuant to the JAMS Comprehensive Rules or the JAMS Streamlined Rules, as the case may be. The arbitrator shall be bound by and shall strictly enforce the terms of this Note and the other Loan Documents and may not limit, expand, or otherwise modify any term or provision of this Note or any other Loan Document or any other contract or document between Borrower and Lender. The arbitrator shall not have the

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy held by the designated custodian

power to award to Borrower any damages that are excluded or that have been waived by Borrower under this Note or any other Loan Document, and Borrower irrevocably waives any claim that it may have thereto. The arbitrator shall not have the power to order pre-hearing discovery of documents or the taking of depositions. The arbitrator shall render a written decision within six (6) months after being selected. Any arbitration will be held in Indianapolis, Indiana (or its greater metro area). Each Party will bear its own expenses in the arbitration and will share equally the costs of the arbitration; provided, however, that the arbitrator may, in his or her discretion, award costs and fees to the prevailing Party. The result of any arbitration shall be final and binding upon the Parties. Judgment upon any arbitration award may be entered in any court having jurisdiction over the award or over the applicable party or its assets.

(d) This Note and the other Loan Documents evidence transactions in interstate commerce, and thus the Federal Arbitration Act governs the interpretation and enforcement of this Section 22, notwithstanding the provisions of Section 20.

23. WAIVER OF JURY TRIAL. AFTER CONSULTING OR HAVING HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL, LENDER AND BORROWER KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVE ANY RIGHT EITHER PARTY MAY HAVE TO A TRIAL BY JURY IN ANY LITIGATION BASED UPON OR ARISING OUT OF THIS NOTE OR ANY OTHER LOAN DOCUMENT, OR ANY OF THE TRANSACTIONS CONTEMPLATED BY THIS NOTE OR ANY OF THE OTHER LOAN DOCUMENTS, OR ANY COURSE OF CONDUCT, STATEMENT, WHETHER ORAL OR WRITTEN, OR ACTIONS OF LENDER OR BORROWER. NEITHER LENDER NOR BORROWER SHALL SEEK TO CONSOLIDATE, BY COUNTERCLAIM OR OTHERWISE, ANY ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED. THESE PROVISIONS SHALL NOT HAVE BEEN DEEMED TO HAVE BEEN MODIFIED IN ANY RESPECT OR RELINQUISHED BY LENDER OR BORROWER EXCEPT BY WRITTEN INSTRUMENT EXECUTED BY BOTH LENDER AND BORROWER.

24. LIMITATION OF LIABILITY. IN NO EVENT SHALL ANY LENDER PARTY BE LIABLE FOR ANY SPECIAL, INDIRECT, EXEMPLARY, PUNITIVE, INCIDENTAL, MULTIPLE OR CONSEQUENTIAL DAMAGES (INCLUDING ANY DAMAGES RESULTING FROM LOSS OF USE, LOSS OF PROFITS, LOSS OF BUSINESS OR OTHER ECONOMIC LOSS) ARISING OUT OF OR IN CONNECTION WITH THIS NOTE OR ANY OTHER LOAN DOCUMENT (OR ANY ADVANCES MADE BY LENDER HEREUNDER OR THEREUNDER), EVEN IF SUCH LENDER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. FURTHER, IN NO EVENT SHALL THE LENDER PARTIES, COLLECTIVELY, BE LIABLE FOR ANY DAMAGES UNDER THIS NOTE OR ANY OTHER LOAN DOCUMENT (OR IN CONNECTION WITH ANY ADVANCE BY LENDER HEREUNDER OR THEREUNDER) THAT EXCEED, IN THE AGGREGATE, AN AMOUNT EQUAL TO THE SUM OF THE INTEREST AND FLOORPLAN FEES ACTUALLY PAID TO LENDER BY BORROWER UNDER THIS NOTE DURING THE TWELVE (12) MONTH PERIOD IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO THE CLAIM AT ISSUE (OR, IN THE CASE OF MULTIPLE EVENTS, THE FIRST SUCH EVENT GIVING RISE TO THE CLAIM AT ISSUE).

25. WAIVER OF BOND. BORROWER WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY BOND OR SURETY OR SECURITY ON SUCH BOND WHICH MIGHT, BUT FOR THIS WAIVER, BE REQUIRED OF LENDER DURING ATTEMPTS TO RECOVER COLLATERAL OR OTHERWISE.

26. CALIFORNIA BORROWERS. In the event Borrower's Place of Business is in the State of California, Borrower acknowledges and agrees that any initial Advance made under this Note must be in the amount of at least Five Thousand Dollars and Zero Cents ($5,000), and Borrower shall neither request nor accept any initial Advance under this Note in an amount less than Five Thousand Dollars and Zero Cents ($5,000).

27. DISCLAIMER. THE DISCOVER PORTAL LICENSED OR PROVIDED HEREUNDER IS PROVIDED AS A CONVENIENCE TO BORROWER AND ON AN "AS-IS" BASIS. LENDER MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, ORAL OR WRITTEN, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTIES OF NON-INFRINGEMENT, TITLE, ACCURACY, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, LENDER MAKES NO REPRESENTATIONS OR WARRANTIES THAT THE DISCOVER PORTAL WILL OPERATE ERROR-FREE OR ON AN UNINTERRUPTED BASIS, AND LENDER SHALL IN NO EVENT BE LIABLE OR RESPONSIBLE FOR ANY OUTAGE OR OTHER LOSS OF FUNCTIONALITY OR CONNECTIVITY WITH RESPECT TO THE DISCOVER PORTAL, AND NO SUCH OUTAGE OR OTHER LOSS OF FUNCTIONALITY OR CONNECTIVITY SHALL EXCUSE ANY FAILURE BY BORROWER TO TIMELY PERFORM ALL OF ITS OBLIGATIONS TO LENDER UNDER THIS NOTE AND THE OTHER LOAN DOCUMENTS.

28. DESCRIPTIVE HEADINGS; INTERPRETATION. The descriptive headings herein are for convenience of reference only and shall not control or affect the meaning or construction of any provision of this Note. As used in this Note and the other Loan Documents, the terms "include," "includes," and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of like import. Words (including the defined terms set forth in Appendix A) of one gender shall be held to include the other gender as the context requires. Any references in this Note or in the other Loan Documents to a particular statute or regulation shall be deemed to include all amendments thereto, rules and regulations thereunder and any successor statute, rule, or regulation, or published clarifications or interpretations with respect thereto, in each case as in effect from time to time.

29. EFFECTIVE DATE OF OTHER LOAN DOCUMENTS. Unless otherwise stated in the applicable Loan Document, the effective date of any Loan Document executed by a party shall be the later of (a) the Effective Date of this Note, or (b) the date of Borrower's execution thereof as set forth below Borrower's signature thereon (or, in the case of any guaranty, the date of Guarantor's execution thereof as set forth below Guarantor's signature thereon). In the event that the date of Borrower's or Guarantor's execution of any Loan Document is not set forth below Borrower's or Guarantor's signature thereon, then the effective date of such Loan Document shall be deemed to be the Effective Date of this Note.

WHEREFORE, the Parties, by their respective duly authorized representatives, have executed this Demand Promissory Note and Loan and Security Agreement on the dates set forth below.

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

**LENDER:**

NEXTGEAR CAPITAL, INC.

DocuSigned by:
Shane O'Dell
32464ECD45174EF

By:
Name: Shane O'Dell
Title: President
3/27/2019 | 10:47:56 AM EDT
Date:

**BORROWER:**

Premier Group Autos LLC DBA Overfinch Miami

DocuSigned by:
James Michael C Blackburn
C485919C88D84D1

By:
Name: James Michael C Blackburn
Title: Manager
3/26/2019 | 4:42:48 PM EDT
Date:

DocuSigned by:
Edward Anthony Kessler
8420328A15AC498

By:
Name: Edward Anthony Kessler
Title: Manager
3/27/2019 | 10:46:09 AM EDT
Date:

COPY VIEW

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

GUARANTORS ACKNOWLEDGE AND CONSENT TO THE FOREGOING:

DocuSigned by:
Guarantor (Sign) James Michael C Blackburn
C465919CB8084D1

Name: James Michael C Blackburn

DocuSigned by:
Guarantor (Sign) Edward Anthony Kessler
8420320A15AC496

Name: Edward Anthony Kessler

COPY VIEW

Page 13 of 13

NextGear Demand Promissory Note and Loan and Security Agreement (v. 1.1)

PAG-B0057

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h by the designated custodian

## APPENDIX A

(1) "Administrative Charge" shall mean any expense charged by Lender to Borrower that is reasonable or necessary, in Lender's sole discretion, to administer or monitor Borrower's account, to preserve any Collateral, or to collect any Liabilities owed by Borrower.

(2) "Advance" shall mean any discretionary loan or payment in any amount, for any purpose, made pursuant to this Note by Lender to Borrower or on Borrower's behalf to any third party.

(3) "Advance Schedule" shall mean any addendum or other document executed pursuant to this Note, in each case as modified from time to time, which indicates the applicable specific terms regarding Borrower's Floorplan Fees, Receivable Fees, Contract Rate of Interest, Period(s), Required Reserve Amount, Reserve Charge, required principal reduction to obtain a Curtailment of the Maturity Date, and number of available Curtailments.

(4) "ACH" shall mean any payment by or on behalf of Borrower to Lender made via a nationwide electronic funds transfer network processing electronic debit and credit entries to or from Borrower's bank accounts.

(5) "Affiliate" shall mean, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such first-named Person (which shall, for purposes of clarity, include any parent company and any direct or indirect subsidiary of such first-named Person) and, if such first-named Person is a natural person, also includes any member of such first-named Person's immediate family. For purposes of this definition, the term "control" means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

(6) "Base Rate" shall mean the greater of that variable rate of interest or that fixed rate of interest as stated in the Finance Program Rate, Fee, and Term Schedule.

(7) "Borrower" shall have the meaning set forth in the Preamble.

(8) "Borrower's Place of Business" shall mean the primary place where the Collateral and Borrower's books and records are kept, and where Borrower's operations are conducted.

(9) "Business" shall mean Borrower's business, as it relates to the purchase and sale, lease, or rent of Inventory and/or the origination of any Receivables.

(10) "Business Day" shall mean any day other than a Saturday, Sunday, federal holiday or day on which banking institutions in Carmel, Indiana are authorized or obligated by Law or executive order to be closed.

(11) "Check" shall mean any payment by or on behalf of Borrower to Lender not made in cash, via certified funds, wire transfer, or ACH.

(12) "Collateral" shall have the meaning set forth in Section 2(a).

(13) "Collateral Protection Program" shall mean that certain program in which Borrower may participate in lieu of providing third party insurance as required under this Note.

(14) "Contract Rate" shall mean that rate of interest as stated on the applicable Advance Schedule.

(15) "Credit Line" shall mean Borrower's floorplan line of credit with Lender pursuant to and under this Note.

(16) "Curtailment" shall mean that grant by Lender, in its sole discretion, to Borrower of additional time extending the Maturity Date with respect to a Floorplan Advance or a Receivable Advance for an additional Period. The number of allowable Curtailments for a Floorplan Advance or a Receivable Advance shall be as stated on the applicable Advance Schedule.

(17) "Discover Portal" shall mean that certain web-based portal located at http://www.nextgearcapital.com (or any similar successor or related portal, interface or website including any mobile or tablet application or website) owned, operated or maintained by Lender and, subject to the Terms and Conditions, to which Borrower shall have access to from time to time as determined by Lender.

(18) "Effective Date" shall have the meaning set forth in the Preamble.

(19) "E-Sign Act" shall have the meaning set forth in Section 14.

(20) "Event of Default" shall have the meaning set forth in Section 6.

(21) "Extension" shall mean that grant by Lender, in its sole discretion, to Borrower of additional time extending the Maturity Date with respect to a Floorplan Advance beyond the last Period as stated on the applicable Advance Schedule.

COPY VIEW

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy by the designated custodian

(22) "Finance Program" shall mean any finance program offered by Lender and available to Borrower for the financing of Inventory or Receivables pursuant to an Advance under this Note.

(23) "Finance Program Rate, Fee, and Term Schedule" shall mean that current schedule of applicable universal interest rates, fees and term and condition amendments for each Finance Program, including Universal Program Fees; late fees; fees relating to returned checks or ACH payments due to insufficient funds; the Base Rate; Collateral Protection Program fees; and notice of amendments to the Terms and Conditions, published by Lender via posting such schedule of such universal rates and fees and notice of amendments to the Terms and Conditions on the Discover Portal.

(24) "Floorplan Advance" shall mean an Advance made pursuant to this Note relating to a Unit of Inventory to be offered for sale, lease or rent, or leased or rented by Borrower in the Ordinary Course of Business.

(25) "Floorplan Date" shall mean (a) for a Universal Source Purchase, the sale date, regardless of the date the Floorplan Advance is actually requested or funded; and (b) for a Specific Source Purchase, the date the request for the Floorplan Advance is received by Lender, regardless of the date such Floorplan Advance is actually funded.

(26) "Floorplan Fee" shall mean the fee charged by Lender to Borrower, as set forth on the applicable Advance Schedule, for each Unit of Lender Financed Inventory for each Period, including any Extensions thereof.

(27) "Guarantor" shall mean any Person executing this Note as a Guarantor or any Person executing any guaranty pursuant to this Note.

(28) "Interest" shall mean the aggregate rate of interest which accrues on all outstanding Liabilities of Borrower under or arising under this Note or any of the other Loan Documents.

(29) "Inventory" shall mean all Units held by Borrower for wholesale or retail sale, lease, or rent, or leased or rented by Borrower. "Inventory" includes Lender Financed Inventory.

(30) "JAMS" shall have the meaning set forth in Section 22(c).

(31) "JAMS Comprehensive Rules" shall have the meaning set forth in Section 22(c).

(32) "JAMS Streamlined Rules" shall have the meaning set forth in Section 22(c).

(33) "Law" or "Laws" shall mean applicable common law and any applicable statute, permit, ordinance, code or other law, rule, regulation or order enacted, adopted, promulgated or applied by any governmental authority, all as in effect from time to time.

(34) "Lender" shall have the meaning set forth in the Preamble.

(35) "Lender Financed Inventory" shall mean all Units for which an Advance has been made under this Note.

(36) "Lender Guide" shall mean those procedures and instructions for the use of Lender's system and the Discover Portal, in each case as modified by Lender from time to time in Lender's sole discretion, which are available in hard copy upon Borrower's written request to Lender or by Borrower logging onto the Discover Portal.

(37) "Lender Parties" shall have the meaning set forth in Section 11.

(38) "Liabilities" shall mean any and all Advances, debts, financial obligations, Administrative Charges, Lender Universal Program Fees, Interest, Floorplan Fees, NSF fees, late fees, charges, expenses, attorneys' fees, costs of collection, covenants, and duties owing, arising, due, or payable from Borrower to Lender of any kind or nature, present, or future, under any instrument, guaranty, or other document, whether arising under this Note, any other Loan Document, or otherwise, whether directly or indirectly (including those acquired by assignment), absolute or contingent, primary or secondary, due or to become due, now existing, or hereafter arising, and however acquired.

(39) "Liens" shall mean any claims, liabilities, security interests, liens, mortgages, deeds of trust, pledges, conditions, charges, claims, options, rights of first refusal, easements, proxies, voting trusts or agreements, transfer restrictions under any contract or agreement or encumbrances of any kind or nature whatsoever.

(40) "Loan Documents" shall have the meaning set forth in Section 8.

(41) "Maturity Date" shall mean (a) for all Liabilities concerning or relating to a Floorplan Advance or a Receivable Advance, the earlier of the last day of the current Period or the day on which Lender declares a Maturity Event; (b) for all Liabilities not directly related to a Floorplan Advance or a Receivable Advance, ten (10) days after the date such Liability is posted to Borrower's account; and (c) for One Day Loans, the date such One Day Loan is posted to Borrower's account. Notwithstanding the foregoing, upon the declaration of an Event of Default by Lender, the Maturity Date for all Liabilities shall be the earlier of (i) the date on which such Event of Default is declared by Lender, or (ii) the date on which such Event of Default first occurred. In the event the Maturity Date is not a Business Day, the Maturity Date shall be deemed to be the next Business Day.

COPY VIEW

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h
hy the designated custodian

(42) "Maturity Event" shall mean any event, act or circumstance arising under this Note or any other Loan Document (including any failure by Borrower to adhere to any term or provision of this Note or any other Loan Document), which causes Lender to declare the event, act or circumstance a "Maturity Event" with respect to any Floorplan Advance or Receivable Advance.

(43) "MSO" shall mean the manufacturer's statement of origin or other document evidencing ownership of a Unit issued by the manufacturer of the Unit.

(44) "Note" shall mean this Demand Promissory Note and Loan and Security Agreement and all present and future amendments, modifications, and addendums related thereto.

(45) "One Day Loan" shall mean the amount of any Advance that is in excess of the market value of a Unit, as determined by Lender in its sole discretion. The determination of whether to approve an Advance which would result in the posting of a One Day Loan to Borrower's account shall be in Lender's sole discretion. One Day Loans mature on the date on which they post to Borrower's account.

(46) "Opt-Out Notice" shall have the meaning set forth in Section 22(a).

(47) "Ordinary Course of Business" shall mean the ordinary course of the Business of Borrower, consistent with past practices (but only to the extent such past practices were in compliance with Law and in accordance with best industry practices).

(48) "Parent Company" shall mean, with respect to Borrower or any Guarantor, the Person(s) that, directly or indirectly, have the power to direct or cause the direction of the management and policies of Borrower or Guarantor, as the case may be, whether through the ownership of voting securities, by contract or otherwise.

(49) "Party" or "Parties" shall have the meaning set forth in the Preamble.

(50) "Period" shall mean the number of days set forth on the applicable Advance Schedule, which (a) in the case of a Floorplan Advance, shall be calculated beginning on the Floorplan Date; and (b) in the case of a Receivable Advance, shall be calculated beginning on the Receivable Origination Date.

(51) "Person" shall mean any individual, corporation, joint stock company, association, partnership, joint ventures, trust, estate, limited liability company, limited liability partnership, governmental authority or other entity or organization.

(52) "Receivable" shall mean chattel paper, including a retail installment contract or buy here pay here contract, evidencing a monetary obligation of a buyer for the purchase of a motor vehicle from Borrower and the granting of a security interest in the vehicle to Borrower as security for the repayment of the monetary obligation.

(53) "Receivable Advance" shall mean an Advance made pursuant to this Note to provide Borrower with working capital secured by a specific Receivable owned and originated by Borrower in the Ordinary Course of Business.

(54) "Receivable Fee" shall mean the fee charged by Lender to Borrower, set forth on the applicable Advance Schedule, for each individual Receivable Advance for each Period.

(55) "Receivable Origination Date" shall mean, with respect to any Receivable for which a Receivable Advance is made pursuant to this Note, the date on which such Receivable was originated by Borrower.

(56) "Representative" shall mean, with respect to Borrower or Lender, as the case may be, the directors, officers, stockholders, employees, trustees, agents, and representatives, including any investment banker, consultant, attorney, or accountant, of Borrower or Lender, as the case may be.

(57) "Required Reserve Amount" shall mean the aggregate total amount of funds required to be remitted by Borrower to Lender, as set forth in the applicable Advance Schedule, and held in the Reserve as a condition to the grant of credit to Borrower under this Note and the other Loan Documents.

(58) "Reserve" shall mean the cash deposited with Lender by Borrower on a voluntary basis or as required as an underwriting condition and held by Lender as additional security for Borrower's Liabilities, and other Obligations (as defined in the applicable reserve agreement) to the Lender Parties.

(59) "Reserve Charge" shall mean that charge by Lender to Borrower, as set forth on the applicable Advance Schedule, assessed for the purpose of funding any Reserve.

(60) "Setoff Funds" shall have the meaning set forth in Section 5(l).

(61) "Specific Source Purchase" shall mean all purchases or other requests for an Advance, made by or on behalf of Borrower that do not constitute a Universal Source Purchase.

(62) "Terms and Conditions" shall mean all provisions of this Note and the other Loan Documents, with the exception of terms specifically referenced on the applicable Advance Schedule.

COPY VIEW

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

(63)   "Title" shall mean the certificate of title or other document evidencing ownership of a Unit issued by a duly authorized state, commonwealth, province, or government agency.

(64)   "UCC" shall mean the Uniform Commercial Code as enacted in the State where the Collateral at issue is located.

(65)   "Unit" shall mean any manufactured item, including motor vehicles, for which there exists a Title, MSO, or other similar evidence of ownership acceptable to Lender.

(66)   "Universal Program Fee" shall mean any published fee, as stated in the Finance Program Rate, Fee, and Term Schedule, charged by Lender to Borrower pursuant to a Finance Program.

(67)   "Universal Source Purchase" shall mean any purchase made by or on behalf of Borrower for which (a) a request for an Advance is made by or on behalf of Borrower; (b) from an auction or third party business that has entered into a universal funding agreement with Lender; and (c) such request for an Advance is received by Lender within seven (7) days of Borrower's purchase of the vehicle that is the subject of such request.



DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy held by the designated custodian

# ADDENDUM TO DEMAND PROMISSORY NOTE AND LOAN AND SECURITY AGREEMENT – READY LOGISTICS

THIS ADDENDUM TO DEMAND PROMISSORY NOTE AND LOAN AND SECURITY AGREEMENT (this "Addendum") is being entered into by the undersigned borrower ("Borrower") and NextGear Capital, Inc. ("Lender"), pursuant to that certain Demand Promissory Note and Loan and Security Agreement by and between Borrower and Lender (the "Note").

WHEREAS, Borrower has requested of Lender that Lender make one or more Advances on behalf of Borrower, directly to Ready Logistics LLC ("Ready Logistics") in order to cover transportation and other related acquisition charges (collectively "Charges") incurred by Borrower related to one or more Units of Lender Financed Inventory; and

WHEREAS, subject to the terms and conditions set forth in the Note and the other Loan Documents, all as the same now exist or are hereafter amended, supplemented or added to. Lender is willing to make such Advance(s);

NOW, THEREFORE, in consideration of the premises and the mutual agreements and covenants set forth herein, and other good and valuable consideration, the undersigned hereby agree as follows:

1. Notwithstanding anything to the contrary in the Note or the other Loan Documents, the decision to make an Advance related to Charges on behalf of Borrower is the exclusive right of Lender, whether or not an Event of Default has occurred.

2. Borrower acknowledges and agrees that Lender may make such Advance(s) at any time on or after receipt of an invoice from Ready Logistics for such Charges.

3. Borrower acknowledges and agrees that each Advance made by Lender on behalf of Borrower, directly to Ready Logistics, to cover Charges, shall be added to the outstanding balance for the related Unit of Lender Financed Inventory for which such Charge applies, as of the date Lender receives notice from Ready Logistics of such Charge. Such Advance, shall accrue Interest and other related charges as of such date, regardless of the date the related Charge is actually paid. Borrower acknowledges and agrees that if an Advance related to a Charge is added to Borrower's account on a date other than the Floorplan Date for such Unit of Lender Financed Inventory, that the number of days remaining in the applicable Period, for an Advance related to a Charge will be reduced to the number of days remaining in the applicable Period for the related Unit of Lender Financed Inventory.

4. Borrower acknowledges and agrees that such Advance(s) is a Liability under the Note and, except as provided for herein, is subject to all terms and conditions noted therein. Borrower acknowledges and agrees that Borrower is and shall remain obligated to repay such Liability, including accrued Interest, to Lender no later than the Maturity Date for such Advance, excepting that Lender may, in its sole discretion and without notice, defer payment of the Advance or any portion thereof (excluding Interest) until final payoff.

5. Borrower acknowledges and agrees that Borrower is and shall remain obligated to repay such Liability to Lender for such Advance(s) no later than the Maturity Date for such Advance(s), regardless of whether the sale of the related Unit of Lender Financed Inventory, for which an Advance was made to Ready Logistics on Borrower's behalf, is subsequently arbitrated, voided, or the vehicle is otherwise returned for any reason.

Capitalized terms used herein but not defined herein shall have the respective meanings as set forth in the Note (such meanings to be equally applicable to both the singular and plural forms of the terms defined).

The undersigned Borrower hereby expressly acknowledges that this Addendum shall be binding on Borrower whether executed in original, "wet ink" form; submitted by facsimile; or submitted by electronically transmitted signature ("e-signature"). The undersigned Borrower further acknowledge(s) that the acceptance of the terms of this Addendum, if by e-signature, shall be deemed to satisfy all requirements imposed on electronic or digital

COPY VIEW

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy held by the designated custodian

signatures under the Electronic Signatures in Global and National Commerce Act (the "E-Sign Act"), 15 U.S.C. §7001(a) et seq., and any other similar laws relating to the validity or enforceability of electronic or digital signatures. Each of the parties acknowledges and agrees that this Addendum may be executed by affixing to this Addendum an electronic or digital signature, which shall for all purposes be deemed effective to constitute the valid signature of the party affixing such electronic or digital signature.

☒ Borrower, by its duly authorized representative, AGREES to be bound by the terms of this Addendum as of the date set forth below.

☐ Borrower, by its duly authorized representative, DECLINES the terms of this Addendum. Borrower will not request any Advances to be made to Ready Logistics on Borrower's behalf for Charges, and Lender will not approve any such requests.

**BORROWER:**

PREMIER GROUP AUTOS LLC DBA OVERFINCH MIAMI

By: DocuSigned by: James Michael C Blackburn

Name: James Michael C Blackburn

Title: Manager

Date: 3/26/2019 | 4:42:48 PM EDT

COPY VIEW

**LENDER:**

NEXTGEAR CAPITAL, INC.

By: DocuSigned by: Shane O'Dell

Name: Shane O'Dell

Title: President

Date: 3/27/2019 | 10:47:56 AM EDT

Dealer # 125308

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy by the designated custodian

# ADVANCE SCHEDULE
(Retail)

Borrower: Premier Group Autos LLC DBA Overfinch Miami

Market: Ft. Lauderdale North

Account Number: 125308

Finance Program: Core

This Advance Schedule is being entered into by the undersigned borrower ("Borrower") and NextGear Capital, Inc. ("Lender") pursuant to that certain Demand Promissory Note and Loan and Security Agreement by and between Borrower and Lender (the "Note"). Capitalized terms used herein but not defined herein shall have the respective meanings as set forth in the Note (such meanings to be equally applicable to both the singular and plural forms of the terms defined).

The following terms shall apply to Advances made under the Note and this Advance Schedule:

The Floorplan Fee, the Period(s), and the required principal reduction for Curtailment for each Advance made pursuant to the Note and this Advance Schedule shall be as follows:

| Period | Number of Days in Period | Required Principal Reduction for Curtailment of Maturity Date | Floorplan Fee |
|---|---|---|---|
| 1 | 60 | 10% | $80.00 |
| 2 | 30 | 5% | $45.00 |
| 3 | 30 | N/A – No Further Curtailments Available | $45.00 |

Contract Rate: 3.0%

Additional fees, charges, and other terms applicable to Advances made pursuant to the Note and this Advance Schedule are set forth on the Finance Program Rate, Fee, and Term Schedule, which can be found on the Discover Portal.

The undersigned Borrower hereby expressly acknowledges that this Advance Schedule shall be binding on Borrower whether executed in original, "wet ink" form; submitted by facsimile; or submitted by electronically transmitted signature ("e-signature"). The undersigned Borrower further acknowledges that the acceptance of the terms of this Advance Schedule, if by e-signature, shall be deemed to satisfy all requirements imposed on electronic or digital signatures under the Electronic Signatures in Global and National Commerce Act (the "E-Sign Act"), 15 U.S.C. §7001(a) et seq., and any other similar laws relating to the validity or enforceability of electronic or digital signatures. Each of the parties acknowledges and agrees that this Advance Schedule may be executed by affixing to this Advance Schedule an electronic or digital signature, which shall for all purposes be deemed effective to constitute the valid signature of the party affixing such electronic or digital signature.

WHEREFORE, the Parties, by their respective duly authorized representatives, have executed this Advance Schedule on the dates set forth below.

COPY VIEW

LENDER:

NEXTGEAR CAPITAL, INC.

DocuSigned by:
Shane O'Dell
32464ECD45174EF...

By:
Name: Shane O'Dell
Title: President

3/27/2019 | 10:47:56 AM EDT
Date:

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy by the designated custodian

**BORROWER:**

Premier Group Autos LLC DBA Overfinch Miami

DocuSigned by:
James Michael C Blackburn
C485919CBBD84D1...
By:
Name: James Michael C Blackburn
Title: Manager

Date: 3/26/2019 | 4:42:48 PM EDT

DocuSigned by:
Edward Anthony Kessler
8420328A15AC496...
By:
Name: Edward Anthony Kessler
Title: Manager

Date: 3/27/2019 | 10:46:09 AM EDT

COPY VIEW

Page 2

Advance Schedule (Retail) (v. 1.1)

PAG-B0065

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h by the designated custodian

# INDIVIDUAL GUARANTY

THIS INDIVIDUAL GUARANTY (this "Guaranty") is made and entered into by the undersigned guarantor ("Guarantor") in favor of NextGear Capital, Inc. ("Lender") and it Affiliates, pursuant to that certain Demand Promissory Note and Loan and Security Agreement by and between Borrower (as defined below) and Lender (the "Note").

NOW, THEREFORE, in consideration of any loan or other financial accommodation heretofore or hereafter at any time made or granted to Borrower by Lender, and the mutual covenants, agreements, and conditions contained herein, Guarantor agrees as follows:

1. DEFINITIONS. Capitalized terms used herein and not defined in this Section 1 or elsewhere in this Guaranty shall have the respective meanings as set forth in the Note (such meanings to be equally applicable to both the singular and plural forms of the terms defined). Any capitalized terms used herein, but not otherwise defined herein or in the Note, as the case may be, shall have the meanings ascribed to them in the UCC.

(a) "Borrower" shall mean the Person listed below, including any Affiliates of such Person, whether now in existence or hereinafter established or acquired:

Premier Group Autos LLC DBA Overfinch Miami, 11 SW 12th Ave Ste 103 Bldg 59, Dania Beach, FL 33004-3527
Telephone: (954) 440-0717

(b) "Liabilities" shall mean any and all Advances, debts, financial obligations, fees, charges, expenses, attorneys' fees and costs of collection owing, arising, due, or payable from Borrower to Lender or any of its Affiliates, of any kind or nature, present or future, under any instrument, guaranty, or other document, whether arising under the Note or any other Loan Document, whether directly or indirectly, absolute or contingent, primary or secondary, due or to become due, now existing or hereafter arising, and however acquired.

2. GUARANTY AND OTHER AGREEMENTS.

(a) Guaranty Obligations. Guarantor hereby voluntarily, unconditionally, and absolutely guarantees (i) the full and prompt payment when due, whether by acceleration or otherwise, and at all times hereafter, of all Liabilities; and (ii) the full and prompt performance of all the terms, covenants, conditions, and agreements related to the Liabilities. Guarantor further agrees to pay all expenses, including attorneys' fees and court costs (including, in each case, those relating to bankruptcy and appeals), paid or incurred by Lender or its Affiliates in endeavoring to collect on any Liabilities, and in enforcing this Guaranty or in defending any claims by Borrower or any Guarantor related to any of the Liabilities, plus interest on such amounts at the lesser of (A) thirteen percent (13%) per annum, compounded daily, or (B) the maximum rate permitted by Law. Interest on such amounts paid or incurred by Lender shall be computed from the date of payment made by Lender and shall be payable on demand.

(b) General Nature of Guaranty. Guarantor acknowledges that this Guaranty is a guaranty of payment and not of collection, and that his or her obligations hereunder shall be absolute, unconditional, and unaffected by: (i) the waiver of the performance or observance by Borrower or any Guarantor of any agreement, covenant, term, or condition to be performed or observed by Borrower or any such Guarantor, as the case may be; (ii) the extension of time for the payment of any sums owing or payable with respect to any of the Liabilities or the time for performance of any other obligation arising out of or relating to any of the Liabilities; (iii) the modification, alteration, or amendment of any obligation arising out of or relating to any of the Liabilities; (iv) any failure, delay, or omission by Lender to enforce, assert, or exercise any right, power, or remedy in connection with any of the Liabilities; (v) the genuineness, validity, or enforceability of any of the Liabilities or any document related thereto; (vi) the existence, value, or condition of, or failure of Lender or any of its Affiliates to perfect its lien against, any security pledged in connection with the Liabilities; (vii) the release of any security pledged in connection with the Liabilities, or the release, modification, waiver, or failure to enforce any other guaranty, pledge, or security agreement; (viii) the voluntary or involuntary liquidation, dissolution, sale of all or substantially all of the property, marshalling of assets and liabilities, receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization, arrangement, composition, or readjustment or other similar application or proceeding affecting Borrower or any assets of Borrower; (ix) the release or discharge of Borrower or any other Guarantor from the performance or observance of any agreements, covenants, terms, or conditions in connection with any of the Liabilities, by operation of Law or otherwise; (x) the default of Borrower in any obligations to Guarantor or any torts committed by Borrower against Guarantor, even if Lender is alleged to be complicit or to have committed a direct tort against Guarantor; or (xi) any change in Borrower's ownership, entity type, legal structure, or state of organization or formation, or in Guarantor's relationship to Borrower or any other Guarantor.

(c) Continuing and Unlimited Nature of Guaranty. The obligations of Guarantor under this Guaranty shall be continuing and shall cover any and all Liabilities existing as of the effective date of this Guaranty and any and all Liabilities thereafter incurred by Borrwer, including any and all Liabilities existing at the time of any termination of this Guaranty. This Guaranty shall be unlimited in amount and shall continue in effect until this Guaranty is terminated pursuant to Section 3.

(d) Waivers by Guarantor. Guarantor hereby expressly waives: (i) notice of the acceptance by Lender of this Guaranty; (ii) notice of the existence, creation, or non-payment of all or any of the Liabilities; (iii) presentment, demand, notice of dishonor, protest, and all other notices whatsoever; (iv) diligence in collection or protection of, or realization upon any of the Liabilities, any obligation under this Guaranty, or any security for or guaranty of any of the foregoing; (v) impairment of any collateral securing the Liabilities; (vi) notice of any change in Borrower's credit terms or limits with Lender, including any temporary or permanent increases in Borrower's Credit Line (and Guarantor prospectively consents to any such change); (vii) any non-contractual duties of Lender to Borrower or any Guarantor; and (viii) the protections of any Laws intended to protect consumers or regulate consumer loans, as the Liabilities are commercial in nature.

(e) Authorization. Guarantor authorizes Lender to obtain and share credit information relating to Guarantor from and with credit bureaus, financial institutions, trade creditors, affiliates, and others and to conduct such other credit investigations that Lender in its sole discretion deems necessary.

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy by the designated custodian

Guarantor expressly authorizes Lender to obtain his or her consumer credit report from time to time at Lender's discretion, and expressly ratifies any such consumer credit report that may have been obtained by or on behalf of Lender prior to the effective date of this Guaranty. Guarantor also authorizes Lender to contact any third parties to disclose information for the purpose of, among other things, obtaining intercreditor agreements and perfecting Lender's security interest. Further, Guarantor authorizes Lender to periodically obtain additional credit information on Guarantor through any available medium.

(f) Communication. Guarantor hereby expressly authorizes Lender and its Affiliates to communicate with Guarantor via facsimile transmissions, email messages, telephonic transmissions, both to a residential telephone line and/or cell phone, including text messaging, using an automatic telephone dialing system or an artificial or prerecorded voice message, and/or any other forms of communication, for any purpose, including general business matters, account information, marketing materials, collection, and/or any other communication needs. Guarantor acknowledges and agrees that such express permission shall extend to any and all of the contact information that Guarantor has provided herein, including any physical and email addresses, phone numbers, fax numbers, etc., and to such other addresses, phone numbers, email addresses, online chat, social media platforms, etc. that Guarantor may provide to Lender or any of its Affiliates or that Lender or any of its Affiliates may obtain from any third party at a later date.

(g) Enforcement. In no event shall Lender have any obligation to proceed against Borrower, any other Guarantor or any other Person, or any security pledged in connection with the Liabilities, before seeking satisfaction from Guarantor. Lender may, at its option, proceed, prior or subsequent to, or simultaneously with, the enforcement of its rights hereunder, to exercise any right or remedy it may have against Borrower, any other Guarantor or other Person, or any security pledged in connection with the Liabilities. This Guaranty is in addition to, and not in substitution for, any other guaranty or other securites which Lender may now or hereafter hold.

(h) Reinstatement. Guarantor agrees that, if, at any time, all or any part of any payment theretofore applied by Lender to any of the Liabilities is or must be rescinded or returned by Lender for any reason whatsoever (including as a result of any insolvency, bankruptcy, or reorganization of Borrower or any of his or her Affiliates), such Liabilities shall, for purposes of this Guaranty, to the extent that such payment is or must be rescinded or returned, be deemed to have continued in existence, notwithstanding such application by Lender, and this Guaranty shall continue to be effective or reinstated, as applicable, as to all such Liabilities, all as though such application by Lender had not been made.

(i) Financial Statements. Upon Lender's request, Guarantor will provide Lender with Guarantor's audited financial statements, as certified by Guarantor's independent certified public accountant, and such other financial statements, information, and other materials as Lender may request from time to time.

(j) Application of Payments; Subrogation. Any amounts received by Lender from any source on account of the Liabilities may be applied by it toward the payment of such of the Liabilities, and in such order of application, as Lender may from time to time elect. Notwithstanding any payments made by or for the account of Guarantor, Guarantor shall not be subrogated to any rights of Lender.

3. TERMINATION.

(a) Payment of Liabilities and Termination of Credit Line. This Guaranty shall be terminated upon the occurrence of all of the following: (i) the payment by Borrower or any Guarantor, either jointly or severally, of all Liabilities outstanding; (ii) the payment of all obligations by Guarantor which may be due to Lender under this Guaranty; and (iii) the filing of a UCC termination statement as to Borrower by or on behalf of Lender, or other written verification from Lender that Borrower's Credit Line is terminated.

(b) Revocation of Guaranty. This Guaranty may be revoked by Guarantor upon written notice to Lender by certified mail, return receipt requested, to the address provided in Section 5(d). This Guaranty shall be deemed terminated upon the occurrence of a revocation in the manner provided in this Section 3(b). However, such revocation and termination shall in no way terminate or otherwise affect: (i) any obligations of Guarantor existing on or prior to the effective date of such revocation or termination; or (ii) any obligations of Guarantor arising after the effective date of such revocation or termination with respect to any Liabilities incurred by Borrower on or before the effective date of such revocation or termination.

4. EVENTS OF DEFAULT. The occurrence of any of the following events shall be considered an event of default under this Guaranty (each, an "Event of Default"):

(a) Guarantor fails to make full payment of any amount owed hereunder after notice from Lender;

(b) Guarantor fails to perform or observe any agreement, covenant, term, or condition contained in this Guaranty (other than any monetary obligation described in clause (a) above), and such failure continues for ten (10) days after notice from Lender;

(c) Guarantor makes an assignment for the benefit of creditors or fails to pay his or her debts as the same become due and payable;

(d) Guarantor petitions or applies to any tribunal for the appointment of a trustee or receiver of the business, estate, or assets or of any substantial portion of his or her business, estate, or assets, or commences any proceedings relating to Guarantor under any bankruptcy, reorganization, insolvency, readjustment of debt, dissolution, or liquidation Law of any jurisdiction, whether now or hereafter in effect (each, a "Bankruptcy Filing");

(e) any Bankruptcy Filing is filed or any related proceedings commenced against Guarantor, and Guarantor by any act indicates his or her approval thereof, consent thereto, or acquiescence therein, or any order is entered appointing any trustee or receiver, declaring Guarantor bankrupt or insolvent, or approving or accepting the Bankruptcy Filing in any such proceedings;

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h by the designated custodian

(f) any suit or proceeding is filed or any related proceedings commenced against Guarantor or any of his or her Affiliates. which, if adversely determined, could substantially impair the ability of Guarantor or Borrower to perform any of their respective obligations with respect to this Guaranty or any of the Liabilities, in each case as determined by Lender in its sole and absolute discretion; or

(g) there is any Event of Default by Guarantor under the Note.

If an Event of Default under this Guaranty shall have occurred, in addition to pursuing any remedies which may be available to Lender with respect to the Liabilities, Lender, at its option, may take whatever action at law or in equity Lender may deem necessary, regardless of whether Lender shall have exercised any of its rights or remedies with respect to any of the Liabilities, and Lender may demand, at its option, that Guarantor pay forthwith the full amount which would be due and payable hereunder as if all Liabilities were then due and payable.

5. GENERAL.

(a) Assignment; Successors and Assigns. This Guaranty may be assigned by Lender without notice to Guarantor, but Guarantor may not assign this Guaranty without the prior written consent of Lender. The guaranty and the other agreements contained herein shall bind the legal representatives, heirs, successors, and assigns of Guarantor, and shall inure to the benefit of Lender and its successors and assigns. Each reference to Guarantor herein shall be deemed to include the legal representatives, heirs, and agents of Guarantor, and their respective successors and assigns.

(b) Amendment; Merger. This Guaranty is intended by the Parties to be an amendment to and restatement of any prior Individual Guaranty or other similar document or instrument between Lender (or any predecessor of Lender, including Dealer Services Corporation and/or Manheim Automotive Financial Services, Inc.) and Guarantor, or otherwise executed by Guarantor for the benefit Lender (or any predecessor of Lender, including Dealer Services Corporation and/or Manheim Automotive Financial Services, Inc.). This Guaranty may be modified or amended only upon the written consent of Lender and Guarantor. The Parties acknowledge that Guarantor may have also acknowledged and consented to the terms and conditions set forth in the Note, and, in such event, this Guaranty shall be deemed supplemental and in addition to the terms and conditions of the Note to which Guarantor has acknowledged and consented. In the event of any conflict between a term or provision set forth in this Guaranty, and a term or provision set forth in the Note, the term or provision set forth in this Guaranty shall, as between Lender and Guarantor, be deemed controlling.

(c) Execution. Guarantor may execute this Guaranty only by original signature of Guarantor, unless otherwise authorized by Lender. Lender may, in its sole discretion, permit Guarantor to execute this Guaranty by affixing to this Guaranty an electronic or digital signature. Guarantor acknowledges and agrees that any electronic or digital signature of Guarantor shall for all purposes be deemed effective and constitute the valid signature of Guarantor, and shall be deemed to satisfy all requirements imposed on electronic or digital signatures under the UCC, the Electronic Signatures in Global and National Commerce Act (the "E-Sign Act"), and any other similar Laws relating to the validity or enforceability of electronic or digital signatures (including, without limitation, any enactment of the Uniform Electronic Transactions Act (UETA)), and such electronic or digital signature shall not be denied legal effect, validity, or enforceability solely because it is in electronic or digital form. A facsimile or photocopied reproduction of the signatures on this Guaranty shall be deemed original signatures for all intents and purposes.

(d) Notices. All notices, demands and requests required or permitted to be given under this Guaranty shall be (i) in writing, (ii) delivered by personal delivery or sent by commercial delivery service or certified mail, return receipt requested (except with respect to notices pursuant to Section 3(b), which notices may only be given by certified mail, return receipt requested), (iii) deemed to have been given on the date of personal delivery or the date set forth in the records of the delivery service or on the return receipt, and (iv) addressed as follows (or, in the case of Lender, to any other subsequent address that Lender may provide to Guarantor (through written notice or otherwise) for purposes of directing future notices, demands or requests):

If to Lender: NextGear Capital, Inc., 11799 North College Avenue, Carmel, IN 46032
Telephone: (317) 571-3721

with a copy to:

NextGear Capital, Inc., 11799 North College Avenue, Carmel, IN 46032
Telephone: (317) 571-3721
Attention: Legal Department

If to Guarantor: James Michael C Blackburn, 1500 Cordova Rd #206, Fort Lauderdale, FL 33316
Telephone: 954-232-7661

(e) No Waiver. No failure or delay by Lender in exercising any right, power, or privilege or the granting of an exception by Lender with respect to any term or condition of this Guaranty will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege, or the exercise of any other right, power, or privilege by Lender.

(f) Severability. Any provision of this Guaranty that is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability, without rendering invalid or unenforceable the remaining provisions of this Guaranty or affecting the validity or enforceability of any provision of this Guaranty in any other jurisdiction.

(g) Governing Law. Except with respect to the interpretation or enforcement of the arbitration and other provisions set forth in Section 5(i) (which shall be governed by the Federal Arbitration Act), the validity, enforceability, and interpretation of this Guaranty shall be governed by the internal Laws of the State of Indiana, without regard to conflicts of Laws provisions thereof.

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy by the designated custodian

(h) Jurisdiction and Venue. As evidenced by Guarantor's signature below, subject to the provisions in Section 5(i), Guarantor submits to the personal jurisdiction and venue of the state and federal courts of Marion County and Hamilton County, Indiana, and agrees that any and all claims or disputes pertaining to this Guaranty, or to any matter arising out of or related to this Guaranty, which are initiated by Guarantor against Lender, to the extent, if any, that such claims or disputes are not subject to the provisions noted in Section 5(i), shall be brought in the state or federal courts of Marion County or Hamilton County, Indiana. Further, Guarantor expressly consents to the jurisdiction and venue of the state and federal courts of Marion County and Hamilton County, Indiana, as to any legal or equitable action that may be brought in such court by Lender, and waives any objection based upon lack of personal jurisdiction, improper venue or forum non conveniens with respect to any such action. Guarantor acknowledges and agrees that Lender reserves the right to initiate and prosecute any action against Guarantor in any court of competent jurisdiction, and Guarantor consents to such forum as Lender may elect.

(i) Mandatory Binding Arbitration; Waiver of Class Action Rights.

(i) In the unlikely event that Lender is unable to resolve a dispute or claim that Guarantor may have, Guarantor agrees to arbitrate any such dispute or claim in accordance with this Section 5(i). This agreement to arbitrate is intended to be broadly interpreted, and includes (i) all disputes, claims and counterclaims arising out of or relating to this Guaranty or any aspect of Guarantor's past, present or future relationship with Lender, whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory; (ii) all disputes, claims and counterclaims that may have arisen before this Guaranty or any prior contract or agreement between Guarantor and Lender; and (iii) any disputes, claims and counterclaims that may arise after the termination of this Guaranty. Additionally, Guarantor acknowledges that Lender may (BUT SHALL IN NO EVENT BE REQUIRED TO) arbitrate any dispute or claim that it may have against Guarantor, with any such arbitration being governed by the provisions of this Section 5(i). BY AGREEING TO ARBITRATION, GUARANTOR UNDERSTANDS AND AGREES THAT IT IS WAIVING ITS RIGHTS TO MAINTAIN OTHER AVAILABLE RESOLUTION PROCESSES, SUCH AS COURT ACTION (INCLUDING A JURY TRIAL) OR ADMINISTRATIVE PROCEEDING, IN ORDER TO SETTLE OR RESOLVE DISPUTES OR ANY CLAIMS AGAINST LENDER. ARBITRATION IS DIFFERENT THAN A COURT ACTION, AND THE RULES IN ARBITRATION ARE DIFFERENT THAN THE RULES THAT APPLY IN COURT. THERE IS NO JUDGE OR JURY IN ARBITRATION, AND REVIEW IS LIMITED, BUT AN ARBITRATOR CAN AWARD THE SAME DAMAGES AND RELIEF AS A COURT, SUBJECT TO THE AGREED TERMS AND LIMITATIONS IN THIS NOTE. Guarantor, at his or her election, may opt-out of the arbitration provisions set forth in Sections 5(i)(i), 5(i)(iii) and 5(i)(iv) by providing written notice of his or her election to opt-out no later than thirty (30) days after Guarantor's execution of this Guaranty, which notice shall be provided to Lender pursuant to Section 5(d) ("Opt-Out Notice"), provided that such Opt-Out Notice shall become effective only upon Guarantor's receipt of written confirmation from Lender that such Opt-Out Notice has been received by Lender within the required time period. Guarantor acknowledges and agrees that, irrespective of any Opt-Out Notice or any written confirmation thereof, Guarantor shall in all events be subject to the provisions of Section 5(i)(ii).

(ii) ANY ARBITRATION OR OTHER LEGAL PROCEEDING OF ANY TYPE OR NATURE UNDER OR RELATING TO THIS GUARANTY OR TO ANY ASPECT OF GUARANTOR'S PAST, PRESENT OR FUTURE RELATIONSHIP OR ACTIVITIES WITH OR INVOLVING LENDER (INCLUDING ANY MARKETING ACTIVITIES OR SOLICITATIONS BY OR ON BEHALF OF LENDER), WILL TAKE PLACE ON AN INDIVIDUAL BASIS. CLASS ARBITRATIONS AND CLASS ACTIONS OF ANY KIND (WHETHER PURSUED THROUGH ARBITRATION OR THROUGH THE COURTS) ARE NOT PERMITTED. GUARANTOR AGREES THAT IT MAY BRING CLAIMS AGAINST LENDER ONLY IN HIS OR HER INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. GUARANTOR AGREES THAT, BY ENTERING INTO THIS GUARANTY, GUARANTOR IS WAIVING HIS OR HER RIGHT TO PARTICIPATE IN ANY CLASS ACTION OR OTHER SIMILAR REPRESENTATIVE PROCEEDING. UNLESS CONSENTED TO IN WRITING BY LENDER, THE ARBITRATOR MAY NOT CONSOLIDATE MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING. GUARANTOR ACKNOWLEDGES AND AGREES THAT THE SIZE OF BORROWER'S CREDIT LINE, THE INTEREST RATE TO WHICH ADVANCES ARE SUBJECT AND CERTAIN FEES CHARGED TO BORROWER, AS WELL AS THE SIZE AND DATES OF SPECIFIC ADVANCES AND WHAT (IF ANY) GUARANTIES ARE REQUIRED, ARE UNIQUE TO AND NEGOTIATED BY BORROWER (AND, IF APPLICABLE, GUARANTOR), AND THAT SUCH FACTORS WILL AND DO VARY AMONG BORROWERS AND OTHER GUARANTORS.

(iii) Any dispute or claim subject to arbitration pursuant to this Section 5(i) shall be submitted to binding arbitration administered by the Judicial Arbitration and Mediation Service ("JAMS") pursuant to its Comprehensive Arbitration Rules and Procedures as then in effect (the "JAMS Comprehensive Rules"); provided, however, that any dispute or claim that is subject to arbitration pursuant to this Section 5(i) and that involves disputes or claims where the aggregate amount reasonably in dispute or controversy is less than $100,000, shall be submitted to binding arbitration administered by JAMS pursuant to its Streamlined Arbitration Rules and Procedures as in effect as of the effective date of this Guaranty (the "JAMS Streamlined Rules"). The disputes and claims subject to arbitration pursuant to this Section 5(i) will be resolved by a single arbitrator selected pursuant to the JAMS Comprehensive Rules or the JAMS Streamlined Rules, as the case may be. The arbitrator shall be bound by and shall strictly enforce the terms of this Guaranty and may not limit, expand or otherwise modify any term or provision of this Guaranty or any other contract or document between Guarantor and Lender. The arbitrator shall not have the power to award to Guarantor any damages that are excluded or that have been waived by Guarantor under this Guaranty, and Guarantor irrevocably waives any claim that it may have thereto. The arbitrator shall not have the power to order pre-hearing discovery of documents or the taking of depositions. The arbitrator shall render a written decision within six (6) months after being selected. Any arbitration will be held in Indianapolis, Indiana (or its greater metro area). Each Party will bear its own expenses in the arbitration and will share equally the costs of the arbitration; provided, however, that the arbitrator may, in his or her discretion, award costs and fees to the prevailing Party. The result of any arbitration shall be final and binding upon the Parties. Judgment upon any arbitration award may be entered in any court having jurisdiction over the award or over the applicable party or its assets.

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h by the designated custodian

(iv) This Guaranty evidences transactions in interstate commerce, and thus the Federal Arbitration Act governs the interpretation and enforcement of this Section 5(i), notwithstanding the provisions of Section 5(g).

(j) WAIVER OF JURY TRIAL. AFTER CONSULTING OR HAVING HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL, LENDER AND GUARANTOR KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVE ANY RIGHT EITHER PARTY MAY HAVE TO A TRIAL BY JURY IN ANY LITIGATION BASED UPON OR ARISING OUT OF THIS GUARANTY, OR ANY OF THE TRANSACTIONS CONTEMPLATED BY THIS GUARANTY, OR ANY COURSE OF CONDUCT, STATEMENT, WHETHER ORAL OR WRITTEN, OR ACTIONS OF LENDER OR GUARANTOR. NEITHER LENDER NOR GUARANTOR SHALL SEEK TO CONSOLIDATE, BY COUNTERCLAIM OR OTHERWISE, ANY ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED. THESE PROVISIONS SHALL NOT HAVE BEEN DEEMED TO HAVE BEEN MODIFIED IN ANY RESPECT OR RELINQUISHED BY LENDER OR GUARANTOR EXCEPT BY WRITTEN INSTRUMENT EXECUTED BY BOTH LENDER AND GUARANTOR.

(k) LIMITATION OF LIABILITY. IN NO EVENT SHALL ANY LENDER PARTY BE LIABLE FOR ANY SPECIAL, INDIRECT, EXEMPLARY, PUNITIVE, INCIDENTAL, MULTIPLE OR CONSEQUENTIAL DAMAGES (INCLUDING ANY DAMAGES RESULTING FROM LOSS OF USE, LOSS OF PROFITS, LOSS OF BUSINESS OR OTHER ECONOMIC LOSS) ARISING OUT OF OR IN CONNECTION WITH THIS GUARANTY, EVEN IF SUCH LENDER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. FURTHER, IN NO EVENT SHALL THE LENDER PARTIES, COLLECTIVELY, BE LIABLE FOR ANY DAMAGES UNDER THIS GUARANTY OR ANY OTHER LOAN DOCUMENT THAT EXCEED, IN THE AGGREGATE, AN AMOUNT EQUAL TO THE SUM OF THE INTEREST AND FLOORPLAN FEES ACTUALLY PAID TO LENDER BY BORROWER UNDER THE NOTE DURING THE TWELVE (12) MONTH PERIOD IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO THE CLAIM AT ISSUE (OR, IN THE CASE OF MULTIPLE EVENTS, THE FIRST SUCH EVENT GIVING RISE TO THE CLAIM AT ISSUE).

(l) Descriptive Headings; Interpretation. The descriptive headings herein are for convenience of reference only and shall not control or affect the meaning or construction of any provision of this Guaranty. As used in this Guaranty, the terms "include," "includes," and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of like import.

WHEREFORE, Guarantor has executed this Guaranty on the date set forth below.

GUARANTOR:

DocuSigned by: James Michael C Blackburn
C4...919C8BD84D1...

By:
Name: James Michael C Blackburn
3/26/2019 | 4:42:48 PM EDT
Date: ____________________

COPY VIEW

PAG-B0070

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy by the designated custodian

# INDIVIDUAL GUARANTY

THIS INDIVIDUAL GUARANTY (this "Guaranty") is made and entered into by the undersigned guarantor ("Guarantor") in favor of NextGear Capital, Inc. ("Lender") and it Affiliates, pursuant to that certain Demand Promissory Note and Loan and Security Agreement by and between Borrower (as defined below) and Lender (the "Note").

NOW, THEREFORE, in consideration of any loan or other financial accommodation heretofore or hereafter at any time made or granted to Borrower by Lender, and the mutual covenants, agreements, and conditions contained herein, Guarantor agrees as follows:

1. DEFINITIONS. Capitalized terms used herein and not defined in this Section 1 or elsewhere in this Guaranty shall have the respective meanings as set forth in the Note (such meanings to be equally applicable to both the singular and plural forms of the terms defined). Any capitalized terms used herein, but not otherwise defined herein or in the Note, as the case may be, shall have the meanings ascribed to them in the UCC.

(a) "Borrower" shall mean the Person listed below, including any Affiliates of such Person, whether now in existence or hereinafter established or acquired:

Premier Group Autos LLC DBA Overfinch Miami, 11 SW 12th Ave Ste 103 Bldg 59, Dania Beach, FL 33004-3527
Telephone: (954) 440-0717

(b) "Liabilities" shall mean any and all Advances, debts, financial obligations, fees, charges, expenses, attorneys' fees and costs of collection owing, arising, due, or payable from Borrower to Lender or any of its Affiliates, of any kind or nature, present or future, under any instrument, guaranty, or other document, whether arising under the Note or any other Loan Document, whether directly or indirectly, absolute or contingent, primary or secondary, due or to become due, now existing or hereafter arising, and however acquired.

2. GUARANTY AND OTHER AGREEMENTS.

(a) Guaranty Obligations. Guarantor hereby voluntarily, unconditionally, and absolutely guarantees (i) the full and prompt payment when due, whether by acceleration or otherwise, and at all times hereafter, of all Liabilities, and (ii) the full and prompt performance of all the terms, covenants, conditions, and agreements related to the Liabilities. Guarantor further agrees to pay all expenses, including attorneys' fees and court costs (including, in each case, those relating to bankruptcy and appeals), paid or incurred by Lender or its Affiliates in endeavoring to collect on any Liabilities, and in enforcing this Guaranty or in defending any claims by Borrower or any Guarantor related to any of the Liabilities, plus interest on such amounts at the lesser of (A) thirteen percent (13%) per annum, compounded daily, or (B) the maximum rate permitted by Law. Interest on such amounts paid or incurred by Lender shall be computed from the date of payment made by Lender and shall be payable on demand.

(b) General Nature of Guaranty. Guarantor acknowledges that this Guaranty is a guaranty of payment and not of collection, and that his or her obligations hereunder shall be absolute, unconditional, and unaffected by: (i) the waiver of the performance or observance by Borrower or any Guarantor of any agreement, covenant, term, or condition to be performed or observed by Borrower or any such Guarantor, as the case may be; (ii) the extension of time for the payment of any sums owing or payable with respect to any of the Liabilities or the time for performance of any other obligation arising out of or relating to any of the Liabilities; (iii) the modification, alteration, or amendment of any obligation arising out of or relating to any of the Liabilities; (iv) any failure, delay, or omission by Lender to enforce, assert, or exercise any right, power, or remedy in connection with any of the Liabilities; (v) the genuineness, validity, or enforceability of any of the Liabilities or any document related thereto; (vi) the existence, value, or condition of, or failure of Lender or any of its Affiliates to perfect its lien against, any security pledged in connection with the Liabilities; (vii) the release of any security pledged in connection with the Liabilities, or the release, modification, waiver, or failure to enforce any other guaranty, pledge, or security agreement; (viii) the voluntary or involuntary liquidation, dissolution, sale of all or substantially all of the property, marshalling of assets and liabilities, receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization, arrangement, composition, or readjustment or other similar application or proceeding affecting Borrower or any assets of Borrower; (ix) the release or discharge of Borrower or any other Guarantor from the performance or observance of any agreements, covenants, terms, or conditions in connection with any of the Liabilities, by operation of Law or otherwise; (x) the default of Borrower in any obligations to Guarantor or any torts committed by Borrower against Guarantor, even if Lender is alleged to be complicit or to have committed a direct tort against Guarantor; or (xi) any change in Borrower's ownership, entity type, legal structure, or state of organization or formation, or in Guarantor's relationship to Borrower or any other Guarantor.

(c) Continuing and Unlimited Nature of Guaranty. The obligations of Guarantor under this Guaranty shall be continuing and shall cover any and all Liabilities existing as of the effective date of this Guaranty and any and all Liabilities thereafter incurred by Borrwer, including any and all Liabilities existing at the time of any termination of this Guaranty. This Guaranty shall be unlimited in amount and shall continue in effect until this Guaranty is terminated pursuant to Section 3.

(d) Waivers by Guarantor. Guarantor hereby expressly waives: (i) notice of the acceptance by Lender of this Guaranty; (ii) notice of the existence, creation, or non-payment of all or any of the Liabilities; (iii) presentment, demand, notice of dishonor, protest, and all other notices whatsoever; (iv) diligence in collection or protection of, or realization upon any of the Liabilities, any obligation under this Guaranty, or any security for or guaranty of any of the foregoing; (v) impairment of any collateral securing the Liabilities; (vi) notice of any change in Borrower's credit terms or limits with Lender, including any temporary or permanent increases in Borrower's Credit Line (and Guarantor prospectively consents to any such change); (vii) any non-contractual duties of Lender to Borrower or any Guarantor; and (viii) the protections of any Laws intended to protect consumers or regulate consumer loans, as the Liabilities are commercial in nature.

(e) Authorization. Guarantor authorizes Lender to obtain and share credit information relating to Guarantor from and with credit bureaus, financial institutions, trade creditors, affiliates, and others and to conduct such other credit investigations that Lender in its sole discretion deems necessary.

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

Guarantor expressly authorizes Lender to obtain his or her consumer credit report from time to time at Lender's discretion, and expressly ratifies any such consumer credit report that may have been obtained by or on behalf of Lender prior to the effective date of this Guaranty. Guarantor also authorizes Lender to contact any third parties to disclose information for the purpose of, among other things, obtaining intercreditor agreements and perfecting Lender's security interest. Further, Guarantor authorizes Lender to periodically obtain additional credit information on Guarantor through any available medium.

(f) Communication. Guarantor hereby expressly authorizes Lender and its Affiliates to communicate with Guarantor via facsimile transmissions, email messages, telephonic transmissions, both to a residential telephone line and/or cell phone, including text messaging, using an automatic telephone dialing system or an artificial or prerecorded voice message, and/or any other forms of communication, for any purpose, including general business matters, account information, marketing materials, collection, and/or any other communication needs. Guarantor acknowledges and agrees that such express permission shall extend to any and all of the contact information that Guarantor has provided herein, including any physical and email addresses, phone numbers, fax numbers, etc., and to such other addresses, phone numbers, email addresses, online chat, social media platforms, etc. that Guarantor may provide to Lender or any of its Affiliates or that Lender or any of its Affiliates may obtain from any third party at a later date.

(g) Enforcement. In no event shall Lender have any obligation to proceed against Borrower, any other Guarantor or any other Person, or any security pledged in connection with the Liabilities, before seeking satisfaction from Guarantor. Lender may, at its option, proceed, prior or subsequent to, or simultaneously with, the enforcement of its rights hereunder, to exercise any right or remedy it may have against Borrower, any other Guarantor or other Person, or any security pledged in connection with the Liabilities. This Guaranty is in addition to, and not in substitution for, any other guaranty or other securites which Lender may now or hereafter hold.

(h) Reinstatement. Guarantor agrees that, if, at any time, all or any part of any payment theretofore applied by Lender to any of the Liabilities is or must be rescinded or returned by Lender for any reason whatsoever (including as a result of any insolvency, bankruptcy, or reorganization of Borrower or any of his or her Affiliates), such Liabilities shall, for purposes of this Guaranty, to the extent that such payment is or must be rescinded or returned, be deemed to have continued in existence, notwithstanding such application by Lender, and this Guaranty shall continue to be effective or reinstated, as applicable, as to all such Liabilities, all as though such application by Lender had not been made.

(i) Financial Statements. Upon Lender's request, Guarantor will provide Lender with Guarantor's audited financial statements, as certified by Guarantor's independent certified public accountant, and such other financial statements, information, and other materials as Lender may request from time to time.

(j) Application of Payments; Subrogation. Any amounts received by Lender from any source on account of the Liabilities may be applied by it toward the payment of such of the Liabilities, and in such order of application, as Lender may from time to time elect. Notwithstanding any payments made by or for the account of Guarantor, Guarantor shall not be subrogated to any rights of Lender.

3. TERMINATION.

(a) Payment of Liabilities and Termination of Credit Line. This Guaranty shall be terminated upon the occurrence of all of the following: (i) the payment by Borrower or any Guarantor, either jointly or severally, of all Liabilities outstanding; (ii) the payment of all obligations by Guarantor which may be due to Lender under this Guaranty; and (iii) the filing of a UCC termination statement as to Borrower by or on behalf of Lender, or other written verification from Lender that Borrower's Credit Line is terminated.

(b) Revocation of Guaranty. This Guaranty may be revoked by Guarantor upon written notice to Lender by certified mail, return receipt requested, to the address provided in Section 5(d). This Guaranty shall be deemed terminated upon the occurrence of a revocation in the manner provided in this Section 3(b). However, such revocation and termination shall in no way terminate or otherwise affect: (i) any obligations of Guarantor existing on or prior to the effective date of such revocation or termination; or (ii) any obligations of Guarantor arising after the effective date of such revocation or termination with respect to any Liabilities incurred by Borrower on or before the effective date of such revocation or termination.

4. EVENTS OF DEFAULT. The occurrence of any of the following events shall be considered an event of default under this Guaranty (each, an "Event of Default"):

(a) Guarantor fails to make full payment of any amount owed hereunder after notice from Lender;

(b) Guarantor fails to perform or observe any agreement, covenant, term, or condition contained in this Guaranty (other than any monetary obligation described in clause (a) above), and such failure continues for ten (10) days after notice from Lender;

(c) Guarantor makes an assignment for the benefit of creditors or fails to pay his or her debts as the same become due and payable;

(d) Guarantor petitions or applies to any tribunal for the appointment of a trustee or receiver of the business, estate, or assets or of any substantial portion of his or her business, estate, or assets, or commences any proceedings relating to Guarantor under any bankruptcy, reorganization, insolvency, readjustment of debt, dissolution, or liquidation Law of any jurisdiction, whether now or hereafter in effect (each, a "Bankruptcy Filing");

(e) any Bankruptcy Filing is filed or any related proceedings commenced against Guarantor, and Guarantor by any act indicates his or her approval thereof, consent thereto, or acquiescence therein, or any order is entered appointing any trustee or receiver, declaring Guarantor bankrupt or insolvent, or approving or accepting the Bankruptcy Filing in any such proceedings;

DocuSign Envelope ID: FAE10158-F46A-48C8-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h by the designated custodian

(f) any suit or proceeding is filed or any related proceedings commenced against Guarantor or any of his or her Affiliates, which, if adversely determined, could substantially impair the ability of Guarantor or Borrower to perform any of their respective obligations with respect to this Guaranty or any of the Liabilities, in each case as determined by Lender in its sole and absolute discretion; or

(g) there is any Event of Default by Guarantor under the Note.

If an Event of Default under this Guaranty shall have occurred, in addition to pursuing any remedies which may be available to Lender with respect to the Liabilities, Lender, at its option, may take whatever action at law or in equity Lender may deem necessary, regardless of whether Lender shall have exercised any of its rights or remedies with respect to any of the Liabilities, and Lender may demand, at its option, that Guarantor pay forthwith the full amount which would be due and payable hereunder as if all Liabilities were then due and payable.

5. GENERAL.

(a) Assignment; Successors and Assigns. This Guaranty may be assigned by Lender without notice to Guarantor, but Guarantor may not assign this Guaranty without the prior written consent of Lender. The guaranty and the other agreements contained herein shall bind the legal representatives, heirs, successors, and assigns of Guarantor, and shall inure to the benefit of Lender and its successors and assigns. Each reference to Guarantor herein shall be deemed to include the legal representatives, heirs, and agents of Guarantor, and their respective successors and assigns.

(b) Amendment; Merger. This Guaranty is intended by the Parties to be an amendment to and restatement of any prior Individual Guaranty or other similar document or instrument between Lender (or any predecessor of Lender, including Dealer Services Corporation and/or Manheim Automotive Financial Services, Inc.) and Guarantor, or otherwise executed by Guarantor for the benefit Lender (or any predecessor of Lender, including Dealer Services Corporation and/or Manheim Automotive Financial Services, Inc.). This Guaranty may be modified or amended only upon the written consent of Lender and Guarantor. The Parties acknowledge that Guarantor may have also acknowledged and consented to the terms and conditions set forth in the Note, and, in such event, this Guaranty shall be deemed supplemental and in addition to the terms and conditions of the Note to which Guarantor has acknowledged and consented. In the event of any conflict between a term or provision set forth in this Guaranty, and a term or provision set forth in the Note, the term or provision set forth in this Guaranty shall, as between Lender and Guarantor, be deemed controlling.

(c) Execution. Guarantor may execute this Guaranty only by original signature of Guarantor, unless otherwise authorized by Lender. Lender may, in its sole discretion, permit Guarantor to execute this Guaranty by affixing to this Guaranty an electronic or digital signature. Guarantor acknowledges and agrees that any electronic or digital signature of Guarantor shall for all purposes be deemed effective and constitute the valid signature of Guarantor, and shall be deemed to satisfy all requirements imposed on electronic or digital signatures under the UCC, the Electronic Signatures in Global and National Commerce Act (the "E-Sign Act"), and any other similar Laws relating to the validity or enforceability of electronic or digital signatures (including, without limitation, any enactment of the Uniform Electronic Transactions Act (UETA)), and such electronic or digital signature shall not be denied legal effect, validity, or enforceability solely because it is in electronic or digital form. A facsimile or photocopied reproduction of the signatures on this Guaranty shall be deemed original signatures for all intents and purposes.

(d) Notices. All notices, demands and requests required or permitted to be given under this Guaranty shall be (i) in writing, (ii) delivered by personal delivery or sent by commercial delivery service or certified mail, return receipt requested (except with respect to notices pursuant to Section 3(b), which notices may only be given by certified mail, return receipt requested), (iii) deemed to have been given on the date of personal delivery or the date set forth in the records of the delivery service or on the return receipt, and (iv) addressed as follows (or, in the case of Lender, to any other subsequent address that Lender may provide to Guarantor (through written notice or otherwise) for purposes of directing future notices, demands or requests):

If to Lender: NextGear Capital, Inc., 11799 North College Avenue, Carmel, IN 46032
Telephone: (317) 571-3721

with a copy to:

NextGear Capital, Inc., 11799 North College Avenue, Carmel, IN 46032
Telephone: (317) 571-3721
Attention: Legal Department

If to Guarantor: Edward Anthony Kessler, 1500 Cordova Rd #206, Fort Lauderdale, FL 33316
Telephone: 412-527-8695

(e) No Waiver. No failure or delay by Lender in exercising any right, power, or privilege or the granting of an exception by Lender with respect to any term or condition of this Guaranty will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege, or the exercise of any other right, power, or privilege by Lender.

(f) Severability. Any provision of this Guaranty that is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability, without rendering invalid or unenforceable the remaining provisions of this Guaranty or affecting the validity or enforceability of any provision of this Guaranty in any other jurisdiction.

(g) Governing Law. Except with respect to the interpretation or enforcement of the arbitration and other provisions set forth in Section 5(i) (which shall be governed by the Federal Arbitration Act), the validity, enforceability, and interpretation of this Guaranty shall be governed by the internal Laws of the State of Indiana, without regard to conflicts of Laws provisions thereof.

DocuSign Envelope ID: FAE10158-F46A-46C8-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

(h) Jurisdiction and Venue. As evidenced by Guarantor's signature below, subject to the provisions in Section 5(i), Guarantor submits to the personal jurisdiction and venue of the state and federal courts of Marion County and Hamilton County, Indiana, and agrees that any and all claims or disputes pertaining to this Guaranty, or to any matter arising out of or related to this Guaranty, which are initiated by Guarantor against Lender, to the extent, if any, that such claims or disputes are not subject to the provisions noted in Section 5(i), shall be brought in the state or federal courts of Marion County or Hamilton County, Indiana. Further, Guarantor expressly consents to the jurisdiction and venue of the state and federal courts of Marion County and Hamilton County, Indiana, as to any legal or equitable action that may be brought in such court by Lender, and waives any objection based upon lack of personal jurisdiction, improper venue or forum non conveniens with respect to any such action. Guarantor acknowledges and agrees that Lender reserves the right to initiate and prosecute any action against Guarantor in any court of competent jurisdiction, and Guarantor consents to such forum as Lender may elect.

(i) Mandatory Binding Arbitration; Waiver of Class Action Rights.

(i) In the unlikely event that Lender is unable to resolve a dispute or claim that Guarantor may have, Guarantor agrees to arbitrate any such dispute or claim in accordance with this Section 5(i). This agreement to arbitrate is intended to be broadly interpreted, and includes (i) all disputes, claims and counterclaims arising out of or relating to this Guaranty or any aspect of Guarantor's past, present or future relationship with Lender, whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory; (ii) all disputes, claims and counterclaims that may have arisen before this Guaranty or any prior contract or agreement between Guarantor and Lender; and (iii) any disputes, claims and counterclaims that may arise after the termination of this Guaranty. Additionally, Guarantor acknowledges that Lender may (BUT SHALL IN NO EVENT BE REQUIRED TO) arbitrate any dispute or claim that it may have against Guarantor, with any such arbitration being governed by the provisions of this Section 5(i). BY AGREEING TO ARBITRATION, GUARANTOR UNDERSTANDS AND AGREES THAT IT IS WAIVING ITS RIGHTS TO MAINTAIN OTHER AVAILABLE RESOLUTION PROCESSES, SUCH AS COURT ACTION (INCLUDING A JURY TRIAL) OR ADMINISTRATIVE PROCEEDING, IN ORDER TO SETTLE OR RESOLVE DISPUTES OR ANY CLAIMS AGAINST LENDER. ARBITRATION IS DIFFERENT THAN A COURT ACTION, AND THE RULES IN ARBITRATION ARE DIFFERENT THAN THE RULES THAT APPLY IN COURT. THERE IS NO JUDGE OR JURY IN ARBITRATION, AND REVIEW IS LIMITED, BUT AN ARBITRATOR CAN AWARD THE SAME DAMAGES AND RELIEF AS A COURT, SUBJECT TO THE AGREED TERMS AND LIMITATIONS IN THIS NOTE. Guarantor, at his or her election, may opt-out of the arbitration provisions set forth in Sections 5(i)(i), 5(i)(iii) and 5(i)(iv) by providing written notice of his or her election to opt-out no later than thirty (30) days after Guarantor's execution of this Guaranty, which notice shall be provided to Lender pursuant to Section 5(b) ("Opt-Out Notice"), provided that such Opt-Out Notice shall become effective only upon Guarantor's receipt of written confirmation from Lender that such Opt-Out Notice has been received by Lender within the required time period. Guarantor acknowledges and agrees that, irrespective of any Opt-Out Notice or any written confirmation thereof, Guarantor shall in all events be subject to the provisions of Section 5(i)(ii).

(ii) ANY ARBITRATION OR OTHER LEGAL PROCEEDING OF ANY TYPE OR NATURE UNDER OR RELATING TO THIS GUARANTY OR TO ANY ASPECT OF GUARANTOR'S PAST, PRESENT OR FUTURE RELATIONSHIP OR ACTIVITIES WITH OR INVOLVING LENDER (INCLUDING ANY MARKETING ACTIVITIES OR SOLICITATIONS BY OR ON BEHALF OF LENDER), WILL TAKE PLACE ON AN INDIVIDUAL BASIS. CLASS ARBITRATIONS AND CLASS ACTIONS OF ANY KIND (WHETHER PURSUED THROUGH ARBITRATION OR THROUGH THE COURTS) ARE NOT PERMITTED. GUARANTOR AGREES THAT IT MAY BRING CLAIMS AGAINST LENDER ONLY IN HIS OR HER INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. GUARANTOR AGREES THAT, BY ENTERING INTO THIS GUARANTY, GUARANTOR IS WAIVING HIS OR HER RIGHT TO PARTICIPATE IN ANY CLASS ACTION OR OTHER SIMILAR REPRESENTATIVE PROCEEDING. UNLESS CONSENTED TO IN WRITING BY LENDER, THE ARBITRATOR MAY NOT CONSOLIDATE MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING. GUARANTOR ACKNOWLEDGES AND AGREES THAT THE SIZE OF BORROWER'S CREDIT LINE, THE INTEREST RATE TO WHICH ADVANCES ARE SUBJECT AND CERTAIN FEES CHARGED TO BORROWER, AS WELL AS THE SIZE AND DATES OF SPECIFIC ADVANCES AND WHAT (IF ANY) GUARANTIES ARE REQUIRED, ARE UNIQUE TO AND NEGOTIATED BY BORROWER (AND, IF APPLICABLE, GUARANTOR), AND THAT SUCH FACTORS WILL AND DO VARY AMONG BORROWERS AND OTHER GUARANTORS.

(iii) Any dispute or claim subject to arbitration pursuant to this Section 5(i) shall be submitted to binding arbitration administered by the Judicial Arbitration and Mediation Service ("JAMS") pursuant to its Comprehensive Arbitration Rules and Procedures as then in effect (the "JAMS Comprehensive Rules"); provided, however, that any dispute or claim that is subject to arbitration pursuant to this Section 5(i) and that involves disputes or claims where the aggregate amount reasonably in dispute or controversy is less than $100,000, shall be submitted to binding arbitration administered by JAMS pursuant to its Streamlined Arbitration Rules and Procedures as in effect as of the effective date of this Guaranty (the "JAMS Streamlined Rules"). The disputes and claims subject to arbitration pursuant to this Section 5(i) will be resolved by a single arbitrator selected pursuant to the JAMS Comprehensive Rules or the JAMS Streamlined Rules, as the case may be. The arbitrator shall be bound by and shall strictly enforce the terms of this Guaranty and may not limit, expand or otherwise modify any term or provision of this Guaranty or any other contract or document between Guarantor and Lender. The arbitrator shall not have the power to award to Guarantor any damages that are excluded or that have been waived by Guarantor under this Guaranty, and Guarantor irrevocably waives any claim that it may have thereto. The arbitrator shall not have the power to order pre-hearing discovery of documents or the taking of depositions. The arbitrator shall render a written decision within six (6) months after being selected. Any arbitration will be held in Indianapolis, Indiana (or its greater metro area). Each Party will bear its own expenses in the arbitration and will share equally the costs of the arbitration; provided, however, that the arbitrator may, in his or her discretion, award costs and fees to the prevailing Party. The result of any arbitration shall be final and binding upon the Parties. Judgment upon any arbitration award may be entered in any court having jurisdiction over the award or over the applicable party or its assets.

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h by the designated custodian

(iv) This Guaranty evidences transactions in interstate commerce, and thus the Federal Arbitration Act governs the interpretation and enforcement of this Section 5(i), notwithstanding the provisions of Section 5(g).

(j) WAIVER OF JURY TRIAL. AFTER CONSULTING OR HAVING HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL, LENDER AND GUARANTOR KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVE ANY RIGHT EITHER PARTY MAY HAVE TO A TRIAL BY JURY IN ANY LITIGATION BASED UPON OR ARISING OUT OF THIS GUARANTY, OR ANY OF THE TRANSACTIONS CONTEMPLATED BY THIS GUARANTY, OR ANY COURSE OF CONDUCT, STATEMENT, WHETHER ORAL OR WRITTEN, OR ACTIONS OF LENDER OR GUARANTOR. NEITHER LENDER NOR GUARANTOR SHALL SEEK TO CONSOLIDATE, BY COUNTERCLAIM OR OTHERWISE, ANY ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED. THESE PROVISIONS SHALL NOT HAVE BEEN DEEMED TO HAVE BEEN MODIFIED IN ANY RESPECT OR RELINQUISHED BY LENDER OR GUARANTOR EXCEPT BY WRITTEN INSTRUMENT EXECUTED BY BOTH LENDER AND GUARANTOR.

(k) LIMITATION OF LIABILITY. IN NO EVENT SHALL ANY LENDER PARTY BE LIABLE FOR ANY SPECIAL, INDIRECT, EXEMPLARY, PUNITIVE, INCIDENTAL, MULTIPLE OR CONSEQUENTIAL DAMAGES (INCLUDING ANY DAMAGES RESULTING FROM LOSS OF USE, LOSS OF PROFITS, LOSS OF BUSINESS OR OTHER ECONOMIC LOSS) ARISING OUT OF OR IN CONNECTION WITH THIS GUARANTY, EVEN IF SUCH LENDER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. FURTHER, IN NO EVENT SHALL THE LENDER PARTIES, COLLECTIVELY, BE LIABLE FOR ANY DAMAGES UNDER THIS GUARANTY OR ANY OTHER LOAN DOCUMENT THAT EXCEED, IN THE AGGREGATE, AN AMOUNT EQUAL TO THE SUM OF THE INTEREST AND FLOORPLAN FEES ACTUALLY PAID TO LENDER BY BORROWER UNDER THE NOTE DURING THE TWELVE (12) MONTH PERIOD IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO THE CLAIM AT ISSUE (OR, IN THE CASE OF MULTIPLE EVENTS, THE FIRST SUCH EVENT GIVING RISE TO THE CLAIM AT ISSUE).

(l) Descriptive Headings; Interpretation. The descriptive headings herein are for convenience of reference only and shall not control or affect the meaning or construction of any provision of this Guaranty. As used in this Guaranty, the terms "include," "includes," and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of like import.

WHEREFORE, Guarantor has executed this Guaranty on the date set forth below.

GUARANTOR:

DocuSigned by:
Edward Anthony Kessler
...28A15AC498...

By:
Name: Edward Anthony Kessler
Date: 3/27/2019 | 10:46:09 AM EDT

COPY VIEW

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h by the designated custodian

## ACH AUTHORIZATION AND REQUEST
(Debit or Credit)

The undersigned borrower ("Borrower") has incurred, or may in the future incur, certain Liabilities to NextGear Capital, Inc. ("Lender") under that certain Demand Promissory Note and Loan and Security Agreement by and between Borrower and Lender (the "Note"). Capitalized terms used herein but not defined herein shall have the respective meanings as set forth in the Note (such meanings to be equally applicable to both the singular and plural forms of the terms defined).

Borrower hereby authorizes and requests Lender, as Lender under the Note, to initiate electronic debit entries (each, an "Authorized Debit") to the bank account specified below (the "Designated Account") in payment of amounts and other Liabilities owed by Borrower under the Note and the other Loan Documents. Lender may initiate an Authorized Debit, (i) in the amount requested by Borrower in a written or oral communication with Lender (an "Elective Payment"); or (ii) in the amount due and owing by Borrower under the Note and the other Loan Documents, including all interest, fees, and other Liabilities with respect thereto (a "Required Payment"). Additionally, Borrower authorizes and requests Lender, as Lender under the Note, to initiate electronic credit entries (each, an "Authorized Credit") to the Designated Account. Borrower further acknowledges and agrees that:

- Lender may initiate an Elective Payment from the Designated Account at any time on or after the date such request is made by Borrower.
- Lender may initiate a Required Payment from the Designated Account on or after the first Business Day following a Maturity Date for any Liability, in each case in such amount as is due and owing with respect to such Liability on the date that such Required Payment is initiated by Lender (including any applicable fees and other amounts incurred by Borrower or accrued on such Liability after the Maturity Date).
- Borrower must maintain sufficient funds in the Designated Account to satisfy its payment obligations to Lender under this ACH Authorization and Request. If the Designated Account holds insufficient funds to cover an Authorized Debit, Borrower may be assessed fees or other charges by both the financial institution at which the Designated Account is held (the "Depository Bank") and by Lender, just as if Borrower had written a check to Lender that was returned for insufficient funds.
- Borrower is solely responsible for any overdraft charges or other fees that the Depository Bank may assess in connection with any transfers, whether debit or credit, initiated pursuant to this ACH Authorization and Request (including any Authorized Debit or Authorized Credit).
- This ACH Authorization and Request shall be deemed a "Loan Document" for all intents and purposes under the Note, and Lender shall be entitled to avail itself of any limitations of liability and other similar protections or relief afforded Lender under the Note, and these provisions and protections shall apply to any Authorized Debit, Authorized Credit, or other transaction initiated by Lender hereunder. Additionally, Lender shall have no liability and shall not be responsible for any damages arising from or relating to any checks or other payments dishonored after the available balance in the Designated Account is reduced by any Authorized Debit or other transaction initiated by Lender hereunder.
- Borrower will remain liable and responsible for all amounts owed under the Note and the other Loan Documents which remain unpaid as a result of an unsuccessful attempt to debit funds from the Designated Account pursuant to this ACH Authorization and Request.
- This ACH Authorization and Request does not create a fiduciary relationship between Lender and Borrower.
- Borrower is bound by the Operating Rules of the National Automated Clearing House Association (NACHA), as in effect from time to time with regard to each Authorized Debit, Authorized Credit, and other transaction initiated by Lender hereunder.
- Lender may provide via email to the email account designated below ("Designated Email") confirmation of each Authorized Debit, Authorized Credit, and other transaction processed hereunder (each a "Confirmation Email").
- Lender's business records reflecting the following shall be deemed conclusive proof of Borrower's authorization and request for an Authorized Debit: (1) a Confirmation Email of an Authorized Debit having been sent by Lender to the Designated Email or otherwise communicated to Borrower; and (2) no written objection having been confirmed received by Lender from Borrower within five (5) Business Days from the date the Confirmation Email or other communication was sent to Borrower.
- Borrower shall maintain the active status of the Designated Email (or provide immediate written notification to Lender of any change in the Designated Email) at all times.
- Borrower is the owner (or joint-owner) of the Designated Account, or, if the Designated Account is a corporate or other company account, the undersigned representative of Borrower is a duly authorized corporate or company representative of Borrower with permission to make and authorize the Authorized Debits, Authorized Credits and other transactions authorized by Borrower hereunder, in each case in the manner described herein. In the event that any of Borrower's Designated Account information changes, or in the event that Borrower closes the Designated Account, Borrower will promptly notify Lender at least ten (10) Business Days prior to such change or closure so that Lender can process Borrower's updated Designated Account information.

Lender may, if necessary, initiate adjustments at any time and without advance notice to Borrower for any debit or credit entry made in error to the Designated Account pursuant to this ACH Authorization and Request. This ACH Authorization and Request will remain in effect until Lender

DocuSign Envelope ID: FAE10158-F46A-48C8-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy by the designated custodian

has received, and has had sufficient time (but not less than ten (10) Business Days) to process, a written notice of termination delivered by Borrower to Lender in accordance with the provisions of Section 15 of the Note. Lender may terminate this ACH Authorization and Request at any time by providing written notice to Borrower. A facsimile or photocopied reproduction of any signature on this ACH Authorization and Request shall be deemed an original signature for all intents and purposes.

The undersigned Borrower hereby expressly acknowledges that this ACH Authorization and Request shall be binding on Borrower whether executed in original, "wet ink" form; submitted by facsimile; or submitted by electronically transmitted signature ("e-signature"). The undersigned Borrower further acknowledges that the acceptance of the terms of this ACH Authorization and Request, if by e-signature, shall be deemed to satisfy all requirements imposed on electronic or digital signatures under the Electronic Signatures in Global and National Commerce Act (the "E-Sign Act"), 15 U.S.C. §7001(a) et seq., and any other similar laws relating to the validity or enforceability of electronic or digital signatures. Each of the parties acknowledges and agrees that this ACH Authorization and Request may be executed by affixing to this ACH Authorization and Request an electronic or digital signature, which shall for all purposes be deemed effective to constitute the valid signature of the party affixing such electronic or digital signature.

| Designated Bank Account and Designated Email |
|---|
| Bank Name: HSBC Account Number: [redacted]716 Routing Number: [redacted]088 |
| Signor 1 on Account: James Michael C Blackburn Signor 2 on Account: Edward Anthony Kessler |
| Designated Email (for payment confirmation): sales@overfinchmiami.com |

WHEREFORE, Borrower, by its duly authorized representative, has executed this ACH Authorization and Request on the date set forth below.

**BORROWER:**

Premier Group Autos LLC DBA Overfinch Miami

DocuSigned by:
James Michael C Blackburn
C465419C8BD8401...
By:
Name: James Michael C Blackburn
Title: Manager

Date: 3/26/2019 | 4:42:48 PM EDT

DocuSigned by:
Edward Anthony Kessler
B42532EA13AC490...
By:
Name: Edward Anthony Kessler
Title: Manager

Date: 3/27/2019 | 10:46:09 AM EDT

COPY VIEW

# POWER OF ATTORNEY
(Entity/Partnership)

This Power of Attorney is executed by the undersigned borrower ("Borrower") and delivered to NextGear Capital, Inc. ("Lender") pursuant to that certain Demand Promissory Note and Loan and Security Agreement by and between Borrower and Lender (the "Note"). Capitalized terms used herein but not defined herein shall have the respective meanings as set forth in the Note (such meanings to be equally applicable to both the singular and plural forms of the terms defined). Any capitalized terms used herein, but not otherwise defined herein or in the Note, as the case may be, shall have the meanings ascribed to them in the UCC.

1. No Person to whom this Power of Attorney is presented, as authority for Lender to take any action described below, shall be required to inquire into or seek confirmation from Borrower as to the authority of Lender to take any action described below, or as to the existence of or fulfillment of any condition to this Power of Attorney, which is intended to grant to Lender unconditionally the authority to take and perform the actions described below. Borrower irrevocably waives any right that it may have, now or at any time in the future, to commence any claim, litigation, suit, petition, writ, or proceeding in any court of competent jurisdiction or before any arbitrator or other neutral, against any Person acting in reliance upon or otherwise acknowledging any power or authority granted by Borrower under this Power of Attorney. The Power of Attorney granted hereby is coupled with an interest and may not be revoked or canceled by Borrower without Lender's written consent or as otherwise allowed by Law. This Power of Attorney shall be deemed a "Loan Document" for all intents and purposes as referenced in the Note.

2. With or without the occurrence of an Event of Default under the Note, Borrower irrevocably appoints Lender (and all Representatives designated by Lender), with full power of substitution, as Borrower's true and lawful attorney-in-fact with full power and authority in the place and stead of Borrower and in the name of Borrower or in its own name, from time to time in Lender's discretion, to take any and all appropriate actions and to execute and deliver any and all documents and instruments which may be necessary or desirable to accomplish the purposes of the Note and each of the other Loan Documents. Without limiting the generality of the foregoing, Borrower hereby grants to Lender the power and right, on behalf of Borrower, without further notice to or assent by Borrower, at any time, to do the following:

   (a) execute such security agreements, invoices, notes, and related documentation as may be necessary for Borrower to acquire, refinance, or sell any Collateral (including any Units secured or to be secured by Advances made thereon);

   (b) execute all documents necessary for Lender to perfect or secure its interest in the Collateral;

   (c) make, settle, and adjust claims under policies of insurance, and endorse any check, draft, instrument, or other item of payment for the proceeds of such policies of insurance, and make all determinations and decisions with respect to such policies of insurance;

   (d) endorse the name of Borrower upon any document, instrument, certificate, evidence of title, state registration documents, trust receipt, checks or other items of payment, or any related or similar documents, in each case as necessary to pay for or protect the Collateral, including, without limitation, any agreements between Borrower and any global positioning satellite company;

   (e) endorse the name of Borrower upon any items of payment or proceeds of any Collateral (including any Units constituting Collateral), and to deposit the same to the account of Lender on account of Borrower's Liabilities under the Note and the other Loan Documents;

   (f) endorse the name of Borrower upon any chattel paper, document, instrument, invoice, freight bill, bill of lading, or similar document or agreement relating to any Collateral;

   (g) use the information recorded on or contained in any data processing equipment, computer hardware, or software relating to any Collateral to which Borrower has access;

   (h) pay or discharge any taxes, liens, security interests, or other encumbrances levied or placed on or threatened against Borrower or any of the Collateral;

   (i) communicate with any party to any contract with regard to the assignment of the right, title, and interest of Borrower in and under such contract and/or the Collateral, and other matters relating thereto;

   (j) contact any third parties and disclose and/or receive any Borrower information, including, without limitation, information or data in Borrower's application for credit with Lender, the Note, or Borrower's Credit Line, in each case for the purpose of, among other things, preserving Lender's security interest in the Collateral and ensuring the satisfaction of Borrower's Liabilities under the Note and the other Loan Documents; and

   (k) do all other things reasonably necessary to satisfy Borrower's Liabilities under the Note and the other Loan Documents.

3. Upon the occurrence of an Event of Default under the Note, Borrower irrevocably appoints Lender (and all Representatives designated by Lender), with full power of substitution, as Borrower's true and lawful attorney-in-fact with full power and authority in the place and stead of Borrower and in the name of Borrower or in its own name, from time to time in Lender's discretion, to do the following:

   (a) demand, collect, accept receipt for, settle, compromise, adjust, foreclose, or realize upon any of the Collateral, in each case in such manner as Lender may determine;

   (b) file or prosecute any claim, litigation, suit, petition, writ, or proceeding in any court of competent jurisdiction or before any arbitrator or other neutral, or take any other action otherwise deemed appropriate by Lender for the purpose of collecting any and all such moneys due to

EXHIBIT
5

Borrower, whenever payable, and to enforce any other right in respect of the Collateral, including, without limitation, confessing to or consenting to judgments, writs of replevin or possession, and/or any equitable relief in favor of Lender or its Affiliates;

(c) file or prosecute all proofs of claim against any account debtor on behalf of Borrower; and

(d) notify the United States Postal Service of a change in address for the delivery of Borrower's mail to an address designated by Lender, and to receive Borrower's mail on behalf of Borrower.

4. Any provision of this Power of Attorney that is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability, without rendering invalid or unenforceable the remaining provisions of this Power of Attorney or affecting the validity or enforceability of any provision of this Power of Attorney in any other jurisdiction. Borrower hereby ratifies, to the extent permitted by Law, all that Lender or its designated Representatives shall lawfully do or cause to be done by virtue hereof, whether such actions were done before or after the actual execution date of this Power of Attorney. The rights and privileges set forth herein shall be deemed supplemental and in addition to any rights and privileges to which Lender or any other Person may be entitled under the Note or any other Loan Document. A facsimile or photocopied reproduction of any signature on this Power of Attorney shall be deemed an original signature for all intents and purposes.

WHEREFORE, Borrower, by its duly authorized representative, has executed this Power of Attorney on the date set forth below.

**BORROWER**:

Premier Group Autos LLC DBA Overfinch Miami

By: ____________
Name: James Michael C Blackburn
Title: Manager
Date: 4.18.19

STATE OF FLORIDA )
) SS:
COUNTY OF BROWARD )

Before me, a Notary Public in and for said County and State, personally appeared James Michael C Blackburn known to me to be the Manager of Premier Group Autos LLC DBA Overfinch Miami who acknowledged the execution of the foregoing Power of Attorney, and who, having been duly sworn, states that any representations contained therein are true.

Witness my hand and Notarial Seal this 18 day of APRIL, 2019.

Notary Signature ____________

Notary Name (Printed) ARTURO MAYORAL

My Commission Expires: 10/11/2021 County of Residence: BROWARD

Notary Public State of Florida
Arturo Mayoral
My Commission GG 150838
Expires 10/11/2021

**POWER OF ATTORNEY**
(Entity/Partnership)

This Power of Attorney is executed by the undersigned borrower ("Borrower") and delivered to NextGear Capital, Inc. ("Lender") pursuant to that certain Demand Promissory Note and Loan and Security Agreement by and between Borrower and Lender (the "Note"). Capitalized terms used herein but not defined herein shall have the respective meanings as set forth in the Note (such meanings to be equally applicable to both the singular and plural forms of the terms defined). Any capitalized terms used herein, but not otherwise defined herein or in the Note, as the case may be, shall have the meanings ascribed to them in the UCC.

1. No Person to whom this Power of Attorney is presented, as authority for Lender to take any action described below, shall be required to inquire into or seek confirmation from Borrower as to the authority of Lender to take any action described below, or as to the existence of or fulfillment of any condition to this Power of Attorney, which is intended to grant to Lender unconditionally the authority to take and perform the actions described below. Borrower irrevocably waives any right that it may have, now or at any time in the future, to commence any claim, litigation, suit, petition, writ, or proceeding in any court of competent jurisdiction or before any arbitrator or other neutral, against any Person acting in reliance upon or otherwise acknowledging any power or authority granted by Borrower under this Power of Attorney. The Power of Attorney granted hereby is coupled with an interest and may not be revoked or canceled by Borrower without Lender's written consent or as otherwise allowed by Law. This Power of Attorney shall be deemed a "Loan Document" for all intents and purposes as referenced in the Note.

2. With or without the occurrence of an Event of Default under the Note, Borrower irrevocably appoints Lender (and all Representatives designated by Lender), with full power of substitution, as Borrower's true and lawful attorney-in-fact with full power and authority in the place and stead of Borrower and in the name of Borrower or in its own name, from time to time in Lender's discretion, to take any and all appropriate actions and to execute and deliver any and all documents and instruments which may be necessary or desirable to accomplish the purposes of the Note and each of the other Loan Documents. Without limiting the generality of the foregoing, Borrower hereby grants to Lender the power and right, on behalf of Borrower, without further notice to or assent by Borrower, at any time, to do the following:

   (a) execute such security agreements, invoices, notes, and related documentation as may be necessary for Borrower to acquire, refinance, or sell any Collateral (including any Units secured or to be secured by Advances made thereon);

   (b) execute all documents necessary for Lender to perfect or secure its interest in the Collateral;

   (c) make, settle, and adjust claims under policies of insurance, and endorse any check, draft, instrument, or other item of payment for the proceeds of such policies of insurance, and make all determinations and decisions with respect to such policies of insurance;

   (d) endorse the name of Borrower upon any document, instrument, certificate, evidence of title, state registration documents, trust receipt, checks or other items of payment, or any related or similar documents, in each case as necessary to pay for or protect the Collateral, including, without limitation, any agreements between Borrower and any global positioning satellite company;

   (e) endorse the name of Borrower upon any items of payment or proceeds of any Collateral (including any Units constituting Collateral), and to deposit the same to the account of Lender on account of Borrower's Liabilities under the Note and the other Loan Documents;

   (f) endorse the name of Borrower upon any chattel paper, document, instrument, invoice, freight bill, bill of lading, or similar document or agreement relating to any Collateral;

   (g) use the information recorded on or contained in any data processing equipment, computer hardware, or software relating to any Collateral to which Borrower has access;

   (h) pay or discharge any taxes, liens, security interests, or other encumbrances levied or placed on or threatened against Borrower or any of the Collateral;

   (i) communicate with any party to any contract with regard to the assignment of the right, title, and interest of Borrower in and under such contract and/or the Collateral, and other matters relating thereto;

   (j) contact any third parties and disclose and/or receive any Borrower information, including, without limitation, information or data in Borrower's application for credit with Lender, the Note, or Borrower's Credit Line, in each case for the purpose of, among other things, preserving Lender's security interest in the Collateral and ensuring the satisfaction of Borrower's Liabilities under the Note and the other Loan Documents; and

   (k) do all other things reasonably necessary to satisfy Borrower's Liabilities under the Note and the other Loan Documents.

3. Upon the occurrence of an Event of Default under the Note, Borrower irrevocably appoints Lender (and all Representatives designated by Lender), with full power of substitution, as Borrower's true and lawful attorney-in-fact with full power and authority in the place and stead of Borrower and in the name of Borrower or in its own name, from time to time in Lender's discretion, to do the following:

   (a) demand, collect, accept receipt for, settle, compromise, adjust, foreclose, or realize upon any of the Collateral, in each case in such manner as Lender may determine;

   (b) file or prosecute any claim, litigation, suit, petition, writ, or proceeding in any court of competent jurisdiction or before any arbitrator or other neutral, or take any other action otherwise deemed appropriate by Lender for the purpose of collecting any and all such moneys due to

EXHIBIT
6

Borrower, whenever payable, and to enforce any other right in respect of the Collateral, including, without limitation, confessing to or consenting to judgments, writs of replevin or possession, and/or any equitable relief in favor of Lender or its Affiliates;

(c) file or prosecute all proofs of claim against any account debtor on behalf of Borrower; and

(d) notify the United States Postal Service of a change in address for the delivery of Borrower's mail to an address designated by Lender, and to receive Borrower's mail on behalf of Borrower.

4. Any provision of this Power of Attorney that is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability, without rendering invalid or unenforceable the remaining provisions of this Power of Attorney or affecting the validity or enforceability of any provision of this Power of Attorney in any other jurisdiction. Borrower hereby ratifies, to the extent permitted by Law, all that Lender or its designated Representatives shall lawfully do or cause to be done by virtue hereof, whether such actions were done before or after the actual execution date of this Power of Attorney. The rights and privileges set forth herein shall be deemed supplemental and in addition to any rights and privileges to which Lender or any other Person may be entitled under the Note or any other Loan Document. A facsimile or photocopied reproduction of any signature on this Power of Attorney shall be deemed an original signature for all intents and purposes.

WHEREFORE, Borrower, by its duly authorized representative, has executed this Power of Attorney on the date set forth below.

**BORROWER:**

Premier Group Autos LLC DBA Overfinch Miami

By: [signature]
Name: Edward Anthony Kessler
Title: Manager
Date: 4.18.19

STATE OF Florida )
) SS:
COUNTY OF Broward )

Before me, a Notary Public in and for said County and State, personally appeared Edward Anthony Kessler known to me to be the Manager of Premier Group Autos LLC DBA Overfinch Miami who acknowledged the execution of the foregoing Power of Attorney, and who, having been duly sworn, states that any representations contained therein are true.

Witness my hand and Notarial Seal this 18 day of April, 2019

Notary Signature [signature]

Notary Name (Printed) Arturo Mayoral

My Commission Expires: 10/11/2021 County of Residence: Broward

Notary Public State of Florida
Arturo Mayoral
My Commission GG 150838
Expires 10/11/2021

BUSINESS LOAN AGREEMENT

MADE: the 11th Day of March 2019

BETWEEN

PREMIER GROUP AUTOS, LLC, a Florida Limited Liability Corporation

DBA – "OVERFINCH MIAMI"

(hereinafter called "BORROWER")

AND

EDWARD P. KESSLER & KRISTINE E. KESSLER (hereinafter called "LENDER")

WHEREAS, the LENDER promises to loan the BORROWER and the BORROWER promises to repay this principal amount to the LENDER. The LOAN amount will be:

*THREE HUNDRED THOUSAND DOLLARS AND ZERO CENTS*

*$300,000.00*

*@ $i^{(12)} = 8.00\%$ annual which is equivalent to $i^{(12)}/12 = 0.666\%$ per month*

Lawful money of the United States of America, together with interest thereon at the rate provided in the LOAN until the indebtedness is paid in full and in the manner and at the times therein set forth.

A. TRANSER OF FUNDS

a. The funds will be wired per the wiring instructions presented in various emails.

B. PAYMENTS

a. The BORROWER will pay the LENDER interest payments on the 1st of every month starting on May 1st, 2019
b. Per the agreement, the interest on the principal is due on the 1st of every month.
c. The BORROWER has the right to either write a check or wire the interest payments to the LENDER.
d. The LENDER will, if not already, have a wiring agreement set up with a bank in order to receive the wire transfers.

BORROWER Initials E.A.K /_____ LENDER Initials _____/_____

EXHIBIT 7

C. PURPOSE OF LOAN

a. The LOAN was lent to the BORROWER in order to purchase two (2) new Overfinch Range Rovers in order to increase the inventory of the fleet owned by the BORROWER. BORROWER will use this loan strictly for business transactions in "revolving" its inventory for the betterment of the business.

b. The BORROWER is to use this money for only purchasing vehicles in which will be reinvested into a new vehicle once a current vehicle has been sold.

D. DEFAULT

a. Notwithstanding anything to the contrary in this Agreement, if the BORROWER defaults in the performance of any obligation under this Agreement, then the LENDER may declare the principal amount owing and interest due under this Agreement at the time to be immediately due and payable.

b. If the BORROWER defaults and does not meet the financial statues or number of car sales expected to repay the LENDER the principal amount, but has inventory (Overfinch Range Rover) available, the title of the vehicle/s will be transferred from the BORROWER to the LENDER in order for the LENDER to acquire an "asset" as a substitute for repayments. This will give LENDER opportunity to sell vehicle on its own to receive the principal in a different route.

E. BINDING EFFECT

a. This Agreement will pass to the benefit of an be binding upon the respective heirs, executors, administrators, successors and permitted assigns of the Borrower and Lender. The BORROWER waives presentment for payment, notice of non-payment, protest, and notice of protest.

F. LOAN TERMS REVISIT

a. This LOAN agreement will be revisited by all parties in OCTOBER of the 2019 fiscal year.

b. Terms will depend on the performance of the BORROWER throughout the year.

c. Terms will be negotiated by all parties on whether all or some of the principal will be repaid by the end of the 2019 fiscal year. The option of keeping the money in the company will be on the table as well.

d. Whatever decision is made, all parties will have to agree on the terms, but seniority will go to the LENDER.

G. EVENT OF ADDITIONAL FUNDING REQUESTS FROM DIFFERENT LENDERS

a. In the event the BORROWER askes for more loans from different parties, the LENDER of this loan shall be made aware of any requests. The LENDER of this

loan will distinguish what path it would like to take as an effect to a choice made by the BORROWER.

H. SENIORITY

a. This loan will have seniority over other loans already put in the business by the current owners of the business.
b. The owners will have to repay this principal prior to repaying the principal of their own loans, unless the LENDER of this agreement agrees with any of those requests/transactions in writing.
c. This loan will also have seniority over any stock holder's contributions (equity) in the company as it stands before the processing of this loan. The owners of the BORROWER will know draw contribution money out of the company, and not

BORROWER Initials EAK /______ LENDER Initials ______/______

WITNESS and due execution hereof the day and year first above written.

BORROWER

WITNESS:

PREMIER GROUP AUTOS, LLC
DBA: OVERFINCH MIAMI

______________________

By : ______________________
Edward A. Kessler – Member/Manager

______________________

By : ______________________
James Blackburn – Member/Manager

LENDER:

WITNESS:

______________________

By: ______________________
Edward P. Kessler

______________________

By: ______________________
Kristine E. Kessler

PAG-B0086

Filing # 110321507 E-Filed 07/16/2020 09:44:11 AM

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT IN AND FOR BROWARD COUNTY, FLORIDA

EDWARD KESSLER, individually and on behalf of PREMIER GROUP AUTOS, LLC d/b/a Overfinch Miami,

CASE NO.: CACE 20-004101
DIVISION: 07
JUDGE: Jack Tuter

Plaintiffs,

v.

JAMES BLACKBURN, individually; KERRY KENWRIGHT, individually; CITYLIFE SOCIAL, LLC; NAUTIC CREW WORLDWIDE, LLC d/b/a Nautic Charters d/b/a Nautic Charter Worldwide; AND PREMIER WARRANTY CO. d/b/a CityLife Social d/b/a CityLife Social App Development d/b/a International Yacht Company d/b/a Quiet Planes,

Defendants.
_______________________________________/

**PLAINTIFFS' NOTICE OF FILING REPORT OF INDEPENDENT ACCOUNTANT**

Plaintiffs, EDWARD KESSLER ("Kessler") and PREMIER GROUP AUTOS, LLC ("PGA"), by and through their undersigned counsel, hereby give notice of filing of the Report of Independent Accountant, attached hereto at **Exhibit A.**

Exhibit 37
Witness Kessler
Date 10/29/21 ETL

EXHIBIT
Exhibit C

00613061.DOCX

PAG-B0566

KM000001

Dated: July 16, 2020

BAST AMRON LLP
*Counsel for Plaintiffs*
SunTrust International Center
One Southeast Third Avenue, Suite 1400
Miami, FL 33131
Telephone: 305.379.7904
Facsimile: 305.379.7905
Email: bamron@bastamron.com
Email: jhart@bastamron.com
Email: dquick@bastamron.com

By: *_/s/ Dana R. Quick_*
Brett M. Amron, Esq. (FBN 148342)
Jeremy J. Hart, Esq. (FBN 510645)
Dana R. Quick, Esq. (FBN 0074402)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed with the Florida Courts E-Filing Portal, which served a copy via automated e-service upon the all parties, this 16th day of July, 2020.

By: *_/s/ Dana R. Quick_*
Dana R. Quick, Esq.

IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

Case No. CACE 20004101

EDWARD KESSLER, et al,

Plaintiff(s) / Petitioner(s)

v.

JAMES BLACKBURN, et al

Defendant(s) / Respondent(s)

______________________________/

REPORT OF INDEPENDENT ACCOUNTANT

BARRY MUKAMAL, CPA/PFS/ABV/CFE/CFF/CIRA

July 13, 2020

## TABLE OF CONTENTS

| | Page No. |
|---|---|
| Introduction and Scope of Engagement | 3 |
| Professional Qualifications of Barry Mukamal | 3 |
| Background and Overview | 4 |
| Summary of Findings | 7 |
| Discussion | 10 |
| Conclusion | 13 |

## EXHIBITS

| | |
|---|---|
| Exhibit 1 | Documents Considered |
| Exhibit 2 | PGA Liabilities |
| Exhibit 3 | Sources and Uses of Cash |
| Exhibit 4 | Detail of Payments Made to Blackburn Entities and Insiders |
| Exhibit 5 | Summary of American Express Card Charges |
| Exhibit 6 | Detail of Personal Expenses |

## ATTACHMENTS

| | |
|---|---|
| Attachment 1 | Curriculum Vitae |
| Attachment 2 | Testimony Record |
| Attachment 3 | Court's Order Appointing Accountant dated April 30, 2020 |
| Attachment 4 | Kessler – Blackburn Agreement dated November 5, 2018 |
| Attachment 5 | Overfinch America Distribution Agreement dated December 3, 2018 |
| Attachment 6 | Agreement between Edward Anthony Kessler and Premier Group Autos, LLC dated December 3, 2018 |
| Attachment 7 | Business Loan Agreement Edward P. Kessler and Kristine E. Kessler dated March 11, 2019 |
| Attachment 8 | NextGear Capital Agreement dated April 18, 2019 |

Kapila/Mukamal
CPAs Forensic and Insolvency Advisors

## INTRODUCTION AND SCOPE OF ENGAGEMENT

1. Barry E. Mukamal, CPA of KapilaMukamal, LLP (hereinafter referred to as "KM") was appointed by this Court to "prepare the Reports as that term is defined in the Status Conference Order, and any schedules, spreadsheets or supplemental reports as needed to do so" ("Report") to include: a) an accounting of all assets, whether liquid or not, and liabilities of PGA[1]; and b) a schedule of all of PGA's expenditures of $2,500 or more, from PGA's inception through the present, along with an explanation for each expenditure.[2]

2. This Report sets forth KM's opinions based on the information available and the analyses KM has performed through the date of this Report. KM reserves the right to supplement this Report as necessary, and to respond to any other relevant information that becomes available between the date of this Report and, in the event required by the Court, the date that I may testify in this matter.

## PROFESSIONAL QUALIFICATIONS OF BARRY E. MUKAMAL

3. I, Barry E. Mukamal, am Co-Managing Partner at Kapila Mukamal, LLP. I am a Certified Public Accountant ("CPA") licensed in Florida. My Curriculum Vitae is attached hereto as Attachment 1 and includes additional details of my professional qualifications and experience.

4. I possess over 40 years of experience in the public accounting profession and financial services industry. I am accredited in business valuation ("ABV") and hold accreditation as

[1] Premier Group Autos, LLC

[2] See Attachment 3.

a personal financial specialist ("PFS"), certified fraud examiner ("CFE"), and certified in financial forensics ("CFF") and am a Certified Insolvency and Restructuring Advisor ("CIRA"). Areas of expertise include financial accounting, business valuation, forensic (investigative) accounting in litigation proceedings, economic damages, bankruptcy and insolvency matters. I have been appointed and currently serve as a Bankruptcy Panel Trustee in the Southern District of Florida. My prior experience includes consulting and expert testimony in numerous arbitration and litigation matters. A list of cases in which I have previously provided expert testimony is also included in Attachment 2. I expend approximately 50% of my billable hours for expert testimony work, of which approximately 60% pertains to plaintiff representation, and approximately 40% pertains to defense representation.

5. Other professionals at KapilaMukamal, LLP have worked on this engagement under my supervision and direction. I have reviewed and am familiar with all such procedures performed and work inventory prepared. Fees for professional services provided are based on hours actually expended by each assigned staff member extended by the standard hourly billing rate for that individual. Hourly billing rates for professional staff working on this matter range from $190 to $550. Fees are not contingent on the outcome of this matter.

## BACKGROUND AND OVERVIEW

6. PGA was formed by and between Edward A. Kessler ("Kessler" or "Plaintiff") and James Blackburn ("Blackburn" or "Defendant") pursuant to an agreement dated November 5, 2018 (the "Agreement") see Attachment 4. Material contracts entered into by PGA to carry

Kapila/Mukamal
CPAs Forensic and Insolvency Advisors

out its business plan to sell aftermarket Overfinch-branded Land Rover and Range Rover vehicles included:

a. Distribution agreement with Overfinch America dated December 3, 2018 (Attachment 5);

b. Loan Agreement for $160,000 between Kessler and PGA dated December 3, 2018 (the "EAK Loan") (Attachment 6);

c. Business Loan Agreement for $300,000 between PGA and Edward P. Kessler and Kristine Kessler dated March 11, 2019 ("Kessler Sr. Loan") (Attachment 7);

d. Demand Promissory Note and Loan and Security Agreement between PGA and NextGear Capital, Inc. dated April 18, 2019 (the "NextGear Loan")[3] to finance vehicle purchases (Attachment 8).

7. The EAK Loan, and an additional $20,356 funded by Kessler in January 2019, provided the funds to purchase the first Overfinch vehicle thereby commencing PGA's business operations. Proceeds from the sale of the first vehicle financed by the EAK Loan were deposited into the PGA bank account..

8. Funds provided to PGA via the Kessler Sr. Loan were used to purchase two additional vehicles. PGA paid interest of $2,000 monthly[4] from May to December 2019 to Edward P. Kessler on the $300,000 Kessler Senior Loan. No interest was paid on the Kessler Sr. Loan balance in 2020.

---

[3] Plaintiff has alleged that his signature was forged on the NextGear Loan documents.

[4] Equal to 8% interest on the $300.000 loan, consistent with the Kessler Sr. Loan Agreement.

Kapila/Mukamal

9. The NextGear loan funds were also used to purchase vehicles. PGA repaid partial funds to NextGear between April 2019 and September 2019. The information provided to KM indicates that PGA did not make any further repayments to NextGear after September 19, 2019.[5]

10. Kessler funded another $25,000 into PGA on May 31, 2019. This funding does not appear to have been evidenced by a note as with the EAK Loan.[6]

11. There was transactional activity in the PGA bank accounts maintained at HSBC from February 7, 2019 to April 20, 2020.[7]

12. There was transactional activity on the PGA American Express credit card account[8] from December 20, 2018 to May 27, 2019.[9]

13. The records provided indicate that PGA made its final vehicle sale in October 2019.

14. By the end of its first thirteen months of operations, PGA had been named as a defendant in three separate lawsuits brought by third parties seeking repayment of over $492,000.[10]

---

[5] NextGear filed a lawsuit against PGA seeking the return of over $357,00C in unpaid funds. This is addressed further below.

[6] Kessler also funded an additional $7,000 into PGA in September 2019 which was reflected on the PGA general ledger as being returned to Kessler approximately two weeks later.

[7] HSBC checking account ending in 3716 and HSBC savings account ending in 3724. KM was advised by Mr. Blackburn that there were no PGA bank accounts other than the aforementioned HSBC accounts.

[8] Blackburn and Kessler each had an American Express card for the American Express account ending in 1005.

[9] American Express did not allow any further charges after this date due to non-payment of over $100,000 in prior American Express charges.

[10] American Express National Bank v. Edward Kessler and Premier Group Autos, LLC [Case No. CACE-19-021456, Broward County Circuit Court] filed October 16, 2019 for $109,497.52.
Naples Motorsports, Inc. v. Premier Group Autos, LLC [Case No. CACE-19-022213] filed October 27, 2019 for $25,000.00.
NextGear Capital, Inc. v. Premier Group Autos, LLC [Case No. 1:20-CV-354, US District Court for the Southern District of Indiana] filed December 18, 2019 for $357,588.73.

Kapila/Mukamal
CPAs Forensic and Insolvency Advisors

## SUMMARY OF FINDINGS

15. Based on the information analyzed by KM, the company does not appear to have any remaining identifiable assets.[11]

16. PGA's liabilities amount to $1,009,499. PGA also may be obligated for up to an additional $230,000 in potential liabilities. *See* **Exhibit 2 – PGA Liabilities** for detail.

17. KM, in accordance with the court's instruction, identified those expenditures greater than $2,500. A list of those expenditures in their summary categories identified by KM are attached as **Exhibit 3 – Sources and Uses of Cash.**

18. Excluding cash outflows from the company which could not be identified as having a business purpose[12], PGA posted a modest profit. In the short time of its existence, PGA realized $2.6 million in sales revenue reduced by almost $2.2 million in vehicle purchases and another $340,000 in expenses assumed or identified by KM to be related to PGA's business operations resulting in estimated net income related to identified business operations of $65,610 as reflected in Table #1 below.

---

The aggregate $492,068.25 sought by the Plaintiffs in the lawsuits does not include pre-judgment interest, post-judgment interest or treble damages (sought by Naples Motorsports, Inc.).

[11] Amounts that might otherwise be classified as receivables for an ongoing business operation (such as disbursements to Blackburn entities) are considered, for purposes of this report, to be uncollectible by PGA. Those amounts are detailed further below.

[12] KM's inability to identify the business purpose of the cash outflows referenced is a result of KM not being provided with supporting documentation evidencing the business purpose for those expenditures.

*Table #1 – Premier Group Autos Estimated Net Income*

*for December 1, 2018 to April 20, 2020* [13] [14] [15]

| | | |
|---|---|---|
| Revenue | | |
| Vehicle Sales Revenues [2] | | 2,605,007 |
| | | |
| Expenses | | |
| HSBC Account | | |
| Vehicle Purchases | (2,198,927) | |
| Events, Shows & Marketing | (120,342) | |
| Miscellaneous Business Expense | (50,920) | |
| Vehicle Transport, Towing, & Delivery | (41,540) | |
| Professional Fees | (40,966) | |
| Interest Expense (Kessler Sr. Loan) | (16,000) | |
| Wages/ Commissions | (15,492) | |
| Vehicle Detailing, Repair & Maintenance | (13,811) | |
| Garage Insurance | (11,745) | |
| Other Vehicle Expenses (Tags, Gas, Parking & Tolls) | (9,440) | |
| Business Expenses - Edward A. Kessler | (7,094) | |
| Subtotal: Expenses *(HSBC Account)* | (2,526,278) | |
| Expenses *(Amercian Express Account)* | (13,119) | |
| Total Expenses | | (2,539,397) |
| Net Income | | 65,610 |
| | | |
| Notes: | | |
| 1) Source \| Exhibit 3 - Sources and Uses of Cash | | |
| 2) Excludes $255,000 customer deposits for which there was no evidence of vehicle purchase or sales. | | |

[13] April 20, 2020 was the last day of banking activity as reflected on the HSBC bank statements.

[14] KM was advised by PGA bookkeeper, Donna DeGroff, that PGA's 2018 activity was recorded under Blackburn entities Nautic Crew or Premier Warranty. To the extent that any PGA-related transactions were recorded under those or any other entities, such amounts would modify KM's findings.

[15] Excludes any cash outflows (i.e. – Expenses) for which a business purpose was not identified. See Exhibit 3 – Sources and Uses of Cash.

Kapila Mukamal
CPAs Forensic and Insolvency Advisors

19. PGA disbursed in excess of $1.17 million, and also incurred in excess of $96,000 in unpaid American Express card charges, for which no support as to business purpose has been provided. [16]

20. Included in the $1.17 million noted above, were over $930,000 in funds paid to Blackburn controlled entities or for Blackburn-related expenditures as summarized in Table #2 below. In comparison, PGA paid just under $7,100 to Kessler – an amount which *was* supported by expense reports submitted to PGA by Kessler.

[16] *See* Table 2, Footnote 2.

Kapila Mukamal
CPAs, Forensic and Insolvency Advisors

*Table #2 – PGA Payments to or for the benefit of PGA Owners*

| | | Blackburn [5] | Kessler [6] | Total |
|---|---|---|---|---|
| Nautic Crew Worldwide, LLC | [1] | $ 354,990 | $ - | $ 354,990 |
| James M Blackburn | | 150,560 | - | 150,560 |
| Samuel Blackburn | | 172,475 | - | 172,475 |
| Nicholas R Blackburn | | 7,037 | - | 7,037 |
| *Blackburn Entities & Insiders - HSBC Acct* | [2] | *685,062* | - | *685,062* |
| City Life Social, LLC - Amex Acct | [3] | 48,690 | - | 48,690 |
| *Blackburn Entities & Insiders -Total* | | 733,752 | - | 733,752 |
| | | | | |
| Personal Expenses - HSBC | [2] | 135,969 | - | 135,969 |
| Rent to Southern Center Associates | [4] | 33,611 | - | 33,611 |
| Travel - Barbados | | 16,432 | - | 16,432 |
| Personal Expenses - American Express | [3] | 12,060 | - | 12,060 |
| Kessler Business Expense Reimbursments | | - | 7,094 | 7,094 |
| Grand Total | | $ 931,824 | $ 7,094 | $ 938,918 |

Notes:

1) Net of $11,405 NSF checks.
2) Per HSBC bank records for accounts ending #3716 & #3724 for the period from January 3, 2019 through May 4, 2020. Excludes cash outflows categorized on Exhibit 3 - Sources and Uses of Cash as Pending Classification totaling $306,120. Documentation to identify unclassified cash outflows has not been provided and it is unknown whether these disbursements inured to the benefit of Blackburn or PGA.
3) Per American Express #1005 credit card statements for the period from December 20, 2018 through May 27, 2019. *See* Exhibit 5.
4) The office premises is leased by Nautic Crew Worldwide, LLC.
5) Support for amounts in the Blackburn column was not provided.
6) Supported by Kessler Expense reports.

## DISCUSSION

21. KM reviewed the complaint and pleadings, including the Order Appointing Accountant, in the matter as well as the material contracts referenced above to obtain an understanding of the case.

Kapila/Mukamal
CPAs Forensic and Insolvency Advisors

22. Documentation was requested from both parties including: all bank statements; balance sheets, income statements, and general ledger for 2019 and year-to-date 2020 (the "Accounting Reports"); documents supporting expenditures made by PGA whether direct or indirect (i.e. – via credit cards); and documentation relating to the NextGear Loan. KM reviewed and relied on the information provided by Plaintiff to perform its assigned scope of work.[17]

23. KM interviewed bookkeeper Donna DeGroff. Ms. DeGroff advised that she maintained hard copy files for PGA transactions on premises at the Blackburn office located at 1500 Cordova Road. Ms. DeGroff further advised that any documents supporting transactions, to the extent that such supporting documents were provided to DeGroff by Blackburn, were available in hard copy format at the time she ceased providing bookkeeping services for PGA.[18]

[17] The Plaintiff provided the requested information ranging from January 2019 to January 2020 for the Accounting Reports prepared by PGA bookkeeper Donna DeGroff as well as the HSBC bank account statements for January 2019 to May 2020. The Accounting Reports generally provide an accurate reflection of PGA's transactional activity. Ms. DeGroff advised KM that in many instances Mr. Blackburn did not provide her with any documents supporting various PGA cash outflows. As result, she created a series of accounts in the PGA income statement to categorize such unsupported cash outflows by payee and/or their purported purpose (i.e. – "Nautic Crew", "Travel - Barbados", etc…). KM used the Accounting Reports, specifically the general ledger, and the HSBC bank account statements as the basis for its analysis.

[18] Documents were not provided by the Defendants. A laptop utilized by PGA was provided to KM for imaging. KM obtained a forensic image of the laptop. The laptop image contained files which related to PGA including: vehicle sales; vehicle purchase orders; interim income statements and general ledgers; various interim schedules in Microsoft Excel (e.g. –NextGear funding activity); and, other PGA related information. With the exception of vehicle purchases, KM did not identify any support for the various expenditures incurred by PGA on the laptop forensic image. KM observed, but did not analyze, many emails on the laptop image.

Kapila Mukamal
CPAs Forensic and Insolvency Advisors

24. KM conducted calls with the Plaintiff and, separately, the Defendant with each of their respective counsel on those calls. KM also had other calls with counsel for each party to follow-up on document requests and related reporting issues.

25. The general ledgers provided by the Plaintiff were validated by KM referencing the HSBC banking records which were separately provided by the Plaintiff. [19] PGA's general ledger only reflects activity through January 24, 2020. KM therefore reconstructed the activity reflected on the HSBC bank account statements for January 25, 2020 to April 20, 2020.[20]

26. In accordance with the Court's Order, KM invited counsel for both parties to participate in a Meet and Confer on June 22, 2020 at 4:00 pm.[21] The Meet and Confer took place as scheduled. Plaintiff's Counsel participated. Defense Counsel did not participate.[22]

---

[19] In order to complete this analysis, the bank statements were converted into Microsoft Excel database format. The data validation was a time-consuming endeavor due to the fact that each transaction description from the Frazer general ledger includes all data relevant to the transaction aggregated into a single data field rather than separate data fields (e.g. payee, purpose, time period, invoice number, etc…). As a result, the matching of the transactions as recorded on the PGA general ledger to their corresponding activity and payee on the bank statements required much more effort than would have been anticipated had PGA general ledger transaction information been reflected in separate data fields. Furthermore, identification of the account where the reciprocal entry was recorded for a cash transaction had to be determined manually by date and amount.

[20] Identification of the account where the reciprocal entry was recorded for cash transaction activity had to be determined manually by date and amount.

[21] The Meet and Confer call was scheduled after Defense Counsel's assistant confirmed that he was available at that date and time. KM did not receive an acceptance of the electronic calendar invite from Defense Counsel. However, after the invite was sent to counsel, the Defendant provided a tentative acceptance response to the calendar invite. As the electronic calendar invitations were only provided to the parties' attorneys, we assume that Defense Counsel forwarded (or caused to have forwarded) the invitation to his client. The Defendant did not participate in the Meet and Confer call.

[22] Defense Counsel conferred with the accountants on June 23rd. At that time, KM reiterated KM's prior requests of May 4th, May 13th and May 19th for documents supporting the various cash outflows from PGA as business expenditures. KM also requested documents memorializing the agreement asserted by Blackburn providing for Blackburn's expenses to be reimbursed by PGA in lieu of him taking a salary from PGA. To date, such information has not been provided by the Defendant.

## CONCLUSION

27. KM provides this Report for the Court's consideration and is available to advise the Court further as to any questions or follow-up inquiries the Court may deem appropriate. KM reserves the right to revise this Report for relevant documentation provided to KM subsequent to the date of this Report.

Respectfully submitted,

Barry Mukamal, CPA/PFS/ABV/CFE/CFF/CIRA

Kapila Mukamal
CPAs Forensic and Insolvency Advisors

# Exhibit 1

PAG-B0581
KM000016

Kessler et al v. Blackburn et al | Case No. CACE-20-004101

## Exhibit 1 - Documents Considered

| Description | Date Produced |
|---|---|
| **Documents produced by Plaintiff** | |
| Bought Car with EAK Loan Affidavit.pdf | 2020 05 02 |
| Missing Wire - 1s (4).msg | 2020 05 02 |
| Missing Wire - 1s.msg | 2020 05 02 |
| RE deposit list.msg | 2020 05 02 |
| RE Missing Wire - 1s (5).msg | 2020 05 02 |
| RE Missing Wire - 1s.msg | 2020 05 02 |
| RE Overfinch Miami 1st Vehicle (1).msg | 2020 05 02 |
| RE Overfinch Miami 1st Vehicle (2).msg | 2020 05 02 |
| RE Overfinch Miami 1st Vehicle (3).msg | 2020 05 02 |
| RE Overfinch Miami 1st Vehicle .msg | 2020 05 02 |
| Amex Charges.pdf | 2020 05 11 |
| Balance Sheet & Income Stmt.zip | 2020 05 11 |
| Checks (00600452xC20C6).PDF | 2020 05 11 |
| General Ledger 01.01.19 - 12.31.19 (00587246xC20C6).PDF | 2020 05 11 |
| General Ledger.zip | 2020 05 11 |
| Kessler expense reports 3.pdf | 2020 05 11 |
| Kessler expense reports.4.pdf | 2020 05 11 |
| Kessler expense reports.5.pdf | 2020 05 11 |
| Kessler Expense Reports.zip | 2020 05 11 |
| Kessler.expense reports 1.pdf | 2020 05 11 |
| Kessler.expense reports.2.pdf | 2020 05 11 |
| R-4-1 (Balance Sheet) 2020-01-24 1704.pdf | 2020 05 11 |
| R-4-1 (Income Statement) 2020-01-20 1144.pdf | 2020 05 11 |
| R-4-1 (Income Statement) 2020-01-24 1705.pdf | 2020 05 11 |
| R-4-2-D (General Ledger Listing) 2020-01-20 1143.pdf | 2020 05 11 |
| Statements and Checks.zip | 2020 05 11 |
| Statements_3110 (00600451xC20C6).PDF | 2020 05 11 |
| Statements_3716 (00600450xC20C6).PDF | 2020 05 11 |
| Wire Records (00601383xC20C6).xlsx | 2020 05 12 |
| Blackburn TLO Report (00583793xC20C6).pdf | 2020 05 26 |
| FRZDATA1_2020.csv | 2020 05 26 |
| Kenwright TLO Report (00584268xC20C6).pdf | 2020 05 26 |
| | |
| **Pleadings** | |
| 2020 03 05 Complaint | |
| 2020 03 02 Affidavit of Donna DeGroff | |
| 2020 04 20 Motion to Dismiss | |
| 2020 04 30 Order Appointing Accountant | |
| 2020 06 09 Hearing Transcript | |
| | |
| **Agreements** | |
| 2018 11 05 Kessler Blackburn Agreement.pdf | |

Kessler et al v. Blackburn et al | Case No. CACE-20-004101

## Exhibit 1 - Documents Considered

| Description | Date Produced |
|---|---|
| 2018 12 03 Edward A Kessler $160K Loan to PGA.pdf | |
| 2018 12 03 Overfinch Distribution Agreement.pdf | |
| 2019 03 11 Edward Kessler Sr $300K Loan to PGA.pdf | |
| 2019 04 18 NextGear Financing Agreement.pdf | |
| | |
| **Other** | |
| 2019 10 27 Naples Motorsports, Inc v Premier Group Autos Complaint | |

# Exhibit 2

PAG-B0584

KM000019

## Exhibit 2 - PGA Liabilities

| | | Principal | Interest | Total |
|---|---|---|---|---|
| Edward A. Kessler Loan dated 12/3/2018 ("EAK Loan") | [1] | 160,000 | 12,667 | 172,667 |
| Edward A. Kessler supplement to EAK Loan 1/3/2019 | [2] | 20,356 | | 20,356 |
| Ewdard P. Kessler & Kristine Kessler Loan dated 3/11/2019 ("Kessler Sr. Loan") | [3] | 300,000 | 12,000 | 312,000 |
| NextGear Loan dated 4/28/2019 | [4] | 344,978 | | 344,978 |
| Kessler Subsequent Loan 5/31/2019 | [5] | 25,000 | | 25,000 |
| American Express | [6] | 109,498 | | 109,498 |
| Naples Motorsports, Inc. | [7] | 25,000 | | 25,000 |
| Total Known Outstanding Liabilities | | 984,832 | 24,667 | 1,009,499 |
| | | | | |
| Potential Liabilities - PGA Customer Deposits | [8] | 230,000 | | 230,000 |
| Total Liabilties | | 1,214,832 | 24,667 | 1,239,499 |

Notes:

1) Kessler loaned $160,000 to PGA to purchase the first Overfinch vehicle by paying Overfinch directly for the vehicle in December 2018. See Attachment 4. No interest or principal was paid on this loan. Interest as calcuated above is reflected through June 30, 2020.
2) Represents additional payment to Overfinch made by Kessler in January 2019 to complete the first Overfinch vehicle purchase. A loan agreement between PGA and Kessler for this second payment was not provided. Interest, if applicable, has not been calculated.
3) PGA paid $2,000 monthly interest on this loan from May to December 2019. No principal payments were made. Interest as calculated above is reflected through June 30, 2020. *See* Attachment 6.
4) NextGear alleged a balance due of $357,589 in their December 18, 2019 complaint. Interest charges likely are continuing to accrue but have not been included in this analysis.
5) Reflects undocumented loan funded by Kessler to PGA in May 2019. Interest, if appliable, has not been calculated.
6) Unpaid balance due from PGA as alleged in the American Express complaint against PGA. This amount agrees with the Amercian Express statements received by PGA. American Express voluntarily dismissed its complaint against PGA in November 2019, however, KM has not been provided evidence that this balance has been satisfied. The amount reflected excludes accrued interest, if any.
7) Naples Motorsports, Inc. ("NMS") complaint against PGA in Broward County [Case #CACE 19-022213] alleged that PGA did not deliver an Overfinch vehicle to NMS for which this $25,000 was advanced. NMS claimed the vehicle PGA provided to NMS was not what had been ordered; NMS returned the unwanted vehicle but PGA did not refund the $25,000 deposit. NMS is seeking treble damages, which are not included above.
8) The PGA January 24, 2020 internal balance sheet reflects $255,000 Customer Deposits, including the amount reflected in Footnote 7 above. There was no evidence in any of the records reviewed by KM, including the bank statments, that any of the Customer Deposits were satisfied either by product delivery (i.e. - sale) or refund.

# Exhibit 3

PAG-B0586

KM000021

Kessler et al v. Blackburn et al | Case No. CACE-20-004101

Exhibit 3 | Summary of Sources and Uses of Cash for Premier Group Autos LLC [1]

| | | Activity | Evidence of, or Assumed, Business Connection | No Evidence of PGA Expense | Pending Classification |
|---|---|---|---|---|---|
| **Sources of Cash** | | | | | |
| Vehicle Sales Revenues | [2] | 2,605,007 | 2,605,007 | - | - |
| Customer Deposits | [3] | 255,000 | 255,000 | | |
| Loan - Edward A. Kessler ("EAK Loan") | [4] | 180,536 | 180,536 | - | - |
| Loan - Edward P. Kessler & Kristine Kessler | [5] | 300,000 | 300,000 | - | - |
| Floorplan Loan - NextGear Funding | [6] | 285,972 | 285,972 | - | - |
| Loan - Edward A. Kessler | [7] | 25,000 | 25,000 | - | - |
| Line of Credit | | 1,213 | 1,213 | - | - |
| Unidentified Deposits | [8] | 50,742 | - | - | 50,742 |
| **Total Sources** | | 3,703,472 | 3,652,729 | - | 50,742 |
| | | | | | |
| **Uses of Cash** | | | | | |
| Vehicle Purchases | [9] | (2,198,927) | (2,198,927) | - | - |
| Blackburn Entities & Insiders | [10] | (685,062) | - | (685,062) | - |
| Travel | | (142,065) | - | - | (142,065) |
| Personal Expenses | | (135,969) | - | (135,969) | - |
| Events, Shows & Marketing | | (120,342) | (120,342) | - | - |
| Meals | | (79,265) | - | - | (79,265) |
| Credit Card Payments | | (55,441) | - | - | (55,441) |
| Miscellaneous Business Expense | | (50,920) | (50,920) | - | - |
| Vehicle Transport, Towing, & Delivery | | (41,540) | (41,540) | - | - |
| Professional Fees | | (40,966) | (40,966) | - | - |
| Rent | [11] | (33,611) | - | (33,611) | - |
| Cash | | (17,962) | - | - | (17,962) |
| Travel - Barbados | | (16,432) | - | (16,432) | - |
| Interest Expense (Kessler Sr. Loan) | | (16,000) | (16,000) | - | - |
| Wages/ Commissions | | (15,492) | (15,492) | - | - |
| Vehicle Detailing, Repair & Maintenance | | (13,811) | (13,811) | | |
| Garage Insurance | | (11,745) | (11,745) | - | - |
| Entertainment | | (11,387) | - | - | (11,387) |
| Other Vehicle Expenses (Tags, Gas, Parking & Tolls) | | (9,440) | (9,440) | - | - |
| Business Expenses - Edward A. Kessler | | (7,094) | (7,094) | - | - |
| **Total Uses of Cash** | [12] | (3,703,471) | (2,526,278) | (871,074) | (306,120) |
| | | | | | |
| American Express | [13] | (109,498) | (13,119) | (60,750) | (35,629) |
| **Total Incurred by PGA** | | (3,812,969) | (2,539,397) | (931,824) | (341,748) |
| Less: Customer Deposits & Loans (Kessler, NextGear, Line of Credit) | | | (1,047,722) | | |
| **Net Profit** | | | 65,610 | | |

Notes:

1) Source | PGA accounting records validated by HSBC bank statements
2) Excludes $255,000 customer deposits for which there was no evidence of vehicle purchase or sales, which are reflected as liabilities for purposes of this report. *See* Exhibit 2, Footnotes 7 and 8. To the extent that any of these Customer Deposits is determined to represent a PGA sale, such amount would increase PGA's estimated sales revenue accordingly.
3) Source | Exhibit 2.
4) Amounts loaned to PGA by Kessler to purchase the first Overfinch vehicle. *See* Exhibit 2, Footnotes 1 and 2.
5) Kessler Sr. Loan dated March 11, 2019. *See* Exhibit 2, Footnote 3.
6) The PGA Balance Sheet dated January 24, 2020 reflects a $344,978 outstanding liability to NextGear for floorplan financing. Neither the general ledger nor the bank statements reflect payments to NextGear subsequent to September 20, 2019. Note there is a discrepancy between the amount of receipts reflected on the bank statements ($285,972 above) and the PGA internal balance sheet ($344,978) which KM is unable to reconcile pending receipt of source documentation. NextGear alleges an outstanding balance of $357,589 in its complaint against PGA (see Complaint at ¶13).
7) Funded by Kessler in May 2019. Note that Kessler also funded another $7,000 into PGA in September 2019 which was reflected on the PGA general ledgers as being returned to Kessler approximately two weeks later which is not reflected above.

## Exhibit 3 | Summary of Sources and Uses of Cash for Premier Group Autos LLC [1]

8) Deposits with no descriptive source in the books or the bank statements.
9) Includes initial vehicle purchase funded by EAK Loan which did not flow through PGA's bank account but was instead paid directly by Kessler.
10) Includes Nautic Crew, James Blackburn, Samuel Blackburn, Nicholas Blackburn and City Life Social. *See* Exhibit 4.
11) The office premises is leased by Nautic Crew Worldwide, LLC.
12) Excludes $592,012 of inter-account transfers between the two PGA bank accounts at HSBC.
13) American Express credit card activity, both payments and charges, was not recorded on the PGA general ledger. *See* Exhibit 5.
14) Assumed Business Connection expenditures include: Events, Shows and Marketing; Miscellaneous Business Expense; and Professional Fees. Upon receipt of supporting documentation, such amounts may be reclassified into one of the other two categories.
15) Documentation supporting classification of these expenditures as related to PGA's business operations has not been provided. Upon receipt of supporting documentation, such amounts may be reclassified into one of the other two categories.
16) Documentation supporting classification of these expenditures has not been provided. Upon receipt of supporting documentation, such amounts may be reclassified into one of the other two categories.

# Exhibit 4

PAG-B0589

KM000024

Kessler et al v. Blackburn et al | Case No. CACE-20-004101

**Exhibit 4 - Detail of Payments Made to Blackburn Entities & Insiders**

Source | Bank Records for HSBC (#3716 & #3724) and American Express #1005 account statements

| Bank ID # | Statement Clearing Date | Check # / Dep Ref # | Payee/ Received From | Deposits / Credits | Checks / Debits | Net Activity |
|---|---|---|---|---|---|---|
| HSBC-3716 | 02/13/2019 | 1455 | Nautic Crew Worldwide, LLC | - | 1,500 | (1,500) |
| HSBC-3716 | 02/13/2019 | 1454 | Nautic Crew Worldwide, LLC | - | 12,500 | (12,500) |
| HSBC-3716 | 02/20/2019 | 1456 | Nautic Crew Worldwide, LLC | - | 10,000 | (10,000) |
| HSBC-3716 | 03/15/2019 | 3 | Nautic Crew Worldwide, LLC | - | 7,600 | (7,600) |
| HSBC-3716 | 03/18/2019 | 5 | Nautic Crew Worldwide, LLC | - | 4,500 | (4,500) |
| HSBC-3716 | 03/25/2019 | 8 | Nautic Crew Worldwide, LLC | - | 7,000 | (7,000) |
| HSBC-3716 | 04/01/2019 | 16 | Nautic Crew Worldwide, LLC | - | 7,500 | (7,500) |
| HSBC-3716 | 04/02/2019 | | Nautic Crew Worldwide, LLC | - | 6,500 | (6,500) |
| HSBC-3716 | 04/02/2019 | 22 | Nautic Crew Worldwide, LLC | - | 5,900 | (5,900) |
| HSBC-3716 | 04/04/2019 | 26 | Nautic Crew Worldwide, LLC | - | 5,000 | (5,000) |
| HSBC-3716 | 04/09/2019 | 34 | Nautic Crew Worldwide, LLC | - | 5,500 | (5,500) |
| HSBC-3716 | 04/16/2019 | 39 | Nautic Crew Worldwide, LLC | - | 7,500 | (7,500) |
| HSBC-3716 | 04/22/2019 | | Nautic Crew Worldwide, LLC | - | 6,500 | (6,500) |
| HSBC-3716 | 04/30/2019 | 47 | Nautic Crew Worldwide, LLC | - | 12,000 | (12,000) |
| HSBC-3716 | 05/01/2019 | 58 | Nautic Crew Worldwide, LLC | - | 4,000 | (4,000) |
| HSBC-3716 | 05/02/2019 | 62 | Nautic Crew Worldwide, LLC | - | 5,000 | (5,000) |
| HSBC-3716 | 05/06/2019 | | Nautic Crew Worldwide, LLC | - | 5,000 | (5,000) |
| HSBC-3716 | 05/13/2019 | | Nautic Crew Worldwide, LLC | - | 5,800 | (5,800) |
| HSBC-3716 | 05/14/2019 | | Nautic Crew Worldwide, LLC | - | 2,500 | (2,500) |
| HSBC-3716 | 05/20/2019 | | Nautic Crew Worldwide, LLC | - | 3,500 | (3,500) |
| HSBC-3716 | 05/28/2019 | | Nautic Crew Worldwide, LLC | - | 4,000 | (4,000) |
| HSBC-3716 | 05/30/2019 | 85 | Nautic Crew Worldwide, LLC | - | 11,000 | (11,000) |
| HSBC-3716 | 06/03/2019 | | Nautic Crew Worldwide, LLC | - | 4,000 | (4,000) |
| HSBC-3716 | 06/04/2019 | | Nautic Crew Worldwide, LLC | - | 1,750 | (1,750) |
| HSBC-3716 | 06/05/2019 | | Nautic Crew Worldwide, LLC | - | 2,000 | (2,000) |
| HSBC-3716 | 06/07/2019 | | Nautic Crew Worldwide, LLC | - | 1,300 | (1,300) |
| HSBC-3716 | 06/11/2019 | | Nautic Crew Worldwide, LLC | - | 4,000 | (4,000) |
| HSBC-3716 | 06/13/2019 | | Nautic Crew Worldwide, LLC | - | 1,750 | (1,750) |
| HSBC-3716 | 06/17/2019 | | Nautic Crew Worldwide, LLC | - | 1,500 | (1,500) |
| HSBC-3716 | 06/20/2019 | | Nautic Crew Worldwide, LLC | - | 2,800 | (2,800) |
| HSBC-3716 | 06/24/2019 | | Nautic Crew Worldwide, LLC | - | 3,000 | (3,000) |
| HSBC-3716 | 06/25/2019 | 106 | Nautic Crew Worldwide, LLC | - | 4,000 | (4,000) |
| HSBC-3716 | 06/28/2019 | 108 | Nautic Crew Worldwide, LLC | - | 940 | (940) |
| HSBC-3716 | 07/02/2019 | | Nautic Crew Worldwide, LLC | - | 650 | (650) |
| HSBC-3716 | 07/02/2019 | | Nautic Crew Worldwide, LLC | - | 950 | (950) |
| HSBC-3716 | 07/05/2019 | | Nautic Crew Worldwide, LLC | - | 4,500 | (4,500) |
| HSBC-3716 | 07/08/2019 | | Nautic Crew Worldwide, LLC | - | 3,800 | (3,800) |
| HSBC-3716 | 07/09/2019 | | Nautic Crew Worldwide, LLC | - | 6,000 | (6,000) |
| HSBC-3716 | 07/11/2019 | | Nautic Crew Worldwide, LLC | - | 3,500 | (3,500) |
| HSBC-3716 | 07/16/2019 | 120 | Nautic Crew Worldwide, LLC | - | 4,700 | (4,700) |
| HSBC-3716 | 07/22/2019 | 127 | Nautic Crew Worldwide, LLC | - | 4,500 | (4,500) |
| HSBC-3716 | 07/23/2019 | 128 | Nautic Crew Worldwide, LLC | - | 1,250 | (1,250) |
| HSBC-3716 | 07/25/2019 | | Nautic Crew Worldwide, LLC | - | 2,500 | (2,500) |
| HSBC-3716 | 07/30/2019 | | Nautic Crew Worldwide, LLC | - | 4,500 | (4,500) |
| HSBC-3716 | 08/01/2019 | 143 | Nautic Crew Worldwide, LLC | - | 2,000 | (2,000) |
| HSBC-3716 | 08/06/2019 | 148 | Nautic Crew Worldwide, LLC | - | 8,750 | (8,750) |
| HSBC-3716 | 08/06/2019 | 149 | Nautic Crew Worldwide, LLC | - | 5,000 | (5,000) |
| HSBC-3716 | 08/08/2019 | 152 | Nautic Crew Worldwide, LLC | - | 6,700 | (6,700) |
| HSBC-3716 | 08/14/2019 | 160 | Nautic Crew Worldwide, LLC | - | 1,290 | (1,290) |
| HSBC-3716 | 08/20/2019 | 166 | Nautic Crew Worldwide, LLC | - | 5,900 | (5,900) |
| HSBC-3716 | 08/27/2019 | 176 | Nautic Crew Worldwide, LLC | - | 5,800 | (5,800) |
| HSBC-3716 | 09/04/2019 | 183 | Nautic Crew Worldwide, LLC | - | 6,210 | (6,210) |
| HSBC-3716 | 09/09/2019 | 187 | Nautic Crew Worldwide, LLC | - | 2,500 | (2,500) |
| HSBC-3716 | 09/10/2019 | 196 | Nautic Crew Worldwide, LLC | - | 5,100 | (5,100) |

**Exhibit 4 - Detail of Payments Made to Blackburn Entities & Insiders**

Source | Bank Records for HSBC (#3716 & #3724) and American Express #1005 account statements

| Bank ID # | Statement Clearing Date | Check # / Dep Ref # | Payee/ Received From | Deposits / Credits | Checks / Debits | Net Activity |
|---|---|---|---|---|---|---|
| HSBC-3716 | 09/12/2019 | 201 | Nautic Crew Worldwide, LLC | - | 7,250 | (7,250) |
| HSBC-3716 | 09/17/2019 | 203 | Nautic Crew Worldwide, LLC | - | 3,405 | (3,405) |
| HSBC-3716 | 09/18/2019 | | Nautic Crew Worldwide, LLC | 3,405 | - | 3,405 |
| HSBC-3716 | 09/20/2019 | | Nautic Crew Worldwide, LLC | - | 5,000 | (5,000) |
| HSBC-3724 | 09/20/2019 | | Nautic Crew Worldwide, LLC | - | 10,000 | (10,000) |
| HSBC-3716 | 09/26/2019 | 206 | Nautic Crew Worldwide, LLC | - | 4,150 | (4,150) |
| HSBC-3716 | 10/02/2019 | 219 | Nautic Crew Worldwide, LLC | - | 2,250 | (2,250) |
| HSBC-3716 | 10/04/2019 | 227 | Nautic Crew Worldwide, LLC | - | 6,650 | (6,650) |
| HSBC-3716 | 10/08/2019 | 229 | Nautic Crew Worldwide, LLC | - | 5,600 | (5,600) |
| HSBC-3716 | 10/16/2019 | 235 | Nautic Crew Worldwide, LLC | - | 4,500 | (4,500) |
| HSBC-3716 | 10/21/2019 | 240 | Nautic Crew Worldwide, LLC | - | 3,000 | (3,000) |
| HSBC-3716 | 10/23/2019 | 241 | Nautic Crew Worldwide, LLC | - | 2,500 | (2,500) |
| HSBC-3716 | 10/28/2019 | 253 | Nautic Crew Worldwide, LLC | - | 2,800 | (2,800) |
| HSBC-3716 | 11/04/2019 | 251 | Nautic Crew Worldwide, LLC | - | 4,100 | (4,100) |
| HSBC-3716 | 11/05/2019 | 274 | Nautic Crew Worldwide, LLC | - | 5,500 | (5,500) |
| HSBC-3716 | 11/06/2019 | 277 | Nautic Crew Worldwide, LLC | - | 4,800 | (4,800) |
| HSBC-3716 | 11/14/2019 | 285 | Nautic Crew Worldwide, LLC | - | 4,250 | (4,250) |
| HSBC-3716 | 11/18/2019 | 290 | Nautic Crew Worldwide, LLC | - | 1,800 | (1,800) |
| HSBC-3716 | 11/21/2019 | 295 | Nautic Crew Worldwide, LLC | - | 2,800 | (2,800) |
| HSBC-3716 | 11/22/2019 | 264 | Nautic Crew Worldwide, LLC | - | 2,650 | (2,650) |
| HSBC-3716 | 11/26/2019 | 300 | Nautic Crew Worldwide, LLC | - | 900 | (900) |
| HSBC-3716 | 11/26/2019 | 303 | Nautic Crew Worldwide, LLC | - | 750 | (750) |
| HSBC-3716 | 12/03/2019 | 313 | Nautic Crew Worldwide, LLC | - | 1,750 | (1,750) |
| HSBC-3716 | 12/04/2019 | 314 | Nautic Crew Worldwide, LLC | - | 1,750 | (1,750) |
| HSBC-3716 | 12/05/2019 | 315 | Nautic Crew Worldwide, LLC | - | 4,500 | (4,500) |
| HSBC-3716 | 12/09/2019 | 311 | Nautic Crew Worldwide, LLC | - | 2,300 | (2,300) |
| HSBC-3716 | 01/07/2020 | 312 | Nautic Crew Worldwide, LLC | - | 4,000 | (4,000) |
| HSBC-3716 | 01/08/2020 | | Nautic Crew Worldwide, LLC | 4,000 | - | 4,000 |
| HSBC-3716 | 02/10/2020 | 312 | Nautic Crew Worldwide, LLC | - | 4,000 | (4,000) |
| HSBC-3716 | 02/11/2020 | | Nautic Crew Worldwide, LLC | 4,000 | - | 4,000 |
| HSBC-3716 | 02/21/2020 | | Nautic Crew Worldwide, LLC | - | 10,000 | (10,000) |
| | | | **Nautic Crew Worldwide, LLC Total** | **11,405** | **366,395** | **(354,990)** |
| | | | | | | |
| HSBC-3716 | 05/06/2019 | | James M Blackburn | - | 10,250 | (10,250) |
| HSBC-3716 | 05/16/2019 | | James M Blackburn | - | 3,000 | (3,000) |
| HSBC-3716 | 07/23/2019 | | James M Blackburn | - | 100 | (100) |
| HSBC-3716 | 09/05/2019 | | James M Blackburn | - | 150 | (150) |
| HSBC-3716 | 09/20/2019 | | James M Blackburn | - | 3,000 | (3,000) |
| HSBC-3716 | 10/28/2019 | | James M Blackburn | - | 40,000 | (40,000) |
| HSBC-3716 | 11/22/2019 | | James M Blackburn | - | 10,000 | (10,000) |
| HSBC-3716 | 02/10/2020 | | James M Blackburn | - | 32,060 | (32,060) |
| HSBC-3716 | 02/21/2020 | | James M Blackburn | - | 25,000 | (25,000) |
| HSBC-3716 | 02/21/2020 | | James M Blackburn | - | 25,000 | (25,000) |
| HSBC-3716 | 02/21/2020 | | James M Blackburn | - | 2,000 | (2,000) |
| | | | **James M Blackburn Total** | **-** | **150,560** | **(150,560)** |
| | | | | | | |
| HSBC-3716 | 02/20/2019 | 1 | Samuel Blackburn | - | 5,625 | (5,625) |
| HSBC-3716 | 03/01/2019 | | Samuel Blackburn | - | 9,500 | (9,500) |
| HSBC-3716 | 03/20/2019 | | Samuel Blackburn | - | 10,000 | (10,000) |
| HSBC-3716 | 03/26/2019 | 15 | Samuel Blackburn | - | 615 | (615) |
| HSBC-3716 | 03/26/2019 | 14 | Samuel Blackburn | - | 3,962 | (3,962) |
| HSBC-3716 | 04/02/2019 | | Samuel Blackburn | - | 7,500 | (7,500) |
| HSBC-3716 | 04/09/2019 | 38 | Samuel Blackburn | - | 2,500 | (2,500) |
| HSBC-3716 | 04/09/2019 | 37 | Samuel Blackburn | - | 340 | (340) |

## Exhibit 4 - Detail of Payments Made to Blackburn Entities & Insiders

Source | Bank Records for HSBC (#3716 & #3724) and American Express #1005 account Statements

| Bank ID # | Statement Clearing Date | Check # / Dep Ref # | Payee/ Received From | Deposits / Credits | Checks / Debits | Net Activity |
|---|---|---|---|---|---|---|
| HSBC-3716 | 04/15/2019 | 41 | Samuel Blackburn | - | 739 | (739) |
| HSBC-3716 | 04/15/2019 | 42 | Samuel Blackburn | - | 220 | (220) |
| HSBC-3716 | 04/26/2019 | 45 | Samuel Blackburn | - | 2,500 | (2,500) |
| HSBC-3716 | 05/07/2019 | 63 | Samuel Blackburn | - | 3,797 | (3,797) |
| HSBC-3716 | 05/14/2019 | 73 | Samuel Blackburn | - | 6,500 | (6,500) |
| HSBC-3716 | 06/03/2019 | 84 | Samuel Blackburn | - | 3,500 | (3,500) |
| HSBC-3716 | 06/05/2019 | 87 | Samuel Blackburn | - | 2,500 | (2,500) |
| HSBC-3716 | 06/12/2019 | 92 | Samuel Blackburn | - | 920 | (920) |
| HSBC-3716 | 06/21/2019 | 103 | Samuel Blackburn | - | 6,300 | (6,300) |
| HSBC-3716 | 07/02/2019 | 112 | Samuel Blackburn | - | 10,485 | (10,485) |
| HSBC-3716 | 07/08/2019 | 114 | Samuel Blackburn | - | 3,000 | (3,000) |
| HSBC-3716 | 07/08/2019 | 116 | Samuel Blackburn | - | 2,500 | (2,500) |
| HSBC-3716 | 07/23/2019 | | Samuel Blackburn | - | 7,500 | (7,500) |
| HSBC-3716 | 07/25/2019 | 129 | Samuel Blackburn | - | 2,630 | (2,630) |
| HSBC-3716 | 07/26/2019 | 131 | Samuel Blackburn | - | 1,990 | (1,990) |
| HSBC-3716 | 08/07/2019 | 150 | Samuel Blackburn | - | 2,500 | (2,500) |
| HSBC-3716 | 08/21/2019 | | Samuel Blackburn | - | 7,500 | (7,500) |
| HSBC-3716 | 08/27/2019 | 177 | Samuel Blackburn | - | 6,490 | (6,490) |
| HSBC-3716 | 09/10/2019 | 199 | Samuel Blackburn | - | 2,500 | (2,500) |
| HSBC-3716 | 09/20/2019 | 211 | Samuel Blackburn | - | 6,285 | (6,285) |
| HSBC-3724 | 09/20/2019 | | Samuel Blackburn | - | 5,400 | (5,400) |
| HSBC-3716 | 09/26/2019 | 207 | Samuel Blackburn | - | 1,216 | (1,216) |
| HSBC-3716 | 09/30/2019 | 218 | Samuel Blackburn | - | 1,060 | (1,060) |
| HSBC-3716 | 10/08/2019 | 228 | Samuel Blackburn | - | 12,741 | (12,741) |
| HSBC-3716 | 10/16/2019 | 233 | Samuel Blackburn | - | 500 | (500) |
| HSBC-3716 | 10/17/2019 | 237 | Samuel Blackburn | - | 750 | (750) |
| HSBC-3716 | 10/25/2019 | 250 | Samuel Blackburn | - | 2,500 | (2,500) |
| HSBC-3716 | 10/25/2019 | 243 | Samuel Blackburn | - | 1,000 | (1,000) |
| HSBC-3716 | 11/05/2019 | 276 | Samuel Blackburn | - | 2,500 | (2,500) |
| HSBC-3716 | 11/07/2019 | 280 | Samuel Blackburn | - | 8,750 | (8,750) |
| HSBC-3716 | 11/15/2019 | 292 | Samuel Blackburn | - | 750 | (750) |
| HSBC-3716 | 11/22/2019 | 298 | Samuel Blackburn | - | 9,160 | (9,160) |
| HSBC-3716 | 12/05/2019 | 310 | Samuel Blackburn | - | 2,500 | (2,500) |
| HSBC-3716 | 02/21/2020 | | Samuel Blackburn | - | 2,500 | (2,500) |
| HSBC-3716 | 02/21/2020 | | Samuel Blackburn | - | 750 | (750) |
| | | | **Samuel Blackburn Total** | - | **172,475** | **(172,475)** |
| | | | | | | |
| HSBC-3716 | 03/05/2019 | | Nicholas R Blackburn | - | 7,037 | (7,037) |
| | | | **Nicholas R Blackburn Total** | - | **7,037** | **(7,037)** |
| | | | | | | |
| | | | ***Blackburn Entities and Insiders*** | ***11,405*** | ***696,467*** | ***(685,062)*** |
| | | | | | | |
| Amex-1005 | | | CityLife Social, LLC | | 7,500 | (7,500) |
| Amex-1005 | | | CityLife Social, LLC | - | 3,500 | (3,500) |
| Amex-1005 | | | CityLife Social, LLC | - | 450 | (450) |
| Amex-1005 | | | CityLife Social, LLC | - | 500 | (500) |
| Amex-1005 | | | CityLife Social, LLC | - | 1,000 | (1,000) |
| Amex-1005 | | | CityLife Social, LLC | - | 500 | (500) |
| Amex-1005 | | | CityLife Social, LLC | - | 2,500 | (2,500) |
| Amex-1005 | | | CityLife Social, LLC | - | 1,100 | (1,100) |
| Amex-1005 | | | CityLife Social, LLC | - | 2,400 | (2,400) |
| Amex-1005 | | | CityLife Social, LLC | - | 1,000 | (1,000) |
| Amex-1005 | | | CityLife Social, LLC | - | 500 | (500) |
| Amex-1005 | | | CityLife Social, LLC | - | 1,000 | (1,000) |

## Exhibit 4 - Detail of Payments Made to Blackburn Entities & Insiders

Source | Bank Records for HSBC (#3716 & #3724) and American Express #1005 account statements

| Bank ID # | Statement Clearing Date | Check # / Dep Ref # | Payee/ Received From | Deposits / Credits | Checks / Debits | Net Activity |
|---|---|---|---|---|---|---|
| Amex-1005 | | | CityLife Social, LLC | - | 500 | (500) |
| Amex-1005 | | | CityLife Social, LLC | - | 1,000 | (1,000) |
| Amex-1005 | | | CityLife Social, LLC | - | 1,500 | (1,500) |
| Amex-1005 | | | CityLife Social, LLC | - | 500 | (500) |
| Amex-1005 | | | CityLife Social, LLC | - | 500 | (500) |
| Amex-1005 | | | CityLife Social, LLC | - | 7,500 | (7,500) |
| Amex-1005 | | | CityLife Social, LLC | - | 1,250 | (1,250) |
| Amex-1005 | | | CityLife Social, LLC | - | 1,000 | (1,000) |
| Amex-1005 | | | CityLife Social, LLC | - | 1,250 | (1,250) |
| Amex-1005 | | | CityLife Social, LLC | - | 1,275 | (1,275) |
| Amex-1005 | | | CityLife Social, LLC | - | 3,465 | (3,465) |
| Amex-1005 | | | CityLife Social, LLC | - | 500 | (500) |
| Amex-1005 | | | CityLife Social, LLC | - | 2,000 | (2,000) |
| Amex-1005 | | | CityLife Social, LLC | - | 2,000 | (2,000) |
| Amex-1005 | | | CityLife Social, LLC | - | 2,500 | (2,500) |
| | | | ***CityLife Social, LLC Total*** | - | ***48,690*** | ***(48,690)*** |
| | | | **Grand Total** | 11,405 | 745,157 | (733,752) |

# Exhibit 5

PAG-B0594

KM000029

Kessler et al v. Blackburn et al | Case No. CACE-20-004101

## Exhibit 5 - Summary of American Express Card Charges | December 20, 2018 to May 27, 2019

Source: American Express #2-71005 credit card statements for the periods indicated.

| | | Net Activity | Assumed Business Connection | No Evidence of PGA Expense | Pending Classification |
|---|---|---|---|---|---|
| Charges | [1] | | | | |
| City Life Social (Blackburn entity) | | (48,690) | - | (48,690) | - |
| Misc. Business Expense | | (16,779) | (16,779) | - | - |
| Travel | | (13,008) | - | - | (13,008) |
| Personal Expenses | | (12,060) | - | (12,060) | - |
| Further Investigation Required | | (10,525) | - | - | (10,525) |
| Cash | | (6,127) | - | - | (6,127) |
| Meals | | (3,755) | - | - | (3,755) |
| Vehicle Detailing, Repair & Maintenance | | (2,754) | (2,754) | - | - |
| Entertainment | | (2,213) | - | - | (2,213) |
| Events, Shows & Marketing | | (1,923) | (1,923) | - | - |
| Vehicle Transport, Towing, & Delivery | | (1,745) | (1,745) | - | - |
| Other Vehicle Expenses (Tags, Gas, Parking & Tolls) | | (341) | (341) | - | - |
| Total Charges | | (119,921) | (23,543) | (60,750) | (35,629) |
| Payments | [2] | 10,424 | | | |
| Net Due to American Express | [3] | (109,498) | | | |

Notes:

1) Uses categorized by KM based on identification of payees.
2) Payments were not made via the PGA accounts at HSBC. KM was unable to identify the source of the payments.
3) Excludes accrued interest, if any.
4) Assumed Business Connection expenditures include: Events, Shows and Marketing; and, Miscellaneous Business Expense. Upon receipt of supporting documentation, such amounts may be reclassified into one of the other two categories.
5) Documentation supporting classification of these expenditures as related to PGA's business operations has not been provided. Upon receipt of supporting documentation, such amounts may be reclassified into one of the other two categories.
6) Documentation supporting classification of these expenditures has not been provided. Upon receipt of supporting documentation, such amounts may be reclassified into one of the other two categories.

# Exhibit 6

PAG-B0596
KM000031

## Exhibit 6 - Detail of Personal Expenses

Source: Bank Records for HSBC (#3716 & #3724).

| Bank ID # | Statement Clearing Date | Check # / Dep Ref # | Payee / Received From | Net Activity |
|---|---|---|---|---|
| HSBC-3716 | 02/22/2019 | | Rani Arabella Inc | (435.00) |
| HSBC-3716 | 02/25/2019 | | Rani Arabella Inc | 60.00 |
| HSBC-3716 | 02/26/2019 | | Neiman Marcus | (1,725.60) |
| HSBC-3716 | 02/26/2019 | | Neiman Marcus | (267.50) |
| HSBC-3716 | 03/01/2019 | | Anthony Troulan/ FirstCaribbean International Bank | (13,000.00) |
| HSBC-3716 | 03/01/2019 | | Ditech Flower Shop | (548.95) |
| HSBC-3716 | 03/04/2019 | | Teco Stores | (508.44) |
| HSBC-3716 | 03/04/2019 | | Ditech Flower Shop | (82.10) |
| HSBC-3716 | 03/06/2019 | | TJ Baldwyn Son Stratfo | (427.65) |
| HSBC-3716 | 03/13/2019 | | Turmeaus Sampling Lounge | (40.93) |
| HSBC-3716 | 03/13/2019 | | Turmeaus Sampling Lounge | (35.47) |
| HSBC-3716 | 03/20/2019 | | Itunes.Com | (9.99) |
| HSBC-3716 | 03/25/2019 | | Neiman Marcus | (1,000.00) |
| HSBC-3716 | 03/25/2019 | | Neiman Marcus | (834.60) |
| HSBC-3716 | 03/25/2019 | | Neiman Marcus | (743.65) |
| HSBC-3716 | 03/25/2019 | | Itunes.Com | (9.99) |
| HSBC-3716 | 03/25/2019 | | Itunes.Com | (0.99) |
| HSBC-3716 | 03/25/2019 | | Itunes.Com | (5.99) |
| HSBC-3716 | 04/01/2019 | | Meat Market | (116.84) |
| HSBC-3716 | 04/01/2019 | | Meat Market | (230.46) |
| HSBC-3716 | 04/01/2019 | | Meat Market | (230.46) |
| HSBC 3716 | 04/01/2019 | | Itunes.Com | (2.83) |
| HSBC-3716 | 04/02/2019 | 21 | Bob Willie | (500.00) |
| HSBC 3716 | 04/02/2019 | | Meat Market | (1,048.10) |
| HSBC-3716 | 04/03/2019 | | Neiman Marcus | (556.40) |
| HSBC-3716 | 04/04/2019 | | Bergdorf Goodman | (865.56) |
| HSBC-3716 | 04/05/2019 | | Francis L Dean & Associates | (84.00) |
| HSBC-3716 | 04/09/2019 | | HCMG Cardiology Associates | (65.00) |
| HSBC 3716 | 04/10/2019 | | Lowes | (414.42) |
| HSBC-3716 | 04/11/2019 | | Lowes | (11.40) |
| HSBC-3716 | 04/12/2019 | | Anthony Troulan/ FirstCaribbean International Bank | (10,750.00) |
| HSBC-3716 | 04/12/2019 | | Massaging Inso | (48.00) |
| HSBC-3716 | 04/12/2019 | | Itunes.Com | (9.99) |
| HSBC-3716 | 04/15/2019 | | Southport Hardware | (19.84) |
| HSBC-3716 | 04/15/2019 | | Millionaire Ga | (4,805.00) |
| HSBC-3716 | 04/16/2019 | | Rock Lives On | (4,500.00) |
| HSBC-3716 | 04/17/2019 | | Millionaire Ga | (500.00) |
| HSBC-3716 | 04/18/2019 | | Lucky Farmers Market C | (60.12) |
| HSBC-3716 | 04/18/2019 | | Itunes.Com | (69.98) |
| HSBC-3716 | 04/19/2019 | | Flora Ottimer | (10.69) |
| HSBC-3716 | 04/22/2019 | | Pompano Discount Liquo | (467.92) |
| HSBC-3716 | 04/22/2019 | | Publix | (67.39) |
| HSBC-3716 | 04/22/2019 | | Publix | (12.67) |
| HSBC-3716 | 04/23/2019 | | Neiman Marcus | (126.26) |
| HSBC-3716 | 04/24/2019 | | Lucky Farmers Market C | (46.16) |

Kessler et al v. Blackburn et al | Case No. CACE-20-004101

**Exhibit 6 - Detail of Personal Expenses**

Source: Bank Records for HSBC (#3716 & #3724).

| Bank ID # | Statement Clearing Date | Check # / Dep Ref # | Payee / Received From | Net Activity |
|---|---|---|---|---|
| HSBC-3716 | 04/24/2019 | | Florida Foot & Ankle | (220.00) |
| HSBC-3716 | 04/25/2019 | | Lucky's Meat Market | (497.77) |
| HSBC-3716 | 04/26/2019 | | Meat Market | (1,043.49) |
| HSBC-3716 | 04/26/2019 | | Meat Market | (301.12) |
| HSBC-3716 | 04/29/2019 | | Publix | (199.64) |
| HSBC-3716 | 04/29/2019 | | Walgreens | (24.87) |
| HSBC-3716 | 04/29/2019 | | Walgreens | (2.79) |
| HSBC-3716 | 04/29/2019 | | Lucky Farmers Market C | (93.62) |
| HSBC-3716 | 05/01/2019 | | Publix | (45.35) |
| HSBC-3716 | 05/01/2019 | | Itunes.Com | (5.99) |
| HSBC-3716 | 05/02/2019 | | Anthony Troulan/ FirstCaribbean International Bank | (2,500.00) |
| HSBC-3716 | 05/02/2019 | | Itunes.Com | (2.99) |
| HSBC-3716 | 05/02/2019 | | Retro Red's Beauty Shop | (36.00) |
| HSBC-3716 | 05/06/2019 | | Lowes | (31.85) |
| HSBC-3716 | 05/09/2019 | 64 | Tim Elms | (2,000.00) |
| HSBC-3716 | 05/13/2019 | | Itunes.Com | (9.99) |
| HSBC-3716 | 05/13/2019 | | Samsonite Brands | (321.64) |
| HSBC-3716 | 05/13/2019 | | Winn-Dixie | (3.79) |
| HSBC-3716 | 05/13/2019 | | Smittys Old Fashion Butcher | (267.88) |
| HSBC-3716 | 05/14/2019 | | Neiman Marcus | (731.88) |
| HSBC-3716 | 05/15/2019 | | Neiman Marcus | (583.15) |
| HSBC-3716 | 05/17/2019 | | Itunes.Com | (69.98) |
| HSBC-3716 | 05/28/2019 | | Anthony Troulan/ FirstCaribbean International Bank | (1,616.00) |
| HSBC-3716 | 05/28/2019 | | Anthony Troulan/ FirstCaribbean International Bank | (2,728.00) |
| HSBC-3716 | 05/28/2019 | | Itunes.Com | (5.99) |
| HSBC-3716 | 05/30/2019 | 65 | Tim Elms | (2,000.00) |
| HSBC-3716 | 06/03/2019 | | Itunes.Com | (2.99) |
| HSBC-3716 | 06/05/2019 | | Embroidme | (84.80) |
| HSBC-3716 | 06/06/2019 | | Paypal Ebay Inc | (4.00) |
| HSBC-3716 | 06/07/2019 | | Duane Reade Pharmacy | (29.40) |
| HSBC-3716 | 06/10/2019 | | See Eyewear | (107.79) |
| HSBC-3716 | 06/10/2019 | | Duane Reade Pharmacy | (54.99) |
| HSBC-3716 | 06/10/2019 | | Bergdorf Goodman | (1,001.65) |
| HSBC-3716 | 06/11/2019 | | Itunes.Com | (9.99) |
| HSBC-3716 | 06/17/2019 | | Samsonite Brands | 23.16 |
| HSBC-3716 | 06/18/2019 | | Itunes.Com | (9.99) |
| HSBC-3716 | 06/18/2019 | | Itunes.Com | (59.99) |
| HSBC-3716 | 06/18/2019 | | Francis L Dean & Associates | (84.00) |
| HSBC-3716 | 06/24/2019 | | GFS Store | (77.02) |
| HSBC-3716 | 06/24/2019 | | Havana Republic Cigar | (71.69) |
| HSBC-3716 | 06/25/2019 | | Adams Hometown Market | (1,018.23) |
| HSBC-3716 | 06/25/2019 | | Shore Discount | (712.70) |
| HSBC-3716 | 06/28/2019 | | The Art of Shaving | (42.50) |
| HSBC-3716 | 06/28/2019 | | Instacart | (50.98) |
| HSBC-3716 | 07/01/2019 | | Itunes.Com | (5.99) |

## Exhibit 6 - Detail of Personal Expenses

Source: Bank Records for HSBC (#3716 & #3724).

| Bank ID # | Statement Clearing Date | Check # / Dep Ref # | Payee / Received From | Net Activity |
|---|---|---|---|---|
| HSBC-3716 | 07/02/2019 | | Itunes.Com | (2.99) |
| HSBC-3716 | 07/02/2019 | | Itunes.Com | (2.99) |
| HSBC-3716 | 07/02/2019 | | Paypal Ebay Inc | (154.00) |
| HSBC-3716 | 07/05/2019 | | Winn-Dixie | (66.20) |
| HSBC-3716 | 07/05/2019 | | Instacart | (115.03) |
| HSBC-3716 | 07/05/2019 | | Instacart | (78.65) |
| HSBC-3716 | 07/05/2019 | | Instacart | (52.49) |
| HSBC-3716 | 07/08/2019 | | Pompano Discount Liquo | (490.78) |
| HSBC-3716 | 07/08/2019 | | Instacart | (57.08) |
| HSBC-3716 | 07/08/2019 | | Instacart | (51.64) |
| HSBC-3716 | 07/09/2019 | | Instacart | (45.24) |
| HSBC-3716 | 07/10/2019 | | Homeology Propery Ins | (590.00) |
| HSBC-3716 | 07/11/2019 | | Louis Vuitton | (309.45) |
| HSBC-3716 | 07/11/2019 | | Reiss | (48.35) |
| HSBC-3716 | 07/12/2019 | | Itunes.Com | (9.99) |
| HSBC-3716 | 07/15/2019 | | Turmeaus Sampling Lounge | (190.85) |
| HSBC-3716 | 07/16/2019 | | Instacart | (42.64) |
| HSBC-3716 | 07/18/2019 | | Itunes.Com | (69.98) |
| HSBC-3716 | 07/18/2019 | | Instacart | (101.99) |
| HSBC-3716 | 07/22/2019 | | Neiman Marcus | (458.82) |
| HSBC-3716 | 07/22/2019 | | Harrods Ltd | (1,425.61) |
| HSBC-3716 | 07/22/2019 | | Harrods Ltd | (937.48) |
| HSBC-3716 | 07/22/2019 | | Boots | (7.16) |
| HSBC-3716 | 07/24/2019 | | Instacart | (66.40) |
| HSBC-3716 | 07/26/2019 | | Instacart | (46.66) |
| HSBC-3716 | 07/26/2019 | | In Elite Luxury | (3,165.00) |
| HSBC-3716 | 07/29/2019 | | Gucci | (4,000.00) |
| HSBC-3716 | 07/29/2019 | | Sherry-Lehmann Inc | (326.41) |
| HSBC-3716 | 07/29/2019 | | CVS Pharmacy | (16.31) |
| HSBC-3716 | 07/29/2019 | | Itunes.Com | (5.99) |
| HSBC-3716 | 08/01/2019 | | Itunes.Com | (2.99) |
| HSBC-3716 | 08/01/2019 | | Instacart | (43.21) |
| HSBC-3716 | 08/01/2019 | | Instacart | (115.00) |
| HSBC-3716 | 08/01/2019 | | Instacart | (2.24) |
| HSBC-3716 | 08/06/2019 | | Instacart | (90.00) |
| HSBC-3716 | 08/06/2019 | | Instacart | (70.64) |
| HSBC-3716 | 08/06/2019 | | Couture Kids | (253.63) |
| HSBC-3716 | 08/06/2019 | | Sitters Studio | (472.50) |
| HSBC-3716 | 08/09/2019 | | Golden Gate Meat Co | (447.67) |
| HSBC-3716 | 08/09/2019 | | Winco Foods | (114.83) |
| HSBC-3716 | 08/09/2019 | | Francis L Dean & Associates | (335.78) |
| HSBC-3716 | 08/12/2019 | | Whole Foods | (63.20) |
| HSBC-3716 | 08/12/2019 | | Fry's Electronics | (283.17) |
| HSBC-3716 | 08/12/2019 | | Itunes.Com | (9.99) |
| HSBC-3716 | 08/13/2019 | | Whole Foods | (397.12) |

## Exhibit 6 - Detail of Personal Expenses

Source: Bank Records for HSBC (#3716 & #3724).

| Bank ID # | Statement Clearing Date | Check # / Dep Ref # | Payee / Received From | Net Activity |
|---|---|---|---|---|
| HSBC-3716 | 08/14/2019 | | Swenson & Silacci Flowers | (87.25) |
| HSBC-3716 | 08/15/2019 | | Extra Space | (131.57) |
| HSBC-3716 | 08/15/2019 | | Itunes.Com | (9.99) |
| HSBC-3716 | 08/19/2019 | | Itunes.Com | (59.99) |
| HSBC-3716 | 08/19/2019 | | The Meatery | (36.18) |
| HSBC-3716 | 08/22/2019 | | Instacart | (48.00) |
| HSBC-3716 | 08/22/2019 | | Instacart | (128.98) |
| HSBC-3716 | 08/23/2019 | | Instacart | (38.34) |
| HSBC-3716 | 08/26/2019 | | Broward Medical and Urgent Care | (100.00) |
| HSBC-3716 | 08/26/2019 | | Publix | (66.03) |
| HSBC-3716 | 08/27/2019 | | CVS Pharmacy | (21.39) |
| HSBC-3716 | 08/27/2019 | | Instacart | (54.83) |
| HSBC-3716 | 08/28/2019 | | Brothers Marketp | (649.21) |
| HSBC-3716 | 08/28/2019 | | CVS Pharmacy | (7.22) |
| HSBC-3716 | 08/29/2019 | | Gulf Verc Ent | (60.00) |
| HSBC-3716 | 08/29/2019 | | Brothers Marketp | (138.78) |
| HSBC-3716 | 08/29/2019 | | Itunes.Com | (5.99) |
| HSBC-3716 | 08/30/2019 | | In Pond Hoppers | (149.75) |
| HSBC-3716 | 09/03/2019 | | Itunes.Com | (2.99) |
| HSBC-3716 | 09/06/2019 | | Instacart | (185.08) |
| HSBC-3716 | 09/10/2019 | | Unique | (291.43) |
| HSBC-3716 | 09/10/2019 | | Instacart | (89.49) |
| HSBC-3716 | 09/12/2019 | | Itunes.Com | (9.99) |
| HSBC-3716 | 09/12/2019 | | Alex and Annin | (160.50) |
| HSBC-3716 | 09/13/2019 | | Royal Warrant | (125.00) |
| HSBC-3716 | 09/13/2019 | | Royal Warrant | (448.83) |
| HSBC-3716 | 09/16/2019 | | Uber Eats | (24.00) |
| HSBC-3716 | 09/16/2019 | | Instacart | (52.72) |
| HSBC-3716 | 09/16/2019 | | Instacart | (51.04) |
| HSBC-3716 | 09/16/2019 | 197 | Lincoln Life Insurance Co. | (1,240.50) |
| HSBC-3716 | 09/17/2019 | | Uber Eats | (36.58) |
| HSBC-3716 | 09/18/2019 | | Itunes.Com | (69.98) |
| HSBC-3716 | 09/18/2019 | | Retro Red's Beauty Shop | (37.50) |
| HSBC-3716 | 09/26/2019 | | Francis L Dean & Associates | (171.55) |
| HSBC-3716 | 09/26/2019 | | Turmeaus Sampling Lounge | (113.94) |
| HSBC-3716 | 09/26/2019 | | Turmeaus Sampling Lounge | (18.03) |
| HSBC-3716 | 09/30/2019 | | Instacart | (43.49) |
| HSBC-3716 | 09/30/2019 | | Itunes.Com | (5.99) |
| HSBC-3716 | 10/02/2019 | | Brooks Brothers | (380.00) |
| HSBC-3716 | 10/02/2019 | | Itunes.Com | (2.99) |
| HSBC-3716 | 10/02/2019 | | The Arts Club | (1,299.76) |
| HSBC-3716 | 10/02/2019 | | The Arts Club | (88.77) |
| HSBC-3716 | 10/07/2019 | | The Loop T1 Co | (443.84) |
| HSBC-3716 | 10/08/2019 | | Instacart | (57.80) |
| HSBC-3716 | 10/08/2019 | 222 | Lincoln Life Insurance Co. | (2,536.50) |

## Exhibit 6 - Detail of Personal Expenses

Source: Bank Records for HSBC (#3716 & #3724).

| Bank ID # | Statement Clearing Date | Check # / Dep Ref # | Payee / Received From | Net Activity |
|---|---|---|---|---|
| HSBC-3716 | 10/09/2019 | | F Mcintyre Sons Ltd | (113.49) |
| HSBC-3716 | 10/11/2019 | | Boots | (18.49) |
| HSBC-3716 | 10/15/2019 | | Lowes | (238.47) |
| HSBC-3716 | 10/15/2019 | | Itunes.Com | (9.99) |
| HSBC-3716 | 10/15/2019 | | Smittys Old Fashion Butcher | (131.63) |
| HSBC-3716 | 10/15/2019 | | Instacart | (171.42) |
| HSBC-3716 | 10/15/2019 | | The Fish Peddler | (223.75) |
| HSBC-3716 | 10/15/2019 | | TM Zac Brown Band | (852.50) |
| HSBC-3716 | 10/15/2019 | | Publix | (63.64) |
| HSBC-3716 | 10/15/2019 | | Itunes.Com | (9.99) |
| HSBC-3716 | 10/15/2019 | | Publix | (25.30) |
| HSBC-3716 | 10/16/2019 | | The Arts Club | (8.68) |
| HSBC-3716 | 10/16/2019 | | The Fish Peddler | (749.47) |
| HSBC-3716 | 10/18/2019 | | Grifs Western Main Store | (1,225.73) |
| HSBC-3716 | 10/18/2019 | | Instacart | (75.00) |
| HSBC-3716 | 10/18/2019 | | Instacart | (20.44) |
| HSBC-3716 | 10/21/2019 | | Itunes.Com | (65.98) |
| HSBC-3716 | 10/21/2019 | | TM Live Nation VIP Cl | (594.00) |
| HSBC-3716 | 10/21/2019 | | Smittys Old Fashion Butcher | (443.28) |
| HSBC-3716 | 10/21/2019 | | Instacart | (57.44) |
| HSBC-3716 | 10/23/2019 | | Instacart | (59.08) |
| HSBC-3716 | 10/23/2019 | | Instacart | (63.37) |
| HSBC-3716 | 10/25/2019 | | Francis L Dean & Associates | (150.00) |
| HSBC-3716 | 10/25/2019 | 249 | Tim Elms | (1,500.00) |
| HSBC-3716 | 10/28/2019 | | Neiman Marcus | (722.25) |
| HSBC-3716 | 10/28/2019 | | Flora Ottimer | (175.48) |
| HSBC-3716 | 10/28/2019 | | Neiman Marcus | (1,487.30) |
| HSBC-3716 | 10/28/2019 | | Vudu.com | (2.99) |
| HSBC-3716 | 10/29/2019 | | Smittys Old Fashion Butcher | (577.23) |
| HSBC-3716 | 10/29/2019 | | Instacart | (88.78) |
| HSBC-3716 | 10/29/2019 | | Neiman Marcus | (72.99) |
| HSBC-3716 | 10/29/2019 | | Francis L Dean & Associates | (102.50) |
| HSBC-3716 | 11/01/2019 | | Apple | (2.99) |
| HSBC-3716 | 11/01/2019 | | Smittys Old Fashion Butcher | (663.66) |
| HSBC-3716 | 11/04/2019 | | Uber Eats | (63.02) |
| HSBC-3716 | 11/04/2019 | | Instacart | (196.12) |
| HSBC-3716 | 11/04/2019 | | Anthony Troulan/ FirstCaribbean International Bank | (2,500.00) |
| HSBC-3716 | 11/04/2019 | | Instacart | (44.45) |
| HSBC-3716 | 11/04/2019 | 286 | Tim Elms | (1,500.00) |
| HSBC-3716 | 11/06/2019 | | Anthony Troulan/ FirstCaribbean International Bank | (3,500.00) |
| HSBC-3716 | 11/08/2019 | | Lone Star Mgmt Ltd | (341.66) |
| HSBC-3716 | 11/08/2019 | | Sand Bank Investment | (321.94) |
| HSBC-3716 | 11/08/2019 | | Diamonds Internationals | (3,906.00) |
| HSBC-3716 | 11/08/2019 | | One Eleven East Inc | (82.81) |
| HSBC-3716 | 11/12/2019 | | Apple | (11.07) |

Kessler et al v. Blackburn et al | Case No. CACE-20-004101

**Exhibit 6 - Detail of Personal Expenses**

Source: Bank Records for HSBC (#3716 & #3724).

| Bank ID # | Statement Clearing Date | Check # / Dep Ref # | Payee / Received From | Net Activity |
|---|---|---|---|---|
| HSBC-3716 | 11/12/2019 | | Lone Star Mgmt Ltd | (55.90) |
| HSBC-3716 | 11/14/2019 | | Instacart | (121.87) |
| HSBC-3716 | 11/15/2019 | 291 | Tim Elms | (1,500.00) |
| HSBC-3716 | 11/18/2019 | | Apple | (9.99) |
| HSBC-3716 | 11/18/2019 | | Smittys Old Fashion Butcher | (284.30) |
| HSBC-3716 | 11/18/2019 | | Smittys Old Fashion Butcher | (38.65) |
| HSBC-3716 | 11/18/2019 | | Publix | (108.50) |
| HSBC-3716 | 11/18/2019 | | Instacart | (57.30) |
| HSBC-3716 | 11/18/2019 | | Apple | (59.99) |
| HSBC-3716 | 11/19/2019 | | Apple | (5.99) |
| HSBC-3716 | 11/20/2019 | | Instacart | (43.40) |
| HSBC-3716 | 11/22/2019 | | Elite Imaging | (122.16) |
| HSBC-3716 | 11/22/2019 | | Apple | (49.99) |
| HSBC-3716 | 11/22/2019 | | Instacart | (42.90) |
| HSBC-3716 | 11/25/2019 | | Tim Elms | 1,000.00 |
| HSBC-3716 | 11/25/2019 | | Smittys Old Fashion Butcher | (1,213.00) |
| HSBC-3716 | 11/25/2019 | | Instacart | (59.03) |
| HSBC-3716 | 11/25/2019 | | Instacart | (42.59) |
| HSBC-3716 | 11/25/2019 | 299 | Tim Elms | (1,500.00) |
| HSBC-3716 | 11/26/2019 | | Neiman Marcus | (156.22) |
| HSBC-3716 | 11/26/2019 | | Vudu.com | (5.99) |
| HSBC-3716 | 11/27/2019 | | The Golf Warehouse | (39.99) |
| HSBC-3716 | 11/27/2019 | | Instacart | (95.44) |
| HSBC-3716 | 11/29/2019 | | Smittys Old Fashion Butcher | (426.88) |
| HSBC-3716 | 12/03/2019 | | Instacart | (40.48) |
| HSBC-3716 | 12/03/2019 | | Instacart | (94.29) |
| HSBC-3716 | 12/03/2019 | | Apple | (2.99) |
| HSBC-3716 | 12/03/2019 | | Vudu.com | (3.99) |
| HSBC-3716 | 12/03/2019 | 305 | Tim Elms | (1,500.00) |
| HSBC-3716 | 12/04/2019 | | Neiman Marcus | (457.96) |
| HSBC-3716 | 12/04/2019 | | Neiman Marcus | (646.36) |
| HSBC-3716 | 12/04/2019 | | Neiman Marcus | (147.24) |
| HSBC-3716 | 12/04/2019 | | Vudu.com | (3.99) |
| HSBC-3716 | 12/04/2019 | | Instacart | (66.56) |
| HSBC-3716 | 12/05/2019 | | Talbots | (95.52) |
| HSBC-3716 | 12/05/2019 | | Retro Red's Beauty Shop | (60.00) |
| HSBC-3716 | 12/06/2019 | | Sherry-Lehmann Inc | (362.06) |
| HSBC-3716 | 12/09/2019 | | The Golf Warehouse | (119.99) |
| HSBC-3716 | 12/09/2019 | | Vudu.com | (3.99) |
| HSBC-3716 | 12/09/2019 | | Vudu.com | (3.99) |
| HSBC-3716 | 12/10/2019 | | Prime Video | (4.52) |
| HSBC-3716 | 12/12/2019 | | Apple | (1.99) |
| HSBC-3716 | 12/12/2019 | | Apple | (11.07) |
| HSBC-3716 | 12/13/2019 | | Instacart | (56.48) |
| HSBC-3716 | 12/19/2019 | | Apple | (14.98) |

## Exhibit 6 - Detail of Personal Expenses

Source: Bank Records for HSBC (#3716 & #3724).

| Bank ID # | Statement Clearing Date | Check # / Dep Ref # | Payee / Received From | Net Activity |
|---|---|---|---|---|
| HSBC-3716 | 12/19/2019 | | Apple | (5.99) |
| HSBC-3716 | 12/23/2019 | | Apple | (59.99) |
| HSBC-3716 | 12/26/2019 | | Vudu.com | (7.99) |
| HSBC-3716 | 12/27/2019 | | Vudu.com | (6.99) |
| HSBC-3716 | 12/30/2019 | | Vudu.com | (2.99) |
| HSBC-3716 | 12/30/2019 | | Vudu.com | (3.99) |
| HSBC-3716 | 01/02/2020 | | Apple | (2.99) |
| HSBC-3716 | 02/21/2020 | | Anthony Troulan/ FirstCaribbean International Bank | (5,500.00) |
| HSBC-3716 | 02/21/2020 | | Anthony Troulan/ FirstCaribbean International Bank | (9,000.00) |
| | | | | **(135,969.44)** |

# Attachment 1

PAG-B0604

KM000039

PROFILE PROFESSIONAL SERVICES

PARTNER

# BARRY E. MUKAMAL CPA*/PFS, ABV, CFE, CFF, CIRA

Barry Mukamal brings more than 30 years of multidisciplinary experience to the Advisory Services Division. He successfully addresses complex issues in bankruptcy and insolvency, capital recovery, fraud, business valuation, and economic damages.

A Chapter 7 Panel Trustee in the Southern District of Florida, Mr. Mukamal has extensive experience operating and/or terminating businesses, operational shutdowns, and liquidating their assets in the U.S. Bankruptcy Court system as well as in state court proceedings. He has been appointed as liquidating trustee and/or plan administrator in numerous complex cases requiring administration and resolution of multiple Ponzi schemes including fraud investigations, quantification of economic damages, and resolution of claims. As plan administrator or trustee on several failed commercial real estate projects, Mr. Mukamal has managed and marketed the completion of construction projects including resolving related creditor claims and construction contractor claims.

Mr. Mukamal has represented debtors, creditors, and creditors' committees in matters of insolvency fraud and abuse, and has assisted trustees in their asset recovery efforts. He has served as a court appointed receiver and mediator, and has testified as an expert witness at the local, state and federal level.

Mr. Mukamal's litigation support experience includes lost profits litigation, fraud investigations, accounting malpractice, and business valuation. He has been retained in investigations and embezzlement issues associated with financial fraud schemes, and occupational fraud.

## AREAS OF EXPERTISE

Bankruptcy and Insolvency
Solvency Opinions
Business Valuations
Commercial Damage Calculations
Contract Disputes
Investigation of Commercial Fraud
Marital Dissolution and Forensic Analysis
Succession Planning
Audit and Review

## KEY CLIENTS

Law Firms
Bankruptcy Trustees, Receivers and Assignees
Real Estate Companies
Construction Companies
Insurance Providers
Domestic and International Companies
Distributors
Aviation Companies
Agricultural Companies

## EDUCATION

Master of Accounting, University of Buffalo
Bachelor of Business Administration, University of Buffalo

## ACCREDITATIONS & DESIGNATIONS

Chapter 7 Panel Trustee
Certified Fraud Examiner
Certified Insolvency & Restructuring Advisor (CIRA)
Business Valuations (AICPA)
Personal Financial Specialist (AICPA)
Certified in Financial Forensics (AICPA)

*Licensed by the State of Florida*

## PROFESSIONAL & CIVIC AFFILIATIONS

American Institute of Certified Public Accountants (AICPA)
Florida Institute of Certified Public Accountants (FICPA)
Association of Certified Fraud Examiners
Chapter 7 Panel Trustee, Southern District of Florida

## ARTICLES, SEMINARS & PRESENTATIONS

"Fiduciary Responsibilities of Professionals in Bankruptcy", presented at the 2011 Central Florida Bankruptcy Law Association Annual Seminar

"Taxation Issues Facing the Domestic Relations Practitioner", presented at Palm Beach County Bar Association's Family Law CLE Committee Seminar

"Privacy and Security issues in a Trustee's Office and ECF Environment", presented at the National Association of Bankruptcy Trustees

"Bankruptcy and Marital Debts: Is It Enforceable or Dischargeable?", presented at ABA/CLE Webinar

American Academy of Matrimonial Lawyers - "Keep Your Client From Drowning: How To Deal With Bankruptcies And Foreclosures"

The Institute 33rd Annual - Florida Chapter - "The Financial Distressed Client: Positioning the Client for Modification, Bankruptcy and/or Foreclosure"

Florida Fiduciary Forum - Ethics Presentation, 2011

## AWARDS

2009 Top CPA's in Litigation Support, *South Florida Legal Guide*
2006 Litigation Key Partner Award Winner, *South Florida Business Journal*

Kapila Mukamal

CPAs, Forensic and Insolvency Advisors

The Kapila Building / 1000 S. Federal Highway / Suite 200 / Miami, FL 33131
T. 786.517.5771 / F. 954.761.1033 / bmukamal@kapilamukamal.com
www.kapilamukamal.com

**BARRY E. MUKAMAL CPA*/PFS, ABV, CFE, CFF, CIRA** CURRICULUM VITAE

## EDUCATION & DESIGNATIONS

CPA - Certified Public Accountant (1978), *regulated by the State of Florida

PFS - Personal Financial Specialist (1999), conferred by the American Institute of Certified Public Accountants

ABV - Accredited in Business Valuation (2000), conferred by the American Institute of Certified Pub ic Accountants

CFE - Certified Fraud Examiner (1994), conferred by the Association of Certified Fraud Examiner

CFF - Certified in Financial Forensics (2009), conferred by the American Institute of Certified Public Accountants

CIRA - Certified Insolvency & Restructuring Advisor

M.B.A., Accounting and Business Administration, University of Buffalo,

B. S., Accounting, University of Buffalo

Extensive continued education in the areas of business valuation, forensic accounting, accounting and auditing, as well as meeting bi-annual requirements for all designations of AICPA and ACFE for continued professional education.

## PROFESSIONAL HISTORY

**Kapila Mukamal** - 2014-present

**Marcum LLP** - January 1997-2014

**Mukamal, Appel, Fromberg & Margolies, P. A.** - 1982-1997

**Laventhal and Horwath** - 1981

**American Assurance Group, Treasurer, Insurance Conglomerate** - 1980

**Peat, Marwick, Mitchell & Company** - 1977-1980

## PRESENTATIONS/SEMINARS

- Top Ten DSO Issues in Bankruptcy", Continuing Legal Education (CLE) Fall Conference, 2009.
- Privacy and Security Issues", 2009 National Association of Bankruptcy Trustees (NABT) Spring Seminar.
- Taxation Issues Facing The Domestic Relations Practitioner", Palm Beach County Bar Association, Family LawCLE Committee presentation.
- Privacy and Security Issues in a Trustee's Office and ECF Environment", National Association of Bankruptcy Trustees.
- Understanding Financial Discovery", Florida Board, Family Law Financial Accounting and Cross Examination Seminar.
- Federal Tax Filing Requirements", Regional 21 Bankruptcy Trustee Association.
- Topics involving financial controls and risk management presented to financial institutions and organizations involved with distressed properties.

*Licensed by the State of Florida

**BARRY E. MUKAMAL CPA*/PFS, ABV, CFE, CFF, CIRA** CURRICULUM VITAE

## RANGE OF EXPERIENCE

A partner at KapilaMukamal, Barry Mukamal brings more than 30 years of multidisciplinary experience to the firm's Advisory Services division. Experienced in some 30 industries, he successfully addresses complex issues in bankruptcy and insolvency, capital recovery, fraud, business valuation and economic damages.

Mr. Mukamal is a Chapter 7 Panel Trustee in the Southern District of Florida. He has extensive experience operating businesses and liquidating their assets in the U.S. Bankruptcy Court system as well as in state court proceedings. He has been appointed as liquidating trustee and/or plan administrator in numerous complex cases requiring administration and resolution of litigation, quantification of economic damages and resolution of claims. As plan administrator or trustee on several failed commercial real estate projects, Mr. Mukamal has managed and marketed the completion of construction projects including resolving related creditor claims and construction contractor claims.

Mr. Mukamal has represented debtors, creditors and creditors' committees in matters of insolvency fraud and abuse, and has assisted trustees in their asset recovery efforts. He has served as a court appointed receiver and mediator, and has testified as an expert witness at the local, state and federal level. He has extensive experience in litigation involving preference transfers and fraudulent conveyances in the context of bankrupt entities.

Mr. Mukamal's extensive litigation support experience includes matrimonial dissolution, lost profits litigation, fraud investigations and business valuations. He has been involved in numerous high profile, high-net-worth divorces involving assets in the U.S. and abroad. In addition, he has been retained in investigations and embezzlement issues associated with financial fraud schemes such as Ponzi schemes and occupational fraud. His experience also extends to lost profits litigation, damages in relation to breach of contract, and personal injury and wrongful death actions. Mr. Mukamal's testimony for the plaintiff in a patent damage action facilitated a multi million dollar award for the client.

Mr. Mukamal's involvement with audit and review engagements make him particularly qualified to address issues of accounting malpractice and to testify in such areas. He has been involved in audit, review, accounting and tax engagements ranging from small, closely-held entities to SEC clients in various industries, including insurance, manufacturing, distribution, real estate, health care, publishing, agriculture, seafood and aviation.

## PROFESSIONAL & CIVIC AFFILIATIONS

- American Institute of Certified Public Accountants (AICPA)
- Florida Institute of Certified Public Accountants (FICPA)
- Association of Certified Fraud Examiners
- Institute of Business Appraisers
- Greater Miami Chamber of Commerce, Trustee Member
- Chapter 7 Panel Trustee, Southern District of Florida
- Association of Insolvency & Restructuring Advisors
- Peninsula Bank, Board of Directors

## AWARDS & RECOGNITIONS

- 2006 Litigation Key Partner Award Winner, South Florida Business Journal
- 2009 Top CPAs in Litigation Support in South Florida - South Florida Legal Guide

*Licensed by the State of Florida

## RECEIVERSHIP EXPERIENCE

Barry Mukumal's experience runs the full gamut of receivership, insolvency and litigation support work on behalf of creditors. He is a member of the panel of Bankruptcy Trustees for the Southern District of Florida. Mr. Mukamal has served as trustee in thousands of bankruptcy cases and most recently, as plan administrator in two cases involving troubled real estate projects on complex high rise condominium projects. His technical skills, abilities and experience are applied on a "hands on basis" in each assignment, which allows him to:

- Quickly assess and analyze the current environment of the estate and formulate an asset management plan to optimize the estate's value
- Termination of Operations
- Communicate and manage the expectations of creditors and equity holders during the execution of the asset management plan
- Effectively manage the financial resources of an estate to optimize the estate's value
- Efficiently manage third party service providers who are needed to maintain or enhance the Estate's value for creditors and equity stakeholders
- Manage the marketing and sale of estate assets of any type
- Identify potentially fraudulent transactions and perform detailed investigations of the debtors' financial affairs
- Manage litigation to optimize the estate's recovery value.

He is well skilled in negotiation and positioning. He has participated in both in-court and out-of-court workouts in a variety of industries including commercial and residential real estate, agriculture, aerospace, manufacturing and distribution. His seasoned skills and experience that are exemplified in the areas of bankruptcy/insolvency and litigation are equally available to assist creditors and debtors in other contexts, including where creditors enter into an assignment for the benefit of creditors with troubled private and public company debtors.

In such challenging situations, he employs the same high standards of conduct and accountability, financial reporting, and asset management and disposition strategies that are routinely used in his Trustee engagements. He is fully cognizant that an assignee acts as a fiduciary for the benefit of all parties with correlative duties tantamount to that of a bankruptcy trustee or court appointed receiver. In addition to the general duties of any fiduciary, such duties may include the following:

- Inventory, secure and protect the property
- Convert the estate to cash in the most expedite and efficient manner that maximizes the net recovery value.
- Take legal action to recover on causes of action that are part of the estate, including receivables, fraudulent transfers and preferential transfers
- Determine which creditors have valid and enforceable claims
- Consider and deal with any tax issues incident to the administration of the estate
- Account for and distribute cash to creditors in accordance with their priority under common or statutory law.

*Licensed by the State of Florida

# Attachment 2

PAG-B0609
KM000044

## BARRY E. MUKAMAL - RECENT TESTIMONY HISTORY

| # | Case Name | Court | Case Number | Judge | Type of Testimony | Year |
|---|---|---|---|---|---|---|
| 1 | DAVID C ARNOLD<br>V<br>ASSOCIATION LAW GROUP, ET AL | MIAMI-DADE | 12-13962 ca 40 | | DEPOSITION / TESTIMONY | 2014 |
| 2 | TODD LARY/STARBRIGHT<br>V<br>BOSTON SCIENTIFIC CORPORATION | SOUTHERN DISTRICT OF FLORIDA | 1:11 CV 23820 | | TRIAL TESTIMONY | 2014 |
| 3 | AMERICAN EDUCATIONAL ENTERPRISES, LLC<br>v<br>THE BOARD OF TRUSTEES OF THE INTERNAL IMPROVEMENT TRUST FUND | MIAMI-DADE COUNTY | CASE #02-23922 CA 09 | | DEPOSITION | 2014 |
| 4 | P & S ASSOCIATES GENERAL PARTNERSHIP<br>& S & P ASSOCIATES GENERAL PARTNERSHIP<br>V<br>ROBERTA P. ALVES, ET AL | BROWARD COUNTY | CASE #12-028324(07) | | TRIAL TESTIMONY | 2014 |
| 5 | IRONSHORE INDEMNITY INC. et al<br>v<br>BANYON 1030-32 LLC ET AL, ROBERT FURR TRUSTEE | BANKRUPTCY COURT SOUTHERN DISTRICT OF FLORIDA | 12-CV-61678-MGC<br>12-CV-61753-WJZ<br>12-CV-61813-KMW | | DEPOSITION | 2014 |
| 6 | PATRICIA MONTES DE OCA<br>v<br>JOSE JUAN RENTERIA | CIRCUIT COURT - MIAMI-DADE COUNTY, FLORIDA | 2012-021622-FC-04 | | Testimony | 2014 |
| 7 | BANNING LARY, MD, ET AL.<br>V.<br>BOSTON SCIENTIFIC CORPORATION | US DISTRICT COURT SOUTHERN DISTRICT OF FLORIDA | 1:11-cv-23820-O'SULLIVAN | O'SULLIVAN | Deposition & Trial | 2014 |
| 8 | TELTRONICS, INC. | BANKRUPTCY COURT MIDDLE DISTRICT OF FLORIDA | 8:11-BK-12150-KRM | KRM | Deposition & Trial | 2015 |
| 9 | ARAZOZA BROTHERS CORP. | CIRCUIT COURT MIAMI-DADE COUNTY, FLORIDA | 13-1908 CA 25 | | Deposition | 2015 |
| 10 | DYADIC INTERNATIONAL, INC.<br>v.<br>ERNST & YOUNG, LP, et al. | CIRCUIT COURT PALM BEACH COUNTY, FLORIDA | 50 2009 CA010680 XXXX MB AA | | Deposition | 2015 |
| 11 | TELTRONICS, INC. | BANKRUPTCY COURT MIDDLE DISTRICT OF FLORIDA | 8:11-BK-12150-KRM | KRM | Deposition & Trial | 2015 |
| 12 | RONALD DEMASI | BANKRUPTCY COURT MIDDLE DISTRICT OF FLORIDA | 8:13-BK-08406-MGW | MGW | Deposition & Trial | 2015 |
| 13 | XTEC, INC. | CIRCUIT COURT MIAMI-DADE COUNTY, FLORIDA | 13-38362 CA 09 | | Deposition & Trial | 2015 |

## BARRY E. MUKAMAL - RECENT TESTIMONY HISTORY

| ID | Case Name | Court | Case Number | Judge | Type of Testimony | Year |
|---|---|---|---|---|---|---|
| 14 | LINDA S. ORTIZ<br>V.<br>HECTOR P. ORTIZ | CIRCUIT COURT<br>11TH JUDICIAL CIRCUIT<br>MIAMI-DADE COUNTY, FL | 2014-8076-FC04 (35)<br>2014-022865-FC04 (39) | | Trial | 2015 |
| 15 | FUTURESELECT PORTFOLIO MANAGEMENT, INC.<br>V.<br>TREMONT GROUP HOLDINGS, INC. | SUPERIOR COURT OF THE STATE OF WASHINGTON | 10-2-30732-0 SEA | | Deposition & Trial | 2015/2016 |
| 16 | TAYLOR, BEAN & WHITAKER PLAN TRUST<br>V.<br>PRICEWATERHOUSECOOPERS, LLP | 11TH JUDICIAL CIRCUIT<br>MIAMI-DADE COUNTY | 13-33964 (40) | | Deposition | 2015/2016 |
| 17 | AGRO SUPPLY, S.A.<br>V.<br>AGRITRADE, LP | 11TH JUDICIAL CIRCUIT<br>MIAMI-DADE COUNTY | 13-15713 CA 01 | | Deposition & Trial | 2015/2016 |
| 18 | DISABILITY LAW CLAIMS, PA, ET AL.<br>V.<br>IM SOLUTIONS, LLC | DISTRICT COURT SOUTHERN DISTRICT OF FLORIDA | 14-6177-CIV-DIMITROULEAS /SNOW | | Deposition | 2015/2016 |
| 19 | MAJORCA ISLES MASTER ASSOCIATION | BANKRUPTCY COURT SOUTHERN DISTRICT OF FLORIDA | 12-19056 BKC AJC | AJC | Trial | 2015/2016 |
| 20 | CITY NATIONAL BANK OF FLORIDA<br>V<br>MAC-ACCESS, CORP | CIRCUIT COURT<br>11TH JUDICIAL CIRCUIT<br>MIAMI-DADE COUNTY, FL | 2015-029121-CA-01(22) | HANZMAN | Forensic Examination | 2016 |
| 21 | LAPCIUC<br>V.<br>LAPCIUC | CIRCUIT COURT<br>11TH JUDICIAL CIRCUIT<br>MIAMI-DADE COUNTY, FL | | | Trial | 2016/2017 |
| 22 | LAMINGTON RESOURCES, INC.<br>V.<br>BURGER KING CORPORATION,<br>V.<br>BK CENTROAMERICA CAYMAN LTD, ET AL. | INTERNATIONAL CHAMBER OF COMMERCE<br>INTERNATIONAL COURT OF ARBITRATION | CASE NO. 20786/RC | | Deposition | 2016/2017 |
| 23 | PEDRO A. TORRES<br>V.<br>ASTOR PROPERTY HOLDINGS, LLC, ET AL. | CIRCUIT COURT<br>11TH JUDICIAL CIRCUIT<br>MIAMI-DADE COUNTY, FL | 2015-014693-CA(20) | | Deposition/Trial | 2016/2017 |
| 24 | S.R. KALB AND ASSOCIATES, INC.<br>V.<br>2250 & 2233 NW 77 TER, LLC AND MICHAEL I. ROSE | CIRCUIT COURT<br>11TH JUDICIAL CIRCUIT<br>MIAMI-DADE COUNTY, FL | 2016-001586-CA-01 | | Receiver | 2016/2017 |
| 25 | REMOS BUILDING & DEVELOPMENT CORPORATION<br>V.<br>CHAPEL TRAIL ASSOCIATES, LTD | CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT, IN AND FOR BROWARD COUNTY, FL | 05-05212 (02) | | Deposition | 2017 |

# BARRY E. MUKAMAL - RECENT TESTIMONY HISTORY

| ID | Case Name | Court | Case Number | Judge | Type of Testimony | Year |
|---|---|---|---|---|---|---|
| 26 | LARRY V. GORDON<br>V.<br>ROBERT FISHMAN | IN THE CIRCUIT COURT OF THE 15TH JUDICIAL CIRCUIT IN AND FOR PALM BEACH COUNTY, FLORIDA | 2014-CA-008927 (AD) | BARKDULL | Deposition | 2017 |
| 27 | GARY DEAR, as Class Representative<br>V.<br>Q-CLUB HOTEL, LLC | UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF FLORIDA | 15-60474-CIV-COHN/SELTZER | COHN | Trial | 2017 |
| 28 | BAHAMIAN VILLAGE, LLC<br>V.<br>FPL | CIRCUIT COURT<br>11TH JUDICIAL CIRCUIT<br>MIAMI-DADE COUNTY, FL | 13-34551-CA-09 | | Deposition | 2017 |
| 29 | DAVID L. CLARKE, ET AL.<br>V.<br>TWO ISLANDS DVELOPMENT CORP. AND PRIVE DEVELOPERS LLC AND TRUST 75 LT21 | CIRCUIT COURT<br>11TH JUDICIAL CIRCUIT<br>MIAMI-DADE COUNTY, FL | 14-21513-CA-09 | BAGLEY | Deposition | 2018 |
| 30 | PHILIP VON KAHLE, CURATOR<br>V.<br>FIDELITY AND DEPOSIT COMPANY OF MARYLAND | CIRCUIT COURT<br>11TH JUDICIAL CIRCUIT<br>MIAMI-DADE COUNTY, FL | 16-021099-CA-01 | THORNTON | Deposition | 2018 |
| 31 | HAROUT SAMRA<br>V.<br>VICKEN BEDOYAN, WPM MIAMI, INC, et al. | CIRCUIT COURT<br>11TH JUDICIAL CIRCUIT<br>MIAMI-DADE COUNTY, FL | 14-22854-CA-40 | THOMAS | Trial | 2018 |
| 32 | JOEL BETH NAVRATIK, et al.<br>V.<br>JON J. RAPPAPORT AND PET MEDICAL CENTERS, LLC | CIRCUIT COURT<br>11TH JUDICIAL CIRCUIT<br>MIAMI-DADE COUNTY, FL | 17-019695-CA-01(44) | Thomas | Deposition & Trial | 2018 |
| 33 | STORATI<br>V.<br>TOTAL GSM, LLC | CIRCUIT COURT<br>11TH JUDICIAL CIRCUIT<br>MIAMI-DADE COUNTY, FL | 14-27987 | Butchko | Deposition | 2018 |
| 34 | CONTRAZZA INTERNATIONAL CONSTRUCTION, INC.<br>V.<br>UNIVERSAL TOWERS CONSTRUCTION, INC. | CIRCUIT COURT 9TH JUDICIAL CIRCUIT FOR ORANGE COUNTY, FLORIDA | 2015-CA-008342 | | Deposition/Trial | 2018 |
| 35 | SHOW ME HOSPITALITY, LLC<br>V.<br>TIM HORTONS USA INC. | UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF FLORIDA | 17-22679-CIV | Martinez-Otazo-Reyes | Deposition | 2019 |
| 36 | WAVE LENGTHS HAIR SALON OF FLORIDA, INC<br>V.<br>CBL & ASSOCIATES PROPERTIES, INC. | UNITED STATES DISTRICT COURT MIDDLE DISTRICT OF FLORIDA | 2:16-cv-00206-SPC-MRM | | Deposition | 2019 |
| 37 | BOUDKO, POLINA<br>V.<br>BUYANOV, DMITRIY | CIRCUIT COURT<br>11TH JUDICIAL CIRCUIT<br>MIAMI-DADE COUNTY, FL | 17-04537-FC-04 | Young | Deposition | 2019 |
| 38 | STEVEN R. SCHAFER, ET AL.<br>V.<br>ROBERT A. DICRISCI, ET AL. | CIRCUIT COURT<br>11TH JUDICIAL CIRCUIT<br>MIAMI-DADE COUNTY, FL | 17-021621-CA-43 | Butchco | Deposition | 2019 |

## BARRY E. MUKAMAL - RECENT TESTIMONY HISTORY

| ID | Case Name | Court | Case Number | Judge | Type of Testimony | Year |
|---|---|---|---|---|---|---|
| 39 | SCHECHTER OPERATING CAPITAL LLP<br>V.<br>BAINBRIDGE INVESTOR, LLC | CIRCUIT COURT<br>15TH JUDICIAL CIRCUIT<br>PALM BEACH COUNTY, FL | 50-2016-CA-8692 | | Deposition | 2019 |
| 40 | IRONSHORE INDEMNITY INC. et al<br>v<br>BANYON 1030-32 LLC ET AL, ROBERT FURR TRUSTEE | BANKRUPTCY COURT<br>SOUTHERN DISTRICT OF FLORIDA | 12-CV-61678-MGC<br>12-CV-61753-WJZ<br>12-CV-61813-KMW | Ray | Trial | 2019 |
| 41 | BOYWIC FARMS, LTD<br>V.<br>BRITT L WEAVER | AMERICAN ARBITRATION ASSOCIATION | 01-18-0001-9008 | | Deposition | 2019 |
| 42 | MANDARIN LAKES NEIGHBORHOOD HOMEOWNERS' ASSOCIATION, INC<br>V.<br>[illegible] | CIRCUIT COURT<br>11TH JUDICIAL CIRCUIT<br>MIAMI-DADE COUNTY, FL | 18-039950-CA-01 | | Deposition | 2019 |
| 43 | HADAD CONSULTING, LLC<br>V.<br>URBAN FARMERS, INC | CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT, IN AND FOR BROWARD COUNTY, FL | 17-019215 | | Trial | 2021 |

PAG-B0613

KM000048

# Attachment 3

PAG-B0614

KM000049

Filing # 106896478 E-Filed 04/30/2020 12:21:16 PM

IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

CASE NO. CACE20004101 DIVISION 07 JUDGE Jack Tuter

**Edward Kessler, et al**
Plaintiff(s) / Petitioner(s)

v.

**James Blackburn, et al**
Defendant(s) / Respondent(s)

_______________________________/

## ORDER APPOINTING ACCOUNTANT

THIS CAUSE having come before the Court on Plaintiff's Notice of Filing Proposed Accountants (the "Notice") and the Motion to Amend and/or Strike Plaintiff's Notice of Filing Proposed Accountants (the "Motion to Strike"), and in furtherance of the Order on Status Conference entered April 20, 2020 (the "Status Conference Order"), it is hereby ORDERED:

1. The Court appoints Barry Mukamal, CPA, PFS, ABV, CFE, CFF, CIRA of Kapila Mukamal located at The Kapila Building, 1000 South Federal Highway, Suite 200, Fort Lauderdale, FL 33316 ("Mukamal") to act as an independent accountant in this matter
2. Mukamal shall prepare the Reports as that term is defined in the Status Conference Order, and any schedules, spreadsheets, or supplemental reports as needed to do so. For the avoidance of doubt, the Reports shall include:
   a. an accounting of the assets, whether liquid or not, and liabilities of PGA; and
   b. a schedule of all of PGA's expenditures of $2,500 or more, from PGA's inception through the present, along with an explanation for each expenditure.
3. Premier Group Autos, LLC ("PGA") members Edward Kessler and James Blackburn (the "Members"), PGA's employees, and anyone acting on behalf of PGA shall provide

Mukamal with all information and documents in their possession, custody, or control reasonably necessary to prepare the Reports, and shall obtain any available additional information and documents from third parties reasonably necessary to complete the Reports. The Members and their agents shall comply with all information and documents requests from Mukamal.

4. Mukamal shall cap his firm's rates at a $425 per hour blended rate.
5. The Members shall each be responsible for 50% of the fees and costs associated with the Reports, including any fee retainer required by Mukamal.
6. The Court reserves jurisdiction to modify the scope of the accounting and other powers conferred upon Mukamal herein.

**DONE** and **ORDERED** in Chambers, at Broward County, Florida on 04-30-2020.

CACE20004101 04-30-2020 10:09 AM

CACE20004101 04-30-2020 10:09 AM
Hon. Jack Tuter
**CIRCUIT JUDGE**
Electronically Signed by Jack Tuter

**Copies Furnished To:**
Brett M Amron , E-mail : bamron@bastamron.com
Brett M Amron , E-mail : mdesvergunat@bastamron.com
Brett M Amron , E-mail : kjones@bastamron.com
Dana Quick , E-mail : dquick@bastamron.com
Dana Quick , E-mail : mdesvergunat@bastamron.com
Dana Quick , E-mail : jmiranda@bastamron.com
Raul Gastesi Jr , E-mail : Efiling@glmlegal.com
Raul Gastesi Jr , E-mail : acevedo@glmlegal.com
Raul Gastesi Jr , E-mail : gastesi@glmlegal.com

# Attachment 4

PAG-B0617

KM000052

Agreement Between Ed Kessler and James Blackburn
5th November 2018

Agreed the following:

- Ed and James will own 50% each of The Premier Group and its subsidiary Overfinch Miami.
- Both parties agree to support the company in their own relative capacity.
- More detailed agreement to follow after training in London in December.
- Initial commitments below.

Ed Kessler

- $50,000 in upfront capital provided
- Use of credit facilities for purchase of floorplan financing and showroom build out.
- Director of operations for the company
- Purchase of first vehicle to be financed
- Any additional financing required via loan or capital support

James Blackburn

- $50,000 in upfront capital provided
- Use of credit facilities for purchase of floorplan financing and showroom build out.
- Chief Executive officer for the company
- Purchase of the first vehicle to be financed
- Any additional financing required via loan or capital support

Any additional financing needed shall be agreed to buy both parties and shall be provided equally.
Both parties capital input is capped at $100,000.
Any extra funds needed shall be sourced in a mutually agreed way.

Ed Kessler

James Blackburn

EXHIBIT
1

PAG-B0618

KM000053

# Attachment 5

PAG-B0619

KM000054

# DISTRIBUTION AGREEMENT

This International Distribution Agreement ("Agreement") is made effective as of Monday 03rd December 18 ("Effective Date") by and between Premier Group Autos LLC ("Distributor") with company registration number L18000263245 with its principal place of business at 1500 Cordova Road, 206 Fort Lauderdale, Florida, 33316 and Overfinch North America Inc. ("OVERFINCH") with its principal place of business at 500 Stinson Drive, Danville VA 24540 USA.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

## 1. DEFINITIONS

1.1 "Conversion" means exterior products including body styling package, badges, lettering, wheels and tires and the fitment thereof by OVERFINCH.

1.2 "Conversion Value" means the value of the Products and services supplied by OVERFINCH as set out in the relevant order acceptance and / or invoice. For the avoidance of doubt, the Conversion Value does not include taxes, duties, freight and transportation charges and similar costs, all of which are payable by the Distributor.

1.3 "Customers" means any current or potential purchasers or end-users of the Products.

1.4 "Initial Term" means twelve months from the Effective Date.

1.5 "Introducers Fee" means an amount in US dollars to be agreed on a deal by deal basis between the parties.

1.6 "Order Value" means the total value of the order including the Vehicle Value and Conversion Value as set-out in such order that is accepted by OVERFINCH.

1.7 "Products" means any Overfinch products sold by OVERFINCH to Distributor for resale to Customers pursuant to the terms of this Agreement, and any related services (including OVERFINCH training).

1.8 "Term" means twelve months commencing from the Effective date and thereafter each twelve-month period following the anniversary of the Initial Term.

1.9 "Territory" means the utility and industrial market segments in South Florida (Miami Dade, Broward, Palm Beach, Monroe, Collier, Lee, Henry, Florida Keys and the Glades) only.

1.10 "Vehicle" means a new vehicle that OVERFINCH has manufactured parts for and is capable of being modified by OVERFINCH.

1.11 "Vehicle Value" means the cost of the vehicle as invoiced to Overfinch by the supplying automotive dealer. For the avoidance of doubt, the Vehicle Value does not include state or local taxes, freight and transportation charges and similar costs, all of which are payable by the Distributor.

## II. RELATIONSHIP

2.1 **Appointment**. OVERFINCH appoints the Distributor as an exclusive, independent distributor of Products to Customers in the Territory. Distributor accepts such appointment and agrees to devote sufficient time and resources to the performance of its duties hereunder. Distributor shall promptly notify OVERFINCH of all inquiries related to Products from persons or entities located outside the Territory. Distributor shall notify OVERFINCH of all changes in personnel assigned to its account.

OVERFINCH reserves the right to transact any business to retail Customers within the Territory that are as a result of online sales made via its website or other online platform and / or sales resulting from any local or national brand advertising events that it has organized and participated in.

OVERFINCH may terminate the exclusivity under this Agreement upon thirty (30) days notice at any time that the Distributor has placed no orders with OVERFINCH for any rolling two-month period, providing that the Distributor has not already ordered, prior to the commencement of that two-month

JB AS.

period. Products that would exceed the minimum amount required by the end of that two-month period.

2.2 **Independent Contractor.** Distributor is an independent contractor. Distributor is not an employee, representative, or agent of OVERFINCH. Distributor is not authorized to make any agreement, warranty or representation on behalf of OVERFINCH, or to create any liability or obligation, express or implied, on behalf of OVERFINCH. Distributor shall not appoint any third party to promote or sell Products or otherwise perform any of Distributor's obligations hereunder. Distributor shall conduct its business in its own name, maintain its own office and be responsible for its expenses, personnel and operations.

2.3 **Direct Sales.** OVERFINCH reserves the right to honor online store orders from Customers that are based within the Territory, with no compensation to the Distributor.

During the Initial Term and any renewal Term, in the event that the Distributor can demonstrate via an information registration service acceptable to OVERFINCH that is has recorded a Customer's details at an event it attended and / or hosted, whereby it introduced that Customer to the Overfinch brand and that Customer is within the Territory and would like to place an order to purchase Products from OVERFINCH directly within a six month period from that introduction, OVERFINCH shall refer that Customer to the Distributor. In the event such Customer is located outside of the Territory OVERFINCH shall pay the Distributor an Introducers Fee.

The Distributor is required to submit the information registration record to OVERFINCH on a monthly basis and within 5 working days following an event that the Distributor has hosted.

OVERFINCH shall maintain an information registration service whereby it records Customer's details at any brand advertising event that it attends and / or hosts.

2.4 **Sales Terms.** OVERFINCH may decline to quote any potential sale and may accept or reject any order, providing that such declination or rejection is based upon a reasonable commercial decision.

All sales of Products by OVERFINCH shall be subject to the OVERFINCH Sales Terms in effect at time of sale, as reflected on the OVERFINCH sales order acknowledgment, to the extent that they do not conflict with the provisions of this Agreement. By placing each order hereunder, Distributor confirms

JB AS.

its agreement with and acceptance of the OVERFINCH Sales Terms. Distributor must extend, honor and perform the warranty services as set forth in the OVERFINCH Sales Terms to Customers. OVERFINCH shall be bound only by the warranty applicable to parts as set forth in the applicable OVERFINCH Sales Terms, and Distributor shall indemnify OVERFINCH against any additional warranty terms. Any warranty or other sales terms required by law in the Territory must be provided by Distributor, and Distributor shall indemnify OVERFINCH for any failure to comply with any such requirements. Distributor must also notify OVERFINCH if any of its standard warranty or other sales terms conflict with any law in the Territory.

During the Initial Term and any subsequent renewal Term thereafter the Distributor shall notify OVERFINCH promptly of any potential warranty claim relating to its Products. Any warranty claims are at the sole decision of OVERFINCH and any costs or expenses incurred by the Distributor shall only be reimbursed providing these have been pre-authorized in writing by OVERFINCH.

OVERFINCH Conversions/Products shall be ordered on a monthly basis. There is no guarantee in respect of the delivery date of any Vehicles. OVERFINCH has no control over the lead time of the Vehicle from the manufacturer. It is not guaranteed, and it is dependent upon the model year of the Vehicle being ordered, but it is envisaged that a Vehicle will be delivered with the Conversion within 16 weeks from OVERFINCH'S acceptance of a Vehicle order. OVERFINCH shall update the Distributor on lead times of Vehicles as and when it receives updates from the supplying automotive dealer.

Upon OVERFINCH's acceptance of an order submitted by the Distributor for a Vehicle and Conversion, the Distributor is required to comply with the following payment terms:

1.) 10% non-refundable deposit of the total Order Value upon OVERFINCH'S acceptance of the order;
2.) Remaining balance of the Vehicle Value to be paid on or before collection of the Vehicle by OVERFINCH from the Land Rover dealer;
3.) Remaining balance of the Conversion Value to be paid upon completion of the conversion by OVERFINCH and before delivery of it to the Distributor.

Upon OVERFINCH's acceptance of an order submitted by the Distributor for a Conversion, the Distributor is required to comply with the following payment terms:

1.) 10% non-refundable deposit of the total Order Value upon OVERFINCH'S acceptance of the order;

JB

2.) Remaining balance of the Conversion Value to be paid upon completion of the conversion by OVERFINCH and before delivery of it to the Distributor.

Payment must be made in cleared funds via wire transfer or cheque only.

All orders are exclusive of state and local taxes, freight and transportation charges and similar costs, all of which should be paid by the Distributor.

Prices for Products shall be those provided in writing by OVERFINCH to Distributor and may be modified by OVERFINCH from time to time. Distributor shall pay all amounts in U.S. Dollars.

Distributor shall provide OVERFINCH with its standard end-user price list upon request.

Distributor acknowledges that OVERFINCH pricing fully compensates Distributor on an ongoing basis for customer and market development, for providing product support and services in the Territory.

Delivery of the Products shall take place at OVERFINCH'S place of business. Acceptance of any change to the delivery point requested by the Distributor shall be at OVERFINCH'S sole discretion and at the Distributors risk and expense.

**2.5 Minimum Annual Order Quantity**

The Distributor is required to place orders for a minimum of 36 OVERFINCH Conversions or Overfinch Products to the value of $1,500,000.00 during the Initial Term. One Conversion/Product order shall be placed upon the Effective Date of this agreement. Thereafter the remaining minimum order quantity shall be spread in equal instalments across each month of the Initial Term, with the Distributor ordering a minimum of 3 Conversions or the equivalent value in Products each month.

Unless notified by OVERFINCH in writing 30 days prior to the expiry of the Initial Term, the contract shall automatically renew for a further Term. The minimum annual order requirement for any such renewal Term shall be an increase of 10% of the minimum annual order value required in the previous Term.

The initial minimum annual order shall commence on the above Effective Date, with each subsequent minimum annual order commencing upon each renewal Term.

JB AS.

The Distributor has the intention to open an Overfinch showroom within the Territory within 8 to 12 months from the Effective Date of this agreement. Upon the Distributor confirming it has finalized its plans in respect of that showroom, both parties shall enter into further discussions regarding the terms of this agreement in view of the investment proposed by the Distributor and document any such variation to the terms hereof that are agreeable between both parties at that time. Further, subject to the Distributor's performance throughout the Initial Term, the parties may enter into discussions regarding distributorships in other potential territories in the United States of America.

**2.6 Initial Order**

Upon execution of this Agreement, the Distributor shall submit an initial order for an OVERFINCH Conversion.

## III. RESPONSIBILITIES

3.1 **Promotion.** Distributor shall devote sufficient time and resources to successfully promote and sell Products to Customers. Distributor shall ensure that all sales personnel are properly trained and possess the appropriate technical competency to promote Products effectively. Distributor shall respond in a timely and professional manner to all inquiries from and referrals to Customers. Distributor shall furnish any market information requested by OVERFINCH, including without limitation annual sales plans, monthly sales reports, monthly forecasting reports, sales forecast updates and explanations of any discrepancies between forecasted and actual sales. Distributor shall attend any required OVERFINCH sales training.

3.2 **Marketing.** The Distributor is required to advertise and promote the Products on a regular basis on an appropriate marketing platform akin to the prestige of the brand. The Distributor should submit a proposed marketing plan to OVERFINCH for its review and written consent.

OVERFINCH may from time to time carry out local and / or national brand advertising and marketing activities, within or outside of the Territory and request the Distributor to make a reasonable contribution to such costs and expenses associated and incurred in respect of that brand advertising. OVERFINCH shall provide reasonable notice of anticipated costs and expenditure for such brand advertising.

JB AS.

3.3 **Events.** The Distributor shall host 10 exclusive events during the course of the initial term in order to promote the OVERFINCH brand and Vehicles. OVERFINCH will provide marketing material and product support for use at such events, upon reasonable notice and as required. The Distributor shall cover the reasonable costs and expenses incurred by OVERFINCH in this regard.

3.4 **Customer and Product Support.** Distributor shall follow up and maintain contact with Customers to ensure customer satisfaction. Distributor shall ensure that Customers receive information about any recalls on Products provided to Distributor. Distributor shall employ personnel who are educated in the field and sufficiently knowledgeable of Products to perform the technical support and services required hereunder.

3.5 **Technical and Marketing Materials.** Distributor shall maintain an adequate inventory of current OVERFINCH technical and marketing materials to promote Products. Distributor may not use any technical or marketing materials not provided by OVERFINCH. Prior written approval for the use of any marketing material should be obtained from OVERFINCH. Distributor shall provide any translations of OVERFINCH technical and marketing materials to OVERFINCH.

3.6 **Compliance.** Distributor shall comply with all governmental laws, regulations and orders of all relevant jurisdictions that may be applicable to Distributor under this Agreement, including without limitation the U.S. Export Administration Act, the U.S. Foreign Corrupt Practices Act and all licensing and registration requirements in the Territory. Distributor shall advise OVERFINCH with respect to any warranty requirements, noise ordinances, safety standards, specifications and other requirements applicable to Products imposed by law, regulation or order in the Territory. Distributor shall notify OVERFINCH of the existence and content of any provision of law in the Territory or any other applicable law that conflicts with any provision of this Agreement or any other document, such as warranty or sales terms, at the time of execution or at any time thereafter.

3.7 **Training.** OVERFINCH shall provide sales and technical training and support as appropriate. The Distributor shall cover the reasonable costs and expenses incurred by OVERFINCH in providing this.

JB AS.

## IV. INTELLECTUAL PROPERTY AND CONFIDENTIALITY

4.1. **Intellectual Property.** Distributor acknowledges that trademarks, service marks, trade dress, patents, copyrights, trade secrets, licenses and any other intellectual property used by OVERFINCH are the sole property of OVERFINCH. Distributor shall not use such OVERFINCH property except in the normal course of promoting Products, or promoting OVERFINCH in general, under the terms of this Agreement. Distributor shall not remove or alter any trademarks, service marks or trade dress that identify OVERFINCH, nor use any trademarks, service marks, trade dress or any other intellectual property that, in the sole discretion of OVERFINCH, are confusingly similar to those of OVERFINCH. Distributor shall make every effort to safeguard the intellectual property of OVERFINCH, and shall immediately notify OVERFINCH in writing of any infringement or suspected infringement and cooperate with OVERFINCH, as OVERFINCH deems necessary, to protect such property against infringement (such cooperation to be at OVERFINCH expense unless the infringement arose from Distributor acts or omissions). Distributor shall comply with the OVERFINCH INTELLECTUAL PROPERTY POLICY, as provided by OVERFINCH. OVERFINCH my immediately terminate this Agreement for any violations of these intellectual property requirements. Upon termination of this agreement the Distributor shall not use the intellectual property.

4.2 **Confidentiality.** All confidential information provided, from time to time, by OVERFINCH to Distributor has been or is provided in strict confidentiality, and can neither be disclosed by Distributor to third parties during the term of this Agreement or after termination or expiration, nor used by Distributor for purposes other than those set forth in this Agreement. Distributor shall maintain such information in strict confidence during the term of this Agreement and for five (5) years after termination or expiration, except when disclosure of such information is required by law. Within thirty (30) days of any request by OVERFINCH or termination or expiration of this Agreement, Distributor shall return or destroy, according to OVERFINCH's instruction at such time, all confidential information and any demonstration products provided by OVERFINCH. Distributor shall ensure compliance with these confidentiality obligations by its employees, representatives and agents, including without limitation by obtaining appropriate confidentiality agreements from such persons.

4.3 **Other brands.** The Distributor shall not fit any other after-market tuning brands parts and / or accessories branded or unbranded to any Vehicle's supplied by OVERFINCH, so as to cause confusion in the market place that any other brands products are that of OVERFINCH or vice versa

JB AS.

## V. TERM AND TERMINATION

5.1 **Term.** Subject to termination, this Agreement shall have an initial term of one (1) year, commencing on the Effective Date, and shall renew automatically for additional one (1) year periods, subject to the below.

5.2 **Termination.** Either party may terminate this Agreement without cause upon thirty (30) days written notice to the other party to expire upon the end of the Initial Term or following that the anniversary of any renewal Term thereafter. Either party may also choose to render the agreement non-exclusive upon thirty (30) days written notice to expire upon the end of the Initial Term or following that the anniversary of any renewal Term thereafter (in addition to the right of OVERFINCH elsewhere in this Agreement to render the Agreement non-exclusive for failure by Distributor to meet its minimum orders).

Either party may terminate this Agreement immediately upon the other party's insolvency, bankruptcy, suspension of business, assignment of assets for the benefit of creditors, voluntary or involuntary dissolution, appointment of a trustee for all or a substantial portion of the party's assets, or breach of this Agreement. OVERFINCH reserves the right to immediately terminate this Agreement on written notice to Distributor if, in the sole discretion of OVERFINCH, the laws or economic circumstances in the Territory have changed in a material way so as to adversely impact OVERFINCH's relationship with Distributor or OVERFINCH's ability to conduct business in the Territory. Upon termination or expiration of this Agreement, OVERFINCH has the right of first refusal in respect of any Products and / or Vehicles and may, at its sole discretion, repurchase from Distributor, at the lesser of either the net prices paid by Distributor or the open market value, any of the Vehicles purchased and remaining unsold by Distributor. OVERFINCH's repurchase of Distributor's Vehicle inventory pursuant to the termination provisions hereof (or Distributor's right to sell such inventory if not so repurchased by OVERFINCH) shall constitute Distributor's sole remedy for termination or expiration of this Agreement. All intellectual property, confidentiality, non-compete and non-hire rights and obligations set forth in this Agreement shall survive termination or expiration.

5.3 **Transition.** During any notice period and after termination or expiration of this Agreement, Distributor shall cooperate with OVERFINCH to assure a smooth transition for Customers and OVERFINCH. Distributor shall introduce OVERFINCH personnel (and the personnel of any distributor or sales representative specified by OVERFINCH) to Customers who have ordered or expressed

JB AS.

interest in Products and invite OVERFINCH (and any distributor or sales representative specified by OVERFINCH) to accompany Distributor's personnel on sales calls related to Products. Distributor shall take all necessary action to terminate any registration as an OVERFINCH distributor with any governmental authority. All indebtedness of Distributor to OVERFINCH shall become immediately due and payable without further notice or demand, which is hereby waived. Distributor shall also cooperate with OVERFINCH in identifying and producing copies of correspondence and business records related to all past, present and pending business activities conducted on behalf of Customers.

5.4 **Warranty.** Distributor shall honor all warranties existing upon expiration or termination of this Agreement until any such warranties expire.

## VI. GENERAL PROVISIONS

6.1 **Indemnification and Limitation of Liability.** The Distributor shall fully indemnify, defend and hold harmless OVERFINCH and all related parties, to the extent that it is not as a direct result of a defective Product supplied by OVERFINCH, from and against any claims or losses arising directly or indirectly from, as a result of or in connection with its performance or breach under this Agreement (including without limitation the above obligation to inform OVERFINCH of any compliance or other relevant legal issues in the Territory), or any other act or omission of Distributor. In no event, whether as a result of breach of contract, indemnity, warranty, tort (including negligence), strict liability or otherwise, shall OVERFINCH liability for any loss or damage exceed the price of the specific Product that gave rise to the claim, nor include any special, consequential, incidental or punitive damages.

6.2 **Insurance.** Distributor agrees to obtain and maintain commercially reasonable insurance, including without limitation comprehensive general liability coverage with combined policy limits of at least $1,000,000 per occurrence and covering bodily injury, personal injury, and property damage, including blanket contractual liability and naming OVERFINCH and its directors, officers, employees, and authorized representatives as additional insureds with respect to operations under this Agreement. Distributor agrees to furnish OVERFINCH with certificates showing the amount and existence of the required coverages and specifying that the policies shall not be canceled or materially changed except after (30) thirty days written notice to OVERFINCH. Distributor acknowledges that compliance with the specific insurance requirement above does not relieve Distributor of its obligation to maintain commercially reasonable insurance (either in regard to higher comprehensive general liability coverage limits or other

JB NS

types of coverage, including without limitation employer liability, automobile liability and worker compensation coverage.).

6.3 **Governing Law and Dispute Resolution.** The laws of the Commonwealth of Virginia excluding conflict of laws principles, shall govern this Agreement. The parties reject any applicability of the United Nations Convention on Contracts for the International Sale of Goods. Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by binding arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, and judgment on the arbitration award may be entered in any court of competent jurisdiction. Arbitration shall be held at a mutually acceptable location in Virginia, or another location agreed upon by the parties, and shall be conducted in English. Either party may seek injunctive relief in a court of competent jurisdiction or other interim measures in the event of breach or threatened breach of this Agreement The prevailing party to any dispute shall be entitled to recover legal fees and other costs (including without limitation arbitration fees, disbursements, collection costs and the allocated cost of in-house counsel).

6.4 **Miscellaneous.** Any notice pursuant to this Agreement shall be deemed given when sent by registered or certified mail (return receipt requested) or overnight delivery to an authorized officer at the headquarters of the other party at the address set forth in this Agreement. Distributor may not assign or otherwise transfer this Agreement or any rights or obligations hereunder without the prior written consent of OVERFINCH. The sale of the majority of Distributor's stock shall constitute an assignment for the purposes of this Agreement. No failure or delay by either party in exercising any right or remedy, or insisting upon strict compliance by the other party with any obligation in this Agreement, shall constitute a waiver of any right thereafter to demand exact compliance with the terms of this Agreement. The invalidity, in whole or part, of any provision in this Agreement shall not affect the remainder of such provision or any other provision and, where possible, shall be replaced by a valid provision that effects as close as possible the intent of the invalid provision. Neither party shall be liable for failure to perform or delay in performance of any obligation under this Agreement (except payment of amounts already due and owing) where such failure or delay results from any event beyond its reasonable control. The English language version of this Agreement shall govern and control any translations of the Agreement into any other language. This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof, and any modification hereof must be in a writing signed by both parties.

JB AS.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed and each of the undersigned represents and warrants that he or she is duly authorized to execute this Agreement.

PREMIER GROUP AUTOS LLC
1500 Cordova Road, 206 Fort Lauderdale, Florida, 33316

By: [signature]

Name: James Blackburn

Title: Owner

OVERFINCH NORTH AMERICA INC.
500 Stinson Drive
Danville VA 24540

By: [signature]

Name: Alexander Sloane.

Title: vice President.

# Attachment 6

PAG-B0632

KM000067

Agreement between
Edward Anthony Kessler
&
Premier Group Autos LLC

12.03.2018

This agreement made today between the above parties is subject to the following terms:

1. Edward Kessler will provide a loan to Premier Group Autos LLC for the purchase of the first vehicle.
2. The loan amount will be $160,000 USD
3. The loan will bear interest at 5% per annum
4. The initial term of the loan will be 12 months
5. Upon sale of the vehicle the lessor has the ability to re – loan at his discretion.

Signed

Edward Kessler

James Blackburn

EXHIBIT 3

# Attachment 7

PAG-B0634

KM000069

# BUSINESS LOAN AGREEMENT

MADE: the 11th Day of March 2019

BETWEEN

PREMIER GROUP AUTOS, LLC, a Florida Limited Liability Corporation

DBA – "OVERFINCH MIAMI"

(hereinafter called "BORROWER")

AND

EDWARD P. KESSLER & KRISTINE E. KESSLER (hereinafter called "LENDER")

WHEREAS, the LENDER promises to loan the BORROWER and the BORROWER promises to repay this principal amount to the LENDER. The LOAN amount will be:

*THREE HUNDRED THOUSAND DOLLARS AND ZERO CENTS*

*$300,000.00*

*@ $i^{(12)}$ = 8.00% annual which is equivalent to $i^{(12)}/12$ = 0.666% per month*

Lawful money of the United States of America, together with interest thereon at the rate provided in the LOAN until the indebtedness is paid in full and in the manner and at the times therein set forth.

A. TRANSER OF FUNDS

a. The funds will be wired per the wiring instructions presented in various emails.

B. PAYMENTS

a. The BORROWER will pay the LENDER interest payments on the 1st of every month starting on May 1st, 2019
b. Per the agreement, the interest on the principal is due on the 1st of every month.
c. The BORROWER has the right to either write a check or wire the interest payments to the LENDER.
d. The LENDER will, if not already, have a wiring agreement set up with a bank in order to receive the wire transfers.

BORROWER Initials EAK /______ LENDER Initials ______/______

EXHIBIT 7

PAG-B0635

KM000070

C. PURPOSE OF LOAN

a. The LOAN was lent to the BORROWER in order to purchase two (2) new Overfinch Range Rovers in order to increase the inventory of the fleet owned by the BORROWER. BORROWER will use this loan strictly for business transactions in "revolving" its inventory for the betterment of the business.

b. The BORROWER is to use this money for only purchasing vehicles in which will be reinvested into a new vehicle once a current vehicle has been sold.

D. DEFAULT

a. Notwithstanding anything to the contrary in this Agreement, if the BORROWER defaults in the performance of any obligation under this Agreement, then the LENDER may declare the principal amount owing and interest due under this Agreement at the time to be immediately due and payable.

b. If the BORROWER defaults and does not meet the financial statues or number of car sales expected to repay the LENDER the principal amount, but has inventory (Overfinch Range Rover) available, the title of the vehicle/s will be transferred from the BORROWER to the LENDER in order for the LENDER to acquire an "asset" as a substitute for repayments. This will give LENDER opportunity to sell vehicle on its own to receive the principal in a different route.

E. BINDING EFFECT

a. This Agreement will pass to the benefit of an be binding upon the respective heirs, executors, administrators, successors and permitted assigns of the Borrower and Lender. The BORROWER waives presentment for payment, notice of non-payment, protest, and notice of protest.

F. LOAN TERMS REVISIT

a. This LOAN agreement will be revisited by all parties in OCTOBER of the 2019 fiscal year.

b. Terms will depend on the performance of the BORROWER throughout the year.

c. Terms will be negotiated by all parties on whether all or some of the principal will be repaid by the end of the 2019 fiscal year. The option of keeping the money in the company will be on the table as well.

d. Whatever decision is made, all parties will have to agree on the terms, but seniority will go to the LENDER.

G. EVENT OF ADDITIONAL FUNDING REQUESTS FROM DIFFERENT LENDERS

a. In the event the BORROWER askes for more loans from different parties, the LENDER of this loan shall be made aware of any requests. The LENDER of this

loan will distinguish what path it would like to take as an effect to a choice made by the BORROWER.

H. SENIORITY

a. This loan will have seniority over other loans already put in the business by the current owners of the business.
b. The owners will have to repay this principal prior to repaying the principal of their own loans, unless the LENDER of this agreement agrees with any of those requests/transactions in writing.
c. This loan will also have seniority over any stock holder's contributions (equity) in the company as it stands before the processing of this loan. The owners of the BORROWER will know draw contribution money out of the company, and not

BORROWER Initials E4K /______ LENDER Initials ______/______

WITNESS and due execution hereof the day and year first above written.

BORROWER

WITNESS:

PREMIER GROUP AUTOS, LLC
DBA: OVERFINCH MIAMI

____________________ By :____________________
Edward A. Kessler – Member/Manager

____________________ By :____________________
James Blackburn – Member/Manager

LENDER:

WITNESS:

____________________ By: ____________________
Edward P. Kessler

____________________ By:____________________
Kristine E. Kessler

# Attachment 8

PAG-B0639

KM000074

DocuSign Envelope ID: FAE10158-F46A-48C6-BE92-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

## NextGear Capital Contract Cover Sheet

| | |
|---|---|
| Exact Legal Name: Premier Group Autos LLC | |
| DBA Name: Overfinch Miami | |
| Requested Floorplan Amount: $1,000,000.00 | Business Type: Limited Liability Corporation |
| Federal Tax ID: ███  Dealer License #: ███ | |
| State of Incorporation of Residence: FL | State Organization ID: |
| Business Email: sales@overfinchmiami.com | |

## Address Information

| | | | |
|---|---|---|---|
| Address: 11 SW 12th Ave Ste 103 Bldg 59 | | | |
| City: Dania Beach | State: FL | ZIP:33004 | County: Broward |
| Phone Number: 954-440-0717 | Fax Number: | | |
| Is Main Lot: Yes | Is Mailing Address: Yes | Has Physical Inventory: Yes | |

## Stakeholder/Guarantor Information

| | | | |
|---|---|---|---|
| Stakeholder/Guarantor Name: James Michael C Blackburn | Title: Manager | | % of Ownership: 50% |
| Home Address: ███ | | | |
| City: Ft Lauderdale | State:FL | ZIP: 33334 | Own or Rent: Own |
| Home Phone: ███ | Cell Phone: ███ | SS#: xxx-xx-5859 | DOB: ███ |
| Drivers License #: ███ | | | |

| | | | |
|---|---|---|---|
| Stakeholder/Guarantor Name: Edward Anthony Kessier | Title: Manager | | % of Ownership: 50% |
| Home Address: ███ | | | |
| City: Bethel Park | State: PA | ZIP: 15101 | Own or Rent: Own |
| Home Phone: ███ | Cell Phone: ███ | SS#: xxx-xx-27██ | DOB: ███ |
| Drivers License #: ███ | | | |

**INTERNAL USE ONLY:**

Home Market: Ft. Lauderdale North

| | |
|---|---|
| Credit Limit Type: Retail | Credit Limit Amount: $150,000.00 |
| Terms: D60/30/30 -- F80/45██ -- R0_0-- C%/██ | |

Account #125308

**EXHIBIT**

**4**

DocuSign Envelope ID: FAE10158-F46A-48C8-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

# DEMAND PROMISSORY NOTE AND LOAN AND SECURITY AGREEMENT

FOR VALUE RECEIVED, the undersigned borrower ("Borrower") promises to pay to the order of NextGear Capital, Inc. ("Lender"), with its principal office at 11799 North College Avenue, Carmel, Indiana 46032, or such other place as Lender may designate in writing or on the Discover Portal from time to time, in lawful money of the United States of America, the principal sum of One Hundred Fifty Thousand Dollars and Zero Cents ($150,000.00), or such greater or lesser sum which may be advanced to or on behalf of Borrower from time to time, together with all costs, interest, fees, and expenses as provided for under this Note and the other Loan Documents. Unless otherwise stated in an addendum to this Note, this Note shall become effective on the date of Borrower's execution hereof as set forth below Borrower's signature (such date, or the effective date otherwise stated in the applicable addendum, the "Effective Date").

NOW, THEREFORE, in consideration of the mutual covenants, agreements and conditions contained herein, Borrower and Lender (each, a "Party" and collectively, the "Parties") agree as follows:

1. DEFINITIONS. Capitalized terms used in this Note or in the other Loan Documents without definition shall have the respective meanings as set forth in Appendix A attached hereto and incorporated herein by reference (such meanings to be equally applicable to both the singular and plural forms of the terms defined). Any capitalized terms used herein or in another Loan Document, but not otherwise defined herein or in such other Loan Document, as the case may be, shall have the meanings ascribed to them in the UCC.

2. GRANT OF SECURITY INTEREST. In order to secure full and prompt payment of all Liabilities and performance of all obligations of Borrower to Lender, its Affiliates, and/or their respective successors or assigns:

   (a) Borrower grants to Lender a continuing security interest in all of Borrower's assets and properties, wherever located, including, without limitation, all equipment of any kind or nature; all vehicles and vehicle parts; all Inventory now owned or hereafter acquired, including, without limitation, all Lender Financed Inventory now owned or hereafter acquired; all amounts in Borrower's Reserve held by or on behalf of Lender, if any; all documents, documents of title, deposit accounts, accounts receivable, manufacturer rebates and incentive payments, chattel paper, including, without limitation, all Receivables and general intangibles now owned or hereafter acquired by Borrower; all cash reserves; all of Borrower's books and records (including any books and records contained on computer hardware or software or otherwise stored by or on behalf of Borrower in electronic or digital form); and all additions, accessions, accessories, replacements, substitutions, and proceeds of any of the foregoing (collectively, the "Collateral").

   (b) The security interest given to Lender in Section 2(a) is given to Lender to secure payment of all Liabilities and the performance of all obligations of Borrower to Lender, and its Affiliates, including all obligations of Borrower under this Note, under any other Loan Document, or otherwise, all without relief from valuation or appraisement Laws. Upon the request of Lender, Borrower shall promptly execute and deliver to Lender or its designee such further documents and instruments, and shall take such further actions, in each case as Lender may deem necessary or desirable to protect Lender's interest in the Collateral or otherwise effectuate the provisions of this Note and the other Loan Documents. Without limiting the generality of the foregoing, Borrower shall, upon the request of Lender, (i) use its best efforts to secure all consents and approvals that may be necessary or appropriate for the assignment to Lender of any Collateral (including any contract of Borrower that constitutes any portion of the Collateral), or that may be necessary in order for Lender to receive the full benefit of all Collateral and to enforce its security interest in the Collateral; (ii) provide Lender and its Representatives with full access to all Collateral, including any and all books and records relating thereto; and (iii) deliver to Lender all Collateral consisting of negotiable documents, chattel paper, and instruments not deposited for collection in the aggregate (in each case, accompanied by any related bills of sale or any other instruments of transfer executed for Borrower), in each case promptly after Borrower receives the same.

   (c) Borrower authorizes Lender to file any UCC financing statements and any amendments thereto and any continuation statements under the UCC, in each case to the extent necessary or desirable in Lender's sole discretion to effect or preserve the security interest granted by Borrower hereunder or under any other Loan Document. Further, Borrower hereby acknowledges, ratifies and approves any UCC financing statements or other filings under the UCC that may have been made by or on behalf of Lender and its Affiliates prior to the Effective Date. The security interest granted by Borrower in Section 2(a) shall be in addition to, and not a substitution for, any right of offset, netting, or reclamation that Lender or any of its Affiliates may have against Borrower, whether pursuant to this Note, any other Loan Document, any Law or otherwise.

3. INTEREST RATE. Interest shall accrue on Borrower's Liabilities to Lender in accordance with the following schedule:

   (a) All outstanding Liabilities relating to a Floorplan Advance or a Receivable Advance shall accrue Interest on a per annum basis from the Floorplan Date or the Receivable Origination Date, as the case may be, based upon a 360-day year, and such Interest shall be compounded daily at the Base Rate, plus the Contract Rate, until such outstanding Liabilities are paid in full.

   (b) The Base Rate may be amended or modified by Lender from time to time in Lender's sole discretion by posting such amendment or modification on the Finance Program Rate, Fee and Term Schedule. However, Lender may increase the Base Rate by no more than fifty (50) basis points (i.e. one-half of one percent) in any thirty (30) day period.

4. BORROWER'S REPRESENTATIONS, WARRANTIES, AND COVENANTS. At the time of Borrower's execution of this Note and continuing at all times thereafter until all Liabilities have been indefeasibly paid and satisfied in full and this Note and all other Loan Documents terminated in accordance with their respective terms, Borrower hereby represents, warrants, covenants, and agrees.

COPY VIEW

DocuSign Envelope ID: FAE10158-F46A-48C6-8EB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy by the designated custodian

(a) To sell, lease, or rent Lender Financed Inventory only in the Ordinary Course of Business and in accordance with Law, and not to sell or otherwise dispose of any Lender Financed Inventory except as herein provided.

(b) To keep Lender Financed Inventory only at Borrower's Place of Business and not to remove any Lender Financed Inventory from such place for a period exceeding twenty-four (24) hours, unless such item of Lender Financed Inventory is the subject of an active daily rental agreement (and floorplanned pursuant to a rental Advance Schedule executed by Borrower and Lender), or such removal has been previously authorized in writing by Lender. Notwithstanding the foregoing, Borrower may request Lender to authorize Borrower to consign certain Lender Financed Inventory to another licensed dealer at such consignee dealer's place of business. Borrower's request to consign Lender Financed Inventory as referenced above is subject to Borrower and the consignee dealer executing and delivering to Lender any documentation that Lender may require, including a UCC financing statement or other similar filing on consignee dealer, or an authorization for Lender to make any such filing. Lender may deny Borrower's request to consign Lender Financed Inventory in Lender's sole and absolute discretion.

(c) To keep Inventory in good repair and insured against all physical risks in such amounts and under such policies issued by such insurance companies as are deemed necessary and satisfactory by Lender; provided, however, that any insurance company issuing required coverage to Borrower pursuant to the requirements of this Section 4(c) shall have been assigned to an A.M. Best Financial Size Category (FSC) of "X" or higher, and shall have a minimum A.M. Best Financial Strength (FSR) rating of "A-". Lender shall be named "loss payee" on such insurance policies. Borrower shall provide Lender with a certificate or certificates of insurance evidencing that the above-mandated insurance requirements have been satisfied and specifying that the applicable insurance carriers will mail direct written notice to Lender at least thirty (30) days prior to any cancellation or non-renewal of any of the above-mandated policies. Alternatively, and unless the Unit of Lender Financed Inventory has been branded as "salvage" or is otherwise ineligible for the Collateral Protection Program, Borrower may satisfy the insurance coverages required under this Section 4(c) by voluntarily enrolling in Lender's Collateral Protection Program and satisfying and adhering to all conditions and other terms thereof at all times during Borrower's enrollment in the Collateral Protection Program. In the event Borrower fails to procure, maintain or provide proof of the insurance coverages required under this Section 4(c), Lender may enroll Borrower in Lender's Collateral Protection Program, or, alternatively, Lender may secure on Borrower's behalf such policies of insurance as Lender, in its sole discretion, deems necessary, in each case from such insurers, in such amounts and with such coverages and deductibles as Lender, in its sole discretion, deems necessary. Charges incurred under the Collateral Protection Program are calculated as of the Floorplan Date from the amount of each original Floorplan Advance related to a Unit of Lender Financed Inventory through the life of the Floorplan Advance. Upon Borrower's enrollment in the Collateral Protection Program (whether voluntary or otherwise), Borrower shall be subject to, and at all times comply with and adhere to, the terms and conditions applicable to the Collateral Protection Program and Borrower's enrollment and participation therein. Borrower understands and agrees that Lender has an insurable interest in the Collateral, including all Lender Financed Inventory, by virtue of Borrower's pledge of the Collateral as security to Lender for the repayment of all Liabilities by Borrower to Lender. Fees, charges and other terms and conditions for the Collateral Protection Program are published in the Finance Program Rate, Fee and Term Schedule or on the documents referenced therein.

(d) To keep at all times complete and accurate records of Borrower's Business and provide to Lender promptly (but in any event within two (2) Business Days) copies of such records and any financial information regarding Borrower's Business or Borrower's financial condition generally, in each case as Lender may request. Borrower authorizes Lender to share such information and any and all other information that Lender may possess regarding Borrower's Credit Line or Borrower's relationship with Lender, including information regarding this Note and the other Loan Documents; Borrower's loan history; account history; payment history; audit history; account balance; loan application; credit worthiness; credit availability; and such other general business information regarding Borrower's Credit Line and Borrower's relationship with Lender, to any and all Persons that Lender, in its sole discretion, deems reasonable, including auctions. Without limiting the generality of the foregoing, Borrower shall maintain complete and accurate records and financial statements for all Advances requested or made hereunder, and all other transactions hereunder, including bank statements, cancelled checks, sales invoices, proofs of payment, and other sales files, in each case for at least a period of five (5) years after the date on which such Advance was made or such transaction occurred, as the case may be.

Borrower Seen [illegible]

(e) To allow Lender and its Representatives to inspect Lender Financed Inventory during normal business hours and at other reasonable times at Borrower's Place of Business and such other places as any Lender Financed Inventory may be located and to inspect and make copies of Borrower's books and records. Borrower shall pay Lender for the costs and expenses incurred by Lender or its Representatives to undertake such audits of any Lender Financed Inventory and such inspections and copying of Borrower's books and records, in each case on the applicable Maturity Date.

(f) To hold all amounts received from the sale of any Unit of Lender Financed Inventory in the form as received in trust for the sole benefit of and for Lender, and to remit such funds satisfying all amounts due Lender and owing by Borrower for such Unit of Lender Financed Inventory, in each case within twenty-four (24) hours of Borrower's receipt of such funds (or receipt of such funds by any Affiliate of Borrower).

(g) To hold all amounts received that relate to any Receivable that is subject to a Receivable Advance in the form as received in trust for the sole benefit of and for Lender, and to remit such funds satisfying all amounts due Lender and owing by Borrower for and in connection with such Receivable, in each case within twenty-four (24) hours of Borrower's receipt of such funds (or receipt of such funds by any Affiliate of Borrower).

(h) That, for each Receivable which is the subject of a Receivable Advance, (i) Borrower is the sole and unconditional owner of such Receivable; (ii) such Receivable is not already encumbered by any voluntary or involuntary Liens which are senior to Lender's security interest in such Receivable; (iii) Borrower has a legal right to pledge such Receivable to Lender as security for all Liabilities of Borrower; (iv) such Receivable represents an original bona fide sale to the buyer(s) named therein; (v) such Receivable is now and will remain free from any claim, defense, setoff, or counterclaim of any nature and is enforceable against the buyer(s) named therein and third parties according to its terms, (vi) all statements, facts, numbers, and other information in such Receivable and all related documents are true and accurate to the best of Borrower's knowledge, are free from fraud, and have not been altered or modified subsequent to their execution, except for such alterations or

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy by the designated custodian

(r) That Borrower and all Guarantors are legally competent and have all necessary power and authority to enter into and perform their respective obligations under this Note and the other Loan Documents.

(s) That Borrower shall not disclose to any third party, without the written consent of Lender, any terms and conditions applicable to Borrower's Credit Line, whether such terms and conditions are set forth on the applicable Advance Schedule, this Note or any other Loan Document.

(t) That Borrower may have an account with Lender where information can be accessed and transmissions can be sent through the Discover Portal or by other electronic means, and Borrower shall have the means and the affirmative obligation to control access to the account information of Borrower by passwords and a Borrower account number. Borrower shall be solely responsible for any unauthorized access to Borrower's account. Access to Borrower's account may be revoked or otherwise restricted by Lender at any time, in Lender's sole discretion, without prior notice to Borrower.

(u) That Borrower shall use Advances solely for Business purposes and not for personal, family, or household purposes. This means, among other things, that Borrower may not use Advances to purchase a vehicle for Borrower's personal, family, or household use, and no Lender Financed Inventory may be used for Borrower's personal, family, or household use. This Note and all Advances requested or made hereunder shall be requested and made only for commercial purposes and Borrower hereby expressly and unconditionally waives, to the fullest extent permitted by Law, the protections of any Law intended to protect consumers or regulate consumer loans.

(v) That Borrower will provide Lender the name of each individual authorized to buy Inventory and make Advance requests hereunder on Borrower's behalf. Notwithstanding the foregoing or anything to the contrary in any Loan Document, Borrower shall be responsible and liable for all Advance requests and other Liabilities incurred by any such appointed individual or any other actual or apparent representative or agent of Borrower (regardless of whether such Person is specifically appointed by Borrower as contemplated above).

5. CREDIT TERMS AND CONDITIONS. Borrower understands and agrees to the following terms, conditions, covenants, and other agreements relating to its Credit Line and any Advances made under this Note and the other Loan Documents, and acknowledges that any failure by Borrower to adhere to any such terms, conditions, covenants, or other agreements shall result in Lender having the right (in addition to any other right that Lender may have), in its sole discretion and without notice to Borrower, to declare a Maturity Event with respect to all Advances:

(a) The decision to make an Advance to or on behalf of Borrower is the exclusive right of Lender, whether or not an Event of Default has occurred, and Borrower understands that Lender may refuse to make an Advance at any time, with or without cause and without prior notice to Borrower or any Guarantors of such decision. Borrower is not obligated to finance any Inventory or Receivable through Lender.

(b) Borrower's Credit Line may require a Reserve as a credit underwriting condition to the grant of credit and as additional security for the repayment of Liabilities by Borrower. In the event a Reserve is either requested by Borrower or required by Lender, Borrower will be required to execute a reserve agreement, and the applicable Required Reserve Amount and Reserve Charge will be indicated on the applicable Advance Schedule.

(c) Borrower must deliver or cause to be delivered to Lender the Title or MSO for any Unit of Inventory at the time of any related Floorplan Advance request, or, in the event of a Universal Source Purchase, within seven (7) days after Lender funds the related Floorplan Advance.

(d) Borrower must deliver or cause to be delivered to Lender the original Receivable which is the subject of a Receivable Advance request within seven (7) days after Lender funds such Receivable Advance. In the event that a Receivable Advance is made by Lender with respect to a Unit for which there is an unpaid Floorplan Advance, then any such Receivable Advance made to Borrower shall be net of such unpaid Floorplan Advance and all other unpaid Liabilities of Borrower with respect to such Unit.

(e) Borrower must be in complete compliance with this Note and the other Loan Documents before an Advance request may be approved by Lender. Additionally, Lender may require certain other information from Borrower to be submitted before Lender will consider an Advance request.

(f) Borrower shall pay all Liabilities, without notice, that concern or relate to a Floorplan Advance for any Unit of Lender Financed Inventory on or before the Maturity Date. Lender shall apply such payments to any and all Liabilities relating to such Floorplan Advance. Notwithstanding anything herein to the contrary, if a shortage exists between the payments received by Lender with respect to a Floorplan Advance, and the Liabilities relating to such Floorplan Advance, then such shortage shall be immediately due and payable and shall continue to be considered a Liability owed by Borrower to Lender, secured by the Collateral.

(g) Borrower shall pay all Liabilities, without notice, that concern or relate to a Receivable Advance for a subject Receivable on or before the Maturity Date. Lender shall apply such payments to any and all Liabilities relating to such Receivable Advance. Notwithstanding anything herein to the contrary, if a shortage exists between the payments received by Lender with respect to a Receivable Advance, and the Liabilities relating to such Receivable Advance, then such shortage shall be immediately due and payable and shall continue to be considered a Liability owed by Borrower to Lender, secured by the Collateral.

(h) Borrower shall pay all Liabilities, without notice, which do not concern or relate to a Floorplan Advance or a Receivable Advance, including Administrative Charges and other account level charges, in each case on their respective Maturity Dates.

(i) With respect to payments that relate to a Floorplan Advance or a Receivable Advance which exceed the outstanding Liabilities owed by Borrower in connection with such Floorplan Advance or Receivable Advance, as the case may be, and with respect to payments for all other Liabilities, the order and method of application of such payments shall be at the sole discretion of Lender. Notwithstanding anything herein

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy by the designated custodian

to the contrary, in the event Lender declares an Event of Default, Lender may apply all subsequent payments, including payments directly related to a Floorplan Advance or a Receivable Advance, in any manner or order. Payments initiated or received by Lender after 5:00PM EST may be applied the next Business Day.

(j) Unless either (i) the Maturity Date for a Floorplan Advance has been accelerated as the result of a Maturity Event or a declaration of an Event of Default; or (ii) such Floorplan Advance is in the final Period pursuant to the applicable Advance Schedule, a Curtailmenr of such Floorplan Advance will automatically be processed at the end of the current Period. Upon the processing of the Curtailment for a Floorplan Advance, Borrower shall pay the accrued Interest, accrued Floorplan Fee, any other accrued Floorplan Advance related fees, and a principal reduction of such Floorplan Advance, in each case pursuant to this Note, the applicable Advance Schedule, and any applicable event sale or promotional terms in effect for such Floorplan Advance. Additionally, unless (a) the Maturity Date for a Floorplan Advance has been accelerated as the result of a Maturity Event or a declaration of an Event of Default; or (b) Borrower has notified Lender that Borrower has disposed of the subject Unit of Lender Financed Inventory by sale or otherwise, Borrower shall be deemed to have requested, and Lender may, in its sole discretion, automatically approve and process, an Extension with respect to such Floorplan Advance. With respect to any Extension, the Period, rate of Interest, Floorplan Fee, any other fees, including Floorplan Advance related fees, and the principal reduction required to be paid by Borrower for such Extension shall, in each case, be equal in all respects to those of the last Period, and, upon the processing of such Extension, Borrower shall pay such accrued Interest, accrued Floorplan Fee, any other fees, including accrued Floorplan Advance related fees, and a principal reduction of such Floorplan Advance, in each case pursuant to this Note, the applicable Advance Schedule, and any applicable event sale or promotional terms in effect for such Floorplan Advance. Additionally, for each Extension, Borrower shall be charged any applicable Universal Program Fee (including any related Extension fee) set forth in the Finance Program Rate, Fee, and Term Schedule for the applicable Finance Program.

(k) Unless either (i) the Maturity Date for a Receivable Advance has been accelerated as the result of a Maturity Event or a declaration of an Event of Default; or (ii) such Receivable Advance is in the final Period pursuant to the applicable Advance Schedule, a Curtailment of such Receivable Advance will automatically be processed at the end of the current Period. Upon the processing of the Curtailment for a Receivable Advance, Borrower shall pay the accrued Interest, accrued Receivable Fee, any other accrued Receivable Advance related fees, and a principal reduction of such Receivable Advance, in each case pursuant to this Note, the applicable Advance Schedule, and any applicable event sale or promotional terms in effect for such Receivable Advance.

(l) Lender or its Affiliates may hold any property (and proceeds thereof) or funds belonging to or payable to Borrower or any of its Affiliates ("Setoff Funds") and apply such Setoff Funds to any outstanding Liabilities of Borrower or to any amounts owing by Borrower to any Affiliate of Lender, and Borrower hereby grants to Lender and its Affiliates, as the case may be, a lien on such Setoff Funds. Lender and its Affiliates may at any time apply any or all of the Setoff Funds to any outstanding Liabilities of Borrower or to any amounts owing by Borrower to any Affiliate of Lender. Borrower expressly waives any requirement of maturity or mutuality among Lender and its various Affiliates.

(m) Any statement of Borrower's account furnished or made available to Borrower by Lender, to the extent no objection is made in writing by Borrower within thirty (30) days after Borrower's receipt of such statement, shall constitute a definitive statement of Borrower's Credit Line and Liabilities as of the date of such statement and shall be binding upon Borrower.

(n) Borrower hereby expressly authorizes Lender and its Affiliates to communicate with Borrower via facsimile transmissions, email, telephonic transmissions, both to a residential telephone line and/or cell phone, including text messaging, using an automatic telephone dialing system or an artificial or prerecorded voice message, and/or any other forms of communication, for any purpose, including general business matters, account information, marketing materials, collection, and/or any other communication needs. Borrower agrees that such express permission shall extend to any and all of the contact information that Borrower has provided herein, including physical and email addresses, phone numbers, fax numbers, etc., and to such other addresses, phone numbers, email addresses, online chat, social media platforms, etc. that Borrower may provide to Lender or that Lender may obtain from any third party at a later date.

(o) So long as Borrower is not in default of this Note or any other Loan Document, Borrower may sell Lender Financed Inventory to bona fide buyers in the Ordinary Course of Business, but nothing herein shall be deemed to waive or release any interest Lender may have hereunder or under any other agreement in any proceeds or replacements of such Lender Financed Inventory. Upon the sale of any Unit of Lender Financed Inventory, Borrower shall hold the proceeds from such sale in trust for the benefit of Lender, and Borrower shall pay to Lender, in accordance with this Note and the other Loan Documents, an amount equal to the unpaid balance of the Liabilities relating to such Unit of Lender Financed Inventory.

(p) Borrower shall allow Lender and its Representatives to access Borrower's books and records at Borrower's Place of Business and such other places as any Lender Financed Inventory may be located, in order to conduct audits of Borrower's Lender Financed Inventory, in each case without prior notice to Borrower of such audits. Borrower shall be responsible for and agrees to pay all of Lender's expenses in conducting such audits.

(q) Each Unit of Lender Financed Inventory must be physically verified at the time of any audit conducted by or on behalf of Lender to be at Borrower's Place of Business, or such other place as Lender may authorize. In the event that any Unit of Lender Financed Inventory is not so verified, Lender may, in its sole discretion, provide Borrower an opportunity to produce such Unit of Lender Financed Inventory at Borrower's Place of Business, or such other place as Lender may authorize.

(r) Borrower may request from Lender, for a legitimate business purpose, the Title to a Unit of Lender Financed Inventory, but Lender reserves the right to grant or deny such request in its sole discretion. In the event Lender grants any such request, any Title provided to Borrower or to any other Person on Borrower's behalf, must be returned to Lender by the close of business on the seventh (7th) day after the date of Lender's release of such Title.

Page 5 of 13

NextGear Demand Promissory Note and Loan and Security Agreement (v. 1.1)

PAG-B0644

KM000079

DocuSign Envelope ID: FAE10158-F4CA-48CC-BEB2-FB528DFFF878

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

(s) Borrower and each Guarantor authorize Lender to obtain and share credit information relating to Borrower and its Guarantors from and with credit bureaus, financial institutions, trade creditors, affiliates, and others and to conduct such other credit investigations that Lender in its sole discretion deems necessary. The individual signing below on behalf of Borrower expressly authorizes Lender to obtain his or her consumer credit report from time to time at Lender's discretion, and expressly ratifies any such consumer credit report that may have been obtained by or on behalf of Lender prior to the Effective Date. Borrower also authorizes Lender to contact any third parties to disclose information, including information contained in Lender application, for the purpose of, among other things, obtaining intercreditor agreements and perfecting Lender's security interest. Further, if a Credit Line is granted, Borrower and each Guarantor authorize Lender to review Borrower's account periodically, which may include obtaining additional credit information on Borrower and each Guarantor through any available medium.

(t) Borrower's account is subject to "NSF" fees in the amount stated in the Finance Program Rate, Fee, and Term Schedule or the maximum amount permitted by Law for each check or ACH issued by Borrower and each ACH or other electronic payment debited or drawn from any of Borrower's designated accounts by Lender or its Representatives pursuant to an ACH authorization or other request for electronic payments provided by Borrower which is subsequently returned for insufficient funds, in addition to any charge or fee imposed by Borrower's and/or Lender's depository institution.

(u) Lender may process checks electronically, at first presentment and any re-presentments, by transmitting the amount of the check, routing number, account number, and check serial number to Borrower's financial institution. By submitting a check for payment, Borrower authorizes Lender to initiate an electronic debit from Borrower's bank account. When Lender processes Borrower's check electronically, Borrower's payment may be debited from Borrower's bank account as soon as the same day Lender receives Borrower's check.

(v) Borrower's account is subject to a late fee in the amount stated in the Finance Program Rate, Fee, and Term Schedule or the maximum amount permitted by Law for any Unit of Lender Financed Inventory for which Borrower fails to remit payment under this Note or any other Loan Document when due. Borrower acknowledges and agrees that the late fee charged by Lender is a reasonable estimate of Lender's additional administrative burden and costs incurred due to the delay and inconvenience to Lender associated with a late payment.

(w) Borrower's account is subject to Administrative Charges. Borrower acknowledges and agrees that any such Administrative Charge charged by Lender is permitted under this Note and the other Loan Documents, and Borrower consents to the assessment of any such Administrative Charge to Borrower's account.

(x) Borrower's account is subject to Universal Program Fees. Lender maintains and publishes the "Finance Program Rate, Fee, and Term Schedule" for each Finance Program applicable to Borrower's Credit Line via posting the same on the Discover Portal. Borrower may request a copy of the Finance Program Rate, Fee, and Term Schedule from Lender in writing at any time. All universal or generally applicable rates and fees and any amendments to the Terms and Conditions shall be published therein, incorporated herein by reference and made a part of this Note and any other applicable Loan Documents. The rates and fees applied to Borrower's Liabilities under this Note, any amended Terms and Conditions, or any applicable event sale or promotional terms in effect with respect to an eligible Floorplan Advance or Receivable Advance shall be (i) the applicable rates and fees set forth on the applicable Advance Schedule; (ii) the rates, fees, and amendments to the Terms and Conditions most recently published on the applicable Finance Program Rate, Fee, and Term Schedule; and (iii) the rates, fees, terms, and conditions as set forth in the applicable marketing materials outlining event sale and/or promotional terms. Lender may amend the rates, fees, terms and/or Terms and Conditions from time to time, at Lender's sole discretion, and without additional notice to Borrower other than the publication of such amendments on the Discover Portal.

(y) Lender maintains and publishes the Lender Guide on the Discover Portal. Borrower acknowledges and agrees that the Lender Guide and the content found therein are not part of this Note or any other Loan Document, are for informational purposes only, and do not create any new or additional contract rights or obligations for Borrower or Lender. Borrower acknowledges and agrees that the Lender Guide and the content therein is subject to change by Lender at any time without notice. To the extent the Lender Guide and the content therein are determined to create or provide additional contractual rights for Borrower and a conflict exists between this Note or any other Loan Document, on the one hand, and the Lender Guide, on the other hand, the provision of this Note or the other Loan Document, as the case may be, shall prevail.

(z) Borrower waives demand, presentment for payment, notice of dishonor, protest, and notice of protest, and expressly agrees that this Note and all payments coming due under it and any other Loan Documents may be extended or modified from time to time without in any way affecting Borrower's liability under this Note or any other Loan Document. Borrower and Guarantors understand that Lender may, at any time and without notice to Borrower, with or without cause, demand that this Note immediately be paid in full. The demand nature of this Note does not limit Lender's election of remedies upon an Event of Default by Borrower, and Borrower and Guarantors acknowledge that upon Lender's declaration of an occurrence of an Event of Default, all Liabilities of Borrower shall automatically accelerate and Lender may, at any time and without notice to Borrower, demand immediate payment of all Liabilities of Borrower and take such further action as may be contemplated under Section 7 or otherwise permitted by Law or in equity. Borrower shall have the right to pay all Liabilities in full at any time.

(aa) Notwithstanding Section 4(f), upon any disposition of a Unit of Lender Financed Inventory, whether by sale or otherwise, or the receipt by Borrower (or any other Person on behalf of Borrower) of full or partial payment by or on behalf of the purchaser of such Unit of Lender Financed Inventory, Lender may, without notice to Borrower and in Lender's sole discretion, declare a Maturity Event with respect to the related Floorplan Advance.

(bb) Notwithstanding Section 4(g), upon any receipt by Borrower of full payment under any Receivable that is subject to a Receivable Advance, or upon Borrower's declaration of a default under any such Receivable, Lender may, without notice to Borrower and in Lender's sole discretion, declare a Maturity Event with respect to the related Receivable Advance.

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h by the designated custodian

(cc) The receipt, by Lender or Borrower, or any third party on Borrower's behalf, of proceeds or other consideration related to any Unit of Lender Financed Inventory shall constitute conclusive proof of the sale or other disposition of such Unit of Lender Financed Inventory for purposes of this Note and the other Loan Documents.

(dd) Borrower acknowledges that Cox Automotive, Inc. (formerly Manheim, Inc.) and Manheim Remarketing, Inc., together with each of their respective direct and indirect subsidiaries and affiliated U.S. auctions (collectively "Manheim"), are Affiliates of Lender. Borrower may from time to time purchase a Unit through a Manheim auction sale (including online purchases via OVE.com or through other Manheim-operated online sales channels). For any Unit purchased by Borrower through a Manheim auction sale (including online purchases via OVE.com or through other Manheim-operated online sales channels) that remains unsettled with Manheim (each, an "Unsettled Unit"), Borrower hereby requests, directs and authorizes Lender, as of the date Lender receives a request for payment from Manheim with respect to such Unsettled Unit, to process and approve, in Lender's sole discretion, a Floorplan Advance on Borrower's Credit Line, which Lender may pay and remit directly to Manheim on Borrower's behalf for such Unsettled Unit. Borrower acknowledges that if any such request is received by Lender from Manheim within seven (7) days of Borrower's purchase of such Unsettled Unit, the purchase will be processed as a Universal Source Purchase, and if any such request is received by Lender from Manheim outside of seven (7) days of Borrower's purchase of such Unsettled Unit, the purchase will be processed as a Specific Source Purchase.

6. EVENTS OF DEFAULT. The occurrence of any of the following events shall be considered an event of default under this Note and the other Loan Documents (each, an "Event of Default"):

(a) Borrower or any Guarantor fails to perform any of its obligations, undertakings or covenants under this Note or under any other Loan Document, including any obligation to repay any Liability when due and Borrower's obligation to pay upon demand any outstanding Liabilities under this Note or any of the other Loan Documents.

(b) Borrower or any Guarantor breaches or otherwise violates any provision of this Note or any other Loan Document.

(c) Borrower makes any representation or warranty to Lender, or provides to Lender any schedule, certificate, financial statement, report, notice, or other writing, which is false or misleading in any material respect when made or delivered.

(d) Any damage or destruction of any Inventory and appropriate insurance naming Lender as "Loss Payee" is not in effect as required under Section 4(c).

(e) Borrower or any Guarantor, or any of their respective Parent Companies, has defaulted in the payment or performance of any debt or obligation under any other agreement, whether to Lender or to a third party.

(f) Borrower or any Guarantor, or any of their respective Parent Companies, becomes insolvent or consents to the appointment of a trustee, receiver, or other custodian for such Borrower, Guarantor, or Parent Company, as the case may be, or for any property belonging to any of the foregoing Persons; or such Borrower, Guarantor, or Parent Company, as the case may be, makes a general assignment for the benefit of its creditors; or any bankruptcy, reorganization, debt arrangement, or other case or proceeding under any bankruptcy or insolvency Law, or a dissolution or liquidation proceeding, is commenced by or against such Borrower, Guarantor, or Parent Company, as the case may be.

(g) Any material change in the management, ownership, or control of Borrower or its Parent Company occurs (unless such material change has been consented to in writing by Lender).

(h) The voluntary or administrative dissolution, death, or incompetence of Borrower or any Guarantor, or any of their respective Parent Companies.

(i) Any change in the financial condition of Borrower or any Guarantor, or any of their respective Parent Companies, which Lender in good faith deems adverse.

(j) Borrower or any Guarantor, or any of their respective Parent Companies, admits in writing that it is unable to pay its debts as they become due.

(k) Borrower fails to deliver, revokes or amends (other than at the written request of Lender) any power of attorney or similar authorization that it has executed in favor of Lender.

(l) Lender in good faith deems itself insecure for any reason.

7. RIGHTS AND REMEDIES. Upon any Event of Default, Lender may, at its option and without notice to Borrower, exercise any or all of the following rights in a separate, successive, or concurrent fashion, and Lender's exercise of any rights hereunder shall not preclude Lender from pursuing other rights and remedies in conjunction therewith or at a later time:

(a) Demand immediate payment of all Liabilities and other indebtedness and amounts owed to Lender and its Affiliates by Borrower and its Affiliates. Lender shall have all rights and remedies available hereunder and under the other Loan Documents, and all rights and remedies available to Lender at law or in equity, including the rights and remedies of a secured party under the UCC. These rights and remedies include the right to cancel any unfunded Advances; to enter into Borrower's premises with or without legal process, but without force, and to take possession of and remove any Collateral; and to notify any account debtors or other Person obligated on Collateral to make payment or otherwise render performance to or for the benefit of Lender. Lender shall have the right to contact any third parties, including auctions,

COPY VIEW

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

governmental agencies, Borrower's licensing authorities, consumer finance companies, floorplan companies, other finance companies, consumers, other borrowers, Auction Insurance Agency, and such other Persons as Lender may elect to contact in its sole discretion, and to share such information as is necessary, in Lender's sole discretion, for any reason, including for purposes of and related to collection of any Liabilities of Borrower. At Lender's request, and to the extent Borrower may lawfully do so, Borrower shall assemble, prepare for removal, and make available to Lender at a place designated by Lender which is reasonably convenient for Lender and Borrower such Collateral as Lender may request.

(b) Initiate proceedings to appoint a receiver in any court of competent jurisdiction. To the extent permitted by Law, Borrower waives the right to notice and hearing of the appointment of a receiver and consents to such appointment without requiring Lender to post a bond.

(c) To the extent permitted by Law, Borrower gives consent to Lender to proceed in any action to collect on or execute against any and all bonds that Borrower or its Affiliates may have posted with any governmental authorities or third parties.

(d) Without limiting the foregoing, Lender may take control of any funds generated by any Collateral, and in Lender's name or Borrower's name, demand, collect, receipt for, settle, compromise, sue for, repossess, accept returns of, foreclose, or realize upon any Collateral. Borrower waives any and all rights it may have to notice prior to seizure by Lender of any Collateral. Borrower agrees that private sale of any Lender Financed Inventory at the amount then owed to Lender on such Lender Financed Inventory, less costs reasonably incurred by Lender in preparation of disposition of such Lender Financed Inventory, shall be a commercially reasonable method of disposition of such Collateral. Additionally, Borrower further agrees that any Inventory Collateral repossessed or otherwise obtained by Lender after an Event of Default may be disposed of by Lender, in Lender's sole discretion, at any regular or online sale of any wholesale auto auction that may be an Affiliate of Lender, or at any National Auto Auction Association member, and, in each case, any such a sale is and shall be deemed commercially reasonable for all purposes. Borrower shall be liable to Lender for any deficiency resulting from Lender's disposition of the Collateral. Borrower agrees that the Collateral is of the type customarily sold on a recognized market and that Lender therefore has no obligation to notify Borrower prior to a sale of any Collateral. Lender shall not be responsible for the accuracy or validity of any document or for the existence or value of any Collateral. Lender shall not be required to marshal any assets in favor of Borrower. Lender has no obligation to pursue any third party for any liability or obligation owed to Borrower. Borrower further agrees to pay all reasonable attorneys' fees and other collection costs incurred by Lender and its Affiliates in enforcing this Note and any other Loan Document after any Event of Default. To the extent not prohibited by Law, Borrower waives all appraisement, valuation, anti-deficiency, homestead, exemption, and usury Laws now or hereafter in effect, and releases all right to appeal after payment in full.

8. LOAN DOCUMENTS. In addition to the execution and delivery of this Note, upon the request of Lender, Borrower shall execute (or cause the execution of) the following additional documents in connection with Borrower's Credit Line (together with all other documents and instruments executed by Borrower in connection with this Note or Borrower's Credit Line, and in each case as the same may be amended, restated, renewed, extended or otherwise modified from time to time, the "Loan Documents"), each of which shall be incorporated herein by reference and made a part of this Note: (a) a power of attorney in favor of Lender and its designated Representative; (b) prior to Lender making any Advances under this Note, an Advance Schedule for each unique set of terms for the Finance Program applicable to Borrower, which may be amended from time to time; (c) such guaranties of Borrower's Liabilities as Lender may request, including guaranties of all legal and beneficial owners of Borrower; (d) a reserve agreement in favor of Lender; (e) prior to Lender authorizing Borrower to place any Lender Financed Inventory on consignment with another licensed dealer, a consignment agreement acceptable to Lender; (f) such ACH authorization and requests for automated payments as Lender may request from time to time; and (g) such other documents or certifications as Lender may request or require from Borrower or any Guarantor from time to time.

9. ASSIGNMENT. This Note and any other Loan Document may be assigned by Lender without notice to Borrower, but Borrower may not assign this Note or any other Loan Document without the prior written consent of Lender.

10. THIRD PARTY BENEFICIARIES. Neither this Note nor any other Loan Document is intended to confer upon any Person other than the Parties any rights or remedies hereunder; provided, however, that the rights and remedies afforded to Lender under Sections 2, 5(l), 5(n), 5(s), 5(dd), 7, 11 and 14 shall also inure to the benefit of the Affiliates of Lender and such Affiliates shall be intended third party beneficiaries of the provisions thereof.

11. INDEMNIFICATION. Borrower shall, at its expense, defend, indemnify and hold harmless Lender and its Affiliates, and each of their respective directors, officers, principals, partners, shareholders or holders of any ownership interest, as the case may be, employees, Representatives, attorneys, and agents (together with Lender, the "Lender Parties") from and against any and all claims, judgments, losses, damages, demands, payments, fines, costs, expenses (including reasonable attorneys' fees and court courts), and liabilities of any nature or description incurred by a Lender Party to the extent arising from or relating to any of the following: (a) any personal injury or property damage caused by Borrower or any of its Representatives; (b) any breach by Borrower of this Note or any other Loan Document, including the breach of any representation, warranty, or other agreement contained in this Note or in any other Loan Document; and (c) Borrower's operation of its Business or any of Borrower's operations or activities.

12. NO JOINT VENTURE, PARTNERSHIP, OR AGENCY. Nothing contained in this Note or in any other Loan Document shall subject Lender or its Affiliates or any of its or their respective Representatives to any liability for, or in respect of, the business, assets, profits, losses, or liabilities of the Borrower. This Note does not constitute and shall not be characterized as a joint venture, partnership, or agency between Lender and Borrower. Nothing in this Section 12 shall limit any of the Liabilities of Borrower, or any of the other obligations of Borrower or any Guarantor under this Note or any of the other Loan Documents.

13. AMENDMENT; MERGER. This Note and the other Loan Documents are intended by the Parties to be an amendment to and restatement of any prior Demand Promissory Note and Loan and Security Agreement or similar document or instrument (including any prior promissory note, loan and security agreement or similar contract) between Lender (or any predecessor of Lender, including Dealer Services Corporation and/or Manheim

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

Automotive Financial Services, Inc.) and Borrower. With the exception of the amendments and modifications that Lender is entitled to make without the prior written consent of Borrower pursuant to this Note or any other Loan Document, this Note may be modified or amended only upon the written consent of Lender and Borrower. In the case of the other Loan Documents, with the exception of the amendments and modifications that Lender is entitled to make without the prior written consent of Borrower pursuant to this Note or any other Loan Document, such other Loan Documents may be modified or amended only upon the written consent of Lender and the Person to whom such amendment relates. Additionally, the Finance Programs, Lender Guide, descriptions of specific Units of Lender Financed Inventory, amounts and terms of Advances, Maturity Dates, Extensions, Interest, Base Rates, Administrative Charges, Lender Universal Program Fees, late fees, NSF fees, and other charges allowed by this Note or any other Loan Document may be proven by the records kept by Lender. Notwithstanding the foregoing, any advance and/or loan originated pursuant to one or more agreements between Borrower and Dealer Services Corporation and/or Manheim Automotive Financial Services, Inc. prior to the Effective Date for which indebtedness from Borrower remains outstanding as of the Effective Date, shall remain subject to the terms and conditions of such prior agreement(s) for all intents and purposes until such indebtedness has been indefeasibly repaid and satisfied in full.

14. EXECUTION. The Parties understand and agree that Lender may execute this Note and any other Loan Documents by affixing the signature of an authorized representative of Lender via signature stamp. Additionally, Lender may execute this Note and any other Loan Documents by affixing to this Note or such other Loan Document, as the case may be, an electronic or digital signature, which electronic or digital signature shall for all purposes be deemed effective to constitute the valid signature of Lender. Any electronic or digital signature affixed to this Note or any other Loan Documents by Lender shall be deemed to satisfy all requirements imposed on electronic or digital signatures under the UCC, the Electronic Signatures in Global and National Commerce Act (the "E-Sign Act"), and any other similar Laws relating to the validity or enforceability of electronic or digital signatures, and such electronic or digital signature shall not be denied legal effect, validity, or enforceability solely because it is in electronic or digital form. Notwithstanding the foregoing, Borrower may execute this Note and any other Loan Documents only by original signature of an authorized representative of Borrower, unless otherwise authorized by Lender. Lender may, in its sole discretion, permit Borrower and/or any Guarantor to execute this Note and any other Loan Documents by affixing to this Note or such other Loan Document, as the case may be, an electronic or digital signature of an authorized representative of Borrower or of any Guarantor, as applicable. Borrower and each Guarantor acknowledges and agrees that any electronic or digital signature of Borrower or any such Guarantor shall for all purposes be deemed effective and constitute the valid signature of Borrower or any such Guarantor, as the case may be, and shall be deemed to satisfy all requirements imposed on electronic or digital signatures under the UCC, the E-Sign Act, and any other similar Laws relating to the validity or enforceability of electronic or digital signatures (including without limitation, any enactment of the Uniform Electronic Transactions Act (UETA)), and such electronic or digital signature shall not be denied legal effect, validity, or enforceability solely because it is in electronic or digital form. A facsimile or photocopied reproduction of signatures on this Note and any other Loan Documents shall be deemed original signatures for all intents and purposes. This Note and the other Loan Documents may be executed by the Parties in one or more counterparts which, collectively, shall constitute one and the same agreement.

15. NOTICES. All notices, demands and requests required or permitted to be given under this Note and any other Loan Document shall be (a) in writing, (b) delivered by personal delivery or sent by commercial delivery service or certified mail, return receipt requested, (c) deemed to have been given on the date of personal delivery or the date set forth in the records of the delivery service or on the return receipt, and (d) addressed as follows (or, in the case of Lender, to any other subsequent address that Lender may provide to Borrower (through written notice, via the Discover Portal, or otherwise) for purposes of directing future notices, demands or requests):

If to Lender: NextGear Capital, Inc., 11799 North College Avenue, Carmel, IN 46032
Telephone: (317) 571-3721

with a copy to:

NextGear Capital, Inc., 11799 North College Avenue, Carmel, IN 46032
Telephone: (317) 571-3721
Attention: Legal Department

If to Borrower: Premier Group Autos LLC DBA Overfinch Miami, 11 SW 12th Ave Ste 103 Bldg 59, Dania Beach, FL 33004-3527
Telephone: 954-440-0717

COPY VIEW

16. NO WAIVER. No failure or delay by Lender in exercising any right, power, or privilege or the granting of an exception by Lender with respect to any of the Terms or Conditions will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege, or the exercise of any other right, power, or privilege by Lender.

17. TERMINATION. No termination of this Note shall alter Borrower's Liabilities or any outstanding obligations of Borrower or any Guarantor under this Note or any of the other Loan Documents, including any outstanding obligations relating to Advances and amounts funded or committed prior to the effective date of such termination, and all rights and remedies, including the security interest granted herein and the rights of Lender as a secured party hereunder, shall extend until all Liabilities of Borrower have been indefeasibly paid and satisfied in full.

18. LEGAL FEES AND COLLECTION COSTS. Borrower shall pay to Lender all reasonable legal fees, expenses, and collection costs incurred by any Lender Parties, including Lender as a result of any Event of Default, or any failure by Borrower or any Guarantor to perform any obligation or satisfy any Liability of Borrower, including any prosecution by Borrower or any Guarantor or any of their respective Representatives of affirmative claims or counterclaims against Lender Parties.

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676
THIS IS A COPY
This is a copy view of the Authoritative Copy h by the designated custodian

19. SEVERABILITY. Any provision of this Note or any other Loan Document that is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability, without rendering invalid or unenforceable the remaining provisions of this Note and the other Loan Documents or affecting the validity or enforceability of any provision of this Note or any other Loan Document in any other jurisdiction.

20. GOVERNING LAW. Except with respect to the interpretation or enforcement of the arbitration and other provisions set forth in Section 22 (which shall be governed by the Federal Arbitration Act), the validity, enforceability, and interpretation of this Note and the other Loan Documents shall be governed by the internal Laws of the State of Indiana, without regard to conflicts of Laws provisions thereof.

21. JURISDICTION AND VENUE. As evidenced by Borrower's signature below, subject to the provisions noted in Section 22, Borrower submits to the personal jurisdiction and venue of the state and federal courts of Marion County and Hamilton County, Indiana, and agrees that any and all claims or disputes pertaining to this Note or any other Loan Document, or to any matter arising out of or related to this Note or any other Loan Document, which are initiated by Borrower against Lender, to the extent, if any, that such claims or disputes are not subject to the provisions noted in Section 22 below, shall be brought in the state or federal courts of Marion County or Hamilton County, Indiana. Further, Borrower expressly consents to the jurisdiction and venue of the state and federal courts of Marion County and Hamilton County, Indiana, as to any legal or equitable action that may be brought in such court by Lender, and waives any objection based upon lack of personal jurisdiction, improper venue, or forum non conveniens with respect to any such action. Borrower acknowledges and agrees that Lender reserves the right to initiate and prosecute any action against Borrower in any court of competent jurisdiction, and Borrower consents to such forum as Lender may elect.

22. MANDATORY BINDING ARBITRATION; WAIVER OF CLASS ACTION RIGHTS.

(a) In most cases, any disputes or claims that Borrower may have can be resolved quickly and to Borrower's satisfaction by contacting Lender regarding such dispute or claims. In the unlikely event that Lender is unable to resolve a dispute or claim that Borrower may have, Borrower agrees to arbitrate any such dispute or claim in accordance with this Section 22. This agreement to arbitrate is intended to be broadly interpreted, and includes (i) all disputes, claims and counterclaims arising out of or relating to this Note or any other Loan Document or any aspect of Borrower's past, present or future relationship with Lender, whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory; (ii) all disputes, claims and counterclaims that may have arisen prior to the Effective Date or from any prior dealings, contract or agreement between Borrower and Lender (including all disputes, claims and counterclaims relating to any marketing or advertising by Lender); and (iii) any disputes, claims and counterclaims that may arise after the termination of this Note and any other Loan Document. Additionally, Borrower acknowledges that Lender may (BUT SHALL IN NO EVENT BE REQUIRED TO) arbitrate any dispute or claim that it may have against Borrower, with any such arbitration being governed by the provisions of this Section 22. BY AGREEING TO ARBITRATION, BORROWER UNDERSTANDS AND AGREES THAT IT IS WAIVING ITS RIGHTS TO MAINTAIN OTHER AVAILABLE RESOLUTION PROCESSES, SUCH AS COURT ACTION (INCLUDING A JURY TRIAL) OR ADMINISTRATIVE PROCEEDING, IN ORDER TO SETTLE OR RESOLVE DISPUTES OR ANY CLAIMS AGAINST LENDER. ARBITRATION IS DIFFERENT THAN A COURT ACTION, AND THE RULES IN ARBITRATION ARE DIFFERENT THAN THE RULES THAT APPLY IN COURT. THERE IS NO JUDGE OR JURY IN ARBITRATION, AND REVIEW IS LIMITED, BUT AN ARBITRATOR CAN AWARD THE SAME DAMAGES AND RELIEF AS A COURT, SUBJECT TO THE AGREED TERMS AND LIMITATIONS IN THIS NOTE. Borrower, at its election, may opt-out of the arbitration provisions set forth in Sections 22(a), 22(c) and 22(d) by providing written notice of its election to opt-out no later than thirty (30) days after the Effective Date, which notice shall be provided to Lender pursuant to Section 15 ("Opt-Out Notice"), provided that such Opt-Out Notice shall become effective only upon Borrower's receipt of written confirmation from Lender that such Opt-Out Notice has been received by Lender within the required time period. Borrower acknowledges and agrees that, irrespective of any Opt-Out Notice or any written confirmation thereof, Borrower shall in all events be subject to the provisions of Section 22(b).

(b) ANY ARBITRATION OR OTHER LEGAL PROCEEDING OF ANY TYPE OR NATURE ARISING UNDER OR RELATING TO THIS NOTE OR ANY OF THE OTHER LOAN DOCUMENTS, OR TO ANY ASPECT OF BORROWER'S PAST, PRESENT OR FUTURE RELATIONSHIP OR ACTIVITIES WITH OR INVOLVING LENDER (INCLUDING ANY MARKETING ACTIVITIES OR SOLICITATIONS BY OR ON BEHALF OF LENDER), WILL TAKE PLACE ON AN INDIVIDUAL BASIS. CLASS ARBITRATIONS AND CLASS ACTIONS OF ANY KIND (WHETHER PURSUED THROUGH ARBITRATION OR THROUGH THE COURTS) ARE NOT PERMITTED. BORROWER AGREES THAT IT MAY BRING CLAIMS AGAINST LENDER ONLY IN ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. BORROWER AGREES THAT, BY ENTERING INTO THIS NOTE, BORROWER IS WAIVING ITS RIGHT TO PARTICIPATE IN ANY CLASS ACTION OR OTHER SIMILAR REPRESENTATIVE PROCEEDING. UNLESS CONSENTED TO IN WRITING BY LENDER, THE ARBITRATOR MAY NOT CONSOLIDATE MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING. BORROWER ACKNOWLEDGES AND AGREES THAT THE SIZE OF BORROWER'S CREDIT LINE, THE INTEREST RATE TO WHICH ADVANCES ARE SUBJECT AND CERTAIN FEES CHARGED TO BORROWER, AS WELL AS THE SIZE AND DATES OF SPECIFIC ADVANCES, ARE UNIQUE TO AND NEGOTIATED BY BORROWER, AND THAT SUCH FACTORS WILL AND DO VARY AMONG BORROWERS.

(c) Any dispute or claim subject to arbitration pursuant to this Section 22 shall be submitted to binding arbitration administered by the Judicial Arbitration and Mediation Service ("JAMS") pursuant to its Comprehensive Arbitration Rules and Procedures as then in effect (the "JAMS Comprehensive Rules"); provided, however, that any dispute or claim that is subject to arbitration pursuant to this Section 22 and that involves disputes or claims where the aggregate amount reasonably in dispute or controversy is less than $100,000, shall be submitted to binding arbitration administered by JAMS pursuant to its Streamlined Arbitration Rules and Procedures as in effect on the Effective Date (the "JAMS Streamlined Rules"). The disputes and claims subject to arbitration pursuant to this Section 22 will be resolved by a single arbitrator selected pursuant to the JAMS Comprehensive Rules or the JAMS Streamlined Rules, as the case may be. The arbitrator shall be bound by and shall strictly enforce the terms of this Note and the other Loan Documents and may not limit, expand, or otherwise modify any term or provision of this Note or any other Loan Document or any other contract or document between Borrower and Lender. The arbitrator shall not have the

COPY VIEW

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676
THIS IS A COPY
This is a copy view of the Authoritative Copy h by the designated custodian

power to award to Borrower any damages that are excluded or that have been waived by Borrower under this Note or any other Loan Document, and Borrower irrevocably waives any claim that it may have thereto. The arbitrator shall not have the power to order pre-hearing discovery of documents or the taking of depositions. The arbitrator shall render a written decision within six (6) months after being selected. Any arbitration will be held in Indianapolis, Indiana (or its greater metro area). Each Party will bear its own expenses in the arbitration and will share equally the costs of the arbitration; provided, however, that the arbitrator may, in his or her discretion, award costs and fees to the prevailing Party. The result of any arbitration shall be final and binding upon the Parties. Judgment upon any arbitration award may be entered in any court having jurisdiction over the award or over the applicable party or its assets.

(d) This Note and the other Loan Documents evidence transactions in interstate commerce, and thus the Federal Arbitration Act governs the interpretation and enforcement of this Section 22, notwithstanding the provisions of Section 20.

23. WAIVER OF JURY TRIAL. AFTER CONSULTING OR HAVING HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL, LENDER AND BORROWER KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVE ANY RIGHT EITHER PARTY MAY HAVE TO A TRIAL BY JURY IN ANY LITIGATION BASED UPON OR ARISING OUT OF THIS NOTE OR ANY OTHER LOAN DOCUMENT, OR ANY OF THE TRANSACTIONS CONTEMPLATED BY THIS NOTE OR ANY OF THE OTHER LOAN DOCUMENTS, OR ANY COURSE OF CONDUCT, STATEMENT, WHETHER ORAL OR WRITTEN, OR ACTIONS OF LENDER OR BORROWER. NEITHER LENDER NOR BORROWER SHALL SEEK TO CONSOLIDATE, BY COUNTERCLAIM OR OTHERWISE, ANY ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED. THESE PROVISIONS SHALL NOT HAVE BEEN DEEMED TO HAVE BEEN MODIFIED IN ANY RESPECT OR RELINQUISHED BY LENDER OR BORROWER EXCEPT BY WRITTEN INSTRUMENT EXECUTED BY BOTH LENDER AND BORROWER.

24. LIMITATION OF LIABILITY. IN NO EVENT SHALL ANY LENDER PARTY BE LIABLE FOR ANY SPECIAL, INDIRECT, EXEMPLARY, PUNITIVE, INCIDENTAL, MULTIPLE OR CONSEQUENTIAL DAMAGES (INCLUDING ANY DAMAGES RESULTING FROM LOSS OF USE, LOSS OF PROFITS, LOSS OF BUSINESS OR OTHER ECONOMIC LOSS) ARISING OUT OF OR IN CONNECTION WITH THIS NOTE OR ANY OTHER LOAN DOCUMENT (OR ANY ADVANCES MADE BY LENDER HEREUNDER OR THEREUNDER), EVEN IF SUCH LENDER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. FURTHER, IN NO EVENT SHALL THE LENDER PARTIES, COLLECTIVELY, BE LIABLE FOR ANY DAMAGES UNDER THIS NOTE OR ANY OTHER LOAN DOCUMENT (OR IN CONNECTION WITH ANY ADVANCE BY LENDER HEREUNDER OR THEREUNDER) THAT EXCEED, IN THE AGGREGATE, AN AMOUNT EQUAL TO THE SUM OF THE INTEREST AND FLOORPLAN FEES ACTUALLY PAID TO LENDER BY BORROWER UNDER THIS NOTE DURING THE TWELVE (12) MONTH PERIOD IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO THE CLAIM AT ISSUE (OR, IN THE CASE OF MULTIPLE EVENTS, THE FIRST SUCH EVENT GIVING RISE TO THE CLAIM AT ISSUE).

25. WAIVER OF BOND. BORROWER WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY BOND OR SURETY OR SECURITY ON SUCH BOND WHICH MIGHT, BUT FOR THIS WAIVER, BE REQUIRED OF LENDER DURING ATTEMPTS TO RECOVER COLLATERAL OR OTHERWISE.

26. CALIFORNIA BORROWERS. In the event Borrower's Place of Business is in the State of California, Borrower acknowledges and agrees that any initial Advance made under this Note must be in the amount of at least Five Thousand Dollars and Zero Cents ($5,000), and Borrower shall neither request nor accept any initial Advance under this Note in an amount less than Five Thousand Dollars and Zero Cents ($5,000).

27. DISCLAIMER. THE DISCOVER PORTAL LICENSED OR PROVIDED HEREUNDER IS PROVIDED AS A CONVENIENCE TO BORROWER AND ON AN "AS-IS" BASIS. LENDER MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, ORAL OR WRITTEN, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTIES OF NON-INFRINGEMENT, TITLE, ACCURACY, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, LENDER MAKES NO REPRESENTATIONS OR WARRANTIES THAT THE DISCOVER PORTAL WILL OPERATE ERROR-FREE OR ON AN UNINTERRUPTED BASIS, AND LENDER SHALL IN NO EVENT BE LIABLE OR RESPONSIBLE FOR ANY OUTAGE OR OTHER LOSS OF FUNCTIONALITY OR CONNECTIVITY WITH RESPECT TO THE DISCOVER PORTAL, AND NO SUCH OUTAGE OR OTHER LOSS OF FUNCTIONALITY OR CONNECTIVITY SHALL EXCUSE ANY FAILURE BY BORROWER TO TIMELY PERFORM ALL OF ITS OBLIGATIONS TO LENDER UNDER THIS NOTE AND THE OTHER LOAN DOCUMENTS.

28. DESCRIPTIVE HEADINGS; INTERPRETATION. The descriptive headings herein are for convenience of reference only and shall not control or affect the meaning or construction of any provision of this Note. As used in this Note and the other Loan Documents, the terms "include," "includes," and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of like import. Words (including the defined terms set forth in Appendix A) of one gender shall be held to include the other gender as the context requires. Any references in this Note or in the other Loan Documents to a particular statute or regulation shall be deemed to include all amendments thereto, rules and regulations thereunder and any successor statute, rule, or regulation, or published clarifications or interpretations with respect thereto, in each case as in effect from time to time.

29. EFFECTIVE DATE OF OTHER LOAN DOCUMENTS. Unless otherwise stated in the applicable Loan Document, the effective date of any Loan Document executed by a party shall be the later of (a) the Effective Date of this Note, or (b) the date of Borrower's execution thereof as set forth below Borrower's signature thereon (or, in the case of any guaranty, the date of Guarantor's execution thereof as set forth below Guarantor's signature thereon). In the event that the date of Borrower's or Guarantor's execution of any Loan Document is not set forth below Borrower's or Guarantor's signature thereon, then the effective date of such Loan Document shall be deemed to be the Effective Date of this Note.

WHEREFORE, the Parties, by their respective duly authorized representatives, have executed this Demand Promissory Note and Loan and Security Agreement on the dates set forth below.

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

**LENDER**:

NEXTGEAR CAPITAL, INC.

DocuSigned by:
Shane O'Dell
32464ECD45174EF...

By: ______________________
Name: Shane O'Dell
Title: President
Date: 3/27/2019 | 10:47:56 AM EDT

**BORROWER**:

Premier Group Autos LLC DBA Overfinch Miami

DocuSigned by:
James Michael C Blackburn
C485019CBBD84D1...

By: ______________________
Name: James Michael C Blackburn
Title: Manager
Date: 3/26/2019 | 4:42:48 PM EDT

DocuSigned by:
Edward Anthony Kessler
8420328A15AC496...

By: ______________________
Name: Edward Anthony Kessler
Title: Manager
Date: 3/27/2019 | 10:46:09 AM EDT

COPY VIEW

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

GUARANTORS ACKNOWLEDGE AND CONSENT TO THE FOREGOING:

DocuSigned by:
Guarantor (Sign) James Michael C Blackburn
C465919CBBD84D1...

Name: James Michael C Blackburn

DocuSigned by:
Guarantor (Sign) Edward Anthony Kessler
8420328A15AC496

Name: Edward Anthony Kessler

PAG-B0652
KM000087

DocuSign Envelope ID: FAE10158-F46A-48C6-8EB2-FB526DFFF676
THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

# APPENDIX A

(1) "Administrative Charge" shall mean any expense charged by Lender to Borrower that is reasonable or necessary, in Lender's sole discretion, to administer or monitor Borrower's account, to preserve any Collateral, or to collect any Liabilities owed by Borrower.

(2) "Advance" shall mean any discretionary loan or payment in any amount, for any purpose, made pursuant to this Note by Lender to Borrower or on Borrower's behalf to any third party.

(3) "Advance Schedule" shall mean any addendum or other document executed pursuant to this Note, in each case as modified from time to time, which indicates the applicable specific terms regarding Borrower's Floorplan Fees, Receivable Fees, Contract Rate of Interest, Period(s), Required Reserve Amount, Reserve Charge, required principal reduction to obtain a Curtailment of the Maturity Date, and number of available Curtailments.

(4) "ACH" shall mean any payment by or on behalf of Borrower to Lender made via a nationwide electronic funds transfer network processing electronic debit and credit entries to or from Borrower's bank accounts.

(5) "Affiliate" shall mean, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such first-named Person (which shall, for purposes of clarity, include any parent company and any direct or indirect subsidiary of such first-named Person) and, if such first-named Person is a natural person, also includes any member of such first-named Person's immediate family. For purposes of this definition, the term "control" means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

(6) "Base Rate" shall mean the greater of that variable rate of interest or that fixed rate of interest as stated in the Finance Program Rate, Fee, and Term Schedule.

(7) "Borrower" shall have the meaning set forth in the Preamble.

(8) "Borrower's Place of Business" shall mean the primary place where the Collateral and Borrower's books and records are kept, and where Borrower's operations are conducted.

(9) "Business" shall mean Borrower's business, as it relates to the purchase and sale, lease, or rent of Inventory and/or the origination of any Receivables.

(10) "Business Day" shall mean any day other than a Saturday, Sunday, federal holiday or day on which banking institutions in Carmel, Indiana are authorized or obligated by Law or executive order to be closed.

(11) "Check" shall mean any payment by or on behalf of Borrower to Lender not made in cash, via certified funds, wire transfer, or ACH.

(12) "Collateral" shall have the meaning set forth in Section 2(a).

(13) "Collateral Protection Program" shall mean that certain program in which Borrower may participate in lieu of providing third party insurance as required under this Note.

(14) "Contract Rate" shall mean that rate of interest as stated on the applicable Advance Schedule.

(15) "Credit Line" shall mean Borrower's floorplan line of credit with Lender pursuant to and under this Note.

(16) "Curtailment" shall mean that grant by Lender, in its sole discretion, to Borrower of additional time extending the Maturity Date with respect to a Floorplan Advance or a Receivable Advance for an additional Period. The number of allowable Curtailments for a Floorplan Advance or a Receivable Advance shall be as stated on the applicable Advance Schedule.

(17) "Discover Portal" shall mean that certain web-based portal located at http://www nextgearcapital.com (or any similar successor or related portal, interface or website including any mobile or tablet application or website) owned, operated or maintained by Lender and, subject to the Terms and Conditions, to which Borrower shall have access to from time to time as determined by Lender.

(18) "Effective Date" shall have the meaning set forth in the Preamble.

(19) "E-Sign Act" shall have the meaning set forth in Section 14.

(20) "Event of Default" shall have the meaning set forth in Section 6.

(21) "Extension" shall mean that grant by Lender, in its sole discretion, to Borrower of additional time extending the Maturity Date with respect to a Floorplan Advance beyond the last Period as stated on the applicable Advance Schedule.

COPY VIEW

DocuSign Envelope ID: FAE10158-F46A-48C8-BEB2-FB526DFFF676
THIS IS A COPY
This is a copy view of the Authoritative Copy by the designated custodian

(22) "Finance Program" shall mean any finance program offered by Lender and available to Borrower for the financing of Inventory or Receivables pursuant to an Advance under this Note.

(23) "Finance Program Rate, Fee, and Term Schedule" shall mean that current schedule of applicable universal interest rates, fees and term and condition amendments for each Finance Program, including Universal Program Fees; late fees; fees relating to returned checks or ACH payments due to insufficient funds; the Base Rate; Collateral Protection Program fees; and notice of amendments to the Terms and Conditions, published by Lender via posting such schedule of such universal rates and fees and notice of amendments to the Terms and Conditions on the Discover Portal.

(24) "Floorplan Advance" shall mean an Advance made pursuant to this Note relating to a Unit of Inventory to be offered for sale, lease or rent, or leased or rented by Borrower in the Ordinary Course of Business.

(25) "Floorplan Date" shall mean (a) for a Universal Source Purchase, the sale date, regardless of the date the Floorplan Advance is actually requested or funded; and (b) for a Specific Source Purchase, the date the request for the Floorplan Advance is received by Lender, regardless of the date such Floorplan Advance is actually funded.

(26) "Floorplan Fee" shall mean the fee charged by Lender to Borrower, as set forth on the applicable Advance Schedule, for each Unit of Lender Financed Inventory for each Period, including any Extensions thereof.

(27) "Guarantor" shall mean any Person executing this Note as a Guarantor or any Person executing any guaranty pursuant to this Note.

(28) "Interest" shall mean the aggregate rate of interest which accrues on all outstanding Liabilities of Borrower under or arising under this Note or any of the other Loan Documents.

(29) "Inventory" shall mean all Units held by Borrower for wholesale or retail sale, lease, or rent, or leased or rented by Borrower. "Inventory" includes Lender Financed Inventory.

(30) "JAMS" shall have the meaning set forth in Section 22(c).

(31) "JAMS Comprehensive Rules" shall have the meaning set forth in Section 22(c).

(32) "JAMS Streamlined Rules" shall have the meaning set forth in Section 22(c).

(33) "Law" or "Laws" shall mean applicable common law and any applicable statute, permit, ordinance, code or other law, rule, regulation or order enacted, adopted, promulgated or applied by any governmental authority, all as in effect from time to time.

(34) "Lender" shall have the meaning set forth in the Preamble.

(35) "Lender Financed Inventory" shall mean all Units for which an Advance has been made under this Note.

(36) "Lender Guide" shall mean those procedures and instructions for the use of Lender's system and the Discover Portal, in each case as modified by Lender from time to time in Lender's sole discretion, which are available in hard copy upon Borrower's written request to Lender or by Borrower logging onto the Discover Portal.

(37) "Lender Parties" shall have the meaning set forth in Section 11.

(38) "Liabilities" shall mean any and all Advances, debts, financial obligations, Administrative Charges, Lender Universal Program Fees, Interest, Floorplan Fees, NSF fees, late fees, charges, expenses, attorneys' fees, costs of collection, covenants, and duties owing, arising, due, or payable from Borrower to Lender of any kind or nature, present, or future, under any instrument, guaranty, or other document, whether arising under this Note, any other Loan Document, or otherwise, whether directly or indirectly (including those acquired by assignment), absolute or contingent, primary or secondary, due or to become due, now existing, or hereafter arising, and however acquired.

(39) "Liens" shall mean any claims, liabilities, security interests, liens, mortgages, deeds of trust, pledges, conditions, charges, claims, options, rights of first refusal, easements, proxies, voting trusts or agreements, transfer restrictions under any contract or agreement or encumbrances of any kind or nature whatsoever.

(40) "Loan Documents" shall have the meaning set forth in Section 8.

(41) "Maturity Date" shall mean (a) for all Liabilities concerning or relating to a Floorplan Advance or a Receivable Advance, the earlier of the last day of the current Period or the day on which Lender declares a Maturity Event; (b) for all Liabilities not directly related to a Floorplan Advance or a Receivable Advance, ten (10) days after the date such Liability is posted to Borrower's account; and (c) for One Day Loans, the date such One Day Loan is posted to Borrower's account. Notwithstanding the foregoing, upon the declaration of an Event of Default by Lender, the Maturity Date for all Liabilities shall be the earlier of (i) the date on which such Event of Default is declared by Lender, or (ii) the date on which such Event of Default first occurred. In the event the Maturity Date is not a Business Day, the Maturity Date shall be deemed to be the next Business Day.

COPY VIEW

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676
THIS IS A COPY
This is a copy view of the Authoritative Copy h by the designated custodian

(42) "Maturity Event" shall mean any event, act or circumstance arising under this Note or any other Loan Document (including any failure by Borrower to adhere to any term or provision of this Note or any other Loan Document), which causes Lender to declare the event, act or circumstance a "Maturity Event" with respect to any Floorplan Advance or Receivable Advance.

(43) "MSO" shall mean the manufacturer's statement of origin or other document evidencing ownership of a Unit issued by the manufacturer of the Unit.

(44) "Note" shall mean this Demand Promissory Note and Loan and Security Agreement and all present and future amendments, modifications, and addendums related thereto.

(45) "One Day Loan" shall mean the amount of any Advance that is in excess of the market value of a Unit, as determined by Lender in its sole discretion. The determination of whether to approve an Advance which would result in the posting of a One Day Loan to Borrower's account shall be in Lender's sole discretion. One Day Loans mature on the date on which they post to Borrower's account.

(46) "Opt-Out Notice" shall have the meaning set forth in Section 22(a).

(47) "Ordinary Course of Business" shall mean the ordinary course of the Business of Borrower, consistent with past practices (but only to the extent such past practices were in compliance with Law and in accordance with best industry practices).

(48) "Parent Company" shall mean, with respect to Borrower or any Guarantor, the Person(s) that, directly or indirectly, have the power to direct or cause the direction of the management and policies of Borrower or Guarantor, as the case may be, whether through the ownership of voting securities, by contract or otherwise.

(49) "Party" or "Parties" shall have the meaning set forth in the Preamble.

(50) "Period" shall mean the number of days set forth on the applicable Advance Schedule, which (a) in the case of a Floorplan Advance, shall be calculated beginning on the Floorplan Date; and (b) in the case of a Receivable Advance, shall be calculated beginning on the Receivable Origination Date.

(51) "Person" shall mean any individual, corporation, joint stock company, association, partnership, joint ventures, trust, estate, limited liability company, limited liability partnership, governmental authority or other entity or organization.

(52) "Receivable" shall mean chattel paper, including a retail installment contract or buy here pay here contract, evidencing a monetary obligation of a buyer for the purchase of a motor vehicle from Borrower and the granting of a security interest in the vehicle to Borrower as security for the repayment of the monetary obligation.

(53) "Receivable Advance" shall mean an Advance made pursuant to this Note to provide Borrower with working capital secured by a specific Receivable owned and originated by Borrower in the Ordinary Course of Business.

(54) "Receivable Fee" shall mean the fee charged by Lender to Borrower, set forth on the applicable Advance Schedule, for each individual Receivable Advance for each Period.

(55) "Receivable Origination Date" shall mean, with respect to any Receivable for which a Receivable Advance is made pursuant to this Note, the date on which such Receivable was originated by Borrower.

(56) "Representative" shall mean, with respect to Borrower or Lender, as the case may be, the directors, officers, stockholders, employees, trustees, agents, and representatives, including any investment banker, consultant, attorney, or accountant, of Borrower or Lender, as the case may be.

(57) "Required Reserve Amount" shall mean the aggregate total amount of funds required to be remitted by Borrower to Lender, as set forth in the applicable Advance Schedule, and held in the Reserve as a condition to the grant of credit to Borrower under this Note and the other Loan Documents.

(58) "Reserve" shall mean the cash deposited with Lender by Borrower on a voluntary basis or as required as an underwriting condition and held by Lender as additional security for Borrower's Liabilities, and other Obligations (as defined in the applicable reserve agreement) to the Lender Parties.

(59) "Reserve Charge" shall mean that charge by Lender to Borrower, as set forth on the applicable Advance Schedule, assessed for the purpose of funding any Reserve.

(60) "Setoff Funds" shall have the meaning set forth in Section 5(l).

(61) "Specific Source Purchase" shall mean all purchases or other requests for an Advance, made by or on behalf of Borrower that do not constitute a Universal Source Purchase.

(62) "Terms and Conditions" shall mean all provisions of this Note and the other Loan Documents, with the exception of terms specifically referenced on the applicable Advance Schedule.

COPY VIEW

DocuSign Envelope ID: FAE10158-F46A-48C8-BEB2-FB526DFFF676
THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

(63) "Title" shall mean the certificate of title or other document evidencing ownership of a Unit issued by a duly authorized state, commonwealth, province, or government agency.

(64) "UCC" shall mean the Uniform Commercial Code as enacted in the State where the Collateral at issue is located.

(65) "Unit" shall mean any manufactured item, including motor vehicles, for which there exists a Title, MSO, or other similar evidence of ownership acceptable to Lender.

(66) "Universal Program Fee" shall mean any published fee, as stated in the Finance Program Rate, Fee, and Term Schedule, charged by Lender to Borrower pursuant to a Finance Program.

(67) "Universal Source Purchase" shall mean any purchase made by or on behalf of Borrower for which (a) a request for an Advance is made by or on behalf of Borrower; (b) from an auction or third party business that has entered into a universal funding agreement with Lender; and (c) such request for an Advance is received by Lender within seven (7) days of Borrower's purchase of the vehicle that is the subject of such request.

DocuSign Envelope ID: FAE10158-F46A-48C8-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy held by the designated custodian

**ADDENDUM TO DEMAND PROMISSORY NOTE AND LOAN AND SECURITY AGREEMENT – READY LOGISTICS**

THIS ADDENDUM TO DEMAND PROMISSORY NOTE AND LOAN AND SECURITY AGREEMENT (this "Addendum") is being entered into by the undersigned borrower ("Borrower") and NextGear Capital, Inc. ("Lender"), pursuant to that certain Demand Promissory Note and Loan and Security Agreement by and between Borrower and Lender (the "Note").

WHEREAS, Borrower has requested of Lender that Lender make one or more Advances on behalf of Borrower, directly to Ready Logistics LLC ("Ready Logistics") in order to cover transportation and other related acquisition charges (collectively "Charges") incurred by Borrower related to one or more Units of Lender Financed Inventory; and

WHEREAS, subject to the terms and conditions set forth in the Note and the other Loan Documents, all as the same now exist or are hereafter amended, supplemented or added to, Lender is willing to make such Advance(s);

NOW, THEREFORE, in consideration of the premises and the mutual agreements and covenants set forth herein, and other good and valuable consideration, the undersigned hereby agree as follows:

1. Notwithstanding anything to the contrary in the Note or the other Loan Documents, the decision to make an Advance related to Charges on behalf of Borrower is the exclusive right of Lender whether or not an Event of Default has occurred.

2. Borrower acknowledges and agrees that Lender may make such Advance(s) at any time on or after receipt of an invoice from Ready Logistics for such Charges.

3. Borrower acknowledges and agrees that each Advance made by Lender on behalf of Borrower, directly to Ready Logistics, to cover Charges, shall be added to the outstanding balance for the related Unit of Lender Financed Inventory for which such Charge applies, as of the date Lender receives notice from Ready Logistics of such Charge. Such Advance, shall accrue Interest and other related charges as of such date, regardless of the date the related Charge is actually paid. Borrower acknowledges and agrees that if an Advance related to a Charge is added to Borrower's account on a date other than the Floorplan Date for such Unit of Lender Financed Inventory, that the number of days remaining in the applicable Period, for an Advance related to a Charge, will be reduced to the number of days remaining in the applicable Period for the related Unit of Lender Financed Inventory.

4. Borrower acknowledges and agrees that such Advance(s) is a Liability under the Note and, except as provided for herein, is subject to all terms and conditions noted therein. Borrower acknowledges and agrees that Borrower is and shall remain obligated to repay such Liability, including accrued Interest, to Lender no later than the Maturity Date for such Advance, excepting that Lender may, in its sole discretion and without notice, defer payment of the Advance or any portion thereof (excluding Interest) until final payoff.

5. Borrower acknowledges and agrees that Borrower is and shall remain obligated to repay such Liability to Lender for such Advance(s) no later than the Maturity Date for such Advance(s), regardless of whether the sale of the related Unit of Lender Financed Inventory, for which an Advance was made to Ready Logistics on Borrower's behalf, is subsequently arbitrated, voided, or the vehicle is otherwise returned for any reason.

Capitalized terms used herein but not defined herein shall have the respective meanings as set forth in the Note (such meanings to be equally applicable to both the singular and plural forms of the terms defined).

The undersigned Borrower hereby expressly acknowledges that this Addendum shall be binding on Borrower whether executed in original, "wet ink" form; submitted by facsimile; or submitted by electronically transmitted signature ("e-signature"). The undersigned Borrower further acknowledge(s) that the acceptance of the terms of this Addendum, if by e-signature, shall be deemed to satisfy all requirements imposed on electronic or digital

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy held by the designated custodian

signatures under the Electronic Signatures in Global and National Commerce Act (the "E-Sign Act"), 15 U.S.C. §7001(a) et seq., and any other similar laws relating to the validity or enforceability of electronic or digital signatures. Each of the parties acknowledges and agrees that this Addendum may be executed by affixing to this Addendum an electronic or digital signature, which shall for all purposes be deemed effective to constitute the valid signature of the party affixing such electronic or digital signature.

☒ Borrower, by its duly authorized representative, AGREES to be bound by the terms of this Addendum as of the date set forth below.

☐ Borrower, by its duly authorized representative, DECLINES the terms of this Addendum. Borrower will not request any Advances to be made to Ready Logistics on Borrower's behalf for Charges, and Lender will not approve any such requests.

**BORROWER:**

PREMIER GROUP AUTOS LLC DBA OVERFINCH MIAMI

By: DocuSigned by: James Michael C Blackburn

Name: James Michael C Blackburn

Title: Manager

Date: 3/26/2019 | 4:42:48 PM EDT

COPY VIEW

**LENDER:**

NEXTGEAR CAPITAL, INC.

By: DocuSigned by: Shane O'Dell

Name: Shane O'Dell

Title: President

Date: 3/27/2019 | 10:47:56 AM EDT

Dealer # 125308

DocuSign Envelope ID: FAE10158 F46A 48C6-BCD2-FD520DFFF078

THIS IS A COPY
This is a copy view of the Authoritative Copy by the designated custodian

# ADVANCE SCHEDULE
(Retail)

Borrower: Premier Group Autos LLC DBA Overfinch Miami

Market: Ft. Lauderdale North

Account Number: 125308

Finance Program: Core

This Advance Schedule is being entered into by the undersigned borrower ("Borrower") and NextGear Capital, Inc. ("Lender") pursuant to that certain Demand Promissory Note and Loan and Security Agreement by and between Borrower and Lender (the "Note"). Capitalized terms used herein but not defined herein shall have the respective meanings as set forth in the Note (such meanings to be equally applicable to both the singular and plural forms of the terms defined).

The following terms shall apply to Advances made under the Note and this Advance Schedule:

The Floorplan Fee, the Period(s), and the required principal reduction for Curtailment for each Advance made pursuant to the Note and this Advance Schedule shall be as follows:

| Period | Number of Days in Period | Required Principal Reduction for Curtailment of Maturity Date | Floorplan Fee |
|---|---|---|---|
| 1 | 60 | 10% | $80.00 |
| 2 | 30 | 5% | $45.00 |
| 3 | 30 | N/A – No Further Curtailments Available | $45.00 |

Contract Rate: 3.0%

Additional fees, charges, and other terms applicable to Advances made pursuant to the Note and this Advance Schedule are set forth on the Finance Program Rate, Fee, and Term Schedule, which can be found on the Discover Portal.

The undersigned Borrower hereby expressly acknowledges that this Advance Schedule shall be binding on Borrower whether executed in original, "wet ink" form; submitted by facsimile; or submitted by electronically transmitted signature ("e-signature"). The undersigned Borrower further acknowledges that the acceptance of the terms of this Advance Schedule, if by e-signature, shall be deemed to satisfy all requirements imposed on electronic or digital signatures under the Electronic Signatures in Global and National Commerce Act (the "E-Sign Act"), 15 U.S.C. §7001(a) et seq., and any other similar laws relating to the validity or enforceability of electronic or digital signatures. Each of the parties acknowledges and agrees that this Advance Schedule may be executed by affixing to this Advance Schedule an electronic or digital signature, which shall for all purposes be deemed effective to constitute the valid signature of the party affixing such electronic or digital signature.

WHEREFORE, the Parties, by their respective duly authorized representatives, have executed this Advance Schedule on the dates set forth below.

COPY VIEW

LENDER:

NEXTGEAR CAPITAL, INC.

DocuSigned by:
Shane O'Dell
32484ECD45174EF...

By: 
Name: Shane O'Dell
Title: President

Date: 3/27/2019 | 10:47:56 AM EDT

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy by the designated custodian

**BORROWER:**

Premier Group Autos LLC DBA Overfinch Miami

DocuSigned by:
James Michael C Blackburn
C465919CBBD64D1...
By: ______________________
Name: James Michael C Blackburr
Title: Manager

Date: 3/26/2019 | 4:42:48 PM EDT

DocuSigned by:
Edward Anthony Kessler
8420328A15AC498...
By: ______________________
Name: Edward Anthony Kessler
Title: Manager

Date: 3/27/2019 | 10:46:09 AM EDT

COPY VIEW

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h by the designated custodian

# INDIVIDUAL GUARANTY

THIS INDIVIDUAL GUARANTY (this "Guaranty") is made and entered into by the undersigned guarantor ("Guarantor") in favor of NextGear Capital, Inc. ("Lender") and it Affiliates, pursuant to that certain Demand Promissory Note and Loan and Security Agreement by and between Borrower (as defined below) and Lender (the "Note").

NOW, THEREFORE, in consideration of any loan or other financial accommodation heretofore or hereafter at any time made or granted to Borrower by Lender, and the mutual covenants, agreements, and conditions contained herein, Guarantor agrees as follows:

1. DEFINITIONS. Capitalized terms used herein and not defined in this Section 1 or elsewhere in this Guaranty shall have the respective meanings as set forth in the Note (such meanings to be equally applicable to both the singular and plural forms of the terms defined). Any capitalized terms used herein, but not otherwise defined herein or in the Note, as the case may be, shall have the meanings ascribed to them in the UCC.

   (a) "Borrower" shall mean the Person listed below, including any Affiliates of such Person, whether now in existence or hereinafter established or acquired:

      Premier Group Autos LLC DBA Overfinch Miami, 11 SW 12th Ave Ste 103 Bldg 59, Dania Beach, FL 33004-3527
      Telephone: (954) 440-0717

   (b) "Liabilities" shall mean any and all Advances, debts, financial obligations, fees, charges, expenses, attorneys' fees and costs of collection owing, arising, due, or payable from Borrower to Lender or any of its Affiliates, of any kind or nature, present or future, under any instrument, guaranty, or other document, whether arising under the Note or any other Loan Document, whether directly or indirectly, absolute or contingent, primary or secondary, due or to become due, now existing or hereafter arising, and however acquired.

2. GUARANTY AND OTHER AGREEMENTS.

   (a) Guaranty Obligations. Guarantor hereby voluntarily, unconditionally, and absolutely guarantees (i) the full and prompt payment when due, whether by acceleration or otherwise, and at all times hereafter, of all Liabilities, and (ii) the full and prompt performance of all the terms, covenants, conditions, and agreements related to the Liabilities. Guarantor further agrees to pay all expenses, including attorneys' fees and court costs (including, in each case, those relating to bankruptcy and appeals), paid or incurred by Lender or its Affiliates in endeavoring to collect on any Liabilities, and in enforcing this Guaranty or in defending any claims by Borrower or any Guarantor related to any of the Liabilities, plus interest on such amounts at the lesser of (A) thirteen percent (13%) per annum, compounded daily, or (B) the maximum rate permitted by Law. Interest on such amounts paid or incurred by Lender shall be computed from the date of payment made by Lender and shall be payable on demand.

   (b) General Nature of Guaranty. Guarantor acknowledges that this Guaranty is a guaranty of payment and not of collection, and that his or her obligations hereunder shall be absolute, unconditional, and unaffected by: (i) the waiver of the performance or observance by Borrower or any Guarantor of any agreement, covenant, term, or condition to be performed or observed by Borrower or any such Guarantor, as the case may be; (ii) the extension of time for the payment of any sums owing or payable with respect to any of the Liabilities or the time for performance of any other obligation arising out of or relating to any of the Liabilities; (iii) the modification, alteration, or amendment of any obligation arising out of or relating to any of the Liabilities; (iv) any failure, delay, or omission by Lender to enforce, assert, or exercise any right, power, or remedy in connection with any of the Liabilities; (v) the genuineness, validity, or enforceability of any of the Liabilities or any document related thereto; (vi) the existence, value, or condition of, or failure of Lender or any of its Affiliates to perfect its lien against, any security pledged in connection with the Liabilities; (vii) the release of any security pledged in connection with the Liabilities, or the release, modification, waiver, or failure to enforce any other guaranty, pledge, or security agreement; (viii) the voluntary or involuntary liquidation, dissolution, sale of all or substantially all of the property, marshalling of assets and liabilities, receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization, arrangement, composition, or readjustment or other similar application or proceeding affecting Borrower or any assets of Borrower; (ix) the release or discharge of Borrower or any other Guarantor from the performance or observance of any agreements, covenants, terms, or conditions in connection with any of the Liabilities, by operation of Law or otherwise; (x) the default of Borrower in any obligations to Guarantor or any torts committed by Borrower against Guarantor, even if Lender is alleged to be complicit or to have committed a direct tort against Guarantor; or (xi) any change in Borrower's ownership, entity type, legal structure, or state of organization or formation, or in Guarantor's relationship to Borrower or any other Guarantor.

   (c) Continuing and Unlimited Nature of Guaranty. The obligations of Guarantor under this Guaranty shall be continuing and shall cover any and all Liabilities existing as of the effective date of this Guaranty and any and all Liabilities thereafter incurred by Borrwer, including any and all Liabilities existing at the time of any termination of this Guaranty. This Guaranty shall be unlimited in amount and shall continue in effect until this Guaranty is terminated pursuant to Section 3.

   (d) Waivers by Guarantor. Guarantor hereby expressly waives: (i) notice of the acceptance by Lender of this Guaranty; (ii) notice of the existence, creation, or non-payment of all or any of the Liabilities; (iii) presentment, demand, notice of dishonor, protest, and all other notices whatsoever; (iv) diligence in collection or protection of, or realization upon any of the Liabilities, any obligation under this Guaranty, or any security for or guaranty of any of the foregoing; (v) impairment of any collateral securing the Liabilities; (vi) notice of any change in Borrower's credit terms or limits with Lender, including any temporary or permnant increases in Borrower's Credit Line (and Guarantor prospectively consents to any such change); (vii) any non-contractual duties of Lender to Borrower or any Guarantor; and (viii) the protections of any Laws intended to protect consumers or regulate consumer loans, as the Liabilities are commercial in nature.

   (e) Authorization. Guarantor authorizes Lender to obtain and share credit information relating to Guarantor from and with credit bureaus, financial institutions, trade creditors, affiliates, and others and to conduct such other credit investigations that Lender in its sole discretion deems necessary

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy by the designated custodian

Guarantor expressly authorizes Lender to obtain his or her consumer credit report from time to time at Lender's discretion, and expressly ratifies any such consumer credit report that may have been obtained by or on behalf of Lender prior to the effective date of this Guaranty. Guarantor also authorizes Lender to contact any third parties to disclose information for the purpose of, among other things, obtaining intercreditor agreements and perfecting Lender's security interest. Further, Guarantor authorizes Lender to periodically obtain additional credit information on Guarantor through any available medium.

(f) Communication. Guarantor hereby expressly authorizes Lender and its Affiliates to communicate with Guarantor via facsimile transmissions, email messages, telephonic transmissions, both to a residential telephone line and/or cell phone, including text messaging, using an automatic telephone dialing system or an artificial or prerecorded voice message, and/or any other forms of communication, for any purpose, including general business matters, account information, marketing materials, collection, and/or any other communication needs. Guarantor acknowledges and agrees that such express permission shall extend to any and all of the contact information that Guarantor has provided herein, including any physical and email addresses, phone numbers, fax numbers, etc., and to such other addresses, phone numbers, email addresses, online chat, social media platforms, etc. that Guarantor may provide to Lender or any of its Affiliates or that Lender or any of its Affiliates may obtain from any third party at a later date.

(g) Enforcement. In no event shall Lender have any obligation to proceed against Borrower, any other Guarantor or any other Person, or any security pledged in connection with the Liabilities, before seeking satisfaction from Guarantor. Lender may, at its option, proceed, prior or subsequent to, or simultaneously with, the enforcement of its rights hereunder, to exercise any right or remedy it may have against Borrower, any other Guarantor or other Person, or any security pledged in connection with the Liabilities. This Guaranty is in addition to, and not in substitution for, any other guaranty or other securites which Lender may now or hereafter hold.

(h) Reinstatement. Guarantor agrees that, if, at any time, all or any part of any payment theretofore applied by Lender to any of the Liabilities is or must be rescinded or returned by Lender for any reason whatsoever (including as a result of any insolvency, bankruptcy, or reorganization of Borrower or any of his or her Affiliates), such Liabilities shall, for purposes of this Guaranty, to the extent that such payment is or must be rescinded or returned, be deemed to have continued in existence, notwithstanding such application by Lender, and this Guaranty shall continue to be effective or reinstated, as applicable, as to all such Liabilities, all as though such application by Lender had not been made.

(i) Financial Statements. Upon Lender's request, Guarantor will provide Lender with Guarantor's audited financial statements, as certified by Guarantor's independent certified public accountant, and such other financial statements, information, and other materials as Lender may request from time to time.

(j) Application of Payments; Subrogation. Any amounts received by Lender from any source on account of the Liabilities may be applied by it toward the payment of such of the Liabilities, and in such order of application, as Lender may from time to time elect. Notwithstanding any payments made by or for the account of Guarantor, Guarantor shall not be subrogated to any rights of Lender.

3. TERMINATION.

(a) Payment of Liabilities and Termination of Credit Line. This Guaranty shall be terminated upon the occurrence of all of the following: (i) the payment by Borrower or any Guarantor, either jointly or severally, of all Liabilities outstanding; (ii) the payment of all obligations by Guarantor which may be due to Lender under this Guaranty; and (iii) the filing of a UCC termination statement as to Borrower by or on behalf of Lender, or other written verification from Lender that Borrower's Credit Line is terminated.

(b) Revocation of Guaranty. This Guaranty may be revoked by Guarantor upon written notice to Lender by certified mail, return receipt requested, to the address provided in Section 5(d). This Guaranty shall be deemed terminated upon the occurrence of a revocation in the manner provided in this Section 3(b). However, such revocation and termination shall in no way terminate or otherwise affect: (i) any obligations of Guarantor existing on or prior to the effective date of such revocation or termination; or (ii) any obligations of Guarantor arising after the effective date of such revocation or termination with respect to any Liabilities incurred by Borrower on or before the effective date of such revocation or termination.

4. EVENTS OF DEFAULT. The occurrence of any of the following events shall be considered an event of default under this Guaranty (each, an "Event of Default"):

(a) Guarantor fails to make full payment of any amount owed hereunder after notice from Lender;

(b) Guarantor fails to perform or observe any agreement, covenant, term, or condition contained in this Guaranty (other than any monetary obligation described in clause (a) above), and such failure continues for ten (10) days after notice from Lender;

(c) Guarantor makes an assignment for the benefit of creditors or fails to pay his or her debts as the same become due and payable;

(d) Guarantor petitions or applies to any tribunal for the appointment of a trustee or receiver of the business, estate, or assets or of any substantial portion of his or her business, estate, or assets, or commences any proceedings relating to Guarantor under any bankruptcy, reorganization, insolvency, readjustment of debt, dissolution, or liquidation Law of any jurisdiction, whether now or hereafter in effect (each, a "Bankruptcy Filing");

(e) any Bankruptcy Filing is filed or any related proceedings commenced against Guarantor, and Guarantor by any act indicates his or her approval thereof, consent thereto, or acquiescence therein, or any order is entered appointing any trustee or receiver, declaring Guarantor bankrupt or insolvent, or approving or accepting the Bankruptcy Filing in any such proceedings;

COPY VIEW

DocuSign Envelope ID: FAE10158-F40A-48C0-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

(f) any suit or proceeding is filed or any related proceedings commenced against Guarantor or any of his or her Affiliates, which, if adversely determined, could substantially impair the ability of Guarantor or Borrower to perform any of their respective obligations with respect to this Guaranty or any of the Liabilities, in each case as determined by Lender in its sole and absolute discretion; or

(g) there is any Event of Default by Guarantor under the Note.

If an Event of Default under this Guaranty shall have occurred, in addition to pursuing any remedies which may be available to Lender with respect to the Liabilities, Lender, at its option, may take whatever action at law or in equity Lender may deem necessary, regardless of whether Lender shall have exercised any of its rights or remedies with respect to any of the Liabilities, and Lender may demand, at its option, that Guarantor pay forthwith the full amount which would be due and payable hereunder as if all Liabilities were then due and payable.

5. GENERAL.

(a) Assignment; Successors and Assigns. This Guaranty may be assigned by Lender without notice to Guarantor, but Guarantor may not assign this Guaranty without the prior written consent of Lender. The guaranty and the other agreements contained herein shall bind the legal representatives, heirs, successors, and assigns of Guarantor, and shall inure to the benefit of Lender and its successors and assigns. Each reference to Guarantor herein shall be deemed to include the legal representatives, heirs, and agents of Guarantor, and their respective successors and assigns.

(b) Amendment; Merger. This Guaranty is intended by the Parties to be an amendment to and restatement of any prior Individual Guaranty or other similar document or instrument between Lender (or any predecessor of Lender, including Dealer Services Corporation and/or Manheim Automotive Financial Services, Inc.) and Guarantor, or otherwise executed by Guarantor for the benefit Lender (or any predecessor of Lender, including Dealer Services Corporation and/or Manheim Automotive Financial Services, Inc.). This Guaranty may be modified or amended only upon the written consent of Lender and Guarantor. The Parties acknowledge that Guarantor may have also acknowledged and consented to the terms and conditions set forth in the Note, and, in such event, this Guaranty shall be deemed supplemental and in addition to the terms and conditions of the Note to which Guarantor has acknowledged and consented. In the event of any conflict between a term or provision set forth in this Guaranty, and a term or provision set forth in the Note, the term or provision set forth in this Guaranty shall, as between Lender and Guarantor, be deemed controlling.

(c) Execution. Guarantor may execute this Guaranty only by original signature of Guarantor, unless otherwise authorized by Lender. Lender may, in its sole discretion, permit Guarantor to execute this Guaranty by affixing to this Guaranty an electronic or digital signature. Guarantor acknowledges and agrees that any electronic or digital signature of Guarantor shall for all purposes be deemed effective and constitute the valid signature of Guarantor, and shall be deemed to satisfy all requirements imposed on electronic or digital signatures under the UCC, the Electronic Signatures in Global and National Commerce Act (the "E-Sign Act"), and any other similar Laws relating to the validity or enforceability of electronic or digital signatures (including, without limitation, any enactment of the Uniform Electronic Transactions Act (UETA)), and such electronic or digital signature shall not be denied legal effect, validity, or enforceability solely because it is in electronic or digital form. A facsimile or photocopied reproduction of the signatures on this Guaranty shall be deemed original signatures for all intents and purposes.

(d) Notices. All notices, demands and requests required or permitted to be given under this Guaranty shall be (i) in writing, (ii) delivered by personal delivery or sent by commercial delivery service or certified mail, return receipt requested (except with respect to notices pursuant to Section 3(b), which notices may only be given by certified mail, return receipt requested), (iii) deemed to have been given on the date of personal delivery or the date set forth in the records of the delivery service or on the return receipt, and (iv) addressed as follows (or, in the case of Lender, to any other subsequent address that Lender may provide to Guarantor (through written notice or otherwise) for purposes of directing future notices, demands or requests):

If to Lender: NextGear Capital, Inc., 11799 North College Avenue, Carmel, IN 46032
Telephone: (317) 571-3721

with a copy to:

NextGear Capital, Inc., 11799 North College Avenue, Carmel, IN 46032
Telephone: (317) 571-3721
Attention: Legal Department

If to Guarantor: James Michael C Blackburn, 1500 Cordova Rd #206, Fort Lauderdale, FL 33316
Telephone: 954-232-7661

(e) No Waiver. No failure or delay by Lender in exercising any right, power, or privilege or the granting of an exception by Lender with respect to any term or condition of this Guaranty will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege, or the exercise of any other right, power, or privilege by Lender.

(f) Severability. Any provision of this Guaranty that is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability, without rendering invalid or unenforceable the remaining provisions of this Guaranty or affecting the validity or enforceability of any provision of this Guaranty in any other jurisdiction.

(g) Governing Law. Except with respect to the interpretation or enforcement of the arbitration and other provisions set forth in Section 5(i) (which shall be governed by the Federal Arbitration Act), the validity, enforceability, and interpretation of this Guaranty shall be governed by the internal Laws of the State of Indiana, without regard to conflicts of Laws provisions thereof

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy by the designated custodian

(h) Jurisdiction and Venue. As evidenced by Guarantor's signature below, subject to the provisions in Section 5(i), Guarantor submits to the personal jurisdiction and venue of the state and federal courts of Marion County and Hamilton County, Indiana, and agrees that any and all claims or disputes pertaining to this Guaranty, or to any matter arising out of or related to this Guaranty, which are initiated by Guarantor against Lender, to the extent, if any, that such claims or disputes are not subject to the provisions noted in Section 5(i), shall be brought in the state or federal courts of Marion County or Hamilton County, Indiana. Further, Guarantor expressly consents to the jurisdiction and venue of the state and federal courts of Marion County and Hamilton County, Indiana, as to any legal or equitable action that may be brought in such court by Lender, and waives any objection based upon lack of personal jurisdiction, improper venue or forum non conveniens with respect to any such action. Guarantor acknowledges and agrees that Lender reserves the right to initiate and prosecute any action against Guarantor in any court of competent jurisdiction, and Guarantor consents to such forum as Lender may elect.

(i) Mandatory Binding Arbitration; Waiver of Class Action Rights.

(i) In the unlikely event that Lender is unable to resolve a dispute or claim that Guarantor may have, Guarantor agrees to arbitrate any such dispute or claim in accordance with this Section 5(i). This agreement to arbitrate is intended to be broadly interpreted, and includes (i) all disputes, claims and counterclaims arising out of or relating to this Guaranty or any aspect of Guarantor's past, present or future relationship with Lender, whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory; (ii) all disputes, claims and counterclaims that may have arisen before this Guaranty or any prior contract or agreement between Guarantor and Lender; and (iii) any disputes, claims and counterclaims that may arise after the termination of this Guaranty. Additionally, Guarantor acknowledges that Lender may (BUT SHALL IN NO EVENT BE REQUIRED TO) arbitrate any dispute or claim that it may have against Guarantor, with any such arbitration being governed by the provisions of this Section 5(i). BY AGREEING TO ARBITRATION, GUARANTOR UNDERSTANDS AND AGREES THAT IT IS WAIVING ITS RIGHTS TO MAINTAIN OTHER AVAILABLE RESOLUTION PROCESSES, SUCH AS COURT ACTION (INCLUDING A JURY TRIAL) OR ADMINISTRATIVE PROCEEDING, IN ORDER TO SETTLE OR RESOLVE DISPUTES OR ANY CLAIMS AGAINST LENDER. ARBITRATION IS DIFFERENT THAN A COURT ACTION, AND THE RULES IN ARBITRATION ARE DIFFERENT THAN THE RULES THAT APPLY IN COURT. THERE IS NO JUDGE OR JURY IN ARBITRATION, AND REVIEW IS LIMITED, BUT AN ARBITRATOR CAN AWARD THE SAME DAMAGES AND RELIEF AS A COURT, SUBJECT TO THE AGREED TERMS AND LIMITATIONS IN THIS NOTE. Guarantor, at his or her election, may opt-out of the arbitration provisions set forth in Sections 5(i)(i), 5(i)(iii) and 5(i)(iv) by providing written notice of his or her election to opt-out no later than thirty (30) days after Guarantor's execution of this Guaranty, which notice shall be provided to Lender pursuant to Section 5(d) ("Opt-Out Notice"), provided that such Opt-Out Notice shall become effective only upon Guarantor's receipt of written confirmation from Lender that such Opt-Out Notice has been received by Lender within the required time period. Guarantor acknowledges and agrees that, irrespective of any Opt-Out Notice or any written confirmation thereof, Guarantor shall in all events be subject to the provisions of Section 5(i)(ii).

(ii) ANY ARBITRATION OR OTHER LEGAL PROCEEDING OF ANY TYPE OR NATURE UNDER OR RELATING TO THIS GUARANTY OR TO ANY ASPECT OF GUARANTOR'S PAST, PRESENT OR FUTURE RELATIONSHIP OR ACTIVITIES WITH OR INVOLVING LENDER (INCLUDING ANY MARKETING ACTIVITIES OR SOLICITATIONS BY OR ON BEHALF OF LENDER), WILL TAKE PLACE ON AN INDIVIDUAL BASIS. CLASS ARBITRATIONS AND CLASS ACTIONS OF ANY KIND (WHETHER PURSUED THROUGH ARBITRATION OR THROUGH THE COURTS) ARE NOT PERMITTED. GUARANTOR AGREES THAT IT MAY BRING CLAIMS AGAINST LENDER ONLY IN HIS OR HER INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. GUARANTOR AGREES THAT, BY ENTERING INTO THIS GUARANTY, GUARANTOR IS WAIVING HIS OR HER RIGHT TO PARTICIPATE IN ANY CLASS ACTION OR OTHER SIMILAR REPRESENTATIVE PROCEEDING. UNLESS CONSENTED TO IN WRITING BY LENDER, THE ARBITRATOR MAY NOT CONSOLIDATE MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING. GUARANTOR ACKNOWLEDGES AND AGREES THAT THE SIZE OF BORROWER'S CREDIT LINE, THE INTEREST RATE TO WHICH ADVANCES ARE SUBJECT AND CERTAIN FEES CHARGED TO BORROWER, AS WELL AS THE SIZE AND DATES OF SPECIFIC ADVANCES AND WHAT (IF ANY) GUARANTIES ARE REQUIRED, ARE UNIQUE TO AND NEGOTIATED BY BORROWER (AND, IF APPLICABLE, GUARANTOR), AND THAT SUCH FACTORS WILL AND DO VARY AMONG BORROWERS AND OTHER GUARANTORS.

(iii) Any dispute or claim subject to arbitration pursuant to this Section 5(i) shall be submitted to binding arbitration administered by the Judicial Arbitration and Mediation Service ("JAMS") pursuant to its Comprehensive Arbitration Rules and Procedures as then in effect (the "JAMS Comprehensive Rules"); provided, however, that any dispute or claim that is subject to arbitration pursuant to this Section 5(i) and that involves disputes or claims where the aggregate amount reasonably in dispute or controversy is less than $100,000, shall be submitted to binding arbitration administered by JAMS pursuant to its Streamlined Arbitration Rules and Procedures as in effect as of the effective date of this Guaranty (the "JAMS Streamlined Rules"). The disputes and claims subject to arbitration pursuant to this Section 5(i) will be resolved by a single arbitrator selected pursuant to the JAMS Comprehensive Rules or the JAMS Streamlined Rules, as the case may be. The arbitrator shall be bound by and shall strictly enforce the terms of this Guaranty and may not limit, expand or otherwise modify any term or provision of this Guaranty or any other contract or document between Guarantor and Lender. The arbitrator shall not have the power to award to Guarantor any damages that are excluded or that have been waived by Guarantor under this Guaranty, and Guarantor irrevocably waives any claim that it may have thereto. The arbitrator shall not have the power to order pre-hearing discovery of documents or the taking of depositions. The arbitrator shall render a written decision within six (6) months after being selected. Any arbitration will be held in Indianapolis, Indiana (or its greater metro area). Each Party will bear its own expenses in the arbitration and will share equally the costs of the arbitration; provided, however, that the arbitrator may, in his or her discretion, award costs and fees to the prevailing Party. The result of any arbitration shall be final and binding upon the Parties. Judgment upon any arbitration award may be entered in any court having jurisdiction over the award or over the applicable party or its assets.

DocuSign Envelope ID: FAE10158 F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h by the designated custodian

(iv) This Guaranty evidences transactions in interstate commerce, and thus the Federal Arbitration Act governs the interpretation and enforcement of this Section 5(i), notwithstanding the provisions of Section 5(g).

(j) WAIVER OF JURY TRIAL. AFTER CONSULTING OR HAVING HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL, LENDER AND GUARANTOR KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVE ANY RIGHT EITHER PARTY MAY HAVE TO A TRIAL BY JURY IN ANY LITIGATION BASED UPON OR ARISING OUT OF THIS GUARANTY, OR ANY OF THE TRANSACTIONS CONTEMPLATED BY THIS GUARANTY, OR ANY COURSE OF CONDUCT, STATEMENT, WHETHER ORAL OR WRITTEN, OR ACTIONS OF LENDER OR GUARANTOR. NEITHER LENDER NOR GUARANTOR SHALL SEEK TO CONSOLIDATE, BY COUNTERCLAIM OR OTHERWISE, ANY ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED. THESE PROVISIONS SHALL NOT HAVE BEEN DEEMED TO HAVE BEEN MODIFIED IN ANY RESPECT OR RELINQUISHED BY LENDER OR GUARANTOR EXCEPT BY WRITTEN INSTRUMENT EXECUTED BY BOTH LENDER AND GUARANTOR.

(k) LIMITATION OF LIABILITY. IN NO EVENT SHALL ANY LENDER PARTY BE LIABLE FOR ANY SPECIAL, INDIRECT, EXEMPLARY, PUNITIVE, INCIDENTAL, MULTIPLE OR CONSEQUENTIAL DAMAGES (INCLUDING ANY DAMAGES RESULTING FROM LOSS OF USE, LOSS OF PROFITS, LOSS OF BUSINESS OR OTHER ECONOMIC LOSS) ARISING OUT OF OR IN CONNECTION WITH THIS GUARANTY, EVEN IF SUCH LENDER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. FURTHER, IN NO EVENT SHALL THE LENDER PARTIES, COLLECTIVELY, BE LIABLE FOR ANY DAMAGES UNDER THIS GUARANTY OR ANY OTHER LOAN DOCUMENT THAT EXCEED, IN THE AGGREGATE, AN AMOUNT EQUAL TO THE SUM OF THE INTEREST AND FLOORPLAN FEES ACTUALLY PAID TO LENDER BY BORROWER UNDER THE NOTE DURING THE TWELVE (12) MONTH PERIOD IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO THE CLAIM AT ISSUE (OR, IN THE CASE OF MULTIPLE EVENTS, THE FIRST SUCH EVENT GIVING RISE TO THE CLAIM AT ISSUE).

(l) Descriptive Headings; Interpretation. The descriptive headings herein are for convenience of reference only and shall not control or affect the meaning or construction of any provision of this Guaranty. As used in this Guaranty, the terms "include," "includes," and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of like import.

WHEREFORE, Guarantor has executed this Guaranty on the date set forth below.

GUARANTOR:

DocuSigned by:
James Michael C Blackburn
C4E3919CB8D84D1...

By:
Name: James Michael C Blackburn
Date: 3/26/2019 | 4:42:48 PM EDT

COPY VIEW

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy by the designated custodian

# INDIVIDUAL GUARANTY

THIS INDIVIDUAL GUARANTY (this "Guaranty") is made and entered into by the undersigned guarantor ("Guarantor") in favor of NextGear Capital, Inc. ("Lender") and it Affiliates, pursuant to that certain Demand Promissory Note and Loan and Security Agreement by and between Borrower (as defined below) and Lender (the "Note").

NOW, THEREFORE, in consideration of any loan or other financial accommodation heretofore or hereafter at any time made or granted to Borrower by Lender, and the mutual covenants, agreements, and conditions contained herein, Guarantor agrees as follows:

1. DEFINITIONS. Capitalized terms used herein and not defined in this Section 1 or elsewhere in this Guaranty shall have the respective meanings as set forth in the Note (such meanings to be equally applicable to both the singular and plural forms of the terms defined). Any capitalized terms used herein, but not otherwise defined herein or in the Note, as the case may be, shall have the meanings ascribed to them in the UCC.

   (a) "Borrower" shall mean the Person listed below, including any Affiliates of such Person, whether now in existence or hereinafter established or acquired:

      Premier Group Autos LLC DBA Overfinch Miami, 11 SW 12th Ave Ste 103 Bldg 59, Dania Beach, FL 33004-3527
      Telephone: (954) 440-0717

   (b) "Liabilities" shall mean any and all Advances, debts, financial obligations, fees, charges, expenses, attorneys' fees and costs of collection owing, arising, due, or payable from Borrower to Lender or any of its Affiliates, of any kind or nature, present or future, under any instrument, guaranty, or other document, whether arising under the Note or any other Loan Document, whether directly or indirectly, absolute or contingent, primary or secondary, due or to become due, now existing or hereafter arising, and however acquired.

2. GUARANTY AND OTHER AGREEMENTS.

   (a) Guaranty Obligations. Guarantor hereby voluntarily, unconditionally, and absolutely guarantees (i) the full and prompt payment when due, whether by acceleration or otherwise, and at all times hereafter, of all Liabilities; and (ii) the full and prompt performance of all the terms, covenants, conditions, and agreements related to the Liabilities. Guarantor further agrees to pay all expenses, including attorneys' fees and court costs (including, in each case, those relating to bankruptcy and appeals), paid or incurred by Lender or its Affiliates in endeavoring to collect on any Liabilities, and in enforcing this Guaranty or in defending any claims by Borrower or any Guarantor related to any of the Liabilities, plus interest on such amounts at the lesser of (A) thirteen percent (13%) per annum, compounded daily, or (B) the maximum rate permitted by Law. Interest on such amounts paid or incurred by Lender shall be computed from the date of payment made by Lender and shall be payable on demand.

   (b) General Nature of Guaranty. Guarantor acknowledges that this Guaranty is a guaranty of payment and not of collection, and that his or her obligations hereunder shall be absolute, unconditional, and unaffected by: (i) the waiver of the performance or observance by Borrower or any Guarantor of any agreement, covenant, term, or condition to be performed or observed by Borrower or any such Guarantor, as the case may be; (ii) the extension of time for the payment of any sums owing or payable with respect to any of the Liabilities or the time for performance of any other obligation arising out of or relating to any of the Liabilities; (iii) the modification, alteration, or amendment of any obligation arising out of or relating to any of the Liabilities; (iv) any failure, delay, or omission by Lender to enforce, assert, or exercise any right, power, or remedy in connection with any of the Liabilities; (v) the genuineness, validity, or enforceability of any of the Liabilities or any document related thereto; (vi) the existence, value, or condition of, or failure of Lender or any of its Affiliates to perfect its lien against, any security pledged in connection with the Liabilities; (vii) the release of any security pledged in connection with the Liabilities, or the release, modification, waiver, or failure to enforce any other guaranty, pledge, or security agreement; (viii) the voluntary or involuntary liquidation, dissolution, sale of all or substantially all of the property, marshalling of assets and liabilities, receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization, arrangement, composition, or readjustment or other similar application or proceeding affecting Borrower or any assets of Borrower; (ix) the release or discharge of Borrower or any other Guarantor from the performance or observance of any agreements, covenants, terms, or conditions in connection with any of the Liabilities, by operation of Law or otherwise; (x) the default of Borrower in any obligations to Guarantor or any torts committed by Borrower against Guarantor, even if Lender is alleged to be complicit or to have committed a direct tort against Guarantor; or (xi) any change in Borrower's ownership, entity type, legal structure, or state of organization or formation, or in Guarantor's relationship to Borrower or any other Guarantor.

   (c) Continuing and Unlimited Nature of Guaranty. The obligations of Guarantor under this Guaranty shall be continuing and shall cover any and all Liabilities existing as of the effective date of this Guaranty and any and all Liabilities thereafter incurred by Borrwer, including any and all Liabilities existing at the time of any termination of this Guaranty. This Guaranty shall be unlimited in amount and shall continue in effect until this Guaranty is terminated pursuant to Section 3.

   (d) Waivers by Guarantor. Guarantor hereby expressly waives: (i) notice of the acceptance by Lender of this Guaranty; (ii) notice of the existence, creation, or non-payment of all or any of the Liabilities; (iii) presentment, demand, notice of dishonor, protest, and all other notices whatsoever; (iv) diligence in collection or protection of, or realization upon any of the Liabilities, any obligation under this Guaranty, or any security for or guaranty of any of the foregoing; (v) impairment of any collateral securing the Liabilities; (vi) notice of any change in Borrower's credit terms or limits with Lender, including any temporary or permnant increases in Borrower's Credit Line (and Guarantor prospectively consents to any such change); (vii) any non-contractual duties of Lender to Borrower or any Guarantor; and (viii) the protections of any Laws intended to protect consumers or regulate consumer loans, as the Liabilities are commercial in nature.

   (e) Authorization. Guarantor authorizes Lender to obtain and share credit information relating to Guarantor from and with credit bureaus, financial institutions, trade creditors, affiliates, and others and to conduct such other credit investigations that Lender in its sole discretion deems necessary.

DocuSign Envelope ID: FAE10158 F46A 48C6 BEB2 FB526DFFF676
THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

Guarantor expressly authorizes Lender to obtain his or her consumer credit report from time to time at Lender's discretion, and expressly ratifies any such consumer credit report that may have been obtained by or on behalf of Lender prior to the effective date of this Guaranty. Guarantor also authorizes Lender to contact any third parties to disclose information for the purpose of, among other things, obtaining intercreditor agreements and perfecting Lender's security interest. Further, Guarantor authorizes Lender to periodically obtain additional credit information on Guarantor through any available medium.

(f) Communication. Guarantor hereby expressly authorizes Lender and its Affiliates to communicate with Guarantor via facsimile transmissions, email messages, telephonic transmissions, both to a residential telephone line and/or cell phone, including text messaging, using an automatic telephone dialing system or an artificial or prerecorded voice message, and/or any other forms of communication, for any purpose, including general business matters, account information, marketing materials, collection, and/or any other communication needs. Guarantor acknowledges and agrees that such express permission shall extend to any and all of the contact information that Guarantor has provided herein, including any physical and email addresses, phone numbers, fax numbers, etc., and to such other addresses, phone numbers, email addresses, online chat, social media platforms, etc. that Guarantor may provide to Lender or any of its Affiliates or that Lender or any of its Affiliates may obtain from any third party at a later date.

(g) Enforcement. In no event shall Lender have any obligation to proceed against Borrower, any other Guarantor or any other Person, or any security pledged in connection with the Liabilities, before seeking satisfaction from Guarantor. Lender may, at its option, proceed, prior or subsequent to, or simultaneously with, the enforcement of its rights hereunder, to exercise any right or remedy it may have against Borrower, any other Guarantor or other Person, or any security pledged in connection with the Liabilities. This Guaranty is in addition to, and not in substitution for, any other guaranty or other securites which Lender may now or hereafter hold.

(h) Reinstatement. Guarantor agrees that, if, at any time, all or any part of any payment theretofore applied by Lender to any of the Liabilities is or must be rescinded or returned by Lender for any reason whatsoever (including as a result of any insolvency, bankruptcy, or reorganization of Borrower or any of his or her Affiliates), such Liabilities shall, for purposes of this Guaranty, to the extent that such payment is or must be rescinded or returned, be deemed to have continued in existence, notwithstanding such application by Lender, and this Guaranty shall continue to be effective or reinstated, as applicable, as to all such Liabilities, all as though such application by Lender had not been made.

(i) Financial Statements. Upon Lender's request, Guarantor will provide Lender with Guarantor's audited financial statements, as certified by Guarantor's independent certified public accountant, and such other financial statements, information, and other materials as Lender may request from time to time.

(j) Application of Payments; Subrogation. Any amounts received by Lender from any source on account of the Liabilities may be applied by it toward the payment of such of the Liabilities, and in such order of application, as Lender may from time to time elect. Notwithstanding any payments made by or for the account of Guarantor, Guarantor shall not be subrogated to any rights of Lender.

3. TERMINATION.

(a) Payment of Liabilities and Termination of Credit Line. This Guaranty shall be terminated upon the occurrence of all of the following: (i) the payment by Borrower or any Guarantor, either jointly or severally, of all Liabilities outstanding; (ii) the payment of all obligations by Guarantor which may be due to Lender under this Guaranty; and (iii) the filing of a UCC termination statement as to Borrower by or on behalf of Lender, or other written verification from Lender that Borrower's Credit Line is terminated.

(b) Revocation of Guaranty. This Guaranty may be revoked by Guarantor upon written notice to Lender by certified mail, return receipt requested, to the address provided in Section 5(d). This Guaranty shall be deemed terminated upon the occurrence of a revocation in the manner provided in this Section 3(b). However, such revocation and termination shall in no way terminate or otherwise affect: (i) any obligations of Guarantor existing on or prior to the effective date of such revocation or termination; or (ii) any obligations of Guarantor arising after the effective date of such revocation or termination with respect to any Liabilities incurred by Borrower on or before the effective date of such revocation or termination.

4. EVENTS OF DEFAULT. The occurrence of any of the following events shall be considered an event of default under this Guaranty (each, an "Event of Default"):

(a) Guarantor fails to make full payment of any amount owed hereunder after notice from Lender;

(b) Guarantor fails to perform or observe any agreement, covenant, term, or condition contained in this Guaranty (other than any monetary obligation described in clause (a) above), and such failure continues for ten (10) days after notice from Lender;

(c) Guarantor makes an assignment for the benefit of creditors or fails to pay his or her debts as the same become due and payable;

(d) Guarantor petitions or applies to any tribunal for the appointment of a trustee or receiver of the business, estate, or assets or of any substantial portion of his or her business, estate, or assets, or commences any proceedings relating to Guarantor under any bankruptcy, reorganization, insolvency, readjustment of debt, dissolution, or liquidation Law of any jurisdiction, whether now or hereafter in effect (each, a "Bankruptcy Filing");

(e) any Bankruptcy Filing is filed or any related proceedings commenced against Guarantor, and Guarantor by any act indicates his or her approval thereof, consent thereto, or acquiescence therein, or any order is entered appointing any trustee or receiver, declaring Guarantor bankrupt or insolvent, or approving or accepting the Bankruptcy Filing in any such proceedings;

COPY VIEW

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy h by the designated custodian

(f) any suit or proceeding is filed or any related proceedings commenced against Guarantor or any of his or her Affiliates, which, if adversely determined, could substantially impair the ability of Guarantor or Borrower to perform any of their respective obligations with respect to this Guaranty or any of the Liabilities, in each case as determined by Lender in its sole and absolute discretion; or

(g) there is any Event of Default by Guarantor under the Note

If an Event of Default under this Guaranty shall have occurred, in addition to pursuing any remedies which may be available to Lender with respect to the Liabilities, Lender, at its option, may take whatever action at law or in equity Lender may deem necessary, regardless of whether Lender shall have exercised any of its rights or remedies with respect to any of the Liabilities, and Lender may demand, at its option, that Guarantor pay forthwith the full amount which would be due and payable hereunder as if all Liabilities were then due and payable.

5. GENERAL.

(a) Assignment; Successors and Assigns. This Guaranty may be assigned by Lender without notice to Guarantor, but Guarantor may not assign this Guaranty without the prior written consent of Lender. The guaranty and the other agreements contained herein shall bind the legal representatives, heirs, successors, and assigns of Guarantor, and shall inure to the benefit of Lender and its successors and assigns. Each reference to Guarantor herein shall be deemed to include the legal representatives, heirs, and agents of Guarantor, and their respective successors and assigns.

(b) Amendment; Merger. This Guaranty is intended by the Parties to be an amendment to and restatement of any prior Individual Guaranty or other similar document or instrument between Lender (or any predecessor of Lender, including Dealer Services Corporation and/or Manheim Automotive Financial Services, Inc.) and Guarantor, or otherwise executed by Guarantor for the benefit Lender (or any predecessor of Lender, including Dealer Services Corporation and/or Manheim Automotive Financial Services, Inc.). This Guaranty may be modified or amended only upon the written consent of Lender and Guarantor. The Parties acknowledge that Guarantor may have also acknowledged and consented to the terms and conditions set forth in the Note, and, in such event, this Guaranty shall be deemed supplemental and in addition to the terms and conditions of the Note to which Guarantor has acknowledged and consented. In the event of any conflict between a term or provision set forth in this Guaranty, and a term or provision set forth in the Note, the term or provision set forth in this Guaranty shall, as between Lender and Guarantor, be deemed controlling.

(c) Execution. Guarantor may execute this Guaranty only by original signature of Guarantor, unless otherwise authorized by Lender. Lender may, in its sole discretion, permit Guarantor to execute this Guaranty by affixing to this Guaranty an electronic or digital signature. Guarantor acknowledges and agrees that any electronic or digital signature of Guarantor shall for all purposes be deemed effective and constitute the valid signature of Guarantor, and shall be deemed to satisfy all requirements imposed on electronic or digital signatures under the UCC, the Electronic Signatures in Global and National Commerce Act (the "E-Sign Act"), and any other similar Laws relating to the validity or enforceability of electronic or digital signatures (including, without limitation, any enactment of the Uniform Electronic Transactions Act (UETA)), and such electronic or digital signature shall not be denied legal effect, validity, or enforceability solely because it is in electronic or digital form. A facsimile or photocopied reproduction of the signatures on this Guaranty shall be deemed original signatures for all intents and purposes.

(d) Notices. All notices, demands and requests required or permitted to be given under this Guaranty shall be (i) in writing, (ii) delivered by personal delivery or sent by commercial delivery service or certified mail, return receipt requested (except with respect to notices pursuant to Section 3(b), which notices may only be given by certified mail, return receipt requested), (iii) deemed to have been given on the date of personal delivery or the date set forth in the records of the delivery service or on the return receipt, and (iv) addressed as follows (or, in the case of Lender, to any other subsequent address that Lender may provide to Guarantor (through written notice or otherwise) for purposes of directing future notices, demands or requests):

If to Lender: NextGear Capital, Inc., 11799 North College Avenue, Carmel, IN 46032
Telephone: (317) 571-3721

with a copy to:

NextGear Capital, Inc., 11799 North College Avenue, Carmel, IN 46032
Telephone: (317) 571-3721
Attention: Legal Department

If to Guarantor: Edward Anthony Kessler, 1500 Cordova Rd #206, Fort Lauderdale, FL 33316
Telephone: 412-527-8695

(e) No Waiver. No failure or delay by Lender in exercising any right, power, or privilege or the granting of an exception by Lender with respect to any term or condition of this Guaranty will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege, or the exercise of any other right, power, or privilege by Lender.

(f) Severability. Any provision of this Guaranty that is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability, without rendering invalid or unenforceable the remaining provisions of this Guaranty or affecting the validity or enforceability of any provision of this Guaranty in any other jurisdiction.

(g) Governing Law. Except with respect to the interpretation or enforcement of the arbitration and other provisions set forth in Section 5(i) (which shall be governed by the Federal Arbitration Act), the validity, enforceability, and interpretation of this Guaranty shall be governed by the internal Laws of the State of Indiana, without regard to conflicts of Laws provisions thereof.

DocuSign Envelope ID: FAE10158 F46A 48C6 BEB2 FB526DFFF076

THIS IS A COPY
This is a copy view of the Authoritative Copy h
by the designated custodian

(h) Jurisdiction and Venue. As evidenced by Guarantor's signature below, subject to the provisions in Section 5(i), Guarantor submits to the personal jurisdiction and venue of the state and federal courts of Marion County and Hamilton County, Indiana, and agrees that any and all claims or disputes pertaining to this Guaranty, or to any matter arising out of or related to this Guaranty, which are initiated by Guarantor against Lender, to the extent, if any, that such claims or disputes are not subject to the provisions noted in Section 5(i), shall be brought in the state or federal courts of Marion County or Hamilton County, Indiana. Further, Guarantor expressly consents to the jurisdiction and venue of the state and federal courts of Marion County and Hamilton County, Indiana, as to any legal or equitable action that may be brought in such court by Lender, and waives any objection based upon lack of personal jurisdiction, improper venue or forum non conveniens with respect to any such action. Guarantor acknowledges and agrees that Lender reserves the right to initiate and prosecute any action against Guarantor in any court of competent jurisdiction, and Guarantor consents to such forum as Lender may elect.

(i) Mandatory Binding Arbitration; Waiver of Class Action Rights.

(i) In the unlikely event that Lender is unable to resolve a dispute or claim that Guarantor may have, Guarantor agrees to arbitrate any such dispute or claim in accordance with this Section 5(i). This agreement to arbitrate is intended to be broadly interpreted, and includes (i) all disputes, claims and counterclaims arising out of or relating to this Guaranty or any aspect of Guarantor's past, present or future relationship with Lender, whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory; (ii) all disputes, claims and counterclaims that may have arisen before this Guaranty or any prior contract or agreement between Guarantor and Lender; and (iii) any disputes, claims and counterclaims that may arise after the termination of this Guaranty. Additionally, Guarantor acknowledges that Lender may (BUT SHALL IN NO EVENT BE REQUIRED TO) arbitrate any dispute or claim that it may have against Guarantor, with any such arbitration being governed by the provisions of this Section 5(i). BY AGREEING TO ARBITRATION, GUARANTOR UNDERSTANDS AND AGREES THAT IT IS WAIVING ITS RIGHTS TO MAINTAIN OTHER AVAILABLE RESOLUTION PROCESSES, SUCH AS COURT ACTION (INCLUDING A JURY TRIAL) OR ADMINISTRATIVE PROCEEDING, IN ORDER TO SETTLE OR RESOLVE DISPUTES OR ANY CLAIMS AGAINST LENDER. ARBITRATION IS DIFFERENT THAN A COURT ACTION, AND THE RULES IN ARBITRATION ARE DIFFERENT THAN THE RULES THAT APPLY IN COURT. THERE IS NO JUDGE OR JURY IN ARBITRATION, AND REVIEW IS LIMITED, BUT AN ARBITRATOR CAN AWARD THE SAME DAMAGES AND RELIEF AS A COURT, SUBJECT TO THE AGREED TERMS AND LIMITATIONS IN THIS NOTE. Guarantor, at his or her election, may opt-out of the arbitration provisions set forth in Sections 5(i)(i), 5(i)(iii) and 5(i)(iv) by providing written notice of his or her election to opt-out no later than thirty (30) days after Guarantor's execution of this Guaranty, which notice shall be provided to Lender pursuant to Section 5(d) ("Opt-Out Notice"), provided that such Opt-Out Notice shall become effective only upon Guarantor's receipt of written confirmation from Lender that such Opt-Out Notice has been received by Lender within the required time period. Guarantor acknowledges and agrees that, irrespective of any Opt-Out Notice or any written confirmation thereof, Guarantor shall in all events be subject to the provisions of Section 5(i)(ii).

(ii) ANY ARBITRATION OR OTHER LEGAL PROCEEDING OF ANY TYPE OR NATURE UNDER OR RELATING TO THIS GUARANTY OR TO ANY ASPECT OF GUARANTOR'S PAST, PRESENT OR FUTURE RELATIONSHIP OR ACTIVITIES WITH OR INVOLVING LENDER (INCLUDING ANY MARKETING ACTIVITIES OR SOLICITATIONS BY OR ON BEHALF OF LENDER), WILL TAKE PLACE ON AN INDIVIDUAL BASIS. CLASS ARBITRATIONS AND CLASS ACTIONS OF ANY KIND (WHETHER PURSUED THROUGH ARBITRATION OR THROUGH THE COURTS) ARE NOT PERMITTED. GUARANTOR AGREES THAT IT MAY BRING CLAIMS AGAINST LENDER ONLY IN HIS OR HER INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. GUARANTOR AGREES THAT, BY ENTERING INTO THIS GUARANTY, GUARANTOR IS WAIVING HIS OR HER RIGHT TO PARTICIPATE IN ANY CLASS ACTION OR OTHER SIMILAR REPRESENTATIVE PROCEEDING. UNLESS CONSENTED TO IN WRITING BY LENDER, THE ARBITRATOR MAY NOT CONSOLIDATE MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING. GUARANTOR ACKNOWLEDGES AND AGREES THAT THE SIZE OF BORROWER'S CREDIT LINE, THE INTEREST RATE TO WHICH ADVANCES ARE SUBJECT AND CERTAIN FEES CHARGED TO BORROWER, AS WELL AS THE SIZE AND DATES OF SPECIFIC ADVANCES AND WHAT (IF ANY) GUARANTIES ARE REQUIRED, ARE UNIQUE TO AND NEGOTIATED BY BORROWER (AND, IF APPLICABLE, GUARANTOR), AND THAT SUCH FACTORS WILL AND DO VARY AMONG BORROWERS AND OTHER GUARANTORS.

(iii) Any dispute or claim subject to arbitration pursuant to this Section 5(i) shall be submitted to binding arbitration administered by the Judicial Arbitration and Mediation Service ("JAMS") pursuant to its Comprehensive Arbitration Rules and Procedures as then in effect (the "JAMS Comprehensive Rules"); provided, however, that any dispute or claim that is subject to arbitration pursuant to this Section 5(i) and that involves disputes or claims where the aggregate amount reasonably in dispute or controversy is less than $100,000, shall be submitted to binding arbitration administered by JAMS pursuant to its Streamlined Arbitration Rules and Procedures as in effect as of the effective date of this Guaranty (the "JAMS Streamlined Rules"). The disputes and claims subject to arbitration pursuant to this Section 5(i) will be resolved by a single arbitrator selected pursuant to the JAMS Comprehensive Rules or the JAMS Streamlined Rules, as the case may be. The arbitrator shall be bound by and shall strictly enforce the terms of this Guaranty and may not limit, expand or otherwise modify any term or provision of this Guaranty or any other contract or document between Guarantor and Lender. The arbitrator shall not have the power to award to Guarantor any damages that are excluded or that have been waived by Guarantor under this Guaranty, and Guarantor irrevocably waives any claim that it may have thereto. The arbitrator shall not have the power to order pre-hearing discovery of documents or the taking of depositions. The arbitrator shall render a written decision within six (6) months after being selected. Any arbitration will be held in Indianapolis, Indiana (or its greater metro area). Each Party will bear its own expenses in the arbitration and will share equally the costs of the arbitration; provided, however, that the arbitrator may, in his or her discretion, award costs and fees to the prevailing Party. The result of any arbitration shall be final and binding upon the Parties. Judgment upon any arbitration award may be entered in any court having jurisdiction over the award or over the applicable party or its assets.

COPY VIEW

DocuSign Envelope ID: FAE10158-F46A-48C6-BEB2-FB526DFFF676
THIS IS A COPY
This is a copy view of the Authoritative Copy h by the designated custodian

(iv) This Guaranty evidences transactions in interstate commerce, and thus the Federal Arbitration Act governs the interpretation and enforcement of this Section 5(i), notwithstanding the provisions of Section 5(g).

(j) WAIVER OF JURY TRIAL. AFTER CONSULTING OR HAVING HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL, LENDER AND GUARANTOR KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVE ANY RIGHT EITHER PARTY MAY HAVE TO A TRIAL BY JURY IN ANY LITIGATION BASED UPON OR ARISING OUT OF THIS GUARANTY, OR ANY OF THE TRANSACTIONS CONTEMPLATED BY THIS GUARANTY, OR ANY COURSE OF CONDUCT, STATEMENT, WHETHER ORAL OR WRITTEN, OR ACTIONS OF LENDER OR GUARANTOR. NEITHER LENDER NOR GUARANTOR SHALL SEEK TO CONSOLIDATE, BY COUNTERCLAIM OR OTHERWISE, ANY ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED. THESE PROVISIONS SHALL NOT HAVE BEEN DEEMED TO HAVE BEEN MODIFIED IN ANY RESPECT OR RELINQUISHED BY LENDER OR GUARANTOR EXCEPT BY WRITTEN INSTRUMENT EXECUTED BY BOTH LENDER AND GUARANTOR.

(k) LIMITATION OF LIABILITY. IN NO EVENT SHALL ANY LENDER PARTY BE LIABLE FOR ANY SPECIAL, INDIRECT, EXEMPLARY, PUNITIVE, INCIDENTAL, MULTIPLE OR CONSEQUENTIAL DAMAGES (INCLUDING ANY DAMAGES RESULTING FROM LOSS OF USE, LOSS OF PROFITS, LOSS OF BUSINESS OR OTHER ECONOMIC LOSS) ARISING OUT OF OR IN CONNECTION WITH THIS GUARANTY, EVEN IF SUCH LENDER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. FURTHER, IN NO EVENT SHALL THE LENDER PARTIES, COLLECTIVELY, BE LIABLE FOR ANY DAMAGES UNDER THIS GUARANTY OR ANY OTHER LOAN DOCUMENT THAT EXCEED, IN THE AGGREGATE, AN AMOUNT EQUAL TO THE SUM OF THE INTEREST AND FLOORPLAN FEES ACTUALLY PAID TO LENDER BY BORROWER UNDER THE NOTE DURING THE TWELVE (12) MONTH PERIOD IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO THE CLAIM AT ISSUE (OR, IN THE CASE OF MULTIPLE EVENTS, THE FIRST SUCH EVENT GIVING RISE TO THE CLAIM AT ISSUE).

(l) Descriptive Headings; Interpretation. The descriptive headings herein are for convenience of reference only and shall not control or affect the meaning or construction of any provision of this Guaranty. As used in this Guaranty, the terms "include," "includes," and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of like import.

WHEREFORE, Guarantor has executed this Guaranty on the date set forth below.

GUARANTOR:

DocuSigned by:
Edward Anthony Kessler
8420326A15AC496

By:
Name: Edward Anthony Kessler
Date: 3/27/2019 | 10:46:09 AM EDT

COPY VIEW

DocuSign Envelope ID: FAF1015B F46A-40C0-BED2-FB526DFFF876
THIS IS A COPY
This is a copy view of the Authoritative Copy h by the designated custodian

# ACH AUTHORIZATION AND REQUEST
(Debit or Credit)

The undersigned borrower ("Borrower") has incurred, or may in the future incur, certain Liabilities to NextGear Capital, Inc. ("Lender") under that certain Demand Promissory Note and Loan and Security Agreement by and between Borrower and Lender (the "Note"). Capitalized terms used herein but not defined herein shall have the respective meanings as set forth in the Note (such meanings to be equally applicable to both the singular and plural forms of the terms defined).

Borrower hereby authorizes and requests Lender, as Lender under the Note, to initiate electronic debit entries (each, an "Authorized Debit") to the bank account specified below (the "Designated Account") in payment of amounts and other Liabilities owed by Borrower under the Note and the other Loan Documents. Lender may initiate an Authorized Debit, (i) in the amount requested by Borrower in a written or oral communication with Lender (an "Elective Payment"); or (ii) in the amount due and owing by Borrower under the Note and the other Loan Documents, including all interest, fees, and other Liabilities with respect thereto (a "Required Payment"). Additionally, Borrower authorizes and requests Lender, as Lender under the Note, to initiate electronic credit entries (each, an "Authorized Credit") to the Designated Account. Borrower further acknowledges and agrees that:

- Lender may initiate an Elective Payment from the Designated Account at any time on or after the date such request is made by Borrower.
- Lender may initiate a Required Payment from the Designated Account on or after the first Business Day following a Maturity Date for any Liability, in each case in such amount as is due and owing with respect to such Liability on the date that such Required Payment is initiated by Lender (including any applicable fees and other amounts incurred by Borrower or accrued on such Liability after the Maturity Date).
- Borrower must maintain sufficient funds in the Designated Account to satisfy its payment obligations to Lender under this ACH Authorization and Request. If the Designated Account holds insufficient funds to cover an Authorized Debit, Borrower may be assessed fees or other charges by both the financial institution at which the Designated Account is held (the "Depository Bank") and by Lender, just as if Borrower had written a check to Lender that was returned for insufficient funds.
- Borrower is solely responsible for any overdraft charges or other fees that the Depository Bank may assess in connection with any transfers, whether debit or credit, initiated pursuant to this ACH Authorization and Request (including any Authorized Debit or Authorized Credit).
- This ACH Authorization and Request shall be deemed a "Loan Document" for all intents and purposes under the Note, and Lender shall be entitled to avail itself of any limitations of liability and other similar protections or relief afforded Lender under the Note, and these provisions and protections shall apply to any Authorized Debit, Authorized Credit, or other transaction initiated by Lender hereunder. Additionally, Lender shall have no liability and shall not be responsible for any damages arising from or relating to any checks or other payments dishonored after the available balance in the Designated Account is reduced by any Authorized Debit or other transaction initiated by Lender hereunder.
- Borrower will remain liable and responsible for all amounts owed under the Note and the other Loan Documents which remain unpaid as a result of an unsuccessful attempt to debit funds from the Designated Account pursuant to this ACH Authorization and Request.
- This ACH Authorization and Request does not create a fiduciary relationship between Lender and Borrower.
- Borrower is bound by the Operating Rules of the National Automated Clearing House Association (NACHA), as in effect from time to time with regard to each Authorized Debit, Authorized Credit, and other transaction initiated by Lender hereunder.
- Lender may provide via email to the email account designated below ("Designated Email") confirmation of each Authorized Debit, Authorized Credit, and other transaction processed hereunder (each a "Confirmation Email").
- Lender's business records reflecting the following shall be deemed conclusive proof of Borrower's authorization and request for an Authorized Debit: (1) a Confirmation Email of an Authorized Debit having been sent by Lender to the Designated Email or otherwise communicated to Borrower; and (2) no written objection having been confirmed received by Lender from Borrower within five (5) Business Days from the date the Confirmation Email or other communication was sent to Borrower.
- Borrower shall maintain the active status of the Designated Email (or provide immediate written notification to Lender of any change in the Designated Email) at all times.
- Borrower is the owner (or joint-owner) of the Designated Account, or, if the Designated Account is a corporate or other company account, the undersigned representative of Borrower is a duly authorized corporate or company representative of Borrower with permission to make and authorize the Authorized Debits, Authorized Credits and other transactions authorized by Borrower hereunder, in each case in the manner described herein. In the event that any of Borrower's Designated Account information changes, or in the event that Borrower closes the Designated Account, Borrower will promptly notify Lender at least ten (10) Business Days prior to such change or closure so that Lender can process Borrower's updated Designated Account information

Lender may, if necessary, initiate adjustments at any time and without advance notice to Borrower for any debit or credit entry made in error to the Designated Account pursuant to this ACH Authorization and Request. This ACH Authorization and Request will remain in effect until Lender

COPY VIEW

DocuSign Envelope ID: FAE10158-F46A-46C6-BEB2-FB526DFFF676

THIS IS A COPY
This is a copy view of the Authoritative Copy by the designated custodian

has received, and has had sufficient time (but not less than ten (10) Business Days) to process, a written notice of termination delivered by Borrower to Lender in accordance with the provisions of Section 15 of the Note. Lender may terminate this ACH Authorization and Request at any time by providing written notice to Borrower. A facsimile or photocopied reproduction of any signature on this ACH Authorization and Request shall be deemed an original signature for all intents and purposes.

The undersigned Borrower hereby expressly acknowledges that this ACH Authorization and Request shall be binding on Borrower whether executed in original, "wet ink" form; submitted by facsimile; or submitted by electronically transmitted signature ("e-signature") The undersigned Borrower further acknowledges that the acceptance of the terms of this ACH Authorization and Request, if by e-signature, shall be deemed to satisfy all requirements imposed on electronic or digital signatures under the Electronic Signatures in Global and National Commerce Act (the "E-Sign Act"), 15 U.S.C. §7001(a) et seq., and any other similar laws relating to the validity or enforceability of electronic or digital signatures. Each of the parties acknowledges and agrees that this ACH Authorization and Request may be executed by affixing to this ACH Authorization and Request an electronic or digital signature, which shall for all purposes be deemed effective to constitute the valid signature of the party affixing such electronic or digital signature.

| Designated Bank Account and Designated Email |
|---|
| Bank Name: HSBC Account Number: [redacted]3716 Routing Number: [redacted]088 |
| Signor 1 on Account: James Michael C Blackburn Signor 2 on Account: Edward Anthony Kessler |
| Designated Email (for payment confirmation): sales@overfinchmiami.com |

WHEREFORE, Borrower, by its duly authorized representative, has executed this ACH Authorization and Request on the date set forth below.

**BORROWER:**

Premier Group Autos LLC DBA Overfinch Miami

DocuSigned by:
James Michael C Blackburn
C465619CB8D84D1...

By:
Name: James Michael C Blackburn
Title: Manager

Date: 3/26/2019 | 4:42:48 PM EDT

DocuSigned by:
Edward Anthony kessler
8420326A15AC496...

By:
Name: Edward Anthony Kessler
Title: Manager

Date: 3/27/2019 | 10:46:09 AM EDT

COPY VIEW

# POWER OF ATTORNEY
(Entity/Partnership)

This Power of Attorney is executed by the undersigned borrower ("Borrower") and delivered to NextGear Capital, Inc. ("Lender") pursuant to that certain Demand Promissory Note and Loan and Security Agreement by and between Borrower and Lender (the "Note"). Capitalized terms used herein but not defined herein shall have the respective meanings as set forth in the Note (such meanings to be equally applicable to both the singular and plural forms of the terms defined). Any capitalized terms used herein, but not otherwise defined herein or in the Note, as the case may be, shall have the meanings ascribed to them in the UCC.

1. No Person to whom this Power of Attorney is presented, as authority for Lender to take any action described below, shall be required to inquire into or seek confirmation from Borrower as to the authority of Lender to take any action described below, or as to the existence of or fulfillment of any condition to this Power of Attorney, which is intended to grant to Lender unconditionally the authority to take and perform the actions described below. Borrower irrevocably waives any right that it may have, now or at any time in the future, to commence any claim, litigation, suit, petition, writ, or proceeding in any court of competent jurisdiction or before any arbitrator or other neutral, against any Person acting in reliance upon or otherwise acknowledging any power or authority granted by Borrower under this Power of Attorney. The Power of Attorney granted hereby is coupled with an interest and may not be revoked or canceled by Borrower without Lender's written consent or as otherwise allowed by Law. This Power of Attorney shall be deemed a "Loan Document" for all intents and purposes as referenced in the Note.

2. With or without the occurrence of an Event of Default under the Note, Borrower irrevocably appoints Lender (and all Representatives designated by Lender), with full power of substitution, as Borrower's true and lawful attorney-in-fact with full power and authority in the place and stead of Borrower and in the name of Borrower or in its own name, from time to time in Lender's discretion, to take any and all appropriate actions and to execute and deliver any and all documents and instruments which may be necessary or desirable to accomplish the purposes of the Note and each of the other Loan Documents. Without limiting the generality of the foregoing, Borrower hereby grants to Lender the power and right, on behalf of Borrower, without further notice to or assent by Borrower, at any time, to do the following:

   (a) execute such security agreements, invoices, notes, and related documentation as may be necessary for Borrower to acquire, refinance, or sell any Collateral (including any Units secured or to be secured by Advances made thereon);

   (b) execute all documents necessary for Lender to perfect or secure its interest in the Collateral;

   (c) make, settle, and adjust claims under policies of insurance, and endorse any check, draft, instrument, or other item of payment for the proceeds of such policies of insurance, and make all determinations and decisions with respect to such policies of insurance;

   (d) endorse the name of Borrower upon any document, instrument, certificate, evidence of title, state registration documents, trust receipt, checks or other items of payment, or any related or similar documents, in each case as necessary to pay for or protect the Collateral, including, without limitation, any agreements between Borrower and any global positioning satellite company;

   (e) endorse the name of Borrower upon any items of payment or proceeds of any Collateral (including any Units constituting Collateral), and to deposit the same to the account of Lender on account of Borrower's Liabilities under the Note and the other Loan Documents;

   (f) endorse the name of Borrower upon any chattel paper, document, instrument, invoice, freight bill, bill of lading, or similar document or agreement relating to any Collateral;

   (g) use the information recorded on or contained in any data processing equipment, computer hardware, or software relating to any Collateral to which Borrower has access;

   (h) pay or discharge any taxes, liens, security interests, or other encumbrances levied or placed on or threatened against Borrower or any of the Collateral;

   (i) communicate with any party to any contract with regard to the assignment of the right, title, and interest of Borrower in and under such contract and/or the Collateral, and other matters relating thereto;

   (j) contact any third parties and disclose and/or receive any Borrower information, including, without limitation, information or data in Borrower's application for credit with Lender, the Note, or Borrower's Credit Line, in each case for the purpose of, among other things, preserving Lender's security interest in the Collateral and ensuring the satisfaction of Borrower's Liabilities under the Note and the other Loan Documents; and

   (k) do all other things reasonably necessary to satisfy Borrower's Liabilities under the Note and the other Loan Documents.

3. Upon the occurrence of an Event of Default under the Note, Borrower irrevocably appoints Lender (and all Representatives designated by Lender), with full power of substitution, as Borrower's true and lawful attorney-in-fact with full power and authority in the place and stead of Borrower and in the name of Borrower or in its own name, from time to time in Lender's discretion, to do the following:

   (a) demand, collect, accept receipt for, settle, compromise, adjust, foreclose, or realize upon any of the Collateral, in each case in such manner as Lender may determine;

   (b) file or prosecute any claim, litigation, suit, petition, writ, or proceeding in any court of competent jurisdiction or before any arbitrator or other neutral, or take any other action otherwise deemed appropriate by Lender for the purpose of collecting any and all such moneys due to

EXHIBIT
5

Borrower, whenever payable, and to enforce any other right in respect of the Collateral, including, without limitation, confessing to or consenting to judgments, writs of replevin or possession, and/or any equitable relief in favor of Lender or its Affiliates;

(c) file or prosecute all proofs of claim against any account debtor on behalf of Borrower; and

(d) notify the United States Postal Service of a change in address for the delivery of Borrower's mail to an address designated by Lender, and to receive Borrower's mail on behalf of Borrower.

4. Any provision of this Power of Attorney that is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability, without rendering invalid or unenforceable the remaining provisions of this Power of Attorney or affecting the validity or enforceability of any provision of this Power of Attorney in any other jurisdiction. Borrower hereby ratifies, to the extent permitted by Law, all that Lender or its designated Representatives shall lawfully do or cause to be done by virtue hereof, whether such actions were done before or after the actual execution date of this Power of Attorney. The rights and privileges set forth herein shall be deemed supplemental and in addition to any rights and privileges to which Lender or any other Person may be entitled under the Note or any other Loan Document. A facsimile or photocopied reproduction of any signature on this Power of Attorney shall be deemed an original signature for all intents and purposes.

WHEREFORE, Borrower, by its duly authorized representative, has executed this Power of Attorney on the date set forth below.

**BORROWER:**

Premier Group Autos LLC DBA Overfinch Miami

By: [signature]
Name: James Michael C Blackburn
Title: Manager
Date: 4.18.19

STATE OF FLORIDA )
) SS:
COUNTY OF BROWARD )

Before me, a Notary Public in and for said County and State, personally appeared James Michael C Blackburn known to me to be the Manager of Premier Group Autos LLC DBA Overfinch Miami who acknowledged the execution of the foregoing Power of Attorney, and who, having been duly sworn, states that any representations contained therein are true.

Witness my hand and Notarial Seal this 18 day of APRIL, 2019.

Notary Signature [signature]

Notary Name (Printed) ARTURO MAYORAL

My Commission Expires: 10/11/2021 County of Residence: BROWARD

Notary Public State of Florida
Arturo Mayoral
My Commission GG 150836
Expires 10/11/2021

# POWER OF ATTORNEY
(Entity/Partnership)

This Power of Attorney is executed by the undersigned borrower ("Borrower") and delivered to NextGear Capital, Inc. ("Lender") pursuant to that certain Demand Promissory Note and Loan and Security Agreement by and between Borrower and Lender (the "Note"). Capitalized terms used herein but not defined herein shall have the respective meanings as set forth in the Note (such meanings to be equally applicable to both the singular and plural forms of the terms defined). Any capitalized terms used herein, but not otherwise defined herein or in the Note, as the case may be, shall have the meanings ascribed to them in the UCC.

1. No Person to whom this Power of Attorney is presented, as authority for Lender to take any action described below, shall be required to inquire into or seek confirmation from Borrower as to the authority of Lender to take any action described below, or as to the existence of or fulfillment of any condition to this Power of Attorney, which is intended to grant to Lender unconditionally the authority to take and perform the actions described below. Borrower irrevocably waives any right that it may have, now or at any time in the future, to commence any claim, litigation, suit, petition, writ, or proceeding in any court of competent jurisdiction or before any arbitrator or other neutral, against any Person acting in reliance upon or otherwise acknowledging any power or authority granted by Borrower under this Power of Attorney. The Power of Attorney granted hereby is coupled with an interest and may not be revoked or canceled by Borrower without Lender's written consent or as otherwise allowed by Law. This Power of Attorney shall be deemed a "Loan Document" for all intents and purposes as referenced in the Note.

2. With or without the occurrence of an Event of Default under the Note, Borrower irrevocably appoints Lender (and all Representatives designated by Lender), with full power of substitution, as Borrower's true and lawful attorney-in-fact with full power and authority in the place and stead of Borrower and in the name of Borrower or in its own name, from time to time in Lender's discretion, to take any and all appropriate actions and to execute and deliver any and all documents and instruments which may be necessary or desirable to accomplish the purposes of the Note and each of the other Loan Documents. Without limiting the generality of the foregoing, Borrower hereby grants to Lender the power and right, on behalf of Borrower, without further notice to or assent by Borrower, at any time, to do the following:

    (a) execute such security agreements, invoices, notes, and related documentation as may be necessary for Borrower to acquire, refinance, or sell any Collateral (including any Units secured or to be secured by Advances made thereon);

    (b) execute all documents necessary for Lender to perfect or secure its interest in the Collateral;

    (c) make, settle, and adjust claims under policies of insurance, and endorse any check, draft, instrument, or other item of payment for the proceeds of such policies of insurance, and make all determinations and decisions with respect to such policies of insurance;

    (d) endorse the name of Borrower upon any document, instrument, certificate, evidence of title, state registration documents, trust receipt, checks or other items of payment, or any related or similar documents, in each case as necessary to pay for or protect the Collateral, including, without limitation, any agreements between Borrower and any global positioning satellite company;

    (e) endorse the name of Borrower upon any items of payment or proceeds of any Collateral (including any Units constituting Collateral), and to deposit the same to the account of Lender on account of Borrower's Liabilities under the Note and the other Loan Documents;

    (f) endorse the name of Borrower upon any chattel paper, document, instrument, invoice, freight bill, bill of lading, or similar document or agreement relating to any Collateral;

    (g) use the information recorded on or contained in any data processing equipment, computer hardware, or software relating to any Collateral to which Borrower has access;

    (h) pay or discharge any taxes, liens, security interests, or other encumbrances levied or placed on or threatened against Borrower or any of the Collateral;

    (i) communicate with any party to any contract with regard to the assignment of the right, title, and interest of Borrower in and under such contract and/or the Collateral, and other matters relating thereto;

    (j) contact any third parties and disclose and/or receive any Borrower information, including, without limitation, information or data in Borrower's application for credit with Lender, the Note, or Borrower's Credit Line, in each case for the purpose of, among other things, preserving Lender's security interest in the Collateral and ensuring the satisfaction of Borrower's Liabilities under the Note and the other Loan Documents; and

    (k) do all other things reasonably necessary to satisfy Borrower's Liabilities under the Note and the other Loan Documents.

3. Upon the occurrence of an Event of Default under the Note, Borrower irrevocably appoints Lender (and all Representatives designated by Lender), with full power of substitution, as Borrower's true and lawful attorney-in-fact with full power and authority in the place and stead of Borrower and in the name of Borrower or in its own name, from time to time in Lender's discretion, to do the following:

    (a) demand, collect, accept receipt for, settle, compromise, adjust, foreclose, or realize upon any of the Collateral, in each case in such manner as Lender may determine;

    (b) file or prosecute any claim, litigation, suit, petition, writ, or proceeding in any court of competent jurisdiction or before any arbitrator or other neutral, or take any other action otherwise deemed appropriate by Lender for the purpose of collecting any and all such moneys due to

EXHIBIT
6

Borrower, whenever payable, and to enforce any other right in respect of the Collateral, including, without limitation, confessing to or consenting to judgments, writs of replevin or possession, and/or any equitable relief in favor of Lender or its Affiliates;

(c) file or prosecute all proofs of claim against any account debtor on behalf of Borrower; and

(d) notify the United States Postal Service of a change in address for the delivery of Borrower's mail to an address designated by Lender, and to receive Borrower's mail on behalf of Borrower.

4. Any provision of this Power of Attorney that is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability, without rendering invalid or unenforceable the remaining provisions of this Power of Attorney or affecting the validity or enforceability of any provision of this Power of Attorney in any other jurisdiction. Borrower hereby ratifies, to the extent permitted by Law, all that Lender or its designated Representatives shall lawfully do or cause to be done by virtue hereof, whether such actions were done before or after the actual execution date of this Power of Attorney. The rights and privileges set forth herein shall be deemed supplemental and in addition to any rights and privileges to which Lender or any other Person may be entitled under the Note or any other Loan Document. A facsimile or photocopied reproduction of any signature on this Power of Attorney shall be deemed an original signature for all intents and purposes.

WHEREFORE, Borrower, by its duly authorized representative, has executed this Power of Attorney on the date set forth below.

**BORROWER:**

Premier Group Autos LLC DBA Overfinch Miami

By: [signature]
Name: Edward Anthony Kessler
Title: Manager
Date: 4.18.19

STATE OF Florida )
) SS:
COUNTY OF Broward )

Before me, a Notary Public in and for said County and State, personally appeared Edward Anthony Kessler known to me to be the Manager of Premier Group Autos LLC DBA Overfinch Miami who acknowledged the execution of the foregoing Power of Attorney, and who, having been duly sworn, states that any representations contained therein are true.

Witness my hand and Notarial Seal this 18 day of April, 2019

Notary Signature [signature]

Notary Name (Printed) Arturo Mayoral

My Commission Expires: 10/11/2021 County of Residence: Broward

Notary Public State of Florida
Arturo Mayoral
My Commission GG 150638
Expires 10/11/2021

**SECURED NOTE**

**$225,000.00**

**Virginia Beach, VA**
**October 3, 2019**

FOR VALUE RECEIVED, the undersigned promises to pay to **JAMES C. ARCHBELL III**, or ORDER, the principal sum of TWO HUNDRED TWENTY-FIVE THOUSAND AND NO/100 **($225,000.00)** Dollars, with interest from the above date at the rate of twelve **(12%)** per centum per annum, the said sum being due and payable via interest only payments of **$1,050.00** beginning on the 17th day of October, 2019, and every 14th day thereafter, with a BALLOON PAYMENT of the entire balance of the debt, including interest, cost and fees, if applicable, being due and payable no later than **January 3, 2020**. The said principal and interest shall be payable at 530 Woodlake Circle, Suite 200, Chesapeake, Virginia 23320, or at such other place as the holder may otherwise specify in writing.

NOTICE: THE NOTE IS SUBJECT TO CALL IN FULL OR THE TERMS THEREOF BEING MODIFIED IN THE EVENT OF SALE OR CONVEYANCE OF THE VEHICLE SECURING THIS NOTE. **Collateral: 2020 Land Rover, VIN#SALGS5SE6LA572387**

The Maker(s) shall be deemed in default in the event any installment payment is not received by the Noteholder within 5 days of its due date.

It is agreed that in the event of default under this note that the Maker(s) and endorser(s) hereof shall pay all costs and expenses of collection, and that if after default this note be placed in the hands of an attorney for collection, a fee of twenty-five percent of the amount due hereon, both before and after judgment shall, if and to the extent permitted by law, be collectible herewith.

It is further agreed that this note, or any part of the principal or interest due thereon, may be renewed from time to time by the holder hereof or payment extended, at the request of the then owners of the property securing this indebtedness, or at the request of any parties bound hereon, or who has assumed or may hereafter assume payment hereof, without the consent of or notice to other parties bound hereon and without releasing them from liability in connection therewith.

The maker(s) and endorser(s) waive demand, presentment, protest and notice of dishonor; and the benefit of their homestead exemptions as to this obligation.

The maker(s) hereby authorizes and appoints Brett B. Thompson or any other attorneys from Thompson Law Group, PLLC, of Virginia Beach, Virginia as his or her attorney in fact to appear in any court in the State of Virginia after any of the above terms or provisions of this note have been breached by the maker(s), and waive the issuing and service of process and confess judgment, jointly and severally, in favor of the Noteholder for the amount of all principal, late charges, interest and additional charges that are due and payable, which charges arise out of the performance of this note, with interest from the date of the breach, together with the costs of the suit, which costs shall include reasonable attorney's fees and expenses incurred in the suit, and

thereupon release all errors and waive all rights to appeal. The foregoing is in addition to any other legal or equitable rights or remedies which the Note Holder may have.

**IMPORTANT NOTICE**

**THIS AGREEMENT CONTAINS A CONFESSION OF JUDGMENT PROVISION WHICH CONSTITUTES A WAIVER OF IMPORTANT RIGHTS YOU MAY HAVE AS A DEBTOR AND ALLOWS THE CREDITOR TO OBTAIN A JUDGMENT AGAINST YOU WITHOUT ANY FURTHER NOTICE.**

PREMIER GROUP AUTOS, LLC
DBA Overfinch Miami

BY:____________________________

Print name:____________________

Title:______________________

______________________________
James Blackburn

# DISTRIBUTION AGREEMENT

This International Distribution Agreement ("Agreement") is made effective as of .Monday..03rd...December...18.. ("Effective Date") by and between Premier Group Autos LLC ("Distributor") with company registration number L18000263245 with its principal place of business at 1500 Cordova Road, 206 Fort Lauderdale, Florida, 33316 and Overfinch North America Inc. ("OVERFINCH") with its principal place of business at 500 Stinson Drive, Danville VA 24540 USA.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

## 1. DEFINITIONS

1.1 "Conversion" means exterior products including body styling package, badges, lettering, wheels and tires and the fitment thereof by OVERFINCH.

1.2 "Conversion Value" means the value of the Products and services supplied by OVERFINCH as set out in the relevant order acceptance and / or invoice. For the avoidance of doubt, the Conversion Value does not include taxes, duties, freight and transportation charges and similar costs, all of which are payable by the Distributor.

1.3 "Customers" means any current or potential purchasers or end-users of the Products.

1.4 "Initial Term" means twelve months from the Effective Date.

1.5 "Introducers Fee" means an amount in US dollars to be agreed on a deal by deal basis between the parties.

1.6 "Order Value" means the total value of the order including the Vehicle Value and Conversion Value as set-out in such order that is accepted by OVERFINCH.

1.7 "Products" means any Overfinch products sold by OVERFINCH to Distributor for resale to Customers pursuant to the terms of this Agreement, and any related services (including OVERFINCH training).

1.8 "Term" means twelve months commencing from the Effective date and thereafter each twelve-month period following the anniversary of the Initial Term.

1.9 "Territory" means the utility and industrial market segments in South Florida (Miami Dade, Broward, Palm Beach, Monroe, Collier, Lee, Henry, Florida Keys and the Glades) only.

1.10 "Vehicle" means a new vehicle that OVERFINCH has manufactured parts for and is capable of being modified by OVERFINCH.

1.11 "Vehicle Value" means the cost of the vehicle as invoiced to Overfinch by the supplying automotive dealer. For the avoidance of doubt, the Vehicle Value does not include state or local taxes, freight and transportation charges and similar costs, all of which are payable by the Distributor.

## II. RELATIONSHIP

2.1 **Appointment.** OVERFINCH appoints the Distributor as an exclusive, independent distributor of Products to Customers in the Territory. Distributor accepts such appointment and agrees to devote sufficient time and resources to the performance of its duties hereunder. Distributor shall promptly notify OVERFINCH of all inquiries related to Products from persons or entities located outside the Territory. Distributor shall notify OVERFINCH of all changes in personnel assigned to its account.

OVERFINCH reserves the right to transact any business to retail Customers within the Territory that are as a result of online sales made via its website or other online platform and / or sales resulting from any local or national brand advertising events that it has organized and participated in.

OVERFINCH may terminate the exclusivity under this Agreement upon thirty (30) days notice at any time that the Distributor has placed no orders with OVERFINCH for any rolling two-month period, providing that the Distributor has not already ordered, prior to the commencement of that two-month

JB AS.

period, Products that would exceed the minimum amount required by the end of that two-month period.

2.2 **Independent Contractor.** Distributor is an independent contractor. Distributor is not an employee, representative, or agent of OVERFINCH. Distributor is not authorized to make any agreement, warranty or representation on behalf of OVERFINCH, or to create any liability or obligation, express or implied, on behalf of OVERFINCH. Distributor shall not appoint any third party to promote or sell Products or otherwise perform any of Distributor's obligations hereunder. Distributor shall conduct its business in its own name, maintain its own office and be responsible for its expenses, personnel and operations.

2.3 **Direct Sales.** OVERFINCH reserves the right to honor online store orders from Customers that are based within the Territory, with no compensation to the Distributor.

During the Initial Term and any renewal Term, in the event that the Distributor can demonstrate via an information registration service acceptable to OVERFINCH that is has recorded a Customer's details at an event it attended and / or hosted, whereby it introduced that Customer to the Overfinch brand and that Customer is within the Territory and would like to place an order to purchase Products from OVERFINCH directly within a six month period from that introduction, OVERFINCH shall refer that Customer to the Distributor. In the event such Customer is located outside of the Territory OVERFINCH shall pay the Distributor an Introducers Fee.

The Distributor is required to submit the information registration record to OVERFINCH on a monthly basis and within 5 working days following an event that the Distributor has hosted.

OVERFINCH shall maintain an information registration service whereby it records Customer's details at any brand advertising event that it attends and / or hosts.

2.4 **Sales Terms.** OVERFINCH may decline to quote any potential sale and may accept or reject any order, providing that such declination or rejection is based upon a reasonable commercial decision.

All sales of Products by OVERFINCH shall be subject to the OVERFINCH Sales Terms in effect at time of sale, as reflected on the OVERFINCH sales order acknowledgment, to the extent that they do not conflict with the provisions of this Agreement. By placing each order hereunder, Distributor confirms

JB AS

its agreement with and acceptance of the OVERFINCH Sales Terms. Distributor must extend, honor and perform the warranty services as set forth in the OVERFINCH Sales Terms to Customers. OVERFINCH shall be bound only by the warranty applicable to parts as set forth in the applicable OVERFINCH Sales Terms, and Distributor shall indemnify OVERFINCH against any additional warranty terms. Any warranty or other sales terms required by law in the Territory must be provided by Distributor, and Distributor shall indemnify OVERFINCH for any failure to comply with any such requirements. Distributor must also notify OVERFINCH if any of its standard warranty or other sales terms conflict with any law in the Territory.

During the Initial Term and any subsequent renewal Term thereafter the Distributor shall notify OVERFINCH promptly of any potential warranty claim relating to its Products. Any warranty claims are at the sole decision of OVERFINCH and any costs or expenses incurred by the Distributor shall only be reimbursed providing these have been pre-authorized in writing by OVERFINCH.

OVERFINCH Conversions/Products shall be ordered on a monthly basis. There is no guarantee in respect of the delivery date of any Vehicles. OVERFINCH has no control over the lead time of the Vehicle from the manufacturer. It is not guaranteed, and it is dependent upon the model year of the Vehicle being ordered, but it is envisaged that a Vehicle will be delivered with the Conversion within 16 weeks from OVERFINCH'S acceptance of a Vehicle order. OVERFINCH shall update the Distributor on lead times of Vehicles as and when it receives updates from the supplying automotive dealer.

Upon OVERFINCH's acceptance of an order submitted by the Distributor for a Vehicle and Conversion, the Distributor is required to comply with the following payment terms:

1.) 10% non-refundable deposit of the total Order Value upon OVERFINCH'S acceptance of the order;
2.) Remaining balance of the Vehicle Value to be paid on or before collection of the Vehicle by OVERFINCH from the Land Rover dealer;
3.) Remaining balance of the Conversion Value to be paid upon completion of the conversion by OVERFINCH and before delivery of it to the Distributor.

Upon OVERFINCH's acceptance of an order submitted by the Distributor for a Conversion, the Distributor is required to comply with the following payment terms:

1.) 10% non-refundable deposit of the total Order Value upon OVERFINCH'S acceptance of the order;

JB

2.) Remaining balance of the Conversion Value to be paid upon completion of the conversion by OVERFINCH and before delivery of it to the Distributor.

Payment must be made in cleared funds via wire transfer or cheque only.

All orders are exclusive of state and local taxes, freight and transportation charges and similar costs, all of which should be paid by the Distributor.

Prices for Products shall be those provided in writing by OVERFINCH to Distributor and may be modified by OVERFINCH from time to time. Distributor shall pay all amounts in U.S. Dollars.

Distributor shall provide OVERFINCH with its standard end-user price list upon request.

Distributor acknowledges that OVERFINCH pricing fully compensates Distributor on an ongoing basis for customer and market development, for providing product support and services in the Territory.

Delivery of the Products shall take place at OVERFINCH'S place of business. Acceptance of any change to the delivery point requested by the Distributor shall be at OVERFINCH'S sole discretion and at the Distributors risk and expense.

**2.5 Minimum Annual Order Quantity**

The Distributor is required to place orders for a minimum of 36 OVERFINCH Conversions or Overfinch Products to the value of $1,500,000.00 during the Initial Term. One Conversion/Product order shall be placed upon the Effective Date of this agreement. Thereafter the remaining minimum order quantity shall be spread in equal instalments across each month of the Initial Term, with the Distributor ordering a minimum of 3 Conversions or the equivalent value in Products each month.

Unless notified by OVERFINCH in writing 30 days prior to the expiry of the Initial Term, the contract shall automatically renew for a further Term. The minimum annual order requirement for any such renewal Term shall be an increase of 10% of the minimum annual order value required in the previous Term.

The initial minimum annual order shall commence on the above Effective Date, with each subsequent minimum annual order commencing upon each renewal Term.

JB AS.

The Distributor has the intention to open an Overfinch showroom within the Territory within 8 to 12 months from the Effective Date of this agreement. Upon the Distributor confirming it has finalized its plans in respect of that showroom, both parties shall enter into further discussions regarding the terms of this agreement in view of the investment proposed by the Distributor and document any such variation to the terms hereof that are agreeable between both parties at that time. Further, subject to the Distributor's performance throughout the Initial Term, the parties may enter into discussions regarding distributorships in other potential territories in the United States of America.

**2.6 Initial Order**

Upon execution of this Agreement, the Distributor shall submit an initial order for an OVERFINCH Conversion.

## III. RESPONSIBILITIES

3.1 **Promotion.** Distributor shall devote sufficient time and resources to successfully promote and sell Products to Customers. Distributor shall ensure that all sales personnel are properly trained and possess the appropriate technical competency to promote Products effectively. Distributor shall respond in a timely and professional manner to all inquiries from and referrals to Customers. Distributor shall furnish any market information requested by OVERFINCH, including without limitation annual sales plans, monthly sales reports, monthly forecasting reports, sales forecast updates and explanations of any discrepancies between forecasted and actual sales. Distributor shall attend any required OVERFINCH sales training.

3.2 **Marketing.** The Distributor is required to advertise and promote the Products on a regular basis on an appropriate marketing platform akin to the prestige of the brand. The Distributor should submit a proposed marketing plan to OVERFINCH for its review and written consent.

OVERFINCH may from time to time carry out local and / or national brand advertising and marketing activities, within or outside of the Territory and request the Distributor to make a reasonable contribution to such costs and expenses associated and incurred in respect of that brand advertising. OVERFINCH shall provide reasonable notice of anticipated costs and expenditure for such brand advertising.

JB AS.

3.3 **Events.** The Distributor shall host 10 exclusive events during the course of the initial term in order to promote the OVERFINCH brand and Vehicles. OVERFINCH will provide marketing material and product support for use at such events, upon reasonable notice and as required. The Distributor shall cover the reasonable costs and expenses incurred by OVERFINCH in this regard.

3.4 **Customer and Product Support.** Distributor shall follow up and maintain contact with Customers to ensure customer satisfaction. Distributor shall ensure that Customers receive information about any recalls on Products provided to Distributor. Distributor shall employ personnel who are educated in the field and sufficiently knowledgeable of Products to perform the technical support and services required hereunder.

3.5 **Technical and Marketing Materials.** Distributor shall maintain an adequate inventory of current OVERFINCH technical and marketing materials to promote Products. Distributor may not use any technical or marketing materials not provided by OVERFINCH. Prior written approval for the use of any marketing material should be obtained from OVERFINCH. Distributor shall provide any translations of OVERFINCH technical and marketing materials to OVERFINCH.

3.6 **Compliance.** Distributor shall comply with all governmental laws, regulations and orders of all relevant jurisdictions that may be applicable to Distributor under this Agreement, including without limitation the U.S. Export Administration Act, the U.S. Foreign Corrupt Practices Act and all licensing and registration requirements in the Territory. Distributor shall advise OVERFINCH with respect to any warranty requirements, noise ordinances, safety standards, specifications and other requirements applicable to Products imposed by law, regulation or order in the Territory. Distributor shall notify OVERFINCH of the existence and content of any provision of law in the Territory or any other applicable law that conflicts with any provision of this Agreement or any other document, such as warranty or sales terms, at the time of execution or at any time thereafter.

3.7 **Training.** OVERFINCH shall provide sales and technical training and support as appropriate. The Distributor shall cover the reasonable costs and expenses incurred by OVERFINCH in providing this.

JB AS.

## IV. INTELLECTUAL PROPERTY AND CONFIDENTIALITY

4.1. **Intellectual Property.** Distributor acknowledges that trademarks, service marks, trade dress, patents, copyrights, trade secrets, licenses and any other intellectual property used by OVERFINCH are the sole property of OVERFINCH. Distributor shall not use such OVERFINCH property except in the normal course of promoting Products, or promoting OVERFINCH in general, under the terms of this Agreement. Distributor shall not remove or alter any trademarks, service marks or trade dress that identify OVERFINCH, nor use any trademarks, service marks, trade dress or any other intellectual property that, in the sole discretion of OVERFINCH, are confusingly similar to those of OVERFINCH. Distributor shall make every effort to safeguard the intellectual property of OVERFINCH, and shall immediately notify OVERFINCH in writing of any infringement or suspected infringement and cooperate with OVERFINCH, as OVERFINCH deems necessary, to protect such property against infringement (such cooperation to be at OVERFINCH expense unless the infringement arose from Distributor acts or omissions). Distributor shall comply with the OVERFINCH INTELLECTUAL PROPERTY POLICY, as provided by OVERFINCH. OVERFINCH my immediately terminate this Agreement for any violations of these intellectual property requirements. Upon termination of this agreement the Distributor shall not use the intellectual property.

4.2 **Confidentiality.** All confidential information provided, from time to time, by OVERFINCH to Distributor has been or is provided in strict confidentiality, and can neither be disclosed by Distributor to third parties during the term of this Agreement or after termination or expiration, nor used by Distributor for purposes other than those set forth in this Agreement. Distributor shall maintain such information in strict confidence during the term of this Agreement and for five (5) years after termination or expiration, except when disclosure of such information is required by law. Within thirty (30) days of any request by OVERFINCH or termination or expiration of this Agreement, Distributor shall return or destroy, according to OVERFINCH's instruction at such time, all confidential information and any demonstration products provided by OVERFINCH. Distributor shall ensure compliance with these confidentiality obligations by its employees, representatives and agents, including without limitation by obtaining appropriate confidentiality agreements from such persons.

4.3 **Other brands.** The Distributor shall not fit any other after-market tuning brands parts and / or accessories branded or unbranded to any Vehicle's supplied by OVERFINCH, so as to cause confusion in the market place that any other brands products are that of OVERFINCH or vice versa.

JB AS-

## V. TERM AND TERMINATION

5.1 **Term.** Subject to termination, this Agreement shall have an initial term of one (1) year, commencing on the Effective Date, and shall renew automatically for additional one (1) year periods, subject to the below.

5.2 **Termination.** Either party may terminate this Agreement without cause upon thirty (30) days written notice to the other party to expire upon the end of the Initial Term or following that the anniversary of any renewal Term thereafter. Either party may also choose to render the agreement non-exclusive upon thirty (30) days written notice to expire upon the end of the Initial Term or following that the anniversary of any renewal Term thereafter (in addition to the right of OVERFINCH elsewhere in this Agreement to render the Agreement non-exclusive for failure by Distributor to meet its minimum orders).

Either party may terminate this Agreement immediately upon the other party's insolvency, bankruptcy, suspension of business, assignment of assets for the benefit of creditors, voluntary or involuntary dissolution, appointment of a trustee for all or a substantial portion of the party's assets, or breach of this Agreement. OVERFINCH reserves the right to immediately terminate this Agreement on written notice to Distributor if, in the sole discretion of OVERFINCH, the laws or economic circumstances in the Territory have changed in a material way so as to adversely impact OVERFINCH's relationship with Distributor or OVERFINCH's ability to conduct business in the Territory. Upon termination or expiration of this Agreement, OVERFINCH has the right of first refusal in respect of any Products and / or Vehicles and may, at its sole discretion, repurchase from Distributor, at the lesser of either the net prices paid by Distributor or the open market value, any of the Vehicles purchased and remaining unsold by Distributor. OVERFINCH's repurchase of Distributor's Vehicle inventory pursuant to the termination provisions hereof (or Distributor's right to sell such inventory if not so repurchased by OVERFINCH) shall constitute Distributor's sole remedy for termination or expiration of this Agreement. All intellectual property, confidentiality, non-compete and non-hire rights and obligations set forth in this Agreement shall survive termination or expiration.

5.3 **Transition.** During any notice period and after termination or expiration of this Agreement, Distributor shall cooperate with OVERFINCH to assure a smooth transition for Customers and OVERFINCH. Distributor shall introduce OVERFINCH personnel (and the personnel of any distributor or sales representative specified by OVERFINCH) to Customers who have ordered or expressed

JB AS.

interest in Products and invite OVERFINCH (and any distributor or sales representative specified by OVERFINCH) to accompany Distributor's personnel on sales calls related to Products. Distributor shall take all necessary action to terminate any registration as an OVERFINCH distributor with any governmental authority. All indebtedness of Distributor to OVERFINCH shall become immediately due and payable without further notice or demand, which is hereby waived. Distributor shall also cooperate with OVERFINCH in identifying and producing copies of correspondence and business records related to all past, present and pending business activities conducted on behalf of Customers.

5.4 **Warranty.** Distributor shall honor all warranties existing upon expiration or termination of this Agreement until any such warranties expire.

## VI. GENERAL PROVISIONS

6.1 **Indemnification and Limitation of Liability.** The Distributor shall fully indemnify, defend and hold harmless OVERFINCH and all related parties, to the extent that it is not as a direct result of a defective Product supplied by OVERFINCH, from and against any claims or losses arising directly or indirectly from, as a result of or in connection with its performance or breach under this Agreement (including without limitation the above obligation to inform OVERFINCH of any compliance or other relevant legal issues in the Territory), or any other act or omission of Distributor. In no event, whether as a result of breach of contract, indemnity, warranty, tort (including negligence), strict liability or otherwise, shall OVERFINCH liability for any loss or damage exceed the price of the specific Product that gave rise to the claim, nor include any special, consequential, incidental or punitive damages.

6.2 **Insurance.** Distributor agrees to obtain and maintain commercially reasonable insurance, including without limitation comprehensive general liability coverage with combined policy limits of at least $1,000,000 per occurrence and covering bodily injury, personal injury, and property damage, including blanket contractual liability and naming OVERFINCH and its directors, officers, employees, and authorized representatives as additional insureds with respect to operations under this Agreement. Distributor agrees to furnish OVERFINCH with certificates showing the amount and existence of the required coverages and specifying that the policies shall not be canceled or materially changed except after (30) thirty days written notice to OVERFINCH. Distributor acknowledges that compliance with the specific insurance requirement above does not relieve Distributor of its obligation to maintain commercially reasonable insurance (either in regard to higher comprehensive general liability coverage limits or other

JB AS

types of coverage, including without limitation employer liability, automobile liability and worker compensation coverage.).

6.3     **Governing Law and Dispute Resolution.**   The laws of the Commonwealth of Virginia excluding conflict of laws principles, shall govern this Agreement.   The parties reject any applicability of the United Nations Convention on Contracts for the International Sale of Goods.   Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by binding arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, and judgment on the arbitration award may be entered in any court of competent jurisdiction.   Arbitration shall be held at a mutually acceptable location in Virginia, or another location agreed upon by the parties, and shall be conducted in English.   Either party may seek injunctive relief in a court of competent jurisdiction or other interim measures in the event of breach or threatened breach of this Agreement.   The prevailing party to any dispute shall be entitled to recover legal fees and other costs (including without limitation arbitration fees, disbursements, collection costs and the allocated cost of in-house counsel).

6.4     **Miscellaneous.**   Any notice pursuant to this Agreement shall be deemed given when sent by registered or certified mail (return receipt requested) or overnight delivery to an authorized officer at the headquarters of the other party at the address set forth in this Agreement.   Distributor may not assign or otherwise transfer this Agreement or any rights or obligations hereunder without the prior written consent of OVERFINCH.   The sale of the majority of Distributor's stock shall constitute an assignment for the purposes of this Agreement.   No failure or delay by either party in exercising any right or remedy, or insisting upon strict compliance by the other party with any obligation in this Agreement, shall constitute a waiver of any right thereafter to demand exact compliance with the terms of this Agreement.   The invalidity, in whole or part, of any provision in this Agreement shall not affect the remainder of such provision or any other provision and, where possible, shall be replaced by a valid provision that effects as close as possible the intent of the invalid provision.   Neither party shall be liable for failure to perform or delay in performance of any obligation under this Agreement (except payment of amounts already due and owing) where such failure or delay results from any event beyond its reasonable control.   The English language version of this Agreement shall govern and control any translations of the Agreement into any other language.   This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof, and any modification hereof must be in a writing signed by both parties.

JB AS.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed and each of the undersigned represents and warrants that he or she is duly authorized to execute this Agreement.

| PREMIER GROUP AUTOS LLC | OVERFINCH NORTH AMERICA INC. |
|---|---|
| 1500 Cordova Road, 206 Fort Lauderdale, Florida, 33316 | 500 Stinson Drive Danville VA 24540 |
| By: [signature] | By: [signature] |
| Name: James Blackburn | Name: Alexander Sloane. |
| Title: Owner | Title: vice President. |



December 11, 2019

**By Overnight Delivery and Electronic Mail (james@premieraviationholdings.com)**
James Blackburn
Premier Group Autos LLC
1500 Cordova Road, Suite 206
Fort Lauderdale, Florida 33316

Re: Further Notice of Default and Termination

Dear Mr. Blackburn:

This letter constitutes further notice of default and termination under the terms of the parties' distribution agreement (the "Distribution Agreement") dated 3rd December 2018.

Section 2.5 of the Distribution Agreement required that Premier Group Autos purchase a minimum of 36 Overfinch Conversions or Overfinch Products with a value of $1,500,000.00 during the Initial Term. Premier Group Autos failed to purchase either 36 Overfinch Conversions or Overfinch Products with a value of $1,500,000.00 during the Initial Term, which failure constitutes a breach of the Distribution Agreement. Accordingly, Overfinch is once again providing notice of termination of the Distribution Agreement pursuant to Section 5.2 of that agreement.

Overfinch reserves all rights and remedies available to it for Premier Group Auto's breach of the Distribution Agreement under the Distribution Agreement's terms, as well as state and federal law.

Regards,

Overfinch North America Inc.

**From:** James Blackburn
**To:** Dick Rocap
**Subject:** Premier Group Autos 12.11.19.pdf
**Date:** Friday, February 28, 2020 3:56:12 AM
**Attachments:** Premier Group Autos 12.11.19.pdf
ATT00001.htm

Overfinch North America then reissued this letter omitting the part about " due to the financing of vehicles" part I believe on next gears request.

# BARRY E. MUKAMAL - RECENT TESTIMONY HISTORY

| ID | Case Name | Court | Case Number | Judge | Type of Testimony | Year |
|---|---|---|---|---|---|---|
| 1 | DAVID C ARNOLD<br>V<br>ASSOCIATION LAW GROUP, ET AL | MIAMI-DADE | 12-13962 ca 40 | | DEPOSITION / TESTIMONY | 2014 |
| 2 | TODD LARY/STARBRIGHT<br>V<br>BOSTON SCIENTIFIC CORPORATION | SOUTHERN DISTRICT OF FLORIDA | 1:11 CV 23820 | | TRIAL TESTIMONY | 2014 |
| 3 | AMERICAN EDUCATIONAL ENTERPRISES, LLC<br>v<br>THE BOARD OF TRUSTEES OF THE INTERNAL IMPROVEMENT TRUST FUND | MIAMI-DADE COUNTY | CASE #02-23922 CA 09 | | DEPOSITION | 2014 |
| 4 | P & S ASSOCIATES GENERAL PARTNERSHIP<br>& S & P ASSOCIATES GENERAL PARTNERSHIP<br>V<br>ROBERTA P. ALVES, ET AL | BROWARD COUNTY | CASE #12-028324(07) | | TRIAL TESTIMONY | 2014 |
| 5 | IRONSHORE INDEMNITY INC. et al<br>v<br>BANYON 1030-32 LLC ET AL, ROBERT FURR TRUSTEE | BANKRUPTCY COURT SOUTHERN DISTRICT OF FLORIDA | 12-CV-61678-MGC<br>12-CV-61753-WJZ<br>12-CV-61813-KMW | | DEPOSITION | 2014 |
| 6 | PATRICIA MONTES DE OCA<br>v<br>JOSE JUAN RENTERIA | CIRCUIT COURT - MIAMI DADE COUNTY, FLORIDA | 2012-021622-FC-04 | | Testimony | 2014 |
| 7 | BANNING LARY, MD, ET AL<br>V.<br>BOSTON SCIENTIFIC CORPORATION | US DISTRICT COURT SOUTHERN DISTRICT OF FLORIDA | 1:11-cv-23820-O'SULL VAN | O'SULLIVAN | Deposition & Trial | 2014 |
| 8 | TELTRONICS, INC. | BANKRUPTCY COURT MIDDLE DISTRICT OF FLORIDA | 8:11-BK-12150-KRM | KRM | Deposition & Trial | 2015 |
| 9 | ARAZOZA BROTHERS CORP. | CIRCUIT COURT MIAMI-DADE COUNTY, FLORIDA | 13-1908 CA 25 | | Deposition | 2015 |
| 10 | DYADIC INTERNATIONAL, INC.<br>v.<br>ERNST & YOUNG, LP, et al. | CIRCUIT COURT PALM BEACH COUNTY, FLORIDA | 50 2009 CA010680 XXXX MB AA | | Deposition | 2015 |
| 11 | TELTRONICS, INC. | BANKRUPTCY COURT MIDDLE DISTRICT OF FLORIDA | 8:11-BK-12150-KRM | KRM | Deposition & Trial | 2015 |
| 12 | RONALD DEMASI | BANKRUPTCY COURT MIDDLE DISTRICT OF FLORIDA | 8:13-BK-08406-MGW | MGW | Deposition & Trial | 2015 |
| 13 | XTEC, INC. | CIRCUIT COURT MIAMI-DADE COUNTY, FLORIDA | 13-38362 CA 09 | | Deposition & Trial | 2015 |

## BARRY E. MUKAMAL - RECENT TESTIMONY HISTORY

| ID | Case Name | Court | Case Number | Judge | Type of Testimony | Year |
|---|---|---|---|---|---|---|
| 14 | LINDA S. ORTIZ<br>V.<br>HECTOR P. ORTIZ | CIRCUIT COURT<br>11TH JUDICIAL CIRCUIT<br>MIAMI-DADE COUNTY, FL | 2014-8076-FC04 (39)<br>2014-022865-FC04 (39) | | Trial | 2015 |
| 15 | FUTURESELECT PORTFOLIO MANAGEMENT, INC<br>V.<br>TREMONT GROUP HOLDINGS, INC. | SUPERIOR COURT OF THE STATE OF WASHINGTON | 10 2-30732 0 SEA | | Deposition & Trial | 2015/2016 |
| 16 | TAYLOR, BEAN & WHITAKER PLAN TRUST<br>V.<br>PRICEWATERHOUSECOOPERS, LLP | 11TH JUDICIAL CIRCUIT<br>MIAMI-DADE COUNTY | 13-33964 (40) | | Deposition | 2015/2016 |
| 17 | AGRO SUPPLY, S.A.<br>V.<br>AGRITRADE, LP | 11TH JUDICIAL CIRCUIT<br>MIAMI-DADE COUNTY | 13-15713 CA 01 | | Deposition & Trial | 2015/2016 |
| 18 | DISABILITY LAW CLAIMS, PA, ET AL<br>V.<br>IM SOLUTIONS, LLC | DISTRICT COURT SOUTHERN DISTRICT OF FLORIDA | 14-6177-CIV-DIMITROULEAS /SNOW | | Deposition | 2015/2016 |
| 19 | MAJORCA ISLES MASTER ASSOCIATION | BANKRUPTCY COURT SOUTHERN DISTRICT OF FLORIDA | 12-19056 BKC AJC | AJC | Trial | 2015/2016 |
| 20 | CITY NATIONAL BANK OF FLORIDA<br>V<br>MAC-ACCESS, CORP | CIRCUIT COURT<br>11TH JUDICIAL CIRCUIT<br>MIAMI-DADE COUNTY, FL | 2015-029121-CA-01(22) | HANZMAN | Forensic Examination | 2016 |
| 21 | LAPCIUC<br>V.<br>LAPCIUC | CIRCUIT COURT<br>11TH JUDICIAL CIRCUIT<br>MIAMI-DADE COUNTY, FL | | | Trial | 2016/2017 |
| 22 | LAMINGTON RESOURCES, INC.<br>V.<br>BURGER KING CORPORATION,<br>V.<br>BK CENTROAMERICA CAYMAN LTD, ET AL. | INTERNATIONAL CHAMBER OF COMMERCE<br>INTERNATIONAL COURT OF ARBITRATION | CASE NO. 20786/RD | | Deposition | 2016/2017 |
| 23 | PEDRO A. TORRES<br>V.<br>ASTOR PROPERTY HOLDINGS, LLC, ET AL. | CIRCUIT COURT<br>11TH JUDICIAL CIRCUIT<br>MIAMI-DADE COUNTY, FL | 2015-014693-CA(20) | | Deposition/Trial | 2016/2017 |
| 24 | S.R. KALB AND ASSOCIATES, INC.<br>V.<br>2250 & 2233 NW 77 TER, LLC AND MICHAEL I. ROSE | CIRCUIT COURT<br>11TH JUDICIAL CIRCUIT<br>MIAMI-DADE COUNTY, FL | 2016-001586-CA-01 | | Receiver | 2016/2017 |
| 25 | REMOS BUILDING & DEVELOPMENT CORPORATION<br>V.<br>CHAPEL TRAIL ASSOCIATES, LTD | CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT, IN AND FOR BROWARD COUNTY, FL | 05-05212 (02) | | Deposition | 2017 |

# BARRY E. MUKAMAL - RECENT TESTIMONY HISTORY

| ID | Case Name | Court | Case Number | Judge | Type of Testimony | Year |
|---|---|---|---|---|---|---|
| 26 | LARRY V. GORDON<br>V.<br>ROBERT FISHMAN | IN THE CIRCUIT COURT OF THE 15TH JUDICIAL CIRCUIT IN AND FOR PALM BEACH COUNTY, FLORIDA | 2014-CA-008927 (AD) | BARKDULL | Deposition | 2017 |
| 27 | GARY UEAR, as Class Representative<br>V.<br>Q-CLUB HOTEL, LLC | UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF FLORIDA | 16-60474 CIV COHN/SELTZER | COHN | Trial | 2017 |
| 28 | BAHAMIAN VILLAGE, LLC<br>V.<br>FPL | CIRCUIT COURT<br>11TH JUDICIAL CIRCUIT<br>MIAMI-DADE COUNTY, FL | 13-34551-CA-09 | | Deposition | 2017 |
| 29 | DAVID L. CLARKE, ET AL.<br>V.<br>TWO ISLANDS DVELOPMENT CORP. AND PRIVE DEVELOPERS LLC AND TRUST 7S LT21 | CIRCUIT COURT<br>11TH JUDICIAL CIRCUIT<br>MIAMI-DADE COUNTY, FL | 14-21513-CA-09 | BAGLEY | Deposition | 2018 |
| 30 | PHILIP VON KAHLE, CURATOR<br>V.<br>FIDELITY AND DEPOSIT COMPANY OF MARYLAND | CIRCUIT COURT<br>11TH JUDICIAL CIRCUIT<br>MIAMI-DADE COUNTY, FL | 16-021099-CA-01 | THORNTON | Deposition | 2018 |
| 31 | HAROUT SAMRA<br>V.<br>VICKEN BEDOYAN, WPM MIAMI, INC, et al. | CIRCUIT COURT<br>11TH JUDICIAL CIRCUIT<br>MIAMI-DADE COUNTY, FL | 14-22854-CA-40 | THOMAS | Trial | 2018 |
| 32 | JOEL BETH NAVRATIK, et al.<br>V.<br>JON J. RAPPAPORT AND PET MEDICAL CENTERS, LLC | CIRCUIT COURT<br>11TH JUDICIAL CIRCUIT<br>MIAMI-DADE COUNTY, FL | 17-019695-CA-01(44) | Thomas | Deposition & Trial | 2018 |
| 33 | STORAI<br>V.<br>TOTAL GSM, LLC | CIRCUIT COURT<br>11TH JUDICIAL CIRCUIT<br>MIAMI-DADE COUNTY, FL | 14 27987 | Butchko | Deposition | 2018 |
| 34 | CONTRAZZA INTERNATIONAL CONSTRUCTION, INC.<br>V.<br>UNIVERSAL TOWERS CONSTRUCTION, INC. | CIRCUIT COURT 9TH JUDICIAL CIRCUIT FOR ORANGE COUNTY, FLORIDA | 2015-CA-008342 | | Deposition/Trial | 2018 |
| 35 | SHOW ME HOSPITALITY, LLC<br>V.<br>TIM HORTONS USA INC. | UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF FLORIDA | 17 22679 CIV | Martinez Otazo Reyes | Deposition | 2019 |
| 36 | WAVE LENGTHS HAIR SALON OF FLORIDA, INC<br>V.<br>CBL & ASSOCIATES PROPERTIES, INC. | UNITED STATES DISTRICT COURT MIDDLE DISTRICT OF FLORIDA | 2:16-cv-00206-SPC-MRM | | Deposition | 2019 |
| 37 | BOUDKO, POLINA<br>V.<br>BUYANOV, DMITRIY | CIRCUIT COURT<br>11TH JUDICIAL CIRCUIT<br>MIAMI-DADE COUNTY, FL | 17 04537 FC-04 | Young | Deposition | 2019 |
| 38 | STEVEN R. SCHAFER, ET AL.<br>V.<br>ROBERT A. DICRISCI, ET AL. | CIRCUIT COURT<br>11TH JUDICIAL CIRCUIT<br>MIAMI-DADE COUNTY, FL | 17-021621-CA-43 | Butchco | Deposition | 2019 |

## BARRY E. MUKAMAL - RECENT TESTIMONY HISTORY

| ID | Case Name | Court | Case Number | Judge | Type of Testimony | Year |
|---|---|---|---|---|---|---|
| 39 | SCHECHTER OPERATING CAPITAL LLP<br>V<br>BAINBRIDGE INVESTOR, LLC | CIRCUIT COURT<br>15TH JUDICIAL CIRCUIT<br>PALM BEACH COUNTY, FL | 50-2016-CA-8692 | | Deposition | 2019 |
| 40 | IRONSHORE INDEMNITY INC. et al<br>v<br>BANYON 1030-32 LLC ET AL, ROBERT FURR TRUSTEE | BANKRUPTCY COURT<br>SOUTHERN DISTRICT OF<br>FLORIDA | 12-CV-61678-MGC<br>12-CV-61753-WJZ<br>12-CV-61813-KMW | Ray | Trial | 2019 |
| 41 | BOYWIC FARMS, LTD<br>V.<br>BRITT L. WEAVER | AMERICAN ARBITRATION<br>ASSOCIATION | 01-18-0001-9008 | | Deposition | 2019 |
| 42 | MANDARIN LAKES NEIGHBORHOOD HOMEOWNERS' ASSOCIATION, INC<br>V<br>RAFAEL ROCA, AMALIA PAPADIMITRIOU, ROBERT BENWARE, RAUL SANCHEZ AND D.R. HORTON, INC. | CIRCUIT COURT<br>11TH JUDICIAL CIRCUIT<br>MIAMI-DADE COUNTY, FL | 18-039950-CA-01 | | Deposition | 2019 |
| 43 | HADAD CONSULTING, LLC<br>V.<br>URBAN FARMERS, INC | CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT, IN AND FOR BROWARD COUNTY, FL | 17-019215 | | Trial | 2020 |
| 44 | IMC GROUP, LLC, ET AL.<br>V.<br>COMVEST IMC HOLDINGS, LLC ET AL. | CIRCUIT COURT<br>11TH JUDICIAL CIRCUIT<br>MIAMI-DADE COUNTY, FL | 18-3297-CA-01 (43) | | Deposition | 2020 |

**Barry E. Mukamal, CPA, CIRA, PFS, ABV, CFE, CFF**

**bmukamal@kapilamukamal.com**



Mr. Mukamal's career spans more than forty years. He has developed a national bankruptcy, insolvency and advisory practice of highly trained professionals specializing in a complex array of services in the accounting and advisory industry. These services include: (i) forensic and investigative accounting of sophisticated white collar crime, occupational fraud and abuse; (ii) expert witness reporting and testimony involving complex business litigation and the quantification of economic damages; and (iii) matrimonial services to high net worth individuals with significant domestic and international assets and business interests.

In addition to spearheading a practice combining the three disciplines described above, Mr. Mukamal has grown to be one of the most reliable and recognizable fiduciaries serving both Federal and State Courts located in the Southeastern United States. In his capacity as a Chapter 7 Panel Trustee, Mr. Mukamal has overseen and continues to oversee hundreds of cases annually with a significant number of those cases involving a multitude of asset types and business concerns across nearly every industry. He has been appointed Liquidating Trustee and/or Plan Administrator in numerous complex cases requiring administration and resolution of multiple Ponzi schemes including fraud investigations, quantification of economic damages and resolution of claims. Mr. Mukamal has managed and marketed the completion of construction projects including resolving related creditor claims and construction contractor claims. He has been involved in Accountant and Auditor Standard of Care and compliance with Professional Standards, accounting and tax engagements and commercial and contract damage analysis ranging from small closely-held entities to SEC clients in various industries including insurance, manufacturing, distribution, real estate, health care, publishing, agriculture, timeshare developers, seafood and aviation.

Mr. Mukamal's fiduciary assignments include those as operating Chapter 11/Liquidating Trustee, State Court Receiverships, Court Examiner and Financial Advisor to various creditor committees. While performing his duties in each of these capacities, Mr. Mukamal has been successful in marshaling distressed assets, securing both operating and non-operating businesses, preserving their value and realizing recoveries consistently exceeding expectations. While advising the Court as an Examiner or as Financial Advisor, Mr. Mukamal has been instrumental in providing even-handed, clear and concise consultation resulting in the ability of the Court and creditor committees to exercise business judgment and decisions affecting significant interests and hundreds of millions of dollars of monetary recoveries and asset preservation.

Mr. Mukamal's extensive litigation support experience includes matrimonial dissolution, fraud investigations, accounting malpractice and business valuations. He has been involved in numerous high profile, high-net-worth divorces involving assets in the U.S. and abroad, equitable distribution, opinions on income and lifestyle and asset and business valuations. In addition, he has been retained in investigations and embezzlement issues associated with financial fraud schemes such as Ponzi schemes and occupational fraud. His experience also extends to lost profits litigation, damages in relation to breach of contract, personal injury and wrongful death actions. Mr. Mukamal's testimony for the plaintiff in a patent damage action facilitated a multi-million dollar award for the client.

Mr. Mukamal has represented debtors, creditors and creditors' committees in matters of insolvency fraud and abuse and assisted trustees in their asset recovery efforts. He has served as Court appointed Receiver and Mediator and has testified as an expert witness at the state, local and federal levels.

As a Receiver, Mr. Mukamal has utilized his technical skills, abilities and experience on a "hands-on" basis which allows him to quickly assess and analyze the current environment of the business. He is well skilled in negotiating and positioning. He has participated in both in-court and out-of-court workouts in a variety of industries. He has performed forensic investigations to trace flows of funds, investigated fraudulent transfers to insiders and related parties and filed lawsuits to recover preferential payments for the estate.



# Barry E. Mukamal, CPA, CIRA, PFS, ABV, CFE, CFF

bmukamal@kapilamukamal.com

## AREAS OF EXPERTISE

Bankruptcy and Insolvency
Solvency Opinions
Business Valuations
Commercial and Contract Damage Analysis
Contract Disputes
Investigation of Commercial Fraud
Marital Dissolution and Forensic Analysis
Succession Planning
Accountant and Auditor Standard of Care and Compliance with Professional Standards

## ACCOMPLISHMENTS

- ***South Florida Legal Guide—***
  ***Top CPA in Litigation Support – multiple years***
- ***South Florida Business Journal—***
  ***Litigation Key Partner Award Winner***

## EDUCATION / QUALIFICATIONS / ACCREDITATIONS

CPA - Certified Public Accountant
CIRA - Certified Insolvency and Restructuring Advisor
CFE - Certified Fraud Examiner
ABV - Accredited in Business Valuation
PFS - Personal Financial Specialist
CFF - Certified in Financial Forensics

Chapter 7 Panel Trustee

University of Buffalo, New York —
M.B.A., Accounting and Business Administration,
B.S., Accounting—Magna Cum Laude

## PROFESSIONAL AND CIVIC ASSOCIATIONS

American Institute of Certified Public Accountants (AICPA)
Florida Institute of Certified Public Accountants (FICPA)
Association of Insolvency and Restructuring Advisors (AIRA)
Association of Certified Fraud Examiners (ACFE)
American Bankruptcy Institute (ABI)
National Association of Bankruptcy Trustees (NABT)

## Industries Served as Trustee and Professional

Real Estate and Construction Companies
Insurance Providers
Distributors
Aviation Companies
Agricultural Companies
Homeowner Associations
Condo Hotels and Hotels
Franchise Operations and Franchisors
Auditor Standard of Care
Probate Estates and Trusts
Hospitals and Health Care Providers
Timeshare Developers

## ARTICLES, SEMINARS AND PRESENTATIONS

"Fiduciary Responsibilities of Professionals in Bankruptcy" - 2011 Central Florida Bankruptcy Law Association Annual Seminar

"Taxation Issues Facing the Domestic Relations Practitioner" - Palm Beach County Bar Association Family Law CLE Committee Seminar

"Privacy and Security Issues in a Trustee's Office and ECF Environment" - National Association of Bankruptcy Trustees

"Keep Your Client From Drowning: How to Deal With Bankruptcies and Foreclosures—American Academy of Matrimonial Lawyers

"The Financial Distressed Client: Positioning the Client for Modification, Bankruptcy and/or Foreclosure—FICPA Ethics Presentation, Florida Fiduciary Forum, 2011

"Recovering Value: Effective Strategies to Recover Assets (Once Found)" - The Offshore Alert Conference, April, 2018

"Bankruptcy Estate Taxation under the Tax Cuts and Jobs Act" - National Association of Bankruptcy Trustees (NABT) Annual Conference, August 2018

"Commercial Fraud Issues: Don't Confuse a Financial Audit with a Fraud Audit" - American Bankruptcy Institute Newsletter, 2019

"Strategies in Bankruptcy Court" - Dade Legal Aid Seminar—Moderator—January 2020

"Valuation Testimony" - American Bankruptcy Institute - 2020 Spring Southeast Virtual Bankruptcy Workshop.

"Identification of Assets and Impact of Divorce and Separation on Recoverable Assets" - CV Region 21 U.S. Trustee Training—November 2020

*KapilaMukamal, LLP*
The Kapila Building
1000 S. Federal Highway, Suite 200
Fort Lauderdale, Florida 33316
Main 786-517-5771
Direct 786-517-5730
*www.kapilamukamal.com*

CPAs, Forensic and Insolvency Advisors

HSBC

P.O. Box 1393
Buffalo, NY 14240-1393

Questions?
Call 1.877.472.2249
TTY 1.800.898.5999
us.hsbc.com
Or write:
HSBC
P.O. Box 9
Buffalo, New York 14240

PREMIER GROUP AUTOS LLC
1500 CORDOVA RD
STE 206
FT LAUDERDALE FL 333162190

HSBC BUSINESS SMART

ACCOUNT NUMBER

STATEMENT PERIOD 04/04/19 TO 05/03/19

OVERDRAFT ACCOUNT NUMBER

*PREMIER GROUP AUTOS LLC*

| | |
|---|---|
| **BEGINNING BALANCE** | **$123,552.99** |
| DEPOSITS & OTHER ADDITIONS | $141,873.00 |
| WITHDRAWALS & OTHER SUBTRACTIONS | $214,783.54 |
| **ENDING BALANCE** | **$50,642.45** |

| DATE POSTED | DESCRIPTION OF TRANSACTIONS | DEPOSITS & OTHER ADDITIONS | WITHDRAWALS & OTHER SUBTRACTIONS | BALANCE |
|---|---|---|---|---|
| **04/04/19** | **OPENING BALANCE** | | | **$123,552.99** |
| 04/04/19 | | | 6,540.00 | $117,012.99 |
| | | | 15.00 | $116,997.99 |
| | K | | 865.56 | $116,132.43 |
| | | | 235.98 | $115,896.45 |
| | | | 5,000.00 | $110,896.45 |
| 04/05/19 | | | 3,734.50 | $107,161.95 |
| | | | 75.63 | $107,086.32 |
| | 09 | | 84.00 | $107,002.32 |
| | | | 1,430.00 | $105,572.32 |
| | | | 8.69 | $105,563.63 |
| 04/08/19 | | | 206.00 | $105,357.63 |
| | | | 977.23 | $104,380.40 |

*CONTINUED ON NEXT PAGE*

EXHIBIT
**Exhibit D**

*Please examine your statement at once.* *If you change your address, please notify us of your ne*

HSBC Bank USA, N.A. (Rev. 6/2018) nMe

Page 1 of 7

CONTINUED FROM PREVIOUS PAGE

| Date | Amount | Balance |
|---|---|---|
| | 115.23 | $104,265.17 |
| | 348.46 | $103,916.71 |
| | 2.50 | $103,914.21 |
| | 3,284.00 | $100,630.21 |
| | 306.00 | $100,324.21 |
| | 655.74 | $99,668.47 |
| | 12.99 | $99,655.48 |
| 04/09/19 | 2,500.00 | $97,155.48 |
| | 340.00 | $96,815.48 |
| | 1,750.00 | $95,065.48 |
| | 823.90 | $94,241.58 |
| | 65.00 | $94,176.58 |
| | 5,500.00 | $88,676.58 |
| 04/10/19 | 414.42 | $88,262.16 |
| | 3.98 | $88,258.18 |
| | 2,247.12 | $86,011.06 |
| | 260.00 | $85,751.06 |
| 04/11/19 | 11.40 | $85,739.66 |
| | 2,000.00 | $83,739.66 |
| | 124.86 | $83,614.80 |
| 04/12/19 | 16,380.00 | $67,234.80 |
| | 15.00 | $67,219.80 |
| | 32.00 | $67,187.80 |
| | 2,400.00 | $64,787.80 |
| | 1,500.00 | $63,287.80 |
| | 15.00 | $63,272.80 |
| | 10,750.00 | $52,522.80 |
| | 15.00 | $52,507.80 |
| | 33.59 | $52,474.21 |
| | 48.00 | $52,426.21 |
| | 7.00 | $52,419.21 |
| | 16.10 | $52,403.11 |
| | 43.72 | $52,359.39 |
| | 9.99 | $52,349.40 |
| | 448.89 | $51,900.51 |

CONTINUED ON NEXT PAGE

*CONTINUED FROM PREVIOUS PAGE*

| Date | Description | | Credits | Debits | Balance |
|---|---|---|---|---|---|
| 04/15/19 | | | | 500.00 | $51,400.51 |
| | | | | 803.00 | $50,597.51 |
| | | | | 2.50 | $50,595.01 |
| | | | | 19.84 | $50,575.17 |
| | | | | 739.00 | $49,836.17 |
| | | | | 220.00 | $49,616.17 |
| | | | | 12.65 | $49,603.52 |
| | | | | 1,545.65 | $48,057.87 |
| | | | | 408.00 | $47,649.87 |
| | | | | 49.52 | $47,600.35 |
| | | | | 235.83 | $47,364.52 |
| | | | | 16.10 | $47,348.42 |
| | | | | 4,805.00 | $42,543.42 |
| 04/16/19 | | | | 7,500.00 | $35,043.42 |
| | | | | 377.60 | $34,665.82 |
| | | | | 35.00 | $34,630.82 |
| | | | | 46.00 | $34,584.82 |
| | | | | 4,500.00 | $30,084.82 |
| | | | | 700.00 | $29,384.82 |
| 04/17/19 | | | | 53.87 | $29,330.95 |
| | | | | 500.00 | $28,830.95 |
| | | | | 280.00 | $28,550.95 |
| 04/18/19 | | | | 13.87 | $28,537.08 |
| | | | | 200.00 | $28,337.08 |
| | | | | 17.65 | $28,319.43 |
| | | | | 439.15 | $27,880.28 |
| | | | | 226.59 | $27,653.69 |
| | | | | 226.59 | $27,427.10 |
| | | | | 50.00 | $27,377.10 |
| | | | | 60.12 | $27,316.98 |
| | L | | | 69.98 | $27,247.00 |
| | | | | 65.11 | $27,181.89 |
| | | | | 44.48 | $27,137.41 |
| 04/19/19 | CASH CONCENTRATION NEXTGEAR FUNDING-FUNDING NEXTGEAR FUNDING 125308 | | 40,000.00 | | $67,137.41 |
| | | | | 7,500.00 | $59,637.41 |
| | | SD | | 15.00 | $59,622.41 |
| | | | | 3,000.00 | $56,622.41 |
| | | | | 15.00 | $56,607.41 |

*CONTINUED ON NEXT PAGE*

*CONTINUED FROM PREVIOUS PAGE*

| Date | | Credits | Debits | Balance |
|---|---|---|---|---|
| | | | 10.69 | $56,596.72 |
| | | | 500.00 | $56,096.72 |
| | | | 17.78 | $56,078.94 |
| | | | 2,000.00 | $54,078.94 |
| 04/22/19 | | | 55.89 | $54,023.05 |
| | | | 467.92 | $53,555.13 |
| | | | 8.03 | $53,547.10 |
| | | | 6,500.00 | $47,047.10 |
| | | | 15.00 | $47,032.10 |
| | | | 67.39 | $46,964.71 |
| | | | 12.67 | $46,952.04 |
| | | | 72.49 | $46,879.55 |
| | | | 50.31 | $46,829.24 |
| | | | 49.75 | $46,779.49 |
| | | | 3,622.50 | $43,156.99 |
| | | | 82.94 | $43,074.05 |
| | | | 45.57 | $43,028.48 |
| | | | 154.82 | $42,873.66 |
| | | | 12.29 | $42,861.37 |
| | | | 33.61 | $42,827.76 |
| 04/23/1 | | | 126.26 | $42,701.50 |
| | | | 28.67 | $42,672.83 |
| | | | 738.29 | $41,934.54 |
| | | | 75.00 | $41,859.54 |
| 04/24/1 | | | 58.01 | $41,801.53 |
| | | 47,000.00 | | $88,801.53 |
| | | | 34.96 | $88,766.57 |
| | | | 46.16 | $88,720.41 |
| | | | 24.69 | $88,695.72 |
| | | | 220.00 | $88,475.72 |
| | | | 10.50 | $88,465.22 |
| 04/25/19 | | | 66.05 | $88,399.17 |
| | 9 | | 102.95 | $88,296.22 |
| | | | 2.50 | $88,293.72 |
| | | | 497.77 | $87,795.95 |
| | | | 27.16 | $87,768.79 |

*CONTINUED ON NEXT PAGE*

*CON*

| | | | |
|---|---|---|---|
| | | 36.83 | $87,731.96 |
| | | 28.03 | $87,703.93 |
| | | 60.29 | $87,643.64 |
| | | 144.74 | $87,498.90 |
| | | 24.32 | $87,474.58 |
| | | 40,418.74 | $47,055.84 |
| | | 2,500.00 | $44,555.84 |
| | | 1,043.49 | $43,512.35 |
| | | 1,750.00 | $41,762.35 |
| | A | 160.50 | $41,601.85 |
| | | 138.75 | $41,463.10 |
| | | 107.38 | $41,355.72 |
| | | 2,680.00 | $38,675.72 |
| | | 301.12 | $38,374.60 |
| | | 199.64 | $38,174.96 |
| | | 40.26 | $38,134.70 |
| | | 24.87 | $38,109.83 |
| | | 2.79 | $38,107.04 |
| | | 93.62 | $38,013.42 |
| | | 63.23 | $37,950.19 |
| | | 150.87 | $37,799.32 |
| | | 11.30 | $37,788.02 |
| | | 299.81 | $37,488.21 |
| | | 1,826.91 | $35,661.30 |
| | | 705.00 | $34,956.30 |
| | | 90.63 | $34,865.67 |
| | | 77.25 | $34,788.42 |
| | | 51.87 | $34,736.55 |
| | | 148.50 | $34,588.05 |
| | | 250.00 | $34,338.05 |
| | | 19.99 | $34,318.06 |
| | | 9.65 | $34,308.41 |
| | | 26.15 | $34,282.26 |
| | | 3,000.00 | $31,282.26 |
| | | 12,000.00 | $19,282.26 |
| | | 4,680.00 | $14,602.26 |

*CONTINUED ON NEXT PAGE*

*CONTINUED FROM PREVIOUS PAGE*

| | | |
|---|---|---|
| 0 | | |
| | | $14,287.26 |
| PU | | $14,241.91 |
| | | $14,235.92 |
| | | $14,210.08 |
| | | $14,200.34 |
| | | $14,158.32 |
| | | $13,841.21 |
| | | $13,836.21 |
| | | $13,778.95 |
| | | $9,778.95 |
| | | $9,729.02 |
| | | $49,729.02 |
| | | $64,602.02 |
| | | $62,102.02 |
| | 15.00 | $62,087.02 |
| | 2.99 | $62,084.03 |
| | 80.01 | $62,004.02 |
| | 11.06 | $61,992.96 |
| | 9.19 | $61,983.77 |
| | 14.14 | $61,969.63 |
| | 29.87 | $61,939.76 |
| | 8.74 | $61,931.02 |
| | 36.00 | $61,895.02 |
| | 6.05 | $61,888.97 |
| | 6.00 | $61,882.97 |
| | 1,900.00 | $59,982.97 |
| | 5,000.00 | $54,982.97 |
| | 103.00 | $54,879.97 |
| | 3,734.50 | $51,145.47 |
| | 2.50 | $51,142.97 |
| | 14.89 | $51,128.08 |
| | 25.84 | $51,102.24 |
| | 17.08 | $51,085.16 |
| | 50.00 | $51,035.16 |
| | 186.20 | $50,848.96 |
| | 169.47 | $50,679.49 |

*CONTINUED ON NEXT PAGE*

*CONTINUED FROM PREVIOUS PAGE*

| | | | |
|---|---|---|---|
| | PURCHASE ON 05022019 AT UBER TRIP 8005928996 C A | 37.04 | $50,642.45 |
| 05/03/19 | ENDING BALANCE | | $50,642.45 |

*All deposited items are credited subject to final payment.*

## ITEMS PAID ON THIS STATEMENT

| | | | |
|---|---|---|---|
| #13 ......... 3,284.00 | #19 ......... 3,734.50 | #26 ......... 5,000.00 | #27 ......... 1,750.00 |
| #28 ......... 32.00 | #30 ......... 49.93 | #34 ......... 5,500.00 | #35 ......... 2,400.00 |
| #36 ......... 75.00 | #37 ......... 340.00 | #38 ......... 2,500.00 | #39 ......... 7,500.00 |
| #40 ......... 280.00 | #41 ......... 739.00 | #42 ......... 220.00 | #43 ......... 700.00 |
| #44 ......... 500.00 | #45 ......... 2,500.00 | #47 ......... 12,000.00 | #49 ......... 3,000.00 |
| #58 ......... 4,000.00 | #59 ......... 3,734.50 | #61 ......... 1,900.00 | #62 ......... 5,000.00 |

For Consumer Accounts Only:
IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS
Electronic transfers (called transfers below) means a) deposits, withdrawals, or payments made at an ATM or store terminal, b) bill payer transfers c) all other electronic transfers (e.g., payroll deposits, Social Security deposits, insurance payments, etc.).

If you think your statement or receipt is wrong, or if you need more information about a transfer on the statement or receipt, TELEPHONE US OR WRITE TO US AS SOON AS YOU CAN -- USE THE TELEPHONE NUMBER OR ADDRESS ON THE FRONT OF THIS STATEMENT.

We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.

(1) Tell us your name and account number (if any).
(2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
(3) Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days to do this, we will credit your account for the amount you think is in error, so that you will have the use of the money during the time it takes to complete our investigation.

© 2019 HSBC Bank USA, National Association
HSBC Bank USA, National Association
Member FDIC.



REAL SIGNATURES OF EDWARD A. KESSLER

Edward Kessler

... funds needed shall be sourced f

Ed Kessler

FORGED SIGNATURES OF EDWARD A. KESSLER

l representative, has executed this Power of Attorney on the date set forth below.

**BORROWER:**

Premier Group Autos LLC DBA Overfinch Miami

By:
Name: Edward Anthony Kessler
Title: Manager
Date: 4.12.19

shareholder, partner, managing member, guardian, tax matters partner, executor, receiver, administrator, trust certify that I have the authority to execute Form 4506-T on behalf of the taxpayer. **Note:** This form must be re signature date.

☒ Signatory attests that he/she has read the attestation clause and upon so reading declares that he/she has the authority to sign the Form 4506-T. See instructions.

**Sign Here**

Signature (see instructions) — Date 01/29/19

Title (if line 1a above is a corporation, partnership, estate, or trust)

Spouse's signature — Date

**For Privacy Act and Paperwork Reduction Act Notice, see page 2.** Cat. No. 37667N

EXHIBIT
**Exhibit E**