**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| **NEXTGEAR CAPITAL, INC.,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | **CASE NO. 1:20-cv-00354-TWP-DLP** |
| **v.** | ) | |
| | ) | |
| **PREMIER GROUP AUTOS, LLC,** | ) | |
| **JAMES M. BLACKBURN, and** | ) | |
| **EDWARD A. KESSLER,** | ) | |
| **Defendants** | ) | |

## DEFENDANT/COUNTERCLAIMANT, EDWARD A. KESSLER'S, MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant/Counterclaim, Edward Kessler (hereinafter "Kessler") is the victim of a serious fraud and forgery. The forgery has been committed by Co-Defendant, James Blackburn ("Blackburn"), and, at a minimum, allowed to occur as a result of the actions of the Plaintiff, NextGear Capital, Inc. ("NextGear"). NextGear (acting through its representatives) have engaged in forgery (whether intentionally or negligently) and allowed a critical "Loan Document" to be forged, i.e., a Power of Attorney, which document was undisputedly required by NextGear to allow NextGear to provide funding through a line of credit under the Note to Co-Defendant, Premier Group Autos, LLC. The NextGear employee, Arturo Mayoral, who participated in the forgery, is a Florida notary public and notarized and swore that he observed Edward Kessler sign the subject Power of Attorney. But, as the undisputed evidence demonstrates, Kessler did not sign the Power of Attorney document that Mayoral notarized and Mayoral and NextGear have engaged in notary misconduct in violation of Florida Statute § 117.05.

Under Florida law, the employer of the notary public who engages in notary misconduct is vicariously liable to the party harmed by the notary misconduct. Here, because of Mayoral's

notary misconduct in violation of Florida law, Kessler has been damaged and is entitled to judgment as a matter of law against NextGear on Count III of Kessler's Counterclaim.

## I.      STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

Edward A. Kessler is an individual who resides in Bethel Park, Pennsylvania and has resided in Pennsylvania all of his life.  (Kessler Aff. At ¶ 2).  Kessler is employed as an actuarial analyst for a company that is located in Pennsylvania.  (*Id*. at ¶ 3).  In late 2017 to early 2018, Kessler was introduced to James Blackburn through mutual friends in Florida.  (*Id*. at ¶ 4).

In the latter part of 2018, Kessler attended the Fort Lauderdale boat show and met with James Blackburn.  (*Id*. at ¶ 5).  During this time, James Blackburn brought a business concept to Kessler about investing in a potential dealership that would sell high-end Range Rover vehicles through the brand name called: "Overfinch".  (*Id*. at ¶ 5).  In furtherance of the dealership business, James Blackburn formed a Florida limited liability company by the name of Premier Group Autos, LLC ("PGA").  (*Id*. at ¶ 6).

PGA was formed for the purpose of distributing high-end aftermarket Range Rovers utilizing the Overfinch branding and trademark.  (*Id*. at ¶ 7).  James Blackburn was a 50% owner in PGA and Edward Kessler ("Kessler") was also a 50% owner of PGA.  (*Id*. at ¶ 8).  Blackburn and Kessler agreed to a 50/50 venture and entered into an agreement regarding the operations of PGA.  (*Id*. at ¶ 9).  Pursuant to Blackburn and Kessler's agreement, Kessler and Blackburn agreed that each would make capital contributions to the company, and further agreed that each person would fund the purchase of at least one Range Rover from the Overfinch distribution.  (*Id*. at ¶ 10).  Kessler, as a 50% owner of PGA, was given the title of "Director of Operations."  Kessler, however, despite the given title was a passive investor in PGA and never intended to have any day-to-day control or management of PGA.  (*Id*. at ¶ 11).

At the time PGA was formed, Kessler was in the process of actively interviewing for jobs as an actuarial analyst and had no intentions of working the PGA business. (*Id*. at ¶ 12). Kessler informed Blackburn that Blackburn would be responsible for the operations and that Kessler would provide an investment in what Kessler believed to be a potentially profitable business through the sale of the Overfinch/Range Rover product. (*Id*.)

Kessler made an initial capital investment of $112,500.00 into PGA and also directly purchased an Overfinch/Range Rover for PGA's use in the amount of $180,536.40. (*Id*. at ¶ 13). Despite Blackburn's promise and obligation to make the same capital contribution and purchase an Overfinch/Range Rover, Blackburn never made his required capital contribution and never purchased an Overfinch/Range Rover. (*Id*. at ¶ 14).

