IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| NEXTGEAR CAPITAL, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CASE NO. 1:20-cv-00354-TWP-DLP |
| vs. | ) | |
| | ) | |
| PREMIER GROUP AUTOS, LLC, | ) | |
| JAMES BLACKBURN, and | ) | |
| EDWARD A. KESSLER. | ) | |
| | ) | |
| Defendants. | ) | |

## DESIGNATION OF EVIDENCE OF PREMIER GROUP AUTOS, LLC, AND JAMES BLACKBURN IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Premier Group Autos, LLC and James Michael C. Blackburn (collectively hereafter

"Defendants"), designate the following evidence in opposition to Plaintiff's Motion for Summary

Judgment:

| Exhibit | Description |
|---|---|
| 1 | Excerpts from Deposition of Arturo Mayoral |
| 2 | Excerpts from Deposition of James Blackburn, including Exhibit 27 thereto |
| 3 | Affidavit of James Blackburn |
| G | Overfinch Distribution Agreement (NextGear's Designation of Evidence) |
| N | Overfinch Termination Letter (NextGear's Designation of Evidence) |

Respectfully submitted:

ROCAP LAW FIRM LLC

 */s/ Richard A. Rocap*
Richard A. Rocap, Atty. No. 6333-49
*Attorney for Premier Group Autos, LLC and James Michael C. Blackburn*

ROCAP LAW FIRM LLC
10293 North Meridian Street, Suite 175
Carmel, IN 46290-1130
(317) 846-0700
rar@rocap-law.com

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on March 28, 2022, a true and correct copy of the

above and foregoing *Designation* was filed electronically through the Court's CM/ECF system.

Service of this filing will be made on all ECF-Registered counsel by operation of the Court's

electronic filing system.  Parties may access the filing through the Court's system.

 */s/ Richard A. Rocap*
Richard A. Rocap, Atty. No. 6333-49
*Attorney for Premier Group Autos, LLC and James*
*Michael C. Blackburn*

ROCAP LAW FIRM LLC
10293 North Meridian Street, Suite 175
Carmel, IN 46290-1130
(317) 846-0700
rar@rocap-law.com

# EXHIBIT 1

## EXCERPTS FROM MAYORAL DEPOSITION

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA


NEXTGEAR CAPITAL, INC.,      )
                             )
        Plaintiff,           )
                             )
                             )   CASE NO.
vs.                          )   1:20-cv-00354-TWP-DLP
                             )
                             )
PREMIER GROUP AUTOS, LLC,    )
JAMES M. BLACKBURN, and      )
EDWARD A. KESSLER,           )
                             )
        Defendants.          )



THE DEPOSITION UPON ORAL EXAMINATION OF

A R T U R O   M A Y O R A L,

   a witness produced and sworn before me, Donna
T. Feider, a Notary Public at large in and for the
State of Indiana, taken on behalf of the Defendant,
at the offices of Bose McKinney & Evans, LLP, 111
Monument Circle, Suite 2700, Indianapolis, Marion
County, Indiana, on Thursday, the 22nd day of July,
2021, commencing at approximately 10:05 a.m.,
pursuant to the Federal Rules of Trial Procedure,
pursuant to Notice.

2

                    A P P E A R A N C E S
FOR THE PLAINTIFF NEXTGEAR CAPITAL, INC.:

            Brian Jones, Esq.
            BOSE MCKINNEY & EVANS, LLP
            111 Monument Circle
            Suite 2700
            Indianapolis, IN  46204
            b.jones@boselaw.com


FOR THE DEFENDANT EDWARD A. KESSLER:

            Jason R. Delk, Esq.
            DELK MCNALLY
            211 South Walnut Street
            Muncie, IN  47305
            delk@delkmcnally.com


FOR THE DEFENDANTS PREMIER GROUP AUTOS, LLC
AND JAMES M. BLACKBURN:

            Richard A. Rocap, Esq.
            ROCAP LAW FIRM
            10293 North Meridian Street
            Suite 175
            Carmel, IN  46290
            rar@rocap-law.com


ALSO PRESENT:

            Gary Hoke
            Edward A. Kessler (telephonically)


*

3

I N D E X   O F   E X A M I N A T I O N

PAGE

DIRECT EXAMINATION...........................05
  Questions By:  Mr. Delk

CROSS-EXAMINATION............................186
  Questions By:  Mr. Rocap

REDIRECT EXAMINATION.........................192
  Questions By:  Mr. Delk

CROSS-EXAMINATION............................194
  Questions By:  Mr. Jones

FURTHER REDIRECT EXAMINATION.................195
  Questions By:  Mr. Delk

I N D E X   O F   E X H I B I T S

Plaintiff's Deposition Exhibits              PAGE

  Ex. 1 - Photocopy of Pennsylvania driver's
          license..............................54

  Ex. 2 - 6/11/2021 letter to Richard Rocap
          from Jason Delk; Subpoena to Testify
          at Deposition to Arturo Mayoral........59

  Ex. 3 - Confidential Dealer Application.......84

  Ex. 4 - Photocopy of Pennsylvania driver's
          license.............................103

