# EXHIBIT 2

## EXCERPTS FROM BLACKBURN DEPOSITION

Page 1

1                UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF INDIANA
2                    INDIANAPOLIS DIVISION
3               Case No. 1:20-cv-00354-TWP-DLP
4
     NEXTGEAR CAPITAL, INC.,              )
5                                         )
             Plaintiff,                   )
6                                         )
                 -vs-                     )
7                                         )
     PREMIER GROUP AUTOS, LLC,            )
8    JAMES M. BLACKBURN, and              )
     EDWARD A. KESSLER,                   )
9                                         )
             Defendants.                  )
10
11
12
13     VIDEORECORDED DEPOSITION OF JAMES M. BLACKBURN
14         The videorecorded deposition upon oral
     examination of JAMES M. BLACKBURN, a witness
15   produced and sworn before me, Craig Williams, RPR,
     CMRS, a Notary Public in and for the County of
16   Marion, State of Indiana, taken on behalf of the
     Plaintiff, via remote Zoom videoconference, on the
17   26th day of October 2021, at 10:00 a.m., pursuant
     to the Federal Rules of Civil Procedure with
18   written notice as to time and place thereof.
19
20
21
22
23
24
25

```
                                                      Page 2
 1                          APPEARANCES
 2                 (All Parties Appearing Remotely)
 3
     FOR THE PLAINTIFF:
 4
                 Brian S. Jones
 5               David J. Jurkiewicz
                 BOSE MCKINNEY & EVANS LLP
 6               111 Monument Circle, Suite 2700
                 Indianapolis, IN  46204
 7               317.684.5000
                 b.jones@boselaw.com
 8               djurkiewicz@boselaw.com
 9   FOR THE DEFENDANTS PREMIER GROUP AUTOS, LLC and
     JAMES M. BLACKBURN:
10
                 Richard A. Rocap
11               ROCAP LAW FIRM
                 10293 North Meridian Street, Suite 175
12               Carmel, IN  46290-1130
                 317.846.0700
13               rar@rocap-law.com
14   FOR THE DEFENDANT EDWARD A. KESSLER:
15               Jason Delk
                 DELK MCNALLY LLP
16               211 S. Walnut Street
                 Muncie, IN  47305
17               765.896.9495
                 delk@delkmcnally.com
18
     VIDEOGRAPHER:
19
                 Rocco Mercadante
20
21
22
23
24
25
```

Page 3

1                    INDEX OF EXAMINATION
2   DIRECT EXAMINATION   .  .  .  .  .  .  .  .  .  .  .  .  .  .  . 5
        Questions by Brian S. Jones
3
4
5
6
7
8
9                    INDEX OF EXHIBITS
10  Deposition Exhibit No.:

11  Exhibit 4  - Driver's Licenses   .  .  .  .  .  .  .  .  .  . .85
    Exhibit 8  - Kessler POA  .  .  .  .  .  .  .  .  .  .  . .88
12  Exhibit 9  - Blackburn POA  .  .  .  .  .  .  .  .  .  . .87
    Exhibit 18 - Deposition Notice Premier Group  .  .  .  .10
13  Exhibit 19 - Blackburn Résumé .  .  .  .  .  .  .  .  . .20
    Exhibit 20 - Complaint dated 3/5/20 .  .  .  .  .  .  . .49
14  Exhibit 21 - Business Loan Agreement 3/11/19  .  .  .  .64
    Exhibit 22 - NextGear Contract 3/26/19  .  .  .  .  . .82
15  Exhibit 23 - Bill of Sale 7/15/19 .  .  .  .  .  .  .  . .90
    Exhibit 24 - Email dated 9/11/19  .  .  .  .  .  .  .  . .95
16  Exhibit 25 - Email dated 9/23/19  .  .  .  .  .  .  .  . .99
    Exhibit 26 - Email 1 dated 9/24/19  .  .  .  .  .  .  . 102
17  Exhibit 27 - Email 2 dated 9/24/19  .  .  .  .  .  .  . 105
    Exhibit 28 - Email dated 9/27/19  .  .  .  .  .  .  .  . 115
18  Exhibit 29 - Email dated 10/18/19 .  .  .  .  .  .  .  . 118
    Exhibit 30 - Email dated 10/24/19 .  .  .  .  .  .  .  . 127
19
20
21
22
23
24
25

```
                                      Page  4

 1          THE  VIDEOGRAPHER:   Good  morning.   We  are

 2     going  on  the  record  at  10:06  a.m.  on  10/26/2021.

 3     This  is  the  Media  Unit  No.  1  of  the

 4     videorecorded  deposition  of  James  M.  Blackburn

 5     in  the  matter  of  NextGear  Capital,  Inc.  versus

 6     Premier  Group  Autos,  LLC,  et  al.,  filed  in  the

 7     U.S.  District  Court,  Southern  District  of

 8     Indiana,  Indianapolis  Division,  Case

 9     No.  1:20-cv-000354-TWP-DLP.

10          This  deposition  is  being  held  remotely.   My

11     name  is  Rocco  Mercadante  from  Veritext.   Our

12     court  reporter  today  is  Craig  Williams  from

13     Veritext  as  well.

14          I  am  not  authorized  to  administer  an  oath.

15     I  am  not  related  to  any  party  in  this  action,

16     nor  am  I  financially  interested  in  the  outcome.

17          Counsel  and  all  present  in  the  room  and

18     everyone  attending  will  now  state  their

19     appearances  and  affiliations  for  the  record,

20     after  which  time  we  can  swear  in  the  witness  and

21     proceed.

22          MR.  JONES:   Good  morning.   Brian  Jones  for

23     NextGear  Capital.   In  the  room  with  me  is  also

24     David  Jurkiewicz.

25          MR.  DELK:   Jason  Delk  on  behalf  of  the
```

