**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| **NEXTGEAR CAPITAL, INC.,** ) | |
| ) | |
| **Plaintiff** ) | |
| ) | **CASE NO. 1:20-cv-00354-TWP-DLP** |
| **v.** ) | |
| ) | |
| **PREMIER GROUP AUTOS, LLC,** ) | |
| **JAMES M. BLACKBURN, and** ) | |
| **EDWARD A. KESSLER,** ) | |
| **Defendants** ) | |

**DEFENDANT/COUNTERCLAIMANT, EDWARD A. KESSLER'S, MEMORANDUM
OF LAW IN OPPOSITION TO PLAINTIFF, NEXTGEAR CAPITAL, INC.'S MOTION
FOR SUMMARY JUDGMENT**

Despite Plaintiff, NextGear Capital, Inc.'s ("NextGear"), claim that this "is a simple contract case," the designated evidence to this Court demonstrates that this case is anything but "simple." Rather, the designated evidence demonstrates that Defendant/Counterclaimant, Edward Kessler (hereinafter "Kessler"), is the victim of a serious fraud and forgery that prevents NextGear's enforcement of the Note and Guaranty against Kessler.

NextGear (acting through its representatives) engaged in forgery (whether intentionally or negligently) and allowed a critical "Loan Document" to be forged, i.e., a Power of Attorney, which document was undisputedly required by NextGear to allow NextGear to provide funding through a line of credit under the Note to Co-Defendant, Premier Group Autos, LLC ("PGA"). Without the execution of the Kessler Power of Attorney document, the undisputed evidence demonstrates that NextGear, at a minimum, would have "locked" the account and no funds would have been lent by NextGear to PGA. And, as a result, Kessler would not have fallen victim to the major fraud committed upon him and would not be forced to defend against NextGear's claim seeking to recover over $429,000.00 from Kessler.

1

But, because NextGear allowed the forgery of the Power of Attorney to occur, and because NextGear failed to follow their own internal protocols, Kessler's former business partner, co-Defendant, James Blackburn ("Blackburn"), was able to steal more than $340,000.00 of funds from the NextGear financing.  And, now, NextGear is seeking to ignore its own culpability and wrongful conduct and hold Kessler fully responsible for the fraud and forgery committed upon him by NextGear and Blackburn.

The NextGear employee, Arturo Mayoral, who participated in the forgery, is a Florida notary public and notarized and swore that he observed Edward Kessler sign the subject Power of Attorney. But, as the undisputed evidence demonstrates, Kessler did not sign the Power of Attorney document that Mayoral notarized.  As a result, Mayoral and NextGear have engaged in notary misconduct in violation of Florida Statute § 117.05.

NextGear cannot (and should not) be able to ignore its own wrongful conduct and seek to hold Kessler responsible for a significant debt that never would have happened if NextGear's representatives simply would have followed the law and NextGear's own policies/procedures.  The designated evidence demonstrates that this is not "a simple contract case" and many factual disputes exist which preclude the entry of summary judgment on NextGear's Complaint, as well as Kessler's Counterclaims.  Accordingly, NextGear's Motion for Summary Judgment should be denied.

## I.    STATEMENT OF MATERIAL FACTS IN DISPUTE

Edward A. Kessler is an individual who resides in Bethel Park, Pennsylvania and has resided in Pennsylvania all of his life.  (Kessler Aff. At ¶ 2).  Kessler is employed as an actuarial analyst for a company that is located in Pennsylvania.  (*Id*. at ¶ 3).  In late 2017 to early 2018, Kessler was introduced to James Blackburn through mutual friends in Florida.  (*Id*. at ¶ 4).

In the latter part of 2018, Kessler attended the Fort Lauderdale boat show and met with James Blackburn.  (*Id*. at ¶ 5).  During this time, James Blackburn brought a business concept to Kessler about investing in a potential dealership that would sell high-end Range Rover vehicles through the brand name called: "Overfinch".  (*Id*. at ¶ 5).  In furtherance of the dealership business, James Blackburn formed a Florida limited liability company by the name of Premier Group Autos, LLC ("PGA").  (*Id*. at ¶ 6).

PGA was formed for the purpose of distributing high-end aftermarket Range Rovers utilizing the Overfinch branding and trademark.  (*Id*. at ¶ 7).  James Blackburn was a 50% owner in PGA and Edward Kessler ("Kessler") was also a 50% owner of PGA.  (*Id*. at ¶ 8).  Blackburn and Kessler agreed to a 50/50 venture and entered into an agreement regarding the operations of PGA.  (*Id*. at ¶ 9).  Pursuant to Blackburn and Kessler's agreement, Kessler and Blackburn agreed that each would make capital contributions to the company, and further agreed that each person would fund the purchase of at least one Range Rover from the Overfinch distribution.  (*Id*. at ¶ 10).  Kessler, as a 50% owner of PGA, was given the title of "Director of Operations."  Kessler, however, despite the given title was a passive investor in PGA and never intended to have any day-to-day control or management of PGA.  (*Id*. at ¶ 11).

At the time PGA was formed, Kessler was in the process of actively interviewing for jobs as an actuarial analyst and had no intentions of working the PGA business.  (*Id*. at ¶ 12).  Kessler informed Blackburn that Blackburn would be responsible for the operations and that Kessler would provide an investment in what Kessler believed to be a potentially profitable business through the sale of the Overfinch/Range Rover product.  (*Id*.)

Kessler made an initial capital investment of $112,500.00 into PGA and also directly purchased an Overfinch/Range Rover for PGA's use in the amount of $180,536.40.  (*Id*. at ¶ 13).

Despite Blackburn's promise and obligation to make the same capital contribution and purchase an Overfinch/Range Rover, Blackburn never made his required capital contribution and never purchased an Overfinch/Range Rover.  (*Id*. at ¶ 14).

In or around late February 2019, Kessler received an email from NextGear Capital and/or Docusign asking for Kessler to review a purported note and loan agreement for PGA's apparent acquisition of a $500,000.00 line of credit from NextGear.  (*Id*. at ¶ 15).  During this time (late February 2019), Kessler was unaware that Blackburn, purportedly acting on behalf of PGA, was seeking to obtain any type of financing from NextGear or any other lender.  (*Id*.)

Kessler informed Blackburn that PGA did not need, nor was PGA ready for, any financing at this level and that terms of the $500,000.00 NextGear financing plan did not make smart financial sense for PGA.  (*Id*. at ¶ 16).  For example, Kessler told Blackburn that Kessler would not agree to the $500,000.00 line of credit from NextGear because: (a) PGA could not afford such a large amount of financing; (b) the terms of the $500,000.00 financing arrangement required PGA to submit a $100,000.00 retainer; and (c) Kessler would not agree to sign a Power of Attorney document that apparently was required to be signed as part of the $500,000.00 NextGear financing package.  (*Id*).

In addition, Kessler informed Blackburn that Kessler would not sign a power of attorney document as part of any financing with NextGear as Kessler had the power of attorney document from NextGear reviewed by an attorney and was counseled not to sign such a document as part of any financing transaction with NextGear.  (*Id*).

Kessler did believe, however, that PGA needed additional access to capital to help fund the purchase of Overfinch/Range Rover vehicles.  (*Id*. at ¶ 17).  Thus, Kessler approached his parents and requested that they provide a $300,000.00 asset backing loan so that PGA could have access

to additional funds to purchase the Overfinch/Range Rover vehicles. (*Id*). Kessler's parents, Edward P. Kessler and Kristine E. Kessler, in or around March 11, 2019, agreed to provide PGA with a $300,000.00 loan, which was memorialized by a "Business Loan Agreement". (*Id*. at ¶ 18).

Thus, after receipt of the $300,000.00 loan from Kessler's parents, Kessler believed that PGA was properly capitalized and ready to engage in business through the purchase and sale of the Overfinch/Range Rover through an Overfinch distribution agreement. (*Id*. at ¶ 19). Blackburn, however, without Kessler's knowledge, still continued to discuss loan opportunities with NextGear. (*Id*. at ¶ 20).

Ultimately, in the latter part of March 2019, Blackburn approached Kessler and said that NextGear agreed to do a floor plan financing transaction that would not exceed $150,000.00 in a total line of credit and the line of credit was to be used in $40,000.00 increments to finance less expensive vehicles. (*Id*. at ¶ 21). As part of this $150,000.00 Loan, Blackburn also told Kessler that NextGear agreed that it would not require the execution of a Power of Attorney document as part of the transaction, which Kessler previously objected to signing or providing as any part of a loan agreement. (*Id*). Blackburn further agreed that the $150,000.00 line of credit from NextGear would only be used by PGA in $40,000.00 increments, and when a non-Overfinch car was sold using the financing, the full $40,000.00 loan would be immediately repaid. (*Id*).

With this understanding and agreement in place, Kessler agreed that PGA could enter into a floor plan financing agreement for the $150,000.00 line of credit with NextGear. (*Id*. at ¶ 22). Thus, on or about March 26, 2019, Kessler received from NextGear/Docusign the contract documents that required execution. (*Id*. at ¶ 23).

As part of the contract documents that Kessler received from NextGear/Docusign, all of the documents required an electronic signature, but there was no place for Kessler to electronically

sign the Power of Attorney documents. (*Id*). Because there was no place for Kessler to "click and sign" the Power of Attorney documents from NextGear/Docusign, Kessler believed and confirmed what Blackburn previously told Kessler was true, i.e., that the Power of Attorney documents were not required to be signed as part of the overall loan/contract process to obtain the $150,000.00 line of credit from NextGear. (*Id*). However, since this litigation has ensued, Kessler has learned that the Power of Attorney document, was, in fact, required to be executed as part of the overall lending process. (*Id*. at ¶ 34).

**The NextGear "Loan Documents" & Execution Requirement for Power of Attorney Documents**

On March 27, 2019, Kessler electronically signed, via DocuSign, the Demand Promissory Note and Loan and Security Agreement (the "Note"), the Advance Schedule, and Individual Guaranty. (*See* Dkt. 1-3 at p. 21 & Dkt. 1-3 at p. 44.)

Pursuant to Section 8 of the Note, PGA was required to execute the Note in addition to executing a Power of Attorney in favor of NextGear. Specifically, Section 8 of the Note provides: "[i]n addition to the execution and delivery of this Note, upon the request of Lender, Borrower shall execute (or cause the execution of) the following additional documents in connection with Borrower's Credit Line (together with all other documents and instruments executed by Borrower in connection with this Note or Borrower's Credit Line, and in each case as the same may be amended, restated, renewed extended or otherwise modified from time to time, the "Loan Documents"), each of which shall be incorporated herein by reference and made a part of this Note: (a) a power of attorney in favor of Lender and its designated Representative…" (*See* Dkt. 1-3 at p. 16).

The Note further provides in Section 14 that: "[t]his Note and the other Loan Documents may be executed by the Parties in one or more counterparts which, collectively, shall constitute

6

one and the same agreement." (*See* Dkt. 1-3 at p. 17). Pursuant to the Note, the term "Loan

Documents" has the meaning set forth in Section 8 above. (*Id*). In NextGear's original Complaint,

which has been litigated throughout this case, NextGear attached the subject Power of Attorney

documents of Mr. Blackburn and Mr. Kessler to the Note as part of the "Note and Loan

Documents." (*See* Dkt. 1-3; Dkt. 1-3 at p. 30-33).

The Note and Loan Documents further provide that it is a default under the Note for the

Borrower to fail to deliver, revoke or amend any power of attorney or similar authorization that it

has executed in favor of Lender. (*See* Dkt. 1-3 at p. 15).

**<u>Kessler Was Required to Execute a Power of Attorney Document in Favor of NextGear</u>**

As part of the contracting and underwriting process for the subject NextGear Note,

NextGear had various "stipulations" that were required to be met. According to NextGear

employees Andrew Ramey and Arturo Mayoral, "stipulations" are "documents or items that are

required in order to secure the line of credit" and are "[r]equirements that are needed to be met

before the contract can be fully executed." (Mayoral Dep. at p. 160); (Ramey Dep. at p. 27-28).

Pursuant to internal NextGear emails, NextGear required as "stipulations" that <u>both</u>

Edward Kessler <u>and</u> James Blackburn sign, provide and return Power of Attorney documents as

part of the contracting process. (Mayoral Dep. at p. 160-161, Ex. 14); (Ramey Dep. at p. 45; Ex.

18).

Mr. Ramey testified as follows:


**045:05 Q.   I'm handing you what's been marked as**
**045:06      Exhibit 18.  Exhibit 18, do you see that kind**
**045:07      of looks like a cutout of an Excel spreadsheet**
**045:08      or some sort of table there in the document?**

**045:09 A.   Yes.**

**045:10 Q.   Describe for me what that is.**

**045:11 A.   It's essentially a summary of what the**
**045:12       underwriter approved, some dealer information**
**045:13       as well, but it gives information about the**
**045:14       dealer and then also what the underwriter**
**045:15       approved and then any outstanding**
**045:16       stipulations.**

**045:17 Q.   And those stipulations are the requirements**
**045:18       for the contracting process, correct?**

**045:19 A.   Yes.**

**045:20 Q.   Yes?**

**045:21 A.   Yes.**

**045:22 Q.   And there on Exhibit 18, it lists two**
**045:23       different Powers of Attorney, correct?**

**045:24 A.   Yes.**

**045:25 Q.   And a Power of Attorney for Edward Kessler and**
**046:01       a Power of Attorney for James Blackburn,**
**046:02       correct?**

**046:03 A.   Yes.**

(Ramey Dep. at p. 45:05-46:03).

According to NextGear and NextGear's official policy, NextGear will lock an account and deny the Borrower from gaining access to any funds and will not lend any funds if the required Power of Attorney documents are not signed and returned within thirty (30) days of original execution of the Note.  (Mayoral Dep. at p. 151-156; 158-159; 165; Ex. 13).

According to Andrew Ramey, Senior Manager of Lending Services for NextGear, if the required Power of Attorney document is not signed within 30 days post activation, the account is locked and the borrower cannot access any funds from NextGear.   (Ramey Dep. at p. 26). Throughout Ramey's tenure with NextGear, Ramey stated that he has never seen a situation where

a dealer/borrower refuses to sign a power of attorney document and still receive funds from NextGear.  (Ramey Dep. at p. 26).

Mr. Ramey testified as follows:

026:03 Q.   I sign a contract with you.  I sign a personal
026:04       guaranty with you.  I never sign a Power of
026:05       Attorney.  What happens?

026:06 A.   At 30 days post activation, the account would
026:07       be locked.

026:08 Q.   And what does that mean?

026:09 A.   The dealer would not have any access to be
026:10       able to floor units.  Really that's it.

026:11 Q.   In your experience with NextGear, have you
026:12       ever seen any line of credit or loan where
026:13       you've allowed a dealer to sign a contract but
026:14       never sign a Power of Attorney and still get
026:15       money?

026:16 A.   No.

(Ramey Dep. at p. 026:03 - 026:16).

**Kessler's Alleged "Execution" of the Power of Attorney Document**

Arturo Mayoral is employed by NextGear as a Sales Executive and is a resident of south Florida.  (Mayoral Dep. at p.5-6 & 9-10).  Mayoral's job duties are to prospect for new customers and sell the NextGear lending product to car dealers.  (*Id*).  As part of Mayoral's job duties, Mayoral assists in getting signatures to help facilitate the contracting process for a new customer of NextGear.  (*Id*. at p. 29-30).  As part of the overall "contract execution" with NextGear, Mayoral states that the contract documents are sent via Docusign, "and then there is a Power of Attorney that has to be signed within 30 days of the account activating or the account will be locked." (Mayoral Dep. at p. 30: 01- 18).