In or around late February 2019, Kessler received an email from NextGear Capital and/or Docusign asking for Kessler to review a purported note and loan agreement for PGA's apparent acquisition of a $500,000.00 line of credit from NextGear. (*Id*. at ¶ 15). During this time (late February 2019), Kessler was unaware that Blackburn, purportedly acting on behalf of PGA, was seeking to obtain any type of financing from NextGear or any other lender. (*Id*.)

Kessler informed Blackburn that PGA did not need, nor was PGA ready for, any financing at this level and that terms of the $500,000.00 NextGear financing plan did not make smart financial sense for PGA. (*Id*. at ¶ 16). For example, Kessler told Blackburn that Kessler would not agree to the $500,000.00 line of credit from NextGear because: (a) PGA could not afford such a large amount of financing; (b) the terms of the $500,000.00 financing arrangement required PGA to submit a $100,000.00 retainer; and (c) Kessler would not agree to sign a Power of Attorney document that apparently was required to be signed as part of the $500,000.00 NextGear financing package. (*Id*).

In addition, Kessler informed Blackburn that Kessler would not sign a power of attorney document as part of any financing with NextGear as Kessler had the power of attorney document from NextGear reviewed by an attorney and was counseled not to sign such a document as part of any financing transaction with NextGear.  (*Id*).

Kessler did believe, however, that PGA did need additional access to capital to help fund the purchase of Overfinch/Range Rover vehicles.  (*Id*. at ¶ 17).  Thus, Kessler approached his parents and requested that they provide a $300,000.00 asset backing loan so that PGA could have access to additional funds to purchase the Overfinch/Range Rover vehicles.  (*Id*).  Kessler's parents, Edward P. Kessler and Kristine E. Kessler, in or around March 11, 2019, agreed to provide PGA with a $300,000.00 loan, which was memorialized by a "Business Loan Agreement".  (*Id*. at ¶ 18).

Thus, after receipt of the $300,000.00 loan from Kessler's parents, Kessler believed that PGA was properly capitalized and ready to engage in business through the purchase and sale of the Overfinch/Range Rover through an Overfinch distribution agreement.  (*Id*. at ¶ 19).  Blackburn, however, without Kessler's knowledge, still continued to discuss loan opportunities with NextGear.  (*Id*. at ¶ 20).

Ultimately, in the latter part of March 2019, Blackburn approached Kessler and said that NextGear agreed to do a floor plan financing transaction that would not exceed $150,000.00 in a total line of credit and the line of credit was to be used in $40,000.00 increments to finance less expensive vehicles.  (*Id*. at ¶ 21).  As part of this $150,000.00 Loan, Blackburn also told Kessler that NextGear agreed that it would not require the execution of a Power of Attorney document as part of the transaction, which Kessler previously objected to signing or providing as any part of a loan agreement.  (*Id*).  Blackburn further agreed that the $150,000.00 line of credit from NextGear

would only be used by PGA in $40,000.00 increments, and when a non-Overfinch car was sold using the financing, the full $40,000.00 loan would be immediately repaid.  (*Id*).

With this understanding and agreement in place, Kessler agreed that PGA could enter into a floor plan financing agreement for the $150,000.00 line of credit with NextGear.  (*Id*. at ¶ 22).  Thus, on or about March 26, 2019, Kessler received from NextGear/Docusign the contract documents that required execution.  (*Id*. at ¶ 23).

As part of the contract documents that Kessler received from NextGear/Docusign, all of the documents required an electronic signature, but there was no place for Kessler to electronically sign the Power of Attorney documents.  (*Id*).  Because there was no place for Kessler to "click and sign" the Power of Attorney documents from NextGear/Docusign, Kessler believed and confirmed what Blackburn previously told Kessler was true, i.e., that the Power of Attorney documents were not required to be signed as part of the overall loan/contract process to obtain the $150,000.00 line of credit from NextGear.  (*Id*).  However, since this litigation has ensued, Kessler has learned that the Power of Attorney document, was, in fact, required to be executed as part of the overall lending process.  (*Id*. at ¶ 34).

### The NextGear "Loan Documents" & Execution Requirement for Power of Attorney Documents

On March 27, 2019, Kessler electronically signed, via DocuSign, the Demand Promissory Note and Loan and Security Agreement (the "Note"), the Advance Schedule, and Individual Guaranty.  (*See* Dkt. 1-3 at p. 21 & Dkt. 1-3 at p. 44.

Pursuant to Section 8 of the Note, in addition to execution of the Note, PGA "shall execute (or cause the execution of) the following additional documents in connection with Borrower's Credit Line (together with all other documents and instruments executed by Borrower in connection with this Note or Borrower's Credit Line, and in each case as the same may be

amended, restated, renewed extended or otherwise modified form time to time, the "Loan Documents") each of which shall be incorporated herein by reference and made a part of this Note: (a) a power of attorney in favor of Lender and its designated Representative…" (*See* Dkt. 1-3 at p. 16).