  Ex. 5 - 3/3/2021 e-mail exchange between
          Arturo Mayoral and Jordan Cox.........105

  Ex. 6 - Discover transcript..................115

  Ex. 7 - Salesforce transcript................118

  Ex. 8 - Edward Kessler Power of Attorney......141

  Ex. 9 - James Blackburn Power of Attorney.....141

*

**Arturo Mayoral - CONFIDENTIAL - July 22, 2021**
**Nextgear Capital v. Premier Group Autos, et al.**

4

```
        I N D E X   O F   E X H I B I T S
              C O N T I N U E D
```

Plaintiff's Deposition Exhibits                PAGE

 Ex. 10 - Pre-Activation Quality Control Form..144

 Ex. 11 - 2019 Incentive Compensation Plan:
          Sr. Client Solutions Executive.......145

 Ex. 12 - NextGear policies, NG002203 through
          NG002208...........................152

 Ex. 13 - NextGear Internal Credit Guidelines,
          Effective June 1, 2021...............156

 Ex. 14 - 6/6/2019 to 6/13/2019 e-mail exchange
          between Arturo Mayoral and Jason
          Kubicki, Subject:  Premier Group
          Autos LLC - 125308...................159

 Ex. 15 - 9/6/2019 e-mail to Claudia Coello
          from Lending@nextgearcapital.com......163

 Ex. 16 - 3/11/19 Performance Improvement Plan..165

 Ex. 17 - NextGear Capital, Inc.'s Objections
          and Responses to Edward A. Kessler's
          First Interrogatories................174

*

5

```
 1            (The witness is sworn by the court
 2       reporter at 10:05 a.m., at which time the
 3       following proceedings are had:)
 4
 5            A R T U R O   M A Y O R A L,
 6               having been duly sworn to tell the
 7               truth, the whole truth and nothing but
 8               the truth relating to said matter, is
 9               examined and testifies as follows:
10  DIRECT EXAMINATION,
11       QUESTIONS BY MR. DELK:
12  Q.   Good morning.  If you could state and spell
13       your name for the record, please.
14  A.   Yes.  My name is Arturo Mayoral, A-R-T-U-R-O,
15       last name M-A-Y-O-R-A-L.
16  Q.   And, Mr. Mayoral, how old are you?
17  A.   ██████████████
18  Q.   And your date of birth?
19  A.   ███████████████.
20  Q.   Have you ever had your deposition taken
21       before?
22  A.   First time.
23  Q.   All right.  So I'm going to try to lay some
24       ground rules for us to make sure we have a
25       good, clean record today because obviously
```

187

1   A.    Yeah.  What I meant by that is that we lend

2         this money in good faith, and when the

3         accounts go default, we take it personally,

4         so I believe that by him going default, he

5         violated my trust.

6   Q.    Nothing else that he did other than default

7         alone?

8   A.    Correct.

9   Q.    All right.  What do you know if anything

10        about Overfinch?  Not Overfinch Miami,

11        the --

12  A.    I know they're an automotive accessory

13        installer, pretty much like AMG is to

14        Mercedes Benz, so I believe it's

15        factory-authorized accessories.

16  Q.    So you can send your vehicle there; they'll

17        upgrade it for you for a price?

18  A.    Correct.

19  Q.    Okay.  And do you know how they run their

20        operation with regard to the dealers that

21        they work with, how they get paid, not paid?

22  A.    No.  I do not have that information.

23  Q.    Do you know if they floor plan or finance or

24        anything like that?

25  A.    I know they had a floor plan with us, and I

188

```
 1          do not know how they sold their vehicles or
 2          what the details of their operation is.
 3   Q.     Okay.  So you would say Overfinch itself had
 4          a floor plan with NextGear, correct?  Did I
 5          hear that correctly?
 6   A.     I believe there was an Overfinch account,
 7          Pennsylvania maybe.
 8   Q.     Okay.
 9   A.     I'm not entirely sure.
10   Q.     Okay.  When in the course of your vetting of
11          Premier Auto, did you get a copy of their
12          contract with Overfinch?
13   A.     I did not.
14   Q.     Did you ask for it?
15   A.     It was not required.  I did not ask for it.
16   Q.     At that time when you were vetting Premier,
17          did you learn that the plan was to buy these
18          Range Rovers, send them to Overfinch, have
19          them outfitted very nicely, brought back
20          either pre-sold or sold?
21   A.     Correct.
22   Q.     Okay.  And did you make any inquiry at all as
23          to the relationship between Premier and
24          Overfinch in terms of how that process
25          worked, what was required of them, what was
```