Page 5

```
 1      defendant, Edward Kessler.
 2           MR. ROCAP:  Richard Rocap on behalf of
 3      Premier Auto Group, LLC and James Blackburn.
 4           THE WITNESS:  James Blackburn, defendant.
 5      I'm also here on behalf of Premier Auto Group.
 6                JAMES M. BLACKBURN,
 7  having been duly sworn to tell the truth, the whole
 8  truth, and nothing but the truth relating to said
 9  matter was examined and testified as follows:
10  DIRECT EXAMINATION,
11    QUESTIONS BY BRIAN S. JONES:
12  Q   Good morning, Mr. Blackburn.  My name is Brian
13      Jones and I represent the plaintiff NextGear
14      Capital, Incorporated in this case.  I
15      appreciate you joining us this morning remotely.
16      I understand you are actually in the United
17      Kingdom at this time; is that correct?
18  A   No, not at the moment.  No, I leave on Thursday.
19  Q   Okay.  Where are you right now?
20  A   Ft. Lauderdale.
21  Q   Oh, you're in Ft. Lauderdale, Florida, okay, got
22      you.
23           So you're heading back to the United
24      Kingdom on Thursday; is that right?
25  A   Yeah, I return to Ft. Lauderdale today and then
```

Page 67

```
 1    Q    Okay.
 2    A    If my memory serves me correctly, it took
 3         Overfinch until February to deliver our first
 4         car.
 5    Q    Okay, okay.
 6    A    I think.
 7    Q    So there was a lag time between when you would
 8         place the order and when it would arrive?
 9    A    I believe the first car, again, if my memory
10         serves me correctly, I think it was a good six
11         to eight weeks from ordering the car to actually
12         being delivered, if not longer.
13    Q    Okay.  At that same time, Overfinch was still
14         expecting those three orders per month to come
15         in; is that right?
16    A    I don't know that they were really expecting
17         that.  I think that was something that was
18         included in the agreement to give them control
19         and protection.  Although the feedback I ever
20         got from the owner of Overfinch was that he was
21         happy with the way we were going.
22    Q    So this $300,000 loan that we're looking at here
23         in Exhibit 21, this was going to allow you to
24         purchase more conversions; is that correct?
25    A    If my memory serves me correctly, that $300,000
```

Page 70

```
 1        of the agreement.  Hence, the reason, you know,

 2        as proven by when the date came for the renewal,

 3        despite the fact we hadn't hit, it was

 4        automatically renewed.

 5   Q    So that agreement we were just looking at there

 6        with Overfinch did, in fact, renew for a second

 7        term; is that right?

 8   A    Yeah, it states in the agreement that if you

 9        haven't been notified within 30 days of the

10        expiration, it will automatically renew.  We

11        didn't get notice of Overfinch termination until

12        I think it was the 11th of November, nine days

13        after or eight days after, to stop it renewed.

14   Q    Got you.

15            We're on this $300,000 loan document.  Turn

16        with me to the second page of that document.

17        I'm looking at paragraph C and it's entitled,

18        "Purpose of Loan."  Do you see that?

19   A    Yeah.

20   Q    Here under A it says, "The loan was lent to the

21        Borrower in order to purchase two new Overfinch

22        Range Rovers in order to increase the inventory

23        of the fleet owned by the Borrower."

24            Does that refresh your recollection as to

25        what this went for?
```