In his role as a Sales Executive for NextGear, Mayoral also serves as a notary public in the State of Florida.  (Mayoral Dep. at p. 36-37).  Mayoral decided to become a notary public to assist the dealers and make sure that everything flows to keep NextGear's customers happy.  (*Id*).  Mayoral serves as a notary public solely for NextGear business and in furtherance of NextGear's business.  (Mayoral Dep. at pp. 38-39).  Mayoral attended an 8-hour course through the State of Florida to become a Florida notary public.  (Mayoral Dep. at p. 39-40).  NextGear reimburses Mayoral for the annual charges associated with the bonding requirements to serve as a notary public in the State of Florida.  (Mayoral Dep. at p. 40-41).

According to Mayoral's training to become a notary public, the process of notarizing a document is as follows:

**3  Q.   Okay.  Walk me through that process of what**

**4       you were trained step by step.**

**5  A.   Basically it's just to give the document to**

**6       the person, make sure that they understand**

**7       what they are signing, that they're signing**

**8       of free will.  I observe them signing, make**

**9       sure that the dates are correct.  I then look**

**10      at the person's driver's license, verify**

**11      signature.  I then fill out my notary section**

**12      with the correct dates.  I apply my**

**13      signature, and then I apply my notary seal**.

(Mayoral Dep. at p. 44)

Mayoral testified that there is no "leeway" whatsoever in the steps identified above and Mayoral stated if there was a deviation that "it wouldn't be valid."  (Mayoral Dep. at p. 47).

On April 18, 2019, Mr. Mayoral testified that he went to the PGA offices in Fort Lauderdale, Florida and obtained the signatures of Mr. James Blackburn and Mr. Edward Kessler on two (2) separate Power of Attorney documents.  (Mayoral Dep. at Ex. 8 & Ex. 9; at pp. 91-94). Prior to April 18, 2019, Mr. Mayoral had never met Edward Kessler.  (Mayoral Dep. at p. 50).

When Mayoral arrived at the PGA office in Fort Lauderdale, Mayoral went to the PGA conference room and was introduced to a person who Mayoral stated was Mr. Edward Kessler. (Mayoral Dep. at p. 91-95).  There was a bit of small talk, and then Mayoral requested Kessler (or the man who allegedly claimed to be Kessler) sign the Power of Attorney document.  (Mayoral Dep. at p. 95-96).  Mayoral asked if there were any questions and the man who claims to be Kessler stated "no" and this person, according to Mayoral, willingly signed the Power of Attorney document.  (Mayoral Dep. at p. 95-98).

Mayoral testified that he gave the Power of Attorney document to Kessler and that Kessler completely filled out the signature block and the date portion of the Power of Attorney document. (Mayoral Dep. Ex. 8 & p. 97-99).  Mayoral testified that Kessler wrote the date portion of the Power of Attorney document and that no one else signed or wrote on any portion of the signature block or the date line.  (Mayoral Dep. at p. 98-99).

After Kessler (or the man who apparently claimed to be Kessler) signed the Power of Attorney document, Mayoral testified that he looked at a black and white photocopy of a picture of Edward Kessler's license and then proceeded to notarize the Power of Attorney document. (Mayoral Dep. at 98-99).  The black and white photocopy of the picture of Kessler's driver's

license that was reviewed by Mayoral to try to confirm that the signature of Edward Kessler was the same as appeared on the Power of Attorney document was the following picture:



(Mayoral Dep. at Ex. 4; at p. 99 & 104).

Mayoral compared the above signature of Edward Kessler from the photocopy of Kessler's license against the below signature of "Edward Kessler" on the Power of Attorney document, which signature was purportedly obtained from the person who just signed Edward Kessler's signature in front of Mayoral was as follows:

I representative, has executed this Power of Attorney on the date set forth below.

**BORROWER:**

Premier Group Autos LLC DBA Overfinch Miami

By:

Name: Edward Anthony Kessler

Title: Manager

Date: 4.18.19

(Mayoral Dep. at pp. 98-99; Ex. 8).

Mayoral testified that he believed the signature on the Kessler license and the Kessler POA above, when comparing the two (2) signatures, "appear similar."  (Mayoral Dep. at p. 99).

Mayoral did not ask the person claiming to be Mr. Edward Kessler to provide the person's actual identification card or driver's license as part of the notary process, nor did Mayoral ask to inspect Edward Kessler's driver's license.  (Mayoral Dep. at p. 48-49).  Despite not asking to see the actual driver's license of Edward Kessler, when Mayoral was asked about the notary process for the subject Power of Attorney from one of his superiors at NextGear, Mayoral stated that he "[Mayoral] verified the ID's and followed Procedure notarizing their respective documents." (Mayoral Dep. at Ex. 5).  Mr. Mayoral also testified that when he told his boss in the email that he followed "Procedure", he meant that he followed the "notary procedure."  (Mayoral Dep. at p. 111-112).  Mr. Mayoral also told his boss that he logged "all" of his activities in Salesforce. (Mayoral Dep. at Ex. 5).  But, the Salesforce log for Mayoral's "activities" on April 18, 2019 do not at all show that Mayoral had the Power of Attorney documents signed and/or notarized. (Mayoral Dep. at p. 131-132).

After reviewing the signatures above, Mayoral notarized the Power of Attorney and completed his attestation clause stating that Edward Kessler appeared before him in Fort Lauderdale, Florida and executed the Power of Attorney.  (Mayoral Dep. at p. 99; Ex. 8).

Mayoral is not aware of any training of being a notary public where it is acceptable to use a picture of a copy of a driver's license instead of requesting to see the actual driver's license of the person while notarizing a document.  (Mayoral Dep. at p. 58: 06-14).

After the man claiming to be Edward Kessler signed the Power of Attorney document, Mayoral directed his attention to James Blackburn to obtain Blackburn's signature on his Power of Attorney document.  (Mayoral Dep. at p. 99-100).  Mayoral did not ask to see Blackburn's

signature because Blackburn was known to Mayoral from prior meetings.  (*Id*).  Just like Mayoral testified regarding the signature of Kessler's  Power of Attorney above, Mayoral also testified that he observed Blackburn sign the Power of Attorney and also date the Power of Attorney in Blackburn's own handwriting. (Mayoral Dep. at p. 101; Ex. 9).

The signature and date of Blackburn on Blackburn's Power of Attorney document appears as follows:



(Mayoral Dep. at Ex. 9).

Despite Mayoral's testimony and alleged review of Kessler's signature on the photocopy of Kessler's license, as compared to the Power of Attorney document Kessler allegedly signed, Mr. Ramey, Senior Manager of Lending Services for NextGear, testified that when he compared the picture of the license (Ex. 4) and the signature of Edward Kessler on the Power of Attorney document (Ex, 8), the two (2) signatures did not look alike.   (Ramey Dep. at p. 97-98). Specifically, Ramey testified as follows:

**098:05 Q.   I'm going to hand you what's been marked**

**098:06      previously as Exhibit 8.  It's the Power of**

**098:07      Attorney of Mr. Kessler.  Does that look like**

098:08      **Mr. Kessler's signature compared to his**

098:09      **license?**

098:10 A.   **Not exactly, no.**

(Ramey Dep. at p. 97-98).

Despite Mayoral testifying under oath that the man claiming to be Kessler signed and dated his own Power of Attorney, and Blackburn signed and dated his own Power of Attorney, Blackburn admitted in his deposition that the date written on Kessler's purported Power of Attorney document "4-8-19" appears to "look like my handwriting on the date, although I don't recall the document." (Blackburn Dep. at p. 195).

**Discovery of Blackburn's Fraud and Misuse of PGA Funds**

In the early summer of 2019, Kessler went to Florida to review the financial records of PGA, as Kessler had not been able to access the bank records of PGA.  (Kessler Aff. at ¶ 24). During this time (June 2019), Kessler reviewed some of the PGA financial records and attempted to reconcile various expenditures made from the PGA account.  (*Id*).  During this first review of the PGA financial records is when Kessler first noticed that Blackburn was sending PGA funds to other companies that Blackburn owned or controlled.  (*Id*).  Kessler questioned Blackburn about these expenditures, but Blackburn never really provided a response that made sense and simply stated that he (Blackburn) would reconcile the books and demonstrate that the expenditures to the other companies were justifiable and in furtherance of actual PGA business.  (*Id*).   However, to date, Kessler has not received any accurate or justifiable explanation from Blackburn about the misuse of PGA's funds and Blackburn's use of PGA funds for his own benefit.  (*Id*. at ¶ 25).

In addition, during the summer of 2019, PGA's bookkeeper, Donna Degroff, asked Blackburn about a certain transaction using the NextGear line of credit.  (*Id*. at ¶ 26).  Ms. Degroff

also stated that this transaction would increase the NextGear line of credit to more than $250,000.00. (*Id*). This is the first time that Kessler learned that Blackburn was potentially misusing the NextGear line of credit. (*Id*).

Later, on September 27, 2019, Kessler received his first communication/notice from NextGear that PGA was delinquent and that the line of credit was in default. (*Id*. at ¶ 27). Prior to September 27, 2019, Kessler never received any communication or notice from NextGear that the line of credit was in default or that Blackburn had misused the line of credit. (*Id*). Prior to this time, Kessler also had no knowledge that Blackburn had increased the line of credit by more than $200,000.00, which was done without Kessler's knowledge and/or consent. (*Id*).

As a result of Blackburn's misappropriation of PGA's funds, Kessler filed a lawsuit against Blackburn in the State of Florida. A true and accurate copy of the lawsuit against Mr. Blackburn is attached to Mr. Kessler's Affidavit as Exhibit B. (*Id*. at ¶ 28). As part of the Florida litigation against Blackburn, a forensic accounting investigation was ordered by the Florida court. (*Id*. at ¶ 29). As a result of this court ordered forensic accounting investigation, it was determined that Blackburn paid himself (or entities he owns/controls) in excess of $900,000.00 of PGA's funds. (*Id*). These payments from PGA funds included payments to Blackburn for trips to Barbados, jewelry and other personal expenditures for the personal benefit of Blackburn or Blackburn's family. (*Id*). A true and accurate copy of the accounting report that was prepared as part of the Florida litigation by the court ordered accountant is attached as Exhibit C to Mr. Kessler's Affidavit.

As part of Mr. Kessler's investigation into Mr. Blackburn's fraud and misappropriation, Kessler also discovered that Blackburn had forged Kessler's name to an American Express credit card and Blackburn spent over $90,000.00 on the American Express credit card without Kessler's

knowledge and/or consent.  (*Id.* at ¶ 30).  American Express brought suit against Kessler for collection of the credit card, but, ultimately, American Express realized that Kessler was the victim of fraud and forgery and American Express dismissed the lawsuit and did not seek reimbursement for the funds that Blackburn inappropriately and unlawfully charged for his own benefit.  (*Id*).

**Discovery of the Forged Power of Attorney Document**

After Kessler was served with the lawsuit in the above-captioned litigation, Kessler learned for the first time that his name was forged on the Power of Attorney document.  (*Id.* at ¶ 31). Kessler never signed the subject Power of Attorney (a copy of which is attached to the deposition transcript of Arturo Mayoral as Exhibit 8), nor did Kessler authorize Blackburn or anyone else to sign his name.  (*Id*).

As stated in Kessler's Interrogatory Answers, Kessler was not in Fort Lauderdale, Florida on April 18, 2019.  But rather, Kessler was in Pennsylvania.  (*Id.* at ¶ 32).  Specifically, after being in Erie, Pennsylvania on April 17, 2019 and driving back to Pittsburgh, Kessler was still in Pittsburgh on the morning of April 18, 2019.  (*Id*).  On the morning of April 18, 2019, at 7:45 a.m., Kessler took a picture of a hockey roster for a pickup game of hockey that he played in later that night in Pennsylvania.  (*Id*).  Also, on the same evening, Kessler also checked in to LA Fitness in Bethel Park, Pennsylvania and worked out prior to the hockey game.  (*Id*).

Kessler did not agree to sign the subject Power of Attorney document as part of the NextGear loan/financing and would not have agreed to allow PGA to enter into the loan/financing agreement if NextGear required the execution of the Power of Attorney document.  (*Id.* at ¶ 33). Nor would Kessler have signed any of the Loan documents, including the personal guaranty, if it was required by NextGear to sign the Power of Attorney document as part of the Loan Documents or financing transaction.  (*Id*).

However, since the instant litigation has taken place, Kessler has now learned that NextGear required both Blackburn and Kessler to execute the Power of Attorney document as part of the overall lending process with NextGear. (*Id.* at ¶ 34).

But, because NextGear assisted in the procurement of a forged Power of Attorney document, Blackburn was able to access the line of credit and incur more than $350,000.00 in debt without Kessler's knowledge and/or consent (*Id.* at ¶ 35).

Exactly one day after the forged Power of Attorney document was provided to NextGear, the PGA bank records demonstrate that the first $40,000.00 draw on the line of credit was made and deposited into the PGA bank account. (*Id.* at ¶ 36). A true and accurate copy of the relevant portion of the PGA bank records demonstrating the deposit was made is attached to the Affidavit of Edward Kessler as Exhibit D.

In addition, during this lawsuit, Kessler has also discovered that his name was forged to a NextGear credit application wherein Blackburn was apparently looking to obtain a $1,000,000.00 line of credit. (*Id.* at ¶ 37). A true and accurate copy of the forgery of the credit application is attached to Arturo Mayoral's deposition transcript as Exhibit 3. Kessler did not sign the NextGear credit application, nor did Kessler permit Blackburn or anyone else to sign his name. (*Id*).

Although Kessler did not learn of the forged credit application until after this lawsuit was filed, NextGear, however, had knowledge of the forged credit application <u>prior</u> to the execution of any of the subject "Loan Documents" and failed to take any action to further investigate the forgery/fraud on the credit application. (Ramey Dep. at p. 28:12 – 30:09; 53:13-54:03, Ex. 40).

NextGear has an internal policy/procedure in place when there is a discrepancy between the signatures on an application and the applicant's driver's license. (Ramey Dep. at p. 28:12-20). Pursuant to NextGear's policy/procedure, when there is a discrepancy between the signature(s) on

the application and the driver's license, a NextGear lending services representative is required to contact the NextGear sales executive and have the sales executive obtain another application and have the applicants fill out a second application in order to verify signatures. (Ramey Dep. at p. 28:12 – 30:09; 31:01-32:14). Pursuant to NextGear policy/procedure, if the second application is not obtained within 60 days, the application would expire and the account would be closed. (Ramey Dep. at 31:01-32:14).

As a result of the forgery and fraud associated with the execution of the Power of Attorney document, Kessler has sustained damages by virtue of NextGear seeking to recover more than $420,000.00 from him for the default of the PGA line of credit. (*Id*. at ¶ 39). In addition, Kessler has incurred attorney's fees in excess of $60,000.00 through the defense of this action simply because of the forged Power of Attorney document that NextGear (and its representatives) assisted in procuring and which was required to obtain funding under the NextGear Loan Documents. (*Id*).