The Note further provides in Section 14 that: "[t]his Note and the other Loan Documents may be executed by the Parties in one or more counterparts which, collectively, shall constitute one and the same agreement." (*See* Dkt. 1-3 at p. 17). Pursuant to the Note, the term "Loan Documents" has the meaning set forth in Section 8 above. (*Id*). In NextGear's original Complaint, which has been litigated throughout this case, NextGear attached the subject Power of Attorney documents of Mr. Blackburn and Mr. Kessler to the Note as part of the "Note and Loan Documents." (*See* Dkt. 1-3; Dkt. 1-3 at p. 30-33).

The Note and Loan Documents further provide that it is a default under the Note for the Borrower to fail to deliver, revoke or amend any power of attorney or similar authorization that it has executed in favor of Lender. (*See* Dkt. 1-3 at p. 15).

As part of the contracting process and underwriting process for the subject NextGear Note, NextGear had various "stipulations" during the contracting process, which are "documents or items that are required in order to secure the line of credit." (Mayoral Dep. at p. 160). "Stipulations", during the contracting process with NextGear, are "[r]equirements that are needed to be met before the contract can be fully executed." (Ramey Dep. at p. 27-28).

Pursuant to internal NextGear emails, NextGear required as "stipulations" that Edward Kessler and James Blackburn sign, provide and return Power of Attorney documents as part of the contracting process. (Mayoral Dep. at p. 160-161, Ex. 14); (Ramey Dep. at p. 45; Ex. 18).

According to NextGear and NextGear's official policy, NextGear will lock an account and deny the Borrower from gaining access to any funds and will not lend any funds if the required Power of Attorney documents are not signed and returned within thirty (30) days of original execution of the Note.  (Mayoral Dep. at p. 151-156; 158-159; 165; Ex. 13).

According to Andrew Ramey, Senior Manager of Lending Services for NextGear, if the required Power of Attorney document is not signed within 30 days post activation, the account is locked and the borrower cannot access any funds from NextGear.  (Ramey Dep. at p. 26).  Throughout Ramey's tenure with NextGear, Ramey stated that he has never seen a situation where a dealer/borrower refuses to sign a power of attorney document and still receive funds from NextGear.  (Ramey Dep. at p. 26).

**Kessler's Alleged "Execution" of the Power of Attorney Document**

Arturo Mayoral is employed by NextGear as a Sales Executive and is a resident of south Florida.  (Mayoral Dep. at p.5-6 & 9-10).  Mayoral's job duties are to prospect for new customers and sell the NextGear lending product to car dealers.  (*Id*).  As part of Mayoral's job duties, Mayoral assist in getting signatures to help facilitate the contracting process for a new customer of NextGear.  (*Id*. at p. 29-30).  As part of the overall "contract execution" with NextGear, Mayoral states that the contract documents are sent via Docusign, "and then there is a Power of Attorney that has to be signed within 30 days of the account activating or the account will be locked." (Mayoral Dep. at p. 30: 01- 18).

In his role as a Sales Executive for NextGear, Mayoral also serves as a notary public in the State of Florida.  (Mayoral Dep. at p. 36-37).  Mayoral decided to become a notary public to assist the dealers and make sure that everything flows to keep NextGear's customers happy.  (*Id*).  Mayoral serves as a notary public solely for NextGear business and in furtherance of NextGear's

business.  (Mayoral Dep. at pp. 38-39).  Mayoral attended an 8-hour course through the State of Florida to become a Florida notary public.  (Mayoral Dep. at p. 39-40).  NextGear reimburses Mayoral for the annual charges associated with the bonding requirements to serve as a notary public in the State of Florida.  (Mayoral Dep. at p. 40-41).

According to Mayoral's training to become a notary public, the process of notarizing a document is as follows:

**3 Q.   Okay.  Walk me through that process of what**

**4       you were trained step by step.**

**5 A.    Basically it's just to give the document to**

**6       the person, make sure that they understand**

**7       what they are signing, that they're signing**

**8       of free will.  I observe them signing, make**

**9       sure that the dates are correct.  I then look**

**10      at the person's driver's license, verify**

**11      signature.  I then fill out my notary section**

**12      with the correct dates.  I apply my**

**13      signature, and then I apply my notary seal**.

(Mayoral Dep. at p. 44)

Mayoral testified that there is no "leeway" whatsoever in the steps identified above and Mayoral stated if there was a deviation that "it wouldn't be valid."  (Mayoral Dep. at p. 47).