# EXHIBIT 2

## EXCERPTS FROM BLACKBURN DEPOSITION

Page 1

1                   UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF INDIANA
2                       INDIANAPOLIS DIVISION
3                 Case No. 1:20-cv-00354-TWP-DLP
4
     NEXTGEAR CAPITAL, INC.,              )
5                                         )
             Plaintiff,                   )
6                                         )
                 -vs-                     )
7                                         )
     PREMIER GROUP AUTOS, LLC,            )
8    JAMES M. BLACKBURN, and              )
     EDWARD A. KESSLER,                   )
9                                         )
             Defendants.                  )
10
11
12
13     VIDEORECORDED DEPOSITION OF JAMES M. BLACKBURN
14          The videorecorded deposition upon oral
     examination of JAMES M. BLACKBURN, a witness
15   produced and sworn before me, Craig Williams, RPR,
     CMRS, a Notary Public in and for the County of
16   Marion, State of Indiana, taken on behalf of the
     Plaintiff, via remote Zoom videoconference, on the
17   26th day of October 2021, at 10:00 a.m., pursuant
     to the Federal Rules of Civil Procedure with
18   written notice as to time and place thereof.
19
20
21
22
23
24
25

Page 2

```
 1                    APPEARANCES
 2            (All Parties Appearing Remotely)
 3
    FOR THE PLAINTIFF:
 4
            Brian S. Jones
 5          David J. Jurkiewicz
            BOSE MCKINNEY & EVANS LLP
 6          111 Monument Circle, Suite 2700
            Indianapolis, IN  46204
 7          317.684.5000
            b.jones@boselaw.com
 8          djurkiewicz@boselaw.com
 9   FOR THE DEFENDANTS PREMIER GROUP AUTOS, LLC and
    JAMES M. BLACKBURN:
10
            Richard A. Rocap
11          ROCAP LAW FIRM
            10293 North Meridian Street, Suite 175
12          Carmel, IN  46290-1130
            317.846.0700
13          rar@rocap-law.com
14   FOR THE DEFENDANT EDWARD A. KESSLER:
15          Jason Delk
            DELK MCNALLY LLP
16          211 S. Walnut Street
            Muncie, IN  47305
17          765.896.9495
            delk@delkmcnally.com
18
    VIDEOGRAPHER:
19
            Rocco Mercadante
20
21
22
23
24
25
```

Page 3

1                    INDEX OF EXAMINATION
2       DIRECT EXAMINATION  . . . . . . . . . . . . . . . 5
            Questions by Brian S. Jones
3
4
5
6
7
8
9                      INDEX OF EXHIBITS
10      Deposition Exhibit No.:
11      Exhibit 4  - Driver's Licenses  . . . . . . . . . .85
        Exhibit 8  - Kessler POA  . . . . . . . . . . . .88
12      Exhibit 9  - Blackburn POA  . . . . . . . . . . .87
        Exhibit 18 - Deposition Notice Premier Group  . . . .10
13      Exhibit 19 - Blackburn Résumé . . . . . . . . . .20
        Exhibit 20 - Complaint dated 3/5/20 . . . . . . . .49
14      Exhibit 21 - Business Loan Agreement 3/11/19  . . . .64
        Exhibit 22 - NextGear Contract 3/26/19  . . . . . .82
15      Exhibit 23 - Bill of Sale 7/15/19 . . . . . . . . .90
        Exhibit 24 - Email dated 9/11/19  . . . . . . . . .95
16      Exhibit 25 - Email dated 9/23/19  . . . . . . . . .99
        Exhibit 26 - Email 1 dated 9/24/19  . . . . . . . . 102
17      Exhibit 27 - Email 2 dated 9/24/19  . . . . . . . . 105
        Exhibit 28 - Email dated 9/27/19  . . . . . . . . . 115
18      Exhibit 29 - Email dated 10/18/19 . . . . . . . . . 118
        Exhibit 30 - Email dated 10/24/19 . . . . . . . . . 127
19
20
21
22
23
24
25

```
                                          Page  4
```

1          THE VIDEOGRAPHER:  Good morning.  We are
2     going on the record at 10:06 a.m. on 10/26/2021.
3     This is the Media Unit No. 1 of the
4     videorecorded deposition of James M. Blackburn
5     in the matter of NextGear Capital, Inc. versus
6     Premier Group Autos, LLC, et al., filed in the
7     U.S. District Court, Southern District of
8     Indiana, Indianapolis Division, Case
9     No. 1:20-cv-000354-TWP-DLP.
10          This deposition is being held remotely.  My
11     name is Rocco Mercadante from Veritext.  Our
12     court reporter today is Craig Williams from
13     Veritext as well.
14          I am not authorized to administer an oath.
15     I am not related to any party in this action,
16     nor am I financially interested in the outcome.
17          Counsel and all present in the room and
18     everyone attending will now state their
19     appearances and affiliations for the record,
20     after which time we can swear in the witness and
21     proceed.
22          MR. JONES:  Good morning.  Brian Jones for
23     NextGear Capital.  In the room with me is also
24     David Jurkiewicz.
25          MR. DELK:  Jason Delk on behalf of the

```
                                             Page 5

 1      defendant, Edward Kessler.

 2           MR. ROCAP:  Richard Rocap on behalf of

 3      Premier Auto Group, LLC and James Blackburn.

 4           THE WITNESS:  James Blackburn, defendant.

 5      I'm also here on behalf of Premier Auto Group.

 6                    JAMES M. BLACKBURN,

 7  having been duly sworn to tell the truth, the whole

 8  truth, and nothing but the truth relating to said

 9  matter was examined and testified as follows:

10  DIRECT EXAMINATION,

11      QUESTIONS BY BRIAN S. JONES:

12  Q   Good morning, Mr. Blackburn.  My name is Brian

13      Jones and I represent the plaintiff NextGear

14      Capital, Incorporated in this case.  I

15      appreciate you joining us this morning remotely.

16      I understand you are actually in the United

17      Kingdom at this time; is that correct?

18  A   No, not at the moment.  No, I leave on Thursday.

19  Q   Okay.  Where are you right now?

20  A   Ft. Lauderdale.

21  Q   Oh, you're in Ft. Lauderdale, Florida, okay, got

22      you.

23           So you're heading back to the United

24      Kingdom on Thursday; is that right?

25  A   Yeah, I return to Ft. Lauderdale today and then
```