Page 75

1        the auction standing on the auctioneer's stand.
2   Q    Okay.  And when you say auction, you mean an
3        auto auction; right?
4   A    Yes.
5   Q    And what were you -- what was your purpose in
6        being at that auto auction?
7   A    To buy cars.
8   Q    Okay.  And were these going to be -- when you
9        say to buy cars, were these going to be like
10       Range Rovers or Land Rovers you were purchasing?
11  A    No.
12  Q    Would these be different cars that Premier would
13       sell?
14  A    I can't remember what my exact intentions were
15       on that specific trip.
16  Q    Let me ask it this way.  Did Premier Group Autos
17       ever sell a vehicle that wasn't Overfinch?
18  A    Yes.
19  Q    Okay.  What other vehicles did Premier Group
20       Auto sell?
21  A    We had our used car dealer's license, so there
22       was a few.
23  Q    Was it your primary business in selling used
24       cars, or was it kind of just a side thing?
25  A    No, Premier Group Autos became everyone's main

Page 76

```
 1        business when we got involved with it.
 2    Q   But I mean like in terms of selling used cars
 3        versus selling Overfinch.
 4    A   No, Overfinch was the main piece.
 5    Q   Overfinch was the main piece, okay.
 6            But Premier did sell a few used cars in
 7        addition to the Overfinch vehicles; is that
 8        right?
 9    A   Yes.
10    Q   Do you recall like roughly how many used cars
11        Premier sold?
12    A   No.
13    Q   Are we talking like 50, 100, or just a handful?
14    A   No, just a handful.
15    Q   Okay.  So you met Mr. Mayoral at this auto
16        auction; is that right?
17    A   I believe so, yeah.
18    Q   Okay.  And what do you remember happening after
19        that?  Did you guys like meet for coffee or
20        something to talk about NextGear?
21    A   I don't recall.
22    Q   At some point Premier decided to do business
23        with NextGear.  What made you decide to do
24        business with NextGear over some of the other
25        companies that were offering floor plan
```

Page 107

1  A   I don't recall exactly.  I wasn't involved in

2      the Long Island sale.  It was usually at that

3      the discretion of the salesman.

4  Q   Okay.  So back on Exhibit 27, that

5      September 24th email.  The question Donna asked

6      was, "Are we purchasing this unit back from Long

7      Island?"

8          And the email you responded to two minutes

9      later on September 24th, 2019, you said, "No I

10     am dealing NextGear head office a gentleman

11     called Michael."

12         So it sounds like, no, you weren't

13     purchasing that vehicle back from Long Island.

14     Does that refresh your recollection?

15 A   I mean, that's what it says there.  It doesn't

16     refresh my recollection on the actual deal, but

17     yeah, that's --

18 Q   At the very top, same day, September 24th, 2019,

19     you have an email to Donna and Ed and say, "We

20     have with a new floor plan company who are

21     wiring NextGear $350,000 to buy us out.  They

22     are providing us with one million."

23         Who was that new floor plan company?

24 A   On the top of my head, that was an Overfinch

25     client called James Archbell.

Page 108

1    Q   James Archbell?

2    A   Yeah.

3    Q   A-R-C-H-B-E-L-L, did I get that?

4    A   Yeah, I think so.

5    Q   And he was going to be providing -- first of

6        all, is that a person or is that a company?

7    A   It's a person.

8    Q   He was going to be providing a

9        one-million-dollar investment or loan or

10       whatever?

11   A   Initially, that was what was agreed, yeah.

12   Q   What ended up happening with Mr. Archbell?

13   A   He became aware of our dispute with NextGear

14       through a NextGear representative who deterred

15       him, in my opinion, from concluding the deal

16       with us.

17   Q   Now, you said dispute with NextGear.  What

18       dispute are you talking about?