**NextGear's Inconsistent Statements Regarding Execution of the Kessler Power of Attorney**

In NextGear's Answers to Kessler's Interrogatories, NextGear was requested in Interrogatory No. 4 to provide detail and circumstances surrounding the execution of the Kessler Power of Attorney. In its Answer to Interrogatory No. 4, Andrew Ramey, the authorized representative of NextGear, who signed the Interrogatory Answers under oath stated that Kessler and Blackburn both were within the presence of Arturo Mayoral and that "Kessler provided his Pennsylvania driver's license as identification, a picture of which was taken contemporaneously with Kessler's signing of the Power of Attorney that he executed. Kessler signed the Power of attorney without reservation and of his own free will." (*See* NextGear Ans. to Kessler Interrogatories at No. 4).

However, despite NextGear's Answer to Interrogatory No. 4, when Arturo Mayoral was deposed, Mayoral testified that he never took a picture of Kessler's license and has never told anyone that he ever took a picture of Kessler's license. (Mayoral Dep. at p. 181).

Ultimately, NextGear has finally admitted that "Mr. Kessler most likely did not sign a Power of Attorney in the presence of Mr. Mayoral." (*See* NextGear Second Amended Answer to Interrogatory No. 4). In fact, despite originally denying the Request for Admission, NextGear has also admitted that the Power of Attorney document, purportedly signed by Edward Kessler, was not signed by Edward Kessler. (*See* NextGear Amended Resp. to Req. for Admission No. 1).

Also, despite Mayoral's testimony and notary attestation, NextGear has also now admitted in its Amended Responses to Kessler's Requests for Admission that Kessler did not appear before Arturo Mayoral and sign the Power of Attorney document and that Kessler has never signed the Power of Attorney document. (*See Id*.at Req. No.'s 2 & 5).

## II.    ARGUMENT

### A.  The Note and Guaranty are Unenforceable Against Kessler.

Since the beginning of this litigation, NextGear has continuously failed to understand the significance of the forged Power of Attorney document. In NextGear's view, the fact that Mr. Kessler's signature was forged onto the Power of Attorney is irrelevant because Kessler admittedly signed the Note and Guaranty. This argument, however, is without merit and the forged Power of Attorney document prevents enforcement of the Note and Guaranty against Mr. Kessler. As the designated evidence shows, the Power of Attorney was (and is) absolutely necessary as part of the overall line of credit provided by NextGear and for the lending of money to PGA. NextGear's own policies and procedures required execution of the Power of Attorney document by Kessler. And, because NextGear required Kessler to sign the Power of Attorney document as part of the

"stipulations," i.e., a document necessary "in order to secure the line of credit," the Power of Attorney document is considered a "Loan Document" and is required to be construed together in determining the overall enforcement of the Note and Guaranty against Kessler.  Because the Kessler Power of Attorney is forged/fraudulent, all "Loan Documents," including the Note and Guaranty, are likewise unenforceable and are considered void under Indiana law.  Accordingly, NextGear's Motion for Summary Judgment against Kessler should be denied.

> i.   **The Power of Attorney Document Should be Construed Together with All Other "Loan Documents," including the Note and Kessler Guaranty, and are, therefore, Void.**

Writings executed at the same time and relating to the same transaction will be construed together in determining the contract. *Bird v. Valley Acre Farms, Inc.*, 177 N.E.3d 459, 468 (Ind. Ct. App. 2021) (citing *Salcedo v. Toepp*, 696 N.E.2d 426, 435 (Ind. Ct. App. 1998).  Even if documents are executed at different times, they may still be construed together as long as they are a part of the same transaction. *McCae Mgmt. Corp. v. Merchants Nat. Bank and Trust Co. of Indianapolis*, 553 N.E.2d 884, 887 (Ind. Ct. App. 1990).

First, it must be observed that the Note and Loan documents specifically state the Power of Attorney documents are part of the overall "Loan Documents" and "shall constitute one and the same agreement."[1]  Thus, under the plain language of the Note, the Kessler Power of Attorney document is considered a Loan Document and must be construed together with all other Loan Documents, including the Note and Kessler Guaranty.

---

[1] Pursuant to the plain language of Section 8 of the Note, in addition to execution of the Note, PGA "shall execute (or cause the execution of) the following additional documents in connection with Borrower's Credit Line (together with all other documents and instruments executed by Borrower in connection with this Note or Borrower's Credit Line, and in each case as the same may be amended, restated, renewed extended or otherwise modified from time to time, the "Loan Documents") **each of which shall be incorporated herein by reference and made a part of this Note: (a) a power of attorney in favor of Lender and its designated Representative…**" (*See* Dkt. 1-3 at p. 16) (emphasis added).

Second, the designated evidence also proves that the Power of Attorney was a necessary part of the contracting process. According to NextGear policy, NextGear will lock an account and deny the Borrower from gaining access to any funds and will not lend funds if the required Power of Attorney documents are not signed and returned within thirty (30) days of original execution of the Note. (Mayoral Dep. at 151-156; 158-159; 165; Ex. 13). In fact, Andrew Ramey, Senior Manager of Lending Services for NextGear, testified that he has never encountered a situation where a dealer/borrower fails to sign a power of attorney document yet still receives funds from NextGear. (Ramey Dep. 26).

Moreover, NextGear's own internal documents show that the "stipulations", i.e., documents required for overall contract execution and lending of money, required both Blackburn and Kessler to sign the subject POA documents. (Ramey Dep. 27:21-28:6, 45:1-24, Ex. 14). This directly contradicts NextGear's assertion that it did not need a POA from Kessler because it already had a binding POA via Blackburn's signature. (*See* Dkt. No. 116, pg. 20).  NextGear conveniently fails to discuss the undisputed evidence demonstrating that the NextGear "stipulations" required both Kessler and Blackburn to sign and deliver the Power of Attorney documents.

Needless to say, the designated evidence rebuts the notion that the Power of Attorney document is irrelevant to the Note and Security Agreement at issue. Indeed, the Power of Attorney was essential to the lending of money from NextGear to PGA.  And in fact, this court would not be breaking new ground by interpreting a forged document as essential to an overarching security agreement. *See Omnisource Corp. v. CNA/Transcontinental Ins. Co*., 949 F. Supp. 681, 687 (N.D. Ind. 1996) (holding that all documents -both forged and authentic- should be construed together if the documents were necessary for letter of credit to be extended); *See also Community State Bank of Galva v. Hartford Insurance Co.,* 542 N.E.2d 1317 (Ill. App. Ct. 1989) (interpreting a forged

power of attorney and promissory note together because promissory note would not have been honored without a the power of attorney).

Contrary to NextGear's belief, Mr. Kessler's valid signature on the Note and Guaranty does not automatically make him liable for the debt at issue. The Power of Attorney, Guaranty, and Note (and other "Loan Documents") were all executed as part of the same transaction and for the same purpose and must be construed together when determining the enforceability of the Note and Guaranty against Kessler.  NextGear has already conceded that Mr. Kessler'a signature was forged onto the Power of Attorney document. Accordingly, the forgery of this essential document, coupled with the need to construe it together with the Note and Guaranty, renders the entire Note and Guaranty unenforceable against Kessler. *See Laborers' Pension Fund v. A & C Envtl., Inc.,* 301 F.3d 768, 779 (7th Cir. 2002) ("A promisor's signature procured by fraud in the execution gives no more effect to a contract than a promisor's signature that has been forged. In either case **the contract is void**; it has never had any legal effect.") (emphasis added).  Direct forgery of a signature, or causing a signature to be forged, renders a contract void and therefore is a valid defense to enforcement of a contract. *Id.* at 779-80; *See also Schaeffer v. Kessler*, 2013 U.S. Dist. LEXIS 38781, at *23 (S.D.N.Y. Mar. 20, 2013) (noting that "causing a signature to appear" on a document amounted to a defense of fraud in the execution).

Because the Power of Attorney is required to be construed with all other Loan Documents, and because the Power of Attorney is a "Loan Document," the forgery of the "Loan Documents" renders the Note and Kessler Guaranty void as a matter of law.[2]

---

[2] Under the Uniform Commercial Code, a person is not liable on an instrument unless…the person signed the instrument.  *See* 26-1-3.1-401(a).  Here, Kessler undisputedly did not sign the Power of Attorney and it was forged. The Power of Attorney document is considered a "Loan Document" and must be construed together with all other Loan Documents, including the Note and Kessler Guaranty.  Because of the forgery, Kessler is not liable to NextGear under the Note and Guaranty.

**B.  Kessler Cannot Be Held Liable for the Full Amount of NextGear's Alleged Damages.**

Contrary to NextGear's argument, the forged Kessler Power of Attorney is (and was) required for NextGear to lend money to PGA under the subject line of credit.  The plain language of the Note makes clear that the Power of Attorney was required and the unchallenged evidence demonstrates that the "stipulations" required both Kessler and Blackburn to sign Power of Attorney documents "in order to secure the line of credit."  (*See* Mayoral Dep. at p. 160-161; Ramey Dep. at p. 45-46).  Further, the designated and unchallenged evidence also demonstrates that if the required Power of Attorney documents are not signed within thirty (30) days of contract execution, then the account is locked and no money will be loaned by NextGear to PGA.  (Ramey Dep. at p. 26).

NextGear attempts to backpedal from the significance of the Kessler Power of Attorney by arguing that only one Power of Attorney document was required to be signed; and, since Blackburn signed a Power of Attorney document, Kessler's forged Power of Attorney is irrelevant.  Understandably, NextGear wants to avoid explaining its own employee's involvement in the forgery of the Power of Attorney and Mayoral's failure to comply with statutorily mandated notary procedure.  But, contrary to NextGear's argument, the undisputed evidence and facts show that NextGear required both Blackburn and Kessler to sign the Power of Attorney document.  There is no evidence suggesting only Blackburn was required to sign the Power of Attorney.  The only designated evidence shows that both Blackburn and Kessler were required to sign.  If only Blackburn was required to sign as part of contract activation and securing the line of credit, then the "stipulations" would only show one Power of Attorney.  The "stipulations," however, unequivocally show both Blackburn and Kessler had to sign the Power of Attorney in order to "secure the line of credit."

But, as the undisputed evidence shows, Kessler never agreed to sign the Power of Attorney and adamantly objected to providing NextGear with such a document. Thus, but for the forgery of the Kessler Power of Attorney, which Mayoral assisted in procuring by improperly notarizing a forged document, the NextGear line of credit never would have been "secured" and the line of credit would have been locked within thirty (30) days of contract execution. Accordginly, pursuant to NextGear's own policies/procedures, no additional funds would have been provided by NextGear to PGA. Which, also means, that Blackburn would not have had an opportunity to substantially increase the line of credit and improperly use the line of credit for his own personal benefit—all of which was done without the knowledge of Kessler.

There is a dispute in the evidence regarding when NextGear actually provided funds under the line of credit to PGA. According to PGA's bank records, the first money received from NextGear under the subject line of credit was on April 19, 2019—one (1) day after NextGear obtained the Power of Attorney documents from Blackburn and purportedly Kessler. (*See* Aff. Kessler at Dkt. 119 ¶ 36). NextGear claims to have provided funds in the amount of $17,900.00 on April 16, 2019—two (2) days prior to the execution of the Power of Attorney documents.

Regardless, of who is right on the timing of the issuance of funds, which is a factual dispute improper for summary judgment, one thing is clear: Kessler cannot be held liable for the full indebtedness claimed by NextGear. This is because the majority of the alleged indebtedness was incurred by PGA/Blackburn well after the expiration of the thirty (30) day period, i.e., the period of time in which the PGA account would have been locked as the Kessler Power of Attorney would not have been provided by Kessler. But, because NextGear (acting by and through Mayoral) assisted in the procurement of the forged Power of Attorney, the PGA line of credit was not locked in accordance with NextGear policy/procedure and Blackburn was able to abscond with over

$340,000.00. This evidence demonstrates that NextGear first materially breached the Loan Documents by failing to comply with its own policies/procedures relating to the locking of accounts if all required "stipulations" are not met.

Accordingly, because material factual disputes exist regarding the enforceability of the Note and Guaranty against Kessler, NextGear's Motion for Summary Judgment on its claim against Kessler for breach of the Note and Guaranty should be completely denied.[3]

**C. Arturo Mayoral Engaged in Notary Misconduct in Violation of Fla. Stat. §117.05.[4]**

It is undisputed that Arturo Mayoral, while acting within the course and scope of his employment with NextGear, committed notary misconduct in violation of Fla. Stat. § 117.05. Florida Statute § 117.05 sets forth the various requirements and obligations that a Florida notary public must comply with while performing notary services. The record is undisputed that Mayoral is a resident of the state of Florida, and, on April 18, 2019, notarized a forged Power of Attorney document. The record is also undisputed that Mayoral did not ask to inspect the driver's license of the person claiming to be Edward Kessler as the Florida statute expressly requires. (*See* Fla. Stat. § 117.05(5)(b)(2)(d).

In its Motion for Summary Judgment, NextGear claims that the Florida notary public statute does not govern Mayoral's conduct, or create liability for Mayoral and NextGear, because the Note and Guaranty "expressly state that they are interpreted solely under Indiana law." (*See* Dkt. 116 at p. 24). NextGear's argument fails for several reasons. First, Mayoral and NextGear's

---

[3] The designated evidence cited above demonstrates that factual disputes exist regarding Kessler's affirmative defenses of fraud, estoppel, illegality and first material breach. In its Motion for Summary Judgment, NextGear simply states that no evidence exists that support Kessler's affirmative defenses. But, as demonstrated above, the factual record certainly demonstrates that factual disputes exist regarding NextGear's ability to enforce the Note and Kessler Guaranty against Kessler.

[4] Kessler's arguments in this section also serve as Kessler's reply in support of Kessler's Motion for Partial Summary Judgment. For the sake of brevity and in the avoidance of serious repetition, Kessler does not see a need to repeat the same arguments in a separate reply brief.

vicarious liability under Fla. Stat. § 117.05 is not dependent on the interpretation of the Note and/or Guaranty.  The choice of law clause found in the Note and Guaranty applies only to the validity, enforceability and/or interpretation of the Note and/or Guaranty.  The Florida Notary Public Statute has absolutely nothing to do with the interpretation, enforcement or validity of the Note and/or Guaranty.  Rather, the Florida Notary Public Statute expressly governs the conduct of Arturo Mayoral who is a Florida resident that was granted notary public powers by the state of Florida and is licensed to perform notary public services in the state of Florida in accordance with the requirements of the Florida Notary Public Statute.

Mayoral's notary public duties and requirements cannot be governed by any law other than the State of Florida as Florida is the only state in which Mayoral is licensed to perform Notary services.  Mayoral's power to perform notary services is granted by Florida law and Mayoral must comply with Florida law in performing notary services—especially when those notary services are provided in the State of Florida, such as the case here.  The Indiana choice of law provision in the Note and Guaranty does not apply to Mayoral's duties/obligations in performing notary services in the State of Florida.  Quite simply, if NextGear did not want to create vicarious liability for itself, it should not have authorized (and in this case encouraged) Mayoral to perform notary public services in the State of Florida.  But, NextGear expressly allowed such conduct and now must face the risks associated with Mayoral's violation of the Florida Notary Public Statute.  Accordingly, the Indiana choice of law provision does not prevent Mayoral and NextGear from exposure to violations of Fla. Stat. § 117.05.