On April 18, 2019, Mr. Mayoral testified that he went to the PGA offices in Fort Lauderdale, Florida and obtained the signatures of Mr. James Blackburn and Mr. Edward Kessler

on two (2) separate Power of Attorney documents.  (Mayoral Dep. at Ex. 8 & Ex. 9; at pp. 91-94).

Prior to April 18, 2019, Mr. Mayoral had never met Edward Kessler.  (Mayoral Dep. at p. 50).

When Mayoral arrived at the PGA office in Fort Lauderdale, Mayoral went to the PGA conference room and was introduced to a person who Mayoral stated was Mr. Edward Kessler. (Mayoral Dep. at p. 91-95).  There was a bit of small talk, and then Mayoral requested Kessler (or the man who allegedly claimed to be Kessler) sign the Power of Attorney document.  (Mayoral Dep. at p. 95-96).  Mayoral asked if there were any questions and the man who claims to be Kessler stated "no" and this person, according to Mayoral, willingly signed the Power of Attorney document.  (Mayoral Dep. at p. 95-98).

Mayoral testified that he gave the Power of Attorney document to Kessler and that Kessler completely filled out the signature block and the date portion of the Power of Attorney document. (Mayoral Dep. Ex. 8 & p. 97-99).  Mayoral testified that Kessler wrote the date portion of the Power of Attorney document and that no one else signed or wrote on any portion of the signature block or the date line.  (Mayoral Dep. at p. 98-99).

After Kessler (or the man who apparently claimed to be Kessler) signed the Power of Attorney document, Mayoral testified that he looked at a black and white photocopy of a picture of Edward Kessler's license and then proceeded to notarize the Power of Attorney document. (Mayoral Dep. at 98-99).  The black and white photocopy of the picture of Kessler's driver's license that was reviewed by Mayoral to try to confirm that the signature of Edward Kessler was the same as appeared on the Power of Attorney document was the following picture:



(Mayoral Dep. at Ex. 4; at p. 99 & 104).

Mayoral compared the above signature of Edward Kessler from the photocopy of Kessler's license against the below signature of "Edward Kessler" on the Power of Attorney document, which signature was purportedly obtained from the person who just signed Edward Kessler's signature in front of Mayoral was as follows:

I representative, has executed this Power of Attorney on the date set forth below.

**BORROWER:**

Premier Group Autos LLC DBA Overfinch Miami

By:
Name: Edward Anthony Kessler
Title: Manager
Date: 4.18.19

(Mayoral Dep. at pp. 98-99; Ex. 8).

Mayoral testified that he believed the two (2) signatures above, when comparing the two (2) signatures, "appear similar." (Mayoral Dep. at p. 99).

Mayoral did not ask the person claiming to be Mr. Edward Kessler to provide the person's actual identification card or driver's license as part of the notary process, nor did Mayoral ask to inspect Edward Kessler's driver's license. (Mayoral Dep. at p. 48-49). Despite not asking to see the actual driver's license of Edward Kessler, when Mayoral was asked about the notary process for the subject Power of Attorney from one his superiors at NextGear, Mayoral stated that he "[Mayoral] verified the ID's and followed Procedure notarizing their respective documents." (Mayoral Dep. at Ex. 5). Mr. Mayoral also testified that when he told his boss in the email that he followed "Procedure", he meant that he followed the "notary procedure." (Mayoral Dep. at p. 111-112). Mr. Mayoral also told his boss that he logged "all" of his activities in Salesforce. (Mayoral Dep. at Ex. 5). But, the Salesforce log for Mayoral's "activities" on April 18, 2019 do not at all show that Mayoral had the Power of Attorney documents signed and/or notarized. (Mayoral Dep. at p. 131-132).

After reviewing the signatures above, Mayoral notarized the Power of Attorney and completed his attestation clause stating that Edward Kessler appeared before him in Fort Lauderdale, Florida and executed the Power of Attorney. (Mayoral Dep. at p. 99; Ex. 8).

Mayoral is not aware of any training of being a notary public where it is acceptable to use a picture of a copy of a driver's license instead of requesting to see the actual driver's license of the person while notarizing a document. (Mayoral Dep. at p. 58: 06-14).

After the man claiming to be Edward Kessler signed the Power of Attorney document, Mayoral directed his attention to James Blackburn to obtain Blackburn's signature on his Power of Attorney document. (Mayoral Dep. at p. 99-100). Mayoral did not ask to see Blackburn's signature because Blackburn was known to Mayoral from prior meetings. (*Id*). Just like Mayoral testified regarding the signature of Kessler's  Power of Attorney above, Mayoral also testified that

he observed Blackburn sign the Power of Attorney and also date the Power of Attorney in Blackburn's own handwriting. (Mayoral Dep. at p. 101; Ex. 9).