Page 67

1    Q    Okay.

2    A    If my memory serves me correctly, it took

3         Overfinch until February to deliver our first

4         car.

5    Q    Okay, okay.

6    A    I think.

7    Q    So there was a lag time between when you would

8         place the order and when it would arrive?

9    A    I believe the first car, again, if my memory

10        serves me correctly, I think it was a good six

11        to eight weeks from ordering the car to actually

12        being delivered, if not longer.

13   Q    Okay.  At that same time, Overfinch was still

14        expecting those three orders per month to come

15        in; is that right?

16   A    I don't know that they were really expecting

17        that.  I think that was something that was

18        included in the agreement to give them control

19        and protection.  Although the feedback I ever

20        got from the owner of Overfinch was that he was

21        happy with the way we were going.

22   Q    So this $300,000 loan that we're looking at here

23        in Exhibit 21, this was going to allow you to

24        purchase more conversions; is that correct?

25   A    If my memory serves me correctly, that $300,000

Page 70

```
 1        of the agreement.  Hence, the reason, you know,
 2        as proven by when the date came for the renewal,
 3        despite the fact we hadn't hit, it was
 4        automatically renewed.
 5   Q    So that agreement we were just looking at there
 6        with Overfinch did, in fact, renew for a second
 7        term; is that right?
 8   A    Yeah, it states in the agreement that if you
 9        haven't been notified within 30 days of the
10        expiration, it will automatically renew.  We
11        didn't get notice of Overfinch termination until
12        I think it was the 11th of November, nine days
13        after or eight days after, to stop it renewed.
14   Q    Got you.
15             We're on this $300,000 loan document.  Turn
16        with me to the second page of that document.
17        I'm looking at paragraph C and it's entitled,
18        "Purpose of Loan."  Do you see that?
19   A    Yeah.
20   Q    Here under A it says, "The loan was lent to the
21        Borrower in order to purchase two new Overfinch
22        Range Rovers in order to increase the inventory
23        of the fleet owned by the Borrower."
24             Does that refresh your recollection as to
25        what this went for?
```

1      the auction standing on the auctioneer's stand.

2   Q   Okay.  And when you say auction, you mean an

3      auto auction; right?

4   A   Yes.

5   Q   And what were you -- what was your purpose in

6      being at that auto auction?

7   A   To buy cars.

8   Q   Okay.  And were these going to be -- when you

9      say to buy cars, were these going to be like

10      Range Rovers or Land Rovers you were purchasing?

11   A   No.

12   Q   Would these be different cars that Premier would

13      sell?

14   A   I can't remember what my exact intentions were

15      on that specific trip.

16   Q   Let me ask it this way.  Did Premier Group Autos

17      ever sell a vehicle that wasn't Overfinch?

18   A   Yes.

19   Q   Okay.  What other vehicles did Premier Group

20      Auto sell?

21   A   We had our used car dealer's license, so there

22      was a few.

23   Q   Was it your primary business in selling used

24      cars, or was it kind of just a side thing?

25   A   No, Premier Group Autos became everyone's main

Page 76

1        business when we got involved with it.

2    Q   But I mean like in terms of selling used cars

3        versus selling Overfinch.

4    A   No, Overfinch was the main piece.

5    Q   Overfinch was the main piece, okay.

6            But Premier did sell a few used cars in

7        addition to the Overfinch vehicles; is that

8        right?

9    A   Yes.

10   Q   Do you recall like roughly how many used cars

11       Premier sold?

12   A   No.

13   Q   Are we talking like 50, 100, or just a handful?

14   A   No, just a handful.

15   Q   Okay.  So you met Mr. Mayoral at this auto

16       auction; is that right?

17   A   I believe so, yeah.

18   Q   Okay.  And what do you remember happening after

19       that?  Did you guys like meet for coffee or

20       something to talk about NextGear?

21   A   I don't recall.

22   Q   At some point Premier decided to do business

23       with NextGear.  What made you decide to do

24       business with NextGear over some of the other

25       companies that were offering floor plan

Page 107

1   A   I don't recall exactly.  I wasn't involved in

2       the Long Island sale.  It was usually at that

3       the discretion of the salesman.