19   A   Well, he's aware that we owed NextGear 350 grand

20       and obviously whatever conference calls had gone

21       on with Michael.  The same -- in the end, when

22       it became -- it first went from a million, and

23       then he came down to 450, for whatever reason.

24           And just as the 450 was about to be funded,

25       he was notified by NextGear, a chap who was the

Page 109

1        account manager.

2             Because we'd also told Overfinch about

3        Mr. Archbell giving a floor plan.  And Overfinch

4        were made aware of the NextGear problem by a guy

5        called Zach, who was NextGear's representative

6        in their territory.  Zach then took it upon

7        himself to reach out to Mr. Archbell to let

8        Mr. Archbell know about the disputes, which made

9        Mr. Archbell pull out of the deal.  Go on.

10   Q   I'm sorry, I'm not trying to interrupt.  Go

11       ahead.

12   A   That, in my opinion, is what I seem to recall

13       happened.

14   Q   I'm wondering, because you said "dispute."  Was

15       Premier disputing the amount of money owed to

16       NextGear?

17   A   No, but Premier didn't have the capital to pay

18       the money back to NextGear.  So these emails you

19       can see from the 24th of September, Michael

20       obviously had to get involved at the next level.

21       I think our account manager was a lady.  So it's

22       already been escalated.  By the time December

23       came around, eight weeks later when this 350K --

24       which was in the end 350K wasn't paid back to

25       NextGear, it became quite an issue.

Page 110

1          This Zach chap -- we've got his last name

2      somewhere -- he worked for you, let -- despite

3      the fact our agreement with Overfinch had been

4      renewed, they then wrote us a letter stating

5      basically, it says in the letter, that we've

6      become aware of your financing issues, I think

7      they said, which they'd been told about by

8      NextGear's employee, so therefore we're ceasing

9      all business with you and canceling your

10     contract.

11         That same employee of NextGear's then

12     reached out to James Archbell and made James

13     Archbell aware of the issues we were having with

14     NextGear, and he pulled out the financing as

15     well.

16  Q  Okay.

17  A  So overnight we went from trying to pull this

18     off to pay people back and keep the company

19     going, to our supplier and our financier both

20     pulling the plug on us together.

21  Q  So I guess I'm trying to understand what the

22     dispute was.  It sounds like you don't dispute

23     that you owed money to NextGear.

24  A  No, we owed money to NextGear.  The problem was,

25     we couldn't pay them back immediately.  It was a

Page 111

1    temporary increase in our loan increase.  So it
2    was 350 grand in the end, of which $200,000 was
3    a temporary increase.  That you can only have --
4    I can't remember the time period, 30 days maybe,
5    maybe less, I don't recall.  But that was the
6    issue.  It was a loan increase temporarily.
7          So when that temporary period passed,
8    NextGear wanted the money, and it had been
9    swallowed up operationally or whatever and we
10   couldn't afford to immediately cut them a check.
11   Things became very hostile, which we understand.
12  Q  I got you.  So was there anything that -- again,
13      I'm trying to understand this -- was there
14      anything that these people from NextGear said to
15      Overfinch or to Mr. Archbell that wasn't true?
16  A  Well, I don't know the extent of the
17      conversation.  I wasn't in the room.  All I know
18      is that a gentleman who worked for NextGear took
19      it upon himself -- you know, it wasn't a
20      high-level member of staff, it was a field rep
21      for that area -- took it upon himself to tell
22      Overfinch what was going on.  And then also
23      obtained contact details for Mr. Archbell and
24      let Mr. Archbell know what was going on.
25          So whatever was said, whether it was true

Page 112

```
 1        or not, whether he passed an opinion of, I
 2        wouldn't get involved with these guys if I was
 3        you or not, I don't know.  But the results of
 4        his conversations with our supplier and our
 5        financier made them both pull out.
 6   Q    So if you look at Exhibit 27, which is the
 7        September 24th Email No. 2, you say that, "We
 8        have a new floor plan company who are wiring
 9        NextGear 350K to buy us out."
10             That was Mr. Archbell; right?
11   A    Right.
12   Q    So it sounds like Mr. Archbell was already aware
13        that you owed money to NextGear.
14   A    Yes, exactly.  We weren't lying to anyone.  We
15        had a relationship with NextGear.  We currently
16        have 350 grand with them, we need to pay that
17        off and we want to start a new relationship with
18        you.
19   Q    Okay.  So I guess I'm not following.  If
20        NextGear called Mr. Archbell and said, Hey,
21        Premier owes us $350,000.  That's not news to
22        him; right?
23   A    Well, do you know that was what was said?
24   Q    I have no idea, I'm just asking, I'm trying to
25        understand.
```