Next, NextGear also argues that a court of law does not have the jurisdiction to enforce a violation of Fla. Stat. § 117.05.  In support of this argument, NextGear cites to *Filippova v. Mogilvesky,* No. 18-80044-CI, 2018 WL 7825449, at *4 (S.D. Fla. Aug. 29, 2018).  However, this

case is outdated and has been superseded/clarified by *Filippova v. Mogilvesky*, No. 18-80044-CIV, 2019 U.S. Dist LEXIS 58451 (S.D. Fla. Jan. 15, 2019).  The subsequent *Filippova* decision expressly declared that Florida courts allow a private right of action against a notary's employer – even if the notary is not named as a defendant. *See Filippova v. Mogilvesky*, No. 18-80044-CIV-MARRA/MATTHEWMAN, 2019 U.S. Dist. LEXIS 58451 (S.D. Fla. Jan. 15, 2019).

In *Filippova*, the Court notes that the previous order (on Aug. 29, 2018) dismissed without prejudice Plaintiff's claim pursuant to Florida Statute § 117.05(6) on the basis that the Court could not determine against whom the claim was brought or the factual underpinnings of the claim. *Id*. at *5. However, Plaintiff's amended complaint cured previous deficiencies and listed her sole cause of action against the notary's employer pursuant to Florida Statute § 117.05(6). *Id*. The Court specifically noted that such a claim is proper and may be heard. *Id*. In the Court's own words: "Previously, the Court ruled that a violation of Florida Statute § 117.107(9) allows for administrative relief and falls within the jurisdiction of the Governor's office.  The Court **did not** rule that a violation of **Florida Statute § 117.05(6)** was outside the jurisdiction of the Court." *Id*.

NextGear's failure to provide the updated/superseded Order from the Florida Court is very telling and demonstrates that Florida law expressly acknowledges the enforcement of a violation of Fla. Stat. §117.05(6) in a court of law.  Accordingly, NextGear's argument must be rejected and Kessler is entitled to judgment in his favor on his claim for violation of Fla. Stat. §117.05(6).

In addition, contrary to NextGear's argument, the exculpatory language found in the Note and Guaranty does not bar Kessler's claim for violation of Fla. Stat. §117.05.  The section of the exculpatory clause relied upon by NextGear states the Guaranty shall be unaffected by "…any torts committed by Borrower against Guarantor, even if Lender is alleged to be complicit or to have committed a direct tort against Guarantor…."  Again, NextGear's argument fails.  First, the

plain and express language of the exculpatory clause, at best, only applies to "torts" committed against a Guarantor. Here, Kessler's claim is a statutory claim for Mayoral and NextGear's vicarious liability under Fla. Stat. §117.05. This claim is not a tort—it is a claim for a violation of Florida statutory law. Thus, the plain language of the exculpatory clause does not apply to Kessler's claim.

But, even if the word "tort" could be construed to include Kessler's statutory claim, it is widely accepted by the majority of States that a party may not contract against liability for intentional tortious acts. *State Grp. Indus. (USA) Ltd. v. Murphy & Assocs. Indus. Servs.*, 878 N.E.2d 475, 479 (Ind. Ct. App. 2007) (citing cases noting that public policy prevents a party from limiting damages for "willfull and wonton misconduct"). Moreover, Indiana courts have declined to release parties from liability based on exculpatory provisions phrased in general terms. *Id.* (citing *Powell v. American Health Fitness Ctr. of Fort Wayne, Inc.*, 694 N.E.2d 757, 761-62 (Ind. Ct. App. 1998); *See also Andy Mohr Truck Ctr., Inc. v. Volvo Trucks N. Am.,* No. 1:12-cv-448-WTL-DKL, 2015 U.S. Dist. LEXIS 59154, at *11 (S.D. Ind. May 6, 2015).

NextGear, by or through Artural Mayoral, aided in the forgery and fraudulent execution of the Power of Attorney document at issue. Allowing NextGear to escape liability after engaging in this type of willful and wanton conduct is certainly not in line with public policy. Furthermore, the inherent wording of NextGear's exculpatory clause is too broad to be enforced. (See Kessler Guaranty at ¶ 2(b)). Use of the phrase "direct tort" is not enough to release NextGear from liability because it in no way refers to the violations of statutes or to specific criminal or fraudulent conduct which took place –i.e., forgery and deception. Public policy considerations aside, specificity of the exculpatory clause is needed and the aforementioned language is far too general.

Finally, NextGear also argues that there is "no evidence that NextGear or its employee committed any violation of Florida law."  In making this statement, NextGear clearly ignores the plain language of the statue and the designated evidence.  The undisputed evidence demonstrates that Mayoral, when serving as a notary public on behalf of NextGear, did <u>not</u> obtain any of the acceptable forms of identification from the person claiming to be Mr. Edward Kessler on April 18, 2019.  At best, Mr. Mayoral had a black and white photocopy of a picture of Mr. Kessler's license, i.e., Mayoral had a copy of a copy of Mr. Kessler's license.  It is undisputed that Mayoral did not ask the person claiming to be Mr. Kessler to provide his driver's license or acceptable form of identification at the time of performing the notary service.  This failure is a direct violation of Fla. Stat. § 117.05(5)(b)(2)(d).  The plain language of the statute does not allow Mayoral to use a black and white photocopy of a picture of the license.  If the statute allowed for a copy of a copy, the statute would have expressly stated as much.  The express language of the statute is clear—the form of identification must be the actual driver license or identification card.  The reason for the requirement to present the **<u>actual</u>** license is to prevent fraud and to ensure the person claiming to be Kessler is, in fact, Edward Kessler.  Using a black and white photo copy of a picture of a license presents great opportunity for fraud—which is exactly what happened here.

If Mayoral simply would have followed his notary public requirements, as required by Fla. Stat. § 117.05, and required the person claiming to be Mr. Kessler to present his driver's license or other picture identification, Mr. Mayoral would not have notarized the Power of Attorney document as the person claiming to be Mr. Kessler would not have had Mr. Kessler's actual driver's license.  The presentation of the driver's license in conjunction with the notary of an official document is absolute.  Nowhere within the statute does it allow for a notary public to review a black and white photographed copy of a picture of a driver's license to satisfy the

identification requirement of Fla. Stat. § 117.05.  Mayoral failed to comply with his obligations and his failure has caused serious harm and damages to Kessler.

The damages caused by Mayoral's notary misconduct are substantial.  Because Mayoral failed to follow procedure in notarizing the Kessler Power of Attorney document, Mayoral allowed a fraudulent and forged Power of Attorney document to exist and be presented to NextGear.  In light of this forgery, the NextGear lending department had all "stipulations" required for contract execution and in securing the line of credit.  As a result of the forged Power of Attorney, the PGA line of credit was able to proceed and was never locked as required by NextGear policy and procedure.  As a result, Blackburn was able to siphon over $350,000.00 from the line of credit.

Quite simply, but for Mayoral's participation in the forgery (negligent or otherwise), NextGear would not have provided over $350,000.00 in funds to PGA because NextGear would not have received the required Power of Attorney document.  And, as NextGear's policy makes clear, NextGear would have locked the PGA account because the required Power of Attorney documents were not received.  Therefore, no funds would have been provided to PGA and Kessler would not be in a situation where NextGear is seeking to recover over $420,000.00 in damages, attorney's fees and interest from Kessler.

Mayoral's notary misconduct allowed NextGear to obtain a document absolutely critical and necessary to the overall funding of the PGA line of credit.  Because of Mayoral's misconduct, Kessler has been damaged and NextGear is liable to Kessler for all amounts it seeks to recover through this lawsuit against Kessler, as well as the attorney's fees incurred through Kessler's defense of this case.[5]

---

[5] The limitation of liability on damages provision in the Note and Guaranty also does not prevent Kessler's claim. The limitation only applies to indirect, exemplary, punitive, multiple or consequential damages.  The damages sustained by Kessler through the forged Power of Attorney and violation of Fla. Stat. §117.05 are direct damages. But for Mayoral's notary misconduct, the "stipulations" of having Kessler's Power of Attorney would not have been

**D.  Summary Judgment is Improper on Kessler's Claim for Deception.**

NextGear argues that Kessler's claim for deception under I.C. §35-43-5-3 fails because the statute has been repealed.  However, NextGear failed to bring to the Court's attention that the public law that repealed I.C. §35-43-5-3 expressly states that proceedings that have begun under I.C. §35-43-5 before the repeal shall "continue and shall be imposed and enforced under prior law as if that section of IC 35-43-5 had not been amended or enacted."  The public law also states that the doctrine of amelioration is not intended to apply to any section of IC 35-43-5, as amended or enacted during the 2021 regular session of the Indiana General Assembly.  Accordingly, under the plain language of P.L. 174-2021, Sec. 45, Kessler's claim for deception still exists and is actionable, especially when the claim for deception was instituted prior to the enactment of the public law repealing I.C. §35-43-5-3.  Thus, NextGear's Motion for Summary Judgment should be denied.

NextGear also argues that Kessler has no evidence of criminal intent to prove the requisite *mens rea* element for deception.  Pursuant to I.C. §35-43-5-3(a)(2): a person who "knowingly or intentionally" makes a false or misleading written statement with intent to obtain property commits deception.  The term "knowingly" is a decreased level of intent and "[a] person engages in conduct 'knowingly' if…he is aware of a high probability that he is doing so."  *Quicken Loans v. Downing*, 2012 U.S. Dist. LEXIS 144272, at *20 (S.D. Ind. 2012), *citing*, Indiana Code §35-41-2-2(b).

Here, the designated evidence demonstrates that Mayoral was certainly aware that he was not following the required mandates for procedure when notarizing the Power of Attorney document.  Mayoral admitted in his deposition of what he believed to be the required and actual

---

satisfied and NextGear would have locked the PGA line of credit 30 days after contract execution—which would have been April 26, 2019.  Accordingly, any amounts loaned after April 26, 2019 were directly caused by Mayoral's notary misconduct and are now amounts for which NextGear seeks to recoup from Kessler as a result of Mayoral's own misconduct.

steps for notarizing a document.  Specifically, Mayoral testified that when performing notary services "…I then look at the person's driver's license, verify signature."  (Mayoral Dep. at 44:3-13).  Mayoral testified that there is no "leeway" whatsoever in the steps identified above and Mayoral stated if there was a deviation that "it wouldn't be valid."  (Mayoral Dep. at p. 47).

In addition to Mayoral's own admission that the review of the driver's license is required to notarize a document, the express language of the Florida Notary Public Statute also makes clear that the notary is required to inspect the driver's license of the individual.  Fla. Stat. §117.05(5)(b)(2)(d).

Mayoral's conscious decision to use a black and white copy of a photograph of Kessler's license to confirm Kessler's identity certainly creates factual disputes regarding the issue of whether Mayoral knowingly made a false or misleading statement on the Kessler Power of Attorney document when he attested and swore that Kessler personally appeared before him and executed the Power of Attorney.  The evidence demonstrates that Mayoral was aware of a high probability that he was making a false or misleading statement when he attested Kessler appeared before him to sign the POA, but completely failed to follow required procedure and inspect Kessler's license.

Further evidence of Mayoral and NextGear's criminal intent can be found in the numerous inconsistent and misleading Interrogatory Answers cited above where NextGear originally claimed that Mayoral personally took a picture of Kessler's actual driver's license contemporaneous with the execution of the Power of Attorney document.  We have now learned, and NextGear has admitted, that NextGear's original "story" in NextGear's Interrogatory Answers surrounding the execution of the Power of Attorney was 100% false and fabricated.  Quite simply, factual disputes exist regarding whether NextGear (acting by and through Mayoral performing official acts on

behalf of NextGear) acted with the requisite criminal intent to be held liable for the claim of

deception.  As such, NextGear's Motion for Summary Judgment should be denied. [6]

**E.  Summary Judgment is Improper on Kessler's Claim for Indemnification.**

Indiana adheres to the general rule that in the absence of an express contractual or statutory

right to indemnity, a party may bring an action for indemnification only if he is without fault. The

right to indemnity may be implied at common law only in favor of one whose liability to another

is solely derivative or constructive and only against one whose wrongful act has caused such

liability to be imposed."  *Mullen v. Cogdell*, 643 N.E.2d 390, 400 (Ind. Ct. App. 1994);

*Indianapolis-Marion Cnty. Pub. Library v. Charlier Clark & Linard, PC*, 929 N.E.2d 838, 848

(Ind. Ct. App. 2010).  "Derivative liability is liability for a wrong that a person other than the one

wronged has a right to redress."  *Samaron Corp. v. United of Omaha Life Ins. Co.,* 2014 U.S. Dist.

LEXIS 137656 (N.D. Ind. Sept. 29, 2014).

Here, Kessler's liability is derivative and flows directly from Mayoral's wrongful conduct

in assisting in the forgery of the Kessler Power of Attorney.  But for the forged Kessler Power of

Attorney, which was required by NextGear to lend money beyond 30 days from contract execution,

PGA and Blackburn would not have been able to draw on the line of credit and would not have

been able to incur over $340,000.00 in loan proceeds—all of which was done without Kessler's

knowledge or consent.  But, now, because of the forged Power of Attorney, which was improperly

notarized by Mayoral, NextGear is seeking to enforce a Guaranty against Kessler for damages in

excess of $420,000.00.  The evidence demonstrates that it was NextGear (acting by and through

---

[6] Although not argued by NextGear, Mayoral and NextGear made the false/misleading statement with intent to obtain property, i.e., money, proceed and profit through the selling of a loan program to PGA.  Of course, Mayoral benefited from making the false statement to "close the deal" as he knew Kessler's Power of Attorney was required to be signed and delivered as part of the "stipulations."  If Mayoral, doesn't "close the deal" and get the line of credit secured, Mayoral does not receive commissions from the sale of the loan to PGA.  NextGear also benefits from Mayoral's closing of the loan by the interest and profit it stood to gain over the lifetime of the Note.

Mayoral) who engaged in the misconduct and forged the Power of Attorney.  Kessler had no

knowledge of the forged Power of Attorney and did not cause the forgery.  Accordingly, Kessler

is entitled to common law indemnification for the amounts NextGear seeks to recover against

Kessler—all of which was caused by NextGear and Mayoral's wrongful conduct.  As such,

NextGear's Motion for Summary Judgment should be denied.[7]

## III.    CONCLUSION

For the foregoing reasons, Defendant/Counterclaimant, Edward A. Kessler, respectfully

requests the Court to deny NextGear's Motion for Summary Judgment in its entirety and enter

judgment in favor of Kessler and against NextGear Capital on Count III of Kessler's Counterclaim.


Respectfully submitted,

DELK McNALLY LLP

*/s/ Jason R. Delk*
Jason R. Delk, Atty. No. 24853-18
*Attorney for Defendant, Edward Kessler*


DELK McNALLY, LLP
211 S. Walnut Street
Muncie, IN 47305
Telephone: 765-896-9495
Facsimile: 888/453-0545

---

[7] A claim for indemnification may be litigated contemporaneously with the injured party's claim even if no actual damages have been awarded against the injured party.  *See Fitz v. Rust-Oleum Corp.*, 883 N.E.2d 1177, 1181 (Ind. Ct. App. 2008).  Also, an indemnitee, who incurs legal expenses through defending an action against him for which he is entitled to indemnification, is entitled to recover the expense of creating his defense. *Bethlehem Steel Corp. v. Sercon Corp.*, 654 N.E.2d 1163, 1169 (Ind. Ct. App. 1995).

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that a copy of the foregoing has been served upon all counsel of record via the Court's electronic case filing system this 28th day of March, 2022.