The signature and date of Blackburn on Blackburn's Power of Attorney document appears as follows:



(Mayoral Dep. at Ex. 9).

Despite Mayoral's testimony and alleged review of Kessler's signature on the photocopy of Kessler's license, as compared to the Power of Attorney document Kessler allegedly signed, Mr. Ramey, Senior Manager of Lending Services for NextGear, testified that when he compared the picture of the license (Ex. 4) and the signature of Edward Kessler on the Power of Attorney document (Ex, 8), the two (2) signatures did not look alike.  (Ramey Dep. at p. 97-98). Specifically, Ramey testified as follows:

**098:05 Q.   I'm going to hand you what's been marked**

**098:06       previously as Exhibit 8.  It's the Power of**

**098:07       Attorney of Mr. Kessler.  Does that look like**

**098:08       Mr. Kessler's signature compared to his**

**098:09     license?**

**098:10 A.   Not exactly, no.**

(Ramey Dep. at p. 97-98).

Despite Mayoral testifying under oath that the man claiming to be Kessler signed and dated his own Power of Attorney, and Blackburn signed and dated his own Power of Attorney, Blackburn admitted in his deposition that the date written on Kessler's purported Power of Attorney document "4-8-19" appears to "look like my handwriting on the date, although I don't recall the document." (Blackburn Dep. at p. 195).

**Discovery of Blackburn's Fraud and Misuse of PGA Funds**

In the early summer of 2019, Kessler went to Florida to review the financial records of PGA, as Kessler had not been able to access the bank records of PGA.  (Kessler Aff. at ¶ 24). During this time (June 2019), Kessler reviewed some of the PGA financial records and attempted to reconcile various expenditures made from the PGA account.  (*Id*).  During this first review of the PGA financial records is when Kessler first noticed that Blackburn was sending PGA funds to other companies that Blackburn owned or controlled.  (*Id*).  Kessler questioned Blackburn about these expenditures, but Blackburn never really provided a response that made sense and simply stated that he (Blackburn) would reconcile the books and demonstrate that the expenditures to the other companies were justifiable and in furtherance of actual PGA business.  (*Id*).   However, to date, Kessler has not received any accurate or justifiable explanation from Blackburn about the misuse of PGA's funds and Blackburn's use of PGA funds for his own benefit.  (*Id*. at ¶ 25).

In addition, during the summer of 2019, PGA's bookkeeper, Donna Degroff, asked Blackburn about a certain transaction using the NextGear line of credit.  (*Id*. at ¶ 26).  Ms. Degroff also stated that this transaction would increase the NextGear line of credit to more than

$250,000.00. (*Id*). This is the first time that Kessler learned that Blackburn was potentially misusing the NextGear line of credit. (*Id*).

Later, on September 27, 2019, Kessler received his first communication/notice from NextGear that PGA was delinquent and that the line of credit was in default. (*Id*. at ¶ 27). Prior to September 27, 2019, Kessler never received any communication or notice from NextGear that the line of credit was in default or that Blackburn had misused the line of credit. (*Id*). Prior to this time, Kessler also had no knowledge that Blackburn had increased the line of credit by more than $200,000.00, which was done without Kessler's knowledge and/or consent. (*Id*).

As a result of Blackburn's misappropriation of PGA's funds, Kessler filed a lawsuit against Blackburn in the State of Florida. A true and accurate copy of the lawsuit against Mr. Blackburn is attached to Mr. Kessler's Affidavit as Exhibit B. (*Id*. at ¶ 28). As part of the Florida litigation against Blackburn, a forensic accounting investigation was ordered by the Florida court. (*Id*. at ¶ 29). As a result of this court ordered forensic accounting investigation, it was determined that Blackburn paid himself (or entities he owns/controls) in excess of $900,000.00 of PGA's funds. (*Id*). These payments from PGA funds included payments to Blackburn for trips to Barbados, jewelry and other personal expenditures for the personal benefit of Blackburn or Blackburn's family. (*Id*). A true and accurate copy of the accounting report that was prepared as part of the Florida litigation by the court ordered accountant is attached as Exhibit C to Mr. Kessler's Affidavit.