4   Q   Okay.  So back on Exhibit 27, that

5       September 24th email.  The question Donna asked

6       was, "Are we purchasing this unit back from Long

7       Island?"

8           And the email you responded to two minutes

9       later on September 24th, 2019, you said, "No I

10      am dealing NextGear head office a gentleman

11      called Michael."

12          So it sounds like, no, you weren't

13      purchasing that vehicle back from Long Island.

14      Does that refresh your recollection?

15  A   I mean, that's what it says there.  It doesn't

16      refresh my recollection on the actual deal, but

17      yeah, that's --

18  Q   At the very top, same day, September 24th, 2019,

19      you have an email to Donna and Ed and say, "We

20      have with a new floor plan company who are

21      wiring NextGear $350,000 to buy us out.  They

22      are providing us with one million."

23          Who was that new floor plan company?

24  A   On the top of my head, that was an Overfinch

25      client called James Archbell.

Page 108

1    Q    James Archbell?

2    A    Yeah.

3    Q    A-R-C-H-B-E-L-L, did I get that?

4    A    Yeah, I think so.

5    Q    And he was going to be providing -- first of

6         all, is that a person or is that a company?

7    A    It's a person.

8    Q    He was going to be providing a

9         one-million-dollar investment or loan or

10        whatever?

11   A    Initially, that was what was agreed, yeah.

12   Q    What ended up happening with Mr. Archbell?

13   A    He became aware of our dispute with NextGear

14        through a NextGear representative who deterred

15        him, in my opinion, from concluding the deal

16        with us.

17   Q    Now, you said dispute with NextGear.  What

18        dispute are you talking about?

19   A    Well, he's aware that we owed NextGear 350 grand

20        and obviously whatever conference calls had gone

21        on with Michael.  The same -- in the end, when

22        it became -- it first went from a million, and

23        then he came down to 450, for whatever reason.

24            And just as the 450 was about to be funded,

25        he was notified by NextGear, a chap who was the

Page 109

1    account manager.

2        Because we'd also told Overfinch about

3    Mr. Archbell giving a floor plan.  And Overfinch

4    were made aware of the NextGear problem by a guy

5    called Zach, who was NextGear's representative

6    in their territory.  Zach then took it upon

7    himself to reach out to Mr. Archbell to let

8    Mr. Archbell know about the disputes, which made

9    Mr. Archbell pull out of the deal.  Go on.

10  Q  I'm sorry, I'm not trying to interrupt.  Go

11     ahead.

12  A  That, in my opinion, is what I seem to recall

13     happened.

14  Q  I'm wondering, because you said "dispute."  Was

15     Premier disputing the amount of money owed to

16     NextGear?

17  A  No, but Premier didn't have the capital to pay

18     the money back to NextGear.  So these emails you

19     can see from the 24th of September, Michael

20     obviously had to get involved at the next level.

21     I think our account manager was a lady.  So it's

22     already been escalated.  By the time December

23     came around, eight weeks later when this 350K --

24     which was in the end 350K wasn't paid back to

25     NextGear, it became quite an issue.

Page 110

1           This Zach chap -- we've got his last name

2      somewhere -- he worked for you, let -- despite

3      the fact our agreement with Overfinch had been

4      renewed, they then wrote us a letter stating

5      basically, it says in the letter, that we've

6      become aware of your financing issues, I think

7      they said, which they'd been told about by

8      NextGear's employee, so therefore we're ceasing

9      all business with you and canceling your

10     contract.

11          That same employee of NextGear's then

12     reached out to James Archbell and made James

13     Archbell aware of the issues we were having with

14     NextGear, and he pulled out the financing as

15     well.

16  Q   Okay.

17  A   So overnight we went from trying to pull this

18     off to pay people back and keep the company

19     going, to our supplier and our financier both

20     pulling the plug on us together.

21  Q   So I guess I'm trying to understand what the

22     dispute was.  It sounds like you don't dispute

23     that you owed money to NextGear.

24  A   No, we owed money to NextGear.  The problem was,

25     we couldn't pay them back immediately.  It was a

                                    Page 111

1          temporary increase in our loan increase.  So it

2          was 350 grand in the end, of which $200,000 was

3          a temporary increase.  That you can only have --

4          I can't remember the time period, 30 days maybe,

5          maybe less, I don't recall.  But that was the

6          issue.  It was a loan increase temporarily.

7                So when that temporary period passed,

8          NextGear wanted the money, and it had been

9          swallowed up operationally or whatever and we

10         couldn't afford to immediately cut them a check.

11         Things became very hostile, which we understand.

12    Q    I got you.  So was there anything that -- again,

13         I'm trying to understand this -- was there

14         anything that these people from NextGear said to

15         Overfinch or to Mr. Archbell that wasn't true?

16    A    Well, I don't know the extent of the

17         conversation.  I wasn't in the room.  All I know

18         is that a gentleman who worked for NextGear took

19         it upon himself -- you know, it wasn't a

20         high-level member of staff, it was a field rep

21         for that area -- took it upon himself to tell

22         Overfinch what was going on.  And then also

23         obtained contact details for Mr. Archbell and

24         let Mr. Archbell know what was going on.