Page 113

```
 1   A   Neither do I.  All I know are the facts that due

 2       to them phone calls, which have been confirmed

 3       for me by Mr. Archbell and someone at Overfinch

 4       North America, due to them phone calls,

 5       information released from Zach to them two

 6       parties, prompted the pullout of both

 7       agreements.

 8            So I don't know whether he passed a comment

 9       of, I wouldn't trust these guys, or I wouldn't

10       do business with them if I was you, or whatever.

11            What I can tell you is, that Mr. Archbell

12       was aware we had a floor plan facility with

13       NextGear.  So simply ringing Mr. Archbell up and

14       saying, He has a floor plan agreement with us,

15       wouldn't have deterred him from completely --

16            At this point, as well, I was on quite a

17       friendly basis with Mr. Archbell.  I'd been to

18       his house in Palm Beach.  He invited me and my

19       ex-wife onto his yacht at Fort Lauderdale for

20       dinner one night.  We got on very well, and very

21       quickly the whole thing was put to a stop, which

22       we found out was the day after the communication

23       from this Zach chap.

24            We can surmise what we want, but this is

25       the time scale of what happened.  It seems
```

Page 114

```
 1        almost too coincidental to me that he didn't
 2        have something negative or derogatory to say
 3        about me and Mr. Kessler which made him pull out
 4        of the deal.
 5   Q    But sitting here today, you don't know what he
 6        said to Mr. Archbell or to Overfinch; right?
 7   A    I have no idea what his words were.
 8   Q    Have you spoken to Mr. Archbell since that time?
 9   A    Yes.
10   Q    Have you?
11   A    Yeah.
12   Q    And have you asked him, Well, what did NextGear
13        tell you?
14   A    Well, I did inquire.  The issue with
15        Mr. Archbell is, he has a relationship with
16        NextGear.  He owns a dealership in -- off the
17        top of my head, I think it's in Virginia --
18   Q    Okay.
19   A    -- where he spends a lot of his time.
20             He's a very friendly, amicable guy, and he
21        just said, Look, I no longer want to get
22        involved.  He acknowledged that he was aware of
23        problems we were having with NextGear and just
24        said, You know, I've got a relationship with
25        them as well and, therefore, this relationship
```

Page 115

```
 1      isn't going to work.

 2           If I see Mr. Archbell today, it would be

 3      all hugs and kisses and how are you and long

 4      time no see and all that kind of -- we never

 5      officially fell out over it.

 6           Mr. Rocap, my counsel, has had extensive

 7      conversations with him to figure out what

 8      happened.

 9   Q  Okay.  And don't tell me anything your lawyer

10      told you, because that's privilege.  I'm not

11      asking for that, so just be aware.

12           As I understand it, then, so the problem

13      with NextGear at this time was that you couldn't

14      pay them back what they said was owed; right?

15   A  Correct.

16           (Deposition Exhibit 28 was marked for

17      identification.)

18   Q  Okay, got you.

19           Take a look, this one is going to be

20      September 27th, 2019.  I'm going to mark this as

21      Exhibit No. 28, I believe is the number we're

22      at.

23   A  I've got a note that this file is empty.

24   Q  Oh, this one is empty, okay.  See if this came

25      through in your email.  If not, I can shoot it
```

Page 116

1      to you real quick.  Apologies for that.

2  A   I think it's my side if everyone else is

3      receiving it.

4          MR. JONES:  Jason and Dick, are you guys

5      able to open it?

6          MR. ROCAP:  Yeah.  If you want, Brian, I

7      can just share screen and then he can look at

8      it.

9          MR. JONES:  That would be great.  Thank you

10     for doing that, Dick, I appreciate that.

11         MR. ROCAP:  All right, see that, James?

12         THE WITNESS:  Yeah.

13         MR. ROCAP:  You guys are going to have to

14     tell me to scroll up and scroll down because you

15     don't have control.

16         MR. JONES:  All right.  So if you would

17     scroll down just a little bit, I think you can

18     get the whole email in one -- yeah, there you

19     go.  That's perfect, thank you.