*/s/ Jason R. Delk*           
Jason R. Delk

DELK McNALLY, LLP
211 S. Walnut Street
Muncie, IN 47305
Telephone: 765/896-9495
delk@delkmcnally.com

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| **NEXTGEAR CAPITAL, INC.,** | ) |
| | ) |
| **Plaintiff** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **PREMIER GROUP AUTOS, LLC,** | ) |
| **JAMES M. BLACKBURN, and** | ) |
| **EDWARD A. KESSLER,** | ) |
| **Defendants** | ) |

**CASE NO. 1:20-cv-00354-TWP-DLP**

## DEFENDANT/COUNTERCLAIMANT, EDWARD A. KESSLER'S, MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF, NEXTGEAR CAPITAL, INC.'S MOTION FOR SUMMARY JUDGMENT

Despite Plaintiff, NextGear Capital, Inc.'s ("NextGear"), claim that this "is a simple contract case," the designated evidence to this Court demonstrates that this case is anything but "simple." Rather, the designated evidence demonstrates that Defendant/Counterclaimant, Edward Kessler (hereinafter "Kessler"), is the victim of a serious fraud and forgery that prevents NextGear's enforcement of the Note and Guaranty against Kessler.

NextGear (acting through its representatives) engaged in forgery (whether intentionally or negligently) and allowed a critical "Loan Document" to be forged, i.e., a Power of Attorney, which document was undisputedly required by NextGear to allow NextGear to provide funding through a line of credit under the Note to Co-Defendant, Premier Group Autos, LLC ("PGA"). Without the execution of the Kessler Power of Attorney document, the undisputed evidence demonstrates that NextGear, at a minimum, would have "locked" the account and no funds would have been lent by NextGear to PGA. And, as a result, Kessler would not have fallen victim to the major fraud committed upon him and would not be forced to defend against NextGear's claim seeking to recover over $429,000.00 from Kessler.

1

But, because NextGear allowed the forgery of the Power of Attorney to occur, and because NextGear failed to follow their own internal protocols, Kessler's former business partner, co-Defendant, James Blackburn ("Blackburn"), was able to steal more than $340,000.00 of funds from the NextGear financing.  And, now, NextGear is seeking to ignore its own culpability and wrongful conduct and hold Kessler fully responsible for the fraud and forgery committed upon him by NextGear and Blackburn.

The NextGear employee, Arturo Mayoral, who participated in the forgery, is a Florida notary public and notarized and swore that he observed Edward Kessler sign the subject Power of Attorney. But, as the undisputed evidence demonstrates, Kessler did not sign the Power of Attorney document that Mayoral notarized.  As a result, Mayoral and NextGear have engaged in notary misconduct in violation of Florida Statute § 117.05.

NextGear cannot (and should not) be able to ignore its own wrongful conduct and seek to hold Kessler responsible for a significant debt that never would have happened if NextGear's representatives simply would have followed the law and NextGear's own policies/procedures.  The designated evidence demonstrates that this is not "a simple contract case" and many factual disputes exist which preclude the entry of summary judgment on NextGear's Complaint, as well as Kessler's Counterclaims.  Accordingly, NextGear's Motion for Summary Judgment should be denied.

## I.    STATEMENT OF MATERIAL FACTS IN DISPUTE

Edward A. Kessler is an individual who resides in Bethel Park, Pennsylvania and has resided in Pennsylvania all of his life.  (Kessler Aff. At ¶ 2).  Kessler is employed as an actuarial analyst for a company that is located in Pennsylvania.  (*Id*. at ¶ 3).  In late 2017 to early 2018, Kessler was introduced to James Blackburn through mutual friends in Florida.  (*Id*. at ¶ 4).

In the latter part of 2018, Kessler attended the Fort Lauderdale boat show and met with James Blackburn.  (*Id*. at ¶ 5).  During this time, James Blackburn brought a business concept to Kessler about investing in a potential dealership that would sell high-end Range Rover vehicles through the brand name called: "Overfinch".  (*Id*. at ¶ 5).  In furtherance of the dealership business, James Blackburn formed a Florida limited liability company by the name of Premier Group Autos, LLC ("PGA").  (*Id*. at ¶ 6).

PGA was formed for the purpose of distributing high-end aftermarket Range Rovers utilizing the Overfinch branding and trademark.  (*Id*. at ¶ 7).  James Blackburn was a 50% owner in PGA and Edward Kessler ("Kessler") was also a 50% owner of PGA.  (*Id*. at ¶ 8).  Blackburn and Kessler agreed to a 50/50 venture and entered into an agreement regarding the operations of PGA.  (*Id*. at ¶ 9).  Pursuant to Blackburn and Kessler's agreement, Kessler and Blackburn agreed that each would make capital contributions to the company, and further agreed that each person would fund the purchase of at least one Range Rover from the Overfinch distribution.  (*Id*. at ¶ 10).  Kessler, as a 50% owner of PGA, was given the title of "Director of Operations."  Kessler, however, despite the given title was a passive investor in PGA and never intended to have any day-to-day control or management of PGA.  (*Id*. at ¶ 11).

At the time PGA was formed, Kessler was in the process of actively interviewing for jobs as an actuarial analyst and had no intentions of working the PGA business.  (*Id*. at ¶ 12).  Kessler informed Blackburn that Blackburn would be responsible for the operations and that Kessler would provide an investment in what Kessler believed to be a potentially profitable business through the sale of the Overfinch/Range Rover product.  (*Id*.)

Kessler made an initial capital investment of $112,500.00 into PGA and also directly purchased an Overfinch/Range Rover for PGA's use in the amount of $180,536.40.  (*Id*. at ¶ 13).

Despite Blackburn's promise and obligation to make the same capital contribution and purchase an Overfinch/Range Rover, Blackburn never made his required capital contribution and never purchased an Overfinch/Range Rover.  (*Id*. at ¶ 14).

In or around late February 2019, Kessler received an email from NextGear Capital and/or Docusign asking for Kessler to review a purported note and loan agreement for PGA's apparent acquisition of a $500,000.00 line of credit from NextGear.  (*Id*. at ¶ 15).  During this time (late February 2019), Kessler was unaware that Blackburn, purportedly acting on behalf of PGA, was seeking to obtain any type of financing from NextGear or any other lender.  (*Id*.)

Kessler informed Blackburn that PGA did not need, nor was PGA ready for, any financing at this level and that terms of the $500,000.00 NextGear financing plan did not make smart financial sense for PGA.  (*Id*. at ¶ 16).  For example, Kessler told Blackburn that Kessler would not agree to the $500,000.00 line of credit from NextGear because: (a) PGA could not afford such a large amount of financing; (b) the terms of the $500,000.00 financing arrangement required PGA to submit a $100,000.00 retainer; and (c) Kessler would not agree to sign a Power of Attorney document that apparently was required to be signed as part of the $500,000.00 NextGear financing package.  (*Id*).

In addition, Kessler informed Blackburn that Kessler would not sign a power of attorney document as part of any financing with NextGear as Kessler had the power of attorney document from NextGear reviewed by an attorney and was counseled not to sign such a document as part of any financing transaction with NextGear.  (*Id*).

Kessler did believe, however, that PGA needed additional access to capital to help fund the purchase of Overfinch/Range Rover vehicles.  (*Id*. at ¶ 17).  Thus, Kessler approached his parents and requested that they provide a $300,000.00 asset backing loan so that PGA could have access

to additional funds to purchase the Overfinch/Range Rover vehicles. (*Id*). Kessler's parents, Edward P. Kessler and Kristine E. Kessler, in or around March 11, 2019, agreed to provide PGA with a $300,000.00 loan, which was memorialized by a "Business Loan Agreement". (*Id*. at ¶ 18).

Thus, after receipt of the $300,000.00 loan from Kessler's parents, Kessler believed that PGA was properly capitalized and ready to engage in business through the purchase and sale of the Overfinch/Range Rover through an Overfinch distribution agreement. (*Id*. at ¶ 19). Blackburn, however, without Kessler's knowledge, still continued to discuss loan opportunities with NextGear. (*Id*. at ¶ 20).

Ultimately, in the latter part of March 2019, Blackburn approached Kessler and said that NextGear agreed to do a floor plan financing transaction that would not exceed $150,000.00 in a total line of credit and the line of credit was to be used in $40,000.00 increments to finance less expensive vehicles. (*Id*. at ¶ 21). As part of this $150,000.00 Loan, Blackburn also told Kessler that NextGear agreed that it would not require the execution of a Power of Attorney document as part of the transaction, which Kessler previously objected to signing or providing as any part of a loan agreement. (*Id*). Blackburn further agreed that the $150,000.00 line of credit from NextGear would only be used by PGA in $40,000.00 increments, and when a non-Overfinch car was sold using the financing, the full $40,000.00 loan would be immediately repaid. (*Id*).

With this understanding and agreement in place, Kessler agreed that PGA could enter into a floor plan financing agreement for the $150,000.00 line of credit with NextGear. (*Id*. at ¶ 22). Thus, on or about March 26, 2019, Kessler received from NextGear/Docusign the contract documents that required execution. (*Id*. at ¶ 23).

As part of the contract documents that Kessler received from NextGear/Docusign, all of the documents required an electronic signature, but there was no place for Kessler to electronically

sign the Power of Attorney documents. (*Id*). Because there was no place for Kessler to "click and sign" the Power of Attorney documents from NextGear/Docusign, Kessler believed and confirmed what Blackburn previously told Kessler was true, i.e., that the Power of Attorney documents were not required to be signed as part of the overall loan/contract process to obtain the $150,000.00 line of credit from NextGear. (*Id*). However, since this litigation has ensued, Kessler has learned that the Power of Attorney document, was, in fact, required to be executed as part of the overall lending process. (*Id*. at ¶ 34).

**The NextGear "Loan Documents" & Execution Requirement for Power of Attorney Documents**

On March 27, 2019, Kessler electronically signed, via DocuSign, the Demand Promissory Note and Loan and Security Agreement (the "Note"), the Advance Schedule, and Individual Guaranty. (*See* Dkt. 1-3 at p. 21 & Dkt. 1-3 at p. 44.)

Pursuant to Section 8 of the Note, PGA was required to execute the Note in addition to executing a Power of Attorney in favor of NextGear. Specifically, Section 8 of the Note provides: "[i]n addition to the execution and delivery of this Note, upon the request of Lender, Borrower shall execute (or cause the execution of) the following additional documents in connection with Borrower's Credit Line (together with all other documents and instruments executed by Borrower in connection with this Note or Borrower's Credit Line, and in each case as the same may be amended, restated, renewed extended or otherwise modified from time to time, the "Loan Documents"), each of which shall be incorporated herein by reference and made a part of this Note: (a) a power of attorney in favor of Lender and its designated Representative…" (*See* Dkt. 1-3 at p. 16).

The Note further provides in Section 14 that: "[t]his Note and the other Loan Documents may be executed by the Parties in one or more counterparts which, collectively, shall constitute

6

one and the same agreement." (*See* Dkt. 1-3 at p. 17). Pursuant to the Note, the term "Loan Documents" has the meaning set forth in Section 8 above. (*Id*). In NextGear's original Complaint, which has been litigated throughout this case, NextGear attached the subject Power of Attorney documents of Mr. Blackburn and Mr. Kessler to the Note as part of the "Note and Loan Documents." (*See* Dkt. 1-3; Dkt. 1-3 at p. 30-33).

The Note and Loan Documents further provide that it is a default under the Note for the Borrower to fail to deliver, revoke or amend any power of attorney or similar authorization that it has executed in favor of Lender. (*See* Dkt. 1-3 at p. 15).

**Kessler Was Required to Execute a Power of Attorney Document in Favor of NextGear**

As part of the contracting and underwriting process for the subject NextGear Note, NextGear had various "stipulations" that were required to be met. According to NextGear employees Andrew Ramey and Arturo Mayoral, "stipulations" are "documents or items that are required in order to secure the line of credit" and are "[r]equirements that are needed to be met before the contract can be fully executed." (Mayoral Dep. at p. 160); (Ramey Dep. at p. 27-28).

Pursuant to internal NextGear emails, NextGear required as "stipulations" that both Edward Kessler and James Blackburn sign, provide and return Power of Attorney documents as part of the contracting process. (Mayoral Dep. at p. 160-161, Ex. 14); (Ramey Dep. at p. 45; Ex. 18).

Mr. Ramey testified as follows:

**045:05 Q.   I'm handing you what's been marked as
045:06      Exhibit 18.  Exhibit 18, do you see that kind
045:07      of looks like a cutout of an Excel spreadsheet
045:08      or some sort of table there in the document?**

**045:09 A.   Yes.**

**045:10 Q.   Describe for me what that is.**

**045:11 A.   It's essentially a summary of what the**
**045:12       underwriter approved, some dealer information**
**045:13       as well, but it gives information about the**
**045:14       dealer and then also what the underwriter**
**045:15       approved and then any outstanding**
**045:16       stipulations.**

**045:17 Q.   And those stipulations are the requirements**
**045:18       for the contracting process, correct?**

**045:19 A.   Yes.**

**045:20 Q.   Yes?**

**045:21 A.   Yes.**

**045:22 Q.   And there on Exhibit 18, it lists two**
**045:23       different Powers of Attorney, correct?**

**045:24 A.   Yes.**

**045:25 Q.   And a Power of Attorney for Edward Kessler and**
**046:01       a Power of Attorney for James Blackburn,**
**046:02       correct?**

**046:03 A.   Yes.**

(Ramey Dep. at p. 45:05-46:03).

According to NextGear and NextGear's official policy, NextGear will lock an account and deny the Borrower from gaining access to any funds and will not lend any funds if the required Power of Attorney documents are not signed and returned within thirty (30) days of original execution of the Note.  (Mayoral Dep. at p. 151-156; 158-159; 165; Ex. 13).

According to Andrew Ramey, Senior Manager of Lending Services for NextGear, if the required Power of Attorney document is not signed within 30 days post activation, the account is locked and the borrower cannot access any funds from NextGear.  (Ramey Dep. at p. 26). Throughout Ramey's tenure with NextGear, Ramey stated that he has never seen a situation where

a dealer/borrower refuses to sign a power of attorney document and still receive funds from NextGear.  (Ramey Dep. at p. 26).

        Mr. Ramey testified as follows:

**026:03 Q.   I sign a contract with you.  I sign a personal**
**026:04       guaranty with you.  I never sign a Power of**
**026:05       Attorney.  What happens?**

**026:06 A.   At 30 days post activation, the account would**
**026:07       be locked.**

**026:08 Q.   And what does that mean?**

**026:09 A.   The dealer would not have any access to be**
**026:10       able to floor units.  Really that's it.**

**026:11 Q.   In your experience with NextGear, have you**
**026:12       ever seen any line of credit or loan where**
**026:13       you've allowed a dealer to sign a contract but**
**026:14       never sign a Power of Attorney and still get**
**026:15       money?**

**026:16 A.   No.**

(Ramey Dep. at p. 026:03 - 026:16).

**Kessler's Alleged "Execution" of the Power of Attorney Document**

        Arturo Mayoral is employed by NextGear as a Sales Executive and is a resident of south Florida.  (Mayoral Dep. at p.5-6 & 9-10).  Mayoral's job duties are to prospect for new customers and sell the NextGear lending product to car dealers.  (*Id*).  As part of Mayoral's job duties, Mayoral assists in getting signatures to help facilitate the contracting process for a new customer of NextGear.  (*Id*. at p. 29-30).  As part of the overall "contract execution" with NextGear, Mayoral states that the contract documents are sent via Docusign, "and then there is a Power of Attorney that has to be signed within 30 days of the account activating or the account will be locked." (Mayoral Dep. at p. 30: 01- 18).