As part of Mr. Kessler's investigation into Mr. Blackburn's fraud and misappropriation, Kessler also discovered that Blackburn had forged Kessler's name to an American Express credit card and Blackburn spent over $90,000.00 on the American Express credit card without Kessler's knowledge and/or consent. (*Id*. at ¶ 30). American Express brought suit against Kessler for

collection of the credit card, but, ultimately, American Express realized that Kessler was the victim of fraud and forgery and American Express dismissed the lawsuit and did not seek reimbursement for the funds that Blackburn inappropriately and unlawfully charged for his own benefit.  (*Id*).

**Discovery of the Forged Power of Attorney Document**

After Kessler was served with the lawsuit in the above-captioned litigation, Kessler learned for the first time that his name was forged on the Power of Attorney document.  (*Id*. at ¶ 31). Kessler never signed the subject Power of Attorney (a copy of which is attached to the deposition transcript of Arturo Mayoral as Exhibit 8), nor did Kessler authorize Blackburn or anyone else to sign his name.  (*Id*).

As stated in Kessler's Interrogatory Answers, Kessler was not in Fort Lauderdale, Florida on April 18, 2019.  But rather, Kessler was in Pennsylvania.  (*Id*. at ¶ 32).  Specifically, after being in Erie, Pennsylvania on April 17, 2019 and driving back to Pittsburgh, Kessler was still in Pittsburgh on the morning of April 18, 2019.  (*Id*).  On the morning of April 18, 2019, at 7:45 a.m., Kessler took a picture of a hockey roster for a pickup game of hockey that he played in later that night in Pennsylvania.  (*Id*).  Also, on the same evening, Kessler also checked in to LA Fitness in Bethel Park, Pennsylvania and worked out prior to the hockey game.  (*Id*).

Kessler did not agree to sign the subject Power of Attorney document as part of the NextGear loan/financing and would not have agreed to allow PGA to enter into the loan/financing agreement if NextGear required the execution of the Power of Attorney document.  (*Id*. at ¶ 33). Nor would Kessler have signed any of the Loan documents, including the personal guaranty, if it was required by NextGear to sign the Power of Attorney document as part of the Loan Documents or financing transaction.  (*Id*).

However, since the instant litigation has taken place, Kessler has now learned that NextGear required both Blackburn and Kessler to execute the Power of Attorney document as part of the overall lending process with NextGear.  (*Id.* at ¶ 34).

But, because NextGear assisted in the procurement of a forged Power of Attorney document, Blackburn was able to access the line of credit and incur more than $350,000.00 in debt without Kessler's knowledge and/or consent (*Id.* at ¶ 35).

Exactly one day after the forged Power of Attorney document was provided to NextGear, the PGA bank records demonstrate that the first $40,000.00 draw on the line of credit was made and deposited into the PGA bank account.  (*Id.* at ¶ 36).  A true and accurate copy of the relevant portion of the PGA bank records demonstrating the deposit was made is attached to the Affidavit of Edward Kessler as Exhibit D.

In addition, during this lawsuit, Kessler has also discovered that his name was forged to a NextGear credit application wherein Blackburn was apparently looking to obtain a $1,000,000.00 line of credit.  (*Id.* at ¶ 37).  A true and accurate copy of the forgery of the credit application is attached to Arturo Mayoral's deposition transcript as Exhibit 3).  Kessler did not sign the NextGear credit application, nor did Kessler permit Blackburn or anyone else to sign his name.  (*Id*).

As a result of the forgery and fraud associated with the execution of the Power of Attorney document, Kessler claims to have sustained damages by virtue of NextGear seeking to recover more than $420,000.00 from him for the default of the PGA line of credit.  (*Id*. at ¶ 39).  In addition, Kessler has incurred attorney's fees in excess of $60,000.00 through the defense of this action simply because of the forged Power of Attorney document that NextGear (and its representatives) assisted in procuring and which was required to obtain funding under the NextGear Loan Documents.  (*Id*).

**NextGear's Inconsistent Statements Regarding Execution of the Kessler Power of Attorney**

In NextGear's Answers to Kessler's Interrogatories, NextGear was requested in Interrogatory No. 4 to provide detail and circumstances surrounding the execution of the Kessler Power of Attorney.   In its Answer to Interrogatory No. 4, Andrew Ramey, the authorized representative of NextGear, who signed the Interrogatory Answers under oath stated that Kessler and Blackburn both were within the presence of Arturo Mayoral and that "Kessler provided his Pennsylvania driver's license as identification, a picture of which was taken contemporaneously with Kessler's signing of the Power of Attorney that he executed.  Kessler signed the Power of attorney without reservation and of his own free will."   (*See* NextGear Ans. to Kessler Interrogatories at No. 4).