25                So whatever was said, whether it was true

Page 112

```
 1        or not, whether he passed an opinion of, I
 2        wouldn't get involved with these guys if I was
 3        you or not, I don't know.  But the results of
 4        his conversations with our supplier and our
 5        financier made them both pull out.
 6   Q    So if you look at Exhibit 27, which is the
 7        September 24th Email No. 2, you say that, "We
 8        have a new floor plan company who are wiring
 9        NextGear 350K to buy us out."
10             That was Mr. Archbell; right?
11   A    Right.
12   Q    So it sounds like Mr. Archbell was already aware
13        that you owed money to NextGear.
14   A    Yes, exactly.  We weren't lying to anyone.  We
15        had a relationship with NextGear.  We currently
16        have 350 grand with them, we need to pay that
17        off and we want to start a new relationship with
18        you.
19   Q    Okay.  So I guess I'm not following.  If
20        NextGear called Mr. Archbell and said, Hey,
21        Premier owes us $350,000.  That's not news to
22        him; right?
23   A    Well, do you know that was what was said?
24   Q    I have no idea, I'm just asking, I'm trying to
25        understand.
```

Page 113

1   A    Neither do I.  All I know are the facts that due

2        to them phone calls, which have been confirmed

3        for me by Mr. Archbell and someone at Overfinch

4        North America, due to them phone calls,

5        information released from Zach to them two

6        parties, prompted the pullout of both

7        agreements.

8             So I don't know whether he passed a comment

9        of, I wouldn't trust these guys, or I wouldn't

10       do business with them if I was you, or whatever.

11            What I can tell you is, that Mr. Archbell

12       was aware we had a floor plan facility with

13       NextGear.  So simply ringing Mr. Archbell up and

14       saying, He has a floor plan agreement with us,

15       wouldn't have deterred him from completely --

16            At this point, as well, I was on quite a

17       friendly basis with Mr. Archbell.  I'd been to

18       his house in Palm Beach.  He invited me and my

19       ex-wife onto his yacht at Fort Lauderdale for

20       dinner one night.  We got on very well, and very

21       quickly the whole thing was put to a stop, which

22       we found out was the day after the communication

23       from this Zach chap.

24            We can surmise what we want, but this is

25       the time scale of what happened.  It seems

Page 114

```
 1       almost too coincidental to me that he didn't
 2       have something negative or derogatory to say
 3       about me and Mr. Kessler which made him pull out
 4       of the deal.
 5    Q  But sitting here today, you don't know what he
 6       said to Mr. Archbell or to Overfinch; right?
 7    A  I have no idea what his words were.
 8    Q  Have you spoken to Mr. Archbell since that time?
 9    A  Yes.
10    Q  Have you?
11    A  Yeah.
12    Q  And have you asked him, Well, what did NextGear
13       tell you?
14    A  Well, I did inquire.  The issue with
15       Mr. Archbell is, he has a relationship with
16       NextGear.  He owns a dealership in -- off the
17       top of my head, I think it's in Virginia --
18    Q  Okay.
19    A  -- where he spends a lot of his time.
20           He's a very friendly, amicable guy, and he
21       just said, Look, I no longer want to get
22       involved.  He acknowledged that he was aware of
23       problems we were having with NextGear and just
24       said, You know, I've got a relationship with
25       them as well and, therefore, this relationship
```

Page 115

1      isn't going to work.

2           If I see Mr. Archbell today, it would be

3      all hugs and kisses and how are you and long

4      time no see and all that kind of -- we never

5      officially fell out over it.

6           Mr. Rocap, my counsel, has had extensive

7      conversations with him to figure out what

8      happened.

9  Q   Okay.  And don't tell me anything your lawyer

10     told you, because that's privilege.  I'm not

11     asking for that, so just be aware.

12          As I understand it, then, so the problem

13     with NextGear at this time was that you couldn't

14     pay them back what they said was owed; right?

15 A   Correct.

16          (Deposition Exhibit 28 was marked for

17     identification.)

18 Q   Okay, got you.

19          Take a look, this one is going to be

20     September 27th, 2019.  I'm going to mark this as

21     Exhibit No. 28, I believe is the number we're

22     at.

23 A   I've got a note that this file is empty.

24 Q   Oh, this one is empty, okay.  See if this came

25     through in your email.  If not, I can shoot it

Page 116

1      to you real quick.  Apologies for that.

2   A   I think it's my side if everyone else is

3      receiving it.

4          MR. JONES:  Jason and Dick, are you guys

5      able to open it?

6          MR. ROCAP:  Yeah.  If you want, Brian, I

7      can just share screen and then he can look at

8      it.

9          MR. JONES:  That would be great.  Thank you

10     for doing that, Dick, I appreciate that.

11         MR. ROCAP:  All right, see that, James?

12         THE WITNESS:  Yeah.

13         MR. ROCAP:  You guys are going to have to

14     tell me to scroll up and scroll down because you

15     don't have control.