20  Q   So Mr. Blackburn, Exhibit 28 here is a

21     September 27th, 2019 email, and it's from Mickey

22     Agnew to you and Mr. Kessler and then Sales.

23     I'm assuming the sales email address was

24     probably Samuel; is that right?

25  A   I think sales was just a generic.

Page 117

```
 1   Q    Okay.
 2             And it says, "Afternoon.  We recently
 3        advised you of an open NSF/delinquency incident
 4        in need of your attention.  To date that
 5        incident remains unresolved.  Your lack of
 6        urgency will result in additional collection
 7        activity that will include your account being
 8        placed in default and the subsequent termination
 9        of your line of credit."
10             And it says, "Need wire for $147,224.82 as
11        of today.  Please send wire confirmation once
12        done."  It provides the wiring information.  It
13        says, "I urge you to contact your account
14        executive today to resolve this matter and avoid
15        further action."
16             Do you recall what the issue was with
17        regard to this $147,000 that was said to be
18        needed?
19   A    That's everything we've just gone over.
20   Q    Okay.
21   A    I believe.  I'm presuming that's the first
22        $150,000 of temporary increases that had become
23        due.
24   Q    It says, "Open NSF."  Were these things that
25        NextGear tried to recover but the bank said
```

Page 118

1     there's not sufficient funds?

2  A  I think they were the transactions that Donna

3     wrote to us about, saying they had gone into the

4     account to take them, there wasn't enough money

5     in there to send them over.

6  Q  Okay.  Do you recall having any conversations

7     with Mickey Agnew on this issue?

8  A  No.  The only gentleman that I remember talking

9     to was, because he leaves quite a -- his

10    reputation precedes him -- is a guy whose alias

11    is Will Smith.

12 Q  Will Smith, okay.  I think that might be in our

13    next series of emails.

14        MR. JONES:  Dick, thanks for that.

15        (Deposition Exhibit 29 was marked for

16    identification.)

17 Q  Mr. Blackburn, let's see if you can open up,

18    it's an October 18th, 2019 email, at least

19    that's the name of the file.  Does that one

20    open?

21 A  Yes.

22 Q  Okay, perfect.  And again, I'm sorry about the

23    issues with OneDrive.  It's usually pretty

24    reliable.

25        So this is a fairly lengthy document.  For

**James Blackburn <james@overfinchmiami.com>**                                    9/24/2019 9:26 AM

# Re: Next Gear Summary

To Donna <donna@overfinchmiami.com>   Copy ek13@comcast.net <ek13@comcast.net>

We have a new floor plan company who are wiring next gear 350k to buy us out. They are providing us with one million.

Very Best Regards,


James Blackburn
Chief Executive


Overfinch Miami

1500 Cordova Road, Suite 206
Fort Lauderdale, Florida, 33316

Cell: +1 954 232 7661
Office: 954 870 7174
Email: james@overfinchmiami.com
Web: www.overfinch.com

---

Confidentiality Notice: This e-mail, and any attachment to it, contains privileged and confidential information intended only for the use of the individual(s) or entity named on the e-mail. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that reading this e-mail is strictly prohibited. If you have received this e-mail in error, please immediately return it to the sender and delete it from your system.

On Sep 24, 2019, at 14:20, James Blackburn < james@overfinchmiami.com> wrote:

> No. I am dealing with next gear head office a gentlemen called Michael.
>
> Very Best Regards,
>
>
> James Blackburn
> Chief Executive
>
>
> Overfinch Miami
>
> 1500 Cordova Road, Suite 206
> Fort Lauderdale, Florida, 33316

**EXHIBIT 27**

Cell: +1 954 232 7661
Office: 954 870 7174
Email: james@overfinchmiami.com
Web: www.overfinch.com

---

Confidentiality Notice: This e-mail, and any attachment to it, contains privileged and confidential information intended only for the use of the individual(s) or entity named on the e-mail. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that reading this e-mail is strictly prohibited. If you have received this e-mail in error, please immediately return it to the sender and delete it from your system.

On Sep 24, 2019, at 14:18, Donna < donna@overfinchmiami.com> wrote:

James – There is another Title pending with Next Gear on Unit KA546018,  Title is due in 2 days.
This unit was sold to Long Island and I have already sent them the Title.
Are we purchasing this unit back from Long Island?

Regards,
Donna