In his role as a Sales Executive for NextGear, Mayoral also serves as a notary public in the State of Florida.  (Mayoral Dep. at p. 36-37).  Mayoral decided to become a notary public to assist the dealers and make sure that everything flows to keep NextGear's customers happy.  (*Id*).  Mayoral serves as a notary public solely for NextGear business and in furtherance of NextGear's business.  (Mayoral Dep. at pp. 38-39).  Mayoral attended an 8-hour course through the State of Florida to become a Florida notary public.  (Mayoral Dep. at p. 39-40).  NextGear reimburses Mayoral for the annual charges associated with the bonding requirements to serve as a notary public in the State of Florida.  (Mayoral Dep. at p. 40-41).

According to Mayoral's training to become a notary public, the process of notarizing a document is as follows:

**3  Q.   Okay.  Walk me through that process of what**

**4        you were trained step by step.**

**5  A.   Basically it's just to give the document to**

**6        the person, make sure that they understand**

**7        what they are signing, that they're signing**

**8        of free will.  I observe them signing, make**

**9        sure that the dates are correct.  I then look**

**10       at the person's driver's license, verify**

**11        signature.  I then fill out my notary section**

**12        with the correct dates.  I apply my**

**13        signature, and then I apply my notary seal**.

(Mayoral Dep. at p. 44)

Mayoral testified that there is no "leeway" whatsoever in the steps identified above and Mayoral stated if there was a deviation that "it wouldn't be valid." (Mayoral Dep. at p. 47).

On April 18, 2019, Mr. Mayoral testified that he went to the PGA offices in Fort Lauderdale, Florida and obtained the signatures of Mr. James Blackburn and Mr. Edward Kessler on two (2) separate Power of Attorney documents. (Mayoral Dep. at Ex. 8 & Ex. 9; at pp. 91-94). Prior to April 18, 2019, Mr. Mayoral had never met Edward Kessler. (Mayoral Dep. at p. 50).

When Mayoral arrived at the PGA office in Fort Lauderdale, Mayoral went to the PGA conference room and was introduced to a person who Mayoral stated was Mr. Edward Kessler. (Mayoral Dep. at p. 91-95). There was a bit of small talk, and then Mayoral requested Kessler (or the man who allegedly claimed to be Kessler) sign the Power of Attorney document. (Mayoral Dep. at p. 95-96). Mayoral asked if there were any questions and the man who claims to be Kessler stated "no" and this person, according to Mayoral, willingly signed the Power of Attorney document. (Mayoral Dep. at p. 95-98).

Mayoral testified that he gave the Power of Attorney document to Kessler and that Kessler completely filled out the signature block and the date portion of the Power of Attorney document. (Mayoral Dep. Ex. 8 & p. 97-99). Mayoral testified that Kessler wrote the date portion of the Power of Attorney document and that no one else signed or wrote on any portion of the signature block or the date line. (Mayoral Dep. at p. 98-99).

After Kessler (or the man who apparently claimed to be Kessler) signed the Power of Attorney document, Mayoral testified that he looked at a black and white photocopy of a picture of Edward Kessler's license and then proceeded to notarize the Power of Attorney document. (Mayoral Dep. at 98-99). The black and white photocopy of the picture of Kessler's driver's

11

license that was reviewed by Mayoral to try to confirm that the signature of Edward Kessler was the same as appeared on the Power of Attorney document was the following picture:



(Mayoral Dep. at Ex. 4; at p. 99 & 104).

Mayoral compared the above signature of Edward Kessler from the photocopy of Kessler's license against the below signature of "Edward Kessler" on the Power of Attorney document, which signature was purportedly obtained from the person who just signed Edward Kessler's signature in front of Mayoral was as follows:



(Mayoral Dep. at pp. 98-99; Ex. 8).

Mayoral testified that he believed the signature on the Kessler license and the Kessler POA above, when comparing the two (2) signatures, "appear similar."  (Mayoral Dep. at p. 99).

Mayoral did not ask the person claiming to be Mr. Edward Kessler to provide the person's actual identification card or driver's license as part of the notary process, nor did Mayoral ask to inspect Edward Kessler's driver's license.  (Mayoral Dep. at p. 48-49).  Despite not asking to see the actual driver's license of Edward Kessler, when Mayoral was asked about the notary process for the subject Power of Attorney from one of his superiors at NextGear, Mayoral stated that he "[Mayoral] verified the ID's and followed Procedure notarizing their respective documents." (Mayoral Dep. at Ex. 5).  Mr. Mayoral also testified that when he told his boss in the email that he followed "Procedure", he meant that he followed the "notary procedure."  (Mayoral Dep. at p. 111-112).  Mr. Mayoral also told his boss that he logged "all" of his activities in Salesforce. (Mayoral Dep. at Ex. 5).  But, the Salesforce log for Mayoral's "activities" on April 18, 2019 do not at all show that Mayoral had the Power of Attorney documents signed and/or notarized. (Mayoral Dep. at p. 131-132).

After reviewing the signatures above, Mayoral notarized the Power of Attorney and completed his attestation clause stating that Edward Kessler appeared before him in Fort Lauderdale, Florida and executed the Power of Attorney.  (Mayoral Dep. at p. 99; Ex. 8).

Mayoral is not aware of any training of being a notary public where it is acceptable to use a picture of a copy of a driver's license instead of requesting to see the actual driver's license of the person while notarizing a document.  (Mayoral Dep. at p. 58: 06-14).

After the man claiming to be Edward Kessler signed the Power of Attorney document, Mayoral directed his attention to James Blackburn to obtain Blackburn's signature on his Power of Attorney document.  (Mayoral Dep. at p. 99-100).  Mayoral did not ask to see Blackburn's

signature because Blackburn was known to Mayoral from prior meetings. (*Id*). Just like Mayoral testified regarding the signature of Kessler's Power of Attorney above, Mayoral also testified that he observed Blackburn sign the Power of Attorney and also date the Power of Attorney in Blackburn's own handwriting. (Mayoral Dep. at p. 101; Ex. 9).

The signature and date of Blackburn on Blackburn's Power of Attorney document appears as follows:



(Mayoral Dep. at Ex. 9).

Despite Mayoral's testimony and alleged review of Kessler's signature on the photocopy of Kessler's license, as compared to the Power of Attorney document Kessler allegedly signed, Mr. Ramey, Senior Manager of Lending Services for NextGear, testified that when he compared the picture of the license (Ex. 4) and the signature of Edward Kessler on the Power of Attorney document (Ex, 8), the two (2) signatures did not look alike. (Ramey Dep. at p. 97-98). Specifically, Ramey testified as follows:

**098:05 Q.   I'm going to hand you what's been marked**

**098:06        previously as Exhibit 8.  It's the Power of**

**098:07        Attorney of Mr. Kessler.  Does that look like**

098:08   **Mr. Kessler's signature compared to his**

098:09   **license?**

098:10 A.   **Not exactly, no.**

(Ramey Dep. at p. 97-98).

Despite Mayoral testifying under oath that the man claiming to be Kessler signed and dated his own Power of Attorney, and Blackburn signed and dated his own Power of Attorney, Blackburn admitted in his deposition that the date written on Kessler's purported Power of Attorney document "4-8-19" appears to "look like my handwriting on the date, although I don't recall the document." (Blackburn Dep. at p. 195).

**<u>Discovery of Blackburn's Fraud and Misuse of PGA Funds</u>**

In the early summer of 2019, Kessler went to Florida to review the financial records of PGA, as Kessler had not been able to access the bank records of PGA.  (Kessler Aff. at ¶ 24). During this time (June 2019), Kessler reviewed some of the PGA financial records and attempted to reconcile various expenditures made from the PGA account.  (*Id*).  During this first review of the PGA financial records is when Kessler first noticed that Blackburn was sending PGA funds to other companies that Blackburn owned or controlled.  (*Id*).  Kessler questioned Blackburn about these expenditures, but Blackburn never really provided a response that made sense and simply stated that he (Blackburn) would reconcile the books and demonstrate that the expenditures to the other companies were justifiable and in furtherance of actual PGA business.  (*Id*).   However, to date, Kessler has not received any accurate or justifiable explanation from Blackburn about the misuse of PGA's funds and Blackburn's use of PGA funds for his own benefit.  (*Id*. at ¶ 25).

In addition, during the summer of 2019, PGA's bookkeeper, Donna Degroff, asked Blackburn about a certain transaction using the NextGear line of credit.  (*Id*. at ¶ 26).  Ms. Degroff

also stated that this transaction would increase the NextGear line of credit to more than $250,000.00. (*Id*). This is the first time that Kessler learned that Blackburn was potentially misusing the NextGear line of credit. (*Id*).

Later, on September 27, 2019, Kessler received his first communication/notice from NextGear that PGA was delinquent and that the line of credit was in default. (*Id*. at ¶ 27). Prior to September 27, 2019, Kessler never received any communication or notice from NextGear that the line of credit was in default or that Blackburn had misused the line of credit. (*Id*). Prior to this time, Kessler also had no knowledge that Blackburn had increased the line of credit by more than $200,000.00, which was done without Kessler's knowledge and/or consent. (*Id*).

As a result of Blackburn's misappropriation of PGA's funds, Kessler filed a lawsuit against Blackburn in the State of Florida. A true and accurate copy of the lawsuit against Mr. Blackburn is attached to Mr. Kessler's Affidavit as Exhibit B. (*Id*. at ¶ 28). As part of the Florida litigation against Blackburn, a forensic accounting investigation was ordered by the Florida court. (*Id*. at ¶ 29). As a result of this court ordered forensic accounting investigation, it was determined that Blackburn paid himself (or entities he owns/controls) in excess of $900,000.00 of PGA's funds. (*Id*). These payments from PGA funds included payments to Blackburn for trips to Barbados, jewelry and other personal expenditures for the personal benefit of Blackburn or Blackburn's family. (*Id*). A true and accurate copy of the accounting report that was prepared as part of the Florida litigation by the court ordered accountant is attached as Exhibit C to Mr. Kessler's Affidavit.

As part of Mr. Kessler's investigation into Mr. Blackburn's fraud and misappropriation, Kessler also discovered that Blackburn had forged Kessler's name to an American Express credit card and Blackburn spent over $90,000.00 on the American Express credit card without Kessler's

knowledge and/or consent. (*Id*. at ¶ 30). American Express brought suit against Kessler for collection of the credit card, but, ultimately, American Express realized that Kessler was the victim of fraud and forgery and American Express dismissed the lawsuit and did not seek reimbursement for the funds that Blackburn inappropriately and unlawfully charged for his own benefit. (*Id*).

**<u>Discovery of the Forged Power of Attorney Document</u>**

After Kessler was served with the lawsuit in the above-captioned litigation, Kessler learned for the first time that his name was forged on the Power of Attorney document. (*Id*. at ¶ 31). Kessler never signed the subject Power of Attorney (a copy of which is attached to the deposition transcript of Arturo Mayoral as Exhibit 8), nor did Kessler authorize Blackburn or anyone else to sign his name. (*Id*).

As stated in Kessler's Interrogatory Answers, Kessler was not in Fort Lauderdale, Florida on April 18, 2019. But rather, Kessler was in Pennsylvania. (*Id*. at ¶ 32). Specifically, after being in Erie, Pennsylvania on April 17, 2019 and driving back to Pittsburgh, Kessler was still in Pittsburgh on the morning of April 18, 2019. (*Id*). On the morning of April 18, 2019, at 7:45 a.m., Kessler took a picture of a hockey roster for a pickup game of hockey that he played in later that night in Pennsylvania. (*Id*). Also, on the same evening, Kessler also checked in to LA Fitness in Bethel Park, Pennsylvania and worked out prior to the hockey game. (*Id*).

Kessler did not agree to sign the subject Power of Attorney document as part of the NextGear loan/financing and would not have agreed to allow PGA to enter into the loan/financing agreement if NextGear required the execution of the Power of Attorney document. (*Id*. at ¶ 33). Nor would Kessler have signed any of the Loan documents, including the personal guaranty, if it was required by NextGear to sign the Power of Attorney document as part of the Loan Documents or financing transaction. (*Id*).

However, since the instant litigation has taken place, Kessler has now learned that NextGear required both Blackburn and Kessler to execute the Power of Attorney document as part of the overall lending process with NextGear.  (*Id.* at ¶ 34).

But, because NextGear assisted in the procurement of a forged Power of Attorney document, Blackburn was able to access the line of credit and incur more than $350,000.00 in debt without Kessler's knowledge and/or consent (*Id*. at ¶ 35).

Exactly one day after the forged Power of Attorney document was provided to NextGear, the PGA bank records demonstrate that the first $40,000.00 draw on the line of credit was made and deposited into the PGA bank account.  (*Id*. at ¶ 36).  A true and accurate copy of the relevant portion of the PGA bank records demonstrating the deposit was made is attached to the Affidavit of Edward Kessler as Exhibit D.

In addition, during this lawsuit, Kessler has also discovered that his name was forged to a NextGear credit application wherein Blackburn was apparently looking to obtain a $1,000,000.00 line of credit.  (*Id*. at ¶ 37).  A true and accurate copy of the forgery of the credit application is attached to Arturo Mayoral's deposition transcript as Exhibit 3.  Kessler did not sign the NextGear credit application, nor did Kessler permit Blackburn or anyone else to sign his name.  (*Id*).

Although Kessler did not learn of the forged credit application until after this lawsuit was filed, NextGear, however, had knowledge of the forged credit application prior to the execution of any of the subject "Loan Documents" and failed to take any action to further investigate the forgery/fraud on the credit application.  (Ramey Dep. at p. 28:12 – 30:09; 53:13-54:03, Ex. 40).

NextGear has an internal policy/procedure in place when there is a discrepancy between the signatures on an application and the applicant's driver's license.  (Ramey Dep. at p. 28:12-20).  Pursuant to NextGear's policy/procedure, when there is a discrepancy between the signature(s) on

the application and the driver's license, a NextGear lending services representative is required to contact the NextGear sales executive and have the sales executive obtain another application and have the applicants fill out a second application in order to verify signatures. (Ramey Dep. at p. 28:12 – 30:09; 31:01-32:14). Pursuant to NextGear policy/procedure, if the second application is not obtained within 60 days, the application would expire and the account would be closed. (Ramey Dep. at 31:01-32:14).

As a result of the forgery and fraud associated with the execution of the Power of Attorney document, Kessler has sustained damages by virtue of NextGear seeking to recover more than $420,000.00 from him for the default of the PGA line of credit. (*Id*. at ¶ 39). In addition, Kessler has incurred attorney's fees in excess of $60,000.00 through the defense of this action simply because of the forged Power of Attorney document that NextGear (and its representatives) assisted in procuring and which was required to obtain funding under the NextGear Loan Documents. (*Id*).