However, despite NextGear's Answer to Interrogatory No. 4, when Arturo Mayoral was deposed, Mayoral testified that he never took a picture of Kessler's license and has never told anyone that he ever took a picture of Kessler's license.  (Mayoral Dep. at p. 181).

Ultimately, NextGear has finally admitted that "Mr. Kessler most likely did not sign a Power of Attorney in the presence of Mr. Mayoral."  (*See* NextGear Second Amended Answer to Interrogatory No. 4).  In fact, despite originally denying the Request for Admission, NextGear has also admitted that the Power of Attorney document, purportedly signed by Edward Kessler, was not signed by Edward Kessler.  (*See* NextGear Amended Resp. to Req. for Admission No. 1).

Also, despite Mayoral's testimony and notary attestation, NextGear has also now admitted in its Amended Responses to Kessler's Requests for Admission that Kessler did not appear before Arturo Mayoral and sign the Power of Attorney document and that Kessler has never signed the Power of Attorney document.  (*See Id.*at Req. No.'s 2 & 5).

## II.      SUMMARY JUDGMENT STANDARD

A motion for summary judgment may be granted where there exists "no genuine dispute as to any material fact…and the moving party is entitled to judgment as a matter of law." *New Horizons Rehab., Inc. v. Indiana*, 400 F. Supp. 3d 751, 758 (S.D. Ind. 2019) (citing Federal Rule of Civil Procedure 56(a)). The purpose of summary judgment is to "pierce the pleadings and determine whether there is a genuine need for trial." *Id*. (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)). This notion applies equally to situations where opposing parties each move for summary judgment in their favor. *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 774 (7th Cir. 1996). The existence of cross-motions for summary judgment means the court must take the facts in the light most favorable to the non-movant, first for one side and then for the other. *Id*. at 648. The moving party is entitled to summary judgment if no reasonable factfinder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009).

## III.     ARGUMENT

### A. Arturo Mayoral Engaged in Notary Misconduct in Violation of Fla. Stat. §117.05.

It is undisputed that Arturo Mayoral, while acting within the course and scope of his employment with NextGear, committed notary misconduct in violation of Fla. Stat. § 117.05. Florida Statute § 117.05 sets forth the various requirements and obligations that a Florida notary public must comply with while performing notary services.   Specifically, Fla. Stat. § 117.05(5) provides, in relevant part that:

> A notary public may not notarize a signature on a document unless he or she personally knows, or has satisfactory evidence, that the person whose signature is to be notarized is the individual who is described in and who is executing the instrument.  A notary public shall certify in the certificate of acknowledgement or jurat the type

of identification, either based on personal knowledge or other form of identification, upon which the notary public is relying.

******

(b) For the purposes of this subsection, the term "satisfactory evidence" means the absence of any information, evidence, or other circumstances which would lead a reasonable person to believe that the person whose signature is to be notarized is not the person he or she claims to be and any of the following:

*****

2. Reasonable reliance on the presentation to the notary public of any one of the following forms of identification, if the document is current or has been issued within the past 5 years and bears a serial or other identifying number:

   a. A Florida identification card or driver license issued by the public agency authorized to issue driver licenses;
   b. A passport issued by the Department of State of the United States;
   c. A passport issued by a foreign government if the document is stamped by the United States Bureau of Citizenship and Immigration Services;
   d. A driver license or an identification card issued by a public agency authorized to issue driver licenses in a state other than Florida or a territory of the United States, or Canada or Mexico
   e. An identification card issued by any branch of the armed forces of the United States;

*****

Fla. Stat. § 117.05

Here, in the present case, the undisputed evidence is that Arturo Mayoral, when serving as a notary public on behalf of NextGear, did <u>not</u> obtain any of the acceptable forms of identification from the person claiming to be Mr. Edward Kessler on April 18, 2019.  At best, Mr. Mayoral had a black and white photocopy of a picture of Mr. Kessler's license, i.e., Mayoral had a copy of a copy of Mr. Kessler's license.  It is undisputed that Mayoral did not ask the person to provide his driver's license or acceptable form of identification at the time of performing the notary service, which is in direct violation of Fla. Stat. § 117.05(5)(B)(2).

We now know, however, that if Mayoral simply would have followed his notary public requirements, as required by Fla. Stat. § 117.05, and required the person claiming to be Mr. Kessler to present his driver's license or other picture identification, Mr. Mayoral would not have notarized the Power of Attorney document as the person claiming to be Mr. Kessler would not have had Mr. Kessler's actual driver's license.  The presentation of the driver's license in conjunction with the notary of an official document is absolute.  Nowhere within the statute does it allow for a notary public to review a black and white photographed copy of a picture of a driver's license to satisfy the identification requirement of Fla. Stat. § 117.05.  Mayoral failed to comply with his obligations and his failure has caused serious harm and damages to Kessler.