16         MR. JONES:  All right.  So if you would

17     scroll down just a little bit, I think you can

18     get the whole email in one -- yeah, there you

19     go.  That's perfect, thank you.

20  Q   So Mr. Blackburn, Exhibit 28 here is a

21     September 27th, 2019 email, and it's from Mickey

22     Agnew to you and Mr. Kessler and then Sales.

23     I'm assuming the sales email address was

24     probably Samuel; is that right?

25  A   I think sales was just a generic.

```
                                        Page 117

 1   Q    Okay.

 2            And it says, "Afternoon.  We recently

 3        advised you of an open NSF/delinquency incident

 4        in need of your attention.  To date that

 5        incident remains unresolved.  Your lack of

 6        urgency will result in additional collection

 7        activity that will include your account being

 8        placed in default and the subsequent termination

 9        of your line of credit."

10            And it says, "Need wire for $147,224.82 as

11        of today.  Please send wire confirmation once

12        done."  It provides the wiring information.  It

13        says, "I urge you to contact your account

14        executive today to resolve this matter and avoid

15        further action."

16            Do you recall what the issue was with

17        regard to this $147,000 that was said to be

18        needed?

19   A    That's everything we've just gone over.

20   Q    Okay.

21   A    I believe.  I'm presuming that's the first

22        $150,000 of temporary increases that had become

23        due.

24   Q    It says, "Open NSF."  Were these things that

25        NextGear tried to recover but the bank said
```

Page 118

```
 1        there's not sufficient funds?
 2   A    I think they were the transactions that Donna
 3        wrote to us about, saying they had gone into the
 4        account to take them, there wasn't enough money
 5        in there to send them over.
 6   Q    Okay.  Do you recall having any conversations
 7        with Mickey Agnew on this issue?
 8   A    No.  The only gentleman that I remember talking
 9        to was, because he leaves quite a -- his
10        reputation precedes him -- is a guy whose alias
11        is Will Smith.
12   Q    Will Smith, okay.  I think that might be in our
13        next series of emails.
14            MR. JONES:  Dick, thanks for that.
15            (Deposition Exhibit 29 was marked for
16        identification.)
17   Q    Mr. Blackburn, let's see if you can open up,
18        it's an October 18th, 2019 email, at least
19        that's the name of the file.  Does that one
20        open?
21   A    Yes.
22   Q    Okay, perfect.  And again, I'm sorry about the
23        issues with OneDrive.  It's usually pretty
24        reliable.
25            So this is a fairly lengthy document.  For
```

**James Blackburn <james@overfinchmiami.com>**                                      9/24/2019 9:26 AM

# Re: Next Gear Summary

To Donna <donna@overfinchmiami.com>   Copy ek13@comcast.net <ek13@comcast.net>

---

We have a new floor plan company who are wiring next gear 350k to buy us out. They are providing us with one million.

Very Best Regards,


James Blackburn
Chief Executive


Overfinch Miami

1500 Cordova Road, Suite 206
Fort Lauderdale, Florida, 33316

Cell: +1 954 232 7661
Office: 954 870 7174
Email: james@overfinchmiami.com
Web: www.overfinch.com

---

Confidentiality Notice: This e-mail, and any attachment to it, contains privileged and confidential information intended only for the use of the individual(s) or entity named on the e-mail. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that reading this e-mail is strictly prohibited. If you have received this e-mail in error, please immediately return it to the sender and delete it from your system.

On Sep 24, 2019, at 14:20, James Blackburn < james@overfinchmiami.com> wrote:

> No. I am dealing with next gear head office a gentlemen called Michael.
>
> Very Best Regards,
>
>
> James Blackburn
> Chief Executive
>
>
> Overfinch Miami
>
> 1500 Cordova Road, Suite 206
> Fort Lauderdale, Florida, 33316

**EXHIBIT 27**

Cell: +1 954 232 7661
Office: 954 870 7174
Email: james@overfinchmiami.com
Web: www.overfinch.com

---

Confidentiality Notice: This e-mail, and any attachment to it, contains privileged and
confidential information intended only for the use of the individual(s) or entity named on
the e-mail. If the reader of this e-mail is not the intended recipient, or the employee or
agent responsible for delivering it to the intended recipient, you are hereby notified that
reading this e-mail is strictly prohibited. If you have received this e-mail in error, please
immediately return it to the sender and delete it from your system.