**NextGear's Inconsistent Statements Regarding Execution of the Kessler Power of Attorney**

In NextGear's Answers to Kessler's Interrogatories, NextGear was requested in Interrogatory No. 4 to provide detail and circumstances surrounding the execution of the Kessler Power of Attorney. In its Answer to Interrogatory No. 4, Andrew Ramey, the authorized representative of NextGear, who signed the Interrogatory Answers under oath stated that Kessler and Blackburn both were within the presence of Arturo Mayoral and that "Kessler provided his Pennsylvania driver's license as identification, a picture of which was taken contemporaneously with Kessler's signing of the Power of Attorney that he executed. Kessler signed the Power of attorney without reservation and of his own free will." (*See* NextGear Ans. to Kessler Interrogatories at No. 4).

However, despite NextGear's Answer to Interrogatory No. 4, when Arturo Mayoral was deposed, Mayoral testified that he never took a picture of Kessler's license and has never told anyone that he ever took a picture of Kessler's license. (Mayoral Dep. at p. 181).

Ultimately, NextGear has finally admitted that "Mr. Kessler most likely did not sign a Power of Attorney in the presence of Mr. Mayoral." (*See* NextGear Second Amended Answer to Interrogatory No. 4). In fact, despite originally denying the Request for Admission, NextGear has also admitted that the Power of Attorney document, purportedly signed by Edward Kessler, was not signed by Edward Kessler. (*See* NextGear Amended Resp. to Req. for Admission No. 1).

Also, despite Mayoral's testimony and notary attestation, NextGear has also now admitted in its Amended Responses to Kessler's Requests for Admission that Kessler did not appear before Arturo Mayoral and sign the Power of Attorney document and that Kessler has never signed the Power of Attorney document. (*See Id*.at Req. No.'s 2 & 5).

## II.    ARGUMENT

### A. The Note and Guaranty are Unenforceable Against Kessler.

Since the beginning of this litigation, NextGear has continuously failed to understand the significance of the forged Power of Attorney document. In NextGear's view, the fact that Mr. Kessler's signature was forged onto the Power of Attorney is irrelevant because Kessler admittedly signed the Note and Guaranty. This argument, however, is without merit and the forged Power of Attorney document prevents enforcement of the Note and Guaranty against Mr. Kessler. As the designated evidence shows, the Power of Attorney was (and is) absolutely necessary as part of the overall line of credit provided by NextGear and for the lending of money to PGA. NextGear's own policies and procedures required execution of the Power of Attorney document by Kessler. And, because NextGear required Kessler to sign the Power of Attorney document as part of the

"stipulations," i.e., a document necessary "in order to secure the line of credit," the Power of Attorney document is considered a "Loan Document" and is required to be construed together in determining the overall enforcement of the Note and Guaranty against Kessler.   Because the Kessler Power of Attorney is forged/fraudulent, all "Loan Documents," including the Note and Guaranty, are likewise unenforceable and are considered void under Indiana law.   Accordingly, NextGear's Motion for Summary Judgment against Kessler should be denied.

     i.   **The Power of Attorney Document Should be Construed Together with All Other "Loan Documents," including the Note and Kessler Guaranty, and are, therefore, Void.**

Writings executed at the same time and relating to the same transaction will be construed together in determining the contract. *Bird v. Valley Acre Farms, Inc.*, 177 N.E.3d 459, 468 (Ind. Ct. App. 2021) (citing *Salcedo v. Toepp*, 696 N.E.2d 426, 435 (Ind. Ct. App. 1998).   Even if documents are executed at different times, they may still be construed together as long as they are a part of the same transaction. *McCae Mgmt. Corp. v. Merchants Nat. Bank and Trust Co. of Indianapolis*, 553 N.E.2d 884, 887 (Ind. Ct. App. 1990).

First, it must be observed that the Note and Loan documents specifically state the Power of Attorney documents are part of the overall "Loan Documents" and "shall constitute one and the same agreement."[1]   Thus, under the plain language of the Note, the Kessler Power of Attorney document is considered a Loan Document and must be construed together with all other Loan Documents, including the Note and Kessler Guaranty.

---

[1] Pursuant to the plain language of Section 8 of the Note, in addition to execution of the Note, PGA "shall execute (or cause the execution of) the following additional documents in connection with Borrower's Credit Line (together with all other documents and instruments executed by Borrower in connection with this Note or Borrower's Credit Line, and in each case as the same may be amended, restated, renewed extended or otherwise modified from time to time, the "Loan Documents") **each of which shall be incorporated herein by reference and made a part of this Note: (a) a power of attorney in favor of Lender and its designated Representative…**" (*See* Dkt. 1-3 at p. 16) (emphasis added).

Second, the designated evidence also proves that the Power of Attorney was a necessary part of the contracting process. According to NextGear policy, NextGear will lock an account and deny the Borrower from gaining access to any funds and will not lend funds if the required Power of Attorney documents are not signed and returned within thirty (30) days of original execution of the Note. (Mayoral Dep. at 151-156; 158-159; 165; Ex. 13). In fact, Andrew Ramey, Senior Manager of Lending Services for NextGear, testified that he has never encountered a situation where a dealer/borrower fails to sign a power of attorney document yet still receives funds from NextGear. (Ramey Dep. 26).

Moreover, NextGear's own internal documents show that the "stipulations", i.e., documents required for overall contract execution and lending of money, required both Blackburn and Kessler to sign the subject POA documents. (Ramey Dep. 27:21-28:6, 45:1-24, Ex. 14). This directly contradicts NextGear's assertion that it did not need a POA from Kessler because it already had a binding POA via Blackburn's signature. (*See* Dkt. No. 116, pg. 20).  NextGear conveniently fails to discuss the undisputed evidence demonstrating that the NextGear "stipulations" required both Kessler and Blackburn to sign and deliver the Power of Attorney documents.

Needless to say, the designated evidence rebuts the notion that the Power of Attorney document is irrelevant to the Note and Security Agreement at issue. Indeed, the Power of Attorney was essential to the lending of money from NextGear to PGA.  And in fact, this court would not be breaking new ground by interpreting a forged document as essential to an overarching security agreement. *See Omnisource Corp. v. CNA/Transcontinental Ins. Co*., 949 F. Supp. 681, 687 (N.D. Ind. 1996) (holding that all documents -both forged and authentic- should be construed together if the documents were necessary for letter of credit to be extended); *See also Community State Bank of Galva v. Hartford Insurance Co.,* 542 N.E.2d 1317 (Ill. App. Ct. 1989) (interpreting a forged

power of attorney and promissory note together because promissory note would not have been honored without a the power of attorney).

Contrary to NextGear's belief, Mr. Kessler's valid signature on the Note and Guaranty does not automatically make him liable for the debt at issue. The Power of Attorney, Guaranty, and Note (and other "Loan Documents") were all executed as part of the same transaction and for the same purpose and must be construed together when determining the enforceability of the Note and Guaranty against Kessler.  NextGear has already conceded that Mr. Kessler'a signature was forged onto the Power of Attorney document. Accordingly, the forgery of this essential document, coupled with the need to construe it together with the Note and Guaranty, renders the entire Note and Guaranty unenforceable against Kessler. *See Laborers' Pension Fund v. A & C Envtl., Inc.,* 301 F.3d 768, 779 (7th Cir. 2002) ("A promisor's signature procured by fraud in the execution gives no more effect to a contract than a promisor's signature that has been forged. In either case **the contract is void**; it has never had any legal effect.") (emphasis added).  Direct forgery of a signature, or causing a signature to be forged, renders a contract void and therefore is a valid defense to enforcement of a contract. *Id*. at 779-80; *See also Schaeffer v. Kessler*, 2013 U.S. Dist. LEXIS 38781, at *23 (S.D.N.Y. Mar. 20, 2013) (noting that "causing a signature to appear" on a document amounted to a defense of fraud in the execution).

Because the Power of Attorney is required to be construed with all other Loan Documents, and because the Power of Attorney is a "Loan Document," the forgery of the "Loan Documents" renders the Note and Kessler Guaranty void as a matter of law.[2]

---

[2] Under the Uniform Commercial Code, a person is not liable on an instrument unless…the person signed the instrument.  *See* 26-1-3.1-401(a).  Here, Kessler undisputedly did not sign the Power of Attorney and it was forged. The Power of Attorney document is considered a "Loan Document" and must be construed together with all other Loan Documents, including the Note and Kessler Guaranty.  Because of the forgery, Kessler is not liable to NextGear under the Note and Guaranty.

**B.  Kessler Cannot Be Held Liable for the Full Amount of NextGear's Alleged Damages.**

Contrary to NextGear's argument, the forged Kessler Power of Attorney is (and was) required for NextGear to lend money to PGA under the subject line of credit.  The plain language of the Note makes clear that the Power of Attorney was required and the unchallenged evidence demonstrates that the "stipulations" required both Kessler and Blackburn to sign Power of Attorney documents "in order to secure the line of credit."  (*See* Mayoral Dep. at p. 160-161; Ramey Dep. at p. 45-46).  Further, the designated and unchallenged evidence also demonstrates that if the required Power of Attorney documents are not signed within thirty (30) days of contract execution, then the account is locked and no money will be loaned by NextGear to PGA.  (Ramey Dep. at p. 26).

NextGear attempts to backpedal from the significance of the Kessler Power of Attorney by arguing that only one Power of Attorney document was required to be signed; and, since Blackburn signed a Power of Attorney document, Kessler's forged Power of Attorney is irrelevant. Understandably, NextGear wants to avoid explaining its own employee's involvement in the forgery of the Power of Attorney and Mayoral's failure to comply with statutorily mandated notary procedure.  But, contrary to NextGear's argument, the undisputed evidence and facts show that NextGear required both Blackburn and Kessler to sign the Power of Attorney document.  There is no evidence suggesting only Blackburn was required to sign the Power of Attorney.  The only designated evidence shows that both Blackburn and Kessler were required to sign.  If only Blackburn was required to sign as part of contract activation and securing the line of credit, then the "stipulations" would only show one Power of Attorney.  The "stipulations," however, unequivocally show both Blackburn and Kessler had to sign the Power of Attorney in order to "secure the line of credit."

But, as the undisputed evidence shows, Kessler never agreed to sign the Power of Attorney and adamantly objected to providing NextGear with such a document.  Thus, but for the forgery of the Kessler Power of Attorney, which Mayoral assisted in procuring by improperly notarizing a forged document, the NextGear line of credit never would have been "secured" and the line of credit would have been locked within thirty (30) days of contract execution.  Accordginly, pursuant to NextGear's own policies/procedures, no additional funds would have been provided by NextGear to PGA.  Which, also means, that Blackburn would not have had an opportunity to substantially increase the line of credit and improperly use the line of credit for his own personal benefit—all of which was done without the knowledge of Kessler.

There is a dispute in the evidence regarding when NextGear actually provided funds under the line of credit to PGA.  According to PGA's bank records, the first money received from NextGear under the subject line of credit was on April 19, 2019—one (1) day after NextGear obtained the Power of Attorney documents from Blackburn and purportedly Kessler.  (*See* Aff. Kessler at Dkt. 119 ¶ 36).  NextGear claims to have provided funds in the amount of $17,900.00 on April 16, 2019—two (2) days prior to the execution of the Power of Attorney documents.

Regardless, of who is right on the timing of the issuance of funds, which is a factual dispute improper for summary judgment, one thing is clear: Kessler cannot be held liable for the full indebtedness claimed by NextGear.  This is because the majority of the alleged indebtedness was incurred by PGA/Blackburn well after the expiration of the thirty (30) day period, i.e., the period of time in which the PGA account would have been locked as the Kessler Power of Attorney would not have been provided by Kessler.  But, because NextGear (acting by and through Mayoral) assisted in the procurement of the forged Power of Attorney, the PGA line of credit was not locked in accordance with NextGear policy/procedure and Blackburn was able to abscond with over

25

$340,000.00. This evidence demonstrates that NextGear first materially breached the Loan Documents by failing to comply with its own policies/procedures relating to the locking of accounts if all required "stipulations" are not met.

Accordingly, because material factual disputes exist regarding the enforceability of the Note and Guaranty against Kessler, NextGear's Motion for Summary Judgment on its claim against Kessler for breach of the Note and Guaranty should be completely denied.[3]

### C. Arturo Mayoral Engaged in Notary Misconduct in Violation of Fla. Stat. §117.05.[4]

It is undisputed that Arturo Mayoral, while acting within the course and scope of his employment with NextGear, committed notary misconduct in violation of Fla. Stat. § 117.05. Florida Statute § 117.05 sets forth the various requirements and obligations that a Florida notary public must comply with while performing notary services. The record is undisputed that Mayoral is a resident of the state of Florida, and, on April 18, 2019, notarized a forged Power of Attorney document. The record is also undisputed that Mayoral did not ask to inspect the driver's license of the person claiming to be Edward Kessler as the Florida statute expressly requires. (*See* Fla. Stat. § 117.05(5)(b)(2)(d).

In its Motion for Summary Judgment, NextGear claims that the Florida notary public statute does not govern Mayoral's conduct, or create liability for Mayoral and NextGear, because the Note and Guaranty "expressly state that they are interpreted solely under Indiana law." (*See* Dkt. 116 at p. 24). NextGear's argument fails for several reasons. First, Mayoral and NextGear's

---

[3] The designated evidence cited above demonstrates that factual disputes exist regarding Kessler's affirmative defenses of fraud, estoppel, illegality and first material breach. In its Motion for Summary Judgment, NextGear simply states that no evidence exists that support Kessler's affirmative defenses. But, as demonstrated above, the factual record certainly demonstrates that factual disputes exist regarding NextGear's ability to enforce the Note and Kessler Guaranty against Kessler.

[4] Kessler's arguments in this section also serve as Kessler's reply in support of Kessler's Motion for Partial Summary Judgment. For the sake of brevity and in the avoidance of serious repetition, Kessler does not see a need to repeat the same arguments in a separate reply brief.

vicarious liability under Fla. Stat. § 117.05 is not dependent on the interpretation of the Note and/or Guaranty. The choice of law clause found in the Note and Guaranty applies only to the validity, enforceability and/or interpretation of the Note and/or Guaranty. The Florida Notary Public Statute has absolutely nothing to do with the interpretation, enforcement or validity of the Note and/or Guaranty. Rather, the Florida Notary Public Statute expressly governs the conduct of Arturo Mayoral who is a Florida resident that was granted notary public powers by the state of Florida and is licensed to perform notary public services in the state of Florida in accordance with the requirements of the Florida Notary Public Statute.

Mayoral's notary public duties and requirements cannot be governed by any law other than the State of Florida as Florida is the only state in which Mayoral is licensed to perform Notary services. Mayoral's power to perform notary services is granted by Florida law and Mayoral must comply with Florida law in performing notary services—especially when those notary services are provided in the State of Florida, such as the case here. The Indiana choice of law provision in the Note and Guaranty does not apply to Mayoral's duties/obligations in performing notary services in the State of Florida. Quite simply, if NextGear did not want to create vicarious liability for itself, it should not have authorized (and in this case encouraged) Mayoral to perform notary public services in the State of Florida. But, NextGear expressly allowed such conduct and now must face the risks associated with Mayoral's violation of the Florida Notary Public Statute. Accordingly, the Indiana choice of law provision does not prevent Mayoral and NextGear from exposure to violations of Fla. Stat. § 117.05.

Next, NextGear also argues that a court of law does not have the jurisdiction to enforce a violation of Fla. Stat. § 117.05. In support of this argument, NextGear cites to *Filippova v. Mogilvesky,* No. 18-80044-CI, 2018 WL 7825449, at *4 (S.D. Fla. Aug. 29, 2018). However, this

case is outdated and has been superseded/clarified by *Filippova v. Mogilvesky*, No. 18-80044-CIV, 2019 U.S. Dist LEXIS 58451 (S.D. Fla. Jan. 15, 2019).   The subsequent *Filippova* decision expressly declared that Florida courts allow a private right of action against a notary's employer – even if the notary is not named as a defendant. *See Filippova v. Mogilvesky*, No. 18-80044-CIV-MARRA/MATTHEWMAN, 2019 U.S. Dist. LEXIS 58451 (S.D. Fla. Jan. 15, 2019).

In *Filippova*, the Court notes that the previous order (on Aug. 29, 2018) dismissed without prejudice Plaintiff's claim pursuant to Florida Statute § 117.05(6) on the basis that the Court could not determine against whom the claim was brought or the factual underpinnings of the claim. *Id*. at *5. However, Plaintiff's amended complaint cured previous deficiencies and listed her sole cause of action against the notary's employer pursuant to Florida Statute § 117.05(6). *Id*. The Court specifically noted that such a claim is proper and may be heard. *Id*. In the Court's own words: "Previously, the Court ruled that a violation of Florida Statute § 117.107(9) allows for administrative relief and falls within the jurisdiction of the Governor's office.  The Court **did not** rule that a violation of **Florida Statute § 117.05(6)** was outside the jurisdiction of the Court." *Id*.

NextGear's failure to provide the updated/superseded Order from the Florida Court is very telling and demonstrates that Florida law expressly acknowledges the enforcement of a violation of Fla. Stat. §117.05(6) in a court of law.  Accordingly, NextGear's argument must be rejected and Kessler is entitled to judgment in his favor on his claim for violation of Fla. Stat. §117.05(6).

In addition, contrary to NextGear's argument, the exculpatory language found in the Note and Guaranty does not bar Kessler's claim for violation of Fla. Stat. §117.05.  The section of the exculpatory clause relied upon by NextGear states the Guaranty shall be unaffected by "…any torts committed by Borrower against Guarantor, even if Lender is alleged to be complicit or to have committed a direct tort against Guarantor…."  Again, NextGear's argument fails.  First, the

plain and express language of the exculpatory clause, at best, only applies to "torts" committed against a Guarantor.  Here, Kessler's claim is a statutory claim for Mayoral and NextGear's vicarious liability under Fla. Stat. §117.05.  This claim is not a tort—it is a claim for a violation of Florida statutory law.  Thus, the plain language of the exculpatory clause does not apply to Kessler's claim.

But, even if the word "tort" could be construed to include Kessler's statutory claim, it is widely accepted by the majority of States that a party may not contract against liability for intentional tortious acts. *State Grp. Indus. (USA) Ltd. v. Murphy & Assocs. Indus. Servs.*, 878 N.E.2d 475, 479 (Ind. Ct. App. 2007) (citing cases noting that public policy prevents a party from limiting damages for "willfull and wonton misconduct").  Moreover, Indiana courts  have declined to release parties from liability based on exculpatory provisions phrased in general terms. *Id*. (citing *Powell v. American Health Fitness Ctr. of Fort Wayne, Inc.*, 694 N.E.2d 757, 761-62 (Ind. Ct. App. 1998); *See also Andy Mohr Truck Ctr., Inc. v. Volvo Trucks N. Am.,* No. 1:12-cv-448-WTL-DKL, 2015 U.S. Dist. LEXIS 59154, at *11 (S.D. Ind. May 6, 2015).

NextGear, by or through Artural Mayoral, aided in the forgery and fraudulent execution of the Power of Attorney document at issue. Allowing NextGear to escape liability after engaging in this type of willful and wanton conduct is certainly not in line with public policy. Furthermore, the inherent wording of NextGear's exculpatory clause is too broad to be enforced. (See Kessler Guaranty at ¶ 2(b)). Use of the phrase "direct tort" is not enough to release NextGear from liability because it in no way refers to the violations of statutes or to specific criminal or fraudulent conduct which took place –i.e., forgery and deception. Public policy considerations aside, specificity of the exculpatory clause is needed and the aforementioned language is far too general.

Finally, NextGear also argues that there is "no evidence that NextGear or its employee committed any violation of Florida law."  In making this statement, NextGear clearly ignores the plain language of the statue and the designated evidence.  The undisputed evidence demonstrates that Mayoral, when serving as a notary public on behalf of NextGear, did <u>not</u> obtain any of the acceptable forms of identification from the person claiming to be Mr. Edward Kessler on April 18, 2019.  At best, Mr. Mayoral had a black and white photocopy of a picture of Mr. Kessler's license, i.e., Mayoral had a copy of a copy of Mr. Kessler's license.  It is undisputed that Mayoral did not ask the person claiming to be Mr. Kessler to provide his driver's license or acceptable form of identification at the time of performing the notary service.  This failure is a direct violation of Fla. Stat. § 117.05(5)(b)(2)(d).  The plain language of the statute does not allow Mayoral to use a black and white photocopy of a picture of the license.  If the statute allowed for a copy of a copy, the statute would have expressly stated as much.  The express language of the statute is clear—the form of identification must be the actual driver license or identification card.  The reason for the requirement to present the **<u>actual</u>** license is to prevent fraud and to ensure the person claiming to be Kessler is, in fact, Edward Kessler.  Using a black and white photo copy of a picture of a license presents great opportunity for fraud—which is exactly what happened here.

If Mayoral simply would have followed his notary public requirements, as required by Fla. Stat. § 117.05, and required the person claiming to be Mr. Kessler to present his driver's license or other picture identification, Mr. Mayoral would not have notarized the Power of Attorney document as the person claiming to be Mr. Kessler would not have had Mr. Kessler's actual driver's license.  The presentation of the driver's license in conjunction with the notary of an official document is absolute.  Nowhere within the statute does it allow for a notary public to review a black and white photographed copy of a picture of a driver's license to satisfy the

identification requirement of Fla. Stat. § 117.05.  Mayoral failed to comply with his obligations and his failure has caused serious harm and damages to Kessler.

The damages caused by Mayoral's notary misconduct are substantial.  Because Mayoral failed to follow procedure in notarizing the Kessler Power of Attorney document, Mayoral allowed a fraudulent and forged Power of Attorney document to exist and be presented to NextGear.  In light of this forgery, the NextGear lending department had all "stipulations" required for contract execution and in securing the line of credit.  As a result of the forged Power of Attorney, the PGA line of credit was able to proceed and was never locked as required by NextGear policy and procedure.  As a result, Blackburn was able to siphon over $350,000.00 from the line of credit.

Quite simply, but for Mayoral's participation in the forgery (negligent or otherwise), NextGear would not have provided over $350,000.00 in funds to PGA because NextGear would not have received the required Power of Attorney document.  And, as NextGear's policy makes clear, NextGear would have locked the PGA account because the required Power of Attorney documents were not received.  Therefore, no funds would have been provided to PGA and Kessler would not be in a situation where NextGear is seeking to recover over $420,000.00 in damages, attorney's fees and interest from Kessler.

Mayoral's notary misconduct allowed NextGear to obtain a document absolutely critical and necessary to the overall funding of the PGA line of credit.  Because of Mayoral's misconduct, Kessler has been damaged and NextGear is liable to Kessler for all amounts it seeks to recover through this lawsuit against Kessler, as well as the attorney's fees incurred through Kessler's defense of this case.[5]

---

[5] The limitation of liability on damages provision in the Note and Guaranty also does not prevent Kessler's claim. The limitation only applies to indirect, exemplary, punitive, multiple or consequential damages.  The damages sustained by Kessler through the forged Power of Attorney and violation of Fla. Stat. §117.05 are direct damages. But for Mayoral's notary misconduct, the "stipulations" of having Kessler's Power of Attorney would not have been

**D. Summary Judgment is Improper on Kessler's Claim for Deception.**

NextGear argues that Kessler's claim for deception under I.C. §35-43-5-3 fails because the statute has been repealed.  However, NextGear failed to bring to the Court's attention that the public law that repealed I.C. §35-43-5-3 expressly states that proceedings that have begun under I.C. §35-43-5 before the repeal shall "continue and shall be imposed and enforced under prior law as if that section of IC 35-43-5 had not been amended or enacted."  The public law also states that the doctrine of amelioration is not intended to apply to any section of IC 35-43-5, as amended or enacted during the 2021 regular session of the Indiana General Assembly.  Accordingly, under the plain language of P.L. 174-2021, Sec. 45, Kessler's claim for deception still exists and is actionable, especially when the claim for deception was instituted prior to the enactment of the public law repealing I.C. §35-43-5-3.  Thus, NextGear's Motion for Summary Judgment should be denied.

NextGear also argues that Kessler has no evidence of criminal intent to prove the requisite *mens rea* element for deception.  Pursuant to I.C. §35-43-5-3(a)(2): a person who "knowingly or intentionally" makes a false or misleading written statement with intent to obtain property commits deception.  The term "knowingly" is a decreased level of intent and "[a] person engages in conduct 'knowingly' if…he is aware of a high probability that he is doing so."  *Quicken Loans v. Downing*, 2012 U.S. Dist. LEXIS 144272, at *20 (S.D. Ind. 2012), *citing*, Indiana Code §35-41-2-2(b).

Here, the designated evidence demonstrates that Mayoral was certainly aware that he was not following the required mandates for procedure when notarizing the Power of Attorney document.  Mayoral admitted in his deposition of what he believed to be the required and actual

---

satisfied and NextGear would have locked the PGA line of credit 30 days after contract execution—which would have been April 26, 2019.  Accordingly, any amounts loaned after April 26, 2019 were directly caused by Mayoral's notary misconduct and are now amounts for which NextGear seeks to recoup from Kessler as a result of Mayoral's own misconduct.

steps for notarizing a document.  Specifically, Mayoral testified that when performing notary services "…I then look at the person's driver's license, verify signature."  (Mayoral Dep. at 44:3-13).  Mayoral testified that there is no "leeway" whatsoever in the steps identified above and Mayoral stated if there was a deviation that "it wouldn't be valid."  (Mayoral Dep. at p. 47).

In addition to Mayoral's own admission that the review of the driver's license is required to notarize a document, the express language of the Florida Notary Public Statute also makes clear that the notary is required to inspect the driver's license of the individual.  Fla. Stat. §117.05(5)(b)(2)(d).

Mayoral's conscious decision to use a black and white copy of a photograph of Kessler's license to confirm Kessler's identity certainly creates factual disputes regarding the issue of whether Mayoral knowingly made a false or misleading statement on the Kessler Power of Attorney document when he attested and swore that Kessler personally appeared before him and executed the Power of Attorney.  The evidence demonstrates that Mayoral was aware of a high probability that he was making a false or misleading statement when he attested Kessler appeared before him to sign the POA, but completely failed to follow required procedure and inspect Kessler's license.

Further evidence of Mayoral and NextGear's criminal intent can be found in the numerous inconsistent and misleading Interrogatory Answers cited above where NextGear originally claimed that Mayoral personally took a picture of Kessler's actual driver's license contemporaneous with the execution of the Power of Attorney document.  We have now learned, and NextGear has admitted, that NextGear's original "story" in NextGear's Interrogatory Answers surrounding the execution of the Power of Attorney was 100% false and fabricated.  Quite simply, factual disputes exist regarding whether NextGear (acting by and through Mayoral performing official acts on

behalf of NextGear) acted with the requisite criminal intent to be held liable for the claim of deception.  As such, NextGear's Motion for Summary Judgment should be denied. [6]

**E. Summary Judgment is Improper on Kessler's Claim for Indemnification.**

Indiana adheres to the general rule that in the absence of an express contractual or statutory right to indemnity, a party may bring an action for indemnification only if he is without fault. The right to indemnity may be implied at common law only in favor of one whose liability to another is solely derivative or constructive and only against one whose wrongful act has caused such liability to be imposed."  *Mullen v. Cogdell*, 643 N.E.2d 390, 400 (Ind. Ct. App. 1994); *Indianapolis-Marion Cnty. Pub. Library v. Charlier Clark & Linard, PC*, 929 N.E.2d 838, 848 (Ind. Ct. App. 2010).  "Derivative liability is liability for a wrong that a person other than the one wronged has a right to redress."  *Samaron Corp. v. United of Omaha Life Ins. Co.,* 2014 U.S. Dist. LEXIS 137656 (N.D. Ind. Sept. 29, 2014).

Here, Kessler's liability is derivative and flows directly from Mayoral's wrongful conduct in assisting in the forgery of the Kessler Power of Attorney.  But for the forged Kessler Power of Attorney, which was required by NextGear to lend money beyond 30 days from contract execution, PGA and Blackburn would not have been able to draw on the line of credit and would not have been able to incur over $340,000.00 in loan proceeds—all of which was done without Kessler's knowledge or consent.  But, now, because of the forged Power of Attorney, which was improperly notarized by Mayoral, NextGear is seeking to enforce a Guaranty against Kessler for damages in excess of $420,000.00.  The evidence demonstrates that it was NextGear (acting by and through

---

[6] Although not argued by NextGear, Mayoral and NextGear made the false/misleading statement with intent to obtain property, i.e., money, proceed and profit through the selling of a loan program to PGA.  Of course, Mayoral benefited from making the false statement to "close the deal" as he knew Kessler's Power of Attorney was required to be signed and delivered as part of the "stipulations."  If Mayoral, doesn't "close the deal" and get the line of credit secured, Mayoral does not receive commissions from the sale of the loan to PGA.  NextGear also benefits from Mayoral's closing of the loan by the interest and profit it stood to gain over the lifetime of the Note.

Mayoral) who engaged in the misconduct and forged the Power of Attorney. Kessler had no knowledge of the forged Power of Attorney and did not cause the forgery. Accordingly, Kessler is entitled to common law indemnification for the amounts NextGear seeks to recover against Kessler—all of which was caused by NextGear and Mayoral's wrongful conduct. As such, NextGear's Motion for Summary Judgment should be denied.[7]

## III.   CONCLUSION

For the foregoing reasons, Defendant/Counterclaimant, Edward A. Kessler, respectfully requests the Court to deny NextGear's Motion for Summary Judgment in its entirety and enter judgment in favor of Kessler and against NextGear Capital on Count III of Kessler's Counterclaim.

Respectfully submitted,

DELK McNALLY LLP

*/s/ Jason R. Delk*
Jason R. Delk, Atty. No. 24853-18
*Attorney for Defendant, Edward Kessler*

DELK McNALLY, LLP
211 S. Walnut Street
Muncie, IN 47305
Telephone: 765-896-9495
Facsimile: 888/453-0545

---

[7] A claim for indemnification may be litigated contemporaneously with the injured party's claim even if no actual damages have been awarded against the injured party. *See Fitz v. Rust-Oleum Corp.*, 883 N.E.2d 1177, 1181 (Ind. Ct. App. 2008). Also, an indemnitee, who incurs legal expenses through defending an action against him for which he is entitled to indemnification, is entitled to recover the expense of creating his defense. *Bethlehem Steel Corp. v. Sercon Corp.*, 654 N.E.2d 1163, 1169 (Ind. Ct. App. 1995).

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing has been served upon all counsel of record via the Court's electronic case filing system this 28th day of March, 2022.

*/s/ Jason R. Delk*         
Jason R. Delk

DELK McNALLY, LLP
211 S. Walnut Street
Muncie, IN 47305
Telephone: 765/896-9495
delk@delkmcnally.com