Accordingly, because Mr. Mayoral did not comply with the mandates of Fla. Stat. § 117.05, he has committed notary misconduct in violation of the statute and Mayoral and NextGear are responsible to Kessler for the damages caused by the notary misconduct.

**B.    NextGear is Vicariously Liable to Kessler as a result of Arturo Mayoral's Notary Misconduct in Violation of Fla. Stat. §117.05.**

According to Fla. Stat. § 117.05(6), the "employer of a notary public shall be liable to the persons involved for all damages proximately caused by the notary's official misconduct, if the notary public was acting within the scope of his or her employment at the time the notary engaged in the official misconduct."  Here, the undisputed evidence demonstrates that Mayoral was acting in the course and scope of his employment with NextGear at the time he performed the notary of the subject Power of Attorney document.  Mayoral admitted that he was acting in furtherance of NextGear's business at the time of performing notary services and he only performs notary services in furtherance of NextGear's business.  In addition, NextGear even reimburses Mayoral for the costs Mayoral incurs each year to continue his notary registration/certification.  Mayoral also testified that he provides the notary service to assist NextGear's customers.  Thus, the

undisputed record unequivocally demonstrates that Mayoral performed the subject notary services in the course and scope of employment with NextGear.

Next, the undisputed evidence also demonstrates that Mayoral's notary misconduct has proximately caused the harm/damages sustained by Kessler.  NextGear has admitted through the plain language of the "Loan Documents", as well as admissions from NextGear employees Ramey and Mayoral, that the subject Power of Attorney documents were required to be signed as "part of the contracting process."  For example, the Note and Loan Documents specifically state that the Power of Attorney documents are part of the overall "Loan Documents" and "shall constitute one and the same agreement."  In addition, NextGear's own internal documents state that the "stipulations", i.e., documents required for overall contract execution and approval, required both Blackburn and Kessler to sign the subject Power of Attorney documents.  Finally, it is further undisputed that if the subject Power of Attorney documents are not obtained, it is a default under the Note and a violation of NextGear's policy, which policy requires NextGear to lock the account and not provide any funding or money to the borrower.

The undisputed evidence demonstrates that Kessler was adamantly opposed to signing the Power of Attorney document and would not have signed any contracts with NextGear, or allowed PGA to enter into the Note, if the Power of Attorney was required to be signed.  Kessler only allowed PGA to enter into the Note because no Power of Attorney documents were required to be signed. But, because Kessler's Power of Attorney document was forged and Mayoral violated Fla. Stat. § 117.05 by not following notary procedure, the PGA line of credit was able to proceed and was never locked as required by NextGear policy and procedure.  As a result, Blackburn was able to siphon over $350,000.00 from the line of credit.

Quite simply, but for Mayoral's participation in the forgery (negligent or otherwise), NextGear would not have provided over $350,000.00 in funds to PGA because NextGear would not have received the required Power of Attorney document.  And, as NextGear's policy makes clear, NextGear would have locked the PGA account because the required Power of Attorney documents were not received.  Therefore, no funds would have been provided to PGA and Kessler would not be in a situation where NextGear is seeking to recover over $420,000.00 in damages, attorney's fees and interest from Kessler.  Mayoral's notary misconduct allowed NextGear to obtain a document absolutely critical and necessary to the overall funding of the PGA line of credit. Because of Mayoral's misconduct, Kessler has been damaged and NextGear is liable to Kessler for all amounts it seeks to recover through this lawsuit against Kessler, as well as the attorney's fees incurred through Kessler's defense of this case.

## IV.     CONCLUSION

For the foregoing reasons, Defendant/Counterclaimant, Edward A. Kessler, respectfully requests the Court to enter judgment in favor of Kessler and against NextGear Capital on Count III of Kessler's Counterclaim.

Respectfully submitted,

DELK McNALLY LLP

*/s/ Jason R. Delk*
Jason R. Delk, Atty. No. 24853-18
*Attorney for Defendant, Edward Kessler*

DELK McNALLY, LLP
211 S. Walnut Street
Muncie, IN 47305
Telephone: 765-896-9495
Facsimile: 888/453-0545

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing has been served upon all counsel of record via the Court's electronic case filing system this 31st day of January, 2022.

*/s/ Jason R. Delk*
Jason R. Delk

DELK McNALLY, LLP
211 S. Walnut Street
Muncie, IN 47305
Telephone: 765/896-9495
delk@delkmcnally.com