On Sep 24, 2019, at 14:18, Donna < donna@overfinchmiami.com> wrote:

> James – There is another Title pending with Next Gear on Unit KA546018,  Title is due in 2 days.
> This unit was sold to Long Island and I have already sent them the Title.
> Are we purchasing this unit back from Long Island?
>
>
>
> Regards,
> Donna

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

NEXTGEAR CAPITAL, INC.,           )
                                  )
            Plaintiff,            )
                                  )       CASE NO. 1:20-cv-00354-TWP-DLP
vs.                               )
                                  )
PREMIER GROUP AUTOS, LLC,         )
JAMES BLACKBURN, and              )
EDWARD A. KESSLER.                )
                                  )
            Defendants.           )

---

**AFFIDAVIT OF JAMES BLACKBURN IN OPPOSITION TO PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT**

---

James Blackburn, under penalties for perjury, states as follows:

1. I am an adult and competent to testify in court to the matters stated herein.

2. The statements in this affidavit are made based on my personal knowledge.

3. I was a co-owner of Premier Group Autos, LLC from its inception until its demise in 2020.

4. During the course of my negotiations with Arturo Mayoral of NextGear Capital, LLC of the terms of the floor plan financing facility to be provided to Premier Group Autos, LLC, I made known to and advised Mr. Mayoral that the primary business of Premier Group Autos, LLC would be the purchase of Land Rovers and Range Rovers that would then be converted by Overfinch NA for a fee and resold by Premier Group Autos, LLC for a substantial profit. I further made Mr. Mayoral aware of the fact that the distribution agreement with Overfinch NA was critical to and the essence of the business operations of Premier Group Autos, LLC.

5. Attached as Exhibit 2.1 is a true and accurate copy of an email exchange between myself and Will Smith, a representative of NextGear Capital LLC that occurred on or about the dates and times shown on the document. The email messages contained in the exchange were sent or

**EXHIBIT 3**

received by me, personally, and were maintained in the normal and ordinary scope and course of my business as a co-owner of Premier Group Autos, LLC at or about the time created or received.

6.  I learned sometime during the first two weeks of November 2019 that a representative of NextGear Capital LLC had contacted both James Archbell and representatives of Overfinch NA and advised them that Premier Group Autos, LLC was in a default situation on its loan with NextGear Capital LLC and had cautioned them against further business dealings with Premier Group Autos, LLC.

7.  This concludes my affidavit.

I AFFIRM UNDER THE PENALTIES FOR PERJURY THAT THE FOREGOING FACTS, STATEMENTS AND REPRESENTATIONS ARE TRUE AND ACCURATE.

_____
James M.C. Blackburn
March _____, 2022

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on March 28, 2022, a true and correct copy of the above and foregoing *Affidavit* was filed electronically through the Court's CM/ECF system. Service of this filing will be made on all ECF-Registered counsel by operation of the Court's electronic filing system.  Parties may access the filing through the Court's system.

 */s/ Richard A. Rocap*_____
Richard A. Rocap, Atty. No. 6333-49
*Attorney for Premier Group Autos, LLC and James Michael C. Blackburn*

ROCAP LAW FIRM LLC
10293 North Meridian Street, Suite 175
Carmel, IN 46290-1130
(317) 846-0700
rar@rocap-law.com

**EXHIBIT 3**

| From: | James Blackburn |
|---|---|
| To: | Dick Rocap |
| Subject: | Fwd: Zack |
| Date: | Friday, February 28, 2020 3:50:16 AM |

Very Best Regards,


James Blackburn
Chief Executive



Overfinch Miami

1500 Cordova Road, Suite 206
Fort Lauderdale, Florida, 33316

Cell: +1 954 232 7661
Office: 954 870 7174
Email: james@overfinchmiami.com
Web: www.overfinch.com

---

Confidentiality Notice: This e-mail, and any attachment to it, contains privileged and
confidential information intended only for the use of the individual(s) or entity named
on the e-mail. If the reader of this e-mail is not the intended recipient, or the employee
or agent responsible for delivering it to the intended recipient, you are hereby notified
that reading this e-mail is strictly prohibited. If you have received this e-mail in error,
please immediately return it to the sender and delete it from your system.

Begin forwarded message:

> **From:** james@overfinchmiami.com
> **Date:** November 12, 2019 at 12:50:18 AST
> **To:** Will Smith <Will.Smith@coxautoinc.com>
> **Subject: Zack**


> Hi Will,

> I am just taking off to head back to Fort Lauderdale.

> It turns out Zack, your Danville account manager, has taken it upon himself to
> find out from head office who my new floor plan was with and give him a call
> bringing him up to date.

**EXHIBIT 3.1**

Suffice to say he has called yesterday afternoon and cancelled any arrangement we had and ceased dealing with us.

At this point I have nothing to tell you. Can you please forward me a copy of my contract and all relevant documentation we signed when starting our relationship with you.

I believe if it wasn't for Zack this situation would be closer to be being resolved. Now after his involvement not only discussing my account with head office but also calling my new financier and discussing the situation with him also provoking him cancelling any arrangement we had in place.

Very Best Regards,


James Blackburn
Chief Executive



Overfinch Miami

1500 Cordova Road, Suite 206
Fort Lauderdale, Florida, 33316

Cell: +1 954 232 7661
Office: 954 870 7174
Email: james@overfinchmiami.com
Web: www.overfinch.com

Confidentiality Notice: This e-mail, and any attachment to it, contains privileged and confidential information intended only for the use of the individual(s) or entity named on the e-mail. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that reading this e-mail is strictly prohibited. If you have received this e-mail in error, please immediately return it to the sender and delete it from your system.

**EXHIBIT 3